Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P. AND HIGHLAND CLO
FUNDING, LTD**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | Case No. 18-30265-SGJ-11 |
| | § | (Jointly Administered Under |
| Debtors. | § | Case No. 18-30264-SGJ-11) |
| | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. and | § | |
| | § | |
| HIGHLAND CLO FUNDING LTD, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | Adversary No. 18-03078-sgj |
| | § | |
| v. | § | |
| | § | |
| | § | |
| ROBIN PHELAN, CHAPTER 11 TRUSTEE, | § | |
| | § | |
| Defendant. | § | |

## MOTION TO WITHDRAW THE REFERENCE
## TO THE DISTRICT COURT AND MEMORANDUM OF LAW IN SUPPORT

Highland Capital Management, L.P. ("**Highland Capital**") and Highland CLO

Funding, Ltd ("**Highland CLO**," collectively with Highland Capital, the "**Movants**")

hereby file this *Motion to Withdraw the Reference to the District Court and Memorandum of Law in Support* (the "**Motion**"). In support of the Motion, the Movants would respectfully show as follows:

## I.
## SUMMARY OF THE MOTION

1. By this Motion, Movants are seeking withdrawal of the reference to have the District Court address an untenable situation of the Chapter 11 Trustee[1] being subject to conflicting fiduciary duties clearly established under bankruptcy and non-bankruptcy law. Specifically, the Chapter 11 Trustee, who has stepped into the shoes of Acis LP, is an Investment Adviser of certain CLOs and is subject to applicable state and federal securities laws and regulations including, without limitation, the Investment Advisers Act of 1940. Such non-bankruptcy laws impose broad fiduciary duties upon the Chapter 11 Trustee to his advisory clients, including the CLOs. The bankruptcy filing does not change the fact that those duties and obligations exist and must be strictly adhered to.

2. A bankruptcy trustee's duty to creditors does not take precedent over every other state and federal non-bankruptcy legal obligation. The text of 28 U.S.C. § 959(b) makes clear that a trustee continues to be bound by "valid laws." Courts routinely enforce duties and obligations that were imposed pre-petition on a debtor, even where such imposition may have a negative effect on the ability of creditors to recover. However, while the law is clear-cut that federal and state law fiduciary duties continue into a bankruptcy filing, no federal court has addressed the specific situation presented here with respect to applicable securities laws and regulations. As such, because important issues related to non-bankruptcy law affecting interstate commerce are at hand, the Movants seek withdrawal of the reference. As set forth below, the

---

[1] Capitalized terms have the meanings ascribed to them below.

**MOTION TO WITHDRAW THE REFERENCE TO THE DISTRICT COURT AND MEMORANDUM OF LAW IN SUPPORT Page - 2**

4815-0794-3782.7

elements for both mandatory and permissive withdrawal under 28 U.S.C. § 157(d) are clearly met under these facts.

## II.
## PROCEDURAL HISTORY

### A.     Bankruptcy Cases

3.      On January 30, 2018 (the "**Petition Date**"), Joshua N. Terry ("**Terry**") filed involuntary petitions (the "**Involuntary Petitions**") for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") against Acis Capital Management, L.P. ("**Acis L.P.**") and Acis Capital Management GP, LLC ("**Acis GP**," collectively with Acis L.P., the "**Debtors**").

4.      On January 31, 2018, the Debtors filed the *Joint Motion of Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Dismiss Involuntary Petitions and Request for Award of Fees, Costs, and Damages* (the "**Motion to Dismiss**") [Docket No. 8].

5.      The Bankruptcy Court thereafter held a trial that lasted approximately seven (7) days on the Motion to Dismiss and on April 13, 2018, the Court entered in each case (i) *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petitions* ("**FF&CL**") [Case No. 18-30265, Docket No. 113; Case No. 18-30264, Docket No. 119] and (ii) *Orders for Relief in an Involuntary Case* (the "**Orders for Relief**") [Case No. 18-30265, Docket No. 114; Case No. 18-30264, Docket No. 118].[2]

6.      On April 13, 2018, the Bankruptcy Court appointed Diane G. Reed (the "**Chapter 7 Trustee**") as the Chapter 7 Trustee for the Debtors.

---

[2] On April 23, 2018, Neutra, Ltd, Highland CLO Funding, Ltd., and CLO Holdco, Ltd. appealed the Orders for Relief [Case No. 18-30265, Docket No. 135; Case No. 18-30264, Docket No. 145], which are pending before the United States District Court for the Northern District of Texas.

7.      On April 17, 2018, the Chapter 7 Trustee filed the *Trustee's Expedited Motion to Operate the Debtors' Businesses in Chapter 7* (the "**Operating Motion**") [Docket No. 127]. On April 18, 2018, the Bankruptcy Court entered its *Interim Order Granting Trustee's Expedited Motion to Operate the Debtors' Businesses in Chapter 7* [Docket No. 130], authorizing the Chapter 7 Trustee to temporarily operate the Debtors' businesses.

8.      On April 19, 2018, the Bankruptcy Court entered an Order Directing Joint Administration of the Debtors' bankruptcy cases [Docket No. 137].

9.      On April 23, 2018, the Bankruptcy Court held a hearing on the Operating Motion, and on May 6, 2018 the Bankruptcy Court granted the Operating Motion [Docket No. 178].

10.     On May 4, 2018, the Chapter 7 Trustee filed an *Expedited Motion to Convert Cases to Chapter 11* [Doc. No. 171] (the "**Motion to Convert**"). Also on May 4, 2018, Terry filed an *Emergency Motion for an Order Appointing Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Doc. No. 173] (the "**Motion to Appoint Chapter 11 Trustee**").

11.     On May 11, 2018, after a hearing on the matter, the Bankruptcy Court entered orders granting the Motion to Convert [Doc. No. 205] and the Motion to Appoint Chapter 11 Trustee [Doc. No. 206] on the docket for the Acis L.P. bankruptcy case. Also on May 11, 2018, the Bankruptcy Court entered an order granting the Motion to Convert [Doc. No. 167] on the docket for the Acis GP bankruptcy case.

12.     On May 14, 2018, the U.S. Trustee filed a Notice of Appointment of Trustee and Amount of Bond [Doc. No. 213] (the "**Notice of Appointment**") in the Acis L.P. bankruptcy case. Pursuant to the Notice of Appointment, Robin Phelan was named as Chapter 11 Trustee for Acis L.P.'s estate (the "**Chapter 11 Trustee**").

13.     On May 16, 2018, the Bankruptcy Court entered a supplemental order [Doc. No. 219] making clear that the Bankruptcy Court was directing the U.S. Trustee to appoint one Chapter 11 Trustee for the two bankruptcy estates.

14.     On May 17, 2018, the Bankruptcy Court entered an order [Doc. No. 221] approving Robin Phelan's appointment as Chapter 11 Trustee.

## B.     The CLOs and the Portfolio Management Agreements

15.     Acis L.P. was formed in or about 2011 as an affiliated investment advisor to manage Highland Capital's collateralized loan obligations.  Acis L.P. currently has contractual and federal and state regulatory obligations to provide portfolio management services to five collateralized loan obligation entities known as Acis CLO 2013-1 Ltd., Acis CLO 2014-3 Ltd., Acis CLO 2014-4 Ltd., Acis CLO 2014-5 Ltd., and Acis CLO 2015-6 Ltd. (the "**CLOs**") through certain portfolio management agreements ("**PMAs**") with the CLOs.[3]  For those services, Acis L.P. is entitled to portfolio management fees pursuant to the PMAs.[4]  Under the PMAs, which are governed by New York law, Acis L.P. represents that it is, and will act as, an "Investment Adviser" within the meaning of the Investment Advisers Act of 1940 (the "**Advisers Act**").[5]

16.     As a portfolio manager, Acis L.P. is required to be registered with the Securities and Exchange Commission (the "**SEC**") and to comply with all applicable securities laws, notably the Advisers Act as well as other final rules and regulations promulgated by the SEC.

---

[3] For more information on the CLO structure and related economics, see the Complaint filed by the Movants at ¶¶ 20-31.

[4] Acis L.P. does not have, nor has it ever had, any employees.  Indeed, as the Bankruptcy Court has found, "all employees who have ever provided services to the CLO manager are Highland [Capital] employees – which were provided to Acis L. through shared and sub-advisory services agreements. . . . Thus, to be clear, Acis LP has always essentially subcontracted its CLO managerial function out to Highland [Capital]."  FF&CL  at ¶ 25(a).  As a result, independently, Acis L.P. is not able to provide the services necessary to fulfill the contractual obligations under the PMAs.

[5] 15 U.S.C. 80b-1, *et seq*.

**MOTION TO WITHDRAW THE REFERENCE TO THE DISTRICT COURT AND MEMORANDUM OF LAW IN SUPPORT Page - 5**

4815-0794-3782.7

As Investment Adviser, the Advisers Act and related securities laws impose upon Acis L.P. a clear and broad fiduciary duty to its advisory clients – the CLOs. *See SEC v. Cap. Gains Research*, 84 S.Ct. 275, 282-83 (1963) (stating that the Advisers Act "reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship, as well as a congressional intent to eliminate…all conflicts of interest that may incline as investment adviser…to render advice which is not disinterested."); *see also SEC v. Bolla*, 401 F.Supp.2d 43, 67 (D. D.C. 2005) (holding that, by the Advisers Act, Congress created "a fiduciary duty on the part of investment advisers to" their clients); *Morris v. Wachovia Secs., Inc.*, 277 F.Supp.2d 622, 643 (E.D. Va. 2003) (noting that the Advisers Act "creates <u>broad</u> fiduciary duties" (emphasis added)); *compare* 17 C.F.R. § 275.204A-1 (mandating that portfolio managers governed by the Advisers Act "establish, maintain, and enforce a written code of ethics" that reflect the managers' "fiduciary obligations").

17.     The Chapter 11 Trustee, acting in the same capacity as Acis L.P., therefore has significant contractual, statutory, regulatory, and fiduciary obligations to act in the CLOs' best interests. This includes refraining from taking actions that directly result in harm to the CLOs in breach of contractual obligations under the Indentures and the PMAs, as well as obligations under state and federal regulations governing investment advisors.

## C.     The Shared Services Agreement and the Sub-Advisory Agreement

18.     Highland Capital provides back- and middle-office services to Acis L.P. pursuant to the Fourth Amended and Restated Shared Services Agreement, executed on March 17, 2017, (as amended and restated from time to time, the "**Shared Services Agreement**"). A copy of the Shared Services Agreement is attached hereto as **<u>Exhibit A</u>**. The multitude of services provided by Highland Capital are set forth in Article II of the Shared Services Agreement.

19.     Highland Capital also provides front-office services to Acis L.P. pursuant to the Third Amended and Restated Sub-Advisory Agreement, executed March 17, 2017 (as amended and restated from time to time, the "**Sub-Advisory Agreement**," collectively with the Shared Services Agreement, the "**Contracts**").  A copy of the Sub-Advisory Agreement is attached hereto as **Exhibit B**.

20.     The Sub-Advisory Agreement appoints Highland Capital "as Sub-Advisor to the Management Company [Acis LP] for the purpose of assisting the Management Company [Acis LP] in managing the Portfolios of each Account . . . ."  *See* Sub-Advisory Agreement at Section 1(a).  The Sub-Advisory Agreement directs Highland Capital to perform a multitude of investment advisory services set forth in Section 1(b) of the agreement.

21.     Highland Capital is the sole provider of these services to Acis L.P.  *See id.* at Section 5(6).[6]  Given that Acis L.P. has no employees, Highland Capital therefore is the sole provider of these services to the CLOs.

**D.     The Indenture Agreements**

22.     Each CLO is party to a written indenture (the "**Indenture**") with U.S. Bank National Association ("**USB**"), the CLOs' indenture trustee.  Through the Indentures, the CLOs pledged various collateral debt obligations and other assets to USB as security for the secured notes issued by the CLOs.  USB has custody over the CLOs' cash accounts and remits available funds to investors on prescribed payment dates.

23.     As independent corporate entities, the CLOs issue secured notes (the "**Secured Notes**" purchased by "**Secured Noteholders**").  The CLOs issue the Secured Notes in various

---

[6] "So long as this [Sub-Advisory] Agreement or any extension, renewal or amendment of this [Sub-Advisory] Agreement remains in effect, the Sub-Advisor shall be the *only* portfolio management sub-advisor for the Management Company (emphasis added)."  *See* Ex. B at § 5(6).

tranches at varying rates of interest based on the Secured Noteholders' desired rate of return and risk tolerance. Plaintiff Highland CLO purchased the Subordinated Notes for each CLO. Plaintiff Highland CLO holds a supermajority of the aggregate outstanding amount of Subordinated Notes for each CLO.[7]

24. Through the Indentures, the CLOs can redeem the Secured Notes held by the Subordinated Noteholders under certain conditions, including "at the written direction of a Majority of the Subordinated Notes." Through this right of redemption, the Subordinated Noteholders can call the CLOs, in their discretion, when the CLOs no longer meet their investment objectives.

25. USB also acts as the CLOs' Collateral Administrator pursuant to the Collateral Administration Agreements ("**CMAs**"). The CMAs require USB to perform certain administrative services over the collateral on the CLOs' behalf, including bookkeeping services.

26. As noted above, the CLOs also engaged Acis L.P. as their Portfolio Manager pursuant to the PMAs.

**E.    The Redemption Notices and the Chapter 11 Trustee's Response**

27. Irrespective of the Acis bankruptcies, the Subordinated Noteholders including Plaintiff Highland CLO continued to lose money due to the CLOs' above-market fixed debt obligations.

28. With the bankruptcies pending, there is no prospect that the CLOs can effectuate a "re-set" within a reasonably certain time-frame. As such, Plaintiff Highland CLO determined it should get its money back by initiating an "Optional Redemption" as allowed by the Indentures.

---

[7] There is one exception: Highland CLO does not hold a supermajority of the Subordinated Notes for Acis-1, but acted collectively with the other Subordinated Noteholders in Acis-1 in relation to the facts stated herein and in the Complaint.

29.     The Indentures prescribe the following procedures for the CLOs to effect an Optional Redemption:

    a.    Step 1: the Subordinated Noteholders must provide their written direction concerning the redemption to the Indenture Trustee, the CLO, and Acis LP at least 30 days prior to the proposed redemption date.[8]

    b.    Step 2: the CLO, upon receiving instructions from Holders of 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes, must provide a notice of redemption to the Indenture Trustee that, contains the redemption date and redemption price, among other details, at least 20 days prior to the proposed redemption date.[9]

    c.    Step 3: the CLO must provide a notice of redemption to each noteholder not later than 10 days prior to the redemption date.[10]

30.     Upon receipt of a notice of redemption, the Portfolio Manager *must* "direct the sale of all or part of the Collateral Obligations and other Assets." While the Indentures give the Portfolio Manager discretion to determine the best method for selling the assets, they require the Portfolio Manager to effect the sale.

31.     On April 30, 2018, in accordance with the Indentures, Highland CLO Funding sent written notices (the "**Optional Redemption Notices**") directing each CLO, USB, and Acis L.P. to effect an Optional Redemption of all Secured Notes and the Subordinated Notes in full on June 14, 2018." Copies of each Optional Redemption Notices are attached hereto as **Exhibit C**.

32.     The Optional Redemption Notices each state:

In accordance with Sections 9.2 and 14.3 of the Indenture, the undersigned Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes hereby direct the Issuer, the [Indenture] Trustee and the

---

[8] *See, e.g.,* Indenture for CLO 2013-1 at § 9.3.
[9] *Id.* at § 9.2.
[10] *Id.* at §9.3.

Portfolio Manager to effect an Optional Redemption of all Secured Notes and the Subordinated Notes in full on June 14, 2018.

33.     On May 21, 2018, Highland Capital sent the Chapter 11 Trustee, pursuant to the terms of the Contracts, a transactional authorization request (the "**Highland Request**").  A copy of the Highland Request is attached hereto as **Exhibit D**.  By the Highland Request, Highland Capital recommended that Acis LP consent to enter into transactions (the "**Transactions**") on behalf of certain Acis-advised accounts to commence the Optional Redemption process.  The Transactions include the sale of assets valued at $155 million.  As set forth in the Highland Request:

> These Transactions are made to effectuate the Optional Redemption Submitted by the subordinated note holders of the Acis CLOs on April 30, 2018.  These specific $155 million in assets were selected because they have relative low interest rates (spread) and high price levels (marks), meaning there is limited return in continuing to hold these instruments.  While we previously discussed submitting these requests Wednesday (May 18th), there exists a compelling business interest in stating the trades now in order to meet the June 14, 2018 deadline.  After these Transactions are completed, a remaining $1.8 Billion notional across 271 assets remains to be liquidated.

34.     Highland Capital set a May 24, 2018 deadline for the Chapter 11 Trustee to consent to the Transactions (the "**Deadline**") and further advised that:

> if Highland does not receive [the Chapter 11 Trustee's] consent by the Deadline and if applicable, Highland may proceed with the Transactions for other Highland Accounts.  There is no assurance that the Transactions will be available to the Acis Accounts on equal or better terms following the Deadline and Asics Accounts may incur losses as a result of your failure to timely respond by the Deadline.  Further, Highland believes it has an independent fiduciary obligation to the CLOs and must effectuate the Optional Redemption as directed by the Issuers.  If you instruct Highland not to proceed to undertake the Optional Redemption, Highland reserves its rights to seek appropriate protection and redress at law or in equity.

35.     On May 22, 2018, the Chapter 11 Trustee sent a written response to Highland Capital, the CLOs, and USB (the "**May 22 Chapter 11 Trustee Response**").  A copy of the May 22 Chapter 11 Trustee Response is attached hereto as **Exhibit E**.  In that response, the Chapter

11 Trustee alleged: (a) the Optional Redemption Notices were not sent by properly authorized parties; (b) the Optional Redemption Notices fail to comply with the terms of the Indenture; and (3) the Optional Redemption Notices "appear" to violate the automatic stay. The Chapter 11 Trustee further asserted that "Acis LP will not take such action as directed under the [Optional] Redemption Notices unless and until compliance with Section 8 of the PMA is fully completed."

36.     On May 24, 2018, as prescribed by the Indentures, the CLOs issued Notices of Redemption (the "**Issuers Order**") that included the redemption date and redemption price, among other information.[11]  On that same date, the Issuers Orders were provided to the Chapter 11 Trustee.

37.     On May 24, 2018, Highland Capital provided a written response to the Chapter 11 Trustee (the "**Highland Response**") responding to each of the Chapter 11 Trustee's concerns/allegations.  A copy of the Highland Response is attached hereto as **Exhibit F**.  As set forth in the Highland Response, Highland:

(a)     demonstrated that the issuance of the Optional Redemption Notices was duly authorized;

(b)     provided the Issuers Orders demonstrating compliance with the Indenture;

(c)     advised that the automatic stay has no bearing because no property of the Debtors' estates is implicated by the Optional Redemption Notices; and

(d)     noted that the requirements under the PMA, including without limitation Section 8, are currently being performed and will be completed well before June 14, 2018.

The Highland Response further requested confirmation that the Chapter 11 Trustee comply with the Debtors' obligations under the PMAs to effectuate the redemptions.

---

[11] Complaint Ex. 10A, Acis CLO 2013-1, Ltd. Notice of Optional Redemption; Complaint Ex. 10B, Acis CLO 2014-3, Ltd. Notice of Optional Redemption; Complaint Ex. 10C, Acis CLO 2014-4, Ltd. Notice of Optional Redemption; Complaint Ex. 10D, Acis CLO 2014-5, Ltd. Notice of Optional Redemption; Complaint Ex. 10E, Acis CLO 2015-6, Ltd. Notice of Optional Redemption.

38.     Thereafter, on May 25, 2018, the Indenture Trustee issued letters acknowledging receipt of the Issuers Orders, but stating that the Chapter 11 Trustee objected to the Optional Redemption.[12]

39.     On May 27, 2018, the Chapter 11 Trustee responded with the assertion that the Issuers Orders "do not comply with the relevant Indentures and Portfolio Management Agreements" and that the orders are therefore "defective and ineffective" (the "**May 27 Chapter 11 Trustee Response**").  A copy of the May 27 Chapter 11 Trustee Response is attached hereto as **Exhibit G**.  The Chapter 11 Trustee has provided no justification for his conclusion, despite being requested to do so.

40.     On May 30, 2018, the Movants filed the Adversary Proceeding seeking declaratory relief regarding the competing statutory, regulatory, and fiduciary duties currently imposed upon the Chapter 11 Trustee and further alleging breaches of the PMAs by the Chapter 11 Trustee and requesting specific performance.

41.     The Movants are also seeking a temporary injunction enjoining the Chapter 11 Trustee from interfering with the redemption process and allowing the investors to have their money returned before they incur further losses.

### III.
### LEGAL STANDARD

#### A.     The Statutory Predicate

42.     Section 157(d) of title 28 of the United States Code states, in pertinent part, that

---

[12] Complaint Ex. 11A, May 25, 2018 letter from Mark Kotwick concerning Acis CLO 2013-1, Ltd. redemption notice; Complaint Ex. 11B, May 25, 2018 letter from Mark Kotwick concerning Acis CLO 2014-3, Ltd. redemption notice; Complaint Ex. 11C, May 25, 2018 letter from Mark Kotwick concerning Acis CLO 2014-4, Ltd. redemption notice; Complaint Ex. 11D, May 25, 2018 letter from Mark Kotwick concerning Acis CLO 2014-5, Ltd. redemption notice; Complaint Ex. 11E, May 25, 2018 letter from Mark Kotwick concerning Acis CLO 2015-6, Ltd. redemption notice.

[t]he district court <u>may</u> withdraw, in whole or in part, a case or proceeding referred [to the bankruptcy court] under [section 158] . . . for cause shown. The district court <u>shall</u> . . withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulation organizations or activities affecting interstate commerce.

28 U.S.C. § 158(d) (emphasis added). Pursuant to Rule 5011-1 of the Local Rules of Bankruptcy Procedure, the Bankruptcy Court is to issue a written recommendation on all motions to withdraw the reference, after which the final ruling is to be made by the District Court.

43.    As indicated in the language of section 157(d) (i.e., "shall" and "may"), withdrawal of the reference is either mandatory or permissive, depending on the facts and circumstances of the case.

## IV.
## Arguments and Authorities

**A.    Mandatory Withdrawal: The District Court is Required to Withdraw the Reference Because Resolution of the Adversary Proceeding Requires Substantial and Material Interpretation of Non-Title 11 Federal Law**

44.    Withdrawal of the reference is mandatory when: (1) the proceeding involves a substantial and material consideration of both the Bankruptcy Code and non-Bankruptcy Code federal law; (2) non-bankruptcy federal law has more than a *de minimis* effect on interstate commerce; and (3) the motion for withdrawal is timely. *See Sibarium v. NCNM Nat'l Bank*, 107 B.R. 108, 111 (N.D. Tex. 1989).

45.    Courts have concluded that "consideration" of both the Bankruptcy Code and non-bankruptcy federal law means that resolution of the matter at hand requires significant interpretation and application of non-bankruptcy law. *See Sibarium v. NCNM Nat'l Bank*, 107 B.R. 108, 111 (N.D. Tex. 1989); *see also Tex. United Housing Program, Inc. v. Wolverine Mortg. Partner Ret.*, 2017 WL 3822754, at *6 (N.D. Tex. 2017). Moreover, district courts

withdraw the reference when resolution of the controversy requires consideration of the Bankruptcy Code and at least <u>one</u> other non-bankruptcy federal statute. See, e.g., *In re Kiefer*, 276 B.R. 196, 198 (E.D. Mich. 2009) (ERISA); *IRS v. CM Holdings, Inc. (In re CM Holdings)*, 221 B.R. 715, 721-24 (D. Del. 1998) (federal tax law); *Randall v. Am. Solar King Corp.*, 92 B.R. 207, 210-11 (W.D. Tex. 1988) (SEC Rule 10b-5); *Lifemark Hosps. of La., Inc. v. Liljeberg Enters., Inc.*, 161 B.R. 21, 24 (E.D. La. 1993) (antitrust claims); *United States v. Gypsum Co. v. Nat'l Gypsum Co.*, 145 B.R. 539, 541 (N.D. Tex. 1992) (patent claims); *United States v. Johns-Manville Corp., (In re Johns-Manville Corp.)*, 63 B.R. 600, 603 (S.D.N.Y. 1986) (CERCLA claims).

46. In this case, the Court cannot address the matters squarely before it without significant interpretation and application of state and federal securities law, including the Advisers Act, which is federal law affecting interstate commerce. *See* 15 U.S.C. § 80b-1 (enacting the statute based on a "national concern in that…the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, in the national banking system and the national economy"); *see also* 15 U.S.C. § 80b-14 (mandating that the "district courts of the United States" shall have jurisdiction over matters arising under the Advisers Act).

47. In addition, while the consideration of one non-bankruptcy federal statue is sufficient for the purposes of mandatory withdrawal of the reference, the Movants submit that the redemption and related issues – involving billions of dollars invested by entities with their own obligations under the law – implicates a wide range of other state and federal securities laws and regulations.

48. It is well accepted that the Chapter 11 Trustee steps into the shoes of, and otherwise serves in the same capacity as, the Debtors, including related pre-petition duties and obligations of a debtor. Such a requirement to comply with existing law is codified in 28 U.S.C. § 959(b) which states that a trustee "shall manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."

49. While section 959(b) has been interpreted of trustees being required to follow laws related to general health and welfare, the statute is not so limited. The case *In re Baker & Drake, Inc.*, 35 F.3d 1346 (9th Cir. 1994) is especially instructive on this point. The case dealt with a debtor owner of a taxicab company who sought approval of a Chapter 11 plan that was contrary to applicable law requiring taxi drivers to be employees rather than independent contractors. The court analyzed whether provisions of the Bankruptcy Code preempted the Nevada law and concluded they did not. The court stated:

> Congress's purpose in enacting the Bankruptcy Code was not to mandate that every company be organized at all costs, but rather to establish a preference for reorganizations, where they are feasible and economically practical. Thus, if compliance with [the Nevada statute] were to render [the debtor] financially unable to reorganize, neither [the debtor] nor Nevada would thereby be violating any provision of the Bankruptcy Code.

50. Importantly, the taxi regulation in that case could not be seen as a health and welfare statute akin to the exercise of a state's police power. Other courts have applied section 959(b) to a broad cross-section of statues. *See, e.g., In re White Crane Trading Co.*, 170 B.R. 694, 701 (Bankr. E.D. Cal. 1994) (noting that section 959 has been "on the books" since 1887 and citing to cases applying the statute to many different types of non-bankruptcy laws); *see also*

*In re Beker Indus. Corp.*, 57 B.R. 611, 624 (Bankr. S.D.N.Y. 1986) ("The [Bankruptcy] Code does not change the business and regulatory environment in which a debtor operates.").

51.     This is also true outside the context of the section 959(b).  *See, e.g., Lone Star Milk Prods., Inc. v. Litzler*, 370 B.R. 671, 676-77 (Bankr. N.D. Tex. 2007) (a debtor remains subject to state law provisions governing the debtor's handling of proceeds from the sale of milk); *In re Fresh Approach, Inc.*, 51 B.R. 412, 421 (Bankr. N.D. Tex. 1985) (holding that a debtor remains subject during the bankruptcy case to the same duties and obligations imposed upon the debtor pre-petition as a dealer under the federal Perishable Agricultural Commodities Act); *In re Starr*, 89 B.R. 326, 328 (Bankr. W.D. N.Y. 1988) (holding that a debtor continued to be "dutybound" under New York law to exercise ordinary care in dealing with property held in trust by the debtor).

52.     In this case, the Debtors' role (and now the Chapter 11 Trustee's role) as portfolio manager is subject to the Advisers Act, which holds investment advisors to a heightened fiduciary duty consistent with such a highly regulated industry.[13]  As the portfolio manager, the Chapter 11 Trustee has contractual, federal, and state statutory and regulatory obligations to the CLOs.  Furthermore, the Chapter 11 Trustee owes heightened fiduciary duties to the CLOs (as the parties who are entitled to critical and time-sensitive advisory services by the Debtors), while at the same time owing fiduciary duties to the Debtors' estates.  In the exercise of its fiduciary duties as the portfolio manager, the Chapter 11 Trustee is obligated to ensure that the status of the Debtors as bankrupt entities does not cause harm to the CLOs.

53.     When the Chapter 11 Trustee stepped into the shoes of the Debtors, he subjected himself to the Advisers Act to the full extent the Advisers Act applied to the Debtors pre-

---

[13] See above at ¶ 16.

bankruptcy. However, the Chapter 11 Trustee also has a duty under bankruptcy law to maximize value to creditors. Those duties are currently in conflict. While seeking to delay or impede the Optional Redemption Notices may appear to the Chapter 11 Trustee a necessary action to preserve bankruptcy estate value, such actions are directly contrary to the Chapter 11 Trustee's non-bankruptcy law duties. Although a portfolio manager's heighted fiduciary duties are clear under such applicable non-bankruptcy law, courts have not addressed the conflict that arises when the fiduciary duties to maximize value to creditors is imposed upon a portfolio manager pursuant to bankruptcy law.[14] This issue of dueling fiduciary duties is one of first impression and requires substantial interpretation of non-bankruptcy law, including the Advisers Act. For these reasons, the Movants have timely[15] filed this Motion in order to seek resolution of this dispute from the District Court.

54. For the foregoing reasons, withdrawal is mandatory pursuant to 28 U.S.C. § 157(d) and this adversary proceeding should proceed forward before the District Court.

**B.    Permissive Withdrawal: The District Court Should Withdraw the Reference "For Cause"**

55. While the elements of mandatory withdrawal have been met in this matter, "cause" also exists for the permissive withdrawal of the reference. "Cause" to permissively withdraw the reference is not defined in the Bankruptcy Code; however, courts including the

---

[14] It appears that no court has addressed the conflicting fiduciary duties when an investment adviser or portfolio manager is placed into bankruptcy. That weighs further in favor of the District Court addressing such an issue of first impression.

[15] A motion to withdraw is timely if the motion is not premature or delayed so as to render the withdrawal moot. *See In re Fresh Approach, Inc.*, 51 B.R. 412, 415 (N.D. Tex. 1985) (holding that the movant's motion to withdraw is not timely when requested two weeks after the bankruptcy court rendered a decision in the proceeding). When the Chapter 11 Trustee advised that he would not effectuate the Optional Redemption Notices, he made the reference ripe for withdrawal because he placed the Indentures, the PMAs, and the Advisers Act and other applicable state and federal securities laws and regulations into the center of the dispute.

**MOTION TO WITHDRAW THE REFERENCE TO THE DISTRICT COURT AND MEMORANDUM OF LAW IN SUPPORT Page - 17**

4815-0794-3782.7

Fifth Circuit have considered the following factors to determine whether permissive withdrawal is appropriate:

> a.  Whether the issues are core or non-core;
>
> b.  Whether withdrawal would foster a more economical use of the parties' resources;
>
> c.  Whether withdrawal would expedite the bankruptcy process;
>
> d.  Whether withdrawal reduces forum shopping and confusion;
>
> e.  Whether jury demands have been made; and,
>
> f.  Whether withdrawal would promote uniformity in bankruptcy administration.

*See Holland America Ins. Co., v. Roy* 777 F.2d 992, 998-99 (5th Cir. 1985); *accord In re Morrison*, 409 B.R. 384, 386 (S.D. Tex. 2009). The party seeking withdrawal of the reference has the burden of establishing a "sound articulated foundation" for permissive withdrawal. *Holland*, 777 F.2d at 998. The requisite cause may be found "if one or more of these factors is present." *United States v. Kaplan*, 146 B.R. 500, 504 (D. Mass. 1992). When each of these factors is considered, it is evident that the reference of the Adversary Proceeding should be withdrawn.

### (1)  This is a Non-Core Matter

56.  In determining whether a matter is core or non-core, courts analyze whether the proceeding "invokes a substantive right provided by Title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Mirant Corp. v. The Southern Co.,* 337 B.R. 107, 117 (N.D. Tex. 2006) (citing *Wood v. Wood,* 825 F.2d 90, 97 (5th Cir. 1987)). "If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is

one that could exist outside of bankruptcy it is not a core proceeding; it may be *related* to the bankruptcy because it is an 'otherwise related' or non-core proceeding." *Wood v. Wood,* 825 F.2d at 97 (emphasis in original).

57.     As noted above, this adversary proceeding was necessary because the Chapter 11 Trustee made clear that he would seek to prevent the Optional Redemption Notices from becoming effective, in derogation of his obligations under the PMAs as well as his duties under the Advisers Act and other relevant securities law. The application of such law will govern the outcome of this adversary proceeding. As such, the matter does not arise under Title 11 and is non-core.

### (2)     The Judicial Economy Prong is Dispositive

58.     Even in the absence of satisfying the other *Holland* factors, the judicial economy factor is alone sufficient for withdrawal of the reference. *See e.g., In re Enviro-Scope Corp.*, 57 Bankr. 1005, 1008-09 (E.D. Pa, 1985) (holding that judicial economy is sufficient cause for permissive withdrawal); *accord United States v. Oncology Assocs., P.C.* (*In re Equimed, Inc.*), 2000 WL 1074304, at *3-4 (D.Md. July 24, 2000) (same). In determining judicial economy, the courts look to the overall claims and the duplication between the courts. *See Mirant*, 337 B.R. at 122-23 (holding that, where both the core and non-core claims were significant, judicial economy would be served by adjudicating all the claims in the district court because, in part, "adjudicating all of the claims, both core and non-core, in the district court eliminates the prospect of an appeal from the bankruptcy judge's adjudications of core claims. . . ."); *see also In re Tastee Donuts, Inc.,* 137 B.R. 204, 207 (E.D. La. 1992) ("Even if this adversary proceeding involves core matters as well, the Court finds that the interests of judicial efficiency require that the reference be withdrawn for the entire adversary proceeding.").

59. As noted above, the application of non-bankruptcy law makes clear that this is a non-core matter. Because of the non-core matters at issue, the Bankruptcy Court cannot issue final orders. Rather, at best, the Bankruptcy Court is permitted only to issue proposed findings of fact and conclusions of law. *See* 28 U.S.C. § 157(c)(1). It is most efficient to eliminate the need for a *de novo* review by the District Court and appeals to the District Court, and to try these issues once before the District Court. As such, judicial efficiency alone justifies withdrawing the reference in this adversary.

**(3) The Remaining Relevant Factors Weigh in Favor of Withdrawal**

60. While the judicial economy prong is dispositive under these facts, the remaining relevant factors weigh in favor of permissive withdrawal of the reference. Withdrawal will clearly expedite the bankruptcy process because the District Court in this non-core matter will have the power to enter final orders without the necessity of first allowing for the entry of non-final findings of facts and conclusions of law from the Bankruptcy Court. Withdrawal of the reference will also reduce forum shopping, confusion, and promote uniformity in bankruptcy administration because an issue of first impression dealing with non-bankruptcy law potentially having effects on billions of dollars of interstate commerce will be decided by an Article III court, as required under applicable law.

61. For the foregoing reasons, the applicable elements are established and the Court should withdraw the reference.

**V.**
**CONCLUSION**

**WHEREFORE**, the Movants respectfully request that the District Court enter an order: (a) withdrawing the reference, and (b) granting such other and further relief as deemed justified.

Dated: May 30, 2018                         Respectfully submitted,

                                            */s/ Holland N. O'Neil*
                                            Holland N. O'Neil (TX 14864700)
                                            Jason B. Binford (TX 24045499)
                                            Shiva D. Beck (TX 24086882)
                                            Melina N. Bales (TX 24106851)
                                            **FOLEY GARDERE**
                                            **FOLEY & LARDNER LLP**
                                            2021 McKinney Avenue, Ste. 1600
                                            Dallas, Texas 75201
                                            Telephone: (214) 999.3000
                                            Facsimile: (214) 999.4667
                                            honeil@foley.com
                                            jbinford@foley.com
                                            sbeck@foley.com
                                            mbales@foley.com

                                            and

                                            Michael K. Hurst (TX 10316310)
                                            Ben A. Barnes (TX 24092085)
                                            **LYNN PINKER COX & HURST, LLP**
                                            2100 Ross Avenue, Ste. 2700
                                            Dallas, Texas 75201
                                            Telephone: (214) 981.3800
                                            Facsimile: (214) 981.3839
                                            mhurst@lynnllp.com
                                            bbarnes@lynnllp.com

                                            **COUNSEL FOR HIGHLAND CAPITAL**
                                            **MANAGEMENT, L.P. AND HIGHLAND CLO**
                                            **FUNDING, LTD**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served electronically by the Court's PACER system on May 30, 2018 and on the parties listed below via overnight delivery and e-mail where indicated.

*/s/Jason B. Binford*
Jason B. Binford

Robin Phelan, Chapter 11 Trustee
PhelanLaw
4214 Woodfin Drive
Dallas, TX 75220
robin@phelanlaw.org

Lisa L. Lambert
Assistant United States Trustee
United States Department of Justice
Office of the United States Trustee
1100 Commerce St. Room 976
Dallas, Texas 75242
lisa.l.lambert@usdoj.gov

Rakhee V. Patel
Phillip Lamberson
Joe Wielebinski
Annmarie Chiarello
WINSTEAD PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

Jeff P. Prostok
J. Robert Forshey
Suzanne K. Rosen
Matthias Kleinsasser
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX 76102
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com