Mark M. Maloney (GA 468104) (admitted *pro hac vice*)
W. Austin Jowers (GA 405482) (admitted *pro hac vice*)
Paul R. Bessette (TX 02263050)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | **(Jointly Administered Under Case No. 18-30264-SGJ-11)** |
| | § | |
| DEBTORS | § | Chapter 11 |
| | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P. and** | § | |
| | § | |
| **HIGHLAND CLO FUNDING LTD.** | § | |
| | § | **Adversary No. 18-03078-SGJ** |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| **ROBIN PHELAN, CHAPTER 11 TRUSTEE** | § | |
| | § | |
| Defendant. | § | |

## BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

JURISDICTION AND VENUE ..........................................................................................2

RELEVANT FACTS ...........................................................................................................3

LEGAL STANDARD & ARGUMENT ...............................................................................9

    I.   HCLOF Is Substantially Likely to Succeed on the Merits. ..............................................10

        A.  The Oaktree Transaction Cannot and Should Not Be Pursued. ...................................10

        B.  The Exercise of the Redemption Does Not Violate the Stay. .......................................13

        C.  HCLOF is Entitled to Call the Notes under 11 U.S.C. § 555. .....................................15

        D.  The Trustee Has Breached His Contractual and Fiduciary Duties. ..............................17

    II.  HCLOF Has Suffered and Will Continue to Suffer Irreparable Harm. .............................21

    III.  The Balance of Equities Weighs in Favor of Granting the Requested Relief. ..................21

    IV.  The Public Interest is Served by the Relief Requested. ....................................................22

        A.  The Proposed Transaction Likely Violates the Federal Securities Laws. ...................22

        B.  Approval of the Trustee's Proposed Transactions and Plan Would Violate
            Bankruptcy Law and Set Dangerous Precedent. .........................................................24

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 48th Street Steakhouse,*
835 F.2d 427 (2d Cir. 1987)................................................................14

*Allentown Ambassadors, Inc. v. Northwest Am. Baseball, LLC (In re Allentown Ambassadors, Inc.),*
361 B.R. 422 (Bankr. E.D. Pa. 2007) ....................................................15

*Anderson v. Conine (In re Robertson),*
203 F.3d 855 (5th Cir. 2000) .............................................................11

*Arco Capital Corps. Ltd. v. Deutsche Bank AG,*
949 F. Supp. 2d 532 (S.D.N.Y. 2013)....................................................22

*Aspen Tech., Inc. v. M3 Tech., Inc.,*
569 F. App'x 259 (5th Cir. 2014) .......................................................21

*Baledo v. Majeed,*
55 N.Y.S.3d 340 (N.Y. App. Div. 2017) ...............................................17

*Berkowitz v. Stratford Nursing & Convalescent Ctr. (In re Stratford Nursing & Convalescent Ctr.),*
No. 08-27733-JHW, 2009 WL 2982638 (Bankr. D.N.J. Sept. 11, 2009)...............12

*In re Bernard L. Madoff Inv. Sec. LLC,*
773 F.3d 411 (2d Cir. 2014)..............................................................16

*In re Brooks,*
60 B.R. 155 (Bankr. N.D. Tex. 1986)....................................................12

*Bullmore v. Banc of Am. Sec. LLC,*
485 F. Supp. 2d 464 (S.D.N.Y. 2007)....................................................18

*Bullmore v. Ernst & Young Cayman Islands,*
846 N.Y.S.2d 145 (N.Y. App. Div. 2007) ...............................................18

*In re Bush Indus., Inc.,*
315 B.R. 292 (W.D.N.Y. 2004) ...........................................................24

*Cardinal Indus., Inc. v. Buckeye Fed. Savings & Loan Ass'n (In re Cardinal Indus., Inc.),*
105 B.R. 834 (Bank. S.D. Ohio 1989) ...................................................14

*In re Coburn*,
   250 B.R. 401 (Bankr. M.D. Fla. 1999) ................................................................11

*Dresser-Rand Co. v. Virtual Automation, Inc.*,
   361 F.3d 831 (5th Cir. 2004) ..............................................................................21

*In re Energy Future Holding Corp.*,
   527 B.R. 157 (D. Del. 2015).................................................................................23

*In re Enron Sec., Derivative & "ERISA" Litig.*,
   238 F. Supp. 3d 799 (S.D. Tex. 2017) ................................................................24

*First Nat'l Bank v. Community Trust Bank*,
   No. 05-1610, 2006 WL 724882 (W.D. La. Mar. 21, 2006)..................................13

*In re Frascella Enters., Inc.*,
   360 B.R. 435 (E.D. Pa. 2007) .............................................................................25

*Furia v. Furia*,
   498 N.Y.S.2d 12 (N.Y. App. Div. 1986) .............................................................19

*In re Gibralter Res., Inc.*,
   197 B.R. 246 (Bankr. N.D. Tex. 1996).................................................................12

*Goodman v. Crevoisier*,
   No. A-12-CV-1169-JRN, 2013 WL 12116541 (W.D. Tex. May 22, 2013)...........21

*Gryphon Master Fund, L.P. v. Path 1 Network Techs., Inc.*,
   No. 3:06 CV 0107 D, 2007 WL 1723703 (N.D. Tex. June 14, 2007)...................21

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) ................................................................................9

*JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*,
   893 N.Y.S. 2d 237 (N.Y. App. Div. 2010) ..........................................................19

*In re Levitz Furniture Inc.*,
   267 B.R. 516 (Bankr. D. Del. 2000) ....................................................................14

*Loan Syndications & Trading Ass'n v. SEC*,
   882 F.3d 220 (D.C. Cir. 2018)..............................................................................11

*Ltd. v. Patriarch Partners, LLC*,
   286 F. Supp. 3d 634 (S.D.N.Y. 2017)..................................................................16

*In re MacMenamin's Grill Ltd.*,
   450 B.R. 414 (Bankr. S.D.N.Y. 2011)..................................................................17

*Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*,
716 F.3d 736 (3d Cir. 2013)............................................................................................12

*Moldo v. Clark (In re Clark)*,
266 B.R. 163 (9th Cir. BAP 2001)..................................................................................11

*Morrison v. Nat'l Australian Bank Ltd.*,
561 U.S. 247 (2010).........................................................................................................23

*In re New Center Hospital*,
200 B.R. 592 (E.D. Mich. 1996)......................................................................................18

*Princes Point LLC v. Muss Dev. L.L.C.*,
65 N.Y.S.3d 89 (N.Y. 2017) ......................................................................................19, 20

*In re Prudential Lines*,
928 F.2d 565 (2d Cir. 1991)............................................................................................14

*In re Quebecor World (USA) Inc.*,
453 B.R. 201 (Bankr. S.D.N.Y. 2011) ............................................................................16

*Reves v. Ernst & Young*,
494 U.S. 56 (1990)...........................................................................................................22

*In re Schick*,
235 B.R. 318 (Bankr. S.D.N.Y. 1999) ............................................................................12

*SEC v. Blavin*,
557 F. Supp. 1304 (E.D. Mich. 1983)..............................................................................23

*SEC v. Carrillo Huettell LLP*,
No. 13 Civ. 1735 (GBD)(JCF), 2017 WL 213067 (S.D.N.Y. Jan. 17, 2017)...................24

*SEC v. Gruss*,
245 F. Supp. 3d 527 (S.D.N.Y. 2017)..............................................................................23

*SEC v. Universal Express, Inc.*,
475 F. Supp. 2d 412 (S.D.N.Y. 2007)..............................................................................23

*Slater v. Town of Albion (In re Albion Disposal)*,
217 B.R. 394 (W.D.N.Y. 1997) .......................................................................................14

*In re Three Strokes Ltd. P'ship*,
397 B.R. 804 (Bankr. N.D. Tex. 2008)............................................................................14

*Transamerica Mortg. Advisors v. Lewis*,
444 U.S. 11 (1979)...........................................................................................................18

*In re UAL Corp.*,
412 F.3d 775 (7th Cir. 2005) ................................................................................14

*Vineyard v. McKenzie (In re Quality Holstein Leasing)*,
752 F.2d 1009 (5th Cir. 1985) ............................................................................12

*In re Vitro, S.A.B. de C.V.*,
455 B.R. 571 (Bankr. N.D. Tex. 2011).................................................................22

*In re Whitehall Jewelers Holdings, Inc.*,
No. 08–11261(KG), 2008 WL 2951974 (D. Del. July 28, 2008)...........................13

**Statutes**

11 U.S.C. § 101 ........................................................................................15, 16

11 U.S.C. § 105 ..........................................................................................2, 15

11 U.S.C. § 362 ..............................................................................8, 13, 14, 15

11 U.S.C. § 363 ................................................................................................11

11 U.S.C. § 365 ........................................................................................15, 16

11 U.S.C. § 541 ................................................................................................12

11 U.S.C. § 555 ............................................................................10, 15, 16, 17

11 U.S.C. § 741 ........................................................................................15, 16

11 U.S.C. § 1129 ....................................................................................23, 24, 25

11 U.S.C. § 1142 ..............................................................................................23

11 U.S.C. § 1145 ........................................................................................23, 24

15 U.S.C. § 77d ................................................................................................24

15 U.S.C. § 77e ................................................................................................24

15 U.S.C. § 77l ................................................................................................24

15 U.S.C. § 77x ................................................................................................24

15 U.S.C. § 80b-3 ............................................................................................23

15 U.S.C. § 80b-4 ............................................................................................23

15 U.S.C. § 80b-6 ............................................................................................18

15 U.S.C. § 80b-9 ................................................................................................23

15 U.S.C. § 80b-17 ..............................................................................................23

28 U.S.C. § 157 .....................................................................................................2

28 U.S.C. § 1334 ...................................................................................................2

28 U.S.C. § 1409 ...................................................................................................2

Investment Advisers Act of 1940 .....................................................................1, 4

Securities Act of 1933.....................................................................................23, 24

**Other Authorities**

Fed. R. Bankr. P. 7001 ..........................................................................................2

Fed. R. Bankr. P. 7065 ..........................................................................................2

10-54 Corbin on Contracts § 39:37 [4th ed.] ......................................................20

Gilbane, 18 AM. BANKR. INST. L. REV. 241 .......................................................17

## INTRODUCTION

1.　　Robin Phelan is the chapter 11 trustee ("**Trustee**") for the involuntarily-bankrupt debtors in this case, Acis Capital Management, L.P. ("**Acis**") and Acis Capital Management GP, LLC (collectively, the "**Debtors**").　Acis is the portfolio manager of five separate financial investment vehicles known as "collateralized loan obligations" ("**CLOs**").[1]　As the person in control of Acis, the Trustee owes fiduciary duties to the CLOs and their investors under a panoply of federal and state investor-protection statutes, including the Investment Advisers Act of 1940, as well as common law contract principles.　As described below, however, the Trustee has abdicated, and continues to abdicate, those duties, acting instead in the interests of Joshua Terry, the sole petitioning creditor that filed the involuntary petitions against the Debtors.[2]

2.　　The Trustee's ongoing misconduct is and will continue to cause serious and irreparable harm to the CLOs and their investors.　This motion seeks to stop the Trustee's unlawful conduct and require the Trustee to perform his portfolio manager duties as a fiduciary, for the benefit and best interests of the CLOs and their investors.　In that role, the Trustee **must** follow the instructions issued by Highland CLO Funding, Ltd. ("**HCLOF**") and the other controlling equity noteholders.[3]

3.　　HCLOF, as a majority holder of subordinated notes (known as "equity notes") issued by the five CLOs, has sought to exercise its bargained-for contractual rights to protect its investment.　The Trustee refuses to honor these rights.　Instead, the Trustee is attempting to

---

[1] The "collateralized loan obligations" or "CLOs" at issue are: Acis CLO 2013-1, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; and Acis CLO 2015-6, Ltd.

[2] Notably, no other creditor of the Debtors joined in the involuntary petitions, nor has any other creditor filed a claim in the Debtors' bankruptcy cases thus far.

[3] HCLOF is not owned by Highland Capital Management L.P.  Rather, HCLOF is owned by HarbourVest, a Boston institutional investor (49%); a charitable trust (49%); and Highland employees (2%).  Hr'g Tr. (Feb. 7, 2018), at 263:13–24 (Dkt. 28); Findings of Fact & Conclusions of Law at ¶ 25(d)–(e) (Apr. 13, 2018) (Dkt. 118) ("FoFs & CoL in Invol. Bankr. Hr'g").  Citations to "Dkt. __" refer to documents filed in Case No. 18-30264-SGJ-11.

broker a sale of HCLOF's rights in the CLOs — effectively a forced sale of HCLOF's equity notes — to Oaktree Capital Management, L.P. ("**Oaktree**") in an effort to raise money to pay Mr. Terry. In doing so, the Trustee is not only refusing to honor HCLOF's legitimate, contractually specified and regulatorily protected right to redeem its equity notes, but is also engaging in an unauthorized and illegal process of trying to sell what the estates do not own — over the express objection of the proper owners, including HCLOF.

4. HCLOF is incurring concrete losses every day as a result of the thwarting and frustration of its rights — rights designed to prevent the very losses it is now suffering. A potential claim against an insolvent bankruptcy estate is wholly inadequate. Similarly, if HCLOF is forced to part with its own property against its will, it by definition has no adequate remedy for the involuntary taking of its property.

5. This Motion therefore seeks to enjoin the Trustee both from attempting to do what he legally cannot do (selling HCLOF's property without its consent) and refusing to do what he is legally and contractually required to do (comply with the instructions issued by HCLOF).

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(d) and Rule 7001(7) of the Federal Rules of Bankruptcy Procedure. Venue is proper pursuant to 28 U.S.C. § 1409. This is a non-core proceeding. HCLOF does not consent to the entry of final orders or judgment by the Bankruptcy Court.

7. The predicates for the relief requested in the Motion are sections 105(a) of the Bankruptcy Code and Bankruptcy Rules 7001 and 7065.

## RELEVANT FACTS

### A. Background

8.     Investment adviser Acis was put into an involuntary bankruptcy by a purported creditor, Joshua Terry.[4]  *See generally* Involuntary Petition (Dkt. 1).  Acis currently serves as the portfolio manager of five CLOs launched between 2012 to 2016, which hold assets with an aggregate value of approximately $2 billion.  Ex. 1, Dondero Dep. (Excerpt) (June 28, 2017), at 121:3–7.  Each CLO holds a portfolio of diversified syndicated leveraged commercial loans through the private placement of rated secured notes ("**Secured Notes**") and unsecured, subordinated, equity-like securities ("**Equity Notes**" or "**Subordinated Notes**" and, together with the Secured Notes, the "**Notes**"), providing investors with differentiating risk and reward profiles.  Hr'g Tr. (Feb. 7, 2018), at 73:1–74:20.[5]

9.     Each Note is subject to an Indenture, which establishes the rights of the noteholders and the indenture investment criteria.[6]  Through the Indentures, the CLOs pledged various loan assets and other assets to the indenture trustee — US Bank National Association — as security for the Secured Notes issued by the CLOs.

10.     The CLOs engaged Acis as their portfolio manager.  Through a Portfolio Management Agreement ("**PMA**") for each CLO, Acis agreed to manage the assets securing the

---

[4] Mr. Terry received an arbitration award, which was subsequently confirmed by the 44th District Court of Dallas County.  The Debtors have moved to appeal the award, but that action was stayed by the filing of the involuntary petitions by Mr. Terry.  *See* FoFs & CoL in Invol. Bankr. Hr'g ¶¶ 10, 14.

[5] HCLOF purchased the Equity Notes for each CLO and holds 100% of the Equity Notes for three of the five CLOs, 86% of the Equity Notes of one CLO, and together with two other holders, a supermajority of the Equity Notes for the remaining CLO.

[6] Ex. 2, Indenture for Collateralized Loan Obligations for Acis CLO 2013-1 ("**2013-1 Indenture**"); Ex. 3, Indenture for Collateralized Loan Obligations for Acis CLO 2014-3; Ex. 4, Indenture for Collateralized Loan Obligations for Acis CLO 2014-4; Ex. 5, Indenture for Collateralized Loan Obligations for Acis CLO 2014-5; Ex. 6, Indenture for Collateralized Loan Obligations for Acis CLO 2015-6.  References to specific provisions of the Indentures are illustrated by reference to the 2013-1 Indenture. The provisions are substantially similar, if not identical, across the various indentures.

Notes according to the criteria specified in the respective Indentures.[7] Under the PMAs, Acis represented that it is, and will act as, an "Investment Adviser" within the meaning of the Investment Advisers Act of 1940, as amended ("**IAA**"). *E.g.*, 2013-1 PMA § 2. In return for its services, Acis earns management fees, which are specified percentages of the principal amount of the total assets under management. *See, e.g.*, 2013-1 Indenture at 31-32, 64, 66 (defining how management fees are calculated); Hr'g Tr. (Feb. 6, 2018), at 58:14–60:5 (Dkt. 26). With approximately $2 billion of assets under management, Acis's management fee amounts to approximately $8 million per year.

11.     Acis has no employees or other infrastructure necessary to manage the CLOs, and is obligated under Shared Services and Sub-Advisory Agreements to pay Highland approximately 90% of its revenue in exchange for performance of the front, middle, and back office services, leaving Acis with net annual revenue of around $800,000. *See, e.g.*, Ex. 12, Third Amended and Restated Sub-Advisory Agreement by and Between Acis Capital Management, L.P., and Highland Capital Management, L.P., dated March 17, 2017, at App'x A.

12.     At the time of their respective investments in the CLOs, it was represented to the investors, including the Equity Noteholders, that Highland would perform all of the portfolio management duties, and the CLOs and the Equity Noteholders have relied on that representation and the reputation of Highland in the industry to manage their investments. Hr'g Tr. (June 12, 2018), at 36:25–38:25. In fact, as set forth in the PMAs, any proposal to change the sub-servicer

---

[7] Ex. 7, Portfolio Management Agreement between Acis CLO 2013-1, Ltd. and Acis Capital Management, LP ("**2013-1 PMA**"); Ex. 8, Portfolio Management Agreement between Acis CLO 2014-3, Ltd. and Acis Capital Management, LP; Ex. 9, Portfolio Management Agreement between Acis CLO 2014-4, Ltd. and Acis Capital Management, LP; Ex. 10, Portfolio Management Agreement between Acis CLO 2014-5, Ltd. and Acis Capital Management, LP; Ex. 11, Portfolio Management Agreement between Acis CLO 2015-6, Ltd. and Acis Capital Management, LP. References to specific provisions of the PMAs are illustrated by reference to the 2013-1 PMA. The provisions are substantially similar, if not identical, across the various PMAs.

away from Highland requires consent of various parties, including a majority of the equity holders. *E.g.*, 2013-1 PMA § 14(a).

13. Pursuant to the Indentures, the CLOs can redeem the Secured Notes under certain conditions, including at the written direction of 66 2/3% of the aggregate outstanding amount of the Equity Notes.[8] *E.g.*, 2013-1 Indenture § 9.2. Through this right of redemption, the Equity Noteholders can windup the CLOs and have Highland redeploy their funds into other investments, in their discretion, when the CLOs no longer meet their investment objectives. This type of structure is typical for CLOs.

14. Acis is not a party to the Indenture but must comply with certain aspects of the Indenture in its capacity as the Portfolio Manager of the CLOs. *See, e.g.*, 2013-1 PMA § 3(a) ("[T]he Portfolio Manager . . . shall perform on behalf of the Issuer the duties that have been specifically delegated to the Portfolio Manager . . . in the Indenture . . . ."). As relevant here, the Indentures require Acis, "[u]pon receipt or delivery of a notice of a redemption of the Secured Notes," to "direct the sale of all or part of the Collateral Obligations and other Assets" to effect redemption.[9] Once a redemption notice is issued, the portfolio manager is *required* to effect such redemption pursuant to the mechanics set forth in the Indentures — it has no discretion to refuse the request. *Id.* The portfolio manager is required to seek best execution in directing the sale of all or part of the collateral obligations. *See, e.g.,* 2013-1 PMA § 4(a).

## B. HCLOF's Thwarted Efforts to Reset the CLOs

15. HCLOF earns income when the amount of money paid in interest by the borrowers on the underlying loan asset investments exceeds the fixed amount the CLOs must pay

---

[8] Four of the five Indentures require 66 2/3% of Equity Noteholders to effectuate an optional redemption. One Indenture (for ACIS CLO 2014-3) requires only a simple majority.

[9] *E.g.*, 2013-1 Indenture § 9.2.

the Secured Noteholders. When the interest rates on the underlying loans rise or fall, the internal distribution of income may become misaligned with prevailing market rates. When that occurs, HCLOF may receive a return on its investment that is less than it could receive from another equal-risk investment. *See* Hr'g Tr. (Feb. 6, 2018), at 73:22–75:1.

16.     That is the situation that now exists— and has existed for many months. The CLOs were created between 2012 and 2016, when interest rates for the types of collateralized loans owned by the CLOs were much higher. In those years, the CLOs received more income and the CLOs paid a higher rate of return to the holders of the Notes, including the holders of the Equity Notes. But the interest rates on the underlying collateralized loans have since fallen. With lower interest rates, the equity tranches of the CLOs receive less income (after the specified amounts are paid to the holders of the Secured Notes). Given market conditions, a new CLO would not need to pay such a high rate of return to attract secured noteholders. The five CLOs are losing money for HCLOF compared to a similar vehicle that offers a market-appropriate rate of return for the Secured Noteholders. *See* Hr'g Tr. (March 23, 2018), at 28:18–29:25 (Dkt. 99).

17.     Because changes in interest rates affect the return on the CLOs' investments, HCLOF has the contractual right under the Indentures to "reset" the CLO, which is a process of refinancing currently existing collateral loan obligations. Once refinanced, the reset CLO will pay lower interest rates to the CLO's Secured Noteholders and thus maintain or improve the yield to the Equity Noteholders. *See* Hr'g Tr. (Feb. 6, 2018), at 73:22–75:1.

18.     By January 2018, HCLOF had secured sufficient capital to effectuate the reset for the first CLO. Hr'g Tr. (Feb. 7, 2018), at 81:1–83:7. But the transaction did not close because the involuntary bankruptcy petitions were filed before the resets were to be effectuated, and the petitions prevented the CLOs from moving forward with the planned resets. *Id.* at 83:8–84:7,

85:20–89:2; Hr'g Tr. (Mar. 27, 2018), at 27:22–28:1 (Dkt. 107) (Q: "And you knew there was an extreme likelihood that the transaction was not going to go forward as a result of the bankruptcy filing?" Joshua Terry: "Yes, that was our goal on filing the involuntary petitions . . . ."). As a result, HCLOF remains stuck in subpar investments, and it is losing approximately $59,000 per CLO per week — a total of approximately $295,000 per week — compared to what it could earn by redeploying this capital to a better investment. Hr'g Tr. (June 12, 2018) at 40:20–23, 73:1–8.

19.     Following the bankruptcy petitions and the appointment of a Chapter 7 bankruptcy trustee, HCLOF decided to cut its losses, as an insolvent and now bankrupt portfolio manager was untenable. HCLOF determined that a redemption, effected by Highland as the sub-manager for Acis, was its sole remedy under the circumstances. Accordingly, on April 30, 2018, HCLOF instructed the Indenture Trustee and Acis to sell the CLOs' assets through the optional redemption process provided for in the Indentures (the "**Initial Notices**"). *See* Hr'g Tr. (Feb. 6, 2018), at 157:9–160:11. Had those instructions been followed, Highland, as sub-manager, would have effected the redemption and HCLOF would have been able to redeploy its capital in other investments managed by Highland consistent with its investment strategy.[10]

20.     After the Initial Notices were issued, on May 11, 2018, the Bankruptcy Court converted the chapter 7 cases and granted a motion to appoint a Chapter 11 trustee. *See* Order (Dkt. 205). The Trustee was appointed by this Court on May 17, 2018. *See* Order (Dkt. 221).

21.     On May 24, 2018, as prescribed by the Indentures, the CLOs themselves issued the "Issuer" Notices of Redemption, which included the redemption date and redemption price.

---

[10] As even Mr. Terry admits, Acis may not stop a redemption once invoked by the equity noteholders. Hr'g Tr. (Feb. 6, 2018), at 160:6–11 (Q: "[T]here's not anything that would prevent a majority of the equity from exercising an option[al] redemption, is there?" Joshua Terry: "There never has been and - - except for the noncall period and never will be, is my understanding of the document."); Hr'g Tr. (Feb. 7, 2018), at 51:7–8 (Joshua Terry: "[T]he equity does have the right to redeem the CLO . . ."); *see also id.* at 79:13–80:23 (testimony from Scott Ellington in agreement).

*See* Ex. 14, Ltr. to Jeff Prostok (May 24, 2018), Attachment 2. On the same date, the Issuers' notices were provided to the Trustee. *Id.*

22. The Trustee refused to authorize the necessary processes to allow Highland, as sub-manager, to liquidate the CLOs and return HCLOF's capital. *See* Ex. 16, Trustee Ltrs. (May 22, 2018); Ex. 18, Trustee Email (May 27, 2018). That refusal has caused delay and further market losses, and has also allowed Acis to continue to manage the CLOs' assets and ostensibly earn management fees.[11]

23. At a status conference on May 31, 2018, the Trustee argued that HCLOF's optional redemption violated 11 U.S.C. § 362(a)(3), and the Court *sua sponte* entered a temporary restraining order ("**TRO**") (Dkt 256). Hr'g Tr. (May 31, 2018), at 66:11–69:2.

24. At that status conference, the Trustee proposed a transaction with, at that time, an undisclosed party, which he claimed would enable all of the Debtors' creditors to be paid in full and pay "Highland equity" more than it would receive in the redemption. Hr'g Tr. (May 31, 2018) at 7:20–11:13. This transaction was publicly disclosed on June 8, 2018 in conjunction with the filing by the Trustee of an emergency motion for the approval of a break-up fee, expenses reimbursements, and the replacement of Highland with Oaktree as sub-advisor (the "**Oaktree Motion**") (Dkt. 263).

25. Per the disclosures in the Oaktree Motion, the Trustee confirmed his intent to sell the Equity Notes, including those owned by HCLOF, to garner compensation for the transfer of the PMAs.[12] Importantly, the Trustee has essentially confirmed to the parties that there was no

---

[11] The Trustee has not compensated Highland, as the sub-servicer and sub-advisor performing all functions of the portfolio manager.

[12] The offer is conditioned upon "obtaining the necessary approvals and consents from the investors in the CLOs in connection with the Transaction (or obtaining a court order nullifying any such approvals and consents which are not so obtained)." *Id.* Oaktree Motion, Ex. A at 2. This provision acknowledges that the proposal contemplates the sale of property — the Equity Notes — that the Debtors do not own.

offer to buy the PMAs — which are the only assets of the Acis estate. HCLOF does not consent to the purported "forced sale" of its property.

26. On June 13, 2018, HCLOF withdrew the Initial Notices.[13] On June 15, 2018 at 12:01 a.m., the TRO expired by its own terms.

27. Later on June 15, 2018, HCLOF issued new Notices of Redemption (the "**Pending Notices**") with a redemption date of July 30, 2018, in the manner required by the Indentures. *See* Exs. 17A, 17B, 17C, 17D, 17E.

28. On June 21, 2018, the Trustee filed a complaint and application for a temporary restraining order and preliminary injunction. (Dkt. 309) (the "**Complaint**"). That same day, the Court entered the *Ex Parte Temporary Restraining Order* (Adv. No. 18-3212, Dkt. 3).

29. Through the Complaint, the Trustee has unequivocally stated his intention to refuse any instructions related to the Pending Notices, and continue to pursue his efforts to force HCLOF to sell its own property.

## LEGAL STANDARD & ARGUMENT

30. To obtain a preliminary injunction, a party must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the plaintiff outweighs the injury to the defendant; and (4) that granting the injunction does not disserve the public interest. *See, e.g.*, *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citation omitted). As set forth below, HCLOF readily satisfies each of these requirements.

---

[13] The Initial Notices were withdrawn for multiple reasons, including the fact that none of the required redemption mechanics had been effected within the time frame required under the Indentures as a result of the TRO. The Indenture Trustee of the CLOs was also threatening to call a default under the Indentures, further exemplifying the chaotic state of the CLOs resulting from the Trustee's actions.

## I.    HCLOF Is Substantially Likely to Succeed on the Merits.

31.    HCLOF's likelihood to succeed on the merits of this dispute is more than substantial — it is overwhelming.  There is nothing in the law, bankruptcy or otherwise, that permits a bankruptcy trustee to sell property that does not belong to the estate without the owner's permission.  Despite the Trustee's suggestions, the automatic stay does not limit HCLOF's exercise of its redemption rights.  Moreover, even if the stay applied, HCLOF's exercise of its redemption rights is permissible because it fits within the safe harbor provided by section 555 of the Bankruptcy Code.  HCLOF has clearly-defined rights and Acis (and the Trustee) has clearly-defined duties.  The Trustee is breaching both.

### A.    The Oaktree Transaction Cannot and Should Not Be Pursued.

32.    Rather than fulfill his duties, the Trustee has launched an attempt to exercise control over, and to sell, property that does not belong to the Debtors.  He is pursuing this extraordinary, unauthorized, and illegal conduct in service of the interests of a single alleged creditor.  These actions not only constitute a breach of the agreements and duties discussed below, but they also raise serious constitutional concerns, amounting to an attempted conversion or taking of HCLOF's property.

33.    The Trustee's efforts should be a non-starter.  Setting aside that the precise terms of the proposed transaction with Oaktree remain uncertain, the bottom-line desired effect of the proposed transaction — a transfer of HCLOF's Equity Notes — cannot legally and legitimately be accomplished without HCLOF's consent.  And HCLOF does not consent.[14]

---

[14] HCLOF has compelling reasons to reject the Oaktree purchase offer.  Among other things, HCLOF's investment strategy is premised on investing in CLOs created and managed by Highland; and its relationship with Highland produces synergies, opportunities and benefits that will not be realized through the Trustee's "forced sale."  Hr'g Tr. (June 12, 2018), at 69:12–70:1.  Further, the Oaktree proposal requires that Oaktree be put in charge of the portfolio management function immediately — thus allowing it to perform the process necessary to generate the funds to "cash out" HCLOF.  (Dkt. 263).  Because the "price" to be paid to HCLOF is market-dependent (not fixed), Oaktree

34.     The Trustee's conduct would suggest that the Debtors' estates own the CLOs, the collateralized loan obligations owned by the CLOs, and the Notes issued by the CLOs; however, to the contrary, the Debtors' estates own none of this property.  As the D.C. Circuit recently explained, a CLO manager does not "possess[ ] or own[ ] the assets [a CLO] is securitizing":

> CLO managers do not hold the securitized loans at any point. . . . CLO managers neither originate the loans nor hold them as assets at any point.  Rather, like mutual fund or other asset managers, CLO managers only give directions to an S[pecial] P[urpose] V[ehicle] and receive compensation and management fees contingent on the performance of the asset pool over time.

*Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 223 (D.C. Cir. 2018) (internal record citations omitted).  Similarly, the Trustee does not own the notes issued by the CLOs — and he certainly does not own the Equity Notes owned by HCLOF.[15]

35.     It is fundamental that a bankruptcy court may not allow or require the sale of property if the debtor does not own the property.  *See Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 863 (5th Cir. 2000) (trustee lacked authority to sell home "as property of the estate in which there is an interest of 'an entity other than the estate' under section 363(f) . . . ."); *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir. BAP 2001) (court must first decide if property is "property of the estate" before it can be sold free and clear under § 363(f)); *In re Coburn*, 250 B.R. 401, 403 (Bankr. M.D. Fla. 1999) (court must determine if an asset is property of the estate in order to decide whether the trustee is entitled to sell the asset pursuant to § 363(f)).

---

will in a position to influence that price.  Shockingly, the proposal requires that Oaktree be allowed to assume this position with the express disclaimer of *any* fiduciary duties to anyone.  *See* Oaktree Motion, Ex. A at 6-7.

[15] The Trustee has only the contractual rights and obligations specified in the PMAs.  Neither the PMAs nor the Indentures empower the Trustee to sell, or offer for sale, the Equity Notes owned by HCLOF.  *Cf.*, *e.g.*, 2013-1 PMA § 3(e)–(g) a (allowing portfolio manager to sell the collateral loans owned by the CLO).  Furthermore, the Trustee may not take actions related to the CLOs unless specifically permitted to do so by the PMAs.  *See, e.g.*, 2013-1 PMA § 2 (limiting portfolio manager's role to "the investment advisory and related service described below").

36.     There is also no basis in law to permit a bankruptcy trustee or debtor in possession to compel a third party to sell its own property.  It is axiomatic that the debtor in possession or trustee steps into the shoes of a debtor and possesses no greater rights than that of the debtor.  See *Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 748 (3d Cir. 2013) ("It is a given that the trustee or debtor-in-possession can assert no greater rights than the debtor himself had on the date the bankruptcy case was commenced." (internal alterations omitted)); *In re Gibralter Res., Inc.*, 197 B.R. 246, 253 (Bankr. N.D. Tex. 1996) ("the general rule is that a trustee has no greater rights than the debtor and stands in the shoes of the debtor"); *In re Brooks*, 60 B.R. 155, 160 (Bankr. N.D. Tex. 1986) ("Of course, a bankruptcy trustee can acquire no greater rights in property than the debtor possessed." (citation omitted)).  The Debtors had no right to sell the Equity Notes before the commencement of these bankruptcy cases.  The Trustee has no right to do that now.

37.     A debtor cannot sell or attempt to exercise control of non-debtor property without consent — even when doing so would be beneficial to the estate.  See *Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1013 (5th Cir. 1985) (in noting the limitations placed on the trustee's strong arm powers by section 541, stating that "Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own.").[16]  For example, a Chapter 11 debtor may not sell property he merely leases, even if the estate owns regulatory rights that are worth less if sold separately from the leased property.  See *Berkowitz v. Stratford Nursing & Convalescent Ctr. (In re Stratford Nursing & Convalescent Ctr.)*, No. 08-

---

[16]  Notwithstanding HCLOF's justifiable refusal, the Court does not need to — and the Trustee isn't entitled to — question why a third party wants to make a particular choice with respect to its own property.  This inquiry is not pursued in analogous situations.  For example, consent rights of non-debtor parties to executory contracts are not conditioned on whether  the debtor or the court thinks it is a good decision, or whether it is a decision that is in the best interests of the debtor or the third party.  *See, e.g.*, *In re Schick*, 235 B.R. 318, 325 (Bankr. S.D.N.Y. 1999) (concluding that trustees of a limited-partnership apartment building could not compel the assignment of partnership membership to an unrelated corporation without the consent of other partners).

27733-JHW, 2009 WL 2982638, at *8–10 (Bankr. D.N.J. Sept. 11, 2009) (finding that estate could not sell "bed rights" to operate a nursing home where debtor leased the premises, notwithstanding the fact that the debtor's license to operate a nursing home was therefore worthless).  Similarly, a Chapter 11 debtor cannot sell consigned goods in its inventory without first meeting its burden to show that these goods are property of the estate.  *See In re Whitehall Jewelers Holdings, Inc.*, No. 08–11261(KG), 2008 WL 2951974, at *7 (D. Del. July 28, 2008).

38.      The Trustee's act of marketing and soliciting offers for HCLOF's own property is not authorized under Acis's management contracts.  It also constitutes a breach of the Trustee's fiduciary duties to the CLOs, and it has likely created a "fire sale" environment for the CLOs, which continues to harm HCLOF.  It also raises serious constitutional concerns, including violating basic principles of due process, separation of powers, and takings.  The mere fact that the Trustee has stepped into the shoes of a portfolio manager gives it no right, and this Court no authority, to sell or permit the sale of property that is not part of the estate.  *See, e.g.*, *First Nat'l Bank v. Community Trust Bank*, No. 05-1610, 2006 WL 724882, at *4 (W.D. La. Mar. 21, 2006) ("Since the property was not part of the bankruptcy estate, the Bankruptcy Court had no authority or jurisdiction to order the consensual sale and, therefore, the sale was void").

39.      Permitting the Trustee to pursue such a transaction wastes estate resources and further damages HCLOF on a daily basis.

**B.      The Exercise of the Redemption Does Not Violate the Stay.**

40.      Contrary to any assertions by the Trustee, HCLOF's exercise of its rights under the Indenture to issue the Redemption Notices is not a violation of the stay.  Although a liquidation would ultimately eliminate future management fees under the PMAs, "*subsection 362(a)(3) does not bar every [act or] proceeding hostile to a debtor's claimed interest in property, no matter how tangible, unmatured or unliquidated the debtor's claim, and no matter*

*how indirect the attack upon the estate's interest in property*." *In re Levitz Furniture Inc.*, 267 B.R. 516, 522 (Bankr. D. Del. 2000) (emphasis in original) (citation omitted); *see also Cardinal Indus., Inc. v. Buckeye Fed. Savings & Loan Ass'n (In re Cardinal Indus., Inc.)*, 105 B.R. 834, 849 (Bank. S.D. Ohio 1989) ("[A]ctions against the . . . property of another entity which only indirectly affect the value of a debtor's contractual or personal property interests are simply not within the scope of § 362(a)(3)"), *supplemented by* 109 B.R. 743 (Bankr. S.D. Ohio 1989).

41.     Courts have consistently held that section 362(a)(3) does not stay acts that merely reduce the value of property of the estate, but only acts to "exercise control over" or "obtain possession of" estate property.  *See, e.g.*, *In re UAL Corp.*, 412 F.3d 775, 778 (7th Cir. 2005) (sale of stock that affected debtor's interest in loss carry-forwards not stay violation; "an ESOP's sale of stock does not obtain *possession* . . . or exercise *control* over that interest (emphasis in original) (internal quotations removed)); *Slater v. Town of Albion (In re Albion Disposal)*, 217 B.R. 394, 406 (W.D.N.Y. 1997) (no stay violation even though action "dramatically reduce[d] the value of" estate property; "section 362(a)(3) does not stay acts that reduce the value of property of the estate; it stays acts to exercise control over estate property;" noting that any argument that such an indirect action is an act to "exercise control over the debtor's property . . . does not find any support in the Bankruptcy Code.").

42.     Cases invoking section 362(a)(3) involve direct acts against property of the estate. *See, e.g.*, *In re 48th Street Steakhouse*, 835 F.2d 427 (2d Cir. 1987); *In re Prudential Lines*, 928 F.2d 565 (2d Cir. 1991); *In re Three Strokes Ltd. P'ship*, 397 B.R. 804 (Bankr. N.D. Tex. 2008). When, as here, the connection is necessarily indirect and removed, courts are appropriately wary of applying section 362(a)(3).  *See, e.g., In re UAL Corp.*, 412 F.3d 775, 778 (7th Cir. 2005) (distinguishing *In re Prudential Lines*).  In this case, the Trustee is attempting to hold an entire

investment vehicle hostage in an effort to make money at the expense of the very investors that Acis is supposed to be serving. The Court cannot allow this to continue. *See Allentown Ambassadors, Inc. v. Northwest Am. Baseball, LLC (In re Allentown Ambassadors, Inc.)*, 361 B.R. 422 (Bankr. E.D. Pa. 2007) (surveying the case law on section 362(a)(3) and observing that "[w]hen the courts limit the scope of § 362(a), they do so to avoid giving the bankruptcy estate an undue legal advantage in its relationship with other parties."). HCLOF should not and cannot be held hostage to an investment because the portfolio manager wants to earn or monetize future management fees — fees that are in no way assured or guaranteed under the PMAs.[17]

### C. HCLOF is Entitled to Call the Notes under 11 U.S.C. § 555.

43. Even if HCLOF's right to redeem its investment in the CLOs were subject to the automatic stay under § 362(a)(3) (which it is not), the safe harbor recognized under Bankruptcy Code section 555 applies.

44. Section 555 provides that "[t]he exercise of a contractual right of a . . . financial participant . . . to cause the liquidation, termination, or acceleration of a securities contract, as defined in section 741 of this title, because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title." 11 U.S.C. § 555. HCLOF is a "financial participant,"[18] seeking to cause the liquidation of a "securities contract," as those terms are defined under the Bankruptcy Code. As a result, HCLOF's actions are exempted from both the automatic stay (if it applied) and any injunction under section 105(a).

---

[17] It is for this reason that the Trustee is unable to sell the PMAs without also attempting to sell HCLOF's Equity Notes. This central feature of the Trustee's scheme illustrates his overreach on many levels, including with respect to the alleged automatic stay violation.

[18] There can be no dispute that HCLOF is a "financial participant" as defined by the Code, as it has gross market-to-market positions far in excess of $100,000,000 during the relevant timeframe. *See* 11 U.S.C. § 101(22A)(A).

45. The CLO transactions are "securities contracts" under section 741(7). The "term 'securities contract' expansively includes contracts for the purchase or sale of securities, as well as any agreements that are *similar* or *related to* contracts for the purchase or sale of securities." *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 418 (2d Cir. 2014) (emphasis in original).

46. While no court has yet addressed whether a CLO transaction qualifies as a "securities contract" under sections 741(7)(A) and 555, there should be no doubt that it does. CLOs are fundamentally notes backed by corporate loans, *see Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 638 (S.D.N.Y. 2017) (explaining that collateralized loan obligations "are essentially investment notes backed by a pool of loans"), and "notes" are expressly defined as securities in the Bankruptcy Code, *see* 11 U.S.C. § 101(49)(A)(i); *In re Quebecor World (USA) Inc.*, 453 B.R. 201, 215 (Bankr. S.D.N.Y. 2011). In addition to the notes issued to investors, the CLO transactions at issue involve multiple agreements, all of which relate to and govern the purchase and sale of those notes, which is all that is required under section 741(7)(A) to qualify as a "securities contract."

47. The final requirement of section 555 — that the contractual right be exercised because of a condition of the kind specified in section 365(e)(1) — is also satisfied. The three qualifying conditions identified in section 365(e)(1) are (1) the insolvency or financial condition of the debtor at any time before the closing of the case, (2) the commencement of a bankruptcy case, and (3) the appointment of or taking possession by a bankruptcy trustee or a custodian before commencement of the case. 11 U.S.C. § 365(e)(1). As previously explained, the CLOs were positioned to reset to stop on-going losses before the filing of the involuntary bankruptcies. But with losses accelerating and the reset compromised by the involuntary bankruptcy filings,

the Equity Noteholders were forced to exercise their optional redemption right precisely because of conditions (1) and (2).[19]

48. The complications and frustrations that HCLOF has experienced ever since the bankruptcy cases were filed underscore dramatically some of the reasons for, and wisdom in, section 555's safe harbor. It is inappropriate that an investor should be made to continue to invest in securities issued by an entity whose underlying collateral (the basis of the investment) is managed by a bankrupt entity under the control of a chapter 11 trustee.

49. Here, the Acis bankruptcy cases have caused substantial and ongoing losses to HCLOF and the other holders of the Equity Notes. HCLOF's right to liquidate the CLOs is not only protected under section 555, but also satisfies Congress's goals in expanding safe harbors.

**D.      The Trustee Has Breached His Contractual and Fiduciary Duties.**

50. The actions and inactions of the Trustee in refusing to comply with the Notices provides the basis for claims against him for breaches of contract and for breaches of fiduciary duties. New York law governs this dispute. *See, e.g.*, 2013-1 PMA § 24.

*The Trustee Has Breached His Fiduciary Duties*

51. The elements of a breach of common law fiduciary duty claim under New York law are "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Baledo v. Majeed*, 55 N.Y.S.3d 340, 344 (N.Y. App. Div. 2017) (citations omitted).

---

[19] The safe harbor provisions of the Bankruptcy Code, including section 555, were amended through the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) to extend protections to "financial participants" and expand protections for cutting edge financial instruments by broadening the definition of a "securities contract." The goals of those amendments were expressly to "reduce systemic risk in the marketplace" and to "minimize the displacement caused in the commodities and securities markets" in the event of one party's insolvency, by "allowing the expeditious termination of certain types of financial transactions." *In re MacMenamin's Grill Ltd.*, 450 B.R. 414, 420 (Bankr. S.D.N.Y. 2011); *see also* Gilbane, 18 AM. BANKR. INST. L. REV. 241, 245, Testing the Bankruptcy Code Safe Harbors in the Current Financial Crises (2010).

52. The Trustee owes fiduciary duties to HCLOF and its investors. In agreeing to manage the CLO investments, Acis represented to the CLOs that it is "registered as an investment adviser" under the IAA and agreed to perform its portfolio management services consistent with the IAA. *See, e.g.*, 2013-1 PMA § 17(b)(i). The IAA imposes a fiduciary duty on Acis to act for the benefit of the CLO and its investors, including Equity Noteholders like HCLOF. *See Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 36 (1979) ("Congress intended to impose enforceable fiduciary obligations" in passing the Act);15 U.S.C. § 80b-6.[20] The scope of the Debtors' (and thus the Trustee's) fiduciary duties is broad. The Trustee's obligations include a duty to refrain from conduct that directly harms the CLOs. The Trustee's actions violate or imminently threaten to violate this duty, as well as the more general duty of undivided loyalty. *See Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 471 (S.D.N.Y. 2007) (applying New York law). The Trustee has made clear he will not honor the Pending Notices — and instead will continue to try to sell HCLOF's property without its consent because that is the better result for Mr. Terry. That conduct violates Acis's duties to the CLO investors and as explained above and below, has significantly harmed HCLOF.

53. Nor can the Trustee disclaim the duties he owes to the CLOs and the investors under the contracts and securities laws, including the IAA. In one analogous case, *In re New Center Hospital*, 200 B.R. 592 (E.D. Mich. 1996), the chapter 11 trustee sought to escape the duties of the debtor-hospital as the administrator of an employee benefit plan governed by ERISA. The chapter 11 trustee argued that if he were to administer the plan, he would be required to act solely in the interest of the ERISA plan beneficiaries which would be in conflict

---

[20] Acis also owes fiduciary duties as an investment advisor under New York's common law. *See Bullmore v. Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148 (N.Y. App. Div. 2007) ("Professionals such as investment advisors, who owe fiduciary duties to their clients, 'may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties . . .'") (citations omitted).

with his duties to the bankruptcy estate; therefore, he could not serve as an ERISA fiduciary and a bankruptcy estate fiduciary at the same time. *Id*. The district court rejected this argument and overturned the decision of the bankruptcy, concluding that "[t]he Bankruptcy Trustee assumes the position of the debtor as to that debtor's many obligations. Courts have held that statutory obligations that bind the debtor will subsequently bind the bankruptcy trustee." *Id*. (internal citations omitted). Likewise, the Trustee is bound to perform the obligations and duties of Acis under relevant contracts and applicable law, including the IAA.

### *The Trustee Has Breached the PMAs*

54. Without the participation of the Trustee and his consent to the recommended actions by Highland as the sub-servicer and sub-advisor, the redemption of the CLOs cannot occur. As the portfolio manager, Acis is the party that would effectuate the liquidation of the CLOs' positions to enable redemption and would be required to seek best execution in the sale of the CLOs' positions. *See, e.g.*, 2013-1 PMA §§ 3(e), 4(a). Because the Trustee has indicated that he will not complete this step — or honor the redemption at all — the Trustee's conduct constitutes a breach of, or at the very least, an anticipatory repudiation of, his obligations under Indentures and the PMAs.

55. The elements of a breach of contract claim under New York law are "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 893 N.Y.S. 2d 237, 239 (N.Y. App. Div. 2010) (citation omitted); *Furia v. Furia*, 498 N.Y.S.2d 12, 13 (N.Y. App. Div. 1986)).

56. "An anticipatory breach of a contract by a promisor is a repudiation of a contractual duty before the time fixed in the contract for performance has arrived." *Princes Point LLC v. Muss Dev. L.L.C.*, 65 N.Y.S.3d 89, 92 (N.Y. 2017) (internal alterations omitted)

(citing 10-54 Corbin on Contracts § 39:37 [4th ed.]). A plaintiff shows an anticipatory breach in either of two ways: "[1] a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or [2] a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." *Id.* (citation omitted). "[T]he expression of intent not to perform by the repudiator must be positive and unequivocal." *Id.* (citation omitted).

57.     There is no dispute that the relevant contracts — the Indentures and PMAs — are valid, existing contracts. The PMAs require Acis to "perform on behalf of the Issuer the duties that have been specifically delegated to the Portfolio Manager in this Agreement and in the Indenture." *E.g.*, 2013-1 PMA § 3(a). The Indenture, in turn, requires Acis to "direct the sale of all or part of the Collateral Obligations and other Assets" upon receiving a notice of redemption from the CLO.[21]  Through the Initial Notices, HCLOF directed each CLO, the Indenture Trustee, and Acis to effect an optional redemption. In violation of the Indentures and the PMAs, the Trustee responded to HCLOF's redemption instructions, indicating that he would prevent Acis from effecting any redemption. *See* Ex. 16, Trustee Ltrs. (May 22, 2018). The Trustee has also refused to comply with the Issuers' notices of redemption. *See* Ex. 18, Trustee Email (May 27, 2018).

58.     The Trustee's statements and actions unequivocally indicate that he intends to breach Acis's contractual and fiduciary obligations. The Chapter 11 Trustee's conduct constitutes a breach or an anticipatory repudiation of his duties under both the Indentures and the PMAs.

---

[21] It also bears noting that the PMAs are pledged by the CLOs to the Trustees pursuant to the Indentures in order to permit the Trustees to enforce the obligations of Acis under the PMAs. *E.g.*, 2013-1 Indenture § 15.1.

## II.     HCLOF Has Suffered and Will Continue to Suffer Irreparable Harm.

59.     With each passing day, HCLOF stands to suffer ongoing and increasing injury as a result of the Trustee's improper refusal to comply with the PMAs.  The uncontroverted evidence before the Court is that HCLOF and the other CLO investors have been losing approximately $295,000 per week (an annualized loss of over $15 million) as a result of the repeated frustration of its contractual rights. Hr'g Tr. (June 12, 2018) at 40:20–23, 73:1–8.

60.     To the extent HCLOF later prevails on any claims for these losses, it will hold a judgment against Acis, a chapter 11 debtor with no meaningful assets.  *See Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 848 (5th Cir. 2004) ("[T]here is no adequate remedy at law if the defendant is incapable of responding in damages."); *see also Aspen Tech., Inc. v. M3 Tech., Inc.,* 569 F. App'x  259, 273 (5th Cir. 2014) (affirming finding of irreparable harm where there was a substantial probability that movant would be unable to collect a judgment against bankruptcy debtor (citation omitted)); *Gryphon Master Fund, L.P. v. Path 1 Network Techs., Inc.*, No. 3:06 CV 0107 D, 2007 WL 1723703, at *5 (N.D. Tex. June 14, 2007) ("[T]here can be an absence of an adequate remedy at law when '[d]amages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected.'" (citation omitted)).

## III.    The Balance of Equities Weighs in Favor of Granting the Requested Relief.

61.     The Court has no basis to find that the balance of the equities tips in any direction other than in favor of HCLOF.  While HCLOF stands to suffer irreparable harm if this Court does not enter equitable relief, Acis will suffer no harm if the Court enters HCLOF's requested preliminary injunction.  As detailed above, Acis has contractual and fiduciary obligations to each CLO through both the PMAs and the Indentures.  Acis cannot suffer harm by simply being required to comply with its contractual and fiduciary obligations.  *See Goodman v. Crevoisier*,

No. A-12-CV-1169-JRN, 2013 WL 12116541, at *2 (W.D. Tex. May 22, 2013) ("Defendants' assertions that the injunction will create hardship and cause them to incur significant costs are predicated on a false premise . . . .  Defendants are simply required to meet their contractual and fiduciary obligations to Key Ingredient.").

62.     In any event, the uncontroverted evidence before the Court is that Acis's net management fee amounts to around $800,000 per year, whereas HCLOF and the other CLO investors stand to lose over $15 million on an annualized basis as a result of the repeated frustration of their contractual rights.[22]   At bottom, Acis's interest in receiving future management fees from the CLOs is vastly outweighed by HCLOF's and its investors' rights.

## IV.     The Public Interest is Served by the Relief Requested.

63.     The requested preliminary injunctive relief would serve the public interest.  As described above, the Trustee has "gone rogue" and is acting shockingly outside the confines of the contractual and federal statutory frameworks that define his rights and obligations.  The Trustee should not be permitted to wrest away control of more than $2 billion in CLOs, disregard investor instructions, and attempt to effectively sell the entire CLO structures without the consent of the party who actually has contractual control over the CLOs, HCLOF.  The Trustee's actions likely violate federal securities laws and are certainly destabilizing to the CLO market and its participants.  It would be bad public policy to permit the Trustee's rogue conduct to continue.

### A.     The Proposed Transaction Likely Violates the Federal Securities Laws.

64.     The Trustee's proposal consists of selling notes held by HCLOF to Oaktree. These notes are securities.  *See Reves v. Ernst & Young*, 494 U.S. 56, 65, 66-67 (1990); *Arco*

---

[22] Under similar circumstances in *In re Vitro, S.A.B. de C.V.,* the court found that the harm of the requested injunction to senior noteholders, who owned approximately $1.2 billion in accelerated principal and $300 million in past due interest, due to a court-ordered delay in their collection efforts, was substantial and outweighed any harm to the debtor, which was concerned that the noteholders' collection activities against the debtor's non-debtor subsidiaries would result in decreased cash flow to the estates.  455 B.R. 571, 581 (Bankr. N.D. Tex. 2011).

*Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 542–43 (S.D.N.Y. 2013) (sale of CLO notes are a sale of a security under *Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247 (2010)).  Any sale of securities must comport with the requirements of federal securities laws, including the IAA, and to the extent applicable, the Securities Act of 1933 (the "**'33 Act**").  The Trustee is not in compliance with either of these statutes.

65.     The Trustee's proposed sale is in violation of the IAA.  The Trustee, as portfolio manager of the CLOs, is an investment adviser "because it receive[s] fees . . . pursuant to the management agreement[s and t]he management agreements . . . explicitly appointed [the portfolio manager] as the 'investment adviser' to make all investment decisions in exchange for the management fee."  *See SEC v. Gruss*, 245 F. Supp. 3d 527, 591–92 (S.D.N.Y. 2017); *e.g.*, 2013-1 PMA § 2.  As an investment adviser, the Trustee is required to register and file certain reports.  15 U.S.C. §§ 80b-3, 80b-4; *SEC v. Blavin*, 557 F. Supp. 1304, 1309 (E.D. Mich. 1983) (describing the registration and disclosure provisions of the IAA as the "core of the Act") (citation omitted).

66.     The Trustee has not done any of the actions required by the IAA.  Because the Trustee's proposed sale would violate the IAA, he risks incurring substantial civil penalties and exposes the estates to a potentially large administrative claim.[23]  Section 1145 does not absolve the Trustee from compliance with these requirements.[24]

---

[23] Any violation of the IAA may result in criminal proceedings, injunctive relief, and civil liability.  *See* 15 U.S.C. §§ 80b–17, 80b–9(d), 80b–9(e).

[24] "§1145(a) does not include pre-confirmation settlement offers" like the Trustee's plan.  *In re Energy Future Holding Corp.*, 527 B.R. 157, 163 (D. Del. 2015); *see also SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 425 (S.D.N.Y. 2007) ("[T]he section 1145(a) exemption is available only when the offerees are receiving the securities, at least in part, in exchange for claims against or interest in the debtor which they hold." (citation omitted)).  Likewise, section 1142(b) provides the Trustee no safe harbor to break otherwise applicable law or to seek an order from this Court compelling parties such as HCLOF to break the law.  Section 1142(b) is merely an administrative provision of the Code and any assertion that it gives the Trustee broad powers to ignore the law would put that section directly opposed to section 1129(a)(2).

67.     Furthermore, Section 77e of the '33 Act makes it unlawful "to offer to sell or offer to buy . . . any security, unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(c).[25] The Trustee has apparently not filed a registration statement for the proposed sale of the CLO notes. Violations are enforceable in civil litigation or criminally. 15 U.S.C. §§ 77l, 77x. The Trustee's proposal could very well expose him to liability — and again expose the Debtors' estates to a potentially large administrative claim. *See In re Enron Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 830 (S.D. Tex. 2017) ("The Securities Act of 1933 imposes strict liability on offerors and sellers of unregistered securities . . . ." (citation omitted)). The Court should not consider approving a transaction that would violate securities laws.[26]

**B.     Approval of the Trustee's Proposed Transactions and Plan Would Violate Bankruptcy Law and Set Dangerous Precedent.**

68.     The Trustee's proposal to sell HCLOF's Equity Notes as part of a plan is unworkable. A bankruptcy plan may be confirmed only if it is "not by any means forbidden by law." 11 U.S.C. § 1129(a)(3); *see also In re Bush Indus., Inc.*, 315 B.R. 292 (W.D.N.Y. 2004) (denying a proposed reorganization plan that included evidence of a violation of fiduciary responsibility). Because the Trustee's plan purports to sell notes not owned by the estates and circumvents the regulations of the both the '33 Act and the IAA, the plan violates the law.

69.     Moreover, before it may confirm a plan, the bankruptcy court must make a specific finding that the proposed plan is feasible. 11 U.S.C. § 1129(a)(11). A plan that calls for

---

[25] It would be the Trustee's burden to show the applicability of an exemption to this requirement. *E.g.*, *SEC v. Carrillo Huettell LLP*, No. 13 Civ. 1735(GBD)(JCF), 2017 WL 213067, at *3 n.7 (S.D.N.Y. Jan. 17, 2017) (citation omitted). None of the exemptions apply to the Trustee. *See* 15 U.S.C. § 77d.

[26] Bankruptcy Code section 1145 provides a limited exemption when the Trustee sells a security "of an issuer other than the debtor or an affiliate" 11 U.S.C. § 1145(a)(3). The Trustee's proposal clearly does not qualify for this exemption. First, neither the Trustee nor the Debtors owned the securities he proposes to sell on the date the bankruptcy petition was filed, nor do they own them now. *See* supra § I.A. Second, the proposed sale would be for 100% of the notes outstanding in the CLO — which plainly far exceeds any amount allowed by the exemption. Because the section 1145 exemptions do not apply, the Trustee must either follow the requirements under the '33 Act or else he will be in violation of the law.

violations of the law is not feasible. *See In re Frascella Enters., Inc.*, 360 B.R. 435, 445 (E.D. Pa. 2007) ("[T]he legal consequences which might flow from the implementation of a substantive provision which is prohibited by law could affect the plan's feasibility under section 1129(a)(11) . . . [and] might indeed undermine the *bona fides* of the plan's proposal"). The Trustee's plan calls for violations of the law; it is inherently unfeasible and therefore cannot be confirmed under the Bankruptcy Code.

## CONCLUSION

70.     For all of these reasons, HCLOF seeks preliminary injunctive relief preventing the Trustee from (1) continuing his efforts to effect a transfer of HCLOF's Equity Notes without HCLOF's consent and (2) interfering with, or failing to follow instructions related to, the Pending Notices or any other valid instructions provided to Acis under the relevant documents.

Dated:  June 22, 2018

Respectfully submitted,

**KING & SPALDING LLP**

/s/ Paul R. Bessette
Mark M. Maloney
Georgia Bar No. 468104 (admitted *pro hac vice*)
W. Austin Jowers
Georgia Bar No. 405482 (admitted *pro hac vice*)
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com
ajowers@kslaw.com

Paul R. Bessette
Texas Bar No. 02263050
500 West 2nd St., Suite 1800
Austin, TX 78701-4684
(512) 457-2000 (phone)
(512) 457-2100 (fax)
pbessette@kslaw.com

*Counsel for Highland CLO Funding, Ltd.*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served electronically by

the Court's PACER system on June 22, 2018.


/s/ Paul R. Bessette
Paul R. Bessette