EXECUTION COPY

ACIS CLO 2013-1 LTD.
Issuer,

ACIS CLO 2013-1 LLC
Co-Issuer,

AND

U.S. BANK NATIONAL ASSOCIATION
as Trustee

INDENTURE

Dated as of March 18, 2013

COLLATERALIZED LOAN OBLIGATIONS

Table of Contents

Page

ARTICLE 1 Definitions...................................................................................................2

Section 1.1.    Definitions...............................................................................2
Section 1.2.    Assumptions as to Pledged Obligations...........................................74

ARTICLE 2 The Notes ...................................................................................................77

Section 2.1.    Forms Generally...............................................................................77
Section 2.2.    Forms of Notes.................................................................................78
Section 2.3.    Authorized Amount; Stated Maturity; Denominations....................79
Section 2.4.    Additional Notes..............................................................................81
Section 2.5.    Execution, Authentication, Delivery and Dating.............................82
Section 2.6.    Registration, Registration of Transfer and Exchange .....................83
Section 2.7.    Mutilated, Defaced, Destroyed, Lost or Stolen Note......................95
Section 2.8.    Payment of Principal and Interest and Other Amounts; Principal and
               Interest Rights Preserved .................................................................95
Section 2.9.    Persons Deemed Owners .................................................................98
Section 2.10.   Cancellation ....................................................................................99
Section 2.11.   Certificated Notes ...........................................................................99
Section 2.12.   Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of
               ERISA Representations ..................................................................100
Section 2.13.   Tax Purposes..................................................................................102
Section 2.14.   No Gross Up ..................................................................................103

ARTICLE 3 Conditions Precedent ...............................................................................103

Section 3.1.    Conditions to Issuance of Notes on Closing Date .........................103
Section 3.2.    Conditions to Issuance of Additional Notes ..................................106
Section 3.3.    Custodianship; Delivery of Collateral Obligations and Eligible
               Investments ...................................................................................109

ARTICLE 4 Satisfaction and Discharge........................................................................110

Section 4.1.    Satisfaction and Discharge of Indenture ........................................110
Section 4.2.    Application of Trust Money............................................................111
Section 4.3.    Repayment of Monies Held by Paying Agent ................................112

ARTICLE 5 Remedies ..................................................................................................112

Section 5.1.    Events of Default ...........................................................................112
Section 5.2.    Acceleration of Maturity; Rescission and Annulment....................114
Section 5.3.    Collection of Indebtedness and Suits for Enforcement by Trustee...............115

Table of Contents
(continued)

Page

Section 5.4. Remedies.................................................................................................117
Section 5.5. Optional Preservation of Assets..............................................................119
Section 5.6. Trustee May Enforce Claims Without Possession of Notes .........................120
Section 5.7. Application of Money Collected................................................................121
Section 5.8. Limitation on Suits..................................................................................121
Section 5.9. Unconditional Rights of Holders to Receive Principal and Interest..............122
Section 5.10. Restoration of Rights and Remedies.........................................................122
Section 5.11. Rights and Remedies Cumulative.............................................................122
Section 5.12. Delay or Omission Not Waiver.................................................................122
Section 5.13. Control by Majority of Controlling Class...................................................122
Section 5.14. Waiver of Past Defaults ..........................................................................123
Section 5.15. Undertaking for Costs.............................................................................124
Section 5.16. Waiver of Stay or Extension Laws ............................................................124
Section 5.17. Sale of Assets........................................................................................124
Section 5.18. Action on the Notes ...............................................................................125

ARTICLE 6 The Trustee ..................................................................................................125

Section 6.1. Certain Duties and Responsibilities of the Trustee.....................................125
Section 6.2. Representations and Warranties of the Bank ..............................................127
Section 6.3. Certain Rights of the Trustee ...................................................................127
Section 6.4. Trustee Not Responsible for Recitals or Issuance of Notes..........................130
Section 6.5. Trustee May Hold Notes ..........................................................................130
Section 6.6. Money Held in Trust by the Trustee ..........................................................131
Section 6.7. Trustee Compensation and Reimbursement ...............................................131
Section 6.8. Corporate Trustee Required; Eligibility......................................................132
Section 6.9. Resignation and Removal of the Trustee; Appointment of Successor
Trustee.................................................................................................132
Section 6.10. Acceptance of Appointment by Successor Trustee .....................................134
Section 6.11. Merger, Conversion, Consolidation or Succession to Business of the
Trustee.................................................................................................134
Section 6.12. Co-Trustees...........................................................................................134
Section 6.13. Withholding by the Trustee .....................................................................135
Section 6.14. Authenticating Agents ............................................................................136
Section 6.15. Notice of Default by the Trustee...............................................................136
Section 6.16. Certain Duties of the Trustee Related to Delayed Payment of Proceeds.......137
Section 6.17. Trustee Fiduciary for Secured Noteholders Only; Agent for each
Hedge Counterparty and the Holders of the Subordinated Notes................137

ARTICLE 7 Covenants.....................................................................................................137

Section 7.1. Payment of Principal and Interest .............................................................137
Section 7.2. Maintenance of Office or Agency...............................................................138
Section 7.3. Money for Note Payments to be Held in Trust .............................................138
Section 7.4. Existence of Co-Issuers............................................................................140

<u>Table of Contents</u>
(continued)

<div align="right">

Page
</div>

Section 7.5.    Protection of Assets ...................................................................................142
Section 7.6.    Opinions as to Assets ..............................................................................143
Section 7.7.    Performance of Obligations ....................................................................143
Section 7.8.    Negative Covenants .................................................................................143
Section 7.9.    Statement as to Compliance ...................................................................146
Section 7.10.   Co-Issuers May Consolidate, etc., Only on Certain Terms ...............147
Section 7.11.   Successor Substituted..............................................................................148
Section 7.12.   No Other Business ...................................................................................148
Section 7.13.   Maintenance of Listing ..........................................................................149
Section 7.14.   Annual Rating Review ............................................................................149
Section 7.15.   Reporting..................................................................................................150
Section 7.16.   Calculation Agent ...................................................................................150
Section 7.17.   Certain Tax Matters ................................................................................151
Section 7.18.   Ramp-up Period; Purchase of Additional Collateral Obligations.................152
Section 7.19.   Representations Relating to Security Interests in the Assets ..........154
Section 7.20.   Pre-funded Letters of Credit ..................................................................156
Section 7.21.   Objection to Bankruptcy Proceeding ....................................................157

ARTICLE 8 Supplemental Indentures......................................................................157

Section 8.1.    Supplemental Indentures Without Consent of Holders of Offered
               Securities.................................................................................................157
Section 8.2.    Supplemental Indentures With Consent of Holders of Offered
               Securities.................................................................................................160
Section 8.3.    Execution of Supplemental Indentures ..................................................163
Section 8.4.    Effect of Supplemental Indentures ........................................................163
Section 8.5.    Reference in Notes to Supplemental Indentures ...................................163

ARTICLE 9 Redemption of Notes .............................................................................164

Section 9.1.    Mandatory Redemption ..........................................................................164
Section 9.2.    Optional Redemption and Refinancing...................................................164
Section 9.3.    Redemption Procedures ..........................................................................167
Section 9.4.    Notes Payable on Redemption Date .......................................................168
Section 9.5.    Special Redemption .................................................................................169
Section 9.6.    Clean-up Call Redemption......................................................................170

ARTICLE 10 Accounts, Accountings and Releases...................................................172

Section 10.1.   Collection of Money ...............................................................................172
Section 10.2.   Collection Account ..................................................................................172
Section 10.3.   Payment Account; Custodial Account; Ramp-up Account; Expense
               Reserve Account; Interest Reserve Account..................................174
Section 10.4.   The Revolver Funding Account...............................................................176
Section 10.5.   Hedge Accounts ......................................................................................177

Table of Contents
(continued)

Page

Section 10.6. Reinvestment of Funds in Accounts; Reports by Trustee.............................178
Section 10.7. Accountings ...................................................................................................179
Section 10.8. Release of Securities .....................................................................................188
Section 10.9. Reports by Independent Accountants ............................................................189
Section 10.10. Reports to Rating Agencies and Additional Recipients; Rule 17g-5
Procedures....................................................................................................191
Section 10.11. Procedures Relating to the Establishment of Accounts Controlled by
the Trustee....................................................................................................192

ARTICLE 11 Application of Monies .........................................................................................193

Section 11.1. Disbursements of Monies from Payment Account ........................................193
Section 11.2. Payments on the Class A-2 Notes and the Combination Notes....................201

ARTICLE 12 Sale of Collateral Obligations; Purchase of Additional Collateral
Obligations....................................................................................................201

Section 12.1. Sales of Collateral Obligations .....................................................................201
Section 12.2. Purchase of Additional Collateral Obligations .............................................203
Section 12.3. Conditions Applicable to All Sale and Purchase Transactions.....................205
Section 12.4. Post-Reinvestment Period Amendment Proceeds..........................................205

ARTICLE 13 Noteholders' Relations..........................................................................................206

Section 13.1. Subordination; Non-Petition .........................................................................206
Section 13.2. Standard of Conduct ......................................................................................207
Section 13.3. Voting Rights of Holders of Combination Notes ..........................................207
Section 13.4. Sales and Exchanges of Combination Notes .................................................207

ARTICLE 14 Miscellaneous.........................................................................................................208

Section 14.1. Form of Documents Delivered to Trustee .....................................................208
Section 14.2. Acts of Holders ..............................................................................................209
Section 14.3. Notices, etc., to the Trustee, the Co-Issuers, the Collateral
Administrator, the Portfolio Manager, the Placement Agents, the
Hedge Counterparty, the Paying Agent, the Administrator and each
Rating Agency ..............................................................................................210
Section 14.4. Notices to Holders; Waiver............................................................................212
Section 14.5. Effect of Headings and Table of Contents....................................................213
Section 14.6. Successors and Assigns...................................................................................213
Section 14.7. Separability ....................................................................................................213
Section 14.8. Benefits of Indenture......................................................................................213
Section 14.9. Governing Law ...............................................................................................213
Section 14.10. Submission to Jurisdiction and Waiver of Jury Trial....................................213
Section 14.11. Counterparts...................................................................................................214

## Table of Contents
### (continued)

Page

Section 14.12.   Acts of Issuer ................................................................214
Section 14.13.   Confidential Information .............................................214
Section 14.14.   Liability of Co-Issuers ................................................216

ARTICLE 15 Assignment of Certain Agreements .................................216

Section 15.1.   Assignment of Portfolio Management Agreement .......................216
Section 15.2.   Assignment of Hedge Agreement ...............................................217

<u>SCHEDULES</u>

Schedule 1 -- List of Collateral Obligations
Schedule 2 -- Moody's Industry Classification Group List
Schedule 3 -- S&P Industry Classifications
Schedule 4 -- Diversity Score Calculation
Schedule 5 -- Moody's Rating Definitions
Schedule 6 -- Certificate of Issuer Regarding Accountants' Reports and Certificates
Schedule 7 - Additional Report Recipients

<u>EXHIBITS</u>

Exhibit A -- Forms of Notes
Exhibit A1 -- Form of Global Note
Exhibit A2 -- Form of Regulation S Global Subordinated Note
Exhibit A3 -- Form of Certificated Subordinated Note
Exhibit A4 -- Form of Certificated Secured Note
Exhibit A5 -- Form of Combination Note
Exhibit B -- Forms of Transfer and Exchange Certificates
Exhibit B1 -- Form of Transferor Certificate for Transfer of Rule 144A Global Note to Regulation S Global Secured Note
Exhibit B2 -- Form of Transferor Certificate for Transfer of Regulation S Global Secured Note to Rule 144A Global Note
Exhibit B3 -- Form of Transferee Certificate for Transfer of Certificated Secured Note
Exhibit B4 -- Form of Subordinated Note ERISA Certificate
Exhibit B5 -- Form of Transferor Certificate for Transfer to Regulation S Global Subordinated Note
Exhibit B6 -- Form of Transferee Certificate for Transfer of Certificated Subordinated Note
Exhibit B7 -- Form of Exchange Notice
Exhibit C -- Forms of White & Case LLP Opinions
Exhibit D -- Form of Dechert LLP Opinion
Exhibit E -- Form of Seward & Kissel LLP Opinion
Exhibit F -- Form of Appleby (Cayman) Ltd. Opinion
Exhibit G -- Calculation of LIBOR
Exhibit H -- Form of Securities Account Control Agreement
Exhibit I -- Form of Note Owner Certificate

INDENTURE, dated as of March 18, 2013, among Acis CLO 2013-1 Ltd., an exempted company incorporated in the Cayman Islands with limited liability (the "Issuer"), Acis CLO 2013-1 LLC, a limited-liability company organized under the laws of the State of Delaware (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), and U.S. Bank National Association, a national banking association, as trustee (herein, together with its permitted successors in the trusts hereunder, the "Trustee").

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable and governed by this Indenture and to secure the Secured Notes and other obligations secured under this Indenture. Except as otherwise provided herein, all covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Secured Parties and the Trustee. The Co-Issuers are entering into this Indenture and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the agreement's terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Holders of the Secured Notes, the Holders of the Combination Notes, the Trustee, each Hedge Counterparty, the Collateral Administrator and the Portfolio Manager (collectively, the "Secured Parties"), all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, (a) the Collateral Obligations (listed, as of the Closing Date, in Schedule 1 to this Indenture) which the Issuer causes to be delivered to the Trustee (directly or through an intermediary or bailee) herewith and all payments thereon or with respect thereto, and all Collateral Obligations which are purchased, or otherwise acquired, by the Issuer in the future pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Issuer's interest in each of the Accounts, each Hedge Account (to the extent permitted by the applicable Hedge Agreement), any Eligible Investments purchased with funds on deposit therein, and all income from the investment of funds therein, (c) the Issuer's rights under the Portfolio Management Agreement as set forth in Article 15 hereof, the Hedge Agreements (provided, that there is no such Grant to the Trustee on behalf of any Hedge Counterparty in respect of its related Hedge Agreement), the Collateral Administration Agreement and the Placement Agency Agreement, (d) all Cash or Money delivered to the Trustee (or its bailee), (e) all accounts, chattel paper, deposit accounts, financial assets, general intangibles, instruments, investment property, letter-of-credit rights and other supporting obligations relating to the foregoing, (f) any other property otherwise delivered to the Trustee by or on behalf of the Issuer (whether or not constituting Collateral Obligations or Eligible Investments (including, without limitation, Equity Securities)), (g) the Issuer's rights in all assets owned by any ETB Subsidiary and the Issuer's rights under any agreement with any ETB Subsidiary and (h) all proceeds with respect to the foregoing; provided, that such Grants shall not include the $250 transaction fee paid to the Issuer in consideration of the issuance of the Secured Notes and Subordinated Notes, the funds attributable to the issue and allotment of the Issuer's ordinary shares and the Co-Issuer's

membership interests or the bank account in the Cayman Islands in which such funds are deposited (or any interest thereon) (or any funds deposited or credited thereto) (the assets referred to in (a) through (h) are collectively referred to as the "Assets").  Such Grants are made, however, to secure, in accordance with the priorities set forth in the Priority of Payments, the Secured Notes equally and ratably without prejudice, priority or distinction between any Secured Note and any other Secured Note by reason of difference in time of issuance, documentation governing the incurrence or otherwise, except as expressly provided in this Indenture, and to secure, in accordance with the priorities set forth in the Priority of Payments of this Indenture, (i) the payment of all amounts due on the Secured Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture and other related transaction documents and (iii) compliance with the provisions of this Indenture (together, the "Secured Obligations"), all as provided in this Indenture.  The foregoing Grant shall, for the purpose of determining the property subject to the lien of this Indenture, be deemed to include any securities and any investments granted to the Trustee by or on behalf of the Issuer, whether or not such securities or investments satisfy the criteria set forth in the definitions of "Collateral Obligation" or "Eligible Investments," as the case may be.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof.

## ARTICLE 1

### Definitions

Section 1.1.    Definitions.  Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms.  The word "including" shall mean "including without limitation."  All references in this Indenture to designated "Articles," "Sections," "Subsections" and other subdivisions are to the designated articles, sections, subsections and other subdivisions of this Indenture.  The words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular article, section, subsection or other subdivision.

"17g-5 Site":  The meaning specified in Section 10.10(f) (Reports to Rating Agencies and Additional Recipients; Rule 17g-5 Procedures).

"25% Limitation":  The meaning specified in Section 2.6(c) (Registration, Registration of Transfer and Exchange).

"Acceleration Event":  The meaning specified in Section 11.1(a)(iii) (Disbursements of Monies from Payment Account).

"Acceleration Priority of Payments":  The meaning specified in Section 11.1(a)(iii) (Disbursement of Monies from Payment Account).

"Accountants' Report":  A certificate of the firm or firms appointed by the Issuer pursuant to Section 10.9 (Reports by Independent Accountants).

"Accounts": (i) the Payment Account; (ii) the Collection Account; (iii) the Ramp-up Account; (iv) the Revolver Funding Account; (v) the Expense Reserve Account; (vi) the Custodial Account; (vii) the Interest Reserve Account; and (viii) each Hedge Account.

"Accredited Investor": An accredited investor as defined in Regulation D under the Securities Act.

"Act" and "Act of Holders": The meanings specified in Section 14.2 (Acts of Holders).

"Additional Notes Closing Date": The closing date for the issuance of any Additional Subordinated Notes pursuant to Section 2.4 (Additional Notes) as set forth in an indenture supplemental to this Indenture pursuant to Section 8.2(b) (Supplemental Indentures With Consent of Holders of Offered Securities).

"Additional Subordinated Notes": Any Subordinated Notes issued pursuant to Section 2.4 (Additional Notes).

"Adjusted Collateral Principal Amount": As of any date of determination:

(a) the Aggregate Principal Balance of the Collateral Obligations (other than (i) Defaulted Obligations, (ii) Deferring Securities and (iii) Discount Obligations) plus any Principal Financed Accrued Interest; plus

(b) without duplication, the amounts on deposit in the Accounts, excluding the Revolver Funding Account, (including Eligible Investments in such Accounts) representing Principal Proceeds; plus

(c) the lesser of the (i) S&P Collateral Value of each Deferring Security and (ii) Moody's Collateral Value of each Deferring Security; plus

(d) the lesser of (x) the Market Value of each Defaulted Obligation and (y) the lesser of (i) the S&P Recovery Amount for each Defaulted Obligation and (ii) the Moody's Recovery Amount for each Defaulted Obligation; provided that Defaulted Obligations that have constituted Defaulted Obligations for a period of at least 3 years shall be deemed to have a value of 0; plus

(e) the original purchase price (expressed as a percentage of par) multiplied by the current Principal Balance, excluding accrued interest, expressed as a dollar amount, of all Discount Obligations; minus

(f) the Excess CCC/Caa Adjustment Amount;

provided, that with respect to any Collateral Obligation that would be subject to more than one of clauses (c) through (f) of this definition of "Adjusted Collateral Principal Amount", such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the category of Collateral Obligations which results in the lowest Adjusted Collateral Principal Amount on any date of determination; provided, further, that the Aggregate

NEWYORK 8715474 (2K)

Principal Balance of any Deferring Security shall not include any deferred or capitalized interest for purposes of calculating the Adjusted Collateral Principal Amount. For the purposes of clause (a) above, Current Pay Obligations representing up to 5% of the Collateral Principal Amount shall be included in the calculation of the Aggregate Principal Balance of the Collateral Obligations.

"Administration Agreement": An agreement between the Administrator and the Issuer relating to the various administrative functions the Administrator will perform on behalf of the Issuer, including communications with shareholders and the general public, and the provision of certain clerical, administrative and other corporate services in the Cayman Islands, as amended from time to time.

"Administrative Expense Cap": An amount equal on any Payment Date (when taken together with any Administrative Expenses paid during the period since the preceding Payment Date or, in the case of the first Payment Date, the Closing Date (excluding Administrative Expenses paid by amounts in the Expense Reserve Account)) equal to the sum of (a) 0.035% per annum (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount, on the related Determination Date and (b) $175,000 per annum (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months); provided, however, that, if the amount of Administrative Expenses paid under the Administrative Expense Cap (including any excess applied in accordance with this proviso) on the three immediately preceding Payment Dates or during the related Collection Periods is less than the stated Administrative Expense Cap (without regard to any excess applied in accordance with this proviso) in the aggregate for such three preceding Payment Dates, the excess may be applied to the Administrative Expense Cap with respect to the then-current Payment Date; provided, further, that in respect of the first three Payment Dates from the Closing Date, such excess amount shall be calculated based on the Payment Dates preceding such Payment Date; provided further, that the Administrative Expense Cap shall not apply to the Petition Expense Amount or Petition Expenses (except as set forth in the Priority of Payments).

"Administrative Expenses": Fees, expenses (including indemnities) and other amounts due or accrued with respect to any Payment Date and payable in the following order by the Issuer, the Co-Issuer or any ETB Subsidiary: first pro rata to the Trustee pursuant to Section 6.7 (Trustee Compensation and Reimbursement) in each of its capacities hereunder and the Collateral Administrator for its fees and expenses under the Collateral Administration Agreement and then pro rata to (i) the Independent accountants, agents (other than the Portfolio Manager) and counsel of the Issuer and any ETB Subsidiary for fees and expenses and any taxes or government fees of any ETB Subsidiary; (ii) the Rating Agencies for fees and expenses (including surveillance fees) in connection with any rating of the Secured Notes or any Collateral Obligations; (iii) any Person in respect of Petition Expenses; (iv) the Portfolio Manager under this Indenture and the Portfolio Management Agreement, including, without limitation, reasonable expenses of the Portfolio Manager (including fees for its accountants, agents and counsel) incurred in connection with the purchase or sale of any Collateral Obligations (including amounts owed to any Independent Review Party (as defined in the Portfolio Management Agreement)), any other expenses incurred in connection with the Collateral Obligations and amounts payable pursuant to Sections 9(c) and 11 of the Portfolio Management

Agreement but excluding the Management Fees; (v) the Administrator pursuant to the Administration Agreement; and (vi) any other Person in respect of any other fees or expenses permitted under this Indenture and the documents delivered pursuant to or in connection with this Indenture (including the payment of facility rating fees and all legal and other fees and expenses incurred in connection with the purchase or sale of any Collateral Obligations and any other expenses incurred in connection with the Collateral Obligations) and the Offered Securities, including but not limited to, amounts owed to the Co-Issuer pursuant to <u>Section 7.1</u> (Payment of Principal and Interest), any amounts due in respect of the listing of the Offered Securities on any stock exchange or trading system, any costs associated with producing Certificated Notes, any fees, taxes and expenses incurred in connection with complying with FATCA or the establishment and maintenance of any ETB Subsidiary (other than those amounts paid under clause (i)); <u>provided</u>, that amounts due in respect of actions taken on or before the Closing Date (or, at the Portfolio Manager's discretion, expenses incurred in connection with the acquisition of the initial portfolio of Collateral Obligations prior to the fourth Payment Date) shall not be payable as Administrative Expenses but shall be payable only from the Expense Reserve Account pursuant to <u>Section 10.3(d)</u> (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"<u>Administrator</u>":  Appleby Trust (Cayman) Ltd. and any successor thereto.

"<u>Affected</u>":  Any Class of Notes which becomes subject to a tax as a result of a Tax Event.

"<u>Affiliate</u>" or "<u>Affiliated</u>":  With respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (ii) any other Person who is a director, Officer or employee (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in clause (i) above.  For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Persons or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  For purposes of this definition, the management of an account by one Person for the benefit of any other Person shall not constitute "control" of such other Person and no entity shall be deemed an Affiliate of the Issuer or the Co-Issuer solely because the Administrator or its Affiliates serve as administrator or share trustee for such entity.

"<u>Agent Members</u>":  Members of, or participants in, DTC, Euroclear or Clearstream.

"<u>Aggregate Excess Spread</u>":  As of any date of determination, an amount equal to the product of:

(a)  LIBOR applicable to the Secured Notes during the Interest Accrual Period in which such date of determination occurs; <u>multiplied by</u>

(b) the amount (not less than zero) equal to (i) the Aggregate Principal Balance of the Collateral Obligations (excluding any non-cash interest) as of such date of determination <u>minus</u> (ii) the Target Initial Par Amount.

"<u>Aggregate Maximum Notional Amount</u>": The Class A-1 Maximum Notional Amount <u>plus</u> the Class B Maximum Notional Amount <u>plus</u> the Class C Maximum Notional Amount.

"<u>Aggregate Outstanding Amount</u>": With respect to any of the Notes as of any date, the aggregate unpaid principal amount of such Notes Outstanding (including any Deferred Interest previously added to the principal amount of any Class of Deferred Interest Notes that remains unpaid) on such date. Payments received on the Subordinated Notes shall not reduce the Aggregate Outstanding Amount of the Subordinated Notes prior to the Stated Maturity.

"<u>Aggregate Principal Balance</u>": When used with respect to all or a portion of the Collateral Obligations or the Pledged Obligations, the sum of the Principal Balances of all or of such portion of the Collateral Obligations or Pledged Obligations, respectively.

"<u>Aggregate Weighted Average Life</u>" : With respect to all Collateral Obligations as of any date of determination is a date equal to (A) the number of years following such date obtained by (i) summing the products obtained by multiplying the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance of such Collateral Obligation and (ii) *dividing* such sum by the Aggregate Principal Balance at such time of all Collateral Obligations *plus* (B) such date of determination.

"<u>Applicable Issuer</u>" or "<u>Applicable Issuers</u>": With respect to the Co-Issued Notes of any Class, the Issuer or each of the Co-Issuers, as specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations) and with respect to the Issuer Notes, the Issuer only.

"<u>Asset-Backed Commercial Paper</u>": Commercial paper or other short-term obligations of a program that primarily issues externally rated commercial paper backed by assets or exposures held in a bankruptcy-remote, special purpose entity.

"<u>Assets</u>": The meaning assigned in the Granting Clauses hereof.

"<u>Assumed Reinvestment Rate</u>": LIBOR (as determined on the most recent Interest Determination Date relating to an Interest Accrual Period beginning on a Payment Date or the Closing Date, as applicable) <u>minus</u> 0.50% per annum; <u>provided</u>, that, if the calculation above results in an interest rate of less than zero, the Assumed Reinvestment Rate will be deemed to be zero for purposes of such calculation.

"<u>Authenticating Agent</u>": With respect to the Notes or a Class of the Notes, the Person designated by the Trustee to authenticate such Notes on behalf of the Trustee pursuant to <u>Section 6.14</u> (Authenticating Agents) hereof.

"<u>Authorized Officer</u>": With respect to the Issuer or the Co-Issuer, any Officer or any other Person who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer or the Co-Issuer. With respect to the Portfolio Manager,

any Officer, employee, partner, member or agent of the Portfolio Manager or any other Person who is authorized to act for the Portfolio Manager in matters relating to, and binding upon, the Portfolio Manager with respect to the subject matter of the request, certificate or order in question. With respect to the Collateral Administrator, any Officer, employee or agent of the Collateral Administrator who is authorized to act for the Collateral Administrator in matters relating to, and binding upon, the Collateral Administrator with respect to the subject matter of the request or certificate in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Bank Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt from such other party of written notice to the contrary.

"Balance": On any date, with respect to Cash or Eligible Investments in any account, the aggregate (i) current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) principal amount of interest-bearing corporate and government securities, money market accounts and repurchase obligations; and (iii) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"Bank": U.S. Bank National Association, a national banking association, in its individual capacity and not as Trustee, Collateral Administrator or any successor thereto.

"Bank Officer": When used with respect to the Trustee, any officer within the Corporate Office (or any successor group of the Trustee) including any vice president, assistant vice president or officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred at the Corporate Office because of his knowledge of and familiarity with the particular subject and in each case having direct responsibility for the administration of this Indenture.

"Bankruptcy Law": The federal Bankruptcy Code, Title 11 of the United States Code, as amended from time to time, the Companies Winding Up Rules and Part V of the Companies Law (2004 Revision) of the Cayman Islands, as amended from time to time.

"Benefit Plan Investor": Means (a) an employee benefit plan (as defined in Section 3(3) of Title I of ERISA) that is subject to the fiduciary responsibility provisions of Title I of ERISA, (b) a plan as defined in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code, (c) any entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity and (d) a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA.

"Break-even Rate Case": The cases the Portfolio Manager may select in connection with the definition of S&P Test Matrix, including the additional "Break-even Rate Cases" not included in the definition of S&P Test Matrix that the Portfolio Manager obtains from S&P as set forth in the definition of S&P CDO Monitor.

NEWYORK 8715474 (2K)

"Board of Directors":  With respect to the Issuer, the directors of the Issuer duly appointed by the shareholders of the Issuer or the board of directors of the Issuer, and with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the members of the Co-Issuer.

"Board Resolution":  With respect to the Issuer, a resolution of the Board of Directors of the Issuer and, with respect to the Co-Issuer, a resolution of the Board of Directors of the Co-Issuer.

"Bond":  A debt security (that is not a loan) that is issued by a corporation, limited liability company, partnership or trust.

"Bond Yield Change":  The change in implied yield spread relative to the Merrill Lynch US High Yield Master II Index (Bloomberg Ticker:  H0A0) or any other index based upon a nationally recognized index as calculated by the Portfolio Manager in its reasonable commercial judgment.

"Break Funding Amount":  In the case of an Optional Redemption or Refinancing where the Redemption Date is not a Payment Date, an amount for each Secured Note being redeemed, if any, equal to the product of (x) the excess, if any, of (1) LIBOR for the current Interest Accrual Period over (2) LIBOR calculated as if the Redemption Date was a Payment Date beginning a new Interest Accrual Period; (y) the Outstanding principal amount of the Secured Note being redeemed and (z) times the number of days remaining in the current Interest Accrual Period as of the Redemption Date over 360.

"Bridge Loan":  Any loan or other obligation that (x) is incurred in connection with a merger, acquisition, consolidation, or sale of all or substantially all of the assets of a Person or similar transaction and (y) by its terms, is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancings (it being understood that any such loan or debt security that has a nominal maturity date of one year or less from the incurrence thereof but has a term-out or other provision whereby (automatically or at the sole option of the obligor thereof) the maturity of the indebtedness thereunder may be extended to a later date is not a Bridge Loan).

"Business Day":  Any day other than (i) a Saturday or a Sunday or (ii) a day on which commercial banks are authorized or required by applicable law, regulation or executive order to close in New York, New York, London, England or in the city in which the Corporate Office of the Trustee is located or, for any final payment of principal, in the relevant place of presentation.

"Caa Collateral Obligation":  A Collateral Obligation (other than a Defaulted Obligation or a Deferring Security) with a Moody's Rating of "Caa1" or lower.

"Calculation Agent":  The meaning specified in Section 7.16 (Calculation Agent).

"Cash":  Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"CCC Collateral Obligation":  A Collateral Obligation (other than a Defaulted Obligation or a Deferring Security) with an S&P Rating of "CCC+" or lower.

"CCC/Caa Calculated Amount":  With respect to any Collateral Obligation included in the CCC/Caa Excess, the lower of (x) an amount equal to 75% of the outstanding principal balance of such Collateral Obligation and (y) the Market Value of such Collateral Obligation (assuming such Market Value is expressed as a percentage of the principal balance of such Collateral Obligation as of the related Determination Date).

"CCC/Caa Par Reduction Amount":  At any time, an amount equal to the excess, if any, of: (a) the Aggregate Principal Balance of all Collateral Obligations included in the CCC/Caa Excess at such time; *over* (b) the sum of the CCC/Caa Calculated Amounts of all Collateral Obligations included in the CCC/Caa Excess at such time.

"CCC/Caa Excess":  The greater of: (i) the excess, if any, by which the Aggregate Principal Balance of Caa Collateral Obligations *exceeds* 7.5% of the Collateral Principal Amount and (ii) the excess, if any, by which the Aggregate Principal Balance of CCC Collateral Obligations *exceeds* 7.5% of the Collateral Principal Amount; provided, that, in determining which of the CCC Collateral Obligations and the Caa Collateral Obligations shall be included in the CCC/Caa Excess, the CCC Collateral Obligations and the Caa Collateral Obligations with the lowest Market Value (expressed as a percentage of par) shall be deemed to constitute such CCC/Caa Excess; provided, further, that, if the greater of clause (i) or (ii) above does not result in the larger Excess CCC/Caa Adjustment Amount, then the lesser of clause (i) or (ii) shall be applicable for purposes of this definition.

"CDO Liability Rating": The rating corresponding to the case or table selected in connection with the Weighted Average S&P Recovery Rate.

"Certificate of Authentication":  The meaning specified in Section 2.1 (Forms Generally).

"Certificated Note":  The meaning specified in Section 2.11(b) (Certificated Notes).

"Certificated Secured Notes":  The meaning specified in Section 2.11(b) (Certificated Notes).

"Certificated Security":  The meaning specified in Section 8-102(a)(4) of the UCC.

"Certificated Subordinated Note":  The meaning specified in Section 2.2(b) (Forms of Notes) and Section 2.11(b) (Certificated Notes).

"CFTC":  The Commodity Futures Trading Commission.

"Class":  In the case of (1) the Class A Notes, all of the Class A-1 Notes and the Class A-2 Notes together as a single Class (except, in the case of a Refinancing, the Class A-1 Notes and the Class A-2 Notes shall be treated as separate classes), (2) the Class A-2 Notes, all

of the Class A-2A Notes and the Class A-2B Notes together as a single Class (except, in the case of a Refinancing, the Class A-2A Notes and the Class A-2B Notes shall be treated as separate Classes), (3) the Class X Notes, the Class A-1 Notes, the Class A-2A Notes, the Class A-2B Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, all of the Secured Notes having the same Note Interest Rate, Stated Maturity and designation, (4) the Subordinated Notes, all of the Subordinated Notes and (5) the Combination Notes, all of the Combination Notes. Unless otherwise stated in this Indenture, the Class A Notes shall be treated as a single Class for voting and consent purposes. With respect to any exercise of voting rights, any Combination Notes that are entitled to vote on a matter shall vote with each Underlying Class except in connection with any supplemental indenture on Notes of any Underlying Class, in which case the Combination Notes shall vote only as a separate class.

"<u>Class A Notes</u>": Collectively, all of the Class A-1 Notes and the Class A-2 Notes together as a single Class (except, in the case of a Refinancing, the Class A-1 Notes and the Class A-2 Notes shall be treated as separate Classes).

"<u>Class A-1 Maximum Notional Amount</u>": Components of the Combination Notes representing up to $190,750,000 Class A-1 Notes.

"<u>Class A-1 Notes</u>": The Class A-1 Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"<u>Class A-2 Notes</u>": Collectively, all of the Class A-2A Notes and the Class A2-B Notes together as a single Class (except, in the case of a Refinancing, the Class A-2A Notes and the Class A-2B Notes shall be treated as separate Classes).

"<u>Class A-2A Notes</u>": The Class A-2A Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"<u>Class A-2B Notes</u>": The Class A-2B Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"<u>Class A/B Coverage Tests</u>": The Overcollateralization Ratio Test and the Interest Coverage Test applied respectively to the Class A Notes and the Class B Notes, collectively.

"<u>Class B Maximum Notional Amount</u>": Components of the Combination Notes representing up to $37,638,121 Class B Notes.

"<u>Class B Notes</u>": The Class B Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"<u>Class Break-even Default Rate</u>": With respect to each Class of Secured Notes, the maximum percentage of defaults, at any time, that the Current Portfolio or the Proposed

NEWYORK 8715474 (2K)

Portfolio, as applicable, can sustain, from time to time, through application of the S&P CDO Monitor, which, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments, will result in sufficient funds remaining for the payment of such Class of Notes in full. For purposes of determining the Class Break-even Default Rates on any date of determination, the Portfolio Manager will inform S&P which combination of cases from the S&P Test Matrix will be used, and the corresponding set of Class Break-even Default Rates from S&P will apply.

"Class C Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"Class C Maximum Notional Amount": Components of the Combination Notes representing up to $23,787,293 Class C Notes.

"Class C Notes": The Class C Mezzanine Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class D Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class D Notes.

"Class D Notes": The Class D Mezzanine Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Default Differential": With respect to each Class of Secured Notes, at any time, the rate calculated by subtracting the Class Scenario Default Rate for such Class of Notes at such time from the Class Break-even Default Rate for such Class of Notes at such time.

"Class E Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class E Notes.

"Class E Notes": The Class E Junior Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class F Notes": The Class F Junior Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Scenario Default Rate": With respect to each Class of Secured Notes, at any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's Initial Rating of such Class of Secured Notes, determined by application by the Portfolio Manager and the Collateral Administrator of the S&P CDO Monitor at such time.

"Class X Note Payment Amount": An amount equal to 25% of the original principal amount of the Class X Notes issued on the Closing Date, which shall be payable on

each Payment Date in accordance with Section 11.1(a)(i) (Disbursements of Monies from Payment Account).

"Class X Notes":  The Class X Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Clean-up Call Redemption":  A redemption of the Notes in accordance with Section 9.6 (Clean-up Call Redemption).

"Clean-up Call Redemption Date":  The meaning specified in Section 9.6 (Clean-up Call Redemption).

"Clean-up Call Redemption Price":  A purchase price in Cash at least equal to the sum of (a) the Aggregate Outstanding Amount of the Secured Notes, plus (b) all unpaid interest on the Secured Notes accrued to the date of such redemption (including any interest accrued on Deferred Interest), plus (c) the aggregate of all other amounts owing by the Issuer on the date of such redemption that are payable in accordance with the Priority of Payments prior to distributions in respect of the Subordinated Notes, including any amounts payable in respect of any Hedge Agreement and all expenses incurred in connection with effecting the Clean-up Call Redemption; provided that, in connection with any Clean-Up Call Redemption of the Notes, Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Clean-up Call Redemption Price that would otherwise be payable to the Holders of such Class of Secured Notes.

"Clearing Agency":  An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Corporation":  As the context may require, any or all of (i) Clearstream, (ii) DTC, (iii) Euroclear and (iv) any entity included within the meaning of "clearing corporation" under Section 8-102(a)(5) of the UCC.

"Clearing Corporation Security":  Securities which are in the custody of or maintained on the books of a Clearing Corporation or a nominee subject to the control of a Clearing Corporation and, if they are Certificated Securities in registered form, properly endorsed to or registered in the name of the Clearing Corporation or such nominee.

"Clearstream":  Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg.

"Closing Date":  March 18, 2013.

"Code":  The U.S. Internal Revenue Code of 1986, as amended.

"Co-Issued Notes":  The Class X Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Combination Notes.

NEWYORK 8715474 (2K)

"<u>Co-Issuer</u>":  The Person named as such on the first page of this Indenture until a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "<u>Co-Issuer</u>" shall mean such successor Person.

"<u>Co-Issuers</u>":  The Issuer and the Co-Issuer.

"<u>Collateral Administration Agreement</u>":  An agreement dated as of the Closing Date among the Issuer, the Portfolio Manager and the Collateral Administrator, as amended from time to time.

"<u>Collateral Administrator</u>":  U.S. Bank National Association, in its capacity as such under the Collateral Administration Agreement, and any successor thereto.

"<u>Collateral Interest Amount</u>":  As of any date of determination, without duplication, the sum of (i) the aggregate amount of Interest Proceeds in the Interest Collection Subaccount that have been received or that are expected to be received (other than Interest Proceeds expected to be received from Defaulted Obligations and Deferring Securities, but including Interest Proceeds actually received from Defaulted Obligations and Deferring Securities) during the Collection Period (and, if such Collection Period does not end on a Business Day, the next succeeding Business Day) in which such date of determination occurs and (ii) in the case of the Hedge Agreements, any net payments expected to be received by the Issuer on or before the immediately following Payment Date (other than any payments that would be classified as Principal Proceeds).

"<u>Collateral Obligation</u>":  A debt obligation (including, but not limited to, interests in bank loans acquired by way of a sale or assignment, and high-yield debt securities), Participation Interest or Pre-funded Letter of Credit that as of the date of acquisition by the Issuer:

(i)    is U.S. Dollar denominated and is neither convertible by the issuer thereof into, nor payable in, any other currency;

(ii)    is not a Defaulted Obligation, Current Pay Obligation or a Credit Risk Obligation;

(iii)    is not a lease;

(iv)    has not deferred payment of any accrued, unpaid interest which would have otherwise been due and continues to remain unpaid and is not a Deferrable Security or a Partial Deferrable Security;

(v)    provides for a fixed amount of principal payable in Cash on scheduled payment dates and/or at maturity and does not by its terms provide for earlier amortization or prepayment at a price of less than par;

(vi)    does not constitute Margin Stock;

(vii)    is not a Margin Loan;

(viii)   has payments that do not subject the Issuer to withholding tax unless (i) the related obligor is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after tax basis (for the avoidance of doubt, this clause shall not apply to commitment fees, letter of credit fees, Pre-funded Letter of Credit fees or similar fees) or (ii) such withholding is the result of the failure of Noteholders to provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and such withholding is allocated amongst such non-complying Noteholders;

(ix)   has a Moody's Rating and an S&P Rating and does not have an S&P Rating that is below "CCC-" or a Moody's Default Probability Rating that is below "Caa3";

(x)   is not a debt obligation whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(xi)   except for Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations, is not an obligation pursuant to which any future advances or payments, other than Excepted Advances, to the borrower or the obligor thereof may be required to be made by the Issuer;

(xii)   does not have an "f," "r," "p," "pi," "q," "t" or "sf" subscript assigned by S&P;

(xiii)   is not a Related Obligation;

(xiv)   is not subject to an Offer other than (a) an offer of publicly traded registered securities with equal or greater face value and similar terms issued in exchange for securities issued under Rule 144A or a loan or security that would otherwise qualify for purchase under the Investment Criteria or (b) a Permitted Offer;

(xv)   is not a Structured Finance Obligation;

(xvi)   is not a Synthetic Security;

(xvii)   will not consist of a debt obligation of a single obligor where the total potential indebtedness of such obligor under all of its loan agreements, indentures and other underlying instruments is less than $250,000,000;

(xviii)   will not require the Issuer, the Co-Issuer or the pool of Assets to be registered as an investment company under the Investment Company Act;

(xix)   is not an Equity Security or attached with a warrant to purchase Equity Securities and does not provide for mandatory or optional conversion for Equity Securities; provided that a Collateral Obligation may be by its terms convertible into or exchangeable for an Equity Security if the convertible or exchangeable portion of such Collateral Obligation constitutes less than or equal to 2% of the portion of the Collateral Principal Amount represented by such Collateral Obligation;

(xx)   is not a Bridge Loan;

(xxi)   is not a Zero Coupon Obligation;

(xxii)  is not a Step-up Obligation or a Step-down Obligation;

(xxiii) is not an Interest Only Security; and

(xxiv)  it does not mature after the Stated Maturity of the Notes.

"Collateral Principal Amount":  As of any date of determination, the sum of (a) the Aggregate Principal Balance of the Collateral Obligations (other than Defaulted Obligations) and (b) without duplication, the amounts on deposit in the Accounts, excluding the Revolver Funding Account, (including Eligible Investments in such Accounts) representing Principal Proceeds.

"Collateral Quality Test":  A test satisfied if, as of any date of determination at, or subsequent to, the end of the Ramp-up Period (or, with respect to the test set forth in clause (v) below, as of or subsequent to any date of determination immediately succeeding receipt by the Issuer of written confirmation of S&P's Initial Ratings of the Secured Notes and which occurs during the Reinvestment Period), in the aggregate, the Collateral Obligations owned (or in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy each of the tests set forth below, calculated in each case as required by Section 1.2 (Assumptions as to Pledged Obligations) herein:

(i)     the Minimum Fixed Coupon Test;

(ii)    the Minimum Floating Spread Test;

(iii)   the Maximum Moody's Rating Factor Test;

(iv)    the Moody's Diversity Test;

(v)     the S&P CDO Monitor Test;

(vi)    the Minimum Weighted Average Moody's Recovery Rate Test;

(vii)   the Minimum Weighted Average S&P Recovery Rate Test; and

(viii)  the Weighted Average Life Test.

"Collection Account":  The non-interest bearing segregated trust account established pursuant to Section 10.2 (Collection Account), which includes the Principal Collection Subaccount and the Interest Collection Subaccount.

"Collection Period":  With respect to any Payment Date, the period commencing immediately following the prior Collection Period (or on the Closing Date, in the case of the Collection Period relating to the first Payment Date) and ending on the 10th day of the month in which such Payment Date occurs or, in the case of (x) the final Collection Period preceding the latest Stated Maturity of any Class of Notes, (y) the final Collection Period preceding an

Optional Redemption or Clean-up Call Redemption or (z) the final Collection Period preceding final payment on the Notes following the liquidation of the Assets following an Event of Default, ending on the day preceding such Stated Maturity, Redemption Date or final payment, respectively.

"Combination Notes": The Senior Secured Deferrable Combination Notes composed of Components representing Class A-1 Notes, Class B Notes and Class C Notes (each such Class of Notes, an "Underlying Class").

"Combination Notes Table": The meaning specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Components": The Class A-1 Notes, the Class B Notes and the Class C Notes that represent the Underlying Classes of the Combination Notes.

"Concentration Limitations": Limitations satisfied, if as of any date of determination at or subsequent to, the end of the Ramp-up Period, in the aggregate, the Collateral Obligations owned (or in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer comply with all of the requirements set forth below, calculated in each case as required by Section 1.2 (Assumptions as to Pledged Obligations) herein:

(i) all of the Collateral Obligations must be issued by Non-Emerging Market Obligors and the country of organization of such Obligor must either (x) be the United States or (y) have a country ceiling for foreign currency bonds rating of at least "Aa2" by Moody's;

(ii) no more than the percentage listed below of the Collateral Principal Amount may be issued by obligors Domiciled in the country or countries set forth opposite such percentage:

| % Limit | Country or Countries |
|---------|---------------------|
| 10.0% | All countries (in the aggregate) other than the United States; |
| 10.0% | Canada; |
| 10.0% | Any Tax Jurisdiction; |
| 0% | All countries (in the aggregate) other than the United States, Canada and any Tax Jurisdiction; |

(iii) the sum of the aggregate unfunded commitments under Delayed Drawdown Collateral Obligations that are available to be funded and the Aggregate Principal

NEWYORK 8715474 (2K)

Balance of Revolving Collateral Obligations may not be more than 15% of the Collateral Principal Amount;

(iv)      the Moody's Counterparty Criteria are met;

(v)      not less than 95% of the Collateral Principal Amount may consist of Senior Secured Loans;

(vi)      not less than 95% of the Collateral Principal Amount may consist of floating rate Collateral Obligations;

(vii)      not more than 10% of the Collateral Principal Amount may consist of Participation Interests;

(viii)      not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations that are Second Lien Loans;

(ix)      [Reserved];

(x)      [Reserved];

(xi)      not more than 7.5% of the Collateral Principal Amount may consist of DIP Collateral Obligations and not more than 2% of the Collateral Principal Amount may consist of DIP Collateral Obligations issued by a single obligor;

(xii)      [Reserved];

(xiii)      not more than 2.0% of the Collateral Principal Amount may consist of obligations issued by a single obligor, except that up to 2.5% of the Collateral Principal Amount may consist of obligations issued by each of up to five other obligors (so long as Moody's has issued a non-credit estimate rating for such obligor);

(xiv)      (a) not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations with a Moody's Rating of "Caa1" or below and (b) not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations with an S&P Rating of "CCC+" or below;

(xv)      the Third Party Credit Exposure may not exceed 20% of the Collateral Principal Amount and the Third Party Credit Exposure with counterparties with a rating below "AA" by S&P may not exceed 5% of the Collateral Principal Amount; provided that no Third Party Credit Exposure is permitted with counterparties that do not have a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P (or a long-term debt rating of at least "A+" by S&P);

(xvi)      not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations with an S&P Rating derived from a Moody's Rating as set forth in clause (ii)(a) of the definition of the term "S&P Rating";

NEWYORK 8715474 (2K)

(xvii)   not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations with a Moody's Rating derived from an S&P Rating as provided in clauses (iv)(A)(1), (2) or (3) of the definition of the term "Moody's Derived Rating";

(xviii)   not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations that are issued by obligors that belong to any single S&P Industry Classification, except that up to two other S&P Industry Classifications may each represent up to 12% of the Collateral Principal Amount;

(xix)   not more than 3% of the Collateral Principal Amount may consist of Pre-funded Letters of Credit;

(xx)   [Reserved];

(xxi)   not more than 50% of the Collateral Principal Amount may consist of Cov-Lite Loans;

(xxii)   not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations that are High Yield Bonds;

(xxiii)   not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations that are Discount Obligations;

(xxiv)   not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations that are Non-Quarterly Assets; and

(xxv)   not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations with warrants to purchase Equity Securities attached thereto.

"Confidential Information":  The meaning specified in Section 14.13(b).

"Consenting Holder of the Subordinated Notes":  With respect to any Payment Date, a Holder of Subordinated Notes that has consented by delivering an irrevocable written notice to the Paying Agent to a distribution of Equity Securities in lieu of payment of Interest Proceeds on such Payment Date.

"Controlling Class":  The Class A Notes (voting as a single class), so long as any Class A Notes are Outstanding; then the Class B Notes, if there are no Class A Notes Outstanding; then the Class C Notes, if there are no Class A Notes or Class B Notes Outstanding; then the Class D Notes, if there are no Class A Notes, Class B Notes or Class C Notes Outstanding; then the Class E Notes, if there are no Class A Notes, Class B Notes, Class C Notes or Class D Notes Outstanding; then the Class F Notes, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes Outstanding; and then the Subordinated Notes, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes, Class E Notes or Class F Notes Outstanding.  For the avoidance of doubt, the Class X Notes shall not be the Controlling Class.

"Controlling Person": The meaning specified in Section 2.6(c) (Registration, Registration of Transfer and Exchange).

"Corporate Office": With respect to the Trustee, (x) for Note transfer purposes and presentment of the Notes, the corporate office of the Trustee located at 60 Livingston Avenue, St. Paul, MN 55107, Attn: Corporate Trust Services – Acis CLO 2013-1 and (y) for all other purposes, the corporate office of the Trustee located at 190 South LaSalle Street, 10th Floor, Chicago, IL 60603, Attn: Corporate Trust Services – ACIS CLO 2013-1, Fax: 312-332-8030, e-mail: ACIS.CLO.2013.01@usbank.com; and at or such other address as the Trustee may designate from time to time by notice to the Holders, the Portfolio Manager, any Hedge Counterparty and the Issuer or the principal corporate office of any successor Trustee.

"Coverage Tests": The Class A/B Coverage Tests, the Class C Coverage Tests, the Class D Coverage Tests and the Class E Coverage Tests.

"Cov-Lite Loan": A loan that (i) does not contain any financial covenants or (ii) requires the borrower to comply with one or more financial covenants only upon the occurrence of certain actions of the borrower including, but not limited to, a debt issuance, dividend payment, share purchase, merger, acquisition or divestiture (such covenant, an "Incurrence Covenant"), but contains no covenants requiring the borrower to comply with one or more financial covenants during each reporting period, whether or not it has taken any specified action (such covenant, a "Maintenance Covenant"); provided, that for all purposes other than the determination of the S&P Recovery Rate for such loan, a loan described in clause (i) or (ii) above which either contains a cross default provision to, or is pari passu with, another loan of the underlying obligor that requires the underlying obligor to comply with both an Incurrence Covenant and a Maintenance Covenant will be deemed not to be a Cov-Lite Loan.

"CPO": A Commodity Pool Operator.

"Credit Improved Criteria": The criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point increase of 0.50% or more, (ii) if such Collateral Obligation is a loan, the spread over the applicable reference rate for such Collateral Obligation has been decreased in accordance with the Underlying Instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a loan with a spread (prior to such decrease) less than or equal to 2.00%), (b) 0.375% or more (in the case of a loan with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a loan with a spread (prior to such decrease) greater than 4.00%) due, in each case, to an improvement in the related borrower's financial ratios or financial results, (iii) if such Collateral Obligation is a bond, the Bond Yield Change since the date of purchase by the Issuer has been a percentage point decrease of 0.50% or more or (iv) if it has a projected cash flow interest coverage ratio (earnings before interest and taxes divided by cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation that is expected to be more than 1.15 times the current year's projected cash flow interest coverage ratio.

NEWYORK 8715474 (2K)

"<u>Credit Improved Obligation</u>":  Any Collateral Obligation which, in the Portfolio Manager's reasonable commercial judgment, has significantly improved in credit quality after it was acquired by the Issuer, which improvement may (but need not) be evidenced by one of the following:  (a) such Collateral Obligation satisfies at least one of the Credit Improved Criteria, (b) such Collateral Obligation has been upgraded at least one rating sub-category by either Rating Agency or has been placed and remains on credit watch with positive implication by either Rating Agency, (c) the issuer of such Collateral Obligation has raised equity capital or other capital subordinated to the Collateral Obligation or (d) the issuer of such Collateral Obligation has, in the Portfolio Manager's reasonable commercial judgment, shown improved results or possesses less credit risk, in each case since such Collateral Obligation was acquired by the Issuer; <u>provided</u>, <u>however</u>, that during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Improved Obligation only if (i) it has been upgraded by any Rating Agency at least one rating sub category or has been placed and remains on a credit watch with positive implication by Moody's since it was acquired by the Issuer, (ii) at least one of the Credit Improved Criteria are satisfied with respect to such Collateral Obligation or (iii) at least a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Improved Obligation.

"<u>Credit Risk Criteria</u>":  The criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point decrease of 0.50% or more, (ii) if such Collateral Obligation is a loan, the spread over the applicable reference rate for such Collateral Obligation has been increased in accordance with the Underlying Instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a loan with a spread (prior to such increase) less than or equal to 2.00%), (b) 0.375% or more (in the case of a loan with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a loan with a spread (prior to such increase) greater than 4.00%) due, in each case, to a deterioration in the related borrower's financial ratios or financial results, (iii) in the case of a bond, the Bond Yield Change since the date of purchase by the Issuer has been a percentage point increase of 0.50% or more or (iv) if it has a projected cash flow interest coverage ratio (earnings before interest and taxes divided by cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation of less than 1.00 or that is expected to be less than 0.85 times the current year's projected cash flow interest coverage ratio.

"<u>Credit Risk Obligation</u>":  Any Collateral Obligation that, in the Portfolio Manager's reasonable commercial judgment, has a significant risk of declining in credit quality or price unrelated to general market conditions; <u>provided</u>, <u>however</u>, that during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Risk Obligation only if, (i) such Collateral Obligation has been downgraded by any Rating Agency at least one rating sub category or has been placed and remains on a credit watch with negative implication by Moody's since it was acquired by the Issuer, (ii) at least one of the Credit Risk Criteria are satisfied with respect to such Collateral Obligation or (iii) at least a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Risk Obligation.

"<u>Current Pay Obligation</u>":  A Collateral Obligation that would be a Defaulted Obligation but as to which (i) if the issuer of such Collateral Obligation is not subject to a

NEWYORK 8715474 (2K)

bankruptcy proceeding, all scheduled payments contractually due, including interest and principal payments (if any), were paid in cash and the Portfolio Manager reasonably expects that the next interest and contractual principal payment (if any) due will be paid in cash, (ii) if the issuer of such Collateral Obligation is subject to a bankruptcy proceeding, a bankruptcy court has authorized payment of all scheduled amounts due (other than principal amounts due as a result of any automatic acceleration of such Collateral Obligation pursuant to the Underlying Instruments because of the bankruptcy, receivership or similar proceeding of such obligor) on account of such Collateral Obligation and all such scheduled payments have been paid on a current basis in Cash, to the knowledge of the Portfolio Manager, (iii) for so long as Moody's is rating the Class X Notes, the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes, either (x) the Moody's Rating of such Collateral Obligation is at least "B3", (y) the Moody's Rating of such Collateral Obligation is at least "Caa1," and the Market Value of such Collateral Obligation is at least 80% of the par value thereof or (z) the Moody's Rating of such Collateral Obligation is at least "Caa2," and the Market Value of such Collateral Obligation is at least 85% of the par value thereof and (iv) the Market Value of such Collateral Obligation is at least 80% of the par value thereof; provided that the Aggregate Principal Balance of all Collateral Obligations which constitute "Current Pay Obligations" may not exceed 5.0% of the Collateral Principal Amount; provided further, that in determining which of the Collateral Obligations will be included in the preceding proviso as Current Pay Obligations, the Collateral Obligations with the highest Market Value expressed as a percentage will be deemed to constitute Current Pay Obligations. If the Market Value of a Collateral Obligation is determined pursuant to clause (E) of the definition of Market Value, such Collateral Obligation cannot be a Current Pay Obligation.

"Current Portfolio": At any time, the then current portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds (determined in accordance with Section 1.2 (Assumptions as to Pledged Obligations) to the extent applicable), then held by the Issuer.

"Custodial Account": The non-interest bearing segregated custodial account established in the name of the Trustee pursuant to Section 10.3(b) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Custodian": The meaning specified in the first sentence of Section 3.3(a) (Custodianship; Delivery of Collateral Obligations and Eligible Investments) with respect to items of collateral referred to therein, and each entity with which an Account is maintained, as the context may require, each of which shall be a Securities Intermediary.

"Default": Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulted Obligation": Any debt obligation included in the Assets shall constitute a "Defaulted Obligation" if:

(a) a default as to the payment of principal and/or interest has occurred and is continuing with respect to such debt obligation (without regard to any grace period applicable thereto, or waiver thereof, after the passage (in the case of a default that in the Portfolio

Manager's judgment, as certified to the Trustee in writing, is not due to credit-related causes) of a three Business Day grace period);

(b)  a default known to a Responsible Officer of the Portfolio Manager as to the payment of principal and/or interest has occurred and is continuing on another debt obligation of the same issuer which is senior or pari passu in right of payment to such debt obligation (without regard to any grace period applicable thereto, or waiver or forbearance thereof, after the passage (in the case of a default in the Portfolio Manager's judgment that is not due to credit-related causes) of five Business Days or seven calendar days, whichever is greater, but in no case beyond the passage of any grace period applicable thereto; provided, that both debt obligations are full recourse obligations);

(c)  the issuer or others have instituted proceedings to have the issuer adjudicated as bankrupt or insolvent or placed into receivership and such proceedings have not been stayed or dismissed or such issuer has filed for protection under Chapter 11 of the United States Bankruptcy Code;

(d)  (x) such Collateral Obligation has an S&P Rating of "CC" or lower or "SD" or had such rating before such rating was withdrawn or (y) the obligor of such debt obligation has a Moody's probability default rating (as published by Moody's) of "D" or "LD" or had such rating before such rating was withdrawn;

(e)  the Portfolio Manager has in its reasonable commercial judgment otherwise declared such debt obligation to be a "Defaulted Obligation";

(f)  such Collateral Obligation is a Participation Interest and (1) the related Selling Institution fails in any material respect in the performance of any of its payment obligations in accordance with the terms of such Participation Interest and such failure continues for seven Business Days or (2) the Selling Institution has an S&P rating of "CC" or lower or "SD" or a Moody's rating of "D" or "LD" or had either such rating before such rating was withdrawn;

(g)  such debt obligation is pari passu in right of payment as to the payment of principal and/or interest to another debt obligation of the same issuer that would constitute a Defaulted Obligation under clause (d) above were such other debt obligation owned by the Issuer; provided, that both the debt obligation and such other debt obligation are full recourse obligations of the applicable issuer;

(h)  such obligation is a Deferring Security; or

(i) the excess, if any, of Current Pay Obligations the Aggregate Principal Balance of which exceeds 5.0% of the Collateral Principal Amount;

provided, that a Collateral Obligation will not constitute a Defaulted Obligation pursuant to clauses (b) or (c) above if such Collateral Obligation is a DIP Collateral Obligation;

"Deferrable Cash-Pay Interest":  As to any Partial Deferrable Security, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such

Partial Deferrable Security or otherwise deferred and accrued) thereon pursuant to the terms of the related underlying instruments.

"<u>Deferrable Security</u>": A Collateral Obligation which by its terms permits the deferral of payment of any accrued or unpaid interest; <u>provided</u> that such loan or obligation shall not be a Partial Deferrable Security.

"<u>Deferred Interest</u>": With respect to any specified Class of Deferred Interest Notes, the meaning specified in <u>Section 2.8(a)</u> (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved).

"<u>Deferred Interest Notes</u>": The Notes specified as such in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"<u>Deferring Security</u>": A Deferrable Security that is deferring the payment of interest due thereon and has been so deferring the payment of interest due thereon (i) with respect to Collateral Obligations that have a Moody's Rating of at least "<u>Baa3</u>," for the shorter of two consecutive accrual periods or one year and (ii) with respect to Collateral Obligations that have a Moody's Rating of "<u>Ba1</u>" or below, for the shorter of one accrual period or six consecutive months, which deferred capitalized interest has not, as of the date of determination, been paid in Cash.

"<u>Delayed Drawdown Collateral Obligation</u>": A Collateral Obligation that (a) requires the Issuer to make one or more future advances to the borrower under the Underlying Instruments relating thereto, (b) specifies a maximum amount that can be borrowed on one or more borrowing dates and (c) does not permit the re-borrowing of any amount previously repaid by the borrower thereunder; but any such Collateral Obligation will be a Delayed Drawdown Collateral Obligation only until all commitments by the Issuer to make advances to the borrower expire or are terminated or reduced to zero. If a portion of a Pre-funded Letter of Credit is unfunded, such Pre-funded Letter of Credit will also constitute a Delayed Drawdown Collateral Obligation (to the extent of the unfunded amount) until the Issuer's obligations under such Pre-funded Letter of Credit are fully funded.

"<u>Deliver</u>" or "<u>Delivered</u>" or "<u>Delivery</u>": The taking of the following steps:

(i) in the case of each Certificated Security (other than a Clearing Corporation Security), Instrument or Participation Interest in which the underlying loan or Participation Interest is represented by an Instrument,

(a) causing the delivery of such Certificated Security or Instrument to the Custodian registered in the name of the Custodian or its affiliated nominee or endorsed to the Custodian or in blank,

(b) causing the Custodian to continuously indicate on its books and records that such Certificated Security or Instrument is credited to the applicable Account, and

(c) causing the Custodian to maintain continuous possession of such Certificated Security or Instrument;

(ii)     in the case of each Uncertificated Security (other than a Clearing Corporation Security),

(a)     causing such Uncertificated Security to be continuously registered on the books of the issuer thereof to the Custodian, and

(b)     causing the Custodian to continuously indicate on its books and records that such Uncertificated Security is credited to the applicable Account;

(iii)     in the case of each Clearing Corporation Security,

(a)     causing the relevant Clearing Corporation to credit such Clearing Corporation Security to the securities account of the Custodian or a nominee, and

(b)     causing the Custodian to continuously indicate on its books and records that such Clearing Corporation Security is credited to the applicable Account;

(iv)     in the case of each security issued or guaranteed by the United States of America or agency or instrumentality thereof and that is maintained in book-entry records of a Federal Reserve Bank ("FRB") (each such security, a "Government Security"),

(a)     causing the creation of a Security Entitlement to such Government Security by the credit of such Government Security to the securities account of the Custodian at such FRB, and

(b)     causing the Custodian to continuously indicate on its books and records that such Government Security is credited to the applicable Account;

(v)     in the case of each Security Entitlement not governed by clauses (i) through (iv) above,

(a)     causing a Securities Intermediary (x) to indicate on its books and records that the underlying Financial Asset has been credited to the Custodian's securities account, (y) to receive a Financial Asset from a Securities Intermediary or to acquire the underlying Financial Asset for a Securities Intermediary, and in either case, accepting it for credit to the Custodian's securities account or (z) to become obligated under other law, regulation or rule to credit the underlying Financial Asset to a Security Intermediary's securities account,

(b)     causing such Securities Intermediary to make entries on its books and records continuously identifying such Security Entitlement as belonging to the Custodian and continuously indicating on its books and records that such Security Entitlement is credited to the Custodian's securities account, and

(c)     causing the Custodian to continuously indicate on its books and records that such Security Entitlement (or all rights and property of the Custodian representing such Security Entitlement) is credited to the applicable Account;

NEWYORK 8715474 (2K)

(vi)     in the case of Cash or Money,

(a)     causing the delivery of such Cash or Money to the Custodian,

(b)     causing the Custodian to treat such Cash or Money as a Financial Asset maintained by such Custodian for credit to the applicable Account in accordance with the provisions of <u>Article 8</u> of the UCC, and

(c)     causing the Custodian to continuously indicate on its books and records that such Cash or Money is credited to the applicable Account; and

(vii)     in the case of each general intangible (including any loan or Participation Interest in which neither the Participation Interest nor the loan is represented by an Instrument) or any other Asset the security interest in respect of which may be perfected under the UCC by filing a Financing Statement,

(a)     causing the filing of a Financing Statement in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, and

(b)     causing the registration of the security interests granted under this Indenture in the Register of Mortgages and Charges of the Issuer at the Issuer's registered office in the Cayman Islands.

In addition, the Issuer will obtain any and all consents required by the underlying instruments relating to any such general intangibles for the transfer of ownership and/or pledge hereunder (except to the extent that the requirement for such consent is rendered ineffective under Section 9-406 of the UCC).

"<u>Designated Principal Proceeds</u>":  A one time designation by the Portfolio Manager of up to $5,000,000 in Principal Proceeds as Interest Proceeds after the Effective Date and on or prior to the second Determination Date (but only if the Effective Date Overcollateralization Test would be satisfied after such designation).

"<u>Determination Date</u>":  The last day of each Collection Period.

"<u>DIP Collateral Obligation</u>":  A loan paying interest on a current basis made to a debtor-in-possession pursuant to Section 364 of the U.S. Bankruptcy Code having the priority allowed by either Section 364(c) or 364(d) of the U.S. Bankruptcy Code and secured by senior liens.

"<u>Discount Obligation</u>":  Any Collateral Obligation that was purchased (as determined without averaging prices of purchases on different dates and treating each portion of a Collateral Obligation purchased on different dates as a separate Collateral Obligation) for less than (1) 85% of its Principal Balance, if such Collateral Obligation has a Moody's Rating lower than "B3," or (2) 80% of its Principal Balance, if such Collateral Obligation has a Moody's Rating of "B3" or higher; *provided* that

-25-
Exhibit B

(i)    such Collateral Obligation will cease to be a Discount Obligation at such time as the Market Value (expressed as a percentage of the par amount of such Collateral Obligation) determined for such Collateral Obligation on each day during any period of 30 consecutive days since the acquisition by the Issuer of such Collateral Obligation, equals or exceeds 90% of the Principal Balance of such Collateral Obligation;

(ii)   any Collateral Obligation that would otherwise be considered a Discount Obligation, but that is purchased in accordance with the Eligibility Criteria with the proceeds of sale of a Collateral Obligation that was not a Discount Obligation at the time of its purchase, so long as such purchased Collateral Obligation:

(A)    is purchased or committed to be purchased within 20 Business Days of such sale,

(B)    is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) equal to or greater than the sale price of the sold Collateral Obligation,

(C)    is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) not less than 65%; and

(D)    has a Moody's Default Probability Rating equal to or greater than the Moody's Default Probability Rating of the sold Collateral Obligation.

Any Collateral Obligations described in clauses (A) through (D) above will not be considered to be Discount Obligations.

(iii)  clause (ii) above in this proviso shall not apply to any such Collateral Obligation at any time on or after the acquisition by the Issuer of such Collateral Obligation if, as determined at the time of such acquisition, such application would result in:

(A)    more than 5% of the Collateral Principal Amount consisting of Collateral Obligations to which such clause (ii) has been applied (or more than 2.5% of the Collateral Principal Amount consisting of Collateral Obligations to which such clause (ii) has been applied if the purchase price of the Collateral Obligation is less than 75% of the principal balance thereof) or

(B)    the Aggregate Principal Balance of all Collateral Obligations to which such clause (ii) has been applied since the Closing Date being more than 10% of the Target Initial Par Amount.

"Distribution Report": The meaning specified in Section 10.7(b) (Accountings).

"Diversity Score":   A single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 hereto.

"Dollar" or "$": A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"<u>Domicile</u>": With respect to any issuer of, or obligor with respect to, a Collateral Obligation, its country of organization.

"<u>DTC</u>": The Depository Trust Company, its nominees, and their respective successors.

"<u>Due Date</u>": Each date on which any payment is due on a Pledged Obligation in accordance with its terms.

"<u>Effective Date</u>": The date on which each of the Effective Date Conditions are met.

"<u>Effective Date Conditions</u>": Means conditions that will be satisfied if the S&P Effective Date Rating Condition has been satisfied and the Initial Ratings of the Class X Notes and the Class A Notes are confirmed by Moody's (including by means of a deemed confirmation as set forth in the definition of Moody's Rating Condition or <u>Section 7.18(c)</u> (Ramp-up Period; Purchase of Additional Collateral Obligations), after the end of the Ramp-up Period.

"<u>Effective Date Overcollateralization Test</u>": A test that is satisfied if, on any date of determination, the ratio of (x) the Adjusted Collateral Principal Amount *divided* by (y) the Aggregate Outstanding Amount of all Notes is equal to or greater than the Target Initial Par Ratio.

"<u>Effective Date Report</u>": A report, compiled by the Collateral Administrator and provided to each Rating Agency, determined as of the end of the Ramp-up Period, containing (A) the information required in a Monthly Report and (B) a calculation with respect to whether the Target Initial Par Condition is satisfied.

"<u>Eligible Investment Required Ratings</u>": (a) With respect to Moody's, (i) a long-term credit rating of "<u>Aa3</u>" (not on credit watch for possible downgrade) or higher and a short-term credit rating of "<u>P-1</u>" (not on credit watch for possible downgrade) or (ii) if only a long-term credit rating from Moody's, such rating is "<u>Aaa</u>" or (iii) if only a short-term credit rating from Moody's is available, such rating is "<u>P-1</u>" (not on credit watch for possible downgrade) and (b) with respect to S&P, a long-term credit rating of "<u>A</u>" or higher and a short-term credit rating of "<u>A-1</u>" or higher (or, in the case of (x) an applicable obligation that does not have a short-term credit rating from S&P or does not have a short-term credit rating from S&P of "<u>A-1</u>" or higher, a long-term credit rating from S&P of at least "<u>A+</u>" and (y) any Eligible Investment with a maturity of longer than 91 days, a long-term credit rating of "<u>AAA</u>" from S&P).

"<u>Eligible Investments</u>": Any United States dollar denominated investment that, at the time it is Delivered to the Trustee (directly or through an intermediary or bailee), is one or more of the following obligations or securities:

(i)     direct obligations of, and obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are expressly

backed by the full faith and credit of the United States of America and such obligations meet the criteria set forth in clause (b) of the definition of Eligible Investment Required Ratings;

(ii) demand and time deposits in, certificates of deposit of, trust accounts with, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state banking authorities, so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have the Eligible Investment Required Ratings;

(iii) unleveraged repurchase obligations with respect to (a) any security described in clause (i) above or (b) any other security issued or unconditionally guaranteed by an agency or instrumentality of the United States of America, in either case entered into with a depository institution or trust company (acting as principal) described in clause (ii) above or entered into with an entity (acting as principal) with, or whose parent company has, the Eligible Investment Required Ratings;

(iv) securities bearing interest or sold at a discount issued by any entity formed under the laws of the United States of America or any State thereof that have a credit rating of "Aaa" from Moody's and "AAA" from S&P at the time of such investment or contractual commitment providing for such investment;

(v) commercial paper or other short-term obligations (other than Asset-Backed Commercial Paper) with the Eligible Investment Required Ratings and that either bear interest or are sold at a discount from the face amount thereof and have a maturity of not more than 183 days from their date of issuance and such maturity is not extendable;

(vi) a Reinvestment Agreement issued by any bank (if treated as a deposit by such bank), or a Reinvestment Agreement issued by any insurance company or other corporation or entity, in each case with the Eligible Investment Required Ratings; and

(vii) non-U.S. money market funds which funds have, at all times, credit ratings of "Aaa-mf" by Moody's and "AAAm" or "AAAm-G" by S&P, respectively;

provided, that Eligible Investments purchased with funds in the Collection Account shall be held until maturity except as otherwise specifically provided herein and shall include only such obligations or securities, other than those referred to in clause (vii) above, as mature (or are putable at par to the issuer thereof) no later than the Business Day prior to the next Payment Date, unless such Eligible Investments are issued by the Bank in its capacity as a banking institution, in which event such Eligible Investments may mature on such Payment Date; and provided, however, that none of the foregoing obligations or securities shall constitute Eligible Investments if (a) such obligation or security has an "f," "r," "p," "pi," "q," "t" or "sf" subscript assigned by S&P, (b) all, or substantially all, of the remaining amounts payable thereunder consist of interest and not principal payments, (c) such obligation or security is subject to withholding tax unless (i) the issuer of the security is required to make "gross-up"

NEWYORK 8715474 (2K)

payments for the full amount of such foreign withholding tax or (ii) such withholding is solely the result of the failure of Noteholders to provide the Issuer (or its authorized agents) with the Holder FATCA Information and such withholding is allocated amongst such non-complying Noteholders, (d) such obligation or security is secured by real property or subject to an Offer (other than an Eligible Investments Permitted Offer), (e) such obligation or security is purchased at a price greater than 100% of the principal or face amount thereof, (f) in the Portfolio Manager's judgment, such obligation or security is subject to material non-credit related risks or (g) such obligation is a Structured Finance Obligation or Synthetic Security; provided, further, that each Eligible Investment, other than those referred to in clause (vii) above, must mature on the earlier of (A) 60 days following its acquisition or (B) the Business Day prior to the next Payment Date (subject to the limited exception set forth in the first proviso of this paragraph above). Eligible Investments may include, without limitation, those investments for which the Trustee or an Affiliate of the Trustee provides services and receives compensation.

"Eligible Investments Permitted Offer": An offer (i) pursuant to the terms of which the offeror offers to acquire Eligible Investments in exchange for consideration consisting solely of Cash and/or other Eligible Investments in an amount equal to or greater than the full face or principal amount of such Eligible Investment plus any accrued and unpaid interest and (ii) as to which the Portfolio Manager has determined in its judgment that the offeror has sufficient access to financing to consummate the offer.

"Entitlement Order": The meaning specified in Section 8-102(a)(8) of the UCC.

"Equity Security": Any security or debt obligation which at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation and is not an Eligible Investment.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Limited Notes": The Notes specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"ETB Subsidiary": The meaning specified in Section 7.4(b) (Existence of Co-Issuers).

"Euroclear": Euroclear Clearance System.

"Event of Default": The meaning specified in Section 5.1 (Events of Default).

"Excepted Advances": Customary advances made to protect or preserve rights against the borrower of or obligor under a Collateral Obligation or to indemnify an agent or representative for lenders pursuant to the Underlying Instrument.

"Excess CCC/Caa Adjustment Amount": As of any date of determination, an amount equal to the excess, if any, of (i) the Aggregate Principal Balance of all Collateral Obligations included in the CCC/Caa Excess, over (ii) the sum of the Market Values of all Collateral Obligations included in the CCC/Caa Excess.

NEWYORK 8715474 (2K)

"Excess Weighted Average Fixed Coupon": As of any date of determination, an amount equal to: (a) the excess, if any, of the Weighted Average Fixed Coupon over the Minimum Fixed Coupon multiplied by (b) an amount equal to (i) the Aggregate Principal Balance of all fixed rate Collateral Obligations divided by (ii) the Aggregate Principal Balance of all floating rate Collateral Obligations.

"Excess Weighted Average Floating Spread": As of any date of determination, an amount equal to: (a) the excess, if any, of the Weighted Average Floating Spread over the Minimum Floating Spread multiplied by an amount equal to the Aggregate Principal Balance of all floating rate Collateral Obligations as of such date of determination *divided by* (b) the Aggregate Principal Balance of all fixed rate Collateral Obligations.

"Exchange": The meaning specified in Section 13.4 (Exchange of Combination Notes).

"Exchange Act": The United States Securities Exchange Act of 1934, as amended.

"Exchange Notice": The meaning specified in Section 13.4 (Exchange of Combination Notes).

"Expense Reserve Account": The non-interest bearing segregated trust account established pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"FATCA": Sections 1471 through 1474 of the Code and any current or future regulations, published guidance or official interpretations thereof.

"Federal Reserve Board": The Board of Governors of the Federal Reserve System.

"Fee Basis Amount": As of any date of determination, the sum of (a) the Collateral Principal Amount (including all Collateral Obligations held by an ETB Subsidiary) and (b) the Aggregate Principal Amount of all Defaulted Obligations.

"Financial Asset": The meaning specified in Section 8-102(a)(9) of the UCC.

"Financing Statements": The meaning specified in Section 9-102(a)(39) of the UCC.

"Foreign Financial Institution": A non-U.S. entity that (i) accepts deposits in the ordinary course of a banking or similar business; (ii) as a substantial portion of its business, holds financial assets for the accounts of others; or (iii) is engaged (or holds itself out as being engaged) primarily in the business of investing, reinvesting, or trading in securities, partnership interests, commodities, or any interest (including a futures or forward contract or option) in such securities, partnership interests, or commodities.

"GAAP": The meaning specified in Section 6.3(j) (Certain Rights of the Trustee).

NEWYORK 8715474 (2K)

"Global Notes":  Any Regulation S Global Notes or Rule 144A Global Notes.

"Global Rating Agency Condition":  With respect to any action taken or to be taken by or on behalf of the Issuer, satisfaction of both the Moody's Rating Condition (to the extent applicable) and the S&P Rating Condition (to the extent applicable).

"Grant":  To grant, bargain, sell, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of setoff against, deposit, set over and confirm.  A Grant of the Pledged Obligations, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including, the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Pledged Obligations, and all other Monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Hedge Account":  Any trust account established pursuant to Section 10.5 (Hedge Accounts).

"Hedge Agreements":  Any interest rate cap, interest rate swap or similar swap agreement between the Issuer and any Hedge Counterparty, as amended from time to time, and any replacement agreement entered into pursuant to Section 15.2 (Assignment of Hedge Agreement).

"Hedge Counterparty":  Any one or more institutions entering into or guaranteeing a Hedge Agreement with the Issuer.

"High-Yield Bonds":  Below investment-grade corporate high-yield debt securities issued by Non-Emerging Market Obligors.

"Holder":  With respect to any Note, the Person whose name appears on the Register as the registered holder of such Note.

"Holder FATCA Information":  Information and documentation requested by the Issuer (or an authorized agent acting on behalf of the Issuer) to be provided by the Noteholder to the Issuer (or an authorized agent acting on behalf of the Issuer) that is required to enable the Issuer to comply with FATCA.

"Incentive Management Fee":  A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and Section 11.1 (Disbursements of Monies from Payment Account) in amount equal to (1) 20% of the remaining Interest Proceeds, if any, available for payment pursuant to Section 11.1(a)(i)(Z) (Disbursements of Monies from Payment Account), (2) 20% of the remaining Principal Proceeds, if any, available for payment pursuant to Section 11.1(a)(ii)(N) (Disbursements of Monies from Payment Account) and (3) 20% of the remaining amounts, if any, available for payment pursuant to Section 11.1(a)(iii)(T) (Disbursements of Monies from Payment Account).

"Incentive Management Fee Threshold": The threshold that will be satisfied on any Payment Date if the Subordinated Notes have received an annualized internal rate of return (computed using the "XIRR" function in Microsoft® Excel or an equivalent function in another software package) of at least 12.0% on the Subordinated Notes Invested Amount (as defined in the Portfolio Management Agreement) as of the current Payment Date (after giving effect to all payments made or to be made on such Payment Date). The annualized rate of return will be calculated based on the distributions made on the Subordinated Notes issued on the Closing Date, and without taking into account distributions made on any additional Subordinated Notes issued after the Closing Date.

"Indenture": This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"Independent": As to any Person, any other Person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers, and any member thereof, or an investment bank and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person and (ii) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Professional Conduct of the American Institute of Certified Public Accountants.

"Index Maturity": With respect to any Class of Secured Notes, the period indicated with respect to such Class in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Information Agent": The Collateral Administrator.

"Initial Rating": With respect to any Class of Secured Notes, the rating or ratings, if any, indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations). The Initial Rating by S&P of the Combination Note is with respect to the ultimate repayment of principal and interest at a rate of LIBOR plus 1.227% per annum by the Stated Maturity.

"Institutional Accredited Investor": An Accredited Investor under Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Instrument": The meaning specified in Section 9-102(a)(47) of the UCC.

"Interest Accrual Period": The period from and including the Closing Date to but excluding the first Payment Date, and each succeeding period from and including each Payment Date to but excluding the following Payment Date until the principal of the Secured Notes is paid or made available for payment.

"Interest Collection Subaccount": The meaning specified in Section 10.2(a) (Collection Account).

NEWYORK 8715474 (2K)

"Interest Coverage Ratio":  With respect to any designated Class or Classes of Secured Notes, as of any date of determination, an amount, expressed as a percentage, equal to:

(a)  (i) the Collateral Interest Amount as of such date of determination minus (ii) amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clauses (A) through (C) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account); divided by

(b)  (i) amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clause (D) and, with respect to the Deferred Interest Notes, clause (H) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) plus (ii) interest due and payable on the Secured Notes of such Class or Classes and each Priority Class and Pari Passu Class (excluding any Deferred Interest but including any interest on Deferred Interest with respect to any such Classes) on such Payment Date.

"Interest Coverage Test":  A test that is satisfied with respect to any specified Class or Classes of Secured Notes if, as of any date of determination at, or subsequent to, the Determination Date with respect to the second Payment Date, the Interest Coverage Ratio for such Class or Classes is at least equal to the applicable Required Coverage Ratio for such Class or Classes.

"Interest Determination Date":  The second London Banking Day preceding the first day of each Interest Accrual Period.

"Interest Only Security":  Any obligation or security that does not provide in the related Underlying Instruments for the payment or repayment of a stated principal amount in one or more installments on or prior to its stated maturity.

"Interest Proceeds":  With respect to any Collection Period or Determination Date, without duplication, the sum of: (i) all payments of interest received by the Issuer during the related Collection Period on the Collateral Obligations and Eligible Investments, including the accrued interest received in connection with a sale thereof during the related Collection Period, less (x) any such amount that represents Principal Financed Accrued Interest and (y) an amount designated by the Portfolio Manager in writing up to the amount of unpaid interest on the Collateral Obligations that accrued prior to the Closing Date and is owing to the Issuer and remains unpaid as of the Closing Date; (ii) all principal and interest payments on Eligible Investments purchased with Interest Proceeds; (iii) excluding amounts that comprise the Turbo Payment Amount, all amendment and waiver fees, late payment fees and other fees, except for any fee in connection with (a) the lengthening of the maturity of the related Collateral Obligation or (b) the reduction of the par of the related Collateral Obligation; (iv) any amounts deposited in the Interest Collection Subaccount of the Collection Account from the Expense Reserve Account pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account); (v) commitment fees and other similar fees actually received by the Issuer during such Collection Period in respect of Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations; (vi) any payment received with respect to any Hedge Agreement other than an upfront payment received upon entering into such

Hedge Agreement or a payment received as a result of the termination of such Hedge Agreement (for this purpose, any such payment received or to be received on a Payment Date will be deemed received in respect of the preceding Collection Period and included in the calculation of Interest Proceeds received in such Collection Period); (vii) any funds transferred from the Ramp-up Account to the Interest Collection Subaccount of the Collection Account designated as Interest Proceeds by the Portfolio Manager to the Trustee in writing pursuant to Section 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account); (viii) Principal Proceeds designated by the Portfolio Manager, on one occasion only, as Designated Principal Proceeds to be treated as Interest Proceeds after the Effective Date and on or prior to the second Determination Date and (ix) any amount deposited in the Interest Collection Subaccount of the Collection Account from the Interest Reserve Account pursuant to Section 10.3(f) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account);

provided that any amounts received in respect of any Defaulted Obligation will constitute Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Defaulted Obligation since it became a Defaulted Obligation equals the outstanding Principal Balance of such Collateral Obligation when it became a Defaulted Obligation; provided, further, that any amounts received in respect of any Deferring Security will constitute Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Deferring Security since it became a Deferring Security equals the outstanding Principal Balance of such Collateral Obligation (including any deferred or capitalized interest) when it became a Deferring Security, and thereafter any amounts received shall constitute Interest Proceeds. Any amounts received that comprise the Turbo Payment Amount shall constitute Principal Proceeds (and not Interest Proceeds).

With respect to any Payment Date, an amount equal to the Interest Proceeds due to the Consenting Holders of the Subordinated Notes that are paid in the form of Equity Securities in lieu of Cash pursuant to Section 11.1(a)(i) (Application of Moneys) will be treated for all purposes by the Issuer and the Trustee as Principal Proceeds.

"Interest Reinvestment Test": A test that will be satisfied on any Determination Date during the Reinvestment Period if the Adjusted Collateral Principal Amount *divided by* the Aggregate Outstanding Amount of the Secured Notes equals or exceeds 103.9%.

"Interest Reserve Account": The non-interest bearing segregated trust account established pursuant to Section 10.3(f) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Investment Company Act": The Investment Company Act of 1940, as amended from time to time.

"Investment Criteria": The criteria specified in Section 12.2(a) (Purchase of Additional Collateral Obligations).

"<u>Investment Criteria Adjusted Balance</u>": With respect to each Collateral Obligation, the Principal Balance of such Collateral Obligation; <u>provided</u> that for all purposes the Investment Criteria Adjusted Balance of any:

(i) Deferring Security will be the lesser of the (x) S&P Collateral Value of such Deferring Security and (y) Moody's Collateral Value of such Deferring Security;

(ii) Discount Obligation will be the original purchase price (expressed as a percentage of par) multiplied by the current principal balance, excluding accrued interest, expressed as a dollar amount;

(iii) CCC Collateral Obligations and Caa Collateral Obligations included in the CCC/Caa Excess will be the Market Value of such Collateral Obligation; and

(iv) Defaulted Obligation will be the lesser of (x) the Moody's Collateral Value of such Defaulted Obligations and (y) the S&P Collateral Value for such Defaulted Obligations; <u>provided</u>, <u>that</u> any such Defaulted Obligation that has constituted a Defaulted Obligation for a period of at least 3 years shall be deemed to have an Investment Criteria Adjusted Balance of zero;

<u>provided further,</u> that if any Collateral Obligation would be subject to more than one of clauses (i) through (iv) of this definition of "Investment Criteria Adjusted Balance," such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the clause that results in the lowest Investment Criteria Adjusted Balance.

"<u>Irish Listing Agent</u>": The meaning specified in <u>Section 7.2</u> (Maintenance of Office or Agency).

"<u>IRS</u>": The U.S. Internal Revenue Service.

"<u>IRS Agreement</u>": An agreement entered into by a Foreign Financial Institution and the IRS pursuant to FATCA.

"<u>Issuer</u>": The Person named as such on the first page of this Indenture until a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "<u>Issuer</u>" shall mean such successor Person.

"<u>Issuer Notes</u>": The Class E Notes, the Class F Notes and the Subordinated Notes.

"<u>Issuer Order</u>" and "<u>Issuer Request</u>": A written order or request dated and signed in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Portfolio Manager by an Authorized Officer thereof, on behalf of the Issuer.

"<u>Junior Class</u>": With respect to a particular Class of Notes, each Class of Notes that is subordinated to such Class, as indicated in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"Knowledgeable Employee":  The meaning set forth in Rule 3c-5 promulgated under the Investment Company Act.

"LIBOR":  The meaning set forth in Exhibit G hereto, provided, that LIBOR for the Interest Accrual Period beginning on the Closing Date shall be 0.33110% for each Class of Notes.

"LIBOR Floor Obligation":  As of any date of determination, a floating rate Collateral Obligation (a) the interest in respect of which is paid based on a London interbank offered rate and (b) that provides that such London interbank offered rate is (in effect) calculated as the greater of (i) a specified "floor" rate per annum and (ii) the London interbank offered rate for the applicable interest period for such Collateral Obligation.

"Loan Pricing Change":  With respect to a loan, the change in price of such loan (expressed as a percentage of par) relative to the S&P/LSTA U.S. Leveraged Loan 100 Index or any other nationally recognized index as calculated by the Portfolio Manager in its reasonable commercial judgment.

"London Banking Day":  A day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"Majority":  With respect to any Class of Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Class.

"Management Fees":  The Senior Management Fee, the Subordinated Management Fee and the Incentive Management Fee.

"Margin Loan":  An extension of credit that is "purpose credit" within the meaning of Regulation U issued by the Federal Reserve Board.

"Margin Stock":  "Margin Stock" as defined under Regulation U issued by the Federal Reserve Board, including any debt security which is by its terms convertible into "Margin Stock."

"Market Value":  As of any date of determination for any Collateral Obligation and as determined by the Portfolio Manager in the following manner: (A) the average bid price value determined by an Independent pricing service; (B) if the price described in clause (A) is not available, the average of the bid side prices determined by three Independent broker-dealers active in the trading of such Collateral Obligation; (C) if a price or bid described in clause (A) or (B) is not available, the lowest of the bid side prices determined by two Independent broker-dealers active in the trading of such Collateral Obligation; (D) if a price or bid described in clause (A), (B) or (C) is not available and the Portfolio Manager is a Registered Investment Advisor, the bid side price determined by one Independent broker-dealer active in the trading of such Collateral Obligation; or (E) if a price or bid described in clause (A), (B), (C) or (D) is not available, then the lower of (a) the bid side price of such Collateral Obligation determined by the Portfolio Manager in a manner consistent with reasonable and customary market practice and (b) the greater of (i) 70% of the par value of such Collateral Obligation and (ii) the S&P Recovery Rate; provided, however, that (x) if the Market Value of any Collateral Obligation is

determined pursuant to clause (E) above, the Portfolio Manager will use commercially reasonable efforts to obtain the Market Value of such Collateral Obligation in accordance with subclauses (A) through (D) above and (y) if the Portfolio Manager is not a Registered Investment Adviser, the Market Value of any Collateral Obligation that cannot be obtained in accordance with subclauses (A) through (D) above within 30 days of the date on which its Market Value was determined pursuant to clause (E) above shall be deemed to be zero until determined in accordance with subclauses (A) through (D) above; provided, further, that any bid side price determined by the Portfolio Manager pursuant to clause (E)(a) above shall be used by the Portfolio Manager as the market value of such Collateral Obligation in all other portfolios it manages.

"Material Change": With respect to clause (ii)(b) of the definition of S&P Rating and Schedule 5, an event that occurs with respect to a Collateral Obligation upon the occurrence of any of the following (a) non-payment of interest or principal, (b) the rescheduling of any interest or principal, (c) any material covenant breach, (d) any restructuring of debt with respect to the obligor of such Collateral Obligation, (e) the addition of payment-in-kind terms, change in maturity date or any change in coupon rates and (f) the occurrence of the significant sale or acquisition of assets by the obligor.

"Maturity": With respect to any Note, the date on which the unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"Maturity Amendment": As defined in Section 12.4 (Post-Reinvestment Period Amendment Proceeds).

"Maximum Moody's Rating Factor Test": A test that will be satisfied on any date of determination if the Weighted Average Moody's Rating Factor of the Collateral Obligations is less than or equal to the "Maximum Weighted Average Moody's Rating Factor" as determined in the applicable Minimum Diversity/Maximum Rating/Minimum Spread Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable) in accordance with Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations) plus the Rating Factor Adjustment Amount.

"Measurement Date": Means (i) any day on which a sale, a purchase or a default of a Collateral Obligation occurs, (ii) any Determination Date, (iii) the date as of which the information in any Monthly Report is calculated, (iv) with five Business Days prior notice, any Business Day requested by either Rating Agency and (v) the last day of the Ramp-up Period.

"Memorandum and Articles": The Issuer's Memorandum and Articles of Association, as they may be amended, revised or restated from time to time.

"Merging Entity": As defined in Section 7.10 (Co-Issuers May Consolidate, etc., Only on Certain Terms).

"Minimum Diversity/Maximum Rating/Minimum Spread Matrix": The following chart is used to determine which of the tables and "row/column combinations" are applicable for

purposes of determining compliance with the Moody's Diversity Test, the Maximum Moody's Rating Factor Test and the Minimum Floating Spread Test, as set forth in <u>Section 7.18(f)</u> (Ramp-up Period; Purchase of Additional Collateral Obligations). The number obtained for the applicable table and "row/column combinations" shall be the "<u>Maximum Weighted Average Moody's Rating Factor</u>".

| Matrix | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Minimum Diversity Score** | | | | | | |
| **Minimum Weighted Average Spread** | **40** | **45** | **50** | **55** | **60** | **65** | **70** |
| 3.05% | 2265 | 2335 | 2395 | 2480 | 2575 | 2645 | 2705 |
| 3.15% | 2295 | 2355 | 2420 | 2510 | 2600 | 2680 | 2740 |
| 3.25% | 2325 | 2385 | 2450 | 2545 | 2630 | 2710 | 2770 |
| 3.35% | 2350 | 2420 | 2480 | 2570 | 2660 | 2740 | 2800 |
| 3.45% | 2380 | 2450 | 2510 | 2600 | 2690 | 2770 | 2830 |
| 3.55% | 2410 | 2475 | 2540 | 2630 | 2720 | 2800 | 2855 |
| 3.65% | 2440 | 2500 | 2565 | 2660 | 2755 | 2825 | 2885 |
| 3.75% | 2465 | 2530 | 2585 | 2690 | 2780 | 2855 | 2915 |
| 3.85% | 2490 | 2560 | 2600 | 2720 | 2805 | 2885 | 2945 |
| 3.95% | 2520 | 2590 | 2640 | 2750 | 2835 | 2915 | 2975 |
| 4.05% | 2550 | 2610 | 2680 | 2780 | 2865 | 2940 | 3005 |
| 4.15% | 2580 | 2635 | 2705 | 2800 | 2890 | 2970 | 3035 |
| 4.25% | 2605 | 2665 | 2735 | 2825 | 2920 | 2995 | 3060 |
| 4.35% | 2630 | 2700 | 2765 | 2855 | 2950 | 3025 | 3090 |
| 4.45% | 2655 | 2730 | 2795 | 2885 | 2975 | 3055 | 3115 |
| 4.55% | 2680 | 2750 | 2815 | 2910 | 3000 | 3080 | 3140 |
| 4.65% | 2700 | 2775 | 2840 | 2940 | 3025 | 3105 | 3170 |
| 4.75% | 2730 | 2800 | 2870 | 2965 | 3055 | 3130 | 3195 |
| 4.85% | 2760 | 2830 | 2900 | 2995 | 3080 | 3160 | 3220 |
| 4.95% | 2785 | 2860 | 2925 | 3020 | 3105 | 3185 | 3250 |
| 5.05% | 2815 | 2890 | 2945 | 3040 | 3130 | 3210 | 3275 |

"<u>Minimum Fixed Coupon</u>": 7.25%.

"<u>Minimum Fixed Coupon Test</u>": A test that is satisfied on any date of determination if the Weighted Average Fixed Coupon <u>plus</u> the Excess Weighted Average Floating Spread equals or exceeds the Minimum Fixed Coupon.

"<u>Minimum Floating Spread</u>": As of any date of determination, the greater of (i) the number set forth in the column entitled "<u>Minimum Weighted Average Spread</u>" in the applicable table within the definition of Minimum Diversity/Maximum Rating/Minimum Spread Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable) in accordance with <u>Section 7.18(f)</u> (Ramp-up Period; Purchase of Additional Collateral Obligations) and (ii) the number set forth in the column entitled "<u>Minimum Weighted Average Floating Spread</u>" in the applicable S&P Test Matrix, in each case, as applicable on such date of determination.

"<u>Minimum Floating Spread Test</u>": A test that is satisfied on any date of determination if (a) the sum of (i) the Weighted Average Floating Spread and (ii) the Excess Weighted Average Fixed Coupon equals or exceeds (b) the Minimum Floating Spread.

NEWYORK 8715474 (2K)

"Minimum Weighted Average Moody's Recovery Rate": Means 44.0%.

"Minimum Weighted Average Moody's Recovery Rate Test": The test that will be satisfied on any date of determination if the Weighted Average Moody's Recovery Rate equals or exceeds the Minimum Weighted Average Moody's Recovery Rate.

"Minimum Weighted Average S&P Recovery Rate Test": For each Class of Secured Notes then Outstanding, a test that will be satisfied as of any Measurement Date if the Weighted Average S&P Recovery Rate equals or exceeds the S&P Recovery Rate determined by reference to the S&P Test Matrix based upon the applicable row/column combination chosen by the Portfolio Manager.

"Money": The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report": The meaning specified in Section 10.7(a) (Accountings).

"Moody's": Moody's Investors Service, Inc., and its successors in interest.

"Moody's Collateral Value": As of any date of determination, with respect to any Defaulted Obligation or Deferring Security, the lesser of (i) the Moody's Recovery Amount of such Defaulted Obligation or Deferring Security as of such date and (ii) the Market Value of such Defaulted Obligation or Deferring Security as of such date.

"Moody's Counterparty Criteria": With respect to any Participation Interest proposed to be acquired by the Issuer or any Pre-funded Letter of Credit, criteria that will be met if immediately after giving effect to such acquisition, (x) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with Selling Institutions that have the same or a lower Moody's credit rating does not exceed the "Aggregate Percentage Limit" set forth below for such Moody's credit rating and (y) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with any single Selling Institution that has the same or lower Moody's credit rating does not exceed the "Individual Percentage Limit" set forth below for such Moody's credit rating:

| Moody's Credit Rating of Selling Institution (at or below) | Aggregate Percentage Limit | Individual Percentage Limit |
|---|---|---|
| Aaa | 20% | 20% |
| Aa1 | 20% | 10% |
| Aa2 | 20% | 10% |
| Aa3 | 15% | 10% |
| A1 | 10% | 5% |

| A2* and "P-1" <br><br> * and not on Watch for Possible Downgrade. | 5% | 5% |
|---|---|---|
| A2 but not "P-1"; Less than A2; or A2 and "P-1," but on Watch for Possible Downgrade | 0% | 0% |

provided, that the Moody's Counterparty Criteria will be deemed satisfied in connection with the Issuer's acquisition of a Participation Interest or a Pre-funded Letter of Credit from a Selling Institution that meets the criteria in the last row of the table above if the Moody's Rating Condition has been satisfied.

"Moody's Default Probability Rating"": With respect to any Collateral Obligation, the rating determined pursuant to Schedule 5 hereto.

"Moody's Derived Rating"": With respect to any Collateral Obligation whose Moody's Rating or Moody's Default Probability Rating cannot otherwise be determined pursuant to the definitions thereof, the rating determined for such Collateral Obligation as set forth in Schedule 5 hereto.

"Moody's Diversity Test"": A test that will be satisfied on any date of determination if the Diversity Score (rounded up to the nearest whole number) equals or exceeds the number set forth in the column entitled "Minimum Diversity Score" in the applicable Minimum Diversity/Maximum Rating/Minimum Spread Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (with notice to the Collateral Administrator) (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable) in accordance with Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations).

"Moody's Industry Classification"": The industry classifications set forth in Schedule 2 hereto, as such industry classifications shall be updated at the option of the Portfolio Manager (with notice to the Collateral Administrator) if Moody's publishes revised industry classifications.

"Moody's Non-Senior Secured Loan"": Any assignment of or Participation Interest in or other interest in a loan that is not a Moody's Senior Secured Loan.

"Moody's Outlook/Review Rules"": For any Collateral Obligation that is placed on negative outlook or on review for upgrade or downgrade (A) the rating otherwise determined in accordance with the definition of Moody's Default Probability Rating, Moody's Derived Rating or Moody's Rating for the purposes of calculating Moody's Weighted Average Rating Factor shall be adjusted as follows: (i) for any Collateral Obligation that is placed on negative outlook, such rating shall be adjusted downward one notch, (ii) for any Collateral Obligation that is placed on review for possible downgrade, such rating shall be adjusted downward two notches and (iii) for any Collateral Obligation that is placed on review for possible upgrade, such rating

NEWYORK 8715474 (2K)

shall be adjusted upward one notch and (B) the rating otherwise determined in accordance with the definition of Moody's Default Probability Rating, Moody's Derived Rating or Moody's Rating for all other purposes shall be adjusted as follows: (i) for any Collateral Obligation that is placed on review for possible downgrade, such rating shall be adjusted downward one notch and (ii) for any Collateral Obligation that is placed on review for possible upgrade, such rating shall be adjusted upward one notch.

"<u>Moody's Rating</u>": With respect to any Collateral Obligation, the rating determined pursuant to <u>Schedule 5</u> hereto.

"<u>Moody's Rating Condition</u>": With respect to any action taken or to be taken by or on behalf of the Issuer, a condition that is satisfied if Moody's has confirmed in writing (which confirmation may be in the form of a press release) to the Issuer, the Trustee and/or the Portfolio Manager that no immediate withdrawal or reduction with respect to its then-current rating by Moody's of the Class X Notes, the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes will occur as a result of such action; *provided, that* the Moody's Rating Condition will (x) be satisfied if any Class of Secured Notes that receives a solicited rating requested by the Issuer from Moody's are not Outstanding or rated by Moody's or (y) not be required if Moody's makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee that (i) it believes satisfaction of the Moody's Rating Condition is not required with respect to the applicable action or (ii) its practice is not to give such confirmations.

"<u>Moody's Rating Factor</u>": For each Collateral Obligation, the "<u>Moody's Rating Factor</u>" is the number set forth in the table below opposite the Moody's Default Probability Rating of such Collateral Obligation.

| Moody's Default Probability Rating | Moody's Rating Factor | Moody's Default Probability Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

For purposes of the Maximum Moody's Rating Factor Test, any Collateral Obligation issued or guaranteed by the United States government or any agency or instrumentality thereof is assigned a Moody's Rating Factor set forth opposite the then-current rating of full faith and credit obligations of the federal government of the United States.

"<u>Moody's Recovery Amount</u>": With respect to any Collateral Obligation which is a Defaulted Obligation or a Deferring Security, the amount equal to the product of (i) the

applicable Moody's Recovery Rate and (ii) the principal balance of such Defaulted Obligation or Deferring Security.

"<u>Moody's Recovery Rate</u>": With respect to any loan or Bond, as of any date of determination, will be the recovery rate determined in accordance with the following, in the following order of priority:

(a) if the loan or Bond has been specifically assigned a recovery rate by Moody's (for example, in connection with the assignment by Moody's of an estimated rating), such recovery rate;

(b) if the preceding clause does not apply to the loan or Bond (other than a DIP Collateral Obligation), as the case may be, and the loan is a Moody's Senior Secured Loan or a Moody's Non-Senior Secured Loan or, in the case of a Bond, the rate determined pursuant to the table below based on the number of rating subcategories difference between the loan's or Bond's Moody's Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Ratings Subcategories Difference Between the Moody's Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non-Senior Secured Loans | Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 35.0% | 35.0% |
| +1 | 50.0% | 30.0% | 30.0% |
| 0 | 45.0% | 25.0% | 25.0% |
| -1 | 40.0% | 10.0% | 10.0% |
| -2 | 30.0% | 5.0% | 5.0% |
| -3 or less | 20.0% | 0.0% | 0.0% |

(c) if the loan is a DIP Collateral Obligation, 50%.

"<u>Moody's Senior Secured Loan</u>": The meaning specified in <u>Schedule 5</u>.

"<u>Moody's Weighted Average Fixed Coupon</u>": As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), equal to: (i) the aggregate sum, in respect of each fixed rate Collateral Obligation (excluding Deferring Securities), of an amount equal to the product of (a) the interest coupon of such Collateral Obligation <u>multiplied by</u> (b) the Principal Balance of such Collateral Obligation, <u>divided by</u> (ii) the Aggregate Principal Balance of all such fixed rate Collateral Obligations.

"<u>Moody's Weighted Average Floating Spread</u>": As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), obtained by

calculating the sum of: (w) in the case of each floating rate Collateral Obligation (excluding Deferring Securities, Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations), the aggregate interest on such Collateral Obligation over LIBOR <u>multiplied by</u> the outstanding Principal Balance of such Collateral Obligation as of such date, (x) in the case of each Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, (i) the commitment fee for such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation <u>multiplied by</u> the undrawn commitments of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation and (ii) the aggregate interest on such Collateral Obligation over LIBOR <u>multiplied by</u> the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation (<u>provided</u> that letter of credit fees shall be excluded for all purposes), and (y) the Aggregate Excess Spread; and <u>dividing</u> such sum by the lesser of (i) the Target Initial Par Amount <u>minus</u> the Aggregate Principal Balance of all fixed rate Collateral Obligations as of such date of determination and (ii) the Aggregate Principal Balance of all such floating rate Collateral Obligations as of such date of determination. For purposes of the foregoing, (1) in the case of each floating rate Collateral Obligation that bears interest at a spread over an index other than a London interbank offered rate based index, the interest over LIBOR for such Collateral Obligation shall be equal to the excess of the sum of such spread and such index (or, in the case of a Pre-funded Letter of Credit, the applicable rate of interest on the deposited amount) over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date (which spread or excess may be expressed as a negative number), (2) LIBOR with respect to any floating rate Collateral Obligation that bears interest based on a spread over LIBOR shall be calculated in the same manner as it is calculated for payments on such Collateral Obligation, (3) the interest over the applicable index in respect of a floating rate Step-up Obligation shall be deemed to be its current interest spread over such index and the interest over the applicable index in respect of a floating rate Step-down Obligation shall be deemed to be the lowest possible interest spread over such index under the Underlying Instruments relating to such Step-down Obligation and (4) with respect to any LIBOR Floor Obligation, the interest over LIBOR for such Collateral Obligation shall be equal to the sum of (a) the applicable spread over LIBOR and (b) the excess, if any, of the specified "floor" rate relating to such Collateral Obligation over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date.

"<u>Non-Call Period</u>": The period from the Closing Date to but excluding the Payment Date in April 2015.

"<u>Non-Compliant FFI</u>": A Foreign Financial Institution that holds a debt or equity interest in the Issuer and that may be subject to U.S. federal income tax, including withholding tax, under FATCA as a result of not entering into an IRS Agreement.

"<u>Non-Emerging Market Obligor</u>": An Obligor that is Domiciled either in (x) the United States or (y) any country that has a country ceiling for foreign currency bonds of at least "<u>Aa2</u>" by Moody's and a foreign currency issuer credit rating of at least "<u>AA</u>" by S&P.

"<u>Non-Permitted ERISA Holder</u>": As defined in <u>Section 2.12(d)</u> (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations).

NEWYORK 8715474 (2K)

"Non-Permitted Holder":  As defined in Section 2.12(b) (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations).

"Non-Quarterly Assets":  Collateral Obligations (other than Deferrable Securities) that pay interest less frequently than quarterly, but no less frequently than annually.

"Note Interest Amount":  With respect to any specified Class of Secured Notes and any Payment Date, the amount of interest for the next Interest Accrual Period payable in respect of each U.S. $100,000 principal amount of such Class of Secured Notes.

"Note Interest Rate":  With respect to any specified Class of Secured Notes, the per annum interest rate payable on the Secured Notes of such Class with respect to each Interest Accrual Period equal to LIBOR for such Interest Accrual Period plus the spread specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations) with respect to such Notes. The Combination Notes will bear interest at the Note Interest Rates of the Underlying Classes.

"Note Payment Sequence":  The application, in accordance with the Priority of Payments, of Interest Proceeds or Principal Proceeds, as applicable, in the following order:

(i)     to the payment, *pro rata* based upon amounts due, of (1) principal of the Class X Notes, (2) principal of the Class A-1 Notes and (3) subject to Section 11.2 (Payments on the Class A-2 Notes and the Combination Notes), principal of the Class A-2 Notes until each is paid in full;

(ii)     [RESERVED];

(iii)     to the payment of principal of the Class B Notes until the Class B Notes have been paid in full;

(iv)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class C Notes until such amounts have been paid in full;

(v)     to the payment of principal of the Class C Notes until the Class C Notes have been paid in full;

(vi)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class D Notes until such amounts have been paid in full;

(vii)     to the payment of principal of the Class D Notes until the Class D Notes have been paid in full;

(viii)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class E Notes until such amounts have been paid in full;

(ix)     to the payment of principal of the Class E Notes until the Class E Notes have been paid in full;

(x)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class F Notes until such amounts have been paid in full; and

(xi)     to the payment of principal of the Class F Notes until the Class F Notes have been paid in full.

"Noteholder":  With respect to any Note, the Person whose name appears on the Register as the registered holder of such Note.

"Noteholder Reporting Obligations":  The meaning specified in Section 2.13(c) (Tax Purposes).

"Notes":  Collectively, the Secured Notes and the Subordinated Notes authorized by, and authenticated and delivered under, this Indenture (as specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations)) or any supplemental indenture (and including any Additional Subordinated Notes issued hereunder pursuant to Section 2.4 (Additional Notes)).

"Obligor":  The issuer of a Bond or the obligor or guarantor under a loan, as the case may be.

"Offer":  As defined in Section 10.8(c) (Release of Securities).

"Offered Securities":  The Notes.

"Offering":  The offering of the Offered Securities pursuant to the Offering Circular.

"Offering Circular":  The offering circular, dated March 12, 2013 relating to the Offered Securities, including the supplements thereto.

"Officer":  With respect to the Issuer, the Co-Issuer and any corporation, any director, the Chairman of the Board of Directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity or any Person authorized by such entity; with respect to any partnership, any general partner thereof or any Person authorized by such entity; with respect to a limited liability company, any member thereof or any Person authorized by such entity; and with respect to the Trustee, any Bank Officer.

"offshore transaction":  The meaning specified in Regulation S.

"Opinion of Counsel":  A written opinion addressed to the Trustee and any Rating Agency requesting such opinion, in form and substance reasonably satisfactory to the Trustee and such Rating Agency, of a nationally recognized law firm (or, in the case of an opinion relating to the laws of the Cayman Islands, an attorney at law admitted to practice before the highest court of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer or the Co-Issuer, as the case may be, and which firm or attorney, as the case may be, shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on

opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to the Trustee and any Rating Agency requesting such opinion or shall state that the Trustee and such Rating Agency shall be entitled to rely thereon.

"Optional Redemption": A redemption of the Notes in accordance with Section 9.2 (Optional Redemption and Refinancing).

"Outstanding": With respect to the Notes of any specified Class, as of any date of determination, all of the Notes or all of the Notes of such Class, as the case may be, theretofore authenticated and delivered under this Indenture, except:

(i) Notes theretofore canceled by the Registrar or delivered to the Registrar for cancellation in accordance with Section 2.10 (Cancellation);

(ii) Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes pursuant to Section 4.1(a)(ii) (Satisfaction and Discharge of Indenture); provided, that if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii) Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a "protected purchaser" (within the meaning of Section 8-303 of the UCC); and

(iv) Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note);

provided, that in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (I) Notes owned by the Issuer, the Co-Issuer or any other obligor upon the Notes shall be disregarded and deemed not to be Outstanding and (only in the case of a vote to remove or replace the Portfolio Manager and not, for the avoidance of doubt, in the case of a vote to propose or approve a successor Portfolio Manager), Notes owned by the Portfolio Manager, any Affiliate of the Portfolio Manager or any accounts or funds managed by the Portfolio Manager or its Affiliates, shall be disregarded and deemed not to be Outstanding (it being understood that Notes owned by a fund or an account managed by the Portfolio Manager or its Affiliates will not be disregarded and will be deemed to be Outstanding if the voting rights with respect to such Notes are exercised by the fund or account or client or beneficiary of such fund or account and not by the Portfolio Manager or its Affiliate), except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded and (II) Notes so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the

satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, the Co-Issuer, any other obligor upon the Notes, the Portfolio Manager or any Affiliate of the Portfolio Manager.

"Overcollateralization Ratio":  With respect to any specified Class or Classes of Secured Notes (excluding the Class X Notes) as of any Measurement Date, an amount, expressed as a percentage, equal to:  (i) the Adjusted Collateral Principal Amount divided by (ii) the Aggregate Outstanding Amount of the Secured Notes of such Class or Classes, and each Priority Class of Secured Notes (excluding the Class X Notes) and each Pari Passu Class of Secured Notes (other than the Class X Notes) (including all applicable Deferred Interest), in each case, if applicable.

"Overcollateralization Ratio Test":  A test that is satisfied with respect to any Class or Classes of Secured Notes as of any date of determination at, or subsequent to, the Effective Date, if (i) the Overcollateralization Ratio for such Class or Classes is at least equal to the applicable Required Coverage Ratio for such Class or Classes or (ii) such Class or Classes of Secured Notes are no longer Outstanding. For the avoidance of doubt, the Class X Notes shall not be included for the purposes of calculating any Overcollateralization Ratio Test.

"Pari Passu Class":  With respect to each Class of Notes, each Class of Notes that ranks pari passu with such Class, as indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Partial Deferrable Security":  Any Collateral Obligation with respect to which under the related Underlying Instruments (i) a portion of the interest due thereon is required to be paid in Cash on each payment date therefor and is not permitted to be deferred or capitalized (which portion will at least be equal to (A) in the case of floating rate assets, (x) LIBOR plus (y) 0.50% and (B) in the case of fixed rate assets, 4.00%) and (ii) the issuer thereof or obligor thereon may defer or capitalize the remaining portion of the interest due thereon.  Any component of a Partial Deferrable Security that is paid "in kind" shall not be included for purposes of calculations related to the Minimum Floating Spread Test, the Weighted Average Fixed Coupon or the Weighted Average Floating Spread.

"Participation Interest":  A participation interest in a loan that at the time of acquisition is represented by a contractual obligation of a Selling Institution that has at the time of acquisition (i) a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P or (ii) a long-term debt rating of at least "A+" by S&P. Such Selling Institution must directly hold or own the relevant portion of the loan underlying such participation interest, and the Issuer may not acquire a participation interest in a participation.

"Paying Agent":  Any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.2 (Maintenance of Office or Agency).

"Payment Account":  The non-interest bearing segregated payment account established pursuant to Section 10.3(a) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

NEWYORK 8715474 (2K)

"Payment Date":  The 18th day of January, April, July and October of each year, commencing on July 18, 2013 (or if such day is not a Business Day, the next succeeding Business Day).

"PBGC":  The United States Pension Benefit Guaranty Corporation.

"Permissible Ratio":  The ratio set forth under the heading "Permissible Ratio" in the Combination Notes Table; provided that, a Holder may round any of the fractional percentages set forth in this definition either up or down to the extent necessary to cause an Exchange to comply with the $1 integral multiple requirement.

"Permitted Offer":  An offer (i) pursuant to the terms of which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange for consideration consisting solely of Cash, other Eligible Investments and/or other Collateral Obligations in an amount equal to or greater than the full face amount of such debt obligation plus any accrued and unpaid interest and (ii) as to which the Portfolio Manager has determined in its judgment that the offeror has sufficient access to financing to consummate the offer.

"Person":  An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"Petition Expense Amount":  An aggregate sum (until the Notes are paid in full or until this Indenture is otherwise terminated, in which case it will equal zero) of $1,000,000.

"Petition Expenses":  The costs and expenses (including, without limitation, fees and expenses of counsel to the Issuer) incurred by the Issuer in connection with its obligations described in Section 7.21 (Objection to Bankruptcy Proceeding); provided, that such amounts will be payable in accordance with the Priority of Payments as Administrative Expenses, applied first as Petition Expense Amount, and then subject to the Administrative Expense Cap as set forth in the Priority of Payments.  Such Petition Expenses may only be paid to the extent such payment would not directly result in the failure to pay any principal or interest due on the Class X Notes, the Class A Notes, the Class B Notes or the Class C Notes.

"Placement Agency Agreement":  The agreement dated as of March 18, 2013 by and among the Co-Issuers and the Placement Agents relating to the initial placement of the Notes.

"Placement Agents":  GreensLedge Capital Markets LLC and Cantor Fitzgerald & Co. in their capacity as a placement agent under the Placement Agency Agreement.

"Plan":  An employee benefit plan (as defined in Section 3(3) of ERISA that is subject to Title I of ERISA or a plan as defined in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code.

NEWYORK 8715474 (2K)

"Pledged Obligations":  As of any date of determination, the Collateral Obligations, the Eligible Investments and any Equity Security which forms part of the Assets that have been Granted to the Trustee.

"Portfolio Management Agreement":  The Portfolio Management Agreement, dated as of the Closing Date, between the Issuer and the Portfolio Manager relating to the Notes and the Assets, as amended from time to time, in accordance with the terms hereof and thereof.

"Portfolio Manager":  Acis Capital Management, L.P., a Delaware limited partnership, until a successor Person shall have become the Portfolio Manager pursuant to the provisions of the Portfolio Management Agreement, and thereafter "Portfolio Manager" shall mean such successor Person.

"Post-Reinvestment Period Amendment Proceeds": As defined in Section 12.4 (Post-Reinvestment Period Amendment Proceeds).

"Pre-funded Letter of Credit":  Any letter of credit facility that requires a lender party thereto to pre-fund in full its obligations thereunder, provided that any such lender (a) shall have no further funding obligation thereunder and (b) shall have a right to be reimbursed or repaid by the borrower its pro rata share of any draws on a letter of credit issued thereunder; provided, that the account into which the pre-funded amounts in respect of a letter of credit facility shall be deposited shall be a Pre-funded Letter of Credit Eligible Account at the time of such deposit.

"Pre-funded Letter of Credit Eligible Account":  Either (a) a segregated trust account maintained with the corporate trust department of a federal depository institution or state-chartered depository institution subject to regulation regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations Section 9.10(b), which, in either case, has corporate trust power, acting in its fiduciary capacity, which depository institution (x) has a long term senior unsecured debt rating of at least "Baa3" by Moody's and (y) to the extent any related trust account is holding cash, satisfies the ratings requirements specified in clause (b) or (b) an account maintained with an institution or trust company with (x) a long-term debt rating by S&P is at least "A" and whose short-term debt rating by S&P is at least "A-1" (or whose long-term debt rating is at least "A+" by S&P) and (y) a long-term senior unsecured debt rating of at least "A2" or a short-term credit rating of "P-1" by Moody's. If, in the case of clause (a) or (b), such institution's long-term debt rating or short-term credit rating falls below any such required rating, the assets held in the Pre-funded Letter of Credit Eligible Account shall be transferred within (x) 30 calendar days in the case of a failure to meet the required Moody's rating and (y) 60 calendar days in the case of a failure to meet the required S&P rating, in each case, to another institution that satisfies such rating requirements.

"Principal Balance":  Subject to Section 1.2 (Assumptions as to Pledged Obligations), with respect to (a) any Pledged Obligation other than a Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Pledged Obligation (excluding any capitalized interest) and (b) any Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Revolving Collateral Obligation

or Delayed Drawdown Collateral Obligation, plus (except as expressly set forth in this Indenture) any undrawn commitments that have not been irrevocably reduced with respect to such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation; provided, that for all purposes the Principal Balance of any Equity Security or Interest Only Security shall be deemed to be zero.

"Principal Collection Subaccount":  The meaning specified in Section 10.2(a) (Collection Account).

"Principal Financed Accrued Interest":  With respect to any Collateral Obligation purchased during and after the Ramp-up Period, an amount equal to the amount of Principal Proceeds, if any, applied towards the purchase of accrued interest on such Collateral Obligation.

"Principal Proceeds":  With respect to any Collection Period or Determination Date, all amounts received by the Issuer during the related Collection Period that do not constitute Interest Proceeds. For the avoidance of doubt, the proceeds from the issuance of Notes deposited in the Ramp-up Account and all Turbo Payment Amounts will be considered Principal Proceeds.

"Priority Class":  With respect to any specified Class of Notes, each Class of Notes that ranks senior to such Class, as indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Priority Hedge Termination Event":  The occurrence of (i) the Issuer's failure to make required payments or deliveries pursuant to a Hedge Agreement, (ii) certain events of bankruptcy, dissolution or insolvency with respect to the Issuer, (iii) the merger of the Issuer with or into another entity where such surviving entity fails to assume all obligations of the Issuer, (iv) a change in law after the Closing Date which makes it unlawful for the Issuer to perform its obligations under a Hedge Agreement, (v) an "Additional Termination Event" (as defined in such Hedge Agreement) with respect to the Issuer, (vi) the liquidation of the Assets due to an Event of Default under this Indenture or (vii) any termination described in Section 15.2(b) (Assignment of Hedge Agreement) hereof.

"Priority of Payments":  The meaning specified in Section 11.1(a) (Disbursements of Monies from Payment Account).

"Proceeding":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Proposed Portfolio":  The portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds resulting from the proposed purchase, sale, maturity or other disposition of a Collateral Obligation or a proposed reinvestment in an additional Collateral Obligation, as the case may be.

"QIB/QP":  Any Person that, at the time of its acquisition, purported acquisition or proposed acquisition of Notes is both a Qualified Institutional Buyer and a Qualified Purchaser.

NEWYORK 8715474 (2K)

"Qualified Institutional Buyer": The meaning specified in Rule 144A under the Securities Act.

"Qualified Purchaser": The meaning specified in Section 2(a)(51) of the Investment Company Act and Rule 2a51-2 under the Investment Company Act.

"Quarterly Report": As defined in Section 10.7(d) (Accountings).

"Ramp-up Account": The non-interest bearing segregated account established pursuant to Section 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Ramp-up Period": The period commencing on the Closing Date and ending upon the earlier to occur of (a) July 18, 2013 and (b) the date selected by the Portfolio Manager and upon which the Issuer has satisfied the Target Initial Par Condition.

"Rating": The Moody's Rating and/or S&P Rating, as applicable.

"Rating Agency": Each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to debt obligations, any other nationally recognized investment rating agency selected by the Issuer (or the Portfolio Manager on behalf of the Issuer) and reasonably satisfactory to at least a Majority of each Class rated by Moody's and/or S&P, as applicable; provided, that in either case, each of Moody's and S&P shall be a Rating Agency for purposes of this Indenture for only so long as an Outstanding Class of Secured Notes is rated by it. In the event that at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Moody's published ratings for the type of obligation in respect of which such alternative rating agency is used; provided, that the S&P Rating Condition shall be satisfied in order to refer to equivalent categories of any such alternative rating agency whose published ratings for the type of obligation are required. In the event that at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and S&P published ratings for the type of obligation in respect of which such alternative rating agency is used.

"Rating Factor Adjustment Amount": As of any date of determination, an amount equal to the product of (i) the Recovery Rate Excess Amount and (ii) 60.

"Recalcitrant Holder": A beneficial owner of Notes that fails to comply with the Noteholder Reporting Obligations and is thereafter designated by the Issuer or the Portfolio Manager on behalf of the Issuer (in either case in its sole discretion) as a Recalcitrant Holder.

"Record Date": As to any Payment Date, (x) the 15th day (whether or not a Business Day) in the case of Certificated Notes and (y) two Business Days in the case of Global Notes, in each case, prior to such Payment Date.

"Recovery Rate Excess Amount": As of any date of determination, an amount equal to the product of (I) the greater of (a) zero and (b) (i) the Weighted Average Moody's Recovery Rate as of such date of determination minus (ii) 44% and (II) 100; provided, that if as of such date of determination the Weighted Average Moody's Recovery Rate is (x) greater than or equal to 60%, then solely for the purpose of calculating the Recovery Rate Excess Amount, the Weighted Average Moody's Recovery Rate shall be deemed to equal 60% or (y) less than the Minimum Weighted Average Moody's Recovery Rate, then solely for the purpose of calculating the Recovery Rate Excess Amount, the Weighted Average Moody's Recovery Rate shall be deemed to equal the Minimum Weighted Average Moody's Recovery Rate.

"Redemption Date": The Business Day specified for the redemption of Notes pursuant to Sections 9.2 (Optional Redemption), 9.3 (Redemption Procedures), 9.4 (Notes Payable on Redemption Date) or 9.6 (Clean-up Call Redemption).

"Redemption Price": When used with respect to (i) any Class of Secured Notes, an amount equal to (a) 100% of the Aggregate Outstanding Amount of the Secured Notes to be redeemed *plus* (b) accrued and unpaid interest thereon (including, if applicable, interest on any accrued and unpaid Deferred Interest with respect to such Deferred Interest Notes) to the Redemption Date, provided that, if the date of such redemption is not on a Payment Date, any Secured Notes being redeemed shall receive the Break Funding Amount, if any and (ii) any Subordinated Note, its proportional share of the amount of the proceeds of the Assets (including proceeds created when the lien of this Indenture is released) remaining after giving effect to the redemption of the Secured Notes and payment in full of all expenses of the Co-Issuers; provided further, the Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes to be redeemed may elect to receive less than 100% of the Redemption Price that would otherwise be payable to the Holders of such Class of Secured Notes. With respect to any Combination Note, "Redemption Price" means an amount equal to its allocation of the Redemption Price for each Underlying Class.

"Reference Banks": The meaning specified in Exhibit G hereto.

"Refinancing": The meaning specified in Section 9.2 (Optional Redemption and Refinancing).

"Refinancing Proceeds": The meaning specified in Section 9.2 (Optional Redemption and Refinancing).

"Register" and "Registrar": The respective meanings specified in Section 2.6(a) (Registration, Registration of Transfer and Exchange).

"Registered Investment Adviser": An investment adviser registered under the Investment Advisers Act of 1940, as amended.

"Regulation S": Regulation S, as amended, under the Securities Act.

"Regulation S Global Note": The meaning specified in Section 2.2(b)(i) (Forms of Notes).

"Regulation S Global Secured Note":  A Secured Note issued in the form of a Regulation S Global Note.

"Regulation S Global Subordinated Note":  A Subordinated Note issued in the form of a Regulation S Global Note.

"Reinvestment Agreement":  A guaranteed reinvestment agreement from a bank, insurance company or other corporation or entity; provided, however, that such agreement provides that it is terminable by the purchaser, without penalty, in the event that the rating assigned to such agreement by either Rating Agency is at any time lower than such agreement's Eligible Investment Required Rating.

"Reinvestment Period":  The period from and including the Closing Date to and including the earliest of (i) the Payment Date in April 2017 or (ii) the date of the acceleration of the Maturity of any Class of Secured Notes pursuant to Section 5.2 (Acceleration of Maturity; Rescission and Annulment).

"Related Obligation":  An obligation issued by the Portfolio Manager, any of its Affiliates that are investment funds or any other Person that is an investment fund whose investments are primarily managed by the Portfolio Manager or any such Affiliate.

"Required Coverage Ratio":  With respect to a specified Class or Classes of Secured Notes and the related Interest Coverage Test or Overcollateralization Ratio Test as the case may be, as of any date of determination (with respect to the Interest Coverage Test, on and after the Determination Date with respect to the third Payment Date), the applicable percentage indicated below opposite such specified Class:

| Class | Overcollateralization Ratio Test | Interest Coverage Ratio Test |
|-------|----------------------------------|------------------------------|
| A/B   | 122.5%                           | 120.0%                       |
| C     | 112.3%                           | 115.0%                       |
| D     | 108.0%                           | 110.0%                       |
| E     | 105.1%                           | 105.0%                       |

"Responsible Officer":  Any officer, authorized person or employee of the Portfolio Manager set forth on the list provided by the Portfolio Manager to the Issuer and the Trustee, which list shall include any portfolio manager having day-to-day responsibility for the performance of the Portfolio Manager under the Portfolio Management Agreement, as such list may be amended from time to time.

"Restricted Trading Period":  means each day during any period in which either (i) the Moody's rating of the Class X Notes, the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes are one or more sub-categories below its Initial Rating thereof or (ii) the Moody's rating of the Class X Notes, the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes then Outstanding has been withdrawn and not reinstated; provided, that such period will not be a Restricted Trading Period (so long as the Moody's rating of the Class X Notes, the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes has not been further

downgraded, withdrawn or put on watch) upon the direction of the holders of at least a Majority of the Controlling Class.

"<u>Revolver Funding Account</u>": The non-interest bearing segregated account established pursuant to <u>Section 10.4</u> (The Revolver Funding Account).

"<u>Revolving Collateral Obligation</u>": Any Collateral Obligation (other than a Delayed Drawdown Collateral Obligation) that is a loan (including, without limitation, revolving loans, including funded and unfunded portions of revolving credit lines and letter of credit facilities, unfunded commitments under specific facilities and other similar loans and investments) that by its terms may require one or more future advances to be made to the borrower by the Issuer; <u>provided</u>, that any such Collateral Obligation will be a Revolving Collateral Obligation only until all commitments to make advances to the borrower expire or are terminated or irrevocably reduced to zero.

"<u>Rule 144A</u>": Rule 144A, as amended, under the Securities Act.

"<u>Rule 144A Global Note</u>": The meaning specified in <u>Section 2.2(b)(ii)</u> (Forms of Notes).

"<u>Rule 144A Information</u>": The meaning specified in <u>Section 7.15</u> (Reporting).

"<u>S&P</u>": Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business and any successor or successors thereto.

"<u>S&P CDO Monitor</u>": The dynamic, analytical computer model available at www.structuredfinanceinterface.com with written instructions and assumptions to be applied when running such computer model, for the purpose of estimating the default risk of the Collateral Obligations, as the same may be modified by S&P from time to time. S&P will provide nine separate "<u>Break-even Rate Cases</u>" as described in the definition of the term "<u>S&P Test Matrix</u>" at the end of the Ramp-up Period. The Portfolio Manager may request additional input files for the S&P CDO Monitor with respect to additional Minimum Weighted Average Floating Spreads and "<u>Break-even Rate Cases</u>" not included in the definition of "<u>S&P Test Matrix</u>." Following receipt, the Portfolio Manager shall furnish to the Collateral Administrator such additional input files for the S&P CDO Monitor.

"<u>S&P CDO Monitor Test</u>": A test that will be satisfied on any date of determination following receipt by the Portfolio Manager and the Collateral Administrator of the input files for the S&P CDO Monitor if, with respect to each Class of Secured Notes, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, as the case may be, either (x) the Class Default Differential with respect to such Class of Secured Notes is positive or (y) the Class Default Differential with respect to such Class of Secured Notes of the Proposed Portfolio is equal to or greater than the Class Default Differential with respect to such Class of Secured Notes of the Current Portfolio.

"<u>S&P Collateral Value</u>": With respect to any Defaulted Obligation or Deferring Security, the lesser of (i) the S&P Recovery Amount of such Defaulted Obligation or Deferring

NEWYORK 8715474 (2K)

Security as of the relevant Measurement Date and (ii) the Market Value of such Defaulted Obligation or Deferring Security as of the relevant Measurement Date.

"S&P Effective Date Rating Condition": A condition that is satisfied if, after the end of the Ramp-up Period, S&P has confirmed in writing to the Issuer (which confirmation may be in the form of an email to the Issuer or the Portfolio Manager or a press release), the Trustee and/or the Portfolio Manager its Initial Rating of each Class of Secured Notes; provided, that the S&P Effective Date Rating Condition will be deemed to be satisfied if S&P makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee in writing (including by means of email notification or a press release) that (i) it believes satisfaction of the S&P Effective Date Rating Condition is not required or (ii) its practice is not to give such confirmation.

"S&P Excel Default Model Input File": An electronic spreadsheet file in Microsoft Excel format to be provided to S&P by the Portfolio Manager or by the Collateral Administrator at the direction of the Portfolio Manager, which file shall include the balance of Cash and Eligible Investments in each Account and the following information (to the extent such information is available and is not confidential, unless the terms of such Collateral Obligation allow disclosure of such confidential information to S&P) with respect to each Collateral Obligation: (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP, LoanX ID and/or other applicable identification number associated with such Collateral Obligation, (c) the par value of such Collateral Obligation, (d) the type of issue (including, by way of example, whether such Collateral Obligation is a bond, loan, a Cov-Lite Loan or a First-Lien Last-Out Loan), using such abbreviations as may be selected by the Collateral Administrator, (e) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR) and, in the case of a LIBOR Floor Obligation, the specified "floor" rate per annum, (f) the coupon (in the case of a Collateral Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Obligation which bears interest at a floating rate), (g) the S&P Industry Classification Group for such Collateral Obligation, (h) the stated maturity date of such Collateral Obligation, (i) the S&P Rating of such Collateral Obligation or the issuer thereof, as applicable, (j) the priority category of such Collateral Obligation used to determine the S&P Recovery Rate, if available, (k) the balance in Cash and Eligible Investments for each Account of the Issuer, (l) such other information as the Portfolio Manager may determine to include in such file and (m) the settlement date (or, if not yet settled, the anticipated settlement date and purchase price).

"S&P Industry Classification": The S&P Industry Classifications set forth in Schedule 3 hereto, and such industry classifications shall be updated at the option of the Portfolio Manager if S&P publishes revised industry classifications.

"S&P Rating": The S&P Rating of any Collateral Obligation, as of any date of determination, will be determined as follows:

(i) (a) if there is an issuer credit rating of the issuer of such Collateral Obligation by S&P as published by S&P, or the guarantor which meets the applicable S&P criteria and unconditionally and irrevocably guarantees such Collateral Obligation then the S&P

Rating shall be such rating (regardless of whether there is a published rating by S&P on the Collateral Obligations of such issuer held by the Issuer); provided, that private ratings (that is, ratings provided at the request of the obligor) may be used for purposes of this definition if the related obligor has consented to the disclosure thereof and a copy of such consent has been provided to S&P) or (b) if there is no issuer credit rating of the issuer by S&P but (i) there is a senior secured rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category below such rating; (ii) if clause (i) above does not apply but there is a senior unsecured rating on any obligation or security of the issuer, the S&P Rating of such Collateral Obligation shall equal such rating; and (iii) if neither clause (i) or (ii) above applies but there is a subordinated rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category above such rating if such rating is higher than "BB+," and shall be two sub-categories above such rating if such rating is "BB+" or lower;

(ii)     if there is not a rating by S&P on the issuer or on an obligation of the issuer, then the S&P Rating may be determined pursuant to clauses (a) through (c) below:

(a)     if an obligation of the issuer is not a DIP Collateral Obligation and is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Rating set forth above except that the S&P Rating of such obligation will be (1) one sub-category below the S&P equivalent of the Moody's Rating if such Moody's Rating is "Baa3" or higher and (2) two sub-categories below the S&P equivalent of the Moody's Rating if such Moody's Rating is "Ba1" or lower;

(b)     the Issuer or the Portfolio Manager on behalf of the Issuer (or an affiliate of the Portfolio Manager at the direction of the Portfolio Manager) may apply to S&P at CreditEstimates@standardandpoors.com on or prior to the acquisition of a Collateral Obligation for a credit estimate which shall be its S&P Rating and all "information" reasonably available to the Portfolio Manager must be submitted within 30 days of such acquisition; provided, that for a period of up to 90 days from the date of such acquisition, pending receipt from S&P of such estimate, such Collateral Obligation shall be deemed to have the S&P Rating that the Portfolio Manager reasonably believes (as certified in writing by the Portfolio Manager to the Trustee and the Collateral Administrator) will be the S&P credit estimate; provided, further, that, if no credit estimate is received by the Issuer or the Portfolio Manager within 90 days of such acquisition, the Portfolio Manager shall notify S&P and shall make a request for an extension to such credit assessment process.  As used in this clause (ii)(b), "information" means S&P's "Credit Estimate Information Requirements" dated April 2011 and any other information S&P reasonably requests in order to produce a credit estimate for a particular asset.  Upon the receipt of written consent from S&P to such extension, such Collateral Obligation shall continue to be deemed to have the S&P Rating that the Portfolio Manager reasonably believes (as certified in writing by the Portfolio Manager to the Trustee and the Collateral Administrator) will be the S&P credit estimate; provided, further, that if the Portfolio Manager fails to request an extension or if written consent from S&P to extend the credit assessment process past such 90-day period is not obtained, the S&P Rating of such Collateral Obligation shall be "CCC-"; provided, further, that such credit estimate shall

expire 12 months after the acquisition of such Collateral Obligation, following which such Collateral Obligation shall have an S&P Rating of "CCC-" unless, during such 12-month period, the Issuer applies for renewal thereof in accordance with Section 7.14(b) (Annual Rating Review), in which case such credit estimate shall continue to be the S&P Rating of such Collateral Obligation until S&P has confirmed or revised such credit estimate, upon which such confirmed or revised credit estimate shall be the S&P Rating of such Collateral Obligation; provided further that such confirmed or revised credit estimate shall expire on the next succeeding 12-month anniversary of the date of the acquisition of such Collateral Obligation and (when application is made for annual renewal in accordance with Section 7.14(b) (Annual Rating Review)) on each 12-month anniversary thereafter; or

(c)      with respect to a Collateral Obligation that is not a Defaulted Obligation, the S&P Rating of such Collateral Obligation will at the election of the Issuer (at the direction of the Portfolio Manager) be "CCC-"; provided, that, the Issuer, or the Portfolio Manager on behalf of the Issuer, shall still provide the "information" with respect to such Collateral Obligation annually; provided, further, that the Issuer (at the direction of the Portfolio Manager) may only elect a "CCC-" rating if (w) the issuer of such Collateral Obligation and/or its affiliates are not subject to bankruptcy proceedings, (x) the issuer of such Collateral Obligation has not defaulted on any material obligation within the previous two years, (y) the issuer of such Collateral Obligation is current on interest and principal due on all material obligations and the Portfolio Manager believes it will remain current and (z) such Collateral Obligation is being paid current interest and principal and the Portfolio Manager believes that such payments will remain current; or

(iii)      with respect to a DIP Collateral Obligation that has no issue rating by S&P or a Current Pay Obligation that is rated "CC," "D" or "SD" by S&P, the S&P Rating of such DIP Collateral Obligation or Current Pay Obligation, as applicable, will be, at the election of the Issuer (at the direction of the Portfolio Manager), "CCC-" or the S&P Rating determined pursuant to clause (ii)(b) above;

provided, that for purposes of the determination of the S&P Rating, (x) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch positive" by S&P, such rating will be treated as being one sub-category above such assigned rating and (y) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch negative" by S&P, such rating will be treated as being one sub-category below such assigned rating.

"S&P Rating Condition":  With respect to any action taken or to be taken by or on behalf of the Issuer, a condition that is satisfied if S&P has confirmed in writing to the Issuer (which confirmation may be in the form of a press release), the Trustee and/or the Portfolio Manager that no immediate withdrawal or reduction with respect to its then-current rating by S&P of any Class of Secured Notes will occur as a result of such action; provided, that the S&P Rating Condition will be deemed to be satisfied if (x) no Class of Secured Notes Outstanding is rated by S&P or (y) if S&P makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee that (i) it believes satisfaction of the S&P Rating Condition is not required with respect to the applicable action or (ii) its practice is not to give such confirmations.

NEWYORK 8715474 (2K)

"<u>S&P Recovery Amount</u>":  With respect to any Collateral Obligation which is a Defaulted Obligation or a Deferring Security, the amount equal to the product of (i) the recovery rate set forth in the column corresponding to the most senior Class of Notes then Outstanding of the applicable table for the relevant Collateral Obligation category under the definition of "<u>Weighted Average S&P Recovery Rate</u>" and (ii) the principal balance of such Defaulted Obligation or Deferring Security.

"<u>S&P Recovery Rate</u>":  With respect to any category of Collateral Obligation, the corresponding "<u>S&P Recovery Rate</u>" designated in accordance with the methodology specified in the definition of the term "<u>Weighted Average S&P Recovery Rate</u>."

"<u>S&P Selling Institution Percentage</u>":  With respect to any Participation Interest proposed to be entered into by the Issuer or any Pre-funded Letter of Credit, criteria that will be met if immediately after giving effect to such acquisition, (x) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with Selling Institutions that have the same or a lower S&P credit rating does not exceed the "<u>Aggregate Selling Institution Percentage</u>" set forth below for such S&P credit rating and (y) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with any single Selling Institution that have the same or a lower S&P credit rating does not exceed the "<u>Individual Selling Institution Percentage</u>" set forth below for such S&P credit rating:

| Long-Term Senior Unsecured Debt Rating of Selling Institution S&P | Individual Selling Institution Percentage | Aggregate Selling Institution Percentage |
|---|---|---|
| AAA | 20% | 20% |
| AA+ | 10% | 10% |
| AA | 10% | 10% |
| AA- | 10% | 10% |
| A+ | 5% | 5% |
| A* | 5% | 5% |
| Below A** | 0% | 0% |

---

\*        Applies only so long as the S&P short-term unsecured debt rating is "<u>A-1</u>."

\*\*        Also applies to institutions with an S&P long-term senior unsecured debt rating of "A" that do not also have an S&P short-term unsecured debt rating of at least "<u>A-1</u>."

"<u>S&P Test Matrix</u>":  On the Closing Date, the Portfolio Manager, on behalf of the Issuer, shall elect and notify the Collateral Administrator which Minimum Weighted Average S&P Recovery Rate, Minimum Weighted Average Floating Spread and which "<u>Break-even Rate Case</u>" shall apply initially.  Thereafter, the Portfolio Manager may elect to have a different case apply, <u>provided</u> that the Minimum Weighted Average S&P Recovery Rate, Minimum Weighted Average Floating Spread and a different "<u>Break-even Rate Case</u>" applicable to the case to which the Portfolio Manager wishes to change (with notice to the Collateral Administrator), are satisfied or, in the case of any tests that are not satisfied, will be closer to being satisfied.  In no event will the Issuer or the Portfolio Manager be obliged to elect to have a different Minimum

Weighted Average S&P Recovery Rate, Minimum Weighted Average Floating Spread or "Break-even Rate Case" apply. For the avoidance of doubt, (i) once a Minimum Weighted Average Floating Spread and "Break-even Rate Case" have been elected by the Portfolio Manager (with notice to the Collateral Administrator), such elections shall apply in all cases to each table comprising this S&P Test Matrix unless and until changed as specified above, (ii) each table comprising this S&P Test Matrix shall apply only for so long as such Class of Notes remains Outstanding and (iii) the S&P Weighted Average Floating Spread must be used in calculating whether or not the Minimum Floating Spread Test per the tables below is passing.

## Class A Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| | Minimum Weighted Average S&P Recovery Rate | | | | | | | | |
| 3.05% | 43.0% | 44.0% | 45.0% | 46.0% | 47.0% | 48.0% | 49.0% | 50.0% | 51.0% |
| 3.15% | 42.7% | 43.7% | 44.7% | 45.7% | 46.7% | 47.7% | 48.7% | 49.7% | 50.7% |
| 3.25% | 42.3% | 43.3% | 44.3% | 45.3% | 46.3% | 47.3% | 48.3% | 49.3% | 50.3% |
| 3.35% | 42.0% | 43.0% | 44.0% | 45.0% | 46.0% | 47.0% | 48.0% | 49.0% | 50.0% |
| 3.45% | 41.7% | 42.7% | 43.7% | 44.7% | 45.7% | 46.7% | 47.7% | 48.7% | 49.7% |
| 3.55% | 41.3% | 42.3% | 43.3% | 44.3% | 45.3% | 46.3% | 47.3% | 48.3% | 49.3% |
| 3.65% | 41.0% | 42.0% | 43.0% | 44.0% | 45.0% | 46.0% | 47.0% | 48.0% | 49.0% |
| 3.75% | 40.6% | 41.6% | 42.6% | 43.6% | 44.6% | 45.6% | 46.6% | 47.6% | 48.6% |
| 3.85% | 40.3% | 41.3% | 42.3% | 43.3% | 44.3% | 45.3% | 46.3% | 47.3% | 48.3% |
| 3.95% | 40.0% | 41.0% | 42.0% | 43.0% | 44.0% | 45.0% | 46.0% | 47.0% | 48.0% |
| 4.05% | 39.6% | 40.6% | 41.6% | 42.6% | 43.6% | 44.6% | 45.6% | 46.6% | 47.6% |
| 4.15% | 39.3% | 40.3% | 41.3% | 42.3% | 43.3% | 44.3% | 45.3% | 46.3% | 47.3% |
| 4.25% | 39.0% | 40.0% | 41.0% | 42.0% | 43.0% | 44.0% | 45.0% | 46.0% | 47.0% |
| 4.35% | 38.6% | 39.6% | 40.6% | 41.6% | 42.6% | 43.6% | 44.6% | 45.6% | 46.6% |
| 4.45% | 38.3% | 39.3% | 40.3% | 41.3% | 42.3% | 43.3% | 44.3% | 45.3% | 46.3% |
| 4.55% | 38.0% | 39.0% | 40.0% | 41.0% | 42.0% | 43.0% | 44.0% | 45.0% | 46.0% |
| 4.65% | 37.6% | 38.6% | 39.6% | 40.6% | 41.6% | 42.6% | 43.6% | 44.6% | 45.6% |
| 4.75% | 37.3% | 38.3% | 39.3% | 40.3% | 41.3% | 42.3% | 43.3% | 44.3% | 45.3% |
| 4.85% | 37.0% | 38.0% | 39.0% | 40.0% | 41.0% | 42.0% | 43.0% | 44.0% | 45.0% |
| 4.95% | 36.6% | 37.6% | 38.6% | 39.6% | 40.6% | 41.6% | 42.6% | 43.6% | 44.6% |
| 5.05% | 36.3% | 37.3% | 38.3% | 39.3% | 40.3% | 41.3% | 42.3% | 43.3% | 44.3% |

## Class B Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| | Minimum Weighted Average S&P Recovery Rate | | | | | | | | |
| 3.05% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% |
| 3.15% | 51.7% | 52.7% | 53.7% | 54.7% | 55.7% | 56.7% | 57.7% | 58.7% | 59.7% |
| 3.25% | 51.3% | 52.3% | 53.3% | 54.3% | 55.3% | 56.3% | 57.3% | 58.3% | 59.3% |
| 3.35% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% |
| 3.45% | 50.7% | 51.7% | 52.7% | 53.7% | 54.7% | 55.7% | 56.7% | 57.7% | 58.7% |
| 3.55% | 50.3% | 51.3% | 52.3% | 53.3% | 54.3% | 55.3% | 56.3% | 57.3% | 58.3% |
| 3.65% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% |
| 3.75% | 49.6% | 50.6% | 51.6% | 52.6% | 53.6% | 54.6% | 55.6% | 56.6% | 57.6% |

NEWYORK 8715474 (2K)

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | |
| 3.85% | 49.3% | 50.3% | 51.3% | 52.3% | 53.3% | 54.3% | 55.3% | 56.3% | 57.3% |
| 3.95% | 49.0% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% |
| 4.05% | 48.6% | 49.6% | 50.6% | 51.6% | 52.6% | 53.6% | 54.6% | 55.6% | 56.6% |
| 4.15% | 48.3% | 49.3% | 50.3% | 51.3% | 52.3% | 53.3% | 54.3% | 55.3% | 56.3% |
| 4.25% | 48.0% | 49.0% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% |
| 4.35% | 47.6% | 48.6% | 49.6% | 50.6% | 51.6% | 52.6% | 53.6% | 54.6% | 55.6% |
| 4.45% | 47.3% | 48.3% | 49.3% | 50.3% | 51.3% | 52.3% | 53.3% | 54.3% | 55.3% |
| 4.55% | 47.0% | 48.0% | 49.0% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% |
| 4.65% | 46.6% | 47.6% | 48.6% | 49.6% | 50.6% | 51.6% | 52.6% | 53.6% | 54.6% |
| 4.75% | 46.3% | 47.3% | 48.3% | 49.3% | 50.3% | 51.3% | 52.3% | 53.3% | 54.3% |
| 4.85% | 46.0% | 47.0% | 48.0% | 49.0% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% |
| 4.95% | 45.6% | 46.6% | 47.6% | 48.6% | 49.6% | 50.6% | 51.6% | 52.6% | 53.6% |
| 5.05% | 45.3% | 46.3% | 47.3% | 48.3% | 49.3% | 50.3% | 51.3% | 52.3% | 53.3% |

## Class C Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | |
| 3.05% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% | 64.0% | 65.0% | 66.0% | 67.0% |
| 3.15% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% | 64.5% | 65.5% | 66.5% |
| 3.25% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% | 64.0% | 65.0% | 66.0% |
| 3.35% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% | 64.0% | 65.5% |
| 3.45% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% | 64.0% | 65.0% |
| 3.55% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% | 64.5% |
| 3.65% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% | 64.0% |
| 3.75% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% |
| 3.85% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% |
| 3.95% | 54.5% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% |
| 4.05% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% |
| 4.15% | 53.5% | 54.5% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% |
| 4.25% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% |
| 4.35% | 52.5% | 53.5% | 54.5% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% |
| 4.45% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% |
| 4.55% | 51.5% | 52.5% | 53.5% | 54.5% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% |
| 4.65% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% |
| 4.75% | 50.5% | 51.5% | 52.5% | 53.5% | 54.5% | 55.5% | 56.5% | 57.5% | 58.5% |
| 4.85% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% |
| 4.95% | 49.5% | 50.5% | 51.5% | 52.5% | 53.5% | 54.5% | 55.5% | 56.5% | 57.5% |
| 5.05% | 49.0% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% |

## Class D Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | |
| 3.05% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% |

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| | Minimum Weighted Average S&P Recovery Rate | | | | | | | | |
| 3.15% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% |
| 3.25% | 64.5% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% |
| 3.35% | 64.0% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% |
| 3.45% | 63.5% | 64.5% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% |
| 3.55% | 63.0% | 64.0% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% |
| 3.65% | 62.5% | 63.5% | 64.5% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% |
| 3.75% | 62.0% | 63.0% | 64.0% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% |
| 3.85% | 61.5% | 62.5% | 63.5% | 64.5% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% |
| 3.95% | 61.0% | 62.0% | 63.0% | 64.0% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% |
| 4.05% | 60.4% | 61.4% | 62.4% | 63.4% | 64.4% | 65.4% | 66.4% | 67.4% | 68.4% |
| 4.15% | 59.9% | 60.9% | 61.9% | 62.9% | 63.9% | 64.9% | 65.9% | 66.9% | 67.9% |
| 4.25% | 59.3% | 60.3% | 61.3% | 62.3% | 63.3% | 64.3% | 65.3% | 66.3% | 67.3% |
| 4.35% | 58.8% | 59.8% | 60.8% | 61.8% | 62.8% | 63.8% | 64.8% | 65.8% | 66.8% |
| 4.45% | 58.3% | 59.3% | 60.3% | 61.3% | 62.3% | 63.3% | 64.3% | 65.3% | 66.3% |
| 4.55% | 57.7% | 58.7% | 59.7% | 60.7% | 61.7% | 62.7% | 63.7% | 64.7% | 65.7% |
| 4.65% | 57.2% | 58.2% | 59.2% | 60.2% | 61.2% | 62.2% | 63.2% | 64.2% | 65.2% |
| 4.75% | 56.6% | 57.6% | 58.6% | 59.6% | 60.6% | 61.6% | 62.6% | 63.6% | 64.6% |
| 4.85% | 56.1% | 57.1% | 58.1% | 59.1% | 60.1% | 61.1% | 62.1% | 63.1% | 64.1% |
| 4.95% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% |
| 5.05% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% |

## Class E Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| | Minimum Weighted Average S&P Recovery Rate | | | | | | | | |
| 3.05% | 72.0% | 73.0% | 74.0% | 75.0% | 76.0% | 77.0% | 78.0% | 79.0% | 80.0% |
| 3.15% | 71.4% | 72.4% | 73.4% | 74.4% | 75.4% | 76.4% | 77.4% | 78.4% | 79.4% |
| 3.25% | 70.8% | 71.8% | 72.8% | 73.8% | 74.8% | 75.8% | 76.8% | 77.8% | 78.8% |
| 3.35% | 70.1% | 71.1% | 72.1% | 73.1% | 74.1% | 75.1% | 76.1% | 77.1% | 78.1% |
| 3.45% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% | 75.5% | 76.5% | 77.5% |
| 3.55% | 68.9% | 69.9% | 70.9% | 71.9% | 72.9% | 73.9% | 74.9% | 75.9% | 76.9% |
| 3.65% | 68.3% | 69.3% | 70.3% | 71.3% | 72.3% | 73.3% | 74.3% | 75.3% | 76.3% |
| 3.75% | 67.6% | 68.6% | 69.6% | 70.6% | 71.6% | 72.6% | 73.6% | 74.6% | 75.6% |
| 3.85% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% |
| 3.95% | 66.4% | 67.4% | 68.4% | 69.4% | 70.4% | 71.4% | 72.4% | 73.4% | 74.4% |
| 4.05% | 65.8% | 66.8% | 67.8% | 68.8% | 69.8% | 70.8% | 71.8% | 72.8% | 73.8% |
| 4.15% | 65.1% | 66.1% | 67.1% | 68.1% | 69.1% | 70.1% | 71.1% | 72.1% | 73.1% |
| 4.25% | 64.5% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% |
| 4.35% | 63.9% | 64.9% | 65.9% | 66.9% | 67.9% | 68.9% | 69.9% | 70.9% | 71.9% |
| 4.45% | 63.3% | 64.3% | 65.3% | 66.3% | 67.3% | 68.3% | 69.3% | 70.3% | 71.3% |
| 4.55% | 62.6% | 63.6% | 64.6% | 65.6% | 66.6% | 67.6% | 68.6% | 69.6% | 70.6% |
| 4.65% | 62.0% | 63.0% | 64.0% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% |
| 4.75% | 61.4% | 62.4% | 63.4% | 64.4% | 65.4% | 66.4% | 67.4% | 68.4% | 69.4% |
| 4.85% | 60.8% | 61.8% | 62.8% | 63.8% | 64.8% | 65.8% | 66.8% | 67.8% | 68.8% |
| 4.95% | 60.1% | 61.1% | 62.1% | 63.1% | 64.1% | 65.1% | 66.1% | 67.1% | 68.1% |
| 5.05% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% | 64.5% | 65.5% | 66.5% | 67.5% |

## Class F Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | |
| 3.05% | 75.5% | 76.5% | 77.5% | 78.5% | 79.5% | 80.5% | 81.5% | 82.5% | 83.5% |
| 3.15% | 74.9% | 75.9% | 76.9% | 77.9% | 78.9% | 79.9% | 80.9% | 81.9% | 82.9% |
| 3.25% | 74.4% | 75.4% | 76.4% | 77.4% | 78.4% | 79.4% | 80.4% | 81.4% | 82.4% |
| 3.35% | 73.8% | 74.8% | 75.8% | 76.8% | 77.8% | 78.8% | 79.8% | 80.8% | 81.8% |
| 3.45% | 73.3% | 74.3% | 75.3% | 76.3% | 77.3% | 78.3% | 79.3% | 80.3% | 81.3% |
| 3.55% | 72.7% | 73.7% | 74.7% | 75.7% | 76.7% | 77.7% | 78.7% | 79.7% | 80.7% |
| 3.65% | 72.1% | 73.1% | 74.1% | 75.1% | 76.1% | 77.1% | 78.1% | 79.1% | 80.1% |
| 3.75% | 71.6% | 72.6% | 73.6% | 74.6% | 75.6% | 76.6% | 77.6% | 78.6% | 79.6% |
| 3.85% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% | 76.0% | 77.0% | 78.0% | 79.0% |
| 3.95% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% | 75.5% | 76.5% | 77.5% | 78.5% |
| 4.05% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% | 76.0% | 77.0% | 78.0% |
| 4.15% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% | 75.5% | 76.5% | 77.5% |
| 4.25% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% | 76.0% | 77.0% |
| 4.35% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% | 75.5% | 76.5% |
| 4.45% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% | 76.0% |
| 4.55% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% | 75.5% |
| 4.65% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% |
| 4.75% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% |
| 4.85% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% |
| 4.95% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% |
| 5.05% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% |

"S&P Weighted Average Fixed Coupon": As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), equal to: (i) the aggregate sum, in respect of each fixed rate Collateral Obligation (excluding Deferring Securities), of an amount equal to the product of (a) the interest coupon of such Collateral Obligation multiplied by (b) the Principal Balance of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such fixed rate Collateral Obligations.

"S&P Weighted Average Floating Spread": As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), obtained by calculating the sum of: (w) in the case of each floating rate Collateral Obligation (excluding Deferring Securities, Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations), the aggregate interest on such Collateral Obligation over LIBOR multiplied by the outstanding Principal Balance of such Collateral Obligation as of such date and (x) in the case of each Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, (i) the commitment fee for such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation multiplied by the undrawn commitments of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation and (ii) the aggregate interest on such Collateral Obligation over LIBOR multiplied by the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation (provided that letter of credit fees shall be excluded for all purposes), and dividing such sum by the Aggregate Principal Balance of all such floating rate Collateral Obligations as of such date of determination. For purposes of the foregoing, (1) in the case of each floating rate Collateral Obligation that bears interest at a spread over an index other than a London interbank offered rate based index, the interest over LIBOR for such Collateral Obligation shall be equal to the excess of the sum of such spread and such index (or, in the case of a Pre-funded Letter of Credit, the applicable rate of

interest on the deposited amount) over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date (which spread or excess may be expressed as a negative number), (2) LIBOR with respect to any floating rate Collateral Obligation that bears interest based on a spread over LIBOR shall be calculated in the same manner as it is calculated for payments on such Collateral Obligation, (3) with respect to any LIBOR Floor Obligation, the interest over LIBOR for such Collateral Obligation shall be equal to the sum of (a) the applicable spread over LIBOR and (b) the excess, if any, of the specified "floor" rate relating to such Collateral Obligation over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date and (4) the interest over the applicable index in respect of a floating rate Step-up Obligation shall be deemed to be its current interest spread over such index and the interest over the applicable index in respect of a floating rate Step-down Obligation shall be deemed to be the lowest possible interest spread over such index under the Underlying Instruments relating to such Step-down Obligation.

"Sale":  The meaning specified in Section 5.17(a) (Sale of Assets).

"Sale Proceeds":  All proceeds (excluding accrued interest, if any) received with respect to Assets as a result of sales of such Assets less any reasonable expenses incurred by the Portfolio Manager or the Trustee (other than amounts payable as Administrative Expenses) in connection with such sales.  Sale Proceeds will include Principal Financed Accrued Interest received in respect of such sale.

"Schedule of Collateral Obligations":  The schedule of Collateral Obligations attached as Schedule 1 hereto, which schedule shall include the issuer, principal balance, coupon/spread, the Stated Maturity, the Moody's Rating and the S&P Rating for each Collateral Obligation and the percentage of the aggregate commitment under each Revolving Collateral Obligation and Delayed Drawdown Collateral Obligation that is funded, as amended from time to time (without the consent of or any action on the part of any Person) to reflect the release of Collateral Obligations pursuant to Article 10 hereof, the inclusion of additional Collateral Obligations pursuant to Section 7.18 (Ramp-up Period; Purchase of Additional Collateral Obligations) hereof and the inclusion of additional Collateral Obligations as provided in Section 12.2 (Purchase of Additional Collateral Obligations) hereof.

"Scheduled Distribution":  With respect to any Pledged Obligation, for each Due Date, the scheduled payment of principal and/or interest due on such Due Date with respect to such Pledged Obligation, determined in accordance with the assumptions specified in Section 1.2 (Assumptions as to Pledged Obligations) hereof.

"Second Lien Loan":  Any assignment of or Participation Interest in or other interest in a loan (x) that is required to be secured by a valid and perfected second priority pledge of collateral (which (i) pledge may be subject to customary permitted liens, such as, but not limited to, tax liens and (ii) collateral is not secured solely by common stock or equity) and which has a senior (or, solely with respect to any related first lien indebtedness, subordinated) pre-petition priority (including pari passu with other obligations of the obligor) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings and (y) with respect to which the Portfolio Manager determines in good faith that the value of the collateral securing the loan on or about the time of acquisition by the Issuer together with other

NEWYORK 8715474 (2K)

attributes of the issuer of such loan (including, without limitation, its general financial condition, ability to generate cash flow available for debt service, refinancing ability and other demands for that cash flow) is adequate to repay the principal balance of the loan in accordance with its terms and to repay the principal balance of all other loans of equal or greater seniority secured by a security interest in the same collateral.

"Secured Notes":  The Class X Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes, the Class F Notes and the Combination Notes.

"Secured Obligations":  The meaning specified in the Granting Clauses.

"Secured Parties":  The meaning specified in the Granting Clauses.

"Securities Account Control Agreement":  An agreement in substantially the form of Exhibit H hereto.

"Securities Act":  The United States Securities Act of 1933, as amended.

"Securities Intermediary":  As defined in Section 8-102(a)(14) of the UCC.

"Security Entitlement":  The meaning specified in Section 8-102(a)(17) of the UCC.

"Selling Institution":  The entity obligated to make payments to the Issuer under the terms of a Participation Interest (or the agent bank in connection with a Pre-funded Letter of Credit, as the context shall require) and, as to which the S&P Selling Institution Percentage Criteria and the Moody's Counterparty Criteria are met.

"Senior Management Fee":  A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and Section 11.1 (Disbursements of Monies from Payment Account) in an amount equal to 0.20% per annum (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date.

"Senior Notes":  The Class X Notes, the Class A Notes and the Class B Notes.

"Senior Secured Bond":  Any fixed interest rate bond that is secured by the pledge of collateral and has the most senior pre-petition priority (including *pari passu* with other obligations of the obligor, but subject to customary permitted liens, such as, but not limited to, any tax liens) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings.

"Senior Secured Loan":  An assignment of or Participation Interest in or other interest in a loan (x) that is required to be secured by a valid and perfected, first priority pledge of collateral (which (i) pledge may be subject to customary permitted liens, such as, but not limited to, tax liens and (ii) collateral is not secured solely by common stock or equity) and

which has a senior pre-petition priority (including pari passu with other obligations of the obligor) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, (y) solely for purposes of calculating the Weighted Average S&P Recovery Rate, such loan cannot, by its terms, be subordinated to another obligation of the Obligor and the value of the collateral securing such loan, as determined by the Portfolio Manager in good faith, on or about the time of acquisition by the Issuer together with other attributes of the Obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service, refinancing ability and other demands for that cash flow) is adequate to repay the Principal Balance of the loan in accordance with its terms and to repay the Principal Balance of all other loans of equal seniority secured by a security interest in the same collateral and (z) is not a First-Lien Last-Out Loan.

"Senior Secured Note":  Any assignment of or Participation Interest in or other interest in a floating interest rate note (that is not in the form of an assignment of or participation interest in a loan) issued pursuant to an indenture or equivalent document by a corporation, partnership, limited liability company, trust or other person that is required to be secured by either a first or second priority perfected security interest or lien in or on specified collateral securing the Obligor's obligations under such note.

"Senior Unsecured Bond":  Any bond (other than a Senior Secured Bond) that has the most senior pre-petition priority (including *pari passu* with other obligations of the obligor, but subject to customary permitted liens, such as, but not limited to, any tax liens) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings.

"Special Redemption":  As defined in Section 9.5 (Special Redemption).

"Special Redemption Amount":  As defined in Section 9.5 (Special Redemption).

"Special Redemption Date":  As defined in Section 9.5 (Special Redemption).

"Standby Investment":  The US Bank National Association Money Market Fund.

"Stated Maturity":  With respect to any security, the maturity date specified in such security or applicable Underlying Instrument; and with respect to the Notes of any Class, the date specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations). The Combination Notes will mature when the Underlying Classes are repaid in full in accordance with this Indenture.

"Step-down Obligation":  An obligation or security which by the terms of the related Underlying Instruments provides for a decrease in the per annum interest rate on such obligation or security (other than by reason of any change in the applicable index or benchmark rate used to determine such interest rate) or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; provided, that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-down Obligation.

"Step-up Obligation":  An obligation or security which by the terms of the related Underlying Instruments provides for an increase in the per annum interest rate on such obligation

or security, or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; <u>provided</u>, that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-up Obligation.

"<u>Structured Finance Obligation</u>": A non-recourse or limited-recourse debt obligation issued by a special purpose vehicle and secured solely by the assets thereof that is a mortgage backed security, an asset backed security, a collateralized bond obligation, a collateralized loan obligation, a repackaging of a bond (or a pool of bonds) of any of the foregoing or any similar securitization of an asset or a pool of assets (or any combination thereof).

"<u>Subordinated Management Fee</u>": A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and <u>Section 11.1</u> (Disbursements of Monies from Payment Account) of this Indenture in an amount equal to 0.30% per annum (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date. The Subordinated Management Fee is payable on each Payment Date only to the extent that sufficient Interest Proceeds or Principal Proceeds are available, and, to the extent any such Subordinated Management Fee is not paid on any Payment Date for any reason, such payment will be deferred and will accrue interest at LIBOR, compounded quarterly (calculated on the basis of a 360-day year consisting of twelve 30-day months).

"<u>Subordinated Notes</u>": The subordinated notes issued pursuant to this Indenture and having the characteristics specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"<u>Subsequent Delivery Date</u>": A date fixed by the Portfolio Manager on behalf of the Issuer for the delivery of a Collateral Obligation to be pledged to the Trustee after the Closing Date.

"<u>Successor Entity</u>": As defined in <u>Section 7.10</u> (Co-Issuers May Consolidate, <u>etc.</u>, Only on Certain Terms).

"<u>Synthetic Security</u>": A security or swap transaction other than a Participation Interest or a Pre-funded Letter of Credit that has payments associated with either payments of interest and/or principal on a reference obligation or the credit performance of a reference obligation or payments on, or the return of, an equity interest.

"<u>Target Balance</u>": An amount equal to (a) the Target Initial Par Amount, <u>minus</u> (b) the amount of any principal payments made on the Notes of any Class, <u>plus</u> (c) the aggregate amount of Principal Proceeds that result from any additional issuance of Subordinated Notes.

"<u>Target Initial Par Amount</u>": With respect to the Collateral Obligations purchased by the Issuer or subject of binding agreements to purchase at the end of the Ramp-up Period, $500,000,000 in Aggregate Principal Balance of such Collateral Obligations.

NEWYORK 8715474 (2K)

"Target Initial Par Condition":  A condition satisfied as of the end of the Ramp-up Period if the Issuer has purchased, or entered into binding commitments to purchase, Collateral Obligations, including Collateral Obligations acquired by the Issuer on or prior to the Closing Date, the Aggregate Principal Balance of which equals or exceeds the Target Initial Par Amount (not including the reduction in the Aggregate Principal Balance of any Collateral Obligation after the Closing Date as a result of prepayments, maturities or redemptions, unless such amounts have been reinvested in Collateral Obligations).

"Target Initial Par Ratio":  A ratio that is determined by dividing (x) Target Initial Par Amount *by* (y) $469,750,000.

"Tax":  Any present or future tax, levy, impost, duty, charge, assessment, deduction, withholding or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority other than a stamp, registration, documentation or similar tax.

"Tax Event":  Any (1) new, or change to (a) a U.S. or non-U.S. tax statute, treaty, regulation, rule, ruling, practice, procedure or judicial decision or interpretation which results in any portion of any payment due from any issuer or obligor under any Collateral Obligation becoming properly subject to the imposition of U.S. or non-U.S. tax, which in the case of withholding tax is not compensated for by a "gross-up" provision under the terms of the Collateral Obligation or (b) a Cayman Islands law that results in Holders becoming properly subject to the imposition of Cayman Islands withholding tax unless the Issuer has changed its governing jurisdiction to a jurisdiction that does not impose withholding tax on holders of the Secured Notes within 90 days of becoming aware of such change in law and (2) tax arising under or as a result of FATCA as a result of or with respect to any payment due from any issuer or obligor under any Collateral Obligation, which is not compensated for by a "gross-up" provision under the terms of the Collateral Obligation, but only, in each case, (1) or (2), if such tax or taxes amount, in the aggregate, to at least $1,000,000, during any 12 month period.

"Tax Jurisdiction":  The Bahamas, Bermuda, the British Virgin Islands, the Cayman Islands or the Channel Islands and any other tax advantaged jurisdiction as may be notified by Moody's to the Portfolio Manager from time to time; provided, that, in the case of each such tax jurisdiction, in the Portfolio Manager's good faith business judgment, a majority of the assets, revenues or operations supporting the related Collateral Obligation are directly or through subsidiaries located in the United States of America.

"Third Party Credit Exposure":  As of any date of determination, the sum (without duplication) of the Principal Balance (or such lesser amount as may be determined by S&P) of each Collateral Obligation that consists of a Participation Interest or a Pre-funded Letter of Credit.

"Trading Plan":  The meaning specified in Section 1.2(k) (Assumptions as to Pledged Obligations).

"Trading Plan Period":  The meaning specified in Section 1.2(k) (Assumptions as to Pledged Obligations).

"<u>Transfer Agent</u>":  The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"<u>Trustee</u>":  As defined in the first sentence of this Indenture.

"<u>Turbo Payment Amount</u>":  After the Reinvestment Period, and for so long as any Class C Notes remain Outstanding, as of any date of determination, the aggregate Post-Reinvestment Period Amendment Proceeds accumulated during the related Collection Period.

"<u>UCC</u>":  The Uniform Commercial Code as in effect in the State of New York or, if different, the state of the United States that governs the perfection of the relevant security interest as amended from time to time.

"<u>Uncertificated Security</u>":  The meaning specified in Section 8-102(a)(18) of the UCC.

"<u>Underlying Instrument</u>":  The indenture or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Obligation or of which the holders of such Pledged Obligation are the beneficiaries.

"<u>United States owned foreign entity</u>":  The meaning specified in <u>Section 2.13(c)</u> (Tax Purposes).

"<u>Unregistered Securities</u>":  The meaning specified in <u>Section 5.17(c)</u> (Sale of Assets).

"<u>U.S. Person</u>":  The meaning specified in Section 7701(a)(30) of the Code.

"<u>U.S. person</u>":  The meaning specified in Regulation S.

"<u>USD</u>" and "<u>$</u>":  The legal currency of the United States of America.

"<u>Weighted Average Fixed Coupon</u>":  Each of the Moody's Weighted Average Fixed Coupon and the S&P Weighted Average Fixed Coupon, as applicable. In connection with the use of the defined term "Weighted Average Fixed Coupon" in any calculation, test or definition hereof, such calculation, test or definition shall be determined by reference to the definition of each of the Moody's Weighted Average Fixed Coupon and S&P Weighted Average Fixed Coupon separately.

"<u>Weighted Average Floating Spread</u>":  Each of the Moody's Weighted Average Floating Spread and the S&P Weighted Average Floating Spread, as applicable. In connection with the use of the defined term "Weighted Average Floating Spread" in any calculation, test or definition hereof, such calculation, test or definition shall be determined by reference to the definition of each of the Moody's Weighted Average Floating Spread and S&P Weighted Average Floating Spread separately.

NEWYORK 8715474 (2K)

"<u>Weighted Average Life</u>": With respect to each Collateral Obligation as of any date of determination is an amount equal to (i) the sum of the products obtained by multiplying (A) the actual number of years (rounded to the nearest one hundredth thereof) from such date of determination to the respective dates of each successive scheduled distribution of principal of such Collateral Obligation and (B) the related amounts of the principal of such scheduled distribution; divided by (ii) the sum of the aggregate amount of all such scheduled distributions of principal of such Collateral Obligation.

"<u>Weighted Average Life Test</u>": A test that is satisfied if the Aggregate Weighted Average Life on such date of determination is not later than March 14, 2021.

"<u>Weighted Average Moody's Rating Factor</u>": The number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) <u>multiplied by</u> (b) its Moody's Rating Factor, <u>divided by</u> (ii) the outstanding Principal Balance of all such Collateral Obligations.

"<u>Weighted Average Moody's Recovery Rate</u>": As of any date of determination, the number, expressed as a percentage, obtained by summing the product of the Moody's Recovery Rate on such date of determination of each Collateral Obligation and the Principal Balance of such Collateral Obligation, dividing such sum by the Aggregate Principal Balance of all such Collateral Obligations and rounding up to the first decimal place.

"<u>Weighted Average S&P Recovery Rate</u>": As of any date of determination, with respect to each Class of Notes then Outstanding with an Initial Rating corresponding to the rating in the applicable tables below, the fraction (expressed as a percentage) obtained by (a) summing the products obtained by multiplying (i) the Principal Balance of each Collateral Obligation by (ii) the S&P Recovery Rate as set forth in either the column corresponding to the Initial Rating of the relevant Class of Notes using the Tiered Recovery Rate Method table below or the column corresponding to the Initial Rating of the relevant Class of Notes using the Asset Assigned Recovery Rate Method table below, as applicable, (b) dividing such sum by the Aggregate Principal Balance of all Collateral Obligations and (c) rounding up to the nearest hundredth of a percent. For purposes of determining the Weighted Average S&P Recovery Rate, the S&P Recovery Rate for all Collateral Obligations will be determined by using the Asset Assigned Recovery Rate Method tables or, if the Asset Assigned Recovery Rate Method tables do not apply to such Collateral Obligation, the Tiered Recovery Rate Method tables; <u>provided</u>, <u>however</u>, that any other recovery rate proposed by the Portfolio Manager and consented to by S&P in writing or by email may be utilized on a case-by-case basis. The "<u>Tiered Recovery Rate Method</u>" means determining the Weighted Average S&P Recovery Rate by using the Tiered Recovery Rate Method tables. The "<u>Asset Assigned Recovery Rate Method</u>" means determining the Weighted Average S&P Recovery Rate by using the Asset Assigned Recovery Rate Method tables, except in the limited circumstances described below.

NEWYORK 8715474 (2K)

Tiered Recovery Rate Method

| Table 1: S&P Tiered Recovery Rate Method Table (by Asset Class and CDO Liability Rating)[1] | | | | | | |
|---|---|---|---|---|---|---|
| | **CDO Liability Rating** | | | | | |
| | AAA | AA | A | BBB | BB | B |
| Senior Secured Loans[2] | | | | | | |
| Group 1 | 50 | 55 | 59 | 63 | 75 | 79 |
| Group 2 | 45 | 49 | 53 | 58 | 70 | 74 |
| Group 3 | 39 | 42 | 46 | 49 | 60 | 63 |
| Group 4 | 17 | 19 | 27 | 29 | 31 | 34 |
| Senior secured Cov-Lite Loans/Senior Secured Bonds | | | | | | |
| Group 1 | 41 | 46 | 49 | 53 | 63 | 67 |
| Group 2 | 37 | 41 | 44 | 49 | 59 | 62 |
| Group 3 | 32 | 35 | 39 | 41 | 50 | 53 |
| Group 4 | 17 | 19 | 27 | 29 | 31 | 34 |
| Mezzanine/Second-Lien Loans or Senior Secured Notes/Senior Unsecured Loans/Senior Unsecured Bonds/First-Lien Last-Out Loans[3] | | | | | | |
| Group 1 | 18 | 20 | 23 | 26 | 29 | 31 |
| Group 2 | 16 | 18 | 21 | 24 | 27 | 29 |
| Group 3 | 13 | 16 | 18 | 21 | 23 | 25 |
| Group 4 | 10 | 12 | 14 | 16 | 18 | 20 |
| Subordinated loans/subordinated bonds | | | | | | |
| Group 1 | 8 | 8 | 8 | 8 | 8 | 8 |
| Group 2 | 10 | 10 | 10 | 10 | 10 | 10 |
| Group 3 | 9 | 9 | 9 | 9 | 9 | 9 |
| Group 4 | 5 | 5 | 5 | 5 | 5 | 5 |

---

[1] Or, at the election of the Portfolio Manager, such higher rates as provided by S&P.

[2] DIP Collateral Obligations to be treated as Senior Secured Loans.

[3] In the case of second lien loans and First-Lien Last-Out Loans, the first 15% of the Collateral Principal Amount will be treated as senior unsecured loans and the excess over 15% as subordinated loans. Obligations secured primarily by equity or common stock not to be treated as Senior Secured Loans, but rather as senior unsecured loans. First-Lien Last-Out Loans not to be treated as Senior Secured Loans. "First-Lien Last-Out Loan" means a Senior Secured Loan that, prior to a default with respect to such loan, is entitled to receive payments *pari passu* with other Senior Secured Loans of the same obligor, but following a default becomes fully subordinated to other Senior Secured Loans of the same obligor and is not entitled to any payments until such other Senior Secured Loans are paid in full.

NEWYORK 8715474 (2K)

| Table 2: S&P Country Groupings for S&P Recovery Rate | | | |
|---|---|---|---|
| **Group 1** | **Group 2** | **Group 3** | **Group 4** |
| Australia | Austria | Argentina | Kazakhstan |
| Denmark | Belgium | Brazil | Russia |
| Finland | Canada | Chile | Ukraine |
| Hong Kong | Germany | France | Others |
| Ireland | Israel | Greece | |
| The Netherlands | Japan | Italy | |
| New Zealand | Luxembourg | Mexico | |
| Norway | Portugal | South Korea | |
| Singapore | South Africa | Spain | |
| Sweden | Switzerland | Taiwan | |
| U.K. | U.S. | Turkey | |
| | | United Arab Emirates | |

<u>Asset Assigned Recovery Rate Method</u>

If available, the S&P Recovery Rate for Collateral Obligations shall be determined by reference to the table below and a list of debt securities with asset-by-asset current recovery ratings (each such recovery rate, an "<u>Asset Assigned Recovery Rating</u>") listed on the S&P website at "<u>www.standardandpoors.com</u>" or such other website address designated by S&P. For the avoidance of doubt, Asset Assigned Recovery Ratings are determined by reference to the recovery rating of the security and without regard to its characterization as senior secured, senior unsecured, mezzanine or subordinated (or any other designation of seniority or Domicile).

| Table 3: S&P Recovery Rates for Collateral Obligations with S&P Asset Assigned Recovery Ratings | | | | | | |
|---|---|---|---|---|---|---|
| **CDO Liability Rating** | **AAA** | **AA** | **A** | **BBB** | **BB** | **B** |
| **Asset Assigned Recovery Rating** | **S&P Recovery Rates (%)** | | | | | |
| 1+ | 75 | 85 | 88 | 90 | 92 | 95 |
| 1 | 65 | 75 | 80 | 85 | 90 | 95 |
| 2 | 50 | 60 | 66 | 73 | 79 | 85 |
| 3 | 30 | 40 | 46 | 53 | 59 | 65 |
| 4 | 20 | 26 | 33 | 39 | 43 | 45 |
| 5 | 5 | 10 | 15 | 20 | 23 | 25 |
| 6 | 2 | 4 | 6 | 8 | 10 | 10 |

If the relevant Collateral Obligation has no Asset Assigned Recovery Rating from S&P, the S&P Recovery Rate of such Collateral Obligation shall be determined by reference to

the "Tiered Recovery Rate Method" tables; provided that, if the Collateral Obligation is either a senior unsecured debt security or a subordinated debt security with no Asset Assigned Recovery Rating designated but the issuer of such Collateral Obligation has an Asset Assigned Recovery Rating on senior secured debt obligations issued by it, the S&P Recovery Rate for such Collateral Obligation shall be derived from the Asset Assigned Recovery Rating of such senior secured debt obligations by reference to the tables set forth below or such other table(s) as directed by S&P upon request by the Portfolio Manager; provided further, that, if on any date of determination a Collateral Obligation does not have an Asset Assigned Recovery Rating, if on such date of determination S&P provides an Asset Assigned Recovery Rating estimate service, the Portfolio Manager may request from S&P such an estimate for such Collateral Obligation and, upon receipt of such credit estimate, the S&P Recovery Rate for such Collateral Obligation shall be derived by reference to such estimate.

| Table 4:  S&P Recovery Rates for Group 1 senior unsecured assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| **CDO Liability Rating** | **AAA** | **AA** | **A** | **BBB** | **BB** | **B** |
| Asset Assigned Recovery Rating of senior secured asset | **S&P Recovery Rates (%)** | | | | | |
| 1+ | 18 | 20 | 23 | 26 | 29 | 31 |
| 1 | 18 | 20 | 23 | 26 | 29 | 31 |
| 2 | 18 | 20 | 23 | 26 | 29 | 31 |
| 3 | 12 | 15 | 18 | 21 | 22 | 23 |
| 4 | 5 | 8 | 11 | 13 | 14 | 15 |
| 5 | 2 | 4 | 6 | 8 | 9 | 10 |
| 6 | - | - | - | - | - | - |

| Table 5:  S&P Recovery Rates for Group 2 senior unsecured assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| **CDO Liability Rating** | **AAA** | **AA** | **A** | **BBB** | **BB** | **B** |
| Asset Assigned Recovery Rating of senior secured asset | **S&P Recovery Rates (%)** | | | | | |
| 1+ | 16 | 18 | 21 | 24 | 27 | 29 |

| 1 | 16 | 18 | 21 | 24 | 27 | 29 |
| 2 | 16 | 18 | 21 | 24 | 27 | 29 |
| 3 | 10 | 13 | 15 | 18 | 19 | 20 |
| 4 | 5 | 5 | 5 | 5 | 5 | 5 |
| 5 | 2 | 2 | 2 | 2 | 2 | 2 |
| 6 | - | - | - | - | - | - |

| Table 6: S&P Recovery Rates for Group 3 senior unsecured assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
| Asset Assigned Recovery Rating of senior secured asset | S&P Recovery Rates (%) | | | | | |
| 1+ | 13 | 16 | 18 | 21 | 23 | 25 |
| 1 | 13 | 16 | 18 | 21 | 23 | 25 |
| 2 | 13 | 16 | 18 | 21 | 23 | 25 |
| 3 | 8 | 11 | 13 | 15 | 16 | 17 |
| 4 | 5 | 5 | 5 | 5 | 5 | 5 |
| 5 | 2 | 2 | 2 | 2 | 2 | 2 |
| 6 | - | - | - | - | - | - |

| Table 7: S&P Recovery Rates for Groups 1, 2 and 3 subordinated assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
| Asset Assigned Recovery Rating of senior secured asset | S&P Recovery Rates (%) | | | | | |
| 1+ | 8 | 8 | 8 | 8 | 8 | 8 |

| 1 | 8 | 8 | 8 | 8 | 8 | 8 |
| 2 | 8 | 8 | 8 | 8 | 8 | 8 |
| 3 | 5 | 5 | 5 | 5 | 5 | 5 |
| 4 | 2 | 2 | 2 | 2 | 2 | 2 |
| 5 | - | - | - | - | - | - |
| 6 | - | - | - | - | - | - |

"Zero Coupon Security":  Any Collateral Obligation that at the time of purchase does not by its terms provide for the payment of cash interest; provided, that if, after such purchase, such Collateral Obligation provides for the payment of cash interest it shall cease to be a Zero Coupon Security.

Section 1.2.    Assumptions as to Pledged Obligations.  In connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Obligation, or any payments on any other assets included in the Assets, with respect to the sale of and reinvestment in Collateral Obligations, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Obligations and on any other amounts that may be received for deposit in the Collection Account, the provisions set forth in this Section 1.2 (Assumptions as to Pledged Obligations) shall be applied.  The provisions of this Section 1.2 shall be applicable to any determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

(a)    All calculations with respect to Scheduled Distributions on the Pledged Obligations securing the Notes shall be made on the basis of information as to the terms of each such Pledged Obligation and upon report of payments, if any, received on such Pledged Obligation that are furnished by or on behalf of the issuer of such Pledged Obligation and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

(b)    For purposes of calculating the Coverage Tests and the Interest Reinvestment Test, except as otherwise specified in the Coverage Tests or the Interest Reinvestment Test, as applicable, such calculations will not include scheduled interest and principal payments on Defaulted Obligations or payments (including under any Hedge Agreement) as to which the Portfolio Manager or the Issuer has actual knowledge that such payments will not be made unless or until such payments are actually made.

(c)    For each Collection Period and as of any date of determination, the Scheduled Distribution on any Pledged Obligation (other than a Defaulted Obligation, which, except as otherwise provided herein, shall be assumed to have a Scheduled Distribution of zero) shall be the sum of (i) the total amount of payments and collections to be received during such Collection Period in respect of such Pledged Obligation (including the proceeds of the sale of

such Pledged Obligation received and, in the case of sales which have not yet settled, to be received during the Collection Period and not reinvested in additional Collateral Obligations or Eligible Investments or retained in the Collection Account for subsequent reinvestment pursuant to Section 12.2 (Purchase of Additional Collateral Obligations)) that, if paid as scheduled, will be available in the Collection Account at the end of the Collection Period and (ii) any such amounts received in prior Collection Periods that were not disbursed on a previous Payment Date.

(d)    Each Scheduled Distribution receivable with respect to a Pledged Obligation shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Collection Account to earn interest at the Assumed Reinvestment Rate.  All such funds shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Account for application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.  For purposes of the applicable determinations required by Section 10.7(b)(iii) (Accountings), Article 12 and the definition of "Interest Coverage Ratio," the expected interest on Secured Notes and floating rate Collateral Obligations will be calculated using the then-current interest rates applicable thereto.

(e)    References in Section 11.1(a) (Disbursements of Monies from Payment Account) to calculations made on a "pro forma basis" shall mean such calculations after giving effect to all payments, in accordance with the Priority of Payments described herein, that precede (in priority of payment) or include the clause in which such calculation is made.

(f)    For purposes of determining whether the Effective Date Overcollateralization Test has been satisfied, all calculations shall be made on a "pro forma basis" giving effect to any purchases and sales, and, for purposes of determining whether any Coverage Test or the Interest Reinvestment Test has been satisfied on any Determination Date for purposes of the Priority of Payments, all calculations shall be made on a "pro forma" basis after giving effect to any payments made through the applicable clause of the Priority of Payments.

(g)    For purposes of calculating all Concentration Limitations, in both the numerator and the denominator of any component of the Concentration Limitations, Defaulted Obligations will be treated as having a Principal Balance equal to zero.

(h)    If one or more Collateral Obligations included in the Assets would be deemed Current Pay Obligations but for the applicable percentage limitation in the definition thereof, the Portfolio Manager shall determine which such Collateral Obligations have the lowest Market Value expressed as a percentage and such Collateral Obligations with the lowest Market Value expressed as a percentage will be deemed Defaulted Obligations.  Each such Defaulted Obligation will be treated as a Defaulted Obligation for all purposes until such time as the Aggregate Principal Balance of Current Pay Obligations would not exceed, on a pro forma basis including such Defaulted Obligation, the applicable percentage of the Collateral Principal Amount.

NEWYORK 8715474 (2K)

(i)  Except as otherwise provided herein, Defaulted Obligations will not be included in the calculation of the Collateral Quality Test. Solely, for purposes of determining whether a Collateral Obligation satisfies the S&P CDO Monitor Test with respect to a purchase, additional Collateral Obligations purchased with proceeds from the sale of a Credit Risk Obligation, a Defaulted Obligation or an Equity Security shall not be included in the calculation of the S&P CDO Monitor Test.

(j)  For purposes of calculating the Collateral Quality Test, DIP Collateral Obligations will be treated as having an S&P Recovery Rate equal to the recovery rate for Senior Secured Loans set forth in the definition of "Weighted Average S&P Recovery Rate."

(k)  For purposes of calculating compliance with the Investment Criteria, the Portfolio Manager may elect to execute one or more Trading Plans (with notice to the Collateral Administrator, which notice shall include the identity of all sales and purchases forming part of such Trading Plan); provided that if a previous Trading Plan failed to comply with the Investment Criteria, the Portfolio Manager may not execute any further Trading Plans until the S&P Rating Condition is satisfied (and, following the satisfaction of the S&P Rating Condition, any number of additional Trading Plans may be executed subject to the other limitations in this Section 1.2(k) (Assumptions as to Pledged Obligations)). "Trading Plan" means, with respect to any proposed investment, a plan under which compliance with the Investment Criteria will be evaluated after giving effect to all sales and purchases proposed to be entered into within ten Business Days following the date of determination of such compliance (such period, the "Trading Plan Period"); provided that (i) the execution of a Trading Plan will not result in the averaging of the purchase price of a Collateral Obligation or Collateral Obligations purchased at separate times for purposes of any calculation made in connection with the Investment Criteria; (ii) no Trading Plan may be executed over a time period that includes a Determination Date; (iii) no Trading Plan may relate to the purchase of Collateral Obligations having an Aggregate Principal Balance in excess of 5.0% of the Collateral Principal Amount; (iv) only one Trading Plan may be outstanding at any time; (v) so long as the Investment Criteria are satisfied upon the expiry of the applicable Trading Plan Period, the failure of all of the terms and assumptions specified in such Trading Plan to be satisfied shall not be deemed to constitute a failure of such Trading Plan and (vi) the difference between the Collateral Obligation with the highest Weighted Average Life and the Collateral Obligation with the lowest Weighted Average Life, in each case, purchased in connection with a Trading Plan may not be greater than two years.

(l)  For purposes of calculating the sale proceeds of a Collateral Obligation in purchase and sale transactions, sales proceeds will include any Principal Financed Accrued Interest received in respect of such sale.

(m)  For purposes of calculating clauses (v) and (vi) of the Concentration Limitations, without duplication, the amounts on deposit in the Collection Account and the Ramp-up Account (including Eligible Investments therein) representing Principal Proceeds shall each be deemed to be a floating rate Collateral Obligation that is a Senior Secured Loan.

(n)  Notwithstanding any other provision of this Indenture to the contrary, all monetary calculations under this Indenture shall be in U.S. Dollars.

NEWYORK 8715474 (2K)

(o)     For all purposes of this Indenture, (i) a Senior Secured Note shall be deemed to be a Moody's Senior Secured Loan if such Senior Secured Note, if it were a loan, would meet the definition of Moody's Senior Secured Loan and (ii) a Senior Secured Note shall be deemed to be a Moody's Non-Senior Secured Loan if such Senior Secured Note, if it were a loan, would meet the definition of Moody's Non-Senior Secured Loan.

(p)     If the Issuer (or the Portfolio Manager on behalf of the Issuer) is notified by the administrative agent or other withholding agent or otherwise for the syndicate of lenders in respect of any Revolving Collateral Obligation, Delayed Drawdown Collateral Obligation or Pre-funded Letter of Credit or other letter of credit that amounts associated therewith are subject to withholding tax imposed by any jurisdiction, the applicable Collateral Quality Test, the Coverage Tests and the Interest Reinvestment Test shall be calculated thereafter net of the full amount of such withholding tax unless the related obligor is required to make "gross-up" payments to the Issuer that cover the full amount of any such withholding tax on an after-tax basis pursuant to the underlying instruments with respect thereto.

(q)     For all purposes (including calculation of the Coverage Tests, and the Interest Reinvestment Test), the Principal Balance of a Revolving Collateral Obligation or a Delayed Drawdown Collateral Obligation will include all unfunded commitments that have not been irrevocably reduced or withdrawn.

(r)     For purposes of calculating compliance with any tests, ratios, or calculations under this Indenture, the trade date (and not the settlement date) with respect to any acquisition or disposition of a Collateral Obligation or Eligible Investment shall be used to determine whether and when such acquisition or disposition has occurred.

(s)     For reporting purposes and for purposes of calculating the Coverage Tests, the Investment Criteria and the requirements of Section 12.2(b) (Purchase of Additional Collateral Obligations), assets held by any ETB Subsidiary shall be treated as Equity Securities owned by the Issuer (and the equity interest in such ETB Subsidiary shall not be included in such calculation).

(t)     For purposes of calculating the Weighted Average Fixed Coupon and Weighted Average Floating Spread, only the interest payable in cash, including Deferrable Cash-Pay Interest with respect to a Partial Deferrable Security, shall be included in such calculation.

ARTICLE 2

The Notes

Section 2.1.     Forms Generally.  The Notes and the Trustee's or Authenticating Agent's certificate of authentication thereon (the "Certificate of Authentication") shall be in substantially the forms required by this Article, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may be consistent herewith, determined by the Authorized Officers of the Applicable Issuers executing such Notes as evidenced by their execution of such Notes.  Any portion of the

text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

Section 2.2.    Forms of Notes.  (a)  The forms of the Notes, including the forms of Certificated Secured Notes, Certificated Subordinated Notes, Regulation S Global Notes and Rule 144A Global Notes, shall be as set forth in the applicable part of Exhibit A hereto.

(b)    Regulation S Global Notes and Rule 144A Global Notes.  (i)  The Secured Notes of each Class and the Subordinated Note sold to persons who are not U.S. persons in offshore transactions in reliance on Regulation S shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the applicable form of Exhibit A1 or Exhibit A2 hereto (each, a "Regulation S Global Note") and shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, DTC for the respective accounts of Euroclear and Clearstream, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.

(ii)    The Secured Notes of each Class sold to persons that are QIB/QPs shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the applicable form of Exhibit A1 hereto (each, a "Rule 144A Global Note"), which shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, DTC, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.  The Class E Notes sold to Institutional Accredited Investors shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of Exhibit A4 (each, a "Certificated Class E Note") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided. The Class F Notes sold to Institutional Accredited Investors shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of Exhibit A4 (each, a "Certificated Class F Note") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided. The Subordinated Notes (other than Regulation S Global Subordinated Notes) shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of Exhibit A3 (each, a "Certificated Subordinated Note") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.

(iii)    The Aggregate Outstanding Amount of the Regulation S Global Notes and the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or DTC or its nominee, as the case may be, as hereinafter provided.

(c)    Book Entry Provisions.  This Section 2.2(c) (Forms of Notes) shall apply only to Global Notes deposited with or on behalf of DTC.

NEWYORK 8715474 (2K)

The provisions of the "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, will be applicable to the Global Notes insofar as interests in such Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Notes held on their behalf by the Trustee, as custodian for DTC and DTC may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(d)     Certificated Securities.  Except as provided in Section 2.11 (Certificated Notes) hereof, owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of Certificated Notes.

Section 2.3.     Authorized Amount; Stated Maturity; Denominations.     The Aggregate Outstanding Amount of Secured Notes and the Subordinated Notes that may be authenticated and delivered under this Indenture is limited to $525,500,000 Aggregate Outstanding Amount of Notes, except for Deferred Interest with respect to the Deferred Interest Notes, Additional Subordinated Notes issued pursuant to Section 2.4 (Additional Notes) and Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.6 (Registration, Registration of Transfer and Exchange), 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) or 8.5 (Reference in Notes to Supplemental Indentures) and Notes issued pursuant to supplemental indentures in accordance with Article 8. The Aggregate Outstanding Amount of the Combination Notes may not exceed the Aggregate Maximum Notional Amount. The principal amount of each Underlying Class of a Combination Note is included in (and is not in addition to) the Aggregate Outstanding Amount of the related Class of Notes.

Such Notes shall be divided into the Classes, having the designations, original principal amounts and other characteristics as follows:

NEWYORK 8715474 (2K)

## Offered Securities

| Class Designation | X | A-1 | A-2A | A-2B | B | C | D | E | F | Combination Notes[1] | Subordinated Notes[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Issuer(s) | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Issuer | Issuer | Co-Issuers | Issuer |
| Original Principal Amount | $4,000,000 | $190,750,000 | $115,750,000 | $10,250,000 | $62,500,000 | $39,500,000 | $21,500,000 | $19,500,000 | $10,000,000 | $193,000,000 | $51,750,000 |
| Stated Maturity | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024[6] | April 18, 2024 |
| Floating Rate Debt | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Index[2] | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR[6] | N/A |
| Index Maturity | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month[6] | N/A |
| Spread | 1.00% | 0.87% | 1.25% | 1.65% | 1.95% | 2.95% | 4.50% | 5.60% | 6.50% | 1.227%[6] | N/A |
| Initial Rating(s)[3] | | | | | | | | | | | |
| Moody's | Aaa (sf) | Aaa (sf) | Aaa (sf) | Aaa (sf) | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| S&P | AAA (sf) | AAA (sf) | AAA (sf) | AAA (sf) | AA (sf) | A (sf) | BBB (sf) | BB (sf) | B (sf) | A (sf) | N/A |
| Ranking: | | | | | | | | | | | |
| Priority Classes | None | None [5] | None [5] | A-2B[5] | X, A-1, A-2 | X, A-1, A-2, B | X, A-1, A-2, B, C | X, A-1, A-2, B, C, D | X, A-1, A-2, B, C, D, E | N/A | X, A-1, A-2, B, C, D, E, F |
| Pari Passu Classes | A-1, A-2 | X, A-2 | X, A-1 | X, A-1 | None | None | None | None | None | N/A | None |
| Junior Classes | B, C, D, E, F, Subordinated Notes | B, C, D, E, F, Subordinated Notes | A-2B, B, C, D, E, F, Subordinated Notes | B, C, D, E, F, Subordinated Notes | C, D, E, F, Subordinated Notes | D, E, F, Subordinated Notes | E, F, Subordinated Notes | Subordinated Notes, F | Subordinated Notes | N/A | None |
| Deferred Interest Notes | No | No | No | No | No | Yes | Yes | Yes | Yes | Yes | N/A |
| ERISA Limited Notes | No | No | No | No | No | No | No | Yes | Yes | No | Yes |

(1)   The Co-Issuers will issue Combination Notes with a maximum aggregate principal amount of up to U.S.$252,175,414 which maximum amount will be composed of Components representing up to U.S.$190,750,000 aggregate principal amount of Class A-1 Notes, up to U.S.$37,638,121 aggregate principal amount of Class B Notes and up to U.S.$23,787,293 aggregate principal amount of Class C Notes. The Combination Note will not bear interest at a stated rate, but will be entitled to receive interest with respect to the Underlying Classes. The ranking of the Combination Notes is determined by reference to the Underlying Classes. The Stated Maturity of the Combination Note is determined by reference to the Underlying Classes. Reference must be made to the Underlying Classes to determine whether a particular Component of the Combination Notes is a Deferrable Interest Note.

(2)   For the definition of LIBOR, see Exhibit G.

(3)   The Issuer will obtain initial ratings for the Class X Notes, the Class A-1 Notes and the Class A-2 Notes from both Moody's and S&P, and will obtain initial ratings for all Secured Notes from S&P.

(4)   The Subordinated Notes do not bear interest at a stated rate but will receive distributions on each Payment Date in accordance with the Priority of Payments.

(5)   The Class X Notes will be *pari passu* to the Class A-1 Notes and the Class A-2 Notes interest payments and in certain circumstances will be senior in right of principal payment to the Class A-1 Notes and the Class A-2 Notes. The Class A-1 Notes will be *pari passu* to the Class A-2 Notes. Interest payments on the Class A-2B Notes will be subordinated in all respects to interest payments on the Class A-2A Notes. Principal payments of the Class A-2B Notes will be subordinated in all respects to principal payments of the Class A-2A Notes.

(6) These represent the expected stated maturity, index, index maturity and interest to be paid on the Combination Note based on the stated maturity, index, index maturity and interest rates of the Underlying Classes. The Initial Rating by S&P of the Combination Note is with respect to the ultimate repayment of principal and interest at a rate of LIBOR plus 1.227% per annum by the Stated Maturity.

## Combination Notes Table

| Class | Aggregate Principal Amount (as of the Closing Date) | Permissible Ratio[1] | Aggregate Maximum Notional Amount |
|---|---|---|---|
| "Combination Notes" | $193,000,000 (representing Components of U.S.$145,988,657 Aggregate Outstanding Amount of Class A-1 Notes, U.S.$28,805,970 Aggregate Outstanding Amount of Class B Notes and U.S.$18,205,373 Aggregate Outstanding Amount of Class C Notes) | The Permissible Ratio on any date shall be the ratio of the then-current Aggregate Outstanding Amount of the Class A Notes: then-current Aggregate Outstanding Amount of the Class B Notes: and then-current Aggregate Outstanding Amount of the Class C Notes, respectively, divided by the sum of the then-current Aggregate Outstanding Amount of the Class A Notes, the Class B Notes and the Class C Notes. As of the Closing Date, the Permissible Ratio shall be 75.64179%: 14.92537%: 9.43284% | $252,175,414 (representing Components of up to U.S.$190,750,000 Aggregate Outstanding Amount of Class A-1 Notes, up to U.S.$37,638,121 Aggregate Outstanding Amount of Class B Notes and up to U.S.$ 23,787,293 Aggregate Outstanding Amount of Class C Notes) |

[1] A Holder may round any of the fractional percentages set forth in this definition of Permissible Ratio either up or down to the extent necessary to cause an Exchange to comply with the $1 integral multiple requirement

The Notes (other than the Class A-1 Notes, the Class B Notes, the Class C Notes, the Class F Notes and the Combination Notes) shall be issuable in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof (except that up to 20 Certificated Subordinated Notes sold to U.S. persons that the Portfolio Manager has determined are Knowledgeable Employees may be issued in minimum denominations of $50,000). The Class A-1 Notes, the Class B Notes, the Class C Notes, the Class F Notes and the Combination Notes shall be issued in minimum denominations of $150,000 and integral multiples of $1 in excess thereof. Notes shall only be transferred or resold in compliance with the terms of the representation letter delivered by the initial purchaser of such Notes.

Section 2.4. <u>Additional Notes</u>. (a) At any time, the Applicable Issuers may issue Additional Subordinated Notes; <u>provided</u>, that the following conditions are met as certified to the Trustee by the Issuer:

(i) such issuance is approved by (x) the Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Subordinated Notes, (y) the Portfolio Manager and (z) after the Effective Date only, at least a Majority of the Controlling Class;

(ii)     such issuance may not exceed 100% of the original outstanding amount of the Subordinated Notes;

(iii)     the terms of the Subordinated Notes issued must be identical to the respective terms of previously issued Subordinated Notes;

(iv)     an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters shall be delivered to the Trustee to the effect that (1) such issuance will not result in the Issuer becoming subject to U.S. federal income taxation with respect to its net income, (2) such issuance would not cause the holders or beneficial owners of Secured Notes previously issued to be deemed to have sold or exchanged such Notes under Section 1001 of the Code and (3) such issuance would not adversely affect the tax characterization of any Outstanding Notes that was characterized as debt at the time of issuance; provided, that such opinions described in clauses (2) and (3) shall not be required with respect to any Class if 100% of the Holders of such Class have consented to a waiver of such requirement; and

(v)     after giving effect to the issuance of Additional Subordinated Notes, each Overcollateralization Ratio Test for each Class of Notes is satisfied.

(b)     The Additional Subordinated Notes will rank pari passu in all respects with the initial Subordinated Notes.

(c)     Any Additional Subordinated Notes issued pursuant to this Section 2.4 (Additional Notes) will, to the extent reasonably practicable, be offered first to Holders of the Subordinated Notes, in such amounts as are necessary to preserve their pro rata holdings of Subordinated Notes.

(d)     Any Additional Subordinated Notes may be offered at prices that differ from the applicable initial offering price.

(e)     The net proceeds of any Additional Subordinated Notes may be designated as Interest Proceeds or Principal Proceeds by the Portfolio Manager.

Section 2.5.     Execution, Authentication, Delivery and Dating.  The Notes shall be executed on behalf of each of the Applicable Issuers by one of their respective Authorized Officers.  The signature of such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Issuer and the Co-Issuer may deliver Notes executed by the Applicable Issuers to the Trustee or the Authenticating Agent for authentication and the Trustee or the Authenticating

Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

Each Note authenticated and delivered by the Trustee or the Authenticating Agent upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Outstanding principal amount of the Notes so transferred, exchanged or replaced. In the event that any Note is divided into more than one Note in accordance with this Article 2, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their authorized signatories, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.6.   Registration, Registration of Transfer and Exchange. (a) The Issuer shall cause to be kept a register (the "Register") at the office of the Trustee in which, subject to such reasonable regulations as it may prescribe, the Issuer shall provide for the registration of Notes and the registration of transfers of Notes. The Trustee is hereby initially appointed "Registrar" for the purpose of registering Notes and transfers of such Notes with respect to the Register maintained in the United States as herein provided. Upon any resignation or removal of the Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of Registrar.

If a Person other than the Trustee is appointed by the Issuer as Registrar, the Issuer will give the Trustee prompt written notice of the appointment of a Registrar and of the location, and any change in the location, of the Register, and the Trustee shall have the right to inspect the Register at all reasonable times and to obtain copies thereof and the Trustee shall have the right to rely upon a certificate executed on behalf of the Registrar by an Officer thereof as to the names and addresses of the Holders of the Notes and the principal or face amounts and numbers of such Notes. Upon request at any time the Registrar shall provide to the Issuer, the Portfolio Manager, the Placement Agents or any Holder of Notes a current list of Holders as reflected in the Register.

Subject to this Section 2.6 (Registration, Registration of Transfer and Exchange), upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 (Maintenance of Office or Agency), the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the

NEWYORK 8715474 (2K)

designated transferee or transferees, one or more new Notes of any authorized denomination and of a like aggregate principal or face amount. The Trustee shall provide notice of any such transfer to the Placement Agents.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal or face amount, upon surrender of the Notes to be exchanged at such office or agency. Whenever any Note is surrendered for exchange, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Issuer and, solely in the case of the Co-Issued Notes, the Co-Issuer, evidencing the same debt (to the extent they evidence debt), and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Registrar duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in Securities Transfer Agents Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Exchange Act.

(b)      No Note may be sold or transferred (including, without limitation, by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act, is exempt from the registration requirements under applicable state securities laws and will not cause either of the Co-Issuers to become subject to the requirement that it register as an investment company under the Investment Company Act.

(c)      (i)      No transfer of any ERISA Limited Note will be effective, and the Trustee will not recognize any such transfer, if it would result in 25% or more of the value of any Class of ERISA Limited Notes being held by Benefit Plan Investors (the "25% Limitation"). For purposes of these calculations and all other calculations required by this subsection, any ERISA Limited Notes held by a Person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Co-Issuers or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any "affiliate" of such a Person (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) (a "Controlling Person"), the Trustee, the Portfolio Manager, the Placement Agents and their respective affiliates shall be disregarded and not treated as being Outstanding. In addition, if any Holder of ERISA Limited Notes (a) informs the Trustee that as a result of a proposed transfer of interests in, or securities issued by, such

Holder, all or a specified portion of the ERISA Limited Notes owned by such Holder would be deemed to be held by a Benefit Plan Investor and (b) requests the Trustee to determine and notify such Holder whether the 25% Limitation would be exceeded after giving effect to such transfer, then the Trustee shall make such determination, subject to the last sentence of this clause (i), and notify such Holder accordingly. Each Holder of ERISA Limited Notes shall be required to covenant that it will inform the Trustee of any such transfer, will not permit any such transfer that would cause the 25% Limitation to be exceeded to become effective, and will notify the Trustee of the effectiveness of any transfer that is not prohibited by this paragraph. After it is notified of the effectiveness of any transfer pursuant to the foregoing sentence, the Trustee shall regard the ERISA Limited Notes held by such Holder (or specified portion thereof) as being held by a Benefit Plan Investor in future calculations of the 25% Limitation made pursuant to this Indenture unless subsequently notified by such Holder that such Notes (or specified portion thereof) would no longer be deemed to be held by Benefit Plan Investors. The Trustee shall be entitled to rely exclusively upon the information set forth in the face of the transfer certificates received pursuant to the terms of this Section 2.6 (Registration, Registration of Transfer and Exchange) and only Notes that a Bank Officer of the Trustee actually knows to be so held shall be so disregarded.

(d) The Trustee shall not be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate is specifically required by the terms of this Section 2.6 (Registration, Registration of Transfer and Exchange) to be provided to the Trustee by a prospective transferor or transferee, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section 2.6 (Registration, Registration of Transfer and Exchange).

(e) For so long as any of the Notes are Outstanding, the Issuer shall not issue or permit the transfer of any shares of the Issuer to U.S. Persons and the Co-Issuer shall not issue or permit the transfer of any membership interests of the Co-Issuer to U.S. Persons.

(f) So long as a Global Note remains Outstanding and is held by or on behalf of DTC, transfers of such Global Note, in whole or in part, shall only be made in accordance with Section 2.2(b) (Forms of Notes) and this Section 2.6(f) (Registration, Registration of Transfer and Exchange). Subject to clauses (i), (ii) and (iii) of this Section 2.6(f) (Registration, Registration of Transfer and Exchange), transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of DTC or to a successor DTC or such successor's nominee.

(i) <u>Rule 144A Global Note to Regulation S Global Secured Note</u>. If a holder of a beneficial interest in a Rule 144A Global Note deposited with DTC wishes at any time to exchange its interest in such Rule 144A Global Note for an interest in the corresponding Regulation S Global Secured Note, or to transfer its interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Regulation S Global Secured Note, such holder, provided such holder or, in the case of a transfer, the transferee is not a U.S. person and is acquiring such interest in an offshore transaction, may, subject to the immediately

succeeding sentence and the rules and procedures of DTC, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Regulation S Global Secured Note. Upon receipt by the Trustee or Registrar of (A) instructions given in accordance with DTC's procedures from an Agent Member directing the Trustee or Registrar to credit or cause to be credited a beneficial interest in the corresponding Regulation S Global Secured Note, but not less than the minimum denomination applicable to such holder's Notes, in an amount equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, (B) a written order given in accordance with DTC's procedures containing information regarding the participant account of DTC and the Euroclear or Clearstream account to be credited with such increase and (C) a certificate in the form of <u>Exhibit B1</u> attached hereto given by the holder of such beneficial interest stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the holder or the transferee, as applicable, is not a U.S. person, and in an offshore transaction pursuant to and in accordance with Regulation S, then the Trustee or Registrar shall instruct DTC to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Regulation S Global Secured Note by the Aggregate Outstanding Amount of the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, and to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Regulation S Global Secured Note equal to the reduction in the principal amount of the Rule 144A Global Note.

(ii) <u>Regulation S Global Secured Note to Rule 144A Global Note</u>. If a holder of a beneficial interest in a Regulation S Global Secured Note deposited with DTC wishes at any time to exchange its interest in such Regulation S Global Secured Note for an interest in the corresponding Rule 144A Global Note or to transfer its interest in such Regulation S Global Secured Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Note, such holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Rule 144A Global Note. Upon receipt by the Trustee or Registrar of (A) instructions from Euroclear, Clearstream and/or DTC, as the case may be, directing the Trustee or Registrar to cause to be credited a beneficial interest in the corresponding Rule 144A Global Note in an amount equal to the beneficial interest in such Regulation S Global Secured Note, but not less than the minimum denomination applicable to such holder's Notes to be exchanged or transferred, such instructions to contain information regarding the participant account with DTC to be credited with such increase and (B) a certificate in the form of <u>Exhibit B2</u> attached hereto given by the holder of such beneficial interest and stating, among other things, that, in the case of a transfer, the Person transferring such interest in such Regulation S Global Secured Note reasonably believes that the Person acquiring such interest in a Rule 144A Global Note is a Qualified Institutional Buyer, is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and is also a Qualified Purchaser, then the Trustee or Registrar will instruct DTC to reduce, or cause to be reduced, the

Regulation S Global Secured Note by the Aggregate Outstanding Amount of the beneficial interest in the Regulation S Global Secured Note to be transferred or exchanged and the Trustee or Registrar shall instruct DTC, concurrently with such reduction, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Secured Note.

(iii)     Regulation S Global Subordinated Note to Certificated Subordinated Note. If a holder of a beneficial interest in a Regulation S Global Subordinated Note deposited with DTC wishes at any time to transfer its interest in such Regulation S Global Subordinated Note to a Person who wishes to take delivery thereof in the form of a Certificated Subordinated Note, such holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, transfer, or cause the transfer of, such interest for a Certificated Subordinated Note.  Upon receipt by the Registrar of (A) certificates substantially in the form of Exhibits B4 and B6 attached hereto executed by the transferee and (B) appropriate instructions from DTC, if required, the Registrar will approve the instructions at DTC to reduce, or cause to be reduced, the Regulation S Global Subordinated Note by the Aggregate Outstanding Amount of the beneficial interest in the Regulation S Global Subordinated Note to be transferred, record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Issuer and authentication and delivery by the Trustee, one or more corresponding Certificated Subordinated Notes, registered in the names specified in the instructions in clause (B) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the Aggregate Outstanding Amount of the interest in such Regulation S Global Subordinated Notes transferred by the transferor), and in authorized denominations.

(iv)     Other Exchanges.  In the event that a Global Note is exchanged for Notes in definitive registered form without interest coupons pursuant to Section 2.11 (Certificated Notes) hereof, such Notes may be exchanged for one another only in accordance with such procedures as are substantially consistent with the provisions above (including certification requirements intended to insure that such transfers are made only to Holders who are Qualified Purchasers and comply with Rule 144A or are to persons who are not U.S. persons who are non-U.S. residents (as determined for purposes of the Investment Company Act), and otherwise comply with Regulation S under the Securities Act, as the case may be), and as may be from time to time adopted by the Co-Issuers and the Trustee.

(g)     So long as a Certificated Note remains Outstanding, transfers of a Certificated Note, in whole or in part, shall only be made in accordance with this Section 2.6(g) (Registration, Registration of Transfer and Exchange).

(i)     Transfer and Exchange of Certificated Secured Note to Certificated Secured Note.  If a Holder of a Certificated Secured Note wishes at any time to transfer such Certificated Secured Note to a Person who wishes to take delivery thereof in the

NEWYORK 8715474 (2K)

form of one or more Certificated Secured Notes of the same Class, such Holder may transfer or cause the transfer of such Note as provided below.  Upon receipt by the Trustee or the Registrar of (A) such Holder's Certificated Secured Note properly endorsed for assignment to the transferee and (B) a certificate in the form of Exhibit B3 attached hereto given by the transferee of such Certificated Secured Note, then the Registrar shall cancel such Certificated Secured Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Applicable Issuers authenticate and deliver one or more Certificated Secured Notes bearing the same designation as the Certificated Secured Notes endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal or face amounts designated by the transferee (the aggregate of such principal or face amounts being equal to the Aggregate Outstanding Amount of the Certificated Secured Notes surrendered by the transferor), and in authorized denominations. Certificated Secured Notes may be exchanged in the manner set forth in Section 2.6(g)(iv) (Registration, Registration of Transfer and Exchange).

(ii)     Transfer and Exchange of Certificated Subordinated Note to Certificated Subordinated Note.  Upon receipt by the Registrar of (A) a Holder's Certificated Subordinated Note properly endorsed for assignment to the transferee and (B) certificates substantially in the form of Exhibits B4 and B6 attached hereto (which may be in the form of a subscription agreement containing substantially the representations in Exhibits B4 and B6) given by the transferee of such Certificated Subordinated Note, then the Registrar shall cancel such Certificated Subordinated Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Issuer authenticate and deliver one or more Certificated Subordinated Notes bearing the same designation as the Certificated Subordinated Note endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the aggregate principal amount of the Certificated Subordinated Note surrendered by the transferor), and in authorized denominations.  Certificated Subordinated Notes may be exchanged in the manner set forth in Section 2.6(g)(iv) (Registration, Registration of Transfer and Exchange).

(iii)     Transfer of Certificated Subordinated Note to Regulation S Global Subordinated Note.  If a holder of a Certificated Subordinated Note wishes at any time to transfer such Certificated Subordinated Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Regulation S Global Subordinated Note, such holder may, subject to the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, exchange or transfer, or cause the exchange or transfer of, such Certificated Subordinated Note for a beneficial interest in a Regulation S Global Subordinated Note.  Upon receipt by the Registrar of (A) a holder's Certificated Subordinated Note properly endorsed for assignment to the transferee, (B) a certificate substantially in the form of Exhibit B5 attached hereto executed by the transferor, (C) instructions given in accordance with Euroclear, Clearstream or DTC's procedures, as the case may be, from an Agent Member to instruct DTC to cause to be credited a

beneficial interest in the Regulation S Global Subordinated Note in an amount equal to the Certificated Subordinated Note to be transferred or exchanged and (D) a written order given in accordance with DTC's procedures containing information regarding the participant's account at DTC and/or Euroclear or Clearstream to be credited with such increase, the Registrar shall cancel such Certificated Subordinated Note in accordance with <u>Section 2.10</u> (Cancellation), record the transfer in the Register in accordance with <u>Section 2.6(a)</u> (Registration, Registration of Transfer and Exchange) and approve the instructions at DTC, concurrently with such cancellation, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Regulation S Global Subordinated Note equal to the principal amount of the Certificated Subordinated Note transferred or exchanged.

(iv)     <u>Exchange of Certificated Notes</u>.  If a Holder of one or more Certificated Notes wishes at any time to exchange such Certificated Notes for one or more Certificated Notes of the same Class of different principal amounts, such holder may exchange or cause the exchange of such Certificated Note for Certificated Notes bearing the same designation as the Certificated Notes endorsed for exchange.  Upon receipt by the Applicable Issuers and the Trustee or the Registrar of (x) such Holder's Certificated Notes properly endorsed for such exchange and (y) written instructions from such Holder designating the number and principal or face amounts of the Certificated Notes to be issued (the aggregate of such principal or face amounts being equal to the aggregate principal or face amount of the Certificated Notes surrendered for exchange), then the Registrar shall cancel such Certificated Notes in accordance with <u>Section 2.10</u> (Cancellation), record the exchange in the Register in accordance with <u>Section 2.6(a)</u> (Registration, Registration of Transfer and Exchange) and upon execution by the Applicable Issuers authenticate and deliver one or more Certificated Notes bearing the same designation as the Certificated Notes endorsed for exchange, registered in the same names as the Certificated Notes surrendered by such Holder, in different principal or face amounts designated by such Holder, and in authorized denominations.

(v)     <u>Transfer of Certificated Secured Notes to Regulation S Global Note or Rule 144A Global Note</u>.  If a Holder of a Certificated Secured Note wishes at any time to transfer such Certificated Secured Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Regulation S Global Note or Rule 144A Global Note, such Holder may, subject to the rules and procedures of DTC, exchange or transfer, or cause the exchange or transfer of, such Certificated Secured Note for a beneficial interest in a Regulation S Global Note or Rule 144A Global Note, as applicable.  Upon receipt by the Registrar of (A) a Holder's Certificated Secured Note properly endorsed for assignment to the transferee, (B) a certificate substantially in the form of <u>Exhibit B3</u> attached hereto executed by the transferor, (C) instructions given in accordance with Euroclear, Clearstream or DTC's procedures, as the case may be, from an Agent Member to instruct DTC to cause to be credited a beneficial interest in the Regulation S Global Note or Rule 144A Global Note, as applicable, in an amount equal to the Certificated Secured Note to be transferred or exchanged and (D) a written order given in accordance with DTC's procedures containing information regarding the participant's account at DTC and/or Euroclear or Clearstream, as applicable, to be credited with such increase, the Registrar shall cancel such Certificated Secured Note in accordance with <u>Section 2.10</u>

NEWYORK 8715474 (2K)

(Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and approve the instructions at DTC, concurrently with such cancellation, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Regulation S Global Note or Rule 144A Global Note, as applicable, equal to the principal amount of the Certificated Secured Note transferred or exchanged

(h)     If Notes are issued upon the transfer, exchange or replacement of Notes bearing the applicable legends set forth in the applicable part of Exhibit A hereto, and if a request is made to remove such applicable legend on such Notes, the Notes so issued shall bear such applicable legend, or such applicable legend shall not be removed, as the case may be, unless there is delivered to the Trustee and the Applicable Issuers such satisfactory evidence, which may include an Opinion of Counsel acceptable to them, as may be reasonably required by the Applicable Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of the Securities Act, the Investment Company Act, ERISA or the Code.  Upon provision of such satisfactory evidence, the Trustee or its Authenticating Agent, at the written direction of the Applicable Issuers shall, after due execution by the Applicable Issuers authenticate and deliver Notes that do not bear such applicable legend.

(i)     Each Person who becomes a beneficial owner of Notes of a Class represented by an interest in a Global Note will be deemed to have represented and agreed as follows:

(i)     In connection with the purchase of such Notes: (A) none of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator, the Placement Agents or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (B) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Placement Agents other than any statements in the final offering circular for such Notes, and such beneficial owner has read and understands such final offering circular; (C) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to this Indenture) based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Placement Agents; (D) such beneficial owner is either (1) (except in the case of the Subordinated Notes) both (x) a Qualified Institutional Buyer that is not a broker-dealer which owns and invests on a discretionary basis less than $25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (y) either (i) a Qualified Purchaser or (ii) (in the case of the Subordinated Notes

only) a Knowledgeable Employee with respect to the Issuer; or corporations, partnerships, limited liability companies or other entities (other than trusts) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee or a Qualified Purchaser or (2) not a U.S. person and is acquiring the Notes in an offshore transaction in reliance on the exemption from registration provided by Regulation S; (E) such beneficial owner is acquiring its interest in such Notes for its own account; (F) such beneficial owner was not formed for the purpose of investing in such Notes; (G) such beneficial owner understands that the Issuer may receive a list of participants holding interests in the Notes from one or more book-entry depositories; and (H) such beneficial owner will hold and transfer at least the minimum denomination of such Notes and provide notice of the relevant transfer restrictions to subsequent transferees; provided, that in the case of clauses (A), (B) and (C) above, the Portfolio Manager or an Affiliate of the Portfolio Manager has acted as financial and investment advisor to certain accounts for the benefit of certain beneficial owners of Notes managed by the Portfolio Manager or such Affiliate of the Portfolio Manager and in that capacity has provided, and in the future may provide, advice to such beneficial owners of Notes.

(ii) (a) In the case of the Secured Notes other than the Class E Notes and Class F Notes, on each day from the date on which such beneficial owner acquires its interest in such Secured Notes through and including the date on which such beneficial owner disposes of its interest in such Secured Notes that either (x) it is neither a Benefit Plan Investor nor a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (y) its acquisition, holding and disposition of such Secured Note will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law) and (b) in the case of Class E Notes and Class F Notes, on each day from the date on which such beneficial owner acquires its interest in such Class E Note or Class F Note through and including the date on which such beneficial owner disposes of its interest in such Class E Note or Class F Note, that (1) it is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such Class E Note or Class F Note will not constitute or result in a non-exempt violation under any such substantially similar law. Any purported transfer of a Secured Note, or any interest therein to a purchaser or transferee that does not comply with the requirements specified in the applicable documents will be of no force and effect and shall be null and void ab initio.

Each purchaser of Regulation S Global Subordinated Notes from the Issuer in the initial offering will be required to represent and warrant, with certificates substantially in the form of Exhibit B4 hereto, with respect to each day it holds such Regulation S Global Subordinated Note or any beneficial interest therein, (1) whether or not the purchaser or transferee is a Benefit Plan Investor, (2) whether or not the purchaser or transferee is a Controlling Person and (3) (a) if it is a Benefit Plan Investor, its acquisition, holding and disposition of Regulation S Global Subordinated Notes will not constitute or result in a

non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if it is a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of Regulation S Global Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law. Each purchaser from the Issuer in the initial offering of a Regulation S Global Subordinated Note that fails to provide the certification described in the prior sentence will be deemed to have represented and warranted, with respect to each day it holds such Regulation S Global Subordinated Note or any beneficial interest therein, that (1) such purchaser is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of Regulation S Global Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law. Such purchaser or transferee, as applicable, acknowledges that no Regulation S Global Subordinated Notes may be acquired by any purchaser or transferee, as applicable, that is a Benefit Plan Investor or Controlling Person if it would cause 25% or more of the value of the Subordinated Notes to be held by Benefit Plan Investors. Each purchaser or transferee of Regulation S Global Subordinated Notes from persons other than from the Issuer in the initial offering will be deemed to have represented and warranted, with respect to each day it holds such Regulation S Global Subordinated Note or any beneficial interest therein, that (1) such purchaser or transferee is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser or transferee is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of Regulation S Global Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law. No Regulation S Global Subordinated Notes may be acquired from persons other than from the Issuer in the initial offering by Benefit Plan Investors or Controlling Persons. Any purported transfer of the Regulation S Global Subordinated Notes, or any interest therein, to a purchaser or transferee that does not comply with the requirements of this paragraph will be of no force and effect, shall be null and void ab initio and the Issuer will have the right to direct the purchaser to transfer the Subordinated Notes, or any interest therein, as applicable, to a person who meets the foregoing criteria.

      (iii)    Such beneficial owner understands that such Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, such Notes have not been and will not be registered under the Securities Act, and, if in the future such beneficial owner decides to offer, resell, pledge or otherwise transfer such Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of this Indenture and the legend on such Notes. Such beneficial owner acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes. Such beneficial owner understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.

(iv)     It is aware that, except as otherwise provided in this Indenture, the Notes being sold to it, if any, in reliance on Regulation S will be represented by one or more Regulation S Global Notes, and that beneficial interests therein may be held only through Euroclear or Clearstream.

(v)     The holder will provide notice to each Person to whom it proposes to transfer any interest in the Notes of the transfer restrictions and representations set forth in this Section 2.6 (Registration, Registration of Transfer and Exchange), including the Exhibits referenced herein.

(j)     Each Person who becomes an owner of a Certificated Subordinated Note will be required to make the representations and agreements set forth in Exhibit B4 and Exhibit B6.

(k)     Any purported transfer of a Note not in accordance with this Section 2.6 (Registration, Registration of Transfer and Exchange) shall be null and void and shall not be given effect for any purpose whatsoever.

(l)     To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon written notice to the Trustee, impose additional transfer restrictions on the Subordinated Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and other similar laws or regulations, including, without limitation, requiring each transferee of a Subordinated Note to make representations to the Issuer in connection with such compliance.

(m)     Each purchaser has read the summary of the U.S. federal income tax considerations under the heading "*Certain Tax Considerations*" in the Offering Circular. Each purchaser will treat the characterization of the Notes as debt or equity for U.S. tax purposes in a manner consistent with the treatment of such Notes by the Issuer as described under the heading "*Certain Tax Considerations*" in the Offering Circular and will take no action inconsistent with such treatment.

(n)     Each purchaser understands that the Issuer may require certification acceptable to it (i) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding or (ii) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.  Each purchaser agrees to provide any such certification that is requested by the Issuer.

(o)     Each Holder and beneficial owner of a Note that is not a U.S. Person will make, or by acquiring such Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(A) of the Code) or (ii) it is a Person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it

NEWYORK 8715474 (2K)

is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

(p)     Any holder may assign its voting rights to one or more assignees pursuant to agreements entered into between such holder and the assignees.  Holders shall not assign voting rights to a person that has no right to cashflows from the applicable Notes (directly or indirectly) or retain voting rights when such holders have no remaining right to cashflow from the applicable Notes (directly or indirectly).

(q)     Each purchaser has read the summary of the provisions related to no petitions for bankruptcy in "*Description of the Offered Securities – No Petitions for Bankruptcy*" in the Offering Circular.  Each purchaser will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes.  Each purchaser understands that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Trustee to enter into this Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of this Indenture and that any holder or beneficial owner of a Note, the Trustee, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

(r)     Each Holder and beneficial owner of a Note (including a Holder or beneficial owner of a Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of such Note if such holder or beneficial owner fails to sell such Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to this Indenture to enable the Issuer to comply with FATCA.  A clearing organization that holds a Note on behalf of a beneficial owner may convert such Note from a Global Note to a definitive physical Note, upon request from such beneficial owner or the Holder of such Note, if it is unable to obtain the Holder FATCA Information from such beneficial owner or the holder of such Note.

(s)     Each purchaser, beneficial owner and subsequent transferee of a Combination Note or interest therein, by acceptance of such Combination Note or an interest in such Combination Note, will be deemed to have agreed that before any interest in a Combination Note may be exchanged for its ratable share of the Class A-1 Notes, the Class B Notes or the Class C Notes that comprise its Components, the Holder will be required to provide the Trustee with an Exchange Notice in the form of <u>Exhibit B7</u>.

Section 2.7.    Mutilated, Defaced, Destroyed, Lost or Stolen Note.   If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Applicable Issuers, the Trustee and the relevant Transfer Agent evidence to their reasonable satisfaction of the destruction, loss or theft of any Note and (b) there is delivered to the Applicable Issuers, the Trustee and such Transfer Agent such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement delivered to the Trustee by an institutional investor with a net worth of at least $200,000,000 being deemed sufficient to satisfy such security or indemnity requirement), then, in the absence of notice to the Applicable Issuers, the Trustee or such Transfer Agent that such Note has been acquired by a protected purchaser, the Applicable Issuers shall execute and, upon Issuer Order, the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note, of like tenor (including the same date of issuance) and equal principal or face amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a protected purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Applicable Issuers, the Transfer Agent and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Applicable Issuers, the Trustee and the Transfer Agent in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Applicable Issuers in their discretion may, instead of issuing a new Note pay such Note without requiring surrender thereof except that any mutilated or defaced Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note), the Applicable Issuers may require the payment by the Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) in lieu of any mutilated, defaced, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Applicable Issuers and such new Note shall be entitled, subject to the second paragraph of this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note), to all the benefits of this Indenture equally and proportionately with any and all other Notes of the same Class duly issued hereunder.

The provisions of this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.8.    Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved.  (a)  Each Class of Secured Notes shall accrue interest during each

Interest Accrual Period at the applicable Note Interest Rate and such interest will be payable in arrears on each Payment Date on the Aggregate Outstanding Amount thereof on the first day of the related Interest Accrual Period (after giving effect to payments of principal thereof on such date), except as otherwise set forth below. Payment of interest on each Class of Secured Notes (and payments of Interest Proceeds to the Holders of the Subordinated Notes) will be subordinated to the payments of interest on the related Priority Classes. So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of interest due on such Class of Deferred Interest Notes which is not available to be paid ("Deferred Interest" with respect thereto) in accordance with the Priority of Payments on any Payment Date shall not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) (and the failure to pay such interest shall not be an Event of Default) until the earliest of the Payment Date (i) on which such interest is available to be paid in accordance with the Priority of Payments, (ii) which is a Redemption Date with respect to such Class of Deferred Interest Notes and (iii) which is the Stated Maturity of such Class of Deferred Interest Notes. Deferred Interest on any Class of Deferred Interest Notes shall be added to the principal balance of such Class of Deferred Interest Notes and payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to such Class of Deferred Interest Notes and (ii) which is the Stated Maturity of such Class of Deferred Interest Notes. Interest will cease to accrue on each Secured Note, or in the case of a partial repayment, on such part, from the date of repayment or the respective Stated Maturity, unless payment of principal is improperly withheld or unless default is otherwise made with respect to such payments of principal. To the extent lawful and enforceable, (x) interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for such Class until paid as provided herein and (y) interest on the interest on any Class X Notes, the Class A-1 Notes, the Class A-2 Notes or the Class B Notes or, if no Class X Notes, Class A-1 Notes, Class A-2 Notes or Class B Notes are Outstanding, any Class C Note or, if no Class C Notes are Outstanding, any Class D Note or, if no Class D Notes are Outstanding, any Class E Notes or, if no Class E Notes are Outstanding, any Class F Notes that is not paid when due shall accrue at the Note Interest Rate for such Class until paid as provided herein.

(b)     The principal of each Secured Note of each Class matures at par and is due and payable on the Payment Date which is the Stated Maturity for such Class of Secured Notes, unless the unpaid principal of such Secured Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise. Notwithstanding the foregoing, the payment of principal of each Class of Secured Notes (and payments of Principal Proceeds to the Holders of the Subordinated Notes) may only occur (other than amounts constituting Deferred Interest thereon which will be payable from Interest Proceeds pursuant to Section 11.1(a)(i) (Disbursements of Monies from Payment Account)) after principal on each Class of Notes that constitutes a Priority Class with respect to such Class has been paid in full and is subordinated to the payment on each Payment Date of the principal and interest due and payable on such Priority Class(es), and other amounts in accordance with the Priority of Payments, and any payment of principal of any Class of Secured Notes which is not paid, in accordance with the Priority of Payments, on any Payment Date (other than the Payment Date which is the Stated Maturity of such Class or any Redemption Date), shall not be considered "due and payable" for purposes of Section 5.1(a) (Events of Default) until the Payment Date on which such principal may be paid

in accordance with the Priority of Payments or all of the Priority Classes with respect to such Class have been paid in full.

(c)    Principal payments on the Notes will be made in accordance with the Priority of Payments and Section 9.1 (Mandatory Redemption) hereof.

(d)    As a condition to the payment of principal of and interest on any Secured Note or any payment on any Subordinated Note, without the imposition of withholding tax, the Paying Agent may require certification acceptable to it to enable the Issuer, the Co-Issuer, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments in respect of such Note under any present or future law or regulation of the United States and any other applicable jurisdiction, or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

(e)    Payments in respect of interest on and principal of any Secured Note and any payment with respect to any Subordinated Note shall be made by the Trustee in United States dollars to DTC or its designee with respect to a Global Note and to the Holder or its nominee with respect to a Certificated Note, by wire transfer, as directed by the Holder, in immediately available funds to a United States dollar account, as the case may be, maintained by DTC or its nominee with respect to a Global Note, and to the Holder or its designee with respect to a Certificated Note; provided, that in the case of a Certificated Note, the Holder thereof shall have provided written wiring instructions to the Trustee on or before the related Record Date; and provided, further, that if appropriate instructions for any such wire transfer are not received by the related Record Date, then such payment shall be made by check drawn on a U.S. bank mailed to the address of the Holder specified in the Register.  Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Office of the Trustee or at the office of any Paying Agent on or prior to such Maturity; provided, however, that if the Trustee and the Applicable Issuers shall have been furnished such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Applicable Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender.  None of the Co-Issuers, the Trustee, the Portfolio Manager, the Collateral Administrator nor any Paying Agent will have any responsibility or liability for any aspects of the records maintained by DTC, Euroclear, Clearstream or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Global Note.  In the case where any final payment of principal and interest is to be made on any Secured Note (other than on the Stated Maturity thereof) or any final payment is to be made on any Subordinated Note (other than on the Stated Maturity thereof), the Trustee, in the name and at the expense of the Applicable Issuers shall, not more than 30 nor less than 10 days prior to the date on which such payment is to be made, mail (by first class mail, postage prepaid) to the Persons entitled thereto at their addresses appearing on the Register a notice which shall specify the date on which such payment will be made, the amount of such payment per $100,000 original principal amount of Secured Notes, original principal amount of Subordinated Notes and the place where such Notes may be presented and surrendered for such payment.

(f)     Payments of principal to Holders of the Secured Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Debt of such Class registered in the name of each such Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date.  Payments to the Holders of the Subordinated Notes from Interest Proceeds and Principal Proceeds shall be made in the proportion that the Aggregate Outstanding Amount of the Subordinated Notes registered in the name of each such Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Subordinated Notes on such Record Date.

(g)     Interest accrued with respect to the Secured Notes shall be calculated on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360.

(h)     All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)     Notwithstanding any other provision of this Indenture, the obligations of the Applicable Issuers under the Notes and this Indenture are limited recourse obligations of the Applicable Issuers payable solely from the Assets and following realization of the Assets, and application of the proceeds thereof in accordance with this Indenture, all obligations of and any claims against the Co-Issuers hereunder or in connection herewith after such realization shall be extinguished and shall not thereafter revive.  No recourse shall be had against any Officer, director, partner, employee, shareholder, member, manager or incorporator of either the Co-Issuers, the Portfolio Manager or their respective successors or assigns for any amounts payable under the Notes or (except as otherwise provided herein or in the Portfolio Management Agreement) this Indenture.  It is understood that the foregoing provisions of this paragraph (i) shall not (i) prevent recourse to the Assets for the sums due or to become due under any security, instrument or agreement which is part of the Assets or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Assets have been realized.  It is further understood that the foregoing provisions of this paragraph (i) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any Proceeding or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.  The Subordinated Notes are not secured hereunder.

(j)     Subject to the foregoing provisions of this Section 2.8 (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved), each Note delivered and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest and principal (or other applicable amount) that were carried by such other Note.

Section 2.9.     Persons Deemed Owners.  The Issuer, the Co-Issuer, the Trustee and any agent of the Co-Issuers or the Trustee may treat as the owner of such Note the Person in

whose name any Note is registered on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer, the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuers or the Trustee shall be affected by notice to the contrary.

Section 2.10.    Cancellation.  All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall be promptly canceled by the Trustee and may not be reissued or resold.  No Note may be surrendered (including any surrender in connection with any abandonment) except for payment as provided herein, or for registration of transfer, exchange or redemption in accordance with Article 9 hereof, or for replacement in connection with any Note deemed lost or stolen.  Any such Notes shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10 (Cancellation), except as expressly permitted hereunder.  All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Co-Issuers shall direct by an Issuer Order that they be returned to it.  Neither of the Co-Issuers may acquire or purchase any Notes (including any Notes surrendered or abandoned). The previous sentence shall not limit any Optional Redemption, Clean-up Call Redemption, Special Redemption or Mandatory Redemption pursuant to the terms of this Indenture.

Section 2.11.    Certificated Notes.  (a)  A Global Note deposited with DTC pursuant to Section 2.2 (Forms of Notes) shall be transferred in the form of a Certificated Note to the beneficial owners thereof only if such transfer complies with Section 2.6 (Registration, Registration of Transfer and Exchange) and either (i) DTC notifies the Co-Issuers that it is unwilling or unable to continue as depository for such Global Note or (ii) if at any time DTC ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor depository is not appointed by the Co-Issuers within 90 days after such notice.  In addition, the owner of a beneficial interest in a Global Note will be entitled to receive a Certificated Note in exchange for such interest if an Event of Default has occurred and is continuing.

(b)      Any Global Note that is transferable in the form of a Certificated Note to the beneficial owners thereof pursuant to this Section 2.11 (Certificated Notes) shall be surrendered by DTC to the Trustee's office located in the Borough of Manhattan, the City of New York to be so transferred, in whole or from time to time in part, without charge, and the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of definitive physical certificates (pursuant to the instructions of DTC) substantially in the form of Exhibit A3 or Exhibit A4 (each such Secured Note (including a Certificated Class E Note or a Certificated Class F Note) issued in definitive form, a "Certificated Secured Note" and, each such Subordinated Note issued in definitive form, a "Certificated Subordinated Note" and, collectively, the "Certificated Notes") in authorized denominations.  Any Certificated Note delivered in exchange for an interest in a Global Note shall, except as otherwise provided by Section 2.6(h) (Registration, Registration of Transfer and Exchange), bear the legends set forth in the applicable Exhibit A and shall be subject to the transfer restrictions referred to in such legends.

NEWYORK 8715474 (2K)

(c)     Subject to the provisions of paragraph (b) of this <u>Section 2.11</u> (Certificated Notes), the Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

(d)     In the event of the occurrence of either of the events specified in subclauses (i) and (ii) of subsection (a) of this <u>Section 2.11</u> (Certificated Notes), the Co-Issuers will promptly make available to the Trustee a reasonable supply of Certificated Notes in definitive, fully registered form without interest coupons.

(e)     The Certificated Subordinated Notes issued pursuant to this <u>Section 2.11</u> (Certificated Notes) shall be in substantially the same form as the Certificated Subordinated Notes issued pursuant to <u>Section 2.2(b)</u> (Forms of Notes) with such changes therein as the Issuer and Trustee shall agree.

(f)     In the event that Certificated Notes are not so issued by the Issuer to such beneficial owners of interests in Global Notes as required by <u>Section 2.11(a)</u> (Certificated Notes), the Issuer expressly acknowledges that the beneficial owners shall be entitled to pursue any remedy that the Holders of a Global Note would be entitled to pursue in accordance with <u>Article 5</u> of this Indenture (but only to the extent of such beneficial owner's interest in the Global Note) as if Certificated Notes had been issued.

Section 2.12.     <u>Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations</u>.  (a)  Notwithstanding anything to the contrary elsewhere in this Indenture, (x) any transfer of a beneficial interest in any Secured Note (other than the Class E Notes and Class F Notes) to a U.S. person that is not a QIB/QP and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act, (y) any transfer of a beneficial interest in any Class E Note or Class F Note to a U.S. person that is not (i) a Qualified Institutional Buyer or an Institutional Accredited Investor and (ii) a Qualified Purchaser and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act and (z) any transfer of a beneficial interest in any Subordinated Note to a U.S. person that is not (i) a Qualified Institutional Buyer or an Accredited Investor and (ii) a Qualified Purchaser, a Knowledgeable Employee or a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee or a Qualified Purchaser and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act shall be null and void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b)     If (A) (x) any U.S. person that is not a QIB/QP shall become the beneficial owner of an interest in any Secured Note (other than the Class E Notes and Class F Notes), (y) any U.S. person that is not (i) a Qualified Institutional Buyer or an Institutional Accredited Investor and (ii) a Qualified Purchaser shall become the beneficial owner of an interest in a Class E Note or a Class F Note and (z) any person that is not a Qualified Purchaser, a Knowledgeable Employee or a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a

Knowledgeable Employee or a Qualified Purchaser shall become the beneficial owner of an interest in any Subordinated Note (any such person a "Non-Permitted Holder") or (B) any beneficial owner of an interest in any Note is designated as a Recalcitrant Holder or Non-Compliant FFI, the Issuer may (in its sole discretion), promptly after discovery (or after designation as a Recalcitrant Holder or Non-Compliant FFI) that such person is a Non-Permitted Holder, a Recalcitrant Holder or a Non-Compliant FFI by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI demanding that such Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI transfer its interest in the Notes held by such person to a Person that is not a Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI within 30 days of the date of such notice. If such Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI fails to so transfer such Notes, the Issuer shall (1) have the right to compel such Holder to sell its interest in the Notes, (2) assign such Notes a separate CUSIP number or numbers and (3) have the right, without further notice to the Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI, to sell such Notes or interest in such Notes to a purchaser selected by the Issuer that is a not a Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI on such terms as the Issuer may choose. The Issuer, or the Portfolio Manager acting on behalf of the Issuer, may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Notes, and selling such Notes to the highest such bidder. However, the Issuer or the Portfolio Manager acting on behalf of the Issuer may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Note, the Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI and each other Person in the chain of title from the Holder to the Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI, by its acceptance of an interest in the Notes, agrees to cooperate with the Issuer and the Trustee to effect such transfers. The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI. The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of such discretion.

(c) Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a beneficial interest in any ERISA Limited Note to a Person who has made or is deemed to have made an ERISA-related representation required by Section 2.6 (Registration, Registration of Transfer and Exchange) that is subsequently shown to be false or misleading shall be null and void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(d) If any Person shall become the beneficial owner of an interest in any ERISA Limited Note who has made or is deemed to have made an ERISA-related representation required by Section 2.6 (Registration, Registration of Transfer and Exchange) that is subsequently shown to be false or misleading or whose beneficial ownership otherwise causes a violation of the 25% Limitation (any such person a "Non-Permitted ERISA Holder"), the Issuer shall, promptly after discovery by the Issuer that such person is a Non-Permitted ERISA Holder (or upon notice by the Trustee to the Issuer if it makes the discovery), send notice to such

Non-Permitted ERISA Holder demanding that such Non-Permitted ERISA Holder transfer all or any portion of the ERISA Limited Notes held by such Person to a Person that is not a Non-Permitted ERISA Holder within 14 days of the date of such notice. If such Non-Permitted ERISA Holder fails to so transfer its ERISA Limited Notes the Issuer shall have the right, without further notice to the Non-Permitted ERISA Holder, to sell such ERISA Limited Notes or interest in such ERISA Limited Notes to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose. The Issuer may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the ERISA Limited Notes and selling such ERISA Limited Notes to the highest such bidder. However, the Issuer may select a purchaser by any other means determined by it in its sole discretion. The Holder of each ERISA Limited Note, the Non-Permitted ERISA Holder and each other Person in the chain of title from the Holder to the Non-Permitted ERISA Holder, by its acceptance of an interest in the ERISA Limited Notes agrees to cooperate with the Issuer and the Trustee to effect such transfers. The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted ERISA Holder. The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the ERISA Limited Notes sold as a result of any such sale or the exercise of such discretion.

Section 2.13. <u>Tax Purposes</u>. (a) Each Holder and each beneficial owner of a Secured Note by acceptance of such Secured Note, or its interest in such Secured Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Secured Note as debt of the Issuer for U.S. federal income tax purposes except as otherwise required by law. Each Holder and each beneficial owner of a Subordinated Note by acceptance of such Subordinated Note or its interest in such Subordinated Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Subordinated Note as equity in the Issuer for U.S. federal income tax purposes except as otherwise required by law.

(b) Each Holder and beneficial owner of a Note, by acceptance of such Note or its interest in such Note, shall be deemed to understand and acknowledge that failure to provide the Issuer, the Trustee or any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a U.S. Person or an appropriate Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a U.S. Person or the failure to meet its Noteholder Reporting Obligations may result in U.S. federal withholding (including back-up withholding) from payments in respect of such Note.

(c) Each purchaser, beneficial owner and subsequent transferee of a Note or interest therein, by acceptance of such Note or an interest in such Note, shall be deemed to have agreed (1) to provide the Issuer and Trustee (i) any information as is necessary (in the sole determination of the Issuer or the Trustee, as applicable) for the Issuer and the Trustee to determine whether such purchaser, beneficial owner or transferee is a United States person or a United States owned foreign entity (as described in Section 1471(d)(3) of the Code) ("<u>United States owned foreign entity</u>") and (ii) any additional information that the Issuer or its agent requests in connection with FATCA and (2) if it is a United States person or a United States owned foreign entity that is a Holder or beneficial owner of Notes or an interest therein (x) to

provide the Issuer and Trustee its name, address, U.S. taxpayer identification number and any other information requested (in connection with FATCA) by the Issuer or its agent upon request and (y) to update any such information provided in clause (x) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required (such obligation, the "Noteholder Reporting Obligations"). Each purchaser and subsequent transferee of Notes will be required or deemed to acknowledge that the Issuer may provide such information and any other information concerning its investment in the Notes to the IRS. Each purchaser and subsequent transferee of Notes will be required or deemed to understand and acknowledge that the Issuer has the right, hereunder, to compel any beneficial owner of an interest in a Note that fails to comply with the foregoing requirements to sell its interest in such Note, or may sell such interest on behalf of such owner following the procedures and timeframe relating to Non-Permitted Holders specified in Section 2.12 (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations). In addition, each purchaser and subsequent transferee of Notes will be required or deemed to understand and acknowledge that the Issuer has the right, hereunder, to withhold (without any gross-up) on any beneficial owner of an interest in a Note that fails to comply with the foregoing requirements.

Section 2.14. No Gross Up. The Issuer shall not be obligated to pay any additional amounts to the Holders or beneficial owners of the Notes as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges imposed on payments in respect of the Notes.

ARTICLE 3

Conditions Precedent

Section 3.1. Conditions to Issuance of Notes on Closing Date. (a) The Notes to be issued on the Closing Date may be executed by the Applicable Issuers and delivered to the Trustee for authentication upon Issuer Order and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Order and upon receipt by the Trustee (or, with respect to the Accountants' Report specified in clause (xiv) below, the Collateral Administrator (upon its execution of an acknowledgement letter satisfactory to such accountants)) of the following:

(i)      Officers' Certificates of the Co-Issuers Regarding Corporate Matters. An Officer's certificate of each of the Co-Issuers (A) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, and, in the case of the Issuer, the Portfolio Management Agreement, the Securities Account Control Agreement, the Placement Agency Agreement, the Collateral Administration Agreement, any Hedge Agreements and related transaction documents and in each case the execution, authentication and delivery of the Notes applied for by it and specifying the Stated Maturity, principal amount and Note Interest Rate of each Class of Secured Notes to be authenticated and delivered, the Stated Maturity and principal amount of Subordinated Notes to be authenticated and delivered and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon.

(ii)    <u>Governmental Approvals</u>.  From each of the Co-Issuers either (A) a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of such Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes applied for by it or (B) an Opinion of Counsel of the Applicable Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Notes except as have been given.

(iii)    <u>U.S. Counsel Opinions</u>.  Opinions of White & Case LLP, special U.S. counsel to the Co-Issuers, Dechert LLP, counsel to the Portfolio Manager, and Seward & Kissel LLP, counsel to the Trustee, dated the Closing Date, substantially in the form of <u>Exhibit C</u>, <u>Exhibit D</u>, and <u>Exhibit E</u> attached hereto.

(iv)    <u>Cayman Counsel Opinion</u>.  An opinion of Appleby (Cayman) Ltd., Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of <u>Exhibit F</u> attached hereto.

(v)    <u>Officers' Certificates of Co-Issuers Regarding Indenture</u>.  An Officer's certificate of each of the Co-Issuers stating that the Applicable Issuer is not in default under this Indenture and that the issuance of the Offered Securities applied for by it will not result in a default or a breach of any of the terms, conditions or provisions of, or constitute a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Offered Securities applied for by it have been complied with; and that all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid or reserves therefor have been made.  The Officer's certificate of the Issuer shall also state that all of its representations and warranties contained herein are true and correct as of the Closing Date.

(vi)    <u>Hedge Agreements</u>.  Executed copies of any Hedge Agreement entered into by the Issuer.

(vii)    <u>Portfolio Management Agreement and Collateral Administration Agreement</u>.  An executed counterpart of the Portfolio Management Agreement and the Collateral Administration Agreement.

(viii)    <u>Grant of Collateral Obligations</u>.  The Grant pursuant to the Granting Clause of this Indenture of all of the Issuer's right, title and interest in and to the Collateral Obligations pledged to the Trustee for inclusion in the Assets on the Closing Date securing the Notes and Delivery of such Collateral Obligations (including any promissory note and all other Underlying Instruments related thereto to the extent

received by the Issuer) as contemplated by Section 3.3 (Custodianship; Delivery of Collateral Obligations and Eligible Investments).

(ix) <u>Certificate of the Issuer Regarding Assets</u>. A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Assets, on the Closing Date and immediately prior to the Delivery thereof on the Closing Date:

(A) the Issuer is the owner of such Collateral Obligation free and clear of any liens, claims or encumbrances of any nature whatsoever except for (i) those which are being released on the Closing Date and (ii) those Granted pursuant to this Indenture;

(B) the Issuer has acquired its ownership in such Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C) the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Obligation (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(D) the Issuer has full right to Grant a security interest in and assign and pledge such Collateral Obligation to the Trustee;

(E) the information set forth with respect to such Collateral Obligation in the Schedule of Collateral Obligations is correct;

(F) each Collateral Obligation included in the Assets satisfies the requirements of the definition of "<u>Collateral Obligation</u>" and of <u>Section 3.1(a)(viii)</u> (Conditions to Issuance of Notes on Closing Date); and

(G) upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral Obligations and other Assets, except as permitted by this Indenture.

(x) <u>Rating Letters</u>. An Officer's certificate of the Issuer to the effect that attached thereto is a true and correct copy of a letter signed by each Rating Agency, as applicable, and confirming that each Class of Secured Notes has been assigned the applicable Initial Rating and that such ratings are in full force and effect on the Closing Date.

(xi) <u>Accounts</u>. A certificate evidencing the establishment of each of the Accounts.

(xii) <u>Issuer Order for Deposit of Funds into Accounts</u>. (a) An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of $502,631,025 from the proceeds of the issuance

NEWYORK 8715474 (2K)

of the Notes into the Ramp-up Account for use pursuant to Section 7.18 (Ramp-up Period; Purchase of Additional Collateral Obligations) and 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account), (b) an Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of $2,100,000 from the proceeds of the issuance of the Notes into the Expense Reserve Account for use pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account) and (c) an Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of $4,000,000 from the proceeds of the issuance of the Notes into the Interest Reserve Account for use pursuant to Section 10.3(f) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

(xiii)   Irish Listing.   An Officer's certificate of the Issuer to the effect that application has been made to the Irish Stock Exchange to admit the Notes to the Official List and to trade on the Global Exchange Market.

(xiv)   Accountants' Report.   An Accountants' Report (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation set forth on the Schedule of Collateral Obligations attached hereto as Schedule 1 and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to such sources as shall be specified therein, (B) confirming that the Aggregate Principal Balance of the Collateral Obligations which the Issuer has purchased or entered into binding agreements to purchase on or about the Closing Date is at least $250,000,000 and (C) specifying the procedures undertaken by them to review data and computations relating to the foregoing information.

(xv)   Other Documents.   Such other documents as the Trustee may reasonably require; provided, that nothing in this clause (xv) shall imply or impose a duty on the part of the Trustee to require any other documents.

Section 3.2.   Conditions to Issuance of Additional Notes.   Additional Subordinated Notes to be issued on an Additional Notes Closing Date pursuant to Section 2.4 (Additional Notes) may be executed by the Applicable Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered to the Issuer by the Trustee upon Issuer Order and upon receipt by the Trustee (or, with respect to the Accountants' Report specified in clause (vi) below, the Collateral Administrator (upon its execution of an acknowledgement letter satisfactory to such accountants)) of the following:

(i)   Officers' Certificates of the Co-Issuers Regarding Corporate Matters.   An Officer's certificate of each of the Co-Issuers (1) evidencing the authorization by Board Resolution of the execution and delivery of a supplemental indenture pursuant to Section 8.2(b) (Supplemental Indentures With Consent of Holders of Offered Securities) and the execution, authentication and delivery of the Additional Subordinated Notes applied for by it specifying the Stated Maturity and principal amount of the Subordinated

NEWYORK 8715474 (2K)

Notes to be authenticated and delivered and (2) certifying that (a) the attached copy of such Board Resolution is a true and complete copy thereof, (b) such resolutions have not been rescinded and are in full force and effect on and as of the Additional Notes Closing Date and (c) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon.

(ii)    <u>Governmental Approvals</u>.   From each of the Co-Issuers either (A) a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of such Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of such Additional Subordinated Notes or (B) an Opinion of Counsel of the Applicable Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Additional Subordinated Notes except as have been given.

(iii)    <u>U.S. Counsel Opinions</u>.   Opinions of White & Case LLP, special U.S. counsel to the Co-Issuers, or other counsel acceptable to the Trustee, dated the Additional Notes Closing Date, substantially in the form of <u>Exhibit C</u> attached hereto, each with additions or deletions reflecting the additional issuance.

(iv)    <u>Cayman Counsel Opinion</u>.   An opinion of Appleby (Cayman) Ltd., Cayman Islands counsel to the Issuer, or other counsel acceptable to the Trustee, dated the Additional Notes Closing Date, substantially in the form of <u>Exhibit F</u> attached hereto.

(v)    <u>Officers' Certificates of Co-Issuers Regarding Indenture</u>.   An Officer's certificate of each Co-Issuer stating that the Applicable Issuer is not in default under this Indenture and that the issuance of the Additional Subordinated Notes applied for by it will not result in a default or a breach of any of the terms, conditions or provisions of, or constitute a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject; that all conditions precedent provided in this Indenture and the supplemental indenture pursuant to <u>Section 8.2(b)</u> (Supplemental Indentures With Consent of Holders of Offered Securities) relating to the authentication and delivery of the Additional Subordinated Notes applied for have been complied with; and that all expenses due or accrued with respect to the Offering of the Additional Subordinated Notes or relating to actions taken on or in connection with the Additional Notes Closing Date have been paid or reserved.   The Officer's certificate of the Issuer shall also state that all of its representations and warranties contained herein are true and correct as of the Additional Notes Closing Date.

(vi)    <u>Accountants' Report</u>.   An Accountants' Report (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation pledged in connection with the issuance of such Additional Subordinated Notes and the information provided by the Issuer with respect to every other asset

included in the Assets, by reference to such sources as shall be specified therein, (B) provided, that any such issuance of Additional Subordinated Notes occurs after the Ramp-up Period, confirming that after giving effect to such pledge and the issuance of such Additional Subordinated Notes (1) the Coverage Tests are met, (2) in the aggregate, the Collateral Obligations comply with all of the requirements set forth in the Concentration Limitations and (3) the Collateral Quality Test (excluding the S&P CDO Monitor Test) is met and (C) specifying the procedures undertaken by them to review data and computations relating to the foregoing statement.

(vii)    Grant of Collateral Obligations.    The Grant pursuant to the Granting clause of this Indenture of all of the Issuer's right, title and interest in and to the additional Collateral Obligations pledged to the Trustee for inclusion in the Assets on the Additional Notes Closing Date, and Delivery of such additional Collateral Obligations (including any promissory note and all other Underlying Instruments related thereto to the extent received by the Issuer) as contemplated by Section 3.3 (Custodianship; Delivery of Collateral Obligations and Eligible Investments).

(viii)    Certificate of the Issuer Regarding Assets.    A certificate of an Authorized Officer of the Issuer, dated as of the Additional Notes Closing Date, to the effect that, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Assets on the Additional Notes Closing Date and immediately prior to the Delivery thereof on the Additional Notes Closing Date:

(A)    the Issuer is the owner of such Collateral Obligation free and clear of any liens, claims or encumbrances of any nature whatsoever except for (i) those which are being released on the Additional Notes Closing Date or (ii) those Granted pursuant to this Indenture;

(B)    the Issuer has acquired its ownership in such Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Obligation (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(D)    the Issuer has full right to Grant a security interest in and assign and pledge such Collateral Obligation to the Trustee;

(E)    the information set forth with respect to such Collateral Obligation in the Schedule of Collateral Obligations is correct;

(F)    the Collateral Obligations included in the Assets satisfy the requirements of the definition of "Collateral Obligations" and of Section 3.2(vii) (Conditions to Issuance of Additional Notes) and, if the Additional Notes Closing Date is subsequent to the Ramp-up Period, each component of the Concentration Limitations and the Collateral Quality Test; and

(G) upon Grant by the Issuer, the Trustee has a first priority perfected security interest in such Collateral Obligations and other Assets, except as permitted by this Indenture.

(ix) <u>Rating Letters</u>. An Officer's certificate of the Issuer to the effect that attached thereto is a true and correct copy of a letter signed by each Rating Agency, as applicable, and confirming that such Rating Agency's rating of the Secured Notes has not been lowered from the Initial Ratings and will not be lowered as a result of the issuance of the Additional Subordinated Notes.

(x) <u>Irish Listing</u>. If the Additional Subordinated Notes are of a Class of Notes listed on the Irish Stock Exchange, an Officer's certificate of the Issuer to the effect that attached thereto is a true and correct copy of written confirmation from the Irish Stock Exchange that such Additional Subordinated Notes have been admitted to listing on the Irish Stock Exchange.

(xi) <u>Other Documents</u>. Such other documents as the Trustee may reasonably require; <u>provided</u>, that nothing in this clause (xi) shall imply or impose a duty on the Trustee to so require any other documents.

Section 3.3. <u>Custodianship; Delivery of Collateral Obligations and Eligible Investments</u>. (a) The Issuer shall deliver or cause to be delivered to a custodian appointed by the Issuer, which shall be a Securities Intermediary (the "<u>Custodian</u>"), all Assets in accordance with the definition of "<u>Deliver</u>." Initially, the Custodian shall be U.S. Bank National Association. Any successor custodian shall be a state or national bank or trust company that is not an Affiliate of the Issuer or the Co-Issuer and has capital and surplus of at least U.S.$200,000,000 and is a Securities Intermediary and shall be subject to the requirements of <u>Section 10.1</u> (Collection of Money). Subject to the limited right to relocate Pledged Obligations as provided in <u>Section 7.5(b)</u> (Protection of Assets), the Trustee or the Custodian, as applicable, shall hold (i) all Collateral Obligations, Eligible Investments, Cash and other investments purchased in accordance with this Indenture and (ii) any other property of the Issuer otherwise Delivered to the Trustee or the Custodian, as applicable, by or on behalf of the Issuer, in the relevant Account, established and maintained pursuant to <u>Article 10</u>; as to which in each case the Trustee shall have entered into an Agreement with the Custodian substantially in the form of <u>Exhibit H</u> providing, <u>inter alia</u>, that the establishment and maintenance of such Account will be governed by a law of a jurisdiction satisfactory to the Issuer and the Trustee.

(b) Each time that the Portfolio Manager on behalf of the Issuer directs or causes the acquisition of any Collateral Obligation, Eligible Investment, or other investments, the Portfolio Manager (on behalf of the Issuer) shall, if the Collateral Obligation, Eligible Investment, or other investment is required to be, but has not already been, transferred to the relevant Account, cause the Collateral Obligation, Eligible Investment, or other investment to be Delivered to the Custodian to be held in the Custodial Account (or in the case of any such investment that is not a Collateral Obligation, in the Account in which the funds used to purchase the investment are held in accordance with <u>Article 10</u>) for the benefit of the Trustee in accordance with this Indenture. The security interest of the Trustee in the funds or other property used in connection with such acquisition shall, immediately and without further action

on the part of the Trustee, be released. The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Obligation, Eligible Investment, or other investment so acquired, including all interests of the Issuer in to any contracts related to and proceeds of the Collateral Obligations, Eligible Investments, or other investments.

ARTICLE 4

Satisfaction and Discharge

Section 4.1. Satisfaction and Discharge of Indenture. This Indenture shall be discharged and shall cease to be of further effect except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of Holders to receive payments of principal thereof and interest thereon, (iv) the rights and immunities of the Trustee hereunder and those obligations of the Trustee set forth in Section 4.2 (Application of Trust Money), (v) the rights, obligations and immunities of the Portfolio Manager hereunder and under the Portfolio Management Agreement, the rights, obligations and immunities of the Collateral Administrator under the Collateral Administration Agreement and (vi) the rights of Holders of Notes as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture) when:

(a)     either:

(i)     all Notes theretofore authenticated and delivered to Holders (other than (A) Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) and (B) Notes for whose payment Money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3 (Money for Note Payments to be Held in Trust), have been delivered to the Trustee for cancellation; or

(ii)     all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, (B) will become due and payable at their Stated Maturity within one year or (C) are to be called for redemption pursuant to Article 9 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Applicable Issuers pursuant to Section 9.3 (Redemption Procedures), Section 9.6 (Clean-up Call Redemption) and the Issuer has irrevocably deposited or caused to be deposited with the Trustee, in trust for such purpose, Cash or non-callable direct obligations of the United States of America; provided, that the obligations are entitled to the full faith and credit of the United States of America or are debt obligations which are rated "Aaa" by Moody's and "AAA" by S&P, in an amount sufficient, as verified by a firm of Independent certified public accountants which are nationally recognized, to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of such deposit (in the case of

NEWYORK 8715474 (2K)

Notes which have become due and payable), or to the respective Stated Maturity or the respective Redemption Date, as the case may be, and shall have Granted to the Trustee a valid perfected security interest in such Eligible Investment that is of first priority or free of any adverse claim, as applicable, and shall have furnished an Opinion of Counsel with respect thereto; provided, however, that this subsection (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) (Optional Preservation of Assets) shall have been made and not rescinded;

(b)      the Issuer has paid or caused to be paid all other sums then due and payable hereunder (including any amounts then due and payable pursuant to the Hedge Agreements, the Collateral Administration Agreement and the Portfolio Management Agreement without regard to the Administrative Expense Cap) by the Issuer and no other amounts are scheduled to be due and payable by the Issuer; and

(c)      the Co-Issuers have delivered to the Trustee Officers' certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with;

provided, however, that in the case of clause (a)(ii) above, the Issuer has delivered to the Trustee an Opinion of Counsel of Independent U.S. tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that the Holders of Secured Notes would recognize no income gain or loss for U.S. federal income tax purposes as a result of such deposit and satisfaction and discharge of this Indenture; provided, further, that, upon the final distribution of all proceeds of any liquidation of the Collateral Obligations, the Equity Securities and the Eligible Investments effected pursuant to Article 5, the requirements of clauses (a) and (b) above shall be deemed satisfied for the purposes of discharging this Indenture.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Portfolio Manager and, if applicable, the Holders, as the case may be, under Sections 2.8 (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved), 4.2 (Application of Trust Money), 5.4(d) (Remedies), 5.9 (Unconditional Rights of Holders to Receive Principal and Interest), 5.18 (Action on the Notes), 6.6 (Money Held in Trust), 6.7(c) (Trustee Compensation and Reimbursement), 7.1 (Payment of Principal and Interest), 7.3 (Money for Note Payments to be Held in Trust), 13.1 (Subordination; Non-Petition), 14.13 (Confidential Information) and 14.14 (Liability of Co-Issuers) hereof shall survive.

Section 4.2.      Application of Trust Money.  All Monies deposited with the Trustee pursuant to Section 4.1 (Satisfaction and Discharge of Indenture) shall be held in trust and applied by it in accordance with the provisions of the Notes and this Indenture, including, without limitation, the Priority of Payments, to the payment of principal and interest (or other amounts with respect to the Subordinated Notes), either directly or through any Paying Agent, as the Trustee may determine; and such Money shall be held in a segregated account identified as being held in trust for the benefit of the Secured Parties.

NEWYORK 8715474 (2K)

Section 4.3.    Repayment of Monies Held by Paying Agent.  In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all Monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 (Money for Note Payments to be Held in Trust) hereof and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such Monies.

ARTICLE 5

Remedies

Section 5.1.    Events of Default.  "Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    a default in the payment, when due and payable, of (i) any Class X Note Payment Amount or any interest on any Class X Note, Class A-1 Note, Class A-2 Note or Class B Note or, if there are no Class X Notes, Class A-1 Notes, Class A-2 Notes or Class B Notes Outstanding, any Class C Note or, if there are no Senior Notes or Class C Notes Outstanding, any Class D Note or, if there are no Co-Issued Notes Outstanding, any Class E Note or, if there are no Co-Issued Notes or Class E Notes Outstanding, any Class F Note, and the continuation of any such default for five Business Days or (ii) any principal, interest, or Deferred Interest on, or any Redemption Price in respect of, any Secured Note at its Stated Maturity or any Redemption Date; provided that, in each case, if such failure resulted solely from an administrative error or omission by the Trustee, the continuation of any such default for an additional five Business Days;

(b)    unless legally required or permitted to withhold such amounts, the failure by the Issuer on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments (other than as provided in clause (a) above), which failure is incapable of remedy or, if capable of remedy, is not remedied within 30 days after notice of such failure has been given to the Issuer by the Trustee or to the Issuer, the Trustee and the Portfolio Manager by at least a Majority of the Controlling Class (or, if such failure can only be remedied on a Payment Date, is not remedied by the later of the 30 day period specified above and the next Payment Date); provided that, if such failure has not been remedied within the period specified above (or before the next Payment Date, as applicable) it shall not constitute an Event of Default if corrective action is instituted within such specified period (or before the next Payment Date, as applicable) and is diligently pursued until the failure has been remedied;

(c)    either of the Co-Issuers or the Assets becomes an investment company required to be registered under the Investment Company Act;

NEWYORK 8715474 (2K)

(d)      except as otherwise provided in this Section 5.1 (Events of Default), a default, in a material respect, in the performance, or breach, in a material respect, of any other material covenant or other agreement of the Issuer or the Co-Issuer in this Indenture (it being understood, without limiting the generality of the foregoing, that any failure to meet any Concentration Limitation, Collateral Quality Test or Coverage Test is not an Event of Default), or the failure of any material representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith to be correct in all material respects when the same shall have been made, and the continuation of such default, breach or failure for a period of 30 days after notice to the Applicable Issuers and the Portfolio Manager by registered or certified mail or overnight courier, by the Trustee, or to the Applicable Issuers, the Portfolio Manager and the Trustee by at least a Majority of the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; provided, that if the Issuer or the Co-Issuer, as applicable (as notified to the Trustee by the Portfolio Manager in writing) has commenced curing such default, breach or failure during the 30 day period specified above, such default, breach or failure shall not constitute an Event of Default under this clause (d) unless it continues for a period of 45 days (rather than, and not in addition to, such 30 day period specified above) after notice to the Applicable Issuers and the Portfolio Manager by registered or certified mail or overnight courier;

(e)      the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

(f)      the institution by the shareholders or members, as applicable, of the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders or members, as applicable, of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action;

(g)      on any Measurement Date prior to payment in full of the Class A Notes, failure of the percentage equivalent of a fraction, (i) the numerator of which is equal to (1) the Collateral Principal Amount plus (2) the aggregate Market Value of all Defaulted

Obligations on such date and (ii) the denominator of which is equal to the Aggregate Outstanding Amount of the Class A Notes, to equal or exceed 102.5%; or

(h) on any Measurement Date prior to payment in full of the Class A Notes, failure of the percentage equivalent of a fraction, (i) the numerator of which is equal to (1) the Collateral Principal Amount *plus* (2) the aggregate Market Value of all Defaulted Obligations on such date *minus* (3) the CCC/Caa Par Reduction Amount and (ii) the denominator of which is equal to the Aggregate Outstanding Amount of the Class A Notes, to equal or exceed 102.5%.

Upon obtaining knowledge of the occurrence of an Event of Default (in the case of the Trustee, subject to <u>Section 6.1(d)</u> (Certain Duties and Responsibilities of the Trustee) hereof), each of (i) the Co-Issuers, (ii) the Trustee and (iii) the Portfolio Manager shall notify each other of such Event of Default. Upon the occurrence of an Event of Default actually known to a Bank Officer of the Trustee, the Trustee shall promptly notify each Hedge Counterparty, the Noteholders (as their names appear on the Register), each Paying Agent, DTC, each of the Rating Agencies and the Irish Stock Exchange (for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require) of such Event of Default in writing (unless such Event of Default has been waived as provided in <u>Section 5.14</u> (Waiver of Past Defaults)).

Section 5.2. <u>Acceleration of Maturity; Rescission and Annulment</u>. (a) If an Event of Default occurs and is continuing (other than an Event of Default specified in <u>Section 5.1(e)</u>, <u>(f)</u> or <u>(h)</u> (Events of Default)), the Trustee may, and shall, upon the written direction of at least a Majority of the Controlling Class, by notice to the Co-Issuers and each Rating Agency, declare the principal of all the Secured Notes to be immediately due and payable, and upon any such declaration such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable. If an Event of Default specified in <u>Section 5.1(e)</u> or <u>(f)</u> (Events of Default) occurs, all unpaid principal, together with all accrued and unpaid interest thereon, of all the Secured Notes, and other amounts payable hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Noteholder. If an Event of Default specified in <u>Section 5.1(h)</u> (Events of Default) occurs and is continuing, the Trustee may, and shall, upon the written direction of the Holders of at least a Majority of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes (voting separately by Class) by notice to the Co-Issuers and each Rating Agency, declare the principal of all the Secured Notes to be immediately due and payable, and upon any such declaration such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable.

(b) At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Money due has been obtained by the Trustee as hereinafter provided in this <u>Article 5</u>, at least a Majority of the Controlling Class (or in the case of an acceleration as a result of an Event of Default specified in <u>Section 5.1(h)</u> (Events of Default), the Holders of at least a Majority of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes (voting separately by Class)) by written notice to the Issuer and the Trustee, may rescind and annul such declaration and its consequences if:

(i)       The Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)       all unpaid installments of interest and principal then due on the Secured Notes (other than as a result of such acceleration);

(B)       to the extent that the payment of such interest is lawful, interest upon any Deferred Interest at the applicable Note Interest Rates; and

(C)       all unpaid taxes and Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee hereunder and any other amounts then payable by the Co-Issuers hereunder prior to such Administrative Expenses; and

(ii)       The Trustee has determined (based upon the information available to it) that all Events of Default, other than the nonpayment of the interest on or principal of the Secured Notes that have become due solely by such acceleration, have (A) been cured, and at least a Majority of the Controlling Class (or in the case of an acceleration as a result of an Event of Default specified in <u>Section 5.1(h)</u> (Events of Default), the Holders of at least a Majority of Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes (voting separately by Class)) by written notice to the Trustee has agreed with such determination (which agreement shall not be unreasonably withheld) or (B) been waived as provided in <u>Section 5.14</u> (Waiver of Past Defaults).

No such rescission shall affect any subsequent Default or impair any right consequent thereon.

Section 5.3.       <u>Collection of Indebtedness and Suits for Enforcement by Trustee</u>. The Applicable Issuers covenant that if a Default shall occur in respect of the payment of any principal of or interest when due and payable on any Secured Notes, the Applicable Issuers will, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holder of such Secured Note, the whole amount, if any, then due and payable on such Secured Note for principal and interest with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, at the applicable Note Interest Rate, and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel.

If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as agent for the Secured Parties, may, and shall upon written direction of at least a Majority of the Controlling Class, institute a Proceeding for the collection of the sums so due and unpaid, prosecute such Proceeding to judgment or final decree, and enforce the same against the Applicable Issuers or any other obligor upon the Secured Notes and collect the Monies adjudged or decreed to be payable in the manner provided by law out of the Assets.

If an Event of Default occurs and is continuing, the Trustee may in its discretion, and shall upon written direction of at least a Majority of the Controlling Class (and, if the action

of the Applicable Issuers pursuant to such written direction would have a material adverse effect on any Hedge Counterparty as determined by the Applicable Issuers, with the consent of such Hedge Counterparty), proceed to protect and enforce its rights and the rights of Holders of the Secured Notes by such appropriate Proceedings as the Trustee shall deem most effectual (if no such direction is received by the Trustee) or as the Trustee may be directed by at least a Majority of the Controlling Class, to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer or any other obligor upon the Secured Notes under the Bankruptcy Law or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Secured Notes, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether the principal of any Secured Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3 (Collection of Indebtedness and Suits for Enforcement by Trustee), shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a) to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Secured Notes upon direction by at least a Majority of the Controlling Class, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of negligence or willful misconduct) and of the Holders of the Secured Notes allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Secured Notes or to the creditors or property of the Issuer, the Co-Issuer or such other obligor;

(b) unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Secured Notes, upon the direction of at least a Majority of the Controlling Class, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

(c) to collect and receive any Monies or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Holders of the Secured Notes to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Holders of the Secured Notes, to

pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or willful misconduct.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Holder of the Secured Notes, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder of the Secured Notes in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person.

In any Proceedings brought by the Trustee on behalf of the Holders of the Secured Notes (and any such Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders of the Secured Notes.

Notwithstanding anything in this Section 5.3 (Collection of Indebtedness and Suits for Enforcement by Trustee) to the contrary, neither the Trustee nor any Holder may sell or liquidate the Assets or institute Proceedings in furtherance thereof pursuant to this Section 5.3 (Collection of Indebtedness and Suits for Enforcement by Trustee) except according to the provisions specified in Section 5.5(a) (Optional Preservation of Assets).

Section 5.4.     Remedies.  (a)  If an Event of Default shall have occurred and be continuing, and the Secured Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may, and shall, upon written direction of at least a Majority of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)     institute Proceedings for the collection of all amounts then payable on the Secured Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Assets any Monies adjudged due;

(ii)     sell or cause the sale of all or a portion of the Assets or rights or interests therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17 (Sale of Assets) hereof;

(iii)     institute Proceedings from time to time for the complete or partial foreclosure of this Indenture for the benefit of all Secured Parties with respect to the Assets;

(iv)     exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee and the Holders of the Secured Notes hereunder; and

NEWYORK 8715474 (2K)

(v)     exercise any other rights and remedies that may be available at law or in equity;

provided, however, that the Trustee may not sell or liquidate the Assets or institute Proceedings in furtherance thereof pursuant to this Section 5.4 (Remedies) except according to the provisions specified in Section 5.5(a) (Optional Preservation of Assets).

The Trustee may, but need not, obtain (at the expense of the Co-Issuers) and rely upon an opinion of an Independent investment banking firm of national reputation with demonstrated capabilities in structuring and distributing securities similar to the Secured Notes, which may be either of the Placement Agents, as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 (Remedies) and as to the sufficiency of the proceeds and other amounts receivable with respect to the Assets to make the required payments of principal of and interest on the Secured Notes, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)     If an Event of Default as described in Section 5.1(d) (Events of Default) hereof shall have occurred and be continuing the Trustee may, and at the direction of the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section, and enforce any equitable decree or order arising from such Proceeding.

(c)     Upon any sale, whether made under the power of sale hereby given or by virtue of judicial Proceedings, any Holder of Secured Notes may bid for and purchase the Assets or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability; and any purchaser at any such sale may, in paying the purchase Money, deliver to the Trustee for cancellation any of the Class A Notes in lieu of Cash equal to the amount which shall, upon distribution of the net proceeds of such sale, be payable on the Class A Notes so delivered by such Holder (taking into account the Priority of Payments and Article 13).  Said Notes, in case the amounts payable thereon shall be less than the amount due thereon, shall be returned to the Holders thereof after proper notation has been made thereon to show partial payment.

Upon any sale, whether made under the power of sale hereby given or by virtue of judicial Proceedings, the receipt of the Trustee, or of the Officer making a sale under judicial Proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase Money, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial Proceedings, shall bind the Co-Issuers, the Trustee and the Holders of the Secured Notes, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

NEWYORK 8715474 (2K)

(d)    Notwithstanding any other provision of this Indenture, the Trustee may not, prior to the date which is one year plus one day (or if longer, any applicable preference period) after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer, the Co-Issuer or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or State bankruptcy or similar laws.  Nothing in this Section 5.4 (Remedies) shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer, the Co-Issuer or any ETB Subsidiary or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than the Trustee or (ii) from commencing against the Issuer, the Co-Issuer or any ETB Subsidiary or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

Section 5.5.    Optional Preservation of Assets.  (a)  Notwithstanding anything to the contrary herein, if an Event of Default shall have occurred and be continuing, the Trustee shall retain the Assets securing the Secured Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Assets and the Notes in accordance with the Priority of Payments and the provisions of Article 10 and Article 12 unless:

(i)    the Trustee, in consultation with the Portfolio Manager (so long as no "cause" (as defined in the Portfolio Management Agreement) for the termination of the Portfolio Manager has occurred under the Portfolio Management Agreement) determines that the anticipated proceeds of a sale or liquidation of the Assets (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the amounts then due (or, in the case of interest, accrued) and unpaid on the Secured Notes for principal and interest (including Deferred Interest), and all amounts payable prior to payment of principal on such Secured Notes (including amounts payable to any Hedge Counterparty upon liquidation of the Assets and all Administrative Expenses);

(ii)    if an Event of Default described in Section 5.1(a), (d) or (g) has occurred and is continuing, the Holders of at least a Majority of the Controlling Class (without consent of any other Class of Notes) direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation; provided, that, this clause (ii) shall not apply in the case of an Event of Default described in Section 5.1(a) that arises solely from an acceleration of the Secured Notes due to an Event of Default in Section 5.1(b), (c), (e), (f) or (h);

(iii)    if an Event of Default described in Section 5.1(b), (c), (e) or (f) has occurred and is continuing, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of each Class of Secured Notes (voting separately by Class) direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation of the Assets;

(iv)    if an Event of Default described in Section 5.1(h) has occurred and is continuing, the Holders of at least a Majority of each Class of Secured Notes (voting

NEWYORK 8715474 (2K)

separately by Class) direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation of the Assets; or

(v) if an Event of Default described in <u>Section 5.1(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u>, <u>(g)</u> or <u>(h)</u> has occurred and is continuing and all of the Secured Notes has been repaid in full, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation.

The Trustee shall give written notice of the retention of the Assets to the Issuer with a copy to the Co-Issuer and the Portfolio Manager. So long as such Event of Default is continuing, any such retention pursuant to this <u>Section 5.5(a)</u> (Optional Preservation of Assets) may be rescinded at any time when the conditions specified in clause (i), (ii), (iii), (iv) or (v) exist.

(b) Nothing contained in <u>Section 5.5(a)</u> (Optional Preservation of Assets) shall be construed to require the Trustee to sell the Assets securing the Secured Notes if the conditions set forth in any of clauses (i) through (iv) of <u>Section 5.5(a)</u> (Optional Preservation of Assets) are not satisfied. Nothing contained in <u>Section 5.5(a)</u> (Optional Preservation of Assets) shall be construed to require the Trustee to preserve the Assets securing the Notes if prohibited by applicable law.

(c) In determining whether the condition specified in <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets) exists, the Trustee shall obtain bid prices with respect to each security contained in the Assets from two nationally recognized dealers (as specified by the Portfolio Manager in writing) at the time making a market in such securities and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of such bid prices for each such security. For the purposes of making the determinations required pursuant to <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets), the Trustee shall apply the standards set forth in <u>Section 6.3(c)(i)</u> or <u>(ii)</u> (Certain Rights of the Trustee). In addition, for the purposes of determining issues relating to the execution of a sale or liquidation of the Assets and the execution of a sale or other liquidation thereof in connection with a determination whether the condition specified in <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets) exists, the Trustee may retain (at the Co-Issuers' expense) and rely on an opinion of an Independent investment banking firm of national reputation.

The Trustee shall deliver to the Noteholders, the Issuer and the Portfolio Manager a report stating the results of any determination required pursuant to <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets) no later than 10 days after such determination is made. The Trustee shall make the determinations required by <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets) at the request of at least a Majority of the Controlling Class at any time after the occurrence of an Event of Default during which the Trustee retains the Assets pursuant to <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets); <u>provided</u>, that any such request made more frequently than once in any 90 day period shall be at the expense of such requesting party or parties.

Section 5.6. <u>Trustee May Enforce Claims Without Possession of Notes</u>. All rights of action and claims under this Indenture or under any of the Secured Notes may be

NEWYORK 8715474 (2K)

prosecuted and enforced by the Trustee without the possession of any of the Secured Notes or the production thereof in any trial or other Proceeding relating thereto, and any such action or Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in <u>Section 5.7</u> (Application of Money Collected) hereof.

Section 5.7. <u>Application of Money Collected</u>. Any Money collected by the Trustee with respect to the Notes pursuant to this <u>Article 5</u> and any Money that may then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied in accordance with the provisions of <u>Section 11.1</u> (Disbursements of Monies from Payment Account), at the date or dates fixed by the Trustee.

Section 5.8. <u>Limitation on Suits</u>. No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a) such Holder has previously given to the Trustee written notice of an Event of Default;

(b) the Holders of not less than 25% of the then Aggregate Outstanding Amount of the Notes of the Controlling Class shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders have offered to the Trustee indemnity reasonably satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(c) the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(d) no direction inconsistent with such written request has been given to the Trustee during such 30 day period by at least a Majority of the Controlling Class; it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of the Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with the Priority of Payments.

In the event the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall act at the direction of the group of Holders representing a greater percentage of the Controlling Class. If both groups represent the same percentage, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture. Notwithstanding anything to the contrary contained herein, Holders and beneficial owners of Notes may enforce the obligations

NEWYORK 8715474 (2K)

of other Holders and beneficial owners described in <u>Section 13.1(d)</u> (Subordination; Non-Petition).

Section 5.9.     <u>Unconditional Rights of Holders to Receive Principal and Interest</u>.   Subject to <u>Section 2.8(i)</u> (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved), but notwithstanding any other provision in this Indenture, the Holders of any Secured Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Secured Note as such principal and interest become due and payable in accordance with the Priority of Payments and <u>Section 13.1</u> (Subordination; Non-Petition), and, subject to the provisions of <u>Section 5.8</u> (Limitation on Suits), to institute proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.   Holders of Secured Notes ranking junior to Notes still Outstanding shall have no right to institute proceedings for the enforcement of any such payment until such time as no Secured Note ranking senior to such Secured Note remains Outstanding, which right shall be subject to the provisions of <u>Section 5.8</u> (Limitation on Suits), and shall not be impaired without the consent of any such Holder.

Section 5.10.     <u>Restoration of Rights and Remedies</u>.   If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or such Noteholder, then and in every such case the Co-Issuers, the Trustee or Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Secured Parties shall continue as though no such Proceeding had been instituted.

Section 5.11.     <u>Rights and Remedies Cumulative</u>.   No right or remedy herein conferred upon or reserved to the Trustee or any Secured Party is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.   The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12.     <u>Delay or Omission Not Waiver</u>.   No delay or omission of the Trustee or any Holder of Secured Notes to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein or of a subsequent Event of Default.   Every right and remedy given by this <u>Article 5</u> or by law to the Trustee or to the Holders of Secured Notes may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders of the Secured Notes, as the case may be.

Section 5.13.     <u>Control by Majority of Controlling Class</u>.   Notwithstanding any other provision of this Indenture, at least a Majority of the Controlling Class shall have the right following the occurrence, and during the continuance of, an Event of Default to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee; <u>provided</u>, that:

NEWYORK 8715474 (2K)

(a)      such direction shall not conflict with any rule of law or with any express provision of this Indenture;

(b)      the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; provided, however, that subject to Section 6.1 (Certain Duties and Responsibilities of the Trustee), the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received the indemnity as set forth in (c) below);

(c)      the Trustee shall have been provided with indemnity reasonably satisfactory to it; and

(d)      notwithstanding the foregoing, any direction to the Trustee to undertake a Sale of the Assets shall be by the Holders of Notes secured thereby representing the requisite percentage of the Aggregate Outstanding Amount of Notes specified in Section 5.4 (Remedies) and/or 5.5 (Optional Preservation of Assets).

Section 5.14.    Waiver of Past Defaults.  Prior to the time a judgment or decree for payment of the Money due has been obtained by the Trustee, as provided in this Article 5, at least a Majority of the Controlling Class may on behalf of the Holders of all the Notes waive any past Default and its consequences, except a Default:

(a)      in the payment of the principal of any Secured Note (which may be waived with the consent of each Holder of such Secured Note);

(b)      in the payment of interest on the Notes of the Controlling Class (which may be waived with the consent of the Holders of 100% of the Controlling Class);

(c)      in respect of a covenant or provision hereof that under Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities) cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected thereby (which may be waived with the consent of each such Holder); or

(d)      in respect of a representation contained in Section 7.19 (Representations and Warranties Relating to Security Interests in the Assets) (which may be waived by at least a Majority of the Controlling Class if the S&P Rating Condition is satisfied).

In the case of any such waiver, the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. The Trustee shall promptly give written notice of any such waiver to S&P, Moody's, the Portfolio Manager and each Noteholder.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

NEWYORK 8715474 (2K)

Section 5.15.  Underlining for Costs.  All parties to this Indenture agree, and each Holder of any Note by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as the Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.15 (Undertaking for Costs) shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholder, or group of Noteholders, holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the applicable Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date).  Such waiver shall not affect the rights of any Hedge Counterparty, which rights shall be governed by its respective Hedge Agreements.

Section 5.16.  Waiver of Stay or Extension Laws.  The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any valuation, appraisement, redemption or marshalling law or rights, in each case wherever enacted, now or at any time hereafter in force, which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law or rights, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted or rights created.

Section 5.17.  Sale of Assets.  (a)  The power to effect any sale (a "Sale") of any portion of the Assets pursuant to Sections 5.4 (Remedies) and 5.5 (Optional Preservation of Assets) shall not be exhausted by any one or more Sales as to any portion of such Assets remaining unsold, but shall continue unimpaired until the entire Assets shall have been sold or all amounts secured by the Assets shall have been paid.  The Trustee may upon notice to the Noteholders and the Portfolio Manager, and shall, upon direction of at least a Majority of the Controlling Class, from time to time postpone any Sale by public announcement made at the time and place of such Sale.  The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale; provided, that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7 (Trustee Compensation and Reimbursement) hereof.

(b)  The Trustee and the Portfolio Manager (and/or any of its Affiliates) may bid for and acquire any portion of the Assets in connection with a public Sale thereof, and the Trustee may pay all or part of the purchase price by crediting against amounts owing on the Secured Notes or other amounts secured by the Assets, all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7 (Trustee Compensation and Reimbursement) hereof.  The Holder(s) of Subordinated Notes may bid for and acquire any

NEWYORK 8715474 (2K)

portion of the Assets in connection with a public or private Sale thereof. The Secured Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c) If any portion of the Assets consists of securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel.

(d) The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Assets in connection with a Sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney in fact of the Issuer to transfer and convey its interest in any portion of the Assets in connection with a Sale thereof, and to take all action necessary to effect such Sale. No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Monies.

Section 5.18. Action on the Notes. The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Assets or upon any of the assets of the Issuer or the Co-Issuer.

ARTICLE 6

The Trustee

Section 6.1. Certain Duties and Responsibilities of the Trustee. (a) Except during the continuance of an Event of Default:

(i) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided, however, that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not, on their face, they substantially conform to the requirements of this Indenture and shall promptly in the case of an Officer's certificate furnished by the Portfolio Manager, notify the Portfolio Manager if such certificate or opinion does not conform.

NEWYORK 8715474 (2K)

(b)    In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Majority of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)    No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this subsection shall not be construed to limit the effect of subsection (a) of this Section 6.1 (Certain Duties and Responsibilities of the Trustee);

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Bank Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer or the Portfolio Manager in accordance with this Indenture and/or a Majority (or such other percentage as may be required by the terms hereof) of the Controlling Class (or other Class if required or permitted by the terms hereof) relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(iv)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or indemnity reasonably satisfactory to it against such risk or liability is not reasonably assured to it unless such risk or liability relates to incidental costs in connection with the performance of its ordinary services, under this Indenture; and

(v)    in no event shall the Trustee be liable for special, punitive, indirect or consequential loss or damage (including lost profits) even if the Trustee has been advised of the likelihood of such damages and regardless of such action.

(d)    For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in Sections 5.1(c), (d), (e) or (f) (Events of Default) unless a Bank Officer assigned to and working in the Corporate Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or Default is received by a Bank Officer at the Corporate Office, and such notice references the Notes generally, the Issuer, the Co-Issuer, the Assets or this Indenture.  For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or a Default, such reference shall be construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as described in this Section 6.1 (Certain Duties and Responsibilities of the Trustee).

(e)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this <u>Section 6.1</u> (Certain Duties and Responsibilities of the Trustee) and <u>Section 6.3</u> (Certain Rights of the Trustee).

Section 6.2.     <u>Representations and Warranties of the Bank</u>.  The Bank hereby represents and warrants as follows:

(a)     <u>Organization</u>.  The Bank has been duly organized and is validly existing as a national banking association under the laws of the United States and has the power to conduct its business and affairs as a trustee.

(b)     <u>Authorization; Binding Obligations</u>.  The Bank has the corporate power and authority to perform the duties and obligations of trustee under this Indenture.  The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant hereto.  Upon execution and delivery by the Bank, this Indenture will constitute the legal, valid and binding obligation of the Bank enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights and remedies of creditors generally.

(c)     <u>Eligibility</u>.  The Bank is eligible under <u>Section 6.8</u> (Corporate Trustee Required; Eligibility) hereof to serve as Trustee hereunder.

(d)     <u>No Conflict</u>.  Neither the execution, delivery and performance of this Indenture, nor the consummation of the transactions contemplated by this Indenture, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any material agreement to which the Bank is a party.

(e)     <u>Other Capacities</u>.  To the extent that the Bank is acting as Registrar, Calculation Agent, Paying Agent, Authenticating Agent, Securities Intermediary or Custodian, the rights, privileges and indemnities set forth in this <u>Article VI</u> shall also apply to the Bank acting in each such capacity and shall be in addition to any other right, privilege and indemnities the Bank may have in such capacity.

Section 6.3.     <u>Certain Rights of the Trustee</u>.  Except as otherwise provided in <u>Section 6.1</u> (Certain Duties and Responsibilities of the Trustee):

(a)     the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report (including, without limitation, an Accountants Report), notice, request, direction, consent, order, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

NEWYORK 8715474 (2K)

(b)      any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)      whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, request and rely upon an Officer's certificate or (ii) be required to determine the value of any Assets or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)      as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)      the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)      the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report (including any Accountants' Report), notice, request, direction, consent, order, note or other paper or document, but the Trustee, in its discretion, may, and upon the written direction of at least a Majority of the Controlling Class shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Portfolio Manager, to examine the books and records relating to the Notes and the Assets, personally or by agent or attorney, during the Co-Issuers' or the Portfolio Manager's normal business hours; provided, that the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law or by any regulatory or administrative authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)      the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians or attorneys; provided, that the Trustee shall not be responsible for any misconduct or negligence on the part of any non-Affiliated agent or non-Affiliated attorney appointed with due care by it hereunder;

NEWYORK 8715474 (2K)

(h)     the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably believes to be authorized or within its rights or powers hereunder;

(i)     nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, evaluate or verify any report, certificate or information received from the Issuer or Portfolio Manager (unless and except to the extent otherwise expressly set forth herein);

(j)     to the extent any defined term hereunder, or any calculation required to be made or determined by the Trustee hereunder, is dependent upon or defined by reference to generally accepted accounting principles (as in effect in the United States) ("GAAP"), the Trustee shall be entitled to request and receive (and rely upon) instruction from the Issuer or the accountants identified in the Accountants' Report (and in the absence of its receipt of timely instruction therefrom, shall be entitled to obtain from an Independent accountant at the expense of the Issuer) as to the application of GAAP in such connection, in any instance;

(k)     to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise;

(l)     the Trustee shall not be deemed to have notice or knowledge of any matter unless a Bank Officer has actual knowledge thereof or unless written notice thereof is received by a Bank Officer at the Corporate Office and such notice references the Notes generally, the Issuer or this Indenture.  Whenever reference is made in this Indenture to a Default or an Event of Default such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to a Default or an Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph;

(m)     the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty;

(n)     the Trustee shall not be responsible for delays or failures in performance resulting from acts or circumstances beyond its control (such circumstances include but are not limited to acts of God, strikes, lockouts, riots, acts of war, loss or malfunctions of utilities, computer (hardware or software) or communications services);

(o)     the Trustee shall have no liability for the acts or omissions of the Portfolio Manager, the Collateral Administrator, the Issuer or the Co-Issuer, any Paying Agent (other than the Trustee) or any Authenticating Agent (other than the Trustee) appointed under or pursuant to this Indenture;

(p)     the Trustee or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain of the Eligible Investments, (ii) using Affiliates to

NEWYORK 8715474 (2K)

effect transactions in certain Eligible Investments and (iii) effecting transactions in certain Eligible Investments;

(q)     the Trustee is not responsible or liable for the preparation, filing, continuation or correctness of financing statements or the validity or perfection of any lien or security interest;

(r)     in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or such Affiliate is acting as a subagent of the Trustee or for any third person or dealing as principal for its own account. If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments hereunder;

(s)     in order to comply with laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including those relating to the funding of terrorist activities and money laundering, the Trustee is required to obtain, verify and record certain information relating to individuals and entities which maintain a business relationship with the Trustee. Accordingly, each of the parties agrees to provide to the Trustee upon its request from time to time such party's complete name, address, tax identification number and such other identifying information together with copies of such party's constituting documentation, securities disclosure documentation and such other identifying documentation as may be available for such party; and

(t)     Other Capacities. To the extent that the Trustee is acting as Registrar, Calculation Agent, Paying Agent, Authenticating Agent, Securities Intermediary, or Custodian, the rights, privileges and indemnities set forth in this Article VI shall also apply to the Trustee acting in each such capacity and shall be in addition to any other right, privilege and indemnities the Trustee may have in such capacity.

Section 6.4.     Trustee Not Responsible for Recitals or Issuance of Notes. The recitals contained herein and in the Debt, other than the Certificate of Authentication thereon, shall be taken as the statements of the Applicable Issuers; and the Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), the Assets or the Notes. The Trustee shall not be accountable for the use or application by the Co-Issuers of the Notes or the proceeds thereof or any Money paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.5.     Trustee May Hold Notes. The Trustee, any Paying Agent, Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Registrar or such other agent.

NEWYORK 8715474 (2K)

Section 6.6. <u>Money Held in Trust by the Trustee</u>. Money held by the Trustee hereunder shall be held in trust to the extent required herein. The Trustee shall be under no liability for interest on any Money received or invested by it hereunder.

Section 6.7. <u>Trustee Compensation and Reimbursement</u>. (a) The Issuer agrees:

(i) to pay the Trustee on each Payment Date reasonable compensation for all services rendered by it hereunder as set forth in the fee letter dated June 19, 2012 (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii) to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including, without limitation, securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to any term of this Indenture, except any such expense, disbursement or advance as may be attributable to its negligence or willful misconduct) but with respect to securities transaction charges, only to the extent any such charges have not been waived during a Collection Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Portfolio Manager; and

(iii) to indemnify the Trustee and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence or willful misconduct on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves (including reasonable attorney's fees and costs) against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder and under any other transaction document.

(b) The Trustee shall receive amounts pursuant to this <u>Section 6.7</u> (Trustee Compensation and Reimbursement) as provided in <u>Sections 11.1(a)(i)</u>, <u>(ii)</u> and <u>(iii)</u> (Disbursements of Monies from Payment Account) but only to the extent that funds are available for the payment thereof. Subject to <u>Section 6.9</u> (Resignation and Removal of the Trustee; Appointment of Successor), the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder. No direction by the Noteholders or the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture. If on any date when a fee shall be payable to the Trustee pursuant to this Indenture insufficient funds are available for the payment thereof, any portion of a fee not so paid shall be deferred and payable on such later date on which a fee shall be payable and sufficient funds are available therefor.

(c) The Trustee hereby agrees not to cause the filing of a petition in bankruptcy for the non-payment to the Trustee of any amounts provided by this <u>Section 6.7</u> (Trustee Compensation and Reimbursement) until at least one year and one day, or if longer the

NEWYORK 8715474 (2K)

applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture.

(d)    When the Trustee incurs expenses after the occurrence of a Default or an Event of Default under <u>Sections 5.1(e)</u> or <u>(f)</u> (Events of Default) the expenses are intended to constitute expenses of administration under the Bankruptcy Code or any other applicable federal or state bankruptcy, insolvency or similar law; <u>provided that</u>, without limiting the Trustee's rights under the Bankruptcy Code or any other applicable federal or state bankruptcy, insolvency or similar law, such expenses shall be subject to and payable only to the extent allowed under the Priority of Payments.

Section 6.8.    <u>Corporate Trustee Required; Eligibility</u>.  There shall at all times be a Trustee hereunder which shall be an Independent organization or entity organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $200,000,000, subject to supervision or examination by federal or state authority, having a rating of at least "<u>Baa1</u>" by Moody's and at least "<u>BBB+</u>" by S&P and having an office within the United States.  If such organization or entity publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this <u>Section 6.8</u> (Corporate Trustee Required; Eligibility), the combined capital and surplus of such organization or entity shall be deemed to be its combined capital and surplus as set forth in its most recent published report of condition.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this <u>Section 6.8</u> (Corporate Trustee Required; Eligibility), it shall resign immediately in the manner and with the effect hereinafter specified in this <u>Article 6</u>.

Section 6.9.    <u>Resignation and Removal of the Trustee; Appointment of Successor Trustee</u>.  (a)  No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this <u>Article 6</u> shall become effective until the acceptance of appointment by the successor Trustee under <u>Section 6.10</u> (Acceptance of Appointment by Successor Trustee).

(b)    The Trustee may resign at any time by giving not less than 30 days written notice thereof to the Co-Issuers, the Portfolio Manager, the Holders of the Notes and each Rating Agency.  Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor trustee or trustees satisfying the requirements of <u>Section 6.8</u> (Corporate Trustee Required; Eligibility) by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor Trustee or Trustees, together with a copy to each Holder and the Portfolio Manager; <u>provided</u>, that such successor Trustee shall be appointed only upon the written consent of at least a Majority of the Controlling Class and the Portfolio Manager (such consent, in the case of the Portfolio Manager, not to be unreasonably withheld).  If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee or any Holder, on behalf of himself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of

NEWYORK 8715474 (2K)

a successor Trustee satisfying the requirements of Section 6.8 (Corporate Trustee Required; Eligibility).

(c)     The Trustee may be removed at any time by written consent of the Portfolio Manager and Act of at least a Majority of the Controlling Class or, at any time when an Event of Default shall have occurred and be continuing by an Act of at least a Majority of the Controlling Class, delivered to the Trustee and to the Co-Issuers.

(d)     If at any time:

(i)     the Trustee shall cease to be eligible under Section 6.8 (Corporate Trustee Required; Eligibility) and shall fail to resign after written request therefor by the Co-Issuers or at least a Majority of the Controlling Class; or

(ii)     the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation;

then, in any such case (subject to Section 6.9(a) (Resignation and Removal of the Trustee; Appointment of Successor)), (A) the Co-Issuers, by Issuer Order, may remove the Trustee or (B) subject to Section 5.15 (Undertaking for Costs), any Holder may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee shall be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason (other than resignation), the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee.  If the Co-Issuers shall fail to appoint a successor Trustee within 30 days after such removal or incapability or the occurrence of such vacancy, a successor Trustee may be appointed by at least a Majority of the Controlling Class by written instrument delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers.  If no successor Trustee shall have been so appointed by the Co-Issuers or at least a Majority of the Controlling Class and shall have accepted appointment in the manner hereinafter provided, subject to Section 5.15 (Undertaking for Costs), the Trustee or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to the Portfolio Manager, to each Rating Agency and to the Holders of the Notes as their names and addresses appear in the Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Office.  If the Co-Issuers fail to mail such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

Section 6.10.    Acceptance of Appointment by Successor Trustee.    Every successor Trustee appointed hereunder shall meet the requirements of Section 6.8 (Corporate Trustee Required; Eligibility) and shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment.    Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers or at least a Majority of any Class of Secured Notes or the successor Trustee, such retiring Trustee shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and Money held by such retiring Trustee hereunder.    Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

Section 6.11.    Merger, Conversion, Consolidation or Succession to Business of the Trustee.    Any organization or entity into which the Trustee may be merged or converted or with which it may be consolidated, or any organization or entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any organization or entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such organization or entity shall be otherwise qualified and eligible under this Article 6, without the execution or filing of any paper or any further act on the part of any of the parties hereto.    In case any of the Notes has been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.12.    Co-Trustees.    At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Assets may at the time be located, the Co-Issuers and the Trustee shall have power to appoint one or more Persons to act as co-trustee (subject to the written approval of the Rating Agencies), jointly with the Trustee, of all or any part of the Assets, with the power to file proofs of claims and take such other actions pursuant to Section 5.6 (Trustee May Enforce Claims Without Possession of Notes) herein and to make such claims and enforce such rights of action on behalf of the Holders, as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.12 (Co-Trustees).

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee.    If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have the power to make such appointment.

Should any written instrument from the Co-Issuers be required by any co trustee so appointed, more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers.    The Co-Issuers agree to pay (but only from and to the extent of the Assets), to the

NEWYORK 8715474 (2K)

extent funds are available therefor under Section 11.1(a)(i)(B) (Disbursements of Monies from Payment Account), for any reasonable fees and expenses in connection with such appointment.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(a) the Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee;

(b) the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly as shall be provided in the instrument appointing such co-trustee;

(c) the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.12 (Co-Trustees), and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.12 (Co-Trustees);

(d) no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee hereunder;

(e) the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

(f) any Act of Holders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.13. Withholding by the Trustee. If any withholding tax is imposed on the Issuer's payment (or allocations of income) under the Notes to any Holder, such tax shall reduce the amount otherwise distributable to such Holder. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Holder sufficient funds for the payment of any tax that is legally owed by the Issuer (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate proceedings and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings) or may be withheld because of a failure by a Holder to provide any information required under FATCA or as a result of such Holder's status as a Non-Compliant FFI and to timely remit such amounts to the appropriate taxing authority. The amount of any withholding tax imposed with respect to any Holder shall be treated as cash distributed to such Holder at the time it is withheld by the Trustee and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.13 (Withholding). If any Holder wishes to apply for a

refund of any such withholding tax, the Trustee shall reasonably cooperate with such Holder in making such claim so long as such Holder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

Section 6.14.    <u>Authenticating Agents</u>.  Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Subordinated Notes in connection with issuance, transfers and exchanges under <u>Sections 2.4</u> (Additional Notes), <u>2.5</u> (Execution, Authentication, Delivery and Dating), <u>2.6</u> (Registration, Registration of Transfer and Exchange), <u>2.7</u> (Mutilated, Defaced, Destroyed, Lost or Stolen Note) and <u>8.5</u> (Reference in Notes to Supplemental Indentures), as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by such Sections to authenticate such Notes.  For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this <u>Section 6.14</u> (Authenticating Agents) shall be deemed to be the authentication of Notes by the Trustee.

Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer.  The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers.  Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers.

The Co-Issuers (or the Trustee if the Trustee shall have appointed the Authenticating Agent) agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto, and the Trustee if it shall have paid such amounts shall be entitled to be reimbursed for such payments.  The provisions of <u>Sections 2.9</u> (Persons Deemed Owners), <u>6.4</u> (Not Responsible for Recitals or Issuance of Notes) and <u>6.5</u> (Trustee May Hold Notes) shall be applicable to any Authenticating Agent.

Section 6.15.    <u>Notice of Default by the Trustee</u>.  Promptly (and in no event later than five Business Days) after the occurrence of any Default actually known to a Bank Officer of the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to <u>Section 5.2</u> (Acceleration of Maturity; Rescission and Annulment), the Trustee shall provide to the Portfolio Manager, each Rating Agency, and all Noteholders, as their names and addresses appear on the Register, and the Irish Stock Exchange, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require,

notice of all Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived.

Section 6.16. <u>Certain Duties of the Trustee Related to Delayed Payment of Proceeds</u>. In the event that in any month the Trustee shall not have received a payment with respect to any Pledged Obligation on its Due Date, (a) the Trustee shall promptly notify the Issuer and the Portfolio Manager in writing or electronically and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if longer) after such notice such payment shall have been received by the Trustee, or the Issuer, in its absolute discretion (but only to the extent permitted by <u>Section 10.2(a)</u> (Collection Account)), shall have made provision for such payment satisfactory to the Trustee in accordance with <u>Section 10.2(a)</u> (Collection Account), the Trustee shall request the issuer of such Pledged Obligation, the Trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request. In the event that such payment is not made within such time period, the Trustee, subject to the provisions of clause (iv) of <u>Section 6.1(c)</u> (Certain Duties and Responsibilities of the Trustee), shall take such action as the Portfolio Manager shall direct in writing. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. In the event that the Issuer or the Portfolio Manager requests a release of a Pledged Obligation and/or delivers an additional Collateral Obligation in connection with any such action under the Portfolio Management Agreement, such release and/or substitution shall be subject to <u>Section 10.6</u> (Reinvestment of Funds in Accounts; Reports by Trustee) and <u>Article 12</u> of this Indenture, as the case may be.

Section 6.17. <u>Trustee Fiduciary for Secured Noteholders Only; Agent for each Hedge Counterparty and the Holders of the Subordinated Notes</u>. With respect to the security interest created hereunder, the delivery of any item of Pledged Obligation to the Trustee is to the Trustee as representative of the Secured Noteholders and agent for each Hedge Counterparty and the Holders of the Subordinated Notes, in furtherance of the foregoing, the possession by the Trustee of any item of Pledged Obligation, the endorsement to or registration in the name of the Trustee of any item of Pledged Obligation (including, without limitation, as entitlement holder of the Custodial Account) are all undertaken by the Trustee in its capacity as representative of the Secured Noteholders and agent for each Hedge Counterparty and the Holders of the Subordinated Notes.

<div align="center">

ARTICLE 7
Covenants

</div>

Section 7.1. <u>Payment of Principal and Interest</u>. The Applicable Issuers will duly and punctually pay the principal of and interest on the Secured Notes, in accordance with the terms of such Notes and this Indenture pursuant to the Priority of Payments. The Issuer will, to the extent legally permitted and to the extent funds are available pursuant to the Priority of Payments, duly and punctually pay all required distributions on the Subordinated Notes, in accordance with the Subordinated Notes and this Indenture.

The Issuer shall, subject to the Priority of Payments, reimburse the Co-Issuer for any amounts paid by the Co-Issuer pursuant to the terms of the Notes or this Indenture. The

<div align="center">

-137-
Exhibit B

</div>

Co-Issuer shall not reimburse the Issuer for any amounts paid by the Issuer pursuant to the terms of the Notes or this Indenture.

Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Holder shall be considered as having been paid by the Applicable Issuers to such Holder for all purposes of this Indenture.

Section 7.2.    <u>Maintenance of Office or Agency</u>.    The Co-Issuers hereby appoint the Trustee as a Paying Agent for payments on the Notes.  Notes may be surrendered for registration of transfer or exchange at the Corporate Office of the Trustee or its agent designated for purposes of surrender, transfer or exchange.  As of the Closing Date, the Trustee designates the Corporate Office for such purpose, as the place where Notes may be surrendered for transfer and exchange.  The Co-Issuers hereby appoint CT Corporation System, as agent upon whom process or demands may be served in any action arising out of or based on this Indenture or the transactions contemplated hereby.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; <u>provided</u>, <u>however</u>, that the Co-Issuers will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Co-Issuers in respect of such Notes and this Indenture may be served and, subject to any laws or regulations applicable thereto, an office or agency outside of the United States where Notes may be presented and surrendered for payment; and <u>provided</u>, <u>further</u>, that no paying agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding tax solely by reason of the location of the paying agent in such jurisdiction.  The Co-Issuers hereby appoint, for so long as any Class of Notes is listed on the Irish Stock Exchange, McCann FitzGerald Listing Services Limited (the "<u>Irish Listing Agent</u>") as listing agent in Ireland with respect to the Notes.  In the event that the Irish Listing Agent is replaced at any time during such period, notice of the appointment of any replacement will be published in the Companies Announcements Office of the Irish Stock Exchange as promptly as practicable after such appointment.  The Co-Issuers shall at all times maintain a duplicate copy of the Register at the Corporate Office of the Trustee.  The Co-Issuers shall give prompt written notice to the Trustee, each Rating Agency and the Holders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York, or outside the United States, or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made (subject to the limitations described in the preceding paragraph) at and notices and demands may be served on the Co-Issuers, and Notes may be presented and surrendered for payment to the appropriate Paying Agent at its main office, and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands.

Section 7.3.    <u>Money for Note Payments to be Held in Trust</u>.  All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Applicable Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

NEWYORK 8715474 (2K)

When the Applicable Issuers shall have a Paying Agent that is not also the Registrar, they shall furnish, or cause the Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

Whenever the Applicable Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Payment Account), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act. Any Monies deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with Article 10.

The initial Paying Agent shall be as set forth in Section 7.2 (Maintenance of Office or Agency). Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee; provided, however, that so long as the Notes of any Class is rated by a Rating Agency, with respect to any additional or successor Paying Agent, either (i) such Paying Agent an Independent organization or entity organized and doing business under the laws of the United States of America or of any state thereof, having a combined capital and surplus of at least $200,000,000, subject to supervision or examination by federal or state authority, having a rating of at least "Baa1" by Moody's and at least "BBB+" by S&P and having an office within the United States or (ii) the Global Rating Agency Condition is satisfied. In the event that such successor Paying Agent ceases to have the required ratings specified above, the Co-Issuers shall promptly remove such Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.3 (Money for Note Payments to be Held in Trust), that such Paying Agent will:

(a) allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and any Redemption Date among such Holders in the proportion specified in the applicable report to the extent permitted by applicable law;

(b) hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

NEWYORK 8715474 (2K)

(c)    immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

(d)    immediately give the Trustee notice of any default by the Issuer or the Co-Issuer (or any other obligor upon the Notes) in the making of any payment required to be made; and

(e)    during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such Money.

Except as otherwise required by applicable law, any Money deposited with the Trustee or any Paying Agent in trust for any payment on any Note and remaining unclaimed for two years after such amount has become due and payable shall be paid to the Applicable Issuers on Issuer Order; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Applicable Issuers for payment of such amounts and all liability of the Trustee or such Paying Agent with respect to such trust Money (but only to the extent of the amounts so paid to the Applicable Issuers) shall thereupon cease. The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Applicable Issuers any reasonable means of notification of such release of payment, including, but not limited to, mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in Monies due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

Section 7.4.    Existence of Co-Issuers. (a) The Issuer and the Co-Issuer shall, to the maximum extent permitted by applicable law, maintain in full force and effect their existence and rights as companies incorporated or organized under the laws of the Cayman Islands and the State of Delaware, respectively, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Assets; provided, however, that the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer so long as (i) the Issuer has received a legal opinion to the effect that such change is not disadvantageous in any material respect to the Holders, (ii) written notice of such change shall have been given by the Issuer to the Trustee (which shall provide notice to the Noteholders), the Portfolio Manager and each Rating Agency and (iii) on or prior to the 15th Business Day following receipt of such notice the Trustee shall not have received written notice from at least a

Majority of the Controlling Class objecting to such change; and provided, further, that the Issuer shall be entitled to take any action required by this Indenture within the United States notwithstanding any provision of this Indenture requiring the Issuer to take such action outside of the United States so long as prior to taking any such action the Issuer receives a legal opinion from nationally recognized legal counsel to the effect that it is not necessary to take such action outside of the United States or any political subdivision thereof in order to prevent the Issuer from becoming subject to U.S. federal, state or local income taxes on a net income basis or any material other taxes to which the Issuer would not otherwise be subject.

(b)     The Issuer and the Co-Issuer shall (i) ensure that all corporate or other formalities regarding their respective existences (including, if required, holding regular board of directors' and shareholders' or members', or other similar, meetings) are followed, (ii) maintain their books and records separate from any other Person, (iii) maintain their accounts separate from those of any other Person, (iv) not commingle any of their assets with those of another Person, (v) maintain an arm's length relationship with their Affiliates, (vi) each maintain separate financial statements from those of any other Person, (vii) pay their liabilities out of their respective funds, (viii) each hold themselves out as a separate entity and (ix) take affirmative steps to correct any misunderstanding regarding their separate identity.  Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding.  Without limiting the foregoing, (i) the Issuer shall not have any subsidiaries (other than the Co-Issuer and any subsidiary that (x) meets the then-current general criteria of the Rating Agencies for bankruptcy remote entities and (y) is formed for the sole purpose of holding equity interests in "partnerships" (within the meaning of Section 7701(a)(2) of the Code), "grantor trusts" (within the meaning of the Code) or entities that are disregarded as separate from their owners for U.S. federal income tax purposes that are or may be engaged or deemed to be engaged in a trade or business in the United States (excluding, for the avoidance of doubt, any interest that is treated as a real property interest), in each case, promptly following the receipt thereof in a workout of a Defaulted Obligation or otherwise promptly after the acquisition thereof in connection with a workout of a Collateral Obligation (an "ETB Subsidiary")); (ii) the Co-Issuer shall not have any subsidiaries; and (iii) except to the extent contemplated in the Administration Agreement or the declaration of trust dated March 18, 2013, by Appleby Trust (Cayman) Ltd., the Issuer and the Co-Issuer shall not (A) have any employees (other than their respective directors), (B) except as contemplated by the Portfolio Management Agreement, the Memorandum and Articles or the Administration Agreement, engage in any transaction with any shareholder that would constitute a conflict of interest or (C) pay dividends other than in accordance with the terms of this Indenture and the Memorandum and Articles.

(c)     The Issuer shall ensure that any ETB Subsidiary (i) is wholly owned by the Issuer, (ii) will not sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of its assets, except in compliance with the Issuer's rights and obligations under this Indenture and with such subsidiary's constituent documents, (iii) will not have any subsidiaries, (iv) will comply with the restrictions set forth in Section 7.8(a)(ix) and (x) (Negative Covenants), (v) will not incur or guarantee any indebtedness except indebtedness with respect to which the Issuer is the sole creditor and will not hold itself out as being liable of the debts of any other Person, (vi)

will include in its constituent documents a limitation on its business such that it may only engage in the acquisition of Equity Securities and the disposition of Equity Securities and the proceeds thereof to the Issuer (and activities ancillary thereto), (vii) will have at least one director that is Independent from the Portfolio Manager, (viii) will distribute (including by way of interest payment) 100% of the proceeds of the assets acquired by it (net of applicable taxes and expenses payable by such subsidiary) to the Issuer, (ix) will be treated as a corporation for U.S. federal income tax purposes and (x) will not acquire any real property or any ownership interest in real property. The Issuer shall provide prior notice to Moody's and S&P of the formation of any ETB Subsidiary and of the transfer of any Equity Security to an ETB Subsidiary.

Section 7.5. <u>Protection of Assets</u>. (a) The Portfolio Manager on behalf of the Issuer will cause the taking of such action within the Portfolio Manager's control as is reasonably necessary in order to maintain the perfection and priority of the security interest of the Trustee in the Assets. The Issuer shall from time to time execute and deliver all such supplements and amendments hereto and all such Financing Statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Holders of the Secured Notes hereunder and to:

(i) Grant more effectively all or any portion of the Assets;

(ii) maintain, preserve and perfect any Grant made or to be made by this Indenture including, without limitation, the first priority nature of the lien or carry out more effectively the purposes hereof;

(iii) perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations);

(iv) enforce any of the Pledged Obligations or other instruments or property included in the Assets;

(v) preserve and defend title to the Assets and the rights therein of the Trustee and the Holders of the Secured Notes against the claims of all Persons and parties; or

(vi) pay or cause to be paid any and all taxes levied or assessed upon all or any part of the Assets.

The Issuer hereby designates the Trustee as its agent and attorney in fact to prepare, execute and file any Financing Statement, continuation statement and all other instruments, and take all other actions, required pursuant to this <u>Section 7.5</u> (Protection of Assets); <u>provided</u> that such designation shall not impose upon the Trustee any obligations under this <u>Section 7.5</u> (Protection of Assets). The Issuer further authorizes the Trustee to file without the Issuer's signature a Financing Statement that names the Issuer as debtor and the Bank as secured party and that describes "all assets in which the debtor now or hereafter has rights" as the Assets in which the Trustee has a Grant.

NEWYORK 8715474 (2K)

(b)     The Trustee shall not, except in accordance with <u>Section 10.6</u> (Reinvestment of Funds in Accounts; Reports by Trustee) and <u>Section 10.8</u> (Release of Securities) permit the removal of any portion of the Assets or transfer any such Assets from the Account to which it is credited, or cause or permit any change in the Delivery made pursuant to <u>Section 3.3</u> (Custodianship; Delivery of Collateral Obligations and Eligible Investments) with respect to any Assets, if, after giving effect thereto, the jurisdiction governing the perfection of the Trustee's security interest in such Assets is different from the jurisdiction governing the perfection at the time of delivery of the most recent Opinion of Counsel pursuant to <u>Section 7.6</u> (Opinions as to Assets) (or, if no Opinion of Counsel has yet been delivered pursuant to <u>Section 7.6</u>, the Opinion of Counsel delivered at the Closing Date pursuant to <u>Section 3.1 (a)(iii)</u>) (Conditions to Issuance of Notes on Closing Date) unless the Trustee shall have received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property and the priority thereof will continue to be maintained after giving effect to such action or actions.

Section 7.6.     <u>Opinions as to Assets</u>.  On or before the 5th anniversary of the Closing Date and every 5th anniversary thereafter, the Issuer shall furnish to the Trustee, Moody's (so long as the Class X Notes, Class A-1 Notes or Class A-2 Notes are rated by Moody's) and S&P an Opinion of Counsel relating to the security interest granted by the Issuer to the Trustee , which opinion may be substantially in the form of <u>Exhibit C</u> attached hereto.

Section 7.7.     <u>Performance of Obligations</u>.  (a)  The Co-Issuers, each as to itself, shall not take any action, and will use their best efforts not to permit any action to be taken by others, that would release any Person from any of such Person's covenants or obligations under any instrument included in the Assets, except in the case of enforcement action taken with respect to any Defaulted Obligation in accordance with the provisions hereof and actions by the Portfolio Manager under the Portfolio Management Agreement and in conformity with this Indenture or as otherwise required hereby.

(b)     The Applicable Issuers may, with the prior written consent of at least a Majority of each Class of Secured Notes (except in the case of the Portfolio Management Agreement and the Collateral Administration Agreement, in which case no consent shall be required), contract with other Persons, including the Portfolio Manager, the Trustee and the Collateral Administrator for the performance of actions and obligations to be performed by the Applicable Issuers hereunder and under the Portfolio Management Agreement by such Persons. Notwithstanding any such arrangement, the Applicable Issuers shall remain primarily liable with respect thereto.  In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Applicable Issuers; and the Applicable Issuers will punctually perform, and use their best efforts to cause the Portfolio Manager, the Trustee, the Collateral Administrator and such other Person to perform, all of their obligations and agreements contained in the Portfolio Management Agreement, this Indenture, the Collateral Administration Agreement or any such other agreement.

Section 7.8.     <u>Negative Covenants</u>.  (a)  The Issuer will not and, with respect to clauses (ii), (iii), (iv), (vi), (vii), (viii), (ix) and (x) the Co-Issuer will not, in each case from and after the Closing Date:

(i)    sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Assets, except as expressly permitted by this Indenture and the Portfolio Management Agreement;

(ii)    claim any credit on, make any deduction from, or dispute the enforceability of payment of the principal or interest payable (or any other amount) in respect of the Notes (other than amounts withheld in accordance with the Code or in order to comply with FATCA or any applicable laws of the Cayman Islands or other applicable jurisdiction) or assert any claim against any present or future Holder of Notes, by reason of the payment of any taxes levied or assessed upon any part of the Assets;

(iii)    (A) incur or assume or guarantee any indebtedness, other than the Notes and this Indenture and the transactions contemplated hereby (including, without limitation, as a result of a Refinancing) or (B)(1) issue any additional class of securities (except as provided in Section 2.4 (Additional Notes) and Article 8 (Supplemental Indentures) or (2) issue any additional shares, member interests or limited liability company interests, as the case may be;

(iv)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be permitted hereby or by the Portfolio Management Agreement, (B) except as permitted by this Indenture, permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Assets or any part thereof, any interest therein or the proceeds thereof or (C) except as permitted by this Indenture, take any action that would permit the lien of this Indenture not to constitute a valid first priority security interest in the Assets;

(v)    amend the Portfolio Management Agreement except pursuant to the terms thereof and Article 15;

(vi)    dissolve or liquidate in whole or in part, except as permitted hereunder or required by applicable law;

(vii)    pay any distributions other than in accordance with the Priority of Payments;

(viii)    permit the formation of any subsidiaries (other than the Co-Issuer and any ETB Subsidiary);

(ix)    conduct business under any name other than its own;

(x)    have any employees (other than directors to the extent they are employees);

NEWYORK 8715474 (2K)

(xi)    sell, transfer, exchange or otherwise dispose of Assets, or enter into an agreement or commitment to do so or enter into or engage in any business with respect to any part of the Assets, except as expressly permitted by this Indenture or the Portfolio Management Agreement; and

(xii)    at any time during or after the Reinvestment Period, execute, enter into, agree to or vote in favor of any amendment or modification extending or having the effect of extending the maturity of a Collateral Obligation if (x) (1) during the Reinvestment Period, either (A) the Weighted Average Life Test will not be satisfied immediately after giving effect to such amendment or modification or (B) if the Weighted Average Life Test was not satisfied immediately prior to giving effect to such amendment or modification, the level of compliance with the Weighted Average Life Test will not be maintained or improved after giving effect to such amendment or modification or (2) after the Reinvestment Period, the Weighted Average Life Test will not be satisfied after giving effect to such amendment or modification (y) such amendment or modification would cause such Collateral Obligation to mature after the Stated Maturity of the Notes or (z) unless waived in writing by the Holders of at least a Majority of the Controlling Class, the then-current rating by Moody's of the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes is below "Aa3".

(b)    The Co-Issuer will not invest any of its assets in "securities" as such term is defined in the Investment Company Act, and will keep all of its assets in Cash.

(c)    Notwithstanding anything to the contrary contained herein, the Issuer shall not, and shall use its best efforts to ensure that the Portfolio Manager acting on the Issuer's behalf does not, acquire any asset, conduct any activity or take any action if the acquisition or ownership of such asset, the conduct of such activity or the taking of such action, as the case may be, would cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis or income tax on a net income basis in any other jurisdiction.  The requirements of this Section 7.8(c) (Negative Covenants) will be deemed to be satisfied if the requirements of Section 7.8(d) (Negative Covenants) below are satisfied.

(d)    Notwithstanding anything to the contrary contained herein, the Issuer shall comply with all of the provisions set forth in Schedule 1 to the Portfolio Management Agreement, unless, with respect to a particular transaction, the Issuer, the Portfolio Manager and the Trustee shall have received an opinion or advice of White & Case LLP, Dechert LLP or other tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that, under the relevant facts and circumstances with respect to such transaction, taking into account the Issuer's failure to comply with one or more of such provisions and assuming compliance with this Indenture and all other provisions in Schedule 1 to the Portfolio Management Agreement, the Issuer's contemplated activities will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis. The provisions set forth in Schedule 1 to the Portfolio Management Agreement may be waived, amended, eliminated, modified or supplemented (without execution of a supplemental indenture) if the Issuer, the Portfolio Manager and the Trustee shall have received an opinion of White &

Case LLP, Dechert LLP or other tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that, assuming compliance with this Indenture and taking into account the Issuer's compliance with such amended provisions or supplemental provisions or the Issuer's failure to comply with such provisions proposed to be waived, amended, eliminated, modified or supplemented, as the case may be, the Issuer's contemplated activities will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis; provided, however, that written notice of any such amendment, elimination or supplementation of or to the provisions of Schedule 1 to the Portfolio Management Agreement pursuant to this clause (d) shall be provided to each Rating Agency then rating any Outstanding Class of Secured Notes within 60 days of any such amendment, elimination or supplementation. For the avoidance of doubt, in the event an opinion of White & Case LLP, Dechert LLP or other tax counsel as described above has been obtained in accordance with the terms hereof, no consent of any Noteholder or any other Person or satisfaction of any Global Rating Agency Condition shall be required in order to comply with this Section 7.8(d) (Negative Covenants) in connection with the failure to comply with or waiver, amendment, elimination, modification or supplementation of any provision of Schedule 1 to the Portfolio Management Agreement contemplated by such opinion of tax counsel. The Issuer shall only be liable (or otherwise held accountable pursuant to this Section 7.8(d)) for the failure to comply with the provisions set forth in Schedule 1 to the Portfolio Management Agreement to the extent that such non-compliance causes the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis.

(e)    The Issuer, Co-Issuer and any ETB Subsidiary shall not be party to any agreements that provide for a future financial obligation on the part of the Issuer (including Hedge Agreements) without including customary "non-petition" and "limited recourse" provisions therein (and shall not amend or eliminate such provisions in any agreement to which it is party) without satisfaction of the Global Rating Agency Condition, except for (i) any agreements related to the purchase and sale of any Collateral Obligations or Eligible Investments which contain customary (as determined by the Portfolio Manager) purchase or sale terms or which are documented using customary (as determined by the Portfolio Manager) loan trading documentation and (ii) any IRS Agreement.

(f)    The Issuer shall not acquire or hold any Collateral Obligation or Eligible Investment that is a debt obligation in bearer form unless the Collateral Obligation or Eligible Investment is not a "registration required obligation" under Section 163(f)(2)(A) of the Code.

Section 7.9.    Statement as to Compliance.  On or before March 14th in each calendar year commencing in 2014, or immediately if there has been a Default under this Indenture and prior to the issuance of any Additional Subordinated Notes pursuant to Section 2.4 (Additional Notes), the Issuer shall deliver to the Trustee (to be forwarded by the Trustee to each Noteholder making a written request therefor), the Portfolio Manager and each Rating Agency an Officer's certificate of the Issuer that, having made reasonable inquiries of the Portfolio Manager, and to the best of the knowledge, information and belief of the Issuer, there did not exist, as at a date not more than five days prior to the date of the certificate, nor had there existed at any time prior thereto since the date of the last certificate (if any), any Default hereunder or, if

such Default did then exist or had existed, specifying the same and the nature and status thereof, including actions undertaken to remedy the same, and that the Issuer has complied with all of its obligations under this Indenture or, if such is not the case, specifying those obligations with which it has not complied.

Section 7.10.     Co-Issuers May Consolidate, etc., Only on Certain Terms. Neither the Issuer nor the Co-Issuer (the "Merging Entity") shall consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law (in the case of the Issuer) or United States and Delaware law (in the case of the Co-Issuer) and unless:

(a)     the Merging Entity shall be the surviving corporation, or the Person (if other than the Merging Entity) formed by such consolidation or into which the Merging Entity is merged or to which all or substantially all of the assets of the Merging Entity are transferred (the "Successor Entity") (A) if the Merging Entity is the Issuer, shall be a company organized and existing under the laws of the Cayman Islands or any other similar jurisdiction (e.g., having no entity-level tax) and (B) in any case shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee and each Holder, the due and punctual payment of the principal of and interest on all Secured Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided herein;

(b)     each Rating Agency shall have been notified in writing of such consolidation or merger and the Global Rating Agency Condition is satisfied with respect to the consummation of such transaction;

(c)     if the Merging Entity is not the surviving corporation, the Successor Entity shall have agreed with the Trustee (i) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Merging Entity with respect to its Affiliates and (ii) not to consolidate or merge with or into any other Person or transfer or convey the Assets or all or substantially all of its assets to any other Person except in accordance with the provisions of this Section 7.10 (Co-Issuers May Consolidate, etc., Only on Certain Terms);

(d)     if the Merging Entity is not the surviving corporation, the Successor Entity shall have delivered to the Trustee and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in subsection (a) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless

of whether such enforceability is considered in a proceeding in equity or at law); if the Merging Entity is the Issuer, that, immediately following the event which causes such Successor Entity to become the successor to the Issuer, (i) such Successor Entity has title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Assets securing all of the Secured Notes and (ii) the Trustee continues to have a valid perfected first priority security interest in the Assets securing all of the Secured Notes; and in each case as to such other matters as the Trustee or any Noteholder may reasonably require;

(e)     immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(f)     the Merging Entity shall have notified each Rating Agency of such consolidation, merger, transfer or conveyance and shall have delivered to the Trustee and each Noteholder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to the Holders of the Notes (as compared to the tax consequences of not effecting the transaction);

(g)     the Merging Entity shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, neither of the Co-Issuers (or, if applicable, the Successor Entity) will be required to register as an investment company under the Investment Company Act; and

(h)     after giving effect to such transaction, the outstanding stock (other than the Subordinated Notes) of the Merging Entity (or, if applicable, the Successor Entity) will not be beneficially owned within the meaning of the Investment Company Act by any U.S. Person.

Section 7.11.     Successor Substituted.     Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with Section 7.10 (Co-Issuers May Consolidate, etc., Only on Certain Terms) hereof in which the Merging Entity is not the surviving corporation, the Successor Entity shall succeed to, and be substituted for, and may exercise every right and power of, the Merging Entity under this Indenture with the same effect as if such Person had been named as the Issuer or the Co-Issuer, as the case may be, herein. In the event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this Article 7 may be dissolved, wound up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

Section 7.12.     No Other Business.     From and after the Closing Date, the Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and acquiring, owning, holding, selling, lending, exchanging, redeeming,

NEWYORK 8715474 (2K)

pledging, contracting for the management of and otherwise dealing with Collateral Obligations and the other Assets in connection therewith (including, without limitation, establishing and maintaining any ETB Subsidiary) and entering into Hedge Agreements, the Collateral Administration Agreement, the Securities Account Control Agreement, the Portfolio Management Agreement and other agreements specifically contemplated by this Indenture and shall not engage in any activity that would cause the Issuer to be subject to U.S. federal or state income tax on a net income basis, and the Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes to be issued by it pursuant to this Indenture and, with respect to the Issuer and the Co-Issuer, such other activities which are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith or ancillary thereto. The Issuer and the Co-Issuer may amend, or permit the amendment of, their Memorandum and Articles and Certificate of Incorporation or By-laws, respectively, only if such amendment would satisfy the Global Rating Agency Condition; provided, that, without satisfying the Global Rating Agency Condition, the Issuer and Co-Issuer shall each change their names at the direction of the Portfolio Manager only if prior notice of such change is provided to each Hedge Counterparty and Moody's. Notwithstanding anything to the contrary in this Section 7.12 (No Other Business), the Issuer may take all actions necessary or advisable to comply with FATCA.

Section 7.13.    Maintenance of Listing.    To the extent such listing is not obtained on the Closing Date, the Issuer shall continue to use all reasonable efforts to obtain the listing of the Notes on the Irish Stock Exchange. Following such listing, so long as any Class of Notes remain Outstanding, the Co-Issuers shall use all reasonable efforts to maintain the listing of such Notes on the Irish Stock Exchange; provided, however, the Issuer will be permitted pursuant to a supplemental indenture under Section 8.1(xii) (Supplemental Indentures Without Consent of Holders of Offered Securities) to cause the Subordinated Notes (and any other Class of Notes that reasonably could be characterized as equity in the Issuer) to be de-listed from such exchange (and to not be listed on any other exchange) if the listing of such Class of Notes could reasonably be expected to cause the Issuer to be treated as a domestic corporation for U.S. federal income tax purposes.

Section 7.14.    Annual Rating Review.    (a) So long as any of the Secured Notes of any Class remain Outstanding, on or before March 14th in each year commencing in 2014, the Applicable Issuers shall obtain and pay for an annual review of the rating of each such Class of Secured Notes from each Rating Agency, as applicable. The Applicable Issuers shall promptly notify the Trustee and the Portfolio Manager in writing (and the Trustee shall promptly provide the Holders with a copy of such notice) if at any time the rating of any such Class of Secured Notes have been, or is known will be, changed or withdrawn.

(b)    With respect to any Collateral Obligation which has a Moody's Rating derived as set forth in clause (i)(B) of the definition of the term "Moody's Rating," the Issuer shall obtain and pay for an annual review of each such Collateral Obligation. With respect to any Collateral Obligation which has a S&P Rating derived as set forth in clause (ii)(b) of the part of the definition of the term "S&P Rating," the Issuer shall obtain and pay for an annual review of each such Collateral Obligation.

Section 7.15.   Reporting.  At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or beneficial owner of a Note, the Co-Issuers shall promptly furnish or cause to be furnished "Rule 144A Information" to such Holder or beneficial owner, to a prospective purchaser of such Note designated by such Holder, or to the Trustee for delivery to such Holder or beneficial owner or a prospective purchaser designated by such Holder or beneficial owner, as the case may be, in order to permit compliance by such Holder or beneficial owner of such Note with Rule 144A under the Securities Act in connection with the resale of such Note by such Holder or beneficial owner of such Note, respectively.  "Rule 144A Information" shall be such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

Section 7.16.   Calculation Agent.  (a)  The Issuer hereby agrees that for so long as any Secured Notes remain Outstanding there will at all times be an agent appointed (which does not control or is not controlled or under common control with the Issuer or its Affiliates or the Portfolio Manager or its Affiliates) to calculate LIBOR in respect of each Interest Accrual Period in accordance with the terms of Exhibit G hereto (the "Calculation Agent").  The Issuer initially appoints the Trustee as Calculation Agent.  The Calculation Agent may be removed by the Issuer or the Portfolio Manager, on behalf of the Issuer, at any time.  If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer or the Portfolio Manager, on behalf of the Issuer, or if the Calculation Agent fails to determine any of the information required to be published in the Companies Announcements Office of the Irish Stock Exchange, as described in subsection (b), in respect of any Interest Accrual Period, the Issuer or the Portfolio Manager, on behalf of the Issuer, will promptly appoint a replacement Calculation Agent which does not control or is not controlled by or under common control with the Issuer or its Affiliates or the Portfolio Manager or its Affiliates.  For so long as any Class of Notes is listed on the Irish Stock Exchange and the guidelines of such exchange so require, notice of the appointment of any replacement Calculation Agent shall be published in the Companies Announcements Office of the Irish Stock Exchange as promptly as practicable after such appointment.  The Calculation Agent may not resign its duties without a successor having been duly appointed.

(b)     The Calculation Agent shall be required to agree that, as soon as possible after 11:00 a.m. London time on each Interest Determination Date, but in no event later than 11:00 a.m. London time on the London Banking Day immediately following each Interest Determination Date, the Calculation Agent will calculate the Note Interest Rate for each Class of Secured Notes for the next Interest Accrual Period and the Note Interest Amount for each Class of Secured Notes (in each case, rounded to the nearest cent, with half a cent being rounded upward) for the next Interest Accrual Period, on the related Payment Date.  At such time the Calculation Agent will communicate such rates and amounts to the Co-Issuers, the Trustee, each Paying Agent, the Portfolio Manager, Euroclear, Clearstream and, so long as any Class of Notes is listed thereon, the Companies Announcements Office of the Irish Stock Exchange by email to rates@ise.ie.  In the latter case, such information will be published in the Companies Announcements Office of the Irish Stock Exchange as soon as possible after its determination. The Calculation Agent will also specify to the Co-Issuers the quotations upon which the foregoing rates and amounts are based, and in any event the Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (London time) on every Interest Determination Date that either:  (i) it has determined or is in the process of determining the Note Interest Rate and Note Interest

Amount for each Class of Secured Notes or (ii) it has not determined and is not in the process of determining any such Note Interest Rate or Note Interest Amount together with its reasons therefor. The Calculation Agent's determination of the foregoing rates and amounts for any Interest Accrual Period will (in the absence of manifest error) be final and binding upon all parties.

Section 7.17.    Certain Tax Matters.  (a)  For U.S. federal income tax purposes, the Issuer shall treat the Secured Notes as debt of the Issuer and the Subordinated Notes as equity in the Issuer.

(b)    The Issuer has not and shall not elect to be treated as a partnership for U.S. federal, state or local income or franchise tax purposes and shall make any election necessary to avoid classification as a partnership or disregarded entity for U.S. federal, state or local income or franchise tax purposes.

(c)    The Issuer shall treat each purchase of Collateral Obligations as a "purchase" for tax accounting and reporting purposes.

(d)    The Issuer and Co-Issuer shall file, or cause to be filed, any tax returns, including information tax returns, required by any governmental authority.

(e)    The Issuer shall not file, or cause to be filed, any income or franchise tax return in the United States or any state thereof except with respect to any ETB Subsidiary or a return required by a tax imposed under Section 881 of the Code unless it shall have obtained an Opinion of Counsel prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(f)    If required to prevent the withholding and imposition of United States income tax on payments made to the Issuer, the Issuer shall deliver or cause to be delivered a U.S. Internal Revenue Service Form W-8BEN or applicable successor form certifying as to the non-U.S. Person status of the Issuer to each issuer or obligor of or counterparty with respect to an Asset at the time such Asset is purchased or entered into by the Issuer and thereafter prior to the obsolescence or expiration of such form.

(g)    Upon the Trustee's receipt of a written request of a Holder of a Note or written request in the form of Exhibit I of a Person certifying that it is an owner of a beneficial interest in a Note for the information described in U.S. Treasury Regulations section 1.1275-3(b)(1)(i) that is applicable to such Note, the Issuer shall cause its Independent accountants to provide promptly to the Trustee and such requesting Holder or owner of a beneficial interest in such a Note all of such information.

(h)    The Issuer shall use its reasonable commercial efforts to provide, or cause the Independent accountants to provide, within 180 days after the end of the Issuer's tax year, to each Holder of the Subordinated Notes (or any other Note that is required to be treated as equity for U.S. federal income tax purposes) and, upon written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes), to such beneficial owner (or its designee), all information that a U.S. shareholder making a "qualified electing fund"

election (as defined in the Code) with respect to the Subordinated Note (or any other Note treated that is required to be as equity for U.S. federal income tax purposes) is required to obtain from the Issuer for U.S. federal income tax purposes, and a "PFIC Annual Information Statement" as described in U.S. Treasury Regulation Section 1.1295-1(g)(1) (or any successor Treasury Regulation), including all representations and statements required by such statement, and the Issuer will take or cause the accountants to take any other reasonable steps to facilitate such election by a Holder or beneficial owner of a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes).

(i)     The Issuer will provide, or cause its Independent accountants to provide, to a Holder of a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes) upon written request and, upon written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes), to such beneficial owner (or its designee), any information that such Holder or beneficial owner reasonably requests to assist such Holder or beneficial owner with regard to filing requirements that such Holder or beneficial owner is required to satisfy as a result of the controlled foreign corporation rules under the Code.

(j)     Notwithstanding any contrary agreement or understanding, the Portfolio Manager, the Co-Issuers, the Trustee, the Collateral Administrator and the Holders and beneficial owners of the Notes (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Indenture and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and tax structure.  The foregoing provision shall apply from the beginning of discussions between the parties.  For this purpose, the tax treatment of a transaction is the purported or claimed U.S. tax treatment of the transaction under applicable U.S. federal, state or local law, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. tax treatment of the transaction under applicable U.S. federal, state or local law.

(k)     If the Issuer is aware that it has purchased an interest in a "reportable transaction" within the meaning of Section 6011 of the Code, and a Holder of a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes) requests in writing information about any such transactions in which the Issuer is an investor, the Issuer shall provide, or cause its Independent accountants to provide, such information it has reasonably available that is required to be obtained by such Holder under the Code as soon as practicable after such request.

Section 7.18.    Ramp-up Period; Purchase of Additional Collateral Obligations. (a)  The Issuer shall use its commercially reasonable efforts to satisfy the Target Initial Par Condition.

(b)     During the Ramp-up Period, the Issuer shall use the following funds to purchase additional Collateral Obligations in the following order:  (i) to pay for the principal portion of any Collateral Obligation, first, any amounts on deposit in the Ramp-up Account and

second, any Principal Proceeds on deposit in the Collection Account and (ii) to pay for accrued interest on any such Collateral Obligation, first, any amounts on deposit in the Ramp-up Account and second, any Principal Proceeds on deposit in the Collection Account. In addition, the Issuer shall use its commercially reasonable efforts to acquire such Collateral Obligations that will satisfy, as of the end of the Ramp-up Period, the Concentration Limitations, the Collateral Quality Test and each of the Overcollateralization Ratio Tests.

(c) Within 30 days after the end of the Ramp-up Period: (i) the Issuer shall cause the Collateral Administrator to compile and provide to each Rating Agency an Effective Date Report and, to S&P, the S&P Excel Default Model Input File, (ii) the Issuer shall provide to the Collateral Administrator (upon its execution of an acknowledgement letter satisfactory to such accountants) an Accountants' Report (A) setting forth the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation as of the end of the Ramp-up Period and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to such sources as shall be specified therein, (B) calculating as of the end of the Ramp-up Period (1) the Overcollateralization Ratio Tests, (2) the Concentration Limitations, (3) the Collateral Quality Test (excluding the S&P CDO Monitor Test), (4) the Effective Date Overcollateralization Test and (5) the Target Initial Par Condition (such items (1) through (5), the "Moody's Specified Tested Items"); and (C) specifying the procedures undertaken by them to review data and computations relating to the Accountants' Report and (iii) the Issuer shall request that S&P (such request shall be made to CDOEffectiveDatePortfolios@sandp.com) confirm that the S&P Effective Date Rating Condition is satisfied. If (x) the Issuer provides an Accountants' Report to the Collateral Administrator with the results of the Moody's Specified Tested Items, and the Collateral Administrator compares such results and based upon such comparison determines that such results are consistent with the results of the Moody's Specified Tested Items set forth in the Effective Date Report (for the avoidance of doubt, results that each indicate compliance with the Moody's Specified Tested Items will be considered consistent, even if the calculations are not identical), and (y) the Issuer causes the Collateral Administrator to provide to Moody's the Effective Date Report and the Effective Date Report confirms satisfaction of the Moody's Specified Tested Items, then a written confirmation from Moody's of its Initial Rating of the Class X Notes and the Class A Notes shall be deemed to have been provided.

(d) If, after the first Payment Date, the Effective Date Conditions have not been met, the Issuer may, in accordance with Section 10.2(f) (Collection Account), instruct the Trustee to (x) transfer amounts from the Interest Collection Subaccount to the Principal Collection Subaccount in an amount sufficient to satisfy the Effective Date Conditions (provided that the amount of such transfer would not result in the failure to pay interest due on any Senior Notes in accordance with the Priority of Payments) or (y) take such other action, including but not limited to a Special Redemption, sufficient to satisfy the Effective Date Conditions.

(e) The failure of the Issuer to satisfy the requirements of this Section 7.18 (Ramp-up Period; Purchase of Additional Collateral Obligations) will not constitute an Event of Default unless such failure constitutes an Event of Default under Section 5.1(d) (Events of Default) hereof and the Issuer, or the Portfolio Manager acting on behalf of the Issuer, has acted in bad faith. Of the proceeds of the issuance of the Notes which are not applied to pay for the

purchase of Collateral Obligations purchased by the Issuer on or before the Closing Date $502,631,025 shall be deposited in the Ramp-up Account on the Closing Date. At the direction of the Issuer (or the Portfolio Manager on behalf of the Issuer), the Trustee shall apply amounts held in the Ramp-up Account to purchase additional Collateral Obligations. If at the end of the Ramp-up Period, any amounts on deposit in the Ramp-up Account have not been applied to purchase Collateral Obligations, such amounts shall be applied as described in Section 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

(f)     On and after the last day of the Ramp-up Period, the Portfolio Manager shall determine which "row/column combination" of which Minimum Diversity/Maximum Rating/Minimum Spread Matrix shall be applicable for purposes of determining compliance with the Moody's Diversity Test, the Maximum Moody's Rating Factor Test and the Minimum Floating Spread Test, and if such "row/column combination" and/or Minimum Diversity/Maximum Rating/Minimum Spread Matrix differs from the "row/column combination" and/or Minimum Diversity/Maximum Rating/Minimum Spread Matrix chosen to apply as of the Closing Date, the Portfolio Manager will so notify the Issuer, the Collateral Administrator and the Trustee. After the last day of the Ramp-up Period, at any time on written notice to the Issuer, the Trustee and the Collateral Administrator, the Portfolio Manager may elect a different "row/column combination" and/or Minimum Diversity/Maximum Rating/Minimum Spread Matrix to apply to the Collateral Obligations, provided that the Collateral Obligations comply with the Minimum Diversity/Maximum Rating/Minimum Spread Matrix and "row/column combination" to which the Portfolio Manager desires to change. If the Collateral Obligations cease to comply with the Minimum Diversity/Maximum Rating/Minimum Spread Matrix and "row/column combination" which the Portfolio Manager has elected to apply, the Portfolio Manager shall promptly select a Minimum Diversity/Maximum Rating/Minimum Spread Matrix and "row/column combination" with respect to which the Collateral Obligations comply (or which will not cause the Collateral Obligations to be further out of compliance with any Collateral Quality Test measured by reference to the Minimum Diversity/Maximum Rating/Minimum Spread Matrix). Notwithstanding the foregoing, the Portfolio Manager may elect at any time after the last day of the Ramp-up Period, in lieu of selecting a "row/column combination" of the Minimum Diversity/Maximum Rating/Minimum Spread Matrix, to interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

Section 7.19.     Representations Relating to Security Interests in the Assets.  (a) The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to the Assets:

(i)     The Issuer owns such Asset free and clear of any lien, claim or encumbrance of any person, other than such as are created under, or permitted by, this Indenture.

(ii)     Other than the security interest Granted to the Trustee pursuant to this Indenture, except as permitted by this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Assets. The Issuer

has not authorized the filing of and is not aware of any Financing Statements against the Issuer that include a description of collateral covering the Assets other than any Financing Statement relating to the security interest granted to the Trustee hereunder or that has been terminated; the Issuer is not aware of any judgment, PBGC liens or tax lien filings against the Issuer.

(iii)  All Assets constitute Cash, accounts (as defined in Section 9-102(a)(2) of the UCC), Instruments, general intangibles (as defined in Section 9-102(a)(42) of the UCC), uncertificated securities (as defined in Section 8-102(a)(18) of the UCC), Certificated Securities or security entitlements to financial assets resulting from the crediting of financial assets to a "securities account" (as defined in Section 8-501(a) of the UCC).

(iv)  All Accounts constitute "securities accounts" under Section 8-501(a) of the UCC.

(v)  This Indenture creates a valid and continuing security interest (as defined in Section 1-201(37) of the UCC) in such Assets in favor of the Trustee, for the benefit and security of the Secured Parties, which security interest is prior to all other liens, claims and encumbrances (except as permitted otherwise in this Indenture), and is enforceable as such against creditors of and purchasers from the Issuer.

(b)  The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to Assets that constitute Instruments:

(i)  Either (x) the Issuer has caused or shall have caused, within ten days of the Closing Date, the filing of all appropriate Financing Statements in the proper office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Instruments granted to the Trustee, for the benefit and security of the Secured Parties, hereunder or (y)(A) all original executed copies of each promissory note or mortgage note that constitutes or evidences the Instruments have been delivered to the Trustee or the Issuer has received written acknowledgement from a custodian that such custodian is holding the mortgage notes or promissory notes that constitute evidence of the Instruments solely on behalf of the Trustee and for the benefit of the Secured Parties and (B) none of the Instruments that constitute or evidence the Assets has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee, for the benefit of the Secured Parties.

(ii)  The Issuer has received all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(c)  The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to the Assets that constitute Security Entitlements:

NEWYORK 8715474 (2K)

(i)       All of such Assets have been and will have been credited to one of the Accounts which are securities accounts within the meaning of Section 8-501(a) of the UCC.  The Custodian for each Account has agreed to treat all assets credited to such Accounts as "<u>financial assets</u>" within the meaning of Section 8-102(a)(9) the UCC.

(ii)       The Issuer has received all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(iii)       Either (x) the Issuer has caused or shall have caused, within ten days of the Closing Date, the filing of all appropriate Financing Statements in the proper office in the appropriate jurisdictions under applicable law in order to perfect the security interest granted to the Trustee, for the benefit and security of the Secured Parties, hereunder or (y)(A) the Issuer has delivered to the Trustee a fully executed Securities Account Control Agreement pursuant to which the Custodian has agreed to comply with all instructions originated by the Trustee relating to the Accounts without further consent by the Issuer or (B) the Issuer has taken all steps necessary to cause the Custodian to identify in its records the Trustee as the person having a security entitlement against the Custodian in each of the Accounts.

(iv)       The Accounts are not in the name of any person other than the Issuer or the Trustee.  The Issuer has not consented to the Custodian to comply with the entitlement order of any person other than the Trustee (and the Issuer prior to a notice of exclusive control being provided by the Trustee).

(d)       The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to Assets that constitute general intangibles:

(i)       The Issuer has caused or shall have caused, within ten days of the Closing Date, the filing of all appropriate Financing Statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Assets granted to the Trustee, for the benefit and security of the Secured Parties, hereunder.

(ii)       The Issuer has received, or shall receive, all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(e)       The Co-Issuers agree to notify the Rating Agencies promptly if they become aware of the breach of any of the representations and warranties contained in this <u>Section 7.19</u>.

Section 7.20.    <u>Pre-funded Letters of Credit</u>.  If the Issuer (or the Portfolio Manager on behalf of the Issuer) is notified by an administrative agent or other withholding agent for the syndicate of lenders or otherwise in respect of any Pre-funded Letter of Credit that the fees associated therewith are subject to withholding tax imposed by any jurisdiction, the Issuer shall permit the withholding of the full amount of withholding taxes due on such Pre-

funded Letter of Credit. Under such circumstances, Section 1.2(p) (Assumptions as to Pledged Obligations) shall apply.

Section 7.21. Objection to Bankruptcy Proceeding. So long as any of the Notes are Outstanding, the Issuer shall promptly object to the institution of any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other similar proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar law against it and take all necessary or advisable steps to cause the dismissal of any such proceeding; provided, that such obligation shall be subject to the availability of funds therefor.

ARTICLE 8

Supplemental Indentures

Section 8.1. Supplemental Indentures Without Consent of Holders of Offered Securities. Without the consent of the Holders of any Offered Securities, but with the written consent of the Portfolio Manager, the Co-Issuers, when authorized by Board Resolutions, at any time and from time to time subject to the requirement provided below in this Section 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) with respect to the ratings of any Class of Secured Notes, may enter into one or more indentures supplemental hereto for any of the following purposes:

(i) to evidence the succession of another Person to the Issuer or the Co-Issuer and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer herein and in the Notes;

(ii) to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Secured Parties or to surrender any right or power herein conferred upon the Co-Issuers;

(iii) to convey, transfer, assign, mortgage or pledge any property to or with the Trustee or to add to the conditions, limitations or restrictions on the authorized amount, authentication and delivery of the Notes;

(iv) to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Sections 6.9 (Resignation and Removal; Appointment of Successor), 6.10 (Acceptance of Appointment by Successor) and 6.12 (Co-Trustees) hereof;

(v) to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations, whether pursuant to Section 7.5 (Protection of Assets) or otherwise) or to subject to the lien of this Indenture any additional property;

NEWYORK 8715474 (2K)

(vi)     to modify the restrictions on and procedures for resales and other transfers of Notes to reflect any changes in applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(vii)     at the direction of the Portfolio Manager, to change the name of the Issuer and the Co-Issuer, so long as prior notice of such change is provided to each Hedge Counterparty and Moody's;

(viii)     to make such changes as shall be necessary or advisable in order for a Class of Notes to be listed on an exchange, including the Irish Stock Exchange;

(ix)     subject to the approval of the Holders of at least a Majority of the Controlling Class (if such issuance of Additional Subordinated Notes occurs on or after the Effective Date) and the Portfolio Manager, to make such changes as shall be necessary to permit the Applicable Issuers to issue Additional Subordinated Notes of any one or more new classes, provided, that any such new classes of notes shall be subordinate in payment of principal and interest to all existing Classes of Secured Notes; provided, further, that no amendment to this Indenture that does not relate directly to the issuance of the Additional Subordinated Notes or the terms of such Additional Subordinated Notes may be effected under this clause (ix), but may be effected simultaneously under another clause of this Section 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) or under Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), to the extent such other provision is available;

(x)     to conform the provisions of this Indenture to the Offering Circular or, with the consent of the Holders of at least a Majority of the Controlling Class (such consent not to be unreasonably withheld, conditioned or delayed), to correct any inconsistency or cure any ambiguity, omission or errors in this Indenture;

(xi)     with the consent of the Holders of at least a Majority of the Controlling Class, to accommodate, modify or amend existing and/or replacement Hedge Agreements;

(xii)     to (x) take any action advisable to prevent the Co-Issuers, any ETB Subsidiary or the Trustee from becoming subject to withholding or other taxes (other than taxes with respect to the Issuer otherwise permitted under this Indenture and other than taxes imposed on amounts payable or paid to the Trustee as compensation), fees or assessments, to prevent the Co-Issuers from being treated as engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state or local income tax on a net income basis, (y) take any action to allow the Co-Issuers to comply with FATCA or any rules or regulations promulgated thereunder (including providing for remedies against, or imposing penalties upon, any Noteholder who fails to deliver the Holder FATCA Information or is a Non-Compliant FFI) or (z) (A) issue a new Global Note or Global Notes in respect of, or issue one or more new sub-classes of, any Class of Notes to the

extent that the Issuer determines that one or more beneficial owners of Notes of such Class are Recalcitrant Holders or Non-Compliant FFIs; provided, that any sub-class of a Class of Notes issued pursuant to this clause (z) shall be issued on identical terms as the existing Notes of such Class and (B) provide for procedures under which beneficial owners of such Class that are not Recalcitrant Holders or Non-Compliant FFIs may take an interest in such new Global Note(s) or sub-class(es);

(xiii)   with the consent of the Holders of at least a Majority of the Controlling Class, to evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of such Rating Agency set forth herein;

(xiv)   with the consent of the Portfolio Manager and at least a Majority of the Controlling Class to modify the definitions of "Credit Improved Obligation," "Credit Risk Obligation," "Defaulted Obligation" or "Equity Security" or the restrictions on the sales of Collateral Obligations set forth in Section 12.1 (Sales of Collateral Obligations) in a manner not material and adverse to any Holders, subject to the notice and objection provisions set forth in the second succeeding paragraph;

(xv)   to make changes necessary to issue replacement securities or undertake loans in connection with a Refinancing; provided, however, that no amendment to this Indenture that does not relate directly to the issuance of the replacement securities or loans or the terms of such replacement securities or loans may be effected under this clause (xv), but may be effected simultaneously under another clause of this Section 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) or under Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), to the extent such other provision is available.

(xvi)   to modify any provision to facilitate an exchange of one obligation for another obligation of the same Obligor that has substantially identical terms except transfer restrictions, including to effect any serial designation relating to the exchange;

(xvii)   to modify or implement procedures necessary to comply with Rule 17g-5;

(xviii) to make such changes as shall be necessary or advisable in order for the Certificated Class E Notes and/or the Certificated Class F Notes to be held electronically through DTC or other clearing agencies in a manner similar to, and subject to the same procedures as, the Rule 144A Global Notes; or

(xix)   to facilitate the issuance of combination notes with components consisting of existing Classes of Notes.

The Trustee shall join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, except to the extent required by law.

In the case of any supplemental indenture entered into pursuant to Section 8.1(xiv) (*Supplemental Indentures Without Consent of Holders of Offered Securities*), if the Holders of at least a Majority of the Notes of any other Class provide written notice to the Issuer and the Trustee that such Holders will be materially and adversely affected by any such proposed supplemental indenture (which notice shall (i) set forth the basis on which such Holder or Holders are materially and adversely affected thereby and (ii) provide evidence of such Holder's identity, including a guarantee by a member of a signature guarantee program of its signature with respect to such notice), the Co-Issuers and the Trustee shall not enter into such supplemental indenture (it being understood that any Holder that does not object to such proposed supplemental indenture in writing within 15 Business Days of delivery of such proposed supplemental indenture will be deemed to have consented to such proposed supplemental indenture).  In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and the guidelines of such exchange shall so require, the Issuer shall notify the Irish Stock Exchange of any material modification of this Indenture.

Section 8.2.    <u>Supplemental Indentures With Consent of Holders of Offered Securities</u>.  (a)  With the consent of (i) at least a Majority of each Class of Notes (voting separately by Class) materially and adversely affected thereby and (ii) without limiting clause (i) above, at least a Majority of the Controlling Class, if such supplemental indenture would modify the Weighted Average Life Test or extend the Reinvestment Period, the Trustee and the Co-Issuers may enter into a supplemental indenture to add any provisions to, or change in any manner or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Secured Notes or the Holders of the Subordinated Notes, as applicable. Holders of the Combination Notes will vote with each Underlying Class, except in connection with any supplemental indenture that affects the Combination Notes in a materially adverse manner that is different from the effect of such supplemental indenture on the Notes of any Underlying Class, in which case they will vote as a separate Class;  <u>provided</u>, <u>that</u>, notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall, without the consent of each Holder of any Class materially and adversely affected thereby:

(i)    change the Stated Maturity of the principal of any Class of Note or the due date of any installment of interest on any Secured Note, reduce the principal amount thereof or the rate of interest thereon or the Redemption Price with respect to any Offered Security, or change the earliest date on which Notes of any Class may be redeemed, change the provisions of this Indenture relating to the application of proceeds of any Assets to the payment of principal of or interest on Secured Notes or distributions on the Subordinated Notes or change any place where, or the coin or currency in which, Subordinated Notes or Secured Notes or the principal thereof or interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date); <u>provided</u> that, the consent of the Controlling Class shall not be required with respect to a supplemental indenture that reduces the rate of interest on a Class of Notes (unless such reduction is with respect to the Notes of the Controlling Class);

(ii)    reduce the percentage of the Aggregate Outstanding Amount of Noteholders of each Class whose consent is required for the authorization of any such

NEWYORK 8715474 (2K)

supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder or their consequences provided for in this Indenture;

(iii)    impair or adversely affect the Assets;

(iv)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Assets or terminate such lien on any property at any time subject hereto or deprive the Holder of any Secured Note of the security afforded by the lien of this Indenture;

(v)    reduce the percentage of the Aggregate Outstanding Amount of Noteholders, each Class of Secured Notes whose consent is required to request the Trustee to preserve the Assets or rescind the Trustee's election to preserve the Assets pursuant to Section 5.5 (Optional Preservation of Assets) or to sell or liquidate the Assets pursuant to Section 5.4 (Remedies) or 5.5 (Optional Preservation of Assets);

(vi)    modify any of the provisions of this Article 8 (Supplemental Indentures), except to increase the percentage of Outstanding Secured Notes or Subordinated Notes the consent of the Holders of which is required for any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Secured Note or Subordinated Note Outstanding and affected thereby;

(vii)    modify the definition of the terms "Outstanding", "Controlling Class" or "Majority" or modify the Priority of Payments set forth in Section 11.1(a) (Disbursements of Monies from Payment Account) or the Note Payment Sequence;

(viii)    modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of the Redemption Price, interest or principal on any Secured Note, or any amount available for distribution to the Subordinated Notes or to affect the rights of the Holders of Secured Notes to the benefit of any provisions for the redemption of such Secured Notes contained herein; or

(ix)    modify the provisions of this Indenture in such a manner as to affect the extent to which payments on the Underlying Class are made to the Holders of the Combination Notes or modifies the voting rights of Holders of the Combination Notes.

(b)    Subject to Section 8.1, with the consent of the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes delivered to the Trustee and the Portfolio Manager, the Trustee and the Co-Issuers may enter into one or more indentures supplemental hereto to accommodate the issuance of Additional Subordinated Notes pursuant to Section 2.4 (Additional Notes).

(c)    Not later than 20 Business Days prior to the execution of any proposed supplemental indenture pursuant to Sections 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) and 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), the Trustee, at the expense of the Co-Issuers, shall deliver to the Noteholders

NEWYORK 8715474 (2K)

(and, upon receipt of a written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Note, any beneficial owner of a Note) and each Rating Agency (with respect to each Rating Agency, only for so long as any Outstanding Secured Notes are rated by such Rating Agency), a copy of such supplemental indenture. Unless otherwise notified in writing by at least a Majority of any Class of Notes that such Class would be materially and adversely affected by a supplemental indenture, the Trustee may conclusively rely upon an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates (including certificates delivered by the Portfolio Manager) and/or documents) as to whether the interests of any Holder of Notes would be materially and adversely affected by any supplemental indenture or other modification or amendment of this Indenture. Except as set forth in the previous sentence, such determination shall be conclusive and binding on all present and future Holders. The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in Section 8.3 (Execution of Supplemental Indentures) hereof. If such a determination cannot be made with respect to a Class or Classes of Notes, such Class or Classes of Notes will be treated as if they would be materially and adversely affected by such change.

(d)      It shall not be necessary for any Act of Holders under this Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities) to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act or consent shall approve the substance thereof.

(e)      The Issuer shall not enter into any supplemental indenture which materially adversely affects any rights of any Hedge Counterparty under this Indenture without the prior written consent of such Hedge Counterparty.

(f)      Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to Sections 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) and 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), the Trustee at the expense of the Co-Issuers, shall deliver to the Noteholders (and, upon receipt of a written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Note, any beneficial owner of a Note), the Portfolio Manager and each Rating Agency a copy thereof. Any failure of the Trustee to deliver a copy of any supplemental indenture as provided herein, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

(g)      With respect to any supplemental indenture that modifies or amends any component of the Minimum Diversity/Maximum Rating/Minimum Spread Matrix or the definitions related thereto, the following requirements must be satisfied prior to the execution of such supplemental indenture: (i) written consent to such supplemental indenture has been obtained from at least a Majority of the Controlling Class, such consent not to be unreasonably withheld, delayed or conditioned and (ii) the Moody's Rating Condition has been satisfied with respect to such supplemental indenture.

(h)      Any supplemental indenture that amends or modifies the definitions of Concentration Limitations, Collateral Quality Tests, Collateral Obligations, Eligible Investments

NEWYORK 8715474 (2K)

or Investment Criteria shall be deemed to materially and adversely affect the rights and interests of the Holders of each Class of Notes for the purposes of this Article 8.

Section 8.3.    Execution of Supplemental Indentures.  In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Sections 6.1 (Certain Duties and Responsibilities of the Trustee), 6.3 (Certain Rights of Trustee) and Section 8.2(c) (Supplemental Indentures With Consent of Holders of Offered Securities) hereof) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been satisfied.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.  The Portfolio Manager will be bound to follow any amendment or supplement to this Indenture of which it has received written notice from the time it has received a copy of such amendment from the Issuer or the Trustee; provided, however, that with respect to any amendment or supplement to this Indenture which would (i) increase the duties or liabilities of, or adversely change the economic consequences to the Portfolio Manager, (ii) modify the restrictions on the purchases or sales of Collateral Obligations described under Article 12 or the Investment Criteria, (iii) expand or restrict the Portfolio Manager's discretion or (iv) modify the restrictions on and procedures for resales and other transfers of Subordinated Notes, except as set forth in Section 8.1(vi) above, the Portfolio Manager shall not be bound thereby unless the Portfolio Manager shall have consented thereto in writing, such consent not to be unreasonably withheld or delayed.  The Issuer shall promptly provide the Portfolio Manager with notice of any proposed supplemental indenture that would have the effect of modifying the restrictions on and procedures for resales and other transfers of Subordinated Notes (whether as set forth in Section 8.1(vi) above or otherwise).  For so long as any Class of Notes is listed on the Irish Stock Exchange, the Issuer shall notify the Irish Stock Exchange of any material modification to this Indenture.

Section 8.4.    Effect of Supplemental Indentures.  Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

Section 8.5.    Reference in Notes to Supplemental Indentures.  Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and if required by the Issuer shall, bear a notice in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Applicable Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Applicable Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

ARTICLE 9

Redemption of Notes

Section 9.1.    Mandatory Redemption.  If a Coverage Test is not met on any Determination Date occurring subsequent to the Ramp-up Period (or, in the case of each Interest Coverage Test, at or subsequent to the Determination Date with respect to the second Payment Date), the Issuer shall apply available amounts in the Payment Account on the related Payment Date to make payments in accordance with the Note Payment Sequence to the extent necessary to achieve compliance with such Coverage Test, as applicable.  The Combination Notes will be redeemed on any Payment Date in connection with a Mandatory Redemption to the extent that each Underlying Class is redeemed.

Section 9.2.    Optional Redemption and Refinancing.  The Secured Notes shall be redeemable by the Applicable Issuers, in whole, on any Business Day (x) after the end of the Non-Call Period and (y) during the Non-Call Period, only if a Tax Event has occurred.  No Optional Redemption shall occur unless the Issuer has received written direction from Holders of at least (i) when no Tax Event has occurred or is ongoing, 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or (ii) when a Tax Event has occurred and is ongoing, 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or of the Aggregate Outstanding Amount of any Class of Secured Notes Affected by such Tax Event (provided that if the Tax Event that has occurred is with respect to any tax arising under or as a result of FATCA, then Holders that have not provided the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information (to the extent that the failure to provide the Holder FATCA Information was a cause of the tax arising under FATCA) shall not be considered in determining whether the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the applicable Class of Notes have directed a redemption of Secured Notes) provided to the Issuer, the Trustee and the Portfolio Manager not later than 30 days prior to the Business Day on which such redemption shall occur.

Upon receipt or delivery of a notice of redemption of the Secured Notes, the Portfolio Manager in its sole discretion will (except in the case of a Refinancing) direct the sale of all or part of the Collateral Obligations and other Assets in order that the proceeds from such sale and all other funds available for such purpose in the Collection Account and the Payment Account will be at least sufficient to pay the Redemption Price on all of the Secured Notes and to pay any applicable Management Fees, all Administrative Expenses (without limitation thereof by the Administrative Expense Cap) and other fees and expenses payable under the Priority of Payments (including, without limitation, any amounts due to the Hedge Counterparties), provided that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date. On the Redemption Date, proceeds available for an Optional Redemption will be applied to redeem the Secured Notes and pay other amounts and expenses in accordance with the Priority of Payments. If such sale, in the sole discretion of the Portfolio Manager, would not be sufficient to redeem all Secured Notes and to pay such applicable Management Fees, Administrative Expenses and other fees and expenses, the Secured Notes may not be redeemed.  The Portfolio Manager, in its

NEWYORK 8715474 (2K)

discretion, may effect the sale of all or any part of the Collateral Obligations or other Assets through the sale of one or more participations in such Assets.

The Combination Notes shall be redeemed on any Redemption Date in connection with an Optional Redemption to the extent that each Underlying Class is redeemed by allocation of the Redemption Price of each Underlying Class. The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes.

Any Class or Classes of Secured Notes may be redeemed in whole, but not in part, on any Business Day after the Non-Call Period from Refinancing Proceeds at the written direction of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes delivered to the Issuer and the Portfolio Manager (with a copy to the Trustee and the Rating Agencies). The Co-Issuers shall redeem such Class or Classes of Secured Notes on the applicable Redemption Date following receipt of such direction by obtaining a loan or an issuance of replacement securities, the terms of which loan or issuance will be negotiated by the Portfolio Manager on behalf of the Issuer, from one or more financial institutions or purchasers (a refinancing provided pursuant to such loan or issuance, a "Refinancing"). So long as the Combination Notes are Outstanding, the Underlying Classes may only be redeemed in connection with a Refinancing if all of the Underlying Classes will be redeemed on the same Redemption Date. The Combination Notes shall be redeemed on any Redemption Date in connection with a Refinancing to the extent that each Underlying Class is redeemed by allocation of the Redemption Price of each Underlying Class.

The Issuer shall not obtain a Refinancing of less than all Classes of Secured Notes unless the Portfolio Manager determines and certifies to the Trustee and the Issuer that: (i) the Global Rating Agency Condition has been satisfied with respect to any remaining Secured Notes that were not the subject of the Refinancing; (ii) the proceeds from the Refinancing (the "Refinancing Proceeds") (together with Interest Proceeds available in accordance with the Priority of Payments to pay the accrued interest portion of the applicable Redemption Price) will be at least sufficient to pay the Redemption Price of the Class or Classes of Secured Notes subject to Refinancing; (iii) the aggregate principal amount of any obligations providing the Refinancing is equal to the Aggregate Outstanding Amount of the Secured Notes being redeemed with the proceeds of such obligations plus an amount equal to the expenses in connection with such Refinancing (other than expenses to be paid by application of Section 11.1(a)(i)(W) (Disbursements of Monies from Payment Account); (iv) the stated maturity of the obligations providing the Refinancing is no earlier than the Stated Maturity of the Secured Notes being refinanced; (v) the Refinancing Proceeds will be used (to the extent necessary) to redeem the applicable Secured Notes; (vi) the agreements relating to the Refinancing contain limited-recourse and non-petition provisions equivalent to those applicable to the Secured Notes being redeemed, as set forth herein; (vii) the obligations providing the Refinancing are not senior in priority of payment, and do not have greater voting rights than, the Class of Secured Notes being redeemed; and (viii) the expenses in connection with the Refinancing have been paid or will be adequately provided for from (x) the proceeds of the Refinancing (except for expenses owed to persons that agree to be paid solely as Administrative Expenses payable in accordance with the

Priority of Payments) and/or (y) the application of Section 11.1(a)(i)(W) (Disbursements of Monies from Payment Account).

In addition to the foregoing restrictions, no replacement Class of Secured Notes shall be issued in connection with a Refinancing of less than all Classes of Secured Notes unless the Issuer causes to be delivered to the Trustee an Opinion of Counsel in form and substance satisfactory to the Trustee to the effect that the issuance of such Notes would not affect the U.S. Federal income tax treatment of the Secured Notes then Outstanding (including any resulting deemed exchange under Section 1001 of the Code).

In the case of a Refinancing upon a redemption of all Classes of Secured Notes, the Issuer shall not obtain such Refinancing unless (i) the Refinancing Proceeds and all other available funds will be at least sufficient to redeem simultaneously the Secured Notes, in whole but not in part, and to pay the other amounts included in the aggregate Redemption Price and all accrued and unpaid applicable Management Fees, Administrative Expenses (regardless of the Administrative Expense Cap), including the reasonable fees, costs, charges and expenses incurred by the Trustee and the Collateral Administrator (including reasonable attorneys' fees and expenses) in connection with such Refinancing, provided that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date, (ii) the Refinancing Proceeds and other available funds are used (to the extent necessary) to make such redemption and (iii) the agreements relating to the Refinancing contain limited recourse and non-petition provisions equivalent to those applicable to the Secured Notes being redeemed, as set forth herein.

Refinancing Proceeds shall not constitute Interest Proceeds or Principal Proceeds but will be applied directly on the related Redemption Date pursuant to this Indenture to redeem the Secured Notes being refinanced without regard to the Priority of Payments; provided, that to the extent that any Refinancing Proceeds are not applied to redeem the Secured Notes being refinanced or to pay expenses in connection with the Refinancing, such Refinancing Proceeds shall be treated as Principal Proceeds.

The Holders of the Notes shall not have any cause of action against any of the Co-Issuers, the Portfolio Manager or the Trustee for any failure to obtain a Refinancing. In the event that a Refinancing is obtained meeting the requirements specified above as certified by the Portfolio Manager, the Issuer and the Trustee shall amend this Indenture to the extent necessary to reflect the terms of the Refinancing and no further consent for such amendments shall be required from the Holders of Notes other than the consent of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes directing or consenting to the redemption.

In the event of any redemption pursuant to this Section 9.2 (Optional Redemption and Refinancing), the Issuer shall, at least 20 days prior to the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee in writing of such Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on such Redemption Date and the applicable Redemption Price(s).

NEWYORK 8715474 (2K)

Section 9.3. Redemption Procedures. (a) In the event of any redemption pursuant to Section 9.2 (Optional Redemption and Refinancing), the written direction of the Holders of the Subordinated Notes set forth therein shall be provided to the Trustee, the Issuer and the Portfolio Manager not later than 30 days prior to the Business Day on which such redemption is to be made (which date shall be designated in such notice) and a notice of redemption shall be given by first class mail, postage prepaid, mailed not later than 10 Business Days prior to the applicable Redemption Date, to each applicable Holder of Notes, at such Holder's address in the Register and each Rating Agency. In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of redemption pursuant to Section 9.2 (Optional Redemption and Refinancing) shall also be given to the Noteholders by publication in the Companies Announcements Office of the Irish Stock Exchange.

(b) All notices of redemption delivered pursuant to Section 9.3(a) (Redemption Procedures) shall state:

(i) the applicable Redemption Date;

(ii) the Redemption Price of the Notes to be redeemed;

(iii) that all of the Secured Notes are to be redeemed in full, in the case of an Optional Redemption, or listing the applicable Class of Notes that are to be redeemed, in the case of a Refinancing, and that interest on the Secured Notes shall cease to accrue on the Business Day specified in the notice;

(iv) the place or places where Notes are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 (Maintenance of Office or Agency); and

(v) whether the Subordinated Notes are to be redeemed in full on such Redemption Date and, if so, the place or places where the Subordinated Notes are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 (Maintenance of Office or Agency).

The Co-Issuers shall have the option to withdraw any such notice of redemption up to the Business Day immediately prior to the scheduled Redemption Date by written notice to the Trustee and the Portfolio Manager only if the Portfolio Manager shall be unable to deliver the sale agreement or agreements or certifications (described in Section 9.3(c) (Redemption Procedures)), in form satisfactory to the Trustee or is unable to effect the applicable Refinancing. If the Co-Issuers so withdraw any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations and other Assets sold pursuant to Section 9.2 (Optional Redemption and Refinancing) may, during the Reinvestment Period at the Portfolio Manager's discretion, be reinvested in accordance with the Investment Criteria.

Notice of redemption shall be given by the Co-Issuers (so long as the Co-Issuers have received notice thereof) or, upon an Issuer Order, by the Trustee in the name and at the

NEWYORK 8715474 (2K)

expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Notes selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

(c) In the event of any redemption pursuant to Section 9.2 (Optional Redemption and Refinancing), no Notes may be optionally redeemed (other than in connection with a Refinancing) unless (i) at least 10 Business Days before the scheduled Redemption Date the Portfolio Manager shall have furnished to the Trustee evidence, in form satisfactory to the Trustee, that the Portfolio Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial or other institution or institutions to sell to such institution, not later than the second Business Day preceding the scheduled Redemption Date in immediately available funds, all or part of the Collateral Obligations and/or the Hedge Agreements at a purchase price at least equal to an amount sufficient, together with the Eligible Investments maturing, redeemable (or putable to the issuer thereof at par) on or prior to the scheduled Redemption Date and any payments to be received in respect of the Hedge Agreements, to pay any applicable Management Fees, all Administrative Expenses and other fees and expenses payable in accordance with the Priority of Payments (without limitation thereof by the Administrative Expense Cap) prior to the payment of the principal of the Notes to be redeemed and redeem all of the Secured Notes on the scheduled Redemption Date at the applicable Redemption Price, provided that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date or (ii) prior to selling any Collateral Obligations and/or Eligible Investments, the Portfolio Manager shall certify to the Trustee that, in its judgment, the aggregate sum of (A) expected proceeds from Hedge Agreements and the sale of Eligible Investments and (B) the aggregate Market Value of all Collateral Obligations and other Assets shall exceed the sum of (x) the aggregate Redemption Prices of the Outstanding Secured Notes and (y) any applicable Management Fees, all Administrative Expenses and other fees and expenses payable under the Priority of Payments (without limitation thereof by the Administrative Expense Cap) prior to the redemption of the Notes, provided that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date. Any certification delivered pursuant to Section 9.3(c)(ii) (Redemption Procedures) shall include (1) the approximate prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments and/or Hedge Agreements and (2) all calculations required by this Section 9.3(c) (Redemption Procedures). The Issuer shall deposit, or cause to be deposited, the funds required for an Optional Redemption in the Payment Account on or prior to the Redemption Date.

Section 9.4. Notes Payable on Redemption Date. (a) Notice of redemption pursuant to Section 9.3 (Redemption Procedures) having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, subject to (i) Section 9.3(c) (Redemption Procedures) and (ii) the Co-Issuers' right to withdraw any notice of redemption pursuant to Section 9.3(b) (Redemption Procedures), become due and payable at the Redemption Price therein specified, and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) all such Secured Notes shall cease to bear interest on the Redemption Date. Upon final payment on a Note to be so redeemed, each Noteholder shall

present and surrender its Note at the place specified in the notice of redemption on or prior to such Redemption Date; provided, however, that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by any of them to save such party harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender. Payments of interest on Secured Notes so to be redeemed whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Secured Note, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.8(e) (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved).

(b)     If any Secured Note called for redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Note Interest Rate for each successive Interest Accrual Period the Secured Note remains Outstanding; provided, that the reason for such non-payment is not the fault of such Noteholder.

Section 9.5.     Special Redemption.  The Secured Notes shall be subject to redemption in part on any Payment Date (A) during the Reinvestment Period, if the Portfolio Manager at its discretion notifies the Trustee that it has been unable, for a period of 20 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and would meet the Investment Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account that are to be invested in additional Collateral Obligations or (B) after the Ramp-up Period, if the Portfolio Manager notifies the Trustee that a redemption is required pursuant to Section 7.18(d) (Ramp-up Period; Purchase of Additional Collateral Obligations) (in each case, a "Special Redemption").  On the first Payment Date following the Collection Period in which such notice is given (and, in the case of clause (B) above, any subsequent Payment Date) (a "Special Redemption Date"), the amount in the Principal Collection Subaccount representing Principal Proceeds which (1) the Portfolio Manager has determined cannot be reinvested in additional Collateral Obligations or (2) must be applied to redeem the Secured Notes in accordance with Section 7.18(d) (Ramp-up Period; Purchase of Additional Collateral Obligations) (such amount, a "Special Redemption Amount"), as the case may be, will be available to be applied in accordance with the Priority of Payments under Section 11.1(a)(ii) (Disbursements of Monies from Payment Account).  Notice of payments pursuant to this Section 9.5 (Special Redemption) shall be given by the Trustee first class mail, postage prepaid, mailed not less than three Business Days prior to the applicable Special Redemption Date to each Holder of Notes affected thereby at such Holder's address in the Register and to both Rating Agencies.  Failure to give any such notice, or any defect therein, to any Holder selected for redemption shall not impair or affect the validity of the redemption or any other Notes.  In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of Special Redemption shall also be given by publication at the Companies Announcements Office of the Irish Stock Exchange.  The Issuer shall deposit, or cause to be deposited, the funds required for a Special Redemption in the Payment Account on or prior to the Special Redemption Date.  The

NEWYORK 8715474 (2K)

Combination Notes will be redeemed on any Payment Date in connection with a Special Redemption to the extent that each Underlying Class is redeemed.

Section 9.6.    <u>Clean-up Call Redemption</u>. (a) The Notes are redeemable at the option of the Applicable Issuer(s) acting at the direction of the Portfolio Manager (which direction shall (x) be given so as to be received by the Issuer and the Trustee not later than twenty days prior to the proposed Clean-up Call Redemption Date and (y) include the Clean-up Call Redemption Date and the Clean-up Call Redemption Price of the Notes to be redeemed), in whole but not in part (a "<u>Clean-up Call Redemption</u>"), at the applicable Redemption Price, on any Business Day selected by the Portfolio Manager (such Business Day, the "<u>Clean-up Call Redemption Date</u>") which occurs on or after the Payment Date on which the Aggregate Principal Balance of the Collateral Obligations and Eligible Investments is less than or equal to 15% of the Target Initial Par Amount.  In such event a notice of redemption shall be given by first class mail, postage prepaid, mailed not later than six Business Days prior to the applicable Clean-up Call Redemption Date, to each Holder of Notes, at such Holder's address in the Register and to each Rating Agency.  Any such Clean-up Call Redemption may only be effected on a Payment Date and only from (a) the disposition proceeds of the Assets and (b) all other funds in the Accounts on the Payment Date relating to such redemption.  A Clean-up Call Redemption may not occur unless the proceeds from the liquidation of the Assets and all other funds in the Accounts on the Payment Date relating to such redemption results in an amount at least equal to the Clean-up Call Redemption Price.  The Combination Notes will be redeemed on any Clean-up Redemption Date in connection with a Clean-up Call Redemption to the extent that each Underlying Class is redeemed by allocation of the Clean-up Call Redemption Price of each Underlying Class.

(b)    All notices of redemption delivered pursuant to <u>Section 9.6(a)</u> (Clean-up Call Redemption) shall state:

(i)    the Clean-up Call Redemption Date;

(ii)    the Clean-up Call Redemption Price of the Notes to be redeemed; and

(iii)    that all of the Notes are to be redeemed in full and that interest on the Secured Notes shall cease to accrue on the Payment Date specified in the notice.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any Holder shall not impair or affect the validity of the redemption of any other Notes.  In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of Clean-up Call Redemption shall also be given by publication in the Companies Announcement Office of the Irish Stock Exchange.

(c)    Any Clean-up Call Redemption is subject to (i) the purchase of the Assets by any Person(s) from the Issuer, on or prior to the fourth Business Day immediately preceding the Clean-up Call Redemption Date, for a purchase price in Cash at least equal to the Clean-up Call Redemption Price (less the amount of funds in the Accounts that are available to pay the

Clean-up Call Redemption Price) and (ii) the receipt by the Trustee from the Portfolio Manager, prior to such purchase, of a certification from the Portfolio Manager that the sum so received satisfies the requirements of clause (i). Upon receipt by the Trustee of the certification referred to in the preceding sentence, the Trustee (pursuant to written direction from the Portfolio Manager on behalf of the Issuer) and the Portfolio Manager, acting on behalf of the Issuer, shall take all commercially reasonable actions necessary to sell, assign and transfer the Assets to such Person(s) (which may be the Portfolio Manager or any of its Affiliates) upon payment in immediately available funds of the purchase price for such Assets. The Issuer shall deposit, or cause to be deposited, the funds required for a Clean-up Call Redemption in the Payment Account on or prior to the Clean-up Call Redemption Date. The Trustee shall deposit such payment into the Collection Account.

(d)     Any notice of Clean-up Call Redemption may be withdrawn by the Issuer (or the Portfolio Manager on its behalf) up to the fourth Business Day prior to the scheduled Clean-up Call Redemption Date by written notice to the Trustee, the Rating Agencies and (if applicable) the Portfolio Manager only if amounts equal to the Clean-up Call Redemption Price (including funds in the Accounts available to pay the Clean-up Call Redemption Price) are not received in full in immediately available funds by the fourth Business Day immediately preceding the Clean-up Call Redemption Date. Notice of any such withdrawal of a notice of Clean-up Call Redemption shall be given by the Trustee at the expense of the Issuer to each Holder of Notes at such Holder's address in the Note Register by overnight courier guaranteeing next day delivery not later than the second Business Day prior to the scheduled Clean-up Call Redemption Date. The Trustee shall also arrange for notice of such withdrawal to be delivered to the Irish Stock Exchange so long as any Class of Notes is listed thereon and so long as the guidelines of such exchange so require.

(e)     On the Clean-up Call Redemption Date, the Clean-up Call Redemption Price shall be distributed pursuant to the Priority of Payments.

(f)     Notice of redemption pursuant to Section 9.6 (Clean-up Call Redemption) having been given as aforesaid, the Notes to be redeemed shall, on the Clean-up Call Redemption Date, subject to Section 9.6(c) (Clean-up Call Redemption) and the Co-Issuers' right to withdraw any notice of redemption pursuant to Section 9.6(d) (Clean-up Call Redemption), become due and payable at the Clean-up Call Redemption Price therein specified, and from and after the Clean-up Call Redemption Date (unless the Issuer shall default in the payment of the Clean-up Call Redemption Price and accrued interest) all the Secured Notes shall cease to bear interest on the Clean-up Call Redemption Date. Upon final payment on a Note to be so redeemed, the Holder shall present and surrender such Notes at the place specified in the notice of redemption on or prior to such Clean-up Call Redemption Date; provided, however, that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by any of them to save such party harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender.

If any Secured Note called for redemption pursuant to Section 9.6 (Clean-up Call Redemption) shall not be paid upon surrender thereof for redemption, the principal thereof shall,

until paid, bear interest from the Clean-up Call Redemption Date at the applicable Note Interest Rate for each successive Interest Accrual Period the Secured Note remains Outstanding; provided that the reason for such non-payment is not the fault of the Holder of such Secured Note.

## ARTICLE 10

### Accounts, Accountings and Releases

Section 10.1.    Collection of Money.  Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Obligations, in accordance with the terms and conditions of such Pledged Obligations.  The Trustee shall segregate and hold all such Money and property received by it in trust for the Holders of the Notes and shall apply it as provided in this Indenture.

Each Account shall be established and maintained with (a) a federal or state-chartered depository institution with (x) a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P or a long-term debt rating of at least "A+" by S&P and if such institution's long-term debt rating falls below "A" by S&P or its short-term rating falls below "A-1" by S&P (or its long-term rating falls below "A+" by S&P), the assets held in such Account shall be transferred within 60 calendar days to another institution that has a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P (or a long-term debt rating of at least "A+" by S&P) and (y) a long-term senior unsecured debt rating of at least "A2" or a short-term credit rating of "P-1" by Moody's or (b) in segregated non-interest bearing trust accounts with the corporate trust department of a federal or state-chartered deposit institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulation Section 9.10(b), which depository institution (x) has a long term senior unsecured debt rating of at least "Baa3" by Moody's and (y) to the extent any related trust account is holding cash, satisfies the ratings requirements specified in clause (a).  If, in the case of either clause (a) or (b) above, such institution's long-term debt rating or short-term credit rating by Moody's falls below any such required rating, the assets held in the related Accounts shall be transferred within 30 calendar days to another institution that satisfies such rating requirements. The Trustee shall have the right to open subaccounts of any such Account as it deems necessary or appropriate for convenience of administration.

Section 10.2.    Collection Account.  (a)  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Collection Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  In addition, the Trustee shall maintain two segregated subaccounts within the Collection Account, one of which will be designated the "Interest Collection Subaccount," and one of which will be designated the "Principal Collection Subaccount."  The Trustee shall from time to time deposit into the Interest Collection Subaccount, in addition to the deposits required pursuant to Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee),

NEWYORK 8715474 (2K)

immediately upon receipt thereof (except for income earned on amounts deposited in the Ramp-up Account and, to the extent provided in Section 10.4(a) (the Revolver Funding Account), the subaccount of the Revolver Funding Account relating to Permitted Currencies) (i) any funds received by the Issuer after the Closing Date and deemed by the Portfolio Manager to be Interest Proceeds and (ii) all Interest Proceeds (unless simultaneously reinvested in additional Collateral Obligations in accordance with Article 12) received by the Trustee.  The Trustee shall deposit immediately upon receipt thereof all other amounts remitted to the Collection Account into the Principal Collection Subaccount, including in addition to the deposits required pursuant to Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee), (i) any funds received by the Issuer after the Closing Date and deemed by the Portfolio Manager to be Principal Proceeds, (ii) all Principal Proceeds (unless simultaneously reinvested in additional Collateral Obligations in accordance with Article 12 or in Eligible Investments) received by the Trustee, and (iii) all other funds received by the Trustee.  All Monies deposited from time to time in the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Assets and shall be applied to the purposes herein provided.  Subject to Section 10.2(d) (Collection Account), amounts in the Collection Account shall be reinvested pursuant to Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee).

(b)      The Trustee, within one Business Day after receipt of any distribution or other proceeds in respect of the Assets which are not Cash, shall so notify or cause to notify the Issuer and the Issuer shall, use its commercially reasonable efforts to, within five Business Days of receipt of such notice from the Trustee (or as soon as practicable thereafter), sell such distribution or other proceeds for Cash in an arm's length transaction to a Person which is not the Portfolio Manager or an Affiliate of the Issuer or the Portfolio Manager and deposit the proceeds thereof in the Collection Account; provided, however, that the Issuer (i) need not sell such distributions or other proceeds if it delivers an Issuer Order or an Officer's certificate to the Trustee certifying that such distributions or other proceeds constitute Collateral Obligations or Eligible Investments or (ii) may otherwise retain such distribution or other proceeds for up to two years from the date of receipt thereof if it delivers an Officer's certificate to the Trustee certifying that (x) it will sell such distribution within such two-year period and (y) retaining such distribution is not otherwise prohibited by this Indenture.

(c)      At any time when reinvestment is permitted pursuant to Article 12, the Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, (x) withdraw funds on deposit in the Principal Collection Subaccount representing Principal Proceeds (together with accrued interest received with regard to any Collateral Obligation and Interest Proceeds but only to the extent used to pay for accrued interest on an additional Collateral Obligation) and reinvest (or invest, in the case of funds referred to in Section 7.18 (Ramp-up Period; Purchase of Additional Collateral Obligations)) such funds in additional Collateral Obligations or (y) withdraw funds in the Interest Collection Subaccount to exercise a warrant held in the Assets, in each case in accordance with the requirements of Article 12 and such Issuer Order; provided that, in the case of clause (y) above (i) funds on deposit in the Principal Collection Subaccount may be used to exercise warrants in Assets if the Effective Date Overcollateralization Test is satisfied as of the date such warrant is exercised and (ii) proceeds from the sale of securities obtained upon the exercise of such warrant may be treated as Interest Proceeds (up to the amount of Interest Proceeds used to exercise such warrant) or Principal Proceeds at the election of the Portfolio

NEWYORK 8715474 (2K)

Manager.  At any time, the Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, withdraw funds on deposit in the Principal Collection Subaccount representing Principal Proceeds and transfer such funds to the Revolver Funding Account, to be used in accordance with Section 10.4 (The Revolver Funding Account).

(d)      The Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, pay from amounts on deposit in the Collection Account on any Business Day during any Interest Accrual Period (i) from Interest Proceeds only, any amount required to exercise a warrant held in the Assets or right to acquire securities in accordance with the requirements of Article 12 and such Issuer Order; provided that, (x) Principal Proceeds may be used to exercise warrants in Assets if the Effective Date Overcollateralization Test is satisfied as of the date such warrant is exercised and (y) proceeds from the sale of securities obtained upon the exercise of such warrant may be treated as Interest Proceeds (up to the amount of Interest Proceeds used to exercise such warrant) or Principal Proceeds at the election of the Portfolio Manager and (ii) from Interest Proceeds only, any Administrative Expenses; provided, that the aggregate Administrative Expenses paid pursuant to this Section 10.2(d) (Collection Account) during any Collection Period shall not exceed the Administrative Expense Cap for the related Payment Date.

(e)      The Trustee shall transfer to the Payment Account as applicable, from the Collection Account, for application pursuant to Section 11.1(a) (Disbursements of Monies from Payment Account), on or not later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Distribution Report for such Payment Date.

(f)      The Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, transfer from amounts on deposit in the Interest Collection Subaccount on any Business Day during any Interest Accrual Period to the Principal Collection Subaccount, amounts necessary for application pursuant to Section 7.18(d) (Ramp-up Period; Purchase of Additional Collateral Obligations) if, as of the end of the Ramp-up Period, any of the Effective Date Conditions have not been met.

Section 10.3.      Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account.

(a)      Payment Account.  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Payment Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement. Except as provided in Section 11.1(a) (Disbursements of Monies from Payment Account), the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses and other amounts specified herein, each in accordance with the Priority of Payments.  The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

NEWYORK 8715474 (2K)

(b)    Custodial Account.  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Custodial Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement. The only permitted withdrawals from the Custodial Account shall be in accordance with the provisions of this Indenture.  The Trustee agrees to give the Co-Issuers immediate notice if (to the Trustee's actual knowledge) the Custodial Account or any assets or securities on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.

(c)    Ramp-up Account.  The Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Ramp-up Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  The Issuer shall direct the Trustee to deposit the amount specified in Section 3.1(a)(xii) (Conditions to Issuance of Notes on Closing Date) in the Ramp-up Account. In connection with any purchase of an additional Collateral Obligation, the Trustee will apply amounts held in the Ramp-up Account as provided by Section 7.18(b) (Ramp-up Period; Purchase of Additional Collateral Obligations).  After the Effective Date, but prior to the second Determination Date, and after taking into account amounts to be transferred, up to $5,000,000 in Designated Principal Proceeds may be designated, on one occasion only, by the Portfolio Manager as Interest Proceeds (but only if the Effective Date Overcollateralization Test would be satisfied after such designation). Such Designated Principal Proceeds will be withdrawn from the Ramp-up Account and deposited into the Interest Collection Subaccount.  On the first day after the end of the Ramp-up Period or upon the occurrence of an Event of Default (and excluding any proceeds that will be used to settle binding commitments entered into prior to that date), the Trustee will deposit any remaining amounts in the Ramp-up Account into the Principal Collection Subaccount as Principal Proceeds.  Any income earned on amounts deposited in the Ramp-up Account will be deposited in the Ramp-up Account as it is paid.

(d)    Expense Reserve Account.  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Expense Reserve Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  On any Business Day from the Closing Date to and including the Determination Date relating to the fourth Payment Date, the Trustee shall apply funds from the Expense Reserve Account, as directed by the Portfolio Manager, to pay expenses of the Co-Issuers incurred in connection with the establishment of the Co-Issuers, the structuring and consummation of the Offering, the issuance of the Offered Securities or the acquisition of the initial portfolio of Collateral Obligations prior to the fourth Payment Date or to the Collection Account as Principal Proceeds.  By the Determination Date relating to the fourth Payment Date following the Closing Date, all funds in the Expense Reserve Account (after deducting any expenses paid on such Determination Date) will be deposited in the Collection Account as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion) and the Expense Reserve Account will be closed.  Amounts in the

NEWYORK 8715474 (2K)

Expense Reserve Account may be invested at the direction of the Portfolio Manager in Eligible Investments and any income earned on amounts deposited in the Expense Reserve Account will be deposited in the Interest Collection Subaccount as Interest Proceeds as it is paid.

(e) [RESERVED].

(f) Interest Reserve Account. In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Interest Reserve Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement. The Issuer shall direct the Trustee to deposit the amount specified in Section 3.1(a)(xii) (Conditions to Issuance of Notes on Closing Date) in the Interest Reserve Account. On any Business Day from the Closing Date to and including the Determination Date relating to the fourth Payment Date, the Trustee shall transfer funds from the Interest Reserve Account, as directed by the Portfolio Manager, to the Interest Collection Subaccount as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion). By the Determination Date relating to the fourth Payment Date following the Closing Date, all funds in the Interest Reserve Account (after deducting any transfer made on such Determination Date) will be deposited in the Collection Account as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion) and the Interest Reserve Account will be closed. Amounts in the Interest Reserve Account may be invested at the direction of the Portfolio Manager in Eligible Investments and any income earned on amounts deposited in the Interest Reserve Account will be deposited in the Interest Collection Subaccount as Interest Proceeds as it is paid.

Section 10.4. The Revolver Funding Account.

(a) Revolver Funding Account. Upon the purchase of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, funds may be withdrawn first from the Ramp-up Account and then from the Collection Account, and deposited by the Trustee in a single, segregated non-interest bearing trust account maintained by the Issuer with the Custodian (the "Revolver Funding Account") subject to the lien of the Trustee. Upon initial purchase, funds deposited in the Revolver Funding Account in respect of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation will be treated as part of the purchase price therefor. Amounts in each subaccount of the Revolver Funding Account shall be invested in overnight funds that are Eligible Investments selected by the Portfolio Manager and earnings from all such investments will be deposited in the Interest Collection Subaccount as Interest Proceeds.

With respect to any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, upon the purchase of any such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, funds shall be deposited in the Revolver Funding Account such that the sum of the amount of funds on deposit in such account shall be equal to or greater than the sum of the unfunded funding obligations under all such Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations then included in the Assets. If the Issuer receives proceeds with respect to any Delayed Drawdown Collateral Obligation or Revolving

Collateral Obligation that have any remaining unfunded obligations, the Issuer shall deposit all such proceeds into the Revolver Funding Account in an amount up to such unfunded obligations.

Any funds in the Revolver Funding Account (other than earnings from Eligible Investments therein) shall be available solely to cover any drawdowns on the Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations; provided, that any excess of (A) the amounts on deposit in the Revolver Funding Account over (B) the sum of the unfunded funding obligations under all Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations that are included in the Assets may be transferred by the Trustee (at the direction of the Portfolio Manager) from time to time as Principal Proceeds to the Principal Collection Subaccount.

Upon (a) the sale or maturity of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation or (b) the occurrence of an event of default with respect to any such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation or any other event or circumstance which results in the irrevocable reduction of the undrawn commitments under such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, any excess of (A) the amounts on deposit in the Revolver Funding Account over (B) the sum of the unfunded amounts of all Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations that are included in the Assets shall be transferred (at the direction of the Portfolio Manager) by the Trustee as Principal Proceeds to the Principal Collection Subaccount.

Section 10.5.    Hedge Accounts.  If and to the extent that any Hedge Agreement requires the related Hedge Counterparty to secure its obligations thereunder, the Issuer shall, on or prior to the date such Hedge Agreement is entered into, establish a segregated, non-interest bearing trust account which shall be designated as a Hedge Account (each, a "Hedge Account"). The Trustee (as directed by the Portfolio Manager on behalf of the Issuer) shall deposit into each Hedge Account all amounts or collateral which are required to secure the obligations of the Hedge Counterparty in accordance with the terms of the related Hedge Agreement.  Amounts or collateral in the Hedge Account shall be released to the Issuer or the related Hedge Counterparty only in accordance with this Section 10.5(c) (Hedge Accounts), the applicable Hedge Agreement and applicable law.

As directed by the Portfolio Manager in writing, in accordance with the applicable Hedge Agreement, amounts on deposit in a Hedge Account may be invested in Eligible Investments.  Income received on amounts or collateral on deposit in each Hedge Account shall be applied, as directed by the Portfolio Manager, to the payment of any periodic amounts owed by the Hedge Counterparty to the Issuer on the date any such amounts are due.  After application of any such amounts, any income then contained in such Hedge Account shall be withdrawn from such account and paid to the related Hedge Counterparty in accordance with the applicable Hedge Agreement as directed by the Portfolio Manager on behalf of the Issuer.

Upon the occurrence of any "event of default" or "termination event" (each as defined in the applicable Hedge Agreement) under the related Hedge Agreement, amounts contained in the related Hedge Account shall, as directed by the Portfolio Manager in writing, be withdrawn by the Trustee and applied toward the payment of any amounts payable by the related Hedge Counterparty to the Issuer in accordance with the terms of such Hedge Agreement.  Any

NEWYORK 8715474 (2K)

excess amounts held in a Hedge Account after payment of all amounts owing from the related Hedge Counterparty to the Issuer shall be withdrawn from such Hedge Account and paid to the related Hedge Counterparty in accordance with the applicable Hedge Agreement, as directed by the Portfolio Manager on behalf of the Issuer.

Section 10.6. <u>Reinvestment of Funds in Accounts; Reports by Trustee.</u> (a) By Issuer Order (which may be in the form of standing instructions), the Issuer (or the Portfolio Manager on behalf of the Issuer) shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds on deposit in the Accounts and the Hedge Account as so directed in Eligible Investments having Stated Maturities no later than the Business Day preceding the next Payment Date (or such shorter maturities expressly provided herein). If prior to the occurrence of an Event of Default, the Issuer shall not have given any such investment directions, the Trustee shall seek instructions from the Portfolio Manager within three Business Days after transfer of any funds to such accounts. If the Trustee does not thereafter receive written instructions from the Portfolio Manager within five Business Days after transfer of such funds to such accounts, it shall invest and reinvest the funds held in such accounts, as fully as practicable, in the Standby Investment maturing no later than the Business Day immediately preceding the next Payment Date (or such shorter maturities expressly provided herein). If after the occurrence of an Event of Default, the Issuer shall not have given such investment directions to the Trustee for three consecutive days, the Trustee shall invest and reinvest such Monies as fully as practicable in the Standby Investment maturing not later than the earlier of (i) 30 days after the date of such investment (unless putable at par to the issuer thereof) or (ii) the Business Day immediately preceding the next Payment Date (or such shorter maturities expressly provided herein). Except to the extent expressly provided otherwise herein, all interest and other income from such investments shall be deposited in the Interest Collection Subaccount, any gain realized from such investments shall be credited to the Principal Collection Subaccount upon receipt, and any loss resulting from such investments shall be charged to the Principal Collection Subaccount. The Trustee shall not in any way be held liable by reason of any insufficiency of such accounts which results from any loss relating to any such investment, except with respect to investments in obligations of the Bank or any Affiliate thereof (if the Bank is then the Trustee).

(b) The Trustee agrees to give the Issuer immediate notice if any Account or any funds on deposit in any Account, or otherwise to the credit of an Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. All Accounts shall remain at all times with the Trustee or a financial institution having a long-term debt rating of at least equal to "<u>Baa1</u>" by Moody's and having combined capital and surplus of at least $200,000,000 and shall be subject to the requirements of <u>Section 10.1</u> (Collection of Money).

(c) The Trustee shall supply, in a timely fashion, to the Co-Issuers, each Rating Agency and the Portfolio Manager any information regularly maintained by the Trustee that the Co-Issuers, the Rating Agencies or the Portfolio Manager may from time to time request with respect to the Pledged Obligations, the Accounts and the other Assets and provide any other requested information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by <u>Section 10.7</u> (Accountings) or to permit the Portfolio Manager to perform its obligations under the Portfolio Management Agreement. The Trustee

NEWYORK 8715474 (2K)

shall promptly forward to the Portfolio Manager copies of notices and other writings received by it from the issuer of any Collateral Obligation or from any Clearing Agency with respect to any Collateral Obligation which notices or writings advise the holders of such security of any rights that the holders might have with respect thereto (including, without limitation, requests to vote with respect to amendments or waivers and notices of prepayments and redemptions) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer.

Section 10.7.    Accountings.

(a)    Monthly.  Not later than the 18th day of each month (or, if such day is not a Business Day on the next succeeding Business Day) beginning with April 2013, the Issuer shall compile and provide (or cause to be compiled and provided) (including, at the election of the Issuer, via appropriate electronic means acceptable to the recipient) to each Rating Agency, the Trustee, the Portfolio Manager, Intex Solutions, Inc. and the Placement Agents (upon receipt of written request therefor) a monthly report (each a "Monthly Report").  The Monthly Report shall contain the following information with respect to the Collateral Obligations and Eligible Investments included in the Assets, determined as of the close of business on the 10th day of the current month (for which purpose only, assets of any ETB Subsidiary in which the Issuer has a first priority perfected security interest shall be included as if such assets were owned by the Issuer):

(i)    Aggregate Principal Balance of Collateral Obligations and Eligible Investments representing Principal Proceeds.

(ii)    Adjusted Collateral Principal Amount of Collateral Obligations.

(iii)    Collateral Principal Amount of Collateral Obligations.

(iv)    A list of Collateral Obligations, including, with respect to each such Collateral Obligation, the following detailed information:

(A)    The obligor thereon (including the issuer ticker, if any);

(B)    The CUSIP or security identifier thereof;

(C)    The Principal Balance thereof (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest));

(D)    The percentage of the aggregate Collateral Principal Amount represented by such Collateral Obligation;

(E)    The related interest rate or spread (in the case of a LIBOR Floor Obligation, indicating the spread both with and without giving effect to modifications relating to LIBOR Floor Obligations and the specified "floor" rate per annum for such LIBOR Floor Obligation);

(F)    The stated maturity thereof;

NEWYORK 8715474 (2K)

(G)     The related Moody's Industry;

(H)     The related S&P Industry;

(I)     The Moody's Rating, unless such rating is based on a credit estimate unpublished by Moody's (and, in the event of a downgrade or withdrawal of the applicable Moody's Rating, the prior rating and the date such Moody's Rating was changed);

(J)     The Moody's Default Probability Rating;

(K)     The S&P Rating, unless such rating is based on a credit estimate unpublished by S&P;

(L)     The country of Domicile;

(M)     An indication as to whether each such Collateral Obligation is (1) a Defaulted Obligation, (2) a Delayed Drawdown Collateral Obligation (including an indication of the principal amount of unfunded funding obligations thereunder), (3) a Revolving Collateral Obligation (including an indication of the principal amount of unfunded funding obligations thereunder), (4) a Senior Secured Loan, (5) a floating rate Collateral Obligation, (6) a Participation Interest (indicating the related Selling Institution and its ratings by each Rating Agency), (7) a Deferrable Security, (8) a Zero Coupon Security, (9) a Current Pay Obligation, (10) a DIP Collateral Obligation, (11) convertible into or exchangeable for equity securities, (12) a Discount Obligation (including its purchase price), (13) a Cov-Lite Loan, (14) a Pre-funded Letter of Credit, (15) a Bridge Loan, (16) a Non-Quarterly Asset or (17) a First-Lien Last-Out Loan;

(N)     The Moody's Recovery Rate; and

(O)     The S&P Recovery Rate.

(v)     For each of the limitations and tests specified in the definitions of Concentration Limitations and Collateral Quality Test, (1) the result, (2) the related minimum or maximum test level and any calculation of such amount (calculated with and without the Rating Factor Adjustment Amount, the Excess Weighted Average Fixed Coupon, the Excess Weighted Average Floating Spread and the modifications to the Weighted Average Floating Spread calculation relating to LIBOR Floor Obligations (which calculation, with respect to the Minimum Floating Spread Test, will consist of the test level and the calculation of (x) the Weighted Average Floating Spread without giving effect to modifications relating to LIBOR Floor Obligations, (y) the Weighted Average Floating Spread giving effect to modifications relating to LIBOR Floor Obligations and (z) the calculated amount of the modifications relating to LIBOR Floor Obligations), as applicable) and (3) a determination as to whether such result satisfies the related test.

(vi)     The calculation of each of the following:

(A)     Each Interest Coverage Ratio (and setting forth each related Required Coverage Ratio); and

(B)     Each Overcollateralization Ratio (and setting forth each related Required Coverage Ratio and the Overcollateralization Ratio required to pass the Interest Reinvestment Test).

(vii)     For each Account, a schedule showing the beginning balance, each credit or debit specifying the nature, source and amount, and the ending balance.

(viii)     A schedule showing for each of the following the beginning balance, the amount of Interest Proceeds received from the date of determination of the immediately preceding Monthly Report, and the ending balance for the current Measurement Date:

(A)     Interest Proceeds from Collateral Obligations; and

(B)     Interest Proceeds from Eligible Investments.

(ix)     Purchases, prepayments, and sales:

(A)     The identity, Principal Balance (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest)), Principal Proceeds and Interest Proceeds received, and date for (X) each Collateral Obligation that was released for sale or disposition pursuant to Section 12.1 (Sales of Collateral Obligations) during such month and (Y) for each prepayment or redemption of a Collateral Obligation, and in the case of (X), whether such Collateral Obligation was a Credit Risk Obligation or a Credit Improved Obligation, whether the sale of such Collateral Obligation was a discretionary sale and whether such sale of a Collateral Obligation was to an affiliate of the Portfolio Manager; and

(B)     The identity, Principal Balance (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest)), and Principal Proceeds and Interest Proceeds expended to acquire each Collateral Obligation acquired pursuant to Section 12.2 (Purchase of Additional Collateral Obligations) during such month and whether such Collateral Obligation was obtained through a purchase from an affiliate of the Portfolio Manager.

(x)     The identity of each Defaulted Obligation, the Moody's and S&P Collateral Value and Market Value of each such Defaulted Obligation and date of default thereof.

(xi)     The identity of each Collateral Obligation with an S&P Rating of "CCC+" or below and/or a Moody's Rating of "Caa1" or below and the Market Value of each such Collateral Obligation included in the Excess CCC/Caa Adjustment Amount.

(xii) The identity of each Deferring Security, the Moody's and S&P Collateral Value and Market Value of each Deferring Security, and the date on which interest was last paid in full in cash thereon.

(xiii) For any Collateral Obligation, whether the rating of such Collateral Obligation has been upgraded, downgraded or put on credit watch by any Rating Agency since the date of the immediately preceding Monthly Report and such old and new rating or the implication of such credit watch.

(xiv) Whether the Issuer has been notified that the Class Break-even Default Rate has been modified.

(xv) The results of the S&P CDO Monitor Test, including the Class Default Differentials and the characteristics of the current portfolio.

(xvi) The identity of each Current Pay Obligation, the Market Value of each such Current Pay Obligation, the percentage of the Collateral Principal Amount comprised of Current Pay Obligations, the portfolio limitation for Current Pay Obligations expressed as a percentage of the Collateral Principal Amount and whether such limitation is satisfied.

(xvii) For each Hedge Agreement, a schedule showing (x) the notional balance thereof and (y) any amounts due to or from the Hedge Counterparty for such Hedge Agreement.

(xviii) Such other information as the Trustee, any Hedge Counterparty, any Rating Agency or the Portfolio Manager may reasonably request.

(xix) With respect to each Trading Plan commenced or completed since the date of determination of the immediately preceding Monthly Report or Distribution Report, as applicable, the obligor, rating, maturity, trade date and settlement status of each Collateral Obligation sold (or to be sold) and purchased (or to be purchased) pursuant thereto.

(xx) The identity of each ETB Subsidiary and the identity of each Equity Security, if any, held by each such ETB Subsidiary and the amount of Cash, if any, held by each such ETB Subsidiary.

(xxi) A list of the Eligible Investments, including, with respect to each such Eligible Investment, the obligor thereon, the stated maturity thereof and the S&P Rating thereof (unless such rating is based on a credit estimate unpublished by S&P).

(xxii) The S&P Weighted Average Floating Spread as of such date of determination.

(xxiii) Following the end of the Reinvestment Period, a schedule of all Collateral Obligations that the Issuer has purchased on a trade date basis but with respect to which the settlement date has not yet occurred.

Upon receipt of each Monthly Report, the Portfolio Manager shall (a) notify the Issuer (who shall notify S&P) if such Monthly Report indicates that the S&P CDO Monitor Test has not been satisfied as of the relevant Measurement Date and (b) compare the information contained in such Monthly Report to the information contained in its records with respect to the Assets and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer, the Collateral Administrator, the Rating Agencies and the Trustee if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Assets. In the event that any discrepancy exists, the Trustee and the Issuer, or the Portfolio Manager on behalf of the Issuer, shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days cause the Independent accountants appointed by the Issuer pursuant to Section 10.9 (Reports by Independent Accountants) to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture and notice of any error in the Monthly Report shall be sent as soon as practicable by the Issuer to all recipients of such report. In addition, the Portfolio Manager or the Collateral Administrator at the direction of the Portfolio Manager shall deliver to S&P the S&P Excel Default Model Input File with each Monthly Report.

(b)     Payment Date Accounting.   The Issuer shall prepare or cause to be prepared a report (each a "Distribution Report"), determined as of the close of business on each Determination Date preceding a Payment Date, and shall deliver such Distribution Report (including, at the election of the Issuer, via appropriate electronic means acceptable to the recipient) to the Trustee, the Portfolio Manager, the Placement Agents, Intex Solutions, Inc., the Irish Listing Agent (so long as any Notes are listed on the Irish Stock Exchange) and each Rating Agency not later than the Business Day preceding the related Payment Date. The Distribution Report shall contain the following information:

(i)     (a) the Aggregate Outstanding Amount of the Secured Notes of each Class at the beginning of the Interest Accrual Period and such amount as a percentage of the original Aggregate Outstanding Amount of the Secured Notes of such Class, the amount of principal payments to be made on the Secured Notes of each Class on the next Payment Date, the amount of any Deferred Interest on each Class of Deferred Interest Notes, and the Aggregate Outstanding Amount of the Secured Notes of each Class after giving effect to the principal payments, if any, on the next Payment Date and such amount as a percentage of the original Aggregate Outstanding Amount of the Secured Notes of such Class and (b) the Aggregate Outstanding Amount of the Subordinated Notes at the beginning of the Interest Accrual Period and such amount as a percentage of the original Aggregate Outstanding Amount of the Subordinated Notes, the amount of payments to be made on the Subordinated Notes in respect of Subordinated Note Redemption Price on the next Payment Date, and the Aggregate Outstanding Amount of the Subordinated Notes after giving effect to such payments, if any, on the next Payment Date and such amount as a percentage of the original Aggregate Outstanding Amount of the Subordinated Notes;

(ii)     the Note Interest Rate and accrued interest for each applicable Class of Secured Notes for such Payment Date, the Aggregate Outstanding Amount of the Combination Notes and the Aggregate Outstanding Amount of the Components of the Combination Notes;

(iii)     the amounts payable pursuant to each clause of Section 11.1(a)(i) (Disbursements of Monies from Payment Account), each clause of Section 11.1(a)(ii) (Disbursements of Monies from Payment Account) and, if applicable, each clause of Section 11.1(a)(iii) (Disbursements of Monies from Payment Account) on the related Payment Date;

(iv)     for the Collection Account:

(A)     the Balance on deposit in the Collection Account at the end of the related Collection Period (or, with respect to the Interest Collection Subaccount, the next Business Day);

(B)     the amounts payable from the Collection Account to the Payment Account, in order to make payments pursuant to Section 11.1(a)(i) (Disbursements of Monies from Payment Account), Section 11.1(a)(ii) (Disbursements of Monies from Payment Account) and, if applicable, Section 11.1(a)(iii) (Disbursements of Monies from Payment Account) on the next Payment Date (net of amounts which the Portfolio Manager intends to re-invest in additional Collateral Obligations pursuant to Article 12); and

(C)     the Balance remaining in the Collection Account immediately after all payments and deposits to be made on such Payment Date; and

(v)     such other information as the Trustee, any Hedge Counterparty or the Portfolio Manager may reasonably request.

Each Distribution Report shall constitute instructions to the Trustee to withdraw funds from the Payment Account and pay or transfer such amounts set forth in such Distribution Report in the manner specified and in accordance with the priorities established in Section 11.1 (Disbursements of Monies from Payment Account).

(c)     Interest Rate Notice.  The Trustee shall deliver to each Holder of Secured Notes, no later than the sixth day after each Payment Date, a notice setting forth the Note Interest Rate for such Notes for the Interest Accrual Period preceding the next Payment Date.  The Trustee shall also deliver to the Issuer and each Holder of Notes, no later than the sixth day after each Interest Determination Date, a notice setting forth LIBOR for the Interest Accrual Period following such Interest Determination Date.

(d)     Quarterly Report.  Forty-five days after the Determination Date relating to Monthly Reports occurring in March, June, September and December commencing in September 2013, respectively, the Portfolio Manager shall send to the Trustee, each Rating Agency and the Placement Agents a quarterly report describing such events as the Portfolio Manager deems significant relating to the Assets and the performance thereof (each a "Quarterly Report").

(e)    Failure to Provide Accounting.  If the Trustee shall not have received any accounting provided for in this Section 10.7 (Accountings) on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use all reasonable efforts to cause such accounting to be made by the applicable Payment Date.  To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.7 (Accountings) as a result of the failure of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be reimbursed pursuant to Section 6.7 (Trustee Compensation and Reimbursement).

(f)    Required Content of Certain Reports.  Each Monthly Report and each Distribution Report sent to any Holder or beneficial owner of an interest in a Note shall contain, or be accompanied by, the following notices:

The Notes may be held or beneficially owned, as applicable, only by Persons that (a)(i) are not U.S. persons (within the meaning of Regulation S under the United States Securities Act of 1933, as amended) and are purchasing their beneficial interest in an offshore transaction or (ii) are either (A) Qualified Purchasers (as defined for purposes of Section 3(c)(7) of the Investment Company Act) ("Qualified Purchasers") or (B) (in the case of the Subordinated Notes only) Knowledgeable Employees (as defined in Rule 3c-5 under the Investment Company Act) ("Knowledgeable Employees") with respect to the Issuer or corporations, partnerships, limited liability companies or other entities (other than trusts) each shareholder, partner, member or other equity owner of which is either (x) a Knowledgeable Employee with respect to the Issuer or (y) a Qualified Purchaser that in the case of (A) and (B) are either (1) "institutional" accredited investors ("Accredited Investors") (in the case of the Class E Notes, the Class F Notes and the Subordinated Notes only) meeting the requirements of Rule 501(a)(1), (2), (3) or (7) under the Securities Act,  who, in the case of Subordinated Notes only, if "individual" Accredited Investors, are also Knowledgeable Employees with respect to the Issuer or (2) qualified institutional buyers ("Qualified Institutional Buyers") within the meaning of Rule 144A under the Securities Act and (b) can make the representations set forth in Section 2.6 (Registration, Registration of Transfer and Exchange) of the Indenture or the appropriate Exhibit to the Indenture.  Beneficial ownership interests in the Rule 144A Global Notes may be transferred only to a Person that is both a Qualified Institutional Buyer and a Qualified Purchaser and that can make the representations referred to in clause (b) of the preceding sentence.  The Issuer has the right to compel any beneficial owner of an interest in Rule 144A Global Notes that does not meet the qualifications set forth in such clauses to sell its interest in such Notes, or may sell such interest on behalf of such owner, pursuant to Section 2.12 (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations) of the Indenture.

Each Holder or beneficial owner receiving this report agrees to keep all non-public information herein confidential and not to use such information for any purpose other than its evaluation of its investment in the Offered Securities, provided, that any Holder or beneficial owner may provide such information on a confidential basis to any prospective purchaser of such Holder or beneficial owner's Offered Securities that is permitted by the terms of the Indenture to acquire such Holder or beneficial owner's Offered Securities and that agrees to keep such information confidential in accordance with the terms of the Indenture.

In addition, the Trustee shall deliver the foregoing notice under the name of the Issuer to DTC for forwarding to its participants on at least an annual basis with the heading "Important Reminder Notice."

(g) <u>Irish Stock Exchange</u>. So long as any Class of Notes is listed on the Irish Stock Exchange: (i) the Trustee will communicate to the Irish Stock Exchange the Aggregate Outstanding Amount of each such Class following each Payment Date and inform the Irish Stock Exchange if any such Class did not receive scheduled payments of principal or interest on such Payment Date; (ii) the Trustee will inform the Irish Stock Exchange if the Ratings assigned to such Secured Notes are reduced or withdrawn and such information will be published in the Companies Announcements Office of the Irish Stock Exchange and (iii) the Trustee will inform the Irish Stock Exchange, in advance, of the Note Interest Rate for each such Class (as applicable), as well as the exact date of the following Payment Date.

(h) <u>Placement Agents Information</u>. The Issuer and the Placement Agents, or any successor to the Placement Agents, may post the information contained in a Monthly Report, Quarterly Report or Distribution Report to a password-protected internet site accessible only to the Holders of the Notes and to the Portfolio Manager.

(i) <u>Availability of Reports</u>. The Trustee will make the Monthly Report, the Quarterly Report and the Distribution Report available via its internet website initially located at http://trustinvestorreporting.usbank.com on a password protected basis. The Trustee shall separately post the information required under Section 10.7(a)(xix) (Accountings) to its internet website promptly upon knowledge of the Issuer entering into a Trading Plan. Parties that are unable to use the above distribution option are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Trustee shall have the right to change the way such statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Trustee shall provide timely and adequate notification to all above parties regarding any such changes. As a condition to access to the Trustee's internet website, the Trustee may require registration and the acceptance of a disclaimer. The Trustee will not be liable for the dissemination of information in accordance with this Indenture. The Trustee shall be entitled to rely on but shall not be responsible for the content or accuracy of any information provided in the information set forth in the Monthly Report, the Quarterly Report and the Distribution Report and may affix thereto any disclaimer it deems appropriate in its reasonable discretion. Each Noteholder that has previously provided evidence that it is the holder of a Note may at any time be requested by the Trustee or the Portfolio Manager to reconfirm that it continues to be the holder of a Note. If such evidence has not been provided by a Noteholder to the reasonable satisfaction of the Portfolio Manager within 45 days of any such request, such Noteholder will have no further right to obtain either the Monthly Report, the Distribution Report or the associated commentary. The Trustee shall provide each Rating Agency, the Portfolio Manager, the Placement Agents, each Holder (and, upon receipt of a written request therefor in the form of <u>Exhibit I</u> certifying that it is a holder of a beneficial interest in a Note, to any beneficial owner of a Note) and Intex Solutions, Inc. access to its internet website.

(j) Required Actions.

(i)    <u>DTC Actions</u>. The Issuer will direct DTC to take the following steps in connection with the Global Notes:

(A)    The Issuer will direct DTC to include the marker "3c7" in the DTC 20-character security descriptor and the 48-character additional descriptor for the Rule 144A Global Notes in order to indicate that sales are limited to Qualified Purchasers.

(B)    The Issuer will direct DTC to cause each physical deliver order ticket that is delivered by DTC to purchasers to contain the 20-character security descriptor. The Issuer will direct DTC to cause each deliver order ticket that is delivered by DTC to purchasers in electronic form to contain a "3c7" indicator and a related user manual for participants. Such user manual will contain a description of the relevant restrictions imposed by <u>Section 3(c)(7)</u>.

(C)    On or prior to the Closing Date, the Issuer will instruct DTC to send a <u>Section 3(c)(7)</u> Notice to all DTC participants in connection with the offering of the Rule 144A Global Notes.

(D)    In addition to the obligations of the Registrar set forth in <u>Section 2.5</u> (Execution, Authentication, Delivery and Dating), the Issuer will from time to time (upon the request of the Trustee) make a request to DTC to deliver to the Issuer a list of all DTC participants holding an interest in the Rule 144A Global Notes.

(E)    The Issuer will cause each CUSIP number obtained for a Global Note to have a fixed field containing "3c7" and "144A" indicators, as applicable, attached to such CUSIP number.

(ii)    <u>Bloomberg Screens, Etc</u>. The Issuer will from time to time request all third-party vendors to include on screens maintained by such vendors appropriate legends regarding Rule 144A and Section 3(c)(7) under the Investment Company Act restrictions on the Global Notes. Without limiting the foregoing, the Issuer will cause the Placement Agents to request that each third-party vendor include the following legends on each screen containing information about the Notes :

(A)    <u>Bloomberg</u>.

(w)    "Iss'd Under 144A/3c7," to be stated in the "Note Box" on the bottom of the "Security Display" page describing the Global Notes;

(x)    a flashing red indicator stating "See Other Available Information" located on the "Security Display" page;

(y)    a link to an "Additional Security Information" page on such indicator stating that the Rule 144A Global Notes are being offered in reliance on the exception from registration under Rule 144A of the Securities Act of 1933 to persons that are both (i) "<u>Qualified Institutional</u>

Buyers" as defined in Rule 144A under the Securities Act and (ii) "Qualified Purchasers" as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended; and

(z) a statement on the "Disclaimer" page for the Global Notes that the Notes will not be and have not been registered under the Securities Act of 1933, as amended, that the Issuer has not been registered under the Investment Company Act of 1940, as amended, and that the Rule 144A Global Notes may only be offered or sold in accordance with Section 3(c)(7) of the Investment Company Act of 1940, as amended.

(B) Reuters.

(x) a "144A – 3c7" notation included in the security name field at the top of the Reuters Instrument Code screen;

(y) a <144A3c7Disclaimer> indicator appearing on the right side of the Reuters Instrument Code screen; and

(z) a link from such <144A3c7Disclaimer> indicator to a disclaimer screen containing the following language: "These Notes may be sold or transferred only to Persons who are both (i) Qualified Institutional Buyers, as defined in Rule 144A under the Securities Act and (ii) Qualified Purchasers, as defined under Section 3(c)(7) under the U.S. Investment Company Act of 1940."

(k) Trading Plans. Following notice or knowledge of such failure, the Issuer shall provide notice of any failed Trading Plan to Moody's and S&P.

Section 10.8. Release of Securities. (a) The Issuer may, by Issuer Order executed by an Authorized Officer of the Portfolio Manager, delivered to the Trustee at least two Business Days prior to the settlement date for any sale of a security certifying that the sale of such security is being made in accordance with Section 12.1 (Sales of Collateral Obligations) hereof and such sale complies with all applicable requirements of Section 12.1 (Sales of Collateral Obligations), direct the Trustee to release or cause to be released such security from the lien of this Indenture and, upon receipt of such Issuer Order, the Trustee shall deliver any such security, if in physical form, duly endorsed to the broker or purchaser designated in such Issuer Order or, if such security is a Clearing Corporation Security, cause an appropriate transfer thereof to be made, in each case against receipt of the sales price therefor as specified by the Portfolio Manager in such Issuer Order; provided, however, that the Trustee may deliver any such security in physical form for examination in accordance with street delivery custom. The Trustee shall, upon receipt of an Issuer Order, release from the lien of this Indenture any Collateral Obligation or other Asset being transferred to an ETB Subsidiary and deliver such Asset to be held by the ETB Subsidiary in exchange for the pledge of the equity interest in such ETB Subsidiary. Such Issuer Order shall be executed by an Authorized Officer of the Portfolio Manager, request release of a Collateral Obligation or other Asset, certify that such release is

permitted under this Indenture and request that the Trustee execute the agreements, releases or other documents releasing such Asset as presented to it by the Portfolio Manager.

(b)  Subject to <u>Article 12</u> hereof, the Trustee shall upon an Issuer Order (i) deliver any Pledged Obligation, and release or cause to be released such security from the lien of this Indenture, which is set for any mandatory call or redemption or payment in full to the appropriate paying agent on or before the date set for such call, redemption or payment, in each case against receipt of the call or redemption price or payment in full thereof and (ii) provide notice thereof to the Portfolio Manager.

(c)  Upon receiving actual notice of any Offer (as defined below) or any request for a waiver, consent, amendment or other modification with respect to any Collateral Obligation, the Trustee on behalf of the Issuer shall notify the Portfolio Manager of any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action (an "<u>Offer</u>") or such request.  Unless the Notes have been accelerated following an Event of Default, the Portfolio Manager may direct (x) the Trustee to accept or participate in or decline or refuse to participate in such Offer and, in the case of acceptance or participation, to release from the lien of this Indenture such Collateral Obligation in accordance with the terms of the Offer against receipt of payment therefor or (y) the Issuer or the Trustee to agree to or otherwise act with respect to such consent, waiver, amendment or modification.

(d)  As provided in <u>Section 10.2(a)</u> (Collection Account), the Trustee shall deposit any proceeds received by it from the disposition of a Pledged Obligation in the applicable subaccount of the Collection Account, unless simultaneously applied to the purchase of additional Collateral Obligations or Eligible Investments as permitted under and in accordance with the requirements of this <u>Article 10</u> and <u>Article 12</u>.

(e)  The Trustee shall, upon receipt of an Issuer Order at such time as there are no Secured Notes Outstanding and all obligations of the Co-Issuers hereunder in favor of the Holders of the Secured Notes and the Trustee have been satisfied, release any remaining Assets from the lien of this Indenture.

(f)  Any security, Collateral Obligation or amounts that are released pursuant to <u>Section 10.8(a)</u>, <u>(b)</u> or <u>(c)</u> (Release of Securities) shall be released from the lien of this Indenture.

Section 10.9.  <u>Reports by Independent Accountants</u>.  (a)  At the Closing Date, the Issuer shall appoint one or more firms of Independent certified public accountants of recognized international reputation for purposes of reviewing and delivering the reports or certificates of such accountants required by this Indenture, which may be the firm of Independent certified public accountants that performs accounting services for the Issuer or the Portfolio Manager.  The Issuer may remove any firm of Independent certified public accountants at any time without the consent of any Holder of Notes.  Upon any resignation by such firm or removal of such firm by the Issuer, the Issuer (or the Portfolio Manager on behalf of the Issuer) shall promptly appoint by Issuer Order delivered to the Trustee and each Rating Agency a successor thereto that shall also be a firm of Independent certified public accountants of recognized

NEWYORK 8715474 (2K)

international reputation, which may be a firm of Independent certified public accountants that performs accounting services for the Issuer or the Portfolio Manager. If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee of such failure in writing. If the Issuer shall not have appointed a successor within ten days thereafter, the Portfolio Manager shall promptly appoint a successor firm of Independent certified public accountants of recognized international reputation. The fees of such Independent certified public accountants and its successor shall be payable by the Issuer. By acceptance of their Notes, the Noteholders acknowledge and agree that: (i) neither the firm of Independent certified public accountants appointed by the Issuer hereunder nor the Trustee shall be liable for any claims, liabilities, and expenses arising out of or relating to such accountant's engagement, agreed-upon procedures or any report issued by such accountants under any such engagement and (ii) any report issued by such accountants under this Section 10.9(a) cannot be disseminated without the express consent of such accountants.

(b)     On or before March 14th of each year commencing in 2014, the Issuer, or the Portfolio Manager on behalf of the Issuer, shall cause to be delivered to the Collateral Administrator (upon its execution of an acknowledgement letter satisfactory to such accountants), the Portfolio Manager and each Holder of the Notes (upon the Holder's (x) written request therefor and (y) execution of an acknowledgement letter satisfactory to such accountants), a statement from a firm of Independent certified public accountants for each Distribution Report received since the last statement (i) indicating that the calculations within those Distribution Reports (excluding the S&P CDO Monitor Test) have been performed in accordance with the applicable provisions of this Indenture and (ii) listing the Aggregate Principal Balance of the Pledged Obligations and the Aggregate Principal Balance of the Collateral Obligations securing the Secured Notes as of the immediately preceding Determination Dates; provided, however, that in the event of a conflict between such firm of Independent certified public accountants and the Issuer with respect to any matter in this Section 10.9 (Reports by Independent Accountants), the determination by such firm of Independent public accountants shall be conclusive. The reports by Independent certified public accountants referenced in this Section 10.9 (Reports by Independent Accountants) shall only be provided to parties (excluding the Issuer and Portfolio Manager) that have executed an acknowledgement letter satisfactory to the firm of Independent certified public accountants.

(c)     Upon the written request of the Trustee, or any Holder or beneficial owner, the Issuer will use commercially reasonable efforts to cause the firm of Independent certified public accountants appointed pursuant to Section 10.9(a) (Reports by Independent Accountants) to provide such Holder or beneficial owner with all of the information required to be provided by the Issuer pursuant to Section 7.17(g), (h) or (i) (Certain Tax Matters) or assist the Issuer in the preparation thereof.

(d)     Notwithstanding any provision of this Indenture to the contrary, each Person that does not sign and deliver to the Issuer's firm of Independent certified public accountants a written confirmation in the form provided by such firm of Independent certified public accountants indicating the procedures employed by such firm of Independent certified public accountants in connection with each report specified in Section 10.9(b) (Reports by Independent Accountants) and 12.1(e) (Sale of Collateral Obligations) and the Accountants'

Reports specified in 3.1(a)(xiv) (Conditions to Issuance of Notes on Closing Date), 3.2(vi) (Conditions to Issuance of Additional Notes) and 7.18(c) (Ramp-up Period; Purchase of Additional Collateral Obligations) are acceptable for its purposes and that it has taken responsibility for the sufficiency of such procedures will not be entitled to receive any such report or Accountants' Report and shall receive, to the extent it is otherwise entitled to receive any such report or Accountants' Report pursuant to this Indenture, a certificate of the Issuer in the form of Schedule 6 hereto in lieu thereof. In the event such firm requires the Trustee to agree to the procedures performed by such firm, the Issuer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter of agreement in conclusive reliance upon the direction of the Issuer, and the Trustee makes no independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

(e)     The Trustee and the Collateral Administrator shall have no responsibility to the Issuer or the Secured Parties hereunder to make any inquiry or investigation as to, and shall have no obligation in respect of, the terms of any engagement of Independent accountants by the Issuer (or the Portfolio Manager on behalf of the Issuer); provided, however that the Trustee and the Collateral Administrator shall be authorized, upon receipt of an Issuer Order directing the same, to execute any acknowledgment or other agreement with the Independent accountants required for the Trustee and the Collateral Administrator to receive any of the reports or instructions provided for herein, which acknowledgment or agreement may include, among other things, (i) acknowledgements with respect to the sufficiency of the agreed upon procedures to be performed by the Independent accountants by the Issuer, (ii) releases of claims (on behalf of itself and the Noteholders) and other acknowledgments of limitations of liability in favor of the Independent accountants and (iii) restrictions or prohibitions on the disclosure of information or documents provided to it by such firm of Independent accountants (including to the Holders). It is understood and agreed that the Trustee and the Collateral Administrator will deliver such acknowledgement or other agreement in conclusive reliance on the foregoing direction of the Issuer, and the Trustee shall make no inquiry or investigation as to, and shall have no obligation in respect of, the sufficiency, validity or correctness of such procedures. Notwithstanding the foregoing, in no event shall the Trustee or the Collateral Administrator be required to execute any agreement in respect of the Independent accountants that the Trustee or the Collateral Administrator determines adversely affects it in its individual capacity.

Section 10.10.    Reports to Rating Agencies and Additional Recipients; Rule 17g-5 Procedures.  (a)  In addition to the information and reports specifically required to be provided to each Rating Agency pursuant to the terms of this Indenture, the Issuer shall provide each Rating Agency with all information or reports delivered to the Trustee hereunder, and such additional information as either Rating Agency may from time to time reasonably request (including notification to Moody's and S&P of any modification of any loan document relating to a DIP Collateral Obligation or any release of collateral thereunder not permitted by such loan documentation and notification to S&P of any amendment with respect to any Collateral Obligation that is the subject of a rating estimate by S&P).

(b)     The Trustee (without assuming any obligations to any such person, including for its failure to do so) shall make available to the persons identified on Schedule 7 (if any) (including by access to its password protected website) duplicate copies of all reports,

notices and statements that the Trustee is required to deliver to any Noteholder, at the address specified in Schedule 7.

(c)    The Trustee shall, upon the written request of the Portfolio Manager, provide the Portfolio Manager with a list of all registered Holders of Notes.  In addition, if so requested by the Portfolio Manager in writing, the Trustee shall request that DTC request the identity of its participants.

(d)    The Issuer shall submit, or shall cause the Portfolio Manager to submit on its behalf, at least every twelve months (from the date of the last such credit estimate), a request to Moody's to perform a credit estimate on each Collateral Obligation with a credit estimate, together with the information reasonably required by Moody's to perform such credit estimate.

(e)    If the Trustee or the Issuer receives confirmation of the S&P Rating Condition and/or the Moody's Rating Condition in connection with this Indenture or the transactions contemplated hereby, such Person shall promptly forward such confirmation to the other such Person and to the Portfolio Manager.

(f)    (i)  The Trustee shall notify the Portfolio Manager of the internet address of the website to which the Trustee posts Monthly Reports, Distribution Reports and any other reports relating to this Indenture, the Notes or the transactions contemplated hereby and thereby from time to time.  The Information Agent shall maintain a password-protected website required pursuant to Rule 17g-5 (the "17g-5 Site") in accordance with the Collateral Administration Agreement.

(ii)    If the Trustee responds to requests for information by or otherwise communicates with the Rating Agencies in relation to this Indenture, the Trustee agrees to (x) notify the Portfolio Manager of such communication within a reasonable time and (y) use commercially reasonable efforts to assist the Portfolio Manager in complying with Rule 17g-5 (including, but not limited to, providing copies of such communications and/or information provided to the Rating Agencies).  The Trustee may, but shall not be obligated to engage in, or respond to, any oral communications from the Rating Agencies.

(g)    If there is a Material Change with respect to a Collateral Obligation described in clause (ii)(b) of the definition of S&P Rating, the Issuer, or the Portfolio Manager on behalf of the Issuer, shall, upon notice or knowledge thereof, notify S&P and provide available information with respect thereto.  S&P may, in its sole discretion, update its credit estimate of such Collateral Obligation; provided, that, such update shall not, unless so requested by the Issuer, be considered (x) a request for a credit estimate by the Issuer in accordance with or (y) in determining whether or not the Issuer has complied with, in each case, the annual credit estimate requirements set forth in this Indenture.

Section 10.11.    Procedures Relating to the Establishment of Accounts Controlled by the Trustee.  Notwithstanding anything else contained herein, the Trustee agrees that with respect to each of the Accounts and any Hedge Account, it will cause each Securities

Intermediary establishing such accounts to enter into a securities account control agreement and, if the Securities Intermediary is the Bank, in connection with the Accounts, cause the Bank to comply with the provisions of the Securities Account Control Agreement.

## ARTICLE 11

### Application of Monies

Section 11.1.    Disbursements of Monies from Payment Account.    (a) Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 (Disbursements of Monies from Payment Account), on each Payment Date, the Trustee shall disburse amounts transferred from the Collection Account to the Payment Account pursuant to Section 10.2 (Collection Account) in accordance with the following priorities (the "Priority of Payments"); provided, that, unless an Acceleration Event has occurred and is continuing, (x) amounts transferred from the Interest Collection Subaccount shall be applied solely in accordance with Section 11.1(a)(i) (Disbursements of Monies from Payment Account); and (y) amounts transferred from the Principal Collection Subaccount shall be applied solely in accordance with Section 11.1(a)(ii) (Disbursements of Monies from Payment Account).

(i)    On each Payment Date (other than Payment Dates on which the Acceleration Priority of Payments is applicable) and on each Redemption Date (to the extent such Redemption Date is not a Payment Date), Interest Proceeds on deposit in the Collection Account, to the extent received on or before the related Determination Date (or if such Determination Date is not a Business Day, the next succeeding Business Day) and that are transferred into the Payment Account, and, in the case of any Hedge Agreements, payments received on or before such Payment Date, shall be applied in the following order of priority:

(A)    to the payment of taxes and governmental fees owing by the Issuer or the Co-Issuer if any;

(B)    to the payment of the accrued and unpaid Administrative Expenses up to the Administrative Expense Cap in the order set forth in the definition of Administrative Expenses; provided, that the Petition Expense Amount may be applied pursuant to this clause (B) to the payment of Petition Expenses at the time that such Petition Expenses are incurred without regard to the Administrative Expense Cap and, if (but only after) the Petition Expense Amount is applied to the payment of Petition Expenses in full, Petition Expenses shall be paid together with other Administrative Expenses subject to the Administrative Expense Cap above; provided further, that the Petition Expenses paid pursuant to this clause (B) shall be paid in the order set forth in the definition of Administrative Expenses;

(C)    to the payment of the Senior Management Fee to the Portfolio Manager;

NEWYORK 8715474 (2K)

(D)    to the payment, *pro rata*, of any amounts due to any Hedge Counterparty under any Hedge Agreement other than amounts due as a result of the termination (or partial termination) of such Hedge Agreement;

(E)    to the payment, *pro rata* based upon amounts due, of (1) accrued and unpaid interest on the Class X Notes, (2) the Class X Note Payment Amount, (3) accrued and unpaid interest on the Class A-1 Notes and (4) subject to <u>Section 11.2</u> (Payments on the Class A-2 Notes and the Combination Notes), accrued and unpaid interest on the Class A-2 Notes, in each case, until such amounts have been paid in full;

(F)    [RESERVED];

(G)    to the payment of accrued and unpaid interest on the Class B Notes;

(H)    to the payment, *pro rata*, of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement as a result of a Priority Hedge Termination Event;

(I)    if either of the Class A/B Coverage Tests is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class A/B Coverage Tests to be met;

(J)    to the payment of accrued and unpaid interest on the Class C Notes;

(K)    if either of the Class C Coverage Tests is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class C Coverage Tests to be met;

(L)    to the payment of any Deferred Interest on the Class C Notes (and interest accrued thereon);

(M)    to the payment of accrued and unpaid interest on the Class D Notes;

(N)    if either of the Class D Coverage Tests is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class D Coverage Tests to be met;

(O)    to the payment of any Deferred Interest on the Class D Notes (and interest accrued thereon);

(P) to the payment of accrued and unpaid interest on the Class E Notes;

(Q) if either Class E Coverage Test is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class E Coverage Tests to be met;

(R) to the payment of any Deferred Interest on the Class E Notes (and interest accrued thereon);

(S) to the payment of accrued and unpaid interest on the Class F Notes;

(T) to the payment of any Deferred Interest on the Class F Notes (and interest accrued thereon);

(U) if the Effective Date Conditions have not been satisfied on or prior to such Payment Date, at the election of the Portfolio Manager, to (x) the payment of principal of the Secured Notes in accordance with the Note Payment Sequence or (y) purchase Collateral Obligations, in each case, in the amount necessary so that each Rating Agency will be able to confirm its Initial Rating on the Secured Notes (including by means of a deemed confirmation as set forth in the definitions of S&P Rating Condition or Moody's Rating Condition) or the Secured Notes are paid in full, as applicable;

(V) during the Reinvestment Period only, if the Interest Reinvestment Test is not satisfied on the related Determination Date, an amount equal to the lesser of (i) 75% of the Interest Proceeds remaining as of such Payment Date and (ii) an amount which would cause the Interest Reinvestment Test to be satisfied to the Collection Account as Principal Proceeds to purchase additional Collateral Obligations;

(W) (1) *first*, to the payment of any accrued and unpaid Subordinated Management Fee to the Portfolio Manager, together with accrued interest thereon, (2) *second*, to the payment of any Administrative Expenses not paid in full pursuant to clause (B) above due to the limitation contained therein and (3) *third*, to the payment of any expenses incurred in connection with a Refinancing;

(X) to the payment of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement not otherwise paid pursuant to clause (H) above;

(Y) to (1) *first*, unless each of the Effective Date Conditions has been satisfied, all remaining Interest Proceeds to the Interest Collection Subaccount as Interest Proceeds for distribution on the next subsequent Payment Date and (2) *second,* the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of the Subordinated Notes on prior

NEWYORK 8715474 (2K)

Payment Dates) to cause the Incentive Management Fee Threshold to be satisfied; and

(Z)     any remaining Interest Proceeds shall be paid as follows: (i) 20% of such remaining Interest Proceeds to the Portfolio Manager as the Incentive Management Fee and (ii) 80% of such remaining Interest Proceeds to the Holders of the Subordinated Notes.

provided that, in lieu of the payment of Interest Proceeds referred to under clause (Z) above, in whole or in part on any Payment Date, the Portfolio Manager, on behalf of the Issuer, shall have the right to direct the Trustee to distribute any Equity Securities pro rata to the Consenting Holders of the Subordinated Notes with respect to such Payment Date to the extent that the Market Value of such Equity Securities (determined by the Portfolio Manager as of the relevant Determination Date) is equal to or lower than the aggregate amount of Interest Proceeds that would otherwise be due and payable on such Payment Date to such Consenting Holders of the Subordinated Notes. Interest Proceeds in an amount equal to or greater than the Market Value of such Equity Securities (determined by the Portfolio Manager as of the relevant Determination Date) distributed to the Consenting Holders of the Subordinated Notes with respect to any such Payment Date shall be treated for all purposes by the Issuer and the Trustee as Principal Proceeds available for distribution in accordance with the Priority of Payments on the relevant Payment Date. The amount of Interest Proceeds available on the relevant Payment Date shall be reduced and the amount of Principal Proceeds available on the relevant Payment Date shall be increased accordingly.

(ii)     On each Payment Date (other than Payment Dates on which the Acceleration Priority of Payments is applicable) and on each Redemption Date (to the extent such Redemption Date is not a Payment Date), Principal Proceeds on deposit in the Collection Account that are received on or before the related Determination Date and that are transferred to the Payment Account shall be applied, except for any Principal Proceeds that will be used to settle binding commitments (entered into prior to the Determination Date) for the purchase of Collateral Obligations, in the following order of priority:

(A)     to pay the amounts referred to in clauses (A) through (G) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) (in the priority stated therein), but (a) only to the extent not paid in full thereunder and (b) subject to any applicable cap set forth therein; provided that, if the Senior Notes have been repaid in full, to pay the amounts referred to in Section 11.1(a)(i) (Disbursements of Monies from Payment Account) above, through and including full payment of accrued and unpaid interest on the Controlling Class;

(B)     if any Overcollateralization Ratio Test or Interest Coverage Test is not satisfied as of the related Determination Date after giving effect to the application of the amounts referred to in clauses (H) through (Q) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account), to make payments in accordance with the Note Payment Sequence to the extent necessary to cause each such test to be met;

NEWYORK 8715474 (2K)

(C) to make payments in accordance with the Note Payment Sequence in the amount of the Special Redemption Amount, if any;

(D) on any Redemption Date (other than a Redemption Date relating to a Refinancing), (1) *first*, to pay the Redemption Price of the Secured Notes in accordance with the Note Payment Sequence and (2) *second*, to the payments under clauses (W) and (X) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) (in the same order of priority specified thereunder, but only to the extent not paid in full thereunder and without regard to any cap thereunder);

(E) to the extent not paid in full after application of the amounts referred to under Section 11.1(a)(i) (Disbursements of Monies from Payment Account), to the payment of (1) *first*, accrued and unpaid interest on the Class C Notes and (2) *second*, any Deferred Interest on the Class C Notes (and interest thereon); provided, that after giving effect to such payments, each Overcollateralization Ratio Test and Interest Coverage Test will be satisfied on a pro forma basis;

(F) to the extent not paid in full after application of the amounts referred to under Section 11.1(a)(i) (Disbursements of Monies from Payment Account), to the payment of (1) *first*, accrued and unpaid interest on the Class D Notes and (2) *second*, any Deferred Interest on the Class D Notes (and interest thereon); provided, that after giving effect to such payments, each Overcollateralization Ratio Test and Interest Coverage Test will be satisfied on a pro forma basis;

(G) to the extent not paid in full after application of the amounts referred to under Section 11.1(a)(i) (Disbursements of Monies from Payment Account), to the payment of (1) *first*, accrued and unpaid interest on the Class E Notes and (2) *second*, any Deferred Interest on the Class E Notes (and interest accrued thereon); provided, that after giving effect to such payments, each Overcollateralization Ratio Test and Interest Coverage Test will be satisfied on a pro forma basis;

(H) to the extent not paid in full after application of the amounts referred to under Section 11.1(a)(i) (Disbursements of Monies from Payment Account), to the payment of (1) *first*, accrued and unpaid interest on the Class F Notes and (2) *second*, any Deferred Interest on the Class F Notes (and interest accrued thereon); provided, that after giving effect to such payments, each Overcollateralization Ratio Test and Interest Coverage Test will be satisfied on a pro forma basis;

(I) during the Reinvestment Period, at the discretion of the Portfolio Manager, to the Collection Account as Principal Proceeds to invest in Eligible Investments and/or additional Collateral Obligations; provided, however, if the then-current rating by Moody's of the Class A-1 Notes, the Class A-2A Notes or

the Class A-2B Notes is below "Aa3" such Principal Proceeds shall be used to make payments in accordance with the Note Payment Sequence;

(J) after the Reinvestment Period, to make payments in accordance with the Note Payment Sequence;

(K) after the Reinvestment Period, to (1) *first*, the payment of accrued but unpaid Subordinated Management Fees, together with accrued interest thereon, and (2) *second*, Administrative Expenses as referred to in <u>Section 11.1(a)(i)(W)(2)</u> (Disbursements of Monies from Payment Account) in the priority stated therein, but only to the extent not paid in full thereunder;

(L) after the Reinvestment Period, to the payment, *pro rata* of any amount due to any Hedge Counterparty as referred to in <u>Section 11.1(a)(i)(X)</u> (Disbursements of Monies from Payment Account), but only to the extent not paid in full thereunder;

(M) to the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of Subordinated Notes on prior Payment Dates and all payments made under <u>Section 11.1(a)(i)(Y)</u> (Disbursements of Monies from Payment Account) on such Payment Date) to cause the Incentive Management Fee Threshold to be satisfied; and

(N) any remaining Principal Proceeds shall be paid as follows: (i) 20% of such remaining Principal Proceeds to the Portfolio Manager as the Incentive Management Fee and (ii) 80% of such remaining Principal Proceeds to the Holders of the Subordinated Notes.

(iii) Notwithstanding the provisions of <u>Section 11.l(a)(i)</u> and <u>11.1(a)(ii)</u> (Disbursements of Monies from Payment Account), if declaration of acceleration of the maturity of the Secured Notes has occurred following an Event of Default and such acceleration has not been rescinded or annulled (an "<u>Acceleration Event</u>"), on each date or dates fixed by the Trustee, all proceeds in respect of the Assets will be applied in the following order of priority (the "<u>Acceleration Priority of Payments</u>"):

(A) to pay all amounts under clauses (A) through (D) of <u>Section 11.1(a)(i)</u> (Disbursements of Monies from Payment Account) above (only if the Trustee has begun liquidating Assets in accordance with <u>Section 5.5</u> (Optional Preservation of Assets), such payments to be made without regard to the Administrative Expense Cap);

(B) to the payment, *pro rata* based upon interest due, of (1) accrued and unpaid interest on the Class X Notes, (2) accrued and unpaid interest on the Class A-1 Notes and (3) subject to <u>Section 11.2</u> (Payments on the Class A-2 Notes and the Combination Notes), accrued and unpaid interest on the Class A-2 Notes, in each case, until such amounts have been paid in full;

NEWYORK 8715474 (2K)

(C)     to the payment, *pro rata* based upon amounts due, of (1) principal of the Class X Notes, (2) principal of the Class A-1 Notes and (3) subject to Section 11.2 (Payments on the Class A-2 Notes and the Combination Notes), principal of the Class A-2 Notes, in each case, until such amount has been paid in full;

(D)     [RESERVED];

(E)     [RESERVED];

(F)     to the payment of accrued and unpaid interest on the Class B Notes until such amounts have been paid in full;

(G)     to the payment of principal of the Class B Notes until such amount has been paid in full;

(H)     to the payment, *pro rata*, of any amounts due to any Hedge Counterparty or under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement as a result of a Priority Hedge Termination Event;

(I)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class C Notes until such amounts have been paid in full;

(J)     to the payment of principal of the Class C Notes until such amount has been paid in full;

(K)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class D Notes until such amounts have been paid in full;

(L)     to the payment of principal of the Class D Notes until such amount has been paid in full;

(M)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class E Notes until such amounts have been paid in full;

(N)     to the payment of principal of the Class E Notes until such amount has been paid in full;

(O)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class F Notes until such amounts have been paid in full;

(P)     to the payment of principal of the Class F Notes until such amount has been paid in full;

(Q)     (1) *first*, to the payment of any accrued and unpaid Subordinated Management Fee to the Portfolio Manager, together with accrued interest thereon and (2) *second*, to the payment of any Administrative Expenses not paid in full

pursuant to clause (A) above due to the limitation contained therein (in the priority stated therein);

(R)     to the payment of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of such Hedge Agreement not otherwise paid in full pursuant to clause (H) above;

(S)     to the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of Subordinated Notes on prior Payment Dates) to cause the Incentive Management Fee Threshold to be satisfied; and

(T)     any remaining proceeds shall be paid as follows: (i) 20% of such remaining amounts to the Portfolio Manager as the Incentive Management Fee and (ii) 80% of such remaining amounts to the Holders of the Subordinated Notes.

On the Stated Maturity of the Notes, the Trustee shall pay the net proceeds from the liquidation of the Assets and all available Cash, after the payment of all fees, expenses, including the Trustee's fees and other Administrative Expenses, and interest and principal on the Secured Notes, to the Holders of the Subordinated Notes in final payment of such Subordinated Notes.

(b)     If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Distribution Report, the Trustee shall make the disbursements called for in the order and according to the priority set forth under Section 11.1(a) (Disbursements of Monies from Payment Account) above, subject to Section 13.1 (Subordination; Non-Petition), to the extent funds are available therefor.

(c)     In connection with the application of funds to pay Administrative Expenses of the Issuer or the Co-Issuer, as the case may be, in accordance with Section 11.1(a)(i) (Disbursements of Monies from Payment Account), Section 11.1(a)(ii) (Disbursements of Monies from Payment Account) and Section 11.1(a)(iii) (Disbursements of Monies from Payment Account), the Trustee shall remit such funds, to the extent available, as directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee no later than the Business Day prior to each Payment Date.

(d)         In the event that the Hedge Counterparty defaults in the payment of its obligations to the Issuer under any Hedge Agreement on the date on which any payment is due thereunder, the Trustee at the direction of the Portfolio Manager shall make a demand on such Hedge Counterparty, or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on such date. The Trustee shall give notice to the Holders of Notes, the Portfolio Manager and each Rating Agency if such Hedge Counterparty continues to fail to perform its obligations for two Business Days following a demand made by the Trustee on such Hedge Counterparty, and shall take such action with respect to such continuing failure as may be directed to be taken pursuant to Section 5.13 (Control by Majority of Controlling Class).

Section 11.2. <u>Payments on the Class A-2 Notes and the Combination Notes</u>. (a) All payments on the Class A-2 Notes shall be made in the following order of priority, (1) *first,* to the Class A-2A Notes and (2) *second,* to the Class A-2B Notes. Interest payments on the Class A-2B Notes will be subordinated in all respects to interest payments on the Class A-2A Notes. Principal payments of the Class A-2B Notes will be subordinated in all respects to principal payments of the Class A-2A Notes.

(b) The payment priority of each Component of the Combination Notes shall be in accordance with the priority of the respective Underlying Class in accordance with the Priority of Payments. On each date on which payments are made on any Underlying Class, a portion of such payments will be allocated to the Combination Notes in the proportion that the Aggregate Outstanding Amount of the related Component bears to the Aggregate Outstanding Amount of that Underlying Class as a whole (including the related Components). The Combination Notes will be entitled to no other payments. In particular, interest will not accrue or be payable on the Aggregate Outstanding Amount of the Combination Notes, except to the extent, if any, of interest on the related Component.

ARTICLE 12

Sale of Collateral Obligations;
Purchase of Additional Collateral Obligations

Section 12.1. <u>Sales of Collateral Obligations</u>. Subject to the satisfaction of the conditions specified in <u>Section 12.3</u> (Conditions Applicable to All Sale and Purchase Transactions) and <u>provided</u>, that no Event of Default has occurred and is continuing (except for sales pursuant to <u>Sections 12.1(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u>, <u>(e)</u>, <u>(g)</u> and <u>(h)</u> (Sales of Collateral Obligations)), the Portfolio Manager on behalf of the Issuer may in writing direct the Trustee to sell and the Trustee (on behalf of the Issuer) shall sell in the manner directed by the Portfolio Manager any Collateral Obligation or Equity Security if such sale meets the requirements of any one of paragraphs (a) through (h) of this <u>Section 12.1</u> (Sales of Collateral Obligations). For purposes of this <u>Section 12.1</u> (Sales of Collateral Obligations), the Sale Proceeds of a Collateral Obligation sold by the Issuer shall include any Principal Financed Accrued Interest received in respect of such sale.

(a) <u>Credit Risk Obligations</u>. The Portfolio Manager may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Reinvestment Period without restriction.

(b) <u>Credit Improved Obligations</u>. The Portfolio Manager may direct the Trustee to sell any Credit Improved Obligation at any time during or after the Reinvestment Period if either:

(i) during the Reinvestment Period, the Portfolio Manager reasonably believes prior to such sale that it will be able to enter into binding commitments to reinvest all or a portion of the proceeds of such sale, in compliance with the Investment Criteria, in one or more additional Collateral Obligations with an Aggregate Principal

NEWYORK 8715474 (2K)

Balance at least equal to the Investment Criteria Adjusted Balance of the sold Credit Improved Obligation within 20 Business Days of such sale; or

(ii)    at any time, either (1) the Sale Proceeds from such sale are at least equal to the Investment Criteria Adjusted Balance of the sold Credit Improved Obligation or (2) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) plus, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance.

(c)    Defaulted Obligations.  The Portfolio Manager may direct the Trustee to sell any Defaulted Obligation at any time during or after the Reinvestment Period without restriction.

(d)    Equity Securities.  The Portfolio Manager may direct the Trustee to sell any Equity Security or any asset held by any ETB Subsidiary at any time during or after the Reinvestment Period without restriction, and shall use its commercially reasonable efforts to effect the sale of any Equity Security within 45 days of receipt if such Equity Security constitutes Margin Stock, unless such sale is prohibited by applicable law, in which case such Equity Security shall be sold as soon as such sale is permitted by applicable law.

(e)    Optional Redemption; Clean-up Call Redemption.  After the Issuer has notified the Trustee of an Optional Redemption of the Notes in accordance with Section 9.2 (Optional Redemption and Refinancing) or a Clean-up Call Redemption in accordance with Section 9.6 (Clean-up Call Redemption), the Portfolio Manager shall (except in connection with a Refinancing) direct the Trustee to sell (which sale may be through participation) all or a portion of the Collateral Obligations if (i) the applicable requirements of Article 9 (including the certification requirements of Section 9.3(c)(ii) (Redemption Procedures)) are satisfied.

(f)    Discretionary Sales.  The Portfolio Manager may direct the Trustee to sell any Collateral Obligation at any time if (a) during or after the Reinvestment Period, and after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations sold pursuant to this Section 12.1(f) (Sales of Collateral Obligations) during any 12 calendar month period is not greater than 25% of the Collateral Principal Amount as of the beginning of such 12 calendar month period; and (b) either:

(i)    during the Reinvestment Period, the Portfolio Manager reasonably believes prior to such sale that it will be able to enter into binding commitments to reinvest all or a portion of the proceeds of such sale, in compliance with the Investment Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the sold Collateral Obligation within 20 Business Days of such sale; or

(ii)    at any time, either (1) the Sale Proceeds from such sale are at least equal to the Investment Criteria Adjusted Balance of the sold Collateral Obligation or (2) the Effective Date Overcollateralization Test will be satisfied after giving effect to such sale.

NEWYORK 8715474 (2K)

(g) <u>Mandatory Sales</u>. The Portfolio Manager shall use its commercially reasonable efforts to effect the sale (regardless of price) of any Collateral Obligation that (i) no longer meets the criteria described in clause (viii) of the definition of "<u>Collateral Obligation</u>," within 18 months of the failure of such Collateral Obligation to meet any such criteria (unless (x) the Moody's Rating Condition is satisfied and (y) notice has been provided to S&P of the failure of such Collateral Obligation to meet such criteria) and (ii) no longer meets the criteria described in clause (vi) or (vii) of the definition of "<u>Collateral Obligation</u>," within 45 days of the failure of such Collateral Obligation to meet either such criteria. Notwithstanding anything in this <u>Article 12</u> to the contrary, so long as any Secured Notes are Outstanding on the Stated Maturity of the Notes, the Portfolio Manager shall use its commercially reasonable efforts to effect the sale of all remaining Collateral Obligations, Eligible Investments and Equity Securities (including Equity Securities held by any ETB Subsidiary) upon the Stated Maturity of such Notes.

(h) <u>Pre-funded Letters of Credit</u>. If either the Issuer or the Portfolio Manager has actual knowledge that the account in which the funded amount in respect of a Pre-funded Letter of Credit owned by the Issuer is held has ceased to be a Pre-funded Letter of Credit Eligible Account, the Issuer (or the Portfolio Manager on its behalf) may sell such Pre-funded Letter of Credit within 60 days of the date on which the Issuer or the Portfolio Manager obtained actual knowledge that such account ceased to be a Pre-funded Letter of Credit Eligible Account.

Section 12.2. <u>Purchase of Additional Collateral Obligations</u>. On any date during the Reinvestment Period, the Portfolio Manager on behalf of the Issuer may direct the Trustee to invest Principal Proceeds and accrued interest received with respect to any Collateral Obligation to the extent used to pay for accrued interest on additional Collateral Obligations in additional Collateral Obligations, and the Trustee shall invest such proceeds, if each of the conditions specified in this <u>Section 12.2</u> (Purchase of Additional Collateral Obligations) and <u>Section 12.3</u> (Conditions Applicable to All Sale and Purchase Transactions) are met; <u>provided</u> that, for the avoidance of doubt, with respect to any Collateral Obligations for which the trade date has occurred during the Reinvestment Period and for which Principal Proceeds are available (including for this purpose, cash on deposit in the Collection Account as well as any Principal Proceeds that will be received by the Issuer from the sale of Collateral Obligations for which the trade date has already occurred but the settlement date has not yet occurred) are available but which settle after the end of the Reinvestment Period, the purchase of such Collateral Obligations shall be treated as a purchase made during the Reinvestment Period for purposes of this <u>Section 12.2</u> (Purchase of Additional Collateral Obligations).

(a) <u>Investment Criteria</u>. No Collateral Obligation may be purchased unless each of the following conditions are satisfied as of the date the Portfolio Manager commits on behalf of the Issuer to make such purchase, in each case (subject to the provisions of <u>Section 1.2(k)</u> (Assumptions as to Pledged Obligations)) after giving effect to such purchase and all other sales or purchases previously or simultaneously committed to; <u>provided</u> that the conditions set forth in clauses (iii) through (v) below need only be satisfied with respect to purchases of Collateral Obligations occurring after the end of the Ramp-up Period:

(i) such obligation is a Collateral Obligation;

(ii)     such obligation is not as of such date a Credit Risk Obligation as determined by the Portfolio Manager;

(iii)     (A) each Coverage Test will be satisfied, or if not satisfied such Coverage Test will be maintained or improved and (B) if each Coverage Test is not satisfied, the proceeds of any sale of a Defaulted Obligation pursuant to Section 12.1(c) above shall not be reinvested in additional Collateral Obligations;

(iv)     (A) in the case of an additional Collateral Obligation purchased with the proceeds from the sale of a Credit Risk Obligation or a Defaulted Obligation, either (1) the Aggregate Principal Balance of all additional Collateral Obligations purchased with the proceeds from such sale will at least equal the Sale Proceeds from such sale, (2) the Aggregate Principal Balance of the Collateral Obligations when such Credit Risk Obligation or Defaulted Obligation was sold will be maintained or increased following the purchase of such additional Collateral Obligation or (3) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) plus, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance and (B) in the case of any other purchase of additional Collateral Obligations, either (1) the Aggregate Principal Balance of the Collateral Obligations when such Collateral Obligations were sold will be maintained or increased after giving effect to the purchase of such additional Collateral Obligations or (2) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) plus, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance;

(v)     either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment; and

(vi)     the then-current rating by Moody's of the Class A-1 Notes, the Class A-2A Notes and the Class A-2B Notes is at least "Aa3", unless waived in writing by the Holders of at least a Majority of the Controlling Class.

(b)     Reinvesting After the Reinvestment Period.  For the avoidance of doubt, after the Reinvestment Period each of the Issuer and the Portfolio Manager may not invest in or purchase additional Collateral Obligations.

(c)     Post-Reinvestment Period Settlement.  Not later than the Business Day immediately following the end of the Reinvestment Period, the Portfolio Manager shall deliver to the Trustee a schedule of Collateral Obligations that the Issuer has purchased on a trade date basis but with respect to which the settlement date has not yet occurred and shall certify to the

NEWYORK 8715474 (2K)

Trustee that sufficient Principal Proceeds are available (including for this purpose, cash on deposit in the Collection Account as well as any Principal Proceeds that will be received by the Issuer from the sale of Collateral Obligations for which the trade date has already occurred but the settlement date has not yet occurred) to effect the settlement of such Collateral Obligations.

(d)  <u>Certification by Portfolio Manager</u>.  Not later than the Subsequent Delivery Date for any Collateral Obligation purchased after the end of the Ramp-up Period, the Portfolio Manager shall deliver to the Trustee an Officer's certificate of the Portfolio Manager certifying that such purchase complies with this <u>Section 12.2</u> (Purchase of Additional Collateral Obligations) and <u>Section 12.3</u> (Conditions Applicable to All Sale and Purchase Transactions).

(e)  <u>Purchase Following Sale of Credit Improved Obligations and Discretionary Sales</u>.  Following the sale of any Credit Improved Obligation pursuant to <u>Section 12.1(b)(i)</u> (Sales of Collateral Obligations) or any discretionary sale of a Collateral Obligation pursuant to <u>Section 12.1(f)(i)(B)</u> (Sales of Collateral Obligations), the Portfolio Manager shall use its reasonable efforts to purchase additional Collateral Obligations pursuant to this <u>Section 12.2</u> (Purchase of Additional Collateral Obligations) within 20 Business Days after such sale.

(f)  <u>Investment in Eligible Investments</u>.  Cash on deposit in any Account or Hedge Account may be invested at any time in Eligible Investments in accordance with <u>Article 10</u> (or, in the case of Hedge Accounts, collateral required to secure the obligations of the applicable Hedge Counterparty).

Section 12.3.  <u>Conditions Applicable to All Sale and Purchase Transactions</u>. (a)  Any transaction effected under this <u>Article 12</u> or in connection with the acquisition of additional Collateral Obligations during the Ramp-up Period shall be conducted on an arm's length basis and, if effected with a Person Affiliated with the Portfolio Manager, shall be effected in accordance with the requirements of Section 6 of the Portfolio Management Agreement on terms no less favorable to the Issuer than would be the case if such Person were not so Affiliated, <u>provided</u>, that the Trustee shall have no responsibility to oversee compliance with this clause (a) by the other parties.

(b)  Upon any acquisition of a Collateral Obligation pursuant to this <u>Article 12</u>, all of the Issuer's right, title and interest to the Pledged Obligation or Pledged Obligations shall be Granted to the Trustee pursuant to this Indenture, such Pledged Obligations shall be Delivered to the Trustee, and, if applicable, the Issuer shall receive the Pledged Obligation for which the Pledged Obligation was substituted.  The Trustee shall also receive, not later than the Subsequent Delivery Date, an Officer's certificate of the Issuer containing the statements set forth in <u>Section 3.1(a)(ix)</u> (Conditions to Issuance of Notes on Closing Date).

Section 12.4.  <u>Post-Reinvestment Period Amendment Proceeds</u>.  After the Reinvestment Period, with respect to any amendment to a Collateral Obligation that the Issuer (or the Portfolio Manager on the Issuer's behalf) voted in favor of (including any amendment that includes an extension of the stated maturity of such Collateral Obligation (a "<u>Maturity Amendment</u>")), it is understood and agreed that, in accordance with the following sentence, certain of the fees related to such amendment and/or the coupon of such Collateral Obligation

shall comprise the Post-Reinvestment Period Amendment Proceeds (the "Post-Reinvestment Period Amendment Proceeds"). In the event that a Collateral Obligation is amended but such amendment is not a Maturity Amendment, then any economic benefit (such as a step-up in the coupon, an amendment fee, consent fee or any other related fee) actually received by the Issuer as a result of such amendment will comprise Post-Reinvestment Period Amendment Proceeds (as of the effective date of the related amendment or waiver) as certified in writing by the Portfolio Manager (in its reasonable business judgment) to the Issuer and the Trustee; provided, that, in the event such amendment is a Maturity Amendment, then the entire coupon received in respect of the related Collateral Obligation and any other related amendment fees will comprise Post-Reinvestment Period Amendment Proceeds. Following any amendment to a Collateral Obligation that the Issuer (or the Portfolio Manager on the Issuer's behalf) voted in favor of (including any Maturity Amendment), the Portfolio Manager shall certify to the Issuer and the Trustee (i) whether such amendment gives rise to any Post-Reinvestment Period Amendment Proceeds and (ii) the amount of any such Post-Reinvestment Period Amendment Proceeds. After the Reinvestment Period and for so long as any Class C Notes remain Outstanding, all Post-Reinvestment Period Amendment Proceeds will constitute the Turbo Payment Amount, which will be applied as Principal Proceeds in accordance with the Priority of Payments on the applicable Payment Date.

ARTICLE 13

Noteholders' Relations

Section 13.1.    Subordination; Non-Petition.  (a)  Anything in this Indenture or the Notes to the contrary notwithstanding, the Holders of each Class of Notes that constitute a Junior Class agree for the benefit of the Holders of the Notes of each Priority Class with respect to such Junior Class that such Junior Class shall be subordinate and junior to the Notes of each such Priority Class to the extent and in the manner set forth in this Indenture.

(b)    In the event that, notwithstanding the provisions of this Indenture, any Holder of Notes of any Junior Class shall have received any payment or distribution in respect of such Notes contrary to the provisions of this Indenture, then, unless and until each Priority Class with respect thereto shall have been paid in full in Cash or, to the extent a Majority of such Priority Class consents, other than in Cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Class(es) in accordance with this Indenture; provided, however, that if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Assets and subject in all respects to the provisions of this Indenture, including this Section 13.1 (Subordination; Non-Petition).

(c)    Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that such Holder of Junior Class Notes shall not demand, accept, or receive any payment or distribution in respect of such Notes in violation of the provisions of this Indenture including, without limitation, this Section 13.1 (Subordination; Non-Petition); provided, however, that after a Priority Class has been paid in full, the Holders of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of such Priority

NEWYORK 8715474 (2K)

Class. Nothing in this Section 13.1 (Subordination; Non-Petition) shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

(d) The Holders of each Class of Notes agree, for the benefit of all Holders of each Class of Notes, not to cause the filing of a petition in bankruptcy against the Issuer, the Co-Issuer or any ETB Subsidiary until the payment in full of the Notes and not before one year and a day, or if longer, the applicable preference period then in effect, has elapsed since such payment. The restrictions set forth in this Section 13.1(d) (Subordination; Non-Petition) are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into this Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of this Indenture. Any Holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

Section 13.2. Standard of Conduct. In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Holder under this Indenture, a Holder or Holders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Holder, the Issuer, or any other Person, except for any liability to which such Holder may be subject to the extent the same results from such Holder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

Section 13.3. Voting Rights of Holders of Combination Notes. The Holders of the Combination Notes will be treated as Holders of the Underlying Classes for purposes of any voting rights of such Underlying Classes, except in connection with any supplemental indenture that affects the Combination Notes in a materially adverse manner that is different from the effect of such supplemental indenture on Notes of any Underlying Class, in which case the Combination Notes will vote only as a separate Class.

Section 13.4. Sales and Exchanges of Combination Notes. At the written request of the Holder of a Combination Note (i) all or any portion of the Combination Notes may be exchanged for the Underlying Classes represented by such Combination Notes and (ii) all or any portion of the Class A-1 Notes, Class B Notes and Class C Notes representing Underlying Classes may be combined into Combination Notes, in each such case, proportionally in accordance with the Permissible Ratio (each such exchange or combination, an "Exchange"); provided that no Exchange will be permitted during the period commencing on a Record Date and ending on the related Payment Date; provided further that, if the Aggregate Outstanding Amount of the Combination Notes is less than $1,590,190, such Combination Notes will not be eligible to be Exchanged for the Underlying Classes represented by such Combination Notes. The Combination Notes may be sold to a transferee in accordance with this Indenture, proportionally in accordance with the Permissible Ratio.

NEWYORK 8715474 (2K)

If a Holder wishes to make an Exchange, the Holder must notify the Trustee and Collateral Administrator in writing no later than seven Business Days prior to the proposed effective date of such Exchange, which effective date must be at least one Business Day prior to the Record Date. The written notice (the "<u>Exchange Notice</u>") must set forth the following information: the CUSIP and ISIN numbers of each Note to be exchanged and each Note to be received in such Exchange, the calculations of the Permissible Ratio, the Aggregate Outstanding Amount and face amount of each Note to be exchanged and each Note to be received in such Exchange, the Holder's DTC participant number and the proposed effective date of such Exchange. After receiving the Exchange Notice, the Collateral Administrator shall confirm, and the Portfolio Manager shall verify, whether such proposed Exchange satisfies the Permissible Ratio and the requirements set forth above. Within three Business Days after receipt of the Exchange Notice, the Collateral Administrator shall notify the Holder, the Co-Issuers, the Trustee and the Portfolio Manager whether such proposed Exchange satisfies the requirements set forth in the Indenture. If the amounts set forth in the Exchange Notice do not consist of a Permissible Ratio and/or the resulting aggregate amounts of Combination Notes and/or Underlying Classes do not consist of the required minimum denominations and required integral multiples of $1, the Holder agrees to cooperate with the Co-Issuers, the Trustee, the Collateral Administrator and the Portfolio Manager to reallocate such impermissible integral multiples and reach appropriate allocations for each such Exchange. If any such reallocation cannot be promptly achieved, the Collateral Administrator shall within ten (10) Business Days notify the Holder that such Exchange has been rejected. If the Exchange has not been rejected, the holder will utilize the "deposit and withdrawal system" at DTC to effectuate such Exchange. A notice becomes irrevocable on the second Business Day prior to the proposed effective date of such Exchange. Each such Exchange shall be subject to the minimum denomination and integral multiples requirements with respect to the related Class of Notes and the transfer restrictions set forth in this Indenture. The Trustee shall promptly notify S&P upon the occurrence of any Exchange.

## ARTICLE 14

### Miscellaneous

Section 14.1.    <u>Form of Documents Delivered to Trustee</u>.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer, the Co-Issuer or the Portfolio Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or should know that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Officer of the Issuer, Co-Issuer or the Portfolio Manager or Opinion of Counsel may be based, insofar as it relates to factual matters,

upon a certificate or opinion of, or representations by, the Issuer, the Co-Issuer, the Portfolio Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer, the Portfolio Manager or such other Person, unless such Officer of the Issuer, Co-Issuer or the Portfolio Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer of the Portfolio Manager, the Issuer or the Co-Issuer, stating that the information with respect to such matters is in the possession of the Portfolio Manager, the Issuer or the Co-Issuer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of either Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to such Co-Issuer's right to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in Section 6.1(d) (Certain Duties and Responsibilities of Trustee).

Section 14.2.   Acts of Holders.   (a) Any request, demand, authorization, instruction, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in writing or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 14.2 (Acts of Holders).

(b)      The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)      The principal amount or face amount, as the case may be, and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Register.

(d)      Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such Note and of every Note issued upon the registration thereof or in exchange therefor or in

lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

Section 14.3.    Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Placement Agents, the Hedge Counterparty, the Paying Agent, the Administrator and each Rating Agency.    (a)    Any request, demand, authorization, instruction, direction, order, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(i)    the Trustee shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Trustee addressed to such party at the Corporate Office, or at any other address previously furnished in writing to the other parties hereto by the Trustee;

(ii)    the Co-Issuers shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Issuer addressed to it at c/o Appleby Trust (Cayman) Ltd., Clifton House, 75 Fort Street, PO Box 1350, Grand Cayman KYI-1108, Cayman Islands, Attention: The Directors, facsimile no. (345) 949-4901, or to the Co-Issuer addressed to it at  850 Library Avenue, Suite 204, Newark, Delaware, 19711 or at any other address previously furnished in writing to the other parties hereto by the Issuer or the Co-Issuer, as the case may be, with a copy to the Portfolio Manager at its address below;

(iii)    the Portfolio Manager shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Portfolio Manager addressed to it at Acis Capital Management, L.P., 300 Crescent Court, Dallas, TX 75201 or at any other address previously furnished in writing to the other parties hereto;

(iv)    the Placement Agents shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, addressed to GreensLedge Capital Markets LLC, 520 Madison Avenue, 32nd Floor, New York, New York 10022, facsimile no. 212-792-5270, Attention:  CDO Group and Cantor Fitzgerald & Co., 110 East 59th Street, New York, NY 10022, or at any other address previously furnished in writing to the Co-Issuers and the Trustee by the Placement Agents;

(v)    a Hedge Counterparty shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by facsimile in legible form to such Hedge Counterparty addressed to it at the address specified in the relevant Hedge Agreement or at any other address previously furnished in writing to the Issuer and the Trustee by such Hedge Counterparty;

NEWYORK 8715474 (2K)

(vi)    the Rating Agencies shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service to each Rating Agency addressed to it at Moody's Investors Service, Inc., 7 World Trade Center at 250 Greenwich Street, New York, New York, 10007, Attention:  CBO/CLO Monitoring or by email to cdomonitoring@moodys.com and Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041-0003 or by facsimile in legible form to facsimile no. (212) 438-2655, Attention:   Structured Credit Surveillance or by electronic copy to CDO_Surveillance@sandp.com and, solely with respect to S&P CDO Monitor requests, by email to: CDOMonitor@standardandpoors.com;

(vii)    the Irish Listing Agent shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Irish Listing Agent (or, if to the Companies Announcements Office, by email to announcements@ise.ie (such notices to be sent in Microsoft Word format to the extent possible) addressed to it at McCann FitzGerald Listing Services Limited, Riverside One, Sir John Rogerson's Quay, Dublin 2, Ireland, or at any other address previously furnished in writing to the other parties hereto by the Irish Listing Agent except that notices of the Note Interest Rate for Secured Notes will be by email to rates@ise.ie or as otherwise required by the guidelines of the Irish Stock Exchange; and

(viii)    the Administrator shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Administrator addressed to it at Appleby Trust (Cayman) Ltd., Clifton House, 75 Fort Street, PO Box 1350, Grand Cayman KYI-1108, Cayman Islands, Attention: ACIS CLO 2013-1 Ltd.

(b)    In the event that any provision in this Indenture calls for any notice or document to be delivered simultaneously to the Trustee and any other person or entity, the Trustee's receipt of such notice or document shall entitle the Trustee to assume that such notice or document was delivered to such other person or entity unless otherwise expressly specified herein.

(c)    Notwithstanding any provision of this <u>Section 14.3</u> (Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Placement Agents, the Hedge Counterparty, the Paying Agent, the Administrator and each Rating Agency) to the contrary, any request, demand, authorization, direction, order, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with any party specified in <u>Section 14.3(a)</u> (Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Placement Agents, the Hedge Counterparty, the Paying Agent, the Administrator and each Rating Agency) above shall be sufficient for every purpose hereunder if made, given or furnished by electronic mail to an e-mail address specified in <u>Section 14.3(a)</u> (Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Placement Agents, the Hedge

Counterparty, the Paying Agent, the Administrator and each Rating Agency) or provided to the notifying party in accordance therewith.

(d)     The Bank (in each of its capacities) agrees to accept and act upon instructions or directions pursuant to this Indenture or any document executed in connection herewith sent by unsecured email, facsimile transmission or other similar unsecured electronic methods, provided, however, that the Bank shall have received an incumbency certificate listing such person as a person designated to provide such instructions or directions, which incumbency certificate may be amended whenever a person is added or deleted from the listing. If such person elects to give the Bank email or facsimile instructions (or instructions by a similar electronic method) and the Bank in its discretion elects to act upon such instructions, the Bank's reasonable understanding of such instructions shall be deemed controlling. The Bank shall not be liable for any losses, costs or expenses arising directly or indirectly from the Bank's reliance upon and compliance with such instructions notwithstanding such instructions conflicting with or being inconsistent with a subsequent written instruction. Any person providing such instructions or directions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Bank, including without limitation the risk of the Bank acting on unauthorized instructions, and the risk of interception and misuse by third parties and acknowledges and agrees that there may be more secure methods of transmitting such instructions than the method(s) selected by it and agrees that the security procedures (if any) to be followed in connection with its transmission of such instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances.

Section 14.4.     Notices to Holders; Waiver.     Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of any event,

(a)     such notice shall be sufficiently given to Holders if in writing and mailed, first class postage prepaid, to each Holder affected by such event, at the address of such Holder as it appears in the Register not earlier than the earliest date and not later than the latest date, prescribed for the giving of such notice; and

(b)     such notice shall be in the English language.

Such notices will be deemed to have been given on the date of such mailing.

Notwithstanding clause (a) above, a Holder may give the Trustee a written notice in a form acceptable to the Trustee that it is requesting that notices to it be given by facsimile transmissions and stating the facsimile number for such transmission. Thereafter, the Trustee shall give notices to such Holder by facsimile transmission; provided, that if such notice also requests that notices be given by mail, then such notice shall also be given by mail in accordance with clause (a) above.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders. In case by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity or by reason of any other cause it shall be impracticable to give such notice by mail of any event to Holders when such notice is required to be given pursuant to any provision

NEWYORK 8715474 (2K)

of this Indenture, then such notification to Holders as shall be made with the approval of the Trustee shall constitute a sufficient notification to such Holders for every purpose hereunder.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

So long as any Class of Notes is listed on the Irish Stock Exchange and the guidelines of such exchange so require, all notices to Holders of such Notes will be published at the Companies Announcements Office of the Irish Stock Exchange.

Section 14.5.   <u>Effect of Headings and Table of Contents</u>.   The Article and Section headings herein (including those used in cross-references herein) and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 14.6.   <u>Successors and Assigns</u>.   All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7.   <u>Separability</u>.   Except to the extent prohibited by applicable law, in case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 14.8.   <u>Benefits of Indenture</u>.   Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Portfolio Manager, the Holders of the Notes and (to the extent provided herein) the Collateral Administrator and the Administrator (solely in its capacity as such) and the other Secured Parties any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 14.9.   <u>Governing Law</u>.   THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

Section 14.10.   <u>Submission to Jurisdiction and Waiver of Jury Trial</u>.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE NOTES OR THIS INDENTURE, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.

EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS INDENTURE SHALL AFFECT ANY RIGHT THAT THE TRUSTEE OR ANY HOLDER OF NOTES MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS INDENTURE AGAINST THE CO-ISSUERS OR THEIR PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c) EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE IN ANY COURT REFERRED TO IN THE PREVIOUS PARAGRAPH. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d) EACH PARTY (OTHER THAN THE CO-ISSUERS) TO THIS INDENTURE IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES HEREIN. EACH OF THE CO-ISSUERS IRREVOCABLY APPOINTS CT CORPORATION SYSTEM, AS ITS AUTHORIZED AGENT ON WHICH ANY AND ALL LEGAL PROCESS MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING. NOTHING IN THIS INDENTURE WILL AFFECT THE RIGHT OF ANY PARTY TO THIS INDENTURE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(e) EACH PARTY TO THIS INDENTURE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING.

Section 14.11. <u>Counterparts</u>. This instrument may be executed in any number of counterparts (including by facsimile or pdf), each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.12. <u>Acts of Issuer</u>. Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Portfolio Manager on the Issuer's behalf.

Section 14.13. <u>Confidential Information</u>. (a) The Trustee and each Holder of Notes will maintain the confidentiality of all Confidential Information in accordance with procedures adopted by the Trustee or such Holder in good faith to protect Confidential Information of third parties delivered to such Person; <u>provided</u>, that such Person may deliver or disclose Confidential Information to: (i) such Person's directors, trustees, officers, employees, agents, auditors, attorneys and affiliates who agree to hold confidential the Confidential Information substantially in accordance with the terms of this <u>Section 14.13</u> (Confidential

Information) and to the extent such disclosure is reasonably required for the administration of this Indenture, the matters contemplated hereby or the investment represented by the Notes; (ii) such Person's financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section 14.13 (Confidential Information) and to the extent such disclosure is reasonably required for the administration of this Indenture, the matters contemplated hereby or the investment represented by the Notes; (iii) any other Holder; (iv) any Person of the type that would be, to such Person's knowledge, permitted to acquire Notes in accordance with the requirements of Section 2.6 (Registration, Registration of Transfer and Exchange) hereof to which such Person sells or offers to sell any such Note or any part thereof (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 14.13 (Confidential Information)); (v) any other Person from which such former Person offers to purchase any security of the Co-Issuers (if such other Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 14.13 (Confidential Information)); (vi) any Federal or state or other regulatory, governmental or judicial authority having jurisdiction over such Person; (vii) the National Association of Insurance Commissioners or any similar organization, or any nationally recognized rating agency that requires access to information about the investment portfolio of such Person, reinsurers and liquidity and credit providers that agree to hold confidential the Confidential Information substantially in accordance with this Section 14.13 (Confidential Information); (viii) Moody's (so long as any Class X Notes, Class A-1 Notes or Class A-2 Notes are rated by Moody's) or S&P; (ix) any other Person with the consent of the Co-Issuers and the Portfolio Manager; or (x) any other Person to which such delivery or disclosure may be necessary or appropriate (A) to effect compliance with any law, rule, regulation or order applicable to such Person, (B) in response to any subpoena or other legal process upon prior notice to the Co-Issuers (unless prohibited by applicable law, rule, order or decree or other requirement having the force of law), (C) in connection with any litigation to which such Person is a party upon prior notice to the Co-Issuers (unless prohibited by applicable law, rule, order or decree or other requirement having the force of law) or (D) if an Event of Default has occurred and is continuing, to the extent such Person may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under the Notes or this Indenture; and provided, further, however, that delivery to Holders by the Trustee of any report of information required by the terms of this Indenture to be provided to Holders shall not be a violation of this Section 14.13 (Confidential Information). Each Holder of Notes and each person who delivers a note owner certificate in substantially the form of Exhibit I hereto to the Trustee agrees, except as set forth in clauses (vi), (vii) and (x) above, that it shall use the Confidential Information for the sole purpose of making an investment in the Notes or administering its investment in the Notes; and that the Trustee shall neither be required nor authorized to disclose to Holders any Confidential Information in violation of this Section 14.13 (Confidential Information). In the event of any required disclosure of the Confidential Information by such Holder, such Holder agrees to use reasonable efforts to protect the confidentiality of the Confidential Information. Each Holder of a Note, by its acceptance of such Note will be deemed to have agreed to be bound by and to be entitled to the benefits of this Section 14.13 (Confidential Information). Notwithstanding the foregoing, the Holders and beneficial owners of the Offered Securities (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any

kind, the tax treatment and tax structure of the transactions contemplated by this Indenture and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and U.S. federal income tax structure.

(b)    For the purposes of this Section 14.13 (Confidential Information), "Confidential Information" means information delivered to the Trustee or any Holder of Notes or on behalf of the Co-Issuers in connection with and relating to the transactions contemplated by or otherwise pursuant to this Indenture; provided, that such term does not include information that:  (i) was publicly known or otherwise known to the Trustee or such Holder prior to the time of such disclosure; (ii) subsequently becomes publicly known through no act or omission by the Trustee, any Holder or any person acting on behalf of the Trustee or any Holder; (iii) otherwise is known or becomes known to the Trustee or any Holder other than (x) through disclosure by the Co-Issuers or (y) to the knowledge of the Trustee or a Holder, as the case may be, in each case after reasonable inquiry, as a result of the breach of a fiduciary duty to the Co-Issuers or a contractual duty to the Co-Issuers; or (iv) is allowed to be treated as non-confidential by consent of the Co-Issuers.

Section 14.14.    Liability of Co-Issuers.    Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, inter alia, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other of the Co-Issuers.  In particular, neither of the Co-Issuers nor any ETB Subsidiary shall be entitled to petition or take any other steps for the winding up or bankruptcy of the Issuer, the Co-Issuer or any ETB Subsidiary, as applicable, or shall have any claim in respect to any assets of the Issuer, the Co-Issuer or any ETB Subsidiary, as applicable.

## ARTICLE 15

### Assignment of Certain Agreements

Section 15.1.    Assignment of Portfolio Management Agreement.    (a)    The Issuer hereby acknowledges that its Grant pursuant to the first Granting Clause hereof includes all of the Issuer's estate, right, title and interest in, to and under the Portfolio Management Agreement, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Portfolio Manager thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; provided, however, that notwithstanding anything herein to the contrary, the Trustee shall not have the authority to exercise any of the rights set forth in (i) through (iv) above or that may otherwise arise as a result of the Grant until the occurrence of an Event of Default hereunder and such authority shall terminate at such time, if any, as such Event of Default is cured or waived.

NEWYORK 8715474 (2K)

(b)     The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Portfolio Management Agreement, nor shall any of the obligations contained in the Portfolio Management Agreement be imposed on the Trustee.

(c)     Upon the retirement of the Notes, the payment of all amounts required to be paid pursuant to the Priority of Payments and the release of the Assets from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Portfolio Management Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d)     The Issuer represents that the Issuer has not executed any other assignment of the Portfolio Management Agreement.

(e)     The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith.    The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably specify.

Section 15.2.    Assignment of Hedge Agreement.    (a)    After the Closing Date, the Issuer may enter into Hedge Agreements from time to time.  Each Hedge Agreement shall be required to (x) satisfy the Global Rating Agency Condition, (y) contain appropriate limited recourse and non-petition provisions equivalent to those contained in this Indenture with respect to the Notes and (z) provide that any amounts payable to the related Hedge Counterparties thereunder will be subject to the Priority of Payments (including, without limitation, the Acceleration Priority of Payments).  The Issuer shall not enter into a Hedge Agreement unless (x) it reasonably determines that such Hedge Agreement would not cause the Issuer or the Portfolio Manager to be required to register with the CFTC or that the Issuer and the Portfolio Manager would be eligible for an exemption to the requirement to register with the CFTC as a CPO or (y) with the consent of at least a Majority of the Subordinated Notes, the Portfolio Manager will register as a CPO and comply with the requirements of the CFTC.  The Issuer shall assign any such Hedge Agreement to the Trustee pursuant to this Indenture.  The Trustee shall, on behalf of the Issuer and in accordance with the Distribution Report, pay amounts due to the Hedge Counterparty under any Hedge Agreements on any Payment Date in accordance with Section 11.1 (Disbursements of Monies from Payment Account).  The Issuer shall not enter into any Hedge Agreement unless such Hedge Agreement provides that any costs attributable to entering into a replacement Hedge Agreement which exceed the sum of the proceeds of the liquidation of any such Hedge Agreement shall be borne solely by the Hedge Counterparty; provided that such liquidation is not the result of a Priority Hedge Termination Event.

(b)     The Trustee shall agree to any reduction in the notional amount of any Hedge Agreement proposed by the related Hedge Counterparty and agreed to by the Portfolio Manager, or any termination, replacement and/or other modification of a Hedge Agreement or any additional Hedge Agreement proposed by the Portfolio Manager; provided, that the Global Rating Agency Condition has been satisfied.

NEWYORK 8715474 (2K)

(c)     If at any time a Hedge Agreement becomes subject to early termination due to the occurrence of an event of default or a termination event, the Issuer (or the Portfolio Manager on its behalf) and the Trustee (following an Event of Default) shall notify each Rating Agency and take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee under such Hedge Agreement as may be permitted by the terms of such Hedge Agreement and consistent with the terms hereof, and may apply the proceeds of any such actions (including, without limitation, the proceeds of the liquidation of any collateral pledged by the Hedge Counterparty thereunder) to enter into a replacement Hedge Agreement on such terms as satisfy the Global Rating Agency Condition (unless such early termination is due to an additional termination event caused by an Optional Redemption).   No Hedge Agreement entered into by the Issuer may include an additional termination event resulting from an Optional Redemption unless such additional termination event is not effective until the notice of such Optional Redemption given by the Co-Issuers has become irrevocable.

NEWYORK 8715474 (2K)

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Indenture as of the date first written above.

ACIS CLO 2013-1 LTD., as Issuer

By:_____
    Name:
    Title:

ACIS CLO 2013-1 LLC, as Co-Issuer

By:_____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By: _____
    Name:
    Title:

SCHEDULE 1

LIST OF COLLATERAL OBLIGATIONS

## MOODY'S INDUSTRY CLASSIFICATION GROUP LIST

| | |
|---|---|
| CORP - Aerospace & Defense | 1 |
| CORP - Automotive | 2 |
| CORP - Banking, Finance, Insurance & Real Estate | 3 |
| CORP - Beverage, Food & Tobacco | 4 |
| CORP - Capital Equipment | 5 |
| CORP - Chemicals, Plastics, & Rubber | 6 |
| CORP - Construction & Building | 7 |
| CORP - Consumer goods:  Durable | 8 |
| CORP - Consumer goods:  Non-durable | 9 |
| CORP - Containers, Packaging & Glass | 10 |
| CORP - Energy:  Electricity | 11 |
| CORP - Energy:  Oil & Gas | 12 |
| CORP - Environmental Industries | 13 |
| CORP - Forest Products & Paper | 14 |
| CORP - Healthcare & Pharmaceuticals | 15 |
| CORP - High Tech Industries | 16 |
| CORP - Hotel, Gaming & Leisure | 17 |
| CORP - Media:  Advertising, Printing & Publishing | 18 |
| CORP - Media:  Broadcasting & Subscription | 19 |
| CORP - Media:  Diversified & Production | 20 |
| CORP - Metals & Mining | 21 |
| CORP - Retail | 22 |
| CORP - Services:  Business | 23 |
| CORP - Services:  Consumer | 24 |
| CORP - Sovereign & Public Finance | 25 |
| CORP - Telecommunications | 26 |
| CORP - Transportation:  Cargo | 27 |
| CORP - Transportation:  Consumer | 28 |
| CORP - Utilities:  Electric | 29 |
| CORP - Utilities:  Oil & Gas | 30 |
| CORP - Utilities:  Water | 31 |
| CORP - Wholesale | 32 |

<div align="right"><u>SCHEDULE 3</u></div>

<div align="center"><u>S&P INDUSTRY CLASSIFICATIONS</u></div>

| | | | |
|---|---|---|---|
| 1. | Aerospace & defense | 39. | Utilities |
| 2. | Air transport | 40. | Mortgage REITs |
| 3. | Automotive | 41. | Equity REITs and REOCs |
| 4. | Beverage & tobacco | 42. | Reserved corporate |
| 5. | Radio & television | 43. | Life insurance |
| 7. | Building & development | 44. | Health insurance |
| 8. | Business equipment & services | 45. | Property & casualty insurance |
| 9. | Cable & satellite television | 46. | Diversified insurance |
| 10. | Chemical & plastics | 47. | Reserved corporate |
| 11. | Clothing/textiles | 48. | Reserved corporate |
| 12. | Conglomerates | 49. | Reserved corporate |
| 13. | Containers & glass products | | |
| 14. | Cosmetics/toiletries | | |
| 15. | Drugs | | |
| 16. | Ecological services & equipment | | |
| 17. | Electronics/electrical | | |
| 18. | Equipment leasing | | |
| 19. | Farming/agriculture | | |
| 20. | Financial intermediaries | | |
| 21. | Food/drug retailers | | |
| 22. | Food products | | |
| 23. | Food service | | |
| 24. | Forest products | | |
| 25. | Health care | | |
| 26. | Home furnishings | | |
| 27. | Lodging & casinos | | |
| 28. | Industrial equipment | | |
| 30. | Leisure goods/activities/movies | | |
| 31. | Nonferrous metals/minerals | | |
| 32. | Oil & gas | | |
| 33. | Publishing | | |
| 34. | Rail industries | | |
| 35. | Retailers (except food & drug) | | |
| 36. | Steel | | |
| 37. | Surface transport | | |
| 38. | Telecommunications | | |

SCHEDULE 4

DIVERSITY SCORE CALCULATION

The Diversity Score is calculated as follows:

(a) An "Issuer Par Amount" is calculated for each issuer of a Collateral Obligation, and is equal to the Aggregate Principal Balance of all the Collateral Obligations issued by that issuer and all affiliates.

(b) An "Average Par Amount" is calculated by summing the Issuer Par Amounts for all issuers, and dividing by the number of issuers.

(c) An "Equivalent Unit Score" is calculated for each issuer, and is equal to the lesser of (x) one and (y) the Issuer Par Amount for such issuer divided by the Average Par Amount.

(d) An "Aggregate Industry Equivalent Unit Score" is then calculated for each of the Moody's industry classification groups, shown on Schedule 2, and is equal to the sum of the Equivalent Unit Scores for each issuer in such industry classification group.

(e) An "Industry Diversity Score" is then established for each Moody's industry classification group, shown on Schedule 2, by reference to the following table for the related Aggregate Industry Equivalent Unit Score, provided, that if any Aggregate Industry Equivalent Unit Score falls between any two such scores, the applicable Industry Diversity Score will be the lower of the two Industry Diversity Scores:

| Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |

| Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score |
|---|---|---|---|---|---|---|---|
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |
| 4.9500 | 2.6667 | 10.0500 | 4.0100 | 15.1500 | 4.5200 | | |

(f)    The Diversity Score is then calculated by summing each of the Industry Diversity Scores for each Moody's industry classification group shown on Schedule 2.

(g)    For purposes of calculating the Diversity Score, affiliated issuers in the same Industry are deemed to be a single issuer except as otherwise agreed to by Moody's.

SCHEDULE 5

MOODY'S RATING DEFINITIONS

MOODY'S DEFAULT PROBABILITY RATING

(i)      With respect to a Collateral Obligation that is a Moody's Senior Secured Loan or Participation Interest in a Moody's Senior Secured Loan, if the obligor of such Collateral Obligation has a corporate family rating by Moody's, then such corporate family rating.

(ii)      With respect to a Collateral Obligation that is a Moody's Senior Secured Loan or Participation Interest in a Moody's Senior Secured Loan, if not determined pursuant to clause (i) above, if such Collateral Obligation (A) is publicly rated by Moody's, such public rating or (B) is not publicly rated by Moody's but for which a rating or rating estimate has been assigned by Moody's upon the request of the Issuer, the Portfolio Manager or an affiliate of the Portfolio Manager, such rating or the rating estimate, as applicable.

(iii)      With respect to a Collateral Obligation other than a DIP Collateral Obligation, if not determined pursuant to clause (i) or (ii) above, (A) (x) if such Collateral Obligation is publicly rated by Moody's, such public rating or, (y) if no such rating is available, if a rating or rating estimate has been assigned to such Collateral Obligation by Moody's upon the request of the Issuer, the Portfolio Manager or an affiliate of the Portfolio Manager, such rating or, in the case of a rating estimate, the applicable rating estimate for such obligation or (B) if neither clause (A)(x) or (y) is applicable, if the obligor of such Collateral Obligation has one or more senior unsecured obligations publicly rated by Moody's, then the Moody's public rating on any such obligation (or, if the Collateral Obligation is a Moody's Senior Secured Loan, the Moody's rating one subcategory higher than the Moody's public rating on any such senior unsecured obligation) as selected by the Portfolio Manager.

(iv)      With respect to a Collateral Obligation other than a DIP Collateral Obligation, if not determined pursuant to clause (i), (ii) or (iii) above, the Moody's Derived Rating.

(v)      With respect to a DIP Collateral Obligation, the rating assigned by clause (iv)(F) of the Moody's Derived Rating.

For purposes of calculating a Moody's Default Probability Rating, each applicable rating on credit watch by Moody's with positive or negative implication or on negative outlook at the time of calculation will be adjusted in accordance with the Moody's Outlook/Review Rules.

MOODY'S RATING

(i)      With respect to a Collateral Obligation that (A) is publicly rated by Moody's, such public rating or (B) is not publicly rated by Moody's but for which a rating or rating estimate has been assigned by Moody's upon the request of the Issuer, the Portfolio

Manager or an affiliate of the Portfolio Manager, such rating or, in the case of a rating estimate, the applicable rating estimate for such obligation.

(ii)    With respect to a Collateral Obligation that is a Moody's Senior Secured Loan or Participation Interest in a Moody's Senior Secured Loan, if not determined pursuant to clause (i) above, if the obligor of such Collateral Obligation has a corporate family rating by Moody's, then such corporate family rating.

(iii)    With respect to a Collateral Obligation other than a DIP Collateral Obligation, if not determined pursuant to clause (i) or (ii) above, if the obligor of such Collateral Obligation has one or more senior unsecured obligations publicly rated by Moody's, then the Moody's public rating on any such obligation (or, if the Collateral Obligation is a Moody's Senior Secured Loan, the Moody's rating one subcategory higher than the Moody's public rating on any such senior unsecured obligation) as selected by the Portfolio Manager.

(iv)    With respect to a Collateral Obligation other than a DIP Collateral Obligation, if not determined pursuant to clause (i), (ii) or (iii) above, the Moody's Derived Rating.

(v)    With respect to a DIP Collateral Obligation, the facility rating (whether public or private) of such DIP Collateral Obligation rated by Moody's.

For purposes of calculating a Moody's Rating, each applicable rating on credit watch by Moody's with positive or negative implication or on negative outlook at the time of calculation will be adjusted in accordance with the Moody's Outlook/Review Rules.

## MOODY'S DERIVED RATING

With respect to a Collateral Obligation whose Moody's Rating or Moody's Default Probability Rating cannot otherwise be determined pursuant to the definitions thereof, such Moody's Rating or Moody's Default Probability Rating shall be determined as set forth below.

(i)    If the obligor of such Collateral Obligation has a long-term issuer rating by Moody's, then such long-term issuer rating.

(ii)    If not determined pursuant to clause (i) above, if another obligation of the obligor is rated by Moody's, then by adjusting the rating of the related Moody's rated obligations of the related obligor by the number of rating sub-categories according to the table below:

| Obligation Category of Rated Obligation | Rating of Rated Obligation | Number of Subcategories Relative to Rated Obligation Rating |
|---|---|---|
| Senior secured obligation | greater than or equal to B2 | -1 |
| Senior secured obligation | less than B2 | -2 |
| Subordinated obligation | greater than or equal to B3 | +1 |
| Subordinated obligation | less than B3 | 0 |

(iii)     If not determined pursuant to clause (i) or (ii) above, if the obligor of such Collateral Obligation has a corporate family rating by Moody's, then one subcategory below such corporate family rating.

(iv)     If not determined pursuant to clause (i), (ii) or (iii) above, then by using any one of the methods provided below:

(A)     (1) if such Collateral Obligation is publicly rated by S&P:

| Type of Collateral Obligation | Rating by S&P | Collateral Obligation Rated by S&P | Number of Subcategories Relative to Moody's Equivalent of Rating by S&P |
|---|---|---|---|
| Not Structured Finance Obligation | >BBB- | Not a loan or Participation Interest in loan | -1 |
| Not Structured Finance Obligation | <BB+ | Not a loan or Participation Interest in loan | -2 |
| Not Structured Finance Obligation | | loan or Participation Interest in loan | -2 |

(2)     if such Collateral Obligation is not rated by S&P but another security or obligation of the obligor is publicly rated by S&P (a "parallel security"), then the rating of such parallel security will at the election of the Portfolio Manager be determined in accordance with the table set forth in subclause (A)(1) above, and the Moody's Rating or Moody's Default Probability Rating of such Collateral Obligation will be determined in accordance with the methodology set forth in clause (i) above (for such purposes treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (A)(2)); or

(3)     if such Collateral Obligation is not rated by S&P but there is a public issuer credit rating of the issuer of such Collateral Obligation by S&P as published by S&P, or the guarantor which unconditionally and irrevocably guarantees such Collateral Obligation, then such issuer credit rating will at the election of the Portfolio Manager be determined in

accordance with the table set forth in subclause (A)(1) above, and the Moody's Rating or Moody's Default Probability Rating of such Collateral Obligation will be determined in accordance with the methodology set forth in subclause (i) above; or

(4)     if such Collateral Obligation is a DIP Collateral Obligation, no Moody's Rating or Moody's Default Probability Rating may be determined based on a rating by S&P or any other rating agency;

(B)     if such Collateral Obligation is not rated by Moody's or S&P and no other security or obligation of the issuer of such Collateral Obligation is rated by Moody's or S&P, and if Moody's has been requested by the Issuer, the Portfolio Manager or an affiliate of the Portfolio Manager to assign a rating or rating estimate with respect to such Collateral Obligation but such rating or rating estimate has not been received, pending receipt of such estimate, (1) "B3" if the Portfolio Manager certifies to the Trustee (with a copy to the Collateral Administrator) that the Portfolio Manager believes that such estimate will be at least "B3" and if the Aggregate Principal Balance of Collateral Obligations determined pursuant to this clause (B) does not exceed 5% of the Collateral Principal Amount of all Collateral Obligations or (2) otherwise, "Caa1";

(C)     if the obligor of such Collateral Obligation is a U.S. obligor and if such Collateral Obligation is a senior secured obligation of the obligor and (1) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings, (2) no debt securities or obligations of the obligor are in default, (3) neither the obligor nor any of its Affiliates have defaulted on any debt during the past two years, (4) the obligor has been in existence for the past five years, (5) the obligor is current on any cumulative dividends, (6) the fixed-charge ratio for the obligor exceeds 125% for each of the past two fiscal years and for the most recent quarter, (7) the obligor had a net profit before tax in the past fiscal year and the most recent quarter and (8) the annual financial statements of the obligor are unqualified and certified by a firm of Independent accountants of national reputation, and quarterly statements are unaudited but signed by a corporate officer, "Caa1";

(D)     if the obligor of such Collateral Obligation is a U.S. obligor and if such Collateral Obligation is a senior secured or senior unsecured obligation of the obligor and (1) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings and (2) no debt security or obligation of the obligor has been in default during the past two years, "Caa3";

(E)     if a debt security or obligation of the obligor has been in default during the past two years, "Ca"; or

(F)     with respect to any DIP Collateral Obligation, one subcategory below the facility rating (whether public or private) of such DIP Collateral Obligation rated by Moody's.

For purposes of calculating a Moody's Derived Rating, each applicable rating calculated pursuant to clause (iv)(A)(1), (2) or (3) above using an S&P rating that is on credit watch by S&P with positive or negative implication or on negative outlook at the time of calculation will be adjusted in accordance with the Moody's Outlook/Review Rules, after giving effect to the determination of the rating in accordance with the provisions above.

With respect to rating estimates in the definition of Moody's Default Probability Rating, Moody's Rating and Moody's Derived Rating, if there is a Material Change with respect to such Collateral Obligation, the Issuer, or the Portfolio Manager on behalf of the Issuer, shall, upon notice or knowledge thereof, notify Moody's and provide available information with respect thereto. Moody's, in its sole discretion, may update its rating estimate of such Collateral Obligation; provided, that, such update shall not, unless so requested by the Issuer, be considered (x) a request for a credit estimate by the Issuer in accordance with or (y) in determining whether or not the Issuer has complied with, in each case, the annual credit estimate requirements set forth in this Indenture. Subject to the following paragraph, in the event Moody's updates the credit estimate of a Collateral Obligation pursuant to the previous sentence, such credit estimate will be used by the Issuer until such later date that it is updated by Moody's.

For purposes of the definitions of Moody's Default Probability Rating, Moody's Derived Rating and Moody's Rating, any credit estimate assigned by Moody's may be used for thirteen months from the date such estimate was issued by Moody's; provided, that, for purposes of any calculation under this Indenture, if Moody's fails to renew for any reason a credit estimate for a previously acquired Collateral Obligation thereunder on or before such thirteen month anniversary, then (1) before the fifteen month anniversary of such credit estimate, the Issuer shall downgrade such credit estimate by one sub-category, and use such downgraded credit estimate and (2) after the fifteen month anniversary of such credit estimate, such Collateral Obligation will be deemed to have a Moody's Rating of "Caa3".

## MOODY'S SENIOR SECURED LOAN

(a)     A loan that:

(i)     is not (and cannot by its terms become) subordinate in right of payment to any other debt obligation of the Obligor of the loan;

(ii)     is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the Obligor's obligations under the loan; and

(iii)     the value of the collateral securing the loan together with other attributes of the Obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral);

or

(b)      a loan that:

(i)      is not (and cannot by its terms become) subordinate in right of payment to any other debt obligation of the Obligor of the loan, except that such loan can be subordinate with respect to the liquidation of such obligor or the collateral for such loan;

(ii)      with respect to such liquidation, is secured by a valid perfected security interest or lien that is not a first priority in, to or on specified collateral securing the Obligor's obligations under the loan;

(iii)      the value of the collateral securing the loan together with other attributes of the Obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the loan in accordance with its terms and to repay all other loans of equal or higher seniority secured in the same collateral); and

(iv)      has a Moody's Rating determined pursuant to clause (i) of the definition thereof and such Moody's Rating is not lower than the loan's Moody's corporate family rating;

(c)      and the loan is not:

(i)      a DIP Collateral Obligation; or

(ii)      a loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof.

<u>SCHEDULE 6</u>

CERTIFICATE OF ISSUER REGARDING ACCOUNTANTS' REPORTS AND
<u>CERTIFICATES</u>
Section 10.9(d)

Pursuant to <u>Section 10.9(d)</u> of the Indenture, dated as of March 18, 2013 among Acis CLO 2013-1 Ltd., as Issuer, Acis CLO 2013-1 LLC, as Co-Issuer and U.S. Bank National Association, as Trustee, the undersigned, Acis CLO 2013-1 Ltd. does hereby certify that it has received a statement from a firm of Independent certified public accountants indicating that:

1.      Such firm has reviewed each Distribution Report received since the last review and applicable information from the Trustee, including a complete and accurate electronic data file, a copy of the applicable Distribution Report and any assumptions needed to complete their procedures.

2.      The calculations (other than the S&P CDO Monitor Test) within the Distribution Reports dated [   ], [   ], [   ] and [   ] have been performed in accordance with the applicable provisions of the Indenture, except as noted in <u>Exhibit A</u> to this certificate.

3.      The Aggregate Principal Balance of the Pledged Obligations and the Aggregate Principal Balance of the Collateral Obligations securing the Secured Notes as of [   ], [   ], [   ] and [   ] were as follows:

<u>Aggregate Principal Balance of the Pledged Obligations</u>

[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX

<u>Aggregate Principal Balance of the Collateral Obligations</u>

[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX
[   ]$ XXX,XXX,XXX

The information and/or procedures not contained in the engagement letter between the Issuer and the firm of Independent certified public accountants are set forth in <u>Exhibit B</u> to this certificate and provided to the firm of Independent certified public accountants by the Portfolio Manager.

Dated: [   ]

ACIS CLO 2013-1 LTD.

By: _____

Name:
Title:  Authorized Person

<u>SCHEDULE 7</u>

## <u>ADDITIONAL REPORT RECIPIENTS</u>

N/A.

<u>EXHIBIT A</u>

ACIS CLO 2013-1 LTD.
<u>DISTRIBUTION REPORT EXCEPTIONS</u>

| **Description** | **Report Date** | **Dist Rpt Value** | **Accountant Value** | **Notes** |
| --- | --- | --- | --- | --- |

ACIS CLO 2013-1 LTD.
PORTFOLIO MANAGER INFORMATION/PROCEDURES

| **Description** | **Report Date** | **Notes** |
| --- | --- | --- |

<u>CERTIFICATE OF ACIS CLO 2013-1 LTD.</u>
Section [3.1(a)(xiv)][3.2(vi)][7.18(c)][12.1(e)]

Pursuant to <u>Section</u> [<u>3.1(a)(xiv)</u>][<u>3.2(vi)</u>][<u>7.18(c)</u>][<u>12.1(e)</u>] of the Indenture, dated as of March 18, 2013 among Acis CLO 2013-1 Ltd., as Issuer, Acis CLO 2013-1 LLC, as Co-Issuer and U.S. Bank National Association, as Trustee, the undersigned, Acis CLO 2013-1 Ltd., does hereby certify that it has received an [Accountants' Report][report] from a firm of Independent certified public accountants:

[Applicable to <u>Section 3.1(a)(xiv)</u> certificates]

[    (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation set forth on the Schedule of Collateral Obligations attached to the Indenture as <u>Schedule 1</u> and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to the sources specified therein, except as specified in <u>Exhibit A</u> hereto,

(B) confirming that the Aggregate Principal Balance of the Collateral Obligations which the Issuer has purchased or entered into binding agreements to purchase on or about the Closing Date is at least $[          ]; and

(C) specifying the procedures undertaken by them to review data and computations relating to the above referenced statement]

[Applicable to <u>Section 3.2(vi)</u> certificates]

[    (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation pledged in connection with the issuance of the Additional Subordinated Notes and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to the sources specified therein, except as specified in <u>Exhibit A</u> hereto,

(B) [Applicable if the issuance of Additional Subordinated Notes occurs after the Ramp-up Period] confirming that after giving effect to such pledge and the issuance of the Additional Subordinated Notes (1) the Coverage Tests are met, (2) in the aggregate, the Collateral Obligations comply with all of the requirements set forth in the Concentration Limitations and (3) the Collateral Quality Test (excluding the S&P CDO Monitor Test) is met, except as specified in <u>Exhibit A</u> hereto; and

(C) specifying the procedures undertaken by them to review data and computations relating to the above referenced statement.]

[Applicable to <u>Section 7.18(c)</u> certificates]

[    (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with

respect to each Collateral Obligation as of the end of the Ramp-up Period and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to such sources as shall be specified therein, except as specified in <u>Exhibit A</u> hereto; ]

[ (B) confirming that as of the end of the Ramp-up Period (1) the Overcollateralization Ratio Tests were met, (2) the Collateral Obligations complied with all of the requirements of the Concentration Limitations, (3) the Collateral Quality Test (excluding the S&P CDO Monitor Test) was met, (4) the Effective Date Overcollateralization Test is satisfied and (5) the Target Initial Par Condition is satisfied, except as specified in <u>Exhibit A</u> hereto; and ]

[ (C) specifying the procedures undertaken by them to review data and computations relating to above referenced Accountants' Report]

[Applicable to <u>Section 12.1(e)</u> certificates]

[confirmed the calculations contained in the certificate furnished by the Portfolio Manager pursuant to <u>Section 9.3(c)</u>, except as otherwise specified in <u>Exhibit A</u> hereto]

[Applicable to all certificates]

The information and/or procedures not contained in the engagement letter between the Issuer and the firm of Independent certified public accountants are set forth in <u>Exhibit B</u> to this certificate and provided to the firm of Independent certified public accountants by the Portfolio Manager.

Dated: [    ], [   ]

ACIS CLO 2013-1 LTD.


By: _____
        Name:
        Title:  Authorized Person

<u>EXHIBIT A</u>

ACIS CLO 2013-1 LTD.
<u>ACCOUNTANTS' CERTIFICATE EXCEPTIONS</u>

| **Description** | **Issuer Value** | **Accountant Value** | **Notes** |
|---|---|---|---|

<u>EXHIBIT B</u>

ACIS CLO 2013-1 LTD.
<u>PORTFOLIO MANAGER INFORMATION/PROCEDURES</u>

| **<u>Description</u>** | **<u>Report Date</u>** | **<u>Notes</u>** |
| --- | --- | --- |

<u>EXHIBIT A</u>

<u>FORMS OF NOTES</u>

Exhibit B

<div align="right">EXHIBIT A1</div>

<div align="center">

FORM OF GLOBAL NOTE

[RULE 144A GLOBAL NOTE][REGULATION S GLOBAL SECURED NOTE]
representing
CLASS [X][A-1][A-2A][A-2B][B][C][D][E][F] [SENIOR][MEZZANINE][JUNIOR]
SECURED
[DEFERRABLE] FLOATING RATE NOTES DUE 2024

</div>

[This Note has not been and will not be registered under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (A) to a "<u>Qualified Institutional Buyer</u>" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such plan, if investment decisions with respect to the plan are made by the beneficiaries of the plan or (B) to a person that is not a "<u>U.S. person</u>" (as defined in Regulation S under the Securities Act) and is acquiring this Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in this Note that is a U.S. person and is not a Qualified Purchaser and a Qualified Institutional Buyer to sell its interest in the Notes, or may sell such interest on behalf of such owner.][1]

[This Note has not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (a) (x) a "<u>Qualified Institutional Buyer</u>" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such a plan, if investment decisions with respect to the plan are made by the beneficiaries of the plan or (y) an "institutional" accredited investor (an entity defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) that is a "Qualified Purchaser" (as defined for purposes of Section 3(c)(7) of the Investment Company Act) or (b) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an

---

[1] Include for Class X, A, B, C and D Notes.

interest in this Note that is a U.S. person and does not comply with the foregoing restrictions to sell its interest in the Notes, or may sell such interest on behalf of such owner.][2]

[By its acquisition of Co-Issued Notes (the "ERISA Debt Securities"), each purchaser and subsequent transferee will be deemed to have represented and warranted or required to represent and warrant, as applicable, at the time of its acquisition and throughout the period it holds such ERISA Debt Security, that either (x) it is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (y) its acquisition, holding and disposition of the ERISA Debt Security will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law). Any purported transfer of an ERISA Debt Security, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void ab initio.][3]

[Each purchaser and each subsequent transferee of this Note will be deemed to have represented and warranted, at the time of its acquisition and throughout the period that it holds such Note or any interest herein, that (1) it is not an "employee benefit plan" (as defined in Section 3(3) of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity or a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA (collectively, "benefit plan investors") and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of this Note will not constitute or result in a non-exempt violation under any such substantially similar law. Any purported transfer of this Note, or any interest therein to a purchaser or transferee that does not comply with the requirements specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void ab initio.][4]

---

[2] Include for Class E Notes and Class F Notes.
[3] Applicable only to the Co-Issued Notes.
[4] Applicable only to the Class E Notes and Class F Notes.

Any transfer, pledge or other use of this Note for value or otherwise by or to any person is wrongful since the registered owner hereof, Cede & Co., has an interest herein, unless the Note is presented by an authorized representative of the Depository Trust Company ("DTC"), New York, New York, to the Co-Issuers or their agent for registration of transfer, exchange or payment and any Note issued is registered in the name of Cede & Co., or of such other entity as is requested by an authorized representative of DTC (and any payment hereon is made to Cede & Co.).

Transfers of this Note shall be limited to transfers in whole, but not in part, to nominees of DTC or to a successor thereof or such successor's nominee and transfers of portions of this Note shall be limited to transfers made in accordance with the restrictions set forth in the Indenture referred to herein.

Principal of this Note is payable as set forth herein. Accordingly, the outstanding principal of this Note at any time may be less than the amount shown on the face hereof. Any person acquiring this Note may ascertain its current principal amount by inquiry of the Trustee.

The failure to provide the Issuer, the Trustee and any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986 (the "Code") or an appropriate Internal Revenue Service form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code or the Holder FATCA Information) may result in the imposition of U.S. federal withholding tax or back-up withholding tax upon payments to the holder in respect of this Note.

The failure to provide the Issuer, the Trustee and any Paying Agent with any information reasonably requested by the Issuer or the Paying Agent to enable the Issuer or Paying Agent to comply with any reporting agreements with the IRS may result in the imposition of U.S. federal withholding upon payments to the holder in respect of this Note (and may cause the forced sale or transfer of such Note).

Each holder and beneficial owner of this Note (including a holder or beneficial owner of this Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of this Note if such holder or beneficial owner fails to sell its Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to the Indenture to enable the Issuer to comply with FATCA. A clearing organization that holds this Note on behalf of a beneficial owner may convert this Note from a Global Note to a definitive physical Note, upon request from such beneficial owner or the holder of this Note, if it is unable to obtain the Holder FATCA Information from such beneficial owner or the holder of this Note.

Each Holder and beneficial owner of this Note, by acceptance of such Note, or its interest in such Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Note as debt for U.S. federal income tax purposes.

[The Class [●] Notes represented by this certificate are being issued with original issue discount ("OID"), the issue price, total amount of OID, Issue Date and yield to maturity may be obtained by contacting the Trustee at 190 South LaSalle, Chicago, Illinois 60603.][5]

Each holder and beneficial owner of this Note that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) will make, or by acquiring such Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(a) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

Each holder and beneficial owner of this Note will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each holder and beneficial owner of this Note understands that the foregoing restrictions are a material inducement for each other holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

---

[5] Legend to be included for any Secured Notes treated as issued with OID.

ACIS CLO 2013-1 LTD.
ACIS CLO 2013-1 LLC

[RULE 144A GLOBAL NOTE][REGULATION S GLOBAL SECURED NOTE]
representing
CLASS [X][A-1][A-2A][A-2B][B][C][D]|E] [SENIOR] [MEZZANINE] [JUNIOR] SECURED
[DEFERRABLE]
<u>FLOATING RATE NOTES DUE 2024</u>

Up to U.S.$[__]

[R][S]-1
CUSIP No. [__]
[ISIN [__]]

   ACIS CLO 2013-1 LTD., a company incorporated under the laws of the Cayman Islands (the "<u>Issuer</u>")[, and ACIS CLO 2013-1 LLC, a Delaware limited liability company (the "<u>Co-Issuer</u>" and, together with the Issuer, the "<u>Co-Issuers</u>")], for value received, hereby promise[s] to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on <u>Schedule A</u> on the Payment Date in April 2024 (the "<u>Stated Maturity</u>") except as provided below and in the Indenture. The obligations of the [Co-Issuers][Issuer] under this Note and the Indenture are limited recourse obligations of the [Co-Issuers][Issuer] payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.

   The [Co-Issuers promise] [Issuer promises] to pay interest, if any, on the 18th day of January, April, July and October in each year; commencing on July 18, 2013 (or if such day is not a Business Day, the next succeeding Business Day), at the rate equal to LIBOR plus [●]% per annum on the unpaid principal amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

   Interest will cease to accrue on each Class [X][A-1][A-2A][A-2B][B][C][D][E][F]Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a default is otherwise made with respect to such payments. The principal of this Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class [[X][A-1][A-2A][A-2B][B][C][D][E][F] Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

[Any interest on the Class [C][D][E][F] Notes that is not paid when due by operation of the Priority of Payments will be deferred. Any interest so deferred will be added to the principal balance of the Class [C][D][E][F] Notes, and thereafter, interest will accrue on the aggregate outstanding principal amount of the Class [C][D][E][F] Notes, as so increased.][6]

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class [X][A-1][A-2A][A-2B][B][C][D][E][F] [Senior][Mezzanine][Junior] Secured [Deferrable] Floating Rate Notes due 2024 (the "Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of March 18, 2013 (the "Indenture") among the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

Transfers of this [Rule 144A Global Note][Regulation S Global Secured Note] shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of DTC or to a successor of DTC or such successor's nominee.

Interests in this [Rule 144A Global Note][Regulation S Global Secured Note] will be transferable in accordance with DTC's rules and procedures in use at such time, as set forth in the Indenture.

In the event Coverage Tests (other than the Interest Reinvestment Test) are not satisfied on any Determination Date occurring subsequent to the Ramp-up Period or the Interest Reinvestment Test is not satisfied on any Determination Date during the Reinvestment Period, or an Optional Redemption, a Refinancing, a Special Redemption or a Clean-Up Call Redemption occurs as set forth in the Indenture, this Note may be redeemed in whole or in part (as applicable) in the manner and with the effect provided in the Indenture.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

---

[6] Applicable only to Class C Notes, Class D Notes, Class E Notes and Class F Notes.

If an Event of Default shall occur and be continuing, the Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A Global Note][Regulation S Global Secured Note] may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S Global Note][Rule 144A Global Note] subject to the restrictions as set forth in the Indenture. This [Rule 144A Global Note][Regulation S Global Secured Note] is subject to mandatory exchange for Certificated Secured Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A Global Note] [Regulation S Global Secured Note], this [Rule 144A Global Note][Regulation S Global Secured Note] shall be endorsed on <u>Schedule A</u> hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

[The Class [X][A-2A][A-2B][D][E] Notes will be issued in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof.] [The Class [A-1][B][C][F] Notes will be issued in minimum denominations of $150,000 and integral multiples of $1 in excess thereof.]

Title to Notes shall pass by registration in the Note Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the [Co-Issuers have][Issuer has] caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2013-1 LTD.


By:_____
   Name:
   Title:



ACIS CLO 2013-1 LLC


By:_____
   Name:  Donald J. Puglisi
   Title:  President

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION,
  as Trustee


By:_____
  Authorized Signatory

## SCHEDULE A

## SCHEDULE OF EXCHANGES OR REDEMPTIONS

The following exchanges, redemptions of or increase in the whole or a part of the Notes represented by this [Rule 144A Global Note][Regulation S Global Secured Note] have been made:

| Date exchange/redemption /increase made | Original principal amount of this Global Note | Part of principal amount of this Global Note exchanged/redeemed /increased | Remaining principal amount of this Global Note following such exchange/redemption /increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| [___] | $[  ] | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

<u>EXHIBIT A2</u>

<u>FORM OF REGULATION S GLOBAL SUBORDINATED NOTE</u>

REGULATION S GLOBAL SUBORDINATED NOTE
representing

SUBORDINATED NOTES DUE 2024

 This Subordinated Note has not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (a) (1) to a "<u>Qualified Purchaser</u>" (as defined for purposes of Section 3(c)(7) of the Investment Company Act), a Knowledgeable Employee (as defined in Rule 3c-5 under the Investment Company Act of 1940, as amended) with respect to the Issuer or an entity exclusively owned by Knowledgeable Employees and/or Qualified Purchasers that is (2) (x) a "<u>Qualified Institutional Buyer</u>" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule or (y) an accredited investor (as defined in rule 501(a) under the Securities Act) who, if not an "institutional" accredited investor (an entity defined in rule 501(a)(1), (2), (3) or (7) under the Securities Act), is a Knowledgeable Employee with respect to the Issuer or (b) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Subordinated Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any-beneficial owner of an interest in this Subordinated Note that is a U.S. person and does not comply with the foregoing restrictions to sell its interest in the Subordinated Notes, or may sell such interest on behalf of such owner.

 Each purchaser of this Subordinated Note from the Issuer in the initial offering will be required to represent and warrant, with respect to each day it holds the Subordinated Note or any beneficial interest therein, in the form specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, (unless otherwise agreed to by the Issuer) (1) whether or not it is (a) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), that is subject to Section 4975 of the Code, any entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity or a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA (collectively, "<u>Benefit Plan Investors</u>") or (b) a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the Issuer or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person (a "<u>Controlling Person</u>") and (2) (a) if it is a Benefit Plan Investor, its acquisition, holding and disposition of a Subordinated Note will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if it is a governmental, church, non-U.S. or other plan which is

subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of a Subordinated Note will not constitute or result in a non-exempt violation under any such substantially similar law.  Each purchaser from the Issuer in the initial offering of a Subordinated Note that fails to provide the certification described in the prior sentence will be deemed to have represented and warranted, with respect to each day it holds such Subordinated Note or any beneficial interest therein, that (1) such purchaser is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law.  No transfer or purchase of this Subordinated Note will be effective if it would cause 25% or more of the value of the Subordinated Notes to be held by Benefit Plan Investors.  Each purchaser or transferee of this Subordinated Note from persons other than from the Issuer in the initial offering will be deemed to have represented and warranted with respect to each day it holds such Regulation S Subordinated Global Note or any beneficial interest herein that (1) such purchaser or transferee is not a Benefit Plan Investor or Controlling Person and (2) if such purchaser or transferee is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of Regulation S Global Subordinated Note will not constitute or result in a non-exempt violation under any such substantially similar law.  No Regulation S Global Subordinated Notes may be acquired from persons other than the Issuer or other than in the initial offering by Benefit Plan Investors or Controlling Persons.  Each purchaser and transferee further understands and agrees that any purported transfer of the Subordinated Notes, or any interest therein, to a purchaser or transferee that does not comply with the requirements as specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect, shall be null and void ab initio and the Issuer will have the right to direct the purchaser to transfer the Subordinated Notes, or any interest therein, as applicable, to a person who meets the foregoing criteria.

Any transfer, pledge or other use of this Note for value or otherwise by or to any person is wrongful since the registered owner hereof.  Cede & Co., has an interest herein, unless the Note is presented by an authorized representative of the Depository Trust Company ("DTC").  New York, New York, to the Co-Issuers or their agent for registration of transfer, exchange or payment and any Note issued is registered in the name of Cede & Co. or of such other entity as is requested by an authorized representative of DTC (and any payment hereon is made to Cede & Co.)

Transfers of this Note shall be limited to transfers in whole, but not in part, to nominees of DTC or to a successor thereof or such successor's nominee and transfers of portions of this Note shall be limited to transfers made in accordance with the restrictions set forth in the Indenture referred to herein.

Distributions of Principal Proceeds and Interest Proceeds to the holder of the Subordinated Notes represented hereby are subordinate to the payment on each Payment Date of

principal of and interest on the Secured Notes of the Issuer and the payment of certain other amounts, to the extent and as described in the Indenture governing such Secured Notes.

The failure to provide the Issuer, the Trustee and any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an appropriate Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code or the Holder FATCA Information) may result in the imposition of U.S. federal withholding tax or backup withholding tax upon payments to the holder in respect of this Subordinated Note.

The failure to provide the Issuer, the Trustee and any Paying Agent with any information reasonably requested by the Issuer or the Paying Agent to enable the Issuer or Paying Agent to comply with any reporting agreements with the IRS may result in the imposition of U.S. federal withholding upon payments to the holder in respect of this Note (and may cause the forced sale or transfer of such Note).

Each holder and beneficial owner of this Note (including a holder or beneficial owner of this Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, and the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of this Note if such holder or beneficial owner fails to sell its Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to the Indenture to enable the Issuer to comply with FATCA. A clearing organization that holds this Note on behalf of a beneficial owner may convert this Note from a Global Note to a definitive physical Note, upon request from such beneficial owner or the holder of this Note, if it is unable to obtain the Holder FATCA Information from such beneficial owner or the holder of this Note.

Each Holder and beneficial owner of this Note, by acceptance of such Note, or its interest in such Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Note as equity for U.S. federal income tax purposes.

Each holder and beneficial owner of this Note that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) will make, or by acquiring such Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(a) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

Each holder and beneficial owner of this Note will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each holder and beneficial owner of this Note understands that the foregoing restrictions are a material inducement for each other holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

## ACIS CLO 2013-1 LTD.

REGULATION S GLOBAL SUBORDINATED NOTE
representing
SUBORDINATED NOTES DUE 2024

S-1
CUSIP No. [__]                                                              Up to US.$[__]
ISIN:  [__]
Common Code:  [__]

ACIS CLO 2013-1 LTD., a company incorporated under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to CEDE & CO., or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on Schedule A on the Payment Date in April 2024 (the "Stated Maturity") except as provided below and in the Indenture.

The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.  The Subordinated Notes represent unsecured, subordinated obligations of the Issuer and are not entitled to security under the Indenture.

The principal of each Subordinated Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Payments of Interest Proceeds and Principal Proceeds to the Holders of the Subordinated Notes are subordinated to payments in respect of other classes of Notes as set forth in the Indenture and failure to pay such amounts will not constitute an Event of Default under the Indenture.

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Subordinated Notes due 2024 (the "Subordinated Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of March 18, 2013 (the "Indenture") among the Issuer, Acis CLO 2013-1 LLC and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture).  Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes.  In addition, this Note is redeemable at the option of the Co-Issuers acting at the direction of the Portfolio Manager, in whole but not in part, on or after the Payment Date on which the Aggregate Principal Amount of the Collateral Obligations and Eligible Investments has been reduced to 15% or less of the Target Initial Par Amount.

Transfers of this Regulation S Global Subordinated Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee.

Interests in this Regulation S Global Subordinated Note will be transferable in accordance with the DTC's rules and procedures in use at such time, and to transferees acquiring Certificated Subordinated Notes or to a transferee taking an interest in a Regulation S Global Subordinated Note, subject to and in accordance with the restrictions set forth in the Indenture.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary.

Interests in this Regulation S Global Subordinated Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding Certificated Subordinated Note, subject to the restrictions as set forth in the Indenture.  This Regulation S Global Subordinated Note is subject to mandatory exchange for Certificated Subordinated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this Regulation S Global Subordinated Note, this Regulation S Global Subordinated Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Subordinated Notes will be issued in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof (except that up to 20 Certificated Subordinated Notes sold to U.S. persons that the Portfolio Manager has determined are Knowledgeable Employees may be issued in minimum denominations of $50,000).

Title to Notes shall pass by registration in the Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2013-1 LTD.

By:_____
   Name:
   Title:

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION,
   as Trustee


By:_____
   Authorized Signatory

## SCHEDULE A

## SCHEDULE OF EXCHANGES OR REDEMPTIONS

The following exchanges, redemptions of or increase in the whole or a part of the Notes represented by this Regulation S Global Subordinated Note have been made:

| Date exchange/redemption /increase made | Original principal amount of this Regulation S Global Subordinated Note | Part of principal amount of this Regulation S Global Subordinated Note exchanged/re deemed /increased | Remaining principal amount of this Regulation S Global Subordinated Note following such exchange/redemption /increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| [__] | $[__] | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

<u>EXHIBIT A3</u>

FORM OF CERTIFICATED SUBORDINATED NOTE

CERTIFICATED SUBORDINATED NOTE
representing,

SUBORDINATED NOTES DUE 2024

This Subordinated Note has not been and will not be registered under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (a)(1) to a "<u>Qualified Purchaser</u>" (as defined for purposes of Section 3(c)(7) of the Investment Company Act), a Knowledgeable Employee with respect to the Issuer or an entity exclusively owned by Knowledgeable Employees and/or Qualified Purchasers that is (2) (x) a "<u>Qualified Institutional Buyer</u>" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule or (y) an accredited investor (as defined in rule 501(a) under the Securities Act) who, if not an "institutional" accredited investor (an entity defined in rule 501(a)(1), (2), (3) or (7) under the Securities Act), is a Knowledgeable Employee with respect to the Issuer or (b) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Subordinated Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in this Subordinated Note that is a U.S. person and does not comply with the foregoing restrictions to sell its interest in the Subordinated Notes, or may sell such interest on behalf of such owner.

Each purchaser of a Certificated Subordinated Note and each subsequent transferee will be required to represent and warrant, in the form specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, with respect to each day it holds such Certificated Subordinated Note or any beneficial interest herein, (1) whether or not it is (a) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), that is subject to Section 4975 of the Code, any entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity or a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA (collectively, "<u>Benefit Plan Investors</u>") or (b) a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the Issuer or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person (a "<u>Controlling Person</u>") and (2) (a) if it is a Benefit Plan Investor, its acquisition, holding and disposition of a Certificated Subordinated Note will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if it is a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of

Exhibit B

Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of a Certificated Subordinated Note will not constitute or result in a non-exempt violation under any such substantially similar law. No purchase or transfer of a Certificated Subordinated Note will be effective if it would cause 25% or more of the value of the Subordinated Notes to be held by Benefit Plan Investors. Each purchaser and transferee further understands and agrees that any purported transfer of the Certificated Subordinated Notes, or any interest therein, to a purchaser or transferee that does not comply with the requirements as specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect, shall be null and void <u>ab initio</u>, and the Issuer will have the right to direct the purchaser to transfer the Certificated Subordinated Notes, or any interest therein, as applicable, to a person who meets the foregoing criteria.

Distributions of Principal Proceeds and Interest Proceeds to the holder of the Subordinated Notes represented hereby are subordinate to the payment on each Payment Date of principal of and interest on the Secured Notes of the Issuer and the payment of certain other amounts, to the extent and as described in the Indenture governing such Secured Notes.

The failure to provide the Issuer, the Trustee and any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an appropriate Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code or the Holder FATCA Information) may result in the imposition of U.S. federal withholding tax or backup withholding tax upon payments to the holder in respect of this Subordinated Note.

The failure to provide the Issuer, the Trustee and any Paying Agent with any information reasonably requested by the Issuer or the Paying Agent to enable the Issuer or Paying Agent to comply with any reporting agreements with the U.S. Internal Revenue Service may result in the imposition of U.S. federal withholding upon payments to the holder in respect of this Note (and may cause the forced sale or transfer of such Note).

Each holder and beneficial owner of this Certificated Subordinated Note (including a holder or beneficial owner of this Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, and the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of this Certificated Subordinated Note if such holder or beneficial owner fails to sell its Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to the Indenture to enable the Issuer to comply with FATCA.

Each Holder and beneficial owner of this Note, by acceptance of such Note, or its interest in such Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Note as equity for U.S. federal income tax purposes.

Each holder and beneficial owner of this Certificated Subordinated Note that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code will make, or by acquiring such Certificated Subordinated Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (as defined in Section 881(c)(3)(a) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it is not purchasing the Certificated Subordinated Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

Each holder and beneficial owner of this Note will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each holder and beneficial owner of this Note understands that the foregoing restrictions are a material inducement for each other holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

### ACIS CLO 2013-1 LTD.

CERTIFICATED SUBORDINATED NOTE
representing

SUBORDINATED NOTES DUE 2024

C-[__]
CUSIP No. [__]                                                                        U.S.$[__]

ACIS CLO 2013-1 LTD., a company incorporated under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to [_____], or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$ [_____]) on the Payment Date in April 2024 (the "Stated Maturity") except as provided below and in the Indenture.

The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. The Subordinated Notes represent unsecured, subordinated obligations of the Issuer and are not entitled to security under the Indenture.

The principal of each Subordinated Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Payments of Interest Proceeds and Principal Proceeds to the Holders of the Subordinated Notes are subordinated to payments in respect of other classes of Notes as set forth in the Indenture and failure to pay such amounts will not constitute an Event of Default under the Indenture.

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Subordinated Notes due 2024 (the "Subordinated Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of March 18, 2013 (the "Indenture") among the Issuer, Acis CLO 2013-1 LLC and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes.  In addition, this Note is redeemable at the option of the Co-Issuers acting at the direction of the Portfolio Manager, in whole but not in part, on or after the Payment Date on which the aggregate principal balance of the Collateral Obligations and Eligible Investments has been reduced to 15% or less of the Target Initial Par Amount.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary

Interests in this Certificated Subordinated Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding Regulation S Global Subordinated Note, subject to the restrictions as set forth in the Indenture.

The Subordinated Notes will be issued in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof (except that up to 20 Certificated Subordinated Notes sold to U.S. persons that the Portfolio Manager has determined are Knowledgeable Employees may be issued in minimum denominations of $50,000).

Title to Notes shall pass by registration in the Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed. Dated as of _____.

ACIS CLO 2013-1 LTD.

By:_____
   Name:
   Title:

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION, as
    Trustee

By:_____
    Authorized Signatory

## ASSIGNMENT FORM

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Note and docs hereby irrevocably constitute and appoint
_____ Attorney to transfer the Note on the books of the Trustee with
full power of substitution in the premises.

Date: _____     Your Signature* _____

(Sign exactly as your name appears
in the security)

\* NOTE:  The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular without alteration, enlargement or any change whatsoever.  *Such signature must be guaranteed by an "eligible guarantor institution" "meeting the requirements of the Note Registrar, which requirements include membership or participation in Securities Transfer Agents Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.*

<div align="right">

EXHIBIT A4

</div>

<div align="center">

FORM OF CERTIFICATED SECURED NOTE

CERTIFICATED SECURED NOTE
representing
CLASS [X][A-1][A-2A][A-2B][B][C][D][E][F] [SENIOR][MEZZANINE][JUNIOR]
SECURED
[DEFERRABLE] FLOATING RATE NOTES DUE 2024

</div>

[This Note has not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (A) to a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such plan, if investment decisions with respect to the plan are made by the beneficiaries of the plan or (B) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in this Note that is a U.S. person and is not a Qualified Purchaser and a Qualified Institutional Buyer to sell its interest in the Notes, or may sell such interest on behalf of such owner.][7]

[This Note has not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (a) (x) to a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such plan, if investment decisions with respect to the plan are made by the beneficiaries of the plan or (y) an "institutional" accredited investor (as defined in rule 501(a)(1), (2), (3) or (7) under the Securities Act) that is a "Qualified Purchaser" (as defined for purposes of Section 3(c)(7) of the Investment Company Act) or (b) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in this

---

[7] Include for Class X, A, B, C and D Notes.

Note that is a U.S. person and does not comply with the foregoing restrictions to sell its interest in the Notes, or may sell such interest on behalf of such owner.][8]

[By its acquisition of the Notes (the "ERISA Debt Securities"), each purchaser and subsequent transferee will be deemed to have represented and warranted or required to represent and warrant, as applicable, at the time of its acquisition and throughout the period it holds such ERISA Debt Security, that either (x) it is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (y) its acquisition, holding and disposition of the ERISA Debt Security will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law).  Any purported transfer of an ERISA Debt Security, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void ab initio.][9]

[Each purchaser and each subsequent transferee of this Note will be deemed to have represented and warranted, at the time of its acquisition and throughout the period that it holds such Note or any interest herein, that (1) it is not an "employee benefit plan" (as defined in Section 3(3) of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity or a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA (collectively, "benefit plan investors") and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of this Note will not constitute or result in a non-exempt violation under any such substantially similar law.  Any purported transfer of this Note, or any interest therein to a purchaser or transferee that does not comply with the requirements specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void ab initio.][10]

---

[8] Include for Class E Notes and Class F Notes.
[9] Applicable only to the Co-Issued Notes.
[10] Applicable only to the Class E Notes and Class F Notes.

Principal of this Note is payable as set forth herein. Accordingly, the outstanding principal of this Note at any time may be less than the amount shown on the face hereof. Any person acquiring this Note may ascertain its current principal amount by inquiry of the Trustee.

The failure to provide the Issuer, the Trustee and any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986 (the "Code") or an appropriate Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code or the Holder FATCA Information) may result in the imposition of U.S. federal withholding tax or back-up withholding tax upon payments to the holder in respect of this Note.

The failure to provide the Issuer, the Trustee and any Paying Agent with any information reasonably requested by the Issuer or the Paying Agent to enable the Issuer or Paying Agent to comply with any reporting agreements with the U.S. Internal Revenue Service may result in the imposition of U.S. federal withholding upon payments to the holder in respect of this Note (and may cause the forced sale or transfer of such Note).

Each holder and beneficial owner of this Note (including a holder or beneficial owner of this Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of this Note if such holder or beneficial owner fails to sell its Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to the Indenture to enable the Issuer to comply with FATCA. A clearing organization that holds this Note on behalf of a beneficial owner may convert this Note from a Global Note to a definitive physical Note, upon request from such beneficial owner or the holder of this Note, if it is unable to obtain the Holder FATCA Information from such beneficial owner or the holder of this Note.

Each Holder and beneficial owner of this Note, by acceptance of such Note, or its interest in such Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Note as debt for U.S. federal income tax purposes.

[The Class [●] Notes represented by this certificate are being issued with original issue discount ("OID"), the issue price, total amount of OID, Issue Date and yield to maturity may be obtained by contacting the Trustee at 190 South LaSalle, Chicago, Illinois 60603.][11]

Each holder and beneficial owner of this Note that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) will make, or by acquiring such Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the

---

[11] Legend to be included for any Secured Notes treated as issued with OID.

ordinary course of its trade or business (within the meaning of Section 881(c)(3)(a) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

Each holder and beneficial owner of this Note will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each holder and beneficial owner of this Note understands that the foregoing restrictions are a material inducement for each other holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

ACIS CLO 2013-1 LTD.
ACIS CLO 2013-1 LLC

CERTIFICATED SECURED NOTE
representing
CLASS [X][A-1][A-2A][A-2B][B][C][D][E][F] [SENIOR][MEZZANINE][JUNIOR]
SECURED
[DEFERRABLE] FLOATING RATE NOTES DUE 2024

U.S.$[__]

C-[__]
CUSIP No. [__]
ISIN[__]

ACIS CLO 2013-1 LTD., a company incorporated under the laws of the Cayman Islands (the "Issuer")[, and ACIS CLO 2013-1 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers")], for value received, hereby promises] to pay to [_____] or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[____]) in, April 2024 (the "Stated Maturity") except as provided below and in the Indenture. The obligations of the Co-Issuers][Issuer] under this Note and the Indenture are limited recourse obligations of the [Co-Issuers] [Issuer] payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.

The [Co-Issuers promise] [Issuer promises] to pay interest, if any, on the 18th day of January, April, July and October in each year; commencing on July 18, 2013 (or if such day is not a Business Day, the next succeeding Business Day), at the rate equal to LIBOR plus [●]% per annum on the unpaid principal amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

Interest will cease to accrue on each Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a default is otherwise made with respect to such payments. The principal of this Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

[Any interest on the Class [C][D][E][F] Notes that is not paid when due by operation of the Priority of Payments will be deferred. Any interest so deferred will be added to the principal balance of the Class [C][D][E][F] Notes, and thereafter, interest will accrue on the aggregate outstanding principal amount of the Class [C][D][E][F] Notes, as so increased.][12]

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class [X][A-1][A-2A][A-2B][B][C][D][E][F] [Senior][Mezzanine] [Junior] Secured [Deferrable] Floating Rate Notes due 2024 (the "Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of March 18, 2013 (the "Indenture") among the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

In the event Coverage Tests (other than the Interest Reinvestment Test) are not satisfied on any Determination Date occurring subsequent to the Ramp-up Period or the Interest Reinvestment Test is not satisfied on any Determination Date during the Reinvestment Period, or an Optional Redemption, a Refinancing, a Special Redemption or a Clean-Up Call Redemption occurs as set forth in the Indenture, this Note may be redeemed in whole or in part (as applicable) in the manner and with the effect provided in the Indenture.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

[The Class [X][A-2A][A-2B][D][E] Notes will be issued in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof.] [The Class [A-

---

[12] Applicable only to Class C Notes, Class D Notes, Class E Notes and Class F Notes.

1][B][C][F] Notes will be issued in minimum denominations of $150,000 and integral multiples of $1 in excess thereof.]

Title to Notes shall pass by registration in the Note Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the [Co-Issuers have] [Issuer has] caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2013-1 LTD.


By:_____
   Name:
   Title:


ACIS CLO 2013-1 LLC


By:_____
   Name:  Donald J. Puglisi
   Title:  President

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION,
   as Trustee


By:_____
   Authorized Signatory

## ASSIGNMENT FORM

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Note and docs hereby irrevocably constitute and appoint
_____ Attorney to transfer the Note on the books of the Trustee with
full power of substitution in the premises.

Date: _____      Your Signature* _____

(Sign exactly as your name appears
in the security)

*/      NOTE; The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular without alteration, enlargement or any change whatsoever. *Such signature must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Note Registrar, which requirements include membership or participation in Securities Transfer Agents Medallion Program ("STAMP") or such other "signature guarantee program" as may he determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.*

<div align="right"><u>EXHIBIT A5</u></div>

<u>FORM OF COMBINATION NOTE</u>

[RULE 144A GLOBAL NOTE][REGULATION S GLOBAL SECURED NOTE]
[CERTIFICATED]
representing
COMBINATION NOTES

This Note has not been and will not be registered under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (A) to a "<u>Qualified Institutional Buyer</u>" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such plan, if investment decisions with respect to the plan are made by the beneficiaries of the plan or (B) to a person that is not a "<u>U.S. person</u>" (as defined in Regulation S under the Securities Act) and is acquiring this Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in this Note that is a U.S. person and is not a Qualified Purchaser and a Qualified Institutional Buyer to sell its interest in the Notes, or may sell such interest on behalf of such owner.

By its acquisition of Co-Issued Notes (the "<u>ERISA Debt Securities</u>"), each purchaser and subsequent transferee will be deemed to have represented and warranted or required to represent and warrant, as applicable, at the time of its acquisition and throughout the period it holds such ERISA Debt Security, that either (x) it is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (y) its acquisition, holding and disposition of the ERISA Debt Security will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law). Any purported transfer of an ERISA Debt Security, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, this Note, the Offering Circular and any

applicable transfer certification, as applicable, will be of no force and effect and shall be null and void ab initio.

[Any transfer, pledge or other use of this Note for value or otherwise by or to any person is wrongful since the registered owner hereof, Cede & Co., has an interest herein, unless the Note is presented by an authorized representative of the Depository Trust Company ("DTC"), New York, New York, to the Co-Issuers or their agent for registration of transfer, exchange or payment and any Note issued is registered in the name of Cede & Co., or of such other entity as is requested by an authorized representative of DTC (and any payment hereon is made to Cede & Co.).

Transfers of this Note shall be limited to transfers in whole, but not in part, to nominees of DTC or to a successor thereof or such successor's nominee and transfers of portions of this Note shall be limited to transfers made in accordance with the restrictions set forth in the Indenture referred to herein.][13]

Principal of this Note is payable as set forth herein. Accordingly, the outstanding principal of this Note at any time may be less than the amount shown on the face hereof. Any person acquiring this Note may ascertain its current principal amount by inquiry of the Trustee.

The failure to provide the Issuer, the Trustee and any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986 (the "Code") or an appropriate Internal Revenue Service form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code or the Holder FATCA Information) may result in the imposition of U.S. federal withholding tax or back-up withholding tax upon payments to the holder in respect of this Note.

The failure to provide the Issuer, the Trustee and any Paying Agent with any information reasonably requested by the Issuer or the Paying Agent to enable the Issuer or Paying Agent to comply with any reporting agreements with the IRS may result in the imposition of U.S. federal withholding upon payments to the holder in respect of this Note (and may cause the forced sale or transfer of such Note).

Each holder and beneficial owner of this Note (including a holder or beneficial owner of this Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of this Note if such holder or beneficial owner fails to sell its Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to the Indenture to enable the Issuer to comply with FATCA. A clearing organization that holds this Note on behalf of a beneficial

---

[13] Global Notes only.

owner may convert this Note from a Global Note to a definitive physical Note, upon request from such beneficial owner or the holder of this Note, if it is unable to obtain the Holder FATCA Information from such beneficial owner or the holder of this Note.

Each Holder and beneficial owner of this Note, by acceptance of such Note, or its interest in such Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Note as debt for U.S. federal income tax purposes.

[The Class [A-1][B][C] Notes that relate to the Class [A-1][B][C] Note Component represented by this certificate are being issued with original issue discount ("OID"), the issue price, total amount of OID, Issue Date and yield to maturity may be obtained by contacting the Trustee at 190 South LaSalle, Chicago, Illinois 60603.][14]

Each holder and beneficial owner of this Note that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) will make, or by acquiring such Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(a) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

Each holder and beneficial owner of this Note will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each holder and beneficial owner of this Note understands that the foregoing restrictions are a material inducement for each other holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

Each purchaser, beneficial owner and subsequent transferee of this Combination Note or interest therein, by acceptance of this Combination Note or an interest in this Combination Note, will be deemed to have agreed that before any interest in a Combination Note may be exchanged for its ratable share of the Class A-1 Notes, the Class B Notes or the Class C

---

[14] Legend to be included for any Combination Notes comprised of Class A-1 Note Components, Class B Note Components or Class C Note Components consisting of Class A-1 Notes, Class B Notes or Class C Notes treated as issued with OID.

Notes that comprise its Components, the Holder will be required to provide the Trustee with an Exchange Notice in the form attached to the Indenture.

ACIS CLO 2013-1 LTD.
ACIS CLO 2013-1 LLC

[RULE 144A GLOBAL NOTE][REGULATION S GLOBAL SECURED NOTE]
representing
<u>COMBINATION NOTES</u>

Up to U.S.$[__]

[R][S]-1
CUSIP No. [__]
[ISIN [__]]

ACIS CLO 2013-1 LTD., a company incorporated under the laws of the Cayman Islands (the "<u>Issuer</u>"), and ACIS CLO 2013-1 LLC, a Delaware limited liability company (the "<u>Co-Issuer</u>" and, together with the Issuer, the "<u>Co-Issuers</u>"), for value received, hereby promise to pay to [CEDE & CO.][15] [HOLDER][16] or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [up to][17] $[●] United States Dollars (U.S. $[●]]) comprised of (i) a Class A-1 Note Component consisting of an interest in U.S.$ [●] principal amount of Class A-1 Notes of the Co-Issuers (the "<u>Class A-1 Note Component</u>"), (ii) a Class B Note Component consisting of an interest in U.S.$ [●] principal amount of Class B Notes of the Co-Issuers (the "<u>Class B Note Component</u>") and (iii) a Class C Note Component consisting of an interest in U.S.$ [●] principal amount of Class C Notes of the Co-Issuers (the "<u>Class C Note Component</u>" and, together with the Class A-1 Note Component and the Class B Note Component, the "<u>Components</u>")[, or such other principal sum as is equal to the aggregate principal amount of the Combination Notes identified from time to time on the records of the Trustee and as indicated on <u>Schedule A</u>][18]. The obligations of the Co-Issuers under this Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.

The Combination Notes will not themselves bear interest at a stated rate. On the 18th day of January, April, July and October in each year; commencing on July 18, 2013 (or if such day is not a Business Day, the next succeeding Business Day) the Co-Issuers promise to allocate a portion of all interest payments on the Aggregate Outstanding Amount of the Class A-1 Notes, the Class B Notes and the Class C Notes, respectively, to the Holders of the Combination Notes, in the proportion that the Aggregate Outstanding Amount of the Class A-1 Note Component bears to the Aggregate Outstanding Amount of the Class A-1 Notes as a whole (including the Class A-1 Note Component), that the Aggregate Outstanding Amount of the Class B Note Component bears to the Aggregate Outstanding Amount of the Class B Notes as a whole (including the Class B Note Component) and that the Aggregate Outstanding Amount of the Class C Note Component bears to the Aggregate Outstanding Amount of the Class C Notes as a

---

[15] Global Notes only.
[16] Certificated Notes only.
[17] Global Notes only.
[18] Global Notes only.

whole (including the Class C Note Component) at the rate equal to, with respect to the Class A-1 Notes, LIBOR plus 0.87% per annum, with respect to the Class B Notes, LIBOR plus 1.95% per annum and, with respect to the Class C Notes, LIBOR plus 2.95% per annum. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

Interest will cease to accrue on the Class A-1 Note Component, the Class B Note Component and the Class C Note Component, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a default is otherwise made with respect to such payments. The principal of the Class A-1 Notes that relate to the Class A-1 Note Component, Class B Notes that relate to the Class B Note Component and Class C Notes that relate to the Class C Component shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of the Class A-1 Note Component, the Class B Note Component and the Class C Note Component shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Any interest on the Class C Notes that relate to the Class C Note Component that is not paid when due by operation of the Priority of Payments will be deferred. Any interest so deferred will be added to the principal balance of the Class C Notes that relate to the Class C Note Component, and thereafter, interest will accrue on the aggregate outstanding principal amount of the Class C Notes that relate to the Class C Note Component, as so increased.

The payment priority of each Component of the Combination Notes shall be in accordance with the priority of the respective Underlying Class in accordance with the Priority of Payments. On each date on which payments are made on any Underlying Class, a portion of such payments will be allocated to the Combination Notes in the proportion that the Aggregate Outstanding Amount of the related Component bears to the Aggregate Outstanding Amount of that Underlying Class as a whole (including the related Components). The Combination Notes will be entitled to no other payments. In particular, interest will not accrue or be payable on the Aggregate Outstanding Amount of the Combination Notes, except to the extent, if any, of interest on the related Component.

The Holders of the Combination Notes will be treated as Holders of the Underlying Classes for purposes of any voting rights of such Underlying Classes, except in connection with any supplemental indenture that affects the Combination Notes in a materially adverse manner that is different from the effect of such supplemental indenture on Notes of any Underlying Class, in which case the Combination Notes will vote only as a separate Class.

The Combination Notes will be redeemed (i) on any Payment Date in connection with a Mandatory Redemption or Special Redemption to the extent that each Underlying Class is redeemed, (ii) on any Redemption Date in connection with an Optional Redemption or Refinancing to the extent that each Underlying Class is redeemed by allocation of the

Redemption Price of each Underlying Class, (iii) on any Clean-up Redemption Date in connection with a Clean-up Call Redemption to the extent that each Underlying Class is redeemed by allocation of the Clean-up Call Redemption Price of each Underlying Class and (iv) to the extent the Underlying Classes are redeemed in accordance with the Priority of Payments or the Note Payment Sequence.

At the written request of the Holder of a Combination Note (i) all or any portion of the Combination Notes may be exchanged for the Underlying Classes represented by such Combination Notes and (ii) all or any portion of the Class A-1 Notes, Class B Notes and Class C Notes representing Underlying Classes may be combined into Combination Notes, in each such case, proportionally in accordance with the Permissible Ratio and in accordance with Section 13.4 of the Indenture.

This Combination Notes may be sold to a transferee in accordance with the Indenture, proportionally in accordance with the Permissible Ratio.

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Combination Notes (the "Combination Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of March 18, 2013 (the "Indenture") among the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

[Transfers of this [Rule 144A Global Note][Regulation S Global Secured Note] shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of DTC or to a successor of DTC or such successor's nominee.

Interests in this [Rule 144A Global Note][Regulation S Global Secured Note] will be transferable in accordance with DTC's rules and procedures in use at such time, as set forth in the Indenture.][19]

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of

---

[19] Global Notes only.

principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Combination Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

[Interests in this [Rule 144A Global Note][Regulation S Global Secured Note] may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S Global Note][Rule 144A Global Note] subject to the restrictions as set forth in the Indenture. This [Rule 144A Global Note][Regulation S Global Secured Note] is subject to mandatory exchange for Certificated Secured Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A Global Note] [Regulation S Global Secured Note], this [Rule 144A Global Note][Regulation S Global Secured Note] shall be endorsed on <u>Schedule A</u> hereto to reflect the reduction of or increase in the principal amount evidenced hereby.][20]

The Combination Notes will be issued in minimum denominations of $150,000 and integral multiples of $1,000 in excess thereof.

Title to Notes shall pass by registration in the Note Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

---

[20] Global Notes only.

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2013-1 LTD.


By:_____
    Name:
    Title:



ACIS CLO 2013-1 LLC


By:_____
    Name:  Donald J. Puglisi
    Title:  President

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION,
  as Trustee

By:_____
    Authorized Signatory

[SCHEDULE A

SCHEDULE OF EXCHANGES OR REDEMPTIONS

The following exchanges, redemptions of or increase in the whole or a part of the Notes represented by this [Rule 144A Global Note][Regulation S Global Secured Note] have been made:

| Date exchange/redemption /increase made | Original principal amount of this Global Note | Part of principal amount of this Global Note exchanged/redeemed /increased | Remaining principal amount of this Global Note following such exchange/redemption /increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| [___] | $[  ] | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

][21]

---

[21] Global Notes only.

<u>EXHIBIT B</u>

<u>FORMS OF TRANSFER AND EXCHANGE CERTIFICATES</u>

## FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER OF RULE 144A GLOBAL NOTE TO REGULATION S GLOBAL SECURED NOTE

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN  55107
Attn:  Corporate Trust Services – ACIS CLO 2013-1

> Re:    ACIS CLO 2013-1 LTD. and ACIS CLO 2013-1 LLC
> Class [X][A-1][A-2A][A-2B][B][C][D][E][F] [Combination] Notes [due
> 2024] (the "Notes")

Reference is hereby made to the Indenture dated as of March 18, 2013 (the "Indenture") among Acis CLO 2013-1 Ltd., as Issuer, Acis CLO 2013-1 LLC as Co-Issuer (and together with the Issuer, the "Co-Issuers") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S. $[_____] aggregate principal amount of Notes which are held in the form of a Rule 144A Global Note with the Depository in the name of [___] (the "Transferor") to effect the transfer of the Notes in exchange for an equivalent beneficial interest in a Regulation S Global Note.

In connection with such transfer, and in respect of such Notes, the Transferor does hereby certify that such Notes are being transferred to [_____] (the "Transferee") in accordance with the transfer restrictions set forth in the Indenture and the Offering Circular dated March 12, 2013, including the supplements thereto, relating to such Notes and that:

(a)    the offer of the Notes was not made to a person in the United States;

(b)    at the time the buy order was originated, the Transferee was outside the United States or the Transferor and any person acting on its behalf reasonably believed that the Transferee was outside the United States;

(c)    no directed selling efforts have been made in contravention of the requirements of Rule 903 or 904 of Regulation S, as applicable;

(d)    the transaction is not part of a plan or scheme to evade the registration requirements of the United States Securities Act of 1933, as amended (the "Securities Act"):

(e)    the Transferee is not a U.S. person:

(f)    solely with respect to the Class X Notes, the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Combination Notes, either that (1) the Transferee is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975

of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (2) its acquisition, holding and disposition of the Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law; and

(g)    solely with respect to the Class E Notes and Class F Notes, (1) the Transferee is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such Class E Note or Class F Note will not constitute or result in a non-exempt violation under any such substantially similar law.

The Transferor understands that the Co-Issuers, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

(NAME OF TRANSFEROR)

By:_____
   Name:
   Title:

Dated: _____, _____

cc:  Acis CLO 2013-1 Ltd. and Acis CLO 2013-1 LLC

<div align="right">EXHIBIT B2</div>

FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER OF REGULATION S GLOBAL SECURED NOTE TO RULE 144A GLOBAL NOTE

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN 55107
Attn: Corporate Trust Services – ACIS CLO 2013-1

> Re: ACIS CLO 2013-1 LTD. and ACIS CLO 2013-1 LLC
> Class [X][A-1][A-2A][A-2B][B][C][D][E][F] [Combination] Notes [due 2024] (the "Notes")

Reference is hereby made to the Indenture dated as of March 18, 2013 (the "Indenture") among Acis CLO 2013-1 Ltd. as Issuer, Acis CLO 2013-1 LLC, as Co-Issuer (and together with the Issuer, the "Co-Issuers") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S. $[_____] aggregate principal amount of Notes which are held in the form of a Regulation S Global Note in the name of [__] (the "Transferor") to effect the transfer of the Notes in exchange for an equivalent beneficial interest in a Rule 144A Global Note.

In connection with such transfer, and in respect of such Notes, the Transferor does hereby certify that such Notes are being transferred to [_____] (the "Transferee") in accordance with (i) the transfer restrictions set forth in the Indenture and the Offering Circular dated March 12, 2013, including the supplements thereto, relating to such Notes and (ii) Rule 144A under the United States Securities Act of 1933, as amended, and it reasonably believes that (a) the Transferee is purchasing the Notes for its own account or an account with respect to which the Transferee exercises sole investment discretion, (b) the Transferee and any such account is a QIB/QP or, solely with respect to the Class E Notes and Class F Notes, a (1) Qualified Purchaser and (2) either (x) a Qualified Institutional Buyer or (y) an Institutional Accredited Investor, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, (c) solely with respect to the Class X Notes, the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Combination Notes, either that (1) the Transferee is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (2) its acquisition, holding and disposition of the Notes will not constitute or result in a non-exempt prohibited

transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law and (d) solely with respect to the Class E Notes and Class F Notes, (1) the Transferee is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such Class E Notes or Class F Notes will not constitute or result in a non-exempt violation under any such substantially similar law.

The Transferor understands that the Co-Issuers, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

(NAME OF TRANSFEROR)

By:_____
    Name:
    Title:


Dated:  _____,_____

cc:  Acis CLO 2013-1 Ltd. and Acis CLO 2013-1 LLC

FORM OF TRANSFEREE CERTIFICATE FOR TRANSFER OF CERTIFICATED
SECURED NOTE

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN  55107
Attn:  Corporate Trust Services – ACIS CLO 2013-1

> Re:    Acis CLO 2013-1 Ltd.
>        Class [X][A-1][A-2A][A-2B][B][C][D][E][F] [Combination] Notes

Reference is hereby made to the Indenture, dated as of March 18, 2013, among Acis CLO 2013-1 Ltd., as issuer, Acis CLO 2013-1 LLC, as Co-Issuer, and U.S. Bank National Association, as Trustee (the "Indenture") Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S.$[_____] aggregate principal amount of Notes, which are held in the form of one or more Certificated Secured Notes in the name of _____ (the "Transferor") to effect the transfer of the Certificated Secured Notes to _____ (the "Transferee"),

In connection with such request, and in respect of such Notes, the Transferee does hereby certify that the Certificated Secured Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "Securities Act") and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

In addition, the Transferee hereby represents, warrants and covenants for the benefit of the Issuer and its counsel that we are:

(a)    (PLEASE CHECK ONLY ONE)

_____    a "qualified institutional buyer" as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act");

_____    [an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3), (7) or (8) under the Securities Act; or][22]

_____    a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and are acquiring the Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from Securities Act registration provided by Regulation S; and

---

[22] Class E Note and Class F Note only.

Exhibit B

(d)      acquiring the Certificated Secured Notes for our own account (and not for the account of any other Person) in a minimum denomination of $200,000 and in integral multiples of $1,000 in excess thereof (or (x) in the case of the Class A-1 Notes, the Class B Notes, the Class C Notes and the Class F Notes, $150,000 and in integral multiples of $1 in excess thereof or (y) in such other minimum denominations as the Issuer may agree on a case-by-case basis).

The Transferee further represents and warrants as follows:

1.      It understands that the Certificated Secured Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Certificated Secured Notes, such Certificated Secured Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legends on such Certificated Secured Notes, including the requirement for written certifications.  In particular, it understands that the Certificated Secured Notes may be transferred only to a person that is either (1) both (a) [either (x)] a qualified institutional buyer (as defined under Rule 144A under the Securities Act) that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A under the Securities Act or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A under the Securities Act that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan [or (y) an "institutional" accredited investor (an entity defined in rule 501(a)(1), (2), (3) or (7) under the Securities Act)][23] and (b) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act or (2) not a "U.S. person" as defined in Regulation S and is acquiring the Certificated Secured Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from registration provided by Regulation S.  It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Certificated Secured Notes.

2.      In connection with its purchase of the Certificated Secured Notes:  (i) none of the Co-Issuers, the Placement Agents, the Trustee, the Collateral Administrator, the Portfolio Manager or any of their respective affiliates are acting as a fiduciary or financial or investment adviser for it; (ii) it is not relying (for purposes of making any investment decision or otherwise) on any written or oral advice, counsel or representations of the Co-Issuers, the Placement Agents, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates other than any statements in the final offering circular for such Notes; (iii) it has read and understands the final offering circular for such Notes (including, without limitation, the descriptions therein of the structure of the transaction in which the Notes are being issued and the risks to purchasers of the Notes); (iv) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary, and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuer, the Placement Agents, the Portfolio Manager, the Trustee, the Collateral Administrator or any of

---

[23] Include for Class E Note and Class F Note only.

their respective affiliates; (v) it will hold and transfer at least the minimum denomination of such Notes; (vi) it was not formed for the purpose of investing in the Notes; and (vii) it is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

   3.  (i) It is either (1) both (a) a qualified institutional buyer (as defined under Rule 144A under the Securities Act) that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A under the Securities Act or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A under the Securities Act that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (b) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act or (2) not a "U.S. person" as defined in Regulation S and is acquiring the Certificated Secured Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from registration provided by Regulation S thereunder; (ii) it is acquiring the Certificated Secured Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (iii) it is not a (A) partnership, (B) common trust fund, or (C) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made:  (iv) it agrees that it shall not hold any Certificated Secured Notes for the benefit of any other person, that it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and that it shall not sell participation interests in the Certificated Secured Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Certificated Secured Notes; and (v) it will hold and transfer at least the minimum denomination of the Certificated Secured Notes and provide notice of the relevant transfer restrictions to subsequent transferees.

   4.  [It acknowledges and agrees that on each day from the date on which it acquires its interest in a Certificated Secured Note through and including the date on which it disposes of its interest in such Note, either that (A) it is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(l) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (B) its purchase, acquisition and disposition of a Certificated Secured Note, as applicable, will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation under any substantially similar law).  It acknowledges that any purported transfer of a Certificated Secured Note, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, the Certificated

Secured Note, the Offering Circular or any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void <u>ab initio</u>.][24]

[It acknowledges and agrees that on each day from the date on which it acquires its interest in such [Class E Notes] [Class F Notes] through and including the date on which it disposes of its interest in such [Class E Notes] [Class F Notes], that (1) it is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such [Class E Notes] [Class F Notes] will not constitute or result in a non-exempt violation under any such substantially similar law.][25]

5.      It will treat its Certificated Secured Note as debt of the Issuer for United States federal income tax purposes

6.      It is [_____] (check if applicable) a "United States person" within the meaning of Section 7701(a)(30) of the Code, and a properly completed and signed Internal Revenue Service Form W-9 (or applicable successor form) is attached hereto; or [_____] (check if applicable) not a "United States person" within the meaning of Section 7701(a)(30) of the Code, and a properly completed and signed applicable Internal Revenue Service Form W-8 (or applicable successor form) is attached hereto.  It understands and acknowledges that failure to provide the Issuer or the Trustee with the applicable United States federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an applicable Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) may result in United States federal back-up withholding from payments to it in respect of the Notes.

7.      It agrees not to seek to commence in respect of the Issuer or the Co-Issuer, or cause the Issuer or Co-Issuer to commence, a bankruptcy proceeding before a year and a day has elapsed since the payment in full to the Holders of the Notes or, if longer, the applicable preference period then in effect.

8.      To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "<u>USA Patriot Act</u>") and other similar laws or regulations, including, without limitation, requiring each transferee of a Note to make representations to the Issuer in connection with such compliance.

The Transferee agrees to provide promptly such information and execute and deliver such documents as may be necessary to comply with any and all laws and regulations

---

[24] Applicable only to Co-issued Notes.
[25] Applicable only to Class E Notes and Class F Notes.

(including the USA Patriot Act) to which the Issuer may be subject. The Transferee understands and agrees that, in order to ensure compliance under applicable anti-money laundering laws and regulations, the Issuer may require a detailed verification of the identity of the Transferee. The Issuer reserves the right to request such information as is necessary to verify the identity of a Transferee. In the event of delay or failure by the Transferee to produce any information required for verification purposes, the Issuer may refuse to issue the Notes to the Transferee until proper information has been provided.

The Transferee covenants and agrees that it shall provide the Issuer with such information as the Issuer determines to be necessary or appropriate to (a) verify compliance with the anti-money laundering regulations of any applicable jurisdiction or (b) respond to requests for information concerning the identity of the Transferee from any governmental authority, self-regulatory organization or financial institution in connection with the Issuer's anti-money laundering compliance procedures.

9. The rules and regulations administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/offices/enforcement/ofac/. In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists. The Transferee represents and warrants that, to the best of its knowledge, none of: (a) the Transferee; (b) any Person controlling or controlled by the Transferee; (c) if the Transferee is a privately held entity, any Person having a beneficial interest in the Transferee; (d) if the Transferee is not the beneficial owner of all of the Certificated Secured Notes, any Person having a beneficial interest in the Certificated Secured Notes; or (e) any Person for whom the Transferee is acting as agent or nominee in connection with this investment in the Certificated Secured Notes is a country, territory, individual or entity named on any OFAC list, or is a person or entity prohibited under the OFAC Programs.

10. It hereby agrees to provide the Issuer and Trustee (i) any information as is necessary (in the sole determination of the Issuer or the Trustee, as applicable) for the Issuer and the Trustee to determine whether it is a United States person as defined in Section 7701(a)(30) of the Code (a "United States person") or a United States owned foreign entity as described in Section 1471(d)(3) of the Code (a "United States owned foreign entity") and (ii) any additional information that the Issuer or its agent requests in connection with FATCA. If it is a United States person or a United States owned foreign entity that is a holder or beneficial owner of Notes or an interest therein, it also hereby agrees to be required to (x) provide the Issuer and Trustee its name, address, U.S. taxpayer identification number and any other information requested by the Issuer or its agent upon request and (y) update any such information provided in clause (x) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. It understands and acknowledges that the Issuer may provide such information and any other information concerning its investment in the Notes to the IRS. It understands and acknowledges that the Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in the Notes that fails to comply with the foregoing requirements to sell its interest in such Notes, or may sell such interest on behalf of such owner.

11.     Any funds to be used by it to purchase the Notes shall not directly or indirectly be derived from activities that may contravene applicable laws and regulations, including anti-money laundering laws and regulations

12.     It is not a member of the public in the Cayman Islands.

13.     It understands that the Issuer, the Trustee, the Placement Agents and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

14.     It has read the summary of the U.S. federal income tax considerations under the heading "*Certain Tax Considerations*" in the Offering Circular. It agrees to treat the characterization of the Notes as debt or equity for U.S. tax purposes in a manner consistent with the treatment of such Notes by the Issuer as described under the heading "*Certain Tax Considerations*" in the Offering Circular and will take no action inconsistent with such treatment.

15.     It has read the summary of the provisions related to no petitions for bankruptcy under the heading "*Description of the Offered Securities – No Petitions for Bankruptcy*" in the Offering Circular It will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. It understands that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

16.     It understands that the Issuer may require certification acceptable to it (i) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding or (ii) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.  It agrees to provide any such certification that is requested by the Issuer.

17.     If such purchaser is not a "United States person" (as defined in Section 7701(a)(30) of the Code) it makes a representation that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(A) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent

establishment in the United States, and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

18.     The Transferee acknowledges that any purported transfer of a Secured Note, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, the Notes, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void *ab initio*

Name of Purchaser:

Dated:

By:_____
    Name:
    Title:

Amount of Notes:  $_____

Taxpayer identification number:

Address for notices:                    Wire transfer information for payments:

                                        Bank:

                                        Address:

                                        Bank ABA#:

                                        Account #:

Telephone:                              FAO:

Facsimile:                              Attention:

Attention:

Denominations of certificates (if more than one):  Registered name:

cc:  Acis CLO 2013-1 Ltd. and Acis CLO 2013-1 LLC

<u>EXHIBIT B4</u>

## FORM OF SUBORDINATED NOTE ERISA CERTIFICATE

The purpose of this ERISA Certificate (this "<u>Certificate</u>") is, among other things, to (i) endeavor to ensure that less than 25% of the value of the Subordinated Notes issued by Acis CLO 2013-1 Ltd. (the "<u>Issuer</u>") is held by (a) an "employee benefit plan" (as defined in Section 3(3) of the United States Employee Retirement Income Security Act of 1974, as amended ("ERISA") that is subject to the fiduciary responsibility provisions of Title I of ERISA, (b) a "plan" as defined in Section 4975(e)(1) of the United States Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), that is subject to Section 4975 of the Code, (e) any entity whose underlying assets include "plan assets" by reason of any such employee benefit plan's or plan's investment in the entity or (d) a "benefit plan investor" as defined in U.S. Department of Labor regulations or under Section 3(42) of ERISA (collectively, "<u>Benefit Plan Investors</u>") so that the Issuer will not be subject to the U.S. federal pension laws contained in ERISA and Section 4975 of the Code, (ii) obtain from you certain representations and agreements and (iii) provide you with certain related information with respect to your acquisition, holding or disposition of the Subordinated Notes.  By signing this Certificate, you agree to be bound by its terms.

Please be aware that the information contained in this Certificate is not intended to constitute advice and the examples given below are not intended to be, and are not, comprehensive.  You should contact your own counsel if you have any questions in completing this Certificate.  Capitalized terms not defined in this Certificate shall have the meanings ascribed to them in the final offering circular of the Issuer or the Indenture.

Please review the information in this Certificate and check the box(es) that are applicable to you.

If a box is not checked, you are agreeing that the applicable Section does not, and will not, apply to you.

1.     <u>Employee Benefit Plans Subject to ERISA or the Code</u>.  We, or the entity on whose behalf we are acting, are an "employee benefit plan" within the meaning Section 3(3) of ERISA that is subject to the fiduciary responsibility provisions of Title I of ERISA or a "plan" within the meaning of Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code.

<u>Examples</u>:   (i) tax qualified retirement plans such as pension, profit sharing and section 401 (k) plans, (ii) welfare benefit plans such as accident, life and medical plans, (iii) individual retirement accounts or "IRAs" and "Keogh" plans and (iv) certain tax-qualified educational and savings trusts.

2.     <u>Entity Holding Plan Assets by Reason of Plan Asset Regulations</u>. We, or the entity on whose behalf we are acting, are an entity or fund whose underlying assets include "plan assets" by reason of the investment in such entity by an employee benefit plan or plan described in <u>Section 1</u> above.

<u>Examples</u>:  (i) a hedge fund or other private investment vehicle where 25% or more of the value of any class of its equity is held by Benefit Plan Investors. (ii) an insurance company separate account and (iii) a bank collective trust fund.

ERISA and the regulations promulgated thereunder are technical.  Accordingly, if you have any question regarding whether you may be an entity described in this <u>Section 2</u>, you should consult with your counsel.

If you check Box 2, please also complete Box A.

A.    The maximum percentage of the entity's or fund's assets that we anticipate will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulations is:  ____%.

IF YOU CHECKED BOX 2 BUT DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

3.    <u>Insurance Company General Account</u>.  We, or the entity on whose behalf we are acting, are an insurance company purchasing the Subordinated Notes with funds from our or their general account (<u>i.e.</u>, the insurance company's corporate investment portfolio), the assets of which, in whole or in part, constitute "plan assets" for purposes of the U.S. Department of Labor's regulations set forth at 29 C.F.R. Section 2510.3-101, as effectively modified by Section 3(42) of ERISA (the "<u>Plan Asset Regulations</u>").

If you check Box 3, please also check either Box A or Box B.

A.    We are not able to determine an exact percentage of the general account that constitutes "plan assets" but the maximum percentage of the general account that constitutes (or will constitute) "plan assets" for purposes of, the Plan Asset Regulations is less than 25%.

B.    The maximum percentage of the insurance company general account that will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulations is:  ____%.  IF YOU CHECK THIS BOX B BUT DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

4.    <u>None of Sections (1) Through (3) Above Apply</u>.  We, or the entity on whose behalf we are acting, are a person that does not fall into any of the categories described in <u>Sections (1) through (3)</u> above.

5.    <u>No Prohibited Transaction</u>.  If we checked any of the boxes in <u>Sections (1) through (3)</u> above, we represent, warrant and agree that our acquisition, holding and disposition of the Subordinated Notes do not and will not constitute or give rise to a non-exempt prohibited

transaction under Section 406 of ERISA or Section 4975 of the Code.

6.     No Violation of Similar Law.  If we are a governmental, church, non-U.S. or other plan subject to any federal, state, local or non-U.S. law substantially similar to Title I of ERISA or Section 4975 of the Code, we represent, warrant and agree that our acquisition, holding and disposition of the Subordinated Notes do not and will not constitute or give rise to a non-exempt violation of any such similar federal, state, local or non-U.S. law.

7.     Controlling Person.  We are, or we are acting on behalf of any of: (i) the Trustee, (ii) the Portfolio Manager, (iii) any person that has discretionary authority or control with respect to the assets of the Issuer, (iv) any person who provides financial or investment advice for a fee (direct or indirect) with respect to such assets or (v) any "affiliate" of any of the above persons.  "Affiliate" shall have the meaning set forth in the Plan Asset Regulations.  Any of the persons described in the first sentence of this Section (7) is referred to in this Certificate as a "Controlling Person." 

Note:  We understand that, for purposes of determining whether Benefit Plan Investors hold less than 25% of the value of the Subordinated Notes, the value of any Subordinated Notes held by Controlling Persons (other than Benefit Plan Investors) are required to be disregarded.

8.     Compelled Disposition.  We acknowledge and agree that:

(i)     if any representation that we made hereunder is subsequently shown to be false or misleading or our beneficial ownership otherwise causes Benefit Plan Investors to own 25% or more of the value of any class of equity in the Issuer, the Issuer shall, promptly after such discovery (or upon notice from the Trustee if a responsible officer of the Trustee makes the discovery (who, in each case, agrees to notify the Issuer of such discovery, if any)), send notice to us demanding that we transfer our interest to a person that is not a Non-Permitted ERISA Holder within 14 days of the date of such notice;

(ii)     if we fail to transfer our Subordinated Notes, the Issuer shall have the right, without further notice to us, to sell our Subordinated Notes or our interest in the Subordinated Notes, to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose;

(iii)     the Issuer may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Subordinated Notes and selling such securities to the highest such bidder. However, the Issuer may select a purchaser by any other means determined by it in its sole discretion;

(iv)     by our acceptance of an interest in the Subordinated Notes, we agree to cooperate with the Issuer to effect such transfers;

(v)     the proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to us; and

(vi)     the terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to us, as a result of any such sale or the exercise of such discretion.

9.     <u>Required Notification</u>.  We hereby agree that we (a) will inform the Trustee of any proposed transfer by us of all or a specified portion of the Subordinated Notes owned by us to a transferee who would be deemed to be a Benefit Plan Investor or a Controlling Person or of any proposed change in our status under ERISA which would result in all or a portion of the Subordinated Notes owned by us and not previously so characterized being deemed to be held by a Benefit Plan Investor or a Controlling Person and (b) will not permit any such transfer or change of status that would cause Benefit Plan Investors to own 25% or more of the value of any class of equity in the Issuer to be exceeded to become effective.  We hereby agree and acknowledge that after the Trustee effects any permitted transfer of Subordinated Notes owned by us to a Benefit Plan Investor or a Controlling Person or receives notice of any such permitted change of status, the Trustee shall include such Subordinated Notes in future calculations of this 25% limitation made pursuant hereto unless subsequently notified that such Subordinated Notes (or such portion), as applicable, would no longer be deemed to be held by Benefit Plan Investors or Controlling Persons.

10.     <u>Continuing Representation; Reliance</u>.  We acknowledge and agree that the representations contained in this Certificate shall be deemed made on each day from the date we make such representations through and including the date on which we dispose of our interests in the Subordinated Notes.  We understand and agree that the information supplied in this Certificate will be used and relied upon by the Issuer, the trustee to determine that Benefit Plan Investors own or hold less than 25% of the value of the Subordinated Notes upon any subsequent transfer of the Subordinated Notes in accordance with the indenture.

11.     <u>Further Acknowledgement</u>.  We acknowledge and agree that (i) all of the assurances contained in this Certificate are for the benefit of the Issuer, the Trustee, the Placement Agents and the Portfolio Manager as third-party beneficiaries hereof, (ii) copies of this Certificate and any information contained herein may be provided to the Issuer, the Trustee, the Placement Agents, the Portfolio Manager, affiliates of any of the foregoing parties and to each of the foregoing parties' respective counsel for purposes of making the determinations described above and (iii) any acquisition or transfer of the Subordinated Notes by us that is not in accordance with the provisions of this Certificate shall be null and void from the beginning, and of no legal effect.

12.     <u>Future Transfer Requirements</u>.

<u>Transferee Letter and its Delivery</u>.  We acknowledge and agree that we may not transfer any Subordinated Notes to any person unless the Trustee has received a certificate substantially in the form of this Certificate.  Any attempt to transfer in violation of this section will be null and void from the beginning, and of no legal effect.

Note: Unless you are notified otherwise, the name and address of the Trustee is as follows:

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN 55107
Attn: Corporate Trust Services – ACIS CLO 2013-1

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Certificate.

_____ [Insert Purchaser's Name]
By:
Name:
Title:

Dated:

This Certificate relates to $_____ of Subordinated Notes.

<u>EXHIBIT B5</u>

FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER TO REGULATION S
<u>GLOBAL SUBORDINATED NOTE</u>

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN  55107
Attn:  Corporate Trust Services – ACIS CLO 2013-1

   Re: ACIS CLO 2013-1 LTD.
     Subordinated Notes

   Reference is hereby made to the Indenture dated as of March 18, 2013 (the "<u>Indenture</u>") among Acis CLO 2013-1 Ltd., as Issuer, Acis CLO 2013-1 LLC, as Co-Issuer (and together with the Issuer, the "<u>Co-Issuers</u>") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

   This letter relates to U.S. $[_____] aggregate principal amount of Subordinated Notes which are held in the form of a Certificated Subordinated Note by [__] (the "<u>Transferor</u>") to effect the transfer of the Subordinated Notes in exchange for an equivalent beneficial interest in a Regulation S Global Subordinated Note.

   In connection with such transfer, and in respect of such Subordinated Notes, the Transferor does hereby certify that such Subordinated Notes are being transferred to _____ (the "<u>Transferee</u>") in accordance with the transfer restrictions set forth in the Indenture and the Offering Circular dated March 12, 2013, including the supplements thereto, relating to such Subordinated Notes and that:

   (a) the offer of the Subordinated Notes was not made to a person in the United States;

   (b) at the time the buy order was originated, the Transferee was outside the United States or the Transferor and any person acting on its behalf reasonably believed that the Transferee was outside the United States;

   (c) no directed selling efforts have been made in contravention of the requirements of Rule 903 or 904 of Regulation S, as applicable;

   (d) the transaction is not part of a plan or scheme to evade the registration requirements of the United States Securities Act of 1933, as amended (the "<u>Securities Act</u>");

   (e) the Transferee is not a U.S. person;

   (f) the Transferee is not a Benefit Plan Investor or Controlling Person; and

(g)     if the Transferee is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law.

The Transferor understands that the Issuer, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

(NAME OF TRANSFEROR)


By:_____
   Name:
   Title:


Dated: _____, _____

cc: Acis CLO 2013-1 Ltd.

EXHIBIT B6

FORM OF TRANSFEREE CERTIFICATE FOR TRANSFER OF CERTIFICATED
SUBORDINATED NOTE

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN  55107
Attn:  Corporate Trust Services – ACIS CLO 2013-1

> Re:    Acis CLO 2013-1 Ltd.
>         Subordinated Notes

Reference is hereby made to the Indenture, dated as of March 18, 2013, among the Issuer, Acis CLO 2013-1 LLC, as co-issuer of the Co-Issued Notes, and U.S. Bank National Association, as Trustee (the "Indenture").  Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to _____ Aggregate Outstanding Amount of Subordinated Notes (the "Subordinated Notes"), which are held in the form of one or more certificated Subordinated Notes in the name of _____ (the "Transferor") to effect the transfer of the Certificated Subordinated Notes to _____ (the "Transferee").

In connection with such request, and in respect of such Subordinated Notes, the Transferee does hereby certify that the Subordinated Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "Securities Act") and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

In addition, the Transferee hereby represents, warrants and covenants for the benefit of the Issuer and its counsel that we are:

(a)      (PLEASE CHECK ONLY ONE)

_____    a "qualified institutional buyer" as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act");

_____    an institutional "accredited investor" as defined in Rule 501 (a)(l), (2), (3) or (7) under the Securities Act;

_____    an individual "accredited investor" as defined in Rule 501(a)(5), (6) or (8) under the Securities Act who, is also a "Knowledgeable Employee" with respect to the Issuer; or

_____ a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and are acquiring the Subordinated Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from Securities Act registration provided by Regulation S; and

(b)     acquiring the Certificated Subordinated Notes for our own account (and not for the account of any other Person) in a minimum denomination of $200,000 and in integral multiples of $1,000 in excess thereof (except that up to 20 Certificated Subordinated Notes sold to U.S. persons that the Portfolio Manager has determined are Knowledgeable Employees may be issued in minimum denominations of $50,000).

The Transferee further represents and warrants as follows:

1.      It understands that the Certificated Subordinated Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Certificated Subordinated Notes, such Certificated Subordinated Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legends on such Certificated Subordinated Notes, including the requirement for written certifications.  In particular, it understands that the Certificated Subordinated Notes may be transferred only to a person that is either (a) a "qualified purchaser" (as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act")), (b) a "Knowledgeable Employee," as defined in Rule 3c-5 promulgated under the Investment Company Act, with respect to the Issuer or (c) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee or a Qualified Purchaser; and in the case of (a), (b) and (c) above that is either (i) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases such Certificated Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder (or, in the case of the initial investors in the Subordinated Notes, another exemption from the registration requirements of the Securities Act) or (ii) an "accredited investor" as defined in Rule 501(a) under the Securities Act who, if not an "institutional accredited investor" (an entity defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) is also a "Knowledgeable Employee" with respect to the Issuer or (d) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and is acquiring the Certificated Subordinated Notes in an offshore transaction (as defined in Regulation S thereunder) in reliance on the exemption from registration provided by Regulation S thereunder.  It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Certificated Subordinated Notes.

2.      In connection with its purchase of the Certificated Subordinated Notes:  (i) none of the Co-Issuers, the Placement Agents, the Trustee, the Collateral Administrator, the Portfolio Manager or any of their respective affiliates are acting as a fiduciary or financial or investment adviser for it; (ii) it is not relying (for purposes of making any investment decision or otherwise) on any written or oral advice, counsel or representations of the Co-Issuers, the Placement Agents, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates other than any statements in the final offering circular for such Subordinated Notes; (iii) it has read and understands the final offering circular for such

Subordinated Notes (including, without limitation, the descriptions therein of the structure of the transaction in which the Certificated Subordinated Notes are being issued and the risks to purchasers of the Certificated Subordinated Notes); (iv) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary, and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuer, the Placement Agents, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates; (v) it will hold and transfer at least the minimum denomination of such Subordinated Notes; (vi) it was not formed for the purpose of investing in the Subordinated Notes; and (vii) it is a sophisticated investor and is purchasing the Certificated Subordinated Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

3.     (i) It is either (A) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act, (B) a "Knowledgeable Employee" with respect to the Issuer for purposes of Rule 3c-5 of the Investment Company Act or (C) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee or a Qualified Purchaser and in the case of (A), (B) and (C) above that is either (x) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases such Certificated Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder (or, in the case of the initial investors in the Subordinated Notes, another exemption from the registration requirements of the Securities Act) or (y) an "accredited investor" as defined in Rule 501(a) under the Securities Act who, if not an "institutional accredited investor" (an entity defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) is also a "Knowledgeable Employee" with respect to the Issuer or (D) not a "U.S. person" as defined in Regulation S under the Securities Act and is acquiring the Certificated Subordinated Notes in an offshore transaction (as defined in Regulation S thereunder) in reliance on the exemption from registration provided by Regulation S thereunder; (ii) it is acquiring the Certificated Subordinated Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (iii) it is not a (A) partnership, (B) common trust fund, or (C) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made; (iv) it agrees that it shall not hold any Certificated Subordinated Notes for the benefit of any other person, that it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and that it shall not sell participation interests in the Certificated Subordinated Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Certificated Subordinated Notes; (v) it is acquiring its interest in the Certificated Subordinated Notes for its own account; and (vi) it will hold and transfer at least the minimum denomination of the Certificated Subordinated Notes and provide notice of the relevant transfer restrictions to subsequent transferees.

4.     It acknowledges and agrees that all of the assurances given by it in the attached Subordinated Note ERISA Certificate are correct and are for the benefit of the Issuer, the Trustee, the Placement Agents and the Portfolio Manager. It agrees and acknowledges that

none of Issuer or the Trustee will recognize any transfer of the Subordinated Notes if such transfer may result in 25% or more of the value of the Subordinated Notes being held by Benefit Plan Investors.

5. It will treat its Certificated Subordinated Notes as equity of the Issuer for United States federal income tax purposes.

6. It is _____ (check if applicable) a "United States person" within the meaning of Section 770l(a)(30) of the Code, and a properly completed and signed Internal Revenue Service Form W-9 (or applicable successor form) is attached hereto; or _____ (check if applicable) not a "United States person" within the meaning of Section 7701(a)(30) of the Code, and a properly completed and signed applicable Internal Revenue Service Form W-8 (or applicable successor form) is attached hereto. It understands and acknowledges that failure to provide the Issuer or the Trustee with the applicable United States federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an applicable Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) may result in United States federal back-up withholding from payments to it in respect of the Subordinated Notes.

7. It agrees not to seek to commence in respect of the Issuer or the Co-Issuer, or cause the Issuer or Co-Issuer to commence, a bankruptcy proceeding before a year and a day has elapsed since the payment in full to the Holders of the Notes or, if longer, the applicable preference period then in effect.

8. To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Subordinated Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot Act") and other similar laws or regulations, including, without limitation, requiring each transferee of a Subordinated Note to make representations to the Issuer in connection with such compliance.

The Transferee agrees to provide promptly such information and execute and deliver such documents as may be necessary to comply with any and all laws and regulations (including the USA Patriot Act) to which the Issuer may be subject. The Transferee understands and agrees that, in order to ensure compliance under applicable anti-money laundering laws and regulations, the Issuer may require a detailed verification of the identity of the Transferee. The Issuer reserves the right to request such information as is necessary to verify the identity of a Transferee. In the event of delay or failure by the Transferee to produce any information required for verification purposes, the Issuer may refuse to issue the Subordinated Notes to the Transferee until proper information has been provided.

The Transferee covenants and agrees that it shall provide the Issuer with such information as the Issuer determines to be necessary or appropriate to (a) verify compliance with the anti-money laundering regulations of any applicable jurisdiction or (b) respond to requests

for information concerning the identity of the Transferee from any governmental authority, self-regulatory organization or financial institution in connection with the Issuer's anti-money laundering compliance procedures.

9.       The rules and regulations administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain countries, territories, entities and individuals.  The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/offices/enforcement/ofac/.   In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.   The Transferee represents and warrants that, to the best of its knowledge, none of:   (a) the Transferee; (b) any Person controlling or controlled by the Transferee; (c) if the Transferee is a privately held entity, any Person having a beneficial interest in the Transferee; (d) if the Transferee is not the beneficial owner of all of the Certificated Subordinated Notes, any Person having a beneficial interest in the Certificated Subordinated Notes; or (e) any Person for whom the Transferee is acting as agent or nominee in connection with this investment in the Certificated Subordinated Notes is a country, territory, individual or entity named on any OFAC list, or is a person or entity prohibited under the OFAC Programs.

10.      It hereby agrees to provide the Issuer and Trustee (i) any information as is necessary (in the sole determination of the Issuer or the Trustee, as applicable) for the Issuer and the Trustee to determine whether it is a United States person as defined in Section 7701(a)(30) of the Code (a "United States person") or a United States owned foreign entity as described in Section 1471(d)(3) of the Code (a "United States owned foreign entity") and (ii) any additional information that the Issuer or its agent requests in connection with FATCA.  If it is a United States person or a United States owned foreign entity that is a holder or beneficial owner of Subordinated Notes or an interest therein, it also hereby agrees to be required to (x) provide the Issuer and Trustee its name, address, U.S. taxpayer identification number and any other information requested by the Issuer or its agent upon request and (y) update any such information provided in clause (x) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required.  It understands and acknowledges that the Issuer may provide such information and any other information concerning its investment in the Subordinated Notes to the IRS.  It understands and acknowledges that the Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in the Subordinated Notes that fails to comply with the foregoing requirements to sell its interest in such Subordinated Notes, or may sell such interest on behalf of such owner.

11.      Any funds to be used by it to purchase the Subordinated Notes shall not directly or indirectly be derived from activities that may contravene applicable laws and regulations, including anti-money laundering laws and regulations

12.      It is not a member of the public in the Cayman Islands.

13.      It understands that the Issuer, the Trustee, the Placement Agents and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

14. It has read the summary of the U.S. federal income tax considerations under the heading "*Certain Tax Considerations*" in the Offering Circular. It agrees to treat the characterization of the Notes as debt or equity for U.S. tax purposes in a manner consistent with the treatment of such Notes by the Issuer as described under the heading "*Certain Tax Considerations*" in the Offering Circular and will take no action inconsistent with such treatment.

15. It has read the summary of the provisions related to no petitions for bankruptcy under the heading "*Description of the Offered Securities – No Petitions for Bankruptcy*" in the Offering Circular. It will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. It understands that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

16. It understands that the Issuer may require certification acceptable to it (i) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding or (ii) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. It agrees to provide any such certification that is requested by the Issuer.

17. If such purchaser is not a "United States person" (as defined in Section 7701(a)(30) of the Code) it makes a representation that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(A) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

18. The Transferee acknowledges that any purported transfer of a Secured Note, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, the Notes, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void *ab initio*

Name of Purchaser:

Dated:


By:_____
   Name:
   Title:

Amount of Subordinated Notes:  $_____

Taxpayer identification number:

| Address for notices: | Wire transfer information for payments: |
|---|---|
| | Bank: |
| | Address: |
| | Bank ABA#: |
| | Account #: |
| Telephone: | FAO: |
| Facsimile: | Attention: |
| Attention: | |

Denominations of certificates (if more than one):
Registered name:

cc:    Acis CLO 2013-1 Ltd.
c/o Appleby Trust (Cayman) Ltd.
Clifton House, 75 Fort Street
PO Box 1350
Grand Cayman KYI-1108, Cayman Islands

FORM OF EXCHANGE NOTICE

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN  55107
Attn:  Corporate Trust Services – ACIS CLO 2013-1

      Re:    ACIS CLO 2013-1 LTD.
           Combination Notes

      Reference is hereby made to the Indenture dated as of March 18, 2013 (the "Indenture") among Acis CLO 2013-1 Ltd., as Issuer, Acis CLO 2013-1 LLC, as Co-Issuer (and together with the Issuer, the "Co-Issuers") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

      [This letter relates to U.S. $[_____] aggregate principal amount of Combination Notes (the "Combination Notes") which are held in the form of [Rule 144A Global Securities][Regulation S Global Securities] (CUSIP [(CINS)] No._____). The undersigned hereby requests that the Trustee effect the exchange of its interest in such Combination Notes for its ratable share of the Class A-1 Notes, the Class B Notes and the Class C Notes] to be held in the form of [Rule 144A Global Securities][Regulation S Global Securities] (CUSIP [(CINS)] No._____, _____ and _____, respectively)  that are allocated to and represented by the Class A-1 Note Component, the Class B Note Component and the Class C Component, in accordance with Section 13.4 of the Indenture.][26]

      [This letter relates to U.S. $[_____] aggregate principal amount of Class A-1 Notes, U.S. $[_____] aggregate principal amount of Class B Notes and U.S. $[_____] aggregate principal amount of Class C Notes which are held in the form of [Rule 144A Global Securities][Regulation S Global Securities] (CUSIP [(CINS)] No._____, _____ and _____, respectively) and are collectively referred to as the "Exchange Notes".  The undersigned hereby requests that the Trustee effect the exchange of its interest in such Exchange Notes for its ratable share of Combination Notes which to be held in the form of [Rule 144A Global Securities][Regulation S Global Securities] (CUSIP [CINS)] No._____), in accordance with Section 13.4 of the Indenture.][27]

      In connection with such exchange, the undersigned does hereby certify that such Notes are being exchanged in accordance with the exchange restrictions set forth in the Indenture and the Offering Circular dated March 12, 2013, including the supplements thereto, relating to such Notes and further certify that:

---

[26] For exchange of Combination Notes for the Underlying Classes represented by such Notes.
[27] For the combination of  Class A-1 Notes, Class B Notes and Class C Notes representing Underlying Classes into Combination Notes.

    (a)      the Permissible Ratio is [_____];

    (b)      the Aggregate Outstanding Amount and face amount of each Note to be exchanged and each Note to be received in such Exchange is [_____];

    (c)      the Holder's DTC participant number is [_____]; and

    (d)      the proposed effective date of the Exchange is [_____].

IN WITNESS WHEREOF, the undersigned has executed this Exchange Notice on the date set forth below.

(NAME OF HOLDER)


By:_____
    Name:
    Title:


Dated:  _____, _____

cc:  Acis CLO 2013-1 Ltd.

<u>EXHIBIT C</u>

<u>FORMS OF WHITE & CASE LLP OPINIONS</u>

<u>EXHIBIT D</u>

<u>FORM OF DECHERT LLP OPINION</u>

Exhibit B

<u>EXHIBIT E</u>

<u>FORM OF SEWARD & KISSEL LLP OPINION</u>

<u>EXHIBIT F</u>

<u>FORM OF APPLEBY (CAYMAN) LTD. OPINION</u>

## CALCULATION OF LIBOR

LIBOR for any Interest Accrual Period will equal (a) the rate appearing on the Reuters Screen for deposits with a term of three months; provided, that LIBOR for the first Interest Accrual Period will be determined by interpolating linearly (and rounding to five decimal places) between (i) the rate appearing on the Reuters Screen for deposits with a term of 4 months and (ii) the rate appearing on the Reuters Screen for deposits with a term of 5 months or (b) if such rate is unavailable at the time LIBOR is to be determined, LIBOR shall be determined on the basis of the rates at which deposits in U.S. Dollars are offered by four major banks in the London market selected by the Calculation Agent (the "Reference Banks") at approximately 11:00 a.m., London time, on the Interest Determination Date to prime banks in the London interbank market for a period approximately equal to such period and an amount approximately equal to the Aggregate Outstanding Amount of the Secured Notes.  The Calculation Agent will request the principal London office of each Reference Bank to provide a quotation of its rate.  If at least two such quotations are provided, LIBOR shall be the arithmetic mean of such quotations (rounded upward to the next higher 1/100).  If fewer than two quotations are provided as requested, LIBOR with respect to such Interest Accrual Period will be the arithmetic mean of the rates quoted by three major banks in New York, New York selected by the Calculation Agent at approximately 11:00 a.m., New York time, on such Interest Determination Date for loans in U.S. Dollars to leading European banks for a term approximately equal to such Interest Accrual Period and an amount approximately equal to the Aggregate Outstanding Amount of the Secured Notes.  If the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR will be LIBOR as determined on the previous Interest Determination Date.

"Reuters Screen" means the rates for deposits in dollars which appear on the Reuters Screen LIBOR 01 Page (or such other page that may replace that page on such service for the purpose of displaying comparable rates) on the Bloomberg Financial Markets Commodities News as of 11:00 a.m., London time, on the Interest Determination Date.

<u>EXHIBIT H</u>

<u>FORM OF SECURITIES ACCOUNT CONTROL AGREEMENT</u>

<div align="right">EXHIBIT I</div>

<div align="center">FORM OF NOTE OWNER CERTIFICATE</div>

U.S. Bank National Association,
as Trustee
60 Livingston Avenue
St. Paul, MN  55107
Attn:  Corporate Trust Services — Acis CLO 2013-1


Acis CLO 2013-1 Ltd.
c/o Appleby Trust (Cayman) Ltd.
Clifton House, 75 Fort Street
PO Box 1350
Grand Cayman KYI-1108, Cayman Islands


Acis CLO 2013-1 LLC
c/o Puglisi & Associates
850 Library Avenue, Ste. 204
Newark, DE  19711


Acis Capital Management, L.P.
300 Crescent Court
Dallas, Texas  75201


> Re:   Reports Prepared Pursuant to the Indenture, dated as of March 18, 2013, among ACIS CLO 2013-1 Ltd., Acis CLO 2013-1 LLC and U.S. Bank National Association, as Trustee (the "Indenture").

Ladies and Gentlemen:

The undersigned hereby certifies that it is the beneficial owner of U.S.$_____ in principal amount of the [Class X Senior Secured Floating Rate Note due 2024] [Class A-1 Senior Secured Floating Rate Note due 2024] [Class A-2 Senior Secured Floating Rate Note due 2024] [Class B Senior Secured Floating Rate Note due 2024] [Class C Mezzanine Secured Deferrable Floating Rate Note due 2023] [Class D Mezzanine Secured Deferrable Floating Rate Note due 2024] [of Acis CLO 2013-1 Ltd. and Acis CLO 2013-1 LLC] [Class E Junior Secured Deferrable Floating Rate Note due 2024][Class F Junior Secured Deferrable Floating Rate Note due 2024] [Combination Notes] [Subordinated Notes due 2024] [of Acis CLO 2013-1 LLC], and hereby requests the Trustee to provide to it (or its designated nominee set forth below) at the following address the [information specified in Section 7.17(g) of the Indenture] [and/or the] [information specified in Section 7.17(h) of the Indenture] [and/or the] [information specified in Section 7.17(i) of the Indenture] [and/or the] [access to the

<div align="right">
Exhibit I

Page 2
</div>

Trustees website specified in <u>Section 10.7(i)</u> of the Indenture] [and/or the] [statement of Independent certified public accountants specified in <u>Section 10.9(b)</u> of the Indenture].

Please return the form via facsimile to the Trustee at 190 South LaSalle Street, 10th Floor, Chicago, IL 60603, Attn: Corporate Trust Services – ACIS CLO 2013-1, Fax: 312-332-8030.

Address:_____

_____

_____

IN WITNESS WHEREOF, the undersigned has caused this certificate to be duly executed this _____ day of _____, _____.


[NAME OF BENEFICIAL OWNER]


By: _____

Authorized Signatory

**EXECUTION VERSION**

**DATED AS OF FEBRUARY 25, 2014**

**ACIS CLO 2014-3 LTD.**
ISSUER

**ACIS CLO 2014-3 LLC**
CO-ISSUER

**U.S. BANK NATIONAL ASSOCIATION,**
TRUSTEE

INDENTURE

18750188.25.BUSINESS

# TABLE OF CONTENTS

**Page**

1.  DEFINITIONS ................................................................................................ 2

　1.1 Definitions ............................................................................................. 2
　1.2 Assumptions as to Assets ..................................................................... 64
　1.3 Uncertificated Subordinated Notes ..................................................... 67


2.  THE NOTES ................................................................................................. 67

　2.1 Forms Generally .................................................................................. 68
　2.2 Forms of Notes .................................................................................... 66
　2.3 Authorized Amount; Stated Maturity; Denominations ....................... 70
　2.4 Execution, Authentication, Delivery and Dating ............................... 73
　2.5 Registration, Registration of Transfer and Exchange ........................ 74
　2.6 Mutilated, Defaced, Destroyed, Lost or Stolen Note ......................... 83
　2.7 Payment of Principal and Interest and Other Amounts; Principal and
　　　Interest Rights Preserved ................................................................... 84
　2.8 Persons Deemed Owners ..................................................................... 87
　2.9 Cancellation ......................................................................................... 88
　2.10 DTC Ceases to be Depository ............................................................. 88
　2.11 Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of
　　　ERISA Representations ...................................................................... 89
　2.12 Treatment ............................................................................................ 91
　2.13 Additional Issuance ............................................................................ 91


3.  CONDITIONS PRECEDENT ...................................................................... 93

　3.1 Conditions to Issuance of Notes on Closing Date .............................. 93
　3.2 Conditions to Additional Issuance ..................................................... 97
　3.3 Custodianship; Delivery of Collateral Obligations and Eligible
　　　Investments ........................................................................................ 99


4.  SATISFACTION AND DISCHARGE ........................................................ 100

　4.1 Satisfaction and Discharge of Indenture ........................................... 100
　4.2 Application of Trust Money ............................................................... 101
　4.3 Repayment of Monies Held by Paying Agent ................................... 101
　4.4 Limitation on Obligation to Incur Administrative Expenses ............ 102


5.  REMEDIES ................................................................................................. 102

Exhibit B

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 5.1 | Events of Default | 102 |
| 5.2 | Acceleration of Maturity; Rescission and Annulment | 104 |
| 5.3 | Collection of Indebtedness and Suits for Enforcement by Trustee | 105 |
| 5.4 | Remedies | 107 |
| 5.5 | Optional Preservation of Assets | 109 |
| 5.6 | Trustee May Enforce Claims Without Possession of Notes | 110 |
| 5.7 | Application of Money Collected | 110 |
| 5.8 | Limitation on Suits | 110 |
| 5.9 | Unconditional Rights of Secured Noteholders to Receive Principal and Interest | 111 |
| 5.10 | Restoration of Rights and Remedies | 111 |
| 5.11 | Rights and Remedies Cumulative | 112 |
| 5.12 | Delay or Omission Not Waiver | 112 |
| 5.13 | Control by Majority of Controlling Class | 112 |
| 5.14 | Waiver of Past Defaults | 112 |
| 5.15 | Undertaking for Costs | 113 |
| 5.16 | Waiver of Stay or Extension Laws | 113 |
| 5.17 | Sale of Assets | 114 |
| 5.18 | Action on the Notes | 114 |
| 6. | THE TRUSTEE | 115 |
| 6.1 | Certain Duties and Responsibilities | 115 |
| 6.2 | Notice of Default | 117 |
| 6.3 | Certain Rights of Trustee | 117 |
| 6.4 | Not Responsible for Recitals or Issuance of Notes | 120 |
| 6.5 | May Hold Notes | 121 |
| 6.6 | Money Held in Trust | 121 |
| 6.7 | Compensation and Reimbursement | 121 |
| 6.8 | Corporate Trustee Required; Eligibility | 122 |
| 6.9 | Resignation and Removal; Appointment of Successor | 123 |
| 6.10 | Acceptance of Appointment by Successor | 124 |
| 6.11 | Merger, Conversion, Consolidation or Succession to Business of Trustee | 125 |
| 6.12 | Co-Trustees | 125 |
| 6.13 | Certain Duties of Trustee Related to Delayed Payment of Proceeds | 126 |
| 6.14 | Authenticating Agents | 127 |
| 6.15 | Withholding | 127 |
| 6.16 | Representative for Secured Noteholders Only; Agent for each other Secured Party and the Holders of the Subordinated Notes | 128 |
| 6.17 | Representations and Warranties of the Bank | 128 |
| 6.18 | Notices Relating to the Portfolio Manager | 129 |

## TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| 7. | | COVENANTS | 129 |
| | 7.1 | Payment of Principal and Interest | 129 |
| | 7.2 | Maintenance of Office or Agency | 129 |
| | 7.3 | Money for Note Payments to be Held in Trust | 130 |
| | 7.4 | Existence of Co-Issuers | 132 |
| | 7.5 | Protection of Assets | 133 |
| | 7.6 | Opinions as to Assets | 134 |
| | 7.7 | Performance of Obligations | 134 |
| | 7.8 | Negative Covenants | 135 |
| | 7.9 | Statement as to Compliance | 138 |
| | 7.10 | Co-Issuers May Consolidate, etc., Only on Certain Terms | 138 |
| | 7.11 | Successor Substituted | 140 |
| | 7.12 | Maintenance of Listing | 140 |
| | 7.13 | Annual Rating Review | 140 |
| | 7.14 | Reporting | 141 |
| | 7.15 | Calculation Agent | 141 |
| | 7.16 | Certain Tax Matters | 142 |
| | 7.17 | Effective Date; Purchase of Additional Collateral Obligations | 149 |
| | 7.18 | Representations Relating to Security Interests in the Assets | 152 |
| | 7.19 | Rule 17g-5 Compliance | 154 |
| | 7.20 | Filings | 156 |
| 8. | | SUPPLEMENTAL INDENTURES | 156 |
| | 8.1 | Supplemental Indentures Without Consent of Holders of Notes | 156 |
| | 8.2 | Supplemental Indentures With Consent of Holders of Notes | 159 |
| | 8.3 | Execution of Supplemental Indentures | 160 |
| | 8.4 | Effect of Supplemental Indentures | 162 |
| | 8.5 | Reference in Notes to Supplemental Indentures | 162 |
| | 8.6 | Re-Pricing Amendments | 163 |
| | 8.7 | Base Rate Amendments | 165 |
| 9. | | REDEMPTION OF NOTES | 166 |
| | 9.1 | Mandatory Redemption | 166 |
| | 9.2 | Optional Redemption | 166 |
| | 9.3 | Tax Redemption | 168 |
| | 9.4 | Redemption Procedures | 169 |

**TABLE OF CONTENTS**
(continued)

Page

9.5    Notes Payable on Redemption Date ................................................................. 171

9.6    Special Redemption ........................................................................................ 172

10.    ACCOUNTS, ACCOUNTINGS AND RELEASES ...................................................... 173

10.1    Collection of Money ....................................................................................... 173

10.2    Collection Account ......................................................................................... 173

10.3    Transaction Accounts...................................................................................... 175

10.4    The Revolver Funding Account...................................................................... 178

10.5    Reinvestment of Funds in Accounts; Reports by Trustee................................. 180

10.6    Accountings .................................................................................................... 181

10.7    Release of Assets ........................................................................................... 189

10.8    Reports by Independent Accountants .............................................................. 190

10.9    Reports to Rating Agencies and Additional Recipients..................................... 191

10.10    Procedures Relating to the Establishment of Accounts Controlled by the Trustee............................................................................................................. 192

10.11    Section 3(c)(7) Procedures.............................................................................. 192

11.    APPLICATION OF MONIES ......................................................................................... 193

11.1    Disbursements of Monies from Payment Account .......................................... 193

12.    SALE OF COLLATERAL OBLIGATIONS; PURCHASE OF ADDITIONAL COLLATERAL OBLIGATIONS ................................................................................. 201

12.1    Sales of Collateral Obligations ....................................................................... 201

12.2    Purchase of Additional Collateral Obligations ................................................ 204

12.3    Conditions Applicable to All Sale and Purchase Transactions.......................... 207

12.4    Disposition of Illiquid Assets.......................................................................... 208

13.    NOTEHOLDERS' RELATIONS ................................................................................... 209

13.1    Subordination.................................................................................................. 209

13.2    Standard of Conduct ....................................................................................... 210

14.    MISCELLANEOUS ....................................................................................................... 211

14.1    Form of Documents Delivered to Trustee ....................................................... 211

14.2    Acts of Holders .............................................................................................. 212

**TABLE OF CONTENTS**
(continued)

**Page**

14.3    Notices, etc., to Trustee, the Co-Issuers, the Portfolio Manager, the Initial Purchaser, the Collateral Administrator, the Paying Agent, the Administrator and any Rating Agency ............................................................ 212
14.4    Notices to Holders; Waiver ................................................................ 214
14.5    Effect of Headings and Table of Contents ........................................ 215
14.6    Successors and Assigns ..................................................................... 215
14.7    Severability ........................................................................................ 215
14.8    Benefits of Indenture ......................................................................... 216
14.9    Legal Holidays .................................................................................. 216
14.10  Governing Law .................................................................................. 216
14.11  Submission to Jurisdiction ................................................................ 216
14.12  Waiver of Jury Trial .......................................................................... 216
14.13  Counterparts ...................................................................................... 217
14.14  Acts of Issuer .................................................................................... 217
14.15  Confidential Information ................................................................... 217
14.16  Liability of Co-Issuers ...................................................................... 219

15.      ASSIGNMENT OF CERTAIN AGREEMENTS ........................................ 219
15.1    Assignment of Portfolio Management Agreement ............................ 219

**TABLE OF CONTENTS**
(continued)

**Page**

Schedules and Exhibits

Schedule 1     List of Collateral Obligations
Schedule 2     S&P Industry Classifications
Schedule 3     Moody's Rating Definitions
Schedule 4     Diversity Score Calculation
Schedule 5     Moody's Industry Classification Group List
Schedule 6     S&P Test Matrix Tables

Exhibit A     Forms of Notes

A1     Form of Global Class A-1 Note
A2     Form of Global Class A-2 Note
A3     Form of Global Class A-X Note
A4     Form of Global Class B Note
A5     Form of Global Class C Note
A6     Form of Global Class D Note
A7     Form of Global Class E Note
A8     Form of Global Class F Note
A9     Form of Global Subordinated Note
A10     Form of Certificated Subordinated Note
A11     Form of Certificated Class A-1 Note
A12     Form of Certificated Class A-2 Note
A13     Form of Certificated Class A-X Note
A14     Form of Certificated Class B Note
A15     Form of Certificated Class C Note
A16     Form of Certificated Class D Note
A17     Form of Certificated Class E Note
A18     Form of Certificated Class F Note

Exhibit B     Forms of Transfer and Exchange Certificates

B1     Form of Transferor Certificate for Transfer of Rule 144A Global Note or Certificated
          Note to Regulation S Global Note
B2     Form of Purchaser Representation Letter for Certificated Secured Notes
B3     Form of Transferor Certificate for Transfer of Regulation S Global Note or Certificated
          Note to Rule 144A Global Note
B4     Form of Purchaser Representation Letter for Certificated Subordinated Notes or
          Uncertificated Subordinated Notes
B5     Form of ERISA Certificate
B6     Form of Transferee Certificate of Rule 144A Global Note
B7     Form of Transferee Certificate of Regulation S Global Note

**TABLE OF CONTENTS**
(continued)

**Page**

B8      Form of Transferor Certificate for Transfer of Certificated/Uncertificated Subordinated Note

Exhibit C          Form of Opinion of Dechert LLP

Exhibit D          Form of Opinion of Seward & Kissel LLP

Exhibit E          Form of Opinion of Dechert LLP

Exhibit F          Form of Opinion of Maples and Calder

Exhibit G          Calculation of LIBOR

Exhibit H          Form of Note Owner Certificate

Exhibit I          Form of Confirmation of Registration

Exhibit B

**INDENTURE**, dated as of February 25, 2014, among ACIS CLO 2014-3 Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), ACIS CLO 2014-3 LLC, a limited liability company formed under the laws of the State of Delaware (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), and U.S. Bank National Association, as trustee (herein, together with its permitted successors and assigns in the trusts hereunder, the "Trustee").

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture. Except as otherwise provided herein, all covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Secured Parties. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the agreement's terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Holders of the Secured Notes, the Trustee, the Portfolio Manager and the Collateral Administrator (collectively, the "Secured Parties"), all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, (a) the Collateral Obligations (listed, as of the Closing Date, in Schedule 1 to this Indenture) which the Issuer causes to be delivered to the Trustee (directly or through an intermediary or bailee) herewith and all payments thereon or with respect thereto and all Collateral Obligations that are delivered to the Trustee in the future pursuant to the terms hereof and all payments thereon or with respect thereto, (b) each of the Accounts, and any Eligible Investments purchased with funds on deposit in any of the Accounts, and all income from the investment of funds therein, (c) the equity interest in any Tax Subsidiary and all payments and rights thereunder, (d) the Portfolio Management Agreement as set forth in Article 15 and the Collateral Administration Agreement, (e) all Cash or Money delivered to the Trustee (or its bailee) for the benefit of the Secured Parties, (f) all accounts, chattel paper, deposit accounts, financial assets, general intangibles, instruments, investment property, goods, letter-of-credit rights and other supporting obligations relating to the foregoing (in each case as defined in the UCC), (g) any other property otherwise delivered to the Trustee by or on behalf of the Issuer (whether or not constituting Collateral Obligations or Eligible Investments) and (h) all proceeds with respect to the foregoing; *provided* that such Grants shall not include the U.S.$250 transaction fee paid to the Issuer in consideration of the issuance of the Secured Notes and Subordinated Notes, the funds attributable to the issuance and allotment of the Issuer's ordinary shares or the bank account in the Cayman Islands in which such funds are deposited (or any interest thereon) (collectively, the "Excepted Property") (the assets referred to in (a) through (h), excluding the Excepted Property, are collectively referred to as the "Assets").

The above Grant is made in trust to secure the Secured Obligations as provided for herein. Except as set forth in the Priority of Payments and Article 13 of this Indenture, the

18750188.25.BUSINESS

Secured Notes are secured by the Grant equally and ratably without prejudice, priority or distinction between any Secured Note and any other Secured Note by reason of difference in time of issuance or otherwise. The Grant is made to secure, in accordance with the priorities set forth in the Priority of Payments and Article 13 of this Indenture, (i) the payment of all amounts due on the Secured Notes in accordance with their terms, (ii) the payment of all other sums (other than in respect of the Subordinated Notes) payable under this Indenture, (iii) the payment of amounts owing by the Issuer under the Portfolio Management Agreement and the Collateral Administration Agreement and (iv) compliance with the provisions of this Indenture, all as provided in this Indenture (collectively, the "Secured Obligations"). The foregoing Grant shall, for the purpose of determining the property subject to the lien of this Indenture, be deemed to include any securities and any investments granted to the Trustee by or on behalf of the Issuer, whether or not such securities or investments satisfy the criteria set forth in the definitions of "Collateral Obligation" or "Eligible Investments", as the case may be.

The Trustee acknowledges such Grant, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein in accordance with the terms hereof.

## 1. DEFINITIONS

### 1.1 Definitions

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms. Except as otherwise specified herein or as the context may otherwise require: (i) references to an agreement or other document are to it as amended, supplemented, restated and otherwise modified from time to time and to any successor document (whether or not already so stated); (ii) references to a statute, regulation or other government rule are to it as amended from time to time and, as applicable, are to corresponding provisions of successor governmental rules (whether or not already so stated); (iii) the word "including" and correlative words shall be deemed to be followed by the phrase "without limitation" unless actually followed by such phrase or a phrase of like import; (iv) the word "or" is always used inclusively herein (for example, the phrase "A or B" means "A or B or both," not "either A or B but not both"), unless used in an "either … or" construction; (v) references to a Person are references to such Person's successors and assigns (whether or not already so stated); (vi) all references in this Indenture to designated "Articles", "Sections", "sub-Sections" and other subdivisions are to the designated articles, sections, sub-sections and other subdivisions of this Indenture; and (vii) the words "herein", "hereof", "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular article, section, sub-section or other subdivision.

"17g-5 Information Website": The internet website of the Issuer, located at ACIS20143@structuredfn.com, access to which is limited to Rating Agencies and NRSROs who have provided an NRSRO Certification.

18750188.25.BUSINESS

"Acceleration Event": The meaning specified in Section 5.4(a).

"Accountants' Report": An agreed-upon procedures report from the firm or firms selected by the Issuer pursuant to Section 10.8(a).

"Accounts": (i) the Payment Account, (ii) the Collection Account, (iii) the Ramp-Up Account, (iv) the Revolver Funding Account, (v) the Expense Reserve Account, (vi) the Interest Reserve Account, (vii) the Reinvestment Amount Account and (viii) the Custodial Account.

"Accredited Investor": The meaning set forth in Rule 501(a) under the Securities Act.

"Act" and "Act of Holders" The meanings specified in Section 14.2.

"Additional Issuance Threshold Test. A test that will be satisfied on the date of any issuance of additional notes if (1) no Event of Default has occurred and is continuing or would result therefrom, (2) the Overcollateralization Ratio Test with respect to the Class A Notes is satisfied after giving effect to such issuance and (3) the aggregate principal amount of additional Subordinated Notes being issued is at least equal to U.S.$2,000,000.

"Adjusted Collateral Principal Amount": As of any date of determination, (a) the Aggregate Principal Balance of the Collateral Obligations (other than Defaulted Obligations, Discount Obligations and Deferring Securities); *plus* (b) without duplication, the amounts on deposit in the Collection Account, the Payment Account and the Ramp-Up Account (including Eligible Investments therein) representing Principal Proceeds; *plus* (c) the S&P Collateral Value of all Defaulted Obligations and Deferring Securities; *plus* (d) the aggregate, for each Discount Obligation, of the purchase price (expressed as a percentage of par) multiplied by the Principal Balance of such Discount Obligation as of such date of determination; *minus* (e) the greater of (x) the Caa Excess Adjustment Amount and (y) the CCC Excess Adjustment Amount; *provided* that, with respect to any Collateral Obligation that satisfies more than one of the definitions of Defaulted Obligation, Discount Obligation, Deferring Security or any asset that falls into the Caa Excess Adjustment Amount or CCC Excess Adjustment Amount, such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the category of Collateral Obligations which results in the lowest Adjusted Collateral Principal Amount on any date of determination; *provided further* that with respect to any Tax Subsidiary Asset held by a Tax Subsidiary, for purposes of this definition and the calculation of any Overcollateralization Ratio, such Tax Subsidiary Asset will be treated in the same manner as if it were held directly by the Issuer.

"Administration Agreement": An agreement between the Administrator and the Issuer (as amended from time to time) relating to the various management functions that the Administrator will perform on behalf of the Issuer, including the provision of certain clerical, administrative and other services during the term of such agreement.

"Administrative Expense Cap": An amount equal on any Payment Date (when taken together with any Administrative Expenses paid during the period since the preceding Payment Date or in the case of the first Payment Date, the period since the Closing Date), to the sum of (a) 0.02% per annum (prorated for the related Interest Accrual Period on the basis of a 360-day

Page 3

year consisting of twelve 30-day months) of the Fee Basis Amount on the related Determination Date and (b) U.S.$250,000 per annum (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months); *provided* that (1) in respect of any Payment Date after the third Payment Date following the Closing Date, if the aggregate amount of Administrative Expenses paid pursuant to Sections 11.1(a)(i)(A), 11.1(a)(ii)(A) and 11.1(a)(iii)(A) (including any excess applied in accordance with this proviso) on the three immediately preceding Payment Dates and during the related Collection Periods is less than the stated Administrative Expense Cap (without regard to any excess applied in accordance with this proviso) in the aggregate for such three preceding Payment Dates, then the excess may be applied to the Administrative Expense Cap with respect to the then-current Payment Date; and (2) in respect of the third Payment Date following the Closing Date, such excess amount shall be calculated based on the Payment Dates preceding such Payment Date.

"<u>Administrative Expenses</u>":   The fees, expenses (including indemnities) and other amounts due or accrued with respect to any Payment Date (including, with respect to any Payment Date, any such amounts that were due and not paid on any prior Payment Date) and payable in the following order by the Issuer or the Co-Issuer:  *first*, to the Trustee pursuant to <u>Section 6.7</u> and the other provisions of this Indenture, *second*, to the Collateral Administrator pursuant to the Collateral Administration Agreement, *third*, on a pro rata basis, the following amounts (excluding indemnities) to the following parties: (i) the Independent accountants, agents (other than the Portfolio Manager) and counsel of the Issuer for fees and expenses; (ii) the Rating Agency for fees and expenses (including any annual fee, amendment fees and surveillance fees) in connection with any rating of the Secured Notes or in connection with the rating of (or provision of credit estimates in respect of) any Collateral Obligations; (iii) the Portfolio Manager under this Indenture and the Portfolio Management Agreement, including without limitation reasonable expenses of the Portfolio Manager (including fees for its accountants, agents and counsel) incurred in connection with the purchase or sale of any Collateral Obligations, any other expenses incurred in connection with the Collateral Obligations and amounts payable pursuant to Sections 6, 9 and 11 of the Portfolio Management Agreement but excluding the Management Fee; (iv) the Administrator pursuant to the Administration Agreement and the Registered Office Agreement; (v) any other Person in respect of any other fees or expenses permitted under this Indenture and the documents delivered pursuant to or in connection with this Indenture (including any expenses related to creating or administering Tax Subsidiaries, the payment of facility rating fees, in connection with satisfying the requirements of Rule 17g-5 of the Exchange Act and all legal and other fees and expenses incurred in connection with the purchase or sale of any Collateral Obligations and any other expenses incurred in connection with the Collateral Obligations) and the Notes, including but not limited to, amounts owed to the Co-Issuer pursuant to <u>Section 7.1</u> and any amounts due in respect of the listing of the Notes on any stock exchange or trading system; and (vi) to make any capital contribution to a Tax Subsidiary necessary to pay any taxes, registered office or governmental fees owing by such Tax Subsidiary and *fourth*, on a pro rata basis, indemnities payable to any Person pursuant to any Transaction Document; *provided* that (x) for the avoidance of doubt, amounts that are expressly payable to any Person under the Priority of Payments in respect of an amount that is stated to be payable as an amount other than as Administrative Expenses (including, without limitation, interest and principal in respect of the Notes) shall not constitute Administrative Expenses and (y) no amount shall be payable to the Portfolio Manager as Administrative Expenses in reimbursement of fees or

Page 4

expenses of any third party unless the Portfolio Manager shall have first paid the fees or expenses that are the subject of such reimbursement.

"<u>Administrator</u>":  MaplesFS Limited and any successor thereto.

"<u>Affected Class</u>":  Any Class of Secured Notes that, as a result of the occurrence of a Tax Event described in the definition of "Tax Redemption", has not received 100% of the aggregate amount of principal and interest that would otherwise be due and payable to such Class on any Payment Date.

"<u>Affiliate</u>":  With respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (ii) any other Person who is a director, Officer, employee or general partner (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in clause (i) above. For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Persons, or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  For purposes of this definition, the management of an account by one Person for the benefit of any other Person shall not constitute "control" of such other Person and no entity shall be deemed an Affiliate of the Issuer or the Co-Issuer solely because the Administrator or its Affiliates serve as administrator or share trustee for such entity.

"<u>Agent Members</u>":  Members of, or participants in, DTC, Euroclear or Clearstream.

"<u>Aggregate Coupon</u>":  As of any Measurement Date, the sum of the products obtained by multiplying, in the case of each Fixed Rate Obligation, (i) the stated coupon on such Collateral Obligation (excluding any non-Cash interest portion of such coupon for any Deferring Security) expressed as a percentage and (ii) the Principal Balance of such Collateral Obligation (with respect to (a) any Deferrable Security, including for this purpose any capitalized interest with respect to which current cash interest is being paid and (b) any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, excluding the unfunded portion).

"<u>Aggregate Excess Funded Spread</u>":  As of any Measurement Date, the amount obtained by *multiplying*: (a) the amount equal to the Base Rate applicable to the Secured Notes during the Interest Accrual Period in which such Measurement Date occurs; by (b) the amount (not less than zero) equal to (i) the Aggregate Principal Balance of the Collateral Obligations as of such Measurement Date (with respect to any Deferrable Security, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid) minus (ii) the Reinvestment Target Par Balance.

"<u>Aggregate Funded Spread</u>": As of any Measurement Date, the sum of: (a) in the case of each Floating Rate Obligation that bears interest at a spread over a London interbank offered rate based index, (i) the stated interest rate spread  (excluding any non-Cash interest portion) on such Collateral Obligation above such index *multiplied by* (ii) the Principal Balance of such Collateral Obligation (with respect to (A) any Deferrable Security, including for this purpose any

Page 5

capitalized interest with respect to which current cash interest is being paid and (B) any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, excluding the unfunded portion), and (b) in the case of each Floating Rate Obligation that bears interest at a spread over an index other than a London interbank offered rate based index, (i) the excess of the sum of such spread (excluding any non-Cash interest portion of such spread for any Deferring Security) and such index over LIBOR as of the immediately preceding Interest Determination Date (which spread or excess may be expressed as a negative percentage) *multiplied by* (ii) the Principal Balance of each such Collateral Obligation (with respect to (A) any Deferrable Security, including for this purpose any capitalized interest with respect to which current cash interest is being paid and (B) any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, excluding the unfunded portion); *provided* that, for purposes of this definition, the interest rate spread with respect to any Floating Rate Obligation that has a floor based on the London interbank offered rate will be deemed to be the stated interest rate spread plus, if positive, (x) the value of such floor minus (y) LIBOR as of the immediately preceding Interest Determination Date.

"Aggregate Outstanding Amount":  (a) With respect to any of the Secured Notes as of any date (other than the Class A-X Notes), the aggregate unpaid principal amount of such Notes Outstanding (including any Secured Note Deferred Interest previously added to the principal amount of any Class of Secured Notes that remains unpaid) on such date; (b) with respect to the Class A-X Notes, as of any date, the difference between (i) $3,500,000 minus (ii) the aggregate amount of all or any portion of each Class A-X Principal Amortization Amount and (without duplication) each Unpaid Class A-X Principal Amortization Amount paid pursuant to any of the Priority of Payments on any Payment Date that occurred prior to such date; and (c) with respect to the Subordinated Notes, as of any date, the aggregate unpaid principal amount of such Subordinated Notes Outstanding as of such date.

"Aggregate Principal Balance":  When used with respect to all or a portion of the Collateral Obligations or the Assets, the sum of the Principal Balances of all or of such portion of the Collateral Obligations or Assets, respectively.

"Aggregate Unfunded Spread": As of any Measurement Date, the sum of the products obtained by *multiplying* (i) for each Delayed Drawdown Collateral Obligation and Revolving Collateral Obligation (other than Defaulted Obligations), the related commitment fee then in effect as of such date and (ii) the undrawn commitments of each such Delayed Drawdown Collateral Obligation and Revolving Collateral Obligation as of such date.

"Alternative Base Rate":  The meaning specified in Section 8.7(a).

"Applicable Issuer" or "Applicable Issuers":  With respect to the Secured Notes other than the Class E Notes and the Class F Notes, the Co-Issuers; with respect to the Class E Notes, the Class F Notes and the Subordinated Notes, the Issuer only; and with respect to any additional notes issued in accordance with Sections 2.13 and 3.2, the Issuer and, if such notes are co-issued, the Co-Issuer.

18750188.25.BUSINESS

"<u>Asset Assigned Recovery Rate Method</u>":  The meaning specified in the definition of the term "Weighted Average S&P Recovery Rate".

"<u>Asset Assigned Recovery Rating</u>":  The meaning specified in the definition of the term "Weighted Average S&P Recovery Rate".

"<u>Asset-backed Commercial Paper</u>":  Commercial paper or other short-term obligations of a program that primarily issues externally rated commercial paper backed by assets or exposures held in a bankruptcy-remote, special purpose entity.

"<u>Assets</u>":  The meaning assigned in the Granting Clauses hereof.

"<u>Assigned Moody's Rating</u>":  With respect to any Collateral Obligation, the "Assigned Moody's Rating" as defined on <u>Schedule 3</u> hereto (or such other schedule provided by Moody's to the Issuer, the Trustee, the Collateral Administrator and the Portfolio Manager).

"<u>Assumed Reinvestment Rate</u>":  LIBOR (as determined on the most recent Interest Determination Date relating to an Interest Accrual Period beginning on a Payment Date or the Closing Date) minus 0.50% per annum; *provided* that the Assumed Reinvestment Rate shall not be less than 0.00%.

"<u>Authenticating Agent</u>":  With respect to the Notes or a Class of the Notes, the Person designated by the Trustee to authenticate such Notes on behalf of the Trustee pursuant to <u>Section 6.14</u>.

"<u>Authorized Officer</u>":  With respect to the Issuer or the Co-Issuer, any Officer or any other Person who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer or the Co-Issuer.  With respect to the Portfolio Manager, any Officer, authorized person or employee of the Portfolio Manager set forth on the list provided by the Portfolio Manager to the Issuer and the Trustee, which list shall include any portfolio manager having day-to-day responsibility for the performance of the Portfolio Manager under the Portfolio Management Agreement, as such list may be amended from time to time.  With respect to the Collateral Administrator, any Officer, employee, partner or agent of the Collateral Administrator who is authorized to act for the Collateral Administrator in matters relating to, and binding upon, the Collateral Administrator with respect to the subject matter of the request, certificate or order in question.  With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer.  With respect to any Authenticating Agent, any Officer of such Authenticating Agent who is authorized to authenticate the Notes.  Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"<u>Available Funds</u>":  With respect to any Payment Date, the amount of any positive balance (of Cash and Eligible Investments) in the Collection Account and the Reinvestment Amount Account as of the Determination Date relating to such Payment Date and, with respect to any other date, such amount as of that date.

<p style="text-align:center">Page 7</p>

"Average Life": On any date of determination with respect to any Collateral Obligation, the quotient obtained by *dividing* (i) the sum of the products of (a) the number of years (rounded to the nearest one hundredth thereof) from such date of determination to the respective dates of each successive Scheduled Distribution of principal of such Collateral Obligation and (b) the respective amounts of principal of such Scheduled Distributions *by* (ii) the sum of all successive Scheduled Distributions of principal on such Collateral Obligation.

"Balance": On any date, with respect to Cash or Eligible Investments in any account, the aggregate of the (i) current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) principal amount of interest-bearing corporate and government securities, money market accounts and repurchase obligations; and (iii) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"Bank": U.S. Bank National Association, in its individual capacity or any successor thereto.

"Bankruptcy Filing": Either of, (i) the institution of any proceeding to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent or (ii) the filing of any petition seeking relief, reorganization, arrangement, adjustment or composition of or in respect of the Issuer or Co-Issuer, as the case may be, under applicable bankruptcy law or other applicable law.

"Bankruptcy Law": The federal Bankruptcy Code, Title 11 of the United States Code, the Companies Winding Up Rules 2008 of the Cayman Islands and Part V of the Companies Law of the Cayman Islands, each as amended from time to time.

"Base Management Fee": The fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9(a) of the Portfolio Management Agreement and Section 11.1 of this Indenture, in an amount equal to 0.15% per annum (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date or, for the relevant period, such lesser rate as specified in the related Fee Election Notice.

"Base Rate": For each Class of Floating Rate Notes and each Interest Accrual Period, (A) LIBOR or (B) if a Base Rate Amendment is entered into, for each Interest Accrual Period commencing after the execution and effectiveness of such Base Rate Amendment, the Alternative Base Rate.

"Base Rate Amendment": The meaning specified in Section 8.7(b).

"Benefit Plan Investor": A "benefit plan investor" as defined in 29 C.F.R. Section 2510. 3-101 and Section 3(42) of ERISA, which includes an employee benefit plan (as defined in Section 3(3) of ERISA that is subject to Part 4, Subtitle B of Title I of ERISA, a plan as defined in Section 4975(e)(1) to which Section 4975 of the Code applies or an entity whose underlying

assets include "plan assets" by reason of such an employee benefit plan's or a plan's investment in such entity.

"Board of Directors": With respect to the Issuer, the directors of the Issuer duly appointed by the shareholders of the Issuer or the board of directors of the Issuer, and with respect to the Co-Issuer, the manager of the Co-Issuer duly appointed by the members of the Co-Issuer.

"Board Resolution": With respect to the Issuer, a resolution of the Board of Directors of the Issuer and, with respect to the Co-Issuer, a resolution of the Board of Directors of the Co-Issuer.

"Bond": A debt security (that is not a Loan) that is issued by a corporation, limited liability company, partnership or trust.

"Bond Yield Change": The change in implied yield spread relative to the Merrill Lynch US High Yield Master II Index (Bloomberg Ticker: H0A0) or any other index based upon a nationally recognized index as calculated by the Portfolio Manager in its reasonable commercial judgment.

"Break-even Rate Case": The cases the Portfolio Manager may select in connection with the definition of S&P Test Matrix.

"Bridge Loan": Any Loan or other obligation that (x) is incurred in connection with a merger, acquisition, consolidation, or sale of all or substantially all of the assets of a Person or similar transaction and (y) by its terms, is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancings (it being understood that any such Loan or debt security that has a nominal maturity date of one year or less from the incurrence thereof but has a term-out or other provision whereby (automatically or at the sole option of the obligor thereof) the maturity of the indebtedness thereunder may be extended to a later date is not a Bridge Loan).

"Business Day": Any day other than (i) a Saturday or a Sunday or (ii) a day on which commercial banks are authorized or required by applicable law, regulation or executive order to close in New York, New York or in the city in which the Corporate Trust Office of the Trustee is located or, for any final payment of principal, in the relevant place of presentation.

"Caa Collateral Obligation": A Collateral Obligation (other than a Defaulted Obligation) with a Moody's Rating of "Caa1" or lower.

"Caa Excess": As of any Measurement Date, the excess, if any, of (a) the Aggregate Principal Balance of all Caa Collateral Obligations owned by the Issuer on such date *over* (b) 7.5% of the Collateral Principal Amount as of such date; *provided* that, in determining which of the Collateral Obligations shall be included in the Caa Excess, the Caa Collateral Obligations with the lowest Market Value (expressed as a percentage of its Principal Balance as of such Measurement Date) shall be deemed to constitute such Caa Excess.

18750188.25.BUSINESS

"Caa Excess Adjustment Amount":  means, as of any Measurement Date, an amount equal to the excess, if any, of (i) the Aggregate Principal Balance of all Collateral Obligations included in the Caa Excess *over* (ii) the Market Value of all Collateral Obligations (or portion thereof) included in the Caa Excess.

"Calculation Agent":  The meaning specified in Section 7.15(a).

"Cash":  Such funds denominated in currency of the United States of America as at the time shall be legal tender for payment of all public and private debts, including funds standing to the credit of an Account.

"CCC Collateral Obligation":  A Collateral Obligation (other than a Defaulted Obligation or a Deferring Security) with an S&P Rating of "CCC+" or lower.

"CCC Excess":  As of any Measurement Date, the excess, if any, of (a) the Aggregate Principal Balance of all CCC Collateral Obligations owned by the Issuer on such date *over* (b) 7.5% of the Collateral Principal Amount as of such date; *provided* that, in determining which of the Collateral Obligations shall be included in the CCC Excess, the CCC Collateral Obligations with the lowest Market Value (expressed as a percentage of its Principal Balance as of such Measurement Date) shall be deemed to constitute such CCC Excess.

"CCC Excess Adjustment Amount":  As of any Measurement Date, an amount equal to the excess, if any, of (i) the Aggregate Principal Balance of all Collateral Obligations included in the CCC Excess *over* (ii) the Market Value of all Collateral Obligations (or portion thereof) included in the CCC Excess.

"CCC/Caa Collateral Obligations":  As of any Measurement Date, (A) if the Aggregate Principal Balance of all Collateral Obligations that are Caa Collateral Obligations is greater than the Aggregate Principal Balance of all Collateral Obligations that are CCC Collateral Obligations, then all of the Caa Collateral Obligations owned by the Issuer as of such date and (B) otherwise, all of the CCC Collateral Obligations owned by the Issuer as of such date.

"Certificate of Authentication":  The meaning specified in Section 2.1.

"Certificated Notes":  The meaning specified in Section 2.2(b)(iii).

"Certificated Secured Note":  The meaning specified in Section 2.2(b)(iii).

"Certificated Security":  The meaning specified in Section 8-102(a)(4) of the UCC.

"Certificated Subordinated Note":  The meaning specified in Section 2.2(b)(ii).

"CFR":  With respect to an obligor of a Collateral Obligation, the "CFR" as defined on Schedule 3 hereto (or such other schedule provided by Moody's to the Issuer, the Trustee, the Collateral Administrator and the Portfolio Manager).

"Class":  In the case of:

Page 10

(a) the Secured Notes, all of the Secured Notes having the same Interest Rate, Stated Maturity and designation; it being agreed and understood that, notwithstanding any of the foregoing, the Class A-1A Notes, the Class A-1F Notes, the Class A-2A Notes, the Class A-2B Notes and the Class A-X Notes shall constitute a single Class except as otherwise provided in this Indenture (or as the context otherwise may require); and

(b) the Subordinated Notes, all of the Subordinated Notes.

"Class A Notes":  The Class A-1 Notes, the Class A-2 Notes and the Class A-X Notes, collectively.

"Class A-1/A-2/B Coverage Tests":  The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class A-1 Notes, the Class A-2 Notes and the Class B Notes collectively.

"Class A-1 Notes":  The Class A-1A Notes and the Class A-1F Notes, collectively.

"Class A-1/A-2 Make-Whole Amount":  With respect to a redemption or repayment of principal of a Class A-1 Note or Class A-2 Note, as applicable, on a Redemption Date or Payment Date before the Payment Date in February 2017 in the circumstances set forth in Section 9.7, (i) 100% of the Aggregate Outstanding Amount of such Class A-1 Note or Class A-2 Note, as applicable (in the case of clauses (a) or (b) of Section 9.7) or the amount of principal of the Class A-1 Note or Class A-2 Note, as applicable, being repaid (in the case of clauses (c) or (d) of Section 9.7) multiplied by (ii) the product of (A) (w) in the case of the Class A-1A Notes, 1.51%, (x) in the case of the Class A-1F Notes, 1.56%, (y) in the case of the Class A-2A Notes, 1.55% and (z) in the case of the Class A-2B Notes, 2.00% and (B) the number of days in the period from and including such Redemption Date or Payment Date, as the case may be, to but excluding the Payment Date in February 2017, divided by 360.

"Class A-1A Notes":  The Class A-1A Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class A-1F Notes":  The Class A-1F Senior Secured Fixed Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class A-2 Notes":  The Class A-2A Notes and the Class A-2B Notes, collectively.

"Class A-2A Notes":  The Class A-2A Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class A-2B Notes":  The Class A-2B Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class A-X Notes":  The Class A-X Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

Page 11

"Class A-X Principal Amortization Amount": An amount equal to for each Payment Date beginning with the August 2014 Payment Date and ending with, but including, the May 2015 Payment Date, $875,000.

"Class B Notes": The Class B Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class Break-even Default Rate": With respect to each Class of Secured Notes, the maximum percentage of defaults, at any time, that the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, from time to time, through application of the S&P CDO Monitor, which, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments, will result in sufficient funds remaining for the payment of such Class of Secured Notes in full. For purposes of determining the Class Break-even Default Rates on any date of determination, the Portfolio Manager will inform S&P which combination of cases from the S&P Test Matrix will be used, and the corresponding set of Class Break-even Default Rates from S&P will apply, which, for the avoidance of doubt, must meet the requirements set forth in Section 7.17(g).

"Class C Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"Class C Notes": The Class C Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class D Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class D Notes.

"Class D Notes": The Class D Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class Default Differential": With respect to any Class of Secured Notes, at any time, the rate calculated by subtracting the Class Scenario Default Rate at such time for such Class of Notes from the Class Break-even Default Rate for such Class of Notes at such time.

"Class E Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class E Notes.

"Class E Notes": The Class E Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class F Notes": The Class F Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class Scenario Default Rate": With respect to any Class of Secured Notes, at any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's Initial Rating of such Class of Notes, determined by

18750188.25.BUSINESS

application by the Portfolio Manager and the Collateral Administrator of the S&P CDO Monitor at such time.

"Clearing Agency": An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Corporation": (i) Clearstream, (ii) DTC, (iii) Euroclear and (iv) any entity included within the meaning of "clearing corporation" under Section 8-102(a)(5) of the UCC.

"Clearing Corporation Security": Securities which are in the custody of or maintained on the books of a Clearing Corporation or a nominee subject to the control of a Clearing Corporation and, if they are Certificated Securities in registered form, properly endorsed to or registered in the name of the Clearing Corporation or such nominee.

"Clearstream": Clearstream Banking, société anonyme, a corporation organized under the laws of the Duchy of Luxembourg (formerly known as Cedelbank, société anonyme).

"Closing Date": February 25, 2014.

"Code": The United States Internal Revenue Code of 1986, as amended.

"Co-Issuer": The Person named as such on the first page of this Indenture, until a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"Co-Issuers": The Issuer and the Co-Issuer.

"Collateral Administration Agreement": An agreement, dated as of the Closing Date, among the Issuer, the Portfolio Manager and the Collateral Administrator, as amended from time to time.

"Collateral Administrator": U.S. Bank National Association, in its capacity as collateral administrator under the Collateral Administration Agreement, and any successor thereto.

"Collateral Interest Amount": As of any date of determination, without duplication, the aggregate amount of Interest Proceeds that has been received or that is expected to be received (other than Interest Proceeds expected to be received from Defaulted Obligations and Deferring Securities, but including Interest Proceeds actually received from Defaulted Obligations and Deferring Securities), in each case during the Collection Period in which such date of determination occurs (or after such Collection Period but on or prior to the related Payment Date if such Interest Proceeds would be treated as Interest Proceeds with respect to such Collection Period).

"Collateral Obligation": A (1) Senior Secured Loan, (2) Second Lien Loan, (3) First Lien Last Out Loan, (4) Unsecured Loan (in the cases of clauses (1) through (4), including, but not limited to, interests in bank loans acquired by way of a purchase or assignment) or (5)

Page 13

Participation Interest in any of the assets described in clauses (1) through (4), that as of the date of acquisition (or date of entry into a commitment for acquisition) by the Issuer:

(i) is U.S. Dollar denominated and is neither convertible by the obligor or issuer thereof into, nor payable in, any other currency;

(ii) is not (A) a Defaulted Obligation, (B) a Credit Risk Obligation or (C) a Bond;

(iii) is not a lease (including a finance lease);

(iv) is not an Interest Only Security, Step-Up Obligation or Step-Down Obligation;

(v) if it is a Deferrable Security, is not currently deferring the payment of any accrued and unpaid interest that otherwise would have been due and continues to remain unpaid;

(vi) provides (in the case of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, with respect to amounts drawn thereunder) for a fixed amount of principal payable in Cash on scheduled payment dates and/or at maturity and does not by its terms provide for earlier amortization or prepayment at a price of less than par;

(vii) does not constitute Margin Stock;

(viii) the Issuer will receive payments due under the terms of such asset and proceeds from disposing of such asset free and clear of withholding Tax, other than (A) withholding Tax as to which the obligor or issuer must make additional payments so that the net amount received by the Issuer after satisfaction of such Tax is the amount due to the Issuer before the imposition of any withholding Tax and (B) withholding Tax on (x) amendment, waiver, consent and extension fees and (y) commitment fees and other similar fees in respect of Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations;

(ix) has a Moody's Rating and an S&P Rating;

(x) is not a debt obligation whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(xi) except for Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations, is not an obligation pursuant to which any future advances or payments to the borrower or the obligor thereof may be required to be made by the Issuer;

(xii) does not have an "f", "r", "p", "pi", "q" or "t" subscript assigned by S&P or an "sf" subscript assigned by any nationally recognized investment rating agency;

(xiii)   is not a Related Obligation, a Zero Coupon Bond, a Bridge Loan, a Middle Market Loan or a Structured Finance Obligation;

(xiv)   will not require the Issuer, the Co-Issuer or the pool of Assets to be registered as an investment company under the Investment Company Act;

(xv)   is not, by its terms, convertible into or exchangeable for an Equity Security at any time over its life;

(xvi)   is not the subject of an Offer;

(xvii)   does not have an S&P Rating that is below "CCC-" or a Moody's Default Probability Rating that is below "Caa3";

(xviii)   does not mature after the Stated Maturity of the Notes;

(xix)   accrues interest at a floating rate determined by reference to (a) the Dollar prime rate, federal funds rate or the Base Rate or (b) a similar interbank offered rate, commercial deposit rate or any other index in respect of which S&P has been notified;

(xx)   is Registered;

(xxi)   is not a Synthetic Security;

(xxii)   does not pay interest less frequently than semi-annually;

(xxiii)   does not include or support a letter of credit;

(xxiv)   is not an interest in a grantor trust unless all assets of the grantor trust consist of assets that the Issuer would otherwise be entitled under this Indenture to acquire;

(xxv)   is purchased at a price (expressed as a percentage of the par amount of such Collateral Obligation) at least equal to 65% of its Principal Balance;

(xxvi)   is issued by a Non-Emerging Market Obligor; and

(xxvii)   is not issued by a sovereign, or by a corporate issuer located in a country, which sovereign or country on the date on which the obligation is acquired by the Issuer imposed foreign exchange controls that effectively limit the availability or use of U.S. Dollars to make when due the scheduled payments of principal thereof and interest thereon.

"Collateral Principal Amount":   As of any date of determination, the sum of (a) the Aggregate Principal Balance of the Collateral Obligations (other than Defaulted Obligations) and (b) without duplication, the amounts on deposit in the Collection Account and the Ramp-Up Account (including Eligible Investments therein) representing Principal Proceeds.

Page 15

"Collateral Quality Test":  A test satisfied on any date of determination on and after the Effective Date if, in the aggregate, the Collateral Obligations owned (or in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy each of the tests set forth below (or, if a test is not satisfied on such date of determination, the degree of compliance with such test is maintained or improved after giving effect to any purchase or sale effected on such date of determination), calculated in each case as required by Section 1.2 herein:

(i)     the Minimum Floating Spread Test;

(ii)    the Minimum Weighted Average Coupon Test;

(iii)   the S&P CDO Monitor Test;

(iv)   the Minimum Weighted Average S&P Recovery Rate Test; and

(v)    the Weighted Average Life Test.

"Collection Account":  The trust account established pursuant to Section 10.2, which consists of the Principal Collection Subaccount and the Interest Collection Subaccount.

"Collection Period":  (i) With respect to the first Payment Date, the period commencing on the Closing Date and ending at the close of business on the eighth Business Day prior to the first Payment Date; and (ii) with respect to any other Payment Date, the period commencing on the day immediately following the prior Collection Period and ending (a) in the case of the final Collection Period preceding the latest Stated Maturity of any Class of Notes, on the day preceding such Stated Maturity, (b) in the case of the final Collection Period preceding an Optional Redemption or Tax Redemption in whole of the Notes, on the day preceding the Redemption Date and (c) in any other case, at the close of business on the eighth Business Day prior to such Payment Date.

"Concentration Limitations":  Limitations satisfied on any date of determination on or after the Effective Date if, in the aggregate, the Collateral Obligations owned (or in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer comply with all of the requirements set forth below (or if not in compliance, the relevant requirements must be maintained or improved after giving effect to the purchase), calculated in each case as required by Section 1.2 herein:

(i)     not less than 90.0% of the Collateral Principal Amount may consist of Senior Secured Loans, Cash and Eligible Investments;

(ii)    not more than 10.0% of the Collateral Principal Amount may consist, in the aggregate, of Second Lien Loans, First Lien Last Out Loans and Unsecured Loans and not more than 0.0% of the Collateral Principal Amount may consist, in the aggregate, of Unsecured Bonds, Senior Secured Bonds and Senior Secured Floating Rate Notes; *provided* that, with respect to any obligor and its Affiliates,

Page 16

not more than 1.0% of the Collateral Principal Amount may consist of obligations of such obligor and its Affiliates that are not Senior Secured Loans;

(iii)   not more than 2.0% of the Collateral Principal Amount may consist of obligations issued by a single obligor and its Affiliates, except that obligations (other than DIP Collateral Obligations) issued by up to three obligors and their respective Affiliates may each constitute up to 2.5% of the Collateral Principal Amount;

(iv)   not more than 7.5% of the Collateral Principal Amount may consist of CCC/Caa Collateral Obligations;

(v)   not more than 5.0% of the Collateral Principal Amount may consist of Collateral Obligations that pay interest less frequently than quarterly;

(vi)   not more than 5.0% of the Collateral Principal Amount may consist of Fixed Rate Obligations;

(vii)   not more than 2.5% of the Collateral Principal Amount may consist of Current Pay Obligations; *provided* that, at the time of purchase of a Current Pay Obligation, Current Pay Obligations issued by the obligor of such Current Pay Obligation and its Affiliates may not constitute more than 1.0% of the Collateral Principal Amount;

(viii)   not more than 5.0% of the Collateral Principal Amount may consist of DIP Collateral Obligations; *provided* that, at the time of purchase of a DIP Collateral Obligation, not more than 1.0% of the Collateral Principal Amount may consist of DIP Collateral Obligations issued by a single obligor and its Affiliates;

(ix)   not more than 10.0% of the Collateral Principal Amount may consist, in the aggregate, of unfunded commitments under Delayed Drawdown Collateral Obligations and unfunded and funded commitments under Revolving Collateral Obligations;

(x)   not more than 20.0% of the Collateral Principal Amount may consist of Participation Interests;

(xi)   the Third Party Credit Exposure Limits may not be exceeded;

(xii)   not more than 10.0% of the Collateral Principal Amount may have an S&P Rating derived from a Moody's Rating as set forth in clause (iii)(a) of the definition of the term "S&P Rating";

(xiii)   (a) all of the Collateral Obligations must be issued by Non-Emerging Market Obligors and (b) no more than the percentage listed below of the Collateral Principal Amount may be issued by obligors Domiciled in the country or countries set forth opposite such percentage:

Page 17

| **% Limit** | **Country or Countries** |
|---|---|
| 20.0% | All countries (in the aggregate) other than the United States; |
| 10.0% | all countries (in the aggregate) other than the United States, Canada and the United Kingdom; and |
| 10.0% | all countries (in the aggregate) other than the United States and Canada; |

(xiv)  not more than 10.0% of the Collateral Principal Amount may consist of Collateral Obligations that are issued by obligors that belong to any single S&P Industry Classification, except that (x) Collateral Obligations in up to two S&P Industry Classification groups may each constitute up to 12.0% of the Collateral Principal Amount; and (y) Collateral Obligations in one additional S&P Industry Classification group may constitute up to 15.0% of the Collateral Principal Amount;

(xv)  not more than 0.0% of the Collateral Principal Amount may consist of the LC Commitment Amount under Letter of Credit Reimbursement Obligations;

(xvi)  not more than 60.0% of the Collateral Principal Amount may consist of Cov-Lite Loans; *provided* that not more than 60.0% of the Collateral Principal Amount may consist of, in the aggregate, Cov-Lite Loans, Second Lien Loans, Unsecured Loans, Unsecured Bonds, Senior Secured Bonds and Senior Secured Floating Rate Notes;

(xvii)  no more than 5.0% of the Collateral Principal Amount may consist of Deferrable Securities; *provided* that no such Deferrable Securities are Deferring Securities;

(xviii)  no more than 0.0% of the Collateral Principal Amount may consist of Collateral Obligations maturing after the Stated Maturity; and

(xix)  no more than 0.0% of the Collateral Principal Amount may consist of (a) Zero Coupon Bonds, (b) Step-Up Obligations, (c) Structured Finance Obligations, (d) Asset-backed Commercial Paper, (e) Bridge Loans, (f) Synthetic Securities, or (g) any Collateral Obligation that is, by its terms, convertible or exchangeable for an Equity Security at any time over its life.

"Confidential Information":  The meaning specified in Section 14.15(b).

"Confirmation of Registration":  With respect to an Uncertificated Subordinated Note, a confirmation of registration, substantially in the form of Exhibit I, provided to the owner thereof promptly after the registration of the Uncertificated Subordinated Note in the Register by the Registrar.

Page 18

"Controlling Class":  The Class A Notes so long as any Class A Notes are outstanding; then the Class B Notes so long as any Class B Notes are outstanding; then the Class C Notes so long as any Class C Notes are outstanding; then the Class D Notes so long as any Class D Notes are outstanding; then the Class E Notes so long as any Class E Notes are outstanding; then the Class F Notes so long as any Class F Notes are outstanding; and then the Subordinated Notes.

"Controlling Person":  A Person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the Issuer or any Person who provides investment advice for a fee (direct or indirect) with respect to such assets or an affiliate of any such Person.  For this purpose, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person.  "Control," with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

"Corporate Trust Office":  The principal corporate trust office of the Trustee, currently located at (a) for Note transfer purposes and presentment of the Notes for final payment thereon, U.S. Bank National Association, 60 Livingston Avenue, St. Paul, Minnesota 55103, Attention: Bondholder Services – ACIS CLO 2014-3 Ltd. and (b) for all other purposes, U.S. Bank National Association, 190 S. LaSalle Street, 8th Floor, Chicago, IL  60603, Attention: Global Corporate Trust – ACIS CLO 2014-3 Ltd., email address: ACIS.CLO.2014.03@usbank.com, or such other address as the Trustee may designate from time to time by notice to the Holders, the Portfolio Manager and the Issuer or the principal corporate trust office of any successor Trustee.

"Cov-Lite Loan": Any Loan that (i) does not contain any financial covenants or (ii) requires the borrower to comply with one or more financial covenants only upon the occurrence of certain actions of the borrower including, but not limited to, a debt issuance, dividend payment, share purchase, merger, acquisition or divestiture (such covenant, an "Incurrence Covenant"), but contains no covenants requiring the borrower to comply with one or more financial covenants during each reporting period, whether or not it has taken any specified action (such covenant, a "Maintenance Covenant"); *provided* that, for all purposes other than the determination of the S&P Recovery Rate for such Loan, a Loan described in clause (i) or (ii) above which either contains a cross default provision to, or is *pari passu* with, another Loan of the underlying obligor that requires the underlying obligor to comply with both an Incurrence Covenant and a Maintenance Covenant will be deemed not to be a Cov-Lite Loan.

"Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied to each specified Class of Secured Notes.

"Credit Improved Criteria": The criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a Loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point increase of 0.50% or more, (ii) if such Collateral Obligation is a Loan, the spread over the applicable reference rate for such Collateral Obligation has been decreased in accordance with the underlying instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a Loan with a spread (prior to such decrease) less than or equal to 2.00%), (b) 0.375% or more (in the case of a Loan with a spread (prior to such decrease) greater than 2.00% but less than or

Page 19

equal to 4.00%) or (c) 0.50% or more (in the case of a Loan with a spread (prior to such decrease) greater than 4.00%) due, in each case, to an improvement in the related borrower's financial ratios or financial results, (iii) if such Collateral Obligation is a Bond, the Bond Yield Change since the date of purchase by the Issuer has been a percentage point decrease of 0.50% or more or (iv) if it has a projected cash flow interest coverage ratio (earnings before interest and Taxes divided by cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation that is expected to be more than 1.15 times the current year's projected cash flow interest coverage ratio.

"Credit Improved Obligation":  A Collateral Obligation which, in the Portfolio Manager's reasonable commercial judgment, has significantly improved in credit quality after it was acquired by the Issuer, which improvement may (but need not) be evidenced by one of the following:  (a) such Collateral Obligation satisfies at least one of the Credit Improved Criteria, (b) such Collateral Obligation has been upgraded at least one rating sub category by any Rating Agency or has been placed and remains on credit watch with positive implication by any Rating Agency, (c) the issuer of such Collateral Obligation has raised equity capital or other capital subordinated to the Collateral Obligation or (d) the issuer of such Collateral Obligation has, in the Portfolio Manager's reasonable commercial judgment, shown improved results or possesses less credit risk, in each case since such Collateral Obligation was acquired by the Issuer; *provided* that, during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Improved Obligation only if (i) it has been upgraded by any Rating Agency at least one rating sub category or has been placed and remains on a credit watch with positive implication by Moody's since it was acquired by the Issuer, (ii) at least one of the Credit Improved Criteria are satisfied with respect to such Collateral Obligation or (iii) a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Improved Obligation.

"Credit Risk Criteria": The criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a Loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point decrease of 0.50% or more, (ii) if such Collateral Obligation is a Loan, the spread over the applicable reference rate for such Collateral Obligation has been increased in accordance with the underlying instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a Loan with a spread (prior to such increase) less than or equal to 2.00%), (b) 0.375% or more (in the case of a Loan with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a Loan with a spread (prior to such increase) greater than 4.00%) due, in each case, to a deterioration in the related borrower's financial ratios or financial results, (iii) in the case of a Bond, the Bond Yield Change since the date of purchase by the Issuer has been a percentage point increase of 0.50% or more or (iv) if it has a projected cash flow interest coverage ratio (earnings before interest and Taxes divided by cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation of less than 1.00 or that is expected to be less than 0.85 times the current year's projected cash flow interest coverage ratio.

"Credit Risk Obligation":  A Collateral Obligation that, in the Portfolio Manager's reasonable commercial judgment, has a significant risk of declining in credit quality or price unrelated to general market conditions; *provided* that, during a Restricted Trading Period, a

Page 20

Collateral Obligation will qualify as a Credit Risk Obligation only if, (i) such Collateral Obligation has been downgraded by any Rating Agency at least one rating sub category or has been placed and remains on a credit watch with negative implication by Moody's since it was acquired by the Issuer, (ii) at least one of the Credit Risk Criteria are satisfied with respect to such Collateral Obligation or (iii) a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Risk Obligation.

"Current Pay Obligation":  Any Collateral Obligation (other than a DIP Collateral Obligation) that would otherwise be treated as a Defaulted Obligation but as to which no payments are due and payable that are unpaid (disregarding any forbearance or grace period in excess of 90 days with respect to any payment that is unpaid but would be due and payable but for such forbearance or grace period) and with respect to which the Portfolio Manager has certified to the Trustee (with a copy to the Collateral Administrator) in writing that it believes, in its reasonable business judgment, that the issuer or obligor of such Collateral Obligation (a) will continue to make scheduled payments of interest (and/or fees, as applicable, in the case of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation) thereon and will pay the principal thereof by maturity or as otherwise contractually due, (b) if the issuer or obligor is subject to a bankruptcy proceeding, it has been the subject of an order of a bankruptcy court that authorizes payments on such Collateral Obligation and all interest (and/or fees, as applicable, in the case of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation) and principal payments and any other amounts due thereunder have been paid in cash when due and (c) the Collateral Obligation has a Market Value of at least 80% of its par value (Market Value being determined, solely for the purposes of clause (c), without taking into consideration clause (iii) of the definition of the term "Market Value").

"Current Portfolio":  At any time, the portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds (determined in accordance with Section 1.2 to the extent applicable), then held by the Issuer.

"Custodial Account":  The custodial account established pursuant to Section 10.3(b).

"Custodian":  The meaning specified in the first sentence of Section 3.3(a) with respect to items of collateral referred to therein, and each entity with which an Account is maintained, as the context may require, each of which shall be a Securities Intermediary.

"Default":  Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulted Obligation":  Any Collateral Obligation included in the Assets as to which:

(a)     a default as to the payment of principal and/or interest has occurred and is continuing with respect to such Collateral Obligation (without regard to any grace period applicable thereto, or waiver or forbearance thereof, after the passage (in the case of a default that in the Portfolio Manager's judgment, as certified to the Trustee in writing, is not due to credit-related causes) of five Business Days or seven calendar days, whichever is greater, but in no case beyond the passage of any grace period applicable thereto);

<div align="center">Page 21</div>

(b)     a default known to the Portfolio Manager as to the payment of principal and/or interest has occurred and is continuing on another debt obligation of the same issuer or obligor which is senior or *pari passu* in right of payment to such Collateral Obligation (without regard to any grace period applicable thereto, or waiver or forbearance thereof, after the passage (in the case of a default that in the Portfolio Manager's judgment, as certified to the Trustee in writing, is not due to credit-related causes) of five Business Days or seven calendar days, whichever is greater, but in no case beyond the passage of any grace period applicable thereto; and the holders of such other debt obligation have accelerated the maturity of all or a portion of such other debt obligation; *provided* that (x) such Collateral Obligation shall constitute as Defaulted Obligation under this clause only until such acceleration has been rescinded and (y) both the Collateral Obligation and such other debt obligation are full recourse obligations of the applicable issuer or obligor or secured by the same collateral);

(c)     the issuer or obligor or others have instituted proceedings to have the issuer or obligor adjudicated as bankrupt or insolvent or placed into receivership and such proceedings have not been stayed or dismissed or such issuer or obligor has filed for protection under Chapter 11 of the United States Bankruptcy Code;

(d)     such Collateral Obligation has an S&P Rating of "CC" or lower or "SD" or had such rating before such rating was withdrawn;

(e)     such Collateral Obligation is *pari passu* or subordinate in right of payment as to the payment of principal and/or interest to another debt obligation of the same issuer or obligor which has an S&P Rating of "CC" or lower or "SD" or had such rating before such rating was withdrawn; *provided* that both the Collateral Obligation and such other debt obligation are full recourse obligations of the applicable issuer or obligor or secured by the same collateral;

(f)     a default with respect to which the Portfolio Manager has received notice or has knowledge that a default has occurred under the underlying instruments and any applicable grace period has expired and the holders of such Collateral Obligation have accelerated the repayment of the Collateral Obligation (but only until such acceleration has been rescinded) in the manner provided in the Underlying Instrument;

(g)     the Portfolio Manager has in its reasonable commercial judgment otherwise declared such debt obligation to be a "Defaulted Obligation";

(h)     such Collateral Obligation is a Participation Interest with respect to which the Selling Institution has defaulted in any respect in the performance of any of its payment obligations under the Participation Interest; or

(i)     such Collateral Obligation is a Participation Interest in a Loan that would, if such Loan were a Collateral Obligation, constitute a "Defaulted Obligation" or with respect to which the Selling Institution has an S&P Rating of "CC" or lower or "SD" or had such rating before such rating was withdrawn;

Page 22

*provided* that (x) a Collateral Obligation shall not constitute a Defaulted Obligation pursuant to clauses (b) through (e) and (i) above if such Collateral Obligation (or, in the case of a Participation Interest, the underlying Senior Secured Loan, Second Lien Loan or Unsecured Loan) is a Current Pay Obligation (*provided* that the Aggregate Principal Balance of Current Pay Obligations exceeding 2.5% of the Collateral Principal Amount will be treated as Defaulted Obligations) and (y) a Collateral Obligation shall not constitute a Defaulted Obligation pursuant to any of clauses (b), (c), (e) and (i) if such Collateral Obligation (or, in the case of a Participation Interest, the underlying Senior Secured Loan, Second Lien Loan or Unsecured Loan) is a DIP Collateral Obligation (other than a DIP Collateral Obligation that has an S&P Rating of "CC" or lower).

Each obligation received in connection with a Distressed Exchange that (a) would be a Collateral Obligation but for the fact that it is a Defaulted Obligation or (b) would satisfy the proviso in the definition "Distressed Exchange" but for the fact that it exceeds the percentage limit therein, shall in each case be deemed to be a Defaulted Obligation, and each other obligation received in connection with a Distressed Exchange shall be deemed to be an Equity Security.

"Deferrable Security":  A Collateral Obligation which by its terms permits the deferral or capitalization of payment of accrued, unpaid interest.

"Deferred Interest Secured Notes":  The Notes specified as such in Section 2.3.

"Deferring Security":  A Deferrable Security that is deferring the payment of interest due thereon and has been so deferring the payment of interest due thereon for the shorter of two consecutive accrual periods or one year, which deferred capitalized interest has not, as of the date of determination, been paid in cash.

"Delayed Drawdown Collateral Obligation":  A Collateral Obligation that (a) requires the Issuer to make one or more future advances to the borrower under the Underlying Instruments relating thereto, (b) specifies a maximum amount that can be borrowed on one or more fixed borrowing dates, and (c) does not permit the re-borrowing of any amount previously repaid by the borrower thereunder; but any such Collateral Obligation will be a Delayed Drawdown Collateral Obligation only until all commitments by the Issuer to make advances to the borrower expire or are terminated or are reduced to zero (and only to the extent of the amount remaining to be borrowed).

"Deliver" or "Delivered" or "Delivery":  The taking of the following steps:

(i)     in the case of each Certificated Security (other than a Clearing Corporation Security), Instrument and Participation Interest in which the underlying Loan is represented by an Instrument,

(a)     causing the delivery of such Certificated Security or Instrument to the Custodian by registering the same in the name of the Custodian or its affiliated nominee or by endorsing the same to the Custodian or in blank;

Page 23

(b)      causing the Custodian to indicate continuously on its books and records that such Certificated Security or Instrument is credited to the applicable Account; and

(c)      causing the Custodian to maintain continuous possession of such Certificated Security or Instrument;

(ii)    in the case of each Uncertificated Security (other than a Clearing Corporation Security),

(a)      causing such Uncertificated Security to be continuously registered on the books of the issuer thereof to the Custodian; and

(b)      causing the Custodian to indicate continuously on its books and records that such Uncertificated Security is credited to the applicable Account;

(iii)    in the case of each Clearing Corporation Security,

(a)      causing the relevant Clearing Corporation to credit such Clearing Corporation Security to the securities account of the Custodian, and

(b)      causing the Custodian to indicate continuously on its books and records that such Clearing Corporation Security is credited to the applicable Account;

(iv)    in the case of each security issued or guaranteed by the United States of America or agency or instrumentality thereof and that is maintained in book-entry records of a Federal Reserve Bank ("FRB") (each such security, a "Government Security"),

(a)      causing the creation of a Security Entitlement to such Government Security by the credit of such Government Security to the securities account of the Custodian at such FRB, and

(b)      causing the Custodian to indicate continuously on its books and records that such Government Security is credited to the applicable Account;

(v)    in the case of each Security Entitlement not governed by clauses (i) through (iv) above,

(a)      causing a Securities Intermediary (x) to indicate on its books and records that the underlying Financial Asset has been credited to the Custodian's securities account, (y) to receive a Financial Asset from a Securities Intermediary or acquiring the underlying

Page 24

Financial Asset for a Securities Intermediary, and in either case, accepting it for credit to the Custodian's securities account or (z) to become obligated under other law, regulation or rule to credit the underlying Financial Asset to a Securities Intermediary's securities account,

(b) causing such Securities Intermediary to make entries on its books and records continuously identifying such Security Entitlement as belonging to the Custodian and continuously indicating on its books and records that such Security Entitlement is credited to the Custodian's securities account, and

causing the Custodian to indicate continuously on its books and records that such Security Entitlement (or all rights and property of the Custodian representing such Security Entitlement) is credited to the applicable Account;

(vi) in the case of Cash or Money,

(a) causing the delivery of such Cash or Money to the Custodian,

(b) causing the Custodian to treat such Cash or Money as a Financial Asset maintained by such Custodian for credit to the applicable Account in accordance with the provisions of Article 8 of the UCC, and

(c) causing the Custodian to indicate continuously on its books and records that such Cash or Money is credited to the applicable Account; and

(vii) in the case of each general intangible (including any Participation Interest in which neither the Participation Interest nor the underlying Loan is represented by an Instrument),

(a) causing the filing of a Financing Statement in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, and

(b) causing the registration of the security interests granted under this Indenture in the Register of Mortgages and Charges of the Issuer at the Issuer's registered office in the Cayman Islands.

In addition, the Portfolio Manager on behalf of the Issuer will obtain any and all consents required by the Underlying Instruments relating to any general intangibles for the transfer of ownership and/or pledge hereunder (except to the extent that the requirement for such consent is rendered ineffective under Section 9-406 of the UCC).

Page 25

"Designated Principal Proceeds": The meaning specified in Section 10.3(c).

"Determination Date": The last day of each Collection Period.

"DIP Collateral Obligation": A Loan made to a debtor-in-possession pursuant to Section 364 of the U.S. Bankruptcy Code having the priority allowed by either Section 364(c) or 364(d) of the U.S. Bankruptcy Code and fully secured by senior liens.

"Discount Obligation": (1) Any Collateral Obligation that is a not a Bond which was purchased (as determined without averaging prices of purchases on different dates) for less than (a) 85.0% of its Principal Balance, if such Collateral Obligation has an S&P Rating lower than "B-", or (b) 80.0% of its Principal Balance, if such Collateral Obligation has an S&P Rating of "B-" or higher; or (2) any Collateral Obligation that is a Bond which was purchased (as determined without averaging prices of purchases on different dates) for less than (a) 80.0% of its Principal Balance, if such Collateral Obligation has an S&P Rating lower than "B-", or (b) 75.0% of its Principal Balance, if such Collateral Obligation has a S&P Rating of "B-" or higher; *provided* that (x) such Collateral Obligation shall cease to be a Discount Obligation at such time as the Market Value (expressed as a percentage of the par amount of such Collateral Obligation) determined for such Collateral Obligation on each day during any period of 30 consecutive days since the acquisition by the Issuer of such Collateral Obligation, equals or exceeds (A) 90% on each such day in the case of a Collateral Obligation that is not a Bond or (B) 85% on each such day in the case of a Collateral Obligation that is a Bond; (y) any Collateral Obligation that would otherwise be considered a Discount Obligation, but that is purchased in accordance with the Investment Criteria with the proceeds of sale of a Collateral Obligation that was not a Discount Obligation at the time of its purchase, so long as such purchased Collateral Obligation (A) is purchased or committed to be purchased within 20 Business Days of such sale, (B) is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) equal to or greater than the sale price of the sold Collateral Obligation, (C) is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) not less than 65% and (D) has an S&P Rating equal to or greater than the S&P Rating of the sold Collateral Obligation, will not be considered to be a Discount Obligation; and (z) clause (y) above in this proviso shall not apply to any such Collateral Obligation at any time on or after the acquisition by the Issuer of such Collateral Obligation if, as determined at the time of such acquisition, such application would result in (A) more than 5% of the Collateral Principal Amount consisting of Collateral Obligations to which such clause (y) has been applied or (B) the Aggregate Principal Balance of all Collateral Obligations to which such clause (y) has been applied since the Closing Date being more than 10% of the Target Initial Par Amount.

"Distressed Exchange": In connection with any Collateral Obligation, a distressed exchange or other debt restructuring has occurred, as reasonably determined by the Portfolio Manager, pursuant to which the issuer or obligor of such Collateral Obligation has issued to the holders of such Collateral Obligation a new security or package of securities or obligations that, in the sole judgment of the Portfolio Manager, amounts to a diminished financial obligation or has the purpose of helping the issuer or obligor of such Collateral Obligation avoid default; *provided* that no Distressed Exchange shall be deemed to have occurred if the securities or obligations received by the Issuer in connection with such exchange or restructuring satisfy the

Page 26

definition of "Collateral Obligation" (*provided* that the Aggregate Principal Balance of all securities and obligations to which this proviso applies or has applied, measured cumulatively from the Closing Date onward, may not exceed 27% of the Target Initial Par Amount).

"Distribution Amount": The meaning specified in Section 11.1(a)(ii).

"Distribution Compliance Period": The 40-day period prescribed by Regulation S commencing on the later of (a) the date upon which Notes are first offered to Persons other than the initial Holders and any other distributor (as such term is defined in Regulation S) of the Notes and (b) the Closing Date.

"Distribution Report": The meaning specified in Section 10.6(b).

"Diversity Score": A single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 hereto.

"Dollar, "USD" or "U.S.$": A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"Domicile" or "Domiciled": With respect to any issuer of, or obligor with respect to, a Collateral Obligation:

(a)     if it is organized other than in Ireland, each of such jurisdiction and the country in which, in the Portfolio Manager's good faith estimate, a substantial portion of its operations are located or from which a substantial portion of its revenue is derived, in each case directly or through subsidiaries (which shall be any jurisdiction and country known at the time of designation by the Portfolio Manager to be the source of the majority of revenues, if any, of such issuer or obligor); and

(b)     if it is organized in Ireland, its "Domicile" will be deemed to be the country (if different from Ireland) in which, in the Portfolio Manager's good faith estimate, a substantial portion of its operations are located or from which a substantial portion of its revenue is derived, in each case directly or through subsidiaries (which shall be any jurisdiction and country known at the time of designation by the Portfolio Manager to be the source of the majority of revenues, if any, of such issuer or obligor).

"DTC": The Depository Trust Company, its nominees, and their respective successors.

"Due Date": Each date on which any payment is due on an Asset in accordance with its terms.

"Effective Date": The earlier to occur of (i) June 20, 2014 and (ii) the first date on which the Portfolio Manager certifies to the Trustee and the Collateral Administrator that the Target Initial Par Condition has been satisfied.

"Effective Date Accountants' Report": The meaning assigned to such term in Section 7.17(d).

Page 27

"Effective Date Issuer Certificate":   The meaning assigned to such term in Section 7.17(d).

"Effective Date Overcollateralization Test":   A test that is satisfied if, on any date of determination, the ratio of (x) the Adjusted Collateral Principal Amount divided by (y) the Aggregate Outstanding Amount of all Secured Notes is equal to or greater than the Target Initial Par Ratio.

"Effective Date Report":  The meaning assigned to such term in Section 7.17(d).

"Eligible Custodian":  A custodian that satisfies, *mutatis mutandis*, the eligibility requirements set out in Section 6.8.

"Eligible Investment Required Ratings":  Are (a) if such obligation or security (i) has both a long-term and a short-term credit rating from Moody's, such ratings are "Aa3" or higher (not on credit watch for possible downgrade) and "P-1" (not on credit watch for possible downgrade), respectively, (ii) has only a long-term credit rating from Moody's, such rating is at least equal to or higher than the current Moody's sovereign ratings of the U.S. government, and (iii) has only a short-term credit rating from Moody's, such rating is "P-1" (not on credit watch for possible downgrade), and (b) "A-1" or higher (or, in the absence of a short-term credit rating, "A+" or higher) from S&P.

"Eligible Investments":  Are (a) Cash and (b) any Dollar investment that, at the time it is Delivered (directly or through an intermediary or bailee), (x) matures not later than the earlier of (A) the date that is 60 days after the date of Delivery thereof and (B) the Business Day immediately preceding the Payment Date immediately following the date of Delivery thereof, and (y) is one or more of the following obligations or securities:

   (i)     direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States of America or any agency or instrumentality of the United States of America, in each case with the Eligible Investment Required Ratings, the obligations of which are expressly backed by the full faith and credit of the United States of America;

   (ii)    demand and time deposits in, certificates of deposit of, trust accounts with, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America (including the Bank) or any state thereof and subject to supervision and examination by federal and/or state banking authorities, in each case payable within 183 days after issuance, so long as the commercial paper and/or the debt obligations of such depository institution or trust company at the time of such investment or contractual commitment providing for such investment have the Eligible Investment Required Ratings;

   (iii)   commercial paper or other short-term obligations (other than Asset-backed Commercial Paper) with the Eligible Investment Required Ratings and that either

Page 28

bear interest or are sold at a discount from the face amount thereof and have a maturity of not more than 183 days from their date of issuance; and

(iv) non-U.S. money market funds that have, at all times, credit ratings of (a) "AAAm" by S&P or, if not available, equivalent ratings at such time, and (b) "Aaa-mf" by Moody's or, if not available, equivalent ratings at such time;

*provided* that (1) Eligible Investments purchased with funds in the Collection Account shall be held until maturity except as otherwise specifically provided herein and shall include only such obligations or securities, other than those referred to in clause (vii) above, as mature (or are putable at par to the issuer thereof) no later than the Business Day prior to the next Payment Date unless such Eligible Investments are issued by the Trustee in its capacity as a banking institution, in which event such Eligible Investments may mature on such Payment Date; and (2) none of the foregoing obligations or securities shall constitute Eligible Investments if (a) such obligation or security has an "f", "r", "p", "pi", "q", "sf" or "t" subscript assigned by S&P, (b) all, or substantially all, of the remaining amounts payable thereunder consist of interest and not principal payments, (c) payments with respect to such obligations or securities or proceeds of disposition are subject to withholding Taxes by any jurisdiction unless the payor is required to make "gross-up" payments that cover the full amount of any such withholding Tax on an after-Tax basis, (d) such obligation or security is secured by real property, (e) such obligation or security is purchased at a price greater than 100% of the principal or face amount thereof, (f) such obligation or security is subject of a tender offer, voluntary redemption, exchange offer, conversion or other similar action, (g) in the Portfolio Manager's judgment, such obligation or security is subject to material non-credit related risks, (h) such obligation is a Structured Finance Obligation or (i) such obligation or security is represented by a certificate of interest in a grantor trust. Eligible Investments may include, without limitation, those investments for which the Trustee or an Affiliate of the Trustee provides services and receives compensation. For the avoidance of doubt, the Issuer shall not acquire any Eligible Investments that are not "cash equivalents" as defined in and subject to the Volcker Rule.

"Enforcement Event": The meaning specified in Section 11.1(a)(iii).

"Entitlement Order": The meaning specified in Section 8-102(a)(8) of the UCC.

"Equity Security": Any security or debt obligation which at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation and is not an Eligible Investment.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Restricted Notes": The Class E Notes, the Class F Notes and the Subordinated Notes.

"Euroclear": Euroclear Bank S.A./N.V.

"Event of Default": The meaning specified in Section 5.1.

18750188.25.BUSINESS

"Excel Default Model Input File": The meaning specified in Section 7.17(c).

"Excepted Property": The meaning assigned in the Granting Clauses hereof.

"Excess Weighted Average Coupon": A percentage equal as of any date of determination to a number obtained by multiplying (a) the excess, if any, of the Weighted Average Coupon over the Minimum Weighted Average Coupon, by (b) the number obtained by dividing the Aggregate Principal Balance of all Fixed Rate Obligations by the Aggregate Principal Balance of all Floating Rate Obligations (with respect to any Deferrable Security, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid).

"Excess Weighted Average Floating Spread": A percentage equal as of any date of determination to a number obtained by multiplying (a) the excess, if any, of the Weighted Average Floating Spread over the Minimum Floating Spread, by (b) the number obtained by dividing the Aggregate Principal Balance of all Floating Rate Obligations by the Aggregate Principal Balance of all Fixed Rate Obligations (with respect to any Deferrable Security, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid).

"Exchange Act": The United States Securities Exchange Act of 1934, as amended.

"Expense Reserve Account": The trust account established pursuant to Section 10.3(d).

"FATCA": Sections 1471 through 1474 of the Code, and the regulations (and any notices, guidance or official pronouncements) promulgated thereunder, any agreement entered into thereto, and any law implementing an intergovernmental agreement or approach thereto.

"Federal Reserve Board": The Board of Governors of the Federal Reserve System.

"Fee Basis Amount": As of any date of determination, the sum of (a) the Collateral Principal Amount, (b) the Aggregate Principal Balance of all Defaulted Obligations and (c) the aggregate amount of all Principal Financed Accrued Interest.

"Fee Election": The meaning specified in the Portfolio Management Agreement.

"Fee Election Notice": Notice from the Portfolio Manager to the Issuer, the Trustee and Collateral Administrator delivered no later than the Determination Date related to the first Payment Date with respect to which the Fee Election will apply, that specifies (x) the Payment Dates on which the Fee Election will apply, (y) the specific percentage by which the Portfolio Manager is electing to reduce the Senior Management Fee (and thus increase the Subordinated Management Fee), which will not be greater than the entire Senior Management Fee and (z) that the Fee Election is not revocable with respect to any such Payment Date unless Acis Capital Management, L.P. is no longer the Portfolio Manager.

Page 30

"Financial Asset":  The meaning specified in Section 8-102(a)(9) of the UCC.

"Financing Statements":  The meaning specified in Section 9-102(a)(39) of the UCC.

"First Interest Determination End Date" means May 1, 2014.

"First Lien Last Out Loan":  Any assignment of or Participation Interest in a Loan that: (a) may by its terms become subordinate in right of payment to any other obligation of the Obligor of the Loan solely upon the occurrence of a default or event of default by the Obligor of the Loan and (b) is secured by a valid perfected first priority security interest or lien in, to or on specified collateral securing the Obligor's obligations under the Loan.

"Fixed Rate Obligation":  Any Collateral Obligation that bears a fixed rate of interest.

"Floating Rate Notes":  All of the Secured Notes other than the Class A-1F Notes.

"Floating Rate Obligation":  Any Collateral Obligation that bears a floating rate of interest.

"GAAP":  The meaning specified in Section 6.3(j).

"Global Notes":  Any Regulation S Global Notes or Rule 144A Global Notes.

"Grant" or "Granted":  To grant, bargain, sell, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of setoff against, deposit, set over and confirm.  A Grant of the Assets, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including, the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Assets, and all other Monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Holder" or "Noteholder":  With respect to any Note, the Person whose name appears on the Register as the registered holder of such Note.

"holder":  With respect to any Note, any Holder or beneficial owner of a Note.

"Illiquid Asset":  The meaning specified in Section 12.4(a).

"Incentive Management Fee":  The fee payable to the Portfolio Manager in arrears on each Payment Date pursuant to Section 9(a) of the Portfolio Management Agreement and Section 11.1, in an amount equal to, as applicable on such Payment Date, (x) the sum of 20% of the remaining Interest Proceeds, if any, distributable pursuant to clause (V) of Section 11.1(a)(i) and 20% of the remaining Principal Proceeds, if any, distributable pursuant to clause (I) of Section 11.1(a)(ii), in each case after making the preceding distributions on the relevant Payment

Page 31

Date in accordance with Section 11.1 or (y) 20% of any remaining Interest Proceeds and Principal Proceeds distributable pursuant to clause (Y) of Section 11.1(a)(iii) after making the preceding distributions on the relevant Payment Date in accordance with Section 11.1.

"Indenture":  This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"Independent":  As to any Person, any other Person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers, and any member thereof, or an investment bank and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, and (ii) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Professional Conduct of the American Institute of Certified Public Accountants.

Whenever any Independent Person's opinion or certificate is to be furnished to the Trustee, such opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning hereof.

Any pricing service, certified public accountant or legal counsel that is required to be Independent of another Person under this Indenture must satisfy the criteria above with respect to the Issuer, the Portfolio Manager and their Affiliates.

"Index Maturity":  With respect to any Class of Secured Notes, the period indicated with respect to such Class in Section 2.3.

"Information": S&P's "Credit Estimate Information Requirements" dated April 2011 and any other available information S&P reasonably requests in order to produce a credit estimate for a particular asset.

"Information Agent":  The Collateral Administrator.

"Initial Purchaser": Jefferies LLC, in its capacity as initial purchaser of the Notes (other than the Subordinated Notes) under the Securities Purchase Agreement.

"Initial Rating":  With respect to the Secured Notes, the rating or ratings, if any, indicated in Section 2.3.

"Instrument":  The meaning specified in Section 9-102(a)(47) of the UCC.

"Interest Accrual Period":  (i) With respect to the initial Payment Date, the period from and including the Closing Date to but excluding such Payment Date; and (ii) with respect to each succeeding Payment Date, the period from and including the immediately preceding Payment

Page 32

Date to but excluding the following Payment Date or, if earlier, the date on which the principal of the Secured Notes is paid or made available for payment; *provided* that any interest-bearing notes issued after the Closing Date in accordance with the terms of this Indenture shall accrue interest during the Interest Accrual Period in which such additional notes are issued from and including the applicable date of issuance of such additional notes to but excluding the last day of such Interest Accrual Period at the applicable Interest Rate; *provided further* that, for purposes of determining any Interest Accrual Period in the case of the Class A-1F Notes, the Payment Date shall be assumed to be the 1st day of the relevant month (irrespective of whether such day is a Business Day).

"Interest Collection Subaccount":  The meaning specified in Section 10.2(a).

"Interest Coverage Ratio":  For any designated Class or Classes of Secured Notes (other than the Class A-X Notes and the Class F Notes, for which no Interest Coverage Ratio applies), as of any date of determination, the percentage derived from the following equation:  $(A - B) / C$, where:

$A$ = The Collateral Interest Amount as of such date of determination;

$B$ = Amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clauses (A) and (B) in Section 11.1(a)(i); and

$C$ = Interest due and payable on the Secured Notes of such Class or Classes and each Class of Secured Notes (in each case, other than the Class A-X Notes) that rank senior to or *pari passu* with such Class or Classes (excluding Secured Note Deferred Interest but including any interest on Secured Note Deferred Interest with respect to any Secured Notes) on such Payment Date.

"Interest Coverage Test":  A test that is satisfied with respect to any Class or Classes of Secured Notes as of any date of determination on, or subsequent to, the Determination Date occurring immediately prior to the second Payment Date, if (i) the Interest Coverage Ratio for such Class or Classes on such date is at least equal to the Required Interest Coverage Ratio for such Class or Classes or (ii) such Class or Classes of Secured Notes is no longer outstanding.

"Interest Determination Date":  (a) With respect to the first Interest Accrual Period, (x) for the period from the Closing Date to but excluding the First Interest Determination End Date, the second London Banking Day preceding the Closing Date, and (y) for the remainder of the first Interest Accrual Period, the second London Banking Day preceding the First Interest Determination End Date, and (b) with respect to each Interest Accrual Period thereafter, the second London Banking Day preceding the first day of each Interest Accrual Period.

"Interest Diversion Test": A test that is satisfied as of any Determination Date during the Reinvestment Period on which Class F Notes remain outstanding if the Overcollateralization Ratio with respect to the Class F Notes as of such Determination Date is at least equal to 104.1%.

18750188.25.BUSINESS

"Interest Only Security":  Any obligation or security that does not provide in the related Underlying Instruments for the payment or repayment of a stated principal amount in one or more installments on or prior to its stated maturity.

"Interest Proceeds":  With respect to any Collection Period or Determination Date, without duplication, the sum of:

(i)      all payments of interest and delayed compensation (representing compensation for delayed settlement) received in Cash by the Issuer during the related Collection Period on the Collateral Obligations and Eligible Investments, including the accrued interest received in connection with a sale thereof during the related Collection Period, less any such amount that represents Principal Financed Accrued Interest;

(ii)     all principal and interest payments received by the Issuer during the related Collection Period on Eligible Investments purchased with Interest Proceeds;

(iii)    excluding amounts that comprise the Turbo Payment Amount, all amendment and waiver fees, late payment fees and other fees received by the Issuer during the related Collection Period, except for those in connection with (a) the lengthening of the maturity of the related Collateral Obligation or (b) the reduction of the par of the related Collateral Obligation, as determined by the Portfolio Manager with notice to the Trustee and the Collateral Administrator;

(iv)    commitment fees and other similar fees received by the Issuer during such Collection Period in respect of Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations;

(v)     any amounts deposited in the Collection Account from the Expense Reserve Account and/or Interest Reserve Account that are designated as Interest Proceeds in the sole discretion of the Portfolio Manager pursuant to this Indenture in respect of the related Determination Date;

(vi)    Principal Proceeds designated by the Portfolio Manager as Designated Principal Proceeds pursuant to Section 10.3(c); and

(vii)   any proceeds from a Tax Subsidiary Asset characterized as "Interest Proceeds" received by the Issuer from any Tax Subsidiary;

provided that (A) any amounts received (1) in respect of any Defaulted Obligation or (2) Tax Subsidiary, in respect of a Tax Subsidiary Asset that was acquired or received in connection with a workout or restructuring of a Defaulted Obligation will constitute Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Defaulted Obligation (including any such proceeds from such Tax Subsidiary in respect of such Tax Subsidiary Asset) since it became a Defaulted Obligation equals the outstanding principal balance of such Collateral Obligation at the time it became a Defaulted Obligation and (B) any amounts deposited in the Collection Account as Principal Proceeds pursuant to clause (Q) of

Page 34

Section 11.1(a)(i) due to the failure of the Interest Diversion Test to be satisfied shall not constitute Interest Proceeds. Any amounts received that comprise the Turbo Payment Amount will constitute Principal Proceeds (and not Interest Proceeds).

"Interest Rate": With respect to each Class of Secured Notes, the per annum stated interest rate payable on such Class with respect to each Interest Accrual Period, which rate (A) for each class of Secured Notes, other than the Class A-1F Notes, shall be equal to the Base Rate for such Interest Accrual Period plus the spread specified in Section 2.3 (or, if a Re-Pricing Amendment shall become effective with respect to such Class, the spread specified for such Class in such Re-Pricing Amendment) and (B) for the Class A-1F Notes, shall be equal to the "Interest Rate" for such Interest Accrual Period specified in Section 2.3.

"Interest Reserve Account": The trust account established pursuant to Section 10.3(e).

"Interest Reserve Amount": The amount specified for deposit in the Interest Reserve Account in Section 3.1(a)(xii).

"Investment Company Act": The Investment Company Act of 1940, as amended from time to time.

"Investment Criteria": The criteria specified in Section 12.2(a).

"Irish Listing Agent": Maples and Calder, in its capacity as Irish Listing Agent for the Co-Issuers, and any successor thereto.

"Issuer": The Person named as such on the first page of this Indenture until a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"Issuer Order" and "Issuer Request": A written order or request (which may be a standing order or request) dated and signed in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Portfolio Manager by an Authorized Officer thereof, on behalf of the Issuer.

"Junior Class": With respect to a particular Class of Notes, each Class of Notes that is subordinated to such Class, as indicated in Section 2.3.

"Knowledgeable Employee": The meaning set forth in Rule 3c-5 promulgated under the Investment Company Act.

"LC Commitment Amount": With respect to any Letter of Credit Reimbursement Obligation, the amount which the Issuer could be required to pay to the LOC Agent Bank in respect thereof (including, for the avoidance of doubt, any portion thereof which the Issuer has collateralized or deposited into a trust or with the LOC Agent Bank for the purpose of making such payments).

<div align="center">Page 35</div>

"Letter of Credit Reimbursement Obligation": A facility whereby (i) a fronting bank ("LOC Agent Bank") issues or will issue a letter of credit ("LC") for or on behalf of a borrower pursuant to an Underlying Instrument, (ii) in the event that the LC is drawn upon, and the borrower does not reimburse the LOC Agent Bank, the lender/participant is obligated to fund its portion of the facility, (iii) the LOC Agent Bank passes on (in whole or in part) the fees and any other amounts it receives for providing the LC to the lender/participant and (iv)(a) the related Underlying Instruments require the Issuer to fully collateralize the Issuer's obligations to the related LOC Agent Bank or obligate the Issuer to make a deposit into a trust in an aggregate amount equal to the related LC Commitment Amount, (b) the collateral posted by the Issuer is held by, or the Issuer's deposit is made in, a depository institution meeting the requirement set forth in Section 10.1 and (c) the collateral posted by the Issuer is invested in Eligible Investments.

"LIBOR": The meaning set forth in Exhibit G hereto.

"Listed Notes": The Notes specified as such in Section 2.3.

"Loan": Any obligation for the payment or repayment of borrowed money that is documented by a term loan agreement, revolving loan agreement or other similar credit agreement.

"Loan Pricing Change": With respect to a Loan, the change in price of such Loan (expressed as a percentage of par) relative to the S&P/LSTA U.S. Leveraged Loan 100 Index or any other nationally recognized index as calculated by the Portfolio Manager in its reasonable commercial judgment.

"LOC Agent Bank": The meaning specified in the definition of the term "Letter of Credit Reimbursement Obligation".

"London Banking Day": A day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"Majority": (A) With respect to any Class of Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Class; (B) with respect to any Sub-class of Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Sub-class; and (C) with respect to more than one Class or Sub-class voting collectively, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Classes or Sub-classes in the aggregate.

"Management Fee": The Base Management Fee, the Subordinated Management Fee and the Incentive Management Fee.

"Margin Stock": "Margin Stock" as defined under Regulation U issued by the Federal Reserve Board, including any debt security which is by its terms convertible into "Margin Stock".

Page 36

18750188.25.BUSINESS

Exhibit B

"Market Value":  As of any date of determination for any Collateral Obligation and as determined by the Portfolio Manager in the following manner:  (A) the average bid price value determined by a nationally recognized independent pricing service, (B) if the price described in clause (A) is not available, the average of the bid side prices determined by three independent broker dealers active in the trading of such Collateral Obligation, (C) if a price or bid described in clause (A) or (B) is not available, the lowest of the bid side prices determined by two independent broker dealers active in the trading of such Collateral Obligation, (D) if a price or bid described in clause (A), (B) or (C) is not available and the Portfolio Manager is a Registered Investment Advisor, the bid side price determined by one independent broker dealer active in the trading of such Collateral Obligation or (E) if a price or bid described in clause (A), (B), (C) or (D) is not available, then the lower of (a) the bid side price of such Collateral Obligation determined by the Portfolio Manager in a manner consistent with reasonable and customary market practice and (b) the greater of (i) 70% of the par value of such Collateral Obligation and (ii) the S&P Recovery Rate; *provided* that (x) if the Market Value of any Collateral Obligation is determined pursuant to clause (E) above, the Portfolio Manager will use commercially reasonable efforts to obtain the Market Value of such Collateral Obligation in accordance with subclauses (A) through (D) above, and (y) if the Portfolio Manager is not a Registered Investment Adviser the Market Value of any Collateral Obligation that cannot be obtained in accordance with subclauses (A) through (D) above within 30 days of the date on which its Market Value was determined pursuant to clause (E) above, shall be deemed to be zero until determined in accordance with subclauses (A) through (D) above; *provided further* that any bid side price determined by the Portfolio Manager pursuant to clause (E)(a) above shall be used by the Portfolio Manager as the market value of such Collateral Obligation in all other portfolios it manages.

"Matrix Combination":  The applicable row/column combination of the S&P Test Matrix chosen by the Portfolio Manager in accordance with Section 7.17(g) (or the linear interpolation between two adjacent rows and/or two adjacent columns, as applicable).

"Maturity":  With respect to any Note, the date on which the unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"Maturity Amendment":  With respect to any Collateral Obligation, any waiver, modification, amendment or variance that would extend the stated maturity date of such Collateral Obligation. For the avoidance of doubt, a waiver, modification, amendment or variance that would extend the stated maturity date of the credit facility of which a Collateral Obligation is part, but would not extend the stated maturity date of the Collateral Obligation held by the Issuer, does not constitute a Maturity Amendment.

"Measurement Date":  (i) Any day on which a purchase of a Collateral Obligation occurs, (ii) any Determination Date, (iii) the date as of which the information in any Monthly Report is calculated, (iv) with five Business Days prior notice, any Business Day requested by any Rating Agency and (v) the Effective Date.

18750188.25.BUSINESS

"Memorandum and Articles":  The Issuer's Memorandum and Articles of Association, as they may be amended, revised or restated from time to time.

"Merging Entity":  As defined in Section 7.10.

"Middle Market Loan":  Any debt obligation of a single obligor where the total of first lien and second lien original facility sizes of such obligor under all of its loan agreements is less than U.S.$250,000,000.

"Minimum Floating Spread":  As of any date of determination, the number set forth in the column entitled "Minimum Weighted Average Floating Spread" in the applicable S&P Test Matrix, based upon the applicable Matrix Combination chosen by the Portfolio Manager, in each case on such date of determination.

"Minimum Floating Spread Test":  The test that is satisfied on any date of determination if the Weighted Average Floating Spread *plus* the Excess Weighted Average Coupon equals or exceeds the Minimum Floating Spread.

"Minimum Weighted Average Coupon":  6.50%.

"Minimum Weighted Average Coupon Test":  The test that is satisfied on any date of determination if the Weighted Average Coupon *plus* the Excess Weighted Average Floating Spread equals or exceeds the Minimum Weighted Average Coupon.

"Minimum Weighted Average S&P Recovery Rate Test":  The test that will be satisfied for each Class of Secured Notes Outstanding as of any date of determination if the Weighted Average S&P Recovery Rate equals or exceeds the "Minimum Weighted Average S&P Recovery Rate" determined by reference to the S&P Test Matrix based upon the applicable Matrix Combination chosen by the Portfolio Manager.

"Money":  The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report":  The meaning specified in Section 10.6(a).

"Monthly Report Determination Date":  The meaning specified in Section 10.6(a).

"Moody's":  Moody's Investors Service, Inc. and any successor thereto.

"Moody's Default Probability Rating":  With respect to any Collateral Obligation, the rating determined pursuant to the methodology set forth under the heading "Moody's Default Probability Rating" on Schedule 3 hereto (or such other schedule provided by Moody's to the Issuer, the Trustee, the Collateral Administrator and the Portfolio Manager).

"Moody's Derived Rating":  With respect to any Collateral Obligation, the rating determined pursuant to the methodology set forth under the heading "Moody's Derived Rating" on Schedule 3 hereto (or such other schedule provided by Moody's to the Issuer, the Trustee, the Collateral Administrator and the Portfolio Manager).

Page 38

18750188.25.BUSINESS

"Moody's Industry Classification": The industry classifications set forth in Schedule 5 hereto, as such industry classifications shall be updated at the option of the Portfolio Manager if Moody's publishes revised industry classifications.

"Moody's Rating": With respect to any Collateral Obligation, the rating determined pursuant to the methodology set forth under the heading "Moody's Rating" on Schedule 3 hereto (or such other schedule provided by Moody's to the Issuer, the Trustee, the Collateral Administrator and the Portfolio Manager).

"Moody's Recovery Rate": With respect to any Collateral Obligation, as of any date of determination, the recovery rate determined in accordance with the following, in the following order of priority:

(a) if the Collateral Obligation has been specifically assigned a recovery rate by Moody's (for example, in connection with the assignment by Moody's of an estimated rating), such recovery rate; or

(b) if the preceding clause does not apply to the Collateral Obligation, except with respect to DIP Collateral Obligations, the rate determined pursuant to the table below based on the number of rating subcategories difference between the Collateral Obligation's Moody's Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Ratings Subcategories Difference Between the Moody's Rating and the Moody's Default Probability Rating | Senior Secured Loans | Second Lien Loans, Senior Secured Bonds, Senior Secured Notes* | Other Collateral Obligations |
|---|---|---|---|
| +2 or more | 60.0% | 55.0% | 45.0% |
| +1 | 50.0% | 45.0% | 35.0% |
| 0 | 45.0% | 35.0% | 30.0% |
| 1 | 40.0% | 25.0% | 25.0% |
| 2 | 30.0% | 15.0% | 15.0% |
| 3 or less | 20.0% | 5.0% | 5.0% |

\* If such Collateral Obligation does not have both a CFR and an Assigned Moody's Rating, such Collateral Obligation's Moody's Recovery Rate will be determined under the "Other Collateral Obligations" column.

or

(c) if the Collateral Obligation is a DIP Collateral Obligation (other than a DIP Collateral Obligation which has been specifically assigned a recovery rate by Moody's), 50%.

Page 39

"Non-Call Period": The period from the Closing Date to but excluding the Payment Date in February, 2016.

"Non-Emerging Market Obligor": An obligor that is Domiciled in any country that has a country ceiling for foreign currency bonds of at least "Aa2" by Moody's and a foreign currency issuer credit rating of at least "AA" by S&P.

"Non-Permitted ERISA Holder": As defined in Section 2.11(d).

"Non-Permitted Holder": As defined in Section 2.11(b).

"Note Interest Amount": With respect to any Class of Secured Notes and any Payment Date, the amount of interest for the related Interest Accrual Period payable in respect of each U.S.$100,000 Outstanding principal amount of such Class of Notes.

"Note Payment Sequence": The application, in accordance with the Priority of Payments, of Interest Proceeds or Principal Proceeds, as applicable, in the following order:

(i) (a) to the payment *pro rata* and *pari passu* of (i) principal of the Class A-1A Notes, (ii) principal of the Class A-1F Notes and (iii) principal of the Class A-2 Notes in the following order of priority: (x) *first*, principal of the Class A-2A Notes and (y) *second,* principal of the Class A-2B Notes and (b) to the payment of, solely in the circumstances where a Class A-1/A-2 Make-Whole Amount is required to be paid pursuant to Section 9.7, the Class A-1/A-2 Make-Whole Amount, in accordance with the allocation provisions of Section 9.7 until such amounts have been paid in full;

(ii) to the payment of principal of the Class A-X Notes until such amount has been paid in full;

(iii) to the payment of principal of the Class B Notes until such amount has been paid in full;

(iv) to the payment of accrued and unpaid interest (including any defaulted interest) and any Secured Note Deferred Interest on the Class C Notes until such amount has been paid in full;

(v) to the payment of principal of the Class C Notes until such amount has been paid in full;

(vi) to the payment of accrued and unpaid interest (including any defaulted interest) and any Secured Note Deferred Interest on the Class D Notes until such amount has been paid in full;

(vii) to the payment of principal of the Class D Notes until such amount has been paid in full;

Page 40

(viii)    to the payment of accrued and unpaid interest (including any defaulted interest) and any Secured Note Deferred Interest on the Class E Notes until such amount has been paid in full;

(ix)    to the payment of principal of the Class E Notes until such amount has been paid in full;

(x)    to the payment of accrued and unpaid interest (including any defaulted interest) and any Secured Note Deferred Interest on the Class F Notes until such amount has been paid in full; and

(xi)    to the payment of principal of the Class F Notes until such amount has been paid in full.

"Notes":  Collectively, the Secured Notes and the Subordinated Notes authorized by, and authenticated and delivered under, this Indenture (as specified in Section 2.3).

"NRSRO":  Any nationally recognized statistical rating organization.

"NRSRO Certification":  A letter, in a form acceptable to the Issuer,  executed by an NRSRO and addressed to the Issuer, with a copy to the Information Agent and the Portfolio Manager, attaching a copy of a certification satisfying the requirements of paragraph (a)(3)(iii)(B) of Rule 17g-5, upon which the Issuer and the Information Agent may conclusively rely for purposes of granting such NRSRO access to the 17g-5 Information Website.

"Obligor":  The obligor or guarantor under a loan.

"Offer":  As defined in Section 10.7(c).

"Offering":  The offering of any Notes pursuant to the Offering Circular.

"Offering Circular":  The final offering circular relating to the offer and sale of the Notes, including any supplements thereto.

"Officer":  (a) With respect to the Issuer and any corporation, any director, the Chairman of the Board of Directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity or any Person authorized by such entity; (b) with respect to any partnership, any general partner thereof or any Person authorized by such entity; (c) with respect to the Co-Issuer or any other limited liability company, any member thereof or any Person authorized by such entity; and (d) with respect to the Trustee and any bank or trust company acting as trustee of an express trust or as custodian or agent, any vice president or assistant vice president of such entity or any officer customarily performing functions similar to those performed by a vice president or assistant vice president of such entity.

"offshore transaction":  The meaning specified in Regulation S.

<div align="center">Page 41</div>

"Opinion of Counsel":  A written opinion addressed to the Trustee (or upon which the Trustee is permitted to rely) and the Issuer and, if required by the terms hereof, S&P, in form and substance reasonably satisfactory to the Trustee and S&P, of a nationally or internationally recognized and reputable law firm one or more of the partners of which are admitted to practice before the highest court of any State of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which law firm may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer, the Co-Issuer or the Portfolio Manager, as the case may be, and which law firm shall be reasonably satisfactory to the Trustee.  Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to the Trustee, the Issuer and S&P or shall state that the Trustee, the Issuer and S&P shall be entitled to rely thereon.

"Optional Redemption":  A redemption of the Notes in accordance with Section 9.2.

"Outstanding":  With respect to the Notes or the Notes of any specified Class, as of any date of determination, all of the Notes or all of the Notes of such Class, as the case may be, theretofore authenticated and delivered under this Indenture, except:

    (i)    Notes theretofore cancelled by the Registrar or delivered to the Registrar for cancellation in accordance with the terms of Section 2.9;

    (ii)    Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes pursuant to Section 4.1(a)(ii); *provided* that if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

    (iii)    Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a "protected purchaser" (within the meaning of Section 8-303 of the UCC); and

    (iv)    Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.6;

*provided* that in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, the following Notes shall be disregarded and deemed not to be Outstanding:

    (I)    Notes owned by the Issuer, the Co-Issuer or any other obligor upon the Notes; and

    (II)    only in the case of a vote on (i) the termination of the Portfolio Management Agreement, (ii) the approval of any delegation by the Portfolio Manager

Page 42

pursuant to Section 14(a) of the Portfolio Management Agreement of any responsibility for the exercise of the final decision to purchase or sell any Collateral Obligation on behalf of the Issuer, (iii) the removal or replacement (other than following a resignation of the Portfolio Manager) of the Portfolio Manager, (iv) the approval of a successor Portfolio Manager if the appointment of the Portfolio Manager is being terminated (other than following a resignation of the Portfolio Manager) pursuant to the Portfolio Management Agreement and (v) the waiver of any event constituting "cause" as a basis for termination of the Portfolio Management Agreement and removal of the Portfolio Manager, any Notes that are Portfolio Manager Notes;

except that (1) in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that a Trust Officer of the Trustee actually knows to be so owned or to be Portfolio Manager Notes shall be so disregarded; and (2) Notes so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not one of the Persons specified above.

"Overcollateralization Ratio":  With respect to any specified Class or Classes of Secured Notes (other than the Class A-X Notes, for which no Overcollateralization Ratio applies) as of any date of determination, the percentage derived from: (i) the Adjusted Collateral Principal Amount on such date divided by (ii) the Aggregate Outstanding Amount on such date of the Secured Notes of such Class or Classes, each Priority Class of Secured Notes and each Pari Passu Class of Secured Notes (in each case, other than the Class A-X Notes).

"Overcollateralization Ratio Test":  A test that is satisfied with respect to any Class or Classes of Secured Notes as of any date of determination on which such test is applicable if (i) the Overcollateralization Ratio for such Class or Classes on such date is at least equal to the Required Overcollateralization Ratio for such Class or Classes or (ii) such Class or Classes of Secured Notes is no longer Outstanding.

"Pari Passu Class":  With respect to any specified Class of Notes, each Class of Notes that ranks pari passu to such Class, as indicated in Section 2.3.  For the avoidance of doubt, (a) the only Pari Passu Classes of Notes hereunder are the Class A-1A Notes, the Class A-1F Notes and the Class A-2 Notes, each of which is a Pari Passu Class with respect to the other; and (b) notwithstanding the fact that the Class A-1 Notes, the Class A-2 Notes and the Class A-X Notes rank pari passu with respect to each other in certain instances under the Priority of Payments, neither the Class A-1 Notes nor the Class A-2 Notes are intended to have Pari Passu Classes or to be Pari Passu Classes with respect to the Class A-X Notes.

"Partial Deferrable Security":  A Collateral Obligation with respect to which under the related Underlying Instruments (i) a portion of the interest due thereon is required to be paid in cash on each payment date therefor and is not permitted to be deferred or capitalized (which portion will at least be equal to (a) in the case of any Floating Rate Obligation, the sum of LIBOR plus 0.50%, and (b) in the case of any Fixed Rate Obligation, 4.00%), and (ii) the issuer thereof or obligor thereon may defer or capitalize the remaining portion of the interest due thereon.  Any component of a Partial Deferrable Security that is paid "in kind" shall not be

<div align="center">Page 43</div>

included for purposes of calculations related to the Minimum Floating Spread Test, the Weighted Average Coupon or the Weighted Average Floating Spread.

"Participation Interest":  A participation interest in a Loan that, at the time of acquisition or the Issuer's commitment to acquire the same, is represented by a contractual obligation of a Selling Institution that has at the time of such acquisition or the Issuer's commitment to acquire the same at least a short-term rating of "A-1" (or if no short-term rating exists, a long-term rating of "A+") by S&P.

"Paying Agent":  Any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.2.

"Payment Account":  The payment account of the Trustee established pursuant to Section 10.3(a).

"Payment Date":  The 1st day of February, May, August and November of each year (or, if such day is not a Business Day, the next succeeding Business Day), commencing in August 2014, except that the final Payment Date (subject to any earlier redemption or payment of the Notes) shall be in February 2026 (or, if such day is not a Business Day, the next succeeding Business Day).

"PBGC":  The United States Pension Benefit Guaranty Corporation.

"Person":  An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"Portfolio Management Agreement":  The agreement dated as of the Closing Date, between the Issuer and the Portfolio Manager relating to the management of the Collateral Obligations and the other Assets by the Portfolio Manager on behalf of the Issuer, as amended from time to time in accordance with the terms hereof and thereof.

"Portfolio Manager":  Acis Capital Management, L.P., a Delaware limited partnership, until a successor Person shall have become the Portfolio Manager pursuant to the provisions of the Portfolio Management Agreement, and thereafter "Portfolio Manager" shall mean such successor Person.

"Portfolio Manager Notes": As of any date of determination, (a) all Notes held on such date by (i) the Portfolio Manager, (ii) any Affiliate of the Portfolio Manager or (iii) any account, fund, client or portfolio managed or advised on a discretionary basis by the Portfolio Manager or any of its Affiliates and (b) all Notes as to which economic exposure is held on such date (whether through any derivative financial transaction or otherwise) by any Person identified in the foregoing clause (a).

"Post Reinvestment Period Amendment Proceeds":  As defined in Section 12.2(f).

"Post Reinvestment Period Settlement Obligation": As defined in Section 12.2(g).

"Principal Balance": Subject to Section 1.2, with respect to (a) any Asset other than a Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Asset (excluding any capitalized interest) and (b) any Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation (excluding any capitalized interest), plus (except as expressly set forth in this Indenture) any undrawn commitments that have not been irrevocably reduced or withdrawn with respect to such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation; *provided* that, for all purposes the Principal Balance of (1) any Equity Security or interest only strip shall be deemed to be zero and (2) any Defaulted Obligation that is not sold or terminated within three years after becoming a Defaulted Obligation shall be deemed to be zero.

"Principal Collection Subaccount": The meaning specified in Section 10.2(a).

"Principal Financed Accrued Interest": With respect to any Collateral Obligation acquired on or after the Closing Date, the amount of Principal Proceeds, if any, applied towards the purchase of accrued interest on such Collateral Obligation.

"Principal Proceeds": With respect to any Collection Period or Determination Date, all amounts received by the Issuer during the related Collection Period that do not constitute Interest Proceeds and any amounts that have been designated as Principal Proceeds pursuant to the terms of this Indenture. For the avoidance of doubt, all Turbo Payment Amounts will be considered Principal Proceeds.

"Priority Class": With respect to any specified Class of Notes, each Class of Notes that ranks senior to such Class, as indicated in Section 2.3.

"Priority of Payments": The meaning specified in Section 11.1(a).

"Proceeding": Any suit in equity, action at law or other judicial or administrative proceeding.

"Proposed Portfolio": The portfolio of Collateral Obligations and Eligible Investments resulting from the proposed purchase, sale, maturity or other disposition of a Collateral Obligation or a proposed reinvestment in an additional Collateral Obligation, as the case may be.

"QEF": The meaning specified in Section 7.16.

"QIB/QP": Any Person that, at the time of its acquisition, purported acquisition or proposed acquisition of Notes is both a Qualified Institutional Buyer and a Qualified Purchaser.

"Qualified Broker/Dealer": Any of Bank of America/Merrill Lynch, Deutsche Bank, JP Morgan, BNP Paribas, UBS, Citibank, Royal Bank of Scotland, Royal Bank of Canada, Morgan Stanley, Goldman Sachs, Credit Suisse, Wells Fargo, Jefferies, Barclays Bank, Imperial Capital,

TD Securities, General Electric Capital, Scotiabank or Canadian Imperial Bank of Commerce (CIBC) and any other financial institution so designated by the Portfolio Manager with notice to any Rating Agency.

"Qualified Institutional Buyer": The meaning specified in Rule 144A under the Securities Act.

"Qualified Purchaser": The meaning specified in Section 2(a)(51) of the Investment Company Act and Rule 2a51-2 under the Investment Company Act.

"Ramp-Up Account": The account established pursuant to Section 10.3(c).

"Ramped-Up Collateral Obligations": The meaning specified in the definition of "Target Initial Par Condition" in this Section 1.1.

"Rating": The S&P Rating.

"Rating Agency": S&P, for so long as any Class of Notes is rated by S&P, or, with respect to Assets generally, if at any time Moody's or S&P ceases to provide rating services with respect to debt obligations, any other nationally recognized investment rating agency selected by the Issuer (or the Portfolio Manager on behalf of the Issuer). In the event that at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and S&P published ratings for the type of obligation in respect of which such alternative rating agency is used.

"Re-Pricing Affected Class": The meaning specified in Section 8.6(a).

"Re-Pricing Amendment": The meaning specified in Section 8.6(a).

"Re-Pricing Notice": The meaning specified in Section 8.6(b).

"Re-Pricing Proposal Notice": The meaning specified in Section 8.6(a).

"Record Date": With respect to the Global Notes, the date one day prior to the applicable Payment Date and, with respect to the Certificated Secured Notes, Certificated Subordinated Notes and Uncertificated Subordinated Notes, the date 15 days prior to the applicable Payment Date.

"Redemption Date": Any Business Day (including without limitation any Payment Date) specified for a redemption of Notes pursuant to Article 9.

"Redemption Price": (a) For each Secured Note to be redeemed (x) 100% of the Aggregate Outstanding Amount of such Secured Note, *plus* (y) accrued and unpaid interest thereon (including interest on any accrued and unpaid Secured Note Deferred Interest, in the case of the Deferred Interest Secured Notes) to the Redemption Date *plus* (z) with respect to the Class A-1 Notes and Class A-2 Notes only, if any Class A-1 Notes or Class A-2 Notes, as applicable,

<div align="center">Page 46</div>

are redeemed after the end of the Non-Call Period but on or before the Payment Date in February 2017 in the circumstances set forth in <u>Section 9.7</u>, the Class A-1/A-2 Make-Whole Amount and (b) for each Subordinated Note, its proportional share (based on the Aggregate Outstanding Amount of such Note) of the portion of the proceeds of the remaining Assets (after giving effect to the Optional Redemption or Tax Redemption of the Secured Notes in whole or after all of the Secured Notes have been repaid in full and payment in full of (and/or creation of a reserve for) all expenses (including all Management Fees and Administrative Expenses) of the Co-Issuers); *provided* that Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to the Holders of such Class of Secured Notes.

"<u>Reference Banks</u>":  The meaning specified in <u>Exhibit G</u> hereto.

"<u>Refinancing</u>":  A loan or an issuance of replacement securities, whose terms in each case will be negotiated by the Portfolio Manager on behalf of the Issuer, from one or more financial institutions or purchasers to refinance the Notes in connection with an Optional Redemption, it being understood that any rating of such replacement securities by a Rating Agency will be based on a credit analysis specific to such replacement securities and independent of the rating of the Notes being refinanced.

"<u>Refinancing Proceeds</u>":  The Cash proceeds from the Refinancing.

"<u>Register</u>" and "<u>Registrar</u>":  The respective meanings specified in <u>Section 2.5(a)</u>.

"<u>Registered</u>":  Issued in registered form for U.S. federal income tax purposes (unless not a "registration-required obligation" as defined in Section 163(f)(2)(A) of the Code) and issued after July 18, 1984.

"<u>Registered Investment Adviser</u>":  A Person duly registered as an investment adviser in accordance with the Investment Advisers Act of 1940, as amended.

"<u>Registered Office Agreement</u>":  An agreement between the Administrator and the Issuer (as amended from time to time) for the provision of registered office facilities to the Issuer.

"<u>Regulation S</u>":  Regulation S, as amended, under the Securities Act.

"<u>Regulation S Global Note</u>":  The meaning specified in <u>Section 2.2(b)(i)</u>.

"<u>Reinvesting Holder</u>":  Each Holder on the Closing Date of a Subordinated Note in the form of a Certificated Subordinated Note, and such Holder's successors other than any purchaser of all or any portion of the Subordinated Notes of such Holder; *provided* that Benefit Plan Investors shall not be entitled to be "Reinvesting Holders."

"<u>Reinvestment Agreement</u>":  A guaranteed reinvestment agreement from a bank, insurance company or other corporation or entity having an Eligible Investment Required Ratings; *provided* that such agreement provides that it is terminable by the purchaser, without

penalty, in the event that the rating assigned to such agreement by any Rating Agency is at any time lower than such agreement's Eligible Investment Required Ratings.

"Reinvestment Amount":  With respect to the Subordinated Notes held by a Reinvesting Holder, any amount that is available to be distributed on any Payment Date during the Reinvestment Period to such Reinvesting Holder in respect of its Subordinated Notes pursuant to clause (U) or (V) of Section 11.1(a)(i) but is instead deposited in the Reinvestment Amount Account on such Payment Date at the direction of such Reinvesting Holder in accordance with the second to last paragraph of Section 11.1(a)(ii).  Each Reinvestment Amount shall be deemed to be paid to the applicable Reinvesting Holder on the Payment Date on which it is deposited in the Reinvestment Amount Account at the direction of such Reinvesting Holder, and each Reinvestment Amount will be actually paid to such Reinvesting Holder after such Payment Date, without interest thereon and solely to the extent of Principal Proceeds available therefor as provided in Section 11.1(a)(ii) or proceeds in respect of the Assets available therefor as provided in Section 11.1(a)(iii), as applicable.

"Reinvestment Amount Account":  The trust account established pursuant to Section 10.3(f).

"Reinvestment Period":  The period from and including the Closing Date to and including the earliest of (i) the Payment Date in February, 2019, (ii) any date on which the Maturity of any Class of Secured Notes is accelerated following an Event of Default (and such acceleration has not been rescinded) pursuant to this Indenture and (iii) any date on which the Portfolio Manager reasonably determines that it can no longer reinvest in additional Collateral Obligations in accordance with this Indenture or the Portfolio Management Agreement, *provided* that, in the case of this clause (iii), the Portfolio Manager notifies the Issuer, the Trustee (who shall notify the Holders of Notes), S&P and the Collateral Administrator thereof at least five Business Days prior to such date.

"Reinvestment Period Settlement Condition":  As defined in Section 12.2(g).

"Reinvestment Target Par Balance":  As of any date of determination, the Target Initial Par Amount minus (i) the amount of any reduction in the Aggregate Outstanding Amount of the Notes through the payment of Principal Proceeds *plus* (ii) the aggregate amount of Principal Proceeds that result from the issuance of any additional notes pursuant to Sections 2.13 and 3.2 (after giving effect to such issuance of any additional notes).

"Related Obligation":  An obligation issued by the Portfolio Manager, any of its Affiliates that are collateralized debt obligation funds or any other Person that is a collateralized debt obligation fund whose investments are primarily managed by the Portfolio Manager or any of its Affiliates.

"Request to Change the Base Rate":  The meaning specified in Section 8.7(a).

"Required Interest Coverage Ratio": (a) for the Class A Notes and Class B Notes, 120.0%, (b) for the Class C Notes, 115.0%, (c) for the Class D Notes, 110.0% and (d) for the

Page 48

Class E Notes, 105.0%.  There shall be no Required Interest Coverage Ratio for the Class F Notes or the Class A-X Notes.

"Required Interest Diversion Amount":  The lesser of (x) 50% of Available Funds from the Collateral Interest Amount on any Payment Date after application of such Collateral Interest Amount to the payment of amounts set forth in clauses (A) through (P) of Section 11.1(a)(i) and (y) the minimum amount that needs to be added to the Adjusted Collateral Principal Amount in order to cause the Interest Diversion Test to be satisfied.

"Required Overcollateralization Ratio":  (a) For the Class A Notes and Class B Notes, 122.0%, (b) for the Class C Notes, 112.5%, (c) for the Class D Notes, 108.0%, and (d) for the Class E Notes, 104.5%.  There shall be no Required Overcollateralization Ratio for the Class F Notes or the Class A-X Notes.

"Restricted Trading Period":  The period during which the S&P rating of the Class A Notes is withdrawn (and not reinstated) or is one or more sub-categories below its rating on the Closing Date; *provided* that (1) such period will not be a Restricted Trading Period upon the direction of the Issuer with the consent of a Majority of the Controlling Class, which direction shall remain in effect until a subsequent direction to the Issuer (with a copy to the Trustee and the Collateral Administrator) by a Majority of the Controlling Class declaring the beginning of a Restricted Trading Period is delivered and (2) no Restricted Trading Period shall restrict any sale of a Collateral Obligation entered into by the Issuer at the time when a Restricted Trading Period is not in effect, regardless of whether such sale has settled.

"Revolver Funding Account":  The account established pursuant to Section 10.4.

"Revolving Collateral Obligation":  Any Collateral Obligation (other than a Delayed Drawdown Collateral Obligation) that is a Loan (including, without limitation, revolving loans, including funded and unfunded portions of revolving credit lines and letter of credit facilities, unfunded commitments under specific facilities and other similar loans and investments) that by its terms may require one or more future advances to be made to the borrower by the Issuer; *provided* that any such Collateral Obligation will be a Revolving Collateral Obligation only until all commitments to make advances to the borrower expire or are terminated or irrevocably reduced to zero.

"Rule 144A":  Rule 144A, as amended, under the Securities Act.

"Rule 144A Global Note":  The meaning specified in Section 2.2(b)(ii).

"Rule 144A Information":  The meaning specified in Section 7.14.

"Rule 17g-5":  Rule 17g-5 under the Exchange Act.

"S&P":  Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor or successors thereto.

18750188.25.BUSINESS

"S&P CDO Monitor":  Each dynamic, analytical computer model developed by S&P used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based upon certain assumptions (including the applicable Weighted Average S&P Recovery Rate) and S&P's proprietary corporate default studies, as may be amended by S&P from time to time upon notice to the Issuer, the Trustee and the Collateral Administrator.  Each S&P CDO Monitor shall be chosen by the Portfolio Manager (with notice to the Collateral Administrator) and associated with either (x) each of (i) a Minimum Weighted Average S&P Recovery Rate chosen from a row in the S&P Test Matrix, (ii) a Minimum Floating Spread chosen from a row in the S&P Test Matrix and (iii) the Minimum Weighted Average Coupon or (y) a Weighted Average S&P Recovery Rate, a Minimum Floating Spread and a Minimum Weighted Average Coupon confirmed by S&P.  For the avoidance of doubt, the Portfolio Manager will be permitted to select the Weighted Average S&P Recovery Rate independently for each Class of Secured Notes rated by S&P. Each S&P CDO Monitor selected by the Portfolio Manager from time to time pursuant to clause (x) above must meet the requirements set forth in Section 7.17(g), which, for the avoidance of doubt, requires, among other things, that if any of the Minimum Weighted Average S&P Recovery Rate Test, Minimum Weighted Average Coupon Test or Minimum Floating Spread Test shall be satisfied at such time, then all of such component tests that were satisfied shall be satisfied after giving effect to such selection and if any of such tests shall not be satisfied at such time, then the level of compliance with each of such tests shall be maintained or improved after giving effect to such selection.

"S&P CDO Monitor Test":  A test that will be satisfied on any date of determination on or after the Effective Date following receipt by the Portfolio Manager and the Collateral Administrator of the input files for the S&P CDO Monitor if, with respect to each Class of Secured Notes then Outstanding, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, as the case may be, either (x) the Class Default Differential with respect to such Class of Secured Notes of the Proposed Portfolio is positive or (y) the Class Default Differential with respect to such Class of Secured Notes of the Proposed Portfolio is equal to or greater than the Class Default Differential with respect to such Class of Secured Notes of the Current Portfolio.

"S&P Collateral Value":  With respect to any Defaulted Obligation or Deferring Security, the lesser of (i) the S&P Recovery Amount of such Defaulted Obligation or Deferring Security, respectively, as of the relevant Measurement Date and (ii) the Market Value of such Defaulted Obligation or Deferring Security, respectively, as of the relevant Measurement Date.

"S&P Industry Classification":  The S&P Industry Classifications set forth in Schedule 2 hereto, and such industry classifications shall be updated at the option of the Portfolio Manager (without entry into any supplemental indenture pursuant to Article 8) if S&P publishes revised industry classifications.

"S&P Rating":   With respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following methodology:

(i)    (a) if there is an issuer credit rating of the issuer of such Collateral Obligation by S&P as published by S&P, or the guarantor which unconditionally and irrevocably guarantees such Collateral Obligation pursuant to a form of guaranty approved by S&P for use in connection with this transaction, then the S&P Rating shall be such rating (regardless of whether there is a published rating by S&P on the Collateral Obligations of such issuer held by the Issuer; *provided* that private ratings (that is, ratings provided at the request of the obligor) may be used for purposes of this definition if the related obligor has consented to the disclosure thereof and a copy of such consent has been provided to S&P) or (b) if there is no issuer credit rating of the issuer by S&P but (1) there is a senior secured rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category below such rating; (2) if clause (1) above does not apply, but there is a senior unsecured rating on any obligation or security of the issuer, the S&P Rating of such Collateral Obligation shall equal such rating; and (3) if neither clause (1) nor clause (2) above applies, but there is a subordinated rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category above such rating if such rating is higher than "BB+", and shall be two sub-categories above such rating if such rating is "BB+" or lower;

(ii)    with respect to any Collateral Obligation that is a DIP Collateral Obligation, the S&P Rating thereof shall be the credit rating assigned to such issue by S&P;

(iii)    if there is not a rating by S&P on the issuer or on an obligation of the issuer, then the S&P Rating may be determined pursuant to clauses (a) through (c) below:

(a)    if an obligation of the issuer is not a DIP Collateral Obligation and is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Rating set forth above except that the S&P Rating of such obligation will be (1) one sub-category below the S&P equivalent of the Moody's Rating if such Moody's Rating is "Baa3" or higher and (2) two sub-categories below the S&P equivalent of the Moody's Rating if such Moody's Rating is "Ba1" or lower;

(b)    the S&P Rating may be based on a credit estimate provided by S&P, and in connection therewith, the Issuer, the Portfolio Manager on behalf of the Issuer or the issuer of such Collateral Obligation shall, prior to or within 30 days after the acquisition of such Collateral Obligation, apply (and concurrently submit all available Information in respect of such application) to S&P for a credit estimate which shall be its S&P Rating; *provided* that, if such Information is submitted within such 30-day period, then, pending receipt from S&P of such estimate, such Collateral Obligation shall have an S&P Rating as determined by the Portfolio Manager in its sole discretion if the Portfolio Manager certifies to the Trustee and the Collateral Administrator that it believes that such S&P Rating determined by the Portfolio Manager is commercially reasonable and will be at least equal to such rating; *provided further* that, if such Information is not submitted within

Page 51

such 30-day period, then, pending receipt from S&P of such estimate, the Collateral Obligation shall have (1) the S&P Rating as determined by the Portfolio Manager for a period of up to 90 days after the acquisition of such Collateral Obligation and (2) an S&P Rating of "CCC-" following such 90-day period; unless, during such 90-day period, the Portfolio Manager has requested the extension of such period and S&P, in its sole discretion, has granted such request; *provided further* that, if such 90-day period (or other extended period) elapses pending S&P's decision with respect to such application, the S&P Rating of such Collateral Obligation shall be "CCC-"; *provided further* that, if the Collateral Obligation has had a public rating by S&P that S&P has withdrawn or suspended within six months prior to the date of such application for a credit estimate in respect of such Collateral Obligation, the S&P Rating in respect thereof shall be "CCC-" pending receipt from S&P of such estimate, and S&P may elect not to provide such estimate until a period of six months have elapsed after the withdrawal or suspension of the public rating; *provided further* that the S&P Rating may not be determined pursuant to this clause (b) if the Collateral Obligation is a DIP Collateral Obligation; *provided further* that such credit estimate shall expire 12 months after the acquisition of such Collateral Obligation, following which such Collateral Obligation shall have an S&P Rating of "CCC-" unless, during such 12-month period, the Issuer applies for renewal thereof in accordance with Section 7.13(b), in which case such credit estimate shall continue to be the S&P Rating of such Collateral Obligation until S&P has confirmed or revised such credit estimate, upon which such confirmed or revised credit estimate shall be the S&P Rating of such Collateral Obligation; *provided further* that such confirmed or revised credit estimate shall expire on the next succeeding 12-month anniversary of the date of the acquisition of such Collateral Obligation and (when renewed annually in accordance with Section 7.13(b)) on each 12-month anniversary thereafter;

(c)     with respect to a Collateral Obligation that is not a Defaulted Obligation, the S&P Rating of such Collateral Obligation will at the election of the Issuer (at the direction of the Portfolio Manager) be "CCC-"; *provided* (i) neither the issuer of such Collateral Obligation nor any of its Affiliates are subject to any bankruptcy or reorganization proceedings and (ii) the issuer has not defaulted on any payment obligation in respect of any debt security or other obligation of the issuer at any time within the two year period ending on such date of determination, all such debt securities and other obligations of the issuer that are *pari passu* with or senior to the Collateral Obligation are current and the Portfolio Manager reasonably expects them to remain current; or

(iv)     with respect to a DIP Collateral Obligation that has no issue rating by S&P or a Current Pay Obligation that is rated "D" or "SD" by S&P, the S&P Rating of such DIP Collateral Obligation or Current Pay Obligation, as applicable, will be, at the election of the Issuer (at the direction of the Portfolio Manager), "CCC-" or the S&P Rating determined pursuant to clause (iii)(b) above;

Page 52

*provided* that, for purposes of the determination of the S&P Rating, (x) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch positive" by S&P, such rating will be treated as being one sub-category above such assigned rating and (y) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch negative" by S&P, such rating will be treated as being one sub-category below such assigned rating.

The Portfolio Manager shall use commercially reasonable efforts to provide to S&P all available Information for any Collateral Obligation with an S&P Rating determined pursuant to clause (iii)(c) of this definition, prior to or within thirty (30) days after the acquisition of such Collateral Obligation.

"S&P Rating Condition":  With respect to any action taken or to be taken by or on behalf of the Issuer, a condition that is satisfied if S&P has specifically confirmed in writing, including by electronic messages, facsimile, press release, posting to its internet website, or other means deemed acceptable by S&P, to the Issuer, the Trustee and the Portfolio Manager that no immediate withdrawal or reduction with respect to its then current rating of any Class of Secured Notes will occur as a result of such action; *provided* that if S&P (a) makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee that (i) it believes the S&P Rating Condition is not required with respect to an action or (ii) its practice is to not give such confirmations, or (b) it no longer constitutes a Rating Agency under this Indenture, the S&P Rating Condition shall not apply.

"S&P Rating Confirmation Failure":  The meaning specified in Section 7.17(e).

"S&P Recovery Amount":  With respect to any Collateral Obligation, an amount equal to: (a) the applicable S&P Recovery Rate *multiplied by* (b) the Principal Balance of such Collateral Obligation.

"S&P Recovery Rate":  With respect to any category of Collateral Obligation, the corresponding "S&P Recovery Rate" designated in accordance with the methodology specified in the definition of the term "Weighted Average S&P Recovery Rate".

"S&P Recovery Rating":  With respect to a Collateral Obligation for which an S&P Recovery Rate is being determined, the "Recovery Rating" assigned by S&P to such Collateral Obligation based upon the following table:

| Recovery Rating | Description of Recovery | Recovery Range (%) |
|:---:|:---|:---:|
| 1+ | High expectation, full recovery | 75-95 |
| 1 | Very high recovery | 65-95 |
| 2 | Substantial recovery | 50-85 |
| 3 | Meaningful recovery | 30-65 |
| 4 | Average recovery | 20-45 |
| 5 | Modest recovery | 5-25 |
| 6 | Negligible recovery | 2-10 |

Page 53

"S&P Test Matrix":  On the Closing Date, the Portfolio Manager, on behalf of the Issuer, shall elect and notify the Collateral Administrator which Minimum Weighted Average S&P Recovery Rate, Minimum Weighted Average Floating Spread and which "Break-even Rate Case" shall apply initially, as set forth in the table in Schedule 6.  Thereafter, the Portfolio Manager may elect to have a different case apply, *provided* that the Minimum Weighted Average S&P Recovery Rate, Minimum Weighted Average Floating Spread and a different "Break even Rate Case" applicable to the case to which the Portfolio Manager wishes to change (with notice to the Collateral Administrator), are satisfied or, in the case of any tests that are not satisfied, will be closer to being satisfied.  In no event will the Issuer or the Portfolio Manager be obliged to elect to have a different Minimum Weighted Average S&P Recovery Rate, Minimum Weighted Average Floating Spread or "Break even Rate Case" apply.  For the avoidance of doubt, (i) once a Minimum Weighted Average Floating Spread and "Break-even Rate Case" have been elected by the Portfolio Manager (with notice to the Collateral Administrator), such elections shall apply in all cases to each table comprising this S&P Test Matrix unless and until changed as specified above, and (ii) each table comprising this S&P Test Matrix shall apply only for so long as such Class of Notes remains outstanding.

"Sale":  The meaning specified in Section 5.17.

"Sale Proceeds":  All proceeds (excluding accrued interest, if any) received with respect to Assets as a result of sales of such Assets in accordance with Article 12 less any reasonable expenses incurred by the Portfolio Manager, the Collateral Administrator or the Trustee (other than amounts payable as Administrative Expenses) in connection with such sales.

"Schedule of Collateral Obligations":  The schedule of Collateral Obligations attached as Schedule 1 hereto, which schedule shall list each Collateral Obligation Delivered hereunder and each Collateral Obligation with respect to which the Portfolio Manager on behalf of the Issuer has entered into a binding commitment to purchase or enter into and shall include, with respect to each such Collateral Obligation, the issuer, Principal Balance, coupon/spread, the stated maturity, the Moody's Rating, the S&P Rating (unless such rating is based on a credit estimate or is a private or confidential rating from S&P) and the S&P Industry Classification for each Collateral Obligation and the percentage of the aggregate commitment under each Revolving Collateral Obligation and Delayed Drawdown Collateral Obligation that is funded, as amended from time to time (without the consent of or any action on the part of any Person) to reflect the release of Collateral Obligations pursuant to Article 10, the inclusion of additional Collateral Obligations pursuant to Section 7.17 and the inclusion of additional Collateral Obligations as provided in Section 12.2.

"Scheduled Distribution":  With respect to any Asset, for each Due Date, the scheduled payment of principal and/or interest due on such Due Date with respect to such Asset, determined in accordance with the assumptions specified in Section 1.2.

"Second Lien Loan":  Any assignment of or Participation Interest in a Loan that:  (a) is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan but which is subordinated (with respect to liquidation preferences with respect to pledged collateral) to a Senior Secured Loan of the obligor; (b) is secured by a valid

Page 54

second-priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Second Lien Loan the value of which is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other Loans of equal or higher seniority secured by a lien or security interest in the same collateral and (c) is not secured solely or primarily by common stock or other equity interests; *provided* that the limitation set forth in this clause (c) shall not apply with respect to a Loan made to a parent entity that is secured solely or primarily by the stock of one or more of the subsidiaries of such parent entity to the extent that the granting by any such subsidiary of a lien on its own property would violate law or regulations applicable to such subsidiary (whether the obligation secured is such Loan or any other similar type of indebtedness owing to third parties); and *provided further* that, for a Loan to which, due to the operation of the foregoing proviso, the limitation set forth in this clause (c) does not apply, the S&P Recovery Rate will be determined on a case by case basis if there is no assigned S&P Recovery Rating.

"Secured Note Deferred Interest":  With respect to any specified Class of Deferred Interest Secured Notes, the meaning specified in Section 2.7(a).

"Secured Noteholders": The Holders of the Secured Notes.

"Secured Notes":  The Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes.

"Secured Parties":  The meaning specified in the Granting Clauses.

"Securities Account Control Agreement":  The Securities Account Control Agreement dated as of the Closing Date between the Issuer, the Trustee and U.S. Bank National Association, as custodian.

"Securities Act":  The United States Securities Act of 1933, as amended.

"Securities Intermediary":  As defined in Section 8-102(a)(14) of the UCC.

"Security Entitlement":  The meaning specified in Section 8-102(a)(17) of the UCC.

"Security Purchase Agreement":  The agreement dated as of the Closing Date by and among the Co-Issuers and Jefferies LLC, as the Initial Purchaser, relating to the Offering of the Notes (other than the Subordinated Notes), as amended from time to time.

"Selling Institution":  The entity obligated to make payments to the Issuer under the terms of a Participation Interest.

"Selling Institution Collateral":  The meaning specified in Section 10.4.

"Senior Secured Bond":  Any obligation that (a) constitutes borrowed money, (b) is in the form of, or represented by, a bond, note, certificated debt security or other debt security (other than any of the foregoing that evidences a Loan, Participation Interest or Senior Secured Floating Rate Note), (c) is not secured solely or primarily by common stock or other equity interests,

Page 55

(d) if it is subordinated by its terms, is subordinated only to indebtedness for borrowed money, trade claims, capitalized leases or other similar obligations and (e) is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under such obligation.

"Senior Secured Floating Rate Note": Any obligation that (a) constitutes borrowed money, (b) is in the form of, or represented by, a bond, note (other than any note evidencing a Loan), certificated debt security or other debt security, (c) is expressly stated to bear interest based upon a London interbank offered rate for Dollar deposits in Europe or a relevant reference bank's published base rate or prime rate for Dollar-denominated obligations in the United States or the United Kingdom, (d) is not secured solely or primarily by common stock or other equity interests, (e) if it is subordinated by its terms, is subordinated only to indebtedness for borrowed money, trade claims, capitalized leases or other similar obligations and (f) is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under such obligation.

"Senior Secured Loan": Any assignment of or Participation Interest in a Loan that: (a) is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan; (b) is secured by a valid first-priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; (c) the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other Loans of equal seniority secured by a first lien or security interest in the same collateral and (d) is not secured solely or primarily by common stock or other equity interests; *provided* that the limitation set forth in this clause (d) shall not apply with respect to a Loan made to a parent entity that is secured solely or primarily by the stock of one or more of the subsidiaries of such parent entity to the extent that the granting by any such subsidiary of a lien on its own property would violate law or regulations applicable to such subsidiary (whether the obligation secured is such Loan or any other similar type of indebtedness owing to third parties); and *provided further* that, for a Loan to which, due to the operation of the foregoing proviso, the limitation set forth in this clause (d) does not apply, the S&P Recovery Rate will be assigned by S&P on a case by case basis if there is no assigned S&P Recovery Rating.

"Similar Law": Any federal, state, local, non-U.S. or other laws or regulations that are substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

"Special Redemption": As defined in Section 9.6.

"Special Redemption Date": As defined in Section 9.6.

"Specified Amendment": With respect to any Collateral Obligation that is the subject of a rating estimate or is a private or confidential rating by S&P, any waiver, modification, amendment or variance that would:

Page 56

(a)     modify the amortization schedule with respect to such Collateral Obligation in a manner that:

    (i)     reduces the Dollar amount of any Scheduled Distribution by more than the greater of (x) 20% and (y) $250,000;

    (ii)    postpones any Scheduled Distribution by more than two payment periods or eliminates a Scheduled Distribution; or

    (iii)   causes the Weighted Average Life of the applicable Collateral Obligation to increase by more than 10%;

(b)     reduce or increase the Cash interest rate payable by the Obligor thereunder by more than 100 basis points (excluding any increase in an interest rate arising by operation of a default or penalty interest clause under a Collateral Obligation);

(c)     extend the stated maturity date of such Collateral Obligation by more than 24 months; *provided* that (x) any such extension shall be deemed not to have been made until the Business Day following the original stated maturity date of such Collateral Obligation and (y) such extension shall not cause the Weighted Average Life of such Collateral Obligation to increase by more than 25%;

(d)     release any party from its obligations under such Collateral Obligation, if such release would have a material adverse effect on the Collateral Obligation;

(e)     reduce the principal amount thereof; or

(f)     in the reasonable business judgment of the Portfolio Manager, have a material adverse impact on the value of such Collateral Obligation.

"<u>Standby Investment</u>": The US Bank National Association Money Market Deposit Account.

"<u>Stated Maturity</u>": With respect to the Notes of any Class, the date specified as such in <u>Section 2.3</u>.

"<u>Step-Down Obligation</u>": An obligation or security which by the terms of the related Underlying Instruments provides for a decrease in the per annum interest rate on such obligation or security (other than by reason of any change in the applicable index or benchmark rate used to determine such interest rate) or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-Down Obligation.

"<u>Step-Up Obligation</u>": An obligation or security which by the terms of the related Underlying Instruments provides for an increase in the per annum interest rate on such obligation or security, or in the spread over the applicable index or benchmark rate, solely as a function of

Page 57

the passage of time; *provided* that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-Up Obligation.

"Structured Finance Obligation":  Any obligation secured directly by, referenced to, or representing ownership of, a pool of receivables or other financial assets of any obligor, including collateralized debt obligations and mortgage-backed securities.

"Sub-class"  Each of the Class A-1A Notes, the Class A-1F Notes, the Class A-2A Notes, the Class A-2B Notes and the Class A-X Notes.

"Subordinated Management Fee":  The fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9(a) of the Portfolio Management Agreement and Section 11.1 of this Indenture, in an amount equal to 0.25% per annum (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date or, for the relevant period, such greater rate as specified in the related Fee Election Notice.  The Subordinated Management Fee is payable on each Payment Date only to the extent that sufficient Interest Proceeds or Principal Proceeds are available, and, to the extent any such Subordinated Management Fee is not paid on any Payment Date for any reason, such payment will be deferred and will accrue interest at LIBOR (as determined for the applicable Interest Accrual Period with respect to the Secured Notes), compounded quarterly (calculated on the basis of a 360-day year consisting of twelve 30-day months).

"Subordinated Notes":  The Subordinated Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Subordinated Notes Internal Rate of Return":  An annualized internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for the following cash flows, assuming all Subordinated Notes were purchased on the Closing Date for an initial offering price of 100% of the face amount of such Notes:

(i)     each distribution of Interest Proceeds made to the Holders of the Subordinated Notes on any prior Payment Date and, to the extent necessary to reach the applicable Subordinated Notes Internal Rate of Return, the current Payment Date; and

(ii)    each distribution of Principal Proceeds made to the Holders of the Subordinated Notes on any prior Payment Date and, to the extent necessary to reach the applicable Subordinated Notes Internal Rate of Return, the current Payment Date;

*provided* that all Reinvestment Amounts with respect to the Subordinated Notes shall be deemed to have been distributed to the relevant Reinvesting Holder(s) through the applicable Payment Date for purposes of calculating the Subordinated Notes Internal Rate of Return (whether or not any relevant Reinvesting Holder continues to hold the applicable Subordinated Notes).

Page 58

"Subsequent Delivery Date": The settlement date with respect to the Issuer's acquisition of a Collateral Obligation to be pledged to the Trustee after the Closing Date.

"Successor Entity": The meaning specified in Section 7.10(a).

"Supermajority": (A) With respect to any Class of Notes, the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Notes of such Class; (B) with respect to any Sub-class of Notes, the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Notes of such Sub-class; and (C) with respect to more than one Class or Sub-class voting collectively, the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Notes of such Classes or Sub-classes in the aggregate.

"Synthetic Security": A security or swap transaction, other than a Participation Interest, that has payments associated with either payments of interest on and/or principal of a reference obligation or the credit performance of a reference obligation.

"Target Initial Par Amount": U.S.$400,000,000.

"Target Initial Par Condition": A condition satisfied on the date that either:

(i) the Aggregate Principal Balance of Collateral Obligations that are held by the Issuer and that the Issuer has committed to purchase on such date, together with the amount of any proceeds of prepayments, maturities or redemptions of Collateral Obligations purchased by the Issuer prior to such date (other than any such proceeds that have been reinvested in Collateral Obligations held by the Issuer on the Effective Date), will equal or exceed the Target Initial Par Amount; or

(ii) both (A) the Issuer has purchased and owns, or has entered into binding commitments to purchase, Collateral Obligations (collectively, the "Ramped-Up Collateral Obligations") having an Aggregate Principal Balance greater than or equal to 97% (but less than 100%) of the Target Initial Par Amount and (B) the sum of (i) the Aggregate Principal Balance of such Ramped-Up Collateral Obligations plus (ii) the aggregate amount of all Principal Proceeds and, without duplication, cash and Eligible Investments attributable to Principal Proceeds credited to either the Principal Collection Subaccount or the Ramp-Up Account is greater than or equal to the Target Initial Par Amount;

*provided* that for purposes of this definition, any Collateral Obligation that becomes a Defaulted Obligation prior to the Effective Date shall be treated as having a Principal Balance equal to its S&P Collateral Value.

"Target Initial Par Ratio": 106.10%.

"Tax": Any tax, levy, impost, duty, charge or assessment of any nature (including interest, penalties and additions thereto) imposed by any governmental taxing authority.

"Tax Event": (a) Any portion of any payment (other than a commitment fee, letter of credit fee, or similar fee or an amendment, waiver, consent and extension fee) due from any

Page 59

obligor under any Asset becoming properly subject to the imposition of U.S. or foreign withholding Tax, which withholding Tax is not compensated for by a "gross-up" provision under the terms of such Asset, (b) any jurisdiction's properly imposing net income, profits or similar Tax on the Issuer; *provided* that the (i) total amount of the Tax or Taxes imposed on the Issuer as described in clause (b) of this definition, and (ii) the total amount withheld from payments to the Issuer which is not compensated for by a "gross-up" provision as described in clause (a) of this definition are determined to be in excess of 5.0% of the aggregate interest due and payable on the Assets during the Collection Period.

"Tax Jurisdiction":  The Bahamas, Bermuda, the British Virgin Islands, the Cayman Islands, the Channel Islands, Ireland or the Netherlands Antilles and any other tax advantaged jurisdiction as may be notified by Moody's to the Portfolio Manager from time to time.

"Tax Redemption": The meaning specified in Section 9.3(a).

"Tax Subsidiary":  The meaning specified in Section 7.16.

"Tax Subsidiary Asset":  The meaning specified in Section 7.16.

"Third Party Credit Exposure":  As of any date of determination, the Principal Balance of each Collateral Obligation that consists of a Participation Interest.

"Third Party Credit Exposure Limits":  Limits that shall be satisfied if the Third Party Credit Exposure with counterparties having the ratings below from S&P do not exceed the percentage of the Collateral Principal Amount specified below:

| S&P's Credit Rating of Selling Institution | Aggregate Percentage Limit | Individual Percentage Limit |
|---|---|---|
| AAA | 20% | 20% |
| AA+ | 10% | 10% |
| AA | 10% | 10% |
| AA- | 10% | 10% |
| A+ | 5% | 5% |
| A | 5% | 5% |
| A- or lower | 0% | 0% |

*provided* that a Selling Institution having an S&P credit rating of "A" must also have a short-term S&P rating of "A-1" otherwise its Aggregate Percentage Limit and Individual Percentage Limit shall be 0%.

"Tiered Recovery Rate Method":  The meaning specified in the definition of the term "Weighted Average S&P Recovery Rate".

Page 60

"Trading Plan": The meaning specified in Section 1.2(o).

"Trading Plan Period": The meaning specified in Section 1.2(o).

"Trading Restrictions": The guidelines set forth in Schedule 1 of the Portfolio Management Agreement.

"Transaction Documents": This Indenture, the Securities Account Control Agreement, the Portfolio Management Agreement, the Collateral Administration Agreement, the Security Purchase Agreement, the Administration Agreement and the Registered Office Agreement.

"Transfer Agent": The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"Transfer Notice": The meaning specified in Section 8.6(b).

"Transferring Noteholder": The meaning specified in Section 8.6(b).

"Transferred Notes": The meaning specified in Section 8.6(b).

"Trust Officer": When used with respect to the Trustee, any Officer within the Corporate Trust Office (or any successor group of the Trustee) including any Officer to whom any corporate trust matter is referred at the Corporate Trust Office because of such person's knowledge of and familiarity with the particular subject and, in each case, having direct responsibility for the administration of this transaction.

"Trustee": As defined in the first sentence of this Indenture.

"Trustee Rating Event": An event that will occur if the Trustee shall fail to be rated at least "BBB" (long-term) by S&P.

"Turbo Payment Amount" means, after the Reinvestment Period, and for so long as any Class B Notes remain outstanding, as of any date of determination, the aggregate Post Reinvestment Period Amendment Proceeds accumulated during the related Collection Period.

"UCC": The Uniform Commercial Code as in effect in the State of New York or, if different, the political subdivision of the United States that governs the perfection of the relevant security interest as amended from time to time.

"Uncertificated Security": The meaning specified in Section 8-102(a)(18) of the UCC.

"Uncertificated Subordinated Note": The meaning specified in Section 2.2(b)(ii).

"Underlying Instrument": The indenture or other agreement pursuant to which an Asset has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Asset or of which the holders of such Asset are the beneficiaries.

"Unit":  An obligation or security with a warrant, option or other equity component attached that is exercisable solely at the option of the holder thereof, which obligation or security otherwise satisfies the definition of "Collateral Obligation".

"Unpaid Class A-X Principal Amortization Amount":  For any Payment Date, the aggregate amount of all or any portion of the Class A-X Principal Amortization Amounts for any prior Payment Dates that were not paid on such prior Payment Dates.

"Unregistered Securities":  The meaning specified in Section 5.17(c).

"Unscheduled Principal Payment":  Any principal payments received with respect to a Collateral Obligation after the Reinvestment Period as a result of prepayment, including but not limited to, prepayments resulting from optional redemptions, exchange offers, tender offers, consents or other prepayments made by the obligor thereunder.

"Unsecured Bond":  Any senior unsecured obligation that (a) constitutes borrowed money, (b) is in the form of, or represented by, a bond, note, certificated debt security or other debt security (other than any of the foregoing that evidences an Unsecured Loan) and (c) which is not (and by its terms is not permitted to become) subordinate in right of payment to any other debt for borrowed money incurred by the obligor under such obligation.

"Unsecured Loan":  A senior unsecured Loan obligation of any obligor which is not (and by its terms is not permitted to become) subordinate in right of payment to any other debt for borrowed money incurred by the obligor under such Loan.

"U.S. Person" and "U.S. person":  The meaning specified in Regulation S.

"U.S. Tax Person":  The meaning specified in Section 7701(a)(30) of the Code.

"Volcker Rule":  Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act and the rules and regulations thereunder, in each case, as amended from time to time.

"Weighted Average Coupon":  As of any Measurement Date, the number obtained by dividing: (a) the amount equal to the Aggregate Coupon in respect of all Fixed Rate Obligations by (b) an amount equal to the Aggregate Principal Balance of all Fixed Rate Obligations as of such Measurement Date (with respect to any Deferrable Security, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid).

"Weighted Average Floating Spread":  As of any Measurement Date, the number obtained by dividing: (a) the amount equal to (A) the Aggregate Funded Spread plus (B) the Aggregate Unfunded Spread plus (C) for purposes other than the S&P CDO Monitor Test, the Aggregate Excess Funded Spread in respect of all Floating Rate Obligations by (b) an amount equal to (x) for purposes other than the S&P CDO Monitor Test, the lesser of (A) the Reinvestment Target Par Balance and (B) the Aggregate Principal Balance of all Floating Rate

Page 62

Obligations as of such Measurement Date (with respect to any Deferrable Security, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid) and (y) for purposes of the S&P CDO Monitor Test only, the amount in clause (b)(x)(B) above.

"Weighted Average Life":  As of any date of determination with respect to all Collateral Obligations other than Defaulted Obligations, the number of years following such date obtained by summing the products obtained by *multiplying*:

(a) the Average Life at such time of each such Collateral Obligation by (b) the outstanding Principal Balance of such Collateral Obligation

*and dividing such sum by:*

the aggregate remaining principal balance at such time of all Collateral Obligations other than Defaulted Obligations.

"Weighted Average Life Test":  A test satisfied on any date of determination if the Weighted Average Life of all Collateral Obligations as of such date is less than the number of years (rounded to the nearest one hundredth thereof) during the period from such date of determination to February 1, 2022.  For purposes of the Investment Criteria, in calculating whether compliance with the Weighted Average Life Test will be maintained or improved after giving effect to an investment in connection with the purchase of any obligation using Principal Proceeds received upon the sale, prepayment or other disposition of a Collateral Obligation, such test will be maintained or improved after giving effect to the reinvestment relative to such test prior to receipt of such Principal Proceeds.

"Weighted Average Moody's Rating Factor":  The number (rounded up to the nearest whole number) determined by:

(a)     summing the products of (i) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (ii) the Moody's Rating Factor of such Collateral Obligation (as described below) and

(b)     dividing such sum by the outstanding Principal Balance of all such Collateral Obligations.

For purposes of the foregoing, the "Moody's Rating Factor" relating to any Collateral Obligation is the number set forth in the table below opposite the Moody's Default Probability Rating of such Collateral Obligation.

| Moody's Default Probability Rating | Moody's Rating Factor | Moody's Default Probability Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |

Page 63

| | | | |
|---|---|---|---|
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

"Weighted Average S&P Recovery Rate":  As of any date of determination, with respect to each Class of Notes then Outstanding with an Initial Rating corresponding to the rating in the applicable tables below, the fraction (expressed as a percentage) obtained by (a) *summing* the products obtained by *multiplying* (i) the Principal Balance of each Collateral Obligation *by* (ii) the S&P Recovery Rate as set forth in either the column corresponding to the Initial Rating of the relevant Class of Notes using the Tiered Recovery Rate Method table below or the column corresponding to the Initial Rating of the relevant Class of Notes using the Asset Assigned Recovery Rate Method table below, as applicable, (b) *dividing* such sum *by* the Aggregate Principal Balance of all Collateral Obligations and (c) rounding up to the nearest hundredth of a percent.  For purposes of determining the Weighted Average S&P Recovery Rate, the S&P Recovery Rate for all Collateral Obligations will be determined by using the Asset Assigned Recovery Rate Method tables or, if Asset Assigned Recovery Rate Method tables do not apply to such Collateral Obligation, the Tiered Recovery Rate Method tables; *provided* that any other recovery rate proposed by the Portfolio Manager and consented to by S&P in writing or by email may be utilized on a case-by-case basis.  The "Tiered Recovery Rate Method" means determining the Weighted Average S&P Recovery Rate by using the Tiered Recovery Rate Method tables.  The "Asset Assigned Recovery Rate Method" means determining the Weighted Average S&P Recovery Rate by using the Asset Assigned Recovery Rate Method tables, except in the limited circumstances described below.

Tiered Recovery Rate Method:

| Table 1:  S&P Tiered Recovery Rate Method Table (by Asset Class and CDO Liability Rating) [1] | | | | | |
|---|---|---|---|---|---|
| | **CDO Liability Rating** | | | | |
| | **AAA** | **AA** | **A** | **BBB** | **BB** | **B** |
| | Senior Secured Loans [2] | | | | | |
| Group 1 | 50 | 55 | 59 | 63 | 75 | 79 |
| Group 2 | 45 | 49 | 53 | 58 | 70 | 74 |
| Group 3 | 39 | 42 | 46 | 49 | 60 | 63 |
| Group 4 | 17 | 19 | 27 | 29 | 31 | 34 |
| | Senior secured Cov-Lite Loans/Senior Secured Bonds | | | | | |
| Group 1 | 41 | 46 | 49 | 53 | 63 | 67 |
| Group 2 | 37 | 41 | 44 | 49 | 59 | 62 |
| Group 3 | 32 | 35 | 39 | 41 | 50 | 53 |
| Group 4 | 17 | 19 | 27 | 29 | 31 | 34 |
| | Mezzanine/Second-Lien Loans or Senior Secured Notes/Senior Unsecured Loans/Senior Unsecured Bonds/First-Lien Last-Out Loans [3] | | | | | |
| Group 1 | 18 | 20 | 23 | 26 | 29 | 31 |
| Group 2 | 16 | 18 | 21 | 24 | 27 | 29 |
| Group 3 | 13 | 16 | 18 | 21 | 23 | 25 |

Page 64

| | | | | | | |
|---|---|---|---|---|---|---|
| Group 4 | 10 | 12 | 14 | 16 | 18 | 20 |
| **Subordinated loans/subordinated bonds** | | | | | | |
| Group 1 | 8 | 8 | 8 | 8 | 8 | 8 |
| Group 2 | 10 | 10 | 10 | 10 | 10 | 10 |
| Group 3 | 9 | 9 | 9 | 9 | 9 | 9 |
| Group 4 | 5 | 5 | 5 | 5 | 5 | 5 |

(1)  Or, at the election of the Portfolio Manager, such higher rates as provided by S&P.

(2)  DIP Collateral Obligations to be treated as Senior Secured Loans.

(3)  In the case of second lien loans and First-Lien Last-Out Loans, the first 15% of the Collateral Principal Amount will be treated as senior unsecured loans and the excess over 15% as subordinated loans.  Obligations secured primarily by equity or common stock not to be treated as Senior Secured Loans, but rather as senior unsecured loans.  First-Lien Last-Out Loans not to be treated as Senior Secured Loans.

| Table 2:  S&P Country Groupings for S&P Recovery Rate | | | |
|---|---|---|---|
| **Group 1** | **Group 2** | **Group 3** | **Group 4** |
| Australia | Austria | Argentina | Kazakhstan |
| Denmark | Belgium | Brazil | Russia |
| Finland | Canada | Chile | Ukraine |
| Hong Kong | Germany | France | Others |
| Ireland | Israel | Greece | |
| The Netherlands | Japan | Italy | |
| New Zealand | Luxembourg | Mexico | |
| Norway | Portugal | South Korea | |
| Singapore | South Africa | Spain | |
| Sweden | Switzerland | Taiwan | |
| U.K. | U.S. | Turkey | |
| | | United Arab Emirates | |

Asset Assigned Recovery Rate Method:

If applicable, the S&P Recovery Rate for Collateral Obligations shall be determined by reference to the table below and a list of debt securities with asset by asset current recovery ratings (each such recovery rate, an "Asset Assigned Recovery Rating") listed on the S&P website at "www.standardandpoors.com" or such other website address designated by S&P.  For the avoidance of doubt, Asset Assigned Recovery Ratings are determined by reference to the recovery rating of the security and without regard to its characterization as senior secured, senior unsecured, mezzanine or subordinated (or any other designation of seniority or Domicile).

| Table 3:  S&P Recovery Rates for Collateral Obligations with S&P Asset Assigned Recovery Ratings | | | | | | |
|---|---|---|---|---|---|---|
| **CDO Liability Rating** | **AAA** | **AA** | **A** | **BBB** | **BB** | **B** |
| **Asset Assigned Recovery Rating** | | | **S&P Recovery Rates (%)** | | | |
| 1+ | 75 | 85 | 88 | 90 | 92 | 95 |
| 1 | 65 | 75 | 80 | 85 | 90 | 95 |
| 2 | 50 | 60 | 66 | 73 | 79 | 85 |
| 3 | 30 | 40 | 46 | 53 | 59 | 65 |

Page 65

| Table 3: S&P Recovery Rates for Collateral Obligations with S&P Asset Assigned Recovery Ratings | | | | | | |
|---|---|---|---|---|---|---|
| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
| Asset Assigned Recovery Rating | S&P Recovery Rates (%) | | | | | |
| 4 | 20 | 26 | 33 | 39 | 43 | 45 |
| 5 | 5 | 10 | 15 | 20 | 23 | 25 |
| 6 | 2 | 4 | 6 | 8 | 10 | 10 |

If the relevant Collateral Obligation has no Asset Assigned Recovery Rating from S&P, the S&P Recovery Rate of such Collateral Obligation shall be determined by reference to the "Tiered Recovery Rate Method" tables; *provided* that, if the Collateral Obligation is either a senior unsecured debt security or a subordinated debt security with no Asset Assigned Recovery Rating designated but the obligor or issuer of such Collateral Obligation has an Asset Assigned Recovery Rating on senior secured debt obligations issued by it, the S&P Recovery Rate for such Collateral Obligation shall be derived from the Asset Assigned Recovery Rating of such senior secured debt obligations by reference to the tables set forth below or such other table(s) as directed by S&P upon request by the Portfolio Manager; *provided further* that, if on any date of determination a Collateral Obligation does not have an Asset Assigned Recovery Rating, if on such date of determination S&P provides an Asset Assigned Recovery Rating estimate service, the Portfolio Manager may request from S&P such an estimate for such Collateral Obligation and, upon receipt of such credit estimate, the S&P Recovery Rate for such Collateral Obligation shall be derived by reference to such estimate.

| Table 4: S&P Recovery Rates for Group 1 senior unsecured assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
| Asset Assigned Recovery Rating | S&P Recovery Rates (%) | | | | | |
| 1+ | 18 | 20 | 23 | 26 | 29 | 31 |
| 1 | 18 | 20 | 23 | 26 | 29 | 31 |
| 2 | 18 | 20 | 23 | 26 | 29 | 31 |
| 3 | 12 | 15 | 18 | 21 | 22 | 23 |
| 4 | 5 | 8 | 11 | 13 | 14 | 15 |
| 5 | 2 | 4 | 6 | 8 | 9 | 10 |
| 6 | - | - | - | - | - | - |

| Table 5: S&P Recovery Rates for Group 2 senior unsecured assets if senior secured asset has an Asset Assigned Recovery Rating |
|---|

18750188.25.BUSINESS

| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
|---|---|---|---|---|---|---|
| Asset Assigned Recovery Rating | | | S&P Recovery Rates (%) | | | |
| 1+ | 16 | 18 | 21 | 24 | 27 | 29 |
| 1 | 16 | 18 | 21 | 24 | 27 | 29 |
| 2 | 16 | 18 | 21 | 24 | 27 | 29 |
| 3 | 10 | 13 | 15 | 18 | 19 | 20 |
| 4 | 5 | 5 | 5 | 5 | 5 | 5 |
| 5 | 2 | 2 | 2 | 2 | 2 | 2 |
| 6 | - | - | - | - | - | - |

| Table 6: S&P Recovery Rates for Group 3 senior unsecured assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
| Asset Assigned Recovery Rating | | | S&P Recovery Rates (%) | | | |
| 1+ | 13 | 16 | 18 | 21 | 23 | 25 |
| 1 | 13 | 16 | 18 | 21 | 23 | 25 |
| 2 | 13 | 16 | 18 | 21 | 23 | 25 |
| 3 | 8 | 11 | 13 | 15 | 16 | 17 |
| 4 | 5 | 5 | 5 | 5 | 5 | 5 |
| 5 | 2 | 2 | 2 | 2 | 2 | 2 |
| 6 | - | - | - | - | - | - |

| Table 7: S&P Recovery Rates for Groups 1, 2 and 3 subordinated assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
| Asset Assigned Recovery Rating | | | S&P Recovery Rates (%) | | | |
| 1+ | 8 | 8 | 8 | 8 | 8 | 8 |
| 1 | 8 | 8 | 8 | 8 | 8 | 8 |
| 2 | 8 | 8 | 8 | 8 | 8 | 8 |
| 3 | 5 | 5 | 5 | 5 | 5 | 5 |
| 4 | 2 | 2 | 2 | 2 | 2 | 2 |
| 5 | - | - | - | - | - | - |
| 6 | - | - | - | - | - | - |

Page 67

"Zero Coupon Bond": Any debt security that by its terms (a) does not bear interest for all or part of the remaining period that it is outstanding, (b) provides for periodic payments of interest in Cash less frequently than semi-annually or (c) pays interest only at its stated maturity.

**1.2   Assumptions as to Assets**

In connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Asset, or any payments on any other assets included in the Assets, with respect to the sale of and reinvestment in Collateral Obligations, and with respect to the income that can be earned on Scheduled Distributions on such Assets and on any other amounts that may be received for deposit in the Collection Account, the provisions set forth in this Section 1.2 shall be applied. The provisions of this Section 1.2 shall be applicable to any determination or calculation that is covered by this Section 1.2, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

(a)     For purposes of calculating all Concentration Limitations, in both the numerator and the denominator of any component of the Concentration Limitations, Defaulted Obligations will be treated as having a principal balance equal to zero. Except where expressly referenced herein for inclusion in such calculations, Defaulted Obligations will not be included in the calculation of the Collateral Quality Test.

(b)     For purposes of calculating the Coverage Tests, except as otherwise specified in the Coverage Tests, such calculations will not include scheduled interest and principal payments on Defaulted Obligations unless or until such payments are actually received.

(c)     For purposes of calculating clause (i) of the Concentration Limitations, the amounts on deposit in the Collection Account and the Ramp-Up Account (including Eligible Investments therein) representing Principal Proceeds shall each be deemed to be a Floating Rate Obligation that is a Senior Secured Loan.

(d)     For the purposes of calculating compliance with each of the Concentration Limitations all calculations will be rounded to the nearest 0.1%. All other calculations, unless otherwise set forth herein or the context otherwise requires, shall be rounded to the nearest ten-thousandth if expressed as a percentage, and to the nearest one-hundredth if expressed otherwise.

(e)     For all purposes (including calculation of the Coverage Tests), the principal balance of a Revolving Collateral Obligation or a Delayed Drawdown Collateral Obligation will include all unfunded commitments that have not been irrevocably reduced or withdrawn.

(f)     For purposes of calculating the Sale Proceeds of a Collateral Obligation in sale transactions, sale proceeds will include any Principal Financed Accrued Interest received in respect of such sale.

(g)     For each Collection Period and as of any date of determination, the Scheduled Distribution on any Asset (other than a Defaulted Obligation, which, except as otherwise

Page 68

provided herein, shall be assumed to have a Scheduled Distribution of zero) shall be the sum of (i) the total amount of payments and collections to be received during such Collection Period in respect of such Asset (including the proceeds of the sale of such Asset received and, in the case of sales which have not yet settled, to be received during the Collection Period and not reinvested in additional Collateral Obligations or Eligible Investments or retained in the Collection Account for subsequent reinvestment pursuant to Section 12.2) that, if received as scheduled, will be available in the Collection Account at the end of the Collection Period and (ii) any such amounts received in prior Collection Periods that were not disbursed on a previous Payment Date.

(h)     Each Scheduled Distribution receivable with respect to an Asset shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Collection Account to earn interest at the Assumed Reinvestment Rate.  All such funds shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Account for application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.  For purposes of the applicable determinations required by Section 10.6(b)(iv), Article 12 and the definition of "Interest Coverage Ratio", the expected interest on the Secured Notes and Floating Rate Obligations will be calculated using the then current interest rates applicable thereto.

(i)     All calculations with respect to Scheduled Distributions on the Assets securing the Notes shall be made on the basis of information as to the terms of each such Asset and upon reports of payments, if any, received on such Asset that are furnished by or on behalf of the obligor on or issuer of such Asset and, to the extent they are not manifestly in error, such information or reports may be conclusively relied upon in making such calculations.

(j)     For purposes of calculating compliance with the Investment Criteria, upon the direction of the Portfolio Manager by notice to the Trustee and the Collateral Administrator, any Eligible Investment representing Principal Proceeds received upon the sale or other disposition of a Collateral Obligation shall be deemed to have the characteristics of such Collateral Obligation until reinvested in an additional Collateral Obligation.  Such calculations shall be based upon the principal amount of such Collateral Obligation, except in the case of Defaulted Obligations and Credit Risk Obligations, in which case the calculations will be based upon the Principal Proceeds received on the disposition or sale of such Defaulted Obligation or Credit Risk Obligation.

(k)     If a Collateral Obligation included in the Assets would be deemed a Current Pay Obligation but for the applicable percentage limitation in the proviso to clause (x) of the proviso to the definition of "Defaulted Obligation", then the Current Pay Obligations with the lowest Market Value (assuming that such Market Value is expressed as a percentage of the Principal Balance of such Current Pay Obligations as of the date of determination) shall be deemed Defaulted Obligations.  Each such Defaulted Obligation will be treated as a Defaulted Obligation for all purposes until such time as the Aggregate Principal Balance of Current Pay Obligations would not exceed, on a pro forma basis

Page 69

including such Defaulted Obligation, the applicable percentage of the Collateral Principal Amount.

(l)     References in <u>Section 11.1(a)</u> to calculations made on a "*pro forma* basis" shall mean such calculations after giving effect to all payments, in accordance with the Priority of Payments described herein, that precede (in priority of payment) or include the clause in which such calculation is made.

(m)     For purposes of determining whether the Effective Date Overcollateralization Test has been satisfied, all calculations shall be made on a *pro forma* basis giving effect to any purchases and sales.

(n)     For purposes of calculating the Collateral Quality Test, DIP Collateral Obligations will be treated as having an S&P Recovery Rate equal to the S&P Recovery Rate for Senior Secured Loans.

(o)     For purposes of calculating compliance with the Investment Criteria, at the election of the Portfolio Manager in its sole discretion, any proposed investment (whether a single Collateral Obligation or a group of Collateral Obligations identified by the Portfolio Manager as such at the time when compliance with the Investment Criteria is required to be calculated (a "<u>Trading Plan</u>")) may be evaluated after giving effect to all sales and reinvestments proposed to be entered into within three Business Days following the date of determination of such compliance (such period, the "<u>Trading Plan Period</u>"); *provided* that (i) no Trading Plan may result in the purchase of Collateral Obligations having an Aggregate Principal Balance that exceeds 5% of the Collateral Principal Amount as of the first day of the Trading Plan Period, (ii) after the Reinvestment Period, no Trading Plan may result in the purchase of a group of Collateral Obligations if the difference between the shortest Average Life of any Collateral Obligation in such group and the longest Average Life of any Collateral Obligation in such group is greater than two years, (iii) the average purchase prices of a single Collateral Obligation or a group of Collateral Obligations, in each case purchased pursuant to a Trading Plan, shall not be used for purposes of determining compliance with the Investment Criteria, (iv) no Trading Plan Period may include a Determination Date, (v) no more than one Trading Plan may be in effect at any time during a Trading Plan Period and (vi) if the Investment Criteria are satisfied prospectively after giving effect to a Trading Plan but are not satisfied upon the expiry of the related Trading Plan Period, the Investment Criteria shall not at any time thereafter be evaluated by giving effect to a Trading Plan; and *provided further* that the Portfolio Manager shall notify S&P, the Trustee and the Collateral Administrator of the commencement of any Trading Plan Period and any Collateral Obligations covered in such Trading Plan (and the Trustee in turn shall place notice of such Trading Plan on the website set forth in <u>Section 10.6(g)</u>).

(p)     Notwithstanding any other provision of this Indenture to the contrary, all monetary calculations under this Indenture shall be in Dollars.

Page 70

(q)     If withholding Tax is imposed on (x) any amendment, waiver, consent or extension fees or (y) commitment fees or other similar fees in respect of Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations, the calculations of the Weighted Average Floating Spread, the Weighted Average Coupon and the Interest Coverage Test, as applicable, shall be made on a net basis after taking into account such withholding, unless the Obligor is required to make "gross-up" payments to the Issuer that cover the full amount of any such withholding Tax on an after-Tax basis pursuant to the Underlying Instrument with respect thereto.

(r)     Any reference in this Indenture to an amount of the Trustee's or the Collateral Administrator's fees calculated with respect to a period at a per annum rate shall be computed on the basis of a 360-day year of twelve 30-day months prorated for the related Interest Accrual Period and shall be based on the aggregate face amount of the Assets.

(s)     To the extent of any ambiguity in the interpretation of any definition or term contained in this Indenture or to the extent more than one methodology can be used to make any of the determinations or calculations set forth herein, the Collateral Administrator shall request direction from the Portfolio Manager as to the interpretation and/or methodology to be used, and the Collateral Administrator shall follow such direction, and together with the Trustee, shall be entitled to conclusively rely thereon without any responsibility or liability therefor.

(t)     For purposes of calculating compliance with any tests hereunder (including the Target Initial Par Condition, Effective Date Overcollateralization Test, Collateral Quality Test and Concentration Limitations), the trade date (and not the settlement date) with respect to any acquisition or disposition of a Collateral Obligation or Eligible Investment shall be used by the Collateral Administrator to determine whether and when such acquisition or disposition has occurred.

**1.3     Uncertificated Subordinated Notes**

Except as otherwise expressly provided herein:

(a)     Uncertificated Subordinated Notes registered in the name of a Person shall be considered "held" by such Person for all purposes under this Indenture.

(b)     With respect to any Uncertificated Subordinated Note, (a) references herein to authentication and delivery of a Note shall be deemed to refer to creation of an entry for such Note in the Register and registration of such Note in the name of the owner, (b) references herein to cancellation of a Note shall be deemed to refer to deregistration of such Note and (c) references herein to the date of authentication of a Note shall refer to the date of registration of such Note in the Register in the name of the owner thereof.

(c)     References to execution of Notes by the Applicable Issuers, to surrender of Notes and to presentment of Notes shall be deemed not to refer to Uncertificated Subordinated Notes; *provided* that the provisions of Section 2.9 relating to surrender of Notes shall apply equally to deregistration of Uncertificated Subordinated Notes.

Page 71

(d)     <u>Section 2.6</u> shall not apply to any Uncertificated Subordinated Notes.

(e)     The Register shall be conclusive evidence of the ownership of an Uncertificated Subordinated Note.

**2.      THE NOTES**

**2.1     Forms Generally**

The Notes (other than the Uncertificated Subordinated Notes) and the Trustee's or Authenticating Agent's certificate of authentication thereon (the "<u>Certificate of Authentication</u>") shall be in substantially the forms required by this Article, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may be consistent herewith, determined by the Authorized Officers of the Applicable Issuers executing such Notes as evidenced by their execution of such Notes.  Any portion of the text of any such Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of such Note.

**2.2     Forms of Notes**

(a)     The forms of the Notes (other than any Uncertificated Subordinated Notes), including the forms of Certificated Secured Notes, Certificated Subordinated Notes, Regulation S Global Notes and Rule 144A Global Notes, shall be as set forth in the applicable part of <u>Exhibit A</u> hereto.  The form of the Confirmation of Registration shall be as set forth in <u>Exhibit I</u> hereto.

(b)     Regulation S Global Notes, Rule 144A Global Notes, Certificated Secured Notes, Certificated Subordinated Notes and Uncertificated Subordinated Notes.

    (i)     The Notes of each Class sold to persons who are (A) not U.S. persons in offshore transactions in reliance on Regulation S (except to the extent that any such Person elects to acquire a Certificated Note as provided below) and (B) in the case of the ERISA Restricted Notes, not Benefit Plan Investors or Controlling Persons, shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the applicable form attached as <u>Exhibit A1</u>, <u>Exhibit A2</u>, <u>Exhibit A3</u>, <u>Exhibit A4</u>, <u>Exhibit A5</u>, <u>Exhibit A6</u>, <u>Exhibit A7</u>, <u>Exhibit A8</u> or <u>Exhibit A9</u> hereto (each, a "<u>Regulation S Global Note</u>"), and shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, DTC for the respective accounts of Euroclear and Clearstream, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.

    (ii)     The Notes of each Class sold to persons that are (A) QIB/QPs (except to the extent that any such QIB/QP elects to acquire a Certificated Note as provided below) and (B) in the case of the ERISA Restricted Notes, not Benefit Plan

Page 72

Investors or Controlling Persons, shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the applicable form attached as <u>Exhibit A1</u>, <u>Exhibit A2</u>, <u>Exhibit A3</u>, <u>Exhibit A4</u>, <u>Exhibit A5</u>, <u>Exhibit A6</u>, <u>Exhibit A7</u>, <u>Exhibit A8</u> or <u>Exhibit A9</u> hereto (each, a "<u>Rule 144A Global Note</u>") and shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, DTC, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.

(iii)     Any Notes sold to Persons that are (A) not U.S. persons in offshore transactions in reliance on Regulation S and who so elect and notify the Issuer, the Initial Purchaser, (B) QIB/QPs that so elect and notify the Issuer and the Initial Purchaser, (C) in the case of the ERISA Restricted Notes, QIB/QPs that, in each case, are Benefit Plan Investors or Controlling Persons or (D) in the case of the Subordinated Notes, Accredited Investors and Knowledgeable Employees with respect to the Issuer (or a corporation, partnership, limited liability company or other entity (other than a trust), each shareholder, partner, member or other equity owner of which is a Knowledgeable Employee with respect to the Issuer) shall be issued initially in the form of definitive, fully registered notes without coupons substantially in the form attached as (1) with respect to a Subordinated Note, <u>Exhibit A10</u> (each, a "<u>Certificated Subordinated Note</u>"), and (2) with respect to the Secured Notes, <u>Exhibit A11</u>, <u>Exhibit A12</u>, <u>Exhibit A13</u>, <u>Exhibit A14</u>, <u>Exhibit A15</u>, <u>Exhibit A16</u>, <u>Exhibit A17</u> or <u>Exhibit A18</u> hereto (each, a "<u>Certificated Secured Note</u>" and, together with the Certificated Subordinated Note, the "<u>Certificated Notes</u>") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.  With respect to the Subordinated Notes only, if requested by the beneficial owner thereof, such Notes will be issued by entry in the Register in uncertificated, fully registered form (each, an "<u>Uncertificated Subordinated Note</u>"), registered in the name of the owner thereof.

(iv)     The aggregate principal amount of the Regulation S Global Notes and the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or DTC or its nominee, as the case may be, as hereinafter provided.

(c)     **Book Entry Provisions.**  This <u>Section 2.2(c)</u> shall apply only to Global Notes deposited with or on behalf of DTC.

The provisions of the "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, will be applicable to the Global Notes insofar as interests in such Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

18750188.25.BUSINESS

Agent Members shall have no rights under this Indenture with respect to any Global Notes held on their behalf by the Trustee, as custodian for DTC and DTC may be treated by the Applicable Issuer, the Trustee, and any agent of the Applicable Issuer or the Trustee as the absolute owner of such Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Applicable Issuer, the Trustee, or any agent of the Applicable Issuer or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

### 2.3 Authorized Amount; Stated Maturity; Denominations

(a)     The aggregate principal amount of Secured Notes and Subordinated Notes that may be authenticated and delivered under this Indenture is limited to U.S.$416,750,000 aggregate principal amount of Notes (except for (i) Secured Note Deferred Interest with respect to the Class C Notes, Class D, Class E Notes and Class F Notes, (ii) Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.5, Section 2.6 or Section 8.5 or (iii) additional notes issued in accordance with Sections 2.13 and 3.2).

Such Notes shall be divided into the Classes, having the designations, original principal amounts and other characteristics as follows:

| Class Designation | A-1A | A-1F | A-2A | A-2B | A-X | B | C | D | E | F |
|---|---|---|---|---|---|---|---|---|---|---|
| Original Principal Amount | U.S.$205,000,000 | U.S.$25,000,000 | U.S.$15,000,000 | U.S.$2,000,000 | U.S.$3,500,000 | U.S.$56,000,000 | U.S.$29,000,000 | U.S.$19,000,000 | U.S.$17,500,000 | U.S.$5,000,000 |
| Stated Maturity | February 2026 | February 2026 | February 2026 | February 2026 | February 2026 | February 2026 | February 2026 | February 2026 | February 2026 | February 2026 |
| Interest Rate | Base Rate* + 1.51% | 3.70% | Base Rate* + 1.55% | Base Rate* + 2.00% | Base Rate* + 1.35%* | Base Rate* + 2.23%* | Base Rate* + 2.50%*** | Base Rate* + 3.12%*** | Base Rate* + 4.75%*** | Base Rate* + 5.60%*** |
| Index | Base Rate | Base Rate | Base Rate | Base Rate | Base Rate | Base Rate | Base Rate | Base Rate | Base Rate | Base Rate |
| Index Maturity | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month |
| S&P Initial Rating(s): | AAA(sf) | AAA(sf) | AAA(sf) | AAA(sf) | AAA(sf) | AA(sf) | A(sf) | BBB(sf) | BB(sf) | B+(sf) |
| Priority Classes | None** | None** | None** | A-2A** | A-1, A-2** | A-1, A-2, A-X | A-1, A-2, A-X, B | A-1, A-2, A-X, B, C | A-1, A-2, A-X, B, C, D | A-1, A-2, A-X, B, C, D, E |
| Pari Passu Classes | A-1F, A-2 | A-1A, A-2 | A-1A, A-1F | A1A, A-1F | None | None | None | None | None | None |
| Junior Classes | B, C, D, E, F, Subordinated | B, C, D, E, F, Subordinated | A-2B, B, C, D, E, F, Subordinated | B, C, D, E, F, Subordinated | B, C, D, E, F, Subordinated | C, D, E, F, Subordinated | D, E, F, Subordinated | E, F, Subordinated | F, Subordinated | Subordinated |
| Listed | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |

Page 74

| Class Designation | A-1A | A-1F | A-2A | A-2B | A-X | B | C | D | E | F |
|---|---|---|---|---|---|---|---|---|---|---|
| Notes | | | | | | | | | | |
| Deferred Interest Secured Notes | No | No | No | No | No | No | Yes | Yes | Yes | Yes |
| Applicable Issuer(s) | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Issuer | Issuer |

\*      The Base Rate may change pursuant to Base Rate Amendments entered into pursuant to Section 8.7(b).  LIBOR shall be calculated by reference to three-month LIBOR (*provided* that two LIBOR rates will be calculated and apply with respect to the first Interest Accrual Period; during the period from the Closing Date to but excluding the First Interest Determination End Date, LIBOR will equal the rate appearing on the Reuters Screen for deposits with a term of three months on the relevant Interest Determination Date; and, during the remainder of the first Interest Accrual Period, LIBOR will equal the rate appearing on the Reuters Screen for deposits with a term of three months on the relevant Interest Determination Date), in accordance with the definition of LIBOR set forth in Exhibit G hereto

\*\*      The Class A-1 and the Class A-2 Notes shall be considered to be Priority Classes with respect to the Class A-X Notes only to the extent that, and under the circumstances in which, the Class A-1 and the Class A-2 Notes are senior in right of payment to the Class A-X Notes pursuant to any of the Priority of Payments described in, and prescribed by, Article 11 of this Indenture.  Accordingly, the Class A-X Notes shall be considered to be a Junior Class with respect to the Class A-1 Notes and the Class A-2 Notes only to the extent that, and under the circumstances in which, the Class A-X Notes are junior in right of payment to the Class A-1 and the Class A-2 Notes pursuant to any of the Priority of Payments described in, and prescribed by, Article 11 of this Indenture.  The Class A-1 Notes shall be considered to be a Pari Passu Class with respect to the Class A-2 Notes pursuant to any of the Priority of Payments described in, and prescribed by, Article 11 of this Indenture.  Among the Class A-2 Notes, the Class A-2A Notes shall be considered a Priority Class with respect to the Class A-2B Notes pursuant to any of the Priority of Payments described in, and prescribed by, Article 11 of this Indenture.

\*\*\*      Subject to Re-Pricing Amendments.

| Class Designation | Subordinated |
|---|---|
| Original Principal Amount | U.S.$39,750,000 |
| Stated Maturity | February 2026 |
| Interest Rate: | |

Page 75

| Class Designation | Subordinated |
|---|---|
| Index | N/A |
| Index Maturity | N/A |
| Spread | N/A |
| S&P Initial Rating(s) | None |
| Priority Classes | A-1, A-2, A-X, B, C, D, E, F |
| Pari Passu Classes | None |
| Junior Classes | None |
| Listed Notes | Yes |
| Deferred Interest Secured Notes | N/A |
| Applicable Issuer(s) | Issuer |

(b)     The Notes shall be issued in minimum denominations of (i) with respect to the Class A Notes, U.S.$ 250,000 and integral multiples of U.S.$10,000 in excess thereof, (ii) with respect to the Class B Notes, Class C Notes, Class D Notes, Class E Notes and Class F Notes, U.S.$250,000 and integral multiples of U.S.$1,000 in excess thereof and (iii) with respect to the Subordinated Notes, U.S.$250,000 and integral multiples of U.S.$1 in excess thereof.  Notes shall only be transferred or resold in compliance with the terms of this Indenture.

## 2.4    Execution, Authentication, Delivery and Dating

The Notes (other than any Uncertificated Subordinated Notes) shall be executed on behalf of each of the Applicable Issuers by one of their respective Authorized Officers.  The signature of such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Applicable Issuer, shall bind the Issuer and the Co-Issuer, as applicable, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Issuer and the Co-Issuer may deliver Notes executed by the Applicable Issuers to the Trustee or

Page 76

the Authenticating Agent for authentication and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

Each Note authenticated and delivered by the Trustee or the Authenticating Agent upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated and delivered after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Outstanding principal amount of the Notes so transferred, exchanged or replaced. In the event that any Note is divided into more than one Note in accordance with this Article 2, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

No Note (other than an Uncertificated Subordinated Note) shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

## 2.5 Registration, Registration of Transfer and Exchange

(a) The Issuer shall cause the Notes to be Registered and shall cause to be kept a register (the "Register") at the office of the Trustee in which, subject to such reasonable regulations as it may prescribe, the Issuer shall provide for the registration of Notes and the registration of transfers of Notes. The Trustee is hereby initially appointed "registrar" (the "Registrar") for the purpose of registering Notes and transfers of such Notes in the Register. Upon any resignation or removal of the Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of Registrar.

If a Person other than the Trustee is appointed by the Issuer as Registrar, the Issuer will give the Trustee prompt written notice of the appointment of a Registrar and of the location, and any change in the location, of the Register, and the Trustee shall have the right to inspect the Register at all reasonable times and to obtain copies thereof and the Trustee shall have the right to rely upon a certificate executed on behalf of the Registrar by an Officer thereof as to the names and addresses of the Holders of the Notes and the principal or face amounts and numbers of such Notes. Upon written request at any time the Registrar shall provide to the Issuer, the Portfolio Manager, the Initial Purchaser or any Holder a current list of Holders as reflected in the Register.

Subject to this Section 2.5, upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2, or

Page 77

otherwise upon transfer of an Uncertificated Subordinated Note to a Certificated Subordinated Note, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like aggregate principal or face amount. At any time, the Initial Purchaser may request a list of Holders from the Trustee.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Notes to be exchanged at such office or agency. Whenever any Note is surrendered for exchange, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive.

All Notes authenticated and delivered upon any registration of transfer or exchange of Notes shall be the valid obligations of the Applicable Issuers, evidencing the same debt (to the extent they evidence debt), and entitled to the same benefits under this Indenture as the Notes surrendered (or deregistered, in the case of Uncertificated Subordinated Notes) upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Registrar duly executed by the Holder thereof or such Holder's attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any Tax or other governmental charge payable in connection therewith. The Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signatures of the transferor and transferee.

(b)     No Note may be sold or transferred (including, without limitation, by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act, is exempt from the registration requirements under applicable state securities laws and will not cause either of the Co-Issuers to become subject to the requirement that it register as an investment company under the Investment Company Act.

(c)     Notwithstanding anything contained herein to the contrary, the Trustee shall not be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the registration provisions of or any exemptions from the Securities Act, applicable state securities laws or the applicable laws of any other jurisdiction, ERISA, the Code or the Investment Company Act; *provided* that if a certificate is specifically required by the terms of this Section 2.5 to be provided to the Trustee by a prospective transferor or transferee, the Trustee shall be under a duty to receive and examine the same to determine whether or not the certificate substantially conforms on its face to the applicable requirements of this Indenture and shall promptly notify the party delivering the same if such certificate does not comply with such terms.

Page 78

(d)   No transfer of any ERISA Restricted Note (or any interest therein) will be effective, and the Trustee will not recognize any such transfer, if after giving effect to such transfer 25% or more of the total value of any Class of ERISA Restricted Notes would be held by Persons who are Benefit Plan Investors. For purposes of these calculations and all other calculations required by this sub-section, (A) any Notes of the Issuer held by a Controlling Person, the Trustee, the Portfolio Manager, the Initial Purchaser or any of their respective affiliates shall be disregarded and not treated as Outstanding and (B) an "affiliate" of a Person shall include any Person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the Person, and "control" with respect to a Person other than an individual shall mean the power to exercise a controlling influence over the management or policies of such Person.

(e)   No ERISA Restricted Notes (or any interest therein) may be owned by any person that is not a U.S. person for U.S. federal income tax purposes. Each purchaser, beneficial owner and subsequent transferee of ERISA Restricted Notes or interests therein will be required, or by acceptance of such Notes or interest therein will be deemed, to have acknowledged and agreed that no ERISA Restricted Notes (or interest therein) may be acquired or owned by any person that is not classified as a U.S. person for such purposes. Each purchaser, beneficial owner and subsequent transferee of ERISA Restricted Notes will be required or deemed to represent that such purchaser or subsequent transferee, as applicable, is not a non-U.S. person for U.S. federal income tax purposes. Purchasers or transferees of ERISA Restricted Notes after the Closing Date, will be required to provide the Issuer and the Trustee written certification by the delivery of a certificate in the form of <u>Exhibit B5</u> hereto as to whether such purchaser or transferee is a non-U.S. person. Purchasers of interests in an ERISA Restricted Note from the Issuer or the Initial Purchaser on the Closing Date, will be required to provide the Issuer or the Initial Purchaser with a subscription agreement containing representations substantially similar to those set forth in <u>Exhibit B5</u> hereto as to whether such purchaser is a non-U.S. person.

(f)   Each holder of a Secured Note (and any interest therein) will be deemed to have represented and agreed to treat the Secured Notes as indebtedness for U.S. federal, state and local income and franchise tax purposes, provided that this shall not prevent a holder from making a "protective qualified electing fund" election with respect to any Class E Note or Class F Note.

(g)   Each holder of a Subordinated Note (and any interest therein) will be deemed to have represented and agreed to treat the Subordinated Notes as equity for U.S. federal, state and local income and franchise tax purposes.

(h)   Each holder of a Note acknowledges that the failure to provide the Issuer and the Trustee (and any of their agents) with the properly completed and signed tax certifications (generally, in the case of U.S. federal income tax, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a U.S. Tax Person or the appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a U.S. Tax Person) may result in withholding from payments in respect of such Note, including U.S. federal withholding or back-up withholding.

Page 79

(i)     Each holder of a Note (and any interest therein) will (i) provide the Issuer, the Trustee and their respective agents with any correct, complete and accurate information that may be required for the Issuer to comply with FATCA and will take any other actions that the Issuer, the Trustee or their respective agents deem necessary to comply with FATCA and (ii) update any such information provided in clause (i) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. In the event the holder fails to provide such information, take such actions or update such information, (a) the Issuer is authorized to withhold amounts otherwise distributable to the holder as compensation for any cost, loss or liability suffered as a result of such failure and (b) the Issuer will have the right to compel the holder to sells its Notes or, if such holder does not sell its Notes within 10 Business Days after notice from the Issuer, to sell such Notes in the same manner as if such holder were a Non-Permitted Holder, and to remit the net proceeds of such sale (taking into account any Taxes incurred by the Issuer in connection with such sale) to the holder as payment in full for such Notes. Each such holder agrees, or by acquiring this Note or an interest in this Note will be deemed to agree, that the Issuer may provide such information and any other information regarding its investment in the Notes to the U.S. Internal Revenue Service or other relevant governmental authority.

(j)     Each holder of a Note (and any interest therein) that is not a U.S. Tax Person will make, or by acquiring a Note or an interest in a Note will be deemed to make, a representation to the effect that (i) either (a) it is not a bank (or an entity affiliated with a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of section 881(c)(3)(A) of the Code), (b) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, or (c) it has provided an Internal Revenue Service Form W-8ECI representing that all payments received or to be received by it on the Notes are effectively connected with the conduct of a trade or business in the United States, and (ii) it is not purchasing the Note or an interest in the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

(k)     Each holder of a Note (and any interest therein) will indemnify the Issuer, the Trustee and their respective agents and each of the holders of the Note from any and all damages, cost and expenses (including any amount of Taxes, fees, interest, additions to Tax, or penalties) resulting from the failure by such holder to comply with Sections 1471 through 1474 of the Code (or any agreement thereunder or in respect thereof) or its obligations under the Note. The indemnification will continue with respect to any period during which the holder held a Note (and any interest therein), notwithstanding the holder ceasing to be a holder of the Note.

(l)     So long as a Note remains Outstanding, transfers of such Note, in whole or in part, shall only be made in accordance with <u>Section 2.2(b)</u> and this <u>Section 2.5(l)</u>.

     (i)     **Transfer and Exchange of Rule 144A Global Note or Certificated Note to Regulation S Global Note.** If a holder of a beneficial interest in a Rule 144A

<div align="center">Page 80</div>

Global Note deposited with DTC or a Holder of a Certificated Note (other than, in each case, an ERISA Restricted Note) wishes at any time to exchange its interest in such Note for an interest in the corresponding Regulation S Global Note, or to transfer its interest in such Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Regulation S Global Note, such holder in the case of the transfer of an interest in a Global Note (*provided* that such holder or, in the case of a transfer, the transferee is not a U.S. person and is acquiring such interest in an offshore transaction) may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Regulation S Global Note. Upon receipt by the Registrar of (A) in the case of the transfer of an interest in a Global Note, instructions given in accordance with DTC's procedures from an Agent Member directing the Registrar to credit or cause to be credited a beneficial interest in the corresponding Regulation S Global Note, but not less than the minimum denomination applicable to such Holder's Notes, in an amount equal to the beneficial interest in the Rule 144A Global Note or Certificated Note to be exchanged or transferred, (B) in the case of the transfer of an interest in a Global Note, a written order given in accordance with DTC's procedures containing information regarding the participant account of DTC and the Euroclear or Clearstream account to be credited with such increase, (C) in the case of a transfer of Certificated Notes, the transferring Holder's Certificated Note properly endorsed for assignment to the transferee, (D) a certificate in the form of <u>Exhibit B1</u> attached hereto given by the holder of such beneficial interest or Holder of a Certificated Note stating that the exchange or transfer of such Certificated Note or interest, as the case may be, has been made in compliance with the transfer restrictions applicable to the Rule 144A Global Notes or the Certificated Notes, including that the holder of a beneficial interest or Holder of a Certificated Note or the transferee, as applicable, is not a U.S. person, and in an offshore transaction pursuant to and in accordance with Regulation S, and (E) a written certification in the form of <u>Exhibit B7</u> attached hereto given by the transferee in respect of such beneficial interest stating, among other things, that such transferee is a non-U.S. person purchasing such Certificated Note or beneficial interest in an offshore transaction pursuant to Regulation S, then the Registrar shall, in the case of the transfer of an interest in a Global Note, approve the instructions at DTC to reduce the Aggregate Outstanding Amount of the beneficial interest in the Rule 144A Global Note to be transferred or exchanged (or, in the case of a transfer of a Certificated Note, the Registrar shall cancel such Note to the extent of such Aggregate Outstanding Amount) and to increase the Aggregate Outstanding Amount of the Regulation S Global Note by the Aggregate Outstanding Amount of the beneficial interest in the Rule 144A Global Note or Certificated Note to be exchanged or transferred, and to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Regulation S Global Note equal to the reduction in the Aggregate Outstanding Amount of the Rule 144A Global Note

Page 81

(or, in the case of a cancellation of Certificated Notes, equal to the Aggregate Outstanding Amount of Notes so cancelled).

(ii)   **Transfer and Exchange of Regulation S Global Note or Certificated Note to Rule 144A Global Note.**  If a holder of a beneficial interest in a Regulation S Global Note deposited with DTC or a Holder of a Certificated Note wishes at any time to exchange its interest in such Note for an interest in the corresponding Rule 144A Global Note or to transfer its interest in such Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Note, such holder, in the case of the transfer of an interest in a Global Note, may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Rule 144A Global Note.  Upon receipt by the Registrar of (A) in the case of the transfer of an interest in a Global Note, instructions from Euroclear, Clearstream and/or DTC, as the case may be, directing the Registrar to cause to be credited a beneficial interest in the corresponding Rule 144A Global Note in an amount equal to the beneficial interest in such Regulation S Global Note, but not less than the minimum denomination applicable to such Holder's Notes to be exchanged or transferred, such instructions to contain information regarding the participant account with DTC to be credited with such increase, (B) in the case of the transfer of an interest in a Global Note, a certificate in the form of <u>Exhibit B3</u> attached hereto given by the Holder of such beneficial interest and stating, among other things, that, in the case of a transfer, the Person transferring such interest in such Regulation S Global Note or Certificated Note reasonably believes that the Person acquiring such interest in a Rule 144A Global Note is a QIB/QP, is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A, in compliance with certain restrictions imposed during the Distribution Compliance Period and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, (C) in the case of a transfer of Certificated Notes, the transferring Holder's Certificated Note properly endorsed for assignment to the transferee and (D) a written certification in the form of <u>Exhibit B6</u> attached hereto given by the transferee in respect of such beneficial interest or Holder of a Certificated Note stating, among other things, that such transferee is a QIB/QP, then the Registrar, in the case of the transfer of an interest in a Global Note, will approve the instructions at DTC to reduce, or cause to be reduced, such Regulation S Global Note by the Aggregate Outstanding Amount of the beneficial interest in such Regulation S Global Note to be transferred or exchanged (or, in the case a transfer of a Certificated Note, the Registrar shall cancel such Notes to the extent of such Aggregate Outstanding Amount) and to increase the Aggregate Outstanding Amount of the Rule 144A Global Note by the Aggregate Outstanding Amount of the beneficial interest in the Regulation S Global Note or Certificated Note to be exchanged or transferred, and to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Rule 144A Global Note

Page 82

equal to the reduction in the Aggregate Outstanding Amount of the Regulation S Global Note (or, in the case of a cancellation of a Certificated Note, equal to the Aggregate Outstanding Amount of Notes so cancelled).

(iii) **Transfer and Exchange of Certificated Secured Notes to Certificated Secured Notes.** Upon receipt by the Registrar of (A) a Holder's Certificated Secured Note properly endorsed for assignment to the transferee, and (B) a certificate substantially in the form of Exhibit B2 (and a certificate substantially in the form of Exhibit B5, in the case of an ERISA Restricted Note) executed by the transferee, the Registrar shall cancel such Certificated Secured Note in accordance with Section 2.9, record the transfer in the Register in accordance with Section 2.5(a) and upon execution by the Issuer and authentication and delivery by the Trustee, deliver one or more Certificated Secured Notes bearing the same designation as the Certificated Secured Note endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the principal amount of the Certificated Secured Note surrendered by the transferor), and in authorized denominations.

(iv) **Transfer and Exchange of Rule 144A Global Notes or Regulation S Global Notes to Certificated Notes**. If a holder of a beneficial interest in a Rule 144A Global Note or a Regulation S Global Note wishes at any time to exchange its interest in such Note for a Certificated Note or to transfer its interest in such Note to a Person who wishes to take delivery thereof in the form of a Certificated Note, such holder may, subject to the immediately succeeding sentence and the rules and procedures of DTC, Euroclear or Clearstream, as the case may be, exchange or transfer, or cause the exchange or transfer of, such interest for a Certificated Note. Upon receipt by the Registrar of (A) a certificate substantially in the form of Exhibit B6 or B7, as applicable (with respect to transfers/exchanges of Secured Notes), or Exhibit B8 (with respect to transfers/exchanges of Subordinated Notes) and (B) appropriate instructions from DTC, Euroclear or Clearstream, as the case may be, if required, the Registrar shall approve the instructions at DTC, Euroclear or Clearstream to reduce, or cause to be reduced, the Rule 144A Global Note or the Regulation S Global Note by the Aggregate Outstanding Amount of the beneficial interest in the Rule 144A Global Note or Regulation S Global Note to be transferred or exchanged, record the transfer in the Register in accordance with Section 2.5(a) and, upon execution by the Applicable Issuers and receipt of an Issuer Order, authenticate and deliver one or more Certificated Notes, registered in the names specified in the instructions described in clause (B) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the principal amount of the interest in the Rule 144A Global Note transferred by the transferor), and in authorized denominations.

(v) **Transfer and Exchange of Certificated Subordinated Notes to Certificated Subordinated Notes or Uncertificated Subordinated Notes.** Upon receipt by the Registrar of (A) a Holder's Certificated Subordinated Note properly endorsed

Page 83

for assignment to the transferee, and (B) certificates in the form of Exhibits B4 and B5 attached hereto given by the transferee of such Certificated Subordinated Note, the Registrar shall (1) cancel such Certificated Subordinated Note in accordance with Section 2.9, (2) record the transfer in the Register in accordance with Section 2.5(a) and (3) (x) in the case of a transfer to Certificated Subordinated Notes, upon execution by the Issuer and authentication and delivery by the Trustee, deliver one or more Certificated Subordinated Notes bearing the same designation as the Certificated Subordinated Note endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the aggregate principal amount of the Certificated Subordinated Note surrendered by the transferor), and in authorized denominations or (y) in the case of a transfer to Uncertificated Subordinated Notes, deliver a Confirmation of Registration in the name specified in the assignment described in clause (A) above, in the principal amount of the Certificated Subordinated Note surrendered by the transferor and in authorized denominations.

(vi)     **Transfer and Exchange of Uncertificated Subordinated Notes to Certificated Subordinated Notes or Uncertificated Subordinated Notes.** Upon receipt by the Registrar of (A) a certificate substantially in the form of Exhibit B8 attached hereto executed by the transferor and (B) certificates in the form of Exhibits B4 and B5 attached hereto given by the transferee of such Uncertificated Subordinated Note, the Registrar shall (1) record the transfer in the Register in accordance with Section 2.5(a) and (2) in the case of a transfer to Certificated Subordinated Notes, upon execution by the Issuer and authentication and delivery by the Trustee, deliver one or more Certificated Subordinated Notes bearing the same designation as the Uncertificated Subordinated Note transferred, registered in the names specified in the certificate described in clause (A) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the aggregate principal amount of the Uncertificated Subordinated Note being transferred), and in authorized denominations.

(m)     If Notes (other than Uncertificated Subordinated Notes) are issued upon the transfer, exchange or replacement of Notes bearing the applicable legends set forth in the applicable part of Exhibit A hereto, and if a request is made to remove such applicable legend on such Notes, the Notes so issued shall bear such applicable legend, or such applicable legend shall not be removed, as the case may be, unless there is delivered to the Trustee and the Applicable Issuers such satisfactory evidence, which may include an Opinion of Counsel acceptable to them, as may be reasonably required by the Applicable Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of the Securities Act, the Investment Company Act, ERISA or the Code. Upon provision of such satisfactory evidence, the Trustee or its Authenticating Agent, at the written direction of the

Page 84

Applicable Issuers shall, after due execution by the Applicable Issuers authenticate and deliver Notes that do not bear such applicable legend.

(n)    Each Person who becomes a beneficial owner of Notes represented by an interest in a Global Note will be deemed to have represented and agreed as follows:

(i)    In connection with the purchase of such Notes:  (A) none of the Co-Issuers, the Portfolio Manager, the Initial Purchaser the Trustee, the Collateral Administrator or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (B) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator, the Initial Purchaser or any of their respective Affiliates other than any statements in the final Offering Circular for such Notes, and such beneficial owner has read and understands such final Offering Circular; (C) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to this Indenture) based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator, the Initial Purchaser or any of their respective Affiliates; (D) such beneficial owner is either (1) (in the case of a beneficial owner of an interest in a Rule 144A Global Note) both (a) a "qualified institutional buyer" (as defined under Rule 144A under the Securities Act) that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25,000,000 in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(i)(d) or (a)(1)(i)(e) of Rule 144A under the Securities Act or a trust fund referred to in paragraph (a)(1)(i)(f) of Rule 144A under the Securities Act that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (b) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act or an entity owned exclusively by "qualified purchasers" or (2) not a "U.S. person" as defined in Regulation S and is acquiring the Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from registration provided by Regulation S; (E) such beneficial owner is acquiring its interest in such Notes for its own account; (F) such beneficial owner was not formed for the purpose of investing in such Notes; (G) such beneficial owner understands that the Issuer may receive a list of participants holding interests in the Notes from one or more book-entry depositories, (H) such beneficial owner will hold and transfer at least the minimum denomination of such Notes, (I) such beneficial owner is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and is capable of and willing to assume those risks and (J) such beneficial owner will provide notice of the relevant transfer restrictions to subsequent transferees.

Page 85

18750188.25.BUSINESS

(ii)    Each Person who purchases a Secured Note (other than an ERISA Restricted Note) or any interest therein will be required or deemed to represent, warrant and agree that (A) if such Person is, or is acting on behalf of, a Benefit Plan Investor, its acquisition, holding and disposition of such interest does not and will not constitute or result in a non-exempt prohibited transaction under Section 406 ERISA or Section 4975 of the Code, and (B) if such Person is a governmental, church, non-U.S. or other plan, such Person's acquisition, holding and disposition of such Note will not constitute or result in a non-exempt violation of any Similar Law.

(iii)    Each Person who purchases an ERISA Restricted Note that is a Global Note or any interest therein will be required or deemed to represent, warrant and agree that (A) such Person is not, and is not acting on behalf of, a Benefit Plan Investor or a Controlling Person and (B) if such Person is a governmental, church, non-U.S. or other plan, such Person's acquisition, holding and disposition of such Note will not constitute or result in a non-exempt violation of any Similar Law.

(iv)    Each Person who purchases an ERISA Restricted Note that is a Certificated Note or an Uncertificated Subordinated Note or who is an initial purchaser of an ERISA Restricted Note that is a Global Note whose purchase has been expressly agreed upon in writing with the Co-Issuers will be required to (i) represent and warrant in writing to the Trustee (1) whether or not, for so long as such Person holds such Note or interest herein, such Person is, or is acting on behalf of, a Benefit Plan Investor, (2) whether or not, for so long as such Person holds such Note or interest therein, such Person is a Controlling Person and (3) that (a) if such Person is, or is acting on behalf of, a Benefit Plan Investor, such Person's acquisition, holding and disposition of such Note will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if such Person is a governmental, church, non-U.S. or other plan, such Person's acquisition, holding and disposition of such Note will not constitute or result in a non-exempt violation of any Similar Law, and (ii) agree to certain transfer restrictions regarding such Person's interest in such Note.

(v)    No transfer of an interest in an ERISA Restricted Note will be permitted or recognized if it would cause 25% or more of the value of any Class of ERISA Restricted Notes to be held by Benefit Plan Investors.

(vi)    Such beneficial owner understands that such Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, such Notes have not been and will not be registered under the Securities Act, and, if in the future such beneficial owner decides to offer, resell, pledge or otherwise transfer such Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of this Indenture and the legend on such Notes. Such beneficial owner acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of such

<div align="center">Page 86</div>

Notes. Such beneficial owner understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.

(vii) Such beneficial owner is aware that, except as otherwise provided in this Indenture, any Notes being sold to it in reliance on Regulation S will be represented by one or more Regulation S Global Notes and that beneficial interests therein may be held only through DTC for the respective accounts of Euroclear or Clearstream.

(viii) Such beneficial owner will provide notice to each person to whom it proposes to transfer any interest in the Notes of the transfer restrictions and representations set forth in this <u>Section 2.5</u>, including the Exhibits referenced herein.

(o) Each Person who becomes an owner of a Certificated Secured Note will be required to make the representations and agreements set forth in <u>Exhibit B2</u>. Each Person who becomes an owner of a Certificated Subordinated Note or an Uncertificated Subordinated Note will be required to make the representations and agreements set forth in <u>Exhibit B4</u>.

(p) Any purported transfer of a Note not in accordance with this <u>Section 2.5</u> shall be null and void and shall not be given effect for any purpose whatsoever.

(q) To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon written notice to the Trustee, impose additional transfer restrictions on the Subordinated Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and other similar laws or regulations, including, without limitation, requiring each transferee of a Subordinated Note to make representations to the Issuer in connection with such compliance.

(r) The Registrar, the Trustee and the Issuer shall be entitled to conclusively rely on any transferor and transferee certificate delivered pursuant to this <u>Section 2.5</u> and shall be able to presume conclusively the continuing accuracy thereof, in each case without further inquiry or investigation.

**2.6    Mutilated, Defaced, Destroyed, Lost or Stolen Note**

If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Applicable Issuers, the Trustee and the relevant Transfer Agent evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (b) there is delivered to the Applicable Issuers, the Trustee and such Transfer Agent such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Applicable Issuers, the Trustee or such Transfer Agent that such Note has been acquired by a protected purchaser, the Applicable Issuers shall execute and, upon Issuer Order, the Trustee shall authenticate and deliver to the Holder, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note, of like tenor (including the same date of issuance) and

Page 87

equal principal or face amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a protected purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Applicable Issuers, the Transfer Agent and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Applicable Issuers, the Trustee and the Transfer Agent in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Applicable Issuers in their discretion may, instead of issuing a new Note pay such Note without requiring surrender thereof except that any mutilated or defaced Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.6, the Applicable Issuers may require the payment by the Holder thereof of a sum sufficient to cover any Tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this Section 2.6 in lieu of any mutilated, defaced, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Applicable Issuers and such new Note shall be entitled, subject to the second paragraph of this Section 2.6, to all the benefits of this Indenture equally and proportionately with any and all other Notes of the same Class duly issued hereunder.

The provisions of this Section 2.6 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

**2.7     Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved**

(a)     The Secured Notes of each Class shall accrue interest during each Interest Accrual Period at the applicable Interest Rate and such interest will be payable in arrears on each Payment Date on the Aggregate Outstanding Amount thereof on the first day of the related Interest Accrual Period (after giving effect to payments of principal thereof on such date), except as otherwise set forth below.  Payment of interest on each Class of Secured Notes (and payments of available Interest Proceeds to the Holders of the Subordinated Notes) will be subordinated to the payment of interest on each related Priority Class.  Any payment of interest due on a Class of Deferred Interest Secured Notes on any Payment Date to the extent sufficient funds are not available to make such payment in accordance with the Priority of Payments on such Payment Date, but only if one or more Priority Classes is Outstanding with respect to such Class of Deferred Interest Secured Notes, shall constitute "Secured Note Deferred Interest" with respect to

Page 88

such Class and shall not be considered "due and payable" for the purposes of Section 5.1(a) (and the failure to pay such interest shall not be an Event of Default) until the earliest of (i) the Payment Date on which funds are available to pay such Secured Note Deferred Interest in accordance with the Priority of Payments, (ii) the Redemption Date with respect to such Class of Deferred Interest Secured Notes and (iii) the Stated Maturity of such Class of Deferred Interest Secured Notes. Secured Note Deferred Interest on any Class of Deferred Interest Secured Notes shall be added to the principal balance of such Class of Deferred Interest Secured Notes and shall be payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (A) which is the Redemption Date with respect to such Class of Deferred Interest Secured Notes and (B) which is the Stated Maturity of such Class of Deferred Interest Secured Notes. Regardless of whether any Priority Class is Outstanding with respect to any Class of Deferred Interest Secured Notes, to the extent that funds are not available on any Payment Date (other than the Redemption Date with respect to, or Stated Maturity of, such Class of Deferred Interest Secured Notes) to pay previously accrued Secured Note Deferred Interest, such previously accrued Secured Note Deferred Interest will not be due and payable on such Payment Date and any failure to pay such previously accrued Secured Note Deferred Interest on such Payment Date will not be an Event of Default. Interest will cease to accrue on each Secured Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. To the extent lawful and enforceable, interest on any interest that is not paid when due on any Class A Note or, if no Class A Notes are Outstanding, any Class B Note or, if no Class A Notes or Class B Notes are Outstanding, any Class C Note, or, if no Class A Notes, Class B Notes or Class C Notes are Outstanding, any Class D Note, or, if no Class A Notes, Class B Notes, Class C Notes or Class D Notes are Outstanding, any Class E Note, or, if no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes are Outstanding, any Class F Note that is not paid when due shall accrue at the Interest Rate for such Class until paid as provided herein.

(b) The principal of each Secured Note of each Class matures at par and is due and payable on the date of the Stated Maturity for such Class, unless such principal has been previously repaid or unless the unpaid principal of such Secured Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise. Notwithstanding the foregoing, the payment of principal of each Class of Secured Notes (and payments of Principal Proceeds to the Holders of the Subordinated Notes) may only occur (other than amounts constituting Secured Note Deferred Interest thereon which will be payable from Interest Proceeds pursuant to Section 11.1(a)(i)) in accordance with the Priority of Payments. Payments of principal on any Class of Secured Notes, and distributions of Principal Proceeds to Holders of Subordinated Notes, which are not paid, in accordance with the Priority of Payments, on any Payment Date (other than the Payment Date which is the Stated Maturity of the such Class of Notes or any Redemption Date), because of insufficient funds therefor shall not be considered "due and payable" for purposes of Section 5.1(a) until the Payment Date on which such principal may be paid in accordance with the Priority of Payments or all Priority Classes with respect to such Class have been paid in full.

Page 89

(c)     Principal payments on the Notes will be made in accordance with the Priority of Payments and Section 9.1.

(d)     The Paying Agent shall require the previous delivery of properly completed and signed applicable tax certifications (generally, in the case of U.S. federal income tax, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a U.S. Tax Person or the applicable Internal Revenue Service Form W-8 (or applicable successor form) in the case of a Person that is not a U.S. Tax Person) and any other certification acceptable to it to enable the Issuer, the Co-Issuer, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any Taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Note or the Holder or beneficial owner of such Note under any present or future law or regulation of the Cayman Islands, the United States, any other jurisdiction or any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.  The Co-Issuers shall not be obligated to pay any additional amounts to the Holders or beneficial owners of the Notes as a result of deduction or withholding for or on account of any present or future Taxes with respect to the Notes.

(e)     Payments in respect of interest on and principal of any Secured Note and any payment with respect to any Subordinated Note shall be made by the Trustee, in Dollars to DTC or its nominee with respect to a Global Note and to the Holder or its nominee with respect to a Certificated Note or an Uncertificated Subordinated Note, by wire transfer, as directed by the Holder, in immediately available funds to a Dollar account maintained by DTC or its nominee with respect to a Global Note, and to the Holder or its nominee with respect to a Certificated Note or an Uncertificated Subordinated Note; *provided* that (1) in the case of a Certificated Note or an Uncertificated Subordinated Note, the Holder thereof shall have provided written wiring instructions to the Trustee on or before the related Record Date and (2) if appropriate instructions for any such wire transfer are not received by the related Record Date, then such payment shall be made by check drawn on a U.S. bank mailed to the address of the Holder specified in the Register.  Other than in the case of an Uncertificated Subordinated Note, upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office of the Trustee or at the office of any Paying Agent on or prior to such Maturity; *provided* that in the absence of notice to the Applicable Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender, if the Trustee and the Applicable Issuers shall have been furnished such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate.  In the case of an Uncertificated Subordinated Note, final payment and deregistration shall be made to the Holder thereof as indicated in Register, in accordance with the instructions previously provided by such Holder to the Trustee. Neither the Co-Issuers, the Trustee, the Portfolio Manager, nor any Paying Agent will have any responsibility or liability for any aspects of the records maintained by DTC, Euroclear, Clearstream or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Global Note.  In the case where any final payment of principal and interest

Page 90

is to be made on any Secured Note (other than on the Stated Maturity thereof) or any final payment is to be made on any Subordinated Note (other than on the Stated Maturity thereof), the Trustee, in the name and at the expense of the Applicable Issuers shall, not more than 30 nor less than 10 days prior to the date on which such payment is to be made, mail (by first class mail, postage prepaid) to the Persons entitled thereto at their addresses appearing on the Register a notice which shall specify the date on which such payment will be made, the amount of such payment per U.S.$1,000 original principal amount of Secured Notes, original principal amount of Subordinated Notes and the place where Notes (other than Uncertificated Subordinated Notes) may be presented and surrendered for such payment.

(f)     Payments to Holders of the Notes of each Class (or, with respect to the Class A Notes, Sub-class) shall be made ratably among the Holders of the Notes of such Class or Sub-class in the proportion that the Aggregate Outstanding Amount of the Notes of such Class or Sub-class registered in the name of each such Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class or Sub-class on such Record Date.

(g)     Interest accrued with respect to any Note shall be calculated on the basis of (i) with respect to any Note other than the Class A-1F Notes, the actual number of days elapsed in the applicable Interest Accrual Period divided by 360 and (ii) with respect to the Class A-1F Notes, a year of 360 days with twelve 30 day months.

(h)     All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)     Notwithstanding any other provision of this Indenture, the obligations of the Applicable Issuers under the Notes and this Indenture are limited recourse obligations of the Applicable Issuers payable solely from the Assets and following realization of the Assets, and application of the proceeds thereof in accordance with this Indenture, all obligations of and any claims against the Co-Issuers hereunder or in connection herewith after such realization shall be extinguished and shall not thereafter revive. No recourse shall be had against any Officer, director, employee, shareholder or incorporator of the Co-Issuers, the Portfolio Manager or their respective Affiliates, successors or assigns for any amounts payable under the Notes or this Indenture. It is understood that the foregoing provisions of this paragraph (i) shall not (i) prevent recourse to the Assets for the sums due or to become due under any security, instrument or agreement which is part of the Assets or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Assets have been realized. It is further understood that the foregoing provisions of this paragraph (i) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any Proceeding or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability

Page 91

shall be asked for or (if obtained) enforced against any such Person or entity. The Subordinated Notes are not secured hereunder.

(j)    Subject to the foregoing provisions of this <u>Section 2.7</u>, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights to unpaid interest and principal (or other applicable amount) that were carried by such other Note.

## 2.8    Persons Deemed Owners

The Issuer, the Co-Issuer, the Trustee, and any agent of the Issuer, the Co-Issuer or the Trustee shall treat as the owner of each Note the Person in whose name such Note is registered on the Register on the applicable Record Date for the purpose of receiving payments on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and none of the Issuer, the Co-Issuers, the Trustee or any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

## 2.9    Cancellation

All Notes surrendered for payment, registration of transfer, exchange or redemption, or mutilated, defaced or deemed lost or stolen, shall be promptly canceled by the Trustee and may not be reissued or resold. No Note may be surrendered (including any surrender in connection with any abandonment, donation, gift, contribution or other event or circumstance) except for payment in full as provided herein, or for registration of transfer, exchange or redemption, or for replacement in connection with any Note mutilated, defaced or deemed lost or stolen. Any such Notes shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee. No Notes shall be authenticated or registered in lieu of or in exchange for any Notes canceled as provided in this <u>Section 2.9</u>, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Co-Issuers shall direct by an Issuer Order received prior to destruction that they be returned to it.

## 2.10    DTC Ceases to be Depository

(a)    A Global Note deposited with DTC pursuant to <u>Section 2.2</u> shall be transferred in the form of a corresponding Certificated Note to the beneficial owners thereof only if (A) such transfer complies with <u>Section 2.5</u> and (B) either (x) (i) DTC notifies the Co-Issuers that it is unwilling or unable to continue as depository for such Global Note or (ii) DTC ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor depository is not appointed by the Co-Issuers within 90 days after such event or (y) an Event of Default has occurred and is continuing and such transfer is requested by the Holder of such Global Note.

(b)    Any Global Note that is transferable in the form of a corresponding Certificated Note to the beneficial owner thereof pursuant to this <u>Section 2.10</u> shall be surrendered by DTC to the Trustee's office located in the Borough of Manhattan, the City of New York to be so transferred, in whole or from time to time in part, without charge, and the Applicable

Page 92

Issuers shall execute and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of definitive physical certificates (pursuant to the instructions of DTC) in authorized denominations. Any Certificated Note delivered in exchange for an interest in a Global Note shall, except as otherwise provided by Section 2.5, bear the legends set forth in the applicable Exhibit A and shall be subject to the transfer restrictions referred to in such legends.

(c)     Subject to the provisions of paragraph (b) of this Section 2.10, the Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which such Holder is entitled to take under this Indenture or the Notes.

(d)     In the event of the occurrence of either of the events specified in sub-Section (a) of this Section 2.10, the Co-Issuers will promptly make available to the Trustee a reasonable supply of Certificated Notes.

In the event that Certificated Notes are not so issued by the Applicable Issuers to such beneficial owners of interests in Global Notes as required by sub-Section (a) of this Section 2.10, the Issuer expressly acknowledges that the beneficial owners shall be entitled to pursue any remedy that the Holders of a Global Note would be entitled to pursue in accordance with Article 5 (but only to the extent of such beneficial owner's interest in the Global Note) as if corresponding Certificated Notes had been issued; *provided* that the Trustee shall be entitled to rely upon any certificate of ownership provided by such beneficial owners (including a certificate in the form of Exhibit H) and/or other forms of reasonable evidence of such ownership.

## 2.11    Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations

(a)     Notwithstanding anything to the contrary elsewhere in this Indenture, (x) any transfer of a beneficial interest in any Secured Note to a U.S. person that is not a QIB/QP and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act and (y) any transfer of a beneficial interest in any Subordinated Note to a U.S. person that is not (i) a Qualified Institutional Buyer or an Accredited Investor and either (ii) a Qualified Purchaser or a Knowledgeable Employee with respect to the Issuer (or a corporation, partnership, limited liability company or other entity (other than a trust), each shareholder, partner, member or other equity owner of which is either a Qualified Purchaser or a Knowledgeable Employee with respect to the Issuer) and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act shall be null and void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b)     If (x) any U.S. person that is not a QIB/QP shall become the beneficial owner of an interest in any Secured Note or (y) any U.S. person that is not (i) a Qualified Institutional Buyer or an Accredited Investor and either (ii) a Qualified Purchaser or a Knowledgeable

Page 93

Employee with respect to the Issuer (or a corporation, partnership, limited liability company or other entity (other than a trust), each shareholder, partner, member or other equity owner of which is either a Qualified Purchaser or a Knowledgeable Employee with respect to the Issuer) shall become the beneficial owner of an interest in any Subordinated Note (any such person a "Non-Permitted Holder"), the Issuer shall, promptly after discovery that such person is a Non-Permitted Holder by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee (if a Trust Officer of the Trustee obtains actual knowledge) or the Co-Issuer to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted Holder demanding that such Non-Permitted Holder transfer its interest in the Notes held by such person to a Person that is not a Non-Permitted Holder within 30 days after the date of such notice. If such Non-Permitted Holder fails to so transfer such Note or interest, as the case may be, the Issuer or the Portfolio Manager acting for the Issuer shall have the right, without further notice to the Non-Permitted Holder, to sell such Notes or interest in such Notes to a purchaser selected by the Issuer that is not a Non-Permitted Holder on such terms as the Issuer may choose. The Issuer, or the Portfolio Manager acting on behalf of the Issuer, may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Notes and sell such Notes to the highest such bidder; *provided* that the Portfolio Manager, its Affiliates and accounts, funds, clients or portfolios established and controlled by the Portfolio Manager shall be entitled to bid in any such sale. However, the Issuer or the Portfolio Manager may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Note (or holder of an interest therein), the Non-Permitted Holder and each other Person in the chain of title from the Holder to the Non-Permitted Holder, by its acceptance of an interest in the Notes, agrees to cooperate with the Issuer, the Portfolio Manager and the Trustee to effectuate such transfers. The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted Holder. The terms and conditions of any sale under this sub-Section shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of such discretion.

(c)     Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a beneficial interest in any ERISA Restricted Note to a Person who has made or is deemed to have made an ERISA-related representation required by Section 2.5 that is subsequently shown to be false or misleading shall be null and void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(d)     If any Person shall become the beneficial owner of an interest in any Note who has made or is deemed to have made a prohibited transaction representation or a Benefit Plan Investor, Controlling Person or Similar Law representation required by Section 2.5 that is subsequently shown to be false or misleading or whose beneficial ownership otherwise causes 25% or more of the value of any Class of ERISA Restricted Notes to be held by Benefit Plan Investors (any such person a "Non-Permitted ERISA Holder"), the Issuer shall, promptly after discovery that such person is a Non-Permitted ERISA Holder by the

Page 94

Issuer or upon notice from the Trustee (if a Trust Officer of the Trustee obtains actual knowledge) or the Co-Issuer to the Issuer, if either of them makes the discovery and who, in each case, agree to notify the Issuer of such discovery, send notice to such Non-Permitted ERISA Holder demanding that such Non-Permitted ERISA Holder transfer all or any portion of the Notes held by such Person to a Person that is not a Non-Permitted ERISA Holder (and that is otherwise eligible to hold such Notes or an interest therein) within 20 days after the date of such notice. If such Non-Permitted ERISA Holder fails to so transfer such Notes the Issuer shall have the right, without further notice to the Non-Permitted ERISA Holder, to sell such Notes or interest in such Notes to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder (and that is otherwise eligible to hold such Notes or an interest therein) on such terms as the Issuer may choose. The Issuer may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Notes and selling such Notes to the highest such bidder. The Holder of each Note, the Non-Permitted ERISA Holder and each other Person in the chain of title from the Holder to the Non-Permitted ERISA Holder, by its acceptance of an interest in the Notes agrees to cooperate with the Issuer and the Trustee to effect such transfers. The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted ERISA Holder. The terms and conditions of any sale under this sub-Section shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of such discretion.

**2.12    Treatment**

(a)    The Issuer, the Co-Issuer and the Trustee agree, and each Holder and each beneficial owner of a Secured Note, by acceptance of such Secured Note or an interest in such Secured Note shall be deemed to have agreed, to treat, and shall treat, the Secured Notes as indebtedness of the Issuer for U.S. federal, state and local income and franchise tax purposes, provided that each Holder and each beneficial owner of a Class E Note or Class F Note may make a "protective qualified electing fund" election with respect to such Note. The Issuer will also treat the Secured Notes as debt for legal, accounting and ratings purposes.

(b)    The Issuer, the Co-Issuer and the Trustee agree, and each Holder and each beneficial owner of a Subordinated Note, by acceptance of such Subordinated Note or an interest in such Subordinated Note shall be deemed to have agreed, to treat, and shall treat, the Subordinated Notes as equity in the Issuer for U.S. federal, state and local income and franchise tax purposes.

**2.13    Additional Issuance**

(a)    The Co-Issuers may issue and sell additional notes of any one or more new classes of notes that are fully subordinated to the existing Secured Notes (or to the most junior class of securities of the Issuer (other than the Subordinated Notes) issued pursuant to this Indenture, if any class of securities issued pursuant to this Indenture other than the

Page 95

Secured Notes and the Subordinated Notes is then Outstanding) and/or additional notes of any one or more existing Classes (subject, in the case of additional notes of an existing Class or Sub-class of Secured Notes, to Section 2.13(a)(vii)) and use the proceeds to purchase additional Collateral Obligations or as otherwise permitted under this Indenture, *provided* that the following conditions are met:

(i)      if Secured Notes are being issued, such issuance occurs only during the Reinvestment Period;

(ii)     the Portfolio Manager consents to such issuance;

(iii)    a Majority of the Subordinated Notes consent to such issuance;

(iv)     if additional Secured Notes are being issued, a Majority of the Class A Notes consent to such issuance;

(v)      if additional Subordinated Notes are being issued (a) during the Reinvestment Period, then either (x) a Majority of the Controlling Class consent to such issuance or (y) the Additional Issuance Threshold Test is satisfied or (b) after the Reinvestment Period, a Majority of the Controlling Class consent to such issuance;

(vi)     in the case of additional Notes of any one or more existing Classes or Sub-classes, the aggregate principal amount of Notes of such Class or Sub-class issued in all additional issuances shall not exceed 100% of the respective original outstanding principal amount of the Notes of such Class or Sub-class;

(vii)    in the case of additional Notes of any one or more existing Classes or Sub-classes, the terms of the Notes issued must be identical to the respective terms of previously issued Notes of the applicable Class or Sub-class (except that the interest due on additional Notes will accrue from the issue date of such additional Notes and the interest rate and price of such notes do not have to be identical to those of the initial Notes of that Class or Sub-class; *provided* that the spread over LIBOR for, or interest rate on, such Notes may not exceed the spread over LIBOR for, or interest rate, applicable to the initial Notes of that Class or Sub-class);

(viii)   such additional Notes must be issued at a Cash sales price equal to or greater than the principal amount thereof;

(ix)     in the case of additional Notes of any one or more existing Classes or Sub-classes, unless only additional Subordinated Notes are being issued, additional Notes of all Classes or Sub-classes must be issued and such issuance of additional Notes must be proportional across all Classes or Sub-classes; *provided* that the principal amount of Subordinated Notes issued in any such issuance may exceed the proportion otherwise applicable to the Subordinated Notes;

(x)      the Issuer notifies S&P of such issuance prior to the issuance date;

Page 96

(xi)    the proceeds of any additional Notes (net of fees and expenses incurred in connection with such issuance) shall be treated as Principal Proceeds and used to purchase additional Collateral Obligations, to invest in Eligible Investments or to apply pursuant to the Priority of Payments;

(xii)    immediately after giving effect to such issuance, each Coverage Test is satisfied or, with respect to any Coverage Test that was not satisfied immediately prior to giving effect to such issuance and will continue not to be satisfied immediately after giving effect to such issuance, the degree of compliance with such Coverage Test is maintained or improved immediately after giving effect to such issuance and the application of the proceeds thereof;

(xiii)    additional Subordinated Notes may be issued only once during any Interest Accrual Period; and

(xiv)    unless only additional Subordinated Notes are being issued, an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters shall be delivered to the Trustee to the effect that (1) such additional issuance will not (x) result in the Issuer becoming subject to U.S. federal income taxation with respect to its net income, (y) result in the Issuer being treated as being engaged in a trade or business within the United States, or (z) have a material adverse effect on the tax treatment of the Issuer or the tax consequences to the Holders of any Class of Notes outstanding at the time of such issuance, as described in the Offering Circular under the heading "U.S. Federal Income Tax Considerations—U.S. Federal Tax Treatment of the Notes," and (2) any additional Class A Notes, Class B Notes, Class C Notes and Class D Notes will, and any additional Class E Notes should, be treated as debt for U.S. federal income tax purposes.

(b)    Any additional Notes of an existing Class or Sub-class issued as described above will, to the extent reasonably practicable, be offered first to Holders of that Class or Sub-class in such amounts as are necessary to preserve their pro rata holdings of Notes of such Class or Sub-class.

## 3.    CONDITIONS PRECEDENT

### 3.1    Conditions to Issuance of Notes on Closing Date

(a)    (1) The Notes to be issued on the Closing Date (other than any Uncertificated Subordinated Notes) may be registered in the names of the respective Holders thereof and may be executed by the Applicable Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee and (2) the Uncertificated Subordinated Notes to be issued on the Closing Date may be registered in the names of the respective Holders thereof and a Confirmation of Registration shall be delivered by the Trustee to each such Holder and S&P, in each case upon Issuer Order and upon receipt by the Trustee of the following:

<div align="center">Page 97</div>

18750188.25.BUSINESS

(i)     **Officers' Certificates of the Co-Issuers Regarding Corporate Matters.**  An Officer's certificate of each of the Co-Issuers (A) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, and, in the case of the Issuer, the Portfolio Management Agreement, the Collateral Administration Agreement, the Security Purchase Agreement and related transaction documents, the execution, authentication and delivery of the Notes (other than any Uncertificated Subordinated Notes) applied for by it (and in the case of the Issuer, the issuance of any Uncertificated Subordinated Notes applied for by it) and specifying the Stated Maturity, principal amount and Interest Rate of each Class of Secured Notes applied for by it and (with respect to the Issuer only) the Stated Maturity and principal amount of Subordinated Notes to be authenticated and delivered (or, in the case of the Uncertificated Subordinated Notes, to be registered) and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon.

(ii)    **Governmental Approvals.**  From each of the Co-Issuers either (A) a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of such Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes or (B) an Opinion of Counsel of the Applicable Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Notes except as has been given.

(iii)   **U.S. Counsel Opinions.**  Opinions of Dechert LLP, special U.S. counsel to the Co-Issuers, Seward & Kissel LLP, counsel to the Trustee and the Collateral Administrator, and Dechert LLP, counsel to the Portfolio Manager, each dated the Closing Date, substantially in the respective forms of Exhibit C, Exhibit D and Exhibit E attached hereto.

(iv)    **Cayman Counsel Opinion.**  An opinion of Maples and Calder, counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit F attached hereto.

(v)     **Officers' Certificates of Co-Issuers Regarding Indenture.**  An Officer's certificate of each of the Co-Issuers stating that, to the best of the signing Officer's knowledge, the Applicable Issuer is not in default under this Indenture and that the issuance of the Notes applied for by it will not result in a default or a breach of any of the terms, conditions or provisions of, or constitute a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by

Page 98

which it may be bound or to which it may be subject; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes applied for by it have been complied with; and that all expenses due or accrued with respect to the Offering of such Notes or relating to actions taken on or in connection with the Closing Date have been paid or reserves therefor have been made. The Officer's certificate of the Issuer shall also state that all of its representations and warranties contained herein are true and correct as of the Closing Date.

(vi) **Portfolio Management Agreement, Collateral Administration Agreement and Securities Account Control Agreement.** An executed counterpart of the Portfolio Management Agreement, the Collateral Administration Agreement and the Securities Account Control Agreement.

(vii) **Certificate of the Portfolio Manager.** An Officer's certificate of the Portfolio Manager, dated as of the Closing Date, to the effect that each Collateral Obligation to be Delivered by the Issuer on the Closing Date and each Collateral Obligation with respect to which the Portfolio Manager on behalf of the Issuer has entered into a binding commitment to purchase or enter into, is listed in the Schedule of Collateral Obligations and:

(A) in the case of each such Collateral Obligation in the Schedule of Collateral Obligations, immediately prior to the Delivery of any Collateral Obligations on the Closing Date, the information with respect to each such Collateral Obligation in the Schedule of Collateral Obligations is complete and correct;

(B) in the case of (x) each such Collateral Obligation in the Schedule of Collateral Obligations to be Delivered on the Closing Date, immediately prior to the Delivery thereof on the Closing Date, it satisfies, and (y) each Collateral Obligation that the Portfolio Manager on behalf of the Issuer committed to purchase on or prior to the Closing Date, each such Collateral Obligation, upon its acquisition, will satisfy, the requirements of the definition of "Collateral Obligation" in this Indenture;

(C) in the case of each such Collateral Obligation in the Schedule of Collateral Obligations, the Issuer purchased or entered into, or committed to purchase or enter into, each such Collateral Obligation in compliance with the Trading Restrictions; and

(D) the Aggregate Principal Balance of the Collateral Obligations which the Issuer has purchased or has entered into binding commitments to purchase on or prior to the Closing Date is approximately U.S.$380,851,083.

(viii) **Grant of Collateral Obligations.** The Grant pursuant to the Granting Clauses of this Indenture of all of the Issuer's right, title and interest in and to the Collateral Obligations pledged to the Trustee for inclusion in the Assets on the Closing Date

Page 99

shall be effective, and Delivery of such Collateral Obligations (including any promissory note and all other Underlying Instruments related thereto to the extent received by the Issuer) as contemplated by Section 3.3 shall have been effected.

(ix) **Certificate of the Issuer Regarding Assets.** A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that:

(A) in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Assets, on the Closing Date and immediately prior to the Delivery thereof (or immediately after Delivery thereof, in the case of clause (vi)(ii) below) on the Closing Date;

   i. the Issuer is the owner of such Collateral Obligation free and clear of any liens, claims or encumbrances of any nature whatsoever except for (i) those which are being released on the Closing Date and (ii) those Granted pursuant to this Indenture;

   ii. the Issuer has acquired its ownership in such Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (I) above;

   iii. the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Obligation (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

   iv. the Issuer has full right to Grant a security interest in and assign and pledge such Collateral Obligation to the Trustee;

   v. based on the certificate of the Portfolio Manager delivered pursuant to Section 3.1(a)(vii), the information set forth with respect to such Collateral Obligation in the Schedule of Collateral Obligations is correct;

   vi. (i) based on the certificate of the Portfolio Manager delivered pursuant to Section 3.1(a)(vii), each Collateral Obligation included in the Assets satisfies the requirements of the definition of "Collateral Obligation" and (ii) the requirements of Section 3.1(a)(viii) have been satisfied; and

   vii. upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral Obligations and other Assets, except as permitted by this Indenture;

(B) based on the certificate of the Portfolio Manager delivered pursuant to Section 3.1(a)(vii), each Collateral Obligation that the Portfolio Manager on behalf of the Issuer purchased or committed to purchase on or prior to

18750188.25.BUSINESS

the Closing Date satisfies, or will upon its acquisition satisfy, the requirements of the definition of "Collateral Obligation"; and

(C) based on the certificate of the Portfolio Manager delivered pursuant to Section 3.1(a)(vii), the Aggregate Principal Balance of the Collateral Obligations which the Issuer has purchased or has entered into binding commitments to purchase on or prior to the Closing Date is approximately U.S.$380,851,083.

(x) **Rating Letter.** An Officer's certificate of the Issuer to the effect that attached thereto with respect to each Class of Secured Notes is a true and correct copy of a letter signed by S&P confirming that such Class of Secured Notes has been assigned the applicable Initial Rating and that such ratings are in effect on the date on which the Notes are delivered.

(xi) **Accounts.** Evidence of the establishment of each of the Accounts by the Trustee.

(xii) **Issuer Order for Deposit of Funds into Accounts.** (A) An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of U.S.$401,880,000 from the proceeds of the issuance of the Notes into the Ramp-Up Account for use pursuant to Section 10.3(c), (B) an Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of U.S.$482,208.05 from the proceeds of the issuance of the Notes into the Expense Reserve Account for use pursuant to Section 10.3(d); (C) an Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of U.S.$1,500,000 from the proceeds of the issuance of the Notes into the Interest Reserve Account for use pursuant to Section 10.3(e); and (D) an Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of U.S.$0 from the proceeds of the issuance of the Notes into the Revolver Funding Account for use pursuant to Section 10.4.

(xiii) **Other Documents.** Such other documents as the Trustee may reasonably require; *provided* that nothing in this clause (xiii) shall imply or impose a duty on the part of the Trustee to require any other documents.

**3.2 Conditions to Additional Issuance**

(a) Any additional notes to be issued during the Reinvestment Period in accordance with Section 2.13 may (x) other than in the case of Uncertificated Subordinated Notes, be executed by the Applicable Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee and (y) in the case of uncertificated subordinated notes, be registered in the name of the respective Holders thereof and a Confirmation of Registration shall be delivered by the Trustee to each such Holder, in each case upon Issuer Order and upon receipt by the Trustee of the following:

Page 101

(i) **Officers' Certificates of the Applicable Issuers Regarding Corporate Matters.** An Officer's certificate of each of the Applicable Issuers (A) evidencing the authorization by Board Resolution of the execution, authentication and delivery of the notes, other than any uncertificated subordinated notes, applied for by it (and in the case of the Issuer, the issuance of any uncertificated subordinated notes applied for by it) and specifying the Stated Maturity, principal amount and Interest Rate (if applicable) of the notes applied for by it and (with respect to the Issuer only) the Stated Maturity and principal amount of Subordinated Notes to be authenticated and delivered (or, in the case of the Uncertificated Subordinated Notes, to be registered) and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the date of issuance and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon.

(ii) **Governmental Approvals.** From each of the Applicable Issuers either (A) a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of such Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of the additional notes or (B) an Opinion of Counsel of the Applicable Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such additional notes except as has been given.

(iii) **Officers' Certificates of Applicable Issuers Regarding Indenture.** An Officer's certificate of each of the Applicable Issuers stating that, to the best of the signing Officer's knowledge, such Applicable Issuer is not in default under this Indenture and that the issuance of the additional notes applied for by it will not result in a default or a breach of any of the terms, conditions or provisions of, or constitute a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject; that the provisions of Section 2.13 and all conditions precedent provided in this Indenture relating to the authentication and delivery of the additional notes applied for by it have been complied with; and that all expenses due or accrued with respect to the offering of such notes or relating to actions taken on or in connection with the additional issuance have been paid or reserves therefor have been made. The Officer's certificate of the Issuer shall also state that all of its representations and warranties contained herein are true and correct as of the date of additional issuance.

(iv) **Supplemental Indenture.** A fully executed counterpart of the supplemental indenture making such changes to this Indenture as shall be necessary to permit such additional issuance.

18750188.25.BUSINESS

Exhibit B

(v)       **Rating Agency Notification**.  Notification to S&P of such additional issuance.

(vi)       **Issuer Order for Deposit of Funds into Accounts.** An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the date of the additional issuance, authorizing the deposit of the net proceeds of the issuance into the Principal Proceeds Subaccount for use pursuant to <u>Section 10.2</u>.

(vii)      **Evidence of Required Consents.**  (a) A certificate of the Portfolio Manager consenting to such additional issuance and (b) satisfactory evidence of the consent of a Majority of the Subordinated Notes to such issuance (which may be in the form of an Officer's certificate of the Issuer) and, as applicable, (x) satisfactory evidence of the consent of a Majority of the Class A Notes to such issuance (which may be in the form of an Officer's certificate of the Issuer) and (y) satisfactory evidence of the consent of the Controlling Class to such issuance (which may be in the form of an Officer's certificate of the Issuer).

(viii)     **Issuer Order for Deposit of Funds into Expense Reserve Account.**  An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the date of the additional issuance, authorizing the deposit of approximately 1% of the proceeds, as calculated by the Portfolio Manager, of such additional issuance into the Expense Reserve Account for use pursuant to <u>Section 10.3(d)</u>.

(ix)       **Other Documents.**  Such other documents as the Trustee may reasonably require; *provided* that nothing in this clause (ix) shall imply or impose a duty on the part of the Trustee to require any other documents.

**3.3**      **Custodianship; Delivery of Collateral Obligations and Eligible Investments**

(a)      The Portfolio Manager, on behalf of the Issuer, shall deliver or cause to be delivered to a custodian appointed by the Issuer, which shall be a Securities Intermediary (the "Custodian"), all Assets in accordance with the definition of "Deliver".  Initially, the Custodian shall be the Bank.  Any successor custodian shall be a state or national bank or trust company that has capital and surplus of at least U.S.$200,000,000 and is a Securities Intermediary.   Subject to the limited right to relocate Assets as provided in <u>Section 7.5(b)</u>, the Trustee or the Custodian, as applicable, shall hold (i) all Collateral Obligations, Eligible Investments, Cash and other investments purchased in accordance with this Indenture and (ii) any other property of the Issuer otherwise Delivered to the Trustee or the Custodian, as applicable, by or on behalf of the Issuer, in the relevant Account established and maintained pursuant to <u>Article 10</u>; as to which in each case the Trustee shall have entered into the Securities Account Control Agreement (or an agreement substantially in the form thereof, in the case of a successor custodian) providing, inter alia, that the establishment and maintenance of such Account will be governed by a law of a jurisdiction satisfactory to the Issuer and the Trustee.

(b)      Each time that the Portfolio Manager on behalf of the Issuer directs or causes the acquisition of any Collateral Obligation, Eligible Investment or other investment, the

Page 103

Portfolio Manager (on behalf of the Issuer) shall, if the Collateral Obligation, Eligible Investment or other investment is required to be, but has not already been, transferred to the relevant Account, cause the Collateral Obligation, Eligible Investment or other investment to be Delivered to the Custodian to be held in the Custodial Account (or in the case of any such investment that is not a Collateral Obligation, in the Account in which the funds used to purchase the investment are held in accordance with Article 10) for the benefit of the Trustee in accordance with this Indenture. The security interest of the Trustee in the funds or other property used in connection with the acquisition shall, immediately and without further action on the part of the Trustee, be released. The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Obligation, Eligible Investment or other investment so acquired, including all interests of the Issuer in to any contracts related to and proceeds of such Collateral Obligation, Eligible Investment or other investment.

## 4. SATISFACTION AND DISCHARGE

### 4.1 Satisfaction and Discharge of Indenture

This Indenture shall be discharged and shall cease to be of further effect except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of Holders to receive payments of principal thereof and interest thereon, (iv) the rights and immunities of the Trustee hereunder and those obligations of the Trustee set forth in Section 4.2, (v) the rights, obligations and immunities of the Portfolio Manager hereunder and under the Portfolio Management Agreement, (vi) the rights, obligations and immunities of the Collateral Administrator hereunder and under the Collateral Administration Agreement and (vii) the rights of Holders as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture) when:

(a) either:

    (i) all Uncertificated Subordinated Notes have been deregistered by the Trustee and all Notes theretofore authenticated and delivered to Holders (other than (A) Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.6, (B) Notes for whose payment Money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3) have been delivered to the Trustee for cancellation; or

    (ii) all Notes not theretofore delivered to the Trustee for cancellation and all Uncertificated Subordinated Notes not theretofore deregistered by the Trustee (A) have become due and payable, or (B) will become due and payable at their Stated Maturity within one year, or (C) are to be called for redemption pursuant to Article 9 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Applicable Issuers pursuant to Section 9.4 and the Issuer has

Page 104

irrevocably deposited or caused to be deposited with the Trustee, in trust for such purpose, Cash or non-callable direct obligations of the United States of America; *provided* that the obligations are entitled to the full faith and credit of the United States of America or are debt obligations which are rated "Aaa" by Moody's and "AAA" by S&P, in an amount sufficient, as recalculated in an agreed-upon procedures report by a firm of Independent certified public accountants which are nationally recognized, to pay and discharge the entire indebtedness on such Notes, for principal and interest to the date of such deposit (in the case of Notes which have become due and payable), or to their Stated Maturity or Redemption Date, as the case may be, and shall have Granted to the Trustee a valid perfected security interest in such Eligible Investment that is of first priority or free of any adverse claim, as applicable, and shall have furnished an Opinion of Counsel with respect thereto; *provided* that this sub-Section (ii) shall not apply if an election to act in accordance with the provisions of <u>Section 5.5(a)</u> shall have been made and not rescinded;

(b)     the Issuer has paid or caused to be paid all other sums then due and payable hereunder (including any amounts then due and payable pursuant to any Transaction Document without regard to the Administrative Expense Cap) by the Issuer and no other amounts are scheduled to be due and payable by the Issuer; and

(c)     the Co-Issuers have delivered to the Trustee Officers' certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with;

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Portfolio Manager and, if applicable, the Holders, as the case may be, under Sections 2.7, <u>4.2</u>, <u>5.4(d)</u>, <u>5.9</u>, <u>5.18</u>, <u>6.6</u>, <u>6.7</u>, <u>7.1</u>, <u>7.3</u>, <u>13.1</u> and <u>14.16</u> shall survive.

## 4.2     Application of Trust Money

All Cash and obligations deposited with the Trustee pursuant to <u>Section 4.1</u> shall be held in trust and applied by it in accordance with the provisions of the Notes and this Indenture, including, without limitation, the Priority of Payments, to the payment of principal and interest (or other amounts with respect to the Subordinated Notes), either directly or through any Paying Agent, as the Trustee may determine; and such Cash and obligations shall be held in a segregated account identified as being held in trust for the benefit of the Secured Parties.

## 4.3     Repayment of Monies Held by Paying Agent

In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all Monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to <u>Section 7.3</u> and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such Monies.

18750188.25.BUSINESS

**4.4**     **Limitation on Obligation to Incur Administrative Expenses**

If at any time (i) the sum of (A) Eligible Investments (including Cash) and (B) amounts reasonably expected to be received by the Issuer in cash during the current Collection Period (as certified by the Portfolio Manager in its reasonable judgment) is less than (ii) the sum of (A) an amount not to exceed the greater of (x) U.S. $30,000 and (y) the amount (if any) reasonably certified by the Portfolio Manager or the Issuer, including but not limited to fees and expenses incurred by the Trustee and the Collateral Administrator and reported to the Portfolio Manager, as the sum of expenses reasonably likely to be incurred in connection with the discharge of this Indenture, the liquidation of the Assets and the dissolution of the Co-Issuers and (B) any amounts payable under Section 11.1(a)(i)(A) hereof, then notwithstanding any other provision of this Indenture, the Issuer shall no longer be required to incur Administrative Expenses as otherwise required by this Indenture to any Person other than amounts needed to make any capital contribution to a Tax Subsidiary necessary to pay any Taxes, registered office or governmental fees owing by such Tax Subsidiary, amounts owed the Trustee (or any other capacity in which the Bank is acting pursuant to the Transaction Documents), the Collateral Administrator, the Administrator and their respective Affiliates, including for Opinions of Counsel in connection with supplemental indentures pursuant to Article 8, any annual opinions required hereunder, services of accountants and fees of any Rating Agency, in each case as required under this Indenture and failure to pay such amounts or provide or obtain such opinions, reports or services shall not constitute a default under this Indenture, and the Trustee shall have no liability for any failure to obtain or receive any of the foregoing opinions, reports or services. The foregoing shall not, however, limit, supersede or alter any right afforded to the Trustee under this Indenture to refrain from taking action in the absence of its receipt of any such opinion, report or service which it reasonably determines is necessary for its own protection.

**5.**     **REMEDIES**

**5.1**     **Events of Default**

"Event of Default", wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     a default in the payment, when due and payable, of (i) any interest on any Class A Note or any Class B Note or, if there are no Class A Notes or Class B Notes Outstanding, any Class C Note or, if there are no Class A Notes, Class B Notes or Class C Notes Outstanding, any Class D Note or, if there are no Class A Notes, Class B Notes, Class C Notes or Class D Notes Outstanding, any Class E Note or, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes Outstanding, any Class F Note and, in each case, the continuation of any such default for five Business Days, or (ii) any principal of, or interest or Secured Note Deferred Interest on, or any Redemption Price in respect of, any Secured Note at its Stated Maturity or on any Redemption Date; *provided* that, in the case of a default resulting from a failure to disburse due to an administrative error or omission by the Portfolio Manager, Trustee, Collateral

<div align="center">Page 106</div>

Administrator or any Paying Agent, such default will not be an Event of Default unless such failure continues for five Business Days after a Trust Officer of the Trustee receives written notice or has actual knowledge of such administrative error or omission;

(b) the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and continuation of such failure for a period of five Business Days; *provided* that, in the case of a default resulting from a failure to disburse due to an administrative error or omission by the Portfolio Manager, Trustee, Collateral Administrator or any Paying Agent, such default will not be an Event of Default unless such failure continues for five Business Days after a Trust Officer of the Trustee receives written notice or has actual knowledge of such administrative error or omission;

(c) either of the Co-Issuers or the pool of Assets becomes an investment company required to be registered under the Investment Company Act;

(d) except as otherwise provided in this Section 5.1, a default in a material respect in the performance, or breach in a material respect, of any other covenant or other agreement of the Issuer or the Co-Issuer in this Indenture (it being understood, without limiting the generality of the foregoing, that any failure to meet any Concentration Limitation, Collateral Quality Test, Interest Diversion Test or Coverage Test is not an Event of Default and any failure to satisfy the requirements of Section 7.17 is not an Event of Default, except in either case to the extent provided in clause (g) below), or the failure of any representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith to be correct in each case in all material respects when the same shall have been made, and the continuation of such default, breach or failure for a period of 45 days after notice to the Issuer or the Co-Issuer, as applicable, and the Portfolio Manager by registered or certified mail or overnight courier, by the Trustee, the Issuer, the Co-Issuer or the Portfolio Manager, or to the Issuer or the Co-Issuer, as applicable, the Portfolio Manager and the Trustee at the direction of the Holders of at least a Majority of the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(e) the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively, or ordering the winding up or liquidation of its affairs, respectively, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

(f) the institution by the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against

Page 107

the Issuer or Co-Issuer, as the case may be, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment in a Proceeding of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action; or

(g)     on any Measurement Date, failure of the percentage equivalent of a fraction, (i) the numerator of which is equal to the sum of (1) the Aggregate Principal Balance of the Collateral Obligations, excluding Defaulted Obligations plus (2) without duplication, the amounts on deposit in the Collection Account and the Ramp-Up Account (including Eligible Investments therein) representing Principal Proceeds plus (3) the aggregate Market Value of all Defaulted Obligations on such date and (ii) the denominator of which is equal to the Aggregate Outstanding Amount of the Class A-1 Notes and Class A-2 Notes, to equal or exceed 102.5%.

Upon obtaining knowledge of the occurrence of an Event of Default, each of (i) the Co-Issuers, (ii) the Trustee and (iii) the Portfolio Manager shall notify each other. Upon the occurrence of an Event of Default known to a Trust Officer of the Trustee, the Trustee shall, not later than one Business Day thereafter, notify the Noteholders (as their names appear on the Register), each Paying Agent, DTC, S&P and the Irish Stock Exchange (for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require) of such Event of Default in writing (unless such Event of Default has been waived as provided in Section 5.14).

**5.2     Acceleration of Maturity; Rescission and Annulment**

(a)     If an Event of Default occurs and is continuing (other than an Event of Default specified in Section 5.1(e) or (f)), the Trustee may (with the written consent of a Majority of the Controlling Class), and shall (upon the written direction of a Majority of the Controlling Class), by notice to the Co-Issuers and S&P, declare the principal of all the Secured Notes to be immediately due and payable, and upon any such declaration such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable. If an Event of Default specified in Section 5.1(e) or (f) occurs, all unpaid principal, together with all accrued and unpaid interest thereon, of all the Secured Notes, and other amounts payable thereunder and hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Noteholder.

(b)     At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Money due has been obtained by the Trustee as hereinafter provided in this Article 5, a Majority of the Controlling Class by written

18750188.25.BUSINESS

notice to the Issuer and the Trustee, may rescind and annul such declaration and its consequences if:

(i) The Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A) all unpaid installments of interest and principal then due on the Secured Notes;

(B) to the extent that the payment of such interest is lawful, interest upon any Secured Note Deferred Interest at the applicable Interest Rate; and

(C) all unpaid Taxes and Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee hereunder or by the Collateral Administrator under the Collateral Administration Agreement or hereunder, accrued and unpaid Base Management Fees and any other amounts then payable by the Co-Issuers hereunder prior to such Administrative Expenses and such Base Management Fees; and

(ii) It has been determined that all Events of Default, other than the nonpayment of the interest on or principal of the Secured Notes that has become due solely by such acceleration, have (A) been cured, and a Majority of the Controlling Class by written notice to the Trustee has agreed with such determination (which agreement shall not be unreasonably withheld), or (B) been waived as provided in Section 5.14.

No such rescission shall affect any subsequent Default or impair any right consequent thereon.

(c) Notwithstanding anything in this Section 5.2 to the contrary, the Secured Notes will not be subject to acceleration by the Trustee or the Holders of a Majority of the Controlling Class solely as a result of the failure to pay any amount due on any Class of Notes that are subordinate to the Controlling Class.

**5.3 Collection of Indebtedness and Suits for Enforcement by Trustee**

The Applicable Issuers covenant that if a default shall occur in respect of the payment of any principal of or interest when due and payable on any Secured Note, the Applicable Issuers will, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holder of such Secured Note, the whole amount, if any, then due and payable on such Secured Note for principal and interest with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, at the applicable Interest Rate, and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel.

Page 109

If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may, and shall upon direction of a Majority of the Controlling Class, institute a Proceeding for the collection of the sums so due and unpaid, may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Applicable Issuers or any other obligor upon the Secured Notes and collect the Monies adjudged or decreed to be payable in the manner provided by law out of the Assets.

If an Event of Default occurs and is continuing, the Trustee may in its discretion, and shall upon written direction of the Majority of the Controlling Class, proceed to protect and enforce its rights and the rights of the Secured Parties by such appropriate Proceedings as the Trustee shall deem most effectual (if no such direction is received by the Trustee) or as the Trustee may be directed by the Majority of the Controlling Class, to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer or any other obligor upon the Secured Notes under the Bankruptcy Law or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Secured Notes, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether the principal of any Secured Note shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a) to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Secured Notes upon direction by a Majority of the Controlling Class and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of negligence or bad faith) and of the Secured Noteholders allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Secured Notes or to the creditors or property of the Issuer, the Co-Issuer or such other obligor;

(b) unless prohibited by applicable law and regulations, to vote on behalf of the Secured Noteholders upon the direction of a Majority of the Controlling Class, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

Page 110

(c)    to collect and receive any Monies or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Secured Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Secured Noteholders to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Secured Noteholders, as applicable, in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person.

In any Proceedings brought by the Trustee on behalf of the Holders of the Secured Notes (and any such Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders of the Secured Notes.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Assets or institute Proceedings in furtherance thereof pursuant to this Section 5.3 except according to the provisions specified in Section 5.5(a).

## 5.4    Remedies

(a)    If an Event of Default shall have occurred and be continuing, and the Secured Notes have been declared or have become due and payable (an "Acceleration Event") and such Acceleration Event and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may, and shall, upon written direction of a Majority of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)    institute Proceedings for the collection of all amounts then payable on the Secured Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Assets any Monies adjudged due;

(ii)    sell or cause the sale of all or a portion of the Assets or rights or interests therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Assets;

Page 111

(iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee and the Holders of the Secured Notes hereunder (including exercising all rights of the Trustee under the Securities Account Control Agreement); and

(v)    exercise any other rights and remedies that may be available at law or in equity;

*provided* that the Trustee may not sell or liquidate the Assets or institute Proceedings in furtherance thereof pursuant to this <u>Section 5.4</u> except according to the provisions of <u>Section 5.5(a)</u>.

The Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation (the cost of which shall be payable as an Administrative Expense) in structuring and distributing securities similar to the Secured Notes, which may be Jefferies LLC, as to the feasibility of any action proposed to be taken in accordance with this <u>Section 5.4</u> and as to the sufficiency of the proceeds and other amounts receivable with respect to the Assets to make the required payments of principal of and interest on the Secured Notes which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)    If an Event of Default as described in <u>Section 5.1(d)</u> shall have occurred and be continuing the Trustee may, and at the direction of the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section, and enforce any equitable decree or order arising from such Proceeding.

(c)    Upon any sale, whether made under the power of sale hereby given or by virtue of judicial Proceedings, any Secured Party may bid for and purchase the Assets or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability.

Upon any sale, whether made under the power of sale hereby given or by virtue of judicial Proceedings, the receipt of the Trustee, or of the Officer making a sale under judicial Proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase Money, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial Proceedings, shall bind the Co-Issuers, the Trustee and the Holders of the Secured Notes, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)    Notwithstanding any other provision of this Indenture, none of the Trustee, the Secured Parties or the Noteholders may, prior to the date which is one year and one day (or if

Page 112

18750188.25.BUSINESS

longer, any applicable preference period) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer, the Co-Issuer or any Tax Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws. Nothing in this Section 5.4 shall preclude, or be deemed to estop, the Trustee, any Secured Party or any Noteholder (i) from taking any action prior to the expiration of the aforementioned period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than the Trustee, such Secured Party or such Noteholder, respectively, or (ii) from commencing against the Issuer or the Co-Issuer or any of their respective properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

**5.5    Optional Preservation of Assets**

(a)    Notwithstanding anything to the contrary herein, if an Event of Default shall have occurred and be continuing, the Trustee shall retain the Assets securing the Secured Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Assets and the Notes in accordance with the Priority of Payments and the provisions of Article 10, Article 12 and Article 13 unless:

(i)    the Trustee, pursuant to Section 5.5(c), determines that the anticipated proceeds of a sale or liquidation of the Assets (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the amounts then due (or, in the case of interest, accrued) and unpaid on the Secured Notes for principal and interest, and all other amounts payable prior to payment of principal on such Secured Notes (including amounts due and owing as Administrative Expenses (without regard to the Administrative Expense Cap) and due and unpaid Base Management Fee) and a Majority of the Controlling Class agrees with such determination; or

(ii)    (x) if the Class A-1 Notes or the Class A-2 Notes are outstanding and an Event of Default referred to in clause (a), (e) (solely in respect of the Issuer), (f) (solely in respect of the Issuer) or (g) of the definition thereof has occurred and is continuing, a Majority of the Class A-1 Notes and the Class A-2 Notes, as applicable (voting together), directs the sale and liquidation of the Assets or (y) if any other Event of Default has occurred and is continuing, a Supermajority of each Class of the Secured Notes (voting separately by Class) direct the sale and liquidation of the Assets.

The Trustee shall give written notice of the retention of the Assets to the Issuer with a copy to the Co-Issuer and the Portfolio Manager. So long as such Event of Default is

Page 113

continuing, any such retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)    Nothing contained in Section 5.5(a) shall be construed to require the Trustee to sell the Assets securing the Secured Notes if the conditions set forth in clause (i) or (ii) of Section 5.5(a) are not satisfied. Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Assets securing the Notes if prohibited by applicable law.

(c)    In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee shall obtain, with the cooperation of the Portfolio Manager, bid prices with respect to each security contained in the Assets from two nationally recognized dealers (as specified by the Portfolio Manager in writing) at the time making a market in such securities and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of such bid prices for each such security. In addition, for the purposes of determining issues relating to the execution of a sale or liquidation of the Assets and the execution of a sale or other liquidation thereof in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain and rely on an opinion of an Independent investment banking firm of national reputation (the cost of which shall be payable as an Administrative Expense).

The Trustee shall deliver to the Noteholders and the Portfolio Manager a report stating the results of any determination required pursuant to Section 5.5(a)(i) no later than 10 days after such determination is made. The Trustee shall make the determinations required by Section 5.5(a)(i) within 30 days after an Event of Default and at the request of a Majority of the Controlling Class at any time during which the Trustee retains the Assets pursuant to Section 5.5(a)(i).

**5.6    Trustee May Enforce Claims Without Possession of Notes**

All rights of action and claims under this Indenture or under any of the Secured Notes may be prosecuted and enforced by the Trustee without the possession of any of the Secured Notes or the production thereof in any trial or other Proceeding relating thereto, and any such action or Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.7.

**5.7    Application of Money Collected**

Any Money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any Money that may then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied, subject to Section 13.1 and in accordance with the provisions of Section 11.1(a)(iii), at the date or dates fixed by the Trustee (each such date to occur on a Payment Date). Upon the final distribution of all proceeds of any liquidation effected hereunder, the provisions of Section 4.1(b) shall be deemed satisfied for the purposes of discharging this Indenture pursuant to Article 4.

**5.8** **Limitation on Suits**

No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given to the Trustee written notice of an Event of Default;

(b)    the Holders of not less than 25% of the then Aggregate Outstanding Amount of the Notes of the Controlling Class shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders have provided the Trustee indemnity reasonably satisfactory to the Trustee against the costs, expenses (including reasonable attorneys' fees and expenses) and liabilities to be incurred in compliance with such request;

(c)    the Trustee, for 30 days after its receipt of such notice, request and provision of such indemnity, has failed to institute any such Proceeding; and

(d)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by a Majority of the Controlling Class; it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing itself of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of the Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with <u>Section 13.1</u> and the Priority of Payments.

In the event the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall act in accordance with the request specified by the group of Holders with the greatest percentage of the Aggregate Outstanding Amount of the Controlling Class, notwithstanding any other provisions of this Indenture. If all such groups represent the same percentage, the Trustee, in its sole discretion, may determine what action, if any, shall be taken.

**5.9** **Unconditional Rights of Secured Noteholders to Receive Principal and Interest**

Subject to <u>Section 2.7(i)</u>, but notwithstanding any other provision of this Indenture, the Holder of any Secured Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Secured Note, as such principal, interest and other amounts become due and payable in accordance with the Priority of Payments and <u>Section 13.1</u>, as the case may be, and, subject to the provisions of <u>Section 5.8</u>, to institute proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder. Holders of Secured Notes ranking junior to Notes still Outstanding shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Secured Note ranking senior to such Secured Note remains Outstanding,

Page 115

which right shall be subject to the provisions of <u>Section 5.8</u>, and shall not be impaired without the consent of any such Holder.

## 5.10   Restoration of Rights and Remedies

If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Noteholder, then and in every such case the Co-Issuers, the Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Noteholder shall continue as though no such Proceeding had been instituted.

## 5.11   Rights and Remedies Cumulative

No right or remedy herein conferred upon or reserved to the Trustee or to the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

## 5.12   Delay or Omission Not Waiver

No delay or omission of the Trustee or any Holder of Secured Notes to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein or of a subsequent Event of Default.  Every right and remedy given by this <u>Article 5</u> or by law to the Trustee or to the Holders of the Secured Notes may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders of the Secured Notes.

## 5.13   Control by Majority of Controlling Class

Notwithstanding any other provision of this Indenture, a Majority of the Controlling Class shall have the right following the occurrence, and during the continuance of, an Event of Default to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee; *provided* that:

(a)     such direction shall not conflict with any rule of law or with any express provision of this Indenture;

(b)     the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided* that subject to <u>Section 6.1</u>, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received the indemnity as set forth in (c) below);

(c)     the Trustee shall have been provided with indemnity reasonably satisfactory to it; and

<div align="center">Page 116</div>

(d)     notwithstanding the foregoing, any direction to the Trustee to undertake a Sale of the Assets must satisfy the requirements of Section 5.5.

**5.14    Waiver of Past Defaults**

Prior to the time a judgment or decree for payment of the Money due has been obtained by the Trustee, as provided in this Article 5, a Majority of the Controlling Class may on behalf of the Holders of all the Notes waive any past Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default and its consequences, except any such Event of Default or occurrence:

(a)     in the payment of the principal of or interest on any Secured Note (which may be waived only with the consent of the Holder of such Secured Note);

(b)     in the payment of interest on the Secured Notes of the Controlling Class (which may be waived only with the consent of the Holders of 100% of the Controlling Class);

(c)     in respect of a covenant or provision hereof that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note materially and adversely affected thereby (which may be waived only with the consent of each such Holder); or

(d)     in respect of a representation contained in Section 7.18 (which may be waived only by a Majority of the Controlling Class with notice to S&P).

In the case of any such waiver, the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.  The Trustee shall promptly give written notice of any such waiver to S&P, the Portfolio Manager and each Holder.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

**5.15    Undertaking for Costs**

All parties to this Indenture agree, and each Holder of any Note by such Holder's acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.15 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholder, or group of Noteholders, holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any

Page 117

suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the applicable Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date).

**5.16    Waiver of Stay or Extension Laws**

The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any valuation, appraisement, redemption or marshalling law or rights, in each case wherever enacted, now or at any time hereafter in force, which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law or rights, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted or rights created.

**5.17    Sale of Assets**

(a)    The power to effect any sale (a "Sale") of any portion of the Assets pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of such Assets remaining unsold, but shall continue unimpaired until the entire Assets shall have been sold or all amounts secured by the Assets shall have been paid.  The Trustee may upon notice to the Noteholders, and shall, upon direction of a Majority of the Controlling Class, from time to time postpone any Sale by public announcement made at the time and place of such Sale.  The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale; *provided* that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7.

(b)    The Trustee may bid for and acquire any portion of the Assets in connection with a public Sale thereof, and may pay all or part of the purchase price by crediting against amounts owing on the Secured Notes in the case of the Assets or other amounts secured by the Assets, all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7.  The Secured Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)    If any portion of the Assets consists of securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of a Majority of the Controlling Class, seek a no action position from the Securities and Exchange

Page 118

Commission or any other relevant federal or State regulatory authorities, regarding the legality of a public or private Sale of such Unregistered Securities.

(d)      The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Assets in connection with a Sale thereof.  In addition, the Trustee is hereby irrevocably appointed the agent and attorney in fact of the Issuer to transfer and convey its interest in any portion of the Assets in connection with a Sale thereof, and to take all action necessary to effect such Sale.  No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Monies.

**5.18    Action on the Notes**

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Assets or upon any of the assets of the Issuer or the Co-Issuer.

**6.       THE TRUSTEE**

**6.1     Certain Duties and Responsibilities**

(a)      Except during the continuance of an Event of Default:

(i)      the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; *provided* that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform to the requirements of this Indenture and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the Portfolio Manager, notify the party delivering the same if such certificate or opinion does not conform.  If a corrected form shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the Noteholders.

(b)      In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Majority of the Controlling Class, or such other percentage as permitted by this Indenture, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its

Page 119

exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

    (i)      this sub-Section shall not be construed to limit the effect of sub-Section (a) of this <u>Section 6.1</u>;

    (ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

    (iii)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer or the Portfolio Manager in accordance with this Indenture and/or a Majority (or such other percentage as may be required by the terms hereof) of the Controlling Class (or other Class if required or permitted by the terms hereof), relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

    (iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity satisfactory to it against such risk or liability is not reasonably assured to it unless such risk or liability relates to the performance of its ordinary services, including mailing of notices under <u>Article 5</u>, under this Indenture; and

    (v)      in no event shall the Trustee be liable for special, punitive, indirect or consequential loss or damage (including lost profits) even if the Trustee has been advised of the likelihood of such damages and regardless of such action.

(d)     For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in <u>Sections 5.1(c)</u>, <u>(d)</u>, <u>(e)</u>, or <u>(f)</u> unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and such notice references the Notes generally, the Issuer, the Co-Issuer, the Assets or this Indenture. For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or a Default, such reference shall be construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as described in this <u>Section 6.1</u>.

<div align="center">Page 120</div>

(e)     Upon the Trustee receiving written notice from the Portfolio Manager that an event constituting "Cause" as defined in the Portfolio Management Agreement has occurred, the Trustee shall, not later than three Business Days thereafter, notify the Noteholders (as their names appear in the Register).  In addition, the Trustee shall deliver all notices to the Noteholders forwarded to the Trustee by the Issuer or the Portfolio Manager for the purpose of delivery to the Noteholders.

(f)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.1.

**6.2     Notice of Default**

Promptly (and in no event later than three Business Days) after the occurrence of any Default actually known to a Trust Officer of the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall transmit in accordance with Sections 14.3 and 14.4 of this Indenture to the Portfolio Manager, S&P, and all Holders, as their names and addresses appear on the Register, and the Irish Listing Agent, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of all Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived.

**6.3     Certain Rights of Trustee**

Except as otherwise provided in Section 6.1:

(a)     the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)     whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's certificate or (ii) be required to determine the value of any Assets or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants (which may or may not be the Independent accountants selected by the Issuer pursuant to Section 10.8(a)), investment bankers or other persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

Page 121

(d)     as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)     the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders pursuant to this Indenture, unless such Holders shall have provided to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses (including reasonable attorneys' fees and expenses) and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)     the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document, but the Trustee, in its discretion, may, and upon the written direction of a Majority of the Controlling Class or of S&P shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Portfolio Manager, to examine the books and records relating to the Notes and the Assets, personally or by agent or attorney, during the Co-Issuers' or the Portfolio Manager's normal business hours; *provided* that the Trustee shall, and shall cause its agents to, hold in confidence all such information in accordance with Section 14.15 of this Indenture;

(g)     the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys; *provided* that the Trustee shall not be responsible for any misconduct or negligence on the part of any non-Affiliated agent appointed and supervised, or non-Affiliated attorney appointed, with due care by it hereunder;

(h)     the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably believes to be authorized or within its rights or powers hereunder;

(i)     nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, evaluate or verify or independently determine the accuracy of any report, certificate or information received from the Issuer or Portfolio Manager (unless and except to the extent otherwise expressly set forth herein);

(j)     to the extent any defined term hereunder, or any calculation required to be made or determined by the Trustee hereunder, is dependent upon or defined by reference to generally accepted accounting principles (as in effect in the United States) ("GAAP"), the Trustee shall be entitled to request and receive (and rely upon) instruction from the Issuer or a firm of nationally recognized accountants which may or may not be the Independent accountants selected by the Issuer pursuant to Section 10.8(a) (and in the absence of its receipt of timely instruction therefrom, shall be entitled to obtain from an independent

18750188.25.BUSINESS

accountant at the expense of the Issuer) as to the application of GAAP in such connection, in any instance;

(k)    the Trustee shall not be liable for the actions or omissions of the Portfolio Manager, the Issuer, the Co-Issuer, any Paying Agent (other than the Trustee) and without limiting the foregoing, the Trustee shall not be under any obligation to monitor, evaluate or verify compliance by the Portfolio Manager with the terms hereof or of the Portfolio Management Agreement, or to verify or independently determine the accuracy of information received by the Trustee from the Portfolio Manager (or from any selling institution, agent bank, trustee or similar source) with respect to the Collateral;

(l)    notwithstanding any term hereof (or any term of the UCC that might otherwise be construed to be applicable to a "securities intermediary" as defined in the UCC) to the contrary, none of the Trustee, the Custodian or the Securities Intermediary shall be under a duty or obligation in connection with the acquisition or Grant by the Issuer to the Trustee of any item constituting the Assets, or to evaluate the sufficiency of the documents or instruments delivered to it by or on behalf of the Issuer in connection with its Grant or otherwise, or in that regard to examine any Underlying Instrument, in each case, in order to determine compliance with applicable requirements of and restrictions on transfer in respect of such Assets;

(m)    in the event the Bank is also acting in the capacity of Paying Agent, Registrar, Transfer Agent, Custodian, Calculation Agent or Securities Intermediary, the rights, protections, benefits, immunities and indemnities afforded to the Trustee pursuant to this <u>Article 6</u> shall also be afforded to the Bank acting in such capacities;

(n)    any permissive right of the Trustee to take or refrain from taking actions enumerated in this Indenture shall not be construed as a duty;

(o)    to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise;

(p)    the Trustee shall not be deemed to have notice or knowledge of any matter unless a Trust Officer has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the Notes generally, the Issuer, the Co-Issuer or this Indenture. Whenever reference is made in this Indenture to a Default or an Event of Default such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to a Default or an Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph;

(q)    the Trustee shall not be responsible for delays or failures in performance resulting from acts beyond its control;

(r)    to help fight the funding of terrorism and money laundering activities, the Trustee will obtain, verify, and record information that identifies individuals or entities that establish a relationship or open an account with the Trustee. The Trustee will ask for the name,

<div align="center">Page 123</div>

18750188.25.BUSINESS

address, tax identification number and other information that will allow the Trustee to identify the individual or entity who is establishing the relationship or opening the account. The Trustee may also ask for formation documents such as articles of incorporation, an offering memorandum, or other identifying documents to be provided. In accordance with the U.S. Unlawful Internet Gambling Act (the "Gambling Act"), the Issuer may not use the Accounts or other facilities of the Bank in the United States to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y). Therefore, neither the Issuer nor any person who has an ownership interest in or control over the Accounts may use it to process or facilitate payments for prohibited internet gambling transactions. For more information about the Gambling Act, including the types of transactions that are prohibited, please refer to the following link: http://www.federalreserve.gov/newsevents/press/bcreg/20081112b.htm;

(s) to the extent not inconsistent herewith, the rights, protections and immunities afforded to the Trustee pursuant to this Indenture also shall be afforded to the Collateral Administrator;

(t) in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, in each case on an arm's-length basis, whether it or such Affiliate is acting as a subagent of the Trustee or for any third person or dealing as principal for its own account. If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments hereunder;

(u) the Trustee or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder, servicing agent, custodian or subcustodian with respect to certain of the Eligible Investments, (ii) using Affiliates to effect transactions in certain Eligible Investments and (iii) effecting transactions in certain Eligible Investments. Such compensation is not payable or reimbursable under Section 6.7;

(v) the Trustee shall have no duty (i) to see to any recording, filing, or depositing of this Indenture or any supplemental indenture or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording, filing or depositing or to any rerecording, refiling or redepositing of any thereof or (ii) to maintain any insurance; and

(w) the Trustee shall not be responsible for delays or failures in performance resulting from circumstances beyond its control (such circumstances include but are not limited to acts of God, strikes, lockouts, riots, acts of war, loss or malfunctions of utilities, computer (hardware or software) or communications services).

## 6.4 Not Responsible for Recitals or Issuance of Notes

The recitals contained herein and in the Notes (other than any Uncertificated Subordinated Notes), other than the Certificate of Authentication thereon, shall be taken as the statements of the Applicable Issuers; and the Trustee assumes no responsibility for their

Page 124

correctness. The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), the Assets or the Notes. The Trustee shall not be accountable for the use or application by the Co-Issuers of the Notes or the proceeds thereof or any Money paid to the Co-Issuers pursuant to the provisions hereof.

**6.5     May Hold Notes**

The Trustee, any Paying Agent, Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Registrar or such other agent.

**6.6     Money Held in Trust**

Money held by the Trustee hereunder shall be held in trust to the extent required herein. The Trustee shall be under no liability for interest on any Money received by it hereunder except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Bank in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

**6.7     Compensation and Reimbursement**

(a)     The Issuer agrees:

   (i)     to pay the Trustee on each Payment Date reasonable compensation, as set forth in a separate fee schedule, for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

   (ii)     except as otherwise expressly provided herein, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture or other Transaction Document (including, without limitation, securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 6.3(c) or 10.8, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith) but with respect to securities transaction charges, only to the extent any such charges have not been waived during a Collection Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Portfolio Manager;

   (iii)     to indemnify the Trustee and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in

Page 125

connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves (including reasonable attorney's fees and costs) against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder and under any other agreement or instrument related hereto; and

(iv) to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.13.

(b) The Trustee shall receive amounts pursuant to this Section 6.7 and any other amounts payable to it under this Indenture only as provided in Sections 11.1(a)(i), (ii) and (iii) and only to the extent that funds are available for the payment thereof. Subject to Section 6.9, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder; *provided* that nothing herein shall impair or affect the Trustee's rights under Section 6.9. No direction by the Noteholders shall affect the right of the Trustee to collect amounts owed to it under this Indenture. If on any date when a fee shall be payable to the Trustee pursuant to this Indenture insufficient funds are available for the payment thereof, any portion of a fee not so paid shall be deferred and payable on such later date on which a fee shall be payable and sufficient funds are available therefor.

(c) The Trustee hereby agrees not to cause the filing against the Issuer or the Co-Issuer of a petition in bankruptcy for the non-payment to the Trustee of any amounts provided by this Section 6.7 until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes (and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer) issued under this Indenture.

(d) The Issuer's payment obligations to the Trustee under this Section 6.7 shall be secured by the lien of this Indenture, and shall survive the discharge of this Indenture and the resignation or removal of the Trustee. When the Trustee incurs expenses after the occurrence of a Default or an Event of Default under Section 5.1(e) or (f), the expenses are intended to constitute expenses of administration under the Bankruptcy Code or any other applicable federal or state bankruptcy, insolvency or similar law.

## 6.8    Corporate Trustee Required; Eligibility

There shall at all times be a Trustee hereunder which shall be an Independent organization or entity organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state authority, having a rating of at least "BBB+" (long-term) by S&P and having an office within the United States. If such organization or entity publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.8, the combined capital and surplus

Page 126

of such organization or entity shall be deemed to be its combined capital and surplus as set forth in its most recent published report of condition. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this <u>Section 6.8</u>, it shall resign immediately in the manner and with the effect hereinafter specified in this <u>Article 6</u>.

**6.9    Resignation and Removal; Appointment of Successor**

(a)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this <u>Article 6</u> shall become effective until the acceptance of appointment by the successor Trustee under <u>Section 6.10</u>.

(b)    The Trustee may resign at any time by giving not less than 30 days' written notice thereof to the Co-Issuers, the Portfolio Manager, the Holders of the Notes and S&P. Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor trustee or trustees satisfying the requirements of <u>Section 6.8</u> by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor Trustee or Trustees, together with a copy to each Holder and the Portfolio Manager; *provided* that such successor Trustee shall be appointed only upon the written consent of a Majority of the Secured Notes of each Class or, at any time when an Event of Default shall have occurred and be continuing or when a successor Trustee has been appointed pursuant to <u>Section 6.9(e)</u>, by an Act of a Majority of the Controlling Class. If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee or any Holder, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee satisfying the requirements of <u>Section 6.8</u>.

(c)    The Trustee may be removed at any time by (i) an Act of a Majority of each Class of Secured Notes (for which purpose, the Class A Notes will constitute and vote together as a single Class, the Class B Notes will constitute and vote together as a single Class, the Class C Notes will constitute and vote together as a single Class, the Class D Notes will constitute and vote together as a single Class, the Class E Notes will constitute and vote together as a single Class and the Class F Notes will constitute and vote together as a single Class), (ii) at any time when a Trustee Rating Event shall have occurred and be continuing, an Act of a Majority of any Class of Secured Notes or (iii) at any time when an Event of Default shall have occurred and be continuing, an act of a Majority of the Controlling Class, in each case, delivered to the Trustee and to the Co-Issuers.

(d)    If at any time:

(i)    the Trustee shall cease to be eligible under <u>Section 6.8</u> and shall fail to resign after written request therefor by the Co-Issuers or by any Holder; or

(ii)    the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be

Page 127

appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation;

then, in any such case (subject to <u>Section 6.9(a)</u>), (A) the Co-Issuers, by Issuer Order, may remove the Trustee, or (B) subject to <u>Section 5.15</u>, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason (other than resignation), the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee.  If the Co-Issuers shall fail to appoint a successor Trustee within 60 days after such resignation, removal or incapability or the occurrence of such vacancy, a successor Trustee may be appointed by a Majority of the Controlling Class by written instrument delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers.  If no successor Trustee shall have been so appointed by the Co-Issuers or a Majority of the Controlling Class and shall have accepted appointment in the manner hereinafter provided, subject to <u>Section 5.15</u>, any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to the Portfolio Manager, to S&P and to the Holders of the Notes as their names and addresses appear in the Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.  If the Co-Issuers fail to mail such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

(g)     If the Bank shall resign or be removed as Trustee, the Bank shall also resign or be removed as Custodian, Paying Agent, Calculation Agent, Registrar and any other capacity in which the Bank is then acting pursuant to this Indenture or any other Transaction Document.

(h)     If at any time a Trustee Rating Event shall have occurred and be continuing, the Trustee shall give notice thereof to S&P, the Portfolio Manager and each Noteholder.

**6.10     Acceptance of Appointment by Successor**

Every successor Trustee appointed hereunder shall meet the requirements of <u>Section 6.8</u>, shall not be the subject to a Trustee Rating Event and shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment.  Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on

Page 128

18750188.25.BUSINESS

request of the Co-Issuers or a Majority of any Class of Secured Notes or the successor Trustee, such retiring Trustee shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and Money held by such retiring Trustee hereunder. Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

### 6.11 Merger, Conversion, Consolidation or Succession to Business of Trustee

Any organization or entity into which the Trustee may be merged or converted or with which it may be consolidated, or any organization or entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any organization or entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, *provided* that such organization or entity shall be otherwise qualified and eligible under this Article 6, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any of the Notes has been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

### 6.12 Co-Trustees

At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Assets may at the time be located, the Co-Issuers and the Trustee shall have power to appoint one or more Persons to act as co-trustee (subject to the written approval of S&P), jointly with the Trustee, of all or any part of the Assets, with the power to file such proofs of claim and take such other actions pursuant to Section 5.6 herein and to make such claims and enforce such rights of action on behalf of the Holders, as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.12.

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee. If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have the power to make such appointment.

Should any written instrument from the Co-Issuers be required by any co-trustee so appointed, more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers. The Co-Issuers agree to pay as Administrative Expenses, to the extent funds are available therefor under the Priority of Payments, for any reasonable fees and expenses in connection with such appointment.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

Page 129

(a)     the Notes shall be authenticated and delivered, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised, solely by the Trustee;

(b)     the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly as shall be provided in the instrument appointing such co-trustee;

(c)     the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.12, and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.12;

(d)     no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee hereunder;

(e)     the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

(f)     any Act of Holders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

The Issuer shall notify S&P of the appointment of a co-trustee hereunder.

**6.13     Certain Duties of Trustee Related to Delayed Payment of Proceeds**

In the event that the Trustee shall not have received a payment with respect to any Asset on its Due Date, (a) the Trustee shall promptly notify the Issuer and the Portfolio Manager in writing or electronically and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if any) after such notice (x) such payment shall have been received by the Trustee or (y) the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2(a)), shall have made provision for such payment satisfactory to the Trustee in accordance with Section 10.2(a), the Trustee shall, not later than the Business Day immediately following the last day of such period and in any case upon request by the Portfolio Manager, request the issuer of such Asset, the trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment not later than three Business Days after the date of such request. In the event that such payment is not made within such time period, the Trustee, subject to the provisions of clause (iv) of Section 6.1(c), shall take such action as the Portfolio Manager shall direct. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. In the event that the Issuer or the Portfolio Manager requests a release of an Asset and/or delivers an additional Collateral Obligation in connection with any such action under the Portfolio Management Agreement, such release and/or substitution shall be subject to Section 10.7 and

Page 130

Article 12, as the case may be. Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Asset or any additional Collateral Obligation received after the Due Date thereof to the extent the Issuer previously made provisions for such payment satisfactory to the Trustee in accordance with this Section 6.13 and such payment shall not be deemed part of the Assets.

**6.14    Authenticating Agents**

Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with issuance, transfers and exchanges under Sections 2.4, 2.5, 2.6 and 8.5, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by such Sections to authenticate such Notes. For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.14 shall be deemed to be the authentication of Notes by the Trustee.

Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers. Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers.

Unless the Authenticating Agent is also the same entity as the Trustee, the Issuer agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto as an Administrative Expense. The provisions of Sections 2.8, 6.4 and 6.5 shall be applicable to any Authenticating Agent.

**6.15    Withholding**

If any withholding Tax is imposed on the Issuer's payment (or allocations of income) under the Notes by law or pursuant to the Issuer's agreement with a governmental authority, such Tax shall reduce the amount otherwise distributable to the relevant Holder. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Holder sufficient funds for the payment of any Tax that is legally owed or required to be withheld by the Issuer by law or pursuant to the Issuer's agreement with a governmental authority (but such authorization shall not prevent the Trustee from contesting any such Tax in appropriate proceedings and withholding payment of such Tax, if permitted by law, pending the outcome of such proceedings) and to timely remit such amounts to the appropriate taxing

Page 131

authority.  The amount of any withholding Tax imposed by law or pursuant to the Issuer's agreement with a governmental authority with respect to any Note shall be treated as Cash distributed to the relevant Holder at the time it is withheld by the Trustee.  If there is a possibility that withholding Tax is payable with respect to a distribution, the Paying Agent or the Trustee may, in its sole discretion, withhold such amounts in accordance with this Section 6.15.  If any Holder or beneficial owner wishes to apply for a refund of any such withholding Tax, the Trustee shall reasonably cooperate with such Person in providing readily available information so long as such Person agrees to reimburse the Trustee for any out-of-pocket expenses incurred.  Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any Tax or withholding obligation on the part of the Issuer or in respect of the Notes.

### 6.16   Representative for Secured Noteholders Only; Agent for each other Secured Party and the Holders of the Subordinated Notes

With respect to the security interest created hereunder, the delivery of any Asset to the Trustee is to the Trustee as representative of the Secured Noteholders and agent for each other Secured Party and the Holders of the Subordinated Notes.  In furtherance of the foregoing, the possession by the Trustee of any Asset, the endorsement to or registration in the name of the Trustee of any Asset (including without limitation as entitlement holder of the Custodial Account) are all undertaken by the Trustee in its capacity as representative of the Secured Noteholders, and agent for each other Secured Party and the Holders of the Subordinated Notes.

### 6.17   Representations and Warranties of the Bank

The Bank hereby represents and warrants as follows:

(a)   **Organization.**  The Bank has been duly organized and is validly existing as a national banking association with trust powers under the laws of the United States and has the power to conduct its business and affairs as a trustee, paying agent, registrar, transfer agent, custodian, calculation agent and securities intermediary.

(b)   **Authorization; Binding Obligations.**  The Bank has the corporate power and authority to perform the duties and obligations of Trustee, Paying Agent, Registrar, Transfer Agent, Custodian, Calculation Agent and Securities Intermediary under this Indenture.  The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant hereto.  This Indenture has been duly authorized, executed and delivered by the Bank and constitutes the legal, valid and binding obligation of the Bank enforceable in accordance with its terms subject, as to enforcement, (i) to the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights as such laws would apply in the event of any bankruptcy, receivership, insolvency or similar event applicable to the Bank and (ii) to general equitable principles (whether enforcement is considered in a proceeding at law or in equity).

(c)   **Eligibility.**  The Bank is eligible under Section 6.8 to serve as Trustee hereunder.

Page 132

(d)    **No Conflict.** Neither the execution, delivery and performance of this Indenture, nor the consummation of the transactions contemplated by this Indenture, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets, or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any material agreement to which the Bank is a party or by which it or any of its property is bound which would have a material adverse effect on its ability to perform its obligations hereunder.

**6.18    Notices Relating to the Portfolio Manager**

The Trustee shall deliver any notice to the Portfolio Manager, the Issuer, S&P, any Holders of the Notes or any other party as may be requested by the Issuer by Issuer Order in connection with any resignation, replacement or removal of the Portfolio Manager pursuant to the Portfolio Management Agreement or any amendment of the Portfolio Management Agreement.

**7.    COVENANTS**

**7.1    Payment of Principal and Interest**

The Applicable Issuers will duly and punctually pay the principal of and interest on the Secured Notes, in accordance with the terms of such Notes and this Indenture pursuant to the Priority of Payments. The Issuer will, to the extent funds are available pursuant to the Priority of Payments, duly and punctually pay all required distributions on the Subordinated Notes, in accordance with the Subordinated Notes and this Indenture.

The Issuer shall, subject to the Priority of Payments, reimburse the Co-Issuer for any amounts paid by the Co-Issuer pursuant to the terms of the Notes or this Indenture. The Co-Issuer shall not reimburse the Issuer for any amounts paid by the Issuer pursuant to the terms of the Notes or this Indenture.

Amounts properly withheld under the Code or other applicable law or pursuant to the Issuer's agreement with a governmental authority by any Person from a payment under a Note shall be considered as having been paid by the Issuer to the relevant Holder for all purposes of this Indenture.

**7.2    Maintenance of Office or Agency**

The Co-Issuers hereby appoint the Trustee as a Paying Agent for payments on the Notes and the Co-Issuers hereby appoint the Trustee at its applicable Corporate Trust Office, as the Co-Issuers' agent where Notes may be surrendered for registration of transfer or exchange. The Co-Issuers may at any time and from time to time appoint additional paying agents; *provided* that no paying agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding Tax solely as a result of such Paying Agent's activities. If at any time the Co-Issuers shall fail to maintain the appointment of a paying agent, or shall fail to furnish the

18750188.25.BUSINESS

Trustee with the address thereof, presentations and surrenders may be made (subject to the limitations described in the preceding sentence), and Notes may be presented and surrendered for payment, to the Trustee at its main office.

The Co-Issuers hereby appoint Corporation Service Company (the "Process Agent"), as their agent upon whom process or demands may be served in any action arising out of or based on this Indenture or the transactions contemplated hereby. The Co-Issuers may at any time and from time to time vary or terminate the appointment of such process agent or appoint an additional process agent; *provided* that the Co-Issuers will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Co-Issuers in respect of such Notes and this Indenture may be served. If at any time the Co-Issuers shall fail to maintain any required office or agency in the Borough of Manhattan, The City of New York, or shall fail to furnish the Trustee with the address thereof, notices and demands may be served on the Issuer or the Co-Issuer by mailing a copy thereof by registered or certified mail or by overnight courier, postage prepaid, to the Issuer or the Co-Issuer, respectively, at its address specified in Section 14.3 for notices.

The Co-Issuers shall at all times maintain a duplicate copy of the Register at the Corporate Trust Office. The Co-Issuers shall give prompt written notice to the Trustee, S&P and the Holders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

**7.3    Money for Note Payments to be Held in Trust**

All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Issuer by the Trustee or a Paying Agent with respect to payments on the Notes.

When the Applicable Issuers shall have a Paying Agent that is not also the Registrar, they shall furnish, or cause the Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and (other than in the case of Uncertificated Subordinated Notes) of the certificate numbers of individual Notes held by each such Holder.

Whenever the Applicable Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date and any Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date or such Redemption Date, as the case may be, with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Payment Account), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Applicable Issuers shall promptly notify the Trustee of its action or failure so to act. Any Monies deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with Article 10.

18750188.25.BUSINESS

The initial Paying Agent shall be as set forth in Section 7.2. Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee; *provided* that so long as the Notes of any Class are rated by a Rating Agency, with respect to any additional or successor Paying Agent, such Paying Agent has (i) a long-term debt rating of "A+" or higher by S&P or (ii) a short-term debt rating of "A-1" by S&P and a long-term debt rating of "A" or higher by S&P. If such successor Paying Agent ceases to be so rated, the Co-Issuers shall promptly remove such Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.3, that such Paying Agent will:

(a) allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and any Redemption Date among such Holders in the proportion specified in the applicable Distribution Report to the extent permitted by applicable law;

(b) hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(c) if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

(d) if such Paying Agent is not the Trustee, immediately give the Trustee notice of any default by the Issuer or the Co-Issuer (or any other obligor upon the Notes) in the making of any payment required to be made; and

(e) if such Paying Agent is not the Trustee, during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such Money.

Except as otherwise required by applicable law, any Money deposited with the Trustee or any Paying Agent in trust for any payment on any Note and remaining unclaimed for two years

Page 135

after such amount has become due and payable shall be paid to the Applicable Issuers on Issuer Order; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Applicable Issuers for payment of such amounts (but only to the extent of the amounts so paid to the Applicable Issuers) and all liability of the Trustee or such Paying Agent with respect to such trust Money shall thereupon cease. The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Applicable Issuers any reasonable means of notification of such release of payment, including, but not limited to, mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in Monies due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

## 7.4    Existence of Co-Issuers

(a)    The Issuer and the Co-Issuer shall, to the maximum extent permitted by applicable law, maintain in full force and effect their existence and rights as companies incorporated or organized under the laws of the Cayman Islands and the State of Delaware, respectively, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes, or any of the Assets; *provided* that (x) the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer so long as (i) the Issuer has received a legal opinion (upon which the Trustee may conclusively rely) to the effect that such change is not disadvantageous in any material respect to the Holders, (ii) written notice of such change shall have been given by the Trustee to the Holders, the Portfolio Manager and S&P and (iii) on or prior to the 15th Business Day following receipt of such notice the Trustee shall not have received written notice from a Majority of the Controlling Class objecting to such change; and (y) the Issuer shall be entitled to take any action required by this Indenture within the United States notwithstanding any provision of this Indenture requiring the Issuer to take such action outside of the United States so long as prior to taking any such action the Issuer receives an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that it is not necessary to take such action outside of the United States or any political subdivision thereof in order to prevent the Issuer from becoming subject to U.S. federal, state or local income taxes on a net income basis or any material other Taxes to which the Issuer would not otherwise be subject.

(b)    The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors' and shareholders', or other similar, meetings) are followed. Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding. Without limiting the foregoing, (i) the Issuer shall not have any subsidiaries (except as permitted hereunder), (ii) the Co-Issuer shall not have any subsidiaries and (iii) except to the extent contemplated in the Administration Agreement or the Issuer's

Page 136

declaration of trust by MaplesFS Limited, (x) the Issuer and the Co-Issuer shall not (A) have any employees (other than their respective directors), (B) except as contemplated by the Portfolio Management Agreement, the Memorandum and Articles or the Administration Agreement, engage in any transaction with any shareholder that would constitute a conflict of interest or (C) pay dividends other than in accordance with the terms of this Indenture and the Memorandum and Articles and (y) the Issuer shall (A) maintain books and records separate from any other Person, (B) maintain its accounts separate from those of any other Person, (C) not commingle its assets with those of any other Person, (D) conduct its own business in its own name, (E) maintain separate financial statements, (F) pay its own liabilities out of its own funds, (G) maintain an arm's length relationship with its Affiliates, (H) use separate stationery, invoices and checks, (I) hold itself out as a separate Person and (J) correct any known misunderstanding regarding its separate identity.

**7.5** **Protection of Assets**

(a) The Issuer (or the Portfolio Manager on behalf of the Issuer) will cause the taking of such action (in the case of the Portfolio Manager, limited to those actions within the Portfolio Manager's control) as is reasonably necessary in order to maintain the perfection and priority of the security interest of the Trustee in the Assets; *provided* that the Issuer (or the Portfolio Manager on its behalf) shall be entitled to rely on any Opinion of Counsel delivered pursuant to Section 7.6 and any Opinion of Counsel with respect to the same subject matter delivered pursuant to Section 3.1(a)(iii) and (iv) to determine what actions are reasonably necessary, and shall be fully protected in so relying on such an Opinion of Counsel, unless the Issuer (or the Portfolio Manager on its behalf) has actual knowledge that the procedures described in any such Opinion of Counsel are no longer adequate to maintain such perfection and priority. The Issuer shall from time to time execute and deliver all such supplements and amendments hereto and file or authorize the filing of all such Financing Statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Holders of the Secured Notes hereunder and to:

(i) Grant more effectively all or any portion of the Assets;

(ii) maintain, preserve and perfect any Grant made or to be made by this Indenture including, without limitation, the first priority nature of the lien or carry out more effectively the purposes hereof;

(iii) perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations);

(iv) enforce any of the Assets or other instruments or property included in the Assets;

Page 137

(v)     preserve and defend title to the Assets and the rights therein of the Trustee and the Holders of the Secured Notes in the Assets against the claims of all Persons and parties; or

(vi)     pay or cause to be paid any and all Taxes levied or assessed upon all or any part of the Assets.

The Issuer hereby designates the Trustee as its agent and attorney in fact to prepare and file any Financing Statement, continuation statement and all other instruments, and take all other actions, required pursuant to this Section 7.5. Such designation shall not impose upon the Trustee, or release or diminish, the Issuer's and the Portfolio Manager's obligations under this Section 7.5. The Issuer further authorizes and shall cause the Issuer's United States counsel to file without the Issuer's signature a Financing Statement that names the Issuer as debtor and the Trustee, on behalf of the Secured Parties, as secured party and that describes "all personal property of the Debtor now owned or hereafter acquired, other than 'Excepted Property'" (and that defines "Excepted Property" in accordance with its definition herein) as the Assets in which the Trustee has a Grant.

(b)     The Trustee shall not, except in accordance with Section 5.5 or Section 10.7(a), (b) and (c), as applicable, permit the removal of any portion of the Assets or transfer any such Assets from the Account to which it is credited, or cause or permit any change in the Delivery made pursuant to Section 3.3 with respect to any Assets, if, after giving effect thereto, the jurisdiction governing the perfection of the Trustee's security interest in such Assets is different from the jurisdiction governing the perfection at the time of delivery of the most recent Opinion of Counsel pursuant to Section 7.6 (or, if no Opinion of Counsel has yet been delivered pursuant to Section 7.6, the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1(a)(iii)) unless the Trustee shall have received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property and the priority thereof will continue to be maintained after giving effect to such action or actions.

## 7.6    Opinions as to Assets

On or before February 25 in each calendar year, commencing in 2015, the Issuer shall furnish to the Trustee and S&P an Opinion of Counsel relating to the security interest granted by the Issuer to the Trustee, stating that, as for the date of such opinion, the lien and security interest created by this Indenture with respect to the Assets remain in effect and that no further action (other than as specified in such opinion) needs to be taken to ensure the continued effectiveness of such lien over the next year.

## 7.7    Performance of Obligations

(a)     The Co-Issuers, each as to itself, shall not take any action, and will use their best efforts not to permit any action to be taken by others, that would release any Person from any of such Person's covenants or obligations under any instrument included in the Assets, except in the case of enforcement action taken with respect to any Defaulted Obligation

Page 138

in accordance with the provisions hereof and actions by the Portfolio Manager under the Portfolio Management Agreement and in conformity with this Indenture or as otherwise required hereby.

(b)     The Applicable Issuers may, with the prior written consent of a Majority of each Class of Secured Notes (except in the case of the Portfolio Management Agreement and the Collateral Administration Agreement, in which case no consent shall be required), contract with other Persons, including the Portfolio Manager, the Trustee and the Collateral Administrator for the performance of actions and obligations to be performed by the Applicable Issuers hereunder and under the Portfolio Management Agreement by such Persons.   Notwithstanding any such arrangement, the Applicable Issuers shall remain primarily liable with respect thereto.   In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Applicable Issuers; and the Applicable Issuers will punctually perform, and use their best efforts to cause the Portfolio Manager, the Trustee, the Collateral Administrator and such other Person to perform, all of their obligations and agreements contained in the Portfolio Management Agreement, this Indenture, the Collateral Administration Agreement or any such other agreement.

(c)     The Issuer shall notify S&P within 10 Business Days after any material breach of any Transaction Document, following any applicable cure period for such breach.

## 7.8    Negative Covenants

(a)     The Issuer will not and, with respect to clauses (ii), (iii), (iv), (vi), (vii), (viii), (ix), (x) and (xiii) the Co-Issuer will not, in each case from and after the Closing Date:

  (i)     sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Assets, or engage in any business with respect to any party of the Assets, in each case, except as expressly permitted by this Indenture and the Portfolio Management Agreement;

  (ii)    claim any credit on, make any deduction from, or dispute the enforceability of payment of the principal or interest payable (or any other amount) in respect of the Notes (other than amounts withheld or deducted in accordance with the Code or any applicable laws of the Cayman Islands or other applicable jurisdiction);

  (iii)   (A) incur or assume or guarantee any indebtedness, other than the Notes, this Indenture and the transactions contemplated hereby, or (B)(1) issue any additional class of securities except in accordance with Section 2.13 and 3.2 or (2) issue any additional shares or membership interests, as applicable;

  (iv)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from

Page 139

any covenants or obligations with respect to this Indenture or the Notes except as may be permitted hereby or by the Portfolio Management Agreement, (B) except as permitted by this Indenture, permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden any part of the Assets, any interest therein or the proceeds thereof, or (C) except as permitted by this Indenture, take any action that would permit the lien of this Indenture not to constitute a valid first priority security interest in the Assets;

(v)     amend the Portfolio Management Agreement except pursuant to the terms thereof and Article 15;

(vi)    dissolve or liquidate in whole or in part, except as permitted hereunder or required by applicable law;

(vii)   other than as otherwise expressly provided herein, pay any distributions other than in accordance with the Priority of Payments;

(viii)  permit the formation of any subsidiaries (other than the Co-Issuer, if applicable, and any Tax Subsidiaries);

(ix)    conduct business under any name other than its own;

(x)     have any employees (other than directors to the extent they are employees);

(xi)    operate so as to become subject to U.S. federal income taxes on its net income or subject to income tax on a net income basis in any other jurisdiction; and

(xii)   acquire or hold title to any real property or a controlling interest in any entity that holds title to real property; and

(xiii)  enter into any interest rate swap, floor and/or cap agreements, including, without limitation, one or more interest rate basis swap agreements.

(b)    The Co-Issuer will not invest any of its assets in "securities" as such term is defined in the Investment Company Act, and will keep all of its assets in Cash.

(c)    Notwithstanding anything to the contrary contained herein, the Issuer shall not, and shall use its commercially reasonable efforts to ensure that the Portfolio Manager acting on the Issuer's behalf does not, acquire or own any asset, conduct any activity or take any action unless the acquisition or ownership of such asset, the conduct of such activity or the taking of such action, as the case may be, would not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net income basis or income tax on a net income basis in any other jurisdiction.

Page 140

(d)    The Issuer and the Co-Issuer shall not be party to any agreements without including customary "non-petition" and "limited recourse" provisions therein (and shall not amend or eliminate such provisions in any agreement to which it is party), except for any agreements related to the purchase and sale of any Collateral Obligations or Eligible Investments which contain customary (as determined by the Portfolio Manager in its sole discretion) purchase or sale terms or which are documented using customary (as determined by the Portfolio Manager in its sole discretion) loan trading documentation.

(e)    The Issuer shall not enter into any agreement amending, modifying or terminating any Transaction Document without notifying S&P.

(f)    The Issuer may not acquire or conduct acquisitions of any of the Notes (including any Notes surrendered or abandoned). This Section 7.8(f) shall not be deemed to limit an optional or mandatory redemption pursuant to the terms of this Indenture.

(g)    The Issuer shall not fail to maintain an independent director of the Co-Issuer under the Co-Issuer's organizational documents.

(h)    The Issuer shall not transfer its stock interest in the Co-Issuer so long as any Secured Notes are Outstanding and the Co-Issuer shall not permit the transfer of its capital stocks so long as any Secured Notes are Outstanding.

(i)    So long as any Notes are Outstanding, the Co-Issuer shall not elect to be taxable for U.S. federal income tax purposes as other than a disregarded entity.

(j)    In furtherance and not in limitation of Section 7.8(c), notwithstanding anything to the contrary contained herein, the Issuer shall comply with all of the provisions set forth in Schedule 1 to the Portfolio Management Agreement, unless, with respect to a particular transaction, the Portfolio Manager (on behalf of the Issuer) shall have received written advice from Dechert LLP or an opinion of other tax counsel of nationally recognized standing in the United States experienced in such matters, to the effect that the Issuer's contemplated activities will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net income basis. The provisions set forth in Schedule 1 to the Portfolio Management Agreement may be waived, amended, eliminated, modified or supplemented (without execution of an amendment to the Portfolio Management Agreement) if the Portfolio Manager (on behalf of the Issuer) shall have received written advice of Dechert LLP or an opinion of other tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that the Issuer's contemplated activities shall not (A) result in the Issuer becoming subject to U.S. federal income taxation with respect to its net income, (B) result in the Issuer being treated as being engaged in a trade or business within the United States or (C) have a material adverse effect on the tax treatment of the Issuer or the tax consequences to the Holders of any Class of Notes Outstanding at the time of issuance, as described in the Offering Circular under the heading "U.S. Federal Income Tax Considerations— U.S. Federal Income Tax Treatment of the Issuer." For the avoidance

Page 141

of doubt, in the event the written advice of Dechert LLP or opinion of other tax counsel as described above has been obtained in accordance with the terms hereof, no consent of any Holder or S&P Rating Condition shall be required in order to comply with this Section 7.8(j) in connection with the waiver, amendment, elimination, modification or supplementation of any provision of the Trading Restrictions contemplated by such opinion of tax counsel.

(k)  The Co-Issuer shall not engage in any business activity other than issuing and selling the Secured Notes and any additional secured notes issued pursuant to this Indenture and other activities incidental thereto, including entering into the Transaction Documents to which it is a party.

## 7.9  Statement as to Compliance

On or before February 25 in each calendar year commencing in 2015, or immediately if there has been a Default under this Indenture and prior to the issuance of any additional notes pursuant to Section 2.13, the Issuer shall deliver to the Trustee and the Administrator (to be forwarded by the Trustee or the Administrator, as applicable, to the Portfolio Manager, each Noteholder making a written request therefor and S&P) an Officer's certificate of the Issuer that, having made reasonable inquiries of the Portfolio Manager, and to the best of the knowledge, information and belief of the Issuer, there did not exist, as at a date not more than five days prior to the date of the certificate, nor had there existed at any time prior thereto since the date of the last certificate (if any), any Default hereunder or, if such Default did then exist or had existed, specifying the same and the nature and status thereof, including actions undertaken to remedy the same, and that the Issuer has complied with all of its obligations under this Indenture or, if such is not the case, specifying those obligations with which it has not complied.

## 7.10  Co-Issuers May Consolidate, etc., Only on Certain Terms

Neither the Issuer nor the Co-Issuer (the "Merging Entity") shall consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law (in the case of the Issuer) or United States and Delaware law (in the case of the Co-Issuer) and unless:

(a)  the Merging Entity shall be the surviving corporation, or the Person (if other than the Merging Entity) formed by such consolidation or into which the Merging Entity is merged or to which all or substantially all of the assets of the Merging Entity are transferred (the "Successor Entity") (A) if the Merging Entity is the Issuer, shall be a company incorporated and existing under the laws of the Cayman Islands or such other jurisdiction approved by a Majority of the Controlling Class (*provided* that no such approval shall be required in connection with any such transaction undertaken solely to effect a change in the jurisdiction of incorporation pursuant to Section 7.4), and (B) in any case shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee and each Holder, the due and punctual payment of the principal of and interest on all Secured Notes and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided herein;

Page 142

(b)     S&P shall have been notified in writing of such consolidation or merger and the Trustee shall have received written confirmation from S&P, in its discretion, that its ratings issued with respect to the Secured Notes then rated by S&P will not be reduced or withdrawn as a result of the consummation of such transaction;

(c)     if the Merging Entity is not the Successor Entity, the Successor Entity shall have agreed with the Trustee (i) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Merging Entity with respect to its Affiliates and (ii) not to consolidate or merge with or into any other Person or transfer or convey the Assets or all or substantially all of its assets to any other Person except in accordance with the provisions of this Section 7.10;

(d)     if the Merging Entity is not the Successor Entity, the Successor Entity shall have delivered to the Trustee and S&P an Officer's certificate and an Opinion of Counsel each stating that such Person is duly organized, validly existing and in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in sub-Section (a) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); if the Merging Entity is the Issuer, that, immediately following the event which causes such Successor Entity to become the successor to the Issuer, (i) such Successor Entity has title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Assets securing all of the Secured Notes, (ii) the Trustee continues to have a valid perfected first priority security interest in the Assets securing all of the Secured Notes and (iii) such Successor Entity will not be subject to U.S. net income tax or subject to income tax on a net income basis in any other jurisdiction; and in each case as to such other matters as the Trustee or any Noteholder may reasonably require;

(e)     immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(f)     the Merging Entity shall have notified S&P of such consolidation, merger, transfer or conveyance and shall have delivered to the Trustee and each Noteholder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 relating to such transaction have been complied with and that such transaction will not (1) result in the Merging Entity and Successor Entity becoming subject to net income taxation in any jurisdiction, (2) result in the Merging Entity and Successor Entity being treated as being engaged in a trade or

Page 143

business within the United States or (3) have a material adverse effect on the tax treatment of the Issuer or the tax consequences to the Holders or beneficial owners of any Class of Notes Outstanding at the time of issuance, as described in the Offering Circular under the heading "U.S Federal Income Taxation Considerations," unless the Holders agree by unanimous consent that no adverse tax consequences will result therefrom to any of the Merging Entity, Successor Entity and Holders of the Notes (as compared to the tax consequences of not effecting the transaction);

(g)     the Merging Entity shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, neither of the Co-Issuers (or, if applicable, the Successor Entity) will be required to register as an investment company under the Investment Company Act; and

(h)     after giving effect to such transaction, the outstanding stock of the Merging Entity (or, if applicable, the Successor Entity) will not be beneficially owned within the meaning of the Investment Company Act by any U.S. Person.

**7.11    Successor Substituted**

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with Section 7.10 in which the Merging Entity is not the surviving corporation, the Successor Entity shall succeed to, and be substituted for, and may exercise every right and power of, the Merging Entity under this Indenture with the same effect as if such Person had been named as the Issuer or the Co-Issuer, as the case may be, herein.   In the event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this Article 7 may be dissolved, wound up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

**7.12    Maintenance of Listing**

So long as any Listed Notes remain Outstanding, the Co-Issuers shall use all reasonable efforts to maintain the listing of such Notes on the Irish Stock Exchange.

**7.13    Annual Rating Review**

(a)     So long as any of the Secured Notes of any Class remain Outstanding, on or before February 25 in each year commencing in 2015, the Applicable Issuers shall obtain and pay for an annual review of the rating of each such Class of Secured Notes from S&P. The Applicable Issuers shall promptly notify the Trustee and the Portfolio Manager in writing (and the Trustee shall promptly provide the Holders with a copy of such notice) if at any time the rating of any such Class of Secured Notes has been, or is known will be, changed or withdrawn.

Page 144

(b)     The Issuer shall obtain and pay for an annual review of any Collateral Obligation which has a S&P Rating derived as set forth in clause (iii)(b) of the part of the definition of the term "S&P Rating".

**7.14    Reporting**

At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or beneficial owner of a Note, the Co-Issuers shall promptly furnish or cause to be furnished Rule 144A Information to such Holder or beneficial owner, to a prospective purchaser of such Note designated by such Holder or beneficial owner, or to the Trustee for delivery to such Holder or beneficial owner or a prospective purchaser designated by such Holder or beneficial owner, as the case may be, in order to permit compliance by such Holder or beneficial owner with Rule 144A under the Securities Act in connection with the resale of such Note. "Rule 144A Information" shall be such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

**7.15    Calculation Agent**

(a)     The Issuer hereby agrees that for so long as any Secured Notes remain Outstanding there will at all times be an agent appointed (which does not control or is not controlled or under common control with the Issuer or its Affiliates or the Portfolio Manager or its Affiliates) to calculate the Base Rate in respect of each Interest Accrual Period (the "Calculation Agent"), which calculation shall be performed in accordance with the terms of Exhibit G hereto so long as LIBOR is the Base Rate. The Issuer hereby appoints the Collateral Administrator as Calculation Agent. The Calculation Agent may be removed by the Issuer or the Portfolio Manager, on behalf of the Issuer, at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer or the Portfolio Manager, on behalf of the Issuer, or if the Calculation Agent fails to determine any of the information required to be published on the Irish Stock Exchange, as described in sub-Section (b), in respect of any Interest Accrual Period, the Issuer or the Portfolio Manager, on behalf of the Issuer, will promptly appoint a replacement Calculation Agent which does not control or is not controlled by or under common control with the Issuer or its Affiliates or the Portfolio Manager or its Affiliates. The Calculation Agent may not resign its duties or be removed without a successor having been duly appointed.

(b)     The Calculation Agent shall be required to agree (and the Collateral Administrator as Calculation Agent does hereby agree) that, as soon as possible after 11:00 a.m. London time on each Interest Determination Date, but in no event later than 11:00 a.m. New York time on the London Banking Day immediately following each Interest Determination Date, the Calculation Agent will calculate the Interest Rate applicable to each Class of Secured Notes during the related Interest Accrual Period and the Note Interest Amount (in each case, rounded to the nearest cent, with half a cent being rounded upward) payable on the related Payment Date in respect of such Class of Secured Notes in respect of the related Interest Accrual Period. At such time, the Calculation Agent will communicate such rates and amounts to the Co-Issuers, the Trustee, each Paying Agent,

<div align="center">Page 145</div>

the Portfolio Manager, Euroclear, Clearstream. The Calculation Agent will also specify to the Co-Issuers the quotations upon which the foregoing rates and amounts are based, and in any event the Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (New York time) on every Interest Determination Date if it has not determined and is not in the process of determining any such Interest Rate or Note Interest Amount together with its reasons therefor. The Calculation Agent's determination of the foregoing rates and amounts for any Interest Accrual Period will (in the absence of manifest error) be final and binding upon all parties.

**7.16 Certain Tax Matters**

(a) The Co-Issuers will, and each holder of a Note (or any interest therein) will be deemed to have represented and agreed to treat the Co-Issuers as described in the "U.S. Federal Income Tax Considerations" section of the Offering Circular for all U.S. federal, state and local income tax purposes and to take no action inconsistent with such treatment unless required by law; provided that this shall not prevent a holder of a Note (or any interest therein) from making a "protective qualified electing fund" election with respect to any Class E Note or Class F Note.

(b) The Issuer and Co-Issuer shall prepare and file, and the Issuer shall cause each Tax Subsidiary to prepare and file, or in each case shall hire accountants and the accountants shall cause to be prepared and filed (and, where applicable, delivered to the Issuer or holders of the Notes (and any interests therein)) for each taxable year of the Issuer, the Co-Issuer and the Tax Subsidiary the federal, state and local income tax returns and reports as required under the Code, or any tax returns or information tax returns required by any governmental authority which the Issuer, the Co-Issuer or the Tax Subsidiary are required to file (and, where applicable, deliver), and shall timely provide to each such holder any information that such holder reasonably requests in order for such holder to (i) comply with its federal, state, or local tax and information returns and reporting obligations, (ii) make and maintain a "qualified electing fund" ("QEF") election (as defined in the Code) with respect to the Issuer, (iii) file a protective statement preserving such holder's ability to make a retroactive QEF election with respect to the Issuer (such information to be provided at such holder's expense), or (iv) comply with filing requirements that arise as a result of the Issuer being classified as a "controlled foreign corporation" for U.S. federal income tax purposes (all such information to be provided at such holder's expense); provided that neither the Issuer nor the Co-Issuer shall file, or cause to be filed, any income or franchise tax return in the United States or any state of the United States unless it shall have obtained advice from Dechert LLP, or an opinion of other nationally recognized U.S. tax counsel experienced in such matters, prior to such filing that, under the laws of such jurisdiction, the Issuer or Co-Issuer (as applicable) is required to file such income or franchise tax return.

(c) The Issuer (i) may hire advisors (including legal advisors and an accounting firm) or other Persons experienced in such matters to (x) assist the Issuer in complying with FATCA, and (ii) will take all reasonable actions consistent with the law and its obligations under this Indenture to insure that the Issuer satisfies any and all withholding

Page 146

and tax payment obligations under Code Sections 1441, 1445 or any other provision of the Code or other applicable law, including complying with FATCA. Without limiting the generality of the foregoing, the Issuer may withhold (and is not required to pay any additional amounts in respect of) any amount that it or any advisor retained by the Issuer or the Trustee on its behalf determines is required to be withheld from any amounts otherwise distributable to any holder of a Note.

(d) It is the intention of the parties hereto and, by its acceptance of a Note, each holder of a Note (and any interest therein) shall be deemed to have agreed not to treat any income generated by such Note as derived in connection with the Issuer's active conduct of a banking, financing, insurance, or other similar business for purposes of Section 954(h)(2) of the Code.

(e) Upon the Trustee's receipt of a request of a holder of a Note (or any interest therein), delivered in accordance with the notice procedures of Section 14.3, for the information described in United States Treasury Regulations Section 1.1275-3(b)(i) that is applicable to such holder of a Note (or any interest therein), the Issuer shall cause its Independent accountants to provide promptly to such requesting holder or owner of a beneficial interest in such a Note all of such information. Any additional issuance of the additional Notes shall be accomplished in a manner that shall allow the Independent accountants of the Issuer to calculate original issue discount income accurately to holders of the additional Notes.

(f) Prior to the time that the Issuer would acquire or receive any asset in connection with a workout or restructuring of a Collateral Obligation that could cause the Issuer to be treated as engaged in a trade or business in the United States or subject to U.S. federal tax on a net income basis (such asset, a "Nonqualifying Asset"), the Issuer shall either (x) organize one or more wholly-owned special purpose vehicles of the Issuer that are treated as corporations for U.S. federal income tax purposes (each, a "Tax Subsidiary"), and contribute the Collateral Obligation that is the subject of the workout or restructuring to a Tax Subsidiary, (y) contribute such right to receive such Collateral Obligation to an existing Tax Subsidiary, or (z) without regard for the requirements of Section 12.1, sell such right to receive such Collateral Obligation, unless the Issuer has received written advice of Dechert LLP or an opinion of other tax counsel of nationally recognized standing in the United States experienced in such matters that the acquisition, receipt, ownership, and disposition of such Collateral Obligation or asset, as the case may be, will not cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes or otherwise subject the Issuer to U.S. federal income tax on a net income basis, in which case the Issuer may directly acquire, receive and hold the Collateral Obligation or asset. For the avoidance of doubt, if, prior to the time that the Issuer would acquire or receive any Nonqualifying Asset(s) in respect of a Collateral Obligation, the Issuer is able to assign the right to receive each and every such Nonqualifying Asset to a Tax Subsidiary and the Issuer receives written advice of Dechert LLP or an opinion of other tax counsel of nationally recognized standing in the United States experienced in such matters that the acquisition, receipt, ownership, and disposition of such Collateral Obligation and the assignment of the right to receive each

Page 147

and every such Nonqualifying Asset to a Tax Subsidiary will not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes or otherwise subject the Issuer to U.S. federal income tax on a net income basis, the Issuer may assign the right to receive all such Nonqualifying Assets to a Tax Subsidiary prior to the time that the Issuer would acquire or receive each such Nonqualifying Asset instead of transferring such Collateral Obligation to a Tax Subsidiary.

(g)     Each Tax Subsidiary must at all times have at least one independent director meeting the requirements of an "Independent Director" as set forth in the Tax Subsidiary's organizational documents complying with any applicable Rating Agency rating criteria. Each Tax Subsidiary will not have any employees (other than its directors) and will not have any subsidiaries (other than any subsidiaries that are subject to the covenants applicable to Tax Subsidiaries).  The Issuer shall cause the purposes and permitted activities of any Tax Subsidiary to be restricted solely to the acquisition, receipt, holding, management and disposition of Collateral Obligations referred to in  Section 7.16(f)(A) and  Section 7.16(f)(B) and any assets, income and proceeds received in respect thereof (collectively, "Tax Subsidiary Assets"), and shall require each Tax Subsidiary to distribute 100% of the net proceeds of any sale of such Tax Subsidiary Assets, net of any tax or other liabilities, to the Issuer.

(h)     With respect to any Tax Subsidiary:

(i)     the Issuer shall not allow such Tax Subsidiary to purchase any assets or acquire title to real property (or a controlling interest in any entity that owns real property);

(ii)     the Issuer shall ensure that such Tax Subsidiary shall not sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of such Tax Subsidiary Assets, except as expressly permitted by this Indenture and the Portfolio Management Agreement;

(iii)     the Issuer shall ensure that such Tax Subsidiary shall not (A) have any employees (other than its directors), (B) have any subsidiaries (other than any subsidiary of such Tax Subsidiary which is subject, to the extent applicable, to covenants set forth in this Section 7.16 applicable to a Tax Subsidiary), or (C) incur or assume or guarantee any indebtedness or hold itself out as liable for the debt of any other Persons;

(iv)     the Issuer shall ensure that such Tax Subsidiary shall not conduct business under any name other than such Tax Subsidiary's;

(v)     the constitutive documents of such Tax Subsidiary shall provide that recourse with respect to costs, expenses or other liabilities of such Tax Subsidiary shall be solely to the assets of such Tax Subsidiary and no creditor of such Tax Subsidiary

Page 148

shall have any recourse whatsoever to the Issuer or its assets except to the extent otherwise required under applicable law;

(vi)    the Issuer shall ensure that such Tax Subsidiary shall file all tax returns and reports required to be filed by such Tax Subsidiary and to pay all Taxes required to be paid by such Tax Subsidiary;

(vii)    the Issuer shall notify the Trustee of the filing or commencement of any action, suit or proceeding by or before any arbiter or governmental authority against or affecting such Tax Subsidiary; *provided* that the Trustee shall have no obligations or duties in connection therewith and the Issuer (or the Portfolio Manager on its behalf) will take any and all actions to dismiss such action, suit or proceeding;

(viii)    the Issuer shall ensure that such Tax Subsidiary shall not enter into any agreement or other arrangement that prohibits or restricts or imposes any condition upon the ability of such Tax Subsidiary to pay dividends or other distributions with respect to any of its ownership interests;

(ix)    the Issuer shall be permitted to take any actions and enter into any agreements to effect the transactions contemplated by Section 7.16(f) so long as they do not violate Section 7.16(g);

(x)    the Issuer shall keep in full effect the existence, rights and franchises of such Tax Subsidiary as a company or corporation organized under the laws of its jurisdiction and shall obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to preserve the Tax Subsidiary Assets held from time to time by such Tax Subsidiary. In addition, the Issuer and such Tax Subsidiary shall not take any action, or conduct its affairs in a manner, that is likely to result in the separate existence of such Tax Subsidiary being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding. Notwithstanding the foregoing, the Issuer shall be permitted to dissolve any Tax Subsidiary at any time;

(xi)    the parties hereto agree that any reports prepared by the Trustee, the Portfolio Manager or the Collateral Administrator with respect to the Collateral Obligations shall indicate that any Tax Subsidiary Assets are held by a Tax Subsidiary, and shall refer directly and solely to such Tax Subsidiary Assets, and none of the Trustee, the Collateral Administrator or the Portfolio Manager shall be obligated to refer to the equity interest in such Tax Subsidiary;

(xii)    the Issuer, the Co-Issuer, the Portfolio Manager and the Trustee shall not cause the filing of a petition in bankruptcy against the Tax Subsidiary for the nonpayment of any amounts due hereunder until at least one year and one day, or any longer applicable preference period then in effect plus one day, after the payment in full of all the Notes issued under this Indenture;

Page 149

(xiii)   in connection with the organization of such Tax Subsidiary and the contribution of any Tax Subsidiary Assets to such Tax Subsidiary pursuant to <u>Section 7.16(f)</u>, the Tax Subsidiary shall establish one or more custodial and/or collateral accounts, as necessary, with the Bank or the Custodian to hold the Tax Subsidiary Assets pursuant to an account control agreement substantially in the form of the Securities Account Control Agreement; *provided* that (A) a Tax Subsidiary Asset shall not be required to be held in such a custodial or collateral account if doing so would be in violation of another agreement related to such Tax Subsidiary Asset or any other asset and (B) the Issuer may pledge a Tax Subsidiary Asset to a Person other than the Trustee if required pursuant to a related reorganization or bankruptcy Proceeding;

(xiv)   subject to the other provisions of this Indenture, the Issuer shall cause the Tax Subsidiary to distribute, or cause to be distributed, Tax Subsidiary Assets to the Issuer, in such amounts and at such times as shall be determined by the Portfolio Manager (with notice to the Collateral Administrator) (any Cash proceeds distributed to the Issuer shall be deposited into the Principal Collection Subaccount or the Interest Collection Subaccount, as applicable); *provided* that the Issuer shall not cause any amounts to be so distributed unless all amounts in respect of any related Tax liabilities and expenses have been paid in full or have been properly reserved for in accordance with GAAP;

(xv)   notwithstanding the complete and absolute transfer of a Tax Subsidiary Asset to a Tax Subsidiary, for purposes of measuring compliance with the Concentration Limitations, Portfolio Quality Test, and Coverage Tests, the ownership interests of the Issuer in such Tax Subsidiary or any property distributed to the Issuer by the Tax Subsidiary (other than Cash) shall be treated as ownership of the Tax Subsidiary Asset(s) owned by such Tax Subsidiary (and shall be treated as having the same characteristics as such Tax Subsidiary Asset(s)).  If, prior to its transfer to the Tax Subsidiary, a Tax Subsidiary Asset was a Defaulted Obligation, the ownership interests of the Issuer in the Tax Subsidiary shall be treated as a Defaulted Obligation until such Tax Subsidiary Asset would have ceased to be a Defaulted Obligation if owned directly by the Issuer;

(xvi)   any distribution of Cash by such Tax Subsidiary to the Issuer shall be characterized as Interest Proceeds or Principal Proceeds to the same extent that such Cash would have been characterized as Interest Proceeds or Principal Proceeds if received directly by the Issuer; and

(xvii)  if (A) any Event of Default occurs, the Notes have been declared due and payable (and such declaration shall not have been rescinded and annulled in accordance with this Indenture), and the Trustee or any other authorized party takes any action under this Indenture to sell, liquidate or dispose of the Collateral, (B) notice is given of any mandatory redemption, auction call redemption, Optional Redemption, tax redemption, clean up call or other prepayment in full or repayment in full of all Notes Outstanding and such notice is not capable of being

18750188.25.BUSINESS

rescinded, (C) the Stated Maturity has occurred, or (D) irrevocable notice is given of any other final liquidation and final distribution of the Collateral, however described, the Issuer or the Portfolio Manager on the Issuer's behalf shall (x) instruct such Tax Subsidiary to sell each Tax Subsidiary Asset held by such Tax Subsidiary and distribute the proceeds of such sale, net of any amounts necessary to satisfy any related expenses and Tax liabilities, to the Issuer in exchange for the equity security of or other interest in such Tax Subsidiary held by the Issuer or (y) sell its interest in such Tax Subsidiary.

**7.17   Effective Date; Purchase of Additional Collateral Obligations**

(a)     The Issuer will use commercially reasonable efforts to purchase (or enter into commitments to purchase), on or before June 20, 2014, Collateral Obligations, (i) such that the Target Initial Par Condition is satisfied and (ii) that satisfy, as of the Effective Date, the Concentration Limitations, the Collateral Quality Test, the Effective Date Overcollateralization Test and the Overcollateralization Ratio Test.

(b)     During the period from the Closing Date to and including the Effective Date, the Issuer will use the following funds to purchase additional Collateral Obligations in the following order:  (i) to pay for the principal portion of any Collateral Obligation, first, any amounts on deposit in the Ramp-Up Account, and second, any Principal Proceeds on deposit in the Collection Account and (ii) to pay for accrued interest on any such Collateral Obligation, first, any amounts on deposit in the Ramp-Up Account and, second, any Principal Proceeds on deposit in the Collection Account.  In addition, the Issuer will use commercially reasonable efforts to acquire such Collateral Obligations that will satisfy, on the Effective Date, the Concentration Limitations, the Effective Date Overcollateralization Test, the Collateral Quality Test and the Overcollateralization Ratio Test.

(c)     On the Effective Date, the Issuer shall provide, or cause the Portfolio Manager to provide, to S&P a Microsoft Excel file (the "Excel Default Model Input File") that provides all of the inputs required to determine whether the S&P CDO Monitor Test has been satisfied and the Portfolio Manager shall provide a Microsoft Excel file including, at a minimum, the following data with respect to each Collateral Obligation:  CUSIP number (if any), LoanX identification (if any), name of Obligor, coupon, spread (if applicable), LIBOR floor (if applicable), legal final maturity date, average life, principal balance, identification as a Cov-Lite Loan, First Lien Last Out Loan or otherwise, settlement date, S&P Industry Classification and S&P Recovery Rate.

(d)     Within 15 Business Days after the Effective Date, the Issuer shall provide, or cause the Portfolio Manager to provide the following documents: (i) to S&P, a report (which the Issuer shall cause the Collateral Administrator to prepare on its behalf in accordance with, and subject to the terms of the Collateral Administration Agreement) identifying the Collateral Obligations and requesting that S&P reaffirm its Initial Ratings of the Secured Notes; (ii) to S&P (x) a report (which the Issuer shall cause the Collateral Administrator to prepare on its behalf in accordance with, and subject to the terms of the Collateral

18750188.25.BUSINESS

Administration Agreement) stating the following information (the "<u>Effective Date Report</u>"): (A) the Obligor, principal balance, coupon/spread, LIBOR floor (if any), stated maturity, Moody's Default Probability Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation as of the Effective Date and substantially similar information provided by the Issuer with respect to every other asset included in the Assets (to the extent such asset is a security or a loan), by reference to such sources as shall be specified therein and (B) as of the Effective Date, the level of compliance with, and satisfaction or non-satisfaction of, (1) the Target Initial Par Condition, (2) the Effective Date Overcollateralization Test, (3) each Overcollateralization Ratio Test, (4) the Concentration Limitations and (5) the Collateral Quality Test (excluding the S&P CDO Monitor Test) and (y) a certificate of the Issuer (such certificate, the "<u>Effective Date Issuer Certificate</u>") certifying that the Issuer has received an Accountants' Report that recalculates the information set forth in the Effective Date Report (such Accountants' Report, the "<u>Effective Date Accountants' Report</u>"); and (iii) to the Trustee, the Effective Date Accountants' Report. Upon receipt of the Effective Date Report, the Trustee shall compare the information contained in such Effective Date Report to the information contained in its records with respect to the Assets and shall, within three Business Days after receipt of such Effective Date Report, notify the Issuer, the Collateral Administrator, S&P and the Portfolio Manager if the information contained in the Effective Date Report does not conform to the information maintained by the Trustee with respect to the Assets. In the event that any discrepancy exists, the Trustee and the Issuer, or the Portfolio Manager on behalf of the Issuer, shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days notify the Portfolio Manager who shall, on behalf of the Issuer, request that the Independent accountants selected by the Issuer pursuant to <u>Section 10.8(a)</u> perform agreed-upon procedures on the Effective Date Report and the Trustee's records to determine the cause of such discrepancy. If such procedures reveal an error in the Effective Date Report or the Trustee's records, the Effective Date Report or the Trustee's records shall be revised accordingly and notice of any error in the Effective Date Report shall be sent as soon as practicable by the Issuer to all recipients of such report.

(e)     If S&P (which must receive the report described in <u>Section 7.17(d)(ii)</u> to provide written confirmation of its Initial Rating of the Secured Notes) does not provide written confirmation (which may take the form of a press release or other written communication) of its Initial Rating of the Secured Notes (such event, an "<u>S&P Rating Confirmation Failure</u>") within 25 Business Days after the Effective Date, then the Issuer (or the Portfolio Manager on the Issuer's behalf) will instruct the Trustee to transfer amounts from the Interest Collection Subaccount to the Principal Collection Subaccount and may, prior to the first Payment Date, use such funds on behalf of the Issuer for the purchase of additional Collateral Obligations until such time as S&P has provided written confirmation (which may take the form of a press release or other written communication) of its Initial Rating of the Secured Notes; *provided* that, in lieu of complying with this clause (e), the Issuer (or the Portfolio Manager on the Issuer's behalf) may take such action, including but not limited to, a Special Redemption and/or transferring amounts from the Interest Collection Subaccount to the Principal Collection

Page 152

Subaccount as Principal Proceeds (for use in a Special Redemption), sufficient to enable the Issuer (or the Portfolio Manager on the Issuer's behalf) to obtain written confirmation (which may take the form of a press release or other written communication) from each of S&P of its Initial Rating of the Secured Notes; *provided further* that, amounts may not be transferred from the Interest Collection Subaccount to the Principal Collection Subaccount if, after giving effect to such transfer, (I) the amounts available pursuant to the Priority of Payments on the next succeeding Payment Date would be insufficient to pay in the full amount of the accrued and unpaid interest on any Class of Secured Notes on such next succeeding Payment Date or (II) such transfer would result in a deferral of interest with respect to the Class C Notes, Class D Notes, Class E Notes or Class F Notes on the next succeeding Payment Date.

(f) Of the proceeds of the issuance of the Notes which are not applied to pay for the purchase of Collateral Obligations purchased by the Issuer on or before the Closing Date or to pay other applicable fees and expenses, U.S.$401,880,000 will be deposited in the Ramp-Up Account on the Closing Date. At the direction of the Issuer (or the Portfolio Manager on behalf of the Issuer), the Trustee shall apply amounts held in the Ramp-Up Account to purchase additional Collateral Obligations from the Closing Date to and including the Effective Date as described in clause (b) above. If on the Effective Date, any amounts on deposit in the Ramp-Up Account have not been applied to purchase Collateral Obligations, such amounts shall be applied as described in Section 10.3(c).

(g) **Matrix Combination; S&P CDO Monitor**. On or prior to the Effective Date, the Portfolio Manager shall (with notice to the Trustee and the Collateral Administrator) determine which Matrix Combination shall be applicable for purposes of determining compliance with the Minimum Floating Spread Test and the Minimum Weighted Average S&P Recovery Rate Test; and also shall determine the applicable S&P CDO Monitor that shall apply on and after Effective Date for purposes of determining compliance with the S&P CDO Monitor Test.

With respect to the S&P CDO Monitor chosen for the Effective Date, the Portfolio Manager may provide S&P (via email to CDOEffectiveDatePortfolios@standardandpoors.com) with up to 10,000 different combinations of (i) Minimum Weighted Average S&P Recovery Rates for each liability rating of Secured Notes, (ii) Minimum Floating Spreads and (iii) Minimum Weighted Average Coupons with which to calculate the applicable S&P CDO Monitor. Thereafter, from time to time, provided that the Portfolio Manager shall have provided at least two Business Days' written notice to the Trustee, the Collateral Administrator and S&P (via email to CDO_surveillance@standardandpoors.com), the Portfolio Manager may select a different Matrix Combination or a different S&P CDO Monitor to be applied to the Collateral Obligations for such purposes; *provided* that: (A) if any of the component tests of the Collateral Quality Test shall be satisfied at such time, then all of such component tests that were satisfied shall be satisfied after giving effect to such selection or (B) if any of the component tests of the Collateral Quality Test shall not be satisfied at such time, then the level of compliance with each of such component tests shall be maintained or improved after giving effect to such selection. If the Portfolio Manager does not notify

Page 153

the Trustee and the Collateral Administrator that it will alter the Matrix Combination or the S&P CDO Monitor, in each case chosen on the Effective Date in the manner set forth above, the Matrix Combination or the S&P CDO Monitor (as the case may be) chosen on the Effective Date shall continue to apply. Notwithstanding the foregoing, the Portfolio Manager may elect at any time after the Effective Date, in lieu of selecting a Matrix Combination (but otherwise in compliance with the requirements of the third sentence of this Section 7.17(g)), to interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight line basis and round the results to two decimal points.

**7.18  Representations Relating to Security Interests in the Assets**

(a)    The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder):

(i)     The Issuer owns such Asset free and clear of any lien, claim or encumbrance of any person, other than such as are created under, or permitted by, this Indenture.

(ii)    Other than the security interest Granted to the Trustee pursuant to this Indenture, except as permitted by this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Assets. The Issuer has not authorized the filing of and is not aware of any Financing Statements against the Issuer that include a description of collateral covering the Assets other than any Financing Statement relating to the security interest granted to the Trustee hereunder or that has been terminated; the Issuer is not aware of any judgment, PBGC liens or tax lien filings against the Issuer.

(iii)   All Assets constitute Cash, accounts (as defined in Section 9-102(a)(2) of the UCC), Instruments, general intangibles (as defined in Section 9-102(a)(42) of the UCC), uncertificated securities (as defined in Section 8-102(a)(18) of the UCC), Certificated Securities or security entitlements to financial assets resulting from the crediting of financial assets to a "securities account" (as defined in Section 8-501(a) of the UCC).

(iv)    All Accounts constitute "securities accounts" under Section 8-501(a) of the UCC.

(v)     This Indenture creates a valid and continuing security interest (as defined in Section 1 - 201(37) of the UCC) in such Assets in favor of the Trustee, for the benefit and security of the Secured Parties, which security interest is prior to all other liens, claims and encumbrances (except as permitted otherwise in this Indenture), and is enforceable as such against creditors of and purchasers from the Issuer.

(b)    The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be

18750188.25.BUSINESS

deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to Assets that constitute Instruments:

(i) Either (x) the Issuer has caused or will have caused, within ten days after the Closing Date, the filing of all appropriate Financing Statements in the proper office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Instruments granted to the Trustee, for the benefit and security of the Secured Parties or (y) (A) all original executed copies of each promissory note or mortgage note that constitutes or evidences the Instruments have been delivered to the Trustee or the Issuer has received written acknowledgement from a custodian that such custodian is holding the mortgage notes or promissory notes that constitute evidence of the Instruments solely on behalf of the Trustee and for the benefit of the Secured Parties and (B) none of the Instruments that constitute or evidence the Assets has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee, for the benefit of the Secured Parties.

(ii) The Issuer has received all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(c) The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to the Assets that constitute Security Entitlements:

(i) All of such Assets have been and will have been credited to one of the Accounts which are securities accounts within the meaning of Section 8-501(a) of the UCC. The Securities Intermediary for each Account has agreed to treat all assets credited to such Accounts as "financial assets" within the meaning of Section 8-102(a)(9) of the UCC.

(ii) The Issuer has received all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(iii) (x) The Issuer has caused or will have caused, within ten days after the Closing Date, the filing of all appropriate Financing Statements in the proper office in the appropriate jurisdictions under applicable law in order to perfect the security interest granted to the Trustee, for the benefit and security of the Secured Parties, hereunder and (y) (A) the Issuer has delivered to the Trustee a fully executed Securities Account Control Agreement pursuant to which the Custodian has agreed to comply with all instructions originated by the Trustee relating to the Accounts without further consent by the Issuer or (B) the Issuer has taken all steps necessary to cause the Custodian to identify in its records the Trustee as the

Page 155

person having a security entitlement against the Custodian in each of the Accounts.

    (iv)    The Accounts are not in the name of any Person other than the Issuer or the Trustee. The Issuer has not consented to the Custodian to comply with the entitlement order of any Person other than the Trustee (and the Issuer prior to a notice of exclusive control being provided by the Trustee).

(d)    The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to Assets that constitute general intangibles:

    (i)    The Issuer has caused or will have caused, within ten days after the Closing Date, the filing of all appropriate Financing Statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Assets granted to the Trustee, for the benefit and security of the Secured Parties, hereunder.

    (ii)    The Issuer has received, or will receive, all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(e)    The Co-Issuers agree to notify S&P promptly if they become aware of the breach of any of the representations and warranties contained in this <u>Section 7.18</u> and shall not, without notice to S&P, waive any of the representations and warranties in this <u>Section 7.18</u> or any breach thereof.

## 7.19    Rule 17g-5 Compliance

(a)    To enable S&P to comply with its obligations under Rule 17g-5, the Issuer shall post on a password-protected internet website, at the same time such information is provided to S&P, all information (which shall not include any Accountants' Report) the Issuer provides to S&P for the purposes of determining the initial credit rating of the Notes or undertaking credit rating surveillance of the Notes. In the case of information provided for the purposes of undertaking credit rating surveillance of the Notes, such information shall be posted on a password protected internet website in accordance with the procedures set forth in <u>Section 7.19(b)</u>.

(b)    (i)    To the extent that a Rating Agency makes an inquiry or initiates communications with the Issuer, the Portfolio Manager, the Collateral Administrator or the Trustee that is relevant to such Rating Agency's credit rating surveillance of the Secured Notes, all responses to such inquiries or communications from such Rating Agency shall be formulated in writing by the responding party or its representative or adviser and shall be provided to the Information Agent who shall promptly upload such written response to the 17g-5 Information Website in accordance with the procedures set forth in the Collateral Administration Agreement, and after the responding party or its representative

Page 156

18750188.25.BUSINESS

or adviser receives written notification from the Information Agent (which the Information Agent agrees to provide on a reasonably prompt basis) (which may be in the form of e-mail) that such response has been uploaded on the 17g-5 Information Website, such responding party or its representative or adviser may provide such response to such Rating Agency.

(ii)    To the extent that any of the Issuer, the Portfolio Manager, the Collateral Administrator or the Trustee is required to provide any information to, or communicate with, any Rating Agency in accordance with its obligations under this Indenture or the Portfolio Management Agreement, the Issuer, the Portfolio Manager, the Collateral Administrator or the Trustee, as applicable (or their respective representatives or advisers), shall provide such information or communication to the Information Agent by e-mail in accordance with the Collateral Administration Agreement, which the Information Agent shall promptly upload to the 17g-5 Information Website in accordance with the procedures set forth in the Collateral Administration Agreement, and after the applicable party has received written notification from the Information Agent (which the Information Agent agrees to provide on a reasonably prompt basis) (which may be in the form of e-mail) that such information has been uploaded to the 17g-5 Information Website, the applicable party or its representative or adviser shall provide such information to such Rating Agency.

(iii)    The Issuer, the Portfolio Manager, the Collateral Administrator and the Trustee (and their respective representatives and advisers) shall be permitted (but shall not be required) to orally communicate with the Rating Agencies regarding any Collateral Obligation or the Notes; *provided* that such party summarizes the information provided to the Rating Agencies in such communication and provides the Information Agent with such summary in accordance with the procedures set forth in the Collateral Administration Agreement within one Business Day of such communication taking place. The Information Agent shall upload such summary on the 17g-5 Information Website in accordance with the procedures set forth in the Collateral Administration Agreement.

(iv)    In connection with providing access to the 17g-5 Information Website, the Issuer may require registration and the acceptance of a disclaimer. The Information Agent shall not be liable for unauthorized disclosure of any information that it disseminates in accordance with the Collateral Administration Agreement and makes no representations or warranties as to the accuracy or completeness of information made available on the 17g-5 Information Website. The Information Agent shall not be liable for its failure to make any information available to the Rating Agencies or NRSROs unless such information was delivered to the Information Agent at the email address set forth in the Collateral Administration Agreement, with a subject heading of "ACIS CLO 2014-3 Ltd." and sufficient detail to indicate that such information is required to be posted on the 17g-5 Information Website.

Page 157

**7.20 Filings**

The Issuer or the Co-Issuer, as applicable, shall, upon receipt by courier of notice of any Bankruptcy Filing, to the extent that funds are available for such purpose, timely file an answer and any other appropriate pleading objecting to any Bankruptcy Filing. The reasonable fees, costs, charges and expenses incurred by the Issuer or Co-Issuer (including reasonable attorneys' fees and expenses) in connection with taking any such action shall be paid as "Administrative Expenses" in accordance with the priorities set forth in the definition thereof.

**8. SUPPLEMENTAL INDENTURES**

**8.1 Supplemental Indentures Without Consent of Holders of Notes**

(a)    Without the consent of the Holders of any Notes (except any consent required by clause (iii), (vi), (viii), (xi) or (xii) below), the Co-Issuers, when authorized by Board Resolutions, at any time and from time to time subject to the requirement provided below in <u>Section 8.3</u> with respect to the ratings of each Class of Secured Notes, may, without an Opinion of Counsel or an Officer's Certificate from the Portfolio Manager being provided to the Co-Issuers or the Trustee as to whether or not any Class of Notes would be materially and adversely affected thereby (except to the extent required to comply with the provisions below), enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(i)    to evidence the succession of another Person to the Issuer or the Co-Issuer and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer herein and in the Notes;

(ii)    to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Secured Parties;

(iii)    to add to the conditions, limitations or restrictions on the authorized amount, terms and purposes  of the issue, authentication and delivery of the Notes, *provided* that, if the Holders of any Class of Notes would be materially and adversely affected by such supplemental indenture entered into pursuant to this clause (iii), the consent to such supplemental indenture has been obtained from a Majority of each such Class;

(iv)    to convey, transfer, assign, mortgage or pledge any property to or with the Trustee or evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of <u>Sections 6.9</u>, <u>6.10</u> and <u>6.12</u>;

(v)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture

<div align="center">Page 158</div>

(including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations, whether pursuant to Section 7.5 or otherwise) or to subject to the lien of this Indenture any additional property;

(vi)     to modify the restrictions on and procedures for resales and other transfers of Notes to reflect any changes in ERISA or other applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder, *provided* that, if the Holders of any Class of Notes would be materially and adversely affected by such supplemental indenture entered into pursuant to this clause (vi), the consent to such supplemental indenture has been obtained from a Majority of each such Class;

(vii)    to make such changes as shall be necessary or advisable in order for the Listed Notes to be or remain listed on an exchange, including the Irish Stock Exchange;

(viii)   subject to the consent of a Majority of the Class A Notes, to correct any inconsistency or cure any ambiguity, omission or manifest errors in this Indenture;

(ix)     to conform the provisions of this Indenture to the Offering Circular;

(x)      to (A) take any action advisable to prevent the Co-Issuers, any Tax Subsidiary or the Trustee from becoming subject to withholding or other Taxes (other than Taxes with respect to the Issuer otherwise permitted under the Indenture and other than Taxes imposed on amounts payable or paid to the Trustee as compensation), fees or assessments, to prevent the Co-Issuers from being treated as engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state or local income tax on a net income basis; or (B) take any action to allow the Co-Issuers or any Tax Subsidiary to comply (or facilitate compliance) with FATCA or any rules or regulations promulgated thereunder (including providing for remedies against, or imposing penalties upon, any holder who fails to deliver the information required under FATCA or is non-compliant with FATCA);

(xi)     subject to any consents required in connection with the issuance of additional notes or replacement securities as otherwise described herein, to make changes to facilitate (A) issuance by the Co-Issuers of additional notes of any one or more new classes that are fully subordinated to the existing Secured Notes (or to the most junior class of securities of the Issuer (other than the Subordinated Notes) issued pursuant to this Indenture, if any class of securities issued pursuant to this Indenture other than the Secured Notes and the Subordinated Notes is then Outstanding), *provided* that any such additional issuance of notes shall be issued in accordance with this Indenture, including Sections 2.13 and 3.2; (B) issuance by the Co-Issuers of additional notes of any one or more existing Classes, *provided* that any such additional issuance of notes shall be issued in accordance

Page 159

with this Indenture, including Sections 2.13 and 3.2; or (C) issuance by the Co-Issuers of replacement securities in connection with a Refinancing in accordance with this Indenture;

(xii)    subject to the consent of a Majority of the Class A Notes, to evidence (x) any waiver by any Rating Agency as to any requirement or condition of such Rating Agency in this Indenture, or the elimination of any requirement in this Indenture that any Rating Agency confirm that an action or inaction by the Issuer or any other Person will not result in a reduction or withdrawal of its then-current rating of any Class of Secured Notes as a condition to such action or inaction or (y) any modification of any Collateral Quality Test (excluding the Weighted Average Life Test) (or any definition herein relevant to, but only to the extent relevant to, the determination of whether any Collateral Quality Test is satisfied); *provided* that with respect to any proposed supplemental indenture pursuant to this clause, if a Majority of the Controlling Class (when the Controlling Class is not the Class A Notes) has provided written notice to the Trustee within 10 Business Days after the date of notice of the proposed supplemental indenture that any Class of Notes would be materially and adversely affected thereby, the Trustee and the Co-Issuers shall not enter into such supplemental indenture without the consent of a Majority of each Class of Secured Notes materially and adversely affected thereby and, if the Subordinated Notes are materially and adversely affected thereby, a Majority of the Subordinated Notes; or

(xiii)    to make such other changes as the Co-Issuers deem appropriate and that do not materially and adversely affect the interests of any Holder of the Notes as evidenced by a certificate of an Officer of the Portfolio Manager or an Opinion of Counsel delivered to the Trustee (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion); *provided* that, written consent to such supplemental indenture entered into pursuant to this clause (xiii) has been obtained from a Majority of the Controlling Class.

In addition to the foregoing, with the consent of a Majority of the Controlling Class (which consent shall not be unreasonably withheld, delayed or conditioned) (but without the consent of the holders of any other Class of Notes) and the Portfolio Manager, the Co-Issuers, when authorized by Board Resolutions, at any time and from time to time, may, without an Opinion of Counsel or an Officer's Certificate from the Portfolio Manager being provided to the Co-Issuers or the Trustee as to whether or not any Class of Notes would be materially and adversely affected thereby, enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, to amend, modify or otherwise change the provisions in this Indenture so that (1) the Issuer is not a "covered fund" under the Volcker Rule, (2) the Notes constituting the Controlling Class are not considered to constitute "ownership interests" under the Volcker Rule or (3) ownership of the Notes will otherwise be exempt from the Volcker Rule.

Page 160

**8.2** **Supplemental Indentures With Consent of Holders of Notes**

(a)     With the consent of a Majority of each Class or Sub-class of Secured Notes materially and adversely affected thereby, if any (and with the consent of a Majority of the Controlling Class, regardless of whether such Class or Sub-class would be materially and adversely affected thereby, if such supplemental indenture would modify the Weighted Average Life Test or modify any of the Investment Criteria regarding reinvestment set forth under Section 12.2(a)), and, if the Subordinated Notes are materially and adversely affected thereby, a Majority of the Subordinated Notes, by Act of the Holders of such Majority of each Class or Sub-class of Secured Notes materially and adversely affected thereby and, if applicable, such Majority of the Subordinated Notes delivered to the Trustee and the Co-Issuers, the Trustee and the Co-Issuers may, subject to the requirement provided below in Section 8.3 with respect to the ratings of each Class or Sub-class of Secured Notes, execute one or more indentures supplemental hereto to add any provisions to, or change in any manner or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Notes of any Class or Sub-class under this Indenture; *provided* that notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall, without the consent of each Holder of each Outstanding Note of each Class or Sub-class materially and adversely affected thereby:

(i)      change the Stated Maturity of the principal of or the due date of any installment of interest on any Secured Note, reduce the principal amount thereof or the rate of interest thereon or the Redemption Price with respect to any Note, or change the earliest date on which Notes of any Class or Sub-class may be redeemed, change the provisions of this Indenture relating to the application of proceeds of any Assets to the payment of principal of or interest on the Secured Notes or distributions on the Subordinated Notes or change any place where, or the coin or currency in which, Notes or the principal thereof or interest or any distribution thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date); *provided* that, (A) any Re-Pricing Amendment that would have the effect of reducing the rate of interest payable on any Class of Secured Notes shall not be subject to the terms of this clause and shall instead be governed by the terms set forth under Section 8.6 and (B) any Base Rate Amendment shall not be subject to the terms of this clause and shall instead be governed by the terms set forth under Section 8.7;

(ii)     reduce or increase the percentage of the Aggregate Outstanding Amount of Holders of each Class or Sub-class whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder or their consequences provided for in this Indenture;

(iii)    impair or adversely affect the Assets except as otherwise permitted in this Indenture;

Page 161

(iv)    except as otherwise permitted by this Indenture, permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Assets or terminate such lien on any property at any time subject hereto or deprive the Holder of any Secured Note of the security afforded by the lien of this Indenture;

(v)    reduce or increase the percentage of the Aggregate Outstanding Amount of Holders of any Class or Sub-class of Secured Notes whose consent is required to request the Trustee to preserve the Assets or rescind the Trustee's election to preserve the Assets pursuant to Section 5.5 or to sell or liquidate the Assets pursuant to Section 5.4 or 5.5;

(vi)    modify any of the provisions of this Indenture with respect to entering into supplemental indentures, except to increase the percentage of Outstanding Notes the consent of the Holders of which is required for any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Note Outstanding and affected thereby;

(vii)    modify the definition of the term "Controlling Class", the definition of the term "Outstanding" or the Priority of Payments set forth in Section 11.1(a); or

(viii)    modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of interest or principal on any Secured Note or any amount available for distribution to the Subordinated Notes, or to affect the rights of the Holders of any Secured Notes to the benefit of any provisions for the redemption of such Secured Notes contained herein; *provided* that, (A) any Re-Pricing Amendment that would have the effect of reducing the rate of interest payable on any Class of Secured Notes shall not be subject to the terms of this clause and shall instead be governed by the terms set forth under Section 8.6 and (B) any Base Rate Amendment shall not be subject to the terms of this clause and shall instead be governed by the terms set forth under Section 8.7.

**8.3    Execution of Supplemental Indentures**

(a)    The Trustee shall join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, except to the extent required by law.

(b)    The Trustee shall be entitled to conclusively rely upon an Opinion of Counsel as to matters of law (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering such Opinion of Counsel) or, as to matters of fact, upon an Officer's certificate of the Portfolio Manager, as to (i) whether or not the Holders of any Class of Secured Notes would be materially and adversely affected by a supplemental indenture, *provided* that if the Holders of $33^{1/3}$% in Aggregate Outstanding

Page 162

Amount of the Notes of such Class have provided notice to the Trustee within 10 Business Days after the date of notice of the proposed supplemental indenture that such Class would be materially and adversely affected thereby, the Trustee shall not be entitled so to rely upon an Opinion of Counsel or Officer's certificate of the Portfolio Manager as to whether or not the Holders of such Class would be materially and adversely affected by such supplemental indenture and the Trustee shall not enter into such supplemental indenture without the consent of a Majority of such Class and (ii) whether or not the Subordinated Notes would be materially and adversely affected by a supplemental indenture, *provided* that if the Holders of $33^{1/3}$% of the Aggregate Outstanding Amount of the Subordinated Notes have provided notice to the Trustee within 10 Business Days after the date of notice of the proposed supplemental indenture that the Subordinated Notes would be materially and adversely affected thereby, the Trustee shall not be entitled so to rely upon such an Opinion of Counsel or Officer's certificate of the Portfolio Manager as to whether or not the Subordinated Notes would be materially and adversely affected by such supplemental indenture and the Trustee shall not enter into such supplemental indenture without the consent of a Majority of the Subordinated Notes. Such determination shall be conclusive and binding on all present and future Holders. In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been satisfied. The Trustee shall not be liable for any reliance made in good faith upon such an Opinion of Counsel or an Officer's certificate of the Portfolio Manager. At the cost of the Co-Issuers, the Trustee shall provide to the Holders (in the manner described in Section 14.4) a copy of each executed supplemental indenture after its execution. Any failure of the Trustee to publish or deliver such notice, or any defect therein, shall not in any way impair or affect the validity of any such supplemental indenture.

(c)     At the cost of the Co-Issuers, for so long as any Notes shall remain Outstanding, not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to Section 8.1 or Section 8.2, the Trustee shall deliver to the Portfolio Manager, the Collateral Administrator, S&P and the Noteholders a notice attaching a copy of such supplemental indenture and indicating the proposed date of execution of such supplemental indenture. Following such delivery by the Trustee, if any changes are made to such supplemental indenture other than to correct typographical errors or to adjust formatting, then at the cost of the Co-Issuers, for so long as any Notes shall remain Outstanding, not later than 5 Business Days prior to the execution of such proposed supplemental indenture (*provided* that the execution of such proposed supplemental indenture shall not in any case occur earlier than the date 15 Business Days after the initial distribution of such proposed supplemental indenture pursuant to the first sentence of this Section 8.3(c)), the Trustee shall deliver to the Portfolio Manager, the Collateral Administrator, S&P and the Noteholders a copy of such supplemental indenture as revised, indicating the changes that were made. At the cost of the Co-Issuers, the Trustee shall provide to the Holders (in the manner described in Section 14.4) a copy of the

Page 163

18750188.25.BUSINESS

executed supplemental indenture after its execution. Any failure of the Trustee to publish or deliver such notice, or any defect therein, shall not in any way impair or affect the validity of any such supplemental indenture.

(d)     It shall not be necessary for any Act of Holders to approve the particular form of any proposed supplemental indenture, but it shall be sufficient, if the consent of any Holders to such proposed supplemental indenture is required, that such Act shall approve the substance thereof.

(e)     The Portfolio Manager shall not be bound to follow any amendment or supplement to this Indenture unless it has received written notice of such amendment or supplement and a copy of such amendment or supplement from the Issuer or the Trustee. The Issuer agrees that it will not permit to become effective any supplement or modification to this Indenture which would (i) increase the duties or liabilities of, reduce or eliminate any right or privilege of (including as a result of an effect on the amount or priority of any fees or other amounts payable to the Portfolio Manager), or adversely change the economic consequences to, the Portfolio Manager, (ii) modify the restrictions on the Sales of Collateral Obligations, (iii) expand or restrict the Portfolio Manager's discretion or (iv) otherwise adversely affect the Portfolio Manager and the Portfolio Manager shall not be bound thereby unless the Portfolio Manager shall have consented in advance thereto in writing. No amendment or supplement to this Indenture will be effective against the Collateral Administrator if such amendment would adversely affect the Collateral Administrator, including, without limitation, any amendment or supplement that would increase the duties or liabilities of, or adversely change the economic consequences to, the Collateral Administrator, unless the Collateral Administrator otherwise consents in writing.

(f)     For so long as any Notes are listed on the Irish Stock Exchange, the Issuer shall notify the Irish Stock Exchange of any material modification to this Indenture.

**8.4     Effect of Supplemental Indentures**

Upon the execution of any supplemental indenture under this <u>Article 8</u>, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

**8.5     Reference in Notes to Supplemental Indentures**

Notes authenticated and delivered, including as part of a transfer, exchange or replacement pursuant to <u>Article 2</u> of Notes originally issued hereunder, after the execution of any supplemental indenture pursuant to this <u>Article 8</u> may, and if required by the Issuer shall, bear a notice in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Applicable Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Applicable Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

Page 164

**8.6     Re-Pricing Amendments**

(a)     Notwithstanding anything to the contrary herein, on any Business Day that occurs after the end of the Non-Call Period, the Holders of a Majority of the Subordinated Notes, with the approval of the Portfolio Manager and without the consent of any other Holders of the Notes, may through a written notice (a "Re-Pricing Proposal Notice") delivered to the Co-Issuers and the Trustee, direct the Co-Issuers and the Trustee (subject to Section 8.3 hereof) to enter into an amendment or supplemental indenture to the Indenture (a "Re-Pricing Amendment") in order to cause the spread over the Base Rate used to determine the Interest Rate with respect to any Class of Secured Notes (other than the Class A Notes or the Class B Notes) to be reduced to an amount specified by such Holders in such direction.    Any such notice must specify: (i) the proposed effective date of such Re-Pricing Amendment, which effective date may be on any Business Day at least 40 days following delivery of such notice; (ii) the Class or Classes that shall be the subject of such Re-Pricing Amendment (each, a "Re-Pricing Affected Class") and (iii) the changes to the spreads with respect to each of the Re-Pricing Affected Classes.

(b)     The Issuer (or the Trustee in the name of and on behalf of the Issuer), upon its receipt of a Re-Pricing Proposal Notice, shall deliver written notice (a "Re-Pricing Notice") at least 30 days prior to the proposed effective date of such Re-Pricing Amendment to the Holders of Notes of each of the Re-Pricing Affected Classes.    No Re-Pricing Amendment will be permitted to become effective unless at least 30 days' prior written notice thereof has been provided to the Holders of each of the Re-Pricing Affected Classes.    Each Re-Pricing Notice shall specify the same information as set forth in the related Re-Pricing Proposal Notice.    Each Holder of any Notes of a Re-Pricing Affected Class shall have the right, exercisable by delivery of a written transfer notice in the form attached to the Re-Pricing Notice (a "Transfer Notice") to the Issuer and the Trustee within 20 days after the giving of the related Re-Pricing Notice to request that the Notes of any of the Re-Pricing Affected Classes held by such Holder be transferred on the effective date of the Re-Pricing Amendment to a third party eligible to purchase such Notes in accordance with Article 2 hereof at a price equal to what the Redemption Price of such Notes would have been if such date were a Redemption Date (each Holder exercising such transfer right is referred to herein as a "Transferring Noteholder"; and any Notes to be so transferred by such Holder are referred to herein as "Transferred Notes").    Notwithstanding the foregoing, no Holder of a Re-Pricing Affected Class shall be deemed to have consented to such Re-Pricing Amendment unless such Holder has given its affirmative written consent to such Re-Pricing Amendment.

(c)     If any Holder of the Re-Pricing Affected Class does not deliver written consent to the proposed Re-Pricing Amendment within 20 days after the giving of the related Re-Pricing Notice, the Issuer (or, upon Issuer Order, the Trustee in the name of and on behalf of the Issuer) shall deliver written notice thereof to the consenting Holders of the Re-Pricing Affected Class, specifying the Aggregate Outstanding Amount of the Notes of the Re-Pricing Affected Class held by such non-consenting Holders, and shall request each such consenting Holder to provide written notice to the Issuer, the Trustee and the Portfolio Manager if such Holder would like to purchase all or any portion of the Notes

of the Re-Pricing Affected Class held by the non-consenting Holders (each such notice, an "Exercise Notice") within 5 Business Days of receipt of such notice. If the Issuer receives Exercise Notices with respect to more than the Aggregate Outstanding Amount of the Notes of the Re-Pricing Affected Class held by non-consenting Holders, the Issuer shall cause the sale and transfer of such Notes, without further notice to the non-consenting Holders thereof, on the effective date of such Re-Pricing Amendment to the Holders delivering Exercise Notices with respect thereto, pro rata based on the Aggregate Outstanding Amount of the Notes such Holders indicated an interest in purchasing pursuant to their Exercise Notices. If the Issuer receives Exercise Notices with respect to less than the Aggregate Outstanding Amount of the Notes of the Re-Pricing Affected Class held by non-consenting Holders, the Issuer shall cause the sale and transfer of such Notes, without further notice to the non-consenting Holders thereof, on the effective date of such Re-Pricing Amendment to the Holders delivering Exercise Notices with respect thereto, and any excess Notes of the Re-Pricing Affected Class held by non-consenting Holders shall be sold to a transferee designated by the Issuer. All sales of Notes to be effected pursuant to this clause (c) shall be made at a price equal to what the Redemption Price of such Notes would have been if such date were a Redemption Date, and shall be effected only if the related Re-Pricing Amendment is effected in accordance with the provisions hereof. The Holder of each Note, by its acceptance of an interest in the Notes, agrees to sell and transfer its Notes in accordance with this Section 8.6 and agrees to cooperate with the Issuer, the Portfolio Manager and the Trustee to effect such sales and transfers. The Issuer shall deliver written notice to the Trustee and the Portfolio Manager not later than 5 Business Days prior to the proposed effective date of such Re-Pricing Amendment confirming that the Issuer has received written commitments to purchase all Notes of the Re-Pricing Affected Class held by non-consenting Holders.

(d)     No Re-Pricing Amendment shall be effective unless: (i) each Transferring Noteholder shall have received on or prior to the effective date of the Re-Pricing Amendment a purchase price for the Transferred Notes equal to the Redemption Price of such Notes as of the effective date; and (ii) the S&P Rating Condition is satisfied (x) if the spread is decreasing with respect to all such Re-Pricing Affected Classes, solely with respect to the Re-Pricing Affected Classes or (y) otherwise, with respect to all of the Secured Notes. The Issuer may extend the effective date of the Re-Pricing Amendment to a date no later than 5 Business Days after the proposed effective date to facilitate the settlement of the sales in respect of Transferring Noteholders.

(e)     Unless otherwise paid by the Portfolio Manager, any expenses associated with effecting any Re-Pricing Amendment shall be payable as Administrative Expenses pursuant to the Priority of Payments. In satisfying the S&P Rating Condition with respect to the Re-Pricing Affected Classes that are the subject of such Re-Pricing Amendment, the Issuer shall be required to comply with the methodology employed by S&P at the time such confirmation and such ratings are being sought, even if such methodology has been revised since the Closing Date.

<div align="center">Page 166</div>

**8.7** **Base Rate Amendments**

(a) At any time, the Portfolio Manager or a Majority of any Class or Sub-class of the Notes may provide to the Issuer, the Collateral Administrator and the Trustee written notice (such notice is referred to herein as a "Request to Change the Base Rate"), (A) indicating that it has lost confidence in the integrity of LIBOR or the method for determining LIBOR for purposes of calculating the Interest Rate on the Floating Rate Notes under the Indenture or that it would otherwise like to request that the Base Rate used to calculate the Interest Rate on the Floating Rate Notes be changed from LIBOR to an alternative base rate and (B) specifying such alternative base rate (the "Alternative Base Rate"). Within 10 Business Days of its receipt of a Request to Change the Base Rate, the Issuer (or the Trustee in the name of and on behalf of the Issuer) shall provide written notice thereof (together with a copy of such Request to Change the Base Rate) to the Holders of the Notes, the Portfolio Manager and S&P, which written notice shall request that the Holders of the Notes and the Portfolio Manager consent or object to such change of the Base Rate in writing within 15 Business Days of the giving of such notice. The Issuer and the Trustee shall not take any further action with respect to any Request to Change the Base Rate without the prior written consent of a Majority of the Controlling Class. In addition, the Issuer and the Trustee shall not take any further action with respect to any Request to Change the Base Rate if a Majority of the Aggregate Outstanding Amount of all Notes (other than the Controlling Class) (voting as a single Class) object in writing to such Request to Change the Base Rate within 15 Business Days of the giving of such notice. Solely for purposes of such request to consent or object (and not for any other purpose, including the vote to approve the supplemental indenture effecting a Base Rate Amendment), a Noteholder (other than the Noteholders constituting the Controlling Class) will be deemed to consent to such Request to Change the Base Rate if it does not object in writing to such Request to Change the Base Rate within 15 Business Days of the giving of such notice.

(b) If a Majority of the Controlling Class so affirmatively consents and a Majority of the Aggregate Outstanding Amount of all Notes (other than the Controlling Class) (voting as a single Class) do not so object, then the Issuer, in consultation with the Portfolio Manager and the Trustee, shall prepare a draft supplemental indenture providing for a change of the Base Rate from LIBOR to the Alternative Base Rate proposed in the Request to Change the Base Rate. Upon providing such draft supplemental indenture to the Trustee and the Collateral Administrator, the Trustee shall provide a copy thereof to the Holders of the Notes, the Portfolio Manager and S&P together with a request that the Holders of the Notes and the Portfolio Manager consent or object to such supplemental indenture in writing within 15 Business Days of the giving of such notice. If (i) a Majority of each Class of Notes other than the Class A Notes (voting separately by Class), (ii) a Majority of each of the Class A-1A Notes, the Class A-1F Notes, the Class A-2A Notes, the Class A-2B Notes and the Class A-X Notes (voting separately by Sub-class) and (iii) the Portfolio Manager so consent to such change and the S&P Rating Condition is satisfied, then the Co-Issuers and the Trustee (subject to Sections 8.3(a) and 8.3(b) hereof) shall execute and deliver such supplemental indenture (such supplemental indenture is referred to herein as a "Base Rate Amendment"), and the Alternative Base

Page 167

Rate shall replace LIBOR as the Base Rate commencing on the first Interest Accrual Period to begin after the execution and the effectiveness of the Base Rate Amendment.

(c) No Base Rate Amendment will be effective unless the Trustee has received an opinion of tax counsel from Dechert LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters to the effect that the Base Rate Amendment will not have a material adverse effect on the tax treatment of the Issuer or the tax consequences to the holders of any Class of Notes outstanding at the time of such Base Rate Amendment, as described in the Offering Circular under the heading "U.S. Federal Income Tax Considerations".

## 9. REDEMPTION OF NOTES

### 9.1 Mandatory Redemption

If a Coverage Test is not met on any Determination Date on which such Coverage Test is applicable, the Issuer shall apply available amounts in the Payment Account pursuant to the Priority of Payments on the related Payment Date to make payments on the Notes.

### 9.2 Optional Redemption

(a) The Secured Notes shall be redeemable by the Applicable Issuers, on any Business Day after the Non-Call Period, at the written direction of a Majority of the Subordinated Notes and as follows: based upon such written direction, (i) the Secured Notes shall be redeemed in whole (with respect to all Classes of Secured Notes) but not in part from Sale Proceeds and/or Refinancing Proceeds; or (ii) the Secured Notes shall be redeemed in part by Class (other than the Class A Notes or the Class B Notes) from Refinancing Proceeds (so long as any Class of Secured Notes to be redeemed represents not less than the entire Class of such Secured Notes). Additionally, all of the Secured Notes shall be redeemable by the Applicable Issuers on any Business Day after the Non-Call Period in whole (with respect to all Classes of Secured Notes) but not in part at the written direction of the Portfolio Manager if the Collateral Principal Amount is less than 10% of the Target Initial Par Amount. In connection with any such redemption, the Secured Notes shall be redeemed at the applicable Redemption Prices. To effect an Optional Redemption a Majority of Subordinated Notes must provide the above described written direction to the Issuer and the Trustee not later than 45 days prior to the Redemption Date on which such redemption is to be made; *provided* that all Secured Notes to be redeemed must be redeemed simultaneously.

(b) Upon receipt of a notice of a redemption of the Secured Notes in whole but not in part pursuant to Section 9.2(a)(i) (subject to Sections 9.2(d) and (e) with respect to a redemption from proceeds that include Refinancing Proceeds), the Portfolio Manager in its sole discretion shall direct the sale (and the manner thereof) of all or part of the Collateral Obligations and other Assets such that the proceeds from such sale and all other funds available for such purpose in the Collection Account and the Payment Account will be at least sufficient to pay the Redemption Prices of the Secured Notes to be redeemed and to pay all Administrative Expenses (regardless of the Administrative

Page 168

Expense Cap) payable under the Priority of Payments. If such proceeds of such sale and all other funds available for such purpose in the Collection Account and the Payment Account would not be sufficient to redeem all Secured Notes and to pay such fees and expenses, the Secured Notes may not be redeemed. The Portfolio Manager, in its sole discretion, may affect the sale of all or any part of the Collateral Obligations or other Assets through the direct sale of such Collateral Obligations or other Assets or by participation or other arrangement.

(c)    The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment in full of the Secured Notes, at the direction of a Majority of the Subordinated Notes.

(d)    In addition to (or in lieu of) a sale of Collateral Obligations and/or Eligible Investments in the manner provided in <u>Section 9.2(b)</u>, the Secured Notes may, after the Non-Call Period, be redeemed in whole from Refinancing Proceeds and Sale Proceeds or in part by Class (other than the Class A Notes or the Class B Notes) from Refinancing Proceeds as provided in <u>Section 9.2(a)(ii)</u> by a Refinancing; *provided* that the terms of such Refinancing and any financial institutions acting as lenders thereunder or purchasers thereof must be acceptable to the Portfolio Manager and a Majority of the Subordinated Notes and such Refinancing otherwise satisfies the conditions described below.

(e)    In the case of a Refinancing upon a redemption of the Secured Notes in whole but not in part pursuant to <u>Section 9.2(d)</u>, such Refinancing will be effective only if (i) the Refinancing Proceeds, all Sale Proceeds from the sale of Collateral Obligations and Eligible Investments in accordance with the procedures set forth herein, and all other available funds will be at least sufficient to redeem simultaneously the Secured Notes, in whole but not in part, and to pay the other amounts included in the aggregate Redemption Prices and all accrued and unpaid Administrative Expenses (regardless of the Administrative Expense Cap), including the reasonable fees, costs, charges and expenses incurred by the Co-Issuers, the Trustee and the Collateral Administrator (including reasonable attorneys' fees and expenses) in connection with such Refinancing, (ii) the Sale Proceeds, Refinancing Proceeds and other available funds are used (to the extent necessary) to make such redemption and (iii) the agreements relating to the Refinancing contain limited recourse and non-petition provisions equivalent (mutatis mutandis) to those contained in <u>Section 13.1(d)</u> and <u>Section 2.7(i)</u>.

(f)    In the case of a Refinancing upon a redemption of the Secured Notes in part by Class (other than the Class A Notes or the Class B Notes) pursuant to <u>Section 9.2(d)</u>, such Refinancing will be effective only if: (i) S&P has been notified with respect to any remaining Secured Notes that were not the subject of such Refinancing, (ii) the Refinancing Proceeds will be at least sufficient to pay in full the aggregate Redemption Prices of the entire Class or Classes of Secured Notes subject to Refinancing, (iii) the Refinancing Proceeds are used (to the extent necessary) to make such redemption, (iv) the agreements relating to the Refinancing contain limited recourse and non-petition provisions equivalent (*mutatis mutandis*) to those contained in the <u>Section 13.1(d)</u> and <u>Section 2.7(i)</u>, (v) the aggregate principal amount of any obligations providing the

Page 169

Refinancing Proceeds is no greater than the Aggregate Outstanding Amount of the Secured Notes being redeemed with the proceeds of such obligations, (vi) the stated maturity of each class of obligations providing the Refinancing Proceeds is no earlier than the corresponding Stated Maturity of each Class of Secured Notes being refinanced, (vii) the reasonable fees, costs, charges and expenses incurred in connection with such Refinancing have been paid or will be adequately provided for from the Refinancing Proceeds (except for expenses owed to persons that the Portfolio Manager informs the Trustee will be paid solely as Administrative Expenses payable in accordance with the Priority of Payments), (viii) the interest rate of any obligations providing the Refinancing Proceeds will not be greater than the interest rate of the Secured Notes subject to such Refinancing, (ix) the obligations providing the Refinancing Proceeds are subject to the Priority of Payments and do not rank higher in priority pursuant to the Priority of Payments than the Class of Secured Notes being refinanced, (x) the voting rights, consent rights, redemption rights and all other rights of the obligations providing the Refinancing Proceeds are substantially the same as the rights of the corresponding Class of Secured Notes being refinanced and (xi) an opinion of Dechert LLP or tax counsel of nationally recognized standing in the United States experienced in such matters shall be delivered to the Trustee to the effect that (A) any remaining Class A Notes, Class B Notes, Class C Notes or Class D Notes that were not the subject of the Refinancing will, and any remaining Class E Notes that were not the subject of Refinancing should, be treated as debt for U.S. federal income tax purposes, and (B) any obligations providing the Refinancing Proceeds for the Class C Notes or Class D Notes will be treated as debt (or, in the case of any obligations providing refinancing for the Class E Notes, to the effect that such obligations should be treated as debt) for U.S. federal income tax purposes.

(g)     The Holders of the Subordinated Notes will not have any cause of action against any of the Co-Issuers, the Portfolio Manager, the Collateral Administrator or the Trustee for any failure to obtain a Refinancing. If a Refinancing is obtained meeting the requirements specified above as certified by the Portfolio Manager, the Issuer and the Trustee shall amend this Indenture to the extent necessary to reflect the terms of the Refinancing and no further consent for such amendments shall be required from the Holders of Notes other than Holders of the Subordinated Notes directing the redemption. The Trustee shall not be obligated to enter into any amendment that, in its view, adversely affects its duties, obligations, liabilities or protections hereunder, and the Trustee shall be entitled to conclusively rely upon an Officer's certificate and/or Opinion of Counsel as to matters of law (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering such opinion of counsel) provided by the Issuer to the effect that such amendment meets the requirements specified above and is permitted under this Indenture (except that such Officer or counsel shall have no obligation to certify or opine as to the sufficiency of the Refinancing Proceeds, or the sufficiency of the Accountants' Report required pursuant to Section 7.17).

(h)     In the event of any redemption pursuant to this Section 9.2, the Issuer shall, at least 30 days prior to the Redemption Date, notify the Trustee in writing of such Redemption

Date, the applicable Record Date, the principal amount of Notes to be redeemed on such Redemption Date and the applicable Redemption Prices.

**9.3     Tax Redemption**

(a)     The Notes shall be redeemed in whole but not in part (any such redemption, a "Tax Redemption") at the written direction (delivered to the Issuer and the Trustee) of (x) a Majority of any Affected Class or (y) a Majority of the Subordinated Notes, in either case following the occurrence and continuation of a Tax Event.

(b)     Upon its receipt of such written direction directing a Tax Redemption, the Issuer (or the Portfolio Manager on its behalf) shall direct the sale (and the manner thereof) of all or a portion of the Collateral Obligations and other Assets such that the proceeds from such sale and all other funds available for such purpose in the Collection Account and the Payment Account will be at least sufficient to pay the Redemption Prices of the Notes to be redeemed or with respect to any Class of Secured Notes the Holders of which have elected to receive less than 100% of the Redemption Price that would otherwise be payable to the Holders of such Class, such lesser amount that the Holders of such Class have elected to receive, and to pay all Administrative Expenses (regardless of the Administrative Expense Cap) payable under the Priority of Payments. The Issuer (or the Portfolio Manager on its behalf) may affect the sale of all or any part of the Collateral Obligations or other Assets through the direct sale of such Collateral Obligations or other Assets or by participation or other arrangement.

(c)     Upon its receipt of such written direction directing a Tax Redemption, the Trustee shall promptly notify the Portfolio Manager, the Holders and S&P thereof.

(d)     If an Officer of the Portfolio Manager obtains actual knowledge of the occurrence of a Tax Event, the Portfolio Manager shall promptly notify the Issuer, the Collateral Administrator and the Trustee thereof, and upon receipt of such notice the Trustee shall promptly notify the Holders of the Notes and S&P thereof.

**9.4     Redemption Procedures**

(a)     In the event of any redemption pursuant to Section 9.2, the written direction of the Holders of the Subordinated Notes and the Portfolio Manager required thereby shall be provided to the Issuer, the Trustee and the Portfolio Manager not later than 45 days prior to the Redemption Date on which such redemption is to be made (which date shall be designated in such notice).  In the event of any redemption pursuant to Section 9.2 or 9.3, a notice of redemption shall be given by first class mail, postage prepaid, mailed not later than nine Business Days prior to the applicable Redemption Date, to each Holder of Notes, at such Holder's address in the Register and S&P.  So long as any Notes are listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of redemption pursuant to Section 9.2 or 9.3 shall also be given to the Holders thereof by the Issuer for publication on the Irish Stock Exchange.

(b)     All notices of redemption delivered pursuant to Section 9.4(a) shall state:

(i)      the applicable Redemption Date;

(ii)     the Redemption Prices of the Notes to be redeemed;

(iii)    that all of the Secured Notes to be redeemed are to be redeemed in full and that interest on such Secured Notes shall cease to accrue on the Redemption Date specified in the notice;

(iv)     the place or places where Notes are to be surrendered for payment of the Redemption Prices, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2; and

(v)      if all Secured Notes are being redeemed, whether the Subordinated Notes are to be redeemed in full on such Redemption Date and, if so, the place or places where the Subordinated Notes (other than any Uncertificated Subordinated Notes) are to be surrendered for payment of the Redemption Prices, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 in order to receive payment therefor.

The Co-Issuers may withdraw any such notice of redemption delivered pursuant to Section 9.2 (or any such notice of redemption delivered pursuant to Section 9.3, if (i) proceeds from the sale of the Assets will be insufficient to pay, together with other required amounts, the Redemption Price of any Class of Secured Notes, and Holders of such Class have not elected to receive the lesser amount that will be available) or (ii) the Portfolio Manager is unable to obtain the applicable Refinancing on behalf of the Issuer, on any day up to and including the later of (x) the day on which the Portfolio Manager is required to deliver to the Trustee the sale agreement or agreements or certifications as described in Section 9.4(c), by written notice to the Trustee that the Portfolio Manager will be unable to deliver the sale agreement or agreements or certifications described in Section 9.4(c) and (y) the day on which the Holders of Notes are notified of such redemption in accordance with Section 9.4(a), at the written direction of a Majority of the Subordinated Notes and the Portfolio Manager to the Issuer, the Trustee and the Portfolio Manager.

Notice of redemption pursuant to Section 9.2 or 9.3 shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

(c)    Unless Refinancing Proceeds are being used to redeem the Secured Notes in whole or in part (other than the Class A Notes or the Class B Notes), in the event of any redemption pursuant to Section 9.2 or 9.3, no Secured Notes may be so redeemed unless (i) at least five Business Days before the scheduled Redemption Date the Portfolio Manager shall have furnished to the Trustee evidence, in a form reasonably satisfactory to the Trustee, that the Portfolio Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial or other institution or institutions whose short-term

unsecured debt obligations (other than such obligations whose rating is based on the credit of a person other than such institution) are rated, or guaranteed by a Person whose short-term unsecured debt obligations are rated, at least "A-1" by S&P and at least "P-1" by Moody's to purchase (directly or by participation or other arrangement), not later than the Business Day immediately preceding the scheduled Redemption Date in immediately available funds, all or part of the Assets at a purchase price at least sufficient, together with the Eligible Investments maturing, redeemable or putable to the obligor on or issuer thereof at par on or prior to the scheduled Redemption Date, to pay all Administrative Expenses (regardless of the Administrative Expense Cap) payable in accordance with the Priority of Payments and redeem all of the Secured Notes on the scheduled Redemption Date at the applicable Redemption Prices (or in the case of any Class of Secured Notes, such lesser amount that the Holders of such Class have elected to receive, in the case of a Tax Redemption where Holders of such Class have elected to receive less than 100% of the Redemption Price that would otherwise be payable to the Holders of such Class), or (ii) prior to selling any Collateral Obligations and/or Eligible Investments, the Portfolio Manager shall certify to the Trustee that, in its judgment, the aggregate sum of (A) expected proceeds from the sale of Eligible Investments, and (B) for each Collateral Obligation, the product of its Principal Balance and its Market Value, shall exceed the sum of (x) the aggregate Redemption Prices (or in the case of any Class of Secured Notes, such other amount that the Holders of such Class have elected to receive, in the case of a Tax Redemption where Holders of such Class have elected to receive less than 100% of the Redemption Price that would otherwise be payable to the Holders of such Class) of the Outstanding Secured Notes and (y) all Administrative Expenses (regardless of the Administrative Expense Cap) payable under the Priority of Payments. Any certification delivered by the Portfolio Manager pursuant to this Section 9.4(c) shall include (1) the prices of, and expected proceeds from, the sale (directly or by participation or other arrangement) of any Collateral Obligations and/or Eligible Investments and (2) all calculations required by this Section 9.4(c). Any Holder of Notes, the Portfolio Manager or any of the Portfolio Manager's Affiliates shall have the right, subject to the same terms and conditions afforded to other bidders, to bid on Assets to be sold as part of an Optional Redemption or Tax Redemption.

**9.5     Notes Payable on Redemption Date**

(a)      Notice of redemption pursuant to Section 9.4 having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, subject to Section 9.4(c) and the Co-Issuers' right to withdraw any notice of redemption pursuant to Section 9.4(b), become due and payable at the Redemption Prices therein specified, and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Prices and accrued interest) all such Notes that are Secured Notes shall cease to bear interest on the Redemption Date. Other than in the case of an Uncertificated Subordinated Note, upon final payment on a Note to be so redeemed, the Holder shall present and surrender such Note at the place specified in the notice of redemption on or prior to such Redemption Date; *provided* that in the absence of notice to the Applicable Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender, if the Trustee and the Applicable Issuers shall

Page 173

have been furnished such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate.  In the case of an Uncertificated Subordinated Note, final payment and deregistration shall be made to the Holder thereof as indicated in Register, in accordance with the instructions previously provided by such Holder to the Trustee.  Payments of interest on Secured Notes so to be redeemed which are payable on or prior to the Redemption Date shall be payable to the Holders of such Secured Notes, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.7(e).

(b)     If any Secured Note called for redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period such Note remains Outstanding; *provided* that the reason for such non-payment is not the fault of such Noteholder.

**9.6     Special Redemption**

The Secured Notes will be subject to redemption in part by the Co-Issuers or the Issuer, as applicable, on any Payment Date (i) during the Reinvestment Period, if the Portfolio Manager notifies the Trustee at least five Business Days prior to the applicable Special Redemption Date that it has been unable, for a period of at least 20 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager and which would satisfy the Investment Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account that are to be invested in additional Collateral Obligations or (ii) after the Effective Date, if the Portfolio Manager notifies the Trustee that a redemption is required pursuant to Section 7.17 in order to cause S&P to provide written confirmation (which may take the form of a press release or other written communication) of its Initial Ratings of the Secured Notes (in each case, a "Special Redemption"). Any such notice in the case of clause (i) above shall be based upon the Portfolio Manager having attempted, in accordance with the standard of care set forth in the Portfolio Management Agreement, to identify additional Collateral Obligations as described above.  On the first Payment Date (and, to the extent applicable, all subsequent Payment Dates) following the Collection Period in which such notice is given (a "Special Redemption Date"), the amount in the Collection Account representing (1) in the case of a Special Redemption during the Reinvestment Period, Principal Proceeds which the Portfolio Manager has determined cannot be reinvested in additional Collateral Obligations or (2) in the case of a Special Redemption after the Effective Date, all Interest Proceeds and all other Principal Proceeds available in accordance with the Priority of Payments, will in each case be applied in accordance with the Priority of Payments.  In the case of clause (2), such amounts will be used for application in accordance with the Note Payment Sequence in an amount sufficient to cause S&P to provide written confirmation (which may take the form of a press release or other written communication) of its Initial Ratings of the Secured Notes pursuant to Section 7.17(e).  Notice of payments pursuant to this Section 9.6 shall be given not less than (x) in the case of a Special Redemption described in clause (i) above, three Business Days prior to the applicable Special Redemption Date and (y) in the of a Special Redemption described in clause (ii) above, one Business Day prior to the

18750188.25.BUSINESS

applicable Special Redemption Date, in each case by facsimile, email transmission or first class mail, postage prepaid, to each Holder of Secured Notes affected thereby at such Holder's facsimile number, email address or mailing address in the Register and to S&P. In addition, for so long as any Listed Notes are listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of Special Redemption to the holders of such Listed Notes shall also be given by the Issuer or, upon Issuer Order, by the Irish Listing Agent in the name and at the expense of the Co-Issuers, to Noteholders by the Issuer for publication on the Irish Stock Exchange.

**9.7    Class A-1/A-2 Make-Whole Amount**

If the Class A-1 Notes or the Class A-2 Notes, as applicable (a) are redeemed after the end of the Non-Call Period but on or before the Payment Date in February 2017 in connection with an Optional Redemption, (b) are redeemed after the end of the Non-Call Period but on or before the Payment Date in February 2017 in connection with a Refinancing, (c) are repaid principal on any Payment Date before the Payment Date in February 2017 as a result of a termination of the Reinvestment Period because the Portfolio Manager, in its sole discretion, reasonably determines that it can no longer reinvest in additional Collateral Obligations in accordance with this Indenture and the Portfolio Management Agreement, or (d) are repaid principal under Section 11.1(a)(ii)(C)(2) on any Payment Date before the Payment Date in February 2017, then holders of such Class A-1 Notes or Class A-2 Notes, as applicable, are entitled to receive a Class A-1/A-2 Make-Whole Amount as part of the Redemption Price for the Class A-1 Notes or Class A-2 Notes, as applicable, in the circumstances contemplated under clauses (a) or (b) above, or the repayment of principal, in the circumstances contemplated under clauses (c) or (d) above, as the case may be.

In the circumstances contemplated under clauses (c) or (d) above, available Principal Proceeds shall be allocated between (x) repayment of the principal amount, *pro rata* and *pari passu*, of (i) the Class A-1A Notes, (ii) the Class A-1F Notes and (iii) the Class A-2 Notes, as applicable, on the one hand, and (y) payment of the Class A-1/A-2 Make-Whole Amount, on the other hand, as follows:

    (1)    the Class A-1A Notes, the Class A-1F Notes and the Class A-2 Notes, as applicable, shall be repaid principal, *pro rata* and *pari passu,* in an amount equal to the quotient of:

        (x)    the aggregate amount of Principal Proceeds available to pay principal on such Class A-1A Notes, Class A-1F Notes and Class A-2 Notes, as applicable, and/or to pay the Class A-1/A-2 Make-Whole Amount *divided by*

        (y)    the sum (expressed as a percentage) of (i) the product of (A) (w) in the case of the Class A-1A Notes, 1.51%, (x) in the case of the Class A-1F Notes, 1.56%, (y) in the case of the Class A-2A Notes, 1.55% and (z) in the case of the Class A-2B Notes, 2.00% and (B) the number of days in the period from and including such Redemption Date or Payment Date, as

Page 175

the case may be, to but excluding the Payment Date in February 2017, divided by 360 plus (ii) 100%; and

(2) the Class A-1/A-2 Make-Whole Amount shall be calculated and paid, *pro rata* and *pari passu* to the Class A-1A Notes, the Class A-1F Notes and the Class A-2 Notes, assuming the Class A-1A Notes, Class A-1F Notes and Class A-2 Notes, as applicable, are repaid an amount of principal as calculated in the foregoing clause (1);

*provided* that any payment of such Class A-1/A-2 Make-Whole Amount shall be made, in part or in full, only to the extent that the Overcollateralization Test with respect to each Class of Secured Notes would be maintained or improved after any such payment; *provided further* that no payment of such Class A-1/A-2 Make-Whole Amount shall be due or payable on any subsequent Payment Date if not made pursuant to the proviso above.

The Portfolio Manager shall provide written notice to S&P of the payment of any Class A-1/A-2 Make-Whole Amount, and the amount thereof, on or prior to the relevant Payment Date or Redemption Date.

## 10. ACCOUNTS, ACCOUNTINGS AND RELEASES

### 10.1 Collection of Money

Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Assets, in accordance with the terms and conditions of such Assets. The Trustee shall segregate and hold all such Money and property received by it in trust for the Holders of the Notes and shall apply it as provided in this Indenture. Each Account shall be established and maintained with a financial institution (which may be the Trustee) (x) having a long-term debt rating at least equal to "A2" and a short-term debt rating of "P-1" by Moody's and having a combined capital and surplus of at least U.S.$200,000,000, and (y)(1) that is a federal or state-chartered depository institution that has a long-term debt rating of at least "A+" by S&P and a short-term debt rating of at least "A-1" by S&P, or (2) in segregated trust accounts with the corporate trust department of a federal or state-chartered deposit institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulation Section 9.10(b) that has (A) a long-term debt rating of at least "A+" by S&P or a long term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P, and (B) a long-term debt rating at least equal to "A2" and a short-term debt rating of "P-1" by Moody's. If at any time the ratings of a financial institution maintaining any Accounts fail to meet the required ratings set forth above, the Issuer shall cause the assets held in such Accounts to be moved within 30 calendar days to another institution that satisfies the requirements of clauses (x) and (y) above. All Cash deposited in the Accounts shall be invested only in Eligible Investments or Collateral Obligations in accordance with the terms of this Indenture. To avoid the consolidation of the Assets of the Issuer with the general assets of the Bank under any circumstances, the Trustee shall comply, and shall cause the Custodian to

Page 176

comply, with all law applicable to it as a national bank with trust powers holding segregated trust assets in a fiduciary capacity; *provided* that the foregoing shall not be construed to prevent the Trustee or Custodian from investing the Assets of the Issuer in Eligible Investments described in clause (ii) of the definition thereof that are obligations of the Bank.

## 10.2 Collection Account

(a)    In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, prior to the Closing Date, establish at the Custodian two segregated trust accounts, one of which will be designated the "Interest Collection Subaccount" and one of which will be designated the "Principal Collection Subaccount" (and which together will comprise the "Collection Account"), each held in the name of U.S. Bank National Association, as Trustee, for the benefit of the Secured Parties and each of which shall be maintained with the Custodian in accordance with the Securities Account Control Agreement.   The Trustee shall from time to time deposit into the Interest Collection Subaccount, in addition to the deposits required pursuant to Section 10.5(a), immediately upon receipt thereof or upon transfer from the Interest Reserve Account, Expense Reserve Account or Payment Account, all Interest Proceeds (unless simultaneously reinvested in additional Collateral Obligations in accordance with Article 12).   The Trustee shall deposit immediately upon receipt thereof or upon transfer from the Interest Reserve Account, Expense Reserve Account or Revolver Funding Account all other amounts remitted to the Collection Account into the Principal Collection Subaccount, including in addition to the deposits required pursuant to Section 10.5(a), (i) any funds designated as Principal Proceeds by the Portfolio Manager in accordance with this Indenture and (ii) all other Principal Proceeds (unless simultaneously reinvested in additional Collateral Obligations in accordance with Article 12 or in Eligible Investments).   The Issuer may, but under no circumstances shall be required to, deposit from time to time into the Collection Account, in addition to any amount required hereunder to be deposited therein, such Monies received from external sources for the benefit of the Secured Parties (other than payments on or in respect of the Collateral Obligations, Eligible Investments or other existing Assets) as the Issuer deems, in its sole discretion, to be advisable and to designate them as Interest Proceeds or Principal Proceeds.   All Monies deposited from time to time in the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Assets and shall be applied to the purposes herein provided.   Subject to Section 10.2(d), amounts in the Collection Account shall be reinvested pursuant to Section 10.5(a).

(b)    The Trustee, within one Business Day after receipt of any distribution or other proceeds in respect of the Assets which are not Cash, shall so notify the Issuer and the Issuer shall use its commercially reasonable efforts to, within five Business Days after receipt of such notice from the Trustee (or as soon as practicable thereafter), sell such distribution or other proceeds for Cash in an arm's length transaction and deposit the proceeds thereof in the Collection Account; *provided* that the Issuer (i) need not sell such distributions or other proceeds if it delivers an Issuer Order or an Officer's certificate to the Trustee certifying that such distributions or other proceeds constitute Collateral Obligations or Eligible Investments or (ii) may otherwise retain such distribution or other proceeds for

Page 177

up to two years from the date of receipt thereof if it delivers an Officer's certificate to the Trustee certifying that (x) it will sell such distribution within such two-year period and (y) retaining such distribution is not otherwise prohibited by this Indenture.

(c)     At any time when reinvestment is permitted pursuant to Article 12, the Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, withdraw funds on deposit in the Principal Collection Subaccount representing Principal Proceeds (together with Interest Proceeds but only to the extent used to pay for accrued interest on an additional Collateral Obligation) and reinvest (or invest, in the case of funds referred to in Section 7.17) such funds in additional Collateral Obligations or exercise a warrant held in the Assets, in each case in accordance with the requirements of Article 12 and such Issuer Order.  At any time, the Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, withdraw funds on deposit in the Principal Collection Subaccount representing Principal Proceeds and deposit such funds in the Revolver Funding Account to meet funding requirements on Delayed Drawdown Collateral Obligations or Revolving Collateral Obligations.

(d)     The Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, pay from amounts on deposit in the Collection Account on any Business Day during any Interest Accrual Period (i) any amount required to exercise a warrant or right to acquire securities held in the Assets in accordance with the requirements of Article 12 and such Issuer Order, and (ii) from Interest Proceeds only, any Administrative Expenses (such payments to be counted against the Administrative Expense Cap for the applicable period and to be subject to the order of priority as stated in the definition of Administrative Expenses); *provided* that the aggregate Administrative Expenses paid pursuant to this Section 10.2(d) during any Collection Period shall not exceed the Administrative Expense Cap for the related Payment Date.

(e)     The Trustee shall transfer to the Payment Account, from the Collection Account for application pursuant to Section 11.1(a), on the Business Day immediately preceding each Payment Date, the amount set forth to be so transferred in the Distribution Report for such Payment Date.

(f)     The Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, transfer from amounts on deposit in the Interest Collection Subaccount to the Principal Collection Subaccount, amounts necessary for application pursuant to Section 7.17(e)(x)(B), the proviso to Section 7.17(e)(x), Section 7.17(e)(y) or the proviso thereto.

**10.3    Transaction Accounts**

(a)     **Payment Account.**  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, prior to the Closing Date, establish at the Custodian a single, segregated non-interest bearing trust account held in the name of U.S.

Page 178

Bank National Association, as Trustee, for the benefit of the Secured Parties, which shall be designated as the Payment Account, which shall be maintained with the Custodian in accordance with the Securities Account Control Agreement. Except as provided in Section 11.1(a), the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses, Management Fees and other amounts specified herein, each in accordance with the Priority of Payments. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments. Amounts in the Payment Account shall remain uninvested.

(b)     **Custodial Account.**  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, prior to the Closing Date, establish at the Custodian a single, segregated non-interest bearing trust account held in the name of U.S. Bank National Association, as Trustee, for the benefit of the Secured Parties, which shall be designated as the Custodial Account, which shall be maintained with the Custodian in accordance with the Securities Account Control Agreement. All Collateral Obligations shall be credited to the Custodial Account. The only permitted withdrawals from the Custodial Account shall be in accordance with the provisions of this Indenture. The Trustee agrees to give the Co-Issuers immediate notice if (to the actual knowledge of a Trust Officer of the Trustee) the Custodial Account or any assets or securities on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Custodial Account other than in accordance with this Indenture and the Priority of Payments. Amounts in the Custodial Account shall remain uninvested.

(c)     **Ramp-Up Account.**  The Trustee shall, prior to the Closing Date, establish at the Custodian a single, segregated non-interest bearing trust account held in the name of U.S. Bank National Association, as Trustee, for the benefit of the Secured Parties, which shall be designated as the Ramp-Up Account, which shall be maintained with the Custodian in accordance with the Securities Account Control Agreement. The Issuer shall direct the Trustee to deposit the amount specified in Section 3.1(a)(xii)(A) to the Ramp-Up Account. Of such net proceeds of the issuance of the Notes which are not applied to pay for the purchase of Collateral Obligations, after the Effective Date, but prior to the first Determination Date, and after taking into account amounts to be transferred, up to $3,000,000 in Principal Proceeds ("Designated Principal Proceeds") may be designated, on one occasion only, by the Portfolio Manager as Interest Proceeds (but only if the Effective Date Overcollateralization Test would be satisfied after such designation). In connection with any purchase of an additional Collateral Obligation, the Trustee will apply amounts held in the Ramp-Up Account as provided by Section 7.17(b). On the first Business Day after a Trust Officer of the Trustee has received written notice from the Portfolio Manager that S&P has confirmed its Initial Rating of the Secured Notes pursuant to Section 7.17(e), or upon the occurrence of an Event of Default, the Trustee will deposit any remaining amounts in the Ramp-Up Account (excluding any proceeds

Page 179

that will be used to settle binding commitments entered into prior to such date) into the Principal Collection Subaccount as Principal Proceeds. Any income earned on amounts deposited in the Ramp-Up Account will be deposited in the Interest Collection Subaccount.

(d)     **Expense Reserve Account.**  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, prior to the Closing Date, establish at the Custodian a single, segregated non-interest bearing trust account held in the name of U.S. Bank National Association, as Trustee, for the benefit of the Secured Parties, which shall be designated as the Expense Reserve Account, which shall be maintained with the Custodian in accordance with the Securities Account Control Agreement.  The Issuer shall direct the Trustee to deposit to the Expense Reserve Account (i) the amount specified in Section 3.1(a)(xii)(B) and (ii) in connection with any additional issuance of notes, the amount specified in Section 3.2(a)(vii).  On any Business Day from the Closing Date to and including the Determination Date relating to the first Payment Date following the Closing Date, the Trustee shall apply funds from the Expense Reserve Account, as directed by the Portfolio Manager, to pay expenses of the Co-Issuers incurred in connection with the establishment of the Co-Issuers, the structuring and consummation of the Offering and the issuance of the Notes and any additional issuance.  By the Determination Date relating to the first Payment Date following the Closing Date, all funds in the Expense Reserve Account (after deducting any expenses paid on such Determination Date) will be deposited in the Collection Account as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its sole discretion).  On any Business Day after the Determination Date relating to the first Payment Date following the Closing Date, the Trustee shall apply funds from the Expense Reserve Account, as directed by the Portfolio Manager, to pay expenses of the Co-Issuers incurred in connection with any additional issuance of notes or as a deposit to the Collection Account as Principal Proceeds. Any income earned on amounts deposited in the Expense Reserve Account will be deposited in the Interest Collection Subaccount as Interest Proceeds as it is received.

(e)     **Interest Reserve Account**.  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, prior to the Closing Date, establish at the Custodian a single, segregated non-interest bearing trust account held in the name of U.S. Bank National Association, as Trustee, for the benefit of the Secured Parties, which will be designated as the Interest Reserve Account, which shall be maintained with the Custodian in accordance with the Securities Account Control Agreement. On the Closing Date, at the direction of the Portfolio Manager (and with notice to the Collateral Administrator), the Trustee will transfer proceeds from the offering of the Notes in an amount equal to the Interest Reserve Amount.  On or before the Determination Date in the first Collection Period, at the direction of the Portfolio Manager, the Issuer may direct that any portion of the then remaining Interest Reserve Amount be transferred to the Collection Account and included as Interest Proceeds or Principal Proceeds for such Collection Period.  On the Payment Date relating to the first Collection Period, so long as no S&P Rating Confirmation Failure has occurred at such time, all amounts on deposit in the Interest Reserve Account will be transferred to the Payment Account and applied as

Page 180

Interest Proceeds; *provided* that if an S&P Rating Confirmation Failure has occurred such amounts on deposit in the Interest Reserve Account may be applied as Principal Proceeds (as directed by the Portfolio Manager and with notice to the Collateral Administrator) in accordance with Section 7.17(e) and the Priority of Payments, and, at such time the Trustee will close the Interest Reserve Account.  Amounts credited to the Interest Reserve Account shall be reinvested pursuant to Section 10.5(a) in overnight investments that are Eligible Investments and any income earned shall be deposited in the Interest Collection Subaccount.

(f)      **Reinvestment Amount Account**.  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, prior to the Closing Date, establish at the Custodian a single, segregated non-interest bearing trust account held in the name of U.S. Bank National Association, as Trustee, for the benefit of the Secured Parties, which will be designated as the Reinvestment Amount Account, which shall be maintained with the Custodian in accordance with the Securities Account Control Agreement.  Reinvestment Amounts deposited in the Reinvestment Amount Account will be withdrawn, not later than the Business Day after the Payment Date on which such Reinvestment Amounts are deposited in the Reinvestment Amount Account, solely to be transferred to the Collection Account as Principal Proceeds to purchase additional Collateral Obligations in accordance with the terms of this Indenture.  Amounts in the Reinvestment Amount Account shall remain uninvested.

## 10.4      The Revolver Funding Account

Upon the purchase of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, funds in an amount equal to the undrawn portion of such obligation shall be withdrawn first from the Ramp-Up Account and, if necessary, from the Principal Collection Subaccount, and deposited by the Trustee in a single, segregated non-interest bearing trust account established at the Custodian and held in the name of U.S. Bank National Association, as Trustee, for the benefit of the Secured Parties (the "Revolver Funding Account"); *provided* that, if such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation is a Participation Interest with respect to which the Selling Institution requires funds to be deposited with the Selling Institution or its custodian in an amount equal to any portion of the undrawn amount of such obligation as collateral for the funding obligations under such obligation (such funds, the "Selling Institution Collateral"), the Issuer shall deposit the Selling Institution Collateral with such Selling Institution or custodian rather than in the Revolver Funding Account, subject to the following sentence.  Any such deposit of Selling Institution Collateral shall satisfy the following requirement: either (1) the aggregate amount of Selling Institution Collateral deposited with such Selling Institution or its custodian (other than an Eligible Custodian) under all Participation Interests shall not have an Aggregate Principal Balance in excess of 5% of the Collateral Principal Amount and shall not remain on deposit with such Selling Institution or custodian for more than 30 calendar days after such Selling Institution first fails to satisfy the rating requirements set out in the Third Party Credit Exposure Limits (and the terms of each such deposit shall permit the Issuer to withdraw the Selling Institution Collateral if such Selling Institution fails at any time to satisfy the rating requirements set out in the Third

Page 181

Party Credit Exposure Limits); or (2) such Selling Institution Collateral shall be deposited with an Eligible Custodian.

The Issuer shall direct the Trustee to deposit the amount specified in Section 3.1(a)(xii)(C) to the Revolver Funding Account to be reserved for unfunded funding obligations under the Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations purchased on or before the Closing Date. Upon initial purchase of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, funds deposited in the Revolver Funding Account in respect of such Collateral Obligation and Selling Institution Collateral deposited with the Selling Institution in respect of such Collateral Obligation will be treated as part of the purchase price therefor. Amounts on deposit in the Revolver Funding Account will be invested in overnight funds that are Eligible Investments selected by the Portfolio Manager pursuant to Section 10.5 and earnings from all such investments will be deposited in the Interest Collection Subaccount as Interest Proceeds.

Funds shall be deposited in the Revolver Funding Account upon the purchase of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation and upon the receipt by the Issuer of any Principal Proceeds with respect to a Revolving Collateral Obligation as directed by the Portfolio Manager such that the amount of funds on deposit in the Revolver Funding Account shall be equal to or greater than the aggregate amount of unfunded funding obligations (disregarding the portion, if any, of any such unfunded funding obligations that is collateralized by Selling Institution Collateral) under all such Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations then included in the Assets.

Any funds in the Revolver Funding Account (other than earnings from Eligible Investments therein) will be available solely to cover any drawdowns on the Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations; *provided* that any excess of (A) the amounts on deposit in the Revolver Funding Account over (B) the sum of the unfunded funding obligations (disregarding the portion, if any, of any such unfunded funding obligations that is collateralized by Selling Institution Collateral) under all Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations (which excess may occur for any reason, including upon (i) the sale or maturity of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, (ii) the occurrence of an event of default with respect to any such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation or (iii) any other event or circumstance which results in the irrevocable reduction of the undrawn commitments under such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation) may be transferred by the Trustee (at the written direction of the Portfolio Manager on behalf of the Issuer) from time to time as Principal Proceeds to the Principal Collection Subaccount.

**10.5    Reinvestment of Funds in Accounts; Reports by Trustee**

(a)    By Issuer Order (which may be in the form of standing instructions), the Issuer (or the Portfolio Manager on behalf of the Issuer) shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds on deposit in the Collection Account, the Ramp-Up Account, the Revolver Funding Account, the Interest

18750188.25.BUSINESS

Reserve Account and the Expense Reserve Account, as so directed in Eligible Investments having stated maturities no later than the Business Day preceding the next Payment Date (or such shorter maturities expressly provided herein). If prior to the occurrence of an Event of Default, the Issuer shall not have given any such investment directions, the Trustee shall seek instructions from the Portfolio Manager within three Business Days after transfer of any funds to such accounts. If the Trustee does not thereafter receive written instructions from the Portfolio Manager within five Business Days after transfer of such funds to such accounts, it shall invest and reinvest the funds held in such accounts, as fully as practicable, in the Standby Investment maturing no later than the Business Day immediately preceding the next Payment Date (or such shorter maturities expressly provided herein). If after the occurrence of an Event of Default, the Issuer shall not have given such investment directions to the Trustee for three consecutive days, the Trustee shall invest and reinvest such Monies as fully as practicable in the Standby Investment maturing not later than the earlier of (i) 30 days after the date of such investment (unless putable at par to the issuer thereof) or (ii) the Business Day immediately preceding the next Payment Date (or such shorter maturities expressly provided herein). Except to the extent expressly provided otherwise herein, all interest and other income from such investments shall be deposited in the Interest Collection Subaccount, any gain realized from such investments shall be credited to the Principal Collection Subaccount upon receipt, and any loss resulting from such investments shall be charged to the Principal Collection Subaccount. The Trustee shall not in any way be held liable by reason of any insufficiency of such accounts which results from any loss relating to any such investment, *provided* that nothing herein shall relieve the Bank of (i) its obligations or liabilities under any security or obligation issued by the Bank or any Affiliate thereof or (ii) liability for any loss resulting from gross negligence, willful misconduct or fraud on the part of the Bank or any Affiliate thereof.

(b)    The Trustee agrees to give the Issuer immediate notice if any Account or any funds on deposit in any Account, or otherwise to the credit of an Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.

(c)    The Trustee shall supply, in a timely fashion, to the Co-Issuers, S&P and the Portfolio Manager any information regularly maintained by the Trustee that the Co-Issuers, S&P or the Portfolio Manager may from time to time reasonably request with respect to the Assets, the Accounts and the other Assets and provide any other requested information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.6 or to permit the Portfolio Manager to perform its obligations under the Portfolio Management Agreement or the Issuer's obligations hereunder that have been delegated to the Portfolio Manager. The Trustee shall promptly forward to the Portfolio Manager copies of notices and other writings received by it from the issuer of any Collateral Obligation or from any Clearing Agency with respect to any Collateral Obligation which notices or writings advise the holders of such Collateral Obligation of any rights that the holders might have with respect thereto (including, without limitation, requests to vote with respect to amendments or waivers and notices of prepayments and redemptions) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer.

Page 183

(d)     In addition to any credit, withdrawal, transfer or other application of funds with respect to any Account set forth in Article 10, any credit, withdrawal, transfer or other application of funds with respect to any Account authorized elsewhere in this Indenture is hereby authorized.

(e)     Any account established under this Indenture may include any number of subaccounts deemed necessary or advisable by the Trustee in the administration of the accounts.

**10.6    Accountings**

(a)     **Monthly.**  Not later than the 5th day of each calendar month (or, if such day is not a Business Day, the next succeeding Business Day), commencing in April 2014 (other than, after the Effective Date, the months of February, May, August and November in each year), the Issuer shall compile and make available (or cause to be compiled and made available) to S&P, the Trustee, the Portfolio Manager, the Initial Purchaser, Intex Solutions, Bloomberg and, upon written request therefor, to any Holder shown on the Register and, upon written notice to the Trustee in the form of Exhibit H, any beneficial owner of a Note, a monthly report on a trade date basis with respect to the prior calendar month (each such report a "Monthly Report").  The Monthly Report for a calendar month shall contain the following information with respect to the Collateral Obligations and Eligible Investments included in the Assets, and shall be determined as of the 21st day of the prior calendar month (such 21st day, the "Monthly Report Determination Date" related to the current calendar month); *provided* that any Monthly Report delivered with respect to a Monthly Report Determination Date occurring prior to the Effective Date shall contain only the information described in clauses (iii), (iv)(A), (iv)(C), (iv)(D) and (viii) below:

(i)     Aggregate Principal Balance of Collateral Obligations and Eligible Investments representing Principal Proceeds.

(ii)    Adjusted Collateral Principal Amount of Collateral Obligations.

(iii)   Collateral Principal Amount of Collateral Obligations.

(iv)    A list of Collateral Obligations, including, with respect to each such Collateral Obligation, the following information:

(A)    The obligor thereon (including the issuer ticker, if any);

(B)    The CUSIP or security identifier thereof (including, with respect to loans, the LoanX pricing service identification number, if available);

(C)    The Principal Balance thereof (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest));

Page 184

(D)     The percentage of the aggregate Collateral Principal Amount represented by such Collateral Obligation;

(E)     The related interest rate or spread;

(F)     The LIBOR floor, if any, and a description of the operation of such floor;

(G)     The stated maturity thereof;

(H)     The related S&P Industry Classification;

(I)     The Moody's Rating, unless such rating is based on a credit estimate unpublished by Moody's (and, in the event of a downgrade or withdrawal of the applicable Moody's Rating, the prior rating and the date such Moody's Rating was changed), and whether such Moody's Rating is derived from an S&P Rating as provided in clause (e)(i)(A) or (B) of the definition of the term "Moody's Derived Rating";

(J)     The Moody's Default Probability Rating;

(K)     The S&P Rating, unless such rating is based on a credit estimate or is a private or confidential rating from S&P;

(L)     The country of Domicile;

(M)     An indication as to whether each such Collateral Obligation is (1) a Senior Secured Loan, (2) a Second Lien Loan, (3) an Unsecured Loan, (4) a Defaulted Obligation, (5) a Delayed Drawdown Collateral Obligation, (6) a Revolving Collateral Obligation, (7) a Participation Interest (indicating the related Selling Institution and its ratings by each Rating Agency), (8) a Letter of Credit Reimbursement Obligation (indicating the LC Commitment Amount thereunder, the related LOC Agent Bank and its ratings by each Rating Agency), (9) a Deferrable Security, (10) a Current Pay Obligation, (11) a DIP Collateral Obligation, (12) a Discount Obligation, (13) a Discount Obligation purchased in the manner described in clause (y) of the proviso to the definition "Discount Obligation", (14) a Cov-Lite Loan, (15) a Senior Secured Bond, (16) a Senior Secured Floating Rate Note or (17) an Unsecured Bond;

(N)     With respect to each Collateral Obligation that is a Discount Obligation purchased in the manner described in clause (y) of the proviso to the definition "Discount Obligation",

        i.      the identity of the Collateral Obligation (including whether such Collateral Obligation was classified as a Discount Obligation at the time of its original purchase) the proceeds of whose sale are used to purchase the purchased Collateral Obligation;

Page 185

ii.    the purchase price (as a percentage of par) of the purchased Collateral Obligation and the sale price (as a percentage of par) of the Collateral Obligation the proceeds of whose sale are used to purchase the purchased Collateral Obligation;

iii.    the Moody's Default Probability Rating assigned to the purchased Collateral Obligation and the Moody's Default Probability Rating assigned to the Collateral Obligation the proceeds of whose sale are used to purchase the purchased Collateral Obligation; and

iv.    the Aggregate Principal Balance of Collateral Obligations that have been excluded from the definition of "Discount Obligation" and relevant calculations indicating whether such amount is in compliance with the limitations described in clauses (z)(A) and (z)(B) of the proviso to the definition of "Discount Obligation."

(O)    The Aggregate Principal Balance of all Cov-Lite Loans;

(P)    The Moody's Recovery Rate;

(Q)    The S&P Recovery Rate;

(R)    The Market Value of such Collateral Obligation and, if such Market Value was calculated based on a bid price determined by a loan pricing service, the name of such loan pricing service (including such disclaimer language as a loan pricing service may from time to time require, as provided by the Portfolio Manager to the Trustee and the Collateral Administrator);

(S)    (I) Whether the settlement date with respect to such Collateral Obligation has occurred and (II) such settlement date, if it has occurred;

(T)    The identity and Principal Balance (other than any accrued interest that is expected to be purchased with Principal Proceeds (but excluding any capitalized interest)) of each Collateral Obligation that the Issuer has committed to purchase (and the date of such commitment to purchase) for which the settlement date has not yet occurred; and

(U)    The Weighted Average Floating Spread (calculated both with and without reference to the S&P CDO Monitor Test).

(v)    If the Monthly Report Determination Date occurs on or after the Effective Date, for each of the limitations and tests specified in the definitions of Concentration Limitations and Collateral Quality Test (1) the result, (2) the related minimum or maximum test level and (3) a determination as to whether such result satisfies the related test.

(vi)    The calculation of each of the following:

Page 186

(A)     Each Interest Coverage Ratio (and setting forth the percentage required to satisfy each Interest Coverage Test);

(B)     Each Overcollateralization Ratio (and setting forth the percentage required to satisfy each Overcollateralization Ratio Test); and

(C)     The Interest Diversion Test (and setting forth the percentage required to satisfy the Interest Diversion Test).

(vii)     The calculation specified in Section 5.1(g).

(viii)     For each Account, a schedule showing the beginning balance, each credit or debit specifying the nature, source and amount, and the ending balance.

(ix)     A schedule showing for each of the following the beginning balance, the amount of Interest Proceeds received from the date of determination of the immediately preceding Monthly Report, and the ending balance for the current Measurement Date:

(A)     Interest Proceeds from Collateral Obligations; and

(B)     Interest Proceeds from Eligible Investments.

(x)     Purchases, prepayments, and sales:

(A)     The identity, Principal Balance (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest)), Principal Proceeds and Interest Proceeds received, and date for (X) each Collateral Obligation that was released for sale or disposition pursuant to Section 12.1 since the Monthly Report Determination Date related to the prior calendar month and (Y) for each prepayment or redemption of a Collateral Obligation (and identifying whether it is a prepayment or a scheduled redemption), and in the case of (X), whether such Collateral Obligation was a Credit Risk Obligation or a Credit Improved Obligation, whether the sale of such Collateral Obligation was a discretionary sale;

(B)     The identity, Principal Balance (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest)), and Principal Proceeds and Interest Proceeds expended to acquire each Collateral Obligation acquired pursuant to Section 12.2 since the Monthly Report Determination Date related to the prior calendar month; and

(C)     Whether any Trading Plan has been applied and the Collateral Obligations that were subject to such Trading Plan and the percentage of the Aggregate Principal Balance consisting of Collateral Obligations that were

Page 187

subject to such Trading Plan; *provided* that such Trading Plan information shall be reported on its own separate page of the Monthly Report.

(xi) The identity of each Defaulted Obligation, the S&P Collateral Value and Market Value of each such Defaulted Obligation and date of default thereof.

(xii) The identity of each Collateral Obligation with an S&P Rating of "CCC+" or below and/or a Moody's Rating of "Caa1" or below and the Market Value of each such Collateral Obligation.

(xiii) The identity of each Deferring Security, the S&P Collateral Value and Market Value of each Deferring Security, and the date on which interest was last paid in full in Cash thereon.

(xiv) The identity of each Current Pay Obligation, the Market Value of each such Current Pay Obligation, and the percentage of the Collateral Principal Amount comprised of Current Pay Obligations.

(xv) The Aggregate Principal Balance, measured cumulatively from the Closing Date onward, of all Collateral Obligations that would have been acquired through a Distressed Exchange but for the operation of the proviso in the definition of "Distressed Exchange".

(xvi) The Weighted Average Moody's Rating Factor.

(xvii) The Diversity Score.

(xviii) The name, rating and maturity of any Eligible Investments.

(xix) The identity of any First Lien Last Out Loan.

(xx) The identity of the Tax Subsidiary and the identity of each Collateral Obligation, Equity Security or Defaulted Obligation, if any, held by such Tax Subsidiary.

(xxi) The amount of Cash, if any, held by any Tax Subsidiary.

(xxii) On a separate page of the Monthly Report, the identity each Post-Reinvestment Period Settlement Obligation (including the type of asset, Aggregate Principal Balance, size within the portfolio (expressed as a percentage of the Collateral Principal Amount), coupon or spread and maturity, jurisdiction and seniority level and any related information with respect to a Collateral Obligation as provided in this Section 10.6(a)) purchased by the Issuer with respect to which purchases the trade date has occurred but the settlement date has not yet occurred.

(xxiii) On a separate page of the Monthly Report, the identity of any Collateral Obligation purchased pursuant to a Trading Plan (including the type of asset, Aggregate Principal Balance, size within the portfolio (expressed as a percentage

Page 188

of the Collateral Principal Amount), coupon or spread and maturity, jurisdiction and seniority level) during the period covered by such Monthly Report, in each case, based on information provided by the Portfolio Manager to the Collateral Administrator and the Trustee.

(xxiv) The identity of each Collateral Obligation that has been the subject of a Maturity Amendment and the portion of the Aggregate Principal Balance of Collateral Obligations owned by the Issuer which has been the subject of Maturity Amendments after the Reinvestment Period does not exceed 5.0% of the Collateral Principal Amount.

(xxv) Such other information as S&P or the Portfolio Manager may reasonably request.

Upon receipt of each Monthly Report, the Trustee shall (a) notify S&P if such Monthly Report indicates that the S&P CDO Monitor Test has not been satisfied as of the relevant Measurement Date and (b) compare the information contained in such Monthly Report to the information contained in its records with respect to the Assets and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer, the Collateral Administrator, S&P and the Portfolio Manager if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Assets. In the event that any discrepancy exists, the Trustee and the Issuer, or the Portfolio Manager on behalf of the Issuer, shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days notify the Portfolio Manager who shall, on behalf of the Issuer, request that the Independent accountants selected by the Issuer pursuant to Section 10.8(a) perform agreed-upon procedures on the Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such procedures reveal an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture and notice of any error in the Monthly Report shall be sent as soon as practicable by the Issuer to all recipients of such report which may be accomplished by making a notation of such error in the subsequent Monthly Report.

(b) **Payment Date Accounting.** The Issuer shall render an accounting (each a "Distribution Report") determined as of the close of business on each Determination Date preceding a Payment Date, and shall make available such Distribution Report to the Trustee, the Portfolio Manager, the Initial Purchaser, S&P and, upon written request therefor, any Holder shown on the Register and, upon written notice to the Trustee in the form of Exhibit H, any beneficial owner of a Note not later than the Business Day preceding the related Payment Date. The Distribution Report shall contain the following information:

(i) the information required to be in the Monthly Report pursuant to Section 10.6(a);

(ii) (a) the Aggregate Outstanding Amount of the Secured Notes of each Class at the beginning of the Interest Accrual Period and such amount as a percentage of the original Aggregate Outstanding Amount of the Secured Notes of such Class,

Page 189

(b) the amount of principal payments to be made on the Secured Notes of each Class on the next Payment Date, the amount of any Secured Note Deferred Interest on the Class C Notes, Class D Notes, Class E Notes or Class F Notes and the Aggregate Outstanding Amount of the Secured Notes of each Class after giving effect to the principal payments, if any, on the next Payment Date and such amount as a percentage of the original Aggregate Outstanding Amount of the Secured Notes of such Class, (c) the Aggregate Outstanding Amount of the Subordinated Notes at the beginning of the Interest Accrual Period and such amount as a percentage of the original Aggregate Outstanding Amount of the Subordinated Notes, the amount of payments to be made on the Subordinated Notes on the next Payment Date, the Aggregate Outstanding Amount of the Subordinated Notes after giving effect to such payments, if any, on the next Payment Date and such amount as a percentage of the original Aggregate Outstanding Amount of the Subordinated Notes;

(iii)    the Interest Rate and accrued interest for each applicable Class of Notes for such Payment Date;

(iv)    the amounts payable pursuant to each clause of Section 11.1(a)(i), each clause of Section 11.1(a)(ii) and each clause of Section 11.1(a)(iii), as applicable, on the related Payment Date;

(v)    for the Collection Account:

    (A)    the Balance on deposit in the Collection Account at the end of the related Collection Period (or, with respect to the Interest Collection Subaccount, the next Business Day);

    (B)    the amounts payable from the Collection Account to the Payment Account, in order to make payments pursuant to Section 11.1(a)(i) and Section 11.1(a)(ii) and Section 11.1(a)(iii), as applicable, on the next Payment Date (net of amounts which the Portfolio Manager intends to re-invest in additional Collateral Obligations pursuant to Article 12); and

    (C)    the Balance remaining in the Collection Account immediately after all payments and deposits to be made on such Payment Date;

(vi)    in the Distribution Report prepared in connection with the first Payment Date:

    (A)    the Balance on deposit in the Ramp-Up Account as of the date that the Target Initial Par Condition was satisfied (net of unsettled trades);

    (B)    the amount of Principal Proceeds in the Ramp-Up Account that were eligible as Designated Principal Proceeds to be designated by the Portfolio Manager as Interest Proceeds;

Page 190

(C)      the amount of Designated Principal Proceeds in the Ramp-Up Account that were designated by the Portfolio Manager as Interest Proceeds; and

(vii)    such other information as the Portfolio Manager may reasonably request.

Each Distribution Report shall constitute instructions to the Trustee to withdraw funds from the Payment Account and pay or transfer such amounts set forth in such Distribution Report in the manner specified and in accordance with the priorities established in Section 11.1 and Article 13.

(c)     **Interest Rate Notice.** The Trustee shall include in the Monthly Report a notice setting forth the Interest Rate for each Class of Secured Notes for the Interest Accrual Period preceding the next Payment Date. The Trustee shall also include in the Monthly Report a notice setting forth the Base Rate for the Interest Accrual Period preceding the next Payment Date .

(d)     **Failure to Provide Accounting.** If the Trustee shall not have received any accounting provided for in this Section 10.6 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall notify the Portfolio Manager who shall use all reasonable efforts to obtain such accounting by the applicable Payment Date. To the extent the Portfolio Manager is required to provide any information or reports pursuant to this Section 10.6 as a result of the failure of the Issuer to provide such information or reports, the Portfolio Manager shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Portfolio Manager for such Independent certified public accountant shall be paid by the Issuer.

(e)     **Required Content of Certain Reports.** Each Monthly Report and each Distribution Report sent to any Holder or beneficial owner of an interest in a Note shall contain, or be accompanied by, the following notices:

The Notes may be beneficially owned only by Persons that (a) (i) are not U.S. persons (within the meaning of Regulation S under the United States Securities Act of 1933, as amended) and are purchasing their beneficial interest in an offshore transaction or (ii) are (A) Qualified Institutional Buyers or (solely in the case of the Subordinated Notes) Accredited Investors and (B) either Qualified Purchasers or (solely in the case of the Subordinated Notes) Knowledgeable Employees with respect to the Issuer (or corporations, partnerships, limited liability companies or other entities (other than trusts)) each shareholder, partner, member or other equity owner of which is either a Qualified Purchaser or a Knowledgeable Employee with respect to the Issuer and (b) can make the representations set forth in Section 2.5 or the appropriate Exhibit hereto. Beneficial ownership interests in the Rule 144A Global Notes may be transferred only to a Person that is both a Qualified Institutional Buyer and a Qualified Purchaser and that can make the representations referred to in clause (b) of the preceding sentence. The Issuer has the right to compel any beneficial owner of an interest in Rule 144A Global Notes that does not meet the qualifications set forth in the preceding sentence to sell its

Page 191

interest in such Notes, or may sell such interest on behalf of such owner, pursuant to <u>Section 2.11</u>.

Each holder receiving this report agrees to keep all non-public information herein confidential and not to use such information for any purpose other than its evaluation of its investment in the Notes, *provided* that any holder may provide such information on a confidential basis to any prospective purchaser of such holder's Notes that is permitted by the terms of this Indenture to acquire such holder's Notes and that agrees to keep such information confidential in accordance with the terms of this Indenture.

(f)     **Initial Purchaser Information.**  The Issuer and the Initial Purchaser, or any successor to the Initial Purchaser, may post the information contained in a Monthly Report or Distribution Report to a password-protected internet site accessible only to the Holders of the Notes and to the Portfolio Manager.

(g)     **Distribution of Reports and Transaction Documents.**  The Trustee will make the Monthly Report, the Distribution Report and the Transaction Documents (including any amendments thereto) and any notices or communications required to be delivered to the Holders in accordance with this Indenture available via its internet website (including notice of any Trading Plan to be posted no later than the Business Day following receipt thereof from the Portfolio Manager pursuant to <u>Section 1.2(o)</u>).  The Trustee's internet website shall initially be located at "https://www.usbank.com/cdo".    Parties that are unable to use the above distribution option are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such.  The Trustee shall notify S&P via electronic mail to CDO_Surveillance@sandp.com promptly upon a Monthly Report or a Distribution Report being made available via the Trustee's internet website.  The Trustee shall have the right to change the way such statements and the Transaction Documents are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Trustee shall provide timely and adequate notification to all above parties regarding any such changes.  As a condition to access to the Trustee's internet website, the Trustee may require registration and the acceptance of a disclaimer.  The Trustee shall be entitled to rely on but shall not be responsible for the content or accuracy of any information provided in the Monthly Report and the Distribution Report which the Trustee disseminates in accordance with this Indenture and may affix thereto any disclaimer it deems appropriate in its reasonable discretion.

(h)     The Trustee is authorized to make available to Intex Solutions, Inc. each Monthly Report and Distribution Report.

**10.7    Release of Assets**

(a)     If no Event of Default has occurred and is continuing (other than in the case of sales made pursuant to <u>Sections 12.1(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u> and <u>(h)</u>) and subject to <u>Article 12</u>, the Issuer may, by Issuer Order executed by an Authorized Officer of the Portfolio Manager, delivered to the Trustee at least one Business Day prior to the settlement date for any sale

<div align="center">Page 192</div>

of an Asset certifying that the sale of such Asset is being made in accordance with Section 12.1 and such sale complies with all applicable requirements of Section 12.1, direct the Trustee to release or cause to be released such Asset from the lien of this Indenture and, upon receipt of such Issuer Order, the Trustee shall deliver any such Asset, if in physical form, duly endorsed to the broker or purchaser designated in such Issuer Order or, if such Asset is a Clearing Corporation Security, cause an appropriate transfer thereof to be made, in each case against receipt of the sales price therefor as specified by the Portfolio Manager in such Issuer Order; *provided* that the Trustee may deliver any such Asset in physical form for examination in accordance with street delivery custom.

(b)     Subject to the terms of this Indenture, the Trustee shall upon an Issuer Order (i) deliver any Asset, and release or cause to be released such Asset from the lien of this Indenture, which is set for any mandatory call or redemption or payment in full to the appropriate paying agent on or before the date set for such call, redemption or payment, in each case against receipt of the call or redemption price or payment in full thereof and (ii) provide notice thereof to the Portfolio Manager.

(c)     Upon receiving actual notice of any Offer or any request for a waiver, consent, amendment or other modification with respect to any Collateral Obligation, the Trustee on behalf of the Issuer shall notify the Portfolio Manager of any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action (an "Offer") or such request.  Unless the Notes have been accelerated following an Event of Default, the Portfolio Manager may, subject, if applicable, to the additional requirements of Section 12.2(e), direct (x) the Trustee to accept or participate in or decline or refuse to participate in such Offer and, in the case of acceptance or participation, to release from the lien of this Indenture such Collateral Obligation in accordance with the terms of the Offer against receipt of payment therefor, or (y) the Issuer or the Trustee to agree to or otherwise act with respect to such consent, waiver, amendment or modification; *provided* that in the absence of any such direction, the Trustee shall not respond or react to such Offer or request.

(d)     As provided in Section 10.2(a), the Trustee shall deposit any proceeds received by it from the disposition of an Asset in the applicable subaccount of the Collection Account, unless simultaneously applied to the purchase of additional Collateral Obligations or Eligible Investments as permitted under and in accordance with the requirements of this Article 10 and Article 12.

(e)     The Trustee shall, upon receipt of an Issuer Order at such time as there are no Secured Notes Outstanding and all obligations of the Co-Issuers hereunder have been satisfied, release any remaining Assets from the lien of this Indenture.

(f)     Upon receipt by the Trustee of an Issuer Order from an Authorized Officer of the Issuer or an Authorized Officer of the Portfolio Manager certifying that the transfer of any Tax Subsidiary Asset is being made in accordance with Section 7.16 and that all applicable requirements of Section 7.16 have been or shall be satisfied, the Trustee shall release

Page 193

such Tax Subsidiary Asset and shall deliver such Tax Subsidiary Asset as specified in such Issuer Order.

(g)     Any security, Collateral Obligation or amounts that are released pursuant to Section 10.7(a), (b) or (c) shall be released from the lien of this Indenture.

(h)     Any amounts paid from the Payment Account to the Holders of the Subordinated Notes in accordance with the Priority of Payments shall be released from the lien of this Indenture.

**10.8    Reports by Independent Accountants**

(a)     At the Closing Date, the Issuer shall select one or more firms of Independent certified public accountants of recognized international reputation for purposes of performing agreed-upon procedures required by this Indenture, which may be the firm of Independent certified public accountants that performs accounting services for the Issuer or the Portfolio Manager.  The Issuer may remove any firm of Independent certified public accountants at any time without the consent of any Holder of Notes.  Upon any resignation by such firm or removal of such firm by the Issuer, the Issuer (or the Portfolio Manager on behalf of the Issuer) shall promptly appoint by Issuer Order delivered to the Trustee a successor thereto that shall also be a firm of Independent certified public accountants of recognized international reputation, which may be a firm of Independent certified public accountants that performs accounting services for the Issuer or the Portfolio Manager.  If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee of such failure in writing.  If the Issuer shall not have appointed a successor within ten days thereafter, the Trustee shall promptly notify the Portfolio Manager, who shall appoint a successor firm of Independent certified public accountants of recognized international reputation.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer as Administrative Expenses.  The Trustee shall not have any responsibility to the Issuer or the Secured Parties hereunder to make any inquiry or investigation as to, and shall have no obligation in respect of, the terms of any engagement of Independent accountants by the Issuer (or the Portfolio Manager on behalf of the Issuer); *provided* that the Trustee shall be authorized, upon receipt of an Issuer Order directing the same, to execute any acknowledgment or other agreement with the Independent accountants required for the Trustee to receive any of the reports or instructions provided for herein, which acknowledgment or agreement may include, among other things, (i) acknowledgements with respect to the sufficiency of the agreed upon procedures to be performed by the Independent accountants by the Issuer, (ii) releases of claims (on behalf of itself and the Noteholders) and other acknowledgments of limitations of liability in favor of the Independent accountants, or (iii) restrictions or prohibitions on the disclosure of information or documents provided to it by such firm of Independent accountants (including to the Holders). It is understood and agreed that the Trustee will deliver such acknowledgement or other agreement in conclusive reliance on the foregoing direction of the Issuer, and the Trustee shall make no inquiry or investigation as to, and shall have no

Page 194

obligation in respect of, the sufficiency, validity or correctness of such procedures. Notwithstanding the foregoing, in no event shall the Trustee be required to execute any agreement in respect of the Independent accountants that the Trustee determines adversely affects it in its individual capacity.

(b)     On or before February 25 of each year commencing 2015, the Issuer, or the Portfolio Manager on its behalf, shall cause to be delivered to the Trustee, an agreed-upon procedures report from a firm of Independent certified public accountants for each Distribution Report received since the last statement (i) indicating that the calculations within those Distribution Reports (excluding the S&P CDO Monitor Test) have been recalculated and compared to the information provided by the Issuer in accordance with the applicable provisions of this Indenture and (ii) listing the Aggregate Principal Balance of the Assets and the Aggregate Principal Balance of the Collateral Obligations securing the Secured Notes as of the immediately preceding Determination Dates; *provided* that in the event of a conflict between such firm of Independent certified public accountants and the Issuer with respect to any matter in this <u>Section 10.8</u>, the determination by such firm of Independent public accountants shall be conclusive. To the extent a beneficial owner or Holder of a Note requests the yield to maturity in respect of the relevant Note in order to determine any "original issue discount" in respect thereof, the Trustee shall request that the firm of Independent certified public accountants selected by the Issuer recalculate such yield to maturity. The Trustee shall have no responsibility to calculate the yield to maturity nor to verify the accuracy of such Independent certified public accountants' calculation. In the event that the firm of Independent certified public accountants fails to calculate such yield to maturity, the Trustee shall have no responsibility to provide such information to the beneficial owner or Holder of a Note.

(c)     Upon the written request of the Trustee, or any Holder of a Subordinated Note, the Issuer will cause the firm of Independent certified public accountants selected pursuant to <u>Section 10.8(a)</u> to provide any Holder of Subordinated Notes with all of the information required to be provided by the Issuer or pursuant to <u>Section 7.16</u> or assist the Issuer in the preparation thereof.

## 10.9    Reports to Rating Agencies and Additional Recipients

In addition to the information and reports specifically required to be provided to S&P pursuant to the terms of this Indenture, the Issuer shall provide S&P with all information or reports delivered to the Trustee hereunder (with the exception of the Accountants' Report), and such additional information as S&P may from time to time reasonably request (including notification to S&P of any modification of any loan document relating to a DIP Collateral Obligation or any release of collateral thereunder not permitted by such loan documentation and notification to S&P of any Specified Amendment, which notice to S&P shall include a copy of such Specified Amendment and a brief summary of its purpose). Within 10 Business Days after the Effective Date, together with each Monthly Report and on each Payment Date, the Issuer shall provide to S&P, via e-mail in accordance with <u>Section 14.3(a)</u>, a Microsoft Excel file of the Excel Default Model Input File and, with respect to each Collateral Obligation, the name of each obligor thereon, the CUSIP number thereof (if applicable).

Page 195

**10.10 Procedures Relating to the Establishment of Accounts Controlled by the Trustee**

Notwithstanding anything else contained herein, the Trustee agrees that with respect to each of the Accounts, it will cause each Securities Intermediary establishing such accounts to enter into a securities account control agreement and, if the Securities Intermediary is the Bank, shall cause the Bank to comply with the provisions of such securities account control agreement. The Trustee shall have the right to open such subaccounts of any such account as it deems necessary or appropriate for convenience of administration.

**10.11 Section 3(c)(7) Procedures**

(a)　**DTC Actions.** The Issuer will direct DTC to take the following steps in connection with the Global Notes (or such other appropriate steps regarding legends of restrictions on the Global Notes under Section 3(c)(7) of the Investment Company Act and Rule 144A as may be customary under DTC procedures at any given time):

　(i)　The Issuer will direct DTC to include the marker "3c7" in the DTC 20-character security descriptor and the 48-character additional descriptor for the Global Notes.

　(ii)　The Issuer will direct DTC to cause each physical deliver order ticket that is delivered by DTC to purchasers to contain the 20-character security descriptor. The Issuer will direct DTC to cause each deliver order ticket that is delivered by DTC to purchasers in electronic form to contain a "3c7" indicator and a related user manual for participants. Such user manual will contain a description of the relevant restrictions imposed by Section 3(c)(7).

　(iii)　On or prior to the Closing Date, the Issuer will instruct DTC to send a Section 3(c)(7) Notice to all DTC participants in connection with the offering of the Global Notes.

　(iv)　In addition to the obligations of the Registrar set forth in Section 2.5, the Issuer will from time to time (upon the request of the Trustee) make a request to DTC to deliver to the Issuer a list of all DTC participants holding an interest in the Global Notes.

　(v)　The Issuer will cause each CUSIP number obtained for a Global Note to have a fixed field containing "3c7" and "144A" indicators, as applicable, attached to such CUSIP number.

(b)　**Bloomberg Screens, Etc.** The Issuer will from time to time request all third-party vendors to include on screens maintained by such vendors appropriate legends regarding restrictions on the Global Notes under Section 3(c)(7) of the Investment Company Act and Rule 144A.

18750188.25.BUSINESS

## 11. APPLICATION OF MONIES

### 11.1 Disbursements of Monies from Payment Account

(a)     Notwithstanding any other provision in this Indenture, but subject to the other sub-Sections of this Section 11.1 and to Section 13.1, on each Payment Date, the Trustee shall disburse amounts transferred from the Collection Account to the Payment Account pursuant to Section 10.2 in accordance with the following priorities (subject to the preceding clauses of this sentence and the following proviso, the "Priority of Payments"); *provided* that, unless an Enforcement Event has occurred and is continuing, (x) amounts transferred from the Interest Collection Subaccount shall be applied solely in accordance with Section 11.1(a)(i); and (y) amounts transferred from the Principal Collection Subaccount shall be applied solely in accordance with Section 11.1(a)(ii).

(i)     On each Payment Date and on any Redemption Date (to the extent that such Redemption Date is not a Payment Date), unless an Enforcement Event has occurred and is continuing, Interest Proceeds on deposit in the Collection Account, to the extent received on or before the related Determination Date (or if such Determination Date is not a Business Day, the next succeeding Business Day) and that are transferred into the Payment Account, shall be applied in the following order of priority:

(A)     (1) *first*, to the payment of Taxes, governmental fees and registered office fees owing by the Issuer or the Co-Issuer (including any costs of complying with FATCA), if any, and (2) *second*, to the payment of the accrued and unpaid Administrative Expenses, in the priority stated in the definition thereof, up to the Administrative Expense Cap;

(B)     to the payment of the Base Management Fee due and payable to the Portfolio Manager;

(C)     to the payment *pro rata* and *pari passu* of the amounts contemplated by clauses (C)(i), (ii), (iii) and (iv) below:

(i)     accrued and unpaid interest on the Class A-1A Notes (including any defaulted interest);

(ii)     accrued and unpaid interest on the Class A-1F Notes (including any defaulted interest);

(iii)     accrued and unpaid interest on the Class A-2 Notes (including any defaulted interest) in the following order of priority: (a) *first*, accrued and unpaid interest on the Class A-2A Notes (including any defaulted interest) and (b) *second*, accrued and unpaid interest on the Class A-2B Notes (including any defaulted interest); and

Page 197

(iv)  the sum of (a) an amount equal to the sum of (1) the Class A-X Principal Amortization Amount for such Payment Date plus (2) any Unpaid Class A-X Principal Amortization Amount as of such Payment Date plus (b) accrued and unpaid interest on the Class A-X Notes (including any defaulted interest); it being agreed and understood that any amount available to make the payments contemplated by this clause (C)(iv) shall be allocated and applied *pro rata* between the amounts payable pursuant to subclause (a) (as a payment of the principal of the Class A-X Notes) and subclause (b) (as a payment of interest on the Class A-X Notes) of this clause (C)(iv);

(D)  to the payment of the aggregate amount of accrued and unpaid interest on the Class B Notes (including any defaulted interest);

(E)  if either of the Class A-1/A-2/B Coverage Tests (except, in the case of the Interest Coverage Test, if such Payment Date is the first Payment Date after the Closing Date) was not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both of the Class A-1/A-2/B Coverage Tests to be satisfied as of such Determination Date on a *pro forma* basis after giving effect to such payments (or, if not satisfied, until the Class A Notes and the Class B Notes have been paid in full);

(F)  to the payment of accrued and unpaid interest (excluding Secured Note Deferred Interest but including interest on Secured Note Deferred Interest) on the Class C Notes;

(G)  to the payment of any Secured Note Deferred Interest on the Class C Notes;

(H)  if either of the Class C Coverage Tests (except, in the case of the Interest Coverage Test, if such Payment Date is the first Payment Date after the Closing Date) was not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both of the Class C Coverage Tests that are applicable on such Payment Date to be satisfied on a pro forma basis after giving effect to such payments (or, if not satisfied, until the Class A Notes, Class B Notes and Class C Notes have been paid in full);

(I)  to the payment of accrued and unpaid interest (excluding Secured Note Deferred Interest but including interest on Secured Note Deferred Interest) on the Class D Notes;

(J)  to the payment of any Secured Note Deferred Interest on the Class D Notes;

Page 198

(K)     if either of the Class D Coverage Tests (except, in the case of the Interest Coverage Test, if such Payment Date is the first Payment Date after the Closing Date) was not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both of the Class D Coverage Tests that are applicable on such Payment Date to be satisfied on a pro forma basis after giving effect to such payments (or, if not satisfied, until the Class A Notes, Class B Notes, Class C Notes and Class D Notes have been paid in full);

(L)     to the payment of accrued and unpaid interest (excluding Secured Note Deferred Interest but including interest on Secured Note Deferred Interest) on the Class E Notes;

(M)     to the payment of any Secured Note Deferred Interest on the Class E Notes;

(N)     if either of the Class E Coverage Tests (except, in the case of the Interest Coverage Test, if such Payment Date is the first Payment Date after the Closing Date) was not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both of the Class E Coverage Tests that are applicable on such Payment Date to be satisfied on a pro forma basis after giving effect to such payments (or, if not satisfied, until the Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes have been paid in full);

(O)     to the payment of accrued and unpaid interest (excluding Secured Note Deferred Interest but including interest on Secured Note Deferred Interest) on the Class F Notes;

(P)     to the payment of any Secured Note Deferred Interest on the Class F Notes;

(Q)     during the Reinvestment Period, if the Interest Diversion Test was not satisfied on the related Determination Date, to deposit to the Collection Account for application as Principal Proceeds an amount equal to the lesser of (i) 50% of the amount of Interest Proceeds received during the most recently ended Collection Period and remaining on deposit in the Collection Account after giving effect to the applications thereof pursuant to clauses (A) through (P) above and (ii) the amount necessary to cause the Interest Diversion Test to be satisfied as of such Determination Date on a *pro forma* basis after giving effect to such any payments;

(R)     if, with respect to any Payment Date following the Effective Date, S&P has not yet confirmed its Initial Ratings of the Secured Notes pursuant to <u>Section 7.17(e)</u>, amounts available for distribution pursuant to this clause (R) shall be used for application in accordance with the Note Payment

Page 199

Sequence on such Payment Date in an amount sufficient to cause S&P to provide written confirmation (which may take the form of a press release or other written communication) of its Initial Ratings of the Secured Notes;

(S)  to the payment of the Subordinated Management Fee due and payable to the Portfolio Manager;

(T)  to the payment (in the same manner and order of priority stated therein) of any Administrative Expenses not paid pursuant to clause (A)(2) above due to the limitation contained therein;

(U)  to pay the Holders of the Subordinated Notes (other than any Reinvesting Holder that has directed that Reinvestment Amounts in respect of its Subordinated Notes be deposited on such Payment Date in the Reinvestment Amount Account but be deemed to have been paid pursuant to this Indenture), until the Subordinated Notes have realized a Subordinated Notes Internal Rate of Return of 12%; and

(V)  any remaining Interest Proceeds to be paid (x) 20% to the Portfolio Manager as part of the Incentive Management Fee payable on such Payment Date; and (y) 80% to the holders of the Subordinated Notes (other than any Reinvesting Holder that has directed that Reinvestment Amounts in respect of its Subordinated Notes be deposited on such Payment Date in the Reinvestment Amount Account but be deemed to have been paid pursuant to this Indenture).

(ii)  On each Payment Date and on any Redemption Date (to the extent that such Redemption Date is not a Payment Date), unless an Enforcement Event has occurred and is continuing, Principal Proceeds on deposit in the Collection Account that are received on or before the related Determination Date and that are transferred to the Payment Account (which will not include (i) amounts required to meet funding requirements with respect to Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations that are deposited in the Revolver Funding Account, (ii) during the Reinvestment Period, Principal Proceeds that have previously been reinvested in Collateral Obligations or that the Portfolio Manager has previously committed to invest in Collateral Obligations and (iii) after the Reinvestment Period, Principal Proceeds that have previously been reinvested in Collateral Obligations or that the Portfolio Manager has previously committed to invest in Post Reinvestment Period Settlement Obligations) shall be applied in the following order of priority:

(A)  to pay, as contemplated under Section 11.1(a)(i) above (1) *first*, the amounts referred to in clauses (A) through (E) (and in the same manner and order of priority stated therein); (2) *then*, the amounts referred to in clauses (F) and (G); *provided* that payments under clauses (F) and (G)

18750188.25.BUSINESS

shall be made only to the extent the Class C Notes are the Controlling Class on such Payment Date; (3) *then*, the amounts referred to in clause (H); (4) *then*, the amounts referred to in clauses (I) and (J); *provided* that payments under clauses (I) and (J) shall be made only to the extent the Class D Notes are the Controlling Class on such Payment Date; (5) *then*, the amounts referred to in Clause (K); (6) *then*, the amounts referred to in clauses (L) and (M); *provided* that payments under clauses (L) and (M) shall be made only to the extent the Class E Notes are the Controlling Class on such Payment Date; (7) then, the amounts referred to in clause (N), and (8) *then*, the amounts referred to in clauses (O) and (P); *provided* that payments under clauses (O) and (P) shall be made only to the extent the Class F Notes are the Controlling Class on such Payment Date; but, in each case, (a) only to the extent not paid in full thereunder and (b) subject to any applicable caps or other limitations expressly described therein;

(B)     with respect to any Payment Date following the Effective Date, if after the application of Interest Proceeds pursuant to clause (R) of Section 11.1(a)(i) S&P has not yet confirmed its Initial Ratings of the Secured Notes pursuant to Section 7.17(e), amounts available for distribution pursuant to this clause (B) shall be used for application in accordance with the Note Payment Sequence on such Payment Date in an amount sufficient to cause S&P to provide written confirmation (which may take the form of a press release or other written communication) of its Initial Ratings of the Secured Notes;

(C)     (1) on any Redemption Date (other than in respect of a Special Redemption), to make payments in accordance with the Note Payment Sequence, and (2) on any other Payment Date, to make payments in the amount, if any, of the Principal Proceeds that the Portfolio Manager has determined cannot be practically reinvested in additional Collateral Obligations, in accordance with the Note Payment Sequence;

(D)     during the Reinvestment Period, to the Collection Account as Principal Proceeds to invest in Eligible Investments (pending the purchase of additional Collateral Obligations) and/or to the purchase of additional Collateral Obligations;

(E)     after the end of the Reinvestment Period, to make payments in accordance with the Note Payment Sequence after taking into account payments made pursuant to the clauses appearing under Section 11.1(a)(i) above and clauses (A), (B) and (C) above;

(F)     to pay the amounts referred to in clauses (S) and (T) of Section 11.1(a)(i) (and, with respect to clause (T), in the same manner and order of priority stated therein) only to the extent not already paid;

Page 201

(G)     to pay the Reinvesting Holders of the Subordinated Notes (whether or not any applicable Reinvesting Holder continues on such Payment Date to hold all or any portion of such Subordinated Notes) any Reinvestment Amounts not previously paid pursuant to this clause (G) with respect to their respective Subordinated Notes, pro rata in accordance with the respective aggregate Reinvestment Amounts with respect to the Subordinated Notes;

(H)     to pay the Holders of the Subordinated Notes until the Subordinated Notes have realized a Subordinated Notes Internal Rate of Return of 12%; and

(I)     any remaining proceeds to be paid (x) 20% to the Portfolio Manager as part of the Incentive Management Fee payable on such Payment Date; and (y) 80% to the Holders of the Subordinated Notes.

At the written direction of any Reinvesting Holder to the Trustee (with a copy to the Collateral Administrator) not later than, in the case of the first Payment Date after the Closing Date, two Business Days prior to such Payment Date and, in the case of any other Payment Date, three Business Days prior to the applicable Payment Date, with the consent of the Portfolio Manager but without any amendment to this Indenture, any confirmation from S&P or the consent of any other Holder of Notes, all or a specified portion of amounts that would otherwise be distributed on a Payment Date during the Reinvestment Period to such Reinvesting Holder under clause (U) or (V) of Section 11.1(a)(i) in respect of such Reinvesting Holder's Subordinated Notes will instead be deposited by the Trustee in the Reinvestment Amount Account, and such deposit will be deemed to constitute payment of such amounts for purposes of all distributions from the Payment Account to be made on such Payment Date.  Reinvestment Amounts will be actually paid to the applicable Reinvesting Holder after such Payment Date, without interest thereon and solely to the extent of Principal Proceeds available therefor as provided in this Section 11.1(a)(ii) or proceeds in respect of the Assets available therefor as provided in Section 11.1(a)(iii), as applicable.  Any such direction of any Reinvesting Holder shall specify the percentage(s) of the amount(s) that such Reinvesting Holder is entitled to receive on the applicable Payment Date in respect of distributions under clause (U) or (V) of Section 11.1(a)(i) in respect of the Subordinated Notes held by such Reinvesting Holder (such Reinvesting Holder's "Distribution Amount") that such Reinvesting Holder wishes the Trustee to deposit in the Reinvestment Amount Account.  The Issuer (or the Collateral Administrator on the Issuer's behalf) will provide each Reinvesting Holder with a final estimate of such Reinvesting Holder's Distribution Amount not later than, in the case of the first Payment Date after the Closing Date, three Business Days prior to such Payment Date and, in the case of any other Payment Date, five Business Days prior to such Payment Date.  In addition, with respect to any Payment Date other than the first Payment Date after the Closing Date, the Issuer (or the Collateral Administrator on the Issuer's behalf) shall provide each Reinvesting Holder with an initial estimate of such

Page 202

Reinvesting Holder's Distribution Amount not later than six Business Days prior to such Payment Date.

On the Stated Maturity of the Notes, the Trustee shall pay the net proceeds from the liquidation of the Assets and all available Cash, but only after the payment of (or establishment of a reserve for) all Administrative Expenses (in the same manner and order of priority stated in the definition thereof) and Management Fees, and interest and principal on the Secured Notes, to the Holders of the Subordinated Notes in final payment of such Subordinated Notes.

(iii)  Notwithstanding the provisions or the foregoing Sections 11.1(a)(i) and 11.1(a)(ii), if a declaration of acceleration of the maturity of the Notes has occurred following an Event of Default and such declaration of acceleration has not been rescinded (an "Enforcement Event") and also on and after the Stated Maturity of the Notes, on each date or dates fixed by the Trustee (each such date to occur on a Payment Date), Interest Proceeds and Principal Proceeds will be applied in the following order of priority:

(A)  (1) *first*, to the payment of Taxes, governmental fees and registered office fees owing by the Issuer or the Co-Issuer (including any costs of complying with FATCA), if any, and (2) *second*, to the payment of the accrued and unpaid Administrative Expenses, in the priority stated in the definition thereof, up to the Administrative Expense Cap (*provided* that following the commencement of any sales of Assets pursuant to Section 5.5(a)(i), the Administrative Expense Cap shall not be applicable);

(B)  to the payment of the Base Management Fee due and payable to the Portfolio Manager;

(C)  to the payment *pro rata* and *pari passu* of (i) accrued and unpaid interest (including any defaulted interest) on the Class A-1A Notes, (ii) accrued and unpaid interest (including any defaulted interest) on the Class A-1F Notes until such amounts have been paid in full and (iii) accrued and unpaid interest on the Class A-2 Notes (including any defaulted interest) in the following order of priority: (x) *first*, accrued and unpaid interest (including any defaulted interest) on the Class A-2A Notes and (y) *second*, accrued and unpaid interest (including any defaulted interest) on the Class A-2B Notes, until such amounts have been paid in full;

(D)  (a) to the payment *pro rata* and *pari passu* of (i) principal of the Class A-1A Notes, (ii) principal of the Class A-1F Notes and (iii) principal of the Class A-2 Notes in the following order of priority: (x) *first*, principal of the Class A-2A Notes and (y) *second*, principal of the Class A-2B Notes and (b) to the payment of, solely in the circumstances where a Class A-1/A-2 Make-Whole Amount is required to be paid pursuant to Section 9.7, the Class A-1/A-2 Make-Whole Amount, in accordance with the

Page 203

allocation provisions of Section 9.7 until such amounts have been paid in full;

(E)     to the payment of accrued and unpaid interest (including any defaulted interest) on the Class A-X Notes until such amount has been paid in full;

(F)     to the payment of principal of the Class A-X Notes until such amount has been paid in full;

(G)     to the payment of accrued and unpaid interest (including any defaulted interest) on the Class B Notes until such amount has been paid in full;

(H)     to the payment of principal of the Class B Notes until such amount has been paid in full;

(I)     to the payment of accrued and unpaid interest (excluding Secured Note Deferred Interest, but including interest on Secured Note Deferred Interest) on the Class C Notes until such amount has been paid in full;

(J)     to the payment of any Secured Note Deferred Interest on the Class C Notes until such amount has been paid in full;

(K)     to the payment of principal of the Class C Notes until such amount has been paid in full;

(L)     to the payment of accrued and unpaid interest (excluding Secured Note Deferred Interest, but including interest on Secured Note Deferred Interest) on the Class D Notes until such amount has been paid in full;

(M)     to the payment of any Secured Note Deferred Interest on the Class D Notes until such amount has been paid in full;

(N)     to the payment of principal of the Class D Notes until such amount has been paid in full;

(O)     to the payment of accrued and unpaid interest (excluding Secured Note Deferred Interest, but including interest on Secured Note Deferred Interest) on the Class E Notes until such amount has been paid in full;

(P)     to the payment of any Secured Note Deferred Interest on the Class E Notes until such amount has been paid in full;

(Q)     to the payment of principal of the Class E Notes until such amount has been paid in full;

Page 204

(R)     to the payment of accrued and unpaid interest (excluding Secured Note Deferred Interest, but including interest on Secured Note Deferred Interest) on the Class F Notes until such amount has been paid in full;

(S)     to the payment of any Secured Note Deferred Interest on the Class F Notes until such amount has been paid in full;

(T)     to the payment of principal of the Class F Notes until such amount has been paid in full;

(U)     to the payment of the Subordinated Management Fee due and payable to the Portfolio Manager;

(V)     to the payment of (in the same manner and order of priority stated therein) any Administrative Expenses not paid pursuant to clause (A)(2) above due to the limitation contained therein;

(W)     to the payment to the Reinvesting Holders of the Subordinated Notes (whether or not any applicable Reinvesting Holder continues on the date of such payment to hold all or any portion of such Subordinated Notes) of any Reinvestment Amounts not previously paid pursuant to this clause (W) or pursuant to clause (G) under Section 11.1(a)(ii) with respect to their respective Subordinated Notes, pro rata in accordance with the respective aggregate Reinvestment Amounts with respect to the Subordinated Notes;

(X)     to pay the Holders of the Subordinated Notes until the Subordinated Notes have realized a Subordinated Notes Internal Rate of Return of 12%; and

(Y)     to pay the balance to the Portfolio Manager and the Holders of the Subordinated Notes, such balance to be allocated as follows: (x) 20% to the Portfolio Manager as the Incentive Management Fee payable on such Payment Date; and (y) 80% to the Holders of the Subordinated Notes.

(b)     If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Distribution Report, the Trustee shall make the disbursements called for in the order and according to the priority set forth under Section 11.1(a) above, subject to Section 13.1, to the extent funds are available therefor.

(c)     Any reference in the Priority of Payments (including in the Note Payment Sequence) to the payment of interest on a Class of Notes will include accrued interest that is not paid when due (excluding, for the avoidance of doubt, Secured Note Deferred Interest) and will also include interest (if any) that accrues on such unpaid interest.

(d)     In connection with the application of funds to pay Administrative Expenses of the Issuer or the Co-Issuer, as the case may be, in accordance with Section 11.1(a)(i),

Page 205

Section 11.1(a)(ii) and Section 11.1(a)(iii), the Trustee shall remit such funds, to the extent available, as directed and designated in an Issuer Order (which may be in the form of standing instructions, including standing instructions to pay Administrative Expenses in such amounts and to such entities as indicated in the Distribution Report in respect of such Payment Date) delivered to the Trustee no later than the Business Day prior to each Payment Date.

## 12. SALE OF COLLATERAL OBLIGATIONS; PURCHASE OF ADDITIONAL COLLATERAL OBLIGATIONS

### 12.1 Sales of Collateral Obligations

Subject to the satisfaction of the conditions specified in Section 12.3, the Portfolio Manager on behalf of the Issuer may, but will not be required to (except as otherwise specified in this Section 12.1), direct the Trustee to sell and the Trustee shall sell on behalf of the Issuer in the manner directed by the Portfolio Manager any Collateral Obligation or Equity Security if, as certified by the Portfolio Manager, such sale meets the requirements of any one of paragraphs (a) through (h) of this Section 12.1. For purposes of this Section 12.1, the Sale Proceeds of a Collateral Obligation sold by the Issuer shall include any Principal Financed Accrued Interest received in respect of such sale.

(a) **Credit Risk Obligations.** The Portfolio Manager may direct the Trustee to sell any Credit Risk Obligation at any time without restriction.

(b) **Credit Improved Obligations.** The Portfolio Manager may direct the Trustee to sell any Credit Improved Obligation either:

(i) at any time if (A) the Sale Proceeds from such sale are at least equal to the Principal Balance of such Credit Improved Obligation or (B) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Credit Improved Obligation being sold but including, without duplication, the anticipated net proceeds of such sale) plus, without duplication, the amounts on deposit in the Collection Account and the Ramp-Up Account (including Eligible Investments therein) representing Principal Proceeds, will be greater than the Reinvestment Target Par Balance; or

(ii) solely during the Reinvestment Period, if the Portfolio Manager reasonably believes prior to such sale that either (A) after giving effect to such sale and subsequent reinvestment, the Aggregate Principal Balance of all Collateral Obligations (excluding the Credit Improved Obligation being sold but including, without duplication, the Collateral Obligation being purchased and the anticipated cash proceeds, if any, of such sale that are not applied to the purchase of such additional Collateral Obligation) plus, without duplication, the amounts on deposit in the Collection Account and the Ramp-Up Account (including Eligible Investments therein) representing Principal Proceeds, will be greater than the Reinvestment Target Par Balance, or (B) it will be able to enter into one or more binding commitments to reinvest all or a portion of the proceeds of such sale, in

Page 206

compliance with the Investment Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Principal Balance of such Credit Improved Obligation within 20 Business Days after such sale;

(c)     **Defaulted Obligations.**   The Portfolio Manager may direct the Trustee to sell any Defaulted Obligation at any time during or after the Reinvestment Period without restriction.   With respect to each Defaulted Obligation that has not been sold or terminated within three years after becoming a Defaulted Obligation, the Market Value and Principal Balance of such Defaulted Obligation shall be deemed to be zero.

(d)     **Equity Securities.**   The Portfolio Manager may direct the Trustee to sell any Equity Security at any time without restriction, and shall use its commercially reasonable efforts to effect the sale of any Equity Security, regardless of price:

(i)     within 45 Business Days after receipt in the case of Equity Securities received on the exercise of a conversion option relating to any Collateral Obligation (unless such Equity Security is (A) received upon the conversion of a Defaulted Obligation, or (B) received in an exchange initiated by the obligor to avoid bankruptcy); and

(ii)     within 45 days after receipt if such Equity Security constitutes Margin Stock, unless such sale is prohibited by applicable law, in which case such Equity Security shall be sold as soon as such sale is permitted by applicable law.

(e)     **Optional Redemption.**   After the Issuer has notified the Trustee of an Optional Redemption of the Notes in accordance with Section 9.2, the Portfolio Manager shall direct the Trustee to sell (which sale may be through participation or other arrangement) all or a portion of the Collateral Obligations if the requirements of Article 9 (including the certification requirements of Section 9.4(c)(ii), if applicable) are satisfied, without regard to the limitations in this Section 12.1.   If any such sale is made through participations, the Issuer shall use reasonable efforts to cause such participations to be converted to assignments within six months after the sale.

(f)     **Tax Redemption.** After a Majority of an Affected Class or a Majority of the Subordinated Notes has directed (by a written direction delivered to the Issuer and the Trustee) a Tax Redemption, the Issuer (or the Portfolio Manager on its behalf) may at any time effect the sale (which sale may be through participation or other arrangement) of all or a portion of the Collateral Obligations if the requirements of Article 9 (including the certification requirements of Section 9.4(c)(ii), if applicable) are satisfied, without regard to the limitations in this Section 12.1.   If any such sale is made through participations, the Issuer shall use reasonable efforts to cause such participations to be converted to assignments within six months after the sale.

(g)     **Discretionary Sales.**  During the Reinvestment Period, the Portfolio Manager may direct the Trustee to sell any Collateral Obligation at any time other than during a Restricted Trading Period if (i) after giving effect to such sale, the Aggregate Principal Balance of

Page 207

all Collateral Obligations sold as described in this Section 12.1(g) during the preceding period of 12 calendar months (or, for the first 12 calendar months after the Closing Date, during the period commencing on the Closing Date) is not greater than 25% of the Collateral Principal Amount as of the first day of such 12 calendar month period (or as of the Closing Date, as the case may be) and (ii) either:

    (A)    the Portfolio Manager reasonably believes prior to such sale that it will be able to enter into one or more binding commitments to reinvest all or a portion of the proceeds of such sale, in compliance with the Investment Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Principal Balance of such Collateral Obligation within 20 Business Days after such sale; or

    (B)    after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated net proceeds of such sale) plus, without duplication, the amounts on deposit in the Collection Account and the Ramp-Up Account (including Eligible Investments therein) representing Principal Proceeds, will be greater than the Reinvestment Target Par Balance.

(h)    **Mandatory Sales.** The Portfolio Manager on behalf of the Issuer shall use its commercially reasonable efforts to effect the sale (regardless of price) of any Collateral Obligation that (i) no longer meets the criteria described in clauses (viii) and (xxiii) of the definition of "Collateral Obligation", within 18 months after the failure of such Collateral Obligation to meet any such criteria or (ii) no longer meets the criteria described in clause (vii) of the definition of "Collateral Obligation" within 45 days after the failure of such Collateral Obligation to meet such criteria.

(i)    **Unrestricted Sales.** If the Aggregate Principal Balance of all Collateral Obligations is less than $10,000,000, the Portfolio Manager may direct the Trustee to sell the Collateral Obligations without regard to the foregoing limitations.

(j)    **Stated Maturity**. Notwithstanding the restrictions of Section 12.1, the Portfolio Manager will, no later than the Determination Date for the Stated Maturity of the Notes, on behalf of the Issuer, direct the Trustee to sell (and the Trustee shall sell in the manner specified) for settlement in immediately available funds any Collateral Obligations and cause the liquidation of all assets held at each Tax Subsidiary and distribution of any proceeds thereof to the Issuer.

(k)    If an Event of Default has occurred and is continuing, (a) no such sale pursuant to clause (a), (b), (c) or (d) above may be made without the consent of a Majority of the Controlling Class and (b) no such sale may be made pursuant to clause (e) or (g) above.

(l)    Notwithstanding anything contained herein to the contrary, pursuant to Section 7.16 hereof, the Issuer may cause any Tax Subsidiary Asset or the Issuer's interest therein to be transferred to a Tax Subsidiary in exchange for an interest in such Tax Subsidiary.

Page 208

**12.2    Purchase of Additional Collateral Obligations**

On any date during the Reinvestment Period, the Portfolio Manager on behalf of the Issuer may subject to the other requirements in this Indenture, but will not be required to, direct the Trustee to invest Principal Proceeds, proceeds of additional notes issued pursuant to Section 2.13 and 3.2, amounts on deposit in the Ramp-Up Account and accrued interest received with respect to any Collateral Obligation to the extent used to pay for accrued interest on additional Collateral Obligations, and the Trustee shall invest such Principal Proceeds and other amounts in accordance with such direction.

(a)    **Investment Criteria.**  No obligation may be purchased by the Issuer unless each of the following conditions is satisfied as of the date the Portfolio Manager commits on behalf of the Issuer to make such purchase, in each case after giving effect to such purchase and all other sales or purchases previously or simultaneously committed to; *provided* that the conditions set forth in clause (iv) below need only be satisfied with respect to purchases of Collateral Obligations occurring on or after the Effective Date:

(i)    such obligation is a Collateral Obligation;

(ii)    if the commitment to make such purchase occurs on or after the Effective Date (or, in the case of the Interest Coverage Tests, on or after the Determination Date occurring immediately prior to the second Payment Date), (A) each Coverage Test will be satisfied, or if not satisfied, such Coverage Test will be maintained or improved and (B) if each Coverage Test is not satisfied, the Principal Proceeds received in respect of any Defaulted Obligation or the proceeds of any sale of a Defaulted Obligation pursuant to Section 12.1(c) above shall not be reinvested in additional Collateral Obligations;

(iii)    (A) in the case of a substitute Collateral Obligation purchased with the proceeds from the sale of a Credit Risk Obligation or a Defaulted Obligation, either (1) the Aggregate Principal Balance of all additional Collateral Obligations purchased with the proceeds from such sale will at least equal the Sale Proceeds from such sale, (2) the Aggregate Principal Balance of the Collateral Obligations will be maintained or increased (when compared to the Aggregate Principal Balance of the Collateral Obligations immediately prior to such sale) or (3) the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the Collateral Obligation being purchased and the anticipated cash proceeds, if any, of such sale that are not applied to the purchase of such additional Collateral Obligation) plus, without duplication, the amounts on deposit in the Collection Account and the Ramp-Up Account (including Eligible Investments therein) representing Principal Proceeds, will be greater than the Reinvestment Target Par Balance and (B) in the case of any other purchase of additional Collateral Obligations purchased with the proceeds from the sale of a Collateral Obligation, either (1) the Aggregate Principal Balance of the Collateral Obligations will be maintained or increased (when compared to the Aggregate Principal Balance of the Collateral Obligations

Page 209

18750188.25.BUSINESS

immediately prior to such sale) or (2) the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the Collateral Obligation being purchased and the anticipated cash proceeds, if any, of such sale that are not applied to the purchase of such additional Collateral Obligation) plus, without duplication, the amounts on deposit in the Collection Account and the Ramp-Up Account (including Eligible Investments therein) representing Principal Proceeds, will be greater than the Reinvestment Target Par Balance; and

(iv)    either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test (except, in the case of an additional Collateral Obligation purchased with the proceeds from the sale of a Credit Risk Obligation, a Defaulted Obligation or an Equity Security, the S&P CDO Monitor Test) will be satisfied or (B) if any such requirement or test was not satisfied immediately prior to such investment, such requirement or test will be maintained or improved after giving effect to the investment; *provided* that, for purposes of calculating compliance with the Weighted Average Life Test, in connection with the purchase of any obligation using Principal Proceeds received upon the sale, prepayment or other disposition of a Collateral Obligation, such test will be maintained or improved after giving effect to the reinvestment relative to such test prior to receipt of such Principal Proceeds.

During the Reinvestment Period, following the sale of any Credit Improved Obligation or any discretionary sale of a Collateral Obligation, the Portfolio Manager shall use its reasonable efforts to purchase additional Collateral Obligations within 20 Business Days after such sale; *provided* that any such purchase must comply with the requirements of this Section 12.2.

(b)    **Investment After the Reinvestment Period.**  For the avoidance of doubt, after the Reinvestment Period each of the Issuer and the Portfolio Manager may not invest in or purchase additional Collateral Obligations.

(c)    **Certification by Portfolio Manager.**  Not later than the Subsequent Delivery Date for any Collateral Obligation purchased in accordance with this Section 12.2, the Portfolio Manager shall deliver to the Trustee and the Collateral Administrator an Officer's certificate of the Portfolio Manager certifying that such purchase complies with this Section 12.2 and Section 12.3.

(d)    **Investment in Eligible Investments.**  Cash on deposit in any Account (other than the Payment Account) may be invested at any time in Eligible Investments in accordance with Article 10.

(e)    **Maturity Amendment.**  Notwithstanding anything to the contrary contained herein, the Issuer (or the Portfolio Manager on the Issuer's behalf) may vote in favor of a Maturity Amendment, subject to the following restrictions that, as determined by the Portfolio Manager, (i) the Collateral Obligation would be eligible for purchase in accordance with

18750188.25.BUSINESS

the Investment Criteria (unless such Investment Criteria, as a practical matter, would not be applicable to such amendment or modification), (ii) after giving effect to such amendment, the Weighted Average Life Test will be satisfied and (iii) after the Reinvestment Period, after giving effect to the such amendment, the portion of the Aggregate Principal Balance of Collateral Obligations owned by the Issuer which has been the subject of Maturity Amendments after the Reinvestment Period does not exceed 5.0% of the Collateral Principal Amount.

For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Issuer (or the Portfolio Manager on the Issuer's behalf) may not consent to a Maturity Amendment if such amendment would become effective after February 1, 2022. No Maturity Amendment may result in a Collateral Obligation maturing after the Stated Maturity of the Notes.

(f)     **Post Reinvestment Period Amendment Proceeds.** After the Reinvestment Period, with respect to any Maturity Amendment to a Collateral Obligation that the Issuer (or the Portfolio Manager on the Issuer's behalf) voted in favor of which would result in the portion of the Aggregate Principal Balance of Collateral Obligations owned by the Issuer which has been the subject of Maturity Amendments after the Reinvestment Period exceeding 5.0% of the Collateral Principal Amount, any fees related to such amendment and/or any economic benefit (such as a step-up in the coupon, an amendment fee, consent fee or any other related fee) actually received by the Issuer as a result of such amendment will comprise Post Reinvestment Period Amendment Proceeds (the "Post Reinvestment Period Amendment Proceeds") (as of the effective date of the related amendment or waiver) which will be certified in writing by the Portfolio Manager (in its reasonable business judgment) to the Issuer and the Trustee promptly following such effective date. After the Reinvestment Period, following any Maturity Amendment to a Collateral Obligation that the Issuer (or the Portfolio Manager on the Issuer's behalf) voted in favor of which would result in the portion of the Aggregate Principal Balance of Collateral Obligations owned by the Issuer which has been the subject of Maturity Amendments after the Reinvestment Period exceeding 5.0% of the Collateral Principal Amount, the Portfolio Manager will certify to the Issuer and the Trustee (i) whether such amendment gives rise to any Post Reinvestment Period Amendment Proceeds and (ii) the amount of any such Post Reinvestment Period Amendment Proceeds. After the Reinvestment Period and for so long as any Class B Notes remain Outstanding, all Post Reinvestment Period Amendment Proceeds will constitute the Turbo Payment Amount, which will be applied as Principal Proceeds in accordance with the Priority of Payments on the applicable Payment Date.

(g)     **Post Reinvestment Period Settlement Obligations.** Notwithstanding any restriction hereunder prohibiting purchases of Collateral Obligations after the end of the Reinvestment Period, the Issuer may, prior to the end of the Reinvestment Period, commit to purchase one or more Collateral Obligations during the Reinvestment Period even if such purchase(s) would settle after the end of the Reinvestment Period (any such Collateral Obligation, a "Post Reinvestment Period Settlement Obligation") and, after the end of the Reinvestment Period, settle the purchase(s) of such Post Reinvestment Period

Page 211

Settlement Obligations, if the sum of (i) the amount of funds in the Principal Collection Subaccount as of the date that the Issuer commits to the purchase of each Post Reinvestment Period Settlement Obligation plus (ii) the expected aggregate Sale Proceeds from all Collateral Obligations with respect to which the Issuer has entered into written trade tickets or other written binding commitments to sell, which sales are also not expected to settle prior to the end of the Reinvestment Period, is equal to or greater than the Aggregate Principal Balance of all Post Reinvestment Period Settlement Obligations intended to be so purchased (the "Reinvestment Period Settlement Condition"). If the Issuer has entered into a written trade ticket or other written binding commitment to purchase a Post Reinvestment Period Settlement Obligation and the Reinvestment Period Settlement Condition is satisfied, such Post Reinvestment Period Settlement Obligation shall be treated as having been purchased by the Issuer prior to the end of the Reinvestment Period for purposes of the Investment Criteria, and Principal Proceeds received after the end of the Reinvestment Period may be applied to the payment of the purchase price of such Post Reinvestment Period Settlement Obligation.

### 12.3 Conditions Applicable to All Sale and Purchase Transactions

(a) Any transaction effected under this Article 12 or in connection with the acquisition of additional Collateral Obligations shall be conducted on an arm's length basis and, if effected with a Person Affiliated with the Portfolio Manager (or with an account or portfolio for which the Portfolio Manager or any of its Affiliates serves as investment adviser), shall be effected in accordance with the requirements of Section 6 of the Portfolio Management Agreement on terms no less favorable to the Issuer than would be the case if such Person were not so Affiliated, *provided* that the Trustee shall have no responsibility to oversee compliance with this clause (a) by the other parties.

(b) Upon any acquisition of a Collateral Obligation pursuant to this Article 12, all of the Issuer's right, title and interest to the Asset or Assets shall be Granted to the Trustee pursuant to this Indenture, such Asset or Assets shall be Delivered to the Custodian, and, if applicable, the Custodian shall receive such Asset or Assets. The Trustee shall also receive, not later than the Subsequent Delivery Date, an Officer's certificate of the Issuer containing the statements set forth in Section 3.1(a)(ix); *provided* that such requirement shall be satisfied, and such statements shall be deemed to have been made by the Issuer, in respect of such acquisition by the delivery to the Trustee of a trade ticket in respect thereof that is signed by an Authorized Officer of the Portfolio Manager.

(c) Notwithstanding anything contained in this Article 12 to the contrary, the Issuer shall have the right to effect any sale of any Asset or purchase of any Collateral Obligation (*provided* that, in the case of a purchase of a Collateral Obligation, such purchase complies with the Trading Restrictions and the tax requirements set forth in this Indenture) (x) that has been consented to by Noteholders evidencing (i) with respect to purchases during the Reinvestment Period and sales during or after the Reinvestment Period, at least 75% of the Aggregate Outstanding Amount of each Class of Secured Notes and Holders of 75% of the Aggregate Outstanding Amount of the Subordinated Notes and (ii) with respect to purchases after the Reinvestment Period, 100% of the

Page 212

Aggregate Outstanding Amount of each Class of Notes and (y) of which S&P and the Trustee have been notified.

**12.4 Disposition of Illiquid Assets**

(a) Notwithstanding the other provisions of this <u>Article 12</u> or any other provision herein to the contrary, if at any time the Assets consist exclusively of (1) Eligible Investments (including Cash), and/or (2) one or more of the following: (i) a Defaulted Obligation, an Equity Security, an obligation received in connection with an offer or other exchange or any other security or debt obligation that is part of the Assets, in respect of which (x) the Issuer has not received a payment in Cash during the preceding twelve (12) calendar months and (y) the Portfolio Manager certifies that it is not aware, after reasonable inquiry, that the issuer or Obligor of such Asset has publicly announced or informed the holders of such Asset that it intends to make a payment in Cash in respect of such Asset within the next twelve (12) calendar months or (ii) any asset, claim or other property identified in a certificate of an officer of the Portfolio Manager as having a Market Value of less than U.S. $1,000 (the items described in clause (a)(2)(i) and (ii) each being an "<u>Illiquid Asset</u>"), then the Portfolio Manager may request bids with respect to each such Illiquid Asset pursuant to <u>Section 12.4(b)</u> after providing written notice to the Holders of Notes and requesting that any Holder of Notes that wishes to bid on any such Illiquid Asset notify the Trustee (with a copy to the Portfolio Manager) of such intention within 15 Business Days after the date of such notice. The Issuer shall, after the end of such 15 Business Day period, offer the Illiquid Assets for public or private sale as determined and directed by the Portfolio Manager (in a manner and according to terms determined by the Portfolio Manager (including, in the case of a private sale, from Persons identified to the Issuer by the Portfolio Manager) and pursuant to sale documentation provided by the Portfolio Manager) and, if any Holder of Notes so notifies the Trustee that it wishes to bid, such Holder of Notes shall be included in the distribution of sale offering or bid solicitation material in connection therewith and thereby given an opportunity to participate with other bidders, if any.

(b) The Issuer shall request bids for the sale of each such Illiquid Asset, in accordance with the procedures established by the Portfolio Manager, from (i) at least three Persons identified to the Issuer by the Portfolio Manager that make a market in or specialize in obligations of the nature of such Illiquid Asset, (ii) the Portfolio Manager, (iii) each Holder of Notes that so notified the Trustee that it wishes to bid, (iv) in the case of a public sale, any other participating bidders, and (v) the Trustee will have no responsibility for the sufficiency or acceptability of such procedures for any purpose or for any results obtained. The Issuer shall notify the Portfolio Manager promptly of the results of such bids. Subject to the requirements of applicable law, (x) if the aggregate amount of the highest bids received (if any) is greater than or equal to U.S. $100,000, the Issuer shall sell each Illiquid Asset to the highest bidder (which may include the Portfolio Manager and its Affiliates) and (y) if the aggregate amount of the highest bids received is less than U.S. $100,000 or no bids are received, the Issuer shall dispose of the Illiquid Assets as directed by the Portfolio Manager in its reasonable business judgment, which may include (with respect to each Illiquid Asset) (I) selling it to the highest bidder (which

Page 213

may include the Portfolio Manager and its Affiliates) if a bid was received; (II) donating it to a charitable organization designated by the Portfolio Manager or (III) returning it to its issuer or Obligor for cancellation. The proceeds of the sale of Illiquid Assets (after payment of fees and expenses of the Issuer, the Trustee, the Collateral Administrator and the Portfolio Manager incurred in connection with dispositions under the provisions described in this Section 12.4), if any, shall be applied in accordance with the Priority of Payments.

(c)     The Issuer will not dispose of Illiquid Assets in accordance with the immediately preceding paragraph if directed not to do so, at any time following notice of such disposal and prior to release, or acceptance of an offer for sale, of such Illiquid Asset, by a Majority of the Controlling Class or a Majority of the Subordinated Notes. Neither the Issuer nor the Trustee will have any liability for the results of any such sale or disposition of Illiquid Assets, including, without limitation, if the proceeds received, if any, are insufficient to pay all outstanding Administrative Expenses in full.

(d)     Any remaining Assets held by the Issuer will be liquidated immediately prior to the Stated Maturity so that the net proceeds of such liquidation will be available on the Stated Maturity.

## 13.     NOTEHOLDERS' RELATIONS

### 13.1     Subordination

(a)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Holders of each Class of Notes that constitute a Junior Class agree for the benefit of the Holders of the Notes of each Priority Class with respect to such Junior Class that such Junior Class shall be subordinate and junior to the Notes of each such Priority Class to the extent and in the manner set forth in this Indenture.  If any Event of Default has not been cured or waived and acceleration occurs and is not waived in accordance with Article 5, including as a result of an Event of Default specified in Section 5.1(e) or (f), each Priority Class shall be paid in full in Cash or, to the extent a Majority of such Class consents, other than in Cash, before any further payment or distribution of any kind is made on account of any Junior Class with respect thereto, in accordance with Section 11.1(a)(iii).

(b)     In the event that, notwithstanding the provisions of this Indenture, any Holder of Notes of any Junior Class shall have received any payment or distribution in respect of such Notes contrary to the provisions of this Indenture, then, unless and until each Priority Class with respect thereto shall have been paid in full in Cash or, to the extent a Majority of such Priority Class consents, other than in Cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Class(es) in accordance with this Indenture; *provided* that if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Assets and subject in all respects to the provisions of this Indenture, including this Section 13.1.

Page 214

18750188.25.BUSINESS

(c)     Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that such Holder of Junior Class Notes shall not demand, accept, or receive any payment or distribution in respect of such Notes in violation of the provisions of this Indenture including, without limitation, this <u>Section 13.1</u>; *provided* that after a Priority Class has been paid in full, the Holders of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of such Priority Class. Nothing in this <u>Section 13.1</u> shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

(d)     The Holders of each Class of Notes agree, for the benefit of all Holders of each Class of Notes, not to cause the filing of a petition in bankruptcy against the Issuer, the Co-Issuer or any Tax Subsidiary until the payment in full of all Notes (and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer) and the expiration of a period equal to one year and one day or, if longer, the applicable preference period then in effect plus one day, following such payment in full. In the event one or more Holders of Notes cause the filing of a petition in bankruptcy against the Issuer prior to the expiration of such period, any claim that such Holder(s) have against the Issuer (including under all Notes of any Class held by such Holder(s)) or with respect to any Assets (including any proceeds thereof) shall, notwithstanding anything to the contrary in the Priority of Payments and notwithstanding any objection to, or rescission of, such filing, be fully subordinate in right of payment to the claims of each Holder of any Note (and each other secured creditor of the Issuer) that does not seek to cause any such filing, with such subordination being effective until each Note (and each claim of each other secured creditor) held by each Holder of any Note that does not seek to cause any such filing is paid in full in accordance with the Priority of Payments set forth herein (after giving effect to such subordination). The foregoing sentence shall constitute a "subordination agreement" within the meaning of Section 510(a) of the U.S. Bankruptcy Code.

**13.2    Standard of Conduct**

In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Holder under this Indenture, a Holder or Holders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Holder, the Issuer, or any other Person, except for any liability to which such Holder may be subject to the extent the same results from such Holder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

Page 215

18750188.25.BUSINESS

## 14. MISCELLANEOUS

### 14.1 Form of Documents Delivered to Trustee

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer, the Co-Issuer or the Portfolio Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel (*provided* that such counsel is a nationally or internationally recognized and reputable law firm one or more of the partners of which are admitted to practice before the highest court of any State of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which law firm may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer or the Co-Issuer), unless such Officer knows, or should know that the certificate or opinion or representations with respect to the matters upon which such certificate or opinion is based are erroneous. Any such certificate of an Officer of the Issuer, Co-Issuer or the Portfolio Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, the Issuer, the Co-Issuer, the Portfolio Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer, the Portfolio Manager or such other Person, unless such Officer of the Issuer, Co-Issuer or the Portfolio Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer of the Portfolio Manager, the Issuer or the Co-Issuer, stating that the information with respect to such matters is in the possession of the Portfolio Manager, the Issuer or the Co-Issuer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of either Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to such Co-Issuer's right to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in <u>Section 6.1(d)</u>.

<div align="center">Page 216</div>

**14.2 Acts of Holders**

(a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in writing or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 14.2.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c) The principal amount or face amount, as the case may be, and registered numbers of Notes held by any Person, and the date of such Person's holding the same, shall be proved by the Register.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such and of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee, the Issuer or the Co-Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

**14.3 Notices, etc., to Trustee, the Co-Issuers, the Portfolio Manager, the Initial Purchaser, the Collateral Administrator, the Paying Agent, the Administrator and any Rating Agency**

(a) Any request, demand, authorization, direction, instruction, order, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given, delivered, e-mailed or furnished to, or filed with:

    (i) the Trustee shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery, by electronic mail, or by facsimile in legible form, to the Trustee addressed to it at its applicable Corporate Trust Office, or at any other address previously furnished in writing to the other parties hereto by the Trustee, and executed by an Authorized Officer of the entity sending such request, demand, authorization, direction, instruction, order, notice, consent, waiver or other document, *provided* that any demand, authorization, direction, instruction, order, notice, consent, waiver or other document sent to U.S. Bank National Association

Page 217

18750188.25.BUSINESS

(in any capacity hereunder) will be deemed effective only upon receipt thereof by U.S. Bank National Association;

(ii)     the Co-Issuers shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Issuer addressed to it at c/o MaplesFS Limited, P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands, telephone number +1 (345) 945-7099, facsimile number +1 (345) 945-7100, or to the Co-Issuer addressed to it at c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Donald J. Puglisi, facsimile no. (302) 738-7210 or at any other address previously furnished in writing to the other parties hereto by the Issuer or the Co-Issuer, as the case may be, with a copy to the Portfolio Manager at its address below;

(iii)     the Portfolio Manager shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Portfolio Manager addressed to it at Acis Capital Management, L.P., 300 Crescent Court, Dallas, TX 75201, Attention: Josh Terry, facsimile no.: 972-628-4155, email: jterry@hcmlp.com, or at any other address previously furnished in writing to the parties hereto;

(iv)     the Initial Purchaser shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Initial Purchaser addressed to it at Jefferies LLC, 520 Madison Avenue, New York, New York, 10022, Attention: Global CDO Trading, or at any other address previously furnished in writing to the parties hereto;

(v)     the Collateral Administrator shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Collateral Administrator at U.S. Bank National Association, 190 S. LaSalle Street, 8th Floor, Chicago, IL 60603, Attention: Global Corporate Trust – ACIS CLO 2014-3 Ltd., email: ACIS.CLO.2014.03@usbank.com, or at any other address previously furnished in writing to the parties hereto;

(vi)     S&P shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service to Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041-0003 or by facsimile in legible form to facsimile no. (212) 438 2655, Attention: Asset Backed-CBO/CLO Surveillance or by electronic copy to CDO_Surveillance@sandp.com; *provided* that (x) in respect of any request to S&P for a confirmation of its Initial Ratings of the Secured Notes pursuant to Section 7.17(e), such request must be submitted by email to CDOEffectiveDatePortfolios@sandp.com, (y) in respect of any

Page 218

application for a ratings estimate by S&P in respect of a Collateral Obligation, Information must be submitted to creditestimates@sandp.com and (z) in respect of any requests for CDO monitor cases (after the Effective Date) such request must be submitted by email to CDOMonitor@standardandpoors.com;

(vii)    the Irish Stock Exchange shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Irish Stock Exchange at 28 Anglesea Street, Dublin 2, Ireland (or, if to be released through the Irish Stock Exchange website, by submission in Microsoft Word Format via www.isedirect.ie) or at any other address furnished in writing to the Trustee, the Collateral Manager and the Issuer by the Irish Stock Exchange;

(viii)    the Irish Listing Agent shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Irish Listing Agent addressed to it at Maples and Calder, 75 St. Stephen's Green, Dublin 2, Ireland, or at any other address previously furnished in writing to the other parties hereto by the Irish Listing Agent; and

(ix)    the Administrator shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Administrator addressed to it at c/o MaplesFS Limited, P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands, Attention: ACIS CLO 2014-3 Ltd.

(b)    In the event that any provision in this Indenture calls for any notice or document to be delivered simultaneously to the Trustee and any other person or entity, the Trustee's receipt of such notice or document shall entitle the Trustee to assume that such notice or document was delivered to such other person or entity unless otherwise expressly specified herein.

(c)    Notwithstanding any provision to the contrary contained herein or in any agreement or document related thereto, any report, statement or other information required to be provided by the Issuer or the Trustee (except information required to be provided to the Irish Stock Exchange) may be provided by providing access to a website containing such information.

(d)    The Bank agrees to accept and act upon instructions or directions pursuant to this Agreement or any document executed in connection herewith sent by unsecured email, facsimile transmission or other similar unsecured electronic methods; *provided* that any person providing such instructions or directions shall provide to the Bank an incumbency certificate listing persons designated to provide such instructions or directions as such

Page 219

incumbency certificate may be supplemented from time to time. If any person elects to give the Bank email or facsimile instructions (or instructions by a similar electronic method) and the Bank in its discretion elects to act upon such instructions, the Bank's reasonable understanding of such instructions shall be deemed controlling. The Bank shall not be liable for any losses, costs or expenses arising directly or indirectly from the Bank's reliance upon and compliance with such instructions notwithstanding such instructions conflicting with or being inconsistent with a subsequent written instruction. Any person providing such instructions or directions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Bank, including without limitation the risk of the Bank acting on unauthorized instructions, and the risk of interception and misuse by third parties and acknowledges and agrees that there may be more secure methods of transmitting such instructions than the method(s) selected by it and agrees that the security procedures (if any) to be followed in connection with its transmission of such instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances..

**14.4    Notices to Holders; Waiver**

Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of any event,

(a)    such notice shall be sufficiently given to Holders if in writing and mailed, first class postage prepaid, to each Holder affected by such event, at the address of such Holder as it appears in the Register (or, in the case of Holders of Global Notes, emailed to DTC for distribution to each Holder affected by such event), not earlier than the earliest date and not later than the latest date, prescribed for the giving of such notice; and

(b)    such notice shall be in the English language.

Such notices will be deemed to have been given on the date of such mailing.

Notwithstanding clause (a) above, a Holder may give the Trustee a written notice that it is requesting that notices to it be given by electronic mail or by facsimile transmissions and stating the electronic mail address or facsimile number for such transmission. Thereafter, the Trustee shall give notices to such Holder by electronic mail or facsimile transmission, as so requested; *provided* that if such notice also requests that notices be given by mail, then such notice shall also be given by mail in accordance with clause (a) above.

The Trustee will deliver to the Holders any information or notice relating to this Indenture requested to be so delivered by at least 25% of the Holders of any Class of Notes (by Aggregate Outstanding Amount), at the expense of the Issuer.  The Trustee may require the requesting Holders to comply with its standard verification policies in order to confirm Noteholder status.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.  In case by reason of the suspension of regular mail service as a result of a strike, work stoppage or

18750188.25.BUSINESS

similar activity or by reason of any other cause it shall be impracticable to give such notice by mail of any event to Holders when such notice is required to be given pursuant to any provision of this Indenture, then such notification to Holders as shall be made with the approval of the Trustee shall constitute a sufficient notification to such Holders for every purpose hereunder.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

**14.5    Effect of Headings and Table of Contents**

The Article and Section headings herein (including those used in cross-references herein) and the Table of Contents are for convenience only and shall not affect the construction hereof.

**14.6    Successors and Assigns**

All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

**14.7    Severability**

If any term, provision, covenant or condition of this Indenture or the Notes, or the application thereof to any party hereto or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason (in any relevant jurisdiction), the remaining terms, provisions, covenants and conditions of this Indenture or the Notes, modified by the deletion of the unenforceable, invalid or illegal portion (in any relevant jurisdiction), will continue in full force and effect, and such unenforceability, invalidity, or illegality will not otherwise affect the enforceability, validity or legality of the remaining terms, provisions, covenants and conditions of this Indenture or the Notes, as the case may be, so long as this Indenture or the Notes, as the case may be, as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the deletion of such portion of this Indenture or the Notes, as the case may be, will not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.

**14.8    Benefits of Indenture**

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Portfolio Manager, the Collateral Administrator, the Holders of the Notes and (to the extent provided herein) the Administrator (solely in its capacity as such) and the other Secured Parties any benefit or any legal or equitable right, remedy or claim under this Indenture.

Page 221

18750188.25.BUSINESS

**14.9    Legal Holidays**

In the event that the date of any Payment Date, Redemption Date or Stated Maturity shall not be a Business Day, then notwithstanding any other provision of the Notes or this Indenture, payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the nominal date of any such Payment Date, Redemption Date or Stated Maturity date, as the case may be, and except as provided in the definition of "Interest Accrual Period", no interest shall accrue on such payment for the period from and after any such nominal date.

**14.10    Governing Law**

This Indenture and the Notes shall be construed in accordance with, and this Indenture and the Notes and any matters arising out of or relating in any way whatsoever to this Indenture or the Notes (whether in contract, tort or otherwise), shall be governed by, the law of the State of New York.

**14.11    Submission to Jurisdiction**

With respect to any suit, action or proceedings relating to this Indenture or any matter between the parties arising under or in connection with this Indenture ("Proceedings"), each party irrevocably:  (i) submits to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan and the United States District Court for the Southern District of New York, and any appellate court from any thereof; and (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.  Nothing in this Indenture precludes any of the parties from bringing Proceedings in any other jurisdiction, nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

**14.12    WAIVER OF JURY TRIAL**

**EACH OF THE ISSUER, THE CO-ISSUER AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.**  Each party hereby (i) certifies that no representative, agent or attorney of the other has represented, expressly or otherwise, that the other would not, in the event of a Proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it has been induced to enter into this Indenture by, among other things, the mutual waivers and certifications in this paragraph.

**14.13    Counterparts**

This Indenture and the Notes (and each amendment, modification and waiver in respect of this Indenture or the Notes) may be executed and delivered in counterparts (including by

18750188.25.BUSINESS

facsimile transmission), each of which will be deemed an original, and all of which together constitute one and the same instrument. Delivery of an executed counterpart of this Indenture by e-mail (PDF) or telecopy shall be effective as delivery of a manually executed counterpart of this Indenture.

**14.14 Acts of Issuer**

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Portfolio Manager on the Issuer's behalf.

**14.15 Confidential Information**

(a)     The Trustee, the Collateral Administrator and each Holder of Notes will maintain the confidentiality of all Confidential Information in accordance with procedures adopted by the Issuer (after consultation with the Co-Issuer) or such Holder in good faith to protect Confidential Information of third parties delivered to such Person; *provided* that such Person may deliver or disclose Confidential Information to: (i) such Person's directors, trustees, officers, employees, agents, attorneys and affiliates who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section 14.15 and to the extent such disclosure is reasonably required for the administration of this Indenture, the matters contemplated hereby or the investment represented by the Notes; (ii) such Person's financial advisers and other professional advisers who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section 14.15 and to the extent such disclosure is reasonably required for the administration of this Indenture, the matters contemplated hereby or the investment represented by the Notes; (iii) any other Holder; (iv) any Person of the type that would be, to such Person's knowledge, permitted to acquire Notes in accordance with the requirements of Section 2.5 to which such Person sells or offers to sell any such Note or any part thereof (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 14.15); (v) any other Person from which such former Person offers to purchase any security of the Co-Issuers (if such other Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 14.15); (vi) any federal or state or other regulatory, governmental or judicial authority having jurisdiction over such Person; (vii) the National Association of Insurance Commissioners or any similar organization, or any nationally recognized rating agency that requires access to information about the investment portfolio of such Person, reinsurers and liquidity and credit providers that agree to hold confidential the Confidential Information substantially in accordance with this Section 14.15; (viii) Moody's or S&P; (ix) any other Person with the consent of the Co-Issuers and the Portfolio Manager; or (x) any other Person to which such delivery or disclosure may be necessary or appropriate (A) to effect compliance with any law, rule, regulation or order applicable to such Person, (B) in response to any subpoena or other legal process upon prior notice to the Co-Issuers (unless prohibited by applicable law, rule, order or decree or other requirement having the force of law), (C) in connection with any litigation to

Page 223

which such Person is a party upon prior notice to the Co-Issuers (unless prohibited by applicable law, rule, order or decree or other requirement having the force of law) or (D) if an Event of Default has occurred and is continuing, to the extent such Person may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under the Notes or this Indenture or (E) in the Trustee's or Collateral Administrator's performance of its obligations under this Indenture, the Collateral Administration Agreement or other transaction document related thereto; and *provided* that delivery to Holders by the Trustee or the Collateral Administrator of any report of information required by the terms of this Indenture to be provided to Holders shall not be a violation of this Section 14.15. Each Holder of Notes agrees, except as set forth in clauses (vi), (vii) and (x) above, that it shall use the Confidential Information for the sole purpose of making an investment in the Notes or administering its investment in the Notes; and that the Trustee and the Collateral Administrator shall neither be required nor authorized to disclose to Holders any Confidential Information in violation of this Section 14.15. In the event of any required disclosure of the Confidential Information by such Holder, such Holder agrees to use reasonable efforts to protect the confidentiality of the Confidential Information. Each Holder of a Note, by its acceptance of a Note, will be deemed to have agreed to be bound by and to be entitled to the benefits of this Section 14.15 (subject to Section 7.16).

(b)   For the purposes of this Section 14.15, "Confidential Information" means information delivered to the Trustee, the Collateral Administrator or any Holder of Notes by or on behalf of the Co-Issuers in connection with and relating to the transactions contemplated by or otherwise pursuant to this Indenture; *provided* that such term does not include information that: (i) was publicly known or otherwise known to the Trustee, the Collateral Administrator or such Holder prior to the time of such disclosure; (ii) subsequently becomes publicly known through no act or omission by the Trustee, the Collateral Administrator, any Holder or any person acting on behalf of the Trustee, the Collateral Administrator or any Holder; (iii) otherwise is known or becomes known to the Trustee, the Collateral Administrator or any Holder other than (x) through disclosure by the Co-Issuers or (y) to the knowledge of the Trustee, the Collateral Administrator or a Holder, as the case may be, in each case after reasonable inquiry, as a result of the breach of a fiduciary duty to the Co-Issuers or a contractual duty to the Co-Issuers; or (iv) is allowed to be treated as non-confidential by consent of the Co-Issuers.

(c)   Notwithstanding the foregoing, the Trustee and the Collateral Administrator may disclose Confidential Information to the extent disclosure thereof may be required by law or by any regulatory or governmental authority and the Trustee and the Collateral Administrator may disclose on a confidential basis any Confidential Information to its agents, attorneys and auditors in connection with the performance of its responsibilities hereunder and the Trustee is authorized to grant Intex Solutions, Inc. access to the internet website set forth in Section 10.7(g) hereof.

Page 224

**14.16 Liability of Co-Issuers**

Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, inter alia, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other of the Co-Issuers. In particular, neither of the Co-Issuers shall be entitled to petition or take any other steps for the winding up or bankruptcy of the other of the Co-Issuers or shall have any claim in respect to any assets of the other of the Co-Issuers.

## 15. ASSIGNMENT OF CERTAIN AGREEMENTS

**15.1 Assignment of Portfolio Management Agreement**

(a) The Issuer hereby acknowledges that its Grant pursuant to the first Granting Clause hereof includes all of the Issuer's estate, right, title and interest in, to and under the Portfolio Management Agreement, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Portfolio Manager thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; *provided* that notwithstanding anything herein to the contrary, the Trustee shall not have the authority to exercise any of the rights set forth in (i) through (iv) above or that may otherwise arise as a result of the Grant until the occurrence of an Event of Default hereunder and such authority shall terminate at such time, if any, as such Event of Default is cured or waived.

(b) The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Portfolio Management Agreement, nor shall any of the obligations contained in the Portfolio Management Agreement be imposed on the Trustee.

(c) Upon the retirement of the Notes, the payment of all amounts required to be paid pursuant to the Priority of Payments and the release of the Assets from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Portfolio Management Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d) The Issuer represents that the Issuer has not executed any other assignment of the Portfolio Management Agreement.

<p style="text-align:center">Page 225</p>

(e)     The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, from time to time, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as may be necessary to continue and maintain the effectiveness of such assignment.

(f)     The Issuer hereby agrees, and hereby undertakes to obtain the agreement and consent of the Portfolio Manager in the Portfolio Management Agreement, to the following:

(i)     The Portfolio Manager shall consent to the provisions of this assignment and agree to perform any provisions of this Indenture applicable to the Portfolio Manager subject to the terms (including the standard of care set forth in the Portfolio Management Agreement) of the Portfolio Management Agreement.

(ii)    The Portfolio Manager shall acknowledge that the Issuer is assigning all of its right, title and interest in, to and under the Portfolio Management Agreement to the Trustee as representative of the Noteholders and the Portfolio Manager shall agree that all of the representations, covenants and agreements made by the Portfolio Manager in the Portfolio Management Agreement are also for the benefit of the Trustee.

(iii)   The Portfolio Manager shall deliver to the Trustee copies of all notices, statements, communications and instruments delivered or required to be delivered by the Portfolio Manager to the Issuer pursuant to the Portfolio Management Agreement.

(iv)    Neither the Issuer nor the Portfolio Manager will enter into any agreement amending, modifying or terminating the Portfolio Management Agreement without (A) the consent of a Majority of the Subordinated Notes; (B) the consent of a Majority of the Controlling Class; and (C) notice to S&P; *provided* that with notice to S&P but without satisfying the foregoing clauses (A) or (B), the Issuer and the Portfolio Manager may enter into an agreement amending the Portfolio Management Agreement to (w) reflect a change that is of an inconsequential nature; (x) correct inconsistencies, typographical or other errors, defects or ambiguities, (y) conform the Portfolio Management Agreement to the final Offering Circular with respect to the Notes or to this Indenture (as it may be amended from time to time pursuant to Article 8) or (z) reflect a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation (including ERISA, the Code, the Advisers Act and the Investment Company Act) of any U.S. federal or state agency or contained in any U.S. federal or state statute.

(v)     Except as otherwise set forth herein and therein (including pursuant to Section 11 of the Portfolio Management Agreement), the Portfolio Manager shall continue to serve as Portfolio Manager under the Portfolio Management Agreement notwithstanding that the Portfolio Manager shall not have received amounts due it

Page 226

under the Portfolio Management Agreement because sufficient funds were not then available hereunder to pay such amounts in accordance with the Priority of Payments set forth under <u>Section 11.1</u>.  The Portfolio Manager agrees not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for the nonpayment of the fees or other amounts payable by the Issuer to the Portfolio Manager under the Portfolio Management Agreement until the payment in full of all Notes (and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer) issued under this Indenture and the expiration of a period equal to one year and a day, or, if longer, the applicable preference period, following such payment.   Nothing in this <u>Section 15.1</u> shall preclude, or be deemed to stop, the Portfolio Manager (i) from taking any action prior to the expiration of the aforementioned period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than the Portfolio Manager, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

(vi)  Except with respect to transactions contemplated by Section 6 of the Portfolio Management Agreement, if the Portfolio Manager determines that it or any of its Affiliates has a conflict of interest between the Holder of any Note and any other account or portfolio for which the Portfolio Manager or any of its Affiliates is serving as investment adviser which relates to any action to be taken with respect to any Asset, then the Portfolio Manager will give written notice to the Trustee, who shall promptly forward such notice to the relevant Holder, briefly describing such conflict and the action it proposes to take.  The provisions of this clause (vi) shall not apply to any transaction permitted by the terms of the Portfolio Management Agreement.

(vii)  On each Measurement Date on which the S&P CDO Monitor Test is used, the Portfolio Manager on behalf of the Issuer will measure compliance under such test.

(g)  Upon a Trust Officer of the Trustee receiving written notice from the Portfolio Manager that an event constituting "Cause" as defined in the Portfolio Management Agreement has occurred, the Trustee shall, not later than one Business Day thereafter, notify the Noteholders (as their names appear in the Register).

*- signature page follows -*

Page 227

18750188.25.BUSINESS

**IN WITNESS WHEREOF,** we have set our hands as of the day and year first written above.

Executed as a Deed by:

**ACIS CLO 2014-3 LTD.,**
as Issuer

By _____
Name: Wendy Ebanks
Title: Director

In the presence of:

Witness: _____
Name:
Occupation: Lasma Purs
Title: corporate assistant

**ACIS CLO 2014-3 LLC,**
as Co-Issuer

By _____
Name:
Title:

**U.S. BANK NATIONAL ASSOCIATION,**
as Trustee

By _____
Name:
Title:

**IN WITNESS WHEREOF**, we have set our hands as of the day and year first written above.

Executed as a Deed by:

**ACIS CLO 2014-3 LTD.,**
as Issuer

By _____

        Name:

        Title:

In the presence of:

Witness: _____

Name:

Occupation:

Title:

**ACIS CLO 2014-3 LLC,**
as Co-Issuer

By _____

        Name:   Donald J. Puglisi

        Title:   Manager

**U.S. BANK NATIONAL ASSOCIATION,**
as Trustee

By _____

        Name:

        Title:

18750188.BUSINESS

ACIS 2014-3
Indenture

**IN WITNESS WHEREOF**, we have set our hands as of the day and year first written above.

Executed as a Deed by:

**ACIS CLO 2014-3 LTD.,**
as Issuer

By    _____

        Name:
        Title:

In the presence of:

Witness:    _____
Name:
Occupation:
Title:

**ACIS CLO 2014-3 LLC,**
as Co-Issuer

By    _____

        Name:
        Title:

**U.S. BANK NATIONAL ASSOCIATION,**
as Trustee

By    _____

        Name:
        Title:    **Louis Marucheau**
                 **Vice President**

**Schedule 1**

**List of Collateral Obligations**

**Acis CLO 2014-3, Ltd.**

| Issuer | Asset | Commitment | Spread | Maturity | Moody's Def. Prob. Rating | S&P Rating | Domicile |
|---|---|---|---|---|---|---|---|
| 1-800 Contacts, Inc. | Term Loan | 2,500,000 | 3.25% | 1/31/21 | B | B | USA |
| Academy, LTD. | Initial Term Loan (2012) | 600,000 | 3.00% | 8/3/18 | B2 | B | USA |
| Accudyne Industries Borrower S.C.A. | Refinancing Term Loan | 3,000,000 | 3.00% | 12/13/19 | B2 | B | USA |
| Activision Blizzard Inc. | Term Loan | 212,406 | 2.50% | 10/12/20 | Ba1 | BB+ | USA |
| ADS Waste Holdings, Inc. | Term Loan B | 4,000,000 | 3.00% | 10/9/19 | B2 | B | USA |
| Advantage Sales & Marketing Inc. | 2013 Term Loan (First Lien) | 250,000 | 3.25% | 12/18/17 | B2 | B+ | USA |
| Aeroflex Incorporated | Tranche B-1 Term Loan | 1,000,000 | 3.50% | 11/9/19 | B1 | B+ | USA |
| AES Corporation, The | 2013 Other Term Loan | 3,500,000 | 2.75% | 6/1/18 | Ba3 | BB- | USA |
| Affinia Group Inc. | Tranche B-2 Term Loan | 2,000,000 | 3.50% | 4/25/20 | B3 | B | USA |
| Akorn, Inc. | Term Loan B | 1,000,000 | 3.50% | 11/13/20 | B1 | B+ | USA |
| Albertson's LLC | Term B-2 Loan | 4,250,000 | 3.75% | 3/21/19 | B2 | B | USA |
| Alere Inc. (fka IM US Holdings, LLC) | Incremental B-1 Term Loan | 3,456,135 | 3.25% | 6/30/17 | B2 | B | USA |
| Alere Inc. (fka IM US Holdings, LLC) | Incremental B-2 Term Loan | 400,416 | 3.25% | 6/30/17 | B2 | B | USA |
| Alpha Topco Limited | New Facility B (USD) | 6,000,000 | 3.50% | 4/30/19 | B2 | B | Jersey |
| American Builders & Contractors Supply Co., Inc. | Term B Loan | 1,500,000 | 2.75% | 4/16/20 | B1 | BB- | USA |
| Aramark Corporation | U.S. Term D Loan | 4,970,656 | 3.00% | 9/9/19 | B1 | B+ | USA |
| Armstrong World Industries, Inc. | Term Loan B | 200,000 | 2.75% | 3/15/20 | B1 | BB- | USA |
| Arysta LifeScience SPC, LLC | Initial Term Loan (First Lien) | 2,500,000 | 3.50% | 5/29/20 | B2 | B | USA |
| Audio Visual Services Group, Inc. | Term Loan B (First Lien) | 3,000,000 | 3.50% | 1/25/21 | B2 | B | USA |
| Avaya Inc. | Term Loan B | 2,500,000 | 5.50% | 3/31/18 | Caa1 | B- | USA |
| Avaya Inc. | Term B-3 Loan | 5,000,000 | 4.50% | 10/26/17 | Caa1 | B- | USA |
| Avis Budget Car Rental, LLC | Tranche B Term Loan | 250,000 | 2.25% | 3/15/19 | B1 | B+ | USA |
| Axalta Coating Systems Dutch Holding B B.V. | Refinanced Term B Loan | 250,000 | 3.00% | 2/1/20 | B2 | BB- | USA |
| Bass Pro Group, LLC | New Term Loan | 250,000 | 3.00% | 11/20/19 | Ba3 | BB- | USA |
| Bats Global Markets, Inc. | Term Loan | 1,000,000 | 4.00% | 1/31/20 | B1 | BB- | USA |
| Biomet, Inc. | Dollar Term B-2 Loan | 500,000 | 3.50% | 7/25/17 | B2 | B+ | USA |
| BJ's Wholesale Club, Inc. | New 2013 (November) Replacement Loan (First Lien) | 250,000 | 3.50% | 9/26/19 | B3 | B- | USA |
| Booz Allen Hamilton Inc. | Refinance Tranche B | 250,000 | 3.00% | 7/31/19 | Ba3 | BB | USA |
| Burger King Corporation | Tranche B Term Loan (2012) | 3,500,000 | 2.75% | 9/28/19 | B2 | B+ | USA |
| Burlington Coat Factory Warehouse Corporation | Term B-2 Loan | 4,826,927 | 3.25% | 2/23/17 | B2 | B- | USA |
| BWay Holding Company | Initial Term Loan | 250,000 | 3.00% | 8/6/17 | B3 | B | USA |
| Calpine Construction Finance Company, L.P. | Term B-1 Loan | 500,000 | 2.25% | 5/3/20 | B1 | B+ | USA |
| Calpine Corporation | Term Loan (6/11) | 3,000,000 | 3.00% | 4/1/18 | B1 | B+ | USA |
| Capital Automotive L.P. | Tranche B-1 Term Loan Facility | 3,999,476 | 3.25% | 4/10/19 | Ba3 | B+ | USA |
| Catalent Pharma Solutions, Inc. (f/k/a Cardinal Health 409, Inc.) | Refinancing Dollar Term-2 (2017) | 2,500,000 | 3.25% | 9/15/17 | B3 | B+ | USA |
| CBS Outdoor Americas Capital LLC | Term B Loan | 500,000 | 2.25% | 1/31/21 | Ba3 | BB- | USA |
| CDW LLC (fka CDW Corporation) | Term Loan | 200,000 | 2.50% | 4/29/20 | B1 | B+ | USA |
| Cedar Fair, L.P. | U.S. Term Facility | 500,000 | 2.50% | 3/6/20 | Ba3 | BB- | USA |
| Cequel Communications, LLC | Term Loan | 200,000 | 2.75% | 2/14/19 | B1 | B+ | USA |
| Charter Communications Operating, LLC | Term Loan | 250,000 | 2.25% | 7/1/20 | B2 | BBB | USA |
| Chrysler Group LLC | Term Loan B | 6,500,000 | 2.75% | 12/31/18 | B1 | BB- | USA |
| CHS/Community Health Systems, Inc. | 2021 Term D Loan | 4,000,000 | 3.25% | 1/27/21 | B1 | B+ | USA |
| Cinemark USA, Inc. | Term Loan | 250,000 | 3.00% | 12/18/19 | B1 | BBB | USA |
| Clear Channel Communications, Inc. | Tranche D Term Loan | 3,000,000 | 6.75% | 1/30/19 | Caa2 | CCC+ | USA |
| Commscope, Inc. | Tranche 4 Term Loan | 500,000 | 2.50% | 1/14/18 | B1 | B+ | USA |
| Continental Airlines, Inc. (United Air Lines, Inc.) | Class B Term Loan | 3,500,000 | 3.00% | 4/1/19 | B2 | B | USA |
| Crown Castle Operating Company | New Tranche B Term Loan | 1,000,000 | 2.50% | 1/31/21 | Ba2 | BB | USA |
| CSC Holdings, LLC (fka CSC Holdings Inc. (Cablevision)) | Term B Loan | 250,000 | 2.50% | 4/17/20 | Ba3 | BB | USA |
| Cumulus Media Holdings Inc. | Term Loan | 6,000,000 | 3.25% | 12/23/20 | B2 | B | USA |
| DaVita HealthCare Partners Inc. (fka DaVita Inc.) | Tranche B Term Loan | 4,000,000 | 3.00% | 10/20/16 | Ba3 | BB- | USA |
| Del Monte Foods, Inc. | Term Loan (First Lien) | 3,000,000 | 3.25% | 11/26/20 | B2 | B | USA |
| Dell International LLC | Term B Loan | 6,483,750 | 3.50% | 4/29/20 | Ba3 | BB- | USA |
| Delta Air Lines, Inc. | Term Loan B1 | 1,500,000 | 2.75% | 10/18/18 | B1 | B+ | USA |
| Deltek, Inc. | Term Loan (First Lien) | 250,000 | 3.50% | 10/10/18 | B3 | B | USA |
| Doncasters US Finance LLC (Doncasters US LLC) | Second-Lien Term Loans | 1,000,000 | 8.25% | 10/9/20 | B3 | B | USA |
| Dunkin' Brands, Inc. | Term B-3 Loan | 250,000 | 2.50% | 2/5/21 | B2 | B+ | USA |
| EFS Cogen Holdings I LLC | Term B Advance | 5,739,726 | 2.75% | 12/17/20 | Ba2 | BB+ | USA |
| Emdeon Inc. | Term B Loan | 3,000,000 | 2.50% | 11/2/18 | B2 | B | USA |
| EquiPower Resources Holdings, LLC | Term C Advance (First Lien) | 5,922,828 | 3.25% | 12/31/19 | B2 | BB | USA |
| ExGen Renewables, LLC | Term Loan | 2,000,000 | 4.50% | 2/6/21 | B1 | B+ | USA |
| Fairmount Minerals, Ltd. | Tranche B-2 Term Loan | 6,000,000 | 4.00% | 9/5/19 | B1 | BB- | USA |
| FGI Operating Company, LLC | Term Loan | 7,000,000 | 4.25% | 4/19/19 | B1 | B+ | USA |
| Fieldwood Energy LLC | Closing Date Loan (Second Lien) | 442,623 | 7.13% | 9/30/20 | B2 | B- | USA |
| Filtration Group Corporation | Term Loan (First Lien) | 4,000,000 | 3.50% | 11/20/20 | B2 | B | USA |
| First Data Corporation | Term Loan | 2,000,000 | 4.00% | 3/24/21 | B3 | B | USA |
| Fram Group Holdings Inc./Prestone Holdings Inc. | Term Loan (First Lien) | 2,000,000 | 5.00% | 7/31/17 | Caa1 | B | USA |
| Freescale Semiconductor, Inc. | Tranche B-5 Term Loan | 3,000,000 | 3.75% | 1/15/21 | B2 | B | USA |
| FTS International, Inc. (fka Frac Tech International, LLC) | Term Loan | 3,500,000 | 3.50% | 5/6/16 | B3 | B- | USA |
| Generac Power Systems, Inc. | Term Loan B | 200,000 | 2.75% | 5/29/20 | Ba2 | B+ | USA |
| Guitar Center, Inc. | Extended Term Loan | 3,000,000 | 6.00% | 4/9/17 | Caa2 | CCC+ | USA |
| H. J. Heinz Company | Term B-2 Loan | 200,000 | 2.50% | 6/5/20 | Ba3 | BB | USA |
| Harbor Freight Tools USA, Inc. | Initial Loan | 2,992,481 | 3.75% | 7/26/19 | Ba3 | B+ | USA |
| HCA Inc. | Tranche B-4 Term Loan | 250,000 | 2.75% | 5/1/18 | B1 | B+ | USA |
| HD Supply Inc. | Term Loan 2014 | 2,330,000 | 3.00% | 6/28/18 | B3 | B | USA |
| Hertz Corporation, The | Tranche B-2 Term Loan | 3,500,000 | 2.25% | 3/11/18 | B1 | B+ | USA |
| Hilton Worldwide Finance, LLC | Initial Term Loan | 3,000,000 | 3.00% | 10/26/20 | B1 | BB- | USA |
| Hologic, Inc. | Refinancing Tranche B Term Loan | 3,525,000 | 2.75% | 8/1/19 | B1 | BB | USA |
| Hudson's Bay Company | Initial Term Loan (First Lien) | 3,000,000 | 3.75% | 11/4/20 | B1 | B+ | USA |
| Husky Injection Molding Systems Ltd. (Yukon Acquisition Inc.) | New Term Loan | 250,000 | 3.25% | 7/2/18 | B3 | B | Canada |
| IMS Health Incorporated | Tranche B-1 Dollar Term Loan | 1,000,000 | 2.75% | 9/1/17 | B2 | B+ | USA |
| Ina Beteiligungsgesellschaft Mit Beschrankter Haftung (fka Schaeffler AG) | Facility C (USD) | 2,000,000 | 3.25% | 1/27/17 | Ba3 | BB- | Germany |
| Ineos US Finance LLC | Cash Dollar Term Loan | 1,500,000 | 2.75% | 5/4/18 | B1 | B+ | USA |
| Infor (US), Inc. (fka Lawson Software Inc.) | Tranche B-3 Term Loan | 750,000 | 2.75% | 6/3/20 | B2 | B+ | USA |
| Infor (US), Inc. (fka Lawson Software Inc.) | Tranche B-5 Term Loan | 1,500,000 | 2.75% | 6/3/20 | B2 | B | USA |
| Integra Telecom Holdings, Inc. | Term B Loan | 4,500,000 | 4.00% | 2/22/19 | B3 | B | USA |
| J. Crew Group, Inc. | Term B-1 Loan | 249,359 | 3.00% | 3/7/18 | B2 | B | USA |
| J.C. Penney Corporation Inc. | Loan | 4,000,000 | 5.00% | 5/22/18 | Caa2 | CCC+ | USA |
| KAR Auction Services, Inc. | Term Loan | 1,954,720 | 2.75% | 5/19/17 | B1 | BB+ | USA |

| Issuer | Asset | Commitment | Spread | Maturity | Moody's Def. Prob. Rating | S&P Rating | Domicile |
|---|---|---|---|---|---|---|---|
| Kasima, LLC (Digital Cinema Implementation Partners, LLC) | Term Loan | 500,000 | 2.50% | 5/17/21 | Baa1 | BB+ | USA |
| Kinetic Concepts, Inc. | Dollar Term E-1 Loan | 3,000,000 | 3.00% | 5/4/18 | B3 | B3 | USA |
| Kronos Incorporated | Incremental Term Loan (First Lien) | 500,000 | 3.50% | 10/30/19 | B3 | B | USA |
| Kronos Worldwide, Inc. | Term Loan | 1,500,000 | 3.75% | 2/12/20 | Ba3 | B+ | USA |
| Las Vegas Sands, LLC | Term B Loan | 250,000 | 2.50% | 12/19/20 | Ba2 | BBB- | USA |
| Level 3 Financing, Inc. | Tranche B-III 2019 Term Loan | 1,416,000 | 3.00% | 8/1/19 | B3 | B | USA |
| Live Nation Entertainment, Inc. | Term B-1 Loan | 200,000 | 2.75% | 8/17/20 | B1 | BB- | USA |
| LPL Holdings, Inc. | 2013 Incremental Tranche B Term Loan | 700,000 | 2.50% | 3/29/19 | Ba2 | BBB- | USA |
| Macdermid, Incorporated | Tranche B Term Loan (First Lien) | 500,000 | 3.00% | 6/7/20 | B2 | B+ | USA |
| MEG Energy Corp. | New Term Loan | 3,500,000 | 2.75% | 3/31/20 | Ba3 | BB | Canada |
| MGM Resorts International (MGM Grand Detroit, LLC) | Term B Loan | 1,000,000 | 2.50% | 12/20/19 | B2 | B+ | USA |
| Michaels Stores, Inc. | Term B Loan | 1,994,975 | 2.75% | 1/28/20 | B2 | B | USA |
| Microsemi Corporation | Term Loan | 1,600,000 | 2.75% | 2/19/20 | Ba2 | BB- | USA |
| Mitel Networks Corporation | Term Loan | 2,000,000 | 4.25% | 1/31/20 | B2 | B | USA |
| Moneygram International, Inc. | Term Loan | 5,000,000 | 3.25% | 3/27/20 | B1 | BB- | USA |
| National Financial Partners Corp. | Term B Loan | 3,226,897 | 4.25% | 7/1/20 | B3 | B | USA |
| NBTY, INC. | Term B-2 Loan | 200,000 | 2.50% | 10/1/17 | B2 | B+ | USA |
| Neiman Marcus Group Inc., The | Term Loan | 997,500 | 4.00% | 10/25/20 | B3 | B | USA |
| Nuance Communications | Term Loan | 750,000 | 2.75% | 8/7/19 | Ba3 | BB- | USA |
| Nuveen Investments, Inc. | Tranche B First-Lien Term Loan | 3,000,000 | 4.00% | 5/13/17 | B3 | B- | USA |
| Nuveen Investments, Inc. | Tranche B Second-Lien Term Loan | 2,500,000 | 5.25% | 2/28/19 | B3 | B- | USA |
| NXP B.V. | Term Loan | 2,066,067 | 2.00% | 3/4/17 | Ba3 | BB | Netherlands |
| Ocwen Loan Servicing | Initial Term Loan | 8,500,000 | 3.75% | 2/15/18 | B1 | B | USA |
| Onex Carestream Finance LP | Term Loan (Second Lien) | 1,000,000 | 8.50% | 12/7/19 | B2 | B | USA |
| Onex Carestream Finance LP | Term Loan (First Lien 2013) | 4,000,000 | 4.00% | 6/7/19 | B2 | B | USA |
| Pacific Industrial Services Finco Pty Limited | Term B Loan | 5,000,000 | 4.00% | 10/2/18 | B2 | B | USA |
| Party City Holdings Inc. | 2013 Replacement Term Loan | 250,000 | 3.25% | 7/27/19 | B3 | B | USA |
| Phillips Pet Food & Supplies | Term Loan | 3,000,000 | 3.50% | 1/31/21 | B2 | B | USA |
| Pilot Travel Centers LLC | First Amendment Tranche B Term Loan | 1,500,000 | 3.00% | 8/7/19 | B1 | BB | USA |
| Pilot Travel Centers LLC | First Amendment Tranche B Term Loan | 500,000 | 3.00% | 3/30/18 | B1 | BB | USA |
| Pinnacle Entertainment, Inc. | Tranche B-2 Term Loan | 3,500,000 | 2.75% | 8/13/20 | B1 | BB- | USA |
| Pinnacle Foods Finance LLC | New Term Loan G | 200,000 | 2.50% | 4/29/20 | B1 | B+ | USA |
| PQ Corporation (fka Niagara Acquisition, Inc.) | 2013 Term Loan | 3,000,000 | 3.50% | 8/7/17 | B3 | B | USA |
| Quikrete Holdings, Inc. | Initial Loan (First Lien) | 250,000 | 3.00% | 9/26/20 | B1 | B+ | USA |
| Regal Cinemas Corporation | Term Loan | 250,000 | 2.75% | 8/23/17 | B1 | B+ | USA |
| Revlon Consumer Products Corporation | Replacement Term Loan | 250,000 | 3.00% | 8/19/19 | B1 | B+ | USA |
| Reynolds Group Holdings Inc. | Incremental U.S. Term Loan | 2,000,000 | 3.00% | 11/30/18 | B3 | B | USA |
| RP Crown Parent, LLC | New Term Loan (First Lien) | 6,000,000 | 5.00% | 12/21/18 | B3 | B | USA |
| Sabre Inc. | Term B Loan | 7,000,000 | 3.25% | 2/19/19 | B2 | B | USA |
| Scientific Games International Inc. | Initial Term Loan | 3,500,000 | 3.25% | 10/18/20 | B1 | BB | USA |
| Seadrill Partners LLC | Term Loan B | 4,000,000 | 3.00% | 2/12/21 | Ba3 | BB- | USA |
| Sedgwick CMS Holdings, Inc. | Term Loan (Second Lien) | 1,750,000 | 5.75% | 2/11/22 | B3 | B | USA |
| Sequa Corporation | Initial Term Loan | 3,000,000 | 4.00% | 6/19/17 | B3 | B | USA |
| ServiceMaster Company, The | Tranche B Term Loan | 3,000,000 | 4.25% | 1/31/17 | Caa1 | B | USA |
| Shield Finance Co S.Å r.l. | New Term Loan B | 2,000,000 | 4.00% | 1/29/21 | B3 | B | USA |
| Sinclair Television Group, Inc. | New Tranche B Term Loan | 250,000 | 2.75% | 4/9/20 | Ba3 | BB- | USA |
| Skilled Healthcare Group, Inc. | Term Loan | 1,073,560 | 5.25% | 4/9/16 | B2 | B | USA |
| Southwire Company | Term Loan | 3,000,000 | 2.50% | 2/10/21 | Ba2 | BB | USA |
| Spectrum Brands, Inc. | Tranche C Term Loan | 1,000,000 | 2.75% | 9/4/19 | B1 | B+ | USA |
| Spin Holdco Inc. | Initial Term Loan (First Lien) | 250,000 | 3.25% | 11/14/19 | B3 | B | USA |
| SRAM, LLC | Term Loan (First Lien) | 1,750,000 | 3.00% | 4/10/20 | B1 | BB- | USA |
| SS&C Technologies Holdings Europe S.A.R.L. | 2013 Replacement Term B-2 Loan | 18,750 | 2.75% | 6/7/19 | Ba3 | BB- | Luxembourg |
| SS&C Technologies, Inc., /Sunshine Acquisition II, Inc. | 2013 Replacement Term B-1 Loan | 181,250 | 2.75% | 6/7/19 | Ba3 | BB- | Canada |
| Supervalu Inc. | New Term Loan | 5,000,000 | 3.50% | 3/21/19 | B3 | B+ | USA |
| Surgery Center Holdings, Inc. Term Loan (Second Lien) | | 1,400,000 | 8.50% | 4/11/20 | B3 | B | USA |
| Telesat Canada | U.S. Term B-2 Loan | 200,000 | 2.75% | 3/28/19 | B1 | B+ | Canada |
| Tervita Corporation (fka CCS Corporation) | Term Loan | 2,500,000 | 5.00% | 5/15/18 | Caa1 | B- | Canada |
| TGGT Holdings, LLC | Term Loan B | 4,000,000 | 5.50% | 11/15/18 | B2 | B | USA |
| Topaz Power Holdings, LLC | Term B Advance | 8,000,000 | 4.00% | 2/26/20 | B2 | BB- | USA |
| Trans Union LLC | 2013 Replacement Term Loan | 4,075,130 | 3.00% | 2/8/19 | B2 | B+ | USA |
| TransDigm Inc. | Tranche C Term Loan | 250,000 | 3.00% | 2/28/20 | B2 | B | USA |
| Tribune Company | Initial Term Loan | 6,500,000 | 3.00% | 12/27/20 | Ba3 | BB- | USA |
| TWCC Holding Corp. | Term Loan | 2,000,000 | 2.75% | 2/13/17 | B1 | B | USA |
| United Surgical Partners International, Inc. | New Tranche B Term Loan | 250,000 | 3.75% | 4/3/19 | B2 | B | USA |
| Univar Inc. | Term B Loan | 4,000,000 | 3.50% | 6/30/17 | B3 | B+ | USA |
| Univision Communications Inc. | 2013 New First-Lien Term Loan | 5,000,000 | 3.00% | 3/1/20 | B3 | B | USA |
| UPC Financing Partnership | Facility AH | 200,000 | 2.50% | 6/30/21 | Ba3 | BB- | Netherlands |
| Valeant Pharmaceuticals International, Inc. | Series D2 Term Loan B | 2,000,000 | 3.00% | 2/13/19 | B1 | BB- | Canada |
| Verint Systems Inc. | Tranche B Incremental Term Loan | 250,000 | 2.75% | 8/3/20 | B1 | BB | USA |
| Vertafore, Inc. | Term Loan (Second Lien) | 1,000,000 | 8.25% | 10/29/17 | B2 | B | USA |
| Vertafore, Inc. | Term Loan (2013) | 3,346,722 | 3.25% | 10/3/19 | B2 | B | USA |
| Veyance Technologies, Inc. | Term Loan | 5,000,000 | 4.00% | 9/8/17 | B2 | B | USA |
| W.R. Grace & Co. | US Term Loan | 2,210,526 | 2.25% | 2/3/21 | Ba2 | B+ | USA |
| W.R. Grace & Co. | Delayed Draw Term Loan | 789,474 | 2.25% | 2/3/21 | Ba2 | B+ | USA |
| WaveDivision Holdings, LLC | Initial Term Loan | 2,500,000 | 3.00% | 10/12/19 | B2 | B | USA |
| Weight Watchers International, Inc. | Initial Tranche B-2 Term Loan | 9,000,000 | 3.00% | 4/2/20 | Ba3 | BB- | USA |
| Wendy's International, Inc | Term B Loan | 250,000 | 2.75% | 5/15/19 | B1 | B+ | USA |
| West Corporation | Term B-9 Loan | 2,147,731 | 2.00% | 7/15/16 | B1 | BB- | USA |
| Windstream Corporation | Tranche B-5 Term Loan | 2,000,000 | 2.75% | 8/26/19 | Ba3 | BB- | USA |
| Ziggo | Term Loan B1 | 4,000,000 | 2.75% | 1/15/22 | B1 | BB- | Netherlands |

Exhibit B

**Schedule 2**

**S&P Industry Classifications**

| Asset Code | Asset Description |
|---|---|
| 1 | Aerospace & Defense |
| 2 | Air transport |
| 3 | Automotive |
| 4 | Beverage & Tobacco |
| 5 | Radio & Television |
| 6 | |
| 7 | Building & Development |
| 8 | Business equipment & services |
| 9 | Cable & satellite television |
| 10 | Chemicals & plastics |
| 11 | Clothing/textiles |
| 12 | Conglomerates |
| 13 | Containers & glass products |
| 14 | Cosmetics/toiletries |
| 15 | Drugs |
| 16 | Ecological services & equipment |
| 17 | Electronics/electrical |
| 18 | Equipment leasing |
| 19 | Farming/agriculture |
| 20 | Financial intermediaries |
| 21 | Food/drug retailers |

| Asset Code | Asset Description |
|---|---|
| 22 | Food products |
| 23 | Food service |
| 24 | Forest products |
| 25 | Health care |
| 26 | Home furnishings |
| 27 | Lodging & casinos |
| 28 | Industrial equipment |
| 29 | |
| 30 | Leisure goods/activities/movies |
| 31 | Nonferrous metals/minerals |
| 32 | Oil & gas |
| 33 | Publishing |
| 34 | Rail industries |
| 35 | Retailers (except food & drug) |
| 36 | Steel |
| 37 | Surface transport |
| 38 | Telecommunications |
| 39 | Utilities |
| 43 | Life Insurance |
| 44 | Health Insurance |
| 45 | Property & Casualty Insurance |
| 46 | Diversified Insurance |

**Schedule 3**

**Moody's Rating Definitions**

**MOODY'S DEFAULT PROBABILITY RATING**

(a) With respect to a Collateral Obligation, if the obligor of such Collateral Obligation has a CFR, then such CFR;

(b) With respect to a Collateral Obligation if not determined pursuant to clause (a) above, if the obligor of such Collateral Obligation has one or more senior unsecured obligations with an Assigned Moody's Rating, then the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

(c) With respect to a Collateral Obligation if not determined pursuant to clauses (a) or (b) above, if the obligor of such Collateral Obligation has one or more senior secured obligations with an Assigned Moody's Rating, then the Moody's rating that is one subcategory lower than the Assigned Moody's Rating on any such senior secured obligation as selected by the Portfolio Manager in its sole discretion;

(d) With respect to a Collateral Obligation if not determined pursuant to clauses (a), (b) or (c) above, if a rating estimate has been assigned to such Collateral Obligation by Moody's upon the request of the Issuer, the Portfolio Manager or an Affiliate of the Portfolio Manager, then the Moody's Default Probability Rating is such rating estimate as long as such rating estimate or a renewal for such rating estimate has been issued or provided by Moody's in each case within the 15 month period preceding the date on which the Moody's Default Probability Rating is being determined; *provided* that, if such rating estimate has been issued or provided by Moody's for a period (x) longer than 13 months but not beyond 15 months, the Moody's Default Probability Rating will be one subcategory lower than such rating estimate and (y) beyond 15 months, the Moody's Default Probability Rating will be deemed to be "Caa3";

(e) With respect to any DIP Collateral Obligation, the Moody's Default Probability Rating of such Collateral Obligation shall be the rating which is one subcategory below the Assigned Moody's Rating of such DIP Collateral Obligation;

(f) With respect to a Collateral Obligation if not determined pursuant to any of clauses (a) through (e) above and at the election of the Portfolio Manager, the Moody's Derived Rating; and

(g) With respect to a Collateral Obligation if not determined pursuant to any of clauses (a) through (f) above, the Collateral Obligation will be deemed to have a Moody's Default Probability Rating of "Caa3."

For purposes of calculating a Moody's Default Probability Rating, each applicable rating on credit watch by Moody's with positive or negative implication at the time of calculation will be treated as having been upgraded or downgraded by one rating subcategory, as the case may be.

## MOODY'S RATING

(a)    With respect to a Collateral Obligation that is a Senior Secured Loan:

    (i)    if such Collateral Obligation has an Assigned Moody's Rating, such Assigned Moody's Rating;

    (ii)   if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has a CFR, then the Moody's rating that is one subcategory higher than such CFR;

    (iii)  if neither clause (a)(i) nor (a)(ii) above apply, if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has one or more senior unsecured obligations with an Assigned Moody's Rating, then the Moody's rating that is two subcategories higher than the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

    (iv)   if none of clauses (a)(i) through (a)(iii) above apply, at the election of the Portfolio Manager, the Moody's Derived Rating; and

    (v)    if none of clauses (a)(i) through (a)(iv) above apply, the Collateral Obligation will be deemed to have a Moody's Rating of "Caa3"; and

(b)    With respect to a Collateral Obligation other than a Senior Secured Loan:

    (i)    if such Collateral Obligation has an Assigned Moody's Rating, such Assigned Moody's Rating;

    (ii)   if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has one or more senior unsecured obligations with an Assigned Moody's Rating, then the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

    (iii)  if neither clause (b)(i) nor clause (b)(ii) above apply, if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has a CFR, then the Moody's rating that is one subcategory lower than such CFR;

    (iv)   if none of clauses (b)(i), (b)(ii) or (b)(iii) above apply, if such Collateral Obligation does not have an Assigned Moody's Rating but the obligor of such Collateral Obligation has one or more subordinated debt obligations with an Assigned Moody's Rating, then the Moody's rating that is one subcategory higher than the Assigned Moody's Rating on any such obligation as selected by the Portfolio Manager in its sole discretion;

    (v)    if none of clauses (b)(i) through (b)(iv) above apply, at the election of the Portfolio Manager, the Moody's Derived Rating; and

(vi) if none of clauses (b)(i) through (b)(vi) above apply, the Collateral Obligation will be deemed to have a Moody's Rating of "Caa3."

For purposes of calculating a Moody's Rating, each applicable rating on credit watch by Moody's with positive or negative implication at the time of calculation will be treated as having been upgraded or downgraded by one rating subcategory, as the case may be.

### MOODY'S DERIVED RATING

With respect to a Collateral Obligation whose Moody's Rating or Moody's Default Probability Rating is determined as the Moody's Derived Rating, the rating as determined in the manner set forth below.

(a) By using one of the methods provided below:

(i) if such Collateral Obligation is rated by S&P, then the Moody's Rating and Moody's Default Probability Rating (as applicable) of such Collateral Obligation will be determined, at the election of the Portfolio Manager, in accordance with the methodology set forth in the following table below:

| Type of Collateral Obligation | S&P Rating (Public and Monitored) | Collateral Obligation Rated by S&P | Number of Subcategories Relative to Moody's Equivalent of S&P Rating |
|---|---|---|---|
| Not Structured Finance Obligation | ≥ "BBB-" | Not a Loan or Participation Interest in Loan | -1 |
| Not Structured Finance Obligation | ≤ " BB+" | Not a Loan or Participation Interest in Loan | -2 |
| Not Structured Finance Obligation | | Loan or Participation Interest in Loan | -2 |

(ii) if such Collateral Obligation is not rated by S&P but another security or obligation of the obligor has a public and monitored rating by S&P (a "parallel security"), then the rating of such parallel security will at the election of the Portfolio Manager be determined in accordance with the table set forth in subclause (a)(i) above, and the Moody's Derived Rating for purposes of the definitions of Moody's Rating and Moody's Default Probability Rating (as applicable) of such Collateral Obligation will be determined in accordance with the methodology set forth in the following table (for such purposes treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (a)(ii)):

| Obligation Category of Rated Obligation | Rating of Rated Obligation | Subcategories Relative to Rated Obligation Rating |
|---|---|---|
| Senior secured obligation | ≥B2 | -1 |
| Senior secured obligation | < B2 | -2 |
| Subordinated obligation | ≥ B3 | +1 |
| Subordinated obligation | < B3 | 0 |

or

(iii)    if such Collateral Obligation is a DIP Collateral Obligation, no Moody's Derived Rating may be determined based on a rating by S&P or any other rating agency;

*provided* that the Aggregate Principal Balance of the Collateral Obligations that may have a Moody's Rating derived from an S&P Rating as set forth in sub-clauses (i) or (ii) of this clause (a) may not exceed 5% of the Collateral Principal Amount.

(b)    If not determined pursuant to clause (a) above and such Collateral Obligation is not rated by Moody's or S&P and no other security or obligation of the issuer of such Collateral Obligation is rated by Moody's or S&P, and if Moody's has been requested by the Issuer, the Portfolio Manager or the issuer of such Collateral Obligation to assign a rating or rating estimate with respect to such Collateral Obligation but such rating or rating estimate has not been received, pending receipt of such estimate, the Moody's Derived Rating of such Collateral Obligation for purposes of the definitions of Moody's Rating or Moody's Default Probability Rating shall be (x) "B3" if the Portfolio Manager certifies to the Trustee and the Collateral Administrator that the Portfolio Manager believes that such estimate shall be at least "B3" and if the Aggregate Principal Balance of Collateral Obligations determined pursuant to this clause (b)(x) and clause (a) above does not exceed 5% of the Collateral Principal Amount or (y) otherwise, "Caa1."

For purposes of calculating a Moody's Derived Rating, each applicable rating on credit watch by Moody's with positive or negative implication at the time of calculation will be treated as having been upgraded or downgraded by one rating subcategory, as the case may be.

## ASSIGNED MOODY'S RATING

The monitored publicly-available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

## CFR

      With respect to an obligor of a Collateral Obligation, if such obligor has a corporate family rating by Moody's, then such corporate family rating; provided that if such obligor does not have a corporate family rating by Moody's but any entity in the obligor's corporate family does have a corporate family rating, then the CFR is such corporate family rating.

**Schedule 4**

**DIVERSITY SCORE CALCULATION**

The Diversity Score is calculated as follows:

(a) An "Issuer Par Amount" is calculated for each issuer of a Collateral Obligation, and is equal to the Aggregate Principal Balance of all Collateral Obligations issued by that issuer and all affiliates.

(b) An "Average Par Amount" is calculated by summing the Issuer Par Amounts for all issuers, and dividing by the number of issuers.

(c) An "Equivalent Unit Score" is calculated for each issuer, and is equal to the lesser of (x) one and (y) the Issuer Par Amount for such issuer divided by the Average Par Amount.

(d) An "Aggregate Industry Equivalent Unit Score" is then calculated for each of the Moody's industry classification groups, shown on Schedule 5, and is equal to the sum of the Equivalent Unit Scores for each issuer in such industry classification group.

(e) An "Industry Diversity Score" is then established for each Moody's industry classification group, shown on Schedule 5, by reference to the following table for the related Aggregate Industry Equivalent Unit Score; *provided* that, if any Aggregate Industry Equivalent Unit Score falls between any two such scores, the applicable Industry Diversity Score will be the lower of the two Industry Diversity Scores:

| Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |
| 4.9500 | 2.6667 | 10.0500 | 4.0100 | 15.1500 | 4.5200 | | |

(f)     The Diversity Score is then calculated by summing each of the Industry Diversity Scores for each Moody's industry classification group shown on <u>Schedule 5</u>.

(g)     For purposes of calculating the Diversity Score, affiliated issuers in the same Industry are deemed to be a single issuer except as otherwise agreed to by Moody's.

**Schedule 5**

MOODY'S INDUSTRY CLASSIFICATION GROUP LIST

| | |
|---|---|
| CORP - Aerospace & Defense | 1 |
| CORP - Automotive | 2 |
| CORP - Banking, Finance, Insurance & Real Estate | 3 |
| CORP - Beverage, Food & Tobacco | 4 |
| CORP - Capital Equipment | 5 |
| CORP - Chemicals, Plastics, & Rubber | 6 |
| CORP - Construction & Building | 7 |
| CORP - Consumer goods: Durable | 8 |
| CORP - Consumer goods: Non-durable | 9 |
| CORP - Containers, Packaging & Glass | 10 |
| CORP - Energy: Electricity | 11 |
| CORP - Energy: Oil & Gas | 12 |
| CORP - Environmental Industries | 13 |
| CORP - Forest Products & Paper | 14 |
| CORP - Healthcare & Pharmaceuticals | 15 |
| CORP - High Tech Industries | 16 |
| CORP - Hotel, Gaming & Leisure | 17 |
| CORP - Media: Advertising, Printing & Publishing | 18 |
| CORP - Media: Broadcasting & Subscription | 19 |
| CORP - Media: Diversified & Production | 20 |
| CORP - Metals & Mining | 21 |
| CORP – Retail | 22 |
| CORP - Services: Business | 23 |
| CORP - Services: Consumer | 24 |
| CORP - Sovereign & Public Finance | 25 |
| CORP – Telecommunications | 26 |
| CORP - Transportation: Cargo | 27 |
| CORP - Transportation: Consumer | 28 |
| CORP - Utilities: Electric | 29 |
| CORP - Utilities: Oil & Gas | 30 |

18750188.25.BUSINESS

CORP - Utilities: Water ................................................................................................ 31

CORP – Wholesale ..................................................................................................... 32

# Schedule 6

## S&P Test Matrix Tables

### Class A Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 | Break-Even Rate Case 10 | Break-Even Rate Case 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 2.70% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 2.80% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 2.90% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 3.00% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 3.10% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 3.20% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 3.30% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 3.40% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 3.50% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 3.60% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 3.70% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 3.80% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 3.90% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 4.00% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 4.10% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 4.20% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 4.30% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 4.40% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 4.50% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 4.60% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 4.70% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 4.80% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |
| 4.90% | 35.000% | 35.125% | 35.250% | 35.375% | 35.500% | 35.625% | 35.750% | 35.875% | 36.000% | 36.125% | 36.250% |

18750188.25.BUSINESS

**Class A Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 12 | Break-Even Rate Case 13 | Break-Even Rate Case 14 | Break-Even Rate Case 15 | Break-Even Rate Case 16 | Break-Even Rate Case 17 | Break-Even Rate Case 18 | Break-Even Rate Case 19 | Break-Even Rate Case 20 | Break-Even Rate Case 21 | Break-Even Rate Case 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 2.70% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 2.80% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 2.90% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 3.00% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 3.10% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 3.20% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 3.30% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 3.40% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 3.50% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 3.60% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 3.70% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 3.80% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 3.90% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 4.00% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 4.10% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 4.20% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 4.30% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 4.40% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 4.50% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 4.60% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 4.70% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 4.80% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |
| 4.90% | 36.375% | 36.500% | 36.625% | 36.750% | 36.875% | 37.000% | 37.125% | 37.250% | 37.375% | 37.500% | 37.625% |

18750188.25.BUSINESS

**Class A Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 23 | Break-Even Rate Case 24 | Break-Even Rate Case 25 | Break-Even Rate Case 26 | Break-Even Rate Case 27 | Break-Even Rate Case 28 | Break-Even Rate Case 29 | Break-Even Rate Case 30 | Break-Even Rate Case 31 | Break-Even Rate Case 32 | Break-Even Rate Case 33 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 2.70% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 2.80% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 2.90% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 3.00% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 3.10% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 3.20% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 3.30% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 3.40% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 3.50% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 3.60% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 3.70% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 3.80% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 3.90% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 4.00% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 4.10% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 4.20% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 4.30% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 4.40% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 4.50% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 4.60% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 4.70% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 4.80% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |
| 4.90% | 37.750% | 37.875% | 38.000% | 38.125% | 38.250% | 38.375% | 38.500% | 38.625% | 38.750% | 38.875% | 39.000% |

**Class A Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 34 | Break-Even Rate Case 35 | Break-Even Rate Case 36 | Break-Even Rate Case 37 | Break-Even Rate Case 38 | Break-Even Rate Case 39 | Break-Even Rate Case 40 | Break-Even Rate Case 41 | Break-Even Rate Case 42 | Break-Even Rate Case 43 | Break-Even Rate Case 44 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 2.70% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 2.80% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 2.90% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 3.00% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 3.10% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 3.20% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 3.30% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 3.40% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 3.50% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 3.60% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 3.70% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 3.80% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 3.90% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 4.00% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 4.10% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 4.20% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 4.30% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 4.40% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 4.50% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 4.60% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 4.70% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 4.80% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |
| 4.90% | 39.125% | 39.250% | 39.375% | 39.500% | 39.625% | 39.750% | 39.875% | 40.000% | 40.125% | 40.250% | 40.375% |

18750188.25.BUSINESS

**Class A Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 45 | Break-Even Rate Case 46 | Break-Even Rate Case 47 | Break-Even Rate Case 48 | Break-Even Rate Case 49 | Break-Even Rate Case 50 | Break-Even Rate Case 51 | Break-Even Rate Case 52 | Break-Even Rate Case 53 | Break-Even Rate Case 54 | Break-Even Rate Case 55 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum Weighted Average S&P Recovery Rate** | | | | | | | | | | | |
| 2.60% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 2.70% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 2.80% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 2.90% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 3.00% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 3.10% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 3.20% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 3.30% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 3.40% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 3.50% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 3.60% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 3.70% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 3.80% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 3.90% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 4.00% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 4.10% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 4.20% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 4.30% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 4.40% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 4.50% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 4.60% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 4.70% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 4.80% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |
| 4.90% | 40.500% | 40.625% | 40.750% | 40.875% | 41.000% | 41.125% | 41.250% | 41.375% | 41.500% | 41.625% | 41.750% |

**Class A Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 56 | Break-Even Rate Case 57 | Break-Even Rate Case 58 | Break-Even Rate Case 59 | Break-Even Rate Case 60 | Break-Even Rate Case 61 | Break-Even Rate Case 62 | Break-Even Rate Case 63 | Break-Even Rate Case 64 | Break-Even Rate Case 65 | Break-Even Rate Case 66 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 2.70% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 2.80% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 2.90% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 3.00% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 3.10% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 3.20% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 3.30% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 3.40% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 3.50% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 3.60% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 3.70% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 3.80% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 3.90% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 4.00% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 4.10% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 4.20% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 4.30% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 4.40% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 4.50% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 4.60% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 4.70% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 4.80% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |
| 4.90% | 41.875% | 42.000% | 42.125% | 42.250% | 42.375% | 42.500% | 42.625% | 42.750% | 42.875% | 43.000% | 43.125% |

**Class A Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 67 | Break-Even Rate Case 68 | Break-Even Rate Case 69 | Break-Even Rate Case 70 | Break-Even Rate Case 71 | Break-Even Rate Case 72 | Break-Even Rate Case 73 | Break-Even Rate Case 74 | Break-Even Rate Case 75 | Break-Even Rate Case 76 | Break-Even Rate Case 77 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 2.70% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 2.80% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 2.90% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 3.00% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 3.10% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 3.20% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 3.30% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 3.40% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 3.50% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 3.60% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 3.70% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 3.80% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 3.90% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 4.00% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 4.10% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 4.20% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 4.30% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 4.40% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 4.50% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 4.60% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 4.70% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 4.80% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |
| 4.90% | 43.250% | 43.375% | 43.500% | 43.625% | 43.750% | 43.875% | 44.000% | 44.125% | 44.250% | 44.375% | 43.125% |

**Class A Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 78 | Break-Even Rate Case 79 | Break-Even Rate Case 80 | Break-Even Rate Case 81 | Break-Even Rate Case 82 | Break-Even Rate Case 83 | Break-Even Rate Case 84 | Break-Even Rate Case 85 | Break-Even Rate Case 86 | Break-Even Rate Case 87 | Break-Even Rate Case 88 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 2.70% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 2.80% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 2.90% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 3.00% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 3.10% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 3.20% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 3.30% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 3.40% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 3.50% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 3.60% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 3.70% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 3.80% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 3.90% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 4.00% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 4.10% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 4.20% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 4.30% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 4.40% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 4.50% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 4.60% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 4.70% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 4.80% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |
| 4.90% | 44.625% | 44.750% | 44.875% | 45.000% | 45.125% | 45.250% | 45.375% | 45.500% | 45.625% | 45.750% | 45.875% |

**Class A Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 89 | Break-Even Rate Case 90 | Break-Even Rate Case 91 | Break-Even Rate Case 92 | Break-Even Rate Case 93 | Break-Even Rate Case 94 | Break-Even Rate Case 95 | Break-Even Rate Case 96 | Break-Even Rate Case 97 | Break-Even Rate Case 98 | Break-Even Rate Case 99 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 2.70% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 2.80% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 2.90% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 3.00% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 3.10% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 3.20% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 3.30% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 3.40% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 3.50% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 3.60% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 3.70% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 3.80% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 3.90% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 4.00% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 4.10% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 4.20% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 4.30% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 4.40% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 4.50% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 4.60% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 4.70% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 4.80% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |
| 4.90% | 46.000% | 46.125% | 46.250% | 46.375% | 46.500% | 46.625% | 46.750% | 46.875% | 47.000% | 47.125% | 47.250% |

**Class A Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 100 | Break-Even Rate Case 101 | Break-Even Rate Case 102 | Break-Even Rate Case 103 | Break-Even Rate Case 104 | Break-Even Rate Case 105 | Break-Even Rate Case 106 | Break-Even Rate Case 107 | Break-Even Rate Case 108 | Break-Even Rate Case 109 | Break-Even Rate Case 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 2.70% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 2.80% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 2.90% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 3.00% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 3.10% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 3.20% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 3.30% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 3.40% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 3.50% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 3.60% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 3.70% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 3.80% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 3.90% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 4.00% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 4.10% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 4.20% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 4.30% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 4.40% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 4.50% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 4.60% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 4.70% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 4.80% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |
| 4.90% | 47.375% | 47.500% | 47.625% | 47.750% | 47.875% | 48.000% | 48.125% | 48.250% | 48.375% | 48.500% | 48.625% |

18750188.25.BUSINESS

**Class A Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 111 | Break-Even Rate Case 112 | Break-Even Rate Case 113 | Break-Even Rate Case 114 | Break-Even Rate Case 115 | Break-Even Rate Case 116 | Break-Even Rate Case 117 | Break-Even Rate Case 118 | Break-Even Rate Case 119 | Break-Even Rate Case 120 | Break-Even Rate Case 121 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 2.70% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 2.80% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 2.90% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 3.00% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 3.10% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 3.20% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 3.30% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 3.40% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 3.50% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 3.60% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 3.70% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 3.80% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 3.90% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 4.00% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 4.10% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 4.20% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 4.30% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 4.40% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 4.50% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 4.60% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 4.70% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 4.80% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |
| 4.90% | 48.750% | 48.875% | 49.000% | 49.125% | 49.250% | 49.375% | 49.500% | 49.625% | 49.750% | 49.875% | 50.000% |

18750188.25.BUSINESS

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 | Break-Even Rate Case 10 | Break-Even Rate Case 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 2.70% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 2.80% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 2.90% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 3.00% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 3.10% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 3.20% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 3.30% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 3.40% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 3.50% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 3.60% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 3.70% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 3.80% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 3.90% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 4.00% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 4.10% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 4.20% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 4.30% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 4.40% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 4.50% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 4.60% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 4.70% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 4.80% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |
| 4.90% | 40.000% | 40.150% | 40.300% | 40.450% | 40.600% | 40.750% | 40.900% | 41.050% | 41.200% | 41.350% | 41.500% |

18750188.25.BUSINESS

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 12 | Break-Even Rate Case 13 | Break-Even Rate Case 14 | Break-Even Rate Case 15 | Break-Even Rate Case 16 | Break-Even Rate Case 17 | Break-Even Rate Case 18 | Break-Even Rate Case 19 | Break-Even Rate Case 20 | Break-Even Rate Case 21 | Break-Even Rate Case 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum Weighted Average S&P Recovery Rate** | | | | | | | | | | | |
| 2.60% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 2.70% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 2.80% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 2.90% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 3.00% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 3.10% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 3.20% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 3.30% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 3.40% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 3.50% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 3.60% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 3.70% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 3.80% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 3.90% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 4.00% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 4.10% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 4.20% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 4.30% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 4.40% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 4.50% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 4.60% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 4.70% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 4.80% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |
| 4.90% | 41.650% | 41.800% | 41.950% | 42.100% | 42.250% | 42.400% | 42.550% | 42.700% | 42.850% | 43.000% | 43.150% |

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 23 | Break-Even Rate Case 24 | Break-Even Rate Case 25 | Break-Even Rate Case 26 | Break-Even Rate Case 27 | Break-Even Rate Case 28 | Break-Even Rate Case 29 | Break-Even Rate Case 30 | Break-Even Rate Case 31 | Break-Even Rate Case 32 | Break-Even Rate Case 33 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 2.70% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 2.80% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 2.90% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 3.00% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 3.10% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 3.20% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 3.30% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 3.40% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 3.50% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 3.60% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 3.70% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 3.80% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 3.90% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 4.00% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 4.10% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 4.20% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 4.30% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 4.40% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 4.50% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 4.60% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 4.70% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 4.80% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |
| 4.90% | 43.300% | 43.450% | 43.600% | 43.750% | 43.900% | 44.050% | 44.200% | 44.350% | 44.500% | 44.650% | 44.800% |

18750188.25.BUSINESS

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 34 | Break-Even Rate Case 35 | Break-Even Rate Case 36 | Break-Even Rate Case 37 | Break-Even Rate Case 38 | Break-Even Rate Case 39 | Break-Even Rate Case 40 | Break-Even Rate Case 41 | Break-Even Rate Case 42 | Break-Even Rate Case 43 | Break-Even Rate Case 44 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 2.70% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 2.80% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 2.90% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 3.00% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 3.10% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 3.20% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 3.30% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 3.40% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 3.50% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 3.60% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 3.70% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 3.80% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 3.90% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 4.00% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 4.10% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 4.20% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 4.30% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 4.40% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 4.50% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 4.60% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 4.70% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 4.80% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |
| 4.90% | 44.950% | 45.100% | 45.250% | 45.400% | 45.550% | 45.700% | 45.850% | 46.000% | 46.150% | 46.300% | 46.450% |

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 45 | Break-Even Rate Case 46 | Break-Even Rate Case 47 | Break-Even Rate Case 48 | Break-Even Rate Case 49 | Break-Even Rate Case 50 | Break-Even Rate Case 51 | Break-Even Rate Case 52 | Break-Even Rate Case 53 | Break-Even Rate Case 54 | Break-Even Rate Case 55 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum Weighted Average S&P Recovery Rate** | | | | | | | | | | | |
| 2.60% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 2.70% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 2.80% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 2.90% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 3.00% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 3.10% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 3.20% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 3.30% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 3.40% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 3.50% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 3.60% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 3.70% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 3.80% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 3.90% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 4.00% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 4.10% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 4.20% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 4.30% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 4.40% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 4.50% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 4.60% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 4.70% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 4.80% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |
| 4.90% | 46.600% | 46.750% | 46.900% | 47.050% | 47.200% | 47.350% | 47.500% | 47.650% | 47.800% | 47.950% | 48.100% |

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 56 | Break-Even Rate Case 57 | Break-Even Rate Case 58 | Break-Even Rate Case 59 | Break-Even Rate Case 60 | Break-Even Rate Case 61 | Break-Even Rate Case 62 | Break-Even Rate Case 63 | Break-Even Rate Case 64 | Break-Even Rate Case 65 | Break-Even Rate Case 66 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum Weighted Average S&P Recovery Rate** | | | | | | | | | | | |
| 2.60% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 2.70% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 2.80% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 2.90% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 3.00% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 3.10% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 3.20% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 3.30% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 3.40% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 3.50% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 3.60% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 3.70% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 3.80% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 3.90% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 4.00% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 4.10% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 4.20% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 4.30% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 4.40% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 4.50% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 4.60% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 4.70% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 4.80% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |
| 4.90% | 48.250% | 48.400% | 48.550% | 48.700% | 48.850% | 49.000% | 49.150% | 49.300% | 49.450% | 49.600% | 49.750% |

18750188.25.BUSINESS

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 67 | Break-Even Rate Case 68 | Break-Even Rate Case 69 | Break-Even Rate Case 70 | Break-Even Rate Case 71 | Break-Even Rate Case 72 | Break-Even Rate Case 73 | Break-Even Rate Case 74 | Break-Even Rate Case 75 | Break-Even Rate Case 76 | Break-Even Rate Case 77 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 2.70% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 2.80% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 2.90% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 3.00% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 3.10% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 3.20% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 3.30% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 3.40% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 3.50% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 3.60% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 3.70% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 3.80% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 3.90% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 4.00% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 4.10% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 4.20% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 4.30% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 4.40% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 4.50% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 4.60% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 4.70% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 4.80% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |
| 4.90% | 49.900% | 50.050% | 50.200% | 50.350% | 50.500% | 50.650% | 50.800% | 50.950% | 51.100% | 51.250% | 51.400% |

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 78 | Break-Even Rate Case 79 | Break-Even Rate Case 80 | Break-Even Rate Case 81 | Break-Even Rate Case 82 | Break-Even Rate Case 83 | Break-Even Rate Case 84 | Break-Even Rate Case 85 | Break-Even Rate Case 86 | Break-Even Rate Case 87 | Break-Even Rate Case 88 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 2.70% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 2.80% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 2.90% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 3.00% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 3.10% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 3.20% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 3.30% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 3.40% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 3.50% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 3.60% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 3.70% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 3.80% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 3.90% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 4.00% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 4.10% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 4.20% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 4.30% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 4.40% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 4.50% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 4.60% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 4.70% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 4.80% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |
| 4.90% | 51.550% | 51.700% | 51.850% | 52.000% | 52.150% | 52.300% | 52.450% | 52.600% | 52.750% | 52.900% | 53.050% |

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 89 | Break-Even Rate Case 90 | Break-Even Rate Case 91 | Break-Even Rate Case 92 | Break-Even Rate Case 93 | Break-Even Rate Case 94 | Break-Even Rate Case 95 | Break-Even Rate Case 96 | Break-Even Rate Case 97 | Break-Even Rate Case 98 | Break-Even Rate Case 99 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 2.70% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 2.80% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 2.90% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 3.00% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 3.10% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 3.20% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 3.30% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 3.40% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 3.50% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 3.60% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 3.70% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 3.80% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 3.90% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 4.00% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 4.10% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 4.20% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 4.30% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 4.40% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 4.50% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 4.60% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 4.70% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 4.80% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |
| 4.90% | 53.200% | 53.350% | 53.500% | 53.650% | 53.800% | 53.950% | 54.100% | 54.250% | 54.400% | 54.550% | 54.700% |

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 100 | Break-Even Rate Case 101 | Break-Even Rate Case 102 | Break-Even Rate Case 103 | Break-Even Rate Case 104 | Break-Even Rate Case 105 | Break-Even Rate Case 106 | Break-Even Rate Case 107 | Break-Even Rate Case 108 | Break-Even Rate Case 109 | Break-Even Rate Case 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 2.70% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 2.80% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 2.90% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 3.00% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 3.10% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 3.20% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 3.30% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 3.40% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 3.50% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 3.60% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 3.70% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 3.80% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 3.90% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 4.00% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 4.10% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 4.20% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 4.30% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 4.40% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 4.50% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 4.60% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 4.70% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 4.80% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |
| 4.90% | 54.850% | 55.000% | 55.150% | 55.300% | 55.450% | 55.600% | 55.750% | 55.900% | 56.050% | 56.200% | 56.350% |

**Class B Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 111 | Break-Even Rate Case 112 | Break-Even Rate Case 113 | Break-Even Rate Case 114 | Break-Even Rate Case 115 | Break-Even Rate Case 116 | Break-Even Rate Case 117 | Break-Even Rate Case 118 | Break-Even Rate Case 119 | Break-Even Rate Case 120 | Break-Even Rate Case 121 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 2.70% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 2.80% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 2.90% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 3.00% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 3.10% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 3.20% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 3.30% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 3.40% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 3.50% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 3.60% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 3.70% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 3.80% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 3.90% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 4.00% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 4.10% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 4.20% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 4.30% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 4.40% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 4.50% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 4.60% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 4.70% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 4.80% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |
| 4.90% | 56.500% | 56.650% | 56.800% | 56.950% | 57.100% | 57.250% | 57.400% | 57.550% | 57.700% | 57.850% | 58.000% |

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 | Break-Even Rate Case 10 | Break-Even Rate Case 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 2.70% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 2.80% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 2.90% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 3.00% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 3.10% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 3.20% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 3.30% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 3.40% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 3.50% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 3.60% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 3.70% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 3.80% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 3.90% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 4.00% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 4.10% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 4.20% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 4.30% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 4.40% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 4.50% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 4.60% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 4.70% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 4.80% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |
| 4.90% | 41.000% | 41.200% | 41.400% | 41.600% | 41.800% | 42.000% | 42.200% | 42.400% | 42.600% | 42.800% | 43.000% |

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 12 | Break-Even Rate Case 13 | Break-Even Rate Case 14 | Break-Even Rate Case 15 | Break-Even Rate Case 16 | Break-Even Rate Case 17 | Break-Even Rate Case 18 | Break-Even Rate Case 19 | Break-Even Rate Case 20 | Break-Even Rate Case 21 | Break-Even Rate Case 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 2.70% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 2.80% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 2.90% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 3.00% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 3.10% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 3.20% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 3.30% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 3.40% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 3.50% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 3.60% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 3.70% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 3.80% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 3.90% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 4.00% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 4.10% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 4.20% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 4.30% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 4.40% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 4.50% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 4.60% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 4.70% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 4.80% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |
| 4.90% | 43.200% | 43.400% | 43.600% | 43.800% | 44.000% | 44.200% | 44.400% | 44.600% | 44.800% | 45.000% | 45.200% |

18750188.25.BUSINESS

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 23 | Break-Even Rate Case 24 | Break-Even Rate Case 25 | Break-Even Rate Case 26 | Break-Even Rate Case 27 | Break-Even Rate Case 28 | Break-Even Rate Case 29 | Break-Even Rate Case 30 | Break-Even Rate Case 31 | Break-Even Rate Case 32 | Break-Even Rate Case 33 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 2.70% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 2.80% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 2.90% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 3.00% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 3.10% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 3.20% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 3.30% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 3.40% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 3.50% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 3.60% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 3.70% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 3.80% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 3.90% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 4.00% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 4.10% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 4.20% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 4.30% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 4.40% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 4.50% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 4.60% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 4.70% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 4.80% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |
| 4.90% | 45.400% | 45.600% | 45.800% | 46.000% | 46.200% | 46.400% | 46.600% | 46.800% | 47.000% | 47.200% | 47.400% |

18750188.25.BUSINESS

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 34 | Break-Even Rate Case 35 | Break-Even Rate Case 36 | Break-Even Rate Case 37 | Break-Even Rate Case 38 | Break-Even Rate Case 39 | Break-Even Rate Case 40 | Break-Even Rate Case 41 | Break-Even Rate Case 42 | Break-Even Rate Case 43 | Break-Even Rate Case 44 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 2.70% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 2.80% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 2.90% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 3.00% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 3.10% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 3.20% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 3.30% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 3.40% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 3.50% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 3.60% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 3.70% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 3.80% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 3.90% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 4.00% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 4.10% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 4.20% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 4.30% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 4.40% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 4.50% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 4.60% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 4.70% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 4.80% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |
| 4.90% | 47.600% | 47.800% | 48.000% | 48.200% | 48.400% | 48.600% | 48.800% | 49.000% | 49.200% | 49.400% | 49.600% |

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 45 | Break-Even Rate Case 46 | Break-Even Rate Case 47 | Break-Even Rate Case 48 | Break-Even Rate Case 49 | Break-Even Rate Case 50 | Break-Even Rate Case 51 | Break-Even Rate Case 52 | Break-Even Rate Case 53 | Break-Even Rate Case 54 | Break-Even Rate Case 55 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 2.70% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 2.80% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 2.90% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 3.00% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 3.10% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 3.20% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 3.30% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 3.40% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 3.50% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 3.60% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 3.70% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 3.80% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 3.90% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 4.00% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 4.10% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 4.20% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 4.30% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 4.40% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 4.50% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 4.60% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 4.70% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 4.80% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |
| 4.90% | 49.800% | 50.000% | 50.200% | 50.400% | 50.600% | 50.800% | 51.000% | 51.200% | 51.400% | 51.600% | 51.800% |

18750188.25.BUSINESS

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 56 | Break-Even Rate Case 57 | Break-Even Rate Case 58 | Break-Even Rate Case 59 | Break-Even Rate Case 60 | Break-Even Rate Case 61 | Break-Even Rate Case 62 | Break-Even Rate Case 63 | Break-Even Rate Case 64 | Break-Even Rate Case 65 | Break-Even Rate Case 66 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 2.70% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 2.80% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 2.90% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 3.00% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 3.10% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 3.20% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 3.30% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 3.40% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 3.50% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 3.60% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 3.70% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 3.80% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 3.90% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 4.00% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 4.10% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 4.20% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 4.30% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 4.40% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 4.50% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 4.60% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 4.70% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 4.80% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |
| 4.90% | 52.000% | 52.200% | 52.400% | 52.600% | 52.800% | 53.000% | 53.200% | 53.400% | 53.600% | 53.800% | 54.000% |

18750188.25.BUSINESS

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 67 | Break-Even Rate Case 68 | Break-Even Rate Case 69 | Break-Even Rate Case 70 | Break-Even Rate Case 71 | Break-Even Rate Case 72 | Break-Even Rate Case 73 | Break-Even Rate Case 74 | Break-Even Rate Case 75 | Break-Even Rate Case 76 | Break-Even Rate Case 77 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 2.70% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 2.80% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 2.90% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 3.00% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 3.10% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 3.20% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 3.30% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 3.40% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 3.50% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 3.60% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 3.70% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 3.80% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 3.90% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 4.00% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 4.10% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 4.20% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 4.30% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 4.40% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 4.50% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 4.60% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 4.70% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 4.80% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |
| 4.90% | 54.200% | 54.400% | 54.600% | 54.800% | 55.000% | 55.200% | 55.400% | 55.600% | 55.800% | 56.000% | 56.200% |

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 78 | Break-Even Rate Case 79 | Break-Even Rate Case 80 | Break-Even Rate Case 81 | Break-Even Rate Case 82 | Break-Even Rate Case 83 | Break-Even Rate Case 84 | Break-Even Rate Case 85 | Break-Even Rate Case 86 | Break-Even Rate Case 87 | Break-Even Rate Case 88 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 2.70% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 2.80% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 2.90% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 3.00% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 3.10% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 3.20% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 3.30% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 3.40% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 3.50% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 3.60% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 3.70% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 3.80% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 3.90% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 4.00% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 4.10% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 4.20% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 4.30% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 4.40% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 4.50% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 4.60% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 4.70% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 4.80% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |
| 4.90% | 56.400% | 56.600% | 56.800% | 57.000% | 57.200% | 57.400% | 57.600% | 57.800% | 58.000% | 58.200% | 58.400% |

18750188.25.BUSINESS

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 89 | Break-Even Rate Case 90 | Break-Even Rate Case 91 | Break-Even Rate Case 92 | Break-Even Rate Case 93 | Break-Even Rate Case 94 | Break-Even Rate Case 95 | Break-Even Rate Case 96 | Break-Even Rate Case 97 | Break-Even Rate Case 98 | Break-Even Rate Case 99 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum Weighted Average S&P Recovery Rate** | | | | | | | | | | | |
| 2.60% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 2.70% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 2.80% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 2.90% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 3.00% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 3.10% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 3.20% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 3.30% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 3.40% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 3.50% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 3.60% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 3.70% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 3.80% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 3.90% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 4.00% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 4.10% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 4.20% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 4.30% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 4.40% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 4.50% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 4.60% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 4.70% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 4.80% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |
| 4.90% | 58.600% | 58.800% | 59.000% | 59.200% | 59.400% | 59.600% | 59.800% | 60.000% | 60.200% | 60.400% | 60.600% |

18750188.25.BUSINESS

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 100 | Break-Even Rate Case 101 | Break-Even Rate Case 102 | Break-Even Rate Case 103 | Break-Even Rate Case 104 | Break-Even Rate Case 105 | Break-Even Rate Case 106 | Break-Even Rate Case 107 | Break-Even Rate Case 108 | Break-Even Rate Case 109 | Break-Even Rate Case 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 2.70% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 2.80% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 2.90% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 3.00% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 3.10% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 3.20% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 3.30% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 3.40% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 3.50% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 3.60% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 3.70% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 3.80% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 3.90% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 4.00% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 4.10% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 4.20% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 4.30% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 4.40% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 4.50% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 4.60% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 4.70% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 4.80% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |
| 4.90% | 60.800% | 61.000% | 61.200% | 61.400% | 61.600% | 61.800% | 62.000% | 62.200% | 62.400% | 62.600% | 62.800% |

**Class C Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 111 | Break-Even Rate Case 112 | Break-Even Rate Case 113 | Break-Even Rate Case 114 | Break-Even Rate Case 115 | Break-Even Rate Case 116 | Break-Even Rate Case 117 | Break-Even Rate Case 118 | Break-Even Rate Case 119 | Break-Even Rate Case 120 | Break-Even Rate Case 121 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 2.70% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 2.80% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 2.90% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 3.00% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 3.10% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 3.20% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 3.30% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 3.40% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 3.50% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 3.60% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 3.70% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 3.80% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 3.90% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 4.00% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 4.10% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 4.20% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 4.30% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 4.40% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 4.50% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 4.60% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 4.70% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 4.80% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |
| 4.90% | 63.000% | 63.200% | 63.400% | 63.600% | 63.800% | 64.000% | 64.200% | 64.400% | 64.600% | 64.800% | 65.000% |

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 | Break-Even Rate Case 10 | Break-Even Rate Case 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 2.70% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 2.80% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 2.90% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 3.00% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 3.10% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 3.20% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 3.30% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 3.40% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 3.50% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 3.60% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 3.70% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 3.80% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 3.90% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 4.00% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 4.10% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 4.20% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 4.30% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 4.40% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 4.50% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 4.60% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 4.70% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 4.80% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |
| 4.90% | 45.000% | 45.250% | 45.500% | 45.750% | 46.000% | 46.250% | 46.500% | 46.750% | 47.000% | 47.250% | 47.500% |

18750188.25.BUSINESS

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 12 | Break-Even Rate Case 13 | Break-Even Rate Case 14 | Break-Even Rate Case 15 | Break-Even Rate Case 16 | Break-Even Rate Case 17 | Break-Even Rate Case 18 | Break-Even Rate Case 19 | Break-Even Rate Case 20 | Break-Even Rate Case 21 | Break-Even Rate Case 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 2.70% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 2.80% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 2.90% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 3.00% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 3.10% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 3.20% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 3.30% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 3.40% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 3.50% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 3.60% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 3.70% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 3.80% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 3.90% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 4.00% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 4.10% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 4.20% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 4.30% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 4.40% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 4.50% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 4.60% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 4.70% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 4.80% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |
| 4.90% | 47.750% | 48.000% | 48.250% | 48.500% | 48.750% | 49.000% | 49.250% | 49.500% | 49.750% | 50.000% | 50.250% |

18750188.25.BUSINESS

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 23 | Break-Even Rate Case 24 | Break-Even Rate Case 25 | Break-Even Rate Case 26 | Break-Even Rate Case 27 | Break-Even Rate Case 28 | Break-Even Rate Case 29 | Break-Even Rate Case 30 | Break-Even Rate Case 31 | Break-Even Rate Case 32 | Break-Even Rate Case 33 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 2.70% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 2.80% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 2.90% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 3.00% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 3.10% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 3.20% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 3.30% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 3.40% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 3.50% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 3.60% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 3.70% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 3.80% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 3.90% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 4.00% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 4.10% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 4.20% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 4.30% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 4.40% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 4.50% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 4.60% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 4.70% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 4.80% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |
| 4.90% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% | 52.750% | 53.000% |

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 34 | Break-Even Rate Case 35 | Break-Even Rate Case 36 | Break-Even Rate Case 37 | Break-Even Rate Case 38 | Break-Even Rate Case 39 | Break-Even Rate Case 40 | Break-Even Rate Case 41 | Break-Even Rate Case 42 | Break-Even Rate Case 43 | Break-Even Rate Case 44 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum Weighted Average S&P Recovery Rate** | | | | | | | | | | | |
| 2.60% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 2.70% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 2.80% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 2.90% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 3.00% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 3.10% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 3.20% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 3.30% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 3.40% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 3.50% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 3.60% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 3.70% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 3.80% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 3.90% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 4.00% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 4.10% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 4.20% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 4.30% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 4.40% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 4.50% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 4.60% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 4.70% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 4.80% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |
| 4.90% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% | 55.500% | 55.750% |

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 45 | Break-Even Rate Case 46 | Break-Even Rate Case 47 | Break-Even Rate Case 48 | Break-Even Rate Case 49 | Break-Even Rate Case 50 | Break-Even Rate Case 51 | Break-Even Rate Case 52 | Break-Even Rate Case 53 | Break-Even Rate Case 54 | Break-Even Rate Case 55 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 2.70% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 2.80% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 2.90% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 3.00% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 3.10% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 3.20% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 3.30% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 3.40% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 3.50% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 3.60% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 3.70% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 3.80% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 3.90% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 4.00% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 4.10% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 4.20% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 4.30% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 4.40% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 4.50% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 4.60% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 4.70% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 4.80% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |
| 4.90% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% | 58.250% | 58.500% |

18750188.25.BUSINESS

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 56 | Break-Even Rate Case 57 | Break-Even Rate Case 58 | Break-Even Rate Case 59 | Break-Even Rate Case 60 | Break-Even Rate Case 61 | Break-Even Rate Case 62 | Break-Even Rate Case 63 | Break-Even Rate Case 64 | Break-Even Rate Case 65 | Break-Even Rate Case 66 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 2.70% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 2.80% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 2.90% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 3.00% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 3.10% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 3.20% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 3.30% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 3.40% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 3.50% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 3.60% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 3.70% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 3.80% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 3.90% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 4.00% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 4.10% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 4.20% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 4.30% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 4.40% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 4.50% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 4.60% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 4.70% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 4.80% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |
| 4.90% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% | 61.000% | 61.250% |

18750188.25.BUSINESS

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 67 | Break-Even Rate Case 68 | Break-Even Rate Case 69 | Break-Even Rate Case 70 | Break-Even Rate Case 71 | Break-Even Rate Case 72 | Break-Even Rate Case 73 | Break-Even Rate Case 74 | Break-Even Rate Case 75 | Break-Even Rate Case 76 | Break-Even Rate Case 77 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 2.70% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 2.80% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 2.90% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 3.00% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 3.10% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 3.20% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 3.30% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 3.40% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 3.50% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 3.60% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 3.70% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 3.80% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 3.90% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 4.00% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 4.10% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 4.20% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 4.30% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 4.40% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 4.50% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 4.60% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 4.70% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 4.80% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |
| 4.90% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% | 63.750% | 64.000% |

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 78 | Break-Even Rate Case 79 | Break-Even Rate Case 80 | Break-Even Rate Case 81 | Break-Even Rate Case 82 | Break-Even Rate Case 83 | Break-Even Rate Case 84 | Break-Even Rate Case 85 | Break-Even Rate Case 86 | Break-Even Rate Case 87 | Break-Even Rate Case 88 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 2.70% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 2.80% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 2.90% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 3.00% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 3.10% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 3.20% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 3.30% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 3.40% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 3.50% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 3.60% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 3.70% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 3.80% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 3.90% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 4.00% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 4.10% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 4.20% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 4.30% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 4.40% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 4.50% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 4.60% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 4.70% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 4.80% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |
| 4.90% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% | 66.500% | 66.750% |

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 89 | Break-Even Rate Case 90 | Break-Even Rate Case 91 | Break-Even Rate Case 92 | Break-Even Rate Case 93 | Break-Even Rate Case 94 | Break-Even Rate Case 95 | Break-Even Rate Case 96 | Break-Even Rate Case 97 | Break-Even Rate Case 98 | Break-Even Rate Case 99 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 2.70% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 2.80% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 2.90% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 3.00% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 3.10% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 3.20% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 3.30% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 3.40% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 3.50% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 3.60% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 3.70% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 3.80% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 3.90% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 4.00% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 4.10% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 4.20% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 4.30% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 4.40% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 4.50% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 4.60% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 4.70% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 4.80% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |
| 4.90% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% | 69.250% | 69.500% |

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 100 | Break-Even Rate Case 101 | Break-Even Rate Case 102 | Break-Even Rate Case 103 | Break-Even Rate Case 104 | Break-Even Rate Case 105 | Break-Even Rate Case 106 | Break-Even Rate Case 107 | Break-Even Rate Case 108 | Break-Even Rate Case 109 | Break-Even Rate Case 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 2.70% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 2.80% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 2.90% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 3.00% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 3.10% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 3.20% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 3.30% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 3.40% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 3.50% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 3.60% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 3.70% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 3.80% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 3.90% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 4.00% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 4.10% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 4.20% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 4.30% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 4.40% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 4.50% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 4.60% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 4.70% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 4.80% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |
| 4.90% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% | 72.000% | 72.250% |

**Class D Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 111 | Break-Even Rate Case 112 | Break-Even Rate Case 113 | Break-Even Rate Case 114 | Break-Even Rate Case 115 | Break-Even Rate Case 116 | Break-Even Rate Case 117 | Break-Even Rate Case 118 | Break-Even Rate Case 119 | Break-Even Rate Case 120 | Break-Even Rate Case 121 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 2.70% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 2.80% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 2.90% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 3.00% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 3.10% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 3.20% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 3.30% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 3.40% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 3.50% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 3.60% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 3.70% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 3.80% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 3.90% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 4.00% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 4.10% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 4.20% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 4.30% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 4.40% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 4.50% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 4.60% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 4.70% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 4.80% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |
| 4.90% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% | 74.750% | 75.000% |

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 | Break-Even Rate Case 10 | Break-Even Rate Case 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 2.70% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 2.80% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 2.90% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 3.00% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 3.10% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 3.20% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 3.30% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 3.40% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 3.50% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 3.60% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 3.70% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 3.80% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 3.90% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 4.00% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 4.10% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 4.20% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 4.30% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 4.40% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 4.50% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 4.60% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 4.70% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 4.80% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |
| 4.90% | 50.000% | 50.250% | 50.500% | 50.750% | 51.000% | 51.250% | 51.500% | 51.750% | 52.000% | 52.250% | 52.500% |

18750188.25.BUSINESS

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 12 | Break-Even Rate Case 13 | Break-Even Rate Case 14 | Break-Even Rate Case 15 | Break-Even Rate Case 16 | Break-Even Rate Case 17 | Break-Even Rate Case 18 | Break-Even Rate Case 19 | Break-Even Rate Case 20 | Break-Even Rate Case 21 | Break-Even Rate Case 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 2.70% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 2.80% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 2.90% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 3.00% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 3.10% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 3.20% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 3.30% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 3.40% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 3.50% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 3.60% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 3.70% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 3.80% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 3.90% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 4.00% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 4.10% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 4.20% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 4.30% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 4.40% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 4.50% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 4.60% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 4.70% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 4.80% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |
| 4.90% | 52.750% | 53.000% | 53.250% | 53.500% | 53.750% | 54.000% | 54.250% | 54.500% | 54.750% | 55.000% | 55.250% |

18750188.25.BUSINESS

Exhibit B

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 23 | Break-Even Rate Case 24 | Break-Even Rate Case 25 | Break-Even Rate Case 26 | Break-Even Rate Case 27 | Break-Even Rate Case 28 | Break-Even Rate Case 29 | Break-Even Rate Case 30 | Break-Even Rate Case 31 | Break-Even Rate Case 32 | Break-Even Rate Case 33 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 2.70% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 2.80% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 2.90% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 3.00% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 3.10% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 3.20% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 3.30% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 3.40% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 3.50% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 3.60% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 3.70% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 3.80% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 3.90% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 4.00% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 4.10% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 4.20% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 4.30% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 4.40% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 4.50% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 4.60% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 4.70% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 4.80% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |
| 4.90% | 55.500% | 55.750% | 56.000% | 56.250% | 56.500% | 56.750% | 57.000% | 57.250% | 57.500% | 57.750% | 58.000% |

18750188.25.BUSINESS

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 34 | Break-Even Rate Case 35 | Break-Even Rate Case 36 | Break-Even Rate Case 37 | Break-Even Rate Case 38 | Break-Even Rate Case 39 | Break-Even Rate Case 40 | Break-Even Rate Case 41 | Break-Even Rate Case 42 | Break-Even Rate Case 43 | Break-Even Rate Case 44 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 2.70% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 2.80% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 2.90% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 3.00% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 3.10% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 3.20% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 3.30% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 3.40% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 3.50% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 3.60% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 3.70% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 3.80% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 3.90% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 4.00% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 4.10% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 4.20% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 4.30% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 4.40% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 4.50% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 4.60% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 4.70% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 4.80% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |
| 4.90% | 58.250% | 58.500% | 58.750% | 59.000% | 59.250% | 59.500% | 59.750% | 60.000% | 60.250% | 60.500% | 60.750% |

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 45 | Break-Even Rate Case 46 | Break-Even Rate Case 47 | Break-Even Rate Case 48 | Break-Even Rate Case 49 | Break-Even Rate Case 50 | Break-Even Rate Case 51 | Break-Even Rate Case 52 | Break-Even Rate Case 53 | Break-Even Rate Case 54 | Break-Even Rate Case 55 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 2.70% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 2.80% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 2.90% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 3.00% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 3.10% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 3.20% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 3.30% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 3.40% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 3.50% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 3.60% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 3.70% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 3.80% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 3.90% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 4.00% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 4.10% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 4.20% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 4.30% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 4.40% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 4.50% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 4.60% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 4.70% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 4.80% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |
| 4.90% | 61.000% | 61.250% | 61.500% | 61.750% | 62.000% | 62.250% | 62.500% | 62.750% | 63.000% | 63.250% | 63.500% |

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 56 | Break-Even Rate Case 57 | Break-Even Rate Case 58 | Break-Even Rate Case 59 | Break-Even Rate Case 60 | Break-Even Rate Case 61 | Break-Even Rate Case 62 | Break-Even Rate Case 63 | Break-Even Rate Case 64 | Break-Even Rate Case 65 | Break-Even Rate Case 66 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 2.70% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 2.80% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 2.90% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 3.00% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 3.10% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 3.20% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 3.30% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 3.40% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 3.50% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 3.60% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 3.70% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 3.80% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 3.90% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 4.00% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 4.10% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 4.20% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 4.30% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 4.40% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 4.50% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 4.60% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 4.70% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 4.80% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |
| 4.90% | 63.750% | 64.000% | 64.250% | 64.500% | 64.750% | 65.000% | 65.250% | 65.500% | 65.750% | 66.000% | 66.250% |

18750188.25.BUSINESS

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 67 | Break-Even Rate Case 68 | Break-Even Rate Case 69 | Break-Even Rate Case 70 | Break-Even Rate Case 71 | Break-Even Rate Case 72 | Break-Even Rate Case 73 | Break-Even Rate Case 74 | Break-Even Rate Case 75 | Break-Even Rate Case 76 | Break-Even Rate Case 77 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 2.70% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 2.80% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 2.90% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 3.00% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 3.10% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 3.20% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 3.30% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 3.40% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 3.50% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 3.60% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 3.70% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 3.80% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 3.90% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 4.00% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 4.10% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 4.20% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 4.30% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 4.40% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 4.50% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 4.60% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 4.70% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 4.80% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |
| 4.90% | 66.500% | 66.750% | 67.000% | 67.250% | 67.500% | 67.750% | 68.000% | 68.250% | 68.500% | 68.750% | 69.000% |

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 78 | Break-Even Rate Case 79 | Break-Even Rate Case 80 | Break-Even Rate Case 81 | Break-Even Rate Case 82 | Break-Even Rate Case 83 | Break-Even Rate Case 84 | Break-Even Rate Case 85 | Break-Even Rate Case 86 | Break-Even Rate Case 87 | Break-Even Rate Case 88 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 2.70% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 2.80% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 2.90% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 3.00% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 3.10% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 3.20% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 3.30% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 3.40% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 3.50% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 3.60% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 3.70% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 3.80% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 3.90% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 4.00% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 4.10% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 4.20% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 4.30% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 4.40% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 4.50% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 4.60% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 4.70% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 4.80% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |
| 4.90% | 69.250% | 69.500% | 69.750% | 70.000% | 70.250% | 70.500% | 70.750% | 71.000% | 71.250% | 71.500% | 71.750% |

18750188.25.BUSINESS

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 89 | Break-Even Rate Case 90 | Break-Even Rate Case 91 | Break-Even Rate Case 92 | Break-Even Rate Case 93 | Break-Even Rate Case 94 | Break-Even Rate Case 95 | Break-Even Rate Case 96 | Break-Even Rate Case 97 | Break-Even Rate Case 98 | Break-Even Rate Case 99 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 2.70% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 2.80% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 2.90% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 3.00% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 3.10% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 3.20% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 3.30% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 3.40% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 3.50% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 3.60% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 3.70% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 3.80% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 3.90% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 4.00% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 4.10% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 4.20% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 4.30% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 4.40% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 4.50% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 4.60% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 4.70% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 4.80% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |
| 4.90% | 72.000% | 72.250% | 72.500% | 72.750% | 73.000% | 73.250% | 73.500% | 73.750% | 74.000% | 74.250% | 74.500% |

18750188.25.BUSINESS

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 100 | Break-Even Rate Case 101 | Break-Even Rate Case 102 | Break-Even Rate Case 103 | Break-Even Rate Case 104 | Break-Even Rate Case 105 | Break-Even Rate Case 106 | Break-Even Rate Case 107 | Break-Even Rate Case 108 | Break-Even Rate Case 109 | Break-Even Rate Case 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 2.70% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 2.80% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 2.90% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 3.00% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 3.10% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 3.20% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 3.30% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 3.40% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 3.50% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 3.60% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 3.70% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 3.80% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 3.90% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 4.00% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 4.10% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 4.20% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 4.30% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 4.40% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 4.50% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 4.60% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 4.70% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 4.80% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |
| 4.90% | 74.750% | 75.000% | 75.250% | 75.500% | 75.750% | 76.000% | 76.250% | 76.500% | 76.750% | 77.000% | 77.250% |

**Class E Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 111 | Break-Even Rate Case 112 | Break-Even Rate Case 113 | Break-Even Rate Case 114 | Break-Even Rate Case 115 | Break-Even Rate Case 116 | Break-Even Rate Case 117 | Break-Even Rate Case 118 | Break-Even Rate Case 119 | Break-Even Rate Case 120 | Break-Even Rate Case 121 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 2.70% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 2.80% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 2.90% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 3.00% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 3.10% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 3.20% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 3.30% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 3.40% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 3.50% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 3.60% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 3.70% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 3.80% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 3.90% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 4.00% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 4.10% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 4.20% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 4.30% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 4.40% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 4.50% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 4.60% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 4.70% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 4.80% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |
| 4.90% | 77.500% | 77.750% | 78.000% | 78.250% | 78.500% | 78.750% | 79.000% | 79.250% | 79.500% | 79.750% | 80.000% |

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 | Break-Even Rate Case 10 | Break-Even Rate Case 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 2.70% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 2.80% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 2.90% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 3.00% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 3.10% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 3.20% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 3.30% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 3.40% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 3.50% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 3.60% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 3.70% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 3.80% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 3.90% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 4.00% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 4.10% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 4.20% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 4.30% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 4.40% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 4.50% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 4.60% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 4.70% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 4.80% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |
| 4.90% | 50.000% | 50.375% | 50.750% | 51.125% | 51.500% | 51.875% | 52.250% | 52.625% | 53.000% | 53.375% | 53.750% |

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 12 | Break-Even Rate Case 13 | Break-Even Rate Case 14 | Break-Even Rate Case 15 | Break-Even Rate Case 16 | Break-Even Rate Case 17 | Break-Even Rate Case 18 | Break-Even Rate Case 19 | Break-Even Rate Case 20 | Break-Even Rate Case 21 | Break-Even Rate Case 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 2.70% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 2.80% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 2.90% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 3.00% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 3.10% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 3.20% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 3.30% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 3.40% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 3.50% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 3.60% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 3.70% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 3.80% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 3.90% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 4.00% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 4.10% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 4.20% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 4.30% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 4.40% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 4.50% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 4.60% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 4.70% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 4.80% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |
| 4.90% | 54.125% | 54.500% | 54.875% | 55.250% | 55.625% | 56.000% | 56.375% | 56.750% | 57.125% | 57.500% | 57.875% |

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 23 | Break-Even Rate Case 24 | Break-Even Rate Case 25 | Break-Even Rate Case 26 | Break-Even Rate Case 27 | Break-Even Rate Case 28 | Break-Even Rate Case 29 | Break-Even Rate Case 30 | Break-Even Rate Case 31 | Break-Even Rate Case 32 | Break-Even Rate Case 33 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 2.70% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 2.80% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 2.90% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 3.00% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 3.10% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 3.20% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 3.30% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 3.40% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 3.50% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 3.60% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 3.70% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 3.80% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 3.90% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 4.00% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 4.10% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 4.20% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 4.30% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 4.40% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 4.50% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 4.60% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 4.70% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 4.80% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |
| 4.90% | 58.250% | 58.625% | 59.000% | 59.375% | 59.750% | 60.125% | 60.500% | 60.875% | 61.250% | 61.625% | 62.000% |

18750188.25.BUSINESS

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 34 | Break-Even Rate Case 35 | Break-Even Rate Case 36 | Break-Even Rate Case 37 | Break-Even Rate Case 38 | Break-Even Rate Case 39 | Break-Even Rate Case 40 | Break-Even Rate Case 41 | Break-Even Rate Case 42 | Break-Even Rate Case 43 | Break-Even Rate Case 44 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 2.70% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 2.80% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 2.90% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 3.00% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 3.10% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 3.20% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 3.30% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 3.40% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 3.50% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 3.60% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 3.70% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 3.80% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 3.90% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 4.00% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 4.10% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 4.20% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 4.30% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 4.40% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 4.50% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 4.60% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 4.70% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 4.80% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |
| 4.90% | 62.375% | 62.750% | 63.125% | 63.500% | 63.875% | 64.250% | 64.625% | 65.000% | 65.375% | 65.750% | 66.125% |

18750188.25.BUSINESS

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 45 | Break-Even Rate Case 46 | Break-Even Rate Case 47 | Break-Even Rate Case 48 | Break-Even Rate Case 49 | Break-Even Rate Case 50 | Break-Even Rate Case 51 | Break-Even Rate Case 52 | Break-Even Rate Case 53 | Break-Even Rate Case 54 | Break-Even Rate Case 55 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum Weighted Average S&P Recovery Rate** | | | | | | | | | | | |
| 2.60% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 2.70% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 2.80% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 2.90% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 3.00% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 3.10% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 3.20% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 3.30% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 3.40% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 3.50% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 3.60% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 3.70% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 3.80% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 3.90% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 4.00% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 4.10% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 4.20% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 4.30% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 4.40% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 4.50% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 4.60% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 4.70% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 4.80% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |
| 4.90% | 66.500% | 66.875% | 67.250% | 67.625% | 68.000% | 68.375% | 68.750% | 69.125% | 69.500% | 69.875% | 70.250% |

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 56 | Break-Even Rate Case 57 | Break-Even Rate Case 58 | Break-Even Rate Case 59 | Break-Even Rate Case 60 | Break-Even Rate Case 61 | Break-Even Rate Case 62 | Break-Even Rate Case 63 | Break-Even Rate Case 64 | Break-Even Rate Case 65 | Break-Even Rate Case 66 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 2.70% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 2.80% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 2.90% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 3.00% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 3.10% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 3.20% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 3.30% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 3.40% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 3.50% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 3.60% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 3.70% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 3.80% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 3.90% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 4.00% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 4.10% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 4.20% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 4.30% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 4.40% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 4.50% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 4.60% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 4.70% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 4.80% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |
| 4.90% | 70.625% | 71.000% | 71.375% | 71.750% | 72.125% | 72.500% | 72.875% | 73.250% | 73.625% | 74.000% | 74.375% |

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 67 | Break-Even Rate Case 68 | Break-Even Rate Case 69 | Break-Even Rate Case 70 | Break-Even Rate Case 71 | Break-Even Rate Case 72 | Break-Even Rate Case 73 | Break-Even Rate Case 74 | Break-Even Rate Case 75 | Break-Even Rate Case 76 | Break-Even Rate Case 77 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 2.70% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 2.80% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 2.90% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 3.00% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 3.10% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 3.20% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 3.30% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 3.40% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 3.50% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 3.60% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 3.70% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 3.80% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 3.90% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 4.00% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 4.10% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 4.20% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 4.30% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 4.40% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 4.50% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 4.60% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 4.70% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 4.80% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |
| 4.90% | 74.750% | 75.125% | 75.500% | 75.875% | 76.250% | 76.625% | 77.000% | 77.375% | 77.750% | 78.125% | 78.500% |

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 78 | Break-Even Rate Case 79 | Break-Even Rate Case 80 | Break-Even Rate Case 81 | Break-Even Rate Case 82 | Break-Even Rate Case 83 | Break-Even Rate Case 84 | Break-Even Rate Case 85 | Break-Even Rate Case 86 | Break-Even Rate Case 87 | Break-Even Rate Case 88 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum Weighted Average S&P Recovery Rate** | | | | | | | | | | | |
| 2.60% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 2.70% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 2.80% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 2.90% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 3.00% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 3.10% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 3.20% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 3.30% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 3.40% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 3.50% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 3.60% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 3.70% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 3.80% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 3.90% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 4.00% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 4.10% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 4.20% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 4.30% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 4.40% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 4.50% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 4.60% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 4.70% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 4.80% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |
| 4.90% | 78.875% | 79.250% | 79.625% | 80.000% | 80.375% | 80.750% | 81.125% | 81.500% | 81.875% | 82.250% | 82.625% |

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 89 | Break-Even Rate Case 90 | Break-Even Rate Case 91 | Break-Even Rate Case 92 | Break-Even Rate Case 93 | Break-Even Rate Case 94 | Break-Even Rate Case 95 | Break-Even Rate Case 96 | Break-Even Rate Case 97 | Break-Even Rate Case 98 | Break-Even Rate Case 99 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 2.70% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 2.80% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 2.90% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 3.00% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 3.10% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 3.20% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 3.30% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 3.40% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 3.50% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 3.60% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 3.70% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 3.80% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 3.90% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 4.00% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 4.10% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 4.20% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 4.30% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 4.40% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 4.50% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 4.60% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 4.70% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 4.80% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |
| 4.90% | 83.000% | 83.375% | 83.750% | 84.125% | 84.500% | 84.875% | 85.250% | 85.625% | 86.000% | 86.375% | 86.750% |

18750188.25.BUSINESS

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 100 | Break-Even Rate Case 101 | Break-Even Rate Case 102 | Break-Even Rate Case 103 | Break-Even Rate Case 104 | Break-Even Rate Case 105 | Break-Even Rate Case 106 | Break-Even Rate Case 107 | Break-Even Rate Case 108 | Break-Even Rate Case 109 | Break-Even Rate Case 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 2.70% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 2.80% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 2.90% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 3.00% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 3.10% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 3.20% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 3.30% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 3.40% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 3.50% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 3.60% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 3.70% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 3.80% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 3.90% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 4.00% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 4.10% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 4.20% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 4.30% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 4.40% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 4.50% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 4.60% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 4.70% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 4.80% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |
| 4.90% | 87.125% | 87.500% | 87.875% | 88.250% | 88.625% | 89.000% | 89.375% | 89.750% | 90.125% | 90.500% | 90.875% |

**Class F Notes**

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 111 | Break-Even Rate Case 112 | Break-Even Rate Case 113 | Break-Even Rate Case 114 | Break-Even Rate Case 115 | Break-Even Rate Case 116 | Break-Even Rate Case 117 | Break-Even Rate Case 118 | Break-Even Rate Case 119 | Break-Even Rate Case 120 | Break-Even Rate Case 121 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | | | |
| 2.60% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 2.70% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 2.80% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 2.90% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 3.00% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 3.10% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 3.20% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 3.30% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 3.40% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 3.50% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 3.60% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 3.70% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 3.80% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 3.90% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 4.00% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 4.10% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 4.20% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 4.30% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 4.40% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 4.50% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 4.60% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 4.70% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 4.80% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |
| 4.90% | 91.250% | 91.625% | 92.000% | 92.375% | 92.750% | 93.125% | 93.500% | 93.875% | 94.250% | 94.625% | 95.000% |

**EXHIBIT A**

**FORMS OF NOTES**

<div align="right">**EXHIBIT A1**</div>

## FORM OF GLOBAL CLASS A-1[A][F] NOTE

<div align="center">

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS A-1[A][F] SENIOR SECURED [FLOATING] [FIXED] RATE NOTES DUE 2026

</div>

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

<div align="center">A1-1</div>

18779284.6.BUSINESS

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE CO-ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS

A1-2

(GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN

THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

ACIS CLO 2014-3 LTD.

ACIS CLO 2014-3 LLC, LLC

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS A-1[A][F] SENIOR SECURED [FLOATING] [FIXED] RATE NOTES DUE 2026

Up to U.S. $[205,000,000][25,000,000]

A-1[A][F]/[R][S]-[●]

[Date]

CUSIP No. [00100FAA3][1] [G00734AA4][2] [00100FAC9][3] [G00734AB2][4]

ISIN No.:  [US00100FAA30][5] [USG00734AA45][6] [US00100FAC95][7] [USG00734AB28][8]

      ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), for value received, hereby promise to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on Schedule A hereto on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture.  The obligations of the Co-Issuers under this Class A-1[A][F] Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.  None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

      The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if any such day is not a Business Day, the

---

[1] Rule 144A Global Class A-1A Note.

[2] Regulation S Global Class A-1A Note.

[3] Rule 144A Global Class A-1F Note.

[4] Regulation S Global Class A-1F Note.

[5] Rule 144A Global Class A-1A Note.

[6] Regulation S Global Class A-1A Note.

[7] Rule 144A Global Class A-1F Note.

[8] Regulation S Global Class A-1F Note.

A1-5

next succeeding Business Day), at the rate equal to [the Base Rate plus [1.51]] [3.70]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of [the actual number of days elapsed in the applicable Interest Accrual Period divided by 360] [a year of 360 days with twelve 30 day months]. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class A-1[A][F] Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the day (whether or not a Business Day) immediately prior to such Payment Date.

Payments of principal of and interest on this Class A-1[A][F] Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Interest will cease to accrue on each Class A-1[A][F] Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class A-1[A][F] Note is called for redemption and principal payments hereon are not paid upon surrender of this Class A-1[A][F] Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class A-1[A][F] Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class A-1[A][F] Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class A-1[A][F] Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class A-1[A][F] Senior Secured [Floating][Fixed] Rate Notes due 2026 (the "Class A-1[A][F] Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class A-1[A][F] Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class A-1[A][F] Notes, or one or more predecessor Class A-1[A][F] Notes, registered as such at the close of business on the relevant Record Date.

Transfers of this [Rule 144A][Regulation S] Global Class A-1[A][F] Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee, except as otherwise set forth in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class A-1[A][F] Note will be transferable in accordance with the DTC's rules and procedures in use at such time.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class A-1[A][F] Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class A-1[A][F] Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S][Rule 144A] Global Class A-1[A][F] Note subject to the restrictions as set forth in the Indenture. This [Rule 144A][Regulation S] Global Class A-1[A][F] Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A][Regulation S] Global Class A-1[A][F] Note, this [Rule 144A][Regulation S] Global Class A-1[A][F] Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Class A-1[A][F] Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S.$10,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE

INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

*- signature page follows -*

A1-8

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
    Name:
    Title:

A1-9

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
    Name:
    Title:

**CERTIFICATE OF AUTHENTICATION**

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
    Authorized Signatory

A1-11

Exhibit B

<u>SCHEDULE A</u>

<u>SCHEDULE OF EXCHANGES OR REDEMPTIONS</u>

The outstanding principal amount of the Class A-1[A][F] Notes represented by this [Rule 144A][Regulation S] Global Class A-1[A][F] Note on the Closing Date is U.S.$[__]. The following exchanges, redemptions of or increase in the whole or a part of the Class A-1[A][F] Notes represented by this [Rule 144A][Regulation S] Global Class A-1[A][F] Note have been made:

| Date exchange/ increase made | Original principal amount of this [Rule 144A][Regulation S] Global Class A-1[A][F] Note | Part of principal amount of this [Rule 144A][Regulation S] Global Class A-1[A][F] Note exchanged/redeemed/ increased | Remaining principal amount of this [Rule 144A][Regulation S] Global Class A-1[A][F] Note following such exchange/redemption/ increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

A1-12

EXHIBIT A2

## FORM OF GLOBAL CLASS A-2[A][B] NOTE

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS A-2[A][B] SENIOR SECURED FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

A2-1

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE CO-ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS

(GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN

THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

[THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.][9]

---

[9] Insert in the case of the Class A-2B Notes.

ACIS CLO 2014-3 LTD.
ACIS CLO 2014-3 LLC

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS A-2[A][B] SENIOR SECURED FLOATING RATE NOTES DUE 2026

Up to U.S. $[15,000,000][2,000,000]

A-2[A][B]/[R][S]-[●]

[Date]

CUSIP No. [00100FAE5][10] [G00734AC0][11] [00100FAG0][12] [G00734AD8][13]

ISIN No.: [US00100FAE51][14] [USG00734AC01][15] [US00100FAG00][16] [USG00734AD83][17]

      ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), for value received, hereby promise to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on Schedule A hereto on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture. The obligations of the Co-Issuers under this Class A-2[A][B] Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

      The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if any such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [1.55][2.00]% per annum on the

---

[10] Rule 144A Global Class A-2A Note.

[11] Regulation S Global Class A-2A Note.

[12] Rule 144A Global Class A-2B Note.

[13] Regulation S Global Class A-2B Note.

[14] Rule 144A Global Class A-2A Note.

[15] Regulation S Global Class A-2A Note.

[16] Rule 144A Global Class A-2B Note.

[17] Regulation S Global Class A-2B Note.

Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class A-2[A][B] Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the day (whether or not a Business Day) immediately prior to such Payment Date.

Payments of principal of and interest on this Class A-2[A][B] Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Interest will cease to accrue on each Class A-2[A][B] Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class A-2[A][B] Note is called for redemption and principal payments hereon are not paid upon surrender of this Class A-2[A][B] Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class A-2[A][B] Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class A-2[A][B] Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class A-2[A][B] Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class A-2[A][B] Senior Secured Floating Rate Notes due 2026 (the "Class A-2[A][B] Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class A-2[A][B] Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class A-2[A][B] Notes, or one or more predecessor Class A-2[A][B] Notes, registered as such at the close of business on the relevant Record Date.

Transfers of this [Rule 144A][Regulation S] Global Class A-2[A][B] Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee, except as otherwise set forth in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class A-2[A][B] Note will be transferable in accordance with the DTC's rules and procedures in use at such time.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class A-2[A][B] Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class A-2[A][B] Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S][Rule 144A] Global Class A-2[A][B] Note subject to the restrictions as set forth in the Indenture. This [Rule 144A][Regulation S] Global Class A-2[A][B] Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A][Regulation S] Global Class A-2[A][B] Note, this [Rule 144A][Regulation S] Global Class A-2[A][B] Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Class A-2[A][B] Notes will be issued in minimum denominations of U.S.$250,000 and integral multiples of U.S.$10,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

*- signature page follows -*

A2-8

Exhibit B

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
    Name:
    Title:

A2-9

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
    Name:
    Title:

**CERTIFICATE OF AUTHENTICATION**

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A2-11

Exhibit B

SCHEDULE A

SCHEDULE OF EXCHANGES OR REDEMPTIONS

The outstanding principal amount of the Class A-2[A][B] Notes represented by this [Rule 144A][Regulation S] Global Class A-2[A][B] Note on the Closing Date is U.S.$[___]. The following exchanges, redemptions of or increase in the whole or a part of the Class A-2[A][B] Notes represented by this [Rule 144A][Regulation S] Global Class A-2[A][B] Note have been made:

| Date exchange/ increase made | Original principal amount of this [Rule 144A][Regulation S] Global Class A-2[A][B] Note | Part of principal amount of this [Rule 144A][Regulation S] Global Class A-2[A][B] Note exchanged/redeemed/ increased | Remaining principal amount of this [Rule 144A][Regulation S] Global Class A-2[A][B] Note following such exchange/redemption/ increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

A2-12

<div align="right"><b>EXHIBIT A3</b></div>

<div align="center">

## FORM OF GLOBAL CLASS A-X NOTE

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS A-X SENIOR SECURED FLOATING RATE NOTES DUE 2026

</div>

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

<div align="center">A3-1</div>

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE CO-ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS

(GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN

A3-3

THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

ACIS CLO 2014-3 LTD.
ACIS CLO 2014-3 LLC

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS A-X SENIOR SECURED FLOATING RATE NOTES DUE 2026

Up to U.S. $[3,500,000]

A-X/[R][S]-[●]

[Date]

CUSIP No. [00100FAJ4][18] [G00734AE6][19]

ISIN No.: [US00100FAJ49][20] [USG00734AE66][21]


ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), for value received, hereby promise to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on Schedule A hereto on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture. The obligations of the Co-Issuers under this Class A-X Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if any such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [1.35]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class A-X Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the day (whether or not a Business Day) immediately prior to such Payment Date.

---

[18]Rule 144A Global Class A-X Note.

[19]Regulation S Global Class A-X Note.

[20]Rule 144A Global Class A-X Note.

[21]Regulation S Global Class A-X Note.

A3-5

Payments of principal of and interest on this Class A-X Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Interest will cease to accrue on each Class A-X Note, or in the case of a partial repayment, on such repaid part, from the date of repayment.  If this Class A-X Note is called for redemption and principal payments hereon are not paid upon surrender of this Class A-X Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class A-X Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class A-X Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  The principal of each Class A-X Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class A-X Senior Secured Floating Rate Notes due 2026 (the "Class A-X Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture).  Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture.  In the case of any optional redemption of Class A-X Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class A-X Notes, or one or more predecessor Class A-X Notes, registered as such at the close of business on the relevant Record Date.

Transfers of this [Rule 144A][Regulation S] Global Class A-X Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee, except as otherwise set forth in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class A-X Note will be transferable in accordance with the DTC's rules and procedures in use at such time.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection

A3-6

with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class A-X Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class A-X Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S][Rule 144A] Global Class A-X Note subject to the restrictions as set forth in the Indenture. This [Rule 144A][Regulation S] Global Class A-X Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A][Regulation S] Global Class A-X Note, this [Rule 144A][Regulation S] Global Class A-X Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Class A-X Notes will be issued in minimum denominations of U.S.$250,000 and integral multiples of U.S.$10,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

*- signature page follows -*

A3-7

Exhibit B

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
       Name:
       Title:

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
      Name:
      Title:

A3-9

**CERTIFICATE OF AUTHENTICATION**

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A3-10

Exhibit B

<u>SCHEDULE A</u>

<u>SCHEDULE OF EXCHANGES OR REDEMPTIONS</u>

The outstanding principal amount of the Class A-X Notes represented by this [Rule 144A][Regulation S] Global Class A-X Note on the Closing Date is U.S.$[___]. The following exchanges, redemptions of or increase in the whole or a part of the Class A-X Notes represented by this [Rule 144A][Regulation S] Global Class A-X Note have been made:

| Date exchange/ increase made | Original principal amount of this [Rule 144A][Regulation S] Global Class A-X Note | Part of principal amount of this [Rule 144A][Regulation S] Global Class A-X Note exchanged/redeemed/ increased | Remaining principal amount of this [Rule 144A][Regulation S] Global Class A-X Note following such exchange/redemption/ increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

A3-11

Exhibit B

**EXHIBIT A4**

## FORM OF GLOBAL CLASS B NOTE

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS B SENIOR SECURED FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN

A4-1

SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE CO-ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.

A4-4

ACIS CLO 2014-3 LTD.

ACIS CLO 2014-3 LLC

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS B SENIOR SECURED FLOATING RATE NOTES DUE 2026

Up to U.S. $[56,000,000]

B/[R][S]-[●]

[Date]

CUSIP No. [00100FAL9][22] [G00734AF3][23]

ISIN No.:  [US00100FAL94][24] [USG00734AF32][25]

      ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), for value received, hereby promise to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on Schedule A hereto on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture.  The obligations of the Co-Issuers under this Class B Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.  None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

      The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if any such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [2.23]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for.  Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360.  The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class B Note (or one or more predecessor Notes) is registered at

---

[22]Rule 144A Global Class B Note.

[23]Regulation S Global Class B Note.

[24]Rule 144A Global Class B Note.

[25]Regulation S Global Class B Note.

A4-5

the close of business on the Record Date for such interest, which shall be the day (whether or not a Business Day) immediately prior to such Payment Date.

Payments of principal of and interest on this Class B Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Interest will cease to accrue on each Class B Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class B Note is called for redemption and principal payments hereon are not paid upon surrender of this Class B Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class B Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class B Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class B Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class B Senior Secured Floating Rate Notes due 2026 (the "Class B Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class B Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class B Notes, or one or more predecessor Class B Notes, registered as such at the close of business on the relevant Record Date.

Transfers of this [Rule 144A][Regulation S] Global Class B Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee, except as otherwise set forth in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class B Note will be transferable in accordance with the DTC's rules and procedures in use at such time.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the

occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class B Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class B Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S][Rule 144A] Global Class B Note subject to the restrictions as set forth in the Indenture. This [Rule 144A][Regulation S] Global Class B Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A][Regulation S] Global Class B Note, this [Rule 144A][Regulation S] Global Class B Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Class B Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S.$1,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

*- signature page follows -*

A4-7

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
      Name:
      Title:

A4-9

Exhibit B

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A4-10

## SCHEDULE A

## SCHEDULE OF EXCHANGES OR REDEMPTIONS

The outstanding principal amount of the Class B Notes represented by this [Rule 144A][Regulation S] Global Class B Note on the Closing Date is U.S.$[__]. The following exchanges, redemptions of or increase in the whole or a part of the Class B Notes represented by this [Rule 144A][Regulation S] Global Class B Note have been made:

| Date exchange/ increase made | Original principal amount of this [Rule 144A][Regulation S] Global Class B Note | Part of principal amount of this [Rule 144A][Regulation S] Global Class B Note exchanged/redeemed/ increased | Remaining principal amount of this [Rule 144A][Regulation S] Global Class B Note following such exchange/redemption/ increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

A4-11

Exhibit B

<div align="right">**EXHIBIT A5**</div>

## FORM OF GLOBAL CLASS C NOTE

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS C SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

<div align="center">A5-1</div>

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE CO-ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS

(GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN

A5-3

THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.

ACIS CLO 2014-3 LTD.
ACIS CLO 2014-3 LLC

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS C SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

Up to U.S $[29,000,000]

C/[R][S]-[●]

[Date]

CUSIP No. [00100FAN5][26] [G00734AG1][27]

ISIN No.:  [US00100FAN50][28] [USG00734AG15][29]

ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), for value received, hereby promise to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on Schedule A hereto on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture.  The obligations of the Co-Issuers under this Class C Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.  None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if any such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [2.50]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for.  Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360.  The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class C Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the day (whether or not a Business Day) immediately prior to such Payment Date.

---

[26] Rule 144A Global Class C Note.

[27] Regulation S Global Class C Note.

[28] Rule 144A Global Class C Note.

[29] Regulation S Global Class C Note.

A5-5

Payments of principal of and interest on this Class C Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Any payment of interest due on the Class C Notes to the extent that sufficient funds are not available to make such payment in accordance with the Priority of Payments on such Payment Date, but only if one or more one or more Priority Classes is Outstanding with respect to the Class C Notes, shall constitute "Secured Note Deferred Interest" and will not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) of the Indenture (and the failure to pay such interest shall not be an Event of Default) until the earliest of (i) the Payment Date on which funds are available to pay such Secured Note Deferred Interest in accordance with the Priority of Payments, (ii) the Redemption Date with respect to the Class C Notes and (iii) the Stated Maturity of the Class C Notes. Secured Note Deferred Interest on the Class C Notes shall be added to the principal balance of the Class C Notes and shall be payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to the Class C Notes and (ii) which is the Stated Maturity of the Class C Notes. Regardless of whether any Priority Class is Outstanding with respect to the Class C Notes, to the extent that funds are not available on any Payment Date (other than the Redemption Date with respect to, or Stated Maturity of, the Class C Notes) to pay previously accrued Secured Note Deferred Interest, such previously accrued Secured Note Deferred Interest will not be due and payable on such Payment Date and any failure to pay such previously accrued Secured Note Deferred Interest on such Payment Date will not be an Event of Default under the Indenture.

Interest will cease to accrue on each Class C Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class C Note is called for redemption and principal payments hereon are not paid upon surrender of this Class C Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class C Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class C Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class C Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class C Secured Deferrable Floating Rate Notes due 2026 (the "Class C Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

A5-6

Exhibit B

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class C Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class C Notes, or one or more predecessor Class C Notes, registered as such at the close of business on the relevant Record Date.

Transfers of this [Rule 144A][Regulation S] Global Class C Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee, except as otherwise set forth in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class C Note will be transferable in accordance with the DTC's rules and procedures in use at such time.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class C Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class C Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S][Rule 144A] Global Class C Note subject to the restrictions as set forth in the Indenture. This [Rule 144A][Regulation S] Global Class C Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A][Regulation S] Global Class C Note, this [Rule 144A][Regulation S] Global Class C Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Class C Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S. $1,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

*- signature page follows -*

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
      Name:
      Title:

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
    Name:
    Title:

A5-10

Exhibit B

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A5-11

Exhibit B

SCHEDULE A

SCHEDULE OF EXCHANGES OR REDEMPTIONS

The outstanding principal amount of the Class C Notes represented by this [Rule 144A][Regulation S] Global Class C Note on the Closing Date is U.S.$[___]. The following exchanges, redemptions of or increase in the whole or a part of the Class C Notes represented by this [Rule 144A][Regulation S] Global Class C Note have been made:

| Date exchange/ increase made | Original principal amount of this [Rule 144A][Regulation S] Global Class C Note | Part of principal amount of this [Rule 144A][Regulation S] Global Class C Note exchanged/redeemed/ increased | Remaining principal amount of this [Rule 144A][Regulation S] Global Class C Note following such exchange/redemption/increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

A5-12

**EXHIBIT A6**

## FORM OF GLOBAL CLASS D NOTE

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS D SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

A6-1

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE CO-ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS

(GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN

THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.

ACIS CLO 2014-3 LTD.
ACIS CLO 2014-3 LLC

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS D SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

Up to U.S $[19,000,000]

D/[R][S]-[●]

[Date]

CUSIP No. [00100FAQ8][30] [G00734AH9][31]

ISIN No.:  [US00100FAQ81][32] [USG00734AH97][33]

ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), for value received, hereby promise to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on Schedule A hereto on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture.  The obligations of the Co-Issuers under this Class D Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.  None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if any such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [3.12]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for.  Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360.  The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class D Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the day (whether or not a Business Day) immediately prior to such Payment Date.

---

[30] Rule 144A Global Class D Note.

[31] Regulation S Global Class D Note.

[32] Rule 144A Global Class D Note.

[33] Regulation S Global Class D Note.

A6-5

Payments of principal of and interest on this Class D Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Any payment of interest due on the Class D Notes to the extent that sufficient funds are not available to make such payment in accordance with the Priority of Payments on such Payment Date, but only if one or more one or more Priority Classes is Outstanding with respect to the Class D Notes, shall constitute "Secured Note Deferred Interest" and will not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) of the Indenture (and the failure to pay such interest shall not be an Event of Default) until the earliest of (i) the Payment Date on which funds are available to pay such Secured Note Deferred Interest in accordance with the Priority of Payments, (ii) the Redemption Date with respect to the Class D Notes and (iii) the Stated Maturity of the Class D Notes. Secured Note Deferred Interest on the Class D Notes shall be added to the principal balance of the Class D Notes and shall be payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to the Class D Notes and (ii) which is the Stated Maturity of the Class D Notes. Regardless of whether any Priority Class is Outstanding with respect to the Class D Notes, to the extent that funds are not available on any Payment Date (other than the Redemption Date with respect to, or Stated Maturity of, the Class D Notes) to pay previously accrued Secured Note Deferred Interest, such previously accrued Secured Note Deferred Interest will not be due and payable on such Payment Date and any failure to pay such previously accrued Secured Note Deferred Interest on such Payment Date will not be an Event of Default under the Indenture.

Interest will cease to accrue on each Class D Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class D Note is called for redemption and principal payments hereon are not paid upon surrender of this Class D Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class D Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class D Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class D Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class D Secured Deferrable Floating Rate Notes due 2026 (the "Class D Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class D Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class D Notes, or one or more predecessor Class D Notes, registered as such at the close of business on the relevant Record Date.

Transfers of this [Rule 144A][Regulation S] Global Class D Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee, except as otherwise set forth in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class D Note will be transferable in accordance with the DTC's rules and procedures in use at such time.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class D Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class D Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S][Rule 144A] Global Class D Note subject to the restrictions as set forth in the Indenture. This [Rule 144A][Regulation S] Global Class D Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A][Regulation S] Global Class D Note, this [Rule 144A][Regulation S] Global Class D Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Class D Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S. $1,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

*- signature page follows -*

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
     Name:
     Title:

A6-9

Exhibit B

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
    Name:
    Title:

A6-10

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A6-11

SCHEDULE A

SCHEDULE OF EXCHANGES OR REDEMPTIONS

The outstanding principal amount of the Class D Notes represented by this [Rule 144A][Regulation S] Global Class D Note on the Closing Date is U.S.$[___]. The following exchanges, redemptions of or increase in the whole or a part of the Class D Notes represented by this [Rule 144A][Regulation S] Global Class D Note have been made:

| Date exchange/ increase made | Original principal amount of this [Rule 144A][Regulation S] Global Class D Note | Part of principal amount of this [Rule 144A][Regulation S] Global Class D Note exchanged/redeemed/ increased | Remaining principal amount of this [Rule 144A][Regulation S] Global Class D Note following such exchange/redemption/i ncrease | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

A6-12

## FORM OF GLOBAL CLASS E NOTE

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS E SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE (EXCEPT IN THE CASE OF AN INITIAL PURCHASER WHOSE PURCHASE HAS BEEN EXPRESSLY AGREED UPON IN WRITING WITH THE CO-ISSUERS) WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT IT IS NOT, AND IS NOT ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAW THAT IS SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("SIMILAR LAW") ITS ACQUISITION, HOLDING AND DISPOSITION OF THE NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF SIMILAR LAW. EACH PURCHASER ACQUIRING THIS NOTE AS AN INITIAL PURCHASER PURSUANT TO ITS EXPRESS WRITTEN

AGREEMENT WITH THE CO-ISSUERS WILL BE REQUIRED TO (I) REPRESENT AND WARRANT IN WRITING TO THE TRUSTEE (1) WHETHER OR NOT, FOR SO LONG AS IT HOLDS SUCH NOTE OR AN INTEREST THEREIN, IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, (2) WHETHER OR NOT, FOR SO LONG AS IT HOLDS SUCH NOTE OR AN INTEREST THEREIN, IT IS A CONTROLLING PERSON AND (3) THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAW THAT IS SIMILAR PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SIMILAR LAW, AND (II) AGREE TO CERTAIN TRANSFER RESTRICTIONS REGARDING ITS INTEREST IN SUCH NOTE. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY. "CONTROLLING PERSON" MEANS A PERSON (OTHER THAN A BENEFIT PLAN INVESTOR) WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE ISSUER OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF ANY SUCH PERSON. AN "AFFILIATE" OF A PERSON INCLUDES ANY PERSON, DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES, CONTROLLING, CONTROLLED BY OR UNDER COMMON CONTROL WITH THE PERSON. "CONTROL" WITH RESPECT TO A PERSON OTHER THAN AN INDIVIDUAL MEANS THE POWER TO EXERCISE A CONTROLLING INFLUENCE OVER THE MANAGEMENT OR POLICIES OF SUCH PERSON. THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN ERISA RESTRICTED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A BENEFIT PLAN INVESTOR, CONTROLLING PERSON OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING OR WHOSE OWNERSHIP OTHERWISE CAUSES 25% OR MORE OF THE TOTAL VALUE OF THE RELEVANT CLASS OF ERISA RESTRICTED NOTES TO BE HELD BY BENEFIT PLAN INVESTORS TO SELL ITS INTEREST IN THE ERISA RESTRICTED NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE ISSUER OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS

REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE

ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.

ACIS CLO 2014-3 LTD.

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS E SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

Up to U.S. $[17,500,000]

E/[R][S]-[●]

[Date]

CUSIP No. [00100GAA1][34] [G00733AA6][35]

ISIN No.: [US00100GAA13] [36] [USG00733AA61][37]

ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on Schedule A hereto on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture. The obligations of the Issuer under this Class E Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The Issuer promises to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if any such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [4.75]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class E Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the day (whether or not a Business Day) immediately prior to such Payment Date.

---

[34]Rule 144A Global Class E Note.

[35]Regulation S Global Class E Note.

[36]Rule 144A Global Class E Note.

[37]Regulation S Global Class E Note.

Payments of principal of and interest on this Class E Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Any payment of interest due on the Class E Notes to the extent that sufficient funds are not available to make such payment in accordance with the Priority of Payments on such Payment Date, but only if one or more one or more Priority Classes is Outstanding with respect to the Class E Notes, shall constitute "Secured Note Deferred Interest" and will not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) of the Indenture (and the failure to pay such interest shall not be an Event of Default) until the earliest of (i) the Payment Date on which funds are available to pay such Secured Note Deferred Interest in accordance with the Priority of Payments, (ii) the Redemption Date with respect to the Class E Notes and (iii) the Stated Maturity of the Class E Notes. Secured Note Deferred Interest on the Class E Notes shall be added to the principal balance of the Class E Notes and shall be payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to the Class E Notes and (ii) which is the Stated Maturity of the Class E Notes. Regardless of whether any Priority Class is Outstanding with respect to the Class E Notes, to the extent that funds are not available on any Payment Date (other than the Redemption Date with respect to, or Stated Maturity of, the Class E Notes) to pay previously accrued Secured Note Deferred Interest, such previously accrued Secured Note Deferred Interest will not be due and payable on such Payment Date and any failure to pay such previously accrued Secured Note Deferred Interest on such Payment Date will not be an Event of Default under the Indenture.

Interest will cease to accrue on each Class E Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class E Note is called for redemption and principal payments hereon are not paid upon surrender of this Class E Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class E Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class E Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class E Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class E Secured Deferrable Floating Rate Notes due 2026 (the "Class E Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Issuer, ACIS CLO 2014-3 LLC, as Co-Issuer and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

A7-6

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class E Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class E Notes, or one or more predecessor Class E Notes, registered as such at the close of business on the relevant Record Date.

Transfers of this [Rule 144A][Regulation S] Global Class E Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee, except as otherwise set forth in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class E Note will be transferable in accordance with the DTC's rules and procedures in use at such time.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class E Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class E Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S][Rule 144A] Global Class E Note subject to the restrictions as set forth in the Indenture. This [Rule 144A][Regulation S] Global Class E Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A][Regulation S] Global Class E Note, this [Rule 144A][Regulation S] Global Class E Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Class E Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S. $1,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Note, but the Issuer, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other

governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

*- signature page follows -*

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
     Name:
     Title:

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A7-10

## SCHEDULE A

## SCHEDULE OF EXCHANGES OR REDEMPTIONS

The outstanding principal amount of the Class E Notes represented by this [Rule 144A][Regulation S] Global Class E Note on the Closing Date is U.S.$[___]. The following exchanges, redemptions of or increase in the whole or a part of the Class E Notes represented by this [Rule 144A][Regulation S] Global Class E Note have been made:

| Date exchange/ increase made | Original principal amount of this [Rule 144A][Regulation S] Global Class E Note | Part of principal amount of this [Rule 144A][Regulation S] Global Class E Note exchanged/redeemed/ increased | Remaining principal amount of this [Rule 144A][Regulation S] Global Class E Note following such exchange/redemption/increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

A7-11

EXHIBIT A8

## FORM OF GLOBAL CLASS F NOTE

[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS F SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE (EXCEPT IN THE CASE OF AN INITIAL PURCHASER WHOSE PURCHASE HAS BEEN EXPRESSLY AGREED UPON IN WRITING WITH THE CO-ISSUERS) WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT IT IS NOT, AND IS NOT ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAW THAT IS SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("SIMILAR LAW") ITS ACQUISITION, HOLDING AND DISPOSITION OF THE NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF SIMILAR LAW. EACH PURCHASER ACQUIRING THIS NOTE AS AN INITIAL PURCHASER PURSUANT TO ITS EXPRESS WRITTEN

AGREEMENT WITH THE CO-ISSUERS WILL BE REQUIRED TO (I) REPRESENT AND WARRANT IN WRITING TO THE TRUSTEE (1) WHETHER OR NOT, FOR SO LONG AS IT HOLDS SUCH NOTE OR AN INTEREST THEREIN, IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, (2) WHETHER OR NOT, FOR SO LONG AS IT HOLDS SUCH NOTE OR AN INTEREST THEREIN, IT IS A CONTROLLING PERSON AND (3) THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAW THAT IS SIMILAR PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SIMILAR LAW, AND (II) AGREE TO CERTAIN TRANSFER RESTRICTIONS REGARDING ITS INTEREST IN SUCH NOTE. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY. "CONTROLLING PERSON" MEANS A PERSON (OTHER THAN A BENEFIT PLAN INVESTOR) WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE ISSUER OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF ANY SUCH PERSON. AN "AFFILIATE" OF A PERSON INCLUDES ANY PERSON, DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES, CONTROLLING, CONTROLLED BY OR UNDER COMMON CONTROL WITH THE PERSON. "CONTROL" WITH RESPECT TO A PERSON OTHER THAN AN INDIVIDUAL MEANS THE POWER TO EXERCISE A CONTROLLING INFLUENCE OVER THE MANAGEMENT OR POLICIES OF SUCH PERSON. THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN ERISA RESTRICTED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A BENEFIT PLAN INVESTOR, CONTROLLING PERSON OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING OR WHOSE OWNERSHIP OTHERWISE CAUSES 25% OR MORE OF THE TOTAL VALUE OF THE RELEVANT CLASS OF ERISA RESTRICTED NOTES TO BE HELD BY BENEFIT PLAN INVESTORS TO SELL ITS INTEREST IN THE ERISA RESTRICTED NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE ISSUER OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS

REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE

ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.

ACIS CLO 2014-3 LTD.


[RULE 144A][REGULATION S] GLOBAL NOTE
representing
CLASS F SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

Up to U.S. $[5,000,000]

F/[R][S]-[●]

[Date]

CUSIP No. [00100GAC7][38] [G00733AB4][39]

ISIN No.:  [US00100GAC78][40] [USG00733AB45][41]


ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on Schedule A hereto on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture.  The obligations of the Issuer under this Class F Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.  None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The Issuer promises to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if any such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [5.60]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for.  Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360.  The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class F Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the day (whether or not a Business Day) immediately prior to such Payment Date.

---

[38]Rule 144A Global Class F Note.

[39]Regulation S Global Class F Note.

[40]Rule 144A Global Class F Note.

[41]Regulation S Global Class F Note.

A8-5

Payments of principal of and interest on this Class F Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Any payment of interest due on the Class F Notes to the extent that sufficient funds are not available to make such payment in accordance with the Priority of Payments on such Payment Date, but only if one or more one or more Priority Classes is Outstanding with respect to the Class F Notes, shall constitute "Secured Note Deferred Interest" and will not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) of the Indenture (and the failure to pay such interest shall not be an Event of Default) until the earliest of (i) the Payment Date on which funds are available to pay such Secured Note Deferred Interest in accordance with the Priority of Payments, (ii) the Redemption Date with respect to the Class F Notes and (iii) the Stated Maturity of the Class F Notes. Secured Note Deferred Interest on the Class F Notes shall be added to the principal balance of the Class F Notes and shall be payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to the Class F Notes and (ii) which is the Stated Maturity of the Class F Notes. Regardless of whether any Priority Class is Outstanding with respect to the Class F Notes, to the extent that funds are not available on any Payment Date (other than the Redemption Date with respect to, or Stated Maturity of, the Class F Notes) to pay previously accrued Secured Note Deferred Interest, such previously accrued Secured Note Deferred Interest will not be due and payable on such Payment Date and any failure to pay such previously accrued Secured Note Deferred Interest on such Payment Date will not be an Event of Default under the Indenture.

Interest will cease to accrue on each Class F Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class F Note is called for redemption and principal payments hereon are not paid upon surrender of this Class F Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class F Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class F Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class F Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class F Secured Deferrable Floating Rate Notes due 2026 (the "Class F Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Issuer, ACIS CLO 2014-3 LLC, as Co-Issuer and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class F Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class F Notes, or one or more predecessor Class F Notes, registered as such at the close of business on the relevant Record Date.

Transfers of this [Rule 144A][Regulation S] Global Class F Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee, except as otherwise set forth in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class F Note will be transferable in accordance with the DTC's rules and procedures in use at such time.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class F Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Class F Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S][Rule 144A] Global Class F Note subject to the restrictions as set forth in the Indenture. This [Rule 144A][Regulation S] Global Class F Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A][Regulation S] Global Class F Note, this [Rule 144A][Regulation S] Global Class F Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Class F Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S. $1,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Note, but the Issuer, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other

governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

*- signature page follows -*

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
    Name:
    Title:

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A8-10

<u>SCHEDULE A</u>

<u>SCHEDULE OF EXCHANGES OR REDEMPTIONS</u>

The outstanding principal amount of the Class F Notes represented by this [Rule 144A][Regulation S] Global Class F Note on the Closing Date is U.S.$[___]. The following exchanges, redemptions of or increase in the whole or a part of the Class F Notes represented by this [Rule 144A][Regulation S] Global Class F Note have been made:

| Date exchange/ increase made | Original principal amount of this [Rule 144A][Regulation S] Global Class F Note | Part of principal amount of this [Rule 144A][Regulation S] Global Class F Note exchanged/redeemed/ increased | Remaining principal amount of this [Rule 144A][Regulation S] Global Class F Note following such exchange/redemption/increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

A8-11

EXHIBIT A9

## FORM OF GLOBAL SUBORDINATED NOTE

[RULE 144A][REGULATION S] GLOBAL NOTE

SUBORDINATED NOTES DUE 2026

THIS SUBORDINATED NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY TO (A) A PERSON THAT IS BOTH (1) A "QUALIFIED PURCHASER", A "KNOWLEDGEABLE EMPLOYEE" WITH RESPECT TO THE ISSUER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS EITHER A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR A QUALIFIED PURCHASER (IN EACH CASE, AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) AND (2) EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (Y) AN "ACCREDITED INVESTOR" (AS DEFINED IN RULE 501(A) UNDER THE SECURITIES ACT) OR (B) A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS SUBORDINATED NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS SUBORDINATED NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT IT IS NOT, AND IS NOT ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON AND IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAW THAT IS SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE ("SIMILAR LAW") ITS ACQUISITION, HOLDING AND DISPOSITION OF THE SUBORDINATED NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS

18779284.6.BUSINESS

SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY. "CONTROLLING PERSON" MEANS A PERSON (OTHER THAN A BENEFIT PLAN INVESTOR) WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE ISSUER OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF ANY SUCH PERSON. AN "AFFILIATE" OF A PERSON INCLUDES ANY PERSON, DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES, CONTROLLING, CONTROLLED BY OR UNDER COMMON CONTROL WITH THE PERSON. "CONTROL" WITH RESPECT TO A PERSON OTHER THAN AN INDIVIDUAL MEANS THE POWER TO EXERCISE A CONTROLLING INFLUENCE OVER THE MANAGEMENT OR POLICIES OF SUCH PERSON. THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SUBORDINATED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A BENEFIT PLAN INVESTOR, CONTROLLING PERSON OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING OR WHOSE OWNERSHIP OTHERWISE CAUSES A VIOLATION OF THE 25% LIMITATION TO SELL ITS INTEREST IN THE SUBORDINATED NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A SUBORDINATED NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER, A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS EITHER A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER OR AN ACCREDITED INVESTOR TO SELL ITS INTEREST IN THE SUBORDINATED NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

ANY TRANSFER, PLEDGE OR OTHER USE OF THIS SUBORDINATED NOTE FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN, UNLESS THIS SUBORDINATED NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC"), NEW YORK, NEW YORK, TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY SUBORDINATED NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR OF SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO.).

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE.

DISTRIBUTIONS OF PRINCIPAL PROCEEDS AND INTEREST PROCEEDS TO THE HOLDER OF THE SUBORDINATED NOTES REPRESENTED HEREBY ARE SUBORDINATED TO THE PAYMENT ON EACH PAYMENT DATE OF PRINCIPAL OF

AND INTEREST ON THE SECURED NOTES OF THE ISSUER AND THE PAYMENT OF CERTAIN OTHER AMOUNTS, TO THE EXTENT AND AS DESCRIBED IN THE INDENTURE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS EQUITY FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE

OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

ACIS CLO 2014-3 LTD.

[RULE 144A][REGULATION S] GLOBAL SUBORDINATED NOTE
representing

SUBORDINATED NOTES DUE 2026

Up to U.S. $[39,750,000]

SUB/[R][S]-[●]

[Date]

CUSIP No.: [00100GAE3][42] [G00733AC2][43]

ISIN No.: [US00100GAE35][44] [USG00733AC28][45]

ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to [_____], or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[_____]) on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture.

The obligations of the Issuer under this Subordinated Note and the Indenture are non-recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Subordinated Noteholders shall be extinguished and shall not thereafter revive. The Subordinated Notes represent unsecured, subordinated obligations of the Issuer and are not entitled to security under the Indenture. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The principal of this Subordinated Note shall be payable no later than the Stated Maturity unless the unpaid principal of this Subordinated Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Payments of Interest Proceeds and Principal Proceeds to the Holders of the Subordinated Notes are subordinated to payments in respect of the Secured Notes as set forth in the Indenture and failure to pay such amounts to the Holders of the Subordinated Notes will not constitute an Event of Default under the Indenture.

---

[42]Transferees under Rule 144A.

[43]Transferees under Regulation S.

[44]Transferees under Rule 144A.

[45]Transferees under Regulation S.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Subordinated Notes due 2026 (the "Subordinated Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Issuer, ACIS CLO 2014-3 LLC and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note may be redeemed, in whole but not in part, (a) on any Payment Date on or after the redemption or repayment in full of the Secured Notes, at the direction of a Majority of the Subordinated Notes or (b) if a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, in the manner, under the conditions and with the effect provided in the Indenture.

Transfers of this [Rule 144A][Regulation S] Global Subordinated Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee, except as otherwise set forth in the Indenture.

Interests in this [Rule 144A][Regulation S] Global Subordinated Note will be transferable in accordance with the DTC's rules and procedures in use at such time.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee shall treat the Person in whose name this Subordinated Note is registered as the owner of such Subordinated Note on the Register on the applicable Record Date for the purpose of receiving distributions of Principal Proceeds and Interest Proceeds on such Subordinated Note and on any other date for all other purposes whatsoever (whether or not such Subordinated Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary.

Interests in this [Rule 144A][Regulation S] Global Subordinated Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S][Rule 144A] Global Subordinated Note subject to the restrictions as set forth in the Indenture. This [Rule 144A][Regulation S] Global Subordinated Note is subject to mandatory exchange for Certificated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A][Regulation S] Global Subordinated Note, this [Rule 144A][Regulation S] Global Subordinated Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Subordinated Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S. $1 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Subordinated Note, but the Issuer, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.  The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

*- signature page follows -*

A9-7

Exhibit B

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
    Name:
    Title:

A9-8

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
    Authorized Signatory

A9-9

<u>SCHEDULE A</u>

<u>SCHEDULE OF EXCHANGES OR REDEMPTIONS</u>

The outstanding principal amount of the Subordinated Notes represented by this [Rule 144A][Regulation S] Global Subordinated Note on the Closing Date is U.S.$[___]. The following exchanges, redemptions of or increase in the whole or a part of the Subordinated Notes represented by this [Rule 144A][Regulation S] Global Subordinated Note have been made:

| Date exchange/ increase made | Original principal amount of this [Rule 144A][Regulation S] Global Subordinated Note | Part of principal amount of this [Rule 144A][Regulation S] Global Subordinated Note exchanged/redeemed/ increased | Remaining principal amount of this [Rule 144A][Regulation S] Global Subordinated Note following such exchange/redemption/increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

A9-10

<div align="right">**EXHIBIT A10**</div>

## FORM OF CERTIFICATED SUBORDINATED NOTE

<div align="center">CERTIFICATED SUBORDINATED NOTE</div>

<div align="center">SUBORDINATED NOTES DUE 2026</div>

THIS SUBORDINATED NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY TO (A) A PERSON THAT IS BOTH (1) A "QUALIFIED PURCHASER", A "KNOWLEDGEABLE EMPLOYEE" WITH RESPECT TO THE ISSUER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS EITHER A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR A QUALIFIED PURCHASER (IN EACH CASE, AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) AND (2) EITHER (X) A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (Y) AN "ACCREDITED INVESTOR" (AS DEFINED IN RULE 501(A) UNDER THE SECURITIES ACT) OR (B) A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS SUBORDINATED NOTE IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THIS SUBORDINATED NOTE IS AN ERISA RESTRICTED NOTE. EACH PURCHASER OR TRANSFEREE OF A SUBORDINATED NOTE WILL BE REQUIRED TO (I) REPRESENT AND WARRANT IN WRITING TO THE TRUSTEE (1) WHETHER OR NOT, FOR SO LONG AS IT HOLDS SUCH NOTE OR AN INTEREST THEREIN, IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, (2) WHETHER OR NOT, FOR SO LONG AS IT HOLDS SUCH NOTE OR AN INTEREST THEREIN, IT IS A CONTROLLING PERSON AND (3) THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") OR (B) IF IT IS A

<div align="center">A10-1</div>

GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAW THAT IS SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SIMILAR LAW, AND (II) AGREE TO CERTAIN TRANSFER RESTRICTIONS REGARDING ITS INTEREST IN SUCH NOTE. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY. "CONTROLLING PERSON" MEANS A PERSON (OTHER THAN A BENEFIT PLAN INVESTOR) WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE ISSUER OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF ANY SUCH PERSON. AN "AFFILIATE" OF A PERSON INCLUDES ANY PERSON, DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES, CONTROLLING, CONTROLLED BY OR UNDER COMMON CONTROL WITH THE PERSON. "CONTROL" WITH RESPECT TO A PERSON OTHER THAN AN INDIVIDUAL MEANS THE POWER TO EXERCISE A CONTROLLING INFLUENCE OVER THE MANAGEMENT OR POLICIES OF SUCH PERSON.

NO TRANSFER OF A SUBORDINATED NOTE OR ANY INTEREST THEREIN WILL BE PERMITTED, AND THE TRUSTEE WILL NOT RECOGNIZE ANY SUCH TRANSFER, IF IT WOULD CAUSE 25% OR MORE OF THE TOTAL VALUE OF THE SUBORDINATED NOTES TO BE HELD BY BENEFIT PLAN INVESTORS, DISREGARDING SUBORDINATED NOTES (OR INTERESTS THEREIN) HELD BY CONTROLLING PERSONS.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SUBORDINATED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION, BENEFIT PLAN INVESTOR, CONTROLLING PERSON OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING OR WHOSE OWNERSHIP OTHERWISE CAUSES A VIOLATION OF THE 25% LIMITATION TO SELL ITS INTEREST IN THE SUBORDINATED NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A SUBORDINATED NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER, A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS EITHER A KNOWLEDGEABLE EMPLOYEE WITH RESPECT TO THE ISSUER OR A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER OR AN ACCREDITED INVESTOR TO SELL ITS INTEREST IN THE SUBORDINATED NOTES, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

DISTRIBUTIONS OF PRINCIPAL PROCEEDS AND INTEREST PROCEEDS TO THE HOLDER OF THE SUBORDINATED NOTES REPRESENTED HEREBY ARE SUBORDINATED TO THE PAYMENT ON EACH PAYMENT DATE OF PRINCIPAL OF AND INTEREST ON THE SECURED NOTES OF THE ISSUER AND THE PAYMENT OF CERTAIN OTHER AMOUNTS, TO THE EXTENT AND AS DESCRIBED IN THE INDENTURE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS EQUITY FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL

BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

ACIS CLO 2014-3 LTD.

CERTIFICATED SUBORDINATED NOTE
representing

SUBORDINATED NOTES DUE 2026

U.S.$[_____]

SUB/[R][S]-[●]

[Date]

CUSIP No.:  [00100GAE3][46] [00100GAF0][47] [G00733AC2][48]

ISIN No.:  [US00100GAE35][49] [US00100GAF00][50] [USG00733AC28][51]

ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to [_____], or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[_____]) on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture.

The obligations of the Issuer under this Subordinated Note and the Indenture are non-recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Subordinated Noteholders shall be extinguished and shall not thereafter revive.  The Subordinated Notes represent unsecured, subordinated obligations of the Issuer and are not entitled to security under the Indenture. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The principal of this Subordinated Note shall be payable no later than the Stated Maturity unless the unpaid principal of this Subordinated Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

---

[46]Transferees under Rule 144A.

[47]Transferees that are Accredited Investors.

[48]Transferees under Regulation S.

[49]Transferees under Rule 144A.

[50]Transferees that are Accredited Investors.

[51]Transferees under Regulation S.

Payments of Interest Proceeds and Principal Proceeds to the Holders of the Subordinated Notes are subordinated to payments in respect of the Secured Notes as set forth in the Indenture and failure to pay such amounts to the Holders of the Subordinated Notes will not constitute an Event of Default under the Indenture.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Subordinated Notes due 2026 (the "Subordinated Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Issuer, ACIS CLO 2014-3 LLC and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note may be redeemed, in whole but not in part, (a) on any Payment Date on or after the redemption or repayment in full of the Secured Notes, at the direction of a Majority of the Subordinated Notes or (b) if a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, in the manner, under the conditions and with the effect provided in the Indenture.

This Certificated Subordinated Note may be transferred to a transferee acquiring Subordinated Notes subject to and in accordance with the restrictions set forth in the Indenture.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee shall treat the Person in whose name this Subordinated Note is registered as the owner of such Subordinated Note on the Register on the applicable Record Date for the purpose of receiving distributions of Principal Proceeds and Interest Proceeds on such Subordinated Note and on any other date for all other purposes whatsoever (whether or not such Subordinated Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary.

The Subordinated Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S. $1 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Subordinated Note, but the Issuer, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES

AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

*- signature page follows -*

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
     Name:
     Title:

**CERTIFICATE OF AUTHENTICATION**

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A10-9

ASSIGNMENT FORM

For value received _____

does hereby sell, assign, and transfer to

        _____

        _____
        Please insert social security or
        other identifying number of assignee

        Please print or type name
        and address, including zip code,
        of assignee:

_____

_____

_____

_____

the within Security and does hereby irrevocably constitute and appoint _____
Attorney to transfer the Security on the books of the Trustee with full power of substitution in the premises.

Date: _____          Your Signature  _____
                                         (Sign exactly as your name
                                         appears in the security)

**EXHIBIT A11**

**FORM OF CERTIFICATED CLASS A-1[A][F] NOTE**

CERTIFICATED NOTE
representing
CLASS A-1[A][F] SENIOR SECURED [FLOATING] [FIXED] RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

A11-1

18779284.6.BUSINESS

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

A11-2

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER

OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

ACIS CLO 2014-3 LTD.
ACIS CLO 2014-3 LLC


CERTIFICATED NOTE
representing
CLASS A-1[A][F] SENIOR SECURED [FLOATING] [FIXED] RATE NOTES DUE 2026


U.S.$[_____]

A-1[A][F]/[R][S]-[●]

[Date]

CUSIP No.: [00100FAA3][52] [G00734AA4][53] [00100FAC9][54] [G00734AB2][55]

ISIN No.: [US00100FAA30][56] [USG00734AA45][57] [US00100FAC95][58] [USG00734AB28][59]


        ACIS CLO 2014-3 LTD. an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") for value received, hereby promise to pay to [_____], or registered assigns, upon presentation and surrender of this Class A-1[A][F] Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[_____]) on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture.  The obligations of the Co-Issuers under this Class A-1[A][F] Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.  None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

---

[52]Insert in the case of a transferee of Class A-1A Notes under Rule 144A.

[53]Insert in the case of a transferee of Class A-1A Notes under Regulation S.

[54]Insert in the case of a transferee of Class A-1F Notes under Rule 144A.

[55]Insert in the case of a transferee of Class A-1F Notes under Regulation S.

[56]Insert in the case of a transferee of Class A-1A Notes under Rule 144A.

[57]Insert in the case of a transferee of Class A-1A Notes under Regulation S.

[58]Insert in the case of a transferee of Class A-1F Notes under Rule 144A.

[59]Insert in the case of a transferee of Class A-1F Notes under Regulation S.

The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if such day is not a Business Day, the next succeeding Business Day), at the rate equal to [the Base Rate plus [1.51] [3.70]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for.  Interest shall be computed on the basis of [the actual number of days elapsed in the applicable Interest Accrual Period divided by 360] [a year of 360 days with twelve 30 day months].  The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class A-1[A][F] Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the day (whether or not a Business Day) immediately prior to such Payment Date.

Payments of principal of and interest on this Class A-1[A][F] Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Interest will cease to accrue on each Class A-1[A][F] Note, or in the case of a partial repayment, on such repaid part, from the date of repayment.  If this Class A-1[A][F] Note is called for redemption and principal payments hereon are not paid upon surrender of this Class A-1[A][F] Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class A-1[A][F] Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class A-1[A][F] Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  The principal of each Class A-1[A][F] Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class A-1[A][F] Senior Secured [Floating][Fixed] Rate Notes due 2026 (the "Class A-1[A][F] Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture.  In the case of any optional redemption of Class A-1[A][F] Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class A-1[A][F] Notes, or one or more predecessor Class A-1[A][F] Notes, registered as such at the close of business on the relevant Record Date.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes

provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class A-1[A][F] Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

The Class A-1[A][F] Notes will be issued in minimum denominations of U.S.$250,000 and integral multiples of U.S.$10,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Class A-1[A][F] Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
     Name:
     Title:

A11-9

**CERTIFICATE OF AUTHENTICATION**

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A11-10

<center>ASSIGNMENT FORM</center>

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Security and does hereby irrevocably constitute and appoint _____
Attorney to transfer the Security on the books of the Trustee with full power of substitution in the premises.

Date: _____       Your Signature       _____

(Sign exactly as your name
appears in the security)

A11-11

EXHIBIT A12

**FORM OF CERTIFICATED CLASS A-2[A][B] NOTE**

CERTIFICATED NOTE
representing
CLASS A-2[A][B] SENIOR SECURED FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

A12-1

18779284.6.BUSINESS

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER

OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

[THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.][60]

---

[60] Insert in the case of the Class A-2B Notes.

ACIS CLO 2014-3 LTD.
ACIS CLO 2014-3 LLC

CERTIFICATED NOTE
representing
CLASS A-2[A][B] SENIOR SECURED FLOATING RATE NOTES DUE 2026

U.S.$[●]

A-2[A][B]/[R][S]-[●]

[Date]

CUSIP No.: [00100FAE5][61] [G00734AC0][62] [00100FAG0][63] [G00734AD8][64]

ISIN No.: [US00100FAE51][65] [USG00734AC01][66] [US00100FAG00][67] [USG00734AD83][68]

   ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") for value received, hereby promise to pay to [_____], or registered assigns, upon presentation and surrender of this Class A-2[A][B] Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[_____]) on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture. The obligations of the Co-Issuers under this Class A-2[A][B] Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

   The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [1.55][2.00]% per annum on the

---

[61] Insert in the case of a transferee of Class A-2A Notes under Rule 144A.

[62] Insert in the case of a transferee of Class A-2A Notes under Regulation S.

[63] Insert in the case of a transferee of Class A-2B Notes under Rule 144A.

[64] Insert in the case of a transferee of Class A-2B Notes under Regulation S.

[65] Insert in the case of a transferee of Class A-2A Notes under Rule 144A.

[66] Insert in the case of a transferee of Class A-2A Notes under Regulation S.

[67] Insert in the case of a transferee of Class A-2B Notes under Rule 144A.

[68] Insert in the case of a transferee of Class A-2B Notes under Regulation S.

Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class A-2[A][B] Note (or one or more predecessor Class A-2[A][B] Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) immediately prior to such Payment Date.

Payments of principal of and interest on this Class A-2[A][B] Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Interest will cease to accrue on each Class A-2[A][B] Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class A-2[A][B] Note is called for redemption and principal payments hereon are not paid upon surrender of this Class A-2[A][B] Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class A-2[A][B] Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class A-2[A][B] Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class A-2[A][B] Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class A-2[A][B] Senior Secured Floating Rate Notes due 2026 (the "Class A-2[A][B] Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class A-2[A][B] Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class A-2[A][B] Notes, or one or more predecessor Class A-2[A][B] Notes, registered as such at the close of business on the relevant Record Date.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c))

in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class A-2[A][B] Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

The Class A-2[A][B] Notes will be issued in minimum denominations of U.S.$250,000 and integral multiples of U.S.$10,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Class A-2[A][B] Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
     Name:
     Title:

A12-9

**CERTIFICATE OF AUTHENTICATION**

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.


U.S. BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
      Authorized Signatory

A12-10

ASSIGNMENT FORM

For value received _____

does hereby sell, assign, and transfer to

_____

_____
Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Security and does hereby irrevocably constitute and appoint _____
Attorney to transfer the Security on the books of the Trustee with full power of substitution in the premises.

Date: _____          Your Signature _____

(Sign exactly as your name appears in the security)

A12-11

Exhibit B

**EXHIBIT A13**

**FORM OF CERTIFICATED CLASS A-X NOTE**

CERTIFICATED NOTE
representing
CLASS A-X SENIOR SECURED FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.\$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

18779284.6.BUSINESS

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER

OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

A13-4

ACIS CLO 2014-3 LTD.
ACIS CLO 2014-3 LLC

CERTIFICATED NOTE
representing
CLASS A-X SENIOR SECURED FLOATING RATE NOTES DUE 2026

U.S.$[●]

A-X/[R][S]-[●]

[Date]

CUSIP No.: [00100FAJ4][69][G00734AE6][70]

ISIN No.: [US00100FAJ49][71] [USG00734AE66][72]

ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") for value received, hereby promise to pay to [_____], or registered assigns, upon presentation and surrender of this Class A-X Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[_____]) on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture. The obligations of the Co-Issuers under this Class A-X Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [1.35]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class A-X Note (or one or more predecessor Class A-X Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) immediately prior to such Payment Date.

---

[69]Insert in the case of a transferee under Rule 144A.

[70]Insert in the case of a transferee under Regulation S.

[71]Insert in the case of a transferee under Rule 144A.

[72]Insert in the case of a transferee under Regulation S.

A13-5

Payments of principal of and interest on this Class A-X Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Interest will cease to accrue on each Class A-X Note, or in the case of a partial repayment, on such repaid part, from the date of repayment.  If this Class A-X Note is called for redemption and principal payments hereon are not paid upon surrender of this Class A-X Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class A-X Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class A-X Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  The principal of each Class A-X Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class A-X Senior Secured Floating Rate Notes due 2026 (the "Class A-X Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture).  Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture.  In the case of any optional redemption of Class A-X Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class A-X Notes, or one or more predecessor Class A-X Notes, registered as such at the close of business on the relevant Record Date.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such

Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class A-X Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

The Class A-X Notes will be issued in minimum denominations of U.S.$250,000 and integral multiples of U.S.$10,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Class A-X Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
   Name:
   Title:

A13-8

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
    Name:
    Title:

A13-9

Exhibit B

**CERTIFICATE OF AUTHENTICATION**

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
        Authorized Signatory

A13-10

<div align="center">ASSIGNMENT FORM</div>

For value received _____

does hereby sell, assign, and transfer to

_____

_____
Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Security and does hereby irrevocably constitute and appoint _____
Attorney to transfer the Security on the books of the Trustee with full power of substitution in the premises.

Date: _____        Your Signature _____

(Sign exactly as your name appears in the security)

A13-11

Exhibit B

**EXHIBIT A14**

## FORM OF CERTIFICATED CLASS B NOTE

CERTIFICATED NOTE
representing
CLASS B SENIOR SECURED FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.\$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

18779284.6.BUSINESS

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER

OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.

ACIS CLO 2014-3 LTD.

ACIS CLO 2014-3 LLC

CERTIFICATED NOTE
representing
CLASS B SENIOR SECURED FLOATING RATE NOTES DUE 2026

U.S.$ [●]

B/[R][S]-[●]

[Date]

CUSIP No.: [00100FAL9][73] [G00734AF3][74]

ISIN No.: [US00100FAL94][75] [USG00734AF32][76]

   ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") for value received, hereby promise to pay to [_____], or registered assigns, upon presentation and surrender of this Class B Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[_____]) on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture. The obligations of the Co-Issuers under this Class B Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

   The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [2.23]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class B Note (or one or more predecessor Class B Notes) is registered at

---

[73]Insert in the case of a transferee under Rule 144A.

[74]Insert in the case of a transferee under Regulation S.

[75]Insert in the case of a transferee under Rule 144A.

[76]Insert in the case of a transferee under Regulation S.

A14-5

the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) immediately prior to such Payment Date.

Payments of principal of and interest on this Class B Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Interest will cease to accrue on each Class B Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class B Note is called for redemption and principal payments hereon are not paid upon surrender of this Class B Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class B Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class B Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class B Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class B Senior Secured Floating Rate Notes due 2026 (the "Class B Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class B Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class B Notes, or one or more predecessor Class B Notes, registered as such at the close of business on the relevant Record Date.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

A14-6

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class B Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

The Class B Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S. $1,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Class B Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.  The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
    Name:
    Title:

A14-8

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
    Name:
    Title:

A14-9

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
      Authorized Signatory

A14-10

Exhibit B

ASSIGNMENT FORM

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Security and does hereby irrevocably constitute and appoint _____
Attorney to transfer the Security on the books of the Trustee with full power of substitution in the premises.

Date: _____        Your Signature _____

(Sign exactly as your name appears in the security)

A14-11

**EXHIBIT A15**

### FORM OF CERTIFICATED CLASS C NOTE

CERTIFICATED NOTE
representing
CLASS C SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

18779284.6.BUSINESS

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER

A15-3

OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.

ACIS CLO 2014-3 LTD.
ACIS CLO 2014-3 LLC

CERTIFICATED NOTE
representing
CLASS C SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

U.S.$[●]

C/[R][S]-[●]

[Date]

CUSIP No.: [00100FAN5][77] [G00734AG1][78]

ISIN No.: [US00100FAN50][79] [USG00734AG15][80]

ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") for value received, hereby promise to pay to [_____], or registered assigns, upon presentation and surrender of this Class C Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[_____]) on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture. The obligations of the Co-Issuers under this Class C Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [2.50]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class C Note (or one or more predecessor Class C Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) immediately prior to such Payment Date.

---

[77]Insert in the case of a transferee under Rule 144A.

[78]Insert in the case of a transferee under Regulation S.

[79]Insert in the case of a transferee under Rule 144A.

[80]Insert in the case of a transferee under Regulation S.

A15-5

Payments of principal of and interest on this Class C Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Any payment of interest due on the Class C Notes to the extent that sufficient funds are not available to make such payment in accordance with the Priority of Payments on such Payment Date, but only if one or more one or more Priority Classes is Outstanding with respect to the Class C Notes, shall constitute "Secured Note Deferred Interest" and will not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) of the Indenture (and the failure to pay such interest shall not be an Event of Default) until the earliest of (i) the Payment Date on which funds are available to pay such Secured Note Deferred Interest in accordance with the Priority of Payments, (ii) the Redemption Date with respect to the Class C Notes and (iii) the Stated Maturity of the Class C Notes. Secured Note Deferred Interest on the Class C Notes shall be added to the principal balance of the Class C Notes and shall be payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to the Class C Notes and (ii) which is the Stated Maturity of the Class C Notes. Regardless of whether any Priority Class is Outstanding with respect to the Class C Notes, to the extent that funds are not available on any Payment Date (other than the Redemption Date with respect to, or Stated Maturity of, the Class C Notes) to pay previously accrued Secured Note Deferred Interest, such previously accrued Secured Note Deferred Interest will not be due and payable on such Payment Date and any failure to pay such previously accrued Secured Note Deferred Interest on such Payment Date will not be an Event of Default under the Indenture.

Interest will cease to accrue on each Class C Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class C Note is called for redemption and principal payments hereon are not paid upon surrender of this Class C Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class C Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class C Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class C Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class C Secured Deferrable Floating Rate Notes due 2026 (the "Class C Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

A15-6

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture.  In the case of any optional redemption of Class C Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class C Notes, or one or more predecessor Class C Notes, registered as such at the close of business on the relevant Record Date.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class C Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

The Class C Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S.$1,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Class C Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.  The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
     Name:
     Title:

A15-8

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
    Name:
    Title:

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A15-10

ASSIGNMENT FORM

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Security and does hereby irrevocably constitute and appoint _____
Attorney to transfer the Security on the books of the Trustee with full power of substitution in the
premises.

Date: _____       Your Signature _____

(Sign exactly as your name appears in the security)

A15-11

Exhibit B

<div align="right">**EXHIBIT A16**</div>

## FORM OF CERTIFICATED CLASS D NOTE

<div align="center">CERTIFICATED NOTE<br>representing<br>CLASS D SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026</div>

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

EACH PURCHASER, BENEFICIAL OWNER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY STATE, LOCAL, OTHER FEDERAL OR NON-U.S. LAW OR REGULATION THAT IS SUBSTANTIALLY SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE

<div align="center">A16-1</div>

18779284.6.BUSINESS

CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SUCH SIMILAR LAW. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF A SECURED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING TO SELL ITS INTEREST IN SUCH NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER

OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.

ACIS CLO 2014-3 LTD.
ACIS CLO 2014-3 LLC

CERTIFICATED NOTE
representing
CLASS D SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

U.S.$[ ● ]

D/[R][S]-[●]

[Date]

CUSIP No.: [00100FAQ8][81] [G00734AH9][82]

ISIN No.:  [US00100FAQ81][83] [USG00734AH97][84]

ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") for value received, hereby promise to pay to [_____], or registered assigns, upon presentation and surrender of this Class D Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[_____]) on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture.  The obligations of the Co-Issuers under this Class D Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.  None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The Co-Issuers promise to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [3.12]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for.  Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360.  The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class D Note (or one or more predecessor Class D Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) immediately prior to such Payment Date.

---

[81]Insert in the case of a transferee under Rule 144A.

[82]Insert in the case of a transferee under Regulation S.

[83]Insert in the case of a transferee under Rule 144A.

[84]Insert in the case of a transferee under Regulation S.

A16-5

Payments of principal of and interest on this Class D Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Any payment of interest due on the Class D Notes to the extent that sufficient funds are not available to make such payment in accordance with the Priority of Payments on such Payment Date, but only if one or more one or more Priority Classes is Outstanding with respect to the Class D Notes, shall constitute "Secured Note Deferred Interest" and will not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) of the Indenture (and the failure to pay such interest shall not be an Event of Default) until the earliest of (i) the Payment Date on which funds are available to pay such Secured Note Deferred Interest in accordance with the Priority of Payments, (ii) the Redemption Date with respect to the Class D Notes and (iii) the Stated Maturity of the Class D Notes. Secured Note Deferred Interest on the Class D Notes shall be added to the principal balance of the Class D Notes and shall be payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to the Class D Notes and (ii) which is the Stated Maturity of the Class D Notes. Regardless of whether any Priority Class is Outstanding with respect to the Class D Notes, to the extent that funds are not available on any Payment Date (other than the Redemption Date with respect to, or Stated Maturity of, the Class D Notes) to pay previously accrued Secured Note Deferred Interest, such previously accrued Secured Note Deferred Interest will not be due and payable on such Payment Date and any failure to pay such previously accrued Secured Note Deferred Interest on such Payment Date will not be an Event of Default under the Indenture.

Interest will cease to accrue on each Class D Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class D Note is called for redemption and principal payments hereon are not paid upon surrender of this Class D Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class D Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class D Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class D Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class D Secured Deferrable Floating Rate Notes due 2026 (the "Class D Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

A16-6

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class D Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class D Notes, or one or more predecessor Class D Notes, registered as such at the close of business on the relevant Record Date.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class D Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

The Class D Notes will be issued in minimum denominations of U.S. $250,000 and integral multiples of U.S.$1,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Class D Note, but the Co-Issuers, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
    Name:
    Title:

A16-8

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LLC

By:_____
    Name:
    Title:

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A16-10

ASSIGNMENT FORM

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Security and does hereby irrevocably constitute and appoint _____
Attorney to transfer the Security on the books of the Trustee with full power of substitution in the
premises.

Date: _____        Your Signature _____

(Sign exactly as your name appears in the security)

A16-11

Exhibit B

EXHIBIT A17

## FORM OF CERTIFICATED CLASS E NOTE

CERTIFICATED NOTE
representing
CLASS E SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

THIS SECURED NOTE IS AN ERISA RESTRICTED NOTE. EACH PURCHASER OR TRANSFEREE OF AN ERISA RESTRICTED NOTE WILL BE REQUIRED TO (I) REPRESENT AND WARRANT IN WRITING TO THE TRUSTEE (1) WHETHER OR NOT, FOR SO LONG AS IT HOLDS SUCH NOTE OR AN INTEREST THEREIN, IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, (2) WHETHER OR NOT, FOR SO LONG AS IT HOLDS SUCH NOTE OR AN INTEREST THEREIN, IT IS A CONTROLLING PERSON AND (3) THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME

A17-1

18779284.6.BUSINESS

SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") OR (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAW THAT IS SIMILAR PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SIMILAR LAW, AND (II) AGREE TO CERTAIN TRANSFER RESTRICTIONS REGARDING ITS INTEREST IN SUCH NOTE. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY. "CONTROLLING PERSON" MEANS A PERSON (OTHER THAN A BENEFIT PLAN INVESTOR) WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE ISSUER OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF ANY SUCH PERSON. AN "AFFILIATE" OF A PERSON INCLUDES ANY PERSON, DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES, CONTROLLING, CONTROLLED BY OR UNDER COMMON CONTROL WITH THE PERSON. "CONTROL" WITH RESPECT TO A PERSON OTHER THAN AN INDIVIDUAL MEANS THE POWER TO EXERCISE A CONTROLLING INFLUENCE OVER THE MANAGEMENT OR POLICIES OF SUCH PERSON.

NO TRANSFER OF AN ERISA RESTRICTED NOTE OR ANY INTEREST THEREIN WILL BE PERMITTED, AND THE TRUSTEE WILL NOT RECOGNIZE ANY SUCH TRANSFER, IF IT WOULD CAUSE 25% OR MORE OF THE TOTAL VALUE OF THE RELEVANT CLASS OF ERISA RESTRICTED NOTES TO BE HELD BY BENEFIT PLAN INVESTORS, DISREGARDING ERISA RESTRICTED NOTES (OR INTERESTS THEREIN) HELD BY CONTROLLING PERSONS.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN ERISA RESTRICTED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION, BENEFIT PLAN INVESTOR, CONTROLLING PERSON OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING OR WHOSE OWNERSHIP OTHERWISE CAUSES A VIOLATION OF THE 25% LIMITATION TO SELL ITS INTEREST IN THE ERISA RESTRICTED NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS

NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT

IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.

ACIS CLO 2014-3 LTD.

CERTIFICATED NOTE
representing
CLASS E SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

U.S. $[●]

E/[R][S]-[●]

[Date]

CUSIP No.: [00100GAA1][85] [G00733AA6][86]

ISIN No.: [US00100GAA13][87] [USG00733AA61][88]

ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to [_____], or registered assigns, upon presentation and surrender of this Class E Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[_____]) on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture. The obligations of the Issuer under this Class E Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The Issuer promises to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [4.75]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class E Note (or one or more predecessor Class E Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) immediately prior to such Payment Date.

---

[85]Insert in the case of a transferee under Rule 144A.

[86]Insert in the case of a transferee under Regulation S.

[87]Insert in the case of a transferee under Rule 144A.

[88]Insert in the case of a transferee under Regulation S.

Payments of principal of and interest on this Class E Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Any payment of interest due on the Class E Notes to the extent that sufficient funds are not available to make such payment in accordance with the Priority of Payments on such Payment Date, but only if one or more one or more Priority Classes is Outstanding with respect to the Class E Notes, shall constitute "Secured Note Deferred Interest" and will not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) of the Indenture (and the failure to pay such interest shall not be an Event of Default) until the earliest of (i) the Payment Date on which funds are available to pay such Secured Note Deferred Interest in accordance with the Priority of Payments, (ii) the Redemption Date with respect to the Class E Notes and (iii) the Stated Maturity of the Class E Notes. Secured Note Deferred Interest on the Class E Notes shall be added to the principal balance of the Class E Notes and shall be payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to the Class E Notes and (ii) which is the Stated Maturity of the Class E Notes. Regardless of whether any Priority Class is Outstanding with respect to the Class E Notes, to the extent that funds are not available on any Payment Date (other than the Redemption Date with respect to, or Stated Maturity of, the Class E Notes) to pay previously accrued Secured Note Deferred Interest, such previously accrued Secured Note Deferred Interest will not be due and payable on such Payment Date and any failure to pay such previously accrued Secured Note Deferred Interest on such Payment Date will not be an Event of Default under the Indenture.

Interest will cease to accrue on each Class E Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class E Note is called for redemption and principal payments hereon are not paid upon surrender of this Class E Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class E Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class E Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class E Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class E Secured Deferrable Floating Rate Notes due 2026 (the "Class E Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Issuer, ACIS CLO 2014-3 LLC and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class E Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class E Notes, or one or more predecessor Class E Notes, registered as such at the close of business on the relevant Record Date.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class E Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

The Class E Notes will be issued in minimum denominations of U.S.$250,000 and integral multiples of U.S.$1,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Class E Note, but the Issuer, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
        Name:
        Title:

**CERTIFICATE OF AUTHENTICATION**

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Authorized Signatory

A17-9

ASSIGNMENT FORM

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Security and does hereby irrevocably constitute and appoint _____
Attorney to transfer the Security on the books of the Trustee with full power of substitution in the
premises.

Date: _____        Your Signature _____

(Sign exactly as your name appears in the security)

A17-10

Exhibit B

**EXHIBIT A18**

## FORM OF CERTIFICATED CLASS F NOTE

CERTIFICATED NOTE
representing
CLASS F SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO A "QUALIFIED PURCHASER" (AS DEFINED FOR PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT) THAT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM SECURITIES ACT REGISTRATION PROVIDED BY SUCH RULE THAT IS NOT A BROKER-DEALER WHICH OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF THE DEALER AND IS NOT A PLAN REFERRED TO IN PARAGRAPH (A)(1)(i)(D) OR (A)(1)(i)(E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (A)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF THE PLAN OR (B) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, AND IN EACH CASE IN COMPLIANCE WITH THE CERTIFICATION AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE JURISDICTION.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN INTEREST IN A NOTE THAT IS A U.S. PERSON AND IS NOT BOTH (A) A QUALIFIED PURCHASER OR A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY (OTHER THAN A TRUST) EACH SHAREHOLDER, PARTNER, MEMBER OR OTHER EQUITY OWNER OF WHICH IS A QUALIFIED PURCHASER AND (B) A QUALIFIED INSTITUTIONAL BUYER TO SELL ITS INTEREST IN THE NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

THIS SECURED NOTE IS AN ERISA RESTRICTED NOTE. EACH PURCHASER OR TRANSFEREE OF AN ERISA RESTRICTED NOTE WILL BE REQUIRED TO (I) REPRESENT AND WARRANT IN WRITING TO THE TRUSTEE (1) WHETHER OR NOT, FOR SO LONG AS IT HOLDS SUCH NOTE OR AN INTEREST THEREIN, IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, (2) WHETHER OR NOT, FOR SO LONG AS IT HOLDS SUCH NOTE OR AN INTEREST THEREIN, IT IS A CONTROLLING PERSON AND (3) THAT (A) IF IT IS, OR IS ACTING ON BEHALF OF, A BENEFIT PLAN INVESTOR, ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME

A18-1

SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") OR (B) IF IT IS A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAW THAT IS SIMILAR PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (ANY SUCH LAW OR REGULATION, A "SIMILAR LAW"), ITS ACQUISITION, HOLDING AND DISPOSITION OF SUCH NOTE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF ANY SIMILAR LAW, AND (II) AGREE TO CERTAIN TRANSFER RESTRICTIONS REGARDING ITS INTEREST IN SUCH NOTE. "BENEFIT PLAN INVESTOR" MEANS A BENEFIT PLAN INVESTOR, AS DEFINED IN SECTION 3(42) OF ERISA AND INCLUDES (A) AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF TITLE I OF ERISA) THAT IS SUBJECT TO PART 4, SUBTITLE B OF TITLE I OF ERISA, (B) A PLAN AS DEFINED IN SECTION 4975(e)(1) OF THE CODE THAT IS SUBJECT TO SECTION 4975 OF THE CODE OR (C) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN THE ENTITY. "CONTROLLING PERSON" MEANS A PERSON (OTHER THAN A BENEFIT PLAN INVESTOR) WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE ISSUER OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF ANY SUCH PERSON. AN "AFFILIATE" OF A PERSON INCLUDES ANY PERSON, DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES, CONTROLLING, CONTROLLED BY OR UNDER COMMON CONTROL WITH THE PERSON. "CONTROL" WITH RESPECT TO A PERSON OTHER THAN AN INDIVIDUAL MEANS THE POWER TO EXERCISE A CONTROLLING INFLUENCE OVER THE MANAGEMENT OR POLICIES OF SUCH PERSON.

NO TRANSFER OF AN ERISA RESTRICTED NOTE OR ANY INTEREST THEREIN WILL BE PERMITTED, AND THE TRUSTEE WILL NOT RECOGNIZE ANY SUCH TRANSFER, IF IT WOULD CAUSE 25% OR MORE OF THE TOTAL VALUE OF THE RELEVANT CLASS OF ERISA RESTRICTED NOTES TO BE HELD BY BENEFIT PLAN INVESTORS, DISREGARDING ERISA RESTRICTED NOTES (OR INTERESTS THEREIN) HELD BY CONTROLLING PERSONS.

THE ISSUER HAS THE RIGHT, UNDER THE INDENTURE, TO COMPEL ANY BENEFICIAL OWNER OF AN ERISA RESTRICTED NOTE WHO HAS MADE OR HAS BEEN DEEMED TO MAKE A PROHIBITED TRANSACTION, BENEFIT PLAN INVESTOR, CONTROLLING PERSON OR SIMILAR LAW REPRESENTATION THAT IS SUBSEQUENTLY SHOWN TO BE FALSE OR MISLEADING OR WHOSE OWNERSHIP OTHERWISE CAUSES A VIOLATION OF THE 25% LIMITATION TO SELL ITS INTEREST IN THE ERISA RESTRICTED NOTE, OR MAY SELL SUCH INTEREST ON BEHALF OF SUCH OWNER.

TRANSFERS OF THIS NOTE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO HEREIN.

PRINCIPAL OF THIS NOTE IS PAYABLE AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF. ANY PERSON ACQUIRING THIS

A18-2

NOTE MAY ASCERTAIN ITS CURRENT PRINCIPAL AMOUNT BY INQUIRY OF THE TRUSTEE.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO TREAT THE NOTES AS INDEBTEDNESS FOR U.S. FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX PURPOSES, PROVIDED THAT THIS SHALL NOT PREVENT SUCH HOLDER FROM MAKING A "PROTECTIVE QUALIFIED ELECTING FUND" ELECTION WITH RESPECT TO ANY CLASS E NOTE OR CLASS F NOTE.

THE FAILURE TO PROVIDE THE ISSUER AND THE TRUSTEE (AND ANY OF THEIR AGENTS) WITH THE PROPERLY COMPLETED AND SIGNED TAX CERTIFICATIONS (GENERALLY, IN THE CASE OF U.S. FEDERAL INCOME TAX, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR THE APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN WITHHOLDING FROM PAYMENTS IN RESPECT OF SUCH NOTE, INCLUDING U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING.

EACH HOLDER OF A NOTE (AND ANY INTEREST THEREIN) WILL (I) PROVIDE THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS WITH ANY CORRECT, COMPLETE AND ACCURATE INFORMATION THAT MAY BE REQUIRED FOR THE ISSUER TO COMPLY WITH FATCA AND WILL TAKE ANY OTHER ACTIONS THAT THE ISSUER, THE TRUSTEE OR THEIR RESPECTIVE AGENTS DEEM NECESSARY TO COMPLY WITH FATCA AND (II) UPDATE ANY SUCH INFORMATION PROVIDED IN CLAUSE (I) PROMPTLY UPON LEARNING THAT ANY SUCH INFORMATION PREVIOUSLY PROVIDED HAS BECOME OBSOLETE OR INCORRECT OR IS OTHERWISE REQUIRED. IN THE EVENT THE HOLDER FAILS TO PROVIDE SUCH INFORMATION, TAKE SUCH ACTIONS OR UPDATE SUCH INFORMATION, (A) THE ISSUER IS AUTHORIZED TO WITHHOLD AMOUNTS OTHERWISE DISTRIBUTABLE TO THE HOLDER AS COMPENSATION FOR ANY COST, LOSS OR LIABILITY SUFFERED AS A RESULT OF SUCH FAILURE AND (B) THE ISSUER WILL HAVE THE RIGHT TO COMPEL THE HOLDER TO SELLS ITS NOTES OR, IF SUCH HOLDER DOES NOT SELL ITS NOTES WITHIN 10 BUSINESS DAYS AFTER NOTICE FROM THE ISSUER, TO SELL SUCH NOTES IN THE SAME MANNER AS IF SUCH HOLDER WERE A NON-PERMITTED HOLDER, AND TO REMIT THE NET PROCEEDS OF SUCH SALE (TAKING INTO ACCOUNT ANY TAXES INCURRED BY THE ISSUER IN CONNECTION WITH SUCH SALE) TO THE HOLDER AS PAYMENT IN FULL FOR SUCH NOTES. EACH SUCH HOLDER AGREES, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO AGREE, THAT THE ISSUER MAY PROVIDE SUCH INFORMATION AND ANY OTHER INFORMATION REGARDING ITS INVESTMENT IN THE NOTES TO THE U.S. INTERNAL REVENUE SERVICE OR OTHER RELEVANT GOVERNMENTAL AUTHORITY.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) THAT IS NOT A "UNITED STATES PERSON" (AS DEFINED IN SECTION 7701(A)(30) OF THE CODE) WILL MAKE, OR BY ACQUIRING THIS NOTE OR AN INTEREST IN THIS NOTE WILL BE DEEMED TO MAKE, A REPRESENTATION TO THE EFFECT THAT (I) EITHER (A) IT

IS NOT A BANK (OR AN ENTITY AFFILIATED WITH A BANK) EXTENDING CREDIT PURSUANT TO A LOAN AGREEMENT ENTERED INTO IN THE ORDINARY COURSE OF ITS TRADE OR BUSINESS (WITHIN THE MEANING OF SECTION 881(C)(3)(A) OF THE CODE), (B) IT IS A PERSON THAT IS ELIGIBLE FOR BENEFITS UNDER AN INCOME TAX TREATY WITH THE UNITED STATES THAT ELIMINATES U.S. FEDERAL INCOME TAXATION OF U.S. SOURCE INTEREST NOT ATTRIBUTABLE TO A PERMANENT ESTABLISHMENT IN THE UNITED STATES, OR (C) IT HAS PROVIDED AN INTERNAL REVENUE SERVICE FORM W-8ECI REPRESENTING THAT ALL PAYMENTS RECEIVED OR TO BE RECEIVED BY IT ON THE NOTES ARE EFFECTIVELY CONNECTED WITH THE CONDUCT OF A TRADE OR BUSINESS IN THE UNITED STATES, AND (II) IT IS NOT PURCHASING THIS NOTE OR AN INTEREST IN THIS NOTE IN ORDER TO REDUCE ITS U.S. FEDERAL INCOME TAX LIABILITY PURSUANT TO A TAX AVOIDANCE PLAN.

EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN) WILL INDEMNIFY THE ISSUER, THE TRUSTEE AND THEIR RESPECTIVE AGENTS AND EACH OF THE HOLDERS OF THE NOTE FROM ANY AND ALL DAMAGES, COST AND EXPENSES (INCLUDING ANY AMOUNT OF TAXES, FEES, INTEREST, ADDITIONS TO TAX, OR PENALTIES) RESULTING FROM THE FAILURE BY SUCH HOLDER TO COMPLY WITH SECTIONS 1471 THROUGH 1474 OF THE CODE (OR ANY AGREEMENT THEREUNDER OR IN RESPECT THEREOF) OR ITS OBLIGATIONS UNDER THIS NOTE. THE INDEMNIFICATION WILL CONTINUE WITH RESPECT TO ANY PERIOD DURING WHICH THE HOLDER HELD A NOTE (AND ANY INTEREST THEREIN), NOTWITHSTANDING THE HOLDER CEASING TO BE A HOLDER OF THE NOTE.

THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD TO MATURITY OF THIS NOTE MAY BE OBTAINED BY WRITING TO JEFFERIES LLC, 520 MADISON AVENUE, NEW YORK, NEW YORK 10022, ATTN: GLOBAL CDO TRADING.

ACIS CLO 2014-3 LTD.

CERTIFICATED NOTE
representing
CLASS F SECURED DEFERRABLE FLOATING RATE NOTES DUE 2026

U.S. $[●]

E/[R][S]-[●]

[Date]

CUSIP No.: [00100GAC7][89] [G00733AB4][90]

ISIN No.: [US00100GAC78][91] [USG00733AB45][92]

ACIS CLO 2014-3 LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to [_____], or registered assigns, upon presentation and surrender of this Class F Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[_____]) on the Payment Date in February, 2026 (the "Stated Maturity") except as provided below and in the Indenture. The obligations of the Issuer under this Class F Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. None of the Noteholders may, prior to the date which is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer, institute against, or join any other Person in instituting against, the Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or state bankruptcy or similar laws of any jurisdiction.

The Issuer promises to pay interest, if any, on the 1st day of February, May, August and November of each year, commencing August 2014 (or, if such day is not a Business Day, the next succeeding Business Day), at the rate equal to the Base Rate plus [5.60]% per annum on the Aggregate Outstanding Amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Class F Note (or one or more predecessor Class F Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) immediately prior to such Payment Date.

---

[89]Insert in the case of a transferee under Rule 144A.

[90]Insert in the case of a transferee under Regulation S.

[91]Insert in the case of a transferee under Rule 144A.

[92]Insert in the case of a transferee under Regulation S.

A18-5

Payments of principal of and interest on this Class F Note are subordinated to the payment on each Payment Date of certain other amounts in accordance with the Priority of Payments and Section 13.1 of the Indenture.

Any payment of interest due on the Class F Notes to the extent that sufficient funds are not available to make such payment in accordance with the Priority of Payments on such Payment Date, but only if one or more one or more Priority Classes is Outstanding with respect to the Class F Notes, shall constitute "Secured Note Deferred Interest" and will not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) of the Indenture (and the failure to pay such interest shall not be an Event of Default) until the earliest of (i) the Payment Date on which funds are available to pay such Secured Note Deferred Interest in accordance with the Priority of Payments, (ii) the Redemption Date with respect to the Class F Notes and (iii) the Stated Maturity of the Class F Notes. Secured Note Deferred Interest on the Class F Notes shall be added to the principal balance of the Class F Notes and shall be payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to the Class F Notes and (ii) which is the Stated Maturity of the Class F Notes. Regardless of whether any Priority Class is Outstanding with respect to the Class F Notes, to the extent that funds are not available on any Payment Date (other than the Redemption Date with respect to, or Stated Maturity of, the Class F Notes) to pay previously accrued Secured Note Deferred Interest, such previously accrued Secured Note Deferred Interest will not be due and payable on such Payment Date and any failure to pay such previously accrued Secured Note Deferred Interest on such Payment Date will not be an Event of Default under the Indenture.

Interest will cease to accrue on each Class F Note, or in the case of a partial repayment, on such repaid part, from the date of repayment. If this Class F Note is called for redemption and principal payments hereon are not paid upon surrender of this Class F Note, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Interest Rate for each successive Interest Accrual Period this Class F Note remains Outstanding; provided that the reason for such non-payment is not the fault of such Noteholder. The principal of this Class F Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class F Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Unless the certificate of authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class F Secured Deferrable Floating Rate Notes due 2026 (the "Class F Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an indenture dated as of February [25], 2014 (the "Indenture") between the Issuer, ACIS CLO 2014-3 LLC and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

This Note is subject to optional redemption, in whole but not in part, as specified in the Indenture. In the case of any optional redemption of Class F Notes, interest with a Payment Date on or prior to the Redemption Date will be payable to the Holders of such Class F Notes, or one or more predecessor Class F Notes, registered as such at the close of business on the relevant Record Date.

If (a) a redemption occurs because any Coverage Test is not satisfied as set forth in Section 9.1 of the Indenture, (b) a redemption occurs because a Majority of the Subordinated Notes provides written direction to this effect as set forth in Section 9.2 of the Indenture, (c) a Special Redemption occurs as set forth in Section 9.6 of the Indenture or (d) a Tax Redemption occurs because a Majority of an Affected Class or a Majority of the Subordinated Notes so direct the Trustee following the occurrence of certain Tax Events as set forth in Section 9.3 of the Indenture, then in each case this Note may be redeemed, in whole or (in respect of any redemption described in the foregoing clauses (a) or (c)) in part, in the manner, under the conditions and with the effect provided in the Indenture. In connection with any redemption pursuant to clause (d), Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Redemption Price that would otherwise be payable to such Holders of Secured Notes.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee shall treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class F Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

The Class F Notes will be issued in minimum denominations of U.S.$250,000 and integral multiples of U.S.$1,000 in excess thereof.

Title to Notes shall pass by registration in the Register kept by the Registrar.

No service charge shall be made for registration of transfer or exchange of this Class E Note, but the Issuer, the Registrar or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.  The Registrar or the Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THE INDENTURE AND THE NOTES AND ANY MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THE INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE), SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed as of the date first set forth above.

ACIS CLO 2014-3 LTD.

By:_____
    Name:
    Title:

**CERTIFICATE OF AUTHENTICATION**

This is one of the Notes referred to in the within-mentioned Indenture.

Dated as of February __, 2014.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
     Authorized Signatory

A18-9

ASSIGNMENT FORM

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Security and does hereby irrevocably constitute and appoint _____
Attorney to transfer the Security on the books of the Trustee with full power of substitution in the premises.

Date: _____     Your Signature _____

(Sign exactly as your name appears in the security)

A18-10

Exhibit B

**EXHIBIT B**

**FORMS OF TRANSFER AND EXCHANGE CERTIFICATES**

18779285.6.BUSINESS

EXHIBIT B1

**FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER OF RULE 144A GLOBAL NOTE OR CERTIFICATED NOTE TO REGULATION S GLOBAL NOTE**

[U.S. Bank National Association, as Trustee
60 Livingston Avenue
St. Paul, Minnesota 55103]
Attention: Bondholder Services – ACIS CLO 2014-3 Ltd.

Re:    ACIS CLO 2014-3 Ltd. (the "Issuer"), ACIS CLO 2014-3 LLC (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") [Class] [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Notes due 20[26] (the "Notes")

Reference is hereby made to the Indenture dated as of February [25], 2014 (the "Indenture") between the Co-Issuers and U.S. Bank National Association, as Trustee.  Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S. $_____ aggregate principal amount of Notes which are held in the form of a Rule 144A Global [Class] [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Note for the benefit of [        ] (the "Transferor") to effect the transfer of the Notes in exchange for an equivalent beneficial interest in a Regulation S Global [Class] [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Note.

In connection with such transfer, and in respect of such Notes, the Transferor does hereby certify that such Notes are being transferred to [_____] (the "Transferee") in accordance with Regulation S under the United States Securities Act of 1933, as amended (the "Securities Act") and the transfer restrictions set forth in the Indenture and the Offering Circular defined in the Indenture relating to such Notes and that:

a.    the offer of the Notes was not made to a person in the United States;

b.    at the time the buy order was originated, the Transferee was outside the United States or the Transferor and any person acting on its behalf reasonably believed that the Transferee was outside the United States;

c.    no directed selling efforts have been made in contravention of the requirements of Rule 903 or 904 of Regulation S, as applicable;

d.    the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act;

e.    the Transferee is not a U.S. Person (as defined in Regulation S under the Securities Act);

f.    the transaction is an offshore transaction pursuant to and in accordance with Regulation S.

18779285.6.BUSINESS

The Transferor understands that the [Co-Issuers][1][Issuer][2], the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

(Name of Transferor)

By: _____

        Name:
        Title:

Dated: _____, _____

cc:     ACIS CLO 2014-3 Ltd.
        c/o MaplesFS Limited
        P.O. Box 1093, Boundary Hall, Cricket Square
        Grand Cayman, KY1-1102 Cayman Islands
        Facsimile Number: (345) 945-7100
        Attention:  The Directors

        ACIS CLO 2014-3 LLC
        c/o Puglisi & Associates
        850 Library Avenue, Suite 204
        Newark, Delaware 19711

---

[1] Applicable to the Class A, B, C and D Notes

[2] Applicable to the Class E, F and Subordinated Notes.

B-1-2

18779285.6.BUSINESS

**EXHIBIT B2**

## FORM OF PURCHASER REPRESENTATION LETTER FOR CERTIFICATED SECURED NOTES

[DATE]

U.S. Bank National Association, as Trustee
60 Livingston Avenue
St. Paul, Minnesota 55103
Attention: Bondholder Services – ACIS CLO 2014-3 Ltd.

Re:     ACIS CLO 2014-3 Ltd. (the "Issuer") [, ACIS CLO 2014-3 LLC (the "Co-Issuer" and together with the Issuer, the "Co-Issuers")][3] Class [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] Notes due 20[26] (the "Notes")

Reference is hereby made to the Indenture, dated as of February [25], 2014, between the Issuer, ACIS CLO 2014-3 LLC (the "Co-Issuer" and together with the Issuer, the "Co-Issuers")] and U.S. Bank National Association, as Trustee (the "Indenture"). Capitalized terms not defined in this Certificate shall have the meanings ascribed to them in the final offering circular of the Issuer or the Indenture.

This letter relates to U.S.$_____aggregate outstanding principal amount of Class [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] Notes (the "Notes"), in the form of one or more Certificated Notes to effect the transfer of the Notes to _____ (the "Transferee").

In connection with such request, and in respect of such Notes, the Transferee does hereby certify that the Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "Securities Act") and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

In addition, the Transferee hereby represents, warrants and covenants for the benefit of the [Co-Issuers and their counsel][4] [Issuer and its counsel][5] that we are:

(a)          **(PLEASE CHECK ONLY ONE)**

_____          a "qualified institutional buyer" as defined in Rule 144A under the Securities Act, who is also a Qualified Purchaser or an entity owned exclusively by Qualified Purchasers and is acquiring the Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder; or

_____          a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and are acquiring the Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from Securities Act registration provided by Regulation S; and

---

[3]Insert for all Notes other than Class E and F Notes.

[4]Insert for all Notes other than Class E and F Notes.

[5]Insert for Class E and F Notes.

18779285.6.BUSINESS

(b)        acquiring the Notes for our own account (and not for the account of any other Person) in a minimum denomination of U.S.$250,000 and in integral multiples of U.S.[$1,000][6][$10,000][7] in excess thereof.

The Transferee further represents, warrants and covenants for the benefit of the Issuer as follows:

1.      It understands that the Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legends on such Notes, including the requirement for written certifications. In particular, it understands that the Notes may be transferred only to a person that is either (a) a "qualified purchaser" (as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act")) or an entity beneficially owned by one or more "qualified purchasers" that in each case is a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases such Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder or (b) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and is acquiring the Notes in an offshore transaction (as defined in Regulation S thereunder) in reliance on the exemption from registration provided by Regulation S thereunder. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes. It understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act. It understands and acknowledges that the Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in the Notes that fails to comply with the foregoing requirements to sell its interest in such Notes, or may sell such interest on behalf of such owner.

2.      In connection with its purchase of the Notes: (i) none of the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates is acting as a fiduciary or financial or investment adviser for it; (ii) it is not relying (for purposes of making any investment decision or otherwise) upon any written or oral advice, counsel or representations of the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates other than any statements in the final offering circular for such Notes; (iii) it has read and understands the final offering circular for such Notes (including, without limitation, the descriptions therein of the structure of the transaction in which the Notes are being issued and the risks to purchasers of the Notes); (iv) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates; (v) it will hold and transfer at least the minimum denomination of such Notes; (vi) it was not formed for the purpose of investing in the Notes; and (vii) it is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

3.      (i) It is a "qualified institutional buyer" as defined in Rule 144A under the Securities Act and also (x) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act or (y) a corporation, partnership, limited liability company or other entity (other than a trust), each shareholder,

---

[6] Insert for all Notes other than Class A Notes.

[7] Insert for all Class A Notes.

18779285.6.BUSINESS

partner, member or other equity owner of which is either a "qualified purchaser"; (ii) it is acquiring the Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (iii) it is not a (A) partnership, (B) common trust fund, or (C) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made; (iv) it agrees that it shall not hold any Notes for the benefit of any other person, that it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and that it shall not sell participation interests in the Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Notes; (v) it is acquiring its interest in the Notes for its own account; and (vi) it will hold and transfer at least the minimum denomination of the Notes and provide notice of the relevant transfer restrictions to subsequent transferees.

4.      [It represents, warrants and agrees that (a) if it is, or is acting on behalf of, a Benefit Plan Investor, as defined in Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), its acquisition, holding and disposition of such Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), and (b) if it is a governmental, church, non-U.S. or other plan which is subject to any  state, local, other federal or non-U.S. law or regulation that is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code (any such law or regulation an "Similar Law"), its acquisition, holding and disposition of such Notes will not constitute or result in a non-exempt violation of any such Similar Law.][8]  [It represents, warrants and agrees that it shall certify in writing (1) whether or not, for so long as it holds such note or an interest therein, it is, or is acting on behalf of, a benefit plan investor, as defined in section 3(42) of ERISA, (2) whether or not, for so long as it holds such note or an interest therein, it is a controlling person and (3) that (a) if it is, or is acting on behalf of, a benefit plan investor, its acquisition, holding and disposition of such Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), and (b) if it is a governmental, church, non-U.S. or other plan which is subject to any  state, local, other federal or non-U.S. law or regulation that is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code (any such law or regulation an "Similar Law"), its acquisition, holding and disposition of such Notes will not constitute or result in a non-exempt violation of any such Similar Law.  "Controlling Person" means a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the issuer or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of any such person. An "affiliate" of a person includes any person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the person. "Control" with respect to a person other than an individual means the power to exercise a controlling influence over the management or policies of such person. It agrees and acknowledges that no transfer of a Class E Note or Class F Note or any interest therein will be permitted, and neither the issuer nor the trustee will recognize any such transfer, if it would cause 25% or more of the total value of the Class E Notes or the Class F Notes to be held by Benefit Plan Investors disregarding the interests held by Controlling Persons.][9]

5.      It will be deemed to have represented and agreed to treat the Secured Notes as indebtedness for U.S. federal, state and local income and franchise tax purposes, provided that this shall not prevent it from making a "protective qualified electing fund" election with respect to any Class E Note or Class F Note.

---

[8]Insert for Class A Notes, Class B Notes, Class C Notes and Class D Notes.

[9]Insert for Class E Notes and F Notes.

B-2-3

18779285.6.BUSINESS

6.     It acknowledges that the failure to provide the Issuer and the Trustee (and any of their agents) with the properly completed and signed tax certifications (generally, in the case of U.S. federal income tax, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a person that is a "United States Person" within the meaning of section 7701(a)(30) of the Code or the appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a "United States Person" within the meaning of section 7701(a)(30) of the Code) may result in withholding from payments in respect of such Secured Note, including U.S. federal withholding or back-up withholding.

7.     It will (i) provide the Issuer, the Trustee and their respective agents with any correct, complete and accurate information that may be required for the Issuer to comply with FATCA and will take any other actions that the Issuer, the Trustee or their respective agents deem necessary to comply with FATCA and (ii) update any such information provided in clause (i) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. In the event it fails to provide such information, take such actions or update such information, (a) the Issuer is authorized to withhold amounts otherwise distributable to it as compensation for any cost, loss or liability suffered as a result of such failure and (b) the Issuer will have the right to compel it to sells its Secured Notes or, if it does not sell its Secured Notes within 10 business days after notice from the Issuer, to sell such Secured Notes in the same manner as if it were a Non-Permitted Holder, and to remit the net proceeds of such sale (taking into account any taxes incurred by the Issuer in connection with such sale) to it as payment in full for such Secured Notes. It agrees, or by acquiring this Secured Note or an interest in this Secured Note will be deemed to agree, that the Issuer may provide such information and any other information regarding its investment in the Secured Notes to the U.S. Internal Revenue Service or other relevant governmental authority.

8.     It, if not a "United States Person" (as defined in Section 7701(a)(30) of the Code), (i) either (A) is not a bank (or an entity affiliated with a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of section 881(c)(3)(A) of the Code), (B) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, or (C) it has provided an Internal Revenue Service Form W-8ECI representing that all payments received or to be received by it on the Secured Notes are effectively connected with the conduct of a trade or business in the United States, and (ii) is not purchasing the Secured Note or an interest in the Secured Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

9.     It will indemnify the Issuer, the Trustee and their respective agents and each of the holders of the Notes from any and all damages, cost and expenses (including any amount of taxes, fees, interest, additions to tax, or penalties) resulting from its failure to comply with FATCA or its obligations under the Secured Note. The indemnification will continue with respect to any period during which it held a Secured Note (and any interest therein), notwithstanding the holder ceasing to be a holder of the Secured Note.

10.    It agrees not to seek to commence in respect of the Issuer or the Co-Issuer or cause the Issuer or the Co-Issuer to commence, a bankruptcy proceeding before a year and a day has elapsed since the payment in full to the holders of the Notes (and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer) issued pursuant to the Indenture or, if longer, the applicable preference period then in effect.

11.    To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on

18779285.6.BUSINESS

the Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and other similar laws or regulations, including, without limitation, requiring each transferee of a Note to make representations to the Issuer in connection with such compliance.

12.     It represents and warrants that _____ (check if applicable) upon acquisition by it of the Notes, the Notes will constitute Portfolio Manager Notes; or _____ (check if applicable) upon acquisition by it of the Notes, the Notes will not constitute Portfolio Manager Notes.

13.     It represents and warrants that it is not a member of the public in the Cayman Islands.

14.     It understands that the Issuer, the Trustee, Jefferies LLC and the Portfolio Manager will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

[The remainder of this page has been intentionally left blank.]

B-2-5

Name of Purchaser:

Dated:

_____

By:
Name:
Title:


Outstanding principal amount of Class [   ] Notes:  U.S.$

Taxpayer identification number:

| Address for notices: | Wire transfer information for payments: |
|---|---|
| | |
| | Bank: |
| | Address: |
| | Bank ABA#: |
| | Account #: |
| Telephone: | FAO: |
| Facsimile: | Attention: |
| Attention: | |

Denominations of certificates (if more than one):
Registered name:

cc:     ACIS CLO 2014-3 Ltd.
         c/o MaplesFS Limited
         P.O. Box 1093, Boundary Hall, Cricket Square
         Grand Cayman, KY1-1102 Cayman Islands
         Facsimile Number: (345) 945-7100
         Attention:  The Directors


         [ACIS CLO 2014-3 LLC
         c/o Puglisi & Associates
         850 Library Avenue, Suite 204
         Newark, Delaware 19711][10]

_____

[10] Insert for all Notes other than Class E and F Notes.

B-2-6

18779285.6.BUSINESS

EXHIBIT B3

**FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER OF REGULATION S GLOBAL NOTE TO RULE 144A GLOBAL NOTE**

U.S. Bank National Association, as Trustee
60 Livingston Avenue
St. Paul, Minnesota 55103
Attention: Bondholder Services – ACIS CLO 2014-3 Ltd.

Re: ACIS CLO 2014-3 Ltd. (the "Issuer"), ACIS CLO 2014-3 LLC (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") [Class] [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Notes due 20[26] (the "Notes")

Reference is hereby made to the Indenture dated as of February [25], 2014, between the Issuer, the Co-Issuer and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S. $_____ aggregate principal amount of Notes which are held in the form of a Regulation S Global Class [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Note for the benefit of [●] (the "Transferor") to effect the transfer of the Notes in exchange for an equivalent beneficial interest in a Rule 144A Global Class [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Note.

In connection with such transfer, and in respect of such Notes, the Transferor does hereby certify that such Notes are being transferred to _____ (the "Transferee") in accordance with (i) the transfer restrictions set forth in the Indenture and the Offering Circular relating to such Notes and (ii) Rule 144A under the United States Securities Act of 1933, as amended, and it reasonably believes that the Transferee is purchasing the Notes for its own account or an account with respect to which the Transferee exercises sole investment discretion, the Transferee and any such account is a Qualified Institutional Buyer, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

The Transferor understands that the Co-Issuers, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

(Name of Transferor)

By: _____
     Name:
     Title:

Dated: _____, _____

cc: ACIS CLO 2014-3 Ltd.
    c/o MaplesFS Limited

18779285.6.BUSINESS

P.O. Box 1093, Boundary Hall, Cricket Square
Grand Cayman, KY1-1102 Cayman Islands
Facsimile Number: (345) 945-7100
Attention:  The Directors

ACIS CLO 2014-3 LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware  19711

B-3-2

Exhibit B

**EXHIBIT B4**

**FORM OF PURCHASER REPRESENTATION LETTER FOR CERTIFICATED SUBORDINATED NOTES OR UNCERTIFICATED SUBORDINATED NOTES**

[DATE]

U.S. Bank National Association, as Trustee
60 Livingston Avenue
St. Paul, Minnesota 55103
Attention: Bondholder Services – ACIS CLO 2014-3 Ltd.

Re:     ACIS CLO 2014-3 LTD. (the "Issuer"); Subordinated Notes

Reference is hereby made to the Indenture, dated as of February [25], 2014, between the Issuer, ACIS CLO 2014-3 LLC, as Co-Issuer, and U.S. Bank National Association, as Trustee (the "Indenture"). Capitalized terms not defined in this Certificate shall have the meanings ascribed to them in the final offering circular of the Issuer or the Indenture.

This letter relates to U.S.$_____ aggregate outstanding principal amount of the Subordinated Notes (the "Subordinated Notes") referred to on the signature page hereof to be transferred to the undersigned (the "Transferee").

The Transferee hereby represents, warrants and covenants for the benefit of the Issuer and its counsel that we are:

(a)     **(PLEASE CHECK ONLY ONE)**

_____ a "qualified institutional buyer" as defined in Rule 144A under the United States Securities Act of 1933, as amended (the "Securities Act"), who is also a Qualified Purchaser or an entity owned exclusively by Qualified Purchasers and is acquiring the Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder;

_____ a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who is also a Knowledgeable Employee with respect to the Issuer or an entity owned exclusively by Knowledgeable Employees with respect to the Issuer and is acquiring the Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder;

_____ an "accredited investor" as defined in Rule 501(a) under the Securities Act who is also a Qualified Purchaser or an entity owned exclusively by Qualified Purchasers;

_____ an "accredited investor" as defined in Rule 501(a) under the Securities Act who is also a Knowledgeable Employee with respect to the Issuer or an entity owned exclusively by Knowledgeable Employees with respect to the Issuer; or

_____ a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and are acquiring the Subordinated Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from Securities Act registration provided by Regulation S; and

18779285.6.BUSINESS

(b)     acquiring the Subordinated Notes for our own account (and not for the account of any other person) in a minimum denomination of U.S.$250,000 and in integral multiples of U.S.$1 in excess thereof.

The Transferee further represents, warrants and agrees as follows:

1.     It understands that the Subordinated Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Subordinated Notes, such Subordinated Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legends on such Subordinated Notes, including the requirement for written certifications.  In particular, it understands that the Subordinated Notes may be transferred only (I) to a person that is either (a) a "qualified purchaser" (as defined in the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>")), (b) a "Knowledgeable Employee", as defined in Rule 3c-5 promulgated under the Investment Company Act, of the Issuer or (c) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which either is a Qualified Purchaser or is a Knowledgeable Employee with respect to the Issuer and in the case of (a), (b) and (c) above that is either (i) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases such Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder or (ii) an "accredited investor" as defined in Rule 501(a) under the Securities Act or (II) to a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and is acquiring the Subordinated Notes in an offshore transaction (as defined in Regulation S thereunder) in reliance on the exemption from registration provided by Regulation S thereunder.  It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Subordinated Notes.  It understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.  It understands and acknowledges that the Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in the Subordinated Notes that fails to comply with the foregoing requirements to sell its interest in such Subordinated Notes, or may sell such interest on behalf of such owner.

2.     In connection with its purchase of the Subordinated Notes:  (i) none of the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates is acting as a fiduciary or financial or investment adviser for it; (ii) it is not relying (for purposes of making any investment decision or otherwise) upon any written or oral advice, counsel or representations of the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates other than any statements in the final offering circular for such Subordinated Notes; (iii) it has read and understands the final offering circular for such Subordinated Notes (including, without limitation, the descriptions therein of the structure of the transaction in which the Subordinated Notes are being issued and the risks to purchasers of the Subordinated Notes); (iv) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates; (v) it will hold and transfer at least the minimum denomination of such Subordinated Notes; (vi) it was not formed for the purpose of investing in the Subordinated Notes; (vii) it is a sophisticated investor and is purchasing the Subordinated Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks and (viii) neither

18779285.6.BUSINESS

Jefferies LLC nor any affiliate of Jefferies LLC served as an initial purchaser, underwriter or placement agent with respect to its purchase of any Subordinated Notes.

3.      (i) It is either (x) a Person that is (A) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act, (B) a "Knowledgeable Employee" with respect to the Issuer for purposes of Rule 3c-5 of the Investment Company Act or (C) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a Qualified Purchaser or is a Knowledgeable Employee with respect to the Issuer and in the case of (A), (B) and (C) above that is either (1) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases such Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder or (2) an "accredited investor" as defined in Rule 501(a) under the Securities Act or (y) not a "U.S. person" as defined in Regulation S under the Securities Act and is acquiring the Subordinated Notes in an offshore transaction (as defined in Regulation S thereunder) in reliance on the exemption from registration provided by Regulation S thereunder; (ii) it is acquiring the Subordinated Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (iii) it is not a (A) partnership, (B) common trust fund, or (C) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made; (iv) it agrees that it shall not hold any Subordinated Notes for the benefit of any other person, that it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and that it shall not sell participation interests in the Subordinated Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Subordinated Notes; (v) it is acquiring its interest in the Subordinated Notes for its own account; and (vi) it will hold and transfer at least the minimum denomination of the Subordinated Notes and provide notice of the relevant transfer restrictions to subsequent transferees.

4.      It represents, warrants and agrees that it shall certify in writing (1) whether or not, for so long as it holds such note or an interest therein, it is, or is acting on behalf of, a benefit plan investor, as defined in section 3(42) of ERISA, (2) whether or not, for so long as it holds such note or an interest therein, it is a controlling person and (3) that (a) if it is, or is acting on behalf of, a benefit plan investor, its acquisition, holding and disposition of such Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), and (b) if it is a governmental, church, non-U.S. or other plan which is subject to any state, local, other federal or non-U.S. law or regulation that is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code (any such law or regulation an "Similar Law"), its acquisition, holding and disposition of such Notes will not constitute or result in a non-exempt violation of any such Similar Law. "Controlling Person" means a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the issuer or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of any such person. An "affiliate" of a person includes any person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the person. "Control" with respect to a person other than an individual means the power to exercise a controlling influence over the management or policies of such person. It agrees and acknowledges that no transfer of a Subordinated Note or any interest therein will be permitted, and neither the issuer nor the trustee will recognize any such transfer, if it would cause 25% or more of the total value of the Subordinated Notes to be held by Benefit Plan Investors disregarding the interests held by Controlling Persons.

5.      It will be deemed to have represented and agreed to treat the Subordinated Notes as equity for U.S. federal, state and local income and franchise tax purposes.

<div align="center">B-4-3</div>

6.      It acknowledges that the failure to provide the Issuer and the Trustee (and any of their agents) with the properly completed and signed tax certifications (generally, in the case of U.S. federal income tax, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a person that is a "United States Person" within the meaning of section 7701(a)(30) of the Code or the appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a "United States Person" within the meaning of section 7701(a)(30) of the Code) may result in withholding from payments in respect of such Subordinated Note, including U.S. federal withholding or back-up withholding.

7.      It will (i) provide the Issuer, the Trustee and their respective agents with any correct, complete and accurate information that may be required for the Issuer to comply with FATCA and will take any other actions that the Issuer, the Trustee or their respective agents deem necessary to comply with FATCA and (ii) update any such information provided in clause (i) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. In the event it fails to provide such information, take such actions or update such information, (a) the Issuer is authorized to withhold amounts otherwise distributable to it as compensation for any cost, loss or liability suffered as a result of such failure and (b) the Issuer will have the right to compel it to sells its Subordinated Notes or, if it does not sell its Subordinated Notes within 10 business days after notice from the Issuer, to sell such Subordinated Notes in the same manner as if it were a Non-Permitted Holder, and to remit the net proceeds of such sale (taking into account any taxes incurred by the Issuer in connection with such sale) to it as payment in full for such Subordinated Notes. It agrees, or by acquiring this Subordinated Note or an interest in this Subordinated Note will be deemed to agree, that the Issuer may provide such information and any other information regarding its investment in the Subordinated Notes to the U.S. Internal Revenue Service or other relevant governmental authority.

8.      It, if not a "United States person" (as defined in Section 7701(a)(30) of the Code), (i) either (A) is not a bank (or an entity affiliated with a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of section 881(c)(3)(A) of the Code), (B) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, or (C) it has provided an Internal Revenue Service Form W-8ECI representing that all payments received or to be received by it on the Subordinated Notes are effectively connected with the conduct of a trade or business in the United States, and (ii) is not purchasing the Subordinated Note or an interest in the Subordinated Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

9.      It will indemnify the Issuer, the Trustee and their respective agents and each of the holders of the Notes from any and all damages, cost and expenses (including any amount of taxes, fees, interest, additions to tax, or penalties) resulting from its failure to comply with FATCA or its obligations under the Subordinated Note. The indemnification will continue with respect to any period during which it held a Subordinated Note (and any interest therein), notwithstanding the holder ceasing to be a holder of the Subordinated Note.

10.     It agrees not to seek to commence in respect of the Issuer or the Co-Issuer, or cause the Issuer or the Co-Issuer to commence, a bankruptcy proceeding before a year and a day has elapsed since the payment in full to the holders of the Notes (and any other debt obligations of the Issuer that have been rated upon issuance by any rating agency at the request of the Issuer) issued pursuant to the Indenture or, if longer, the applicable preference period then in effect.

18779285.6.BUSINESS

11.     To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Subordinated Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot Act") and other similar laws or regulations, including, without limitation, requiring each transferee of a Subordinated Note to make representations to the Issuer in connection with such compliance.

12.     It represents and warrants that _____ (check if applicable) upon acquisition by it of the Subordinated Notes, the Subordinated Notes will constitute Portfolio Manager Notes; or _____ (check if applicable) upon acquisition by it of the Subordinated Notes, the Subordinated Notes will not constitute Portfolio Manager Notes.

13.     It represents and warrants that it is not a member of the public in the Cayman Islands.

14.     It understands that the Issuer, the Trustee, Jefferies LLC and the Portfolio Manager will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

[The remainder of this page has been intentionally left blank.]

B-4-5

18779285.6.BUSINESS

Name of Purchaser:

Dated:

_____

By:

Name:

Title:

Outstanding principal amount of Subordinated Notes:  U.S.$_____

Taxpayer identification number:

Address for notices:                                    Wire transfer information for payments:


Bank:

Address:

Bank ABA#:

Account #:

Telephone:                                              FAO:

Facsimile:                                              Attention:

Attention:

Denominations of certificates (if applicable and if more than one):

Registered name:

cc:      ACIS CLO 2014-3 LTD.
         c/o MaplesFS Limited
         P.O. Box 1093, Boundary Hall, Cricket Square
         Grand Cayman, KY1-1102 Cayman Islands
         Facsimile Number: (345) 945-7100
         Attention:  The Directors

B-4-6

**EXHIBIT B5**

**FORM OF ERISA CERTIFICATE**

The purpose of this Certificate (this "Certificate") is, among other things, to (i) endeavor to ensure that less than 25% of the value, by Class, of each of the Class E Notes, Class F Notes and the Subordinated Notes issued by ACIS CLO 2014-3 LTD. (the "Issuer") is held by "Benefit Plan Investors" (the "25% Limitation") as contemplated and defined under Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the U.S. Department of Labor's regulations set forth at 29 C.F.R. Section 2510.3-101 as modified by Section 3(42) of ERISA (the "Plan Asset Regulations") so that the Issuer will not be subject to the U.S. federal employee benefits provisions contained in ERISA and Section 4975 of the Internal Revenue Code of 1986 (the "Code"), (ii) obtain from you certain representations and agreements and (iii) provide you with certain related information with respect to your acquisition, holding or disposition of Class E Notes, Class F Notes and the Subordinated Notes. **By signing this Certificate, you agree to be bound by its terms**.

**Please be aware that the information contained in this Certificate is not intended to constitute advice and the examples given below are not intended to be, and are not, comprehensive. You should contact your own counsel if you have any questions in completing this Certificate. Capitalized terms not defined in this Certificate shall have the meanings ascribed to them in the final offering circular of the Issuer or the Indenture.**

Please review the information in this Certificate and check ANY of the following boxes 1, 2, 3, 4, 7 and 10 that apply to you in the spaces provided**.**

**If any of boxes 1, 2, 3, 4, 7 or 10 is not checked, you are agreeing that the applicable Section does not, and will not, apply to you.**

1.　　　☐　　**Employee Benefit Plans Subject to ERISA or the Code**. We, or the entity on whose behalf we are acting, are an "employee benefit plan" within the meaning of Section 3(3) of ERISA that is subject to Part 4, Subtitle B of Title I of ERISA or a "plan" within the meaning of Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code.

　　　**Examples**:  (i) tax qualified retirement plans such as pension, profit sharing and section 401(k) plans, (ii) welfare benefit plans such as accident, life and medical plans, (iii) individual retirement accounts or "IRAs" and "Keogh" plans and (iv) certain tax-qualified educational and savings trusts.

2.　　　☐　　**Entity Holding Plan Assets by Reason of Plan Asset Regulations**. We, or the entity on whose behalf we are acting, are an entity or fund whose underlying assets include "plan assets" by reason of a Benefit Plan Investor's investment in such entity.

　　　**Examples:**  (i) an insurance company separate account, (ii) a bank collective trust fund and (iii) a hedge fund or other private investment vehicle where 25% or more of the value, by Class, of any class of its equity is held by Benefit Plan Investors.

If you check Box 2, please indicate the maximum percentage of the entity or fund that will constitute "plan assets" for purposes of Title I of ERISA or Section 4975 of the Code: _____%.

An entity or fund that cannot provide the foregoing percentage hereby acknowledges that for purposes of determining whether Benefit Plan Investors own less than 25% of the value of each of the Class E Notes,

B-5-1

18779285.6.BUSINESS

Class F Notes and the Subordinated Notes issued by the Issuer, 100% of the assets of the entity or fund will be treated as "plan assets".

ERISA and the regulations promulgated thereunder are technical. Accordingly, if you have any question regarding whether you may be an entity described in this Section 2, you should consult with your counsel.

3. ☐ **Insurance Company General Account**. We, or the entity on whose behalf we are acting, are an insurance company purchasing Class E Notes, Class F Notes or the Subordinated Notes with funds from our or their general account (*i.e.*, the insurance company's corporate investment portfolio), whose assets, in whole or in part, constitute "plan assets" for purposes of the Plan Asset Regulations.

If you check Box 3, please indicate the maximum percentage of the insurance company general account that will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulations: ____%. IF YOU DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

4. ☐ **None of Sections (1) Through (3) Above Apply**. We, or the entity on whose behalf we are acting, are a person that does not fall into any of the categories described in Sections 1 through 3 above.

5. **No Prohibited Transaction**. If we checked any of the boxes in Sections 1 through 3 above, we represent, warrant and agree that our acquisition, holding and disposition of Class E Notes, Class F Notes or the Subordinated Notes do not and will not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

6. **No Violation of Similar Law**. If we are a governmental, church, non-U.S. or other plan, we represent, warrant and agree that our acquisition, holding and disposition of the Class E Notes, Class F Notes or the Subordinated Notes do not and will not constitute or result in a non-exempt violation of any law or regulation that is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

7. ☐ **Controlling Person**. We are, or we are acting on behalf of any of: (i) the Trustee, (ii) the Portfolio Manager, (iii) any person that has discretionary authority or control with respect to the assets of the Issuer, (iv) any person who provides investment advice for a fee (direct or indirect) with respect to such assets or (v) any "affiliate" of any of the above persons. "Affiliate" shall have the meaning set forth in the Plan Asset Regulations. Any of the persons described in the first sentence of this Section (7) is referred to in this Certificate as a "Controlling Person".

**Note**: We understand that, for purposes of determining whether Benefit Plan Investors hold less than 25% of the value, by Class, of each of the Class E Notes, Class F Notes or the Subordinated Notes, the value of any Class E Notes, Class F Notes or the Subordinated Notes held by Controlling Persons (other than Benefit Plan Investors) are required to be disregarded.

8. **Compelled Disposition**. We acknowledge and agree that:

       (i) if any representation that we made hereunder is subsequently shown to be false or misleading or our beneficial ownership otherwise causes a violation of the 25% Limitation, the Issuer shall, promptly after such discovery (or upon notice from the Trustee if the Trustee makes the discovery (who, in each case, agree to notify the Issuer of such discovery, if any)), send notice

to us demanding that we transfer our interest to a person that is not a Non-Permitted ERISA Holder within 20 days after the date of such notice;

(ii)      if we fail to transfer our Class E Notes, Class F Notes or the Subordinated Notes with respect to which we made a false or misleading representation or that are causing a violation of the 25% Limitation, the Issuer shall have the right, without further notice to us, to sell such Class E Notes, Class F Notes or the Subordinated Notes or our interest in such Class E Notes, Class F Notes or the Subordinated Notes, to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose;

(iii)     the Issuer may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Class E Notes, Class F Notes and the Subordinated Notes and selling such securities to the highest such bidder. However, the Issuer may select a purchaser by any other means determined by it in its sole discretion;

(iv)     by our acceptance of an interest in Class E Notes, Class F Notes or the Subordinated Notes, we agree to cooperate with the Issuer to effect such transfers;

(v)      the proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to us; and

(vi)     the terms and conditions of any sale under this sub-section shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to us as a result of any such sale or the exercise of such discretion.

9.     **Required Notification and Agreement**.  We hereby agree that we (a) will inform the Trustee of any proposed transfer by us of all or a specified portion of Class E Notes, Class F Notes or the Subordinated Notes and (b) will not initiate any such transfer after we have been informed by the Issuer or the Transfer Agent in writing that such transfer would cause the 25% Limitation to be exceeded.  We hereby agree and acknowledge that after the Trustee effects any permitted transfer of Class E Notes, Class F Notes or the Subordinated Notes owned by us to a Benefit Plan Investor or a Controlling Person or receives notice of any such permitted change of status, the Trustee shall include such Class E Notes, Class F Notes or the Subordinated Notes in future calculations of the 25% Limitation unless subsequently notified that such Class E Notes, Class F Notes or the Subordinated Notes (or such portion), as applicable, would no longer be deemed to be held by Benefit Plan Investors or Controlling Persons.

10.    **Continuing Representation; Reliance**.  We acknowledge and agree that the representations contained in this Certificate shall be deemed made on each day from the date we make such representations through and including the date on which we dispose of our interests in the Class E Notes, Class F Notes or the Subordinated Notes.  We understand and agree that the information supplied in this Certificate will be used and relied upon by the Issuer and the Trustee to determine that Benefit Plan Investors own or hold less than 25% of the value, by Class, of each of the Class E Notes, Class F Notes and the Subordinated Notes upon any subsequent transfer of Class E Notes, Class F Notes and the Subordinated Notes in accordance with the Indenture.

11.    **Further Acknowledgement and Agreement**.  We acknowledge and agree that (i) all of the assurances contained in this Certificate are for the benefit of the Issuer, the Trustee, Jefferies LLC and the Portfolio Manager as third-party beneficiaries hereof, (ii) copies of this Certificate and any information

18779285.6.BUSINESS

contained herein may be provided to the Issuer, the Trustee, Jefferies LLC, the Portfolio Manager, affiliates of any of the foregoing parties and to each of the foregoing parties' respective counsel for purposes of making the determinations described above and (iii) any acquisition or transfer of Class E Notes, Class F Notes or the Subordinated Notes by us that is not in accordance with the provisions of this Certificate shall be null and void from the beginning, and of no legal effect.

[The remainder of this page has been intentionally left blank.]

B-5-4

18779285.6.BUSINESS

17.      Future Transfer Requirements.

      **<u>Transferee Letter and its Delivery</u>**. We acknowledge and agree that we may not transfer any Certificated Class E Notes, Class F Notes or the Subordinated Notes or Uncertificated Class E Notes, Class F Notes and the Subordinated Notes to any person unless the Trustee has received a certificate substantially in the form of this Certificate. Any attempt to transfer in violation of this section will be null and void from the beginning, and of no legal effect.

**<u>Note</u>**: Unless you are notified otherwise, the name and address of the Trustee is as follows:

        U.S. Bank National Association, as Trustee
        60 Livingston Avenue
        St. Paul, Minnesota 55103
        Attention: Bondholder Services – ACIS CLO 2014-3 Ltd.

      **IN WITNESS WHEREOF**, the undersigned has duly executed and delivered this Certificate.

_____ [Insert Purchaser's Name]

By:
Name:
Title:
Dated:

This Certificate relates to U.S.$_____ of Class E Notes, Class F Notes and the Subordinated Notes

18779285.6.BUSINESS

EXHIBIT B6

**FORM OF TRANSFEREE CERTIFICATE OF RULE 144A GLOBAL SECURED NOTE**

U.S. Bank National Association, as Trustee
60 Livingston Avenue
St. Paul, Minnesota 55103
Attention: Bondholder Services – ACIS CLO 2014-3 Ltd.

Re:     ACIS CLO 2014-3 LTD. (the "Issuer"), ACIS CLO 2014-3 LLC (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") [Class] [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Notes due 20[26]

Reference is hereby made to the Indenture dated as of February [25], 2014, between the Issuer, the Co-Issuer and U.S. Bank National Association, as Trustee (the "Indenture"). Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to _____Aggregate Outstanding Amount of the [Class] [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Notes (the "Notes"), which are to be transferred to the undersigned transferee (the "Transferee") in the form of a Rule 144A Global [Class] [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Note of such Class pursuant to Section 2.5(g) of the Indenture.

In connection with such request, and in respect of such Notes, the Transferee does hereby certify that the Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "Securities Act") and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

In addition, the Transferee hereby represents, warrants and covenants for the benefit of the Co-Issuers and their counsel that we are a "qualified institutional buyer" as defined in Rule 144A under the Securities Act, and are acquiring the Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder.

The Transferee further represents, warrants and agrees as follows:

1.     In connection with the purchase of such Notes: (A) none of the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for the Transferee; (B) the Transferee is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee or the Collateral Administrator or any of their respective Affiliates other than any statements in the final offering circular with respect to such Notes, and such Transferee has read and understands the final offering circular; (C) the Transferee has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to this Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective Affiliates; (D) the Transferee is both (x) a Qualified Institutional Buyer that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25,000,000 in securities of issuers that are not affiliated persons of the dealer and is not a

B-6-1

plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (y) a Qualified Purchaser (for purposes of Section 3(c)(7) of the Investment Company Act) or an entity owned exclusively by Qualified Purchasers; (E) the Transferee is acquiring its interest in such Notes for its own account; (F) the Transferee was not formed for the purpose of investing in such Notes; (G) the Transferee understands that the Issuer may receive a list of participants holding interests in the Notes from one or more book-entry depositories; (H) the Transferee will hold and transfer at least the minimum denomination of such Notes and (I) the Transferee will provide notice of the relevant transfer restrictions to subsequent transferees.

2. The Transferee understands that such Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, such Notes have not been and will not be registered under the Securities Act, and, if in the future the Transferee decides to offer, resell, pledge or otherwise transfer such Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of this Indenture and the legend on such Notes. The Transferee acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes. The Transferee understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.

3. The Transferee will provide notice to each Person to whom it proposes to transfer any interest in the Notes of the transfer restrictions and representations set forth in Section 2.5 (Registration, Registration of Transfer and Exchange) of the Indenture, including the Exhibits referenced therein.

4. With respect to Secured Notes other than Class E Notes and Class F Notes, it represents, warrants and agrees that (a) if it is, or is acting on behalf of, a Benefit Plan Investor, as defined in Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), its acquisition, holding and disposition of such Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), and (b) if it is a governmental, church, non-U.S. or other plan which is subject to any state, local, other federal or non-U.S. law or regulation that is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code (any such law or regulation an "Similar Law"), its acquisition, holding and disposition of such Notes will not constitute or result in a non-exempt violation of any such Similar Law. With respect to Class E Notes and Class F Notes, it represents, warrants and agrees that (a) so long as it holds the Class E Notes or an interest therein, it will not be, and will not be not acting on behalf of, a Benefit Plan Investor, as defined in Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or a Controlling Person, and (b) if it is a governmental, church, non-U.S. or other plan, that is subject to any Similar Law, its acquisition, holding and disposition of such Notes or interest therein will not constitute or result in a non-exempt violation of any Similar Law. A "Controlling Person" means a person (other than a benefit plan investor) who has discretionary authority or control with respect to the assets of the issuer or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of any such person. An "affiliate" of a person includes any person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the person. "Control" with respect to a person other than an individual means the power to exercise a controlling influence over the management or policies of such person.

5.      It will be deemed to have represented and agreed to treat the Secured Notes as indebtedness for U.S. federal, state and local income and franchise tax purposes, provided that this shall not prevent it from making a "protective qualified electing fund" election with respect to any Class E Note or Class F Note.

6.      It acknowledges that the failure to provide the Issuer and the Trustee (and any of their agents) with the properly completed and signed tax certifications (generally, in the case of U.S. federal income tax, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a U.S. Tax Person or the appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a U.S. Tax Person) may result in withholding from payments in respect of such Note, including U.S. federal withholding or back-up withholding.

7.      It will (i) provide the Issuer, the Trustee and their respective agents with any correct, complete and accurate information that may be required for the Issuer to comply with FATCA and will take any other actions that the Issuer, the Trustee or their respective agents deem necessary to comply with FATCA and (ii) update any such information provided in clause (i) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. In the event it fails to provide such information, take such actions or update such information, (a) the Issuer is authorized to withhold amounts otherwise distributable to it as compensation for any cost, loss or liability suffered as a result of such failure and (b) the Issuer will have the right to compel it to sells its Secured Notes or, if it does not sell its Secured Notes within 10 business days after notice from the Issuer, to sell such Secured Notes in the same manner as if it were a Non-Permitted Holder, and to remit the net proceeds of such sale (taking into account any taxes incurred by the Issuer in connection with such sale) to it as payment in full for such Secured Notes. It agrees, or by acquiring this Secured Note or an interest in this Secured Note will be deemed to agree, that the Issuer may provide such information and any other information regarding its investment in the Secured Notes to the U.S. Internal Revenue Service or other relevant governmental authority.

8.      It, if not a "United States Person" (as defined in Section 7701(a)(30) of the Code), (i) either (A) is not a bank (or an entity affiliated with a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of section 881(c)(3)(A) of the Code), (B) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, or (C) it has provided an Internal Revenue Service Form W-8ECI representing that all payments received or to be received by it on the Secured Notes are effectively connected with the conduct of a trade or business in the United States, and (ii) is not purchasing the Secured Note or an interest in the Secured Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

9.      It will indemnify the Issuer, the Trustee and their respective agents and each of the holders of the Notes from any and all damages, cost and expenses (including any amount of taxes, fees, interest, additions to tax, or penalties) resulting from its failure to comply with FATCA or its obligations under the Secured Note. The indemnification will continue with respect to any period during which it held a Secured Note (and any interest therein), notwithstanding the holder ceasing to be a holder of the Secured Note.

10.     It agrees not to seek to commence in respect of the Issuer or the Co-Issuer, or cause the Issuer or the Co-Issuer to commence, a bankruptcy proceeding before a year and a day has elapsed since the payment in full to the holders of the Notes (and any other debt obligations of the Issuer that have

B-6-3

been rated upon issuance by any rating agency at the request of the Issuer) issued pursuant to the Indenture or, if longer, the applicable preference period then in effect.

11.     To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and other similar laws or regulations, including, without limitation, requiring each transferee of a Note to make representations to the Issuer in connection with such compliance.

12.     It represents and warrants that _____ (check if applicable) upon acquisition by it of the Notes, the Notes will constitute Portfolio Manager Notes; or _____ (check if applicable) upon acquisition by it of the Notes, the Notes will not constitute Portfolio Manager Notes.

13.     It represents and warrants that it is not a member of the public in the Cayman Islands.

14.     It understands that the Issuer, the Co-Issuer, the Trustee, Jefferies LLC and the Portfolio Manager and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

B-6-4

Name of Purchaser:
Dated:

_____

By:
Name:
Title:

Aggregate Outstanding Amount of Notes:  U.S.$_____

cc:     ACIS CLO 2014-3 LTD.
       c/o MaplesFS Limited
       P.O. Box 1093, Boundary Hall, Cricket Square
       Grand Cayman, KY1-1102
       Cayman Islands
       Facsimile Number: (345) 945-7100
       Attention:  The Directors

       ACIS CLO 2014-3 LLC
       c/o Puglisi & Associates
       850 Library Avenue, Suite 204
       Newark, Delaware  19711

B-6-5

Exhibit B

EXHIBIT B7

## FORM OF TRANSFEREE CERTIFICATE OF REGULATION S GLOBAL NOTE

U.S. Bank National Association, as Trustee
60 Livingston Avenue
St. Paul, Minnesota 55103
Attention: Bondholder Services – ACIS CLO 2014-3 Ltd.

Re:  ACIS CLO 2014-3 LTD. (the "Issuer"), ACIS CLO 2014-3 LLC (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") [Class] [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Notes due 20[26]

Reference is hereby made to the Indenture, dated as of February [25], 2014, between the Issuer, the Co-Issuer and U.S. Bank National Association], as Trustee (the "Indenture"). Capitalized terms not defined in this Certificate shall have the meanings ascribed to them in the final offering circular of the Issuer or the Indenture.

This letter relates to _____Aggregate Outstanding Amount of the [Class] [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Notes (the "Notes"), which are to be transferred to the undersigned transferee (the "Transferee") in the form of a Regulation S Global Note of such Class pursuant to Section 2.5(g) of the Indenture.

In connection with such request, and in respect of such Notes, the Transferee does hereby certify that the Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "Securities Act") and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

In addition, the Transferee hereby represents, warrants and covenants for the benefit of the Co-Issuers and their counsel that we are a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and are acquiring the Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from Securities Act registration provided by Regulation S.

The Transferee further represents, warrants and agrees as follows:

1.  In connection with the purchase of such Notes: (A) none of the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for the Transferee; (B) the Transferee is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective Affiliates other than any statements in the final offering circular for such Notes, and such Transferee has read and understands the final offering circular; (C) the Transferee has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to this Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, Jefferies LLC, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective Affiliates; (D) the Transferee is not a U.S. Person and is acquiring such Notes in an offshore transaction (as defined in Regulation S) in reliance on the

B-7-1

18779285.6.BUSINESS

exemption from registration provided by Regulation S; (E) the Transferee is acquiring its interest in such Notes for its own account; (F) the Transferee was not formed for the purpose of investing in such Notes; (G) the Transferee understands that the Issuer may receive a list of participants holding interests in the Notes from one or more book-entry depositories; (H) the Transferee will hold and transfer at least the minimum denomination of such Notes and (I) the Transferee will provide notice of the relevant transfer restrictions to subsequent transferees.

2. The Transferee understands that such Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, such Notes have not been and will not be registered under the Securities Act, and, if in the future the Transferee decides to offer, resell, pledge or otherwise transfer such Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of this Indenture and the legend on such Notes. The Transferee acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes. The Transferee understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.

3. The Transferee is aware that, except as otherwise provided in the Indenture, the Notes being sold to it, if any, in reliance on Regulation S will be represented by one or more Regulation S Global [Class] [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] [C] [D] [E] [F] [Subordinated] Notes, and that beneficial interests therein may be held only through Euroclear or Clearstream.

4. The Transferee will provide notice to each Person to whom it proposes to transfer any interest in the Notes of the transfer restrictions and representations set forth in Section 2.5 (Registration, Registration of Transfer and Exchange) of the Indenture, including the Exhibits referenced therein.

4. With respect to Secured Notes other than Class E Notes and Class F Notes, it represents, warrants and agrees that (a) if it is, or is acting on behalf of, a Benefit Plan Investor, as defined in Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), its acquisition, holding and disposition of such Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), and (b) if it is a governmental, church, non-U.S. or other plan which is subject to any state, local, other federal or non-U.S. law or regulation that is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code (any such law or regulation an "Similar Law"), its acquisition, holding and disposition of such Notes will not constitute or result in a non-exempt violation of any such Similar Law. With respect to Class E Notes and Class F Notes, it represents, warrants and agrees that (a) so long as it holds the Class E Notes or an interest therein, it will not be, and will be not be not acting on behalf of, a Benefit Plan Investor, as defined in Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or a Controlling Person, and (b) if it is a governmental, church, non-U.S. or other plan that is subject to any Similar Law, its acquisition, holding and disposition of such Notes or interest therein will not constitute or result in a non-exempt violation of any Similar Law. A "Controlling Person" means a person (other than a benefit plan investor) who has discretionary authority or control with respect to the assets of the issuer or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of any such person. An "affiliate" of a person includes any person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the person. "Control" with respect to a person other than an individual means the power to exercise a controlling influence over the management or policies of such person.

B-7-2

5. It will be deemed to have represented and agreed to treat the Secured Notes as indebtedness for U.S. federal, state and local income and franchise tax purposes, provided that this shall not prevent it from making a "protective qualified electing fund" election with respect to any Class E Note or Class F Note.

6. It acknowledges that the failure to provide the Issuer and the Trustee (and any of their agents) with the properly completed and signed tax certifications (generally, in the case of U.S. federal income tax, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a U.S. Tax Person or the appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a U.S. Tax Person) may result in withholding from payments in respect of such Note, including U.S. federal withholding or back-up withholding.

7. It will (i) provide the Issuer, the Trustee and their respective agents with any correct, complete and accurate information that may be required for the Issuer to comply with FATCA and will take any other actions that the Issuer, the Trustee or their respective agents deem necessary to comply with FATCA and (ii) update any such information provided in clause (i) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. In the event it fails to provide such information, take such actions or update such information, (a) the Issuer is authorized to withhold amounts otherwise distributable to it as compensation for any cost, loss or liability suffered as a result of such failure and (b) the Issuer will have the right to compel it to sells its Secured Notes or, if it does not sell its Secured Notes within 10 business days after notice from the Issuer, to sell such Secured Notes in the same manner as if it were a Non-Permitted Holder, and to remit the net proceeds of such sale (taking into account any taxes incurred by the Issuer in connection with such sale) to it as payment in full for such Secured Notes. It agrees, or by acquiring this Secured Note or an interest in this Secured Note will be deemed to agree, that the Issuer may provide such information and any other information regarding its investment in the Secured Notes to the U.S. Internal Revenue Service or other relevant governmental authority.

8. It, if not a "United States Person" (as defined in Section 7701(a)(30) of the Code), (i) either (A) is not a bank (or an entity affiliated with a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of section 881(c)(3)(A) of the Code), (B) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, or (C) it has provided an Internal Revenue Service Form W-8ECI representing that all payments received or to be received by it on the Secured Notes are effectively connected with the conduct of a trade or business in the United States, and (ii) is not purchasing the Secured Note or an interest in the Secured Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

9. It will indemnify the Issuer, the Trustee and their respective agents and each of the holders of the Notes from any and all damages, cost and expenses (including any amount of taxes, fees, interest, additions to tax, or penalties) resulting from its failure to comply with FATCA or its obligations under the Secured Note. The indemnification will continue with respect to any period during which it held a Secured Note (and any interest therein), notwithstanding the holder ceasing to be a holder of the Secured Note.

10. It agrees not to seek to commence in respect of the Issuer or the Co-Issuer, or cause the Issuer or the Co-Issuer to commence, a bankruptcy proceeding before a year and a day has elapsed since the payment in full to the holders of the Notes (and any other debt obligations of the Issuer that have

18779285.6.BUSINESS

been rated upon issuance by any rating agency at the request of the Issuer) issued pursuant to the Indenture or, if longer, the applicable preference period then in effect.

11.     To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and other similar laws or regulations, including, without limitation, requiring each transferee of a Note to make representations to the Issuer in connection with such compliance.

12.     It represents and warrants that _____ (check if applicable) upon acquisition by it of the Notes, the Notes will constitute Portfolio Manager Notes; or _____ (check if applicable) upon acquisition by it of the Notes, the Notes will not constitute Portfolio Manager Notes.

13.     It represents and warrants that it is not a member of the public in the Cayman Islands.

14.     It understands that the Issuer, the Co-Issuer, the Trustee, Jefferies LLC and the Portfolio Manager and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

B-7-4

18779285.6.BUSINESS

Name of Purchaser:
Dated:

_____

By:
Name:
Title:

Aggregate Outstanding Amount of Notes:  U.S.$_____

cc:     ACIS CLO 2014-3 LTD.
        c/o MaplesFS Limited
        P.O. Box 1093, Boundary Hall, Cricket Square
        Grand Cayman, KY1-1102
        Cayman Islands
        Facsimile Number: (345) 945-7100
        Attention:  The Directors

        ACIS CLO 2014-3 LLC
        c/o Puglisi & Associates
        850 Library Avenue, Suite 204
        Newark, Delaware  19711

B-7-5

18779285.6.BUSINESS

<div align="right">**EXHIBIT B8**</div>

## FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER OF UNCERTIFICATED SUBORDINATED NOTE

U.S. Bank National Association, as Trustee
60 Livingston Avenue
St. Paul, Minnesota 55103
Attention: Bondholder Services – ACIS CLO 2014-3 Ltd.

Re:  ACIS CLO 2014-3 LTD. (the "Issuer") Subordinated Notes due 20[26] (the "Notes")

Reference is hereby made to the Indenture dated as of February [25], 2014 (the "Indenture") between the Issuer, ACIS CLO 2014-3 LLC, as Co-Issuer, and U.S. Bank National Association, as Trustee.  Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S. $_____ aggregate principal amount of Notes which are held in the form of an uncertificated Subordinated Note in the name of [_____] (the "Transferor") to effect the transfer of the Notes in the form of [one or more certificated][an uncertificated] Subordinated Note.

In connection with such transfer, and in respect of such Notes, the Transferor does hereby certify that (i) such Notes are being transferred to _____ (the "Transferee") in accordance with the transfer restrictions set forth in the Indenture and the Offering Circular relating to such Notes and (ii) it reasonably believes that the Transferee is purchasing the Notes for its own account or an account with respect to which the Transferee exercises sole investment discretion, and that the Transferee is either (a) a "qualified purchaser" (as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act")) or (b) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is a Qualified Purchaser and in the case of (a) and (b) above that is either (i) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases such Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder or (ii) an "accredited investor" as defined in Rule 501(a) under the Securities Act.

18779285.6.BUSINESS

The Transferor understands that the Issuer, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

(Name of Transferor)

By: _____
      Name:
      Title:

Dated: _____, _____

cc:     ACIS CLO 2014-3 LTD.
       c/o MaplesFS Limited
       P.O. Box 1093, Boundary Hall, Cricket Square
       Grand Cayman, KY1-1102
       Cayman Islands
       Facsimile Number: (345) 945-7100
       Attention:  The Directors

18779285.6.BUSINESS

Exhibit B

**EXHIBIT C**

**FORM OF OPINION OF DECHERT LLP**

C-1



Bank of America Corporate Center
100 North Tryon Street
Suite 4000
Charlotte, NC 28202-4025
+1 704 339 3100 Main
+1 704 339 3101 Fax
www.dechert.com

February 25, 2014

To Each of the Addressees on Exhibit A
Hereto

Re: ACIS CLO 2014-3 Ltd.

Ladies and Gentlemen:

We have acted as special counsel to ACIS CLO 2014-3 LLC, a Delaware limited liability company ("Company"), and United States counsel for ACIS CLO 2014-3 Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Issuer" and together with the Company, collectively, the "Opinion Parties", each an "Opinion Party") in connection with the transactions contemplated by the Transaction Documents (defined below). Capitalized terms used in this opinion letter and not otherwise defined herein shall have the meanings ascribed to them in the Indenture.

We have examined originals (or copies of executed originals) of the transaction documents described on Schedule I hereto (collectively the "Transaction Documents"), the DC Financing Statement (as defined below), and the following:

(i) the Certificate of Formation of the Company, as certified by the Secretary of State of Delaware on February 21, 2014 (the "Certificate of Formation");

(ii) the Limited Liability Company Agreement of the Company, as certified by the certificate referenced in clause (iv) below ("LLC Agreement");

18973549.BUSINESS

US Austin Boston Charlotte Hartford Los Angeles New York Orange County Philadelphia Princeton San Francisco Silicon Valley
Washington DC EUROPE Brussels Dublin Frankfurt London Luxembourg Moscow Munich Paris ASIA Beijing Hong Kong

# Dechert
LLP

(iii)     the written resolutions by the Manager of the Company dated February 25, 2014, as certified by the certificate referenced in clause (iv) below;

(iv)     Certificates executed by an authorized officer of the Company (including, without limitation, incumbency certificates to which the Company has attached the Company Governing Documents (as defined below) and the written resolutions by the Manager of the Company authorizing the Company to participate in the transactions contemplated by the Transaction Documents, and those certificates, if any, executed in connection with the Transaction Documents); and

(v)     a certificate, dated February 21, 2014 from the Secretary of State of the State of Delaware as to the Company's good standing in such jurisdiction (the "Good Standing Certificate").

For purposes of this opinion letter, the documents referred to in clauses (i) and (ii) are hereinafter referred to as the "Governing Documents."

In making such examination and rendering the opinions set forth below, we have assumed the genuineness of all signatures, the legal capacity and competence of all individuals, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed, photostatic or electronic copies of such documents.

In rendering the opinions set forth below, we have also assumed that (a) each of the parties to the Transaction Documents (other than the Company) has duly and validly executed and delivered the Transaction Documents; (b) each of the parties to the Transaction Documents (other than the Company) is validly existing and in good standing under the laws of the jurisdiction of its organization or formation; (c) each of the parties to the Transaction Documents (other than the Company) has the requisite corporate, limited liability company or partnership power and authority, as applicable, and has taken the corporate, limited liability company or limited partnership action, as applicable, necessary to authorize the execution, delivery of, and performance under, the Transaction Documents and to consummate the transactions contemplated thereby and all such Transaction Documents have been duly authorized, executed and delivered by such parties (other than the Company); (d) the Transaction Documents constitute the legal, valid and binding obligations of each party thereto (other than the Opinion Parties), enforceable against each such other party in accordance with their respective terms; (e) each of the parties of the Transaction Documents (other than the Company and, solely

# Dechert
### LLP

with respect to U.S. law, the Issuer) is in compliance with all regulatory requirements applicable to it and has obtained all requisite consents and approvals in connection with the transactions contemplated by the Transaction Documents; and (f) each of the parties to the Transaction Documents has received all agreed upon consideration for each Transaction Document to which it purports to be a party. We assume that (i) there has been no mutual mistake of fact, or misunderstanding or fraud, duress or undue influence in connection with the negotiation, delivery or execution of the Transaction Documents and (ii) there are and have been no agreements or understandings among the parties, written or oral, and there is and has been no usage of trade or course of prior dealing among the parties that would, in either case, vary, supplement, or qualify the terms of the Transaction Documents. We have also assumed that all the applicable Transaction Documents have been duly filed, indexed and/or recorded, as applicable, among the appropriate official records, with all fees, charges and taxes having been paid.

In rendering the opinions set forth below, we have also assumed that the Issuer has acquired "rights" in and to the Assets and that "value" has been given, each within the meaning of Section 9-203 of the Uniform Commercial Code of the State of New York (the "NY UCC") consistent with and sufficient for the purposes of the Transaction Documents and that the same will be true of each item of Assets acquired or arising after the date hereof. We have also assumed that the Cayman Islands is not a jurisdiction whose law generally requires information concerning the existence of a nonpossessory security interest to be made generally available in a filing, recording or registration system as a condition or result of the security interest's obtaining priority over the rights of a lien creditor with respect to the collateral.

We have not undertaken any independent investigation or inquiry to determine the existence or absence of the facts underlying any of the foregoing assumptions.

Our opinions set forth herein are based on our consideration of only those statutes, rules, regulations and judicial decisions which, in our experience, are normally applicable to transactions of the type contemplated by the Transaction Documents.

With respect to certain factual matters material to our opinions, we have relied upon representations and warranties of the Opinion Parties in the Transaction Documents, and certificates or comparable documents of officers of the Opinion Parties, public officials and other authorized persons and we have made no independent inquiry into the accuracy of such representations and warranties and certificates or comparable documents. Whenever our opinion in this letter with respect to the existence or absence



of facts is qualified by the phrase "to our knowledge" or "known to us," or similar phrases, we are referring to the current actual knowledge of Dechert LLP attorneys who have rendered substantive legal services to the Opinion Parties in connection with the transactions contemplated in the Transaction Documents which knowledge has been obtained by such attorneys in such capacity. Except to the extent expressly set forth in this letter, we have not undertaken any independent investigation or inquiry to determine the existence or absence of those facts, and no inference as to the knowledge of the existence or absence of those facts should be drawn from our representation of the Opinion Parties.

Based upon the foregoing, and subject to the assumptions and qualifications set forth above and hereinafter, we are of the opinion that:

1.      The Company (a) is validly existing and in good standing as a limited liability company under the laws of the jurisdiction in which it was formed and (b) has the limited liability company power and authority to execute and deliver each Transaction Document to which it is a party and perform its obligations thereunder.

2.      The execution and delivery of the Transaction Documents by the Company has been duly authorized by all necessary limited liability company action. The Transaction Documents have been duly executed and delivered by the Company.

3.      Each of the Transaction Documents constitutes the valid and binding obligation of each of the Opinion Parties to the extent it is a party thereto, enforceable against such Opinion Party in accordance with its respective terms.

4.      The execution and delivery of the Transaction Documents and consummation by each of the Opinion Parties of the transactions contemplated by the Transaction Documents, including the valid issuance of the Notes, do not: (a) violate any law, statute, rule or regulation of the federal laws of the United States, the State of New York, the Delaware Limited Liability Company Act, or, to our knowledge, any order or decree of any court, administrative agency or other governmental authority to which such Opinion Party is subject; (b) require the authorization, consent or approval of, or any filing or registration with, any New York or federal governmental body or authority other than (i) those which have been obtained and (ii) any other filings or recordations which create, maintain or perfect the liens and security interests created under the Indenture or (c) result in any violation of the provisions of the Governing Documents of the Company.

# Dechert
LLP

5.      The Issuer is not required to register the Notes under the Securities Act of 1933, as amended, or to qualify the Indenture under the Trust Indenture Act of 1939, as amended, in connection with the offer, sale and delivery of the Notes pursuant to the Security Purchase Agreement or the offer and initial resale of the Notes on the date hereof, in the manner and under the circumstances contemplated by the Security Purchase Agreement, the Indenture and the Offering Circular.  The Notes comply as to form with the requirements of the Indenture and have been duly executed by the Company and/or the Issuer, as the case may be, in accordance with the Indenture, and when authenticated by the Trustee in accordance with the Indenture, the Notes constitute valid and binding obligations of the Company enforceable in accordance with their respective terms.

6.      After giving effect to the offer and sale of the Notes and application of the proceeds thereof as described in the Offering Circular, the Issuer is not registered or required to be registered as an "investment company" pursuant to Section 8 of the Investment Company Act of 1940, as amended.

7.      The provisions of the Indenture are sufficient to create in favor of the Trustee for the benefit of the Secured Parties, a security interest in all right, title and interest of the Issuer in those items and types of Assets described in the Granting Clauses in which a security interest may be created under Article 9 of the NY UCC.

8.      The District of Columbia financing statement, a copy of which is attached hereto as Schedule II (the "DC Financing Statement") is in proper form for filing under the Uniform Commercial Code as in effect in the District of Columbia (the "DC UCC").  Upon the proper filing of the DC Financing Statement for the Issuer as Debtor in the office of the Recorder of Deeds of the District of Columbia, together with the payment of any required filing fees, the security interest and lien in favor of the Trustee for the benefit of the Secured Parties will be perfected to the extent a security interest in the applicable Assets pledged thereby may be perfected by filing a financing statement under the DC UCC.

9.      Assuming that the law of the State of New York governs the effectiveness of the Securities Account Control Agreement and the jurisdiction of the securities intermediary is the State of New York, the provisions of the Securities Account Control Agreement are sufficient to create in favor of the Trustee for the benefit of the Secured Parties, a perfected security interest in the Accounts set forth therein and the financial assets therein, with the consequences of perfection by control accorded by Article 9 of the NY UCC.



10.    The statements set forth under the heading "Certain ERISA and Related Considerations" in the Offering Circular, insofar as such statements purport to summarize the application of ERISA, constitute a fair summary of the principal ERISA consequences of the purchase, ownership, and disposition of the Notes.

The foregoing opinions are subject to the following qualifications:

(a)    The opinions expressed herein are limited by principles of equity (regardless of whether considered in a proceeding in equity or at law) that may limit the availability of certain rights and remedies and do not reflect the effect of (1) bankruptcy (including preferences), insolvency, fraudulent conveyance, receivership, reorganization, moratorium and other laws or decisions relating to or affecting debtors' obligations or creditors' rights generally, and (2) as to rights of indemnification and contribution, principles of public policy. The opinions expressed above also do not reflect the effect of laws and equitable doctrines (including requirements that the parties to agreements act reasonably and in good faith and, with respect to collateral, in a commercially reasonable manner, and give reasonable notice prior to exercising rights and remedies) or the effect of the exercise of discretion of the court before which any proceeding may be brought, which may limit the availability of any particular remedy but which will not, in our judgment (but subject to the other qualifications and limitations in this opinion letter), make the remedies available to the Trustee under the Transaction Documents, taken as a whole, inadequate for the practical realization of the benefits of the security provided for in the Transaction Documents, except for the economic consequences of any delay that may be imposed thereby or result therefrom, and except that we express no opinion as to the rights of any of the parties to the Transaction Documents to accelerate the due dates of any payment due thereunder or to exercise other remedies available to them on the happening of a non-material breach of any such document or agreement.

(b)    Without limiting the generality of the foregoing, we express no opinion with respect to:  (1) the availability of specific performance or other equitable remedies for noncompliance with any of the provisions contained in the Transaction Documents; (2) the enforceability of provisions contained in the Transaction Documents relating to the effect of laws which may be enacted in the future; (3) the enforceability of provisions in the Transaction Documents purporting to waive the effect of applicable laws; (4) the effectiveness of any power-of-attorney given under the Transaction Documents that is intended to bind successors and assigns that have not granted such powers by a power-of-attorney specifically executed by them; (5) provisions related to waivers of remedies (or the delay or omission of enforcement thereof), disclaimers, liability limitations or

# Dechert
### LLP

limitations on the obligations of the Trustee in circumstances in which a failure of condition or default by any party is not material; (6) any provisions in the Transaction Documents relating to indemnification, contribution or exculpation; (7) choice of law provisions or conflict of laws (or the rule and regulations or public policy underlying the same); (8) any provisions providing for waivers of a jury trial or rights to attorneys fees; (9) any provisions of the Transaction Documents to the effect that certain determinations made by one party shall have conclusive or binding effect; (10) any self-help provisions; (11) provisions in the Transaction Documents that purport to establish evidentiary standards; (12) provisions in the Transaction Documents that provide that certain rights or obligations are absolute or unconditional; (13) the right of any Trustee to set off against funds held in any account maintained with such Trustee by an Opinion Party and which account is designated, or contains funds that the Trustee is aware have been set aside, for special purposes, such as payroll, trust and escrow accounts, or which funds are subject to special agreement between such Trustee and an Opinion Party precluding or limiting rights to set off funds; (14) provisions that provide for the enforceability of the remaining terms and provisions of the applicable Transaction Document in circumstances in which certain other terms and provisions of such Transaction Document are illegal or unenforceable; (15) provisions that restrict access to or waive legal or equitable remedies or access to courts; (16) provisions that affect or confer jurisdiction (other than on the courts of New York) or which relate to forum selection; (17) provisions that permit the Trustee to act in its sole discretion or to be exculpated from liability for its actions to the extent not permitted by law; (18) any provision of the Transaction Documents that may be construed as a forfeiture or penalty; (19) any provision of the Transaction Documents that purports to provide that the terms thereof may not be varied or waived except in writing or that the express terms thereof supersede any inconsistent course of performance and/or usage of the trade; (20) the effect of the laws of any jurisdiction (other than New York) in which the Trustee or any Noteholder is located that limits the interest, fees or other charges it may impose for the Notes or use of money or other credit; or (21) the enforceability of any so-called "usury savings clauses" or other provisions of the Transaction Documents purporting to specify methods of, or otherwise assure, compliance with usury laws or other similar laws relating to limitations on the amount of interest or other similar charges which noteholders may make or receive in connection with respect to their notes.

(c)     We express no opinion as to the creation, attachment, validity, binding effect, enforceability, perfection, priority or other effect of perfection or non-perfection of any security interest in (1) the proceeds of any collateral other than in accordance with, and subject to the limitations set forth in, Section 9-315 of the NY UCC, (2) commingled

**Dechert**
LLP

goods arising from any collateral other than in accordance with, and subject to the limitations set forth in, Section 9-336 of the NY UCC, (3) consumer goods, (4) commercial tort claims, (5) rights to demand payment or performance under a letter of credit, (6) as-extracted collateral, (7) farm products, (8) goods that are or are to become fixtures, (9) manufactured homes, (10) standing timber or timber to be cut, (11) cooperative apartment interests, (12) any item of collateral which is subject to restriction on or prohibition against transfer (except to the extent limited by Sections 9-401, 9-406, 9-407, 9-408 or 9-409 of the NY UCC) contained in an agreement, instrument, document or applicable law governing or evidencing or otherwise relating to such item, (13) any obligations of the United States of America or any agency or instrumentality thereof or (14) any collateral covered by a certificate of title.

(d) We express no opinion as to the creation or perfection of any security interest in any portion of the Assets to the extent that, pursuant to §9-109(c) or (d) of the NY UCC, Article 9 of the UCC does not apply thereto. Our opinion with respect to any security entitlement (as defined in the NY UCC §8-102(a)(17)) is subject to Part 5 of Article 8 of the NY UCC. We express no opinion as to the effect of any rule adopted by any clearing corporation (as defined in NY UCC §8-102(a)(5)) governing rights and obligations among such clearing corporation and its participants.

(e) We have made no examination of and express no opinion with respect to: (1) the title to, ownership of or rights in property (real, personal, fixtures or mixed) or fixtures; (2) the validity or ownership of any trademarks, patents or licenses; (3) the existence or absence of any liens, charges or encumbrances on any Assets other than those described in paragraphs 7 through 9 above; and (4) except as expressly set forth in paragraphs 7 through 9 above, the creation, attachment, perfection or priority of any lien or security interest. In addition, to the extent the creation of a lien or security interest in any Assets is governed by the law of any jurisdiction other than the State of New York, we express no opinion. In addition, any opinion herein concerning the creation or perfection of any security interest does not address the sufficiency to create such security interest of any supergeneric description of collateral whether in whole or part as personal property or using words of similar import.

(f) No opinion is rendered as to any federal, state or local laws, rules, or regulations of (1) antitrust or unfair competition; (2) securities or "blue sky" laws (except as set forth in paragraphs 5 and 6 above); (3) environmental matters; (4) tax matters; (5) zoning, subdivision, land use or other matters affecting the use, occupancy or operation of the Assets; (6) ERISA laws, rules and regulations; (7) cities, counties, townships,

# Dechert
### LLP

municipalities or other special local non-state governmental authorities, or political subdivisions; (8) insurance, banking or financial institutions; or (9) anti-terrorism laws and regulations. In addition, no opinion is rendered herein as to applicability to or effect on any of the matters covered herein of laws or regulations that apply specifically to the type of business conducted by any of the Opinion Parties or, except as set forth in paragraph 6, the regulatory status of any party to the Transaction Documents.

(g)    Our opinion set forth in clause (a) of paragraph 1 above relating to good standing and valid existence of the Company is based solely upon our review of the Good Standing Certificate issued by the Secretary of State of the State of Delaware.

(h)    In giving our opinion set forth in clause (b) of paragraph 4, we express no opinion with respect to any action, consent, approval, filing or registration such as may be required as a result of the regulatory status or other facts or circumstances specifically relating to the Trustee or any Noteholder.

(i)    We have assumed that all information required to be disclosed in connection with any consent or approval by the board of directors or stockholders (or equivalent governing group) of any Opinion Party and all other information required to be disclosed in connection with any issue relevant to our opinions has in fact been fully and fairly disclosed to all persons to whom it is required to be disclosed and no such disclosure contains any relevant error or omission.

(j)    Our opinion as to the enforceability of the choice of New York law as the governing law is subject to the qualification that a court may decline to enforce the choice of law provisions in the Transaction Documents on the grounds of comity or because United States constitutional requirements are not satisfied. In connection with the provisions of the Transaction Documents whereby the parties submit to the jurisdiction of the courts of the United States of America located in the State of New York, we note the limitations of 28 U.S.C. §§ 1331 and 1332 on subject matter jurisdiction of the federal courts. In connection with the provisions of the Transaction Documents which relate to forum selection of the courts of the United States located in the State of New York (including, without limitation, any waiver of any objection to venue or any objection that a court is an inconvenient forum), we note such court's discretion to transfer an action from one federal court to another under 28 U.S.C. § 1404(a).

Dechert
LLP

(k)     With respect to the opinion in paragraphs 5 and 6, we assume that (1) no Opinion Party is making nor proposes at this time to make, a public offering of its securities, and (2) all representations and warranties made or deemed to be made by the Noteholders and shareholders of the Issuer are true and correct as of the date hereof.

(l)     We express no opinion on whether any action with respect to any of the Assets (or the registration or perfection of any lien or security interest granted thereon or therein) issued by any entity incorporated or organized in a jurisdiction outside of the United States needs to be taken in connection with the Transaction Documents. Without limiting the foregoing, we express no opinion concerning the laws of any foreign jurisdiction.

We express no opinion as to the laws of any jurisdiction other than those of the United States of America, the State of New York and, to the limited extent described in this paragraph, the DC UCC and the Delaware Limited Liability Company Act. We do not purport to be experts in the DC UCC or the Delaware Limited Liability Company Act, nor did we review official codifications of the DC UCC or the Delaware Limited Liability Company Act. We did, however, review a standard compilation of a version of the DC UCC and the Delaware Limited Liability Company Act, and our opinions with respect thereto are based solely on the foregoing procedure and not upon any other review of the law of the State of Delaware or the District of Columbia.

This opinion speaks only as of the date hereof. We have no obligation to advise the addressees (or any third party) of any changes in the law or facts that may occur after the date of this opinion.

Our opinions expressed herein are solely for your benefit. This opinion may not be relied upon in any manner by any other person or entity and may not be disclosed, quoted, assigned, circulated or furnished to or filed with a governmental agency or otherwise referred to without our express written consent; provided, however, that the foregoing shall not prevent any person to which this opinion is addressed from disclosing this opinion (without reliance) to (i) any governmental or regulatory authorities having jurisdiction over such person, (ii) designated persons pursuant to an order or legal process of any court or governmental agency and with respect to a dispute arising out of the Transaction Documents, in connection with the Trustee's assertion of any defense as to which this opinion is relevant, (iii) accountants and attorneys of such person, and (iv) with respect to the Trustee, a Holder of Notes upon request and to those Persons entitled under the Indenture to inspect the Issuer's or the Trustee's books and records. We hereby



consent to the Issuer posting a copy of this opinion (with no right of reliance) on any website maintained by the Issuer pursuant to a commitment to any rating agency relating to the issuance of the Secured Notes in accordance with 17 CFR 240.17g-5(a)(3), as amended.

DECHERT LLP

*Dechert LLP/gt*

Dechert
LLP

### Exhibit A

Acis Capital Management, L.P.

ACIS CLO 2014-3 Ltd.

ACIS CLO 2014-3 LLC

U.S. Bank National Association

Jefferies LLC

Standard & Poor's Rating Services, Inc.,
a Standard & Poor's Financial Services LLC
business

Dechert
LLP

## Schedule I

1. Indenture, dated as of February 25, 2014 (the "Indenture"), by and among the Issuer, as the issuer, the Company, as the co-issuer, and U.S. Bank National Association, as the trustee.

2. Collateral Administration Agreement, dated as of February 25, 2014, by and among the Issuer, Acis Capital Management, L.P., as the portfolio manager, and U.S. Bank National Association, as the collateral administrator.

3. Security Purchase Agreement, dated as of February 25, 2014 (the "Security Purchase Agreement"), by and among the Issuer, as the issuer, the Company, as the co-issuer, and Jefferies LLC, as the initial purchaser.

4. Portfolio Management Agreement, dated as of February 25, 2014, between the Issuer, as the issuer, and Acis Capital Management, L.P., as the portfolio manager.

5. Securities Account Control Agreement, dated as of February 25, 2014 (the "Securities Account Control Agreement"), by and among the Issuer and U.S. Bank National Association, as trustee and as custodian.



**Schedule II**

## DC Financing Statement

### (see attached)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

OR

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

OR

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

OR

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

4. This FINANCING STATEMENT covers the following collateral:

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. | ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

Exhibit B

**FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)**



1900 K Street, NW
Washington, DC 20006
+1 202 261 3300 Main
+1 202 261 3333 Fax
www.dechert.com

February 25, 2014

To the Addressees on Schedule I

Re:     ACIS CLO 2014-3 Ltd.

Ladies and Gentlemen:

We have acted as special U.S. tax counsel to ACIS CLO 2014-3 Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands (the "Issuer"), and ACIS CLO 2014-3 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") in connection with the issuance and sale (i) by the Co-Issuers of U.S.$205,000,000 Class A-1A Senior Secured Floating Rate Notes, due 2026 (the "Class A-1A Notes"), U.S.$25,000,000 Class A-1F Senior Secured Fixed Rate Notes, due 2026 (the "Class A-1F Notes" and, together with the Class A-1A Notes, the "Class A-1 Notes"), U.S.$15,000,000 Class A-2A Senior Secured Floating Rate Notes, due 2026 (the "Class A-2A Notes"), U.S.$2,000,000 Class A-2B Senior Secured Floating Rate Notes, due 2026 (the "Class A-2B Notes" and, together with the Class A-2A Notes, the "Class A-2 Notes"), U.S.$3,500,000 Class A-X Senior Secured Floating Rate Notes, due 2026 (the "Class A-X Notes" and, together with the Class A-1 Notes and Class A-2 Notes, the "Class A Notes"), U.S.$56,000,000 Class B Senior Secured Floating Rate Notes, due 2026 (the "Class B Notes"), U.S.$29,000,000 Class C Secured Deferrable Floating Rate Notes, due 2026 (the "Class C Notes") and U.S.$19,000,000 Class D Secured Deferrable Floating Rate Notes, due 2026 (the "Class D Notes") and (ii) by the Issuer of U.S.$17,500,000 Class E Secured Deferrable Floating Rate Notes, due 2026 (the "Class E Notes") and U.S.$5,000,000 Class F Secured Deferrable Floating Rate Notes, due 2026 (the "Class F Notes" and, together with the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, and the Class E Notes, the "Secured Notes") and U.S.$39,750,000 Subordinated Notes, due 2026 (the "Subordinated Notes"). The Secured Notes and the Subordinated Notes are collectively referred to as the "Notes". The Notes are to be issued under an indenture, dated as of February 25, 2014 (the "Indenture"), among the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee"). In connection with the issuance of the Notes, the Issuer and Acis Capital Management, L.P., a Delaware limited partnership, as portfolio manager (the "Portfolio Manager"), have entered into that certain Portfolio Management Agreement, dated as of February 25, 2014 (the "Portfolio Management Agreement"). The Secured Notes are secured by a portfolio consisting primarily of bank loans and Participation Interests. You have requested our opinion as to certain matters concerning the U.S. federal income tax treatment of the Issuer and the Secured Notes. Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Indenture.



The Issuer was incorporated on December 24, 2013. As of February 25, 2014 (the "Closing Date"), the Issuer will be capitalized by (i) the Notes and (ii) ordinary shares in the aggregate amount of $250.

In rendering the opinions expressed below, we have reviewed copies of certain documents including, but not limited to:

(i)     the Indenture;

(ii)     the final offering circular, dated February 21, 2014 (the "Final Offering Circular");

(iii)     the Portfolio Management Agreement, including the tax guidelines attached as Schedule I thereto (the "Trading Restrictions"); and

(iv)     the representations made to us by the Issuer in the certificate dated as of the date hereof, a copy of which is attached hereto and made a part hereof.

In rendering the opinions set forth below, we have assumed, without independent investigation or inquiry, that all such documents furnished to us are complete and authentic and that all such documents have been duly authorized, executed, and delivered. We have further assumed without independent investigation or inquiry that the respective parties thereto and all persons having obligations thereunder or making or deemed to be making representations therein will act in all respects and at all relevant times in conformity with the requirements and provisions of such documents and all such representations and the covenants contained therein, without waiver or amendment, and that all such representations are true, correct and complete. In addition, we have assumed that the Portfolio Manager and the Issuer will at all times comply with the Trading Restrictions. The Transaction Documents provide that the Portfolio Manager or the Issuer may take certain actions only if such person has received an opinion or written advice, as applicable, from nationally recognized tax counsel to the effect that such action will not cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes. This opinion does not address those situations.

Based on the foregoing as of the date hereof, and subject to the limitations, qualifications, exceptions and assumptions set forth herein, it is our opinion that, under current law (1) although there is no specific authority with respect to the characterization for U.S. federal income tax purposes of securities having the same terms as the Secured Notes, the Class A Notes, the Class B Notes, the Class C Notes, and the Class D Notes will, and the Class E Notes should, be characterized as indebtedness for U.S. federal income tax purposes; (2) although no activity closely comparable to that contemplated by the Issuer has been the subject of any Treasury regulation, revenue ruling or judicial decision, the contemplated activities of the Issuer will not cause the Issuer to be engaged in a trade or business within the United States for U.S. federal income tax purposes and, accordingly, the Issuer will not be subject to U.S. federal income tax on a net income basis; and (3) subject to the exceptions, assumptions, qualifications and limitations set forth in the Final Offering Circular, the statements under the caption "U.S. Federal



Income Tax Considerations," insofar as such statements purport to constitute summaries of U.S. federal income tax law and regulations or legal conclusions with respect thereto, constitute accurate summaries of the matters described therein in all material respects.

Our opinions are based on current provisions of the Internal Revenue Code of 1986, as amended, the Treasury regulations promulgated thereunder, published pronouncements of the Internal Revenue Service and case law. Any rules set forth in any of the foregoing authorities may be changed at any time with retroactive effect. Further, you should be aware that opinions of counsel are not binding on the Internal Revenue Service or the courts. We express no opinion either as to any matters not specifically covered by the foregoing opinions or other than as to the federal income tax laws of the United States. Additionally, we undertake no obligation to update our opinions in the event there is (i) a change in the legal authorities, in the facts, or in the documents on which our opinions are based, (ii) any breach in performance under those documents, or (iii) any inaccuracy in any of the representations upon which we have relied in rendering our opinions.

This opinion is being delivered solely to the addressees on Schedule I hereof and is not rendered for the benefit of any other person. Without limiting the generality of the foregoing or creating the implication that any other person, including any rating agency that is not an addressee hereof, may rely on this letter, this letter may be posted by an addressee, for information purposes only, on any website meeting the requirements of paragraph (a)(3)(iii)(A) of Rule 17g-5 promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, for the sole purpose of permitting such addressee to comply with its undertaking to maintain certain information relating to the transaction described herein on such website pursuant to Rule 17g-5.

<div align="center">*　　　*　　　*</div>

This opinion is not intended or written by Dechert LLP to be used, and it cannot be used, by any taxpayer for the purpose of avoiding penalties that may be imposed on the taxpayer; it has been written in connection with the promotion or marketing of the transactions and matters addressed by this opinion; and each investor should seek advice based on the investor's particular circumstances from an independent tax advisor.

Very truly yours,

Dechert LLP

12119280.2.TAX



**Schedule I**

Acis CLO 2014-3 Ltd.
c/o MaplesFS Limited
P.O. Box 1093, Boundary Hall
Cricket Square
Grand Cayman KY1-1102
Cayman Islands

Acis CLO 2014-3 LLC
c/o Puglisi & Associates
850 Library Avenue, Ste. 204
Newark, Delaware  19711

Acis Capital Management, L.P.
300 Crescent Court
Dallas, Texas 75201

U.S. Bank National Association
190 S. LaSalle Street, 8th Floor
Chicago, IL  60603

Jefferies LLC
520 Madison Avenue
New York, New York 10022

Standard & Poor's Ratings Services
55 Water Street, 41st Floor
New York, New York 10041

**EXHIBIT D-1**

**FORM OF OPINION OF SEWARD & KISSEL LLP**

# SEWARD & KISSEL LLP

ONE BATTERY PARK PLAZA
NEW YORK, NEW YORK 10004

SHARAN CALAY
PARTNER
(212) 574-1208
calay@sewkis.com

TELEPHONE: (212) 574-1200
FACSIMILE: (212) 480-8421
WWW.SEWKIS.COM

901 K STREET, NW
WASHINGTON, DC 20001
TELEPHONE: (202) 737-8833
FACSIMILE: (202) 737-5184

February 25, 2014

To Each of the Persons Listed
on Schedule I Attached Hereto

**Re:     Acis CLO 2014-3 Ltd.**

Ladies and Gentlemen:

We have acted as special counsel for U.S. Bank National Association ("USBANK") in its capacities as (a) trustee (the "Trustee") under the (i) Indenture dated as of February 25, 2014 (the "Indenture") among Acis CLO 2014-3 Ltd., as issuer (the "Issuer"), Acis CLO 2014-3 LLC, as co-issuer (the "Co-Issuer" and, together with the Issuer, the "Issuers"), and the Trustee, (ii) Securities Account Control Agreement dated as of February 25, 2014 (the "Account Agreement") among the Issuer, the Trustee and USBANK, as securities intermediary (the "Securities Intermediary"); (b) Securities Intermediary under the Account Agreement; and (c) collateral administrator (the "Collateral Administrator") under the Collateral Administration Agreement dated as of February 25, 2014 (the "Collateral Administration Agreement") among the Issuer, Acis Capital Management, L.P., as portfolio manager (the "Portfolio Manager") and the Collateral Administrator. The Indenture, the Collateral Administration Agreement and the Account Agreement are collectively referred to herein as the "Agreements." Capitalized terms used and not defined herein shall have the meanings assigned to them in each of the Agreements, as applicable.

In connection with the opinion expressed below, we have relied upon the representations and warranties contained in the Agreements and we have relied upon originals or certified copies of such documents, certificates and other statements as we have deemed relevant and necessary as a basis for such opinion, and we have not attempted to independently verify or establish the factual matters set forth therein. We have also assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies.

We have assumed for the purposes of our opinion that (i) the execution and delivery of each of the Agreements by all parties thereto (other than the Trustee, the Collateral Administrator and the Securities Intermediary, as the case may be), and (ii) the performance by such parties (other than the Trustee, the Collateral Administrator and the Securities Intermediary, as the case may be) of their respective obligations thereunder are within the powers (corporate or otherwise) of such parties and have been duly authorized by all requisite action of such parties and that such documents have been duly executed and delivered by such parties (other than the

Trustee, the Collateral Administrator and the Securities Intermediary, as the case may be). We have further assumed that each party to each of the Agreements (other than the Trustee, the Collateral Administrator and the Securities Intermediary, as the case may be) has complied with all legal requirements pertaining to its status as such status relates to its rights to enforce each of the Agreements against the Trustee, the Collateral Administrator and the Securities Intermediary, as the case may be.

Based upon the foregoing, it is our opinion that:

1.  USBANK is a national banking association validly existing under the laws of the United States.

2.  Each of the Trustee, the Collateral Administrator and the Securities Intermediary has the requisite power and authority to execute, deliver and perform its respective obligations under each of the Agreements to which it is a party, and has taken all necessary action to authorize the execution, delivery and performance by it of each of the Agreements to which it is a party.

3.  Each of the Agreements has been duly executed and delivered by the Trustee, the Collateral Administrator and the Securities Intermediary, as the case may be, and each of such Agreements constitutes a legal, valid and binding obligation of the Trustee, the Collateral Administrator and the Securities Intermediary, as the case may be, enforceable against the Trustee, the Collateral Administrator and the Securities Intermediary, as the case may be, in accordance with its respective terms, except that certain of such obligations may be enforceable solely against the Assets and except that such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, liquidation, or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.  The Notes delivered on the date hereof have been duly authenticated by the Trustee in accordance with the terms of the Indenture.

5.  No consent, approval, authorization or other action by or filing with any United States federal agency or other governmental body under any United States federal regulation or law, having jurisdiction over the banking or trust powers of USBANK, is required in connection with the execution and delivery by USBANK of each of the Agreements.

6.  The execution and delivery of each of the Agreements and the performance by USBANK of the respective terms of each of the Agreements do not conflict with or result in a violation of (a) any United States federal regulation or law governing the banking trust powers of USBANK or (b) the organizational documents of USBANK.

This opinion is solely for the benefit of the addressees hereof, and is not to be used, quoted, relied upon in any manner, or otherwise referred to by any other person, or for any other purposes, without our prior written consent, except that copies of this opinion may be posted by the Issuer to a password protected website solely accessible by a "nationally recognized statistical rating organization" (an "NRSRO"), including any non-hired NRSROs that

provides a certification (each, a "Non-hired NRSRO") required by subsection (e) of Rule 17g-5 under the Securities Exchange Act of 1934, as amended (or any successor provision to such subsection) pursuant to which it agrees, among other things, to keep such items and information posted on such website confidential; provided, that no such Non-hired NRSRO will be entitled to rely on this opinion, and each such Non-hired NRSRO, by accepting this opinion, will be deemed to have agreed to comply with the terms of this sentence and not to provide copies of this opinion to any other person.

We express no opinion as to any laws other than the law of the State of New York and the federal laws of the United States.

Very truly yours

*Seward & Kissel LLP*

SCHEDULE I

List of Addressees

U.S. Bank National Association
190 South LaSalle Street
Chicago, Illinois 60603

Acis CLO 2014-3 Ltd.
c/o MaplesFS Limited
P.O. Box 1093
Queensgate House
Grand Cayman KY1-1102
Cayman Islands

Acis CLO 2014-3 LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

Acis Capital Management, L.P.
300 Crescent Court
Dallas, Texas 75201

Standard & Poor's
55 Water Street, 41st Floor
New York, New York 10041-0003

Jeffries LLC
520 Madison Avenue
New York, New York 10022

SK 03687 0162 1445998 v2



## U.S. BANK NATIONAL ASSOCIATION
### ASSISTANT SECRETARY'S CERTIFICATE

I, Cara L. Seeley, an Assistant Secretary of U.S. Bank National Association, hereby certify that the following is a true and exact extract from the Bylaws of U.S. Bank National Association, a national banking association organized under the laws of the United States.

### ARTICLE VI.
### CONVEYANCES, CONTRACTS, ETC.

All transfers and conveyances of real estate, mortgages, and transfers, endorsements or assignments of stock, bonds, notes, debentures or other negotiable instruments, securities or personal property shall be signed by any elected or appointed officer.

All checks, drafts, certificates of deposit and all funds of the Association held in its own or in a fiduciary capacity may be paid out by an order, draft or check bearing the manual or facsimile signature of any elected or appointed officer of the Association.

All mortgage satisfactions, releases, all types of loan agreements, all routine transactional documents of the Association, and all other instruments not specifically provided for, whether to be executed in a fiduciary capacity or otherwise, may be signed on behalf of the Association by any elected or appointed officer thereof.

The Secretary or any Assistant Secretary of the Association or other proper officer may execute and certify that required action or authority has been given or has taken place by resolution of the Board under this Bylaw without the necessity of further action by the Board.

I further certify the following officers of U.S. Bank National Association are duly appointed and qualified officers of the Association authorized to act under Article VI of the Bylaws of the Association and that such authority is in full force and effect as of the date hereof and have not been modified, amended or revoked.

| | | | | |
|---|---|---|---|---|
| Syed I. Ali | Vice President | Timothy J. Ruxton | Vice President |
| Matthew D. Clarkin | Vice President | Matthew S. Scott | Vice President |
| Matthew Garvis | Vice President | Jonathan M. Schaller | Vice President |
| Janet Haack | Vice President | Peter Thanoukos | Vice President |
| Christopher M. Hagen | Vice President | Kirill Y. Titomir | Vice President |
| April E. Haley | Vice President | Nicolas A. Valaperta | Vice President |
| Thais Hayum | Vice President | Erich J. Vanravenswaay | Vice President |
| Steven D. Illingworth | Vice President | Brad R. Zwetzig | Vice President |
| Adam R. Jacobs | Vice President | Brandon A. Bashkin | Asst. Vice President |
| Kimberly O. Jacobs | Vice President | Malia A. Baynes | Asst. Vice President |
| Edwin J. Janis | Vice President | Dan M. Domzalski | Asst. Vice President |
| David A. Jason | Vice President | William R. Mader | Asst. Vice President |
| Mamta D. Kamal | Vice President | Lou J. Marucheau | Asst. Vice President |
| Matthew Massier | Vice President | Mark Macesich | Asst. Vice President |
| Michael S. Mateja | Vice President | Patrick J. Mitchell | Asst. Vice President |
| Marcia Moore-Allen | Vice President | Mitchell R. Post | Asst. Vice President |
| Michelle H. Morgan | Vice President | Brian Schott | Asst. Vice President |
| Sashico J. Nishida | Vice President | Zuzana Timkova | Asst. Vice President |
| Christopher J. Nuxoll | Vice President | Gene Vladimirov | Asst. Vice President |
| Michael W. Oliver | Vice President | Molly Walter | Asst. Vice President |
| Steven E. Orlandino | Vice President | Steven Ziolkowski | Asst. Vice President |
| Daniel R. Radick | Vice President | Peter Mooses | Trust Officer |
| Patrick Reichart | Vice President | Alberto Venzor | Trust Officer |
| Paul D. Robinson | Vice President | | |

IN WITNESS WHEREOF, I have set my hand this 9th day of February, 2011.

_Cara L. Seeley_
Cara L. Seeley, Assistant Secretary

(No corporate seal )



Office of the Comptroller of the Currency

Washington, DC 20219

## CERTIFICATE OF CORPORATE EXISTENCE

I, Thomas J. Curry, Comptroller of the Currency, do hereby certify that:

1. The Comptroller of the Currency, pursuant to Revised Statutes 324, et seq, as amended, and 12 USC 1, et seq, as amended, has possession, custody, and control of all records pertaining to the chartering, regulation, and supervision of all national banking associations.

2. "U.S. Bank National Association," Cincinnati, Ohio (Charter No. 24), is a national banking association formed under the laws of the United States and is authorized thereunder to transact the business of banking on the date of this certificate.

IN TESTIMONY WHEREOF, today,

January 22, 2014, I have hereunto

subscribed my name and caused my seal of

office to be affixed to these presents at the

U.S. Department of the Treasury, in the City

of Washington, District of Columbia.



_____

Comptroller of the Currency

Exhibit B

**EXHIBIT E**

**FORM OF OPINION OF DECHERT LLP**

E-1



Bank of America Corporate Center
100 North Tryon Street
Suite 4000
Charlotte, NC 28202-4025
Tel: +1 704 339 3100
Fax: +1 704 339 3101

February 25, 2014

To Each of the Addressees on Exhibit A
Hereto

Re: Acis Capital Management, L.P.

Ladies and Gentlemen:

        We have acted as special counsel to Acis Capital Management, L.P., a Delaware limited partnership (the "Company"), in connection with the transactions contemplated by the Transaction Documents (defined below).  Capitalized terms used in this opinion letter and not otherwise defined herein shall have the meanings ascribed to them in the Transaction Documents, as applicable.

        We have examined originals (or copies of executed originals) of the transaction documents described on Schedule I hereto (collectively the "Transaction Documents") and the following:

        (i)      the Certificate of Limited Partnership of the Company, as certified by the Secretary of State of the State of Delaware on February 20, 2014 (the "Certificate of Limited Partnership");

        (ii)     the Amended and Restated Agreement of Limited Partnership of the Company, as certified by the certificate referenced in clause (iv) below (the "Partnership Agreement");

        (iii)    the resolution of Acis Capital Management GP, LLC, the general partner of the Company dated February 25, 2014, as certified by the certificate referenced in clause (iv) below (the "Resolution");

18913457

Dechert
LLP

(iv)    Certificates executed by authorized representatives of the Company including, without limitation, an incumbency certificate to which the Company has attached the Company Governing Documents (as defined below) and the Resolution, certain certificates delivered to us in connection with this opinion and those certificates, if any, executed in connection with the Transaction Documents; and

(v)    a certificate, dated February 20, 2014, from the Secretary of State of the State of Delaware as to the Company's existence and good standing in each such jurisdiction (the "Good Standing Certificate").

For purposes of this opinion letter, the documents referred to in clauses (i) and (ii) are hereinafter referred to as the "Governing Documents."

In making such examination and rendering the opinions set forth below, we have assumed the genuineness of all signatures, the legal capacity and competence of all individuals, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed, photostatic or electronic copies of such documents.

In rendering the opinions set forth below, we have also assumed that (a) each of the parties to the Transaction Documents (other than the Company) has duly and validly executed and delivered the Transaction Documents; (b) each of the parties to the Transaction Documents (other than the Company) is validly existing and in good standing under the laws of the jurisdiction of its organization or formation; (c) each of the parties to the Transaction Documents (other than the Company) has the requisite corporate, limited liability company or partnership power and authority, as applicable, and has taken the corporate, limited liability company or limited partnership action, as applicable, necessary to authorize the execution, delivery of, and performance under, the Transaction Documents and to consummate the transactions contemplated thereby and all such Transaction Documents have been duly authorized, executed and delivered by such parties (other than the Company); (d) the Transaction Documents constitute the legal, valid and binding obligations of each party thereto (other than the Company), enforceable against each such other party in accordance with their respective terms; (e) each of the parties to the Transaction Documents (other than the Company) is in compliance with all regulatory requirements applicable to it and has obtained all requisite consents and approvals in connection with the transactions contemplated by the Transaction Documents; and (f) each of the parties to the Transaction Documents has received the

- 2 -

# Dechert
### LLP

agreed upon consideration for each Transaction Document to which it purports to be a party. We assume that (i) there has been no mutual mistake of fact, or misunderstanding or fraud, duress or undue influence in connection with the negotiation, delivery or execution of the Transaction Documents and (ii) there are and have been no agreements or understandings among the parties, written or oral, and there is and has been no usage of trade or course of prior dealing among the parties that would, in either case, vary, supplement, or qualify the terms of the Transaction Documents. We have also assumed that all the applicable Transaction Documents have been duly filed, indexed and/or recorded, as applicable, among the appropriate official records, with all fees, charges and taxes having been paid.

We have not undertaken any independent investigation or inquiry to determine the existence or absence of the facts underlying any of the foregoing assumptions.

Our opinions set forth herein are based on our consideration of only those statutes, rules, regulations and judicial decisions which, in our experience, are normally applicable to transactions of the type contemplated by the Transaction Documents.

With respect to certain factual matters material to our opinions, we have relied upon representations and warranties of the Company in the Transaction Documents, and certificates or comparable documents of officers and partners of the Company, public officials and other authorized persons and we have made no independent inquiry into the accuracy of such representations or certificates. Whenever our opinion in this letter with respect to the existence or absence of facts is qualified by the phrase "to our knowledge" or a similar phrase, we are referring to the current actual knowledge of Dechert LLP attorneys who are actively involved in rendering legal services to the Company in connection with the transactions contemplated in the Transaction Documents. Except to the extent expressly set forth in this letter, we have not undertaken any independent investigation or inquiry to determine the existence or absence of those facts, and no inference as to the knowledge of the existence or absence of those facts should be drawn from our representation of the Company.

Based upon the foregoing, and subject to the assumptions and qualifications set forth above and hereinafter, we are of the opinion that:

1. The Company (a) is validly existing and in good standing as a limited partnership under the laws of the State of Delaware and (b) has the limited

- 3 -



partnership power and authority to execute and deliver each Transaction Document to which it is a party and perform its obligations thereunder.

2.     The execution and delivery of the Transaction Documents by the Company have been duly authorized by all necessary limited partnership action. The Transaction Documents have been duly executed and delivered by the Company.

3.     Each of the Transaction Documents constitutes the valid and binding obligation of the Company, enforceable against the Company in accordance with its respective terms.

4.     The execution and delivery of the Transaction Documents and consummation by the Company of the transactions contemplated by the Transaction Documents do not: (a) violate any law, statute, rule or regulation of the federal laws of the United States, the State of New York, the Delaware Revised Uniform Limited Partnership Act, or, to our knowledge, any order or decree of any court, administrative agency or other governmental authority to which the Company is subject; (b) require the consent or approval of, or any filing or registration with, any New York or federal governmental authority other than those which have been obtained; or (c) result in any violation of the provisions of the Governing Documents of the Company.

The foregoing opinions are subject to the following qualifications:

(a)     The opinions expressed herein are limited by principles of equity (regardless of whether considered in a proceeding in equity or at law) that may limit the availability of certain rights and remedies and do not reflect the effect of (1) bankruptcy (including preferences), insolvency, fraudulent conveyance, receivership, reorganization, moratorium and other laws or decisions relating to or affecting debtors' obligations or creditors' rights generally, and (2) as to rights of indemnification and contribution, principles of public policy. The opinions expressed above also do not reflect the effect of laws and equitable doctrines (including requirements that the parties to agreements act reasonably and in good faith and give reasonable notice prior to exercising rights and remedies) or the effect of the exercise of discretion of the court before which any proceeding may be brought, which may limit the availability of any particular remedy but which will not, in our judgment (but subject to the other qualifications and limitations in this opinion letter), make the remedies available to the Trustee on behalf of the Secured Parties under the Transaction Documents, taken as a whole, inadequate for the practical

- 4 -

Exhibit B

# Dechert
### LLP

realization of the benefits of the security provided for in the Transaction Documents, except for the economic consequences of any delay that may be imposed thereby or result therefrom, and except that we express no opinion as to the rights of any of the parties to the Transaction Documents to accelerate the due dates of any payment due thereunder or to exercise other remedies available to them on the happening of a non-material breach of any such document or agreement.

(b)     Without limiting the generality of the foregoing, we express no opinion with respect to:  (1) the availability of specific performance or other equitable remedies for noncompliance with any of the provisions contained in the Transaction Documents; (2) the enforceability of provisions contained in the Transaction Documents relating to the effect of laws which may be enacted in the future; (3) the enforceability of provisions in the Transaction Documents purporting to waive the effect of applicable laws; (4) the effectiveness of any power-of-attorney given under the Transaction Documents that is intended to bind successors and assigns that have not granted such powers by a power-of-attorney specifically executed by them; (5) provisions related to waivers of remedies (or the delay or omission of enforcement thereof), disclaimers, liability limitations or limitations on the obligations of the parties in circumstances in which a failure of condition or default by any party is not material; (6) any provisions in the Transaction Documents relating to indemnification, contribution or exculpation; (7) conflict of laws (or the rule and regulations or public policy underlying the same); (8)any provisions providing for waivers of a jury trial or rights to attorneys fees; (9) any provisions of the Transaction Documents to the effect that certain determinations made by one party shall have conclusive effect; (10) any self-help provisions; (11) provisions in the Transaction Documents that purport to establish evidentiary standards; (12) provisions in the Transaction Documents that provide that certain rights or obligations are absolute or unconditional; (13) provisions that provide for the enforceability of the remaining terms and provisions of the applicable Transaction Document in circumstances in which certain other terms and provisions of such Transaction Document are illegal or unenforceable; (14) provisions that restrict access to or waive legal or equitable remedies or access to courts; (15) provisions that affect or confer jurisdiction (other than on the courts of New York) or which relate to forum selection; (16) provisions that permit the parties to act in their sole discretion or to be exculpated from liability for its actions to the extent not permitted by law; (17) any provision of the Transaction Documents that may be construed as a forfeiture or penalty; or (18) any provision of the Transaction Documents that purports to provide that the terms thereof may not be varied or waived except in

- 5 -



writing or that the express terms thereof supersede any inconsistent course of performance and/or usage of the trade.

(c)     We have made no examination of and express no opinion with respect to: (1) the title to, ownership of or rights in property (real, personal, fixtures or mixed) or fixtures; (2) the validity or ownership of any trademarks, patents or licenses; (3) the existence or absence of any liens, charges or encumbrances on any Collateral; and (4) the creation, attachment, perfection or priority of any lien or security interest.

(d)     No opinion is rendered as to any federal, state or local laws, rules, or regulations of (1) antitrust or unfair competition; (2) securities or "blue sky" laws or the regulations of the Financial Industry Regulatory Authority, except for the Investment Advisers Act of 1940; (3) environmental matters; (4) tax matters; (5) zoning, subdivision, land use or other matters affecting the use, occupancy or operation of the Collateral; (6) ERISA laws, rules and regulations; (7) cities, counties, townships, municipalities or other special local non-state governmental authorities, or political subdivisions; (8) insurance, banking or financial institutions; (9) licensing matters; (10) anti-terrorism laws and regulations; or (11) the Dodd-Frank Wall Street and Consumer Protection Act, except for those sections that amend the Investment Advisers Act of 1940.  In addition, no opinion is rendered herein as to applicability to or effect on any of the matters covered herein of the laws or regulations that apply specifically to the type of business conducted by the Company or the regulatory status of any party to the Transaction Documents.

(e)     Our opinion set forth in clause (a) of paragraph 1 above relating to good standing and valid existence of the Company is based solely upon our review of the Good Standing Certificate.

(f)     Our opinion as to the enforceability of the choice of New York law as the governing law is subject to the qualification that a court may decline to enforce the choice of law provisions in the Transaction Documents on the grounds of comity or because United States constitutional requirements are not satisfied.  In connection with the provisions of the Transaction Documents whereby the parties submit to the jurisdiction of the courts of the United States of America located in the State of New York, we note the limitations of 28 U.S.C. §§ 1331 and 1332 on subject matter jurisdiction of the federal courts.  In connection with the provisions of the Transaction Documents which relate to forum selection of the courts of the United States located in the State of New York (including, without limitation, any waiver of any objection to

# Dechert
### LLP

venue or any objection that a court is an inconvenient forum), we note such court's discretion to transfer an action from one federal court to another under 28 U.S.C. § 1404(a).

We express no opinion as to the laws of any jurisdiction other than those of the United States of America, the State of New York and, to the limited extent described in this paragraph, the Delaware Revised Uniform Limited Partnership Act. We do not purport to be experts in the Delaware Revised Uniform Limited Partnership Act, nor did we review official codifications of the Delaware Revised Uniform Limited Partnership Act. We did, however, review a standard compilation of a version of the Delaware Revised Uniform Limited Partnership Act, and our opinions with respect thereto are based solely on the foregoing procedure and not upon any other review of the law of the State of Delaware.

This opinion speaks only as of the date hereof. We have no obligation to advise the addressees (or any third party) of any changes in the law or facts that may occur after the date of this opinion.

We are furnishing this letter to you solely for your benefit in connection with the transactions referred to herein. Without our prior written consent, this letter is not to be relied upon, used, circulated, quoted or otherwise referred to by, or assigned to, any other person (including any person that acquires the Notes from you or that seeks to assert your rights in respect of this letter (other than your successor in interest by means of merger, consolidation, transfer of a business or other similar transaction)) or for any other purpose, except that this letter may be disclosed to (i) governmental or regulatory authorities having jurisdiction over you, (ii) designated persons pursuant to an order or legal process of any court or governmental agency, (iii) any Person as needed to establish a legal defense and (iv) any of your attorneys, accountants and other advisors; *provided* that (A) such disclosure is made solely to enable any such person to be informed that a letter has been given and to be made aware of its contents but not for the purposes of reliance, (B) we do not assume any duty or liability to any person to whom such disclosure is made and (C) such person agrees not to further disclose this letter or its contents to any other person, other than as permitted above, without our prior written consent. Without limiting the generality of the foregoing or creating the implication that any other person, including any rating agency that is not an addressee hereof, may rely on this letter, this letter may be posted by an addressee, for information purposes only, on

- 7 -



any website meeting the requirements of paragraph (a)(3)(iii) of Rule 17g-5 promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, for the sole purpose of permitting such addressee to comply with its undertaking to maintain certain information relating to the transaction described herein on such website pursuant to Rule 17g-5.

Very truly yours,

Dechert LLP/at

DECHERT LLP

- 8 -



<u>Exhibit A</u>

Acis CLO 2013-2 Ltd.
c/o MaplesFS Limited
P.O. Box 1093, Boundary Hall
Cricket Square
Grand Cayman KY1-1102
Cayman Islands

Acis CLO 2013-2 LLC
c/o Puglisi & Associates
850 Library Avenue, Ste. 204
Newark, Delaware  19711

Acis Capital Management, L.P.
300 Crescent Court
Dallas, Texas 75201

U.S. Bank National Association
190 S. LaSalle Street, 8th Floor
Chicago, IL  60603

Jefferies LLC
520 Madison Avenue
New York, New York 10022

Standard & Poor's Ratings Services
55 Water Street, 41st Floor
New York, New York 10041

18913457



**Schedule I**
**Transaction Documents**

Portfolio Management Agreement dated as of February 25, 2014, by and between the Company and Acis CLO 2014-3 Ltd. (the "Issuer").

Collateral Administration Agreement dated as of February 25, 2014, by and among the Company, the Issuer, and U.S. Bank National Association.

**EXHIBIT F**

**FORM OF OPINION OF MAPLES AND CALDER**

# MAPLES

Our ref: NDB/688117/29885643

To the Addressees named in the First Schedule

25 February 2014

Dear Sirs

**ACIS CLO 2014-3 Ltd.** (the "**Company**")

We have acted as counsel as to Cayman Islands law to the Company in connection with the issue by the Company of (a) together with ACIS CLO 2014-3 LLC (the "**Co-Issuer**"), U.S.$205,000,000 Class A-1A Senior Secured Floating Rate Notes due 2026 (the "**Class A-1A Notes**"), U.S.$25,000,000 A-1F Senior Secured Fixed Rate Notes due 2026 (the "**Class A-1F Notes**"), U.S.$15,000,000 Class A-2A Senior Secured Floating Rate Notes due 2026 (the "**Class A-2A Notes**"), U.S.$2,000,000 Class A-2B Senior Secured Floating Rate Notes due 2026 (the "**Class A-2B Notes**"), U.S.$3,500,000 Class A-X Senior Secured Floating Rate Notes due 2026 (the "**Class A-X Notes**" and together with the Class A-1A Notes, the Class A-1F Notes, the Class A-2A Notes and the Class A-2B Notes, the "**Class A Notes**"), U.S.$56,000,000 Class B Senior Secured Floating Rate Notes due 2026 (the "**Class B Notes**"), U.S.$29,000,000 Class C Secured Deferrable Floating Rate Notes due 2026 (the "**Class C Notes**") and U.S.$19,000,000 Class D Secured Deferrable Floating Rate Notes due 2026 (the "**Class D Notes**" and together with the Class A Notes, the Class B Notes and the Class C Notes, the "**Co-Issued Notes**"); and (b) as sole issuer, U.S.$17,500,000 Class E Secured Deferrable Floating Rate Notes due 2026 (the "**Class E Notes**"), U.S.$5,000,000 Class F Secured Deferrable Floating Rate Notes due 2026 (the "**Class F Notes**") and U.S.$39,750,000 Subordinated Notes due 2026 (the "**Subordinated Notes**" and together with the Class E Notes and the Class F Notes, the "**Issuer Only Notes**"). The Co-Issued Notes and the Issuer Only Notes are referred to herein collectively as the "**Notes**."

## 1 Documents Reviewed

We have reviewed originals, copies, drafts or conformed copies of the following documents:

1.1 The certificate of incorporation dated 24 December 2013 and the memorandum and articles of association of the Company as registered on 24 December 2013 (the "**Memorandum and Articles**").

1.2     The minutes (the "**Minutes**") of the meetings of the board of directors of the Company held on 27 December 2013 and 24 February 2014 (the "**Meetings**") and the corporate records of the Company maintained at its registered office in the Cayman Islands.

1.3     The administration agreement dated 24 February 2014 between the Company and MaplesFS Limited (the "**Share Trustee**") as administrator (the "**Administration Agreement**").

1.4     The registered office agreement dated 27 December 2013 between the Company and the Share Trustee as registered office provider (the "**Registered Office Agreement**").

1.5     The notice to the Share Trustee in respect of the security interest granted over the Company's rights under the Administration Agreement and the Registered Office Agreement.

1.6     The declaration of trust dated 24 February 2014 entered into by the Share Trustee (the "**Declaration of Trust**").

1.7     A certificate of good standing with respect to the Company issued by the Registrar of Companies dated 18 February 2014 (the "**Certificate of Good Standing**").

1.8     A certificate from an authorised signatory of the Share Trustee, a copy of which is attached to this opinion letter (the "**Trustee Certificate**").

1.9     A certificate from a director of the Company, a copy of which is attached to this opinion letter (the "**Director's Certificate**").

1.10    The documents listed in the Second Schedule hereto.

The documents referred to in paragraphs 1 to 5 of the Second Schedule hereto are collectively referred to as the "**Transaction Documents**".

## 2     Assumptions

The following opinions are given only as to, and based on, circumstances and matters of fact existing and known to us on the date of this opinion letter. These opinions only relate to the laws of the Cayman Islands which are in force on the date of this opinion letter. In giving the following opinions we have relied (without further verification) upon the completeness and accuracy of the Director's Certificate, the Trustee's Certificate and the Certificate of Good Standing. We have also relied upon the following assumptions, which we have not independently verified:

2.1     The Transaction Documents and the Notes have been or will be authorised and duly executed, unconditionally delivered and, if applicable, authenticated by or on behalf of all relevant parties in accordance with all relevant laws (other than, with respect to the Company and the Share Trustee, the laws of the Cayman Islands).

2.2     The Transaction Documents and the Notes are, or will be, legal, valid, binding and enforceable against all relevant parties in accordance with their terms under the laws of the State of New York (the "**Relevant Law**") and all other relevant laws (other than, with respect to the Company and the Share Trustee, the laws of the Cayman Islands).

2.3     The choice of the Relevant Law as the governing law of the Transaction Documents and the Notes and the choice of Cayman Islands law as the governing law of the Administration Agreement, the Registered Office Agreement and the Declaration of Trust has been made in

good faith and, in the case of the Transaction Documents and the Notes, would be regarded as a valid and binding selection which will be upheld by the courts of the State of New York and any other relevant jurisdiction (other than the Cayman Islands) (the "**Relevant Jurisdictions**") as a matter of the Relevant Law and all other relevant laws (other than the laws of the Cayman Islands).

2.4 Where a Transaction Document or the Notes have been provided to us in draft or undated form, it will be duly executed, dated and unconditionally delivered by all parties thereto in materially the same form as the last version provided to us and, where we have been provided with successive drafts of a Transaction Document or the Notes marked to show changes to a previous draft, all such changes have been accurately marked.

2.5 Copies of documents, conformed copies or drafts of documents provided to us are true and complete copies of, or in the final forms of, the originals, and translations of documents provided to us are complete and accurate.

2.6 All signatures, initials and seals are genuine.

2.7 The capacity, power, authority and legal right of all parties under all relevant laws and regulations (other than, with respect to the Company and the Share Trustee, the laws of the Cayman Islands) to enter into, execute, unconditionally deliver and perform their respective obligations under the Transaction Documents, the Administration Agreement, the Registered Office Agreement, the Declaration of Trust and the Notes.

2.8 There is no contractual or other prohibition or restriction (other than as arising under Cayman Islands law) binding on the Company prohibiting or restricting it from entering into and performing its obligations under the Transaction Documents, the Administration Agreement, the Registered Office Agreement, the Declaration of Trust and the Notes.

2.9 No monies paid to or for the account of any party under the Transaction Documents represent or will represent criminal property or terrorist property (as defined in the Proceeds of Crime Law, 2008 and the Terrorism Law (2011 Revision), respectively).

2.10 Under the Relevant Law and all other relevant laws (other than the laws of the Cayman Islands), including, without prejudice to the generality of the foregoing, the governing law and situs of the property subject to the security interests created pursuant to the Transaction Documents (the "**Secured Property**"), the Indenture (as defined in the Second Schedule hereto) creates a valid first priority security interest over the Secured Property, any further steps required as a matter of the Relevant Law or other relevant laws (other than the laws of the Cayman Islands) to perfect such security interest or to regulate its ranking in order of priority have been taken and there are no prior encumbrances or interests over the Secured Property.

2.11 None of the Secured Property is situated in the Cayman Islands or governed by Cayman Islands law (other than the Company's right, title and interest in and to the Administration Agreement and the Registered Office Agreement).

2.12 There is nothing under any law (other than the laws of the Cayman Islands) which would or might affect the opinions set out below. Specifically, we have made no independent investigation of the Relevant Law or United States federal law.

2.13 The Share Trustee will at all times maintain its registration and good standing pursuant to the Companies Law (2013 Revision) of the Cayman Islands (the "**Companies Law**") and will maintain in good standing its licence pursuant to the Banks and Trust Companies Law (2013 Revision) of the Cayman Islands enabling it to act as trustee under the Declaration of Trust.

2.14 The Court Register constitutes a complete record of the proceedings before the Grand Court as at the time of the Litigation Search (as those terms are defined below).

2.15 None of the parties to the Transaction Documents (other than the Company or the Share Trustee) is a company incorporated, or a partnership or foreign company registered, under applicable Cayman Islands law and all the activities of such parties in relation to the Transaction Documents and any transactions entered into thereunder have not been and will not be carried on through a place of business in the Cayman Islands.

## 3 Opinions

Based upon, and subject to, the foregoing assumptions and the qualifications set out below, and having regard to such legal considerations as we deem relevant, we are of the opinion that:

3.1 Each of the Company and the Share Trustee has been duly incorporated with limited liability and is validly existing and in good standing under the laws of the Cayman Islands.

3.2 Each of the Company and the Share Trustee has all requisite power and authority under its memorandum and articles of association to enter into, execute and perform its obligations under the Transaction Documents, the Administration Agreement, the Registered Office Agreement and the Notes and to issue the Notes in the case of the Company and to enter into, execute and perform its obligations under the Declaration of Trust, the Administration Agreement and the Registered Office Agreement in the case of the Share Trustee.

3.3 The issue of the Notes, the execution and delivery of the Transaction Documents, the Administration Agreement and the Registered Office Agreement by the Company do not and the performance by the Company of its obligations thereunder will not and the execution and delivery of the Administration Agreement, the Registered Office Agreement and the Declaration of Trust by the Share Trustee do not and the performance by the Share Trustee of its obligations thereunder will not conflict with or result in a breach of any of the terms or provisions of the memorandum and articles of association of the Company or the Share Trustee or any law, public rule or regulation applicable to the Company or the Share Trustee, as the case may be, currently in force in the Cayman Islands.

3.4 The execution, delivery and performance of the Transaction Documents, the Administration Agreement and the Registered Office Agreement have been authorised by and on behalf of the Company and the execution, delivery and performance of the Administration Agreement, the Registered Office Agreement and the Declaration of Trust have been authorised by and on behalf of the Share Trustee and, upon the execution and unconditional delivery of the Transaction Documents, the Administration Agreement and the Registered Office Agreement by an authorised signatory of the Company for and on behalf of the Company and upon the execution and unconditional delivery of the Administration Agreement, the Registered Office Agreement and Declaration of Trust by an authorised signatory of the Share Trustee, the Transaction Documents, the Administration Agreement, the Registered Office Agreement and the Declaration of Trust will have been duly executed and delivered on behalf of the Company and the Share Trustee, as the case may be, and will constitute the legal, valid and binding obligations of the

Company and the Share Trustee, as the case may be, enforceable in accordance with their terms.

3.5 The Notes have been duly authorised by the Company and when the Notes are signed in facsimile or manually by an authorised signatory of the Company and, if appropriate, authenticated in the manner set forth in the Indenture and delivered against due payment, the conditions relating to the issuance of the Notes contained in the Indenture have been satisfied and when appropriate entries are made in the securities register in respect of the Notes, the Notes will be duly executed, issued and delivered and the Notes will constitute the legal, valid and binding obligations of the Company enforceable in accordance with their respective terms.

3.6 No authorisations, consents, approvals, licences, validations or exemptions, other than those that have been obtained, are required by law from any governmental authorities or agencies or other official bodies in the Cayman Islands in connection with:

(a) the execution, creation or delivery (and offering or issue, where applicable) by and on behalf of the Company and the Share Trustee, as applicable, of the Transaction Documents, the Notes, the Administration Agreement, the Registered Office Agreement or the Declaration of Trust;

(b) subject to the payment of the appropriate stamp duty, enforcement of the Transaction Documents, the Notes, the Administration Agreement, the Registered Office Agreement or the Declaration of Trust; or

(c) the performance by the Company or the Share Trustee of its obligations under any of the Transaction Documents, the Notes, the Administration Agreement and the Registered Office Agreement or the Declaration of Trust.

3.7 No taxes, fees or charges (other than stamp duty and as noted in paragraph 4.3 below) are payable (either by direct assessment or withholding) to the government or other taxing authority in the Cayman Islands under the laws of the Cayman Islands in respect of:

(a) the creation, offering, issue or delivery of the Notes;

(b) the execution or delivery of the Transaction Documents, the Notes, the Administration Agreement, the Registered Office Agreement and the Declaration of Trust;

(c) the enforcement of the Transaction Documents, the Administration Agreement, the Registered Office Agreement, the Declaration of Trust and the Notes;

(d) the acquisition, ownership or disposal of the Collateral Obligations, Eligible Investments and Equity Securities (each as defined in the Indenture) by the Company; or

(e) payments made under, or pursuant to, the Transaction Documents, the Notes, the Administration Agreement, the Registered Office Agreement or the Declaration of Trust.

The Cayman Islands currently have no form of income, corporate or capital gains tax and no estate duty, inheritance tax or gift tax.

3.8 The courts of the Cayman Islands will observe and give effect to the choice of the Relevant Law as the governing law of the Transaction Documents and the Notes and to the choice of Cayman

Islands law as the governing law of the Administration Agreement, the Registered Office Agreement and the Declaration of Trust.

3.9 Based solely on our search of the Register of Writs and Other Originating Process (the "**Court Register**") maintained by the Clerk of the Court of the Grand Court of the Cayman Islands from the date of incorporation of the Company to the close of business (Cayman Islands time) on 21 February 2014 (the "**Litigation Search**"), the Court Register disclosed no writ, originating summons, originating motion, petition (including any winding up petition), counterclaim nor third party notice ("**Originating Process**") nor any amended Originating Process pending before the Grand Court of the Cayman Islands, in which the Company is a defendant or respondent.

3.10 Although there is no statutory enforcement in the Cayman Islands of judgments obtained in the courts of the Relevant Jurisdictions, a judgment obtained in any such jurisdiction will be recognised and enforced in the courts of the Cayman Islands at common law, without any re-examination of the merits of the underlying dispute, by an action commenced on the foreign judgment debt in the Grand Court of the Cayman Islands, provided such judgment:

(a) is given by a foreign court of competent jurisdiction;

(b) imposes on the judgment debtor a liability to pay a liquidated sum for which the judgment has been given;

(c) is final;

(d) is not in respect of taxes, a fine or a penalty; and

(e) was not obtained in a manner and is not of a kind the enforcement of which is contrary to natural justice or the public policy of the Cayman Islands.

3.11 In relation to the Indenture:

(a) the courts of the Cayman Islands will recognise the security interest created by the Indenture;

(b) no steps are required as a matter of Cayman Islands law to perfect such security interest or to regulate its ranking in order of priority; and

(c) the security interest created by the Indenture will have priority over any claims by third parties (other than those preferred by law), including any liquidator or a creditor of the Company, subject in the case of a winding up of the Company in a jurisdiction other than the Cayman Islands to any provisions of the laws of that jurisdiction as to priority of claims in a winding up.

3.12 It is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of the Transaction Documents, the Administration Agreement, the Registered Office Agreement, the Declaration of Trust or the Notes that any document be filed, recorded or enrolled with any governmental authority or agency or any official body in the Cayman Islands.

3.13 Subject to the express subordination of the various classes of Notes to each other as set out in the Indenture and obligations of the Company as secured in accordance with the provisions of and priority set forth in the Indenture, the obligations of the Company under the Transaction

Documents and the Notes rank and will rank at least *pari passu* with all its other present and future unsecured obligations, other than those preferred by law. Under Cayman Islands law, a liquidator of the Company is required by the Companies Law to take into account and give effect to any agreement between the Company and any creditors (such as is contained in the Indenture) that the claims of such creditors be subordinated or otherwise deferred to the claims of any other creditors, subject to any subsequent agreement between the Company and any creditor to waive or limit such subordination agreement.

3.14 The statements made in the Offering Circular (as defined in the Second Schedule hereto) under the heading "Cayman Islands Income Tax Considerations" are correct in so far as such statements are summaries of or relate to Cayman Islands law.

3.15 There is no exchange control legislation under Cayman Islands law and accordingly there are no exchange control regulations imposed under Cayman Islands law.

3.16 Based solely on the documents described in paragraphs 1.3 to 1.6 and the facts represented therein at the date of this opinion, the holding of the issued shares of the Company by the Share Trustee, as trustee pursuant to a Declaration of Trust and the authority granted to the Share Trustee under the Administration Agreement and the Registered Office Agreement would not result as a matter of Cayman Islands law in the Company being regarded as a beneficially owned subsidiary of the Share Trustee. In the event of bankruptcy, composition, liquidation, winding up, insolvency, reorganisation, moratorium, receivership or other similar proceeding of the Share Trustee on the date of this opinion no creditor, liquidator, bankruptcy trustee, receiver or similar official of the Share Trustee would have any right to the Secured Property or the undertaking or assets of the Company solely as a result of being a creditor, liquidator, bankruptcy trustee, receiver or similar official of the Share Trustee (except by way of subrogation to the extent of any claims against the Company).

3.17 None of the parties to the Transaction Documents (other than the Company or the Share Trustee) is or will be treated as resident, domiciled or carrying on or transacting business in the Cayman Islands solely by reason of negotiation, preparation or execution of the Transaction Documents or the issue of the Notes.

3.18 The law of the Cayman Islands does not provide for the "perfection" of interests granted or created by way of security by filing or recording with any governmental or other official authority or public office in the Cayman Islands other than in relation to certain limited items of property with a Cayman Islands connection such as ships or aircraft registered in the Cayman Islands, land in the Cayman Islands and certain "personal chattels" as defined in the Bills of Sale Law (2000 Revision) of the Cayman Islands which are situated in the Cayman Islands.

3.19 The Indenture is in such legal form that it may be enforced under the laws of the Cayman Islands (subject to the payment of appropriate stamp duty).

3.20 The submission by the Company in the Transaction Documents to the non-exclusive jurisdiction of the laws of the State of New York is legal, valid and binding on the Company assuming that the same is true under the governing law of the Transaction Documents.

3.21 The Company is not entitled to any immunity under the laws of the Cayman Islands whether characterised as sovereign immunity or otherwise for any legal proceedings in the Cayman Islands to enforce or to collect upon the Transaction Documents or the Notes (including, without

limitation, immunity from service of process, immunity from jurisdiction prior to entry of judgment or from attachment in aid of execution upon a judgment in respect of itself or its property).

3.22 None of the parties to the Transaction Documents (other than the Company or the Share Trustee) is required to be licensed, qualified or otherwise entitled to carry on business in the Cayman Islands in order to enforce their respective rights under the Transaction Documents or as a consequence of the execution, or delivery and performance of, any of the Transaction Documents, or the issue of the Notes.

3.23 Although there is no direct judicial authority in the Cayman Islands with respect to limited recourse provisions (such as those contained in the Transaction Documents), we are of the opinion that contractual provisions providing for the extinguishment of a secured debt after exhaustion of the assets on which such debt is secured would be valid and effective as a matter of Cayman Islands law assuming the same to be the case under the proper law of the contract and, after such extinguishment, such secured creditor would not have *locus standi* to make a claim in respect of such extinguished debt whether for its repayment, for the winding-up of the Company or otherwise. We confirm we are of the opinion that there is nothing in the nature of such contractual provisions in the Transaction Documents which would render them unenforceable following the commencement of the winding up of the Company assuming that the Transaction Documents are otherwise enforceable. We are not aware of any reasons why the Cayman Islands courts would seek to expand the liabilities of the Company beyond those assumed under the Transaction Documents as properly interpreted in accordance with their governing law and, if all relevant liabilities have been extinguished, there can exist no basis for filing a petition to wind up the Company. The discretion of the court under section 92 of the Companies Law, subject to section 95(2) of the Companies Law, to wind up a Cayman Islands company if it is of the opinion that it is just and equitable to do so should not alter the fundamental question of enforceability of obligations.

3.24 Section 95(2) of the Companies Law provides that a Cayman Islands Court shall dismiss a winding up petition or adjourn the hearing of a winding up petition in circumstances where a petitioner is contractually bound not to present a winding up petition against the company.

3.25 There is no applicable money or interest limitation law in the Cayman Islands which may restrict the recovery of any amount expressed to be payable under or in connection with the Notes.

## 4 Qualifications

The opinions expressed above are subject to the following qualifications:

4.1 The obligations assumed by the Company and the Share Trustee under the Transaction Documents, the Notes, the Administration Agreement, the Registered Office Agreement and the Declaration of Trust will not necessarily be enforceable in all circumstances in accordance with their terms. In particular:

    (a)    enforcement may be limited by bankruptcy, insolvency, liquidation, reorganisation, readjustment of debts or moratorium or other laws of general application relating to or affecting the rights of creditors;

    (b)    enforcement may be limited by general principles of equity. For example, equitable remedies such as specific performance may not be available, *inter alia*, where damages are considered to be an adequate remedy;

(c)    some claims may become barred under relevant statutes of limitation or may be or become subject to defences of set off, counterclaim, estoppel and similar defences;

(d)    where obligations are to be performed in a jurisdiction outside the Cayman Islands, they may not be enforceable in the Cayman Islands to the extent that performance would be illegal under the laws of that jurisdiction;

(e)    the courts of the Cayman Islands have jurisdiction to give judgment in the currency of the relevant obligation and statutory rates of interest payable upon judgments will vary according to the currency of the judgment. If the Company becomes insolvent and is made subject to a liquidation proceeding, the courts of the Cayman Islands will require all debts to be proved in a common currency, which is likely to be the "functional currency" of the Company determined in accordance with applicable accounting principles. Currency indemnity provisions have not been tested, so far as we are aware, in the courts of the Cayman Islands;

(f)    arrangements that constitute penalties will not be enforceable;

(g)    enforcement may be prevented by reason of fraud, coercion, duress, undue influence, misrepresentation, public policy or mistake or limited by the doctrine of frustration of contracts;

(h)    provisions imposing confidentiality obligations may be overridden by compulsion of applicable law or the requirements of legal and/or regulatory process;

(i)    the courts of the Cayman Islands may decline to exercise jurisdiction in relation to substantive proceedings brought under or in relation to the Transaction Documents in matters where they determine that such proceedings may be tried in a more appropriate forum;

(j)    we reserve our opinion as to the enforceability of the relevant provisions of the Transaction Documents to the extent that they purport to grant exclusive jurisdiction as there may be circumstances in which the courts of the Cayman Islands would accept jurisdiction notwithstanding such provisions; and

(k)    a company cannot, by agreement or in its articles of association, restrict the exercise of a statutory power and there is doubt as to the enforceability of any provision in the Transaction Documents whereby the Company covenants to restrict the exercise of powers specifically given to it under the Companies Law, including, without limitation, the power to increase its authorised share capital, amend its memorandum and articles of association or present a petition to a Cayman Islands court for an order to wind up the Company.

4.2    Applicable court fees will be payable in respect of the enforcement of the Transaction Documents.

4.3    Cayman Islands stamp duty may be payable if the original Transaction Documents or the Notes are brought to or executed in the Cayman Islands.

4.4 To maintain the Company and the Share Trustee in good standing under the laws of the Cayman Islands, annual filing fees must be paid and returns made to the Registrar of Companies within the time-frame prescribed by law.

4.5 The Company must make an entry in its Register of Mortgages and Charges in respect of all mortgages and charges created under the Transaction Documents in order to comply with section 54 of the Companies Law and we confirm that such an entry has been made in respect of all mortgages and charges created under the Indenture; failure by the Company to comply with this requirement does not operate to invalidate any mortgage or charge though it may be in the interests of the secured parties that the Company should comply with the statutory requirements.

4.6 The obligations of the Company may be subject to restrictions pursuant to United Nations sanctions as implemented under the laws of the Cayman Islands and/or restrictive measures adopted by the European Union Council for Common Foreign and Security Policy extended to the Cayman Islands by the Order of Her Majesty in Council.

4.7 A certificate, determination, calculation or designation of any party to the Transaction Documents as to any matter provided therein might be held by a Cayman Islands court not to be conclusive final and binding if, for example, it could be shown to have an unreasonable or arbitrary basis, or in the event of manifest error.

4.8 The Litigation Search of the Court Register would not reveal, amongst other things, an Originating Process filed with the Grand Court which, pursuant to the Grand Court Rules or best practice of the Clerk of the Courts' office, should have been entered in the Court Register but was not in fact entered in the Court Register (properly or at all).

4.9 In principle the courts of the Cayman Islands will award costs and disbursements in litigation in accordance with the relevant contractual provisions but there remains some uncertainty as to the way in which the rules of the Grand Court will be applied in practice. Whilst it is clear that costs incurred prior to judgment can be recovered in accordance with the contract, it is likely that post-judgment costs (to the extent recoverable at all) will be subject to taxation in accordance with Grand Court Rules Order 62.

4.10 We reserve our opinion as to the extent to which the courts of the Cayman Islands would, in the event of any relevant illegality or invalidity, sever the relevant provisions of the Transaction Documents and enforce the remainder of the Transaction Documents or the transaction of which such provisions form a part, notwithstanding any express provisions in the Transaction Documents in this regard.

4.11 We are not qualified to opine as to the meaning, validity or effect of any references to foreign (i.e. non Cayman Islands) statutes, rules, regulations, codes, judicial authority or any other promulgations and any references to them in the Transaction Documents or the Notes.

4.12 We would draw your attention to the statutory right of the Share Trustee to apply to the Grand Court of the Cayman Islands for an opinion, advice or direction on any question respecting the management or administration of the trust constituted by the Declaration of Trust under section 48 of the Trusts Law (2011 Revision) of the Cayman Islands and to the provision of such section that, in acting on the opinion, advice or direction given by the Court, save in the case of fraud or wilful concealment or misrepresentation, the Share Trustee shall be deemed to have discharged its duty as such trustee in the subject matter of the application.

4.13 A trust established under the laws of the Cayman Islands may vest certain powers and consents, such as the power of appointing new trustees, in persons who are neither parties to the trust instrument nor co-trustees nor beneficiaries. Whether or not such powers or consents are enforceable against the trustee will depend on the settlor's intention as evidenced by the construction of the specific terms of the trust. However, even if they are enforceable, it is possible that they may be subject to the control of the Cayman Islands Court. The extent to which they may be so subject will usually depend upon the extent to which the holder of the power or consent is held or deemed to hold such power as a fiduciary, which will depend on the settlor's intention as evidenced by the construction of the specific terms of the trust. To the extent that the holder of the power or consent is held or deemed to hold the power or consent as a fiduciary, the Cayman Islands Court may direct the holder to give his consent, or exercise his power, or refrain from exercising his power, in a particular manner. In general, the Cayman Islands Court will not interfere with or attempt to control the power or consent under a trust vested in a person who does not hold it as a fiduciary, although there may be exceptions to this, for example where the person is attempting to act or cause others to act unlawfully.

We express no view as to the commercial terms of the Transaction Documents or the Notes or whether such terms represent the intentions of the parties and make no comment with regard to the warranties or representations which may be made by the Company or the Share Trustee.

This opinion letter is addressed to and for the benefit solely of the addressees and may not be relied upon by any other person for any purpose, nor may it be transmitted or disclosed (in whole or part) to any other person without our prior written consent; provided, however, copies of this opinion letter may be posted by the Company to a password protected website accessible by any non-hired "nationally recognized statistical rating organization" (each, an "**NRSRO**") that provides to the Company the certification required by subsection (e) of Rule 17g-5 under the United States Securities and Exchange Act of 1934, as amended (or any successor provision to such subsection) ("**Rule 17g-5**"), and agrees to keep this opinion letter confidential as contemplated by Rule 17g-5; provided, further, that no such NRSRO will be entitled to rely on this opinion letter, and each such NRSRO, by accessing a copy of this opinion letter, will be deemed to have agreed to comply with the terms of this sentence and not to provide copies of this opinion letter to any other person; provided further that you may release a copy of this opinion (i) to the extent required by any applicable law or regulation; (ii) to any of your attorneys or accountants; (iii) to any regulatory authority having jurisdiction over you; (iv) to a Holder of Notes and representatives of Holders of Notes upon request or (v) in connection with any actual or potential dispute or claim to which you are party arising out of the Transaction Documents, in each case for the purposes of information only on the strict understanding that we assume no duty or liability of any kind whatsoever and howsoever arising to any such recipients as a result or otherwise.

Yours faithfully

*Maples and Calder*

Maples and Calder

**First Schedule**

**Addressees**

ACIS CLO 2014-3 Ltd.
c/o MaplesFS Limited
P.O. Box 1093
Boundary Hall, Cricket Square
Grand Cayman, KY1-1102, Cayman Islands

ACIS CLO  2014-3 LLC
c/o Puglisi & Associates, 850 Library Avenue,
Suite 204, Newark
Delaware 19711

U.S. Bank National Association
190 S. LaSalle Street
8th Floor
Chicago
IL  60603

Acis Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas  75201

Moody's Investors Service, Inc.
7 World Trade Center
250 Greenwich Street
New York, New York 10007

Standard  &  Poor's  Ratings  Services,  a
Standard  &  Poor's  Financial  Services  LLC
business
55 Water Street, 42nd Floor
New York, New York 10041

Jefferies LLC
520 Madison Avenue, New York
New York 10022

**Second Schedule**

**Documents**

1. The Indenture (the "**Indenture**") dated as of 25 February 2014 (the "**Closing Date**") among the Company, the Co-Issuer and U.S. Bank National Association, as trustee (the "**Trustee**").

2. The Portfolio Management Agreement dated as of the Closing Date between the Company and Acis Capital Management, L.P., as portfolio manager (the "**Portfolio Manager**").

3. The Collateral Administration Agreement (the "**Collateral Administration Agreement**") dated as of the Closing Date among the Company, the Portfolio Manager and U.S. Bank National Association, as collateral administrator.

4. The Securities Account Control Agreement (the "**Account Agreement**") dated as of the Closing Date among the Company, the Trustee and U.S. Bank National Association, as custodian.

5. The Security Purchase Agreement (the "**Purchase Agreement**"), dated as of the Closing Date, among the Issuer, the Co-Issuer and Jefferies LLC.

6. The form of the Notes.

7. The Final Offering Circular relating to the Notes dated 21 February 2014 (the "**Offering Circular**").

**ACIS CLO 2014-3 Ltd.**
PO Box 1093, Boundary Hall
Cricket Square
Grand Cayman
KY1-1102
Cayman Islands


Maples and Calder
PO Box 309, Ugland House
Grand Cayman
KY1-1104
Cayman Islands


25 February 2014


Dear Sirs

**ACIS CLO 2014-3 Ltd. (the "Company")**

I, the undersigned, being a director of the Company, am aware that you are being asked to provide an opinion letter (the "**Opinion**") in relation to certain aspects of Cayman Islands law.   Unless otherwise defined herein, capitalised terms used in this certificate have the respective meanings given to them in the Opinion.  I hereby certify that:

1    The Memorandum and Articles remain in full force and effect and are unamended.

2    The Minutes are a true and correct record of the proceedings of the Meetings, which were each duly convened and held, and at each of which a quorum was present throughout, in each case, in the manner prescribed in the Memorandum and Articles.  The resolutions set out in the Minutes were duly passed in the manner prescribed in the Memorandum and Articles (including, without limitation, with respect to the disclosure of interests (if any) by directors of the Company) and have not been amended, varied or revoked in any respect

3    The authorised share capital of the Company is US$50,000 divided into 50,000 ordinary shares of US$1.00 par value each.

4    The shareholders of the Company (the "**Shareholders**") have not restricted the powers of the directors of the Company in any way.

5    The directors of the Company at the date of the Meetings and at the date of this certificate were and are as follows: Wendy Ebanks and Cleveland Stewart.

6    The minute book and corporate records of the Company as maintained at its registered office in the Cayman Islands and made available to you are complete and accurate in all material respects, and all minutes and resolutions filed therein represent a complete and accurate record of all meetings of the Shareholders and directors (or any committee thereof) of the Company

(duly convened in accordance with the Memorandum and Articles) and all resolutions passed at the meetings or passed by written resolution or consent, as the case may be.

7     The Company has not entered into any mortgages and charges over its property or assets other than those entered in the register of mortgages and charges, or contemplated by the Transaction Documents.

8     Prior to, at the time of, and immediately following the execution of the Transaction Documents and the Notes, the Company was, or will be, able to pay its debts as they fell, or fall, due and has entered, or will enter, into the Transaction Documents and the Notes for proper value and not with an intention to defraud or wilfully defeat an obligation owed to any creditor or with a view to giving a creditor a preference.

9     Each director considers the transactions contemplated by the Transaction Documents and the issue of the Securities to be of commercial benefit to the Company and has acted in good faith in the best interests of the Company, and for a proper purpose of the Company, in relation to the transactions which are the subject of the Opinion.

10     To the best of my knowledge and belief, having made due inquiry, the Company is not the subject of legal, arbitral, administrative or other proceedings in any jurisdiction. Nor have the directors or Shareholders taken any steps to have the Company struck off or placed in liquidation, nor have any steps been taken to wind up the Company. Nor has any receiver been appointed over any of the Company's property or assets.

11     The Company has no employees.

I confirm that you may continue to rely on this certificate as being true and correct on the day that you issue the Opinion unless I shall have previously notified you in writing personally to the contrary.

Signature: _____

Name:     **Wendy Ebanks**
             **Director**

Title:    Director

**MaplesFS Limited**
PO Box 1093
Boundary Hall, Cricket Square,
Grand Cayman
KY1-1102
Cayman Islands
(the "**Share Trustee**")

Maples and Calder
PO Box 309, Ugland House
Grand Cayman
KY1-1104
Cayman Islands

25 February 2014

Dear Sirs

**ACIS CLO 2014-3 Ltd.: Declaration of Trust dated 24 February 2014 (the "Declaration of Trust"), Administration Agreement dated 24 February 2014 (the "Administration Agreement") and Registered Office Agreement dated 27 December 2013 (the "Registered Office Agreement")**

I, the undersigned, being an authorised signatory of the Share Trustee, am aware that you are being asked to provide an opinion letter (the "**Opinion**") in relation to the Declaration of Trust, the Administration Agreement and the Registered Office Agreement as to certain matters of Cayman Islands law. In connection therewith, I hereby certify for and on behalf of the Share Trustee that:

1    The Declaration of Trust, the Administration Agreement and the Registered Office Agreement have been or will be, as the case may be, duly authorised by and duly executed and delivered on behalf of the Share Trustee in accordance with resolutions passed by the board of directors of the Share Trustee (the "**Resolutions**"), and in accordance with Cayman Islands law and the provisions of the memorandum and articles of association of the Share Trustee.

2    The Resolutions constitute the valid and binding resolutions of the Share Trustee and have not been subsequently varied, revoked or amended.

3    The execution and delivery of the Declaration of Trust, the Administration Agreement and the Registered Office Agreement and the performance by the Share Trustee of its obligations thereunder will not conflict with or result in a breach of any of the terms or provisions of the memorandum and articles of association of the Share Trustee.

4    The Share Trustee is duly licensed and in good standing pursuant to the Banks and Trust Companies Law (2013 Revision) of the Cayman Islands and holds an unrestricted Trust Licence thereunder and that the entry by the Share Trustee into the Declaration of Trust and the performance by the Share Trustee of its obligations thereunder is in all respects within the terms of the licences granted to the Share Trustee pursuant to the Banks and Trust Companies Law (2013 Revision) of the Cayman Islands.

5      The Share Trustee is duly incorporated and in good standing under the Companies Law (2013 Revision) of the Cayman Islands.

I confirm that you may continue to rely on this certificate as being true and correct on the day that you issue the Opinion unless I shall have previously notified you in writing personally to the contrary.

Signature: _____

Name:      **Andrew Dean** _____

Title:    Authorised signatory

**EXHIBIT G**

**CALCULATION OF LIBOR**

"LIBOR" with respect to the Secured Notes, for any Interest Accrual Period will equal (a) the rate appearing on the Reuters Screen (or any successor screen) for deposits with a term of three months (*provided* that two LIBOR rates will be calculated and apply with respect to the first Interest Accrual Period; during the period from the Closing Date to but excluding the First Interest Determination End Date, LIBOR will equal the rate representing the linear interpolation of the rates appearing on the Reuters Screen for deposits with a term of 2 months and 3 months as calculated on the relevant Interest Determination Date; and, during the remainder of the first Interest Accrual Period, LIBOR will equal the rate appearing on the Reuters Screen for deposits with a term of three months on the relevant Interest Determination Date) or (b) if such rate is unavailable at the time LIBOR is to be determined, LIBOR shall be determined on the basis of the rates at which deposits in U.S. Dollars are offered by four major banks in the London market selected by the Calculation Agent after consultation with the Portfolio Manager (the "Reference Banks") at approximately 11:00 a.m., London time, on the Interest Determination Date to prime banks in the London interbank market for a period approximately equal to such Interest Accrual Period and an amount approximately equal to the amount of the Aggregate Outstanding Amount of the Secured Notes. The Calculation Agent will request the principal London office of each Reference Bank to provide a quotation of its rate. If at least two such quotations are provided, LIBOR shall be the arithmetic mean of such quotations (rounded upward to the next higher 1/100). If fewer than two quotations are provided as requested, LIBOR with respect to such Interest Accrual Period will be the arithmetic mean of the rates quoted by three major banks in New York, New York selected by the Calculation Agent after consultation with the Portfolio Manager at approximately 11:00 a.m., New York Time, on such Interest Determination Date for loans in U.S. Dollars to leading European banks for a term approximately equal to such Interest Accrual Period and an amount approximately equal to the amount of the Secured Notes. If the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR will be determined by interpolating between the rate for the next shorter period of time for which rates are available and the rate for the next longer period of time for which rates are available. All interpolation between rates will be linear and rounded to five decimal places. "LIBOR," when used with respect to a Collateral Obligation, means the "LIBOR" rate determined in accordance with the terms of such Collateral Obligation.

"Reuters Screen" means Reuters Page LIBOR01 (or such other page that may replace that page on such service for the purpose of displaying comparable rates) as reported by Bloomberg Financial Markets Commodities News as of 11:00 a.m., London time, on the Interest Determination Date.

18779285.6.BUSINESS

**EXHIBIT H**

## FORM OF NOTE OWNER CERTIFICATE

U.S. Bank National Association, as Trustee and Collateral Administrator
190 S. LaSalle Street, 8th Floor
Chicago, IL 60603
Attention: Global Corporate Trust – ACIS CLO 2014-3 Ltd.
Email: ACIS.CLO.2014.03@usbank.com

ACIS CLO 2014-3 LTD.
c/o MaplesFS Limited
P.O. Box 1093, Boundary Hall, Cricket Square
Grand Cayman, KY1-1102 Cayman Islands
Facsimile Number: (345) 945-7100
Attention: The Directors

ACIS CLO 2014-3 LLC
c/o Puglisi & Associates
850 Library Avenue, Suite 204
Newark, Delaware 19711

Re: Reports Prepared Pursuant to the Indenture, dated as of February [25], 2014, between ACIS CLO 2014-3 LTD., ACIS CLO 2014-3 LLC and U.S. Bank National Association (the "Indenture").

Ladies and Gentlemen:

The undersigned hereby certifies that it is the beneficial owner of U.S.$_____ in principal amount of the [Class [A-1A] [A-1F] [A-2A] [A-2B] [A-X] [B] Senior Secured [Floating] [Fixed] Rate Notes due 2026 of ACIS CLO 2014-3 LTD. and ACIS CLO 2014-3 LLC] [Class [C] [D] Secured Deferrable Floating Rate Notes due 2026 of ACIS CLO 2014-3 LTD. and ACIS CLO 2014-3 LLC] [Class [E] [F] Secured Deferrable Floating Rate Notes due 2026 of ACIS CLO 2014-3 LTD.] [Subordinated Notes due 2026 of ACIS CLO 2014-3 LTD.] and hereby requests the Collateral Administrator and the Trustee grant it access, via a protected password, to each of the Collateral Administrator's and Trustee's Websites in order to view postings of the [information specified in Section 7.17(d) of the Indenture] [and/or the] [Monthly Report specified in Section 10.6(a) of the Indenture] [and/or the] [Distribution Report specified in Section 10.6(b) of the Indenture].

In consideration of the electronic signature hereof by the beneficial owner, the beneficial owner agrees to maintain the confidentiality of all Confidential Information subject to and in accordance with Section 14.15 of the Indenture.

Submission of this certificate bearing the beneficial owner's electronic signature shall constitute effective delivery hereof. This certificate shall be construed in accordance with, and this certificate and all matters arising out of or relating in any way whatsoever (whether in contract, tort or otherwise) to this certificate shall be governed by, the law of the State of New York.

<div align="center">H-1</div>

<div align="center">Exhibit B</div>

H-2

Exhibit B

IN WITNESS WHEREOF, the undersigned has caused this certificate to be duly executed this _____ day of _____, _____.

[NAME OF BENEFICIAL OWNER]

By: _____

Name:
Title:    Authorized Signatory

Tel.: _____
Fax: _____

H-3

Exhibit B

**EXHIBIT I**

## FORM OF CONFIRMATION OF REGISTRATION

U.S. Bank National Association, as Trustee
190 S. LaSalle Street, 8th Floor
Chicago, IL 60603
Attention: Global Corporate Trust – ACIS CLO 2014-3 LTD.

Re: Confirmation of Registration

Reference is hereby made to the Indenture dated as of February [25], 2014 between ACIS CLO 2014-3 LTD., as Issuer, ACIS CLO 2014-3 LLC, as Co-Issuer and U.S. Bank National Association, as Trustee (the "Indenture"), as the same may be supplemented or amended from time to time in accordance with its terms. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

We hereby confirm that the Registrar has registered the principal amount of Uncertificated Subordinated Notes specified below, in the name specified below, in the Register.

Uncertificated Subordinated Notes: [INSERT CLASS AND CUSIP NO:/CINS NO:]

Principal Amount: U.S.$[ ]

Registered Name: [ ]

**U.S. BANK NATIONAL ASSOCIATION,**
as Trustee and Registrar

By: _____
Name:
Title

I-1

EXECUTION VERSION

**ACIS CLO 2014-4 LTD.**
Issuer,


**ACIS CLO 2014-4 LLC**
Co-Issuer,


AND


**U.S. BANK NATIONAL ASSOCIATION**
as Trustee


**INDENTURE**


Dated as of June 5, 2014

**COLLATERALIZED LOAN OBLIGATIONS**

# TABLE OF CONTENTS

Page

ARTICLE 1        DEFINITIONS ............................................................. 2

Section 1.1.        Definitions ................................................................ 2

Section 1.2.        Assumptions as to Pledged Obligations ............................................ 67

ARTICLE 2        THE NOTES ............................................................. 70

Section 2.1.        Forms Generally ................................................................ 70

Section 2.2.        Forms of Notes ................................................................ 71

Section 2.3.        Authorized Amount; Stated Maturity; Denominations ..................... 72

Section 2.4.        Additional Notes ................................................................ 74

Section 2.5.        Execution, Authentication, Delivery and Dating .............................. 75

Section 2.6.        Registration, Registration of Transfer and Exchange ....................... 76

Section 2.7.        Mutilated, Defaced, Destroyed, Lost or Stolen Note ........................ 87

Section 2.8.        Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved ............................................. 88

Section 2.9.        Persons Deemed Owners ................................................................ 92

Section 2.10.       Surrender of Notes; Cancellation ....................................................... 92

Section 2.11.       Certificated Notes ................................................................ 92

Section 2.12.       Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations ................................................. 93

Section 2.13.       Issuer Purchase of Secured Notes ...................................................... 95

Section 2.14.       No Gross Up ................................................................ 97

ARTICLE 3        CONDITIONS PRECEDENT ........................................................ 97

Section 3.1.        Conditions to Issuance of Notes on Closing Date ............................. 97

Section 3.2.        Conditions to Issuance of Additional Notes ................................... 100

Section 3.3.        Custodianship; Delivery of Collateral Obligations and Eligible Investments ................................................................ 102

ARTICLE 4        SATISFACTION AND DISCHARGE ........................................... 103

Section 4.1.        Satisfaction and Discharge of Indenture ......................................... 103

Section 4.2.        Application of Trust Money ............................................................ 105

Section 4.3.        Repayment of Monies Held by Paying Agent ................................. 105

ARTICLE 5        REMEDIES ................................................................ 105

Section 5.1.        Events of Default ................................................................ 105

Exhibit B

**TABLE OF CONTENTS**
(continued)

<div align="right">

**Page**

</div>

| | | |
|---|---|---|
| Section 5.2. | Acceleration of Maturity; Rescission and Annulment | 107 |
| Section 5.3. | Collection of Indebtedness and Suits for Enforcement by Trustee | 108 |
| Section 5.4. | Remedies | 110 |
| Section 5.5. | Optional Preservation of Assets | 112 |
| Section 5.6. | Trustee May Enforce Claims Without Possession of Notes | 114 |
| Section 5.7. | Application of Money Collected | 114 |
| Section 5.8. | Limitation on Suits | 114 |
| Section 5.9. | Unconditional Rights of Holders to Receive Principal and Interest | 115 |
| Section 5.10. | Restoration of Rights and Remedies | 115 |
| Section 5.11. | Rights and Remedies Cumulative | 115 |
| Section 5.12. | Delay or Omission Not Waiver | 115 |
| Section 5.13. | Control by Majority of Controlling Class | 116 |
| Section 5.14. | Waiver of Past Defaults | 116 |
| Section 5.15. | Undertaking for Costs | 117 |
| Section 5.16. | Waiver of Stay or Extension Laws | 117 |
| Section 5.17. | Sale of Assets | 117 |
| Section 5.18. | Action on the Notes | 118 |
| ARTICLE 6 | THE TRUSTEE | 119 |
| Section 6.1. | Certain Duties and Responsibilities of the Trustee | 119 |
| Section 6.2. | Representations and Warranties of the Bank | 120 |
| Section 6.3. | Certain Rights of the Trustee | 121 |
| Section 6.4. | Trustee Not Responsible for Recitals or Issuance of Notes | 124 |
| Section 6.5. | Trustee May Hold Notes | 124 |
| Section 6.6. | Money Held in Trust by the Trustee | 124 |
| Section 6.7. | Trustee Compensation and Reimbursement | 124 |
| Section 6.8. | Corporate Trustee Required; Eligibility | 125 |
| Section 6.9. | Resignation and Removal of the Trustee; Appointment of Successor Trustee | 126 |
| Section 6.10. | Acceptance of Appointment by Successor Trustee | 127 |

**TABLE OF CONTENTS**
(continued)

Section 6.11.  Merger, Conversion, Consolidation or Succession to Business of the Trustee ................................................................................. 127

Section 6.12.  Co-Trustees ................................................................................. 128

Section 6.13.  Withholding by the Trustee .......................................................... 129

Section 6.14.  Authenticating Agents ................................................................. 129

Section 6.15.  Notice of Default by the Trustee................................................... 130

Section 6.16.  Certain Duties of the Trustee Related to Delayed Payment of Proceeds ............................................................................................. 130

Section 6.17.  Trustee Representative for Secured Noteholders Only; Agent for each Hedge Counterparty and the Holders of the Subordinated Notes .......................................................................... 131

ARTICLE 7       COVENANTS ..................................................................................... 131

Section 7.1.   Payment of Principal and Interest .................................................. 131

Section 7.2.   Maintenance of Office or Agency................................................... 131

Section 7.3.   Money for Note Payments to be Held in Trust ................................ 132

Section 7.4.   Existence of Co-Issuers................................................................. 134

Section 7.5.   Protection of Assets ...................................................................... 135

Section 7.6.   Opinions as to Assets .................................................................... 136

Section 7.7.   Performance of Obligations ........................................................... 137

Section 7.8.   Negative Covenants ...................................................................... 137

Section 7.9.   Statement as to Compliance .......................................................... 139

Section 7.10.  Co-Issuers May Consolidate, etc., Only on Certain Terms ............. 139

Section 7.11.  Successor Substituted.................................................................... 141

Section 7.12.  No Other Business ........................................................................ 141

Section 7.13.  Maintenance of Listing ................................................................. 142

Section 7.14.  Annual Rating Review................................................................... 142

Section 7.15.  Reporting...................................................................................... 142

Section 7.16.  Calculation Agent ........................................................................ 142

Section 7.17.  Certain Tax Matters ...................................................................... 143

Section 7.18.  Ramp-up Period; Purchase of Additional Collateral Obligations.... 146

Section 7.19.  Representations Relating to Security Interests in the Assets ........... 148

**TABLE OF CONTENTS**
(continued)

**Page**

Section 7.20. Objection to Bankruptcy Proceeding ............................................... 151

ARTICLE 8 SUPPLEMENTAL INDENTURES .......................................... 151

Section 8.1. Supplemental Indentures Without Consent of Holders of Offered Securities ................................................................ 151

Section 8.2. Supplemental Indentures With Consent of Holders of Offered Securities ........................................................................ 154

Section 8.3. Execution of Supplemental Indentures ........................................... 157

Section 8.4. Effect of Supplemental Indentures.................................................. 158

Section 8.5. Reference in Notes to Supplemental Indentures.............................. 158

ARTICLE 9 REDEMPTION OF NOTES ....................................................... 158

Section 9.1. Mandatory Redemption .................................................................. 158

Section 9.2. Optional Redemption and Refinancing........................................... 158

Section 9.3. Redemption Procedures .................................................................. 161

Section 9.4. Notes Payable on Redemption Date ................................................ 163

Section 9.5. Special Redemption ........................................................................ 163

Section 9.6. Clean-up Call Redemption.............................................................. 164

ARTICLE 10 ACCOUNTS, ACCOUNTINGS AND RELEASES ................................... 166

Section 10.1. Collection of Money ....................................................................... 166

Section 10.2. Collection Account ......................................................................... 167

Section 10.3. Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account .................... 169

Section 10.4. The Revolver Funding Account....................................................... 171

Section 10.5. Letter of Credit Reserve Account ................................................... 172

Section 10.6. Hedge Accounts ............................................................................. 173

Section 10.7. Reinvestment of Funds in Accounts; Reports by Trustee................ 174

Section 10.8. Accountings ................................................................................... 175

Section 10.9. Release of Securities ...................................................................... 184

Section 10.10. Reports by Independent Accountants .............................................. 186

Section 10.11. Reports to Rating Agencies and Additional Recipients; Rule 17g-5 Procedures ........................................................................... 188

Section 10.12. Procedures Relating to the Establishment of Accounts Controlled by the Trustee.............................................................. 189

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE 11 APPLICATION OF MONIES ................................................................... 189

Section 11.1. Disbursements of Monies from Payment Account ........................ 189

Section 11.2. Payments on the Combination Notes ............................................. 197

ARTICLE 12 SALE OF COLLATERAL OBLIGATIONS; PURCHASE OF ADDITIONAL COLLATERAL OBLIGATIONS ..................................... 197

Section 12.1. Sales of Collateral Obligations ....................................................... 197

Section 12.2. Purchase of Additional Collateral Obligations ............................... 199

Section 12.3. Conditions Applicable to All Sale and Purchase Transactions........ 201

Section 12.4. Post Reinvestment Period Amendment Proceeds ........................... 202

ARTICLE 13 NOTEHOLDERS' RELATIONS .............................................................. 202

Section 13.1. Subordination; Non-Petition .......................................................... 202

Section 13.2. Standard of Conduct ....................................................................... 203

Section 13.3. Voting Rights of Holders of Combination Notes ........................... 204

Section 13.4. Sales and Exchanges of Combination Notes .................................. 204

Section 13.5. Information Regarding Holders ....................................................... 205

ARTICLE 14 MISCELLANEOUS ................................................................................ 205

Section 14.1. Form of Documents Delivered to Trustee ...................................... 205

Section 14.2. Acts of Holders ............................................................................... 206

Section 14.3. Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Initial Purchaser, the Hedge Counterparty, the Paying Agent, the Administrator and each Rating Agency .................................................................... 206

Section 14.4. Notices to Holders; Waiver ............................................................. 209

Section 14.5. Effect of Headings and Table of Contents ...................................... 210

Section 14.6. Successors and Assigns ................................................................... 210

Section 14.7. Separability ..................................................................................... 210

Section 14.8. Benefits of Indenture ...................................................................... 210

Section 14.9. Governing Law ................................................................................ 210

Section 14.10. Submission to Jurisdiction and Waiver of Jury Trial ...................... 211

Section 14.11. Counterparts .................................................................................... 212

Section 14.12. Acts of Issuer .................................................................................. 212

# TABLE OF CONTENTS
(continued)

**Page**

Section 14.13. Confidential Information ................................................................. 212

Section 14.14. Liability of Co-Issuers ................................................................... 213

ARTICLE 15 ASSIGNMENT OF CERTAIN AGREEMENTS ...................................... 214

Section 15.1. Assignment of Portfolio Management Agreement .......................... 214

Section 15.2. Assignment of Hedge Agreement .................................................... 214

SCHEDULES

Schedule 1 -- Moody's Industry Classification Group List
Schedule 2 -- S&P Industry Classifications
Schedule 3 -- S&P Recovery Rate Tables
Schedule 4 -- Diversity Score Calculation
Schedule 5 -- Moody's Rating Definitions
Schedule 6 -- Certificate of Issuer Regarding Accountants' Reports and Certificates
Schedule 7 - Additional Report Recipients

EXHIBITS

Exhibit A -- Forms of Notes
Exhibit A1 -- Form of Global Secured Note
Exhibit A2 -- Form of Global Subordinated Note
Exhibit A3 -- Form of Certificated Subordinated Note
Exhibit A4 -- Form of Certificated Secured Note
Exhibit A5 -- Form of Combination Note
Exhibit B -- Forms of Transfer and Exchange Certificates
Exhibit B1 -- Form of Transferor Certificate for Transfer to Regulation S Global Secured Note
Exhibit B2 -- Form of Transferor Certificate for Transfer to Rule 144A Global Secured Note
Exhibit B3 -- Form of Transferee Certificate for Transfer of Certificated Secured Note
Exhibit B4 -- Form of ERISA Certificate
Exhibit B5 -- Form of Transferor Certificate for Transfer to Regulation S Global Subordinated Note
Exhibit B6 -- Form of Transferor Certificate for Transfer to Rule 144A Global Subordinated Note
Exhibit B7 -- Form of Transferee Certificate for Transfer of Certificated Subordinated Note
Exhibit B8 -- Form of Exchange Notice
Exhibit C -- Forms of Dechert LLP Opinions
Exhibit D -- Form of Dechert LLP Opinion
Exhibit E -- Form of Seward & Kissel LLP Opinion
Exhibit F -- Form of Maples and Calder Opinion
Exhibit G -- Calculation of LIBOR
Exhibit H -- Form of Securities Account Control Agreement
Exhibit I -- Form of Note Owner Certificate

Exhibit B

INDENTURE, dated as of June 5, 2014, among ACIS CLO 2014-4 Ltd., an exempted company incorporated in the Cayman Islands with limited liability (the "Issuer"), ACIS CLO 2014-4 LLC, a limited-liability company organized under the laws of the State of Delaware (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), and U.S. Bank National Association, a national banking association, as trustee (herein, together with its permitted successors in the trusts hereunder, the "Trustee").

<div align="center">PRELIMINARY STATEMENT</div>

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable and governed by this Indenture and to secure the Secured Notes and other obligations secured under this Indenture. Except as otherwise provided herein, all covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Secured Parties and the Trustee. The Co-Issuers are entering into this Indenture and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the agreement's terms have been done.

<div align="center">GRANTING CLAUSES</div>

The Issuer hereby Grants to the Trustee, for the benefit and security of the Holders of the Secured Notes, the Holders of the Combination Notes, the Trustee, each Hedge Counterparty, the Collateral Administrator and the Portfolio Manager (collectively, the "Secured Parties"), all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, (a) the Collateral Obligations which the Issuer causes to be delivered to the Trustee (directly or through an intermediary or bailee) herewith and all payments thereon or with respect thereto, and all Collateral Obligations which are purchased, or otherwise acquired, by the Issuer in the future pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Issuer's interest in each of the Accounts, each Hedge Account (to the extent permitted by the applicable Hedge Agreement), any Eligible Investments purchased with funds on deposit therein, and all income from the investment of funds therein, (c) the Issuer's rights under the Portfolio Management Agreement as set forth in Article 15 hereof, the Hedge Agreements (*provided* that there is no such Grant to the Trustee on behalf of any Hedge Counterparty in respect of its related Hedge Agreement), the Collateral Administration Agreement, the Purchase Agreement and any subscription agreements related to the purchase of the Notes, (d) all Cash or Money delivered to the Trustee (or its bailee), (e) all accounts, chattel paper, deposit accounts, financial assets, general intangibles, instruments, investment property, letter-of-credit rights and other supporting obligations relating to the foregoing, (f) any other property otherwise delivered to the Trustee by or on behalf of the Issuer (whether or not constituting Collateral Obligations or Eligible Investments (including, without limitation, Equity Securities)), (g) the Issuer's rights in all assets owned by any ETB Subsidiary and the Issuer's rights under any agreement with any ETB Subsidiary and (h) all proceeds with respect to the foregoing; *provided* that such Grants shall not include the $250 transaction fee paid to the Issuer in consideration of the issuance of the Secured Notes and Subordinated Notes, the funds attributable to the issue and allotment of the Issuer's ordinary shares and the Co-Issuer's

membership interests or the bank account in the Cayman Islands in which such funds are deposited (or any interest thereon) (or any funds deposited or credited thereto) (the assets referred to in (a) through (h) are collectively referred to as the "Assets").  Such Grants are made, however, to secure, in accordance with the priorities set forth in the Priority of Payments, the Secured Notes equally and ratably without prejudice, priority or distinction between any Secured Note and any other Secured Note by reason of difference in time of issuance, documentation governing the incurrence or otherwise, except as expressly provided in this Indenture, and to secure, in accordance with the priorities set forth in the Priority of Payments of this Indenture, (i) the payment of all amounts due on the Secured Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture and other related transaction documents and (iii) compliance with the provisions of this Indenture, all as provided in this Indenture.  The foregoing Grant shall, for the purpose of determining the property subject to the lien of this Indenture, be deemed to include any securities and any investments granted to the Trustee by or on behalf of the Issuer, whether or not securities or investments satisfy the criteria set forth in the definitions of "Collateral Obligation" or "Eligible Investments," as the case may be.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof.

## ARTICLE 1

### DEFINITIONS

Section 1.1.    Definitions.  Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms.  The word "including" shall mean "including without limitation."  All references in this Indenture to designated "Articles," "Sections," "Subsections" and other subdivisions are to the designated articles, sections, subsections and other subdivisions of this Indenture.  The words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular article, section, subsection or other subdivision.

"17g-5 Site":  The meaning specified in Section 10.11(f) (Reports to Rating Agencies and Additional Recipients; Rule 17g-5 Procedures).

"25% Limitation":  The meaning specified in Section 2.6(c) (Registration, Registration of Transfer and Exchange).

"Acceleration Event":  The meaning specified in Section 11.1(a)(iii) (Disbursements of Monies from Payment Account).

"Acceleration Priority of Payments":  The meaning specified in Section 11.1(a)(iii) (Disbursement of Monies from Payment Account).

"Accountants' Report":  A certificate of the firm or firms appointed by the Issuer pursuant to Section 10.10(a) (Reports by Independent Accountants).

"Accounts":  (i) the Payment Account; (ii) the Collection Account; (iii) the Ramp-up Account; (iv) the Revolver Funding Account; (v) the Expense Reserve Account; (vi) the Custodial Account; (vii) the Interest Reserve Account; (viii) each Hedge Account; and (ix) the Letter of Credit Reserve Account.

"Accredited Investor":  An accredited investor as defined in Regulation D under the Securities Act.

"Act" and "Act of Holders":  The meanings specified in Section 14.2 (Acts of Holders).

"Additional Issuance Threshold Test":  A test that will be satisfied on the date of any issuance of Additional Subordinated Notes if (1) no Event of Default has occurred and is continuing or would result therefrom, (2) such issuance does not occur during a Restricted Trading Period, (3) the Overcollateralization Ratio Test with respect to each Class of Notes is satisfied after giving effect to such issuance and (4) the aggregate principal amount of Additional Subordinated Notes being issued is at least equal to U.S.$2,000,000.

"Additional Notes Closing Date":  The closing date for the issuance of any Additional Subordinated Notes pursuant to Section 2.4 (Additional Notes) as set forth in an indenture supplemental to this Indenture pursuant to Section 8.2(b) (Supplemental Indentures With Consent of Holders of Offered Securities).

"Additional Subordinated Notes":  Any Subordinated Notes issued pursuant to Section 2.4 (Additional Notes).

"Adjusted Collateral Principal Amount":  As of any date of determination:

(a)     the Aggregate Principal Balance of the Collateral Obligations (other than (i) Defaulted Obligations, (ii) Deferring Securities and (iii) Discount Obligations) *plus* any Principal Financed Accrued Interest; *plus*

(b)     without duplication, the amounts on deposit in the Accounts, excluding the Revolver Funding Account, (including Eligible Investments in such Accounts) representing Principal Proceeds; *plus*

(c)     the lesser of (i) the S&P Collateral Value of each Deferring Security and (ii) the Moody's Collateral Value of each Deferring Security; *plus*

(d)     the lesser of (x) the Market Value of each Defaulted Obligation and (y) the lesser of (i) the S&P Recovery Amount for each Defaulted Obligation and (ii) the Moody's Recovery Amount for each Defaulted Obligation; *provided* that Defaulted Obligations that have constituted Defaulted Obligations for a period of at least 3 years shall be deemed to have a value of 0; *plus*

(e)     the original purchase price (expressed as a percentage of par) *multiplied by* the current Principal Balance, excluding accrued interest, expressed as a dollar amount, of all Discount Obligations; *minus*

(f)    the Excess CCC/Caa Adjustment Amount;

*provided* that, with respect to any Collateral Obligation that would be subject to more than one of clauses (c) through (f) of this definition of "Adjusted Collateral Principal Amount," such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the category of Collateral Obligations which results in the lowest Adjusted Collateral Principal Amount on any date of determination; *provided further* that the Aggregate Principal Balance of any Deferring Security shall not include any deferred or capitalized interest for purposes of calculating the Adjusted Collateral Principal Amount. For the purposes of clause (a) above, Current Pay Obligations representing up to 5% of the Collateral Principal Amount shall be included in the calculation of the Aggregate Principal Balance of the Collateral Obligations.

"Administration Agreement": An agreement between the Administrator and the Issuer relating to the various administrative functions the Administrator will perform on behalf of the Issuer, including communications with shareholders and the general public, and the provision of certain clerical, administrative and other corporate services in the Cayman Islands, as amended from time to time.

"Administrative Expense Cap": An amount equal on any Payment Date (when taken together with any Administrative Expenses paid during the period since the preceding Payment Date or, in the case of the first Payment Date, the Closing Date (excluding Administrative Expenses paid by amounts in the Expense Reserve Account)) equal to the sum of (a) 0.02% *per annum* (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount, on the related Determination Date and (b) $250,000 *per annum* (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months); *provided* that, if the amount of Administrative Expenses paid under the Administrative Expense Cap (including any excess applied in accordance with this proviso) on the three immediately preceding Payment Dates or during the related Collection Periods is less than the stated Administrative Expense Cap (without regard to any excess applied in accordance with this proviso) in the aggregate for such three preceding Payment Dates, the excess may be applied to the Administrative Expense Cap with respect to the then-current Payment Date; *provided further* that, in respect of the first three Payment Dates from the Closing Date, such excess amount shall be calculated based on the Payment Dates preceding such Payment Date; *provided further* that the Administrative Expense Cap shall not apply to the Petition Expense Amount or Petition Expenses (except as set forth in the Priority of Payments).

"Administrative Expenses": Fees, expenses (including indemnities) and other amounts due or accrued with respect to any Payment Date and payable in the following order by the Issuer, the Co-Issuer or any ETB Subsidiary: first *pro rata* to the Trustee pursuant to Section 6.7 (Trustee Compensation and Reimbursement) and the Bank in each of its capacities hereunder and the Collateral Administrator for its fees and expenses under the Collateral Administration Agreement and then *pro rata* to (i) the Independent accountants, agents (other than the Portfolio Manager) and counsel of the Issuer and any ETB Subsidiary for fees and expenses and any taxes or government fees of any ETB Subsidiary; (ii) the Rating Agencies for fees and expenses (including surveillance fees) in connection with any rating of the Secured Notes or any Collateral Obligations; (iii) any Person in respect of Petition Expenses; (iv) the Portfolio Manager under

this Indenture and the Portfolio Management Agreement, including, without limitation, reasonable expenses of the Portfolio Manager (including fees for its accountants, agents and counsel) incurred in connection with the purchase or sale of any Collateral Obligations (including amounts owed to any Independent Review Party (as defined in the Portfolio Management Agreement)), any other expenses incurred in connection with the Collateral Obligations and amounts payable pursuant to Sections 9(c) and 11 of the Portfolio Management Agreement but excluding the Management Fees; (v) the Administrator pursuant to the Administration Agreement and the Registered Office Agreement; and (vi) any other Person in respect of any other fees or expenses permitted under this Indenture and the documents delivered pursuant to or in connection with this Indenture (including the payment of facility rating fees and all legal and other fees and expenses incurred in connection with the purchase or sale of any Collateral Obligations and any other expenses incurred in connection with the Collateral Obligations) and the Offered Securities, including but not limited to, amounts owed to the Co-Issuer pursuant to Section 7.1 (Payment of Principal and Interest), any amounts due in respect of the listing of the Offered Securities on any stock exchange or trading system, any costs associated with producing Certificated Notes, any fees, taxes and expenses incurred in connection with complying with FATCA or the establishment and maintenance of any ETB Subsidiary (other than those amounts paid under clause (i)); *provided* that amounts due in respect of actions taken on or before the Closing Date (or, at the Portfolio Manager's discretion, expenses incurred in connection with the acquisition of the initial portfolio of Collateral Obligations prior to the fourth Payment Date) shall not be payable as Administrative Expenses but shall be payable only from the Expense Reserve Account pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Administrator": MaplesFS Limited and any successor thereto.

"Affected":  Any Class of Notes which becomes subject to a tax as a result of a Tax Event.

"Affiliate" or "Affiliated":  With respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (ii) any other Person who is a director, Officer or employee (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in clause (i) above.  For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Persons or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  For purposes of this definition, the management of an account by one Person for the benefit of any other Person shall not constitute "control" of such other Person and no entity shall be deemed an Affiliate of the Issuer or the Co-Issuer solely because the Administrator or its Affiliates serve as administrator or share trustee for such entity.

"Agent Members":  Members of, or participants in, DTC, Euroclear or Clearstream.

"Aggregate Maximum Notional Amount": The Class A Maximum Notional Amount *plus* the Class B Maximum Notional Amount.

"Aggregate Outstanding Amount": With respect to any of the Notes as of any date, the aggregate unpaid principal amount of such Notes Outstanding (including any Deferred Interest previously added to the principal amount of any Class of Deferrable Notes that remains unpaid) on such date. Payments received on the Subordinated Notes shall not reduce the Aggregate Outstanding Amount of the Subordinated Notes prior to the Stated Maturity.

"Aggregate Principal Balance": When used with respect to all or a portion of the Collateral Obligations or the Pledged Obligations, the sum of the Principal Balances of all or of such portion of the Collateral Obligations or Pledged Obligations, respectively.

"Aggregate Weighted Average Life" : With respect to all Collateral Obligations as of any date of determination is a date equal to (A) the number of years following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such time of all Collateral Obligations *plus* (B) such date of determination.

"Applicable Issuer" or "Applicable Issuers": With respect to the Co-Issued Notes of any Class, the Issuer or each of the Co-Issuers, as specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations) and with respect to the Issuer Notes, the Issuer only.

"Asset-Backed Commercial Paper": Commercial paper or other short-term obligations of a program that primarily issues externally rated commercial paper backed by assets or exposures held in a bankruptcy-remote, special purpose entity.

"Assets": The meaning assigned in the Granting Clauses hereof.

"Assigned Moody's Rating": With respect to any Collateral Obligation, the rating determined pursuant to Schedule 5 hereto.

"Assumed Reinvestment Rate": For each Interest Accrual Period, LIBOR (as determined on the most recent Interest Determination Date) *minus* 0.50% *per annum*; *provided* that, if the calculation above results in an interest rate of less than zero, the Assumed Reinvestment Rate will be deemed to be zero for purposes of such calculation.

"Authenticating Agent": With respect to the Notes or a Class of the Notes, the Person designated by the Trustee to authenticate such Notes on behalf of the Trustee pursuant to Section 6.14 (Authenticating Agents) hereof.

"Authorized Officer": With respect to the Issuer or the Co-Issuer, any Officer or any other Person who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer or the Co-Issuer. With respect to the Portfolio Manager, any Officer, employee, partner, member or agent of the Portfolio Manager or any other Person who is authorized to act for the Portfolio Manager in matters relating to, and binding upon, the Portfolio Manager with respect to the subject matter of the request, certificate or order in

question. With respect to the Collateral Administrator, any Officer, employee or agent of the Collateral Administrator who is authorized to act for the Collateral Administrator in matters relating to, and binding upon, the Collateral Administrator with respect to the subject matter of the request or certificate in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Bank Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt from such other party of written notice to the contrary.

"Balance":  On any date, with respect to Cash or Eligible Investments in any account, the aggregate (i) current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) principal amount of interest-bearing corporate and government securities, money market accounts and repurchase obligations; and (iii) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"Bank":  U.S. Bank National Association, a national banking association, in its individual capacity and not as Trustee, Collateral Administrator or any successor thereto.

"Bank Officer":  When used with respect to the Trustee, any officer within the Corporate Office (or any successor group of the Trustee) including any vice president, assistant vice president or officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred at the Corporate Office because of his knowledge of and familiarity with the particular subject and in each case having direct responsibility for the administration of this Indenture.

"Bankruptcy Law":  The federal Bankruptcy Code, Title 11 of the United States Code, as amended from time to time, the Companies Winding Up Rules and Part V of the Companies Law (2013 Revision) of the Cayman Islands, as amended from time to time.

"Benefit Plan Investor":  Means (a) an employee benefit plan (as defined in Section 3(3) of Title I of ERISA) that is subject to the fiduciary responsibility provisions of Title I of ERISA, (b) a plan as defined in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code, (c) any entity whose underlying assets include "plan assets" (within the meaning of the Plan Asset Regulations, issued by the United States Department of Labor at 29 C.F.R. Section 2510.3 101, as modified by Section 3(42) of the Employee Retirement Income Security Act of 1974, for purposes of ERISA or Section 4975 of the Code) by reason of such employee benefit plan's or plan's investment in the entity and (d) a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA.

"Board of Directors":  With respect to the Issuer, the directors of the Issuer duly appointed by the shareholders of the Issuer or the board of directors of the Issuer, and with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the members of the Co-Issuer.

"<u>Board Resolution</u>":  With respect to the Issuer, a resolution of the Board of Directors of the Issuer and, with respect to the Co-Issuer, a resolution of the Board of Directors of the Co-Issuer.

"<u>Bond</u>":  A debt security (that is not a loan) that is issued by a corporation, limited liability company, partnership or trust.

"<u>Bond Yield Change</u>":  The change in implied yield spread relative to the Merrill Lynch US High Yield Master II Index (Bloomberg Ticker:  H0A0) or any other index based upon a nationally recognized index as calculated by the Portfolio Manager in its reasonable commercial judgment.

"<u>Break Funding Amount</u>":  In the case of an Optional Redemption or Refinancing where the Redemption Date is not a Payment Date, an amount for each Secured Note being redeemed, if any, equal to the product of (x) the excess, if any, of (1) LIBOR for the current Interest Accrual Period over (2) LIBOR calculated as if the Redemption Date was a Payment Date beginning a new Interest Accrual Period; (y) the Outstanding principal amount of the Secured Note being redeemed and (z) the number of days remaining in the current Interest Accrual Period as of the Redemption Date over 360.

"<u>Bridge Loan</u>":  Any loan or other obligation that (x) is incurred in connection with a merger, acquisition, consolidation, or sale of all or substantially all of the assets of a Person or similar transaction and (y) by its terms, is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancings (it being understood that any such loan or debt security that has a nominal maturity date of one year or less from the incurrence thereof but has a term-out or other provision whereby (automatically or at the sole option of the obligor thereof) the maturity of the indebtedness thereunder may be extended to a later date is not a Bridge Loan).

"<u>Business Day</u>":  Any day other than (i) a Saturday or a Sunday or (ii) a day on which commercial banks are authorized or required by applicable law, regulation or executive order to close in New York, New York or in the city in which the Corporate Office of the Trustee is located or, for any final payment of principal, in the relevant place of presentation.

"<u>Caa Collateral Obligation</u>":  A Collateral Obligation (other than a Defaulted Obligation or a Deferring Security) with a Moody's Rating of "Caa1" or lower.

"<u>Calculation Agent</u>":  The meaning specified in <u>Section 7.16</u> (Calculation Agent).

"<u>Cash</u>":  Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"<u>CCC Collateral Obligation</u>":  A Collateral Obligation (other than a Defaulted Obligation or a Deferring Security) with an S&P Rating of "CCC+" or lower.

"<u>CCC/Caa Calculated Amount</u>":  With respect to any Collateral Obligation included in the CCC/Caa Excess, the lower of (x) an amount equal to 75% of the Principal Balance of such Collateral Obligation and (y) the Market Value of such Collateral Obligation

(assuming such Market Value is expressed as a percentage of the Principal Balance of such Collateral Obligation as of the related Determination Date).

"CCC/Caa Excess":  The greater of: (i) the excess, if any, by which the Aggregate Principal Balance of Caa Collateral Obligations exceeds 7.5% of the Collateral Principal Amount and (ii) the excess, if any, by which the Aggregate Principal Balance of CCC Collateral Obligations exceeds 7.5% of the Collateral Principal Amount; *provided* that, in determining which of the CCC Collateral Obligations and the Caa Collateral Obligations shall be included in the CCC/Caa Excess, the CCC Collateral Obligations and the Caa Collateral Obligations with the lowest Market Value (expressed as a percentage of par) shall be deemed to constitute such CCC/Caa Excess; *provided further* that, if the greater of clause (i) or (ii) above does not result in the larger Excess CCC/Caa Adjustment Amount, then the lesser of clause (i) or (ii) shall be applicable for purposes of this definition.

"Certificate of Authentication":  The meaning specified in Section 2.1 (Forms Generally).

"Certificated Class E Note":  The meaning specified in Section 2.2(b)(ii) (Forms of Notes).

"Certificated Class F Note":  The meaning specified in Section 2.2(b)(ii) (Forms of Notes).

"Certificated Note":   The meaning specified in Section 2.11(b) (Certificated Notes).

"Certificated Secured Notes":   The meaning specified in Section 2.11(b) (Certificated Notes).

"Certificated Security":   The meaning specified in Section 8-102(a)(4) of the UCC.

"Certificated Subordinated Note":   The meaning specified in Section 2.2(b) (Forms of Notes) and Section 2.11(b) (Certificated Notes).

"CFTC":  The Commodity Futures Trading Commission.

"CFR":  With respect to any Collateral Obligation, the rating determined pursuant to Schedule 5 hereto.

"Class":  In the case of (1) the Class X Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, all of the Secured Notes having the same Note Interest Rate, Stated Maturity and designation, (2) the Subordinated Notes, all of the Subordinated Notes and (3) the Combination Notes, all of the Combination Notes.  With respect to any exercise of voting rights, any Combination Notes that are entitled to vote on a matter shall vote with each Underlying Class except in connection with any supplemental indenture that affects the Combination Notes in a materially adverse manner

that is different from the effect of such supplemental indenture on Notes of any Underlying Class, in which case the Combination Notes shall vote only as a separate class.

"Class A Maximum Notional Amount": Components of the Combination Notes representing up to $296,000,000 Class A Notes.

"Class A Notes": The Class A Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class A/B Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test applied respectively to the Class A Notes and the Class B Notes, collectively.

"Class B Maximum Notional Amount": Components of the Combination Notes representing up to $68,000,000 Class B Notes.

"Class B Notes": The Class B Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Break-even Default Rate": With respect to the Controlling Class or any Class of Secured Notes then required to be tested under the current S&P ratings methodology, the maximum percentage of defaults, at any time, that the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, determined through application of the applicable S&P CDO Monitor chosen by the Portfolio Manager in accordance with the definition of "S&P CDO Monitor" that is applicable to the portfolio of Collateral Obligations, which, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments, will result in sufficient funds remaining for the payment of such Class or Classes of Notes in full. The S&P CDO Monitor is available at www.structuredfinanceinterface.com and S&P may provide the Portfolio Manager with any input files in connection therewith, in each case, pursuant to the definition of "S&P CDO Monitor" and based upon the Weighted Average Floating Spread and the Weighted Average S&P Recovery Rate to be associated with such S&P CDO Monitor as selected by the Portfolio Manager from Section 2 of Schedule 3 or any other Weighted Average Floating Spread and Weighted Average S&P Recovery Rate selected by the Portfolio Manager from time to time.

"Class C Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"Class C Notes": The Class C Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class D Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class D Notes.

"Class D Notes":  The Class D Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Default Differential":  With respect to the Controlling Class or any Class of Secured Notes then required to be tested under the current S&P ratings methodology at any time, the rate calculated by subtracting the Class Scenario Default Rate at such time for such Class of Secured Notes from the Class Break-even Default Rate for such Class of Secured Notes at such time.

"Class E Coverage Tests":  The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class E Notes.

"Class E Notes":  The Class E Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class F Notes":  The Class F Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Scenario Default Rate":  With respect to the Controlling Class or any Class of Secured Notes then required to be tested under the current S&P ratings methodology, at any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's Initial Rating of such Class of Secured Notes, determined by application by the Portfolio Manager and the Collateral Administrator of the S&P CDO Monitor at such time.

"Class X Note Payment Amount":  An amount equal to the lesser of (x) 25% of the original principal amount of the Class X Notes issued on the Closing Date and (y) the remaining Aggregate Outstanding Amount of the Class X Notes as of such date, which shall be payable on each Payment Date in accordance with Section 11.1(a)(i) (Disbursements of Monies from Payment Account).

"Class X Notes":  The Class X Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Clean-up Call Redemption":  A redemption of the Notes in accordance with Section 9.6 (Clean-up Call Redemption).

"Clean-up Call Redemption Date":  The meaning specified in Section 9.6 (Clean-up Call Redemption).

"Clean-up Call Redemption Price":  A purchase price in Cash at least equal to the sum of (a) the Aggregate Outstanding Amount of the Secured Notes, *plus* (b) all unpaid interest on the Secured Notes accrued to the date of such redemption (including any interest accrued on Deferred Interest), *plus* (c) the aggregate of all other amounts owing by the Issuer on the date of

such redemption that are payable in accordance with the Priority of Payments prior to distributions in respect of the Subordinated Notes, including any amounts payable in respect of any Hedge Agreement and all expenses incurred in connection with effecting the Clean-up Call Redemption; *provided* that, in connection with any Clean-Up Call Redemption of the Notes, Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Clean-up Call Redemption Price that would otherwise be payable to the Holders of such Class of Secured Notes.

"Clearing Agency":  An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Corporation":  As the context may require, any or all of (i) Clearstream, (ii) DTC, (iii) Euroclear and (iv) any entity included within the meaning of "clearing corporation" under Section 8-102(a)(5) of the UCC.

"Clearing Corporation Security":  Securities which are in the custody of or maintained on the books of a Clearing Corporation or a nominee subject to the control of a Clearing Corporation and, if they are Certificated Securities in registered form, properly endorsed to or registered in the name of the Clearing Corporation or such nominee.

"Clearstream":  Clearstream Banking, *société anonyme*, a corporation organized under the laws of the Grand Duchy of Luxembourg.

"Closing Date":  June 5, 2014.

"Code":  The U.S. Internal Revenue Code of 1986, as amended.

"Co-Issued Notes":  The Class X Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Combination Notes.

"Co-Issuer":  The Person named as such on the first page of this Indenture until a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"Co-Issuers":  The Issuer and the Co-Issuer.

"Collateral Administration Agreement":  An agreement dated as of the Closing Date among the Issuer, the Portfolio Manager and the Collateral Administrator, as amended from time to time.

"Collateral Administrator":  U.S. Bank National Association, in its capacity as such under the Collateral Administration Agreement, and any successor thereto.

"Collateral Interest Amount":  As of any date of determination, without duplication, the sum of (i) the aggregate amount of Interest Proceeds in the Interest Collection Subaccount that have been received or that are expected to be received (other than Interest Proceeds expected to be received from Defaulted Obligations and Deferring Securities, but including Interest Proceeds actually received from Defaulted Obligations and Deferring

Securities) during the Collection Period (and, if such Collection Period does not end on a Business Day, the next succeeding Business Day) in which such date of determination occurs and (ii) in the case of the Hedge Agreements, any net payments expected to be received by the Issuer on or before the immediately following Payment Date (other than any payments that would be classified as Principal Proceeds).

"Collateral Obligation":  A debt obligation (including, but not limited to, interests in bank loans acquired by way of a sale or assignment, and high-yield debt securities), Participation Interest or Pre-funded Letter of Credit that as of the date of acquisition by the Issuer:

(i)      is U.S. Dollar denominated and is neither convertible by the issuer thereof into, nor payable in, any other currency;

(ii)     is not a Defaulted Obligation or a Credit Risk Obligation;

(iii)    is not a lease;

(iv)     if it is a Deferrable Security, is not currently deferring the payment of any accrued and unpaid interest that otherwise would have been due and continues to remain unpaid;

(v)      provides for a fixed amount of principal payable in Cash on scheduled payment dates and/or at maturity and does not by its terms provide for earlier amortization or prepayment at a price of less than par;

(vi)     does not constitute Margin Stock;

(vii)    is not a Margin Loan;

(viii)   has payments that do not subject the Issuer to withholding tax unless (i) the related obligor is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after tax basis (for the avoidance of doubt, this clause shall not apply to commitment fees, letter of credit fees, Pre-funded Letter of Credit fees or similar fees) or (ii) such withholding is imposed under FATCA or on commitment fees, letter of credit fees or other similar fees;

(ix)     has a Moody's Rating and an S&P Rating and does not have an S&P Rating that is below "CCC-" or a Moody's Default Probability Rating that is below "Caa3";

(x)      is not a debt obligation whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(xi)     except for Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations, is not an obligation pursuant to which any

future advances or payments, other than Excepted Advances, to the borrower or the obligor thereof may be required to be made by the Issuer;

(xii) does not have an "f," "r," "p," "pi," "q," "t" or "sf" subscript assigned by S&P or an "sf" subscript assigned by any nationally recognized statistical rating agency;

(xiii) is not a Related Obligation;

(xiv) is not subject to an Offer other than (a) an offer of publicly traded registered securities with equal or greater face value and similar terms issued in exchange for securities issued under Rule 144A or a loan or security that would otherwise qualify for purchase under the Investment Criteria or (b) a Permitted Offer;

(xv) is not a Structured Finance Obligation;

(xvi) is not a Synthetic Security;

(xvii) will not consist of a debt obligation of a single obligor where the total potential indebtedness of such obligor under all of its loan agreements, indentures and other underlying instruments is less than $250,000,000;

(xviii) will not require the Issuer, the Co-Issuer or the pool of Assets to be registered as an investment company under the Investment Company Act;

(xix) is not an Equity Security or attached with a warrant to purchase Equity Securities and does not provide for mandatory or optional conversion for Equity Securities;

(xx) is not a Bridge Loan;

(xxi) is not a Zero Coupon Obligation;

(xxii) is not a Step-up Obligation or a Step-down Obligation;

(xxiii) is not an Interest Only Security;

(xxiv) it does not mature after the earliest Stated Maturity of the Notes;

(xxv) it is not a Bond, Senior Secured Note or Pre-Funded Letter of Credit unless the Permitted Securities Condition is satisfied on such date;

(xxvi) if the obligation is payable 184 days or more from the date of its original issuance, is issued in "registered form" for purposes of Section 163(f) of the Code; and

(xxvii) is purchased at a price at least equal to 65% of its principal balance.

"Collateral Principal Amount":  As of any date of determination, the sum of (a) the Aggregate Principal Balance of the Collateral Obligations (other than Defaulted Obligations) and (b) without duplication, the amounts on deposit in the Accounts, excluding the Revolver Funding Account, (including Eligible Investments in such Accounts) representing Principal Proceeds.

"Collateral Quality Test":  A test satisfied if, as of any date of determination at, or subsequent to, the end of the Ramp-up Period (or, with respect to the test set forth in clause (iii) below, at, or subsequent to any date of determination on or after the Effective Date and which occurs during the Reinvestment Period), in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy each of the tests set forth below (or, if a test is not satisfied on such date of determination, the degree of compliance with such test is maintained or improved after giving effect to any purchase or sale effected on such date of determination), calculated in each case as required by Section 1.2 (Assumptions as to Pledged Obligations) herein:

<blockquote>

(i)　　the Minimum Weighted Average Coupon Test;

(ii)　　the Minimum Floating Spread Test;

(iii)　　the S&P CDO Monitor Test;

(iv)　　the Maximum Moody's Rating Factor Test;

(v)　　the Moody's Diversity Test;

(vi)　　the Minimum Weighted Average Moody's Recovery Rate Test; and

(vii)　　the Weighted Average Life Test.

</blockquote>

"Collection Account":  The non-interest bearing segregated trust account established pursuant to Section 10.2 (Collection Account), which includes the Principal Collection Subaccount and the Interest Collection Subaccount.

"Collection Period":  With respect to any Payment Date, the period commencing immediately following the prior Collection Period (or on the Closing Date, in the case of the Collection Period relating to the first Payment Date) and ending on the 8th Business Day prior to such Payment Date or, in the case of (x) the final Collection Period preceding the latest Stated Maturity of any Class of Notes, (y) the final Collection Period preceding an Optional Redemption or Clean-up Call Redemption or (z) the final Collection Period preceding final payment on the Notes following the liquidation of the Assets following an Event of Default, ending on the day preceding such Stated Maturity, Redemption Date or final payment, respectively.

"Combination Notes":  The Combination Notes composed of Components representing Class A Notes and Class B Notes.

"Combination Notes Table": The meaning specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Components": The Class A Notes and the Class B Notes that represent the Underlying Classes of the Combination Notes.

"Concentration Limitations": Limitations satisfied, if as of any date of determination at or subsequent to, the end of the Ramp-up Period, in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer comply with all of the requirements set forth below, calculated in each case as required by Section 1.2 (Assumptions as to Pledged Obligations) herein:

(i) all of the Collateral Obligations must be issued by Non-Emerging Market Obligors and the country of organization of such Obligor must either (x) be the United States or (y) have a country ceiling for foreign currency bonds rating of at least "Aa2" by Moody's and a foreign currency issuer credit rating of at least "AA" by S&P;

(ii) no more than the percentage listed below of the Collateral Principal Amount may be issued by obligors Domiciled in the country or countries set forth opposite such percentage:

| % Limit | Country or Countries |
|---------|----------------------|
| 10% | All countries (in the aggregate) other than the United States; |
| 10% | Any Tax Jurisdiction; |
| 10% | The aggregate of United Kingdom and Canada; and |
| 5% | The aggregate of Norway, Sweden, Australia, Germany and the Netherlands; |

(iii) the sum of the aggregate unfunded commitments under Delayed Drawdown Collateral Obligations that are available to be funded and the Aggregate Principal Balance of Revolving Collateral Obligations may not be more than 15% of the Collateral Principal Amount;

(iv) the Moody's Counterparty Criteria are met;

(v) not less than 90% of the Collateral Principal Amount may consist of Senior Secured Loans, Cash and Eligible Investments representing Principal Proceeds;

(vi) not less than 95% of the Collateral Principal Amount may consist of floating rate Collateral Obligations, Cash and Eligible Investments representing Principal Proceeds;

(vii)    not more than 10% of the Collateral Principal Amount may consist of Participation Interests;

(viii)    not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations that are Second Lien Loans;

(ix)    not more than 7.5% of the Collateral Principal Amount may consist of DIP Collateral Obligations and not more than 2% of the Collateral Principal Amount may consist of DIP Collateral Obligations issued by a single obligor;

(x)    not more than 2.0% of the Collateral Principal Amount may consist of obligations issued by a single obligor, except that up to 2.5% of the Collateral Principal Amount may consist of obligations issued by each of up to five other obligors;

(xi)    (a) not more than 7.5% of the Collateral Principal Amount may consist of Collateral Obligations with a Moody's Rating of "Caa1" or below and (b) not more than 7.5% of the Collateral Principal Amount may consist of Collateral Obligations with an S&P Rating of "CCC+" or below;

(xii)    the Third Party Credit Exposure may not exceed 20% of the Collateral Principal Amount and the Third Party Credit Exposure with counterparties with a rating below "AA" by S&P may not exceed 5% of the Collateral Principal Amount; *provided* that no Third Party Credit Exposure is permitted with counterparties that do not have a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A 1" by S&P (or a long-term debt rating of at least "A+" by S&P);

(xiii)    not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations with an S&P Rating derived from a Moody's Rating as set forth in clause (iii)(a) of the definition of the term "S&P Rating;"

(xiv)    not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations with a Moody's Rating derived from an S&P Rating as provided in the definition of the term "Moody's Derived Rating" or "Moody's Default Probability Rating";

(xv)    not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations that are issued by obligors that belong to any single S&P Industry Classification, except that up to two other S&P Industry Classifications may each represent up to 12% of the Collateral Principal Amount and up to one other S&P Industry Classification may represent up to 15% of the Collateral Principal Amount;

(xvi)    not more than 3% of the Collateral Principal Amount may consist of Pre-funded Letters of Credit; *provided* that, notwithstanding the foregoing, if the Permitted Securities Condition is not satisfied, no portion of the Collateral

Principal Amount may consist of Collateral Obligations that are Pre-funded Letters of Credit;

(xvii) not more than 60% of the Collateral Principal Amount may consist of Cov-Lite Loans;

(xviii) not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations that are Senior Secured Bonds, High-Yield Bonds or Senior Secured Notes; *provided* that, notwithstanding the foregoing, if the Permitted Securities Condition is not satisfied, no portion of the Collateral Principal Amount may consist of Collateral Obligations that are Senior Secured Bonds, High-Yield Bonds or Senior Secured Notes;

(xix) not more than 7.5% of the Collateral Principal Amount may consist of Collateral Obligations that are Non-Quarterly Assets; *provided* that not more than 3.0% of the Collateral Principal Amount may consist of Collateral Obligations that pay interest less frequently than semi-annually;

(xx) not more than 3% of the Collateral Principal Amount may consist of Deferrable Securities, including Partial Deferrable Securities; *provided* that no such Deferrable Securities are Deferring Securities; and

(xxi) not more than 2.5% of the Collateral Principal Amount may consist of Current Pay Obligations.

"Confidential Information": The meaning specified in Section 14.13(b) (Confidential Information).

"Consenting Holder of the Subordinated Notes": With respect to any Payment Date, a Holder of Subordinated Notes that has consented by delivering an irrevocable written notice to the Paying Agent to a distribution of Equity Securities in lieu of payment of Interest Proceeds on such Payment Date.

"Controlling Class": The Class A Notes (voting as a single class), so long as any Class A Notes are Outstanding; then the Class B Notes, if there are no Class A Notes Outstanding; then the Class C Notes, if there are no Class A Notes or Class B Notes Outstanding; then the Class D Notes, if there are no Class A Notes, Class B Notes or Class C Notes Outstanding; then the Class E Notes, if there are no Class A Notes, Class B Notes, Class C Notes or Class D Notes Outstanding; then the Class F Notes, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes Outstanding; and then the Subordinated Notes, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes, Class E Notes or Class F Notes Outstanding. For the avoidance of doubt, the Class X Notes shall not be the Controlling Class.

"Controlling Person": The meaning specified in Section 2.6(c) (Registration, Registration of Transfer and Exchange).

"Corporate Office": With respect to the Trustee, (x) for Note transfer purposes and presentment of the Notes, the corporate office of the Trustee located at 111 Filmore Avenue East, St. Paul, MN 55103-2292, Attn: Bond Holder Service – ACIS CLO 2014-4 and (y) for all other purposes, the corporate office of the Trustee located at 190 South LaSalle Street, 8th Floor, Chicago, IL 60603, Attn: Corporate Trust Services – ACIS CLO 2014-4, Fax: 312-332-8030, e-mail: ACIS.CLO.2014.04@usbank.com; and at or such other address as the Trustee may designate from time to time by notice to the Holders, the Portfolio Manager, any Hedge Counterparty and the Issuer or the principal corporate office of any successor Trustee.

"Coverage Tests": The Class A/B Coverage Tests, the Class C Coverage Tests, the Class D Coverage Tests and the Class E Coverage Tests.

"Covered Fund Obligation": Any Collateral Obligation, Equity Security or Eligible Investment which, in the Portfolio Manager's reasonable judgment, would cause the Issuer to be a "covered fund" as defined in and subject to the Volcker Rule.

"Cov-Lite Loan": A loan that (i) does not contain any financial covenants or (ii) requires the borrower to comply with one or more financial covenants only upon the occurrence of certain actions of the borrower including, but not limited to, a debt issuance, dividend payment, share purchase, merger, acquisition or divestiture (such covenant, an "Incurrence Covenant"), but contains no covenants requiring the borrower to comply with one or more financial covenants during each reporting period, whether or not it has taken any specified action (such covenant, a "Maintenance Covenant"); *provided* that, for all purposes other than the determination of the S&P Recovery Rate for such loan, a loan described in clause (i) or (ii) above which either contains a cross default provision to, or is *pari passu* with, another loan of the underlying obligor that requires the underlying obligor to comply with both an Incurrence Covenant and a Maintenance Covenant will be deemed not to be a Cov-Lite Loan.

"Credit Improved Criteria": The criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point increase of 0.50% or more, (ii) if such Collateral Obligation is a loan, the spread over the applicable reference rate for such Collateral Obligation has been decreased in accordance with the Underlying Instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a loan with a spread (prior to such decrease) less than or equal to 2.00%), (b) 0.375% or more (in the case of a loan with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a loan with a spread (prior to such decrease) greater than 4.00%) due, in each case, to an improvement in the related borrower's financial ratios or financial results, (iii) if such Collateral Obligation is a bond, the Bond Yield Change since the date of purchase by the Issuer has been a percentage point decrease of 0.50% or more or (iv) if it has a projected cash flow interest coverage ratio (earnings before interest and taxes *divided by* cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation that is expected to be more than 1.15 times the current year's projected cash flow interest coverage ratio.

"Credit Improved Obligation": Any Collateral Obligation which, in the Portfolio Manager's reasonable commercial judgment, has significantly improved in credit quality after it

was acquired by the Issuer, which improvement may (but need not) be evidenced by one of the following: (a) such Collateral Obligation satisfies at least one of the Credit Improved Criteria, (b) such Collateral Obligation has been upgraded at least one rating sub-category by either Rating Agency or has been placed and remains on credit watch with positive implication by either Rating Agency, (c) the issuer of such Collateral Obligation has raised equity capital or other capital subordinated to the Collateral Obligation or (d) the issuer of such Collateral Obligation has, in the Portfolio Manager's reasonable commercial judgment, shown improved results or possesses less credit risk, in each case since such Collateral Obligation was acquired by the Issuer; *provided* that, during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Improved Obligation only if (i) such Collateral Obligation has been upgraded by any Rating Agency at least one rating sub-category or has been placed and remains on a credit watch with positive implication by any Rating Agency since it was acquired by the Issuer, (ii) at least one of the Credit Improved Criteria are satisfied with respect to such Collateral Obligation or (iii) at least a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Improved Obligation.

"Credit Risk Criteria":  The criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point decrease of 0.50% or more, (ii) if such Collateral Obligation is a loan, the spread over the applicable reference rate for such Collateral Obligation has been increased in accordance with the Underlying Instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a loan with a spread (prior to such increase) less than or equal to 2.00%), (b) 0.375% or more (in the case of a loan with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a loan with a spread (prior to such increase) greater than 4.00%) due, in each case, to a deterioration in the related borrower's financial ratios or financial results, (iii) in the case of a bond, the Bond Yield Change since the date of purchase by the Issuer has been a percentage point increase of 0.50% or more or (iv) if it has a projected cash flow interest coverage ratio (earnings before interest and taxes *divided by* cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation of less than 1.00 or that is expected to be less than 0.85 times the current year's projected cash flow interest coverage ratio.

"Credit Risk Obligation":  Any Collateral Obligation that, in the Portfolio Manager's reasonable commercial judgment, has a significant risk of declining in credit quality or price unrelated to general market conditions; *provided* that, during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Risk Obligation only if (i) such Collateral Obligation has been downgraded by any Rating Agency at least one rating sub-category or has been placed and remains on a credit watch with negative implication by any Rating Agency since it was acquired by the Issuer, (ii) at least one of the Credit Risk Criteria are satisfied with respect to such Collateral Obligation or (iii) at least a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Risk Obligation.

"Current Pay Obligation":  Any Collateral Obligation (other than a DIP Collateral Obligation) that would otherwise be treated as a Defaulted Obligation but as to which no payments are due and payable that are unpaid (disregarding any forbearance or grace period in excess of 90 days with respect to any payment that is unpaid but would be due and payable but

20

for such forbearance or grace period) and with respect to which the Portfolio Manager has certified to the Trustee (with a copy to the Collateral Administrator) in writing that it believes, in its reasonable business judgment, that (i) the issuer or obligor of such Collateral Obligation will continue to make scheduled payments of interest (and/or fees, as applicable, in the case of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation) thereon and will pay the principal thereof by maturity or as otherwise contractually due, (ii) if the issuer or obligor is subject to a bankruptcy proceeding, it has been the subject of an order of a bankruptcy court that authorizes payments on such Collateral Obligation and all interest (and/or fees, as applicable, in the case of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation) and principal payments and any other amounts due thereunder have been paid in cash when due, (iii) for so long as Moody's is rating the Class A Notes, either (x) the Moody's Rating of such Collateral Obligation is at least "B3", (y) the Moody's Rating of such Collateral Obligation is at least "Caa1," and the Market Value of such Collateral Obligation is at least 80% of the par value thereof or (z) the Moody's Rating of such Collateral Obligation is at least "Caa2," and the Market Value of such Collateral Obligation is at least 85% of the par value thereof and (iv) the Market Value of such Collateral Obligation is at least 80% of the par value thereof; *provided* that the Aggregate Principal Balance of all Collateral Obligations which constitute "Current Pay Obligations" may not exceed 2.5% of the Collateral Principal Amount; *provided further*, that in determining which of the Collateral Obligations will be included in the preceding proviso as Current Pay Obligations, the Collateral Obligations with the highest Market Value expressed as a percentage will be deemed to constitute Current Pay Obligations. If the Market Value of a Collateral Obligation is determined pursuant to clause (E) of the definition of Market Value, such Collateral Obligation cannot be a Current Pay Obligation.

"Current Portfolio": At any time, the then current portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds (determined in accordance with Section 1.2 (Assumptions as to Pledged Obligations) to the extent applicable), then held by the Issuer.

"Custodial Account": The non-interest bearing segregated trust account established in the name of the Trustee pursuant to Section 10.3(b) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Custodian": The meaning specified in the first sentence of Section 3.3(a) (Custodianship; Delivery of Collateral Obligations and Eligible Investments) with respect to items of collateral referred to therein, and each entity with which an Account is maintained, as the context may require, each of which shall be a Securities Intermediary.

"Default": Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulted Obligation": Any Collateral Obligation included in the Assets shall constitute a "Defaulted Obligation" if:

(a) a default as to the payment of principal and/or interest has occurred and is continuing with respect to such Collateral Obligation (without regard to any grace period applicable thereto, or waiver thereof, after the passage (in the case of a default that in the

Portfolio Manager's judgment, as certified to the Trustee in writing, is not due to credit-related causes) of a three Business Day grace period);

(b) a default known to a Responsible Officer of the Portfolio Manager as to the payment of principal and/or interest has occurred and is continuing on another debt obligation of the same issuer which is senior or *pari passu* in right of payment to such Collateral Obligation (without regard to any grace period applicable thereto, or waiver or forbearance thereof, after the passage (in the case of a default in the Portfolio Manager's judgment that is not due to credit-related causes) of five Business Days or seven calendar days, whichever is greater, but in no case beyond the passage of any grace period applicable thereto; *provided* that both the Collateral Obligation and such other debt obligation are full recourse obligations);

(c) the issuer or others have instituted proceedings to have the issuer adjudicated as bankrupt or insolvent or placed into receivership and such proceedings have not been stayed or dismissed or such issuer has filed for protection under Chapter 11 of the United States Bankruptcy Code;

(d) (x) such Collateral Obligation has an S&P Rating of "CC" or lower or "SD" or had such rating before such rating was withdrawn or (y) the obligor of such Collateral Obligation has a Moody's probability default rating (as published by Moody's) of "D" or "LD" or had such rating before such rating was withdrawn;

(e) the Portfolio Manager has in its reasonable commercial judgment otherwise declared such Collateral Obligation to be a "Defaulted Obligation";

(f) such Collateral Obligation is a Participation Interest and (1) the related Selling Institution fails in any material respect in the performance of any of its payment obligations in accordance with the terms of such Participation Interest and such failure continues for seven Business Days or (2) the Selling Institution has an S&P Rating of "CC" or lower or "SD" or a Moody's probability of default rating of "D" or "LD" or had either such rating before such rating was withdrawn;

(g) such Collateral Obligation is *pari passu* or subordinate in right of payment as to the payment of principal and/or interest to another debt obligation of the same issuer that would constitute a Defaulted Obligation under clause (d) above were such other debt obligation owned by the Issuer; *provided* that both the debt obligation and such other debt obligation are full recourse obligations of the applicable issuer;

(h) such obligation is a Deferring Security; or

(i) the excess, if any, of Current Pay Obligations, the Aggregate Principal Balance of which exceeds 5.0% of the Collateral Principal Amount;

*provided* that a Collateral Obligation will not constitute a Defaulted Obligation pursuant to clauses (b) or (c) above if such Collateral Obligation is a DIP Collateral Obligation.

"Deferrable Cash-Pay Interest":  As to any Partial Deferrable Security, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such Partial Deferrable Security or otherwise deferred and accrued) thereon pursuant to the terms of the related underlying instruments.

"Deferrable Security":  A Collateral Obligation which by its terms permits the deferral of payment of any accrued or unpaid interest.

"Deferrable Notes":  The Notes specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Deferred Interest":  With respect to any specified Class of Deferrable Notes, the meaning specified in Section 2.8(a) (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved).

"Deferring Security":  A Deferrable Security that is deferring the payment of interest due thereon and has been so deferring the payment of interest due thereon (i) with respect to Collateral Obligations that have a Moody's Rating of at least "Baa3," for the shorter of two consecutive accrual periods or one year and (ii) with respect to Collateral Obligations that have a Moody's Rating of "Ba1" or below, for the shorter of one accrual period or six consecutive months, which deferred capitalized interest has not, as of the date of determination, been paid in Cash.

"Delayed Drawdown Collateral Obligation":  A Collateral Obligation that (a) requires the Issuer to make one or more future advances to the borrower under the Underlying Instruments relating thereto, (b) specifies a maximum amount that can be borrowed on one or more borrowing dates and (c) does not permit the re-borrowing of any amount previously repaid by the borrower thereunder; but any such Collateral Obligation will be a Delayed Drawdown Collateral Obligation only until all commitments by the Issuer to make advances to the borrower expire or are terminated or reduced to zero.

"Deliver" or "Delivered" or "Delivery":  The taking of the following steps:

(i)  in the case of each Certificated Security (other than a Clearing Corporation Security), Instrument or Participation Interest in which the underlying loan or Participation Interest is represented by an Instrument,

(a)  causing the delivery of such Certificated Security or Instrument to the Custodian registered in the name of the Custodian or its affiliated nominee or endorsed to the Custodian or in blank,

(b)  causing the Custodian to continuously indicate on its books and records that such Certificated Security or Instrument is credited to the applicable Account, and

(c)  causing the Custodian to maintain continuous possession of such Certificated Security or Instrument;

(ii)    in the case of each Uncertificated Security (other than a Clearing Corporation Security),

(a)    causing such Uncertificated Security to be continuously registered on the books of the issuer thereof to the Custodian, and

(b)    causing the Custodian to continuously indicate on its books and records that such Uncertificated Security is credited to the applicable Account;

(iii)    in the case of each Clearing Corporation Security,

(a)    causing the relevant Clearing Corporation to credit such Clearing Corporation Security to the securities account of the Custodian or a nominee, and

(b)    causing the Custodian to continuously indicate on its books and records that such Clearing Corporation Security is credited to the applicable Account;

(iv)    in the case of each security issued or guaranteed by the United States of America or agency or instrumentality thereof and that is maintained in book-entry records of a Federal Reserve Bank ("FRB") (each such security, a "Government Security"),

(a)    causing the creation of a Security Entitlement to such Government Security by the credit of such Government Security to the securities account of the Custodian at such FRB, and

(b)    causing the Custodian to continuously indicate on its books and records that such Government Security is credited to the applicable Account;

(v)    in the case of each Security Entitlement not governed by clauses (i) through (iv) above,

(a)    causing a Securities Intermediary (x) to indicate on its books and records that the underlying Financial Asset has been credited to the Custodian's securities account, (y) to receive a Financial Asset from a Securities Intermediary or to acquire the underlying Financial Asset for a Securities Intermediary, and in either case, accepting it for credit to the Custodian's securities account or (z) to become obligated under other law, regulation or rule to credit the underlying Financial Asset to a Security Intermediary's securities account,

(b)    causing such Securities Intermediary to make entries on its books and records continuously identifying such Security Entitlement as belonging to the Custodian and continuously indicating on its books and

records that such Security Entitlement is credited to the Custodian's securities account, and

(c) causing the Custodian to continuously indicate on its books and records that such Security Entitlement (or all rights and property of the Custodian representing such Security Entitlement) is credited to the applicable Account;

(vi) in the case of Cash or Money,

(a) causing the delivery of such Cash or Money to the Custodian,

(b) causing the Custodian to treat such Cash or Money as a Financial Asset maintained by such Custodian for credit to the applicable Account in accordance with the provisions of Article 8 of the UCC, and

(c) causing the Custodian to continuously indicate on its books and records that such Cash or Money is credited to the applicable Account; and

(vii) in the case of each general intangible (including any loan or Participation Interest in which neither the Participation Interest nor the loan is represented by an Instrument) or any other Asset the security interest in respect of which may be perfected under the UCC by filing a Financing Statement,

(a) causing the filing of a Financing Statement in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, and

(b) causing the registration of the security interests granted under this Indenture in the Register of Mortgages and Charges of the Issuer at the Issuer's registered office in the Cayman Islands.

In addition, the Issuer will obtain any and all consents required by the underlying instruments relating to any such general intangibles for the transfer of ownership and/or pledge hereunder (except to the extent that the requirement for such consent is rendered ineffective under Section 9-406 of the UCC).

"Designated Principal Proceeds": A one-time designation by the Portfolio Manager of up to $5,000,000 in Principal Proceeds as Interest Proceeds after the Effective Date and on or prior to the second Determination Date (but only if the Effective Date Overcollateralization Test would be satisfied after such designation).

"Determination Date": With respect to each Payment Date, the last day of the related Collection Period.

"DIP Collateral Obligation": A loan paying interest on a current basis made to a debtor-in-possession pursuant to Section 364 of the U.S. Bankruptcy Code having the priority

allowed by either Section 364(c) or 364(d) of the U.S. Bankruptcy Code and secured by senior liens.

"Discount Obligation": Any Collateral Obligation that was purchased (as determined without averaging prices of purchases on different dates and treating each portion of a Collateral Obligation purchased on different dates as a separate Collateral Obligation) for less than (a) 85.0% of its Principal Balance, if such Collateral Obligation has a Moody's Rating lower than "B3," or (b) 80.0% of its Principal Balance, if such Collateral Obligation has a Moody's Rating of "B3" or higher; *provided* that

(i) such Collateral Obligation will cease to be a Discount Obligation at such time as the Market Value (expressed as a percentage of the par amount of such Collateral Obligation) determined for such Collateral Obligation on each day during any period of 30 consecutive days since the acquisition by the Issuer of such Collateral Obligation, equals or exceeds 90% of the Principal Balance of such Collateral Obligation;

(ii) any Collateral Obligation that would otherwise be considered a Discount Obligation, but that is purchased in accordance with the Eligibility Criteria with the proceeds of sale of a Collateral Obligation that was not a Discount Obligation at the time of its purchase, so long as such purchased Collateral Obligation:

(A) is purchased or committed to be purchased within 20 Business Days of such sale,

(B) is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) equal to or greater than the sale price of the sold Collateral Obligation,

(C) is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) not less than 65%; and

(D) has a Moody's Default Probability Rating equal to or greater than the Moody's Default Probability Rating of the sold Collateral Obligation.

Any Collateral Obligations described in clauses (A) through (D) above will not be considered to be Discount Obligations.

(iii) clause (ii) above in this proviso shall not apply to any such Collateral Obligation at any time on or after the acquisition by the Issuer of such Collateral Obligation if, as determined at the time of such acquisition, such application would result in:

(A) more than 5% of the Collateral Principal Amount consisting of Collateral Obligations to which such clause (ii) has been applied; or

(B) the Aggregate Principal Balance of all Collateral Obligations to which such clause (ii) has been applied since the Closing Date being more than 10% of the Target Initial Par Amount.

"Distribution Report":  The meaning specified in Section 10.8(b) (Accountings).

"Diversity Score":  A single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 hereto.

"Dollar" or "$":  A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"Domicile":  With respect to any issuer of, or obligor with respect to, a Collateral Obligation, its country of organization.

"DTC":  The Depository Trust Company, its nominees, and their respective successors.

"Due Date":  Each date on which any payment is due on a Pledged Obligation in accordance with its terms.

"Effective Date":  The date on which each of the Effective Date Conditions are met.

"Effective Date Conditions":  Means conditions that will be satisfied if the S&P Effective Date Rating Condition has been satisfied and the Initial Ratings of the Class A Notes are confirmed by Moody's (including by means of a deemed confirmation as set forth in the definition of Moody's Rating Condition or Section 7.18(c) (Ramp-up Period; Purchase of Additional Collateral Obligations), after the end of the Ramp-up Period.

"Effective Date Overcollateralization Test":  A test that is satisfied if, on any date of determination, the ratio of (x) the Adjusted Collateral Principal Amount *divided by* (y) the Aggregate Outstanding Amount of all Notes is equal to or greater than the Target Initial Par Ratio.

"Effective Date Report":  A report, compiled by the Collateral Administrator and provided to each Rating Agency, determined as of the end of the Ramp-up Period, containing (A) the information required in a Monthly Report and (B) a calculation with respect to whether the Target Initial Par Condition is satisfied.

"Eligible Investment Required Ratings":  Are (a) if such obligation or security (i) has both a long-term and a short-term credit rating from Moody's, such ratings are "Aa3" or higher (not on credit watch for possible downgrade) and "P-1" (not on credit watch for possible downgrade), respectively, (ii) has only a long-term credit rating from Moody's, such rating is at least equal to or higher than the current Moody's sovereign ratings of the U.S. government, and (iii) has only a short-term credit rating from Moody's, such rating is "P-1" (not on credit watch for possible downgrade), and (b) a long-term credit rating "A" or higher and a short-term credit rating of at least "A-1" (or, in the absence of a short-term credit rating, "A+" or higher) from

S&P; *provided* that, if held by the Issuer for more that 60 days, such obligation or security has a long-term credit rating of at least "AA-" from S&P.

"Eligible Investments": (A) Cash and (B) any United States dollar denominated investment that, at the time it is Delivered to the Trustee (directly or through an intermediary or bailee), is one or more of the following obligations or securities:

(i) direct obligations of, and obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are expressly backed by the full faith and credit of the United States of America and such obligations meet the criteria set forth in clause (b) of the definition of Eligible Investment Required Ratings;

(ii) demand and time deposits in, certificates of deposit of, trust accounts with, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state banking authorities, so long as the commercial paper and/or the debt obligations of such depository institution or trust company at the time of such investment or contractual commitment providing for such investment have the Eligible Investment Required Ratings;

(iii) commercial paper or other short-term obligations (other than Asset-Backed Commercial Paper) with the Eligible Investment Required Ratings and that either bear interest or are sold at a discount from the face amount thereof and have a maturity of not more than 183 days from their date of issuance and such maturity is not extendable; and

(iv) offshore money market funds which funds have, at all times, credit ratings of "Aaa-mf" by Moody's and "AAAm" or "AAAm-G" by S&P, respectively;

*provided* that Eligible Investments purchased with funds in the Collection Account shall be held until maturity except as otherwise specifically provided herein and shall include only such obligations or securities, other than those referred to in clause (iv) above, as mature (or are putable at par to the issuer thereof) no later than the Business Day prior to the next Payment Date, unless such Eligible Investments are issued by the Bank in its capacity as a banking institution, in which event such Eligible Investments may mature on such Payment Date; and *provided* that none of the foregoing obligations or securities shall constitute Eligible Investments if (a) such obligation or security has an "f," "r," "p," "pi," "q," "t" or "sf" subscript assigned by S&P, (b) all, or substantially all, of the remaining amounts payable thereunder consist of interest and not principal payments, (c) such obligation or security is subject to withholding tax unless (i) the issuer of the security is required to make "gross-up" payments for the full amount of such foreign withholding tax or (ii) such withholding is solely the result of the failure of Noteholders to provide the Issuer (or its authorized agents) with the Holder FATCA Information and such withholding is allocated amongst such non-complying Noteholders, (d) such obligation or

security is secured by real property, (e) such obligation or security is purchased at a price greater than 100% of the principal or face amount thereof, (f) in the Portfolio Manager's judgment, such obligation or security is subject to material non-credit related risks or (g) such obligation is a Structured Finance Obligation or Synthetic Security; *provided further* that each Eligible Investment, other than those referred to in clause (vii) above, must mature on the earlier of (A) 60 days following its acquisition or (B) the Business Day prior to the next Payment Date (subject to the limited exception set forth in the first proviso of this paragraph above). Eligible Investments may include, without limitation, those investments for which the Trustee or an Affiliate of the Trustee provides services and receives compensation. For the avoidance of doubt, the Issuer shall not acquire any Eligible Investments that are not "cash equivalents" as defined in and subject to the Volcker Rule.

"Entitlement Order": The meaning specified in Section 8-102(a)(8) of the UCC.

"Equity Security": Any security or debt obligation which at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation and is not an Eligible Investment.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Limited Notes": The Notes specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"ETB Subsidiary": The meaning specified in Section 7.4(b) (Existence of Co-Issuers).

"Euroclear": Euroclear Clearance System.

"Event of Default": The meaning specified in Section 5.1 (Events of Default).

"Excepted Advances": Customary advances made to protect or preserve rights against the borrower of or obligor under a Collateral Obligation or to indemnify an agent or representative for lenders pursuant to the Underlying Instrument.

"Excess CCC/Caa Adjustment Amount": As of any date of determination, an amount equal to the excess, if any, of (i) the Aggregate Principal Balance of all Collateral Obligations included in the CCC/Caa Excess, over (ii) the sum of the Market Values of all Collateral Obligations included in the CCC/Caa Excess.

"Excess Weighted Average Coupon": As of any date of determination, an amount equal to: (a) the excess, if any, of the Weighted Average Coupon over the Minimum Weighted Average Coupon *multiplied by* (b) an amount equal to (i) the Aggregate Principal Balance of all fixed rate Collateral Obligations *divided by* (ii) the Aggregate Principal Balance of all floating rate Collateral Obligations.

"Excess Weighted Average Floating Spread": As of any date of determination, an amount equal to: (a) the excess, if any, of the Weighted Average Floating Spread over the

Minimum Floating Spread *multiplied by* an amount equal to the Aggregate Principal Balance of all floating rate Collateral Obligations as of such date of determination *divided by* (b) the Aggregate Principal Balance of all fixed rate Collateral Obligations.

"Exchange":  The meaning specified in Section 13.4 (Exchange of Combination Notes).

"Exchange Act":  The United States Securities Exchange Act of 1934, as amended.

"Exchange Notice":  The meaning specified in Section 13.4 (Exchange of Combination Notes).

"Expense Reserve Account":  The non-interest bearing segregated trust account established pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"FATCA":  Sections 1471 through 1474 of the Code and the Treasury regulations (and any notices, guidance or official pronouncements) promulgated thereunder, any agreement entered into thereto, and any law, rule or regulation implementing an intergovernmental agreement, including any regulations, rules and guidance notes or other approach or practices adopted in respect thereof.

"Federal Reserve Board":  The Board of Governors of the Federal Reserve System.

"Fee Basis Amount":  As of any date of determination, the sum of (a) the Collateral Principal Amount (including all Collateral Obligations held by an ETB Subsidiary) and (b) the Aggregate Principal Amount of all Defaulted Obligations.

"Financial Asset":  The meaning specified in Section 8-102(a)(9) of the UCC.

"Financing Statements":  The meaning specified in Section 9-102(a)(39) of the UCC.

"First Interest Determination End Date":  August 1, 2014.

"First-Lien Last-Out Loan":  Any assignment of or Participation Interest in a Loan that: (a) may by its terms become subordinate in right of payment to any other obligation of the obligor of the Loan solely upon the occurrence of a default or event of default by the obligor of the Loan and (b) is secured by a valid perfected first priority security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan.

"GAAP":  The meaning specified in Section 6.3(j) (Certain Rights of the Trustee).

"Global Notes":  Any Regulation S Global Notes or Rule 144A Global Notes.

"<u>Global Subordinated Notes</u>": Any Regulation S Global Subordinated Notes or Rule 144A Global Subordinated Notes.

"<u>Global Rating Agency Condition</u>": With respect to any action taken or to be taken by or on behalf of the Issuer, satisfaction of both the Moody's Rating Condition (to the extent applicable) and the S&P Rating Condition (to the extent applicable).

"<u>Grant</u>": To grant, bargain, sell, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of setoff against, deposit, set over and confirm. A Grant of the Pledged Obligations, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including, the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Pledged Obligations, and all other Monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"<u>Hedge Account</u>": Any trust account established pursuant to <u>Section 10.6</u> (Hedge Accounts).

"<u>Hedge Agreements</u>": Any interest rate swap, cap or similar agreement between the Issuer and any Hedge Counterparty, as amended from time to time, and any replacement agreement entered into pursuant to <u>Section 15.2</u> (Assignment of Hedge Agreement).

"<u>Hedge Counterparty</u>": Any one or more institutions entering into or guaranteeing a Hedge Agreement with the Issuer.

"<u>High-Yield Bonds</u>": Below investment-grade corporate high-yield debt securities issued by Non-Emerging Market Obligors.

"<u>Holder</u>": With respect to any Note, the Person whose name appears on the Register as the registered holder of such Note.

"<u>Holder FATCA Information</u>": Information and documentation requested by the Issuer (or an authorized agent acting on behalf of the Issuer) to be provided by the holder of a Note to the Issuer (or an authorized agent acting on behalf of the Issuer) that is required to enable the Issuer to comply with FATCA.

"<u>Incentive Management Fee</u>": A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and <u>Section 11.1</u> (Disbursements of Monies from Payment Account) in amount equal to (1) 15% of the remaining Interest Proceeds, if any, available for payment pursuant to <u>Section 11.1(a)(i)(Z)</u> (Disbursements of Monies from Payment Account), (2) 15% of the remaining Principal Proceeds, if any, available for payment pursuant to <u>Section 11.1(a)(ii)(J)</u> (Disbursements of Monies from Payment Account) and (3) 15% of the remaining amounts, if any, available for payment pursuant to <u>Section 11.1(a)(iii)(R)</u> (Disbursements of Monies from Payment Account).

"<u>Incentive Management Fee Threshold</u>":  The threshold that will be satisfied on any Payment Date if the Subordinated Notes that are issued on the Closing Date have received an annualized internal rate of return (computed using the "XIRR" function in Microsoft® Excel or an equivalent function in another software package) of at least 10.0% on the original purchase price of the Subordinated Notes as of the current Payment Date (after giving effect to all payments made or to be made on such Payment Date).  The annualized rate of return will be calculated based on the distributions made on the Subordinated Notes issued on the Closing Date, and without taking into account distributions made on any Additional Subordinated Notes issued after the Closing Date.

"<u>Indenture</u>":  This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"<u>Independent</u>":  As to any Person, any other Person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers, and any member thereof, or an investment bank and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person and (ii) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Professional Conduct of the American Institute of Certified Public Accountants.

"<u>Index Maturity</u>":  With respect to any Class of Secured Notes, the period indicated with respect to such Class in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"<u>Information</u>":  S&P's "Credit Estimate Information Requirements" dated April 2011 and any other available information S&P reasonably requests in order to produce a credit estimate for a particular asset.

"<u>Information Agent</u>":  The Collateral Administrator.

"<u>Initial Purchaser</u>":  Jefferies LLC in its capacity as initial purchaser under the Purchase Agreement.

"<u>Initial Rating</u>":  With respect to any Class of Secured Notes, the rating or ratings, if any, indicated in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations). The Initial Rating by S&P of the Combination Note is with respect to the ultimate repayment of principal by the Stated Maturity and interest at a rate of LIBOR *plus* 1.4853% *per annum* (which rate was determined based on the Permissible Ratio as of the Closing Date).

"<u>Institutional Accredited Investor</u>": An Accredited Investor under Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"<u>Instrument</u>":  The meaning specified in Section 9-102(a)(47) of the UCC.

"Interest Accrual Period":  The period from and including the Closing Date to but excluding the first Payment Date, and each succeeding period from and including each Payment Date to but excluding the following Payment Date until the principal of the Secured Notes is paid or made available for payment.

"Interest Collection Subaccount":  The meaning specified in Section 10.2(a) (Collection Account).

"Interest Coverage Ratio":  With respect to any designated Class or Classes of Secured Notes, as of any date of determination, an amount, expressed as a percentage, equal to:

(a)    (i) the Collateral Interest Amount as of such date of determination *minus* (ii) amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clauses (A) through (C) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account); *divided by*

(b)    (i) amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clause (D) and, with respect to the Deferrable Notes, clause (G) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) *plus* (ii) interest due and payable on the Secured Notes of such Class or Classes and each Priority Class and Pari Passu Class (excluding any Deferred Interest but including any interest on Deferred Interest with respect to any such Classes) on such Payment Date.

"Interest Coverage Test":  A test that is satisfied with respect to any specified Class or Classes of Secured Notes if, as of any date of determination at, or subsequent to, the Determination Date with respect to the second Payment Date, the Interest Coverage Ratio for such Class or Classes is at least equal to the applicable Required Coverage Ratio for such Class or Classes.

"Interest Determination Date":  For each Interest Accrual Period, the second London Banking Day preceding the first day of such Interest Accrual Period.

"Interest Only Security":  Any obligation or security that does not provide in the related Underlying Instruments for the payment or repayment of a stated principal amount in one or more installments on or prior to its stated maturity.

"Interest Proceeds":  With respect to any Collection Period or Determination Date, without duplication, the sum of: (i) all payments of interest received by the Issuer during the related Collection Period on the Collateral Obligations and Eligible Investments, including the accrued interest received in connection with a sale thereof during the related Collection Period, less (x) any such amount that represents Principal Financed Accrued Interest and (y) an amount designated by the Portfolio Manager in writing up to the amount of unpaid interest on the Collateral Obligations that accrued prior to the Closing Date and is owing to the Issuer and remains unpaid as of the Closing Date; (ii) all principal and interest payments on Eligible Investments purchased with Interest Proceeds; (iii) excluding amounts that comprise the Turbo Payment Amount, all amendment and waiver fees, late payment fees and other fees, except for any fee in connection with (a) the lengthening of the maturity of the related Collateral Obligation

or (b) the reduction of the par of the related Collateral Obligation; (iv) any amounts deposited in the Interest Collection Subaccount of the Collection Account from the Expense Reserve Account pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account); (v) commitment fees and other similar fees actually received by the Issuer during such Collection Period in respect of Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations; (vi) any payment received with respect to any Hedge Agreement other than an upfront payment received upon entering into such Hedge Agreement or a payment received as a result of the termination of such Hedge Agreement (for this purpose, any such payment received or to be received on a Payment Date will be deemed received in respect of the preceding Collection Period and included in the calculation of Interest Proceeds received in such Collection Period); (vii) any funds transferred from the Ramp-up Account to the Interest Collection Subaccount of the Collection Account designated as Interest Proceeds by the Portfolio Manager to the Trustee in writing pursuant to Section 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account); (viii) Principal Proceeds designated by the Portfolio Manager, on one occasion only, as Designated Principal Proceeds to be treated as Interest Proceeds after the Effective Date and on or prior to the second Determination Date and (ix) any amount deposited in the Interest Collection Subaccount of the Collection Account from the Interest Reserve Account pursuant to Section 10.3(f) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account);

*provided* that any amounts received in respect of any Defaulted Obligation will constitute (i) Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Defaulted Obligation since it became a Defaulted Obligation equals the outstanding Principal Balance of such Collateral Obligation when it became a Defaulted Obligation, and then (ii) Interest Proceeds thereafter; *provided further* that any amounts received in respect of any Deferring Security will constitute Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Deferring Security since it became a Deferring Security equals the outstanding Principal Balance of such Collateral Obligation (including any deferred or capitalized interest) when it became a Deferring Security, and thereafter any amounts received shall constitute Interest Proceeds. Any amounts received that comprise the Turbo Payment Amount shall constitute Principal Proceeds (and not Interest Proceeds).

With respect to any Payment Date, an amount equal to the Interest Proceeds due to the Consenting Holders of the Subordinated Notes that are paid in the form of Equity Securities in lieu of Cash pursuant to Section 11.1(a)(i) (Application of Moneys) will be treated for all purposes by the Issuer and the Trustee as Principal Proceeds.

"Interest Reinvestment Test": A test that will be satisfied on any Determination Date during the Reinvestment Period if the Adjusted Collateral Principal Amount *divided by* the Aggregate Outstanding Amount of the Secured Notes (excluding the Class X Notes) equals or exceeds 104.8%.

"Interest Reserve Account": The non-interest bearing segregated trust account established pursuant to Section 10.3(f) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Investment Company Act": The Investment Company Act of 1940, as amended from time to time.

"Investment Criteria": The criteria specified in Section 12.2(a) (Purchase of Additional Collateral Obligations).

"Investment Criteria Adjusted Balance": With respect to each Collateral Obligation, the Principal Balance of such Collateral Obligation; *provided* that for all purposes the Investment Criteria Adjusted Balance of any:

(i) Deferring Security will be the lesser of (x) the S&P Collateral Value of such Deferring Security and (y) the Moody's Collateral Value of such Deferring Security;

(ii) Discount Obligation will be the original purchase price (expressed as a percentage of par) *multiplied by* the current Principal Balance, excluding accrued interest, expressed as a dollar amount;

(iii) CCC Collateral Obligations and Caa Collateral Obligations included in the CCC/Caa Excess will be the Market Value of such Collateral Obligation; and

(iv) Defaulted Obligation will be the lesser of (x) the Moody's Collateral Value of such Defaulted Obligations and (y) the S&P Collateral Value for such Defaulted Obligations; *provided* that any such Defaulted Obligation that has constituted a Defaulted Obligation for a period of at least 3 years shall be deemed to have an Investment Criteria Adjusted Balance of zero;

*provided further* that, if any Collateral Obligation would be subject to more than one of clauses (i) through (iv) of this definition of "Investment Criteria Adjusted Balance," such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the clause that results in the lowest Investment Criteria Adjusted Balance.

"Irish Listing Agent": The meaning specified in Section 7.2 (Maintenance of Office or Agency).

"IRS": The U.S. Internal Revenue Service.

"Issuer": The Person named as such on the first page of this Indenture until a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"Issuer Notes": The Class E Notes, the Class F Notes and the Subordinated Notes.

"Issuer Order" and "Issuer Request": A written order or request dated (which may be (i) provided via email or (ii) a standing order or request, respectively), and signed in the

name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Portfolio Manager by an Authorized Officer thereof, on behalf of the Issuer.

"Junior Class":  With respect to a particular Class of Notes, each Class of Notes that is subordinated to such Class, as indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Knowledgeable Employee":  The meaning set forth in Rule 3c-5 promulgated under the Investment Company Act.

"Letter of Credit Reserve Account":  The meaning specified in Section 10.5 (Letter of Credit Reserve Account).

"LIBOR":  The meaning set forth in Exhibit G hereto.

"LIBOR Floor Obligation":  As of any date of determination, a floating rate Collateral Obligation (a) the interest in respect of which is paid based on a London interbank offered rate and (b) that provides that such London interbank offered rate is (in effect) calculated as the greater of (i) a specified "floor" rate *per annum* and (ii) the London interbank offered rate for the applicable interest period for such Collateral Obligation.

"Loan Pricing Change":  With respect to a loan, the change in price of such loan (expressed as a percentage of par) relative to the S&P/LSTA U.S. Leveraged Loan 100 Index or any other nationally recognized index as calculated by the Portfolio Manager in its reasonable commercial judgment.

"London Banking Day":  A day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"Majority":  With respect to any Class of Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Class.

"Management Fees":  The Senior Management Fee, the Subordinated Management Fee and the Incentive Management Fee.

"Margin Loan":  An extension of credit that is "purpose credit" within the meaning of Regulation U issued by the Federal Reserve Board.

"Margin Stock":  "Margin Stock" as defined under Regulation U issued by the Federal Reserve Board, including any debt security which is by its terms convertible into "Margin Stock."

"Market Value":  As of any date of determination for any Collateral Obligation and as determined by the Portfolio Manager in the following manner: (A) the average bid price value determined by an Independent pricing service; (B) if the price described in clause (A) is not available, the average of the bid side prices determined by three Independent broker-dealers active in the trading of such Collateral Obligation; (C) if a price or bid described in clause (A) or (B) is not available, the lowest of the bid side prices determined by two Independent broker-

dealers active in the trading of such Collateral Obligation; (D) if a price or bid described in clause (A), (B) or (C) is not available and the Portfolio Manager is a Registered Investment Adviser, the bid side price determined by one Independent broker-dealer active in the trading of such Collateral Obligation; or (E) if a price or bid described in clause (A), (B), (C) or (D) is not available, then the lower of (a) the bid side price of such Collateral Obligation determined by the Portfolio Manager in a manner consistent with reasonable and customary market practice and (b) the greater of (i) 70% of the par value of such Collateral Obligation and (ii) the S&P Recovery Rate; *provided* that (x) if the Market Value of any Collateral Obligation is determined pursuant to clause (E) above, the Portfolio Manager will use commercially reasonable efforts to obtain the Market Value of such Collateral Obligation in accordance with subclauses (A) through (D) above and (y) if the Portfolio Manager is not a Registered Investment Adviser, the Market Value of any Collateral Obligation that cannot be obtained in accordance with subclauses (A) through (D) above within 30 days of the date on which its Market Value was determined pursuant to clause (E) above shall be deemed to be zero until determined in accordance with subclauses (A) through (D) above; *provided further* that any bid side price determined by the Portfolio Manager pursuant to clause (E)(a) above shall be used by the Portfolio Manager as the market value of such Collateral Obligation in all other portfolios it manages.

"Material Change": With respect to a Collateral Obligation whose S&P Rating is determined pursuant to clauses (iii)(b) or (iii)(c) of the definition of such term, the occurrence of any event, which event, in the reasonable judgment of the Portfolio Manager, constitutes a material adverse change with respect to such Collateral Obligation, including, but not limited to: (i) nonpayment of interest or principal; (ii) the rescheduling of any interest or principal in any part of the capital structure; (iii) any breach of covenants; (iv) the likelihood (more than 50%) of a breach of covenant(s) occurring in the next six months; (v) material underperformance (more than 20% off base case) either at the operating profit or cash flow level; (vi) any restructuring of debt (including proposed debt); (vii) the occurrence of significant transactions (sale or acquisitions of assets); or (viii) changes in payment terms (such as addition of payment-in-kind terms, changes in maturity dates and changes in coupon rates).

"Maturity": With respect to any Note, the date on which the unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"Maturity Amendment": With respect to any Collateral Obligation, any waiver, modification, amendment or variance that would extend the stated maturity date of such Collateral Obligation. For the avoidance of doubt, a waiver, modification, amendment or variance that would extend the stated maturity date of the credit facility of which a Collateral Obligation is part, but would not extend the stated maturity date of the Collateral Obligation held by the Issuer, does not constitute a Maturity Amendment.

"Maximum Moody's Rating Factor Test": The test that will be satisfied on any date of determination if the Weighted Average Adjusted Moody's Rating Factor of the Collateral Obligations is less than or equal to the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator (or the linear interpolation between two adjacent rows and/or two

adjacent columns, as applicable) in accordance with Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations) plus the Rating Factor Adjustment Amount.

"Measurement Date":  Means (i) any day on which a sale, a purchase or a default of a Collateral Obligation occurs, (ii) any Determination Date, (iii) the date as of which the information in any Monthly Report is calculated, (iv) with five Business Days prior notice, any Business Day requested by either Rating Agency and (v) the last day of the Ramp-up Period.

"Memorandum and Articles":  The Issuer's Memorandum and Articles of Association, as they may be amended, revised or restated from time to time.

"Merging Entity":  As defined in Section 7.10 (Co-Issuers May Consolidate, etc., Only on Certain Terms).

"Minimum Floating Spread":  As of any date of determination, the number specified as the "Minimum Floating Spread" in the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing selected by the Portfolio Manager and applicable at such time.

"Minimum Floating Spread/Minimum Weighted Average Coupon Pairing": The Minimum Floating Spread and Minimum Weighted Average Coupon pairing chosen by the Portfolio Manager from time to time pursuant to Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations) from a row in Section 2 of Schedule 3 (or the pairing derived from the linear interpolation of two adjacent rows) and from the Moody's Asset Quality Matrix. For the avoidance of doubt, the pairing chosen by the Portfolio Manager in Section 2 of Schedule 3 (or the pairing derived from linear interpolation of two adjacent rows) must be (i) the same pairing as the pairing chosen by the Portfolio Manager in the S&P Asset Quality Matrix (or the pairing derived from linear interpolation of two cases, as applicable) and (ii) the same pairing as the pairing chosen by the Portfolio Manager in the Moody's Asset Quality Matrix (or the pairing derived from the linear interpolation of two cases, as applicable).

"Minimum Floating Spread Test":  A test that is satisfied on any date of determination if (a) the sum of (i) the Weighted Average Floating Spread and (ii) the Excess Weighted Average Coupon equals or exceeds (b) the Minimum Floating Spread.

"Minimum Weighted Average Coupon Test":  A test that is satisfied on any date of determination if the Weighted Average Coupon *plus* the Excess Weighted Average Floating Spread equals or exceeds the Minimum Weighted Average Coupon.

"Minimum Weighted Average Coupon":  As of any date of determination, the number specified as the "Minimum Weighted Average Coupon" in the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing selected by the Portfolio Manager and applicable at such time.

"Minimum Weighted Average Moody's Recovery Rate":  Means 44%.

"Minimum Weighted Average Moody's Recovery Rate Test": The test that will be satisfied on any date of determination if the Weighted Average Moody's Recovery Rate equals or exceeds the Minimum Weighted Average Moody's Recovery Rate.

"Money": The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report": The meaning specified in Section 10.8(a) (Accountings).

"Monthly Report Determination Date": The meaning specified in Section 10.8(a) (Accountings).

"Moody's": Moody's Investors Service, Inc., and its successors in interest.

"Moody's Asset Quality Matrix": The following chart, used to determine which of the "row/column combinations" (or the linear interpolation between two adjacent rows and/or two adjacent columns, as applicable) are applicable for purposes of determining compliance with the Moody's Diversity Test, the Maximum Moody's Rating Factor Test, the Minimum Floating Spread Test and the Minimum Weighted Average Coupon Test, as set forth in this Indenture.

| Minimum Floating Spread/Minimum Weighted Average Coupon Pairing | Minimum Diversity Score | | | | | | |
|---|---|---|---|---|---|---|---|
| | 40 | 45 | 50 | 55 | 60 | 65 | 70 |
| 2.60% / 3.50% | 2575 | 2615 | 2635 | 2645 | 2655 | 2665 | 2675 |
| 2.70% / 3.75% | 2595 | 2635 | 2655 | 2665 | 2675 | 2685 | 2695 |
| 2.80% / 4.00% | 2615 | 2655 | 2675 | 2685 | 2695 | 2705 | 2715 |
| 2.90% / 4.25% | 2635 | 2675 | 2695 | 2705 | 2715 | 2725 | 2735 |
| 3.00% / 4.50% | 2650 | 2690 | 2710 | 2720 | 2730 | 2740 | 2750 |
| 3.10% / 4.75% | 2665 | 2705 | 2725 | 2735 | 2745 | 2755 | 2765 |
| 3.20% / 5.00% | 2680 | 2720 | 2740 | 2750 | 2760 | 2770 | 2780 |
| 3.30% / 5.25% | 2695 | 2735 | 2755 | 2765 | 2775 | 2785 | 2795 |
| 3.40% / 5.50% | 2710 | 2750 | 2770 | 2780 | 2790 | 2800 | 2810 |
| 3.50% / 5.75% | 2725 | 2765 | 2785 | 2795 | 2805 | 2815 | 2825 |
| 3.60% / 6.00% | 2740 | 2780 | 2800 | 2810 | 2820 | 2830 | 2840 |
| 3.70% / 6.10% | 2765 | 2805 | 2825 | 2835 | 2845 | 2855 | 2865 |
| 3.80% / 6.20% | 2790 | 2830 | 2850 | 2860 | 2870 | 2880 | 2890 |
| 3.90% / 6.30% | 2815 | 2855 | 2875 | 2885 | 2895 | 2905 | 2915 |
| 4.00% / 6.40% | 2840 | 2880 | 2900 | 2910 | 2920 | 2930 | 2940 |
| 4.10% / 6.50% | 2865 | 2905 | 2925 | 2935 | 2945 | 2955 | 2965 |
| 4.20% / 6.60% | 2890 | 2930 | 2950 | 2960 | 2970 | 2980 | 2990 |
| 4.30% / 6.70% | 2915 | 2955 | 2975 | 2985 | 2995 | 3005 | 3015 |
| 4.40% / 6.80% | 2940 | 2980 | 3000 | 3010 | 3020 | 3030 | 3040 |
| 4.50% / 6.90% | 2965 | 3005 | 3025 | 3035 | 3045 | 3055 | 3065 |
| 4.60% / 7.00% | 2990 | 3030 | 3050 | 3060 | 3070 | 3080 | 3090 |
| 4.70% / 7.10% | 3015 | 3055 | 3075 | 3085 | 3095 | 3105 | 3115 |

39

| 4.80% / 7.20% | 3040 | 3080 | 3100 | 3110 | 3120 | 3130 | 3140 |
| 4.90% / 7.30% | 3065 | 3105 | 3125 | 3135 | 3145 | 3155 | 3165 |
| 5.00% / 7.40% | 3090 | 3130 | 3150 | 3160 | 3170 | 3180 | 3190 |
| 5.10% / 7.50% | 3115 | 3155 | 3175 | 3185 | 3195 | 3205 | 3215 |
| 5.20% / 7.60% | 3140 | 3180 | 3200 | 3210 | 3220 | 3230 | 3240 |
| 5.30% / 7.70% | 3165 | 3205 | 3225 | 3235 | 3245 | 3255 | 3265 |
| 5.40% / 7.80% | 3190 | 3230 | 3250 | 3260 | 3270 | 3280 | 3290 |

"Moody's Collateral Value":  As of any date of determination, with respect to any Defaulted Obligation or Deferring Security, the lesser of (i) the Moody's Recovery Amount of such Defaulted Obligation or Deferring Security as of such date and (ii) the Market Value of such Defaulted Obligation or Deferring Security as of such date.

"Moody's Counterparty Criteria":  With respect to any Participation Interest proposed to be acquired by the Issuer or any Pre-funded Letter of Credit, criteria that will be met if immediately after giving effect to such acquisition, (x) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with Selling Institutions that have the same or a lower Moody's credit rating does not exceed the "Aggregate Percentage Limit" set forth below for such Moody's credit rating and (y) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with any single Selling Institution that has the same or lower Moody's credit rating does not exceed the "Individual Percentage Limit" set forth below for such Moody's credit rating:

| Moody's Credit Rating of Selling Institution (at or below) | Aggregate Percentage Limit | Individual Percentage Limit |
| --- | --- | --- |
| Aaa | 20% | 20% |
| Aa1 | 20% | 10% |
| Aa2 | 20% | 10% |
| Aa3 | 15% | 10% |
| A1 | 10% | 5% |
| A2* and "P-1" * and not on Watch for Possible Downgrade. | 5% | 5% |
| A2 but not "P-1"; Less than A2; or A2 and "P-1," but on Watch for Possible Downgrade | 0% | 0% |

*provided* that the Moody's Counterparty Criteria will be deemed satisfied in connection with the Issuer's acquisition of a Participation Interest or a Pre-funded Letter of Credit from a Selling Institution that meets the criteria in the last row of the table above if the Moody's Rating Condition has been satisfied.

"Moody's Default Probability Rating":  With respect to any Collateral Obligation, the rating determined pursuant to Schedule 5 hereto.

"Moody's Derived Rating": With respect to any Collateral Obligation whose Moody's Rating or Moody's Default Probability Rating cannot otherwise be determined pursuant to the definitions thereof, the rating determined for such Collateral Obligation as set forth in Schedule 5 hereto.

"Moody's Diversity Test": The test that will be satisfied on any date of determination if the Diversity Score (rounded to the nearest whole number) equals or exceeds the number set forth in the column entitled "Minimum Diversity Score" in the Moody's Asset Quality Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Trustee and the Collateral Administrator (or the linear interpolation between two adjacent rows and/or two adjacent columns, as applicable) in accordance with Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations).

"Moody's Industry Classification": The industry classifications set forth in Schedule 1 hereto, as such industry classifications shall be updated at the option of the Portfolio Manager (with notice to the Collateral Administrator) if Moody's publishes revised industry classifications.

"Moody's Rating": With respect to any Collateral Obligation, the rating determined pursuant to Schedule 5 hereto.

"Moody's Rating Condition": With respect to any action taken or to be taken by or on behalf of the Issuer, a condition that is satisfied if Moody's has confirmed in writing (which confirmation may be in the form of a press release) to the Issuer, the Trustee and/or the Portfolio Manager that no immediate withdrawal or reduction with respect to its then current rating by Moody's of the Class A Notes will occur as a result of such action; *provided* that the Moody's Rating Condition will (x) not be required if any Class of Secured Notes that receives a solicited rating requested by the Issuer from Moody's are not Outstanding or rated by Moody's or (y) not be required if Moody's makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee that (i) it believes satisfaction of the Moody's Rating Condition is not required with respect to the applicable action or (ii) its practice is not to give such confirmations.

"Moody's Rating Factor": For each Collateral Obligation, the "Moody's Rating Factor" is the number set forth in the table below opposite the Moody's Default Probability Rating of such Collateral Obligation.

| Moody's Default Probability Rating | Moody's Rating Factor | Moody's Default Probability Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |

| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

For purposes of the Maximum Moody's Rating Factor Test, any Collateral Obligation issued or guaranteed by the United States government or any agency or instrumentality thereof is assigned a Moody's Rating Factor set forth opposite the then-current rating of full faith and credit obligations of the federal government of the United States.

"Moody's Recovery Amount":  With respect to any Collateral Obligation which is a Defaulted Obligation or a Deferring Security, the amount equal to the product of (i) the applicable Moody's Recovery Rate and (ii) the Principal Balance of such Defaulted Obligation or Deferring Security.

"Moody's Recovery Rate":  With respect to any Collateral Obligation, as of any date of determination, the recovery rate determined in accordance with the following, in the following order of priority:

(a) if the Collateral Obligation has been specifically assigned a recovery rate by Moody's (for example, in connection with the assignment by Moody's of an estimated rating), such recovery rate; or

(b) if the preceding clause does not apply to the Collateral Obligation, except with respect to DIP Collateral Obligations, the rate determined pursuant to the table below based on the number of rating subcategories difference between the Collateral Obligation's Moody's Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Ratings Subcategories Difference Between the Moody's Rating and the Moody's Default Probability Rating | Senior Secured Loans | Second Lien Loans, Senior Secured Bonds, Senior Secured Notes* | Other Collateral Obligations |
|---|---|---|---|
| +2 or more | 60.0% | 55.0% | 45.0% |
| +1 | 50.0% | 45.0% | 35.0% |
| 0 | 45.0% | 35.0% | 30.0% |
| 1 | 40.0% | 25.0% | 25.0% |
| 2 | 30.0% | 15.0% | 15.0% |
| 3 or less | 20.0% | 5.0% | 5.0% |

\* If such Collateral Obligation does not have both a CFR and an Assigned Moody's Rating, such Collateral Obligation's Moody's Recovery Rate will be determined under the "Other Collateral Obligations" column.

or

(c)     if the Collateral Obligation is a DIP Collateral Obligation (other than a DIP Collateral Obligation which has been specifically assigned a recovery rate by Moody's), 50%.

"Moody's Specified Tested Items":  The meaning specified in Section 7.18(c) (Ramp-up Period; Purchase of Additional Collateral Obligations).

"Non-Call Period":  The period from the Closing Date to but excluding the Payment Date in May 2016.

"Non-Emerging Market Obligor":  An Obligor that is Domiciled either in (x) the United States or (y) any country that has a country ceiling for foreign currency bonds of at least "Aa2" by Moody's and a foreign currency issuer credit rating of at least "AA" by S&P.

"Non-Permitted ERISA Holder":  As defined in Section 2.12(d) (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations).

"Non-Permitted Holder":  As defined in Section 2.12(b) (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations).

"Non-Quarterly Assets":  Collateral Obligations (other than Deferrable Securities) that pay interest less frequently than quarterly, but no less frequently than annually.

"Note Interest Amount":  With respect to any specified Class of Secured Notes and any Payment Date, the amount of interest for the next Interest Accrual Period payable in respect of each U.S. $100,000 principal amount of such Class of Secured Notes.

"Note Interest Rate":  With respect to any specified Class of Secured Notes, the *per annum* interest rate payable on the Secured Notes of such Class with respect to each Interest Accrual Period equal to LIBOR for such Interest Accrual Period *plus* the spread specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations) with respect to such Notes. The Combination Notes will bear interest at the Note Interest Rates of the Underlying Classes.

"Note Payment Sequence":  The application, in accordance with the Priority of Payments, of Interest Proceeds or Principal Proceeds, as applicable, in the following order:

(i)     to the payment, *pro rata* based upon amounts due, of (1) principal of the Class X Notes and (2) principal of the Class A Notes, until each is paid in full;

(ii)    to the payment of principal of the Class B Notes until the Class B Notes have been paid in full;

(iii)   to the payment of accrued and unpaid interest and any Deferred Interest on the Class C Notes until such amounts have been paid in full;

(iv)    to the payment of principal of the Class C Notes until the Class C Notes have been paid in full;

(v)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class D Notes until such amounts have been paid in full;

(vi)    to the payment of principal of the Class D Notes until the Class D Notes have been paid in full;

(vii)   to the payment of accrued and unpaid interest and any Deferred Interest on the Class E Notes until such amounts have been paid in full;

(viii)  to the payment of principal of the Class E Notes until the Class E Notes have been paid in full;

(ix)    to the payment of accrued and unpaid interest and any Deferred Interest on the Class F Notes until such amounts have been paid in full; and

(x)     to the payment of principal of the Class F Notes until the Class F Notes have been paid in full.

"Noteholder":  With respect to any Note, the Person whose name appears on the Register as the registered holder of such Note.

"Notes":  Collectively, the Secured Notes and the Subordinated Notes authorized by, and authenticated and delivered under, this Indenture (as specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations)) or any supplemental indenture (and including any Additional Subordinated Notes issued hereunder pursuant to Section 2.4 (Additional Notes)).

"Obligor":  The issuer of a Bond or the obligor or guarantor under a loan, as the case may be.

"Offer":  As defined in Section 10.9(c) (Release of Securities).

"Offered Securities":  The Notes.

"Offering":   The offering of the Offered Securities pursuant to the Offering Circular.

"Offering Circular":   The offering circular, dated June 3, 2014 relating to the Offered Securities, including the supplements thereto.

"Officer":  With respect to the Issuer, the Co-Issuer and any corporation, any director, the Chairman of the Board of Directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity or any Person authorized by such entity; with respect to any partnership, any general partner thereof or any Person authorized by such entity; with respect to a limited liability company, any member thereof or any Person authorized by such entity; and with respect to the Trustee, any Bank Officer.

"offshore transaction":  The meaning specified in Regulation S.

"Opinion of Counsel":  A written opinion addressed to the Trustee and any Rating Agency requesting such opinion, in form and substance reasonably satisfactory to the Trustee and such Rating Agency, of a nationally recognized law firm (or, in the case of an opinion relating to the laws of the Cayman Islands, an attorney at law admitted to practice before the highest court of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer or the Co-Issuer, as the case may be, and which firm or attorney, as the case may be, shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to the Trustee and any Rating Agency requesting such opinion or shall state that the Trustee and such Rating Agency shall be entitled to rely thereon.

"Optional Redemption":  A redemption of the Notes in accordance with Section 9.2 (Optional Redemption and Refinancing).

"Outstanding":  With respect to the Notes of any specified Class, as of any date of determination, all of the Notes or all of the Notes of such Class, as the case may be, theretofore authenticated and delivered under this Indenture, except:

> (i)     Notes theretofore canceled by the Registrar or delivered to the Registrar for cancellation in accordance with Section 2.10 (Cancellation);

> (ii)    Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes pursuant to Section 4.1(a)(ii) (Satisfaction and Discharge of Indenture); *provided* that, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

> (iii)   Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a "protected purchaser" (within the meaning of Section 8-303 of the UCC); and

> (iv)    Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note);

*provided* that, in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (I)  Notes owned by the Issuer, the Co-Issuer or any other obligor upon the Notes shall be disregarded and deemed not to be Outstanding and (only in the case of a vote to remove or replace the Portfolio Manager and not, for the avoidance of doubt, in the case of a vote to propose or approve a successor Portfolio Manager), Notes owned by the Portfolio Manager, any Affiliate of the Portfolio Manager or any accounts or funds managed by the Portfolio Manager or

its Affiliates, shall be disregarded and deemed not to be Outstanding (it being understood that Notes owned by a fund or an account managed by the Portfolio Manager or its Affiliates will not be disregarded and will be deemed to be Outstanding if the voting rights with respect to such Notes are exercised by the fund or account or client or beneficiary of such fund or account and not by the Portfolio Manager or its Affiliate), except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded and (II) Notes so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, the Co-Issuer, any other obligor upon the Notes, the Portfolio Manager or any Affiliate of the Portfolio Manager.

"Overcollateralization Ratio": With respect to any specified Class or Classes of Secured Notes (excluding the Class X Notes) as of any Measurement Date, an amount, expressed as a percentage, equal to: (i) the Adjusted Collateral Principal Amount *divided by* (ii) the Aggregate Outstanding Amount of the Secured Notes (excluding the Class X Notes) of such Class or Classes, and each Priority Class of Secured Notes (excluding the Class X Notes) and each Pari Passu Class of Secured Notes (other than the Class X Notes) (including all applicable Deferred Interest), in each case, if applicable.

"Overcollateralization Ratio Test": A test that is satisfied with respect to any Class or Classes of Secured Notes as of any date of determination at, or subsequent to, the Effective Date, if (i) the Overcollateralization Ratio for such Class or Classes is at least equal to the applicable Required Coverage Ratio for such Class or Classes or (ii) such Class or Classes of Secured Notes are no longer Outstanding. For the avoidance of doubt, the Class X Notes shall not be included for the purposes of calculating any Overcollateralization Ratio Test.

"Pari Passu Class": With respect to each Class of Notes, each Class of Notes that ranks *pari passu* with such Class, as indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Partial Deferrable Security": Any Collateral Obligation with respect to which under the related Underlying Instruments (i) a portion of the interest due thereon is required to be paid in Cash on each payment date therefor and is not permitted to be deferred or capitalized (which portion will at least be equal to (A) in the case of floating rate assets, LIBOR and (B) in the case of fixed rate assets, 4.00%) and (ii) the issuer thereof or obligor thereon may defer or capitalize the remaining portion of the interest due thereon. Any component of a Partial Deferrable Security that is paid "in kind" shall not be included for purposes of calculations related to the Minimum Floating Spread Test, the Weighted Average Coupon or the Weighted Average Floating Spread.

"Participation Interest": A 100% participation interest in a loan that at the time of acquisition, satisfies each of the following criteria: (i) such loan would constitute a Collateral Obligation were it acquired directly, (ii) the seller of the participation is the lender on the loan, (iii) the aggregate participation in the loan does not exceed the principal amount or commitment of such loan, (iv) such participation does not grant, in the aggregate, to the participant in such

46

participation a greater interest than the seller holds in the loan or commitment that is the subject of the participation, (v) the entire purchase price for such participation is paid in full at the time of its acquisition (or, in the case of a participation in a Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, at the time of the funding of such loan), (vi) the participation provides the participant all of the economic benefit and risk of the whole or part of the loan or commitment that is the subject of the loan participation, and (vii) is represented by a contractual obligation of a Selling Institution that has at the time of acquisition (a) a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P or (b) a long-term-debt rating of at least "A+" by S&P. Such Selling Institution must directly hold or own the relevant portion of the loan underlying such participation interest, and the Issuer may not acquire a participation interest in a participation.  For the avoidance of doubt, a Participation Interest shall not include a sub-participation interest in any loan.

"Paying Agent":  Any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.2 (Maintenance of Office or Agency).

"Payment Account":   The non-interest bearing segregated trust account established pursuant to Section 10.3(a) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Payment Date":  The 1st day of February, May, August and November of each year, commencing in November, 2014 (or, if such day is not a Business Day, then the next succeeding Business Day).

"PBGC":  The United States Pension Benefit Guaranty Corporation.

"Permissible Ratio":  The ratio set forth under the heading "Permissible Ratio" in the Combination Notes Table; *provided* that, the Trustee may round any of the fractional percentages set forth in this definition either up or down to the extent necessary to cause an Exchange to comply with the $1 integral multiple requirement.

"Permitted Offer":  An offer (i) pursuant to the terms of which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange for consideration consisting solely of Cash, other Eligible Investments and/or other Collateral Obligations in an amount equal to or greater than the full face amount of such debt obligation *plus* any accrued and unpaid interest and (ii) as to which the Portfolio Manager has determined in its judgment that the offeror has sufficient access to financing to consummate the offer.

"Permitted Securities Condition": As of any date of determination, a condition that will be satisfied if: (a) the Issuer and the Portfolio Manager have received the written advice of counsel of national reputation experienced in such matters (together with an Officer's certificate of the Issuer or the Portfolio Manager to the Trustee (on which the Trustee may rely) that the advice specified in this definition has been received by the Issuer and the Portfolio Manager) that: (i) assuming the Issuer is a "covered fund," none of the Secured Notes shall be considered an "ownership interest" therein (in each case, as such terms are defined for purposes of the Volcker Rule); or (ii) either (A) the Issuer is exempt from registration under the

Investment Company Act, by virtue of Rule 3a-7 thereunder or another exemption or exclusion from registration as an investment company under the Investment Company Act (other than Section 3(c)(1) or Section 3(c)(7) thereof) or (B) the Issuer will otherwise not be considered a "covered fund" (as defined above) as of such date and, as applicable, after giving effect to any acquisition of assets in connection with the delivery of such written advice; (b) any amendments or supplements to this Indenture that are necessary for the Issuer to receive the advice described in clause (a) above shall have become effective in accordance with the terms thereof; and (c) the consent of a Majority of the Controlling Class shall have been obtained (such consent not to be unreasonably withheld, conditioned or delayed).

"Person": An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"Petition Expense Amount": An aggregate sum (until the Notes are paid in full or until this Indenture is otherwise terminated, in which case it will equal zero) of $1,000,000.

"Petition Expenses": The costs and expenses (including, without limitation, fees and expenses of counsel to the Issuer) incurred by the Issuer in connection with its obligations described in Section 7.20 (Objection to Bankruptcy Proceeding); *provided* that such amounts will be payable in accordance with the Priority of Payments as Administrative Expenses, applied first as Petition Expense Amount in the order set forth in the definition of Administrative Expenses, and then subject to the Administrative Expense Cap as set forth in the Priority of Payments. Such Petition Expenses may only be paid to the extent such payment would not directly result in the failure to pay any principal or interest due on the Class X Notes, the Class A Notes, the Class B Notes or the Class C Notes.

"Pledged Obligations": As of any date of determination, the Collateral Obligations, the Eligible Investments and any Equity Security which forms part of the Assets that have been Granted to the Trustee.

"Portfolio Management Agreement": The Portfolio Management Agreement, dated as of the Closing Date, between the Issuer and the Portfolio Manager relating to the Notes and the Assets, as amended from time to time, in accordance with the terms hereof and thereof.

"Portfolio Manager": Acis Capital Management, L.P., a Delaware limited partnership, until a successor Person shall have become the Portfolio Manager pursuant to the provisions of the Portfolio Management Agreement, and thereafter "Portfolio Manager" shall mean such successor Person.

"Post Reinvestment Period Amendment Proceeds": As defined in Section 12.4 (Post Reinvestment Period Amendment Proceeds).

"Pre-funded Letter of Credit": Any letter of credit facility that requires a lender party thereto to pre-fund in full its obligations thereunder, *provided* that any such lender (a) shall have no further funding obligation thereunder and (b) shall have a right to be reimbursed or repaid by the borrower its *pro rata* share of any draws on a letter of credit issued thereunder;

*provided* that the account into which the pre-funded amounts in respect of a letter of credit facility shall be deposited shall be a Pre-funded Letter of Credit Eligible Account at the time of such deposit.

"Pre-funded Letter of Credit Eligible Account":  Either (a) a segregated trust account maintained with the corporate trust department of a federal depository institution or state-chartered depository institution subject to regulation regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations Section 9.10(b), which, in either case, has corporate trust power, acting in its fiduciary capacity, which depository institution (x) has a long term senior unsecured debt rating of at least "Baa3" by Moody's and (y) to the extent any related trust account is holding cash, satisfies the ratings requirements specified in clause (b) or (b) an account maintained with an institution or trust company with (x) a long-term debt rating by S&P of at least "A" and a short-term debt rating by S&P of at least "A-1" (or with a long-term debt rating of at least "A+" by S&P) and (y) a long-term senior unsecured debt rating of at least "A2" or a short-term credit rating of "P-1" by Moody's. If, in the case of clause (a) or (b), such institution's long-term debt rating or short-term credit rating falls below any such required rating, the assets held in the Pre-funded Letter of Credit Eligible Account shall be transferred within (x) 30 calendar days in the case of a failure to meet the required Moody's rating and (y) 60 calendar days in the case of a failure to meet the required S&P rating, in each case, to another institution that satisfies such rating requirements.

"Principal Balance":  Subject to Section 1.2 (Assumptions as to Pledged Obligations), with respect to (a) any Pledged Obligation other than a Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Pledged Obligation (excluding any capitalized interest) and (b) any Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, *plus* (except as expressly set forth in this Indenture) any undrawn commitments that have not been irrevocably reduced with respect to such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation; *provided* that, for all purposes the Principal Balance of any Equity Security or Interest Only Security shall be deemed to be zero.

"Principal Collection Subaccount":  The meaning specified in Section 10.2(a) (Collection Account).

"Principal Financed Accrued Interest":  With respect to any Collateral Obligation purchased during and after the Ramp-up Period, an amount equal to the amount of Principal Proceeds, if any, applied towards the purchase of accrued interest on such Collateral Obligation.

"Principal Proceeds":  With respect to any Collection Period or Determination Date, all amounts received by the Issuer during the related Collection Period that do not constitute Interest Proceeds. For the avoidance of doubt, the proceeds from the issuance of Notes deposited in the Ramp-up Account and all Turbo Payment Amounts will be considered Principal Proceeds.

"Priority Class": With respect to any specified Class of Notes, each Class of Notes that ranks senior to such Class, as indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Priority Hedge Termination Event": The occurrence of (i) the Issuer's failure to make required payments or deliveries pursuant to a Hedge Agreement, (ii) certain events of bankruptcy, dissolution or insolvency with respect to the Issuer, (iii) the merger of the Issuer with or into another entity where such surviving entity fails to assume all obligations of the Issuer, (iv) the liquidation of the Assets due to an Event of Default under this Indenture, (v) a change in law after the Closing Date which makes it unlawful for the Issuer to perform its obligations under a Hedge Agreement, (vi) any termination described in Section 15.2(b) (Assignment of Hedge Agreement) hereof or (vii) an "Additional Termination Event" (as defined in such Hedge Agreement) with respect to the Issuer.

"Priority of Payments": The meaning specified in Section 11.1(a) (Disbursements of Monies from Payment Account).

"Proceeding": Any suit in equity, action at law or other judicial or administrative proceeding.

"Proposed Portfolio": The portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds resulting from the proposed purchase, sale, maturity or other disposition of a Collateral Obligation or a proposed reinvestment in an additional Collateral Obligation, as the case may be.

"Purchase Agreement": The agreement dated as of June 5, 2014 by and among the Co-Issuers and the Initial Purchaser relating to the Offering of the Notes.

"QIB/QP": Any Person that, at the time of its acquisition, purported acquisition or proposed acquisition of Notes is both a Qualified Institutional Buyer and a Qualified Purchaser.

"Qualified Institutional Buyer": The meaning specified in Rule 144A under the Securities Act.

"Qualified Purchaser": The meaning specified in Section 2(a)(51) of the Investment Company Act and Rule 2a51-2 under the Investment Company Act.

"Ramp-up Account": The non-interest bearing segregated trust account established pursuant to Section 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Ramp-up Period": The period commencing on the Closing Date and ending upon the earlier to occur of (a) September 29, 2014 and (b) the date selected by the Portfolio Manager and upon which the Issuer has satisfied the Target Initial Par Condition.

"Rating": The Moody's Rating and/or S&P Rating, as applicable.

"Rating Agency":  (i) With respect to the Notes, each of Moody's and S&P, for so long as any Class of Notes is rated by Moody's or S&P, as applicable, and (ii) with respect to Assets generally, Moody's or S&P, and if at any time Moody's or S&P ceases to provide rating services with respect to debt obligations, any other nationally recognized investment rating agency selected by the Issuer (or the Portfolio Manager on behalf of the Issuer) and reasonably satisfactory to at least a Majority of each Class rated by Moody's and/or S&P, as applicable; *provided* that, in either case, each of Moody's and S&P shall be a Rating Agency for purposes of this Indenture for only so long as an Outstanding Class of Secured Notes is rated by it.  In the event that at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Moody's published ratings for the type of obligation in respect of which such alternative rating agency is used.  In the event that at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and S&P published ratings for the type of obligation in respect of which such alternative rating agency is used.

"Rating Factor Adjustment Amount":  As of any date of determination, an amount equal to the product of (i) the Recovery Rate Excess Amount and (ii) 60.

"Record Date":  As to any Payment Date, (x) the 15th day (whether or not a Business Day) in the case of Certificated Notes and (y) one day (whether or not a Business Day) in the case of Global Notes, in each case, prior to such Payment Date.

"Recovery Rate Excess Amount":  As of any date of determination, an amount equal to the product of (I) the greater of (a) zero and (b) (i) the Weighted Average Moody's Recovery Rate as of such date of determination minus (ii) 44% and (II) 100; *provided* that, if as of such date of determination the Weighted Average Moody's Recovery Rate is (x) greater than or equal to 60%, then solely for the purpose of calculating the Recovery Rate Excess Amount, the Weighted Average Moody's Recovery Rate shall be deemed to equal 60% or (y) less than the Minimum Weighted Average Moody's Recovery Rate, then solely for the purpose of calculating the Recovery Rate Excess Amount, the Weighted Average Moody's Recovery Rate shall be deemed to equal the Minimum Weighted Average Moody's Recovery Rate.

"Redemption Date":  The Business Day specified for the redemption of Notes pursuant to Sections 9.2 (Optional Redemption), 9.3 (Redemption Procedures), 9.4 (Notes Payable on Redemption Date) or 9.6 (Clean-up Call Redemption).

"Redemption Price":  When used with respect to (i) any Class of Secured Notes, an amount equal to (a) 100% of the Aggregate Outstanding Amount of the Secured Notes to be redeemed *plus* (b) accrued and unpaid interest thereon (including, if applicable, interest on any accrued and unpaid Deferred Interest with respect to such Deferrable Notes) to the Redemption Date, *provided* that, if the date of such redemption is not on a Payment Date, any Secured Notes being redeemed shall receive the Break Funding Amount, if any and (ii) any Subordinated Note, its proportional share of the amount of the proceeds of the Assets (including proceeds created when the lien of this Indenture is released) remaining after giving effect to the redemption of the

Secured Notes and payment in full of all expenses of the Co-Issuers; *provided further* that the Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes to be redeemed may elect to receive less than 100% of the Redemption Price that would otherwise be payable to the Holders of such Class of Secured Notes. With respect to any Combination Note, "Redemption Price" means an amount equal to its allocation of the Redemption Price for each Underlying Class.

"Reference Banks": The meaning specified in Exhibit G hereto.

"Refinancing": The meaning specified in Section 9.2 (Optional Redemption and Refinancing).

"Refinancing Proceeds": The meaning specified in Section 9.2 (Optional Redemption and Refinancing).

"Register" and "Registrar": The respective meanings specified in Section 2.6(a) (Registration, Registration of Transfer and Exchange).

"Registered Investment Adviser": An investment adviser registered under the Investment Advisers Act of 1940, as amended.

"Registered Office Agreement": An agreement between the Administrator and the Issuer for the provision of registered office services to the Issuer, as amended from time to time.

"Regulation S": Regulation S, as amended, under the Securities Act.

"Regulation S Global Note": The meaning specified in Section 2.2(b)(i) (Forms of Notes).

"Regulation S Global Secured Note": A Secured Note issued in the form of a Regulation S Global Note.

"Regulation S Global Subordinated Note": A Subordinated Note issued in the form of a Regulation S Global Note.

"Reinvestment Period": The period from and including the Closing Date to and including the earliest of (i) June 5, 2019 or (ii) the date of the acceleration of the Maturity of any Class of Secured Notes pursuant to Section 5.2 (Acceleration of Maturity; Rescission and Annulment).

"Related Obligation": An obligation issued by the Portfolio Manager, any of its Affiliates that are investment funds or any other Person that is an investment fund whose investments are primarily managed by the Portfolio Manager or any such Affiliate.

"Required Coverage Ratio": With respect to a specified Class or Classes of Secured Notes and the related Interest Coverage Test or Overcollateralization Ratio Test as the case may be, as of any date of determination (with respect to the Interest Coverage Test, on and

after the Determination Date with respect to the second Payment Date), the applicable percentage indicated below opposite such specified Class:

| Class | Overcollateralization Ratio Test | Interest Coverage Ratio Test |
|-------|----------------------------------|------------------------------|
| A/B   | 123.2%                           | 120.0%                       |
| C     | 114.2%                           | 115.0%                       |
| D     | 108.0%                           | 110.0%                       |
| E     | 104.7%                           | 105.0%                       |

"Responsible Officer":  Any officer, authorized person or employee of the Portfolio Manager set forth on the list provided by the Portfolio Manager to the Issuer and the Trustee, which list shall include any portfolio manager having day-to-day responsibility for the performance of the Portfolio Manager under the Portfolio Management Agreement, as such list may be amended from time to time.

"Restricted Trading Period":  Each day during any period in which either (i) the Moody's rating of the Class A Notes is one or more sub-categories below its Initial Rating or (ii) the Moody's rating of the Class A Notes then Outstanding has been withdrawn and not reinstated; *provided* that such period will not be a Restricted Trading Period upon the direction of the holders of at least a Majority of the Controlling Class (so long as the Moody's rating of the Class A Notes has not been further downgraded, withdrawn or put on watch since the receipt of such direction).

"Revolver Funding Account":  The non-interest bearing segregated trust account established pursuant to Section 10.4 (The Revolver Funding Account).

"Revolving Collateral Obligation":  Any Collateral Obligation (other than a Delayed Drawdown Collateral Obligation) that is a loan (including, without limitation, revolving loans, including funded and unfunded portions of revolving credit lines and letter of credit facilities, unfunded commitments under specific facilities and other similar loans and investments) that by its terms may require one or more future advances to be made to the borrower by the Issuer; *provided* that any such Collateral Obligation will be a Revolving Collateral Obligation only until all commitments to make advances to the borrower expire or are terminated or irrevocably reduced to zero.

"Rule 144A":  Rule 144A, as amended, under the Securities Act.

"Rule 144A Global Note":  The meaning specified in Section 2.2(b)(ii) (Forms of Notes).

"Rule 144A Global Secured Note":  A Secured Note issued in the form of a Rule 144A Global Note.

"Rule 144A Global Subordinated Note":  A Subordinated Note issued in the form of a Rule 144A Global Note.

"Rule 144A Information":  The meaning specified in Section 7.15 (Reporting).

"S&P":   Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor or successors thereto.

"S&P Asset Quality Matrix":   For purposes of determining compliance with the Minimum Floating Spread Test and the Minimum Weighted Average Coupon Test as set forth in Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations), the combination (as selected by the Portfolio Manager with notice to the Collateral Administrator) of a certain of the Minimum Floating Spread/Minimum Weighted Average Coupon Pairing and another case of the S&P Recovery Rate (that can be selected separately with respect to each Class of Secured Notes) (or the linear interpolation between two cases, as applicable).

"S&P CDO Monitor":   Each dynamic, analytical computer model developed by S&P and available at www.structuredfinanceinterface.com, used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based upon certain assumptions (including the applicable Weighted Average S&P Recovery Rate) and S&P's proprietary corporate default studies, as may be amended by S&P from time to time.  Each S&P CDO Monitor shall be chosen by the Portfolio Manager and associated with either (x) a Weighted Average S&P Recovery Rate and a Minimum Floating Spread/Minimum Weighted Average Coupon Pairing from Section 2 of Schedule 3 or (y) a Weighted Average S&P Recovery Rate, a Minimum Floating Spread and an Minimum Weighted Average Coupon confirmed by S&P; *provided* that as of any date of determination the Weighted Average S&P Recovery Rate for each Class of Secured Notes outstanding equals or exceeds the Weighted Average S&P Recovery Rate for such Class chosen by the Portfolio Manager, the Weighted Average Floating Spread equals or exceeds the Minimum Floating Spread chosen by the Portfolio Manager, and the Weighted Average Coupon equals or exceeds the Minimum Weighted Average Coupon chosen by the Portfolio Manager.

"S&P CDO Monitor Test":   A test that will be satisfied on any date of determination on or after the Effective Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Class Default Differential of the Proposed Portfolio is positive with respect to the Controlling Class or any Class of Secured Notes then required to be tested under the current S&P ratings methodology.  The S&P CDO Monitor Test will be considered to be improved if the Class Default Differential of the Proposed Portfolio with respect to the Controlling Class or any Class of Secured Notes then required to be tested under the current S&P ratings methodology is greater than the corresponding Class Default Differential of the Current Portfolio.

"S&P Collateral Value":   With respect to any Defaulted Obligation or Deferring Security, the lesser of (i) the S&P Recovery Amount of such Defaulted Obligation or Deferring Security as of the relevant Measurement Date and (ii) the Market Value of such Defaulted Obligation or Deferring Security as of the relevant Measurement Date.

"S&P Effective Date Rating Condition": A condition that is satisfied if, after the end of the Ramp-up Period, S&P has confirmed in writing to the Issuer (which confirmation may be in the form of an email to the Issuer or the Portfolio Manager or a press release), the Trustee and/or the Portfolio Manager its Initial Rating of each Class of Secured Notes; *provided* that the

S&P Effective Date Rating Condition will be deemed to be satisfied if S&P makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee in writing (including by means of email notification or a press release) that (i) it believes satisfaction of the S&P Effective Date Rating Condition is not required or (ii) its practice is not to give such confirmation.

"S&P Excel Default Model Input File":  An electronic spreadsheet file in Microsoft Excel format to be provided to S&P by the Portfolio Manager or by the Collateral Administrator at the direction of the Portfolio Manager, which file shall include the balance of Cash and Eligible Investments in each Account and the following information (to the extent such information is available and is not confidential, unless the terms of such Collateral Obligation allow disclosure of such confidential information to S&P) with respect to each Collateral Obligation:  (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP, LoanX ID and/or other applicable identification number associated with such Collateral Obligation, (c) the par value of such Collateral Obligation, (d) the type of issue (including, by way of example, whether such Collateral Obligation is a bond, loan, a Cov-Lite Loan or a First-Lien Last-Out Loan), using such abbreviations as may be selected by the Collateral Administrator, (e) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR) and, in the case of a LIBOR Floor Obligation, the specified "floor" rate *per annum*, (f) the coupon (in the case of a Collateral Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Obligation which bears interest at a floating rate), (g) the S&P Industry Classification Group for such Collateral Obligation, (h) the stated maturity date of such Collateral Obligation, (i) the S&P Rating of such Collateral Obligation or the issuer thereof, as applicable, (j) the priority category of such Collateral Obligation used to determine the S&P Recovery Rate, if available, (k) the balance in Cash and Eligible Investments for each Account of the Issuer, (l) such other information as the Portfolio Manager may determine to include in such file and (m) the settlement date (or, if not yet settled, the anticipated settlement date and purchase price).

"S&P Industry Classification":  The S&P Industry Classifications set forth in Schedule 3 hereto, and such industry classifications shall be updated at the option of the Portfolio Manager if S&P publishes revised industry classifications.

"S&P Rating":  With respect to any Collateral Obligation, as of any date of determination, will be determined in accordance with the following methodology:

(i)       (a) if there is an issuer credit rating of the issuer of such Collateral Obligation by S&P as published by S&P, or the guarantor which unconditionally and irrevocably guarantees such Collateral Obligation pursuant to a form of guaranty approved by S&P for use in connection with this transaction, then the S&P Rating shall be such rating (regardless of whether there is a published rating by S&P on the Collateral Obligations of such issuer held by the Issuer, *provided* that private ratings (that is, ratings provided at the request of the obligor) may be used for purposes of this definition if the related obligor has consented to the disclosure thereof and a copy of such consent has been provided to S&P) or (b) if there is no issuer credit rating of the issuer by S&P but (1) there is a senior

secured rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category below such rating; (2) if clause (1) above does not apply, but there is a senior unsecured rating on any obligation or security of the issuer, the S&P Rating of such Collateral Obligation shall equal such rating; and (3) if neither clause (1) nor clause (2) above applies, but there is a subordinated rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category above such rating if such rating is higher than "BB+," and shall be two sub-categories above such rating if such rating is "BB+" or lower;

(ii)     with respect to any Collateral Obligation that is a DIP Collateral Obligation, the S&P Rating thereof shall be the credit rating assigned to such issue by S&P;

(iii)     if there is not a rating by S&P on the issuer or on an obligation of the issuer, then the S&P Rating may be determined pursuant to clauses (a) through (c) below:

(a)     if an obligation of the issuer is not a DIP Collateral Obligation and is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Rating set forth above except that the S&P Rating of such obligation will be (1) one sub-category below the S&P equivalent of the Moody's Rating if such Moody's Rating is "Baa3" or higher and (2) two sub-categories below the S&P equivalent of the Moody's Rating if such Moody's Rating is "Ba1" or lower;

(b)     the S&P Rating may be based on a credit estimate provided by S&P, and in connection therewith, the Issuer, the Portfolio Manager on behalf of the Issuer or the issuer of such Collateral Obligation shall, prior to or within 30 days after the acquisition of such Collateral Obligation, apply (and concurrently submit all available Information in respect of such application) to S&P for a credit estimate which shall be its S&P Rating; *provided* that, if such Information is submitted within such 30-day period, then, pending receipt from S&P of such estimate, such Collateral Obligation shall have an S&P Rating as determined by the Portfolio Manager in its sole discretion if the Portfolio Manager certifies to the Trustee and the Collateral Administrator that it believes that such S&P Rating determined by the Portfolio Manager is commercially reasonable and that the credit estimate provided by S&P will be at least equal to such S&P Rating determined by the Portfolio Manager; *provided further* that, if such Information is not submitted within such 30-day period, then, pending receipt from S&P of such estimate, the Collateral Obligation shall have (1) the S&P Rating as determined by the Portfolio Manager for a period of up to 90 days after the acquisition of such Collateral Obligation and (2) an S&P Rating of "CCC-" following such 90-day period; unless, during such 90-day period, the Portfolio Manager has requested the

extension of such period and S&P, in its sole discretion, has granted such request; *provided further* that, if such 90-day period (or other extended period) elapses pending S&P's decision with respect to such application, the S&P Rating of such Collateral Obligation shall be "CCC-"; *provided further* that, if the Collateral Obligation has had a public rating by S&P that S&P has withdrawn or suspended within six months prior to the date of such application for a credit estimate in respect of such Collateral Obligation, the S&P Rating in respect thereof shall be "CCC-" pending receipt from S&P of such estimate, and S&P may elect not to provide such estimate until a period of six months have elapsed after the withdrawal or suspension of the public rating; *provided further* that the S&P Rating may not be determined pursuant to this clause (b) if the Collateral Obligation is a DIP Collateral Obligation; *provided further* that such credit estimate shall expire 12 months after the acquisition of such Collateral Obligation, following which such Collateral Obligation shall have an S&P Rating of "CCC-" unless, during such 12-month period, the Issuer applies for renewal thereof in accordance with Section 7.14(b), in which case such credit estimate shall continue to be the S&P Rating of such Collateral Obligation until S&P has confirmed or revised such credit estimate, upon which such confirmed or revised credit estimate shall be the S&P Rating of such Collateral Obligation; *provided further* that such confirmed or revised credit estimate shall expire on the next succeeding 12-month anniversary of the date of the acquisition of such Collateral Obligation and (when renewed annually in accordance with Section 7.14(b)) on each 12-month anniversary thereafter; or

(c)      with respect to a Collateral Obligation that is not a Defaulted Obligation, the S&P Rating of such Collateral Obligation will at the election of the Issuer (at the direction of the Portfolio Manager) be "CCC-" provided (i) neither the issuer of such Collateral Obligation nor any of its Affiliates are subject to any bankruptcy or reorganization proceedings and (ii) the issuer has not defaulted on any payment obligation in respect of any debt security or other obligation of the issuer at any time within the two year period ending on such date of determination, all such debt securities and other obligations of the issuer that are *pari passu* with or senior to the Collateral Obligation are current and the Portfolio Manager reasonably expects them to remain current; or

(iv)      with respect to a DIP Collateral Obligation that has no issue rating by S&P or a Current Pay Obligation that is rated "D" or "SD" by S&P, the S&P Rating of such DIP Collateral Obligation or Current Pay Obligation, as applicable, will be, at the election of the Issuer (at the direction of the Portfolio Manager), "CCC-" or the S&P Rating determined pursuant to clause (iii)(b) above;

*provided* that, for purposes of the determination of the S&P Rating, (x) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch positive" by S&P, such

rating will be treated as being one sub-category above such assigned rating and (y) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch negative" by S&P, such rating will be treated as being one sub-category below such assigned rating.

The Portfolio Manager shall use commercially reasonable efforts to provide to S&P all available Information for any Collateral Obligation with an S&P Rating determined pursuant to clause (iii)(c) of this definition, prior to or within thirty (30) days after the acquisition of such Collateral Obligation.

"<u>S&P Rating Condition</u>":  With respect to any action taken or to be taken by or on behalf of the Issuer, a condition that is satisfied if S&P has confirmed in writing to the Issuer (which confirmation may be in the form of a press release), the Trustee and/or the Portfolio Manager that no immediate withdrawal or reduction with respect to its then-current rating by S&P of any Class of Secured Notes will occur as a result of such action; *provided* that the S&P Rating Condition will be deemed to be satisfied if (x) no Class of Secured Notes Outstanding is rated by S&P or (y) if S&P makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee that (i) it believes satisfaction of the S&P Rating Condition is not required with respect to the applicable action or (ii) its practice is not to give such confirmations.

"<u>S&P Recovery Amount</u>":  With respect to any Collateral Obligation, an amount equal to: (a) the applicable S&P Recovery Rate *multiplied by* (b) the Principal Balance of such Collateral Obligation.

"<u>S&P Recovery Rate</u>":  with respect to a Collateral Obligation, the recovery rate set forth in Section 1 of <u>Schedule 3</u> using the initial rating of the most senior Class of Secured Notes outstanding at the time of determination.

"<u>S&P Recovery Rating</u>":  With respect to a Collateral Obligation for which an S&P Recovery Rate is being determined, the "Recovery Rating" assigned by S&P to such Collateral Obligation based upon the following table:

| Recovery Rating | Description of Recovery | Recovery Range (%) |
|:---:|:---:|:---:|
| 1+ | High expectation, full recovery | 75-95 |
| 1 | Very high recovery | 65-95 |
| 2 | Substantial recovery | 50-85 |
| 3 | Meaningful recovery | 30-65 |
| 4 | Average recovery | 20-45 |
| 5 | Modest recovery | 5-25 |
| 6 | Negligible recovery | 2-10 |

"<u>S&P Selling Institution Percentage</u>":  With respect to any Participation Interest proposed to be entered into by the Issuer or any Pre-funded Letter of Credit, criteria that will be met if immediately after giving effect to such acquisition, (x) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with Selling Institutions that have the same or a lower S&P credit rating does not exceed the "Aggregate Selling Institution Percentage" set forth below for such S&P credit rating

and (y) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with any single Selling Institution that have the same or a lower S&P credit rating does not exceed the "Individual Selling Institution Percentage" set forth below for such S&P credit rating:

| Long-term Senior Unsecured Debt Rating of Selling Institution S&P | Individual Selling Institution Percentage | Aggregate Selling Institution Percentage |
|---|---|---|
| AAA | 20% | 20% |
| AA+ | 10% | 10% |
| AA | 10% | 10% |
| AA- | 10% | 10% |
| A+ | 5% | 5% |
| A | 5% | 5% |
| Below A | 0% | 0% |

*provided* that a Selling Institution having an S&P credit rating of "A" must also have a short-term S&P rating of "A-1" otherwise its Individual Selling Institution Percentage and Aggregate Selling Institution Percentage shall be 0%.

"Sale":  The meaning specified in Section 5.17(a) (Sale of Assets).

"Sale Proceeds":  All proceeds (excluding accrued interest, if any) received with respect to Assets as a result of sales of such Assets less any reasonable expenses incurred by the Portfolio Manager or the Trustee (other than amounts payable as Administrative Expenses) in connection with such sales.  Sale Proceeds will include Principal Financed Accrued Interest received in respect of such sale.

"Scheduled Distribution":  With respect to any Pledged Obligation, for each Due Date, the scheduled payment of principal and/or interest due on such Due Date with respect to such Pledged Obligation, determined in accordance with the assumptions specified in Section 1.2 (Assumptions as to Pledged Obligations) hereof.

"Second Lien Loan":  Any assignment of or Participation Interest in or other interest in a loan (x) that is required to be secured by a valid and perfected second priority pledge of collateral (which pledge may be subject to customary permitted liens, such as, but not limited to, tax liens) and which has a senior (or, solely with respect to any related first lien indebtedness, subordinated) pre-petition priority (including *pari passu* with other obligations of the obligor) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, (y) with respect to which the Portfolio Manager determines in good faith that the value of the collateral securing the loan on or about the time of acquisition by the Issuer together with other attributes of the issuer of such loan (including, without limitation, its general financial condition, ability to generate cash flow available for debt service, refinancing ability and other demands for that cash flow) is adequate to repay the principal balance of the loan in accordance with its terms and to repay the principal balance of all other loans of equal or greater seniority

secured by a security interest in the same collateral and (z) that is not secured solely or primarily by common stock or other equity interests; *provided* that the limitation set forth in this clause (z) shall not apply with respect to a loan made to a parent entity that is secured solely or primarily by the stock of one or more of the subsidiaries of such parent entity to the extent that the granting by any such subsidiary of a lien on its own property would violate law or regulations applicable to such subsidiary (whether the obligation secured is such loan or any other similar type of indebtedness owing to third parties); and *provided further* that, for a loan to which, due to the operation of the foregoing proviso, the limitation set forth in this clause (z) does not apply, the S&P Recovery Rate will be assigned by S&P on a case by case basis if there is no assigned S&P Recovery Rating.

"Secured Notes":  The Class X Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes, the Class F Notes and the Combination Notes.

"Secured Parties":  The meaning specified in the Granting Clauses.

"Securities Account Control Agreement":  An agreement in substantially the form of Exhibit H hereto.

"Securities Act":  The United States Securities Act of 1933, as amended.

"Securities Intermediary":  As defined in Section 8-102(a)(14) of the UCC.

"Security Entitlement":  The meaning specified in Section 8-102(a)(17) of the UCC.

"Selling Institution":  The entity obligated to make payments to the Issuer under the terms of a Participation Interest (or the agent bank in connection with a Pre-funded Letter of Credit, as the context shall require) and, as to which the S&P Selling Institution Percentage Criteria and the Moody's Counterparty Criteria are met.

"Senior Management Fee":  A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and Section 11.1 (Disbursements of Monies from Payment Account) in an amount equal to 0.15% *per annum* (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date.

"Senior Notes":  The Class X Notes, the Class A Notes and the Class B Notes.

"Senior Secured Bond":  Any fixed interest rate bond that is secured by the pledge of collateral and has the most senior pre-petition priority (including *pari passu* with other obligations of the obligor, but subject to customary permitted liens, such as, but not limited to, any tax liens) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings.

"Senior Secured Loan": An assignment of or Participation Interest in or other interest in a loan (w) that is required to be secured by a valid and perfected, first priority pledge of collateral (which pledge may be subject to customary permitted liens, such as, but not limited to, tax liens) and which has a senior pre-petition priority (including *pari passu* with other obligations of the obligor) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, (x) solely for purposes of calculating the Weighted Average S&P Recovery Rate, such loan cannot, by its terms, be subordinated to another obligation of the Obligor and the value of the collateral securing such loan, as determined by the Portfolio Manager in good faith, on or about the time of acquisition by the Issuer together with other attributes of the Obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service, refinancing ability and other demands for that cash flow) is adequate to repay the Principal Balance of the loan in accordance with its terms and to repay the Principal Balance of all other loans of equal seniority secured by a security interest in the same collateral; (y) that is not secured solely or primarily by common stock or other equity interests; *provided* that the limitation set forth in this clause (y) shall not apply with respect to a loan made to a parent entity that is secured solely or primarily by the stock of one or more of the subsidiaries of such parent entity to the extent that the granting by any such subsidiary of a lien on its own property would violate law or regulations applicable to such subsidiary (whether the obligation secured is such loan or any other similar type of indebtedness owing to third parties); and *provided further* that, for a loan to which, due to the operation of the foregoing proviso, the limitation set forth in this clause (y) does not apply, the S&P Recovery Rate will be assigned by S&P on a case by case basis if there is no assigned S&P Recovery Rating and (z) is not a First-Lien Last-Out Loan.

"Senior Secured Note": Any assignment of or Participation Interest in or other interest in a floating interest rate note (that is not in the form of an assignment of or participation interest in a loan) issued pursuant to an indenture or equivalent document by a corporation, partnership, limited liability company, trust or other person that is required to be secured by either a first or second priority perfected security interest or lien in or on specified collateral securing the Obligor's obligations under such note.

"Similar Law": Any federal, state, local, non-U.S. or other laws or regulations that are substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

"Special Redemption": As defined in Section 9.5 (Special Redemption).

"Special Redemption Amount": As defined in Section 9.5 (Special Redemption).

"Special Redemption Date": As defined in Section 9.5 (Special Redemption).

"Standby Investment": The US Bank National Association Money Market Deposit Account.

"Stated Maturity": With respect to any security, the maturity date specified in such security or applicable Underlying Instrument; and with respect to the Notes of any Class, the date specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

The Combination Notes will mature when the Underlying Classes are repaid in full in accordance with this Indenture.

"Step-down Obligation":  An obligation or security which by the terms of the related Underlying Instruments provides for a decrease in the *per annum* interest rate on such obligation or security (other than by reason of any change in the applicable index or benchmark rate used to determine such interest rate) or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-down Obligation.

"Step-up Obligation":  An obligation or security which by the terms of the related Underlying Instruments provides for an increase in the *per annum* interest rate on such obligation or security, or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; *provided* that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-up Obligation.

"Structured Finance Obligation":  A non-recourse or limited-recourse debt obligation issued by a special purpose vehicle and secured solely by the assets thereof that is a mortgage backed security, an asset-backed security, a collateralized bond obligation, a collateralized loan obligation, a repackaging of a bond (or a pool of bonds) of any of the foregoing or any similar securitization of an asset or a pool of assets (or any combination thereof).

"Subordinated Management Fee":  A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and Section 11.1 (Disbursements of Monies from Payment Account) of this Indenture in an amount equal to 0.25% *per annum* (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date.  The Subordinated Management Fee is payable on each Payment Date only to the extent that sufficient Interest Proceeds or Principal Proceeds are available, and, to the extent any such Subordinated Management Fee is not paid on any Payment Date for any reason, such payment will be deferred and will accrue interest at LIBOR (as determined for the applicable Interest Accrual Period with respect to the Secured Notes), compounded quarterly (calculated on the basis of a 360-day year consisting of twelve 30-day months).

"Subordinated Notes":  The subordinated notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Subsequent Delivery Date":  A date fixed by the Portfolio Manager on behalf of the Issuer for the delivery of a Collateral Obligation to be pledged to the Trustee after the Closing Date.

"Successor Entity": As defined in Section 7.10 (Co-Issuers May Consolidate, etc., Only on Certain Terms).

"Synthetic Security": A security or swap transaction other than a Participation Interest or a Pre-funded Letter of Credit that has payments associated with either payments of interest and/or principal on a reference obligation or the credit performance of a reference obligation or payments on, or the return of, an equity interest.

"Target Balance": An amount equal to (a) the Target Initial Par Amount, *minus* (b) the amount of any principal payments made on the Notes of any Class, *plus* (c) the aggregate amount of Principal Proceeds that result from any additional issuance of Subordinated Notes.

"Target Initial Par Amount": With respect to the Collateral Obligations purchased by the Issuer or subject to binding agreements to purchase at the end of the Ramp-up Period, $485,000,000 in Aggregate Principal Balance of such Collateral Obligations.

"Target Initial Par Condition": A condition satisfied as of the end of the Ramp-up Period if the Issuer has purchased, or entered into binding commitments to purchase, Collateral Obligations, including Collateral Obligations acquired by the Issuer on or prior to the Closing Date, the Aggregate Principal Balance of which equals or exceeds the Target Initial Par Amount (not including the reduction in the Aggregate Principal Balance of any Collateral Obligation after the Closing Date as a result of prepayments, maturities or redemptions, unless such amounts have been reinvested in Collateral Obligations; *provided* that the Principal Balance of any Defaulted Obligation shall be the lower of its S&P Collateral Value and its Moody's Collateral Value).

"Target Initial Par Ratio": A ratio that is determined by *dividing* (x) Target Initial Par Amount by (y) $450,000,000.

"Tax": Any present or future tax, levy, impost, duty, charge, assessment, deduction, withholding or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority other than a stamp, registration, documentation or similar tax.

"Tax Event": Any (1) new, or change to (a) a U.S. or non-U.S. tax statute, treaty, regulation, rule, ruling, practice, procedure or judicial decision or interpretation which results in any portion of any payment due from any issuer or obligor under any Collateral Obligation becoming properly subject to the imposition of U.S. or non-U.S. tax, which in the case of withholding tax is not compensated for by a "gross-up" provision under the terms of the Collateral Obligation (other than withholding imposed on commitment fees, letter of credit fees or other similar fees) or (b) a Cayman Islands law that results in Holders becoming properly subject to the imposition of Cayman Islands withholding tax unless the Issuer has changed its governing jurisdiction to a jurisdiction that does not impose withholding tax on holders of the Secured Notes within 90 days of becoming aware of such change in law and (2) tax arising under or as a result of FATCA as a result of or with respect to any payment due from any issuer or obligor under any Collateral Obligation, which is not compensated for by a "gross-up" provision

under the terms of the Collateral Obligation, but only, in each case, (1) or (2), if such tax or taxes amount, in the aggregate, to at least $1,000,000, during any 12 month period.

"Tax Jurisdiction":  The Bahamas, Bermuda, the British Virgin Islands, the Cayman Islands, Luxembourg or the Channel Islands, Ireland or the Netherlands Antilles and any other tax advantaged jurisdiction as may be notified by Moody's to the Portfolio Manager from time to time; provided that, in the case of each such tax jurisdiction, in the Portfolio Manager's good faith business judgment, a majority of the assets, revenues or operations supporting the related Collateral Obligation are directly or through subsidiaries located in the United States of America.

"Third Party Credit Exposure":  As of any date of determination, the sum (without duplication) of the Principal Balance (or such lesser amount as may be determined by S&P) of each Collateral Obligation that consists of a Participation Interest or a Pre-funded Letter of Credit.

"Trading Plan":  The meaning specified in Section 1.2(k) (Assumptions as to Pledged Obligations).

"Trading Plan Period":  The meaning specified in Section 1.2(k) (Assumptions as to Pledged Obligations).

"Transfer Agent":  The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"Trustee":  As defined in the first sentence of this Indenture.

"Turbo Payment Amount":  After the Reinvestment Period, and for so long as any Class C Notes remain Outstanding, as of any date of determination, the aggregate Post Reinvestment Period Amendment Proceeds accumulated during the related Collection Period.

"UCC":  The Uniform Commercial Code as in effect in the State of New York or, if different, the state of the United States that governs the perfection of the relevant security interest as amended from time to time.

"Uncertificated Security":  The meaning specified in Section 8-102(a)(18) of the UCC.

"Underlying Class":  Each of the Class A Notes and Class B Notes.

"Underlying Instrument":  The indenture or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Obligation or of which the holders of such Pledged Obligation are the beneficiaries.

"Unregistered Securities":  The meaning specified in Section 5.17(c) (Sale of Assets).

"<u>U.S. Tax Person</u>": A "United States person" within the meaning of Section 7701(a)(30) of the Code.

"<u>U.S. person</u>": The meaning specified in Regulation S.

"<u>USD</u>" and "<u>$</u>": The legal currency of the United States of America.

"<u>Volcker Rule</u>": Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act and the rules and regulations thereunder, in each case, as amended from time to time.

"<u>Weighted Average Coupon</u>": As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), equal to: (i) the aggregate sum, in respect of each fixed rate Collateral Obligation (excluding Deferring Securities), of an amount equal to the product of (a) the interest coupon (excluding any non-Cash interest portion) of such Collateral Obligation *multiplied by* (b) the Principal Balance of such Collateral Obligation (with respect to any Deferrable Security, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid), *divided by* (ii) the Aggregate Principal Balance of all such fixed rate Collateral Obligations.

"<u>Weighted Average Floating Spread</u>": As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), obtained by calculating the sum of: (i) in the case of each floating rate Collateral Obligation (excluding Deferring Securities, Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations), the aggregate interest (excluding any non-Cash interest portion) on such Collateral Obligation over LIBOR *multiplied by* the outstanding Principal Balance of such Collateral Obligation as of such date (with respect to any Deferrable Security, including for this purpose any capitalized interest with respect to which current cash interest is being paid but excluding any portion of the Principal Balance or capitalized interest with respect to which current cash interest is not being paid) and (ii) in the case of each Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, (a) the commitment fee for such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation *multiplied by* the undrawn commitments of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation and (b) the aggregate interest on such Collateral Obligation over LIBOR *multiplied by* the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation (*provided* that letter of credit fees shall be excluded for all purposes), and *dividing* such sum *by* the Aggregate Principal Balance of all such floating rate Collateral Obligations as of such date of determination. For purposes of the foregoing, (1) in the case of each floating rate Collateral Obligation that bears interest at a spread over an index other than a London interbank offered rate based index, the interest over LIBOR for such Collateral Obligation shall be equal to the excess of the sum of such spread and such index (or, in the case of a Pre-funded Letter of Credit, the applicable rate of interest on the deposited amount) over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date (which spread or excess may be expressed as a negative number), (2) LIBOR with respect to any floating rate Collateral Obligation that bears interest based on a spread over LIBOR shall be calculated in the same manner as it is calculated for payments on such Collateral Obligation, (3) with respect to

any LIBOR Floor Obligation, the interest over LIBOR for such Collateral Obligation shall be equal to the sum of (a) the applicable spread over LIBOR and (b) the excess, if any, of the specified "floor" rate relating to such Collateral Obligation over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date and (4) the interest over the applicable index in respect of a floating rate Step-up Obligation shall be deemed to be its current interest spread over such index and the interest over the applicable index in respect of a floating rate Step-down Obligation shall be deemed to be the lowest possible interest spread over such index under the Underlying Instruments relating to such Step-down Obligation.

"Weighted Average Life":  With respect to each Collateral Obligation as of any date of determination is an amount equal to (i) the sum of the products obtained by *multiplying* (A) the actual number of years (rounded to the nearest one hundredth thereof) from such date of determination to the respective dates of each successive scheduled distribution of principal of such Collateral Obligation and (B) the related amounts of the principal of such scheduled distribution; *divided by* (ii) the sum of the aggregate amount of all such scheduled distributions of principal of such Collateral Obligation.

"Weighted Average Life Test":  A test that is satisfied if the Aggregate Weighted Average Life on such date of determination is not later than June 5, 2022.

"Weighted Average Adjusted Moody's Rating Factor":  As of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated as having been upgraded by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory.

"Weighted Average Moody's Rating Factor":  The number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations.

"Weighted Average Moody's Recovery Rate":  As of any date of determination, the number, expressed as a percentage, obtained by summing the product of the Moody's Recovery Rate on such date of determination of each Collateral Obligation and the Principal Balance of such Collateral Obligation, dividing such sum by the Aggregate Principal Balance of all such Collateral Obligations and rounding up to the first decimal place.

"Weighted Average S&P Recovery Rate":  As of any date of determination, the number, expressed as a percentage and determined separately for each Class of Secured Notes, obtained by *summing* the products obtained by *multiplying* the Principal Balance as of such time of each Collateral Obligation by its corresponding recovery rate as determined in accordance

with Section 1 of Schedule 3 hereto, *dividing* such sum *by* the Aggregate Principal Balance of all Collateral Obligations, and *rounding* to the nearest tenth of a percent.

"Zero Coupon Security":  Any Collateral Obligation that at the time of purchase does not by its terms provide for the payment of cash interest; *provided* that, if after such purchase, such Collateral Obligation provides for the payment of cash interest it shall cease to be a Zero Coupon Security.

Section 1.2.  Assumptions as to Pledged Obligations.  In connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Obligation, or any payments on any other assets included in the Assets, with respect to the sale of and reinvestment in Collateral Obligations, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Obligations and on any other amounts that may be received for deposit in the Collection Account, the provisions set forth in this Section 1.2 (Assumptions as to Pledged Obligations) shall be applied.  The provisions of this Section 1.2 shall be applicable to any determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

(a)  All calculations with respect to Scheduled Distributions on the Pledged Obligations securing the Notes shall be made on the basis of information as to the terms of each such Pledged Obligation and upon report of payments, if any, received on such Pledged Obligation that are furnished by or on behalf of the issuer of such Pledged Obligation and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

(b)  For purposes of calculating the Coverage Tests and the Interest Reinvestment Test, except as otherwise specified in the Coverage Tests or the Interest Reinvestment Test, as applicable, such calculations will not include scheduled interest and principal payments on Defaulted Obligations or payments (including under any Hedge Agreement) as to which the Portfolio Manager or the Issuer has actual knowledge that such payments will not be made unless or until such payments are actually made.

(c)  For each Collection Period and as of any date of determination, the Scheduled Distribution on any Pledged Obligation (other than a Defaulted Obligation, which, except as otherwise provided herein, shall be assumed to have a Scheduled Distribution of zero) shall be the sum of (i) the total amount of payments and collections to be received during such Collection Period in respect of such Pledged Obligation (including the proceeds of the sale of such Pledged Obligation received and, in the case of sales which have not yet settled, to be received during the Collection Period and not reinvested in additional Collateral Obligations or Eligible Investments or retained in the Collection Account for subsequent reinvestment pursuant to Section 12.2 (Purchase of Additional Collateral Obligations)) that, if paid as scheduled, will be available in the Collection Account at the end of the Collection Period and (ii) any such amounts received in prior Collection Periods that were not disbursed on a previous Payment Date.

(d)     Each Scheduled Distribution receivable with respect to a Pledged Obligation shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Collection Account to earn interest at the Assumed Reinvestment Rate.  All such funds shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Account for application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.  For purposes of the applicable determinations required by Section 10.8(b)(iii) (Accountings), Article 12 and the definition of "Interest Coverage Ratio," the expected interest on Secured Notes and floating rate Collateral Obligations will be calculated using the then-current interest rates applicable thereto.

(e)     References in Section 11.1(a) (Disbursements of Monies from Payment Account) to calculations made on a "*pro forma* basis" shall mean such calculations after giving effect to all payments, in accordance with the Priority of Payments described herein, that precede (in priority of payment) or include the clause in which such calculation is made.

(f)     For purposes of determining whether the Effective Date Overcollateralization Test has been satisfied, all calculations shall be made on a "*pro forma* basis" giving effect to any purchases and sales, and, for purposes of determining whether any Coverage Test or the Interest Reinvestment Test has been satisfied on any Determination Date for purposes of the Priority of Payments, all calculations shall be made on a "*pro forma*" basis after giving effect to any payments made through the applicable clause of the Priority of Payments.

(g)     For purposes of calculating all Concentration Limitations, in both the numerator and the denominator of any component of the Concentration Limitations, Defaulted Obligations will be treated as having a Principal Balance equal to zero.

(h)     If one or more Collateral Obligations included in the Assets would be deemed Current Pay Obligations but for the applicable percentage limitation in the definition thereof, the Portfolio Manager shall determine which such Collateral Obligations have the lowest Market Value expressed as a percentage and such Collateral Obligations with the lowest Market Value expressed as a percentage will be deemed Defaulted Obligations.  Each such Defaulted Obligation will be treated as a Defaulted Obligation for all purposes until such time as the Aggregate Principal Balance of Current Pay Obligations would not exceed, on a *pro forma* basis including such Defaulted Obligation, the applicable percentage of the Collateral Principal Amount.

(i)     Except as otherwise provided herein, Defaulted Obligations will not be included in the calculation of the Collateral Quality Test.  Solely, for purposes of determining whether a Collateral Obligation satisfies the S&P CDO Monitor Test with respect to a purchase, additional Collateral Obligations purchased with proceeds from the sale of a Credit Risk Obligation, a Defaulted Obligation or an Equity Security shall not be included in the calculation of the S&P CDO Monitor Test.

(j)       For purposes of calculating the Collateral Quality Test, DIP Collateral Obligations will be treated as having an S&P Recovery Rate equal to the recovery rate for Senior Secured Loans set forth in the definition of "Weighted Average S&P Recovery Rate."

(k)       For purposes of calculating compliance with the Investment Criteria, the Portfolio Manager may elect to execute one or more Trading Plans (with notice to the Collateral Administrator, which notice shall include the identity of all sales and purchases forming part of such Trading Plan); *provided* that, if a previous Trading Plan failed to comply with the Investment Criteria, the Portfolio Manager may not execute any further Trading Plans until the S&P Rating Condition is satisfied (and, following the satisfaction of the S&P Rating Condition, any number of additional Trading Plans may be executed subject to the other limitations in this Section 1.2(k) (Assumptions as to Pledged Obligations)).  "Trading Plan" means, with respect to any proposed investment, a plan under which compliance with the Investment Criteria will be evaluated after giving effect to all sales and purchases proposed to be entered into within ten Business Days following the date of determination of such compliance (such period, the "Trading Plan Period"); *provided* that (i) the execution of a Trading Plan will not result in the averaging of the purchase price of a Collateral Obligation or Collateral Obligations purchased at separate times for purposes of any calculation made in connection with the Investment Criteria; (ii) no Trading Plan may be executed over a time period that includes a Determination Date; (iii) no Trading Plan may relate to the purchase of Collateral Obligations having an Aggregate Principal Balance in excess of 5.0% of the Collateral Principal Amount; (iv) only one Trading Plan may be outstanding at any time; (v) so long as the Investment Criteria are satisfied upon the expiry of the applicable Trading Plan Period, the failure of all of the terms and assumptions specified in such Trading Plan to be satisfied shall not be deemed to constitute a failure of such Trading Plan; (vi) no Trading Plan may result in the purchase of Collateral Obligations with an Average Life less than six months and (vii) the difference between the Collateral Obligation with the highest Weighted Average Life and the Collateral Obligation with the lowest Weighted Average Life, in each case, purchased in connection with a Trading Plan may not be greater than two years.

(l)       For purposes of calculating the sale proceeds of a Collateral Obligation in purchase and sale transactions, sales proceeds will include any Principal Financed Accrued Interest received in respect of such sale.

(m)       For purposes of calculating clauses (v) and (vi) of the Concentration Limitations, without duplication, the amounts on deposit in the Collection Account and the Ramp-up Account (including Eligible Investments therein) representing Principal Proceeds shall each be deemed to be a floating rate Collateral Obligation that is a Senior Secured Loan.

(n)       Notwithstanding any other provision of this Indenture to the contrary, all monetary calculations under this Indenture shall be in U.S. Dollars.

(o)       If the Issuer (or the Portfolio Manager on behalf of the Issuer) is notified by the administrative agent or other withholding agent or otherwise for the syndicate of

lenders in respect of any Revolving Collateral Obligation, Delayed Drawdown Collateral Obligation or Pre-funded Letter of Credit or other letter of credit that amounts associated therewith are subject to withholding tax imposed by any jurisdiction, the applicable Collateral Quality Test, the Coverage Tests and the Interest Reinvestment Test shall be calculated thereafter net of the full amount of such withholding tax unless the related obligor is required to make "gross-up" payments to the Issuer that cover the full amount of any such withholding tax on an after-tax basis pursuant to the underlying instruments with respect thereto.

(p)     For all purposes (including calculation of the Coverage Tests, the Interest Reinvestment Test and the calculation required pursuant to the Event of Default specified in clause (g) of the definition of such term), the Principal Balance of a Revolving Collateral Obligation or a Delayed Drawdown Collateral Obligation will include all unfunded commitments that have not been irrevocably reduced or withdrawn.

(q)     For purposes of calculating compliance with any tests, ratios, or calculations under this Indenture, the trade date (and not the settlement date) with respect to any acquisition or disposition of a Collateral Obligation or Eligible Investment shall be used to determine whether and when such acquisition or disposition has occurred.

(r)     For reporting purposes and for purposes of calculating the Coverage Tests, the Investment Criteria and the requirements of Section 12.2(b) (Purchase of Additional Collateral Obligations), assets held by any ETB Subsidiary shall be treated as Equity Securities owned by the Issuer (and the equity interest in such ETB Subsidiary shall not be included in such calculation).

(s)     For purposes of calculating the Weighted Average Coupon and Weighted Average Floating Spread, only the interest payable in cash, including Deferrable Cash-Pay Interest with respect to a Partial Deferrable Security, shall be included in such calculation.

## ARTICLE 2

## THE NOTES

Section 2.1.    Forms Generally.  The Notes and the Trustee's or Authenticating Agent's certificate of authentication thereon (the "Certificate of Authentication") shall be in substantially the forms required by this Article, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may be consistent herewith, determined by the Authorized Officers of the Applicable Issuers executing such Notes as evidenced by their execution of such Notes.  Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

Section 2.2.   Forms of Notes.   (a) The forms of the Notes, including the forms of Certificated Secured Notes, Certificated Subordinated Notes, Regulation S Global Notes and Rule 144A Global Notes, shall be as set forth in the applicable part of Exhibit A hereto.

(b)   Regulation S Global Notes and Rule 144A Global Notes.   (i) The Secured Notes of each Class and the Subordinated Notes sold to persons who are not U.S. persons in offshore transactions in reliance on Regulation S shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the applicable form of Exhibit A1 or Exhibit A2 hereto (each, a "Regulation S Global Note") and shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, DTC for the respective accounts of Euroclear and Clearstream, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.

(ii)   The Secured Notes of each Class and Subordinated Notes sold to persons that are QIB/QPs shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the applicable form of Exhibit A1 or Exhibit A2 hereto (each, a "Rule 144A Global Note"), which shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, DTC, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.  The Class E Notes sold to Institutional Accredited Investors shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of Exhibit A4 (each, a "Certificated Class E Note") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided. The Class F Notes sold to Institutional Accredited Investors shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of Exhibit A4 (each, a "Certificated Class F Note") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided. The Subordinated Notes (other than the Global Subordinated Notes) shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of Exhibit A3 (each, a "Certificated Subordinated Note") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.

(iii)   The Aggregate Outstanding Amount of the Regulation S Global Notes and the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or DTC or its nominee, as the case may be, as hereinafter provided.

(c)   Book Entry Provisions.  This Section 2.2(c) (Forms of Notes) shall apply only to Global Notes deposited with or on behalf of DTC.

The provisions of the "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, will be applicable to the Global Notes insofar as interests in such Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Notes held on their behalf by the Trustee, as custodian for DTC and DTC may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(d)     Certificated Securities.  Except as provided in Section 2.11 (Certificated Notes) hereof, owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of Certificated Notes.

Section 2.3.     Authorized Amount; Stated Maturity; Denominations.  The Aggregate Outstanding Amount of the Secured Notes and the Subordinated Notes that may be authenticated and delivered under this Indenture is limited to $504,750,000 Aggregate Outstanding Amount of Notes (reflecting, with respect to the Combination Notes, the Aggregate Outstanding Amount of the Underlying Classes rather than the Aggregate Maximum Notional Amount of the Combination Notes), except for Deferred Interest with respect to the Deferrable Notes, Additional Subordinated Notes issued pursuant to Section 2.4 (Additional Notes) and Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.6 (Registration, Registration of Transfer and Exchange), 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) or 8.5 (Reference in Notes to Supplemental Indentures) and Notes issued pursuant to supplemental indentures in accordance with Article 8. The Aggregate Outstanding Amount of the Combination Notes may not exceed the Aggregate Maximum Notional Amount. The principal amount of each Underlying Class of a Combination Note is included in (and is not in addition to) the Aggregate Outstanding Amount of the related Class of Notes.

Such Notes shall be divided into the Classes, having the designations, original principal amounts and other characteristics as follows:

Offered Securities

| Class Designation | X | A | B | C | D | E | F | Combination Notes | Subordinated Notes[5] |
|---|---|---|---|---|---|---|---|---|---|
| Issuer(s) | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Issuer | Issuer | Co-Issuers | Issuer |
| Original Principal Amount | $4,000,000 | $296,000,000 | $68,000,000 | $33,000,000 | $28,500,000 | $20,500,000 | $4,000,000 | Up to $364,000,000[1] | $50,750,000 |
| Stated Maturity | May 1, 2026 | May 1, 2026 | May 1, 2026 | May 1, 2026 | May 1, 2026 | May 1, 2026 | May 1, 2026 | May 1, 2026 | May 1, 2026 |
| Floating Rate Debt | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Index[2] | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | N/A |
| Index | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | N/A |

| Class Designation | X | A | B | C | D | E | F | Combination Notes | Subordinated Notes[5] |
|---|---|---|---|---|---|---|---|---|---|
| Maturity | | | | | | | | | |
| Spread | 1.00% | 1.42% | 1.77% | 2.55% | 3.10% | 4.80% | 5.15% | 1.4853%[4] | N/A |
| Initial Rating (s)[3] | | | | | | | | | |
| Moody's | N/A | "Aaa(sf)" | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| S&P | "AAA (sf)" | "AAA (sf)" | "AA (sf)" | "A (sf)" | "BBB (sf)" | "BB (sf)" | "B+ (sf)" | "AA (sf)" | N/A |
| Priority Classes | None | None[6] | X, A | X, A, B | X, A, B, C | X, A, B, C, D | X, A, B, C, D, E | N/A | X, A, B, C, D, E, F |
| Pari Passu Classes | A | X | | | | | | | |
| Junior Classes | B, C, D, E, F, Subordinated | B, C, D, E, F, Subordinated | C, D, E, F, Subordinated | D, E, F, Subordinated | E, F, Subordinated | Subordinated, F | Subordinated | N/A | None |
| Deferrable Notes | No | No | No | Yes | Yes | Yes | Yes | N/A | N/A |
| ERISA Limited Notes | No | No | No | No | No | Yes | Yes | No | Yes |

(1)  The Co-Issuers will issue Combination Notes with a maximum aggregate principal amount of up to U.S.$364,000,000 which maximum amount will be composed of Components representing up to U.S.$296,000,000 aggregate principal amount of Class A Notes and up to U.S.$68,000,000 aggregate principal amount of Class B Notes. The Combination Note will not bear interest at a stated rate, but will be entitled to receive interest with respect to the Underlying Classes. The ranking of the Combination Notes is determined by reference to the Underlying Classes. The Stated Maturity of the Combination Notes is determined by reference to the Underlying Classes. Reference must be made to the Underlying Classes to determine whether a particular Component of the Combination Notes is a Deferrable Note. See the Combination Notes Table below for a summary of the terms related to the Combination Notes.

(2)  For the definition of LIBOR, see Exhibit G.

(3)  The Issuer will obtain initial ratings for the Class A Notes both Moody's and S&P, and will obtain initial ratings for all Secured Notes from S&P.

(4)  These represent the expected stated maturity, index, index maturity and interest to be paid on the Combination Note based on the stated maturity, index, index maturity and interest rates of the Underlying Classes. The Initial Rating by S&P of the Combination Note is with respect to the ultimate repayment of principal by the Stated Maturity and interest at a rate of LIBOR plus 1.4853% per annum (which rate was determined based on the Permissible Ratio as of the Closing Date).

(5)  The Subordinated Notes do not bear interest at a stated rate but will receive distributions on each Payment Date in accordance with the Priority of Payments.

(6)  The Class X Notes will be pari passu to the Class A Notes interest payments and in certain circumstances will be senior in right of principal payment to the Class A Notes.

## Combination Notes Table

| Class | Aggregate Principal Amount (as of the Closing Date) | Permissible Ratio[1] | Aggregate Maximum Notional Amount |
|---|---|---|---|
| "Combination Notes" | $347,600,000 (representing Components of U.S.$282,663,736 Aggregate Outstanding Amount of Class A Notes and U.S.$64,936,264 aggregate principal amount of Class B Notes) | The Permissible Ratio for each Underlying Class on any date shall be the ratio of the then-current Aggregate | $364,000,000 (representing Components of up to U.S.$296,000,000 Aggregate Outstanding Amount of Class A Notes and up to U.S.$68,000,000Aggregate |

| Class | Aggregate Principal Amount (as of the Closing Date) | Permissible Ratio[1] | Aggregate Maximum Notional Amount |
|---|---|---|---|
| | | Outstanding Amount of the Class A Notes and the then-current Aggregate Outstanding Amount of the Class B Notes, respectively, *divided by* the sum of the then-current Aggregate Outstanding Amount of the Class A Notes and the Class B Notes.<br><br>As of the Closing Date, the Permissible Ratio shall be 81.31868%% for the Class A Notes and 18.68132% for the Class B Notes | Outstanding Amount of Class B Notes) |

---

1   The Trustee may round any of the fractional percentages set forth in this definition of Permissible Ratio either up or down to the extent necessary to cause an Exchange to comply with the $1 integral multiple requirement

The Notes (other than the Class A Notes, the Class B Notes, the Class C Notes, the Class F Notes and the Combination Notes) shall be issuable in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof. The Class A Notes, the Class B Notes, the Class C Notes, the Class F Notes and the Combination Notes shall be issued in minimum denominations of $150,000 and integral multiples of $1 in excess thereof. Notes shall only be transferred or resold in compliance with the terms of the representation letter delivered by the initial purchaser of such Notes.

Section 2.4.   Additional Notes.   (a) At any time, the Applicable Issuers may issue Additional Subordinated Notes; *provided* that the following conditions are met as certified to the Trustee by the Issuer:

(i)   such issuance is made (x) with the consent of the Holders of at least 66-⅔% of the Aggregate Outstanding Amount of the Subordinated Notes, (y) with the consent of the Portfolio Manager and (z) with the consent of a Majority of the Controlling Class; *provided* that such consent of the Controlling Class will not be required during the Reinvestment Period if the Additional Issuance Threshold Test is satisfied;

(ii)   such issuance may not exceed 100% of the original outstanding amount of the Subordinated Notes;

(iii) the terms of the Subordinated Notes issued must be identical to the respective terms of previously issued Subordinated Notes;

(iv) an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters shall be delivered to the Trustee to the effect that (1) such issuance will not result in the Issuer becoming subject to U.S. federal income taxation with respect to its net income, (2) such issuance would not cause the holders or beneficial owners of Secured Notes previously issued to be deemed to have sold or exchanged such Notes under Section 1001 of the Code and (3) such issuance would not adversely affect the tax characterization of any Outstanding Notes that was characterized as debt at the time of issuance; *provided* that such opinions described in clauses (2) and (3) shall not be required with respect to any Class if 100% of the Holders of such Class have consented to a waiver of such requirement; and

(v) after giving effect to the issuance of Additional Subordinated Notes, each Overcollateralization Ratio Test for each Class of Notes is satisfied.

(b) The Additional Subordinated Notes will rank *pari passu* in all respects with the initial Subordinated Notes.

(c) Any Additional Subordinated Notes issued pursuant to this Section 2.4 (Additional Notes) will, to the extent reasonably practicable, be offered first to Holders of the Subordinated Notes, in such amounts as are necessary to preserve their *pro rata* holdings of Subordinated Notes.

(d) Any Additional Subordinated Notes may be offered at prices that differ from the applicable initial offering price.

(e) The net proceeds of any Additional Subordinated Notes may be designated as Interest Proceeds or Principal Proceeds by the Portfolio Manager.

Section 2.5. Execution, Authentication, Delivery and Dating. The Notes shall be executed on behalf of each of the Applicable Issuers by one of their respective Authorized Officers. The signature of such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Issuer and the Co-Issuer may deliver Notes executed by the Applicable Issuers to the Trustee or the Authenticating Agent for authentication and the Trustee or the Authenticating Agent, upon Issuer Order (which Issuer Order shall, in connection with a transfer of Notes hereunder, be deemed to have been provided upon the delivery of an executed Note to the

Trustee), shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

Each Note authenticated and delivered by the Trustee or the Authenticating Agent upon Issuer Order (which Issuer Order shall, in connection with a transfer of Notes hereunder, be deemed to have been provided upon the delivery of an executed Note to the Trustee) on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Outstanding principal amount of the Notes so transferred, exchanged or replaced. In the event that any Note is divided into more than one Note in accordance with this Article 2, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their authorized signatories, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.6. Registration, Registration of Transfer and Exchange. (a) The Issuer shall cause to be kept a register (the "Register") at the office of the Trustee in which, subject to such reasonable regulations as it may prescribe, the Issuer shall provide for the registration of Notes and the registration of transfers of Notes. The Trustee is hereby initially appointed "Registrar" for the purpose of registering Notes and transfers of such Notes with respect to the Register maintained in the United States as herein provided. Upon any resignation or removal of the Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of Registrar.

If a Person other than the Trustee is appointed by the Issuer as Registrar, the Issuer will give the Trustee prompt written notice of the appointment of a Registrar and of the location, and any change in the location, of the Register, and the Trustee shall have the right to inspect the Register at all reasonable times and to obtain copies thereof and the Trustee shall have the right to rely upon a certificate executed on behalf of the Registrar by an Officer thereof as to the names and addresses of the Holders of the Notes and the principal or face amounts and numbers of such Notes. Upon request at any time the Registrar shall provide to the Issuer, the Portfolio Manager, the Initial Purchaser or any Holder of Notes a current list of Holders as reflected in the Register.

Subject to this Section 2.6 (Registration, Registration of Transfer and Exchange), upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers

to be maintained as provided in <u>Section 7.2</u> (Maintenance of Office or Agency), the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like aggregate principal or face amount. The Trustee shall provide notice of any such transfer to the Initial Purchaser.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal or face amount, upon surrender of the Notes to be exchanged at such office or agency. Whenever any Note is surrendered for exchange, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Issuer and, solely in the case of the Co-Issued Notes, the Co-Issuer, evidencing the same debt (to the extent they evidence debt), and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Registrar duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in Securities Transfer Agents Medallion Program ("<u>STAMP</u>") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Exchange Act.

(b)     No Note may be sold or transferred (including, without limitation, by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act, is exempt from the registration requirements under applicable state securities laws and will not cause either of the Co-Issuers to become subject to the requirement that it register as an investment company under the Investment Company Act.

(c)     (i)     No transfer of any ERISA Limited Note will be effective, and the Trustee will not recognize any such transfer, if it would result in 25% or more of the value of any Class of ERISA Limited Notes being held by Benefit Plan Investors (the "<u>25% Limitation</u>"). For purposes of these calculations and all other calculations required by this subsection, any ERISA Limited Notes held by a Person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Co-Issuers or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any "affiliate" of such a Person (as defined in 29 C.F.R. Section 2510.3-

101(f)(3)) (a "<u>Controlling Person</u>"), the Trustee, the Portfolio Manager, the Initial Purchaser and their respective affiliates shall be disregarded and not treated as being Outstanding.  In addition, if any Holder of ERISA Limited Notes (a) informs the Trustee that as a result of a proposed transfer of any such ERISA Limited Note or of interests in, or securities issued by, such Holder, all or a specified portion of the ERISA Limited Notes owned by such Holder would be deemed to be held by a Benefit Plan Investor and (b) requests the Trustee to determine and notify such Holder whether the 25% Limitation would be exceeded after giving effect to such transfer, then the Trustee shall make such determination, subject to the last sentence of this clause (i), and notify such Holder accordingly.  Each Holder of ERISA Limited Notes shall be required to covenant that it will inform the Trustee of any such transfer, will not permit any such transfer that would cause the 25% Limitation to be exceeded to become effective, and will notify the Trustee of the effectiveness of any transfer that is not prohibited by this paragraph.  After it is notified of the effectiveness of any transfer pursuant to the foregoing sentence, the Trustee shall regard the ERISA Limited Notes held by such Holder (or specified portion thereof) as being held by a Benefit Plan Investor in future calculations of the 25% Limitation made pursuant to this Indenture unless subsequently notified by such Holder that such Notes (or specified portion thereof) would no longer be deemed to be held by Benefit Plan Investors.  The Trustee shall be entitled to rely exclusively upon the information set forth in the face of the transfer certificates received pursuant to the terms of this <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange) and only Notes that a Bank Officer of the Trustee actually knows to be so held shall be so disregarded.

(d)      The Trustee shall not be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate is specifically required by the terms of this <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange) to be provided to the Trustee by a prospective transferor or transferee, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange).

(e)      For so long as any of the Notes are Outstanding, the Issuer shall not issue or permit the transfer of any shares of the Issuer to U.S. persons and the Co-Issuer shall not issue or permit the transfer of any membership interests of the Co-Issuer to U.S. persons.

(f)      So long as a Global Note remains Outstanding and is held by or on behalf of DTC, transfers of such Global Note, in whole or in part, shall only be made in accordance with <u>Section 2.2(b)</u> (Forms of Notes) and this <u>Section 2.6(f)</u> (Registration, Registration of Transfer and Exchange).  Subject to clauses (i), (ii) and (iii) of this <u>Section 2.6(f)</u> (Registration, Registration of Transfer and Exchange), transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of DTC or to a successor DTC or such successor's nominee.

(i) <u>Rule 144A Global Secured Note to Regulation S Global Secured Note</u>. If a holder of a beneficial interest in a Rule 144A Global Secured Note deposited with DTC wishes at any time to exchange its interest in such Rule 144A Global Note for an interest in the corresponding Regulation S Global Secured Note, or to transfer its interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Regulation S Global Secured Note, such holder, provided such holder or, in the case of a transfer, the transferee is not a U.S. person and is acquiring such interest in an offshore transaction, may, subject to the immediately succeeding sentence and the rules and procedures of DTC, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Regulation S Global Secured Note. Upon receipt by the Trustee or Registrar of (A) instructions given in accordance with DTC's procedures from an Agent Member directing the Trustee or Registrar to credit or cause to be credited a beneficial interest in the corresponding Regulation S Global Secured Note, but not less than the minimum denomination applicable to such holder's Notes, in an amount equal to the beneficial interest in the Rule 144A Global Secured Note to be exchanged or transferred, (B) a written order given in accordance with DTC's procedures containing information regarding the participant account of DTC and the Euroclear or Clearstream account to be credited with such increase and (C) a certificate in the form of <u>Exhibit B1</u> attached hereto given by the holder of such beneficial interest stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the holder or the transferee, as applicable, is not a U.S. person, and in an offshore transaction pursuant to and in accordance with Regulation S, then the Trustee or Registrar shall instruct DTC to reduce the principal amount of the Rule 144A Global Secured Note and to increase the principal amount of the Regulation S Global Secured Note by the Aggregate Outstanding Amount of the beneficial interest in the Rule 144A Global Secured Note to be exchanged or transferred, and to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Regulation S Global Secured Note equal to the reduction in the principal amount of the Rule 144A Global Note.

(ii) <u>Regulation S Global Secured Note to Rule 144A Global Secured Note</u>. If a holder of a beneficial interest in a Regulation S Global Secured Note deposited with DTC wishes at any time to exchange its interest in such Regulation S Global Secured Note for an interest in the corresponding Rule 144A Global Secured Note or to transfer its interest in such Regulation S Global Secured Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Secured Note, such holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Rule 144A Global Secured Note. Upon receipt by the Trustee or Registrar of (A) instructions from Euroclear, Clearstream and/or DTC, as the case may be, directing the Trustee or Registrar to cause to be credited a beneficial

interest in the corresponding Rule 144A Global Secured Note in an amount equal to the beneficial interest in such Regulation S Global Secured Note, but not less than the minimum denomination applicable to such holder's Notes to be exchanged or transferred, such instructions to contain information regarding the participant account with DTC to be credited with such increase and (B) a certificate in the form of Exhibit B2 attached hereto given by the holder of such beneficial interest and stating, among other things, that, in the case of a transfer, the Person transferring such interest in such Regulation S Global Secured Note reasonably believes that the Person acquiring such interest in a Rule 144A Global Secured Note is a Qualified Institutional Buyer, is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and is also a Qualified Purchaser, then the Trustee or Registrar will instruct DTC to reduce, or cause to be reduced, the Regulation S Global Secured Note by the Aggregate Outstanding Amount of the beneficial interest in the Regulation S Global Secured Note to be transferred or exchanged and the Trustee or Registrar shall instruct DTC, concurrently with such reduction, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Rule 144A Global Secured Note equal to the reduction in the principal amount of the Regulation S Global Secured Note.

(iii) <u>Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note to Certificated Subordinated Note</u>. If a holder of a beneficial interest in a Regulation S Global Subordinated Note deposited with DTC wishes at any time to transfer its interest in such Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note to a Person who wishes to take delivery thereof in the form of a Certificated Subordinated Note, such holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, transfer, or cause the transfer of, such interest for a Certificated Subordinated Note. Upon receipt by the Registrar of (A) certificates substantially in the form of Exhibits B4 and B7 attached hereto executed by the transferee and (B) appropriate instructions from DTC, if required, the Registrar will approve the instructions at DTC to reduce, or cause to be reduced, the Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note, as applicable, by the Aggregate Outstanding Amount of the beneficial interest in the Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note, as applicable, to be transferred, record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Issuer and authentication and delivery by the Trustee, one or more corresponding Certificated Subordinated Notes, registered in the names specified in the instructions in clause (B) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the Aggregate Outstanding Amount of the interest in such Regulation S Global Subordinated Notes or Rule 144A Global Subordinated Notes, as applicable, transferred by the transferor), and in authorized denominations.

(iv)    Other Exchanges.  In the event that a Global Note is exchanged for Notes in definitive registered form without interest coupons pursuant to Section 2.11 (Certificated Notes) hereof, such Notes may be exchanged for one another only in accordance with such procedures as are substantially consistent with the provisions above (including certification requirements intended to insure that such transfers are made only to Holders who are Qualified Purchasers and comply with Rule 144A or are to persons who are not U.S. persons who are non-U.S. residents (as determined for purposes of the Investment Company Act), and otherwise comply with Regulation S under the Securities Act, as the case may be), and as may be from time to time adopted by the Co-Issuers and the Trustee.

(g)    So long as a Certificated Note remains Outstanding, transfers of a Certificated Note, in whole or in part, shall only be made in accordance with this Section 2.6(g) (Registration, Registration of Transfer and Exchange).

(i)    Transfer and Exchange of Certificated Secured Note to Certificated Secured Note.  If a Holder of a Certificated Secured Note wishes at any time to transfer such Certificated Secured Note to a Person who wishes to take delivery thereof in the form of one or more Certificated Secured Notes of the same Class, such Holder may transfer or cause the transfer of such Note as provided below. Upon receipt by the Trustee or the Registrar of (A) such Holder's Certificated Secured Note properly endorsed for assignment to the transferee and (B) a certificate in the form of Exhibit B3 attached hereto given by the transferee of such Certificated Secured Note, then the Registrar shall cancel such Certificated Secured Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Applicable Issuers authenticate and deliver one or more Certificated Secured Notes bearing the same designation as the Certificated Secured Notes endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal or face amounts designated by the transferee (the aggregate of such principal or face amounts being equal to the Aggregate Outstanding Amount of the Certificated Secured Notes surrendered by the transferor), and in authorized denominations.  Certificated Secured Notes may be exchanged in the manner set forth in Section 2.6(g)(iv) (Registration, Registration of Transfer and Exchange).

(ii)    Transfer and Exchange of Certificated Subordinated Note to Certificated Subordinated Note.  Upon receipt by the Registrar of (A) a Holder's Certificated Subordinated Note properly endorsed for assignment to the transferee and (B) certificates substantially in the form of Exhibits B4 and B7 attached hereto (which may be in the form of a subscription agreement containing substantially the representations in Exhibits B4 and B7) given by the transferee of such Certificated Subordinated Note, then the Registrar shall cancel such Certificated Subordinated Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Issuer authenticate and deliver one or more Certificated Subordinated Notes bearing the

same designation as the Certificated Subordinated Note endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the aggregate principal amount of the Certificated Subordinated Note surrendered by the transferor), and in authorized denominations. Certificated Subordinated Notes may be exchanged in the manner set forth in Section 2.6(g)(iv) (Registration, Registration of Transfer and Exchange).

(iii) Transfer of Certificated Subordinated Note to Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note. If a holder of a Certificated Subordinated Note wishes at any time to transfer such Certificated Subordinated Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Regulation S Global Subordinated Note or a Rule 144A Global Subordinated Note, such holder may, subject to the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, exchange or transfer, or cause the exchange or transfer of, such Certificated Subordinated Note for a beneficial interest in a Regulation S Global Subordinated Note or a Rule 144A Global Subordinated Note, as applicable. Upon receipt by the Registrar of (A) a holder's Certificated Subordinated Note properly endorsed for assignment to the transferee, (B) a certificate substantially in the form of Exhibit B5 or B6, as applicable, attached hereto executed by the transferor, (C) instructions given in accordance with Euroclear, Clearstream or DTC's procedures, as the case may be, from an Agent Member to instruct DTC to cause to be credited a beneficial interest in the Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note, as applicable, in an amount equal to the Certificated Subordinated Note to be transferred or exchanged and (D) a written order given in accordance with DTC's procedures containing information regarding the participant's account at DTC and/or Euroclear or Clearstream to be credited with such increase, the Registrar shall cancel such Certificated Subordinated Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and approve the instructions at DTC, concurrently with such cancellation, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Regulation S Global Subordinated Note or Rule 144A Global Subordinated Note, as applicable, equal to the principal amount of the Certificated Subordinated Note transferred or exchanged.

(iv) Exchange of Certificated Notes. If a Holder of one or more Certificated Notes wishes at any time to exchange such Certificated Notes for one or more Certificated Notes of the same Class of different principal amounts, such holder may exchange or cause the exchange of such Certificated Note for Certificated Notes bearing the same designation as the Certificated Notes endorsed for exchange. Upon receipt by the Applicable Issuers and the Trustee or the Registrar of (x) such Holder's Certificated Notes properly endorsed for such exchange and (y) written instructions from such Holder designating the number

and principal or face amounts of the Certificated Notes to be issued (the aggregate of such principal or face amounts being equal to the aggregate principal or face amount of the Certificated Notes surrendered for exchange), then the Registrar shall cancel such Certificated Notes in accordance with Section 2.10 (Cancellation), record the exchange in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Applicable Issuers authenticate and deliver one or more Certificated Notes bearing the same designation as the Certificated Notes endorsed for exchange, registered in the same names as the Certificated Notes surrendered by such Holder, in different principal or face amounts designated by such Holder, and in authorized denominations.

(v) Transfer of Certificated Secured Notes to Regulation S Global Secured Note or Rule 144A Global Secured Note. If a Holder of a Certificated Secured Note wishes at any time to transfer such Certificated Secured Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Regulation S Global Secured Note or Rule 144A Global Secured Note, such Holder may, subject to the rules and procedures of DTC, exchange or transfer, or cause the exchange or transfer of, such Certificated Secured Note for a beneficial interest in a Regulation S Global Secured Note or Rule 144A Global Secured Note, as applicable. Upon receipt by the Registrar of (A) a Holder's Certificated Secured Note properly endorsed for assignment to the transferee, (B) a certificate substantially in the form of Exhibit B1 or B2, as applicable, attached hereto executed by the transferor, (C) instructions given in accordance with Euroclear, Clearstream or DTC's procedures, as the case may be, from an Agent Member to instruct DTC to cause to be credited a beneficial interest in the Regulation S Global Secured Note or Rule 144A Global Secured Note, as applicable, in an amount equal to the Certificated Secured Note to be transferred or exchanged and (D) a written order given in accordance with DTC's procedures containing information regarding the participant's account at DTC and/or Euroclear or Clearstream, as applicable, to be credited with such increase, the Registrar shall cancel such Certificated Secured Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and approve the instructions at DTC, concurrently with such cancellation, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Regulation S Global Secured Note or Rule 144A Global Secured Note, as applicable, equal to the principal amount of the Certificated Secured Note transferred or exchanged.

(h) If Notes are issued upon the transfer, exchange or replacement of Notes bearing the applicable legends set forth in the applicable part of Exhibit A hereto, and if a request is made to remove such applicable legend on such Notes, the Notes so issued shall bear such applicable legend, or such applicable legend shall not be removed, as the case may be, unless there is delivered to the Trustee and the Applicable Issuers such satisfactory evidence, which may include an Opinion of Counsel acceptable to them, as may be reasonably required by the Applicable Issuers (and which shall by its terms

permit reliance by the Trustee), to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of the Securities Act, the Investment Company Act, ERISA or the Code. Upon provision of such satisfactory evidence, the Trustee or its Authenticating Agent, at the written direction of the Applicable Issuers shall, after due execution by the Applicable Issuers authenticate and deliver Notes that do not bear such applicable legend.

(i) Each Person who becomes a beneficial owner of Notes of a Class represented by an interest in a Global Note will be deemed to have represented and agreed as follows:

(i) In connection with the purchase of such Notes: (A) none of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator, the Initial Purchaser or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (B) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Initial Purchaser or any of their respective Affiliates other than any statements in the final offering circular for such Notes, and such beneficial owner has read and understands such final offering circular; (C) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to this Indenture) based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Initial Purchaser; (D) such beneficial owner is either (1) (except in the case of the Subordinated Notes) both (x) a Qualified Institutional Buyer that is not a broker-dealer which owns and invests on a discretionary basis less than $25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (y) either (i) a Qualified Purchaser, (ii) (in the case of the Subordinated Notes only) a Knowledgeable Employee with respect to the Issuer or (iii) corporations, partnerships, limited liability companies or other entities (other than trusts) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee or a Qualified Purchaser or (2) not a U.S. person and is acquiring the Notes in an offshore transaction in reliance on the exemption from registration provided by Regulation S; (E) such beneficial owner is acquiring its interest in such Notes for its own account; (F) such beneficial owner was not formed for the purpose of investing in such Notes; (G) such beneficial owner understands that the Issuer may receive a list of participants holding interests in the Notes from one or more book-entry depositories; and (H) such beneficial owner will hold and transfer at least the

minimum denomination of such Notes; and (I) such beneficial owner will provide notice of the relevant transfer restrictions to subsequent transferees; *provided* that, in the case of clauses (A), (B) and (C) above, the Portfolio Manager or an Affiliate of the Portfolio Manager has acted as financial and investment advisor to certain accounts for the benefit of certain beneficial owners of Notes managed by the Portfolio Manager or such Affiliate of the Portfolio Manager and in that capacity has provided, and in the future may provide, advice to such beneficial owners of Notes.

(ii) (a) In the case of the Secured Notes other than the Class E Notes and Class F Notes, on each day from the date on which such beneficial owner acquires its interest in such Secured Notes through and including the date on which such beneficial owner disposes of its interest in such Secured Notes that either (x) it is neither a Benefit Plan Investor nor a governmental, church, non-U.S. or other plan which is subject to Similar Law or (y) its purchase, acquisition, holding and disposition of such Secured Note will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of Similar Law) and (b) in the case of Class E Notes and Class F Notes, on each day from the date on which such beneficial owner acquires its interest in such Class E Note or Class F Note through and including the date on which such beneficial owner disposes of its interest in such Class E Note or Class F Note, that (1) it is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of such Class E Note or Class F Note will not constitute or result in a non-exempt violation of Similar Law. Any purported transfer of a Secured Note, or any interest therein to a purchaser or transferee that does not comply with the requirements specified in the applicable documents will be of no force and effect and shall be null and void *ab initio*.

Each purchaser of Global Subordinated Notes from the Issuer in the initial offering will be required to represent and warrant, with certificates substantially in the form of Exhibit B4 hereto, with respect to each day it holds such Global Subordinated Note or any beneficial interest therein, (1) whether or not the purchaser or transferee is a Benefit Plan Investor, (2) whether or not the purchaser or transferee is a Controlling Person and (3) (a) if it is a Benefit Plan Investor, its acquisition, holding and disposition of Global Subordinated Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if it is a governmental, church, non-U.S. or other plan which is subject to Similar Law, its acquisition, holding and disposition of Global Subordinated Notes will not constitute or result in a non-exempt violation of Similar Law. Each purchaser from the Issuer in the initial offering of a Global Subordinated Note that fails to provide the certification described in the prior sentence will be deemed to have represented and warranted, with respect to each day it holds such Global Subordinated Note or any beneficial interest therein, that (1) such purchaser is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser is a governmental, church, non-U.S. or

other plan that is subject to Similar Law, its acquisition, holding and disposition of Global Subordinated Notes will not constitute or result in a non-exempt violation of Similar Law. Such purchaser or transferee, as applicable, acknowledges that no Global Subordinated Notes may be acquired by any purchaser or transferee, as applicable, that is a Benefit Plan Investor or Controlling Person if it would cause 25% or more of the value of the Subordinated Notes to be held by Benefit Plan Investors. Each purchaser or transferee of Global Subordinated Notes other than from the Issuer in the initial offering will be deemed to have represented and warranted, with respect to each day it holds such Global Subordinated Note or any beneficial interest therein, that (1) such purchaser or transferee is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser or transferee is a governmental, church, non-U.S. or other plan that is subject to Similar Law, its acquisition, holding and disposition of Global Subordinated Notes will not constitute or result in a non-exempt violation of Similar Law. No Global Subordinated Notes may be acquired other than from the Issuer in the initial offering by Benefit Plan Investors or Controlling Persons. Any purported transfer of the Global Subordinated Notes, or any interest therein, to a purchaser or transferee that does not comply with the requirements of this paragraph will be of no force and effect, shall be null and void *ab initio* and the Issuer will have the right to direct the purchaser to transfer the Subordinated Notes, or any interest therein, as applicable, to a person who meets the foregoing criteria.

(iii) Such beneficial owner understands that such Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, such Notes have not been and will not be registered under the Securities Act, and, if in the future such beneficial owner decides to offer, resell, pledge or otherwise transfer such Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of this Indenture and the legend on such Notes. Such beneficial owner acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes. Such beneficial owner understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.

(iv) It is aware that, except as otherwise provided in this Indenture, the Notes being sold to it, if any, in reliance on Regulation S will be represented by one or more Regulation S Global Notes, and that beneficial interests therein may be held only through DTC for the respective accounts of Euroclear or Clearstream.

(v) The holder will provide notice to each Person to whom it proposes to transfer any interest in the Notes of the transfer restrictions and representations set forth in this Section 2.6 (Registration, Registration of Transfer and Exchange), including the Exhibits referenced herein.

(j)     Each Person who becomes an owner of a Certificated Note will be required to make the representations and agreements set forth in Exhibit B3, Exhibit B4 and/or Exhibit B7, as applicable.

(k)     Any purported transfer of a Note not in accordance with this Section 2.6 (Registration, Registration of Transfer and Exchange) shall be null and void and shall not be given effect for any purpose whatsoever.

(l)     To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon written notice to the Trustee, impose additional transfer restrictions on the Certificated Class E Notes, the Certificated Class F Notes and the Certificated Subordinated Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and other similar laws or regulations, including, without limitation, requiring each transferee of a Subordinated Note to make representations to the Issuer in connection with such compliance.

(m)     Any holder may assign its voting rights to one or more assignees pursuant to agreements entered into between such holder and the assignees. Holders shall not assign voting rights to a person that has no right to cashflows from the applicable Notes (directly or indirectly) or retain voting rights when such holders have no remaining right to cashflow from the applicable Notes (directly or indirectly).

(n)     Each purchaser will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year *plus* one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each purchaser understands that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Trustee to enter into this Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of this Indenture and that any holder or beneficial owner of a Note, the Trustee, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

(o)     Each purchaser, beneficial owner and subsequent transferee of a Combination Note or interest therein, by acceptance of such Combination Note or an interest in such Combination Note, will be deemed to have agreed that before all or any portion of any interest in a Combination Note may be exchanged for its ratable share of the Class A Notes or the Class B Notes that comprise its Components, the Holder will be required to provide the Trustee with an Exchange Notice in the form of Exhibit B8.

Section 2.7. <u>Mutilated, Defaced, Destroyed, Lost or Stolen Note</u>. If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Applicable Issuers, the Trustee and the relevant Transfer Agent evidence to their reasonable satisfaction of the destruction, loss or theft of any Note and (b) there is delivered to the Applicable Issuers, the Trustee and such Transfer Agent such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Applicable Issuers, the Trustee or such Transfer Agent that such Note has been acquired by a protected purchaser, the Applicable Issuers shall execute and, upon Issuer Order (which Issuer Order shall be deemed to have been provided upon the delivery of an executed Note to the Trustee), the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note, of like tenor (including the same date of issuance) and equal principal or face amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a protected purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Applicable Issuers, the Transfer Agent and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Applicable Issuers, the Trustee and the Transfer Agent in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Applicable Issuers in their discretion may, instead of issuing a new Note pay such Note without requiring surrender thereof except that any mutilated or defaced Note shall be surrendered.

Upon the issuance of any new Note under this <u>Section 2.7</u> (Mutilated, Defaced, Destroyed, Lost or Stolen Note), the Applicable Issuers may require the payment by the Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this <u>Section 2.7</u> (Mutilated, Defaced, Destroyed, Lost or Stolen Note) in lieu of any mutilated, defaced, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Applicable Issuers and such new Note shall be entitled, subject to the second paragraph of this <u>Section 2.7</u> (Mutilated, Defaced, Destroyed, Lost or Stolen Note), to all the benefits of this Indenture equally and proportionately with any and all other Notes of the same Class duly issued hereunder.

The provisions of this <u>Section 2.7</u> (Mutilated, Defaced, Destroyed, Lost or Stolen Note) are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.8. <u>Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved</u>. (a) Each Class of Secured Notes shall accrue interest during each Interest Accrual Period at the applicable Note Interest Rate and such interest will be payable in

arrears on each Payment Date on the Aggregate Outstanding Amount thereof on the first day of the related Interest Accrual Period (after giving effect to payments of principal thereof on such date), except as otherwise set forth below. Payment of interest on each Class of Secured Notes (and payments of Interest Proceeds to the Holders of the Subordinated Notes) will be subordinated to the payments of interest on the related Priority Classes. So long as any Priority Classes are Outstanding with respect to any Class of Deferrable Notes, any payment of interest due on such Class of Deferrable Notes which is not available to be paid ("Deferred Interest" with respect thereto) in accordance with the Priority of Payments on any Payment Date shall not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) (and the failure to pay such interest shall not be an Event of Default) until the earliest of the Payment Date (i) on which such interest is available to be paid in accordance with the Priority of Payments, (ii) which is a Redemption Date with respect to such Class of Deferrable Notes and (iii) which is the Stated Maturity of such Class of Deferrable Notes. Deferred Interest on any Class of Deferrable Notes shall be added to the principal balance of such Class of Deferrable Notes and payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to such Class of Deferrable Notes and (ii) which is the Stated Maturity of such Class of Deferrable Notes. Interest will cease to accrue on each Secured Note, or in the case of a partial repayment, on such part, from the date of repayment or the respective Stated Maturity, unless payment of principal is improperly withheld or unless default is otherwise made with respect to such payments of principal. To the extent lawful and enforceable, (x) interest on Deferred Interest with respect to any Class of Deferrable Notes shall accrue at the Note Interest Rate for such Class until paid as provided herein and (y) interest on the interest on any Class X Notes, the Class A Notes or the Class B Notes or, if no Class X Notes, Class A Notes or Class B Notes are Outstanding, any Class C Note or, if no Class C Notes are Outstanding, any Class D Note or, if no Class D Notes are Outstanding, any Class E Notes or, if no Class E Notes are Outstanding, any Class F Notes that is not paid when due shall accrue at the Note Interest Rate for such Class until paid as provided herein.

(b)     The principal of each Secured Note of each Class matures at par and is due and payable on the Payment Date which is the Stated Maturity for such Class of Secured Notes, unless the unpaid principal of such Secured Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise. Notwithstanding the foregoing, the payment of principal of each Class of Secured Notes (and payments of Principal Proceeds to the Holders of the Subordinated Notes) may only occur (other than amounts constituting Deferred Interest thereon which will be payable from Interest Proceeds pursuant to Section 11.1(a)(i) (Disbursements of Monies from Payment Account)) after principal on each Class of Notes that constitutes a Priority Class with respect to such Class has been paid in full and is subordinated to the payment on each Payment Date of the principal and interest due and payable on such Priority Class(es), and other amounts in accordance with the Priority of Payments, and any payment of principal of any Class of Secured Notes which is not paid, in accordance with the Priority of Payments, on any Payment Date (other than the Payment Date which is the Stated Maturity of such Class or any Redemption Date), shall not be considered "due and payable" for purposes of Section 5.1(a) (Events of Default) until the Payment Date on

which such principal may be paid in accordance with the Priority of Payments or all of the Priority Classes with respect to such Class have been paid in full.

(c) Principal payments on the Notes will be made in accordance with the Priority of Payments and <u>Section 9.1</u> (Mandatory Redemption) hereof.

(d) As a condition to the payment of principal of and interest on any Secured Note or any payment on any Subordinated Note, without the imposition of withholding tax, the Paying Agent may require certification acceptable to it to enable the Issuer, the Co-Issuer, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments in respect of such Note under any present or future law or regulation of the United States and any other applicable jurisdiction, or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

(e) Payments in respect of interest on and principal of any Secured Note and any payment with respect to any Subordinated Note shall be made by the Trustee in United States dollars to DTC or its designee with respect to a Global Note and to the Holder or its nominee with respect to a Certificated Note, by wire transfer, as directed by the Holder, in immediately available funds to a United States dollar account, as the case may be, maintained by DTC or its nominee with respect to a Global Note, and to the Holder or its designee with respect to a Certificated Note; *provided* that, in the case of a Certificated Note, the Holder thereof shall have provided written wiring instructions to the Trustee on or before the related Record Date; and *provided further* that, if appropriate instructions for any such wire transfer are not received by the related Record Date, then such payment shall be made by check drawn on a U.S. bank mailed to the address of the Holder specified in the Register. Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Office of the Trustee or at the office of any Paying Agent on or prior to such Maturity; *provided* that, if the Trustee and the Applicable Issuers shall have been furnished such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Applicable Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender. None of the Co-Issuers, the Trustee, the Portfolio Manager, the Collateral Administrator nor any Paying Agent will have any responsibility or liability for any aspects of the records maintained by DTC, Euroclear, Clearstream or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Global Note. In the case where any final payment of principal and interest is to be made on any Secured Note (other than on the Stated Maturity thereof) or any final payment is to be made on any Subordinated Note (other than on the Stated Maturity thereof), the Trustee, in the name and at the expense of the Applicable Issuers shall, not more than 30 nor less than 10 days prior to the date on which such payment is to be made, mail (by first class mail, postage prepaid) to the Persons entitled thereto at their addresses appearing on the Register a notice which shall specify the date on which such payment will be made, the amount of such payment per $100,000 original principal amount of Secured Notes, original

principal amount of Subordinated Notes and the place where such Notes may be presented and surrendered for such payment.

(f)     Payments of principal to Holders of the Secured Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Debt of such Class registered in the name of each such Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date. Payments to the Holders of the Subordinated Notes from Interest Proceeds and Principal Proceeds shall be made in the proportion that the Aggregate Outstanding Amount of the Subordinated Notes registered in the name of each such Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Subordinated Notes on such Record Date.

(g)     Interest accrued with respect to the Secured Notes shall be calculated on the basis of the actual number of days elapsed in the applicable Interest Accrual Period *divided by* 360.

(h)     All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)     Notwithstanding any other provision of this Indenture, the obligations of the Applicable Issuers under the Notes and this Indenture are limited recourse obligations of the Applicable Issuers payable solely from the Assets and following realization of the Assets, and application of the proceeds thereof in accordance with this Indenture, all obligations of and any claims against the Co-Issuers hereunder or in connection herewith after such realization shall be extinguished and shall not thereafter revive.  No recourse shall be had against any Officer, director, partner, employee, shareholder, member, manager or incorporator of either the Co-Issuers, the Portfolio Manager or their respective successors or assigns for any amounts payable under the Notes or (except as otherwise provided herein or in the Portfolio Management Agreement) this Indenture.  It is understood that the foregoing provisions of this paragraph (i) shall not (i) prevent recourse to the Assets for the sums due or to become due under any security, instrument or agreement which is part of the Assets or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Assets have been realized.  It is further understood that the foregoing provisions of this paragraph (i) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any Proceeding or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.  The Subordinated Notes are not secured hereunder.

(j)     Subject to the foregoing provisions of this Section 2.8 (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved), each Note delivered and upon registration of transfer of or in exchange for or in lieu of any

other Note shall carry the rights of unpaid interest and principal (or other applicable amount) that were carried by such other Note.

Section 2.9.   Persons Deemed Owners.  The Issuer, the Co-Issuer, the Trustee and any agent of the Co-Issuers or the Trustee may treat as the owner of such Note the Person in whose name any Note is registered on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer, the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuers or the Trustee shall be affected by notice to the contrary.

Section 2.10.   Surrender of Notes; Cancellation.  (a) Any Holder may tender any Notes or beneficial interests in Notes owned by such Holder for cancellation by the Trustee without receiving any payment (any such surrendered Notes or beneficial interests in Notes, "Surrendered Notes").   For the avoidance of doubt, Notes surrendered by the Issuer after purchase pursuant to Section 2.13 shall not constitute "Surrendered Notes."  The Issuer shall provide notice to the Co-Issuer, the Trustee and the Rating Agencies of any Surrendered Notes tendered to it and the Trustee shall provide notice to the Applicable Issuers of any Surrendered Note tendered to it.   Any such Surrendered Notes shall be submitted to the Trustee for cancellation; *provided* that, for purposes of calculation of the Overcollateralization Ratio and any calculation required by Section 5.1(g), any Surrendered Notes will be deemed to remain outstanding until all Notes of the applicable Class and each Class that is senior in right of principal payment thereto in the Note Payment Sequence have been retired or redeemed, having an Aggregate Outstanding Amount equal to the Aggregate Outstanding Amount as of the date of surrender, reduced proportionately with, and to the extent of, any payments of principal on Notes of the same Class thereafter.

(b)   All Surrendered Notes and Notes that are surrendered for payment, registration of transfer, exchange or redemption, surrendered by the Issuer following purchase pursuant to Section 2.13, or deemed lost or stolen shall  be promptly cancelled by the Trustee and may not be reissued or resold; *provided* that, in the event an anticipated Optional Redemption or Partial Redemption by Refinancing does not occur, Notes that are delivered in connection with such anticipated Optional Redemption or Partial Redemption by Refinancing shall be returned by the Trustee to the Person surrendering the same.  Any such Notes shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted hereunder.  All canceled Notes held by the Trustee shall be destroyed by the Trustee in accordance with its standard policy, unless the Co-Issuers shall direct by an Issuer Order received prior to destruction that they be returned to it.

Section 2.11.   Certificated Notes.  (a) A Global Note deposited with DTC pursuant to Section 2.2 (Forms of Notes) shall be transferred in the form of a Certificated Note to the beneficial owners thereof only if such transfer complies with Section 2.6 (Registration, Registration of Transfer and Exchange) and either (i) DTC notifies the Co-Issuers that it is unwilling or unable to continue as depository for such Global Note or (ii) if at any time DTC ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor