Phillip Lamberson – State Bar No. 00794134
Rakhee V. Patel – State Bar No. 00797213
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthias Kleinsasser – State Bar No. 24071357
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Fort Worth, Texas  76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN, CHAPTER
11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | **(Jointly Administered Under Case No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P. and HIGHLAND CLO FUNDING LTD,** | § | |
| | § | |
| Plaintiffs and Counter Defendants, | § | |
| | § | **Adversary No. 18-03078-SGJ** |
| vs. | § | |
| **ROBIN PHELAN, Chapter 11 Trustee,** | § | |
| | § | |
| Defendant, Counter Plaintiff, and Third-Party Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| **HIGHLAND HCF ADVISOR, LTD., HIGHLAND CLO MANAGEMENT, LTD., and HIGHLAND CLO HOLDINGS, LTD.,** | § | |
| | § | |
| Third-Party Defendants. | § | |

## DEFENDANT'S AMENDED ANSWER, COUNTERCLAIMS (INCLUDING CLAIM OBJECTIONS) AND THIRD-PARTY CLAIMS

Robin Phelan (the "Trustee" or "Defendant"), the chapter 11 trustee of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP" together with Acis LP, the "Debtors" or "Acis") in the above-styled and jointly administered bankruptcy cases (the "Bankruptcy Cases"), and Defendant in the above-styled adversary proceeding (the "Adversary Proceeding"), files his *Defendant's Amended Answer, Counterclaims (Including Claim Objections) and Third-Party Claims* (this "Amended Answer") to the *Original Complaint and Request for Preliminary Injunction of Highland CLO Funding, Ltd and Highland Capital Management Against Chapter 11 Trustee of Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "Original Complaint") and to the proofs of claims filed by Highland Capital Management, L.P. ("Highland Capital"), and respectfully states as follows:

## ANSWER AND AFFIRMATIVE DEFENSES

1.      Pursuant to Federal Rule of Civil Procedure 41(a), incorporated by Federal Rule of Bankruptcy Procedure 7041, all claims asserted in the Original Complaint by Highland Capital and Highland CLO Funding, Ltd. ("Highland Funding") have been dismissed without prejudice. *See* Docket No. 79. Accordingly, such dismissal of Highland Capital's and Highland Funding's claims obviates the Trustee's answer and affirmative defenses thereto; however, the Trustee reserves all rights with respect to answering or asserting affirmative defenses to any future-filed claims by any parties in this Adversary Proceeding.

2.      Additionally, pursuant to Federal Rule of Civil Procedure 41(a)(2), such dismissal of Highland Capital's and Highland Funding's claims is without prejudice to any counterclaims asserted by the Trustee in the *Defendant's Answer, Affirmative Defenses, Counterclaims, and*

*Third Party Claims* [Docket No. 23] (the "<u>Original Answer</u>"), as may be amended, and such counterclaims remain pending for independent adjudication.

## <u>COUNTERCLAIMS AND THIRD-PARTY CLAIMS</u>

3.        The Trustee hereby asserts the following counterclaims for affirmative recovery against Highland Capital and Highland Funding, and such counterclaims shall also constitute recoupment or offset to any claim Highland Capital has against the Debtors.  The Trustee further asserts the following third-party claims against Highland HCF Advisor, Ltd. ("<u>Highland Advisor</u>"), Highland CLO Management Ltd. ("<u>Highland Management</u>") and Highland CLO Holdings, Ltd. ("<u>Highland Holdings</u>") for purposes of affirmative recovery.

## I.        <u>JURISDICTION, VENUE, AND STATUTORY PREDICATE</u>

4.        This Court has subject matter jurisdiction over the Bankruptcy Cases and this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Adversary Proceeding in this district is proper under 28 U.S.C. § 1409.

5.        This matter arises under the laws of the United States of America and state common law. The statutory predicates for the relief sought herein are pursuant to sections 502, 542, 544, 547, 548, and 550 of 11 U.S.C. § 101 *et seq.* (the "<u>Bankruptcy Code</u>"), Texas Business & Commerce Code § 24.001 *et seq.* ("<u>TUFTA</u>"), and Federal Rules of Bankruptcy Procedure 3007(b) and 7001.

6.        This Adversary Proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Trustee hereby consents to the Court's entry of a final judgment resolving this Adversary Proceeding.  This Adversary Proceeding includes an objection to Highland Capital's proofs of claim pursuant to Federal Rule of Bankruptcy Procedure 3007(b), and the counterclaims asserted herein shall constitute recoupment and/or offset to such proofs of claim, to the extent such claims are otherwise allowed.

## II.     PARTIES

7.     The Trustee is an individual and may be served with pleadings and process in this Adversary Proceeding through undersigned counsel.

8.     Highland Capital is a limited partnership incorporated under the laws of the State of Delaware, with its principal place of business located at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

9.     Highland Funding is an exempted company incorporated with limited liability under the laws of Guernsey, with its registered office located at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands.

10.     Highland Advisor is a company organized under the laws of the Cayman Islands, with its registered office located at Maples Corporate Services Limited, P.O. Box 309 Ugland House, South Church Street, George Town, Grand Cayman KY1-1004. Highland Advisor may be served through its president, James Dondero, at 300 Crescent Court, Suite 700 Dallas, Texas 75201.

11.     Highland Management is a company organized under the laws of the Cayman Islands, with its registered office located at P.O. Box 309 Ugland House, South Church Street, George Town, Grand Cayman KY1-1004. Highland Management may be served through the President of its general partner, Strand Advisors, Inc., James Dondero, at 300 Crescent Court, Suite 700, Dallas, Texas 75201, and its general partner, Strand Advisors, Inc., at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

12.     Highland Holdings is a company organized under the laws of the Cayman Islands, with its registered office located at P.O. Box 309 Ugland House, South Church Street, George Town, Grand Cayman KY1-1004.  Highland Holdings may be served under applicable treaties and conventions between the United States and the Cayman Islands, a British overseas territory.

### III. PROCEDURAL BACKGROUND

13.     On January 30, 2018 (the "Petition Date"), Joshua N. Terry ("Terry"), as petitioning creditor, filed involuntary petitions under section 303 of the Bankruptcy Code against both Acis LP and Acis GP, thereby initiating the Bankruptcy Cases. *See* Case No. 18-30264, Docket No. 1 & Case No. 18-30265, Docket No. 1.

14.     On April 13, 2018, this Court entered its *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Involuntary Bankruptcy Petition* [Case No. 18-30264, Docket No. 118 & Case No. 18-30265, Docket No. 113] (the "Opinion") and *Order for Relief in an Involuntary Case* [Case No. 18-30264, Docket No. 119 & Case No. 18-30265, Docket No. 114] ("Order for Relief").

15.     On May 14, 2018, the Trustee was appointed chapter 11 trustee of the Debtors' bankruptcy estates in the Bankruptcy Cases. *See* Case No. 18-30264, Docket No. 213.

16.     On May 30, 2018, Highland Capital and Highland Funding filed their Original Complaint, initiating this Adversary Proceeding, in which Highland Capital and Highland Funding asserted various claims for breach of contract, declaratory relief, and injunctive relief against the Trustee. *See* Docket No. 1.

17.     On July 2, 2018, the Trustee filed his Original Answer, in which the Trustee asserted certain counterclaims and third-party claims against Highland Capital, Highland Funding, Highland Advisor, and Highland Management (collectively and along with Highland Holdings, the "Highlands") in connection with the Highlands' scheme, described more fully below, to fraudulently transfer Acis LP's assets to the Highlands and otherwise appropriate the business of Acis LP. *See* Docket No. 23.

18.     On July 23, 2018, Highland Capital filed *Highland Capital Management, L.P.'s Motion to Dismiss Counterclaims or, Alternatively, for a More Definite Statement* [Docket

No. 42] ("Highland's Motion to Dismiss"), in which Highland Capital sought, *inter alia*, to dismiss the Trustee's counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6).

19.     Also on July 23, 2018, Highland Funding filed *Highland CLO Funding Ltd.'s Motion to Dismiss* [Docket No. 43] ("Highland Funding's Motion to Dismiss") and *Highland CLO Funding Ltd.'s Brief in Support of its Motion to Dismiss* [Docket No. 44], in which Highland Funding  sought, *inter alia*, to dismiss the Trustee's counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

20.     On August 1, 2018, Highland Capital filed Proof of Claim No. 27 in the claims register for Case No. 18-30264 (the "Highland Acis LP Claim"), in the amount of $4,672,140.38, with the basis of the claim listed as "Sub-Advisory Services and Shared Services."

21.     Also on August 1, 2018, Highland Capital filed Proof of Claim No. 13 in the claims register for Case No. 18-30265 (the "Highland Acis GP Claim," together with the Highland Acis LP Claim, the "Highland Claims"), in the amount of $4,672,140.38, with the basis of the claim listed as "Sub-Advisory Services and Shared Services." The Highland Acis GP Claim is virtually identical to the Highland Acis LP Claim.

22.     On August 10, 2018, Highland Capital and Highland Funding filed *Highland Capital Management, L.P. and Highland CLO Funding Ltd.'s Motion for Leave to Amend Adversary Complaint and Brief in Support* [Docket No. 51] (the "Motion to Amend"), in which Highland Capital and Highland Funding sought to amend their Original Complaint to remove all claims against the Trustee, except for one claim by Highland Funding for a declaratory judgment that the Trustee cannot "sell or transfer Highland Funding's property without Highland Funding's consent."

23.     On October 9, 2018, the Court heard Highland Capital's Motion to Dismiss, Highland Funding's Motion to Dismiss, and the Motion to Amend.  Considering that the Trustee expressed his intent to amend his Original Answer, the parties agreed that all arguments made by Highland Capital and Highland Funding to dismiss the Trustee's counterclaims pursuant to Rule 12(b)(6) were moot. With respect to Highland Funding's argument to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court ruled that Highland Funding has minimum contacts with the United States, and that the Court, has personal jurisdiction over Highland Funding in this Adversary Proceeding, and exercising personal jurisdiction over Highland Funding would not violate any traditional notions of fair play and substantial justice.  Further, the Court ruled that, even if sufficient minimum contacts did not exist, Highland Funding has waived personal jurisdiction in this Adversary Proceeding.

24.     With respect to the Motion to Amend, due to the change in circumstances in the Bankruptcy Cases, Highland Capital and Highland Funding agreed to voluntarily dismiss all claims asserted in the Original Complaint, without prejudice.

## IV.     FACTUAL BACKGROUND

### A.     The Debtors' Business

25.     James Dondero ("Dondero"), Mark Okada ("Okada"), and Terry formed Acis LP in 2011 as a registered investment advisor to raise money from third-party investors to invest in certain collateralized loan obligation funds ("CLOs"). Acis LP is the portfolio manager for the CLOs and generates revenue primarily through the management of the CLOs via certain portfolio management agreements ("PMAs"). *See* Opinion ¶¶ 22-28. While Dondero made and approved the higher-level financial strategies and decisions of Acis, Terry was responsible for the day-to-day management of Acis.

26. Acis LP's business as portfolio manager for the CLOs has been incredibly successful. Between 2011 and 2017, Acis LP distributed $11,037,445.00 to Dondero, $4,598,935.00 to Terry, and $2,759,361.00 to Okada, its partners. Further, on August 31, 2017, right before Highland Capital began its campaign to denude Acis LP and take over its business, Acis LP also boasted millions of dollars in investment assets and total shareholder equity of roughly $3.4 million. Without question, Acis LP's business as portfolio manager for the CLOs and others is very valuable and very lucrative.

27. As is common with the numerous Highland Capital affiliates, Acis LP contracted out certain of its administrative functions and portfolio management responsibilities to Highland Capital pursuant to that certain *Sub-Advisory Agreement*, originally dated January 1, 2011 (as amended, the "Sub-Advisory Agreement") and that certain *Shared Services Agreement*, originally dated January 1, 2011 (as amended, the "Shared Services Agreement"). The *Sub-Advisory Agreement* and *Shared Services Agreement* have been amended multiple times.

28. As the Court explained in its Opinion:

> Acis LP and Acis GP/LLC have never had any employees. Rather, all employees that work for any of the Highland family of companies (including Mr. Terry) have, almost without exception, been employees of Highland itself. Highland has approximately 150 employees in the United States. Highland provides employees to entities in the organizational structure, such as Acis LP and Acis GP/LLC, through both the mechanism of: (a) a Shared Services Agreement (herein so called), which provides "back office'" personnel—such as human resources, accounting, legal and information technology to the Highland family of companies; and (b) a Sub-Advisory Agreement (herein so called), which provides "front office" personnel to entities—such as the managers of investments like Mr. Terry. The evidence indicated that this is typical in the CLO industry to have such agreements.

Opinion at p. 14 (footnotes omitted).

29. Prior to entry of the Order for Relief, Dondero directed, either himself or through Highland Capital employees, all actions taken by Acis. *See* Opinion ¶ 30.

Mr. Dondero [the Chief Executive of Highland] testified that he has decision making authority for the Alleged Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington (General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant General Counsel of Highland) . . . . Mr. Leventon is designated to be the representative for the Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-trial discovery)—he explained that this representative-authority derives from the Shared Services Agreement. Mr. Leventon testified that he takes his instructions generally through his direct supervisor, Mr. Ellington.

*Id.*

30.     Highland Funding, formerly known as Acis Loan Funding, Ltd. ("<u>ALF</u>"),[1] holds the subordinated notes issued by the CLOs and receives the "very last cash flow from the CLOs." Opinion at pp. 12-13. "It, in certain ways, controls the CLO vehicle . . . [and] was essentially the equity owner in the CLO special purpose entities." *Id.* Until the ALF PMA Transfer in the Fall of 2017 (described below), Acis LP had complete control of Highland Funding and its valuable subordinated note rights to further enhance its successful portfolio management business.

**B.     Section 3.10(a) of the Limited Partnership Agreement**

31.     In order to form Acis LP, Acis GP, the general partner, and limited partners The Dugaboy Investment Trust[2] (the "<u>Trust</u>"), Okada, and Terry entered into that certain *Amended and Restated Agreement of Limited Partnership of Acis Capital Management, L.P.* (the "<u>LPA</u>"), dated to be effective as of January 21, 2011.[3] The LPA is attached hereto as **<u>Exhibit A</u>**.  The LPA is governed by Delaware Law. LPA § 6.11. At all relevant times herein, the officers of

---

[1] On October 30, 2017, Acis Loan Funding, Ltd. changed its name to Highland CLO Funding, Ltd. The defined term "ALF" used herein denotes Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. before October 30, 2017.

[2] Dondero owned 100% of the Trust and was President of Acis GP.

[3] The partnership interests of Acis LP were as follows: Acis GP owned .1%; the Trust owned 59.9%; Okada owned 15%; and Terry owned 25%.

Acis GP are Dondero, as President, and Frank Waterhouse ("Waterhouse")[4], as Treasurer. Further, at least between October 14, 2015, and December 19, 2017, Dondero was the sole member of Acis GP. *See* Case No. 18-30265, Docket No. 152.

32.  Pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, Highland Capital received compensation for providing services to Acis LP, but amounts of compensation were subject to certain terms of the LPA. Section 3.10 of the LPA directs compensation and reimbursement of the General Partner and contains subpart (a), which limits compensation and reimbursement of expenses payable to the General Partner and any Affiliate of the General Partner without proper consent:

> Compensation.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that the aggregate annual expenses of the Partnership, inclusive of such compensation, ***may not exceed 20% of Revenues without the consent of all of the members of the Founding Partner Group***.

LPA § 3.10(a) (emphasis added).

33.  An Affiliate under the LPA is defined as:

> [A]ny [entity] that directly or indirectly controls, is controlled by, or is under common control with the [entity] in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of [an entity], whether through ownership of voting Securities, by contract, or otherwise.

*Id.* § 2.01.

34.  Highland Capital is, and has been at all times relevant to this Amended Answer, an Affiliate of Acis GP and Acis LP.  Further, Highland Capital is, and has been at all times relevant to this Amended Answer, an insider of Acis GP and Acis LP.

---

[4] Waterhouse is a partner in Highland Capital and serves as Highland Capital's Chief Financial Officer.

### C. State Court Litigation and Arbitration

35. In June 2016, Highland Capital advised Terry that he had been terminated.

36. In September 2016, Highland Capital sued Terry in the 162nd Judicial District Court of Dallas County, Texas (the "State Court") under a variety of legal theories and causes of action, including breach of fiduciary duty/self-dealing, disparagement, and breach of contract. Terry asserted his own claims against Highland Capital, as well as claims against the Debtors, Dondero, and others, and demanded arbitration. Opinion ¶ 8.

37. On September 28, 2016, the State Court stayed the litigation and ordered the parties to arbitrate. *Id.* The parties then participated in a ten-day arbitration proceeding before JAMS, styled as *Terry v. Highland*, JAMS Arbitration No. 1310022713.

### D. The Arbitration Award

38. On October 20, 2017, Terry obtained an arbitration award (the "Arbitration Award") jointly and severally against the Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate. The Arbitration Award was based on theories of breach of contract and breach of fiduciary duties. The Arbitration Award is attached hereto as **Exhibit B**.

39. Under the Arbitration Award, the arbitration panel found that Terry's termination by Dondero/Highland Capital was wrongful and that, among other things, Acis breached the LPA and breached fiduciary duties owed to Terry as Acis's limited partner. Importantly, the arbitration panel found that Highland Capital had been paid more than 20% of Revenues (as such term is understood under the LPA), without Terry's consent, in violation of Section 3.10(a) of the LPA:

> It is undisputed that ACIS habitually paid more than 20% of Revenues to Highland for providing ACIS with overhead and administration. Respondents' evidence and arguments that Terry waived or consented to ACIS's payment of excess expenses is not persuasive. At most, Terry accepted his ACIS distributions

without regard to the expenses paid to Highland. This is not consent contemplated by the ACIS LPA.

. . . .

The evidence establishes that Terry did not consent to ACIS payments of expenses in excess of 20% of Revenue and Terry has not waived his right to claim damages directly resulting from ACIS's and ACIS GP's breach of contract and breach of fiduciary duty. Clearly, ACIS and ACIS GP ignored Terry's contractual rights and ACIS GP as a general partner has a fiduciary duty not to benefit itself or another at the expense of its limited partner, as they ignore and breach the terms of the partnership agreement and diminish Terry's distributions.

Arbitration Award at pp. 15-16.

40. Additionally, in the analysis of Terry's damages, the arbitration panel stated:

The evidence establishes that ACIS and ACIS GP paid excess expenses to Highland during the years of 2013, 2014, 2015 and January through May 2016. These expenses paid exceeded the 20% of Revenues cap stated in Section 3.10(a) of the ACIS LPA. The payment of these excess expenses reduced Terry's ACIS partnership distributions during this period. Had excess expenses not been paid and only the contractually capped expenses had been paid, Terry would have received additional ACIS profits distributions of $1,755,481.00 for his 25% partnership interest in ACIS.

Arbitration Award at p. 20.

41. Finally, in its findings and conclusions, the arbitration panel stated: "ACIS [LP] and ACIS GP paid Highland Capital expenses in excess of the contractual limit imposed by Section 3.10(a) of the ACIS LPA." Arbitration Award at p. 22, ¶ 7.

42. On December 18, 2017, the 44th Judicial District Court of Dallas County, Texas, entered a final judgment confirming the Arbitration Award. Opinion ¶ 10.

43. Pursuant to the Arbitration Award, Highland Capital wrongly received at least $7,021,924.00 (collectively, the "Expense Overpayments") in excess of the clear cap under Section 3.10(a) of the LPA.[5] On information and belief, Highland Capital has wrongfully received other overpayments of expenses for many years in excess of the express limitations

---

[5] If $1,755,481.00 represents 25% of the amount overpaid to Highland Capital, then the total amount paid to Highland Capital in excess of the 20% cap would be at least $7,021,924.00.

contained in the LPA. The Expense Overpayments for which the Trustee seeks relief herein include all overpayments by Acis LP to Highland Capital in violation of the expense cap pursuant to the LPA whether or not addressed in the Arbitration Award. The Trustee seeks a declaratory judgment that such Expense Overpayments to Highland Capital and any agreements supporting such overpayments were *ultra vires* and, thus, void or voidable. The Trustee also seeks to recover from Highland Capital all such Expense Overpayments, which rightfully belong to Acis LP and are property of its bankruptcy estate, as set forth below.

**E.     Modifications to the Sub-Advisory Agreement and Shared Services Agreement**

44.     The Sub-Advisory Agreement has been amended from time to time.  The first iteration the Sub-Advisory Agreement by and between Acis LP and Highland Capital dated January 1, 2011 (the "Original Sub-Advisory Agreement") provided that Acis LP was to pay Highland Capital certain amounts for assisting Acis LP with the advisory services required by the PMAs.  Under the Original Sub-Advisory Agreement, Acis LP paid Highland Capital 5 bps of the management fees received by Acis LP pursuant to the various PMAs for the sub-advisory services provided to Acis LP by Highland Capital.

45.     On July 29, 2016, the Sub-Advisory Agreement was modified to increase the sub-advisory fee from 5 basis points to 20 basis points (the "Second Amended Sub-Advisory Agreement").  The effective date of the Second Amended Sub-Advisory Agreement was also back-dated to January 1, 2016.  The fourfold increase in the sub-advisory fees via the Second Amended Sub-Advisory Agreement siphons off the funds of Acis LP and effectively gifts the additional amounts to Highland Capital.  Highland Capital was already contractually obligated to provide the sub-advisory services for the lower 5 basis points fee and no legitimate justification for this fourfold increase was ever presented. Notably, Terry was unjustifiably terminated from Acis in June 2016, roughly one month before Acis and Highland Capital

amended the Sub-Advisory Agreement to increase the fee paid fourfold. Further, Dondero consented to the increased sub-advisory fee on behalf of *both* Acis LP and Highland Capital. Dondero signed the Second Amended Sub-Advisory Agreement as president of Highland Capital's general partner, Strand Advisors, Inc., and as president of Acis GP, the general partner of Acis LP.[6]

46. The Shared Services Agreement has also been amended from time to time. The first iteration of the shared services agreement, the Shared Services Agreement by and between Acis LP and Highland Capital, dated January 1, 2011 (the "Original Shared Services Agreement"), provided that Acis LP was to pay Highland Capital certain amounts for providing Acis LP with the back-office services such as book keeping, compliance, human resources and marketing. Under the Original Shared Services Agreement, Acis LP reimbursed Highland Capital for amounts directly attributable to Acis LP for these services. The Shared Services Agreement was later amended to provide compensation to Highland Capital of 15 to 20 basis points, depending on the nature of the fund for which services were provided. Thus, shortly after Terry was terminated by Acis in June 2016, Acis was paying Highland Capital a total of 35 to 40 basis points for the sub-advisory and shared services it provided.

47. Finally, as the Court has already found and as described in more detail below, Highland Capital, Dondero and various of their affiliates and insiders (including Highland Funding, Highland Advisor and Highland Holdings) entered into numerous other transactions through the Fall of 2017 in an attempt to take control of Acis's assets and effectively take over Acis's business. The combination of all of these actions evidence a clear pattern of behavior by Highland Capital, Dondero and various of their affiliates and insiders (including Highland

---

[6] Dondero also signed the Third Amended and Restated Sub-Advisory Agreement, entered into on March 17, 2017, on behalf of both parties (Acis LP and Highland Capital) to the agreement; this amendment retained the 20 bps fee put in place by the Second Amended Sub-Advisory Agreement.

Funding, Highland Advisor, Highland Management, and Highland Holdings)[7] to hinder, delay or defraud Terry as a creditor and appropriate the going-concern business of Acis LP for the Highlands. Opinion, Section 1.C. (pages 16-23).

**F. Highland Capital's Mismanagement of the CLOs and the Trustee's Engagement of Brigade Capital Management, L.P.**

48. During the pendency of these Bankruptcy Cases, while acting as sub-advisor, Highland Capital grossly mismanaged the CLOs. Following the Trustee's appointment in these Bankruptcy Cases, in disregard of its duties under the Sub-Advisory Agreement, Highland Capital failed to purchase a single loan for the CLOs. Yet, at the same time, in an apparent tactical move to accumulate cash in the CLOs (prior to an attempted liquidation), Highland Capital ordered that the Trustee sell numerous loans. Indeed, during this time, Highland Capital's own analysis showed that 19.7% to 32.4% of available loans were eligible for consideration for purchase in the CLOs. Although the Trustee expressed his concerns to Highland Capital about the accumulation of cash in the CLOs and Highland Capital's failure to recommend purchases of eligible collateral in the CLOs, Highland Capital failed to make any change or correction in its sub-advisor role, in abrogation of its duties.

49. In July 2018, considering Highland Capital's mismanagement of the CLOs and the exorbitant amounts charged to Acis for its services under the Sub-Advisory Agreement and Shared Services Agreement, the Trustee solicited potential third parties to provide shared services and sub-advisory services to the Debtors. After contacting over 40 parties, the Trustee received bids from nine parties to perform the services provided by Highland Capital under the Sub-Advisory Agreement and Shared Services Agreement. Through this process, the Trustee

---

[7] The Debtors were also under Highland Capital and Dondero's control at this time and were active participants in all of Highland Capital and Dondero's schemes to denude the Debtors and make them "judgment proof" as the Debtors' own counsel, Gary Cruciani, later boasted. In fact, Highland Funding has admitted that the Debtors were "no more than shell entities" in pleadings recently filed with the Court. Highland Funding's *Motion to Dissolve Preliminary Injunction and Lift the Automatic Stay* at page 21, Docket # 639 in Case No. 18-30264.

was able to locate Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland") to provide such services to the Debtors at a rate far less than that charged by Highland Capital. As set forth more fully in the *Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC* [Case No. 18-30264, Docket No. 448] (the "Brigade Motion"), Brigade agreed to sub-advise the CLOs for 15 basis points. As further described by the Brigade Motion, Cortland agreed to provide middle and back office CLO outsourcing (previously provided by Highland Capital under the Shared Services Agreement) for $30,000 per month, $250-$350 per trade, and a one-time fee of $75,000. Cortland's fee equates to roughly 3 basis points per month.[8]

50. On August 1, 2018, the Court granted the Brigade Motion, and Brigade and Cortland began performing the services previously provided by Highland Capital under the Shared Services Agreement and Sub-Advisory Agreement. *See* Case No. 18-30264, Docket No. 464.

51. Since becoming sub-advisor to the CLOs, Brigade has directed the purchase of approximately $200 million in conforming loans for the CLOs.

**G.   The Highlands' Fraudulent Scheme to Take Over Acis's Business and Dismantle Acis's Assets.**

52. After Terry received the Arbitration Award on October 20, 2017, the Highlands immediately began work to systematically transfer the assets of Acis LP to other Highlands. This was done to denude Acis LP of value and make the Debtors "judgment proof" as the Debtors' own counsel admitted later. This was also done to ensure that Acis LP's very valuable

---

[8] Thus, the Trustee is now paying roughly 18 basis points, instead of the 35 to 40 basis points charged by Highland Capital starting shortly after Terry was terminated by Acis in June 2016, for the work previously performed by Highland Capital under the Sub-Advisory Agreement and the Shared Services Agreement.

business as portfolio manager be taken over by other Highlands and remain under Highland Capital and Dondero's control.

53. The Highlands' scheme was accomplished through, *inter alia*, the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, and the transfer of the 2017-7 Equity and the 2017-7 Agreements (as each is defined below), which all occurred in the three months between October 23 and December 19, 2017. Each of these transfers followed the same pattern: Highland Capital caused Acis LP to fraudulently convey valuable economic rights away from Acis LP to offshore (often newly created) Highland Capital affiliates that were not subject to Terry's Arbitration Award and judgment, thus, safely remaining under the control of Highland Capital and Dondero. Further, the only alleged consideration for these transfers, to the extent there was any, was the satisfaction of purported debts owed to other Highlands or their representatives.

54. Reference to Acis LP's balance sheets right before and right after the Highlands began their campaign of fraud against Terry demonstrate just how effective their scheme was. On August 31, 2017—roughly 45 days before the Arbitration Award—Acis LP boasted $15,441,551 in total assets (including nearly $4 million in valuable portfolio management investments and the $9.5 million note) as well as $3,372,851 in total equity value.[9] After the Arbitration Award and the judgment enforcing it, Acis presented the affidavit of David Klos, Highland Capital's Controller, to the State Court in furtherance of Highland Capital's efforts to get a pathetically small bond for Terry's judgment. The Klos affidavit and attached balance sheet demonstrate that as of February 1, 2018 (the day after the Involuntary Petitions were filed) Acis LP had only $2,855,050 in total assets, no investment assets or notes, and a paltry $35,709

---

[9] Balance Sheet as of August 31, 2017, attached as **Exhibit C**.

in total equity value.[10]  Thus, the amount of value destruction and asset concealment caused by the Highlands' brazen fraud in just the few months immediately after the Arbitration Award is staggering.

**1.**     ***The ALF PMA Transfer and the ALF Share Transfer***

55.     Prior to October 27, 2017, Acis LP—not ALF (or Highland Funding as it is currently named)—had authority to direct and effectuate an optional redemption and otherwise pervasively control ALF's assets. Acis LP had this authority pursuant to that certain Portfolio Services Agreement by and between Acis LP and ALF, dated August 10, 2015 (the "First ALF PMA") and that certain Portfolio Management Agreement by and between Acis LP and ALF, dated December 22, 2016 (the "Second ALF PMA"). A true and correct copy of the First ALF PMA is attached hereto as **Exhibit E.**  A true and correct copy of the Second ALF PMA is attached hereto as **Exhibit F.**

56.     The Second ALF PMA granted Acis LP, as the portfolio manager of ALF, virtually unlimited rights and unfettered discretion to control and manage ALF's assets, including its interests in the Acis CLOs. Section 5 of the Second ALF PMA set out Acis LP's authority, which included authority for and in the name of ALF to:

> (a) invest, directly or indirectly . . . in all types of securities and other financial instruments of United States and non-U.S. entities . . . including without limitation . . . notes representing tranches of debt ('CLO Notes') issued by a special purpose vehicle which issues notes backed by a pool of collateral consisting primarily of loans (which may be represented by a debt or equity security) (a 'CLO') . . . (each of such items, 'Financial Instruments'), (c) provide credit and market research and analysis in connection with the investments and ongoing management of [ALF] and direct the formulation of investment policies and strategies for [ALF] . . . ; (g) possess, transfer, mortgage, pledge or otherwise deal in, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by [ALF] …; (n) cause [ALF] to engage in . . . agency, agency cross, related party principal transactions with affiliates of [Acis LP] . . . ;

---

[10] Declaration of David Klos concerning Defendants' net worth, attached as **Exhibit D**.

and (q) vote Financial Instruments, participate in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

Second ALF PMA § 5(a)-(q) (emphasis added).[11]

57.    While ALF did not have authority to terminate the Second ALF PMA, Acis LP could terminate the Second ALF PMA without cause upon at least ninety (90) days' notice. *See* Second ALF PMA § 13(a)-(c). The Second ALF PMA provided that Acis LP could be removed as portfolio manager only "for cause." *See* ALF PMA § 14(a)-(e).

58.    On October 27, 2017, just seven days after Terry's Arbitration Award, Acis LP ostensibly terminated its own portfolio management rights under the Second ALF PMA and transferred its authority and its valuable portfolio management rights—for no value—to Highland Advisor, an affiliate of Highland Capital.[12]

59.    This transfer of Acis LP's portfolio management rights to Highland Advisor was accomplished by way of a new Portfolio Management Agreement entered into by ALF and Highland Advisor on October 27, 2017 (the "October 2017 PMA"), which empowered Highland Advisor with the same broad authority to direct the management of ALF as was previously held by Acis LP under the ALF PMA (the "ALF PMA Transfer"). *See* October 2017 PMA §§ 1 & 5(a)-(q). A true and correct of the October 2017 PMA is attached hereto as **Exhibit G.**

As the Court explained:

On October 27, 2017 (seven days after the Arbitration Award), ALF—having purchased back the ownership interest that Acis LP had in it, just three days

---

[11] The Highlands contend that the reference to "control" in Section 6 of the Second ALF PMA negates the broad language of Section 5 of the Second ALF PMA. The Trustee disagrees.

[12] Although purportedly a Cayman Islands entity, HCLOF's 2017 Annual Report and Audited Financials lists Highland Advisor's address as Highland Capital's address in Dallas, Texas. This same document also discloses that Highland Capital is the sub-advisor for Highland Advisor, and thus is the party actually in control of Highland Funding's assets. Finally, this same document shows that all of Highland Funding's subordinated notes issued by the CLOs (the primary assets managed by Highland Advisor) are physically held at and are pledged to NexBank, a Dallas bank that is an affiliate of Highland Capital.

earlier—decided that it would no longer use Acis LP as its portfolio manager and entered into a new portfolio management agreement to supersede and replace the ALF Portfolio Management Agreement. Specifically, on October 27, 2017, ALF entered into a new Portfolio Management Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd., replacing Acis LP in its role with ALF. This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017.

Opinion at p. 19 (footnotes omitted).

60.     Under the prior ALF PMA, Acis LP's consent to the termination of the ALF PMA was required in order to effectuate the ALF PMA Transfer. So Acis LP simply signed the October 2017 PMA, consenting and agreeing to its removal and replacement, and transferring all authority and management rights as portfolio manager of ALF to Highland Advisor under the October 2017 PMA. Acis received no consideration for this transfer.

61.     Without this ALF PMA Transfer, which transferred Acis LP's valuable rights under the ALF PMA to Highland Advisor, Highland Funding could not have attempted to liquidate the CLOs, by directing optional redemptions, and further deplete Acis's assets.[13]

62.     On October 24, 2017, a mere four days after the Arbitration Award was entered Waterhouse, on behalf of Acis LP, and Grant Scott, for CLO Holdco Ltd., entered into that certain special resolution whereby Highland Funding, then known as ALF, acquired back Acis's equity interest in ALF (the "ALF Share Transfer"). A true and correct copy of the special resolution is attached hereto as **Exhibit H.** Pursuant the ALF Share Transfer, ALF paid Acis LP $991,180.13 for all of its shares of ALF.

63.     Thus, by virtue of the ALF PMA Transfer and the ALF Share Transfer, Acis LP had given up all of its shares of ALF and all of its control of ALF by October 31, 2017.

---

[13] After the ALF PMA Transfer, Highland Funding and Highland Advisor have issued three different optional redemption notices, in an attempt to terminate the PMAs and cut off the Debtors' primary source of cash. All three notices have been withdrawn and/or enjoined by this Court.

64.    On November 15, 2017 – only days after the ALF Share Transfer and ALF PMA Transfer were completed – Highland Funding,[14] Highland Advisor and CLO Holdco, Ltd. (another Highland Capital affiliate) entered into a subscription agreement whereby Highland Funding completed a private placement of its equity (including, upon information and belief, the equity acquired in the ALF Share Transfer) to third party investors.  The Trustee believes both the ALF PMA Transfer and the ALF Share Transfer were concocted by Highland Capital and Highland Funding to complete this private placement, which was of great value to Highland Funding and Highland Capital, but after the transfers, of no value to Acis.[15]  Without the ALF PMA Transfer and the ALF Share Transfer, control of Highland Funding's assets and the Highland Funding stock held by Acis would be vested in an entity (Acis LP) that was subject to a looming judgment based on Terry's recently acquired Arbitration Award and that would potentially be outside the control of the Highlands, which is exactly what subsequently occurred in this bankruptcy with the Order for Relief and appointment of the Trustee. Thus, after the Arbitration Award, it was critical to Highland Capital that Highland Funding be immediately quarantined from Acis LP, which was accomplished through the ALP PMA Transfer and ALF Share Transfer.

### 2.    *The Note Transfer*

65.    On November 3, 2017, Acis LP, Highland Capital, and Highland Management (a newly created, offshore Highland Capital affiliate) entered into that certain Agreement for

---

[14] ALF had changed its name to Highland Funding at this point.

[15] Highland Funding's board of director minutes from October 6, 2017, disclose that the private placement investment would bring $150 million in new investment in Highland Funding and that they were "confident that they could develop further interest and … bring the total capital to up to around $325 million."  The Arbitration Award was issued against Acis LP exactly two weeks later, throwing a huge monkey wrench in Highland Funding's plans to raise hundreds of millions of dollars for Highland Capital and its cronies. Testimony in the bankruptcy case as well as the subscription agreement demonstrate that numerous Highland Capital executives, as well as Highland Capital itself, received Highland Funding stock in connection with this private placement.  Thus, they were highly motivated to close this transaction and also deprive the Acis LP of any value in this transaction.

Assignment and Transfer of Promissory Note (the "Note Assignment and Transfer Agreement"). A true and correct copy of the Note Assignment and Transfer Agreement is attached hereto as **Exhibit I.** The Note Assignment and Transfer Agreement, among other things, transferred the $9.5 million promissory note executed by Highland Capital and payable to Acis LP (the "Note") from Acis LP to Highland Management (the "Note Transfer"). As noted in the Opinion:

> The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for Acis LP and Mr. Dondero for Highland and some undecipherable name for Highland CLO Management Ltd.
>
> The document recites that (i) Highland is no longer willing to continue providing support services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into the collateral manager role if Acis LP will assign to it the Acis LP Note Receivable from Highland. One more thing: since Acis LP was expected to potentially incur future legal and accounting/administrative fees, and might not have the ability to pay them when due, Highland CLO Management Ltd. agreed to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal expenses and up to $1 million of future accounting/administrative expenses.

Opinion at p. 20.

66. Acis LP received no or insufficient consideration for the Note Transfer. The primary consideration for the Note Transfer was an alleged payable due from Acis LP to Highland Capital in the approximate amount of $7.5 million for participation fees, which was transferred to Highland Management shortly before the Note Assignment and Transfer Agreement was entered. The validity of the alleged "participation fees" is unknown. The remainder of the consideration for the Note Transfer is a promise to pay certain expenses of Acis LP, which (upon information and belief) has never occurred.

67. The Note Transfer was also of great benefit to Highland Capital because it transferred Highland Capital's liability under the Note away from Acis LP (and its legal woes with Terry) and allowed Highland Capital's liability under the Note, and any payments made

thereunder, to stay well within the control of the Highlands.  Just as importantly to Highland

Capital and Dondero, and in furtherance to their ongoing feud with Terry, the Note Transfer

took away the Note as an asset from which Terry could collect his judgment and allowed

Highland Capital to argue (as it has repeatedly in this bankruptcy case) that Terry got his

judgment against the "wrong" entities and that Highland Capital has no liability related to

Terry's claim.  Finally, the Note Transfer allowed Highland Capital to effectively collect all of

the $7.5 million owed by Acis LP (assuming it is even a valid debt) through the use of an

offshore intermediary.

68.    Additionally, the Note Assignment and Transfer Agreement also purports to

initiate the transfer of the PMAs between Acis and the CLOs to Highland Management.[16]

Again, Acis LP was to receive no consideration for transferring its most significant assets, the

PMAs.  As the Court is aware, Acis LP did not in fact transfer the PMAs pursuant to the Note

Assignment and Transfer Agreement, but it was clearly the plan as outlined in that agreement

and further evidence of Highland Capital's intent to steal Acis LP's valuable going-concern

business from it.

**3.    *The Acis CLO 2017-7 Transfers***

69.    On December 19, 2017, Acis LP and Highland Holdings (another newly created,

offshore Highland Capital affiliate)[17] entered into that certain Agreement for Assignment and

---

[16] Highland Management was registered in the Cayman Islands on October 27, 2017, roughly a week before the Note Transfer (and on the exact day of the ALF PMA Transfer).  Thus, Highland Management had no portfolio or collateral management experience whatsoever when it entered the Assignment and Transfer Agreement.  To the contrary, it appears Highland Management was an entity that was created specifically to hold the Note and eventually take possession of the PMAs in an international forum that would be difficult for Terry to reach, similar to the transferees for the ALF PMA Transfer (Highland Advisor, a Cayman Island entity) the ALF Share Transfer (Highland Funding, a Guernsey entity) and the 2017-1 Assignment and Transfer Agreement (Highland Holdings, a Cayman Island entity).  Thus, not only did Highland Capital and Dondero scheme to transfer Acis LP's assets away from it, but they also slyly chose entities in offshore jurisdictions that would be hard for a judgment creditor to reach.

[17] Like Highland Management, Highland Holdings was registered in the Cayman Islands on October 27, 2017.

Transfer (the "2017-7 Assignment and Transfer Agreement"). A true and correct copy of the 2017-7 Assignment and Transfer Agreement is attached here to as **Exhibit J.** The 2017-7 Assignment and Transfer Agreement focused on Acis CLO Management, LLC ("Acis CLO Management"), which is an entity that had been formed to enter into a portfolio management agreement with Acis CLO 2017-7, Ltd. ("CLO 2017-7"). CLO 2017-7 is the last CLO the Highlands formed. Acis CLO Management was indirectly owned by Acis LP, and Acis LP and Acis CLO Management had entered into a Master Sub-Advisory Agreement and a Staff and Services Agreement (the "2017-7 Agreements") that allowed Acis LP to manage the CLO 2017-7 portfolio and collect management fees for CLO 2017-7.

70. The 2017-7 Assignment and Transfer Agreement, among other things, transferred to Highland Holdings all of Acis LP's interest in the 2017-7 Agreements. The 2017-7 Assignment and Transfer Agreement also transferred to Highland Holdings all of Acis LP's equity interests in various entities that constituted Acis LP's indirect equity interests in Acis CLO Management (the "2017-7 Equity"). Thus, similar to the ALF PMA Transfer and the ALF Share Transfer that occurred roughly two months before, Acis LP was divested of both its ownership in Acis CLO Management and its control of Acis CLO Management (and related management fee stream) in one fell swoop on December 19, 2017, which is the day after Terry received his judgment based on the Arbitration Award.

71. Significantly, also on December 19, 2017, Highland Capital entered into an agreement with Highland Holdings that allowed Highland Capital to sub-advise and manage CLO 2017-7 and get paid the management fees that otherwise would have flowed to Acis LP. So like the numerous transfers before it, Highland Capital effectuated the transfer of the 2017-7 Agreements and 2017-7 Equity to cut out Acis LP, while Highland Capital stayed in complete control of CLO 2017-7 and its stream of management fees.

72.     As the Court noted in the Opinion:

On December 19, 2017—just one day after the Arbitration Award was confirmed with the entry of the Final Judgment—the vehicle that can most easily be described as the Acis LP "risk retention structure" (necessitated by federal Dodd Frank law) was transferred away from Acis LP and into the ownership of Highland CLO Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017).

In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.  In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.

Opinion at p. 20 - 21.

73.     The purported consideration for the 2017-7 Equity transferred in the 2017-7 Assignment and Transfer Agreement was the forgiveness of a $2,804,870 payable allegedly owed by Acis LP to Highland Capital and transferred to Highland Funding sometime before the agreement was entered.  According to Acis LP's financial statements, this payable to Highland Capital is entirely comprised of amounts due under the Sub-Advisory Agreement and Shared Services Agreement. Thus, the "consideration" provided in exchange for the 2017-7 Assignment and Transfer Agreement would suffer from the same defects as outlined throughout this Amended Answer related to the Sub-Advisory Agreement and Shared Services Agreement. Finally, like the Note Transfer, the 2017-7 Equity transfer allowed Highland Capital to effectively collect all of the $2.8 million owed by Acis LP (assuming it is even a valid debt) through the use of an offshore intermediary.

74.     Further, the 2017-7 Assignment and Transfer Agreement itself discloses that no consideration was provided for the transfer of the 2017-7 Agreements.  Rather, the justification

for the transfer of the 2017-7 Agreements is Highland Capital's self-serving refusal to continue to do business with Acis LP after the Arbitration Award and related judgment.

4. ***Thwarted Attempts to Transfer the Universal/BVK Agreement and Force an Optional Redemption***

75. Highland Capital and the other Highlands did not stop with the transfers in the Fall of 2017. Immediately after the Involuntary Petitions were filed on January 30, 2018, Highland Capital conspired with Acis LP's own bankruptcy counsel in an effort to appropriate Acis LP's valuable sub-advisor rights under the Agreement for the Outsourcing of Asset Management (the "Universal/BVK Agreement") between Acis LP and Universal–Investment-Luxembourg S.A. ("Universal"), which provided sub-advisory services for a German fund called BayVK R2 Lux S.A., SICAV-FIS ("BVK").[18] Like the many transfers before it, Highland Capital's plan (as clearly outlined in an email from Isaac Leventon to Mike Warner) was "to transfer the BVK investment management agreement from Acis LP to another Highland-affiliated manager."[19] Immediately after Highland Capital sought (and presumably received) advice from Acis's own counsel, Highland Capital reached out to Universal and BVK to solicit their participation in Highland Capital's scheme. In fact, BVK acknowledged in its very first email with Highland Capital after Acis LP's bankruptcy filing that Highland Capital's plan was to replace Acis LP.

76. Over the several weeks leading up to this Court's ruling on the Orders for Relief, Highland Capital and Universal/BVK did, in fact, frequently discuss replacing Acis LP, conducted extensive due diligence in order to replace Acis LP and even negotiated and prepared

---

[18] The Court will recall that it held a lengthy hearing on the Universal/BVK Agreement and related lift stay issues on September 11, 2018.

[19] Email chain from early February 2018 between Mike Warner (Acis's counsel), Isaac Leventon (Highland Capital's in-house counsel), Timothy Cournoyer (Highland Capital's in-house counsel) and Thomas Surgent (Highland Capital's Chief Compliance Officer), attached as **Exhibit K**.

a new asset management agreement between Highland Capital and Universal that was to take effect once Acis LP and its bankruptcy were out of the way. But even after the Orders for Relief were entered and the Debtors were under the control of a trustee, the communications did not stop. Among other things, Highland Capital volunteered to pay Universal and BVK's legal costs incurred in terminating Acis LP and making Highland Capital the new sub-advisor for Universal and BVK, Highland Capital repeatedly criticized the Trustee for his management of Acis, and Highland Capital repeatedly expressed its desire to negotiate with Universal and to "onboard" Highland Capital as Universal's new sub-advisor. And even after Highland Capital was fired by the Trustee as Acis LP's sub-advisor and replaced with Brigade and Cortland, the communications did not stop. Highland Capital's scheme to transfer the Universal/BVK Agreement to Highland Capital or its affiliate was apparently only prevented by this Court taking away Acis LP's right to operate without Court authority under 11 U.S.C. § 303(f) and then later continuing the automatic stay as to the Universal/BVK Agreement.

77.   Finally, Highland Advisor has used its newly acquired management rights of Highland Funding's subordinated notes (acquired through the ALF PMA Transfer) to demand an optional redemption, which would terminate the PMAs and allow the Highlands to create new CLOs fully controlled by the Highlands. The Court is well aware of the Highlands' attempts to compel an optional redemption, and has enjoined these attempts repeatedly.

## H.   Preferential Transfers Made within One Year of the Petition Date

78.   Acis's Statement of Financial Affairs and its general ledger disclose more than two dozen payments totaling $16,113,790.14 made to Highland Capital within one year of the Petition Date based on four categories (the "Prepetition Payments"):

(i)   Contractual Payments: $5,011,836.72

---

(ii)     Services: $7,672,145.25[20]

(iii)    Unsecured Loan Repayments Including Interest: $3,311,497.65

(iv)    Expense Reimbursement: $118,311.32

79.     Acis was insolvent at all times when the Prepetition Payments were made. Based on Terry's pending—or already decided—claims, as well as Highland Capital's absolute operational and financial control of Acis, Highland Capital was aware that Acis was insolvent or reasonably should have been aware Acis was insolvent at all times when the Prepetition Payments were made.

80.     Further, to the extent that the Acis LP payables that served as the consideration for the Note Transfer and the 2017-7 Equity transfer were valid, these transfers would also constitute preferential payments to Highland Capital, Highland Management and Highland Holdings.

## V.    CAUSES OF ACTION[21]

### Count 1: Declaratory Judgment of Ultra Vires Acts by Acis LP in Violation of the LPA

81.     The Trustee incorporates the preceding paragraphs as if set forth fully herein.

82.     Under Delaware law, *ultra vires* corporate acts are either void or voidable. *See Klaassen v. Allegro Dev. Corp.*, C.A. No. 8626-VCL, 2013 Del. Ch. LEXIS 247, at *48-50 (Oct. 11, 2013); *see also Stephen A. Solomon v. Armstrong*, 747 A.2d 1098, 1114 n.45 (1999) (explaining the difference between void and voidable acts). Delaware courts apply the doctrine of *ultra vires* to partnerships by analogy. *See, e.g., In re Mesa Ltd. P'ship Preferred Unitholders Litig.*, Civil Action No. 12,243, 1991 Del. Ch. LEXIS 214, at *20 (Dec. 10, 1991).

---

[20] The Statement of Financial Affairs, filed in the bankruptcy cases by Acis while under Highland Capital control, fails to list an additional $1,868,203.44 in transfers to Highland Capital for "Services" that were made shortly before the Petition Date.

[21] All causes of action asserted herein are also asserted as counterclaims to the Highland Capital Claims pursuant to section 16.069 of the Texas Civil Practice & Remedies Code and other applicable law.

---

83.     Highland Capital invoiced Acis for, and received payments for, at least $7,021,924.00 in excess of 20% of Revenues, in violation of the LPA. Highland Capital, an Affiliate of Acis GP, accepted such funds in violation of Section 3.10(a) of the LPA.

84.     Such Expense Overpayments, and any agreements supporting such Expense Overpayments, were economically irrational, not in the interest of Acis LP, and are therefore void; however, if not void, such actions are voidable because they were done without the consent or ratification of all members of the Founding Partner Group. The payments to Highland Capital of the Expense Overpayments in the amount of at least $7,021,924.00 and any agreements supporting such overpayments were unauthorized or *ultra vires* acts of the partnership in violation of the LPA, and are therefore void or voidable.

### Count 2: Turnover of Property of the Estate under 11 U.S.C. § 542(a) for Unauthorized Overpayments

85.     The Trustee incorporates the preceding paragraphs as if set forth fully herein.

86.     Under section 542(a) of the Bankruptcy Code, "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

87.     Under section 541(a) of the Bankruptcy Code, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). Further, the "estate is comprised of [such] property, wherever located and by whomever held." *Id.*

88.     Highland Capital wrongfully received Expense Overpayments of at least $7,021,924.00 in excess of 20% of Revenues in violation of the LPA.

89.     The property, or value of such property, from the overpayment of funds wrongfully transferred to Highland Capital totaling at least $7,021,924.00, in Highland Capital's possession, custody, or control is property of the estate, and the value of such property is not of inconsequential value or benefit to the estate.

90.     Pursuant to section 542(a) of the Bankruptcy Code, Highland Capital must deliver to the Trustee the property or value of such property, totaling at least $7,021,924.00, wrongfully transferred to Highland Capital.

91.     Therefore, the Trustee seeks turnover of the funds, totaling at least $7,021,924.00, transferred to Highland Capital, to the extent allowed pursuant to section 542 of the Bankruptcy Code.

### Count 3: Money Had and Received for Overcharges and Unauthorized Overpayments

92.     The Trustee incorporates the preceding paragraphs as if set forth fully herein.

93.     "An action for money had and received arises when the defendant obtains money which in equity and good conscience belongs to the plaintiff. This action . . . looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no pet.) (internal citations omitted).

94.     Highland Capital invoiced Acis for, and received Expense Overpayments for, at least $7,021,924.00 in excess of 20% of Revenues in violation of the LPA.  Highland Capital, an Affiliate of Acis GP, accepted such funds in violation of Section 3.10(a) of the LPA. Highland Capital was therefore unjustly enriched in the amount of the Expense Overpayments of at least $7,021,924.00.

95.     Highland Capital invoiced Acis and accepted such Expense Overpayments from Acis despite Highland Capital's knowledge of the LPA. This money rightfully belongs to Acis,

and the overpayment creates a debt in favor of Acis. Therefore, the Trustee is entitled to damages on behalf of Acis in the amount of at least $7,021,924.00. In addition, Highland Capital charged Acis more than a market rate under the Second Amended Sub-Advisory Agreement and the Third Amended Sub-Services Agreement and is liable to Acis in the amount of these overcharges.

### Count 4: Conversion for Unauthorized Overpayments

96. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

97. "Conversion is defined as the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Green Int'l v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997).

98. Highland Capital wrongfully exercised dominion and control over at least $7,021,924.00 in excess of 20% of Revenues in violation of the LPA. Highland Capital, through the common control of Dondero, was aware that it was prohibited from receiving payment in excess of 20% of Revenues without the consent of all members of the Founding Partner Group. Highland Capital also had actual notice of the Arbitration Award through Dondero (who was represented at the arbitration proceeding) that Highland Capital was wrongfully in possession of such money. Despite Highland Capital's actual knowledge that the money does not rightfully belong to Highland Capital, Highland Capital continues to improperly retain the overpaid funds. Therefore, the Trustee is entitled to damages on behalf of Acis in the amount of at least $7,021,924.00. In addition, Highland Capital charged Acis more than a market rate under the Second Amended Sub-Advisory Agreement and the Third Amended Shared Services Agreement and is liable to Acis in the amount of these overcharges.

### *Count 5:  Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) related to the Sub-Advisory Agreement*

99.     The Trustee incorporates the preceding paragraphs as if set forth fully herein.

100.    Section 548(a)(1)(A) of the Bankruptcy Code provides that a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, if the debtor made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

101.    The Trustee seeks to avoid the modifications to the Sub-Advisory Agreement made in the Second Amended Sub-Advisory Agreement and Third Amended Sub-Advisory Agreement, any obligations incurred by Acis in connection with these modifications to the Sub-Advisory Agreement, and any payments made (including increase in payments made) by Acis to Highland Capital in connection with these modifications to the Sub-Advisory Agreement because such modifications and payments were made with an actual intent to hinder, delay, or defraud Terry, a creditor of Acis, demonstrated by, among other things, that:

     (i)     The modifications to the Sub-Advisory Agreement were made shortly after Terry's termination and just prior to litigation with Terry;

     (ii)     The modifications to the Sub-Advisory Agreement—entered into by Dondero on behalf of Acis and Highland Capital—and payments thereunder were made with the actual intent to divert assets to and for the benefit of Highland Capital, in fraud upon Acis's creditors, namely Terry.

     (iii)     Acis was or became insolvent as a result of the modifications to the Sub-Advisory Agreement and payments thereunder;

(iv)    The modifications to the Sub-Advisory Agreement and payments thereunder occurred both before and after substantial debts were incurred by Acis;

(v)    The consideration received by Acis for the modifications to the Sub-Advisory Agreement and payments thereunder were not reasonably equivalent in value; and

(vi)    the transfer/obligation incurred was to an insider.

102.    Therefore, such modifications to the Sub-Advisory Agreements and payments to Highland Capital pursuant to such modifications should be avoided to the extent avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

### Count 6:  Actual Fraudulent Transfer under Tex. Bus. & Com. Code § 24.005(a)(1) related to the Sub-Advisory Agreement

103.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

104.    Section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers or obligations that would be avoidable by certain prepetition creditors of Acis.  Texas Business and Commerce Code section 24.005(a)(1) provides that a current or future creditor may avoid a transfer if the debtor made the transfer or incurred the obligation with an actual intent to hinder, delay or defraud any creditor of the debtor.  Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis, or obligations incurred by Acis, pursuant to Texas Business and Commerce Code sections 24.005(a)(1).

105.    The Trustee seeks to avoid the modifications to the Sub-Advisory Agreement made in the Second Amended Sub-Advisory Agreement and Third Amended Sub-Advisory Agreement, any obligations incurred by Acis in connection with these modifications to the Sub-Advisory Agreement, and any payments made (including increase in payments made) by Acis

to Highland Capital in connection with these modifications to the Sub-Advisory Agreement because such modifications and payments were made with an actual intent to hinder, delay, or defraud Terry, a creditor of Acis, demonstrated by, among other things, that:

(i)     The modifications to the Sub-Advisory Agreement were made shortly after Terry's termination and just prior to litigation with Terry;

(ii)    The modifications to the Sub-Advisory Agreement—entered into by Dondero on behalf of Acis and Highland Capital—and payments thereunder were made with the actual intent to divert assets to and for the benefit of Highland Capital, in fraud upon Acis's creditors, namely Terry.

(iii)   Acis was or became insolvent as a result of the modifications to the Sub-Advisory Agreement and payments thereunder;

(iv)    The modifications to the Sub-Advisory Agreement and payments thereunder occurred both before and after substantial debts were incurred by Acis;

(v)     The consideration received by Acis for the modifications to the Sub-Advisory Agreement and payments thereunder were not reasonably equivalent in value; and

(vi)    The transfer/obligation incurred was to an insider.

106.    Therefore, Acis's creditors have the right to avoid the Sub-Advisory Agreement and payments thereunder under section 24.005(a)(1) of the Texas Business and Commerce Code, and the Trustee can seek to enforce that right under section 544 of the Bankruptcy Code.

### *Count 7: Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) related to the Sub-Advisory Agreement*

107.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

108.   Section 548(a)(1)(B) of the Bankruptcy Code provides that a trustee may avoid any transfer of any interest of the debtor in property, or any obligation incurred by the debtor, if the debtor (i) received less than reasonably equivalent value in exchange for the transfer or obligation; and (ii) (A) was insolvent on the date the transfer was made or the obligation was incurred, or became insolvent as the result of the transfer or obligation; (B) was engaged in business or a transaction, or was about to engage in business or a transaction for which any remaining property was unreasonably small capital; or (C) intended to incur, or believed the debtor would incur, debts that would be beyond the debtors' ability to pay such debts.

109.   As described above, among other things, Acis LP:

(i)     received less than reasonably equivalent value in exchange for the modifications to the Sub-Advisory Agreement and payments made thereunder;

(ii)    was or became insolvent as the result of the modifications to the Sub-Advisory Agreement and payments made thereunder; and

(iii)   intended to incur, or believed Acis would incur, debts that would be beyond Acis's ability to pay such debts.

110.   Therefore, the modifications to the Sub-Advisory Agreement made in the Second Amended Sub-Advisory Agreement and the Third Amended Sub-Advisory Agreement, any obligations incurred by Acis in connection with these modifications to the Sub-Advisory Agreement and any payments made (including increase in payments made) by Acis in connection with these modifications to the Sub-Advisory Agreement are avoidable under section 548(a)(1)(B).

### Count 8: Constructive Fraudulent Transfer under Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.006(a) related to the Sub-Advisory Agreement

111. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

112. Section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers or obligations that would be avoidable by certain prepetition creditors of Acis. Texas Business and Commerce Code section 24.005(a)(2) provides that a current or future creditor may avoid a transfer if the debtor made the transfer or incurred the obligation (i) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (ii) (A) was engaged or about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed, that the debtor would incur debts beyond the debtor's ability to pay as they became due. Similarly, Texas Business and Commerce Code section 24.006(a) provides that a current creditor may avoid a transfer if the debtor made the transfer or incurred the obligation (i) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (ii) the debtor was insolvent or rendered insolvent by the transfer or obligation sought to be avoided. Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis, or obligations incurred by Acis, pursuant to Texas Business and Commerce Code sections 24.005(a)(2) and 24.006(a).

113. As described above, Acis LP did not receive reasonably equivalent value in exchange for the modifications to the Sub-Advisory Agreement and payments made thereunder, and creditors at the time of such modifications and payments could have avoided such modifications and payments under section 24.005(a)(2) of the Texas Business and Commerce Code.

114. At the time of the modifications to the Sub-Advisory Agreement and payments made thereunder, Acis intended to incur, or believed or reasonably should have believed that Acis would incur, debts beyond its ability to pay as they became due, and/or was engaged, or was about to engage in a business or transaction for which the remaining assets of Acis were unreasonably small in relation to such business or transaction.

115. Moreover, as described above, Acis was insolvent or became insolvent by the modifications to the Sub-Advisory Agreement and payments made thereunder.

116. Therefore, the modifications to the Sub-Advisory Agreement made in the Second Amended Sub-Advisory Agreement and the Third Amended Sub-Advisory Agreement, any obligations incurred by Acis in connection with these modifications to the Sub-Advisory Agreement and any payments made (including increase in payments made) by Acis in connection with these modifications to the Sub-Advisory Agreement are avoidable under Texas Business and Commerce Code sections 24.005(a)(2) and 24.006(a).

### Count 9: Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) for the ALF PMA Transfer

117. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

118. Section 548(a)(1)(A) of the Bankruptcy Code provides that a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, if the debtor made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

119. The Trustee seeks to avoid the ALF PMA Transfer because such transfer was made with an actual intent to hinder, delay, or defraud Terry, a creditor of Acis, demonstrated by, among other things, that:

(i)     The ALF PMA Transfer was made just seven days after Terry's Arbitration Award against Acis;

(ii)    The ALF PMA Transfer was made with the actual intent to divert Acis LP's contractual rights under the ALF PMA to and for the benefit of Highland Advisor, in fraud upon Acis LP's creditors, namely Terry.

(iii)   Acis LP was insolvent at the time of the ALF PMA Transfer or became insolvent as a result of the ALF PMA Transfer;

(iv)    The ALF PMA Transfer occurred both before and after substantial debts were incurred by Acis LP;

(v)     Acis LP received less than a reasonably equivalent value in exchange for the ALF PMA Transfer;

(vi)    The transfer was made to an insider (Highland Advisor) and for the benefit of insiders (Highland Funding and Highland Capital); and

(vii)   Highland Capital (as sub-advisor to Highland Advisor) retained effective possession and control of the property transferred after the transfer.

120.    Therefore, the ALF PMA Transfer should be avoided to the extent avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

### Count 10: Actual Fraudulent Transfer under Tex. Bus. & Com. Code § 24.005(a)(1) for the ALF PMA Transfer

121.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

122.    Section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers or obligations that would be avoidable by certain prepetition creditors of Acis. Texas Business and Commerce Code section 24.005(a)(1) provides that a current or future creditor may avoid a transfer if the debtor made the transfer or incurred the obligation with an actual

intent to hinder, delay or defraud any creditor of the debtor. Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis, or obligations incurred by Acis, pursuant to Texas Business and Commerce Code sections 24.005(a)(1).

123. The Trustee seeks to avoid the ALF PMA Transfer because such transfer was made with an actual intent to hinder, delay, or defraud Terry, a creditor of Acis, demonstrated by, among other things, that:

     (i) The ALF PMA Transfer was made just seven days after Terry's Arbitration Award against Acis;

     (ii) The ALF PMA Transfer was made with the actual intent to divert Acis LP's contractual rights under the ALF PMA to and for the benefit of Highland Advisor, in fraud upon Acis LP's creditors, namely Terry.

     (iii) Acis LP was insolvent at the time of the ALF PMA Transfer or became insolvent as a result of the ALF PMA Transfer;

     (iv) The ALF PMA Transfer occurred both before and after substantial debts were incurred by Acis LP; and

     (v) Acis LP received less than a reasonably equivalent value in exchange for the ALF PMA Transfer;

     (vi) The transfer was made to an insider (Highland Advisor) and for the benefit of insiders (Highland Funding and Highland Capital); and

     (vii) Highland Capital (as sub-advisor to Highland Advisor) retained effective possession and control of the property transferred after the transfer.

124. Therefore, Acis's creditors have the right to avoid the ALF PMA Transfer under section 24.005(a)(1) of the Texas Business and Commerce Code, and the Trustee can seek to enforce that right under section 544 of the Bankruptcy Code.

### *Count 11: Constructive Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(B) for the ALF PMA Transfer*

125. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

126. Section 548(a)(1)(B) of the Bankruptcy Code provides that a trustee may avoid any transfer of any interest of the debtor in property, or any obligation incurred by the debtor, if the debtor (i) received less than reasonably equivalent value in exchange for the transfer or obligation; and (ii) (A) was insolvent on the date the transfer was made or the obligation was incurred, or became insolvent as the result of the transfer or obligation: (B) was engaged in business or a transaction, or was about to engage in business or a transaction for which any remaining property was unreasonably small capital; or (C) intended to incur, or believed the debtor would incur, debts that would be beyond the debtors' ability to pay such debts.

127. As described above, among other things, Acis LP:

   (i)     received less than reasonably equivalent value in exchange for the ALF PMA Transfer;

   (ii)    was insolvent on the date the ALF PMA Transfer was made or became insolvent as the result of the ALF PMA Transfer;

   (iii)   was engaged in business or a transaction, or was about to engage in business or a transaction for which any remaining property was unreasonably small capital; and

   (iii)   intended to incur, or believed Acis would incur, debts that would be beyond Acis's ability to pay such debts.

128. Therefore, ALF PMA Transfer is avoidable under section 548(a)(1)(B) of the Bankruptcy Code.

**Count 12: Constructive Fraudulent Transfer under Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.006(a) for the ALF PMA Transfer**

129. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

130. Section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers or obligations that would be avoidable by certain prepetition creditors of Acis. Texas Business and Commerce Code section 24.005(a)(2) provides that a current or future creditor may avoid a transfer if the debtor made the transfer or incurred the obligation (i) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (ii) (A) was engaged or about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed, that the debtor would incur debts beyond the debtor's ability to pay as they became due. Similarly, Texas Business and Commerce Code section 24.006(a) provides that a current creditor may avoid a transfer if the debtor made the transfer or incurred the obligation (i) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (ii) the debtor was insolvent or rendered insolvent by the transfer or obligation sought to be avoided. Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis, or obligations incurred by Acis, pursuant to Texas Business and Commerce Code sections 24.005(a)(2) and 24.006(a).

131. As described above, Acis LP did not receive reasonably equivalent value in exchange for the ALF PMA Transfer, and creditors at the time of the ALF PMA Transfer could have avoided such transfer under section 24.005(a)(2) of the Texas Business and Commerce Code.

132. At the time of the ALF PMA Transfer, Acis intended to incur, or believed or reasonably should have believed that Acis would incur, debts beyond its ability to pay as they

became due, and/or was engaged, or was about to engage in a business or transaction for which the remaining assets of Acis were unreasonably small in relation to such business or transaction.

133. Moreover, as described above, Acis was insolvent or was rendered insolvent by the ALF PMA Transfer.

134. The ALF PMA Transfer is therefore avoidable under Texas Business and Commerce Code sections 24.005(a)(2) and 24.006(a).

### Count 13: Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) for the ALF Share Transfer

135. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

136. Section 548(a)(1)(A) of the Bankruptcy Code provides that a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, if the debtor made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

137. The Trustee seeks to avoid the ALF Share Transfer because such transfer was made with an actual intent to hinder, delay, or defraud Terry, a creditor of Acis, demonstrated by, among other things, that:

    (i)    The ALF Share Transfer was made just four days after Terry's Arbitration Award against Acis;

    (ii)    The ALF Share Transfer was made with the actual intent to divert Acis LP's interest and control in ALF to and for the benefit of Highland Funding, in fraud upon Acis LP's creditors, namely Terry.

    (iii)    Acis LP was insolvent at the time of the ALF Share Transfer or became insolvent as a result of the ALF Share Transfer;

    (iv)     The ALF Share Transfer occurred both before and after substantial debts were incurred by Acis LP; and

    (v)     Acis LP received less than a reasonably equivalent value in exchange for the ALF Share Transfer;

    (vi)     The transfer was made to an insider (Highland Funding) and for the benefit of an insider (Highland Capital); and

    (vii)     Highland Capital (as sub-advisor to Highland Advisor) retained effective possession and control of the property transferred after the transfer.

138.    Therefore, the ALF Share Transfer should be avoided to the extent avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

### Count 14: Actual Fraudulent Transfer under Tex. Bus. & Com. Code § 24.005(a)(1) for the ALF Share Transfer

139.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

140.    Section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers or obligations that would be avoidable by certain prepetition creditors of Acis. Texas Business and Commerce Code section 24.005(a)(1) provides that a current or future creditor may avoid a transfer if the debtor made the transfer or incurred the obligation with an actual intent to hinder, delay or defraud any creditor of the debtor. Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis, or obligations incurred by Acis, pursuant to Texas Business and Commerce Code sections 24.005(a)(1).

141.    The Trustee seeks to avoid the ALF Share Transfer because such transfer was made with an actual intent to hinder, delay, or defraud Terry, a creditor of Acis, demonstrated by, among other things, that:

(i)     The ALF Share Transfer was made just four days after Terry's Arbitration Award against Acis;

(ii)    The ALF Share Transfer was made with the actual intent to divert Acis LP's interest and control in ALF to and for the benefit of Highland Funding, in fraud upon Acis LP's creditors, namely Terry.

(iii)    Acis LP was insolvent at the time of the ALF Share Transfer or became insolvent as a result of the ALF Share Transfer;

(iv)    The ALF Share Transfer occurred both before and after substantial debts were incurred by Acis LP; and

(v)    Acis LP received less than a reasonably equivalent value in exchange for the ALF Share Transfer;

(vi)    The transfer was made to an insider (Highland Funding) and for the benefit of an insider (Highland Capital); and

(vii)    Highland Capital (as sub-advisor to Highland Advisor) retained effective possession and control of the property transferred after the transfer.

142.    Therefore, Acis's creditors have the right to avoid the ALF Share Transfer under section 24.005(a)(1) of the Texas Business and Commerce Code, and the Trustee can seek to enforce that right under section 544 of the Bankruptcy Code.

### *Count 15: Constructive Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(B) for the ALF Share Transfer*

143.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

144.    Section 548(a)(1)(B) of the Bankruptcy Code provides that a trustee may avoid any transfer of any interest of the debtor in property, or any obligation incurred by the debtor, if the debtor (i) received less than reasonably equivalent value in exchange for the transfer or

obligation; and (ii) (A) was insolvent on the date the transfer was made or the obligation was incurred, or became insolvent as the result of the transfer or obligation: (B) was engaged in business or a transaction, or was about to engage in business or a transaction for which any remaining property was unreasonably small capital; or (C) intended to incur, or believed the debtor would incur, debts that would be beyond the debtors' ability to pay such debts.

145.    As described above, among other things, Acis LP:

   (i)    received less than reasonably equivalent value in exchange for the ALF Share Transfer;

   (ii)    was insolvent on the date the ALF Share Transfer was made or became insolvent as the result of the ALF Share Transfer;

   (iii)    was engaged in business or a transaction, or was about to engage in business or a transaction for which any remaining property was unreasonably small capital; and

   (iii)    intended to incur, or believed Acis would incur, debts that would be beyond Acis's ability to pay such debts.

146.    Therefore, ALF Share Transfer is avoidable under section 548(a)(1)(B) of the Bankruptcy Code.

### Count 16:  Constructive Fraudulent Transfer under Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.006(a) for the ALF Share Transfer

147.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

148.    Section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers or obligations that would be avoidable by certain prepetition creditors of Acis.  Texas Business and Commerce Code section 24.005(a)(2) provides that a current or future creditor may avoid a transfer if the debtor made the transfer or incurred the obligation (i) without

receiving reasonably equivalent value in exchange for the transfer or obligation; and (ii) (A) was engaged or about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed, that the debtor would incur debts beyond the debtor's ability to pay as they became due. Similarly, Texas Business and Commerce Code section 24.006(a) provides that a current creditor may avoid a transfer if the debtor made the transfer or incurred the obligation (i) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (ii) the debtor was insolvent or rendered insolvent by the transfer or obligation sought to be avoided. Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis, or obligations incurred by Acis, pursuant to Texas Business and Commerce Code sections 24.005(a)(2) and 24.006(a).

149.    As described above, Acis LP did not receive reasonably equivalent value in exchange for the ALF Share Transfer, and creditors at the time of the ALF Share Transfer could have avoided such transfer under section 24.005(a)(2) of the Texas Business and Commerce Code.

150.    At the time of the ALF Share Transfer, Acis intended to incur, or believed or reasonably should have believed that Acis would incur, debts beyond its ability to pay as they became due, and/or was engaged, or was about to engage in a business or transaction for which the remaining assets of Acis were unreasonably small in relation to such business or transaction.

151.    Moreover, as described above, Acis was insolvent or rendered insolvent by the ALF Share Transfer.

152.    The ALF Share Transfer is therefore avoidable under Texas Business and Commerce Code sections 24.005(a)(2) and 24.006(a).

### Count 17: Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A)
### for the Note Transfer

153. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

154. Section 548(a)(1)(A) of the Bankruptcy Code provides that a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, if the debtor made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

155. The Trustee seeks to avoid the Note Transfer because such transfer was made with an actual intent to hinder, delay, or defraud Terry, a creditor of Acis, demonstrated by, among other things, that:

    (i)    The Note Transfer was made shortly after Terry's Arbitration Award against Acis;

    (ii)    The Note Transfer was made with the actual intent to divert the $9.5 million promissory note by Highland Capital in favor of Acis LP to and for the benefit of Highland Management, in fraud upon Acis LP's creditors, namely Terry.

    (iii)    Acis LP was insolvent at the time of the Note Transfer or became insolvent as a result of the Note Transfer;

    (iv)    The Note Transfer occurred both before and after substantial debts were incurred by Acis LP; and

    (v)    Acis LP received less than a reasonably equivalent value in exchange for the Note Transfer;

(vi)     The transfer was made to an insider (Highland Management) and for the benefit of an insider (Highland Capital); and

(vii)    Highland Capital retained effective possession and control of the property transferred after the transfer.

156.    Therefore, the Note Transfer should be avoided to the extent avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

### Count 18:  Actual Fraudulent Transfer under Tex. Bus. & Com. Code § 24.005(a)(1) for the Note Transfer

157.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

158.    Section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers or obligations that would be avoidable by certain prepetition creditors of Acis.  Texas Business and Commerce Code section 24.005(a)(1) provides that a current or future creditor may avoid a transfer if the debtor made the transfer or incurred the obligation with an actual intent to hinder, delay or defraud any creditor of the debtor.  Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis, or obligations incurred by Acis, pursuant to Texas Business and Commerce Code sections 24.005(a)(1).

159.    The Trustee seeks to avoid the Note Transfer because such transfer was made with an actual intent to hinder, delay, or defraud Terry, a creditor of Acis, demonstrated by, among other things, that:

(i)      The Note Transfer was made shortly after Terry's Arbitration Award against Acis;

(ii)     The Note Transfer was made with the actual intent to divert the $9.5 million promissory note by Highland Capital in favor of Acis LP to and

for the benefit of Highland Management, in fraud upon Acis LP's creditors, namely Terry.

(iii) Acis LP was insolvent at the time of the Note Transfer or became insolvent as a result of the Note Transfer;

(iv) The Note Transfer occurred both before and after substantial debts were incurred by Acis LP; and

(v) Acis LP received less than a reasonably equivalent value in exchange for the Note Transfer;

(vi) The transfer was made to an insider (Highland Management) and for the benefit of an insider (Highland Capital); and

(vii) Highland Capital retained effective possession and control of the property transferred after the transfer.

160. Therefore, Acis's creditors have the right to avoid the ALF Share Transfer under section 24.005(a)(1) of the Texas Business and Commerce Code, and the Trustee can seek to enforce that right under section 544 of the Bankruptcy Code..

### *Count 19: Constructive Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(B) for the Note*

161. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

162. Section 548(a)(1)(B) of the Bankruptcy Code provides that a trustee may avoid any transfer of any interest of the debtor in property, or any obligation incurred by the debtor, if the debtor (i) received less than reasonably equivalent value in exchange for the transfer or obligation; and (ii) (A) was insolvent on the date the transfer was made or the obligation was incurred, or became insolvent as the result of the transfer or obligation: (B) was engaged in business or a transaction, or was about to engage in business or a transaction for which any

remaining property was unreasonably small capital; or (C) intended to incur, or believed the debtor would incur, debts that would be beyond the debtors' ability to pay such debts.

163.    As described above, among other things, Acis LP:

(i)      received less than reasonably equivalent value in exchange for the Note Transfer;

(ii)     was insolvent on the date the Note Transfer was made or became insolvent as the result of the Note Transfer;

(iii)    was engaged in business or a transaction, or was about to engage in business or a transaction for which any remaining property was unreasonably small capital; and

(iii)    intended to incur, or believed Acis would incur, debts that would be beyond Acis's ability to pay such debts.

164.    Therefore, Note Transfer is avoidable under section 548(a)(1)(B) of the Bankruptcy Code.

### Count 20:  Constructive Fraudulent Transfer under Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.006(a) for the Note Transfer

165.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

166.    Section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers or obligations that would be avoidable by certain prepetition creditors of Acis.  Texas Business and Commerce Code section 24.005(a)(2) provides that a current or future creditor may avoid a transfer if the debtor made the transfer or incurred the obligation (i) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (ii) (A) was engaged or about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction, or (B) intended to incur, or

believed or reasonably should have believed, that the debtor would incur debts beyond the debtor's ability to pay as they became due. Similarly, Texas Business and Commerce Code section 24.006(a) provides that a current creditor may avoid a transfer if the debtor made the transfer or incurred the obligation (i) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (ii) the debtor was insolvent or rendered insolvent by the transfer or obligation sought to be avoided. Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis, or obligations incurred by Acis, pursuant to Texas Business and Commerce Code sections 24.005(a)(2) and 24.006(a).

167.   As described above, Acis LP did not receive reasonably equivalent value in exchange for the Note Transfer, and creditors at the time of the Note Transfer could have avoided such transfer under section 24.005(a)(2) of the Texas Business and Commerce Code.

168.   At the time of the Note Transfer, Acis intended to incur, or believed or reasonably should have believed that Acis would incur, debts beyond its ability to pay as they became due, and/or was engaged, or was about to engage in a business or transaction for which the remaining assets of Acis were unreasonably small in relation to such business or transaction.

169.   Moreover, as described above, Acis was insolvent or rendered insolvent by the Note Transfer.

170.   The Note Transfer is therefore avoidable under Texas Business and Commerce Code sections 24.005(a)(2) and 24.006(a).

### Count 21:  Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) for the 2017-7 Equity and 2017-7 Agreement Transfers

171.   The Trustee incorporates the preceding paragraphs as if set forth fully herein.

172.   Section 548(a)(1)(A) of the Bankruptcy Code provides that a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, if

the debtor made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

173. The Trustee seeks to avoid the transfers of the 2017-7 Agreements and the 2017-7 Equity because such transfers were made with an actual intent to hinder, delay, or defraud Terry, a creditor of Acis, demonstrated by, among other things, that:

(i) The transfers of the 2017-7 Agreements and the 2017-7 Equity were made shortly after Terry's Arbitration Award against Acis and immediately after Terry's judgment against Acis;

(ii) The transfers of the 2017-7 Agreements and the 2017-7 Equity were made with the actual intent to divert the 2017-7 Agreements and the 2017-7 Equity from Acis LP to Highland Holdings, in fraud upon Acis LP's creditors, namely Terry;

(iii) Acis LP was insolvent at the time of the transfers of the 2017-7 Agreements and the 2017-7 Equity or became insolvent as a result of the transfers;

(iv) The transfers of the 2017-7 Agreements and the 2017-7 Equity occurred shortly after substantial debts were incurred by Acis LP; and

(v) Acis LP received less than a reasonably equivalent value in exchange for the transfers of the 2017-7 Agreements and the 2017-7 Equity;

(vi) The transfers were made to an insider (Highland Holdings) and for the benefit of an insider (Highland Capital); and

(vii) Highland Capital retained effective possession and control of the property transferred after the transfer.

174. Therefore, the transfers of the 2017-7 Agreements and the 2017-7 Equity should be avoided under section 548(a)(1)(A) of the Bankruptcy Code.

### *Count 22: Actual Fraudulent Transfer under Tex. Bus. & Com. Code § 24.005(a)(1) for the 2017-7 Equity and 2017-7 Agreement Transfers*

175. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

176. Section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers or obligations that would be avoidable by certain prepetition creditors of Acis. Texas Business and Commerce Code section 24.005(a)(1) provides that a current or future creditor may avoid a transfer if the debtor made the transfer or incurred the obligation with an actual intent to hinder, delay or defraud any creditor of the debtor. Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis, or obligations incurred by Acis, pursuant to Texas Business and Commerce Code sections 24.005(a)(1).

177. The Trustee seeks to avoid the transfers of the 2017-7 Agreements and the 2017-7 Equity because such transfers were made with an actual intent to hinder, delay, or defraud Terry, a creditor of Acis, demonstrated by, among other things, that:

    (i)    The transfers of the 2017-7 Agreements and the 2017-7 Equity were made shortly after Terry's Arbitration Award against Acis and immediately after Terry's judgment against Acis;

    (ii)    The transfers of the 2017-7 Agreements and the 2017-7 Equity were made with the actual intent to divert the 2017-7 Agreements and the 2017-7 Equity from Acis LP to Highland Holdings, in fraud upon Acis LP's creditors, namely Terry;

(iii) Acis LP was insolvent at the time of the transfers of the 2017-7 Agreements and the 2017-7 Equity or became insolvent as a result of the transfers;

(iv) The transfers of the 2017-7 Agreements and the 2017-7 Equity occurred shortly after substantial debts were incurred by Acis LP; and

(v) Acis LP received less than a reasonably equivalent value in exchange for the transfers of the 2017-7 Agreements and the 2017-7 Equity;

(vi) The transfers were made to an insider (Highland Management) and for the benefit of an insider (Highland Capital); and

(vii) Highland Capital retained effective possession and control of the property transferred after the transfers.

178. Therefore, Acis's creditors have the right to avoid the transfers of the 2017-7 Agreements and the 2017-7 Equity under section 24.005(a)(1) of the Texas Business and Commerce Code, and the Trustee can seek to enforce that right under section 544 of the Bankruptcy Code.

### Count 23: Constructive Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(B) for the 2017-7 Equity and 2017-7 Agreement Transfers

179. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

180. Section 548(a)(1)(B) of the Bankruptcy Code provides that a trustee may avoid any transfer of any interest of the debtor in property, or any obligation incurred by the debtor, if the debtor (i) received less than reasonably equivalent value in exchange for the transfer or obligation; and (ii) (A) was insolvent on the date the transfer was made or the obligation was incurred, or became insolvent as the result of the transfer or obligation: (B) was engaged in business or a transaction, or was about to engage in business or a transaction for which any

remaining property was unreasonably small capital; or (C) intended to incur, or believed the debtor would incur, debts that would be beyond the debtors' ability to pay such debts.

181.    As described above, among other things, Acis LP:

(i)      received less than reasonably equivalent value in exchange for the transfers of the 2017-7 Agreements and the 2017-7 Equity;

(ii)     was insolvent on the date the transfers of the 2017-7 Agreements and the 2017-7 Equity were made or became insolvent as the result of the transfers;

(iii)    was engaged in business or a transaction, or was about to engage in business or a transaction for which any remaining property was unreasonably small capital; and

(iii)    intended to incur, or believed Acis would incur, debts that would be beyond Acis's ability to pay such debts.

182.    Therefore, the transfers of the 2017-7 Agreements and the 2017-7 Equity are avoidable under section 548(a)(1)(B) of the Bankruptcy Code.

### Count 24:  Constructive Fraudulent Transfer under Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.006(a) for the 2017-7 Equity and 2017-7 Agreement Transfers

183.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

184.    Section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers or obligations that would be avoidable by certain prepetition creditors of Acis.  Texas Business and Commerce Code section 24.005(a)(2) provides that a current or future creditor may avoid a transfer if the debtor made the transfer or incurred the obligation (i) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (ii) (A) was engaged or about to engage in a business or transaction for which the remaining assets were

unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed, that the debtor would incur debts beyond the debtor's ability to pay as they became due. Similarly, Texas Business and Commerce Code section 24.006(a) provides that a current creditor may avoid a transfer if the debtor made the transfer or incurred the obligation (i) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (ii) the debtor was insolvent or rendered insolvent by the transfer or obligation sought to be avoided. Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis, or obligations incurred by Acis, pursuant to Texas Business and Commerce Code sections 24.005(a)(2) and 24.006(a).

185. As described above, Acis LP did not receive reasonably equivalent value in exchange for the transfers of the 2017-7 Agreements and the 2017-7 Equity, and creditors at the time of the transfers of the 2017-7 Agreements and the 2017-7 Equity could have avoided such transfer under section 24.005(a)(2) of the Texas Business and Commerce Code.

186. At the time of the transfers of the 2017-7 Agreements and the 2017-7 Equity, Acis intended to incur, or believed or reasonably should have believed that Acis would incur, debts beyond its ability to pay as they became due, and/or was engaged, or was about to engage in a business or transaction for which the remaining assets of Acis were unreasonably small in relation to such business or transaction.

187. Moreover, as described above, Acis was insolvent or rendered insolvent by the transfers of the 2017-7 Agreements and the 2017-7 Equity.

188. The transfers of the 2017-7 Agreements and the 2017-7 Equity are therefore avoidable under Texas Business and Commerce Code sections 24.005(a)(2) and 24.006(a).

### Count 25: Preferential Transfers to Highland Capital, Highland Holdings and Highland Management under 11 U.S.C. § 547(b)

189.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

190.    Section 547(b) of the Bankruptcy Code provides that a trustee may avoid any transfer of any interest of the debtor in property (i) to or for the benefit of a creditor; (ii) for or on account of an antecedent debt; (iii) made while the debtor was insolvent; (iv) made within one year to an insider; and (v) that enables such creditor to receive more than such creditor would receive in a hypothetical chapter 7 liquidation.

191.    Likewise, section 544 of the Bankruptcy Code provides the Trustee with the ability to avoid transfers that would be avoidable by certain prepetition creditors of Acis. Texas Business and Commerce Code section 24.006(b) provides that a current creditor may avoid a transfer if the debtor made the transfer to an insider for an antecedent debt, the debtor was insolvent, and the insider had reasonable cause to believe that the debtor was insolvent. Pursuant to section 544 of the Bankruptcy Code, the Trustee may seek to avoid transfers made by Acis pursuant to Texas Business and Commerce Code section 24.006(b).

192.    Within one year of the Petition Date, Highland Capital received the Prepetition Payments in the amount $16,113,790.14 from Acis on account of purported debt claims owed by Acis. To the extent that the Prepetition Payments satisfied legitimate debt claims not avoided by any of the causes of action asserted herein, these transfers are avoidable under section 547(b) of the Bankruptcy Code and Texas Business and Commerce Code sections 24.006(b).

193.    Similarly, the 2017-7 Equity transfer and the Note Transfer are purportedly in satisfaction of payables owed by Acis LP to Highland Capital (later conveyed to Highland Holdings and Highland Management). To the extent that these transfers satisfied legitimate

debt claims not avoided by any of the causes of action asserted herein, these transfers are avoidable under section 547(b) of the Bankruptcy Code and Texas Business and Commerce Code sections 24.006(b).

### Count 26: Liability for Avoided Transfers under 11 U.S.C. § 550

194.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

195.    Section 550 of the Bankruptcy Code provides that, if a transfer is avoided under section 544, 547 or 548, the Trustee may recover the property transferred or the value of the property transferred from (i) the initial transferee of such transfer or (ii) the entity for whose benefit such transfer was made.

196.    Highland Capital is an initial transferee of all transfers sought to be avoided in Counts 5 – 8 and 25 above.   The Trustee may recover all avoided transfers from Highland Capital pursuant to section 550, specifically including any transfers made in connection with any obligations avoided through Counts 5 – 8 above.

197.    Highland Advisor is an initial transferee of all transfers sought to be avoided in Counts 9 – 12 above, and Highland Funding and Highland Capital are entities for whose benefit such transfers were made. The Trustee may recover all avoided transfers from Highland Advisor, Highland Funding and Highland Capital pursuant to section 550.

198.    Highland Funding is an initial transferee of all transfers sought to be avoided in Counts 13 – 16 above, and Highland Capital is an entity for whose benefit such transfers were made. The Trustee may recover all avoided transfers from Highland Funding and Highland Capital pursuant to section 550.

199.    Highland Management is an initial transferee of all transfers sought to be avoided in Counts 17 – 20 and 25 above, and Highland Capital is an entity for whose benefit such

transfers were made. The Trustee may recover all avoided transfers from Highland Management and Highland Capital pursuant to section 550.

200. Highland Holdings is an initial transferee of all transfers sought to be avoided in Counts 21 – 25 above, and Highland Capital is an entity for whose benefit such transfers were made. The Trustee may recover all avoided transfers from Highland Holdings and Highland Capital pursuant to section 550.

### Count 27: Civil Conspiracy to Commit Fraud, Including Fraudulent Transfers

201. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

202. The Highlands, Dondero and Waterhouse (collectively, the "Highland Enterprise")[22] sought to engage in a series of fraudulent transfers and other fraudulent schemes, including the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, the 2017-7 Equity transfer, the 2017-7 Agreements transfer and the thwarted Universal/BVK Agreement transfer in order to denude Acis's assets and take over Acis LP's valuable business.

203. The Highland Enterprise, which is comprised of two or more business entities and individuals, had a meeting of the minds on the object or course of action related to the foregoing fraudulent transfers and schemes, including the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer the 2017-7 Equity transfer, the 2017-7 Agreements transfer and the thwarted Universal/BVK Agreement transfer.

204. The fraudulent transfers and schemes, including the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, the 2017-7 Equity transfer, the 2017-7 Agreements transfer and the thwarted Universal/BVK Agreement transfer, constitute one or more unlawful, overt acts.

---

[22] This is without limitation to other entities or individuals that may ultimately be shown to be part of Highland Enterprise.

205.   The Debtors and the Debtors' estates suffered damages as a proximate result of the fraudulent transfers and schemes, including the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, the 2017-7 Equity transfer, the 2017-7 Agreements transfer and the thwarted Universal/BVK Agreement transfer.

206.   The Trustee seeks actual and exemplary damages for the Highland Enterprise's conspiracy.

### Count 28: Civil Conspiracy to Breach Fiduciary Duties

207.   The Trustee incorporates the preceding paragraphs as if set forth fully herein.

208.   To prevail on a civil conspiracy claim under Texas law, the claimant must show "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Murray v. Earle*, 405 F.3d 278, 293 (2005).[23]

209.   Dondero (as an officer of and the sole member in Acis GP), Waterhouse (as an officer of Acis GP) and Highland Capital sought to substantially increase fees paid to Highland Capital under the Sub-Advisory Agreement, as reflected in the modifications on or about July 29, 2016, by increasing the sub-advisory fee from 5 basis points to 20 basis points without any legitimate business justification and to the significant detriment of Acis LP.  The fees charged under the Sub-Advisory Agreement and the Shared Services Agreement were also in clear violation of the LPA, as later determined in the Arbitration Award, resulting in a judgment for breach of fiduciary duty and breach of contract against Acis.  Finally, Highland Capital, Highland Funding, Dondero and Waterhouse conspired to make numerous transfers to denude

---

[23] Alternatively, to the extent Delaware law would apply, "civil conspiracy is an independent wrong that occurs when there is: '(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damages.'" *In re Am. Int'l Group, Inc*., 965 A.2d 763, 805 (Del. Ch. 2009) (quoting *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987)).

Acis, including the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, the 2017-7 Agreements transfer, the 2017-7 Equity transfer and the thwarted Universal/BVK Agreement transfer.

210. Highland Capital, Highland Funding, Dondero and Waterhouse had a meeting of the minds on the object or course of action related to the foregoing schemes.

211. The foregoing schemes constitute one or more unlawful, overt acts by Dondero and Waterhouse—namely the breach of fiduciary duties owed by Dondero and Waterhouse, as the officers and sole member of Acis GP, to Acis LP, its limited partners and its creditors.

212. As the officers and the sole member of Acis GP, Dondero and Waterhouse owed fiduciary duties to the partnership, its limited partners and its creditors. *See In re USACafes, L.P. Litigation*, 600 A.2d 43, 48-49 (Del. Ch. 1991) (holding that directors of a corporate general partner in a limited partnership owe fiduciary duties to the partnership and its limited partners); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) (applying the holding in *USACafes* to the members of an LLC, where the LLC is the general partner in a limited partnership); *North Am. Catholic Educ. Programing Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) (fiduciary duties include creditors when the entity being managed is insolvent)*; In re Performance Nutrition, Inc.*, 239 B.R. 93, 111-12 (Bankr. N.D. Tex. 1999) (managers of a bankruptcy debtor owe broad-ranging fiduciary duties).

213. Dondero and Waterhouse, as the officers and sole member of Acis GP, breached their fiduciary duties to Acis LP, its limited partners, and its creditors.

214. The Debtors and the Debtors' estates suffered damages as a proximate result of these breaches of fiduciary duties.

215. The Trustee seeks actual and exemplary damages for Highland Capital and Highland Funding's conspiracy with Dondero and Waterhouse to breach fiduciary duties to Acis LP its limited partners and its creditors.

### Count 29: Aiding and Abetting Breach of Fiduciary Duties

216. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

217. Under Delaware law, to prevail on a claim for aiding and abetting a breach of fiduciary duty, the claimant must show: (1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant knowingly participated in the fiduciary's breach; and (4) damages to the plaintiff resulting from the concerted action of the fiduciary and the defendant. *Miller v. Greystone Bus. Credit II, L.L.C. (In re USA Detergents, Inc.)*, 418 B.R. 533, 546 (Bankr. D. Del. 2009).[24]

218. As the officers and the sole member of Acis GP, Dondero and Waterhouse owed fiduciary duties to the partnership, its limited partners and its creditors. *See In re USACafes, L.P. Litigation*, 600 A.2d 43, 48-49 (Del. Ch. 1991) (holding that directors of a corporate general partner in a limited partnership owe fiduciary duties to the partnership and its limited partners); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) (applying the holding in *USACafes* to the members of an LLC, where the LLC is the general partner in a limited partnership); *North Am. Catholic Educ. Programing Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) (fiduciary duties include creditors when the entity being managed is insolvent)*; In*

---

[24] Alternatively, to the extent Texas law would apply, to establish the claim of knowing participation in breach of fiduciary duty (the Texas corollary to aiding and abetting a breach of fiduciary duty), the claimant must show: "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Harford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007). "Citing [] Texas cases, the Fifth Circuit has recognized a cause of action for knowing participation in breach of fiduciary duty with elements that are almost identical to Delaware's cause of action for aiding and abetting." *Milligan v. Salamone (In re Westech Capital Corp.)*, 2018 WL 1605171, 2018 Bankr. LEXIS 969, at *21 n.119 (Bankr. W.D. Tex. Mar. 29, 2018) (citing *Meadows*).

*re Performance Nutrition, Inc.*, 239 B.R. 93, 111-12 (Bankr. N.D. Tex. 1999) (managers of a bankruptcy debtor owe broad-ranging fiduciary duties).

219.   Dondero (as an officer of and the sole member in Acis GP), Waterhouse (as an officer of Acis GP) and Highland Capital sought to substantially increase fees paid to Highland Capital under the Sub-Advisory Agreement, as reflected in the modifications on or about July 29, 2016, by increasing the sub-advisory fee from 5 basis points to 20 basis points without any legitimate business justification and to the significant detriment of Acis LP.  The fees charged under the Sub-Advisory Agreement and the Shared Services Agreement were also in clear violation of the LPA, as later determined in the Arbitration Award, resulting in a judgment for breach of fiduciary duty and breach of contract against Acis.  Finally, Highland Capital, Highland Funding, Dondero and Waterhouse conspired to make numerous transfers to denude Acis and allow the Highlands to appropriate its business, including the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, the 2017-7 Agreement transfer, the 2017-7 Equity transfer and the thwarted Universal/BVK Agreement transfer.

220.   Highland Capital and Highland Funding knowingly participated in Dondero and Waterhouse's breach of fiduciary duties to Acis LP, its limited partners and its creditors.

221.   The Debtors and the Debtors' estates suffered damages as a proximate result of the concerted actions of Highland Capital, Highland Funding, Dondero and Waterhouse.

222.   The Trustee seeks actual and exemplary damages for Highland Capital and Highland Funding's aiding and abetting Dondero and Waterhouse's breach of fiduciary duties to Acis LP, its limited partners and its creditors.

### Count 29: Tortious Interference with the Universal/BVK Agreement

223.   The Trustee incorporates the preceding paragraphs as if set forth fully herein.

224.  Under Texas law, a claim for tortious interference with contract requires: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Official Brands, Inc. v. Roc Nation Sports, LLC*, 2015 U.S. Dist. LEXIS 167320 **\*7** (N.D. Tex.) (J. Boyle) (quoting *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex. 2000)).  The fact that a contract is an at-will agreement is no defense to a tortious interference claim.  *Id.*

225.  The Universal/BVK Agreement is an existing contract to which Acis LP is a party.  The Universal/BVK Agreement is an existing contract that is subject to interference.

226.  From nearly day one of these Bankruptcy Cases, Highland Capital has sought to terminate Acis LP as the manager under the Universal/BVK Agreement, and replace Acis LP with Highland Capital or one of its affiliates.  Highland Capital's actions involve communications over many months with Universal and BVK, including numerous communications after Highland Capital was terminated as sub-advisor on August 1, 2018 and no longer had any legitimate reason to communicate with Universal or BVK.  Highland Capital even prepared and sent to Universal and BVK a new outsourcing agreement, which would be entered once Acis LP and its bankruptcy were out of the way.

227.  Acis LP and its estate have suffered and will suffer actual damages as a proximate result of the interference of Highland Capital.

228.  The Trustee seeks actual and exemplary damages for Highland Capital's tortious interference with the Universal/BVK Agreement.

### *Count 30: Breach of Contract by Highland Capital under the Sub-Advisory Agreement*

229.  The Trustee incorporates the preceding paragraphs as if set forth fully herein.

230. Under Texas law, to prevail on a breach of contract claim, a party must show: "(1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

231. The Sub-Advisory Agreement is a valid contract between Acis LP and Highland Capital, under which Highland Capital was obligated to, *inter alia*:[25]

> (i) make recommendations to Acis LP for the purchase, retention, or sale of specific loans or assets in the CLOs;

> (ii) place orders with respect to the purchase or sale of specific loans or assets for the CLOs, upon instruction from Acis LP;

> (iii) identify, evaluate, recommend to Acis LP, and, if applicable, negotiate the structure or terms of investment opportunities for the CLOs;

> (iv) assist Acis LP in performing its due diligence on prospective investments for the CLOs; and

> (v) provide information to Acis LP regarding any investments in the CLOs, and, if requested by Acis LP, provide information to assist in monitoring and servicing investments by the CLOs.

*See* Sub-Advisory Agreement § 1(b). Further, "[n]otwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, [Acis LP]." *Id.*

---

[25] Although the Trustee pleads herein that certain provisions of the Sub-Advisory Agreement, which are in violation of the LPA, are unauthorized and *ultra vires*, section 15 of the Sub-Advisory Agreement provides that any such invalid provision does not affect or render "invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part."

232.   Section 4(a) of the Sub-Advisory Agreement specifically provides:

[T]he Sub-Advisor will perform its obligations [under the Sub-Advisory Agreement] in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios[.]

233.   Since at least the time the Trustee was appointed in these Bankruptcy Cases, while acting as sub-advisor, Highland Capital failed to purchase a single loan for the CLOs, and only provided for the sale of loans, in an attempt to complete a stealth liquidation of the CLOs for the Highlands' benefit, and to the detriment of Acis LP.  Such practice is inconsistent with the practices and procedures followed by institutional managers of national standing, such as Brigade, relating to assets of the nature and character of the CLOs. Highland Capital's activities are, however, completely consistent with the Highlands' ultimate goal to take away Acis LP's valuable assets and take over Acis LP's valuable business as portfolio manager of the CLOs.

234.   Highland Capital grossly mismanaged the CLOs, in abrogation of its duties and disregard of the standard of care under the Sub-Advisory Agreement. Accordingly, Highland Capital has breached its obligations under the Sub-Advisory Agreement, and such breach caused economic damages to Acis LP. Acis LP is therefore entitled to recover, to the fullest extent under applicable law, the amount of such damages from Highland Capital.

### Count 31:  Breach of Fiduciary Duties by Highland Capital

235.   The Trustee incorporates the preceding paragraphs as if fully set forth herein.

236.   Pursuant to the Sub-Advisory Agreement, a principal-agent relationship existed between Acis LP and Highland Capital. Further, based on Highland Capital's role as sub-advisor and investment advisor to Acis LP, a special relationship of trust and confidence existed between Acis LP and Highland Capital.  *See W. Reserve Life Assur. Co. of Ohio v. Graben*, 233

S.W.3d 360, 373-74 (Tex. App.—Fort Worth 2007, no pet.). Accordingly, in its capacity of sub-advisor to Acis LP, Highland Capital owed fiduciary duties to Acis LP.

237. Highland Capital, while acting as sub-advisor for Acis LP, purposefully engaged in conduct that was detrimental to Acis LP in order to enrich itself. As outlined in detail above, Highland Capital increased the amount due to Highland Capital under the Sub-Advisory Agreement, including charging amounts far in excess of appropriate market rates and amounts in excess of the compensation limits of the LPA. Highland Capital was also the ringleader, and ultimate beneficiary, for the series of fraudulent schemes executed in the Fall of 2017 that terminated or transferred away Acis LP's valuable rights in the ALF PMA, the ALF Shares, the Note, the 2017-7 Equity and the 2017-7 Agreements. This was done with the very specific intent to make Acis "judgment proof," as Acis's own counsel later boasted, and in order to ensure that Terry would never receive payment on his judgment, as Dondero has threatened. These transfers, while very damaging to Acis LP, also furthered Highland Capital's plan to take over Acis LP's very lucrative portfolio management business and keep it under the control of Highland Capital and Dondero. Finally, Highland Capital sought to transfer the Universal/BVK Agreement away from Acis LP and to itself or an affiliate, including while Highland Capital was serving as sub-advisor (and as a fiduciary) for such agreement.

238. By its actions, Highland Capital specifically intended to cause harm to Acis LP by denuding it of its assets and enriching Highland Capital. In doing so, Highland Capital breached its fiduciary duties to Acis LP.

239. As a consequence, the Trustee is entitled to an award of punitive damages against Highland Capital in an amount to be determined by the Court.

### Count 32: Punitive Damages

240. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

241. The Highlands, led by Highland Capital and Dondero, engaged in fraud against Acis and its creditors, acted with malice toward Acis and its creditors and were, at best, grossly negligent in their dealings with Acis. Thus, the Trustee is entitled to punitive damages, and the Trustee pleads for such damages in connection with each Count pleaded herein that will support a claim for punitive damages.

### Count 33: Alter Ego/Collapsing Doctrine/Unjust Enrichment

242. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

243. Under Texas law, ignoring the separateness of business entities and holding affiliated entities liable for all debts of the fraudulent enterprise is appropriate "when the corporate form has been used as part of a basically unfair device to achieve and inequitable result. Examples are when the corporate structure has been abused to perpetrate a fraud, evade an existing obligation . . . or justify a wrong." *SSP Partners v. Gladstrong Inv. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008).[26]

244. Thus, each of Highland Capital, Highland Funding, Highland Advisor, Highland Management, and Highland Holdings should be held liable for any damages awarded under any Count in this Amended Answer, as each is the alter ego of the others. Further, Highland Capital, Highland Funding, Highland Advisor, Highland Management, and Highland Holdings should be held liable for any debts of the Debtors, as they are also the alter ego of the Debtors.

245. Further, "multistep transactions can be collapsed when the steps of the transaction are `part of one integrated transaction.'" *In re Yazoo Pipeline Co., L.P.*, 448 B.R. 163, 187 (Bankr. S.D. Tex. 2011) (J. Isgur) (internal citations omitted). The Supreme Court likewise has

---

[26] To the extent Delaware law applies to any of the alter ego claims, Delaware also recognizes alter ego on similar grounds. "Delaware does, however, recognize the traditional alter ego doctrine as grounds to pierce the corporate veil in cases involving the members of a corporate group. To state an alter ego claim under Delaware law, the [plaintiff] must plead (1) that [the] defendants 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness' is present." *Precht v. Global Tower LLC*, No. 2:14-CV-00743, 2016 U.S. Dist. LEXIS 177910, at *9 (W.D. La. Dec. 22, 2016) (internal citations omitted).

held that a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a bankrupt's estate. *Pepper v. Litton*, 308 U.S. 295, 304-05 (1939).

246. The ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, and the transfer of the 2017-7 Equity and the 2017-7 Agreements should be collapsed and recognized for what they are: Highland Capital using offshore entities to take over Acis LP's assets and business while Highland Capital maintains absolute control over such assets and business, and even using alleged debt owed to Highland Capital as the purported consideration for these transactions in order to mask Highland Capital's otherwise clear liability for avoidable transfers.

247. Finally, unjust enrichment is an equitable theory of recovery holding that one who receives benefits unjustly should make restitution for those benefits. *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 927 (Tex. App.--Fort Worth 1994). A party is unjustly enriched when it obtains a "benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

248. Each of the Highlands, and in particular Highland Capital and Highland Funding, benefitted from the ALF PMA Transfer, the ALF Share Transfer, the Note Transfer, and the transfer of the 2017-7 Equity and the 2017-7 Agreements even if they were not the direct transferee. Each of the Highlands should be held liable for benefits unjustly received and make restitution to the Debtors and their estates for those benefits.

### *Count 35: Attorneys' Fees and Costs*

249. The Trustee incorporates the preceding paragraphs as if set forth fully herein.

250. Pursuant to Texas Business and Commerce Code section 24.013, Civil Practice and Remedies Code section 38.001 and any other applicable law, the Trustee may recovery attorneys' fees and costs incurred in bringing this Adversary Proceeding.

## VI.    OBJECTIONS TO HIGHLAND CAPITAL PROOFS OF CLAIM

251.    The Trustee incorporates the preceding paragraphs as if set forth fully herein.

252.    The Highland Capital Claims are allegedly based on claims arising from the Sub-Advisory Agreement and the Shared Services Agreement. The Highland Capital Claims[27] are summarized as follows:

| Alleged Pre-Petition Claim[28] | Alleged Claim Amount |
|---|---|
| Sub-Advisory Agreement | $1,605,362.41 |
| Shared Services Agreement | $1,017,213.62 |
| Total alleged Pre-Petition Claim | $2,622.576.03 |
| **Alleged 502(f) Claim[29]** | **Alleged 502(f) Claim Amount** |
| Sub-Advisory Agreement | $1,170,147.06 |
| Shared Services Agreement | $ 879,417.29 |
| Total alleged 502(f) Claim | $2,049,564.35 |
| **Total Claim Amount** | **$4,672,140.38** |

---

[27] Highland Capital filed virtually identical claims against both Acis LP and Acis GP. Acis GP is not a party to the Sub-Advisory Agreement or the Shared Services Agreement. Presumably, Highland Capital is relying on Delaware partnership law to argue that Acis GP is also liable under the Sub-Advisory Agreement and Shared Services Agreement. *See* 6 Del. C. § 17-403(b) ("Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to persons other than the partnership and the other partners. Except as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to the partnership and to the other partners."); *see also* 6 Del. C. § 15-306(a) ("(a) Except as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law"). If this is the case, the Trustee does not dispute this basic tenet of partnership law; however, the Trustee disputes the Highland Capital Claims for the reasons set forth herein. Accordingly, all arguments set forth herein are applicable to both Highland Capital Claims.

[28] The Alleged Pre-Petition Claim relates to Highland Capital's alleged claim arising prior to January 30, 2018 (the "Petition Date").

[29] The Alleged 502(f) Claim relates to Highland Capital's alleged claim arising after the Petition Date and prior to April 13, 2018, the date the Court entered the Order for Relief.

---

The Highland Capital Claims also include contingent indemnity claims arising under the Sub-Advisory Agreement and the Shared Services Agreement.

253. The Highland Capital Claims should be disallowed under (i) section 502(b)(1) of the Bankruptcy Code; (ii) section 502(b)(4) of the Bankruptcy Code; (iii) and section 502(d) of the Bankruptcy Code. The Highland Capital Claims are unenforceable against the Debtors under the LPA and applicable law. The Highland Capital Claims are for services of an insider of the Debtors and exceed the reasonable value of the services. As set forth above, the Trustee has asserted avoidance actions against Highland Capital such that the Highland Capital Claims should be disallowed. Finally, to the extent allowed at all, the Highland Capital Claims should be equitably subordinated under section 510(c) of the Bankruptcy Code.

254. Pursuant to section 502(b) and (d) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3007, the Trustee seeks entry of an order disallowing and expunging the Highland Capital Claims from the Debtors' claims registers.

**A.      The Highland Capital Claims Should be Disallowed under 11 U.S.C. § 502(b)(1).**

255. "Section 502(b)(1) provides that a claim is allowed except to the extent it is unenforceable under applicable law." *In re White*, No. 06-50247-RLJ-13, 2008 Bankr. LEXIS 167, at *17-18 (Bankr. N.D. Tex. Jan. 28, 2008). "[T]he the validity of a creditor's claims against the debtor at the time the bankruptcy petition is filed 'is to be determined by reference to state law.'" *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 529 (5th Cir. 2004) (quoting *Kellogg v. United States (In re W. Tex. Mktg. Co.)*, 54 F.3d 1194, 1196 (5th Cir. 1995)).

256. As set forth more fully above, the Highland Capital Claims are based entirely on amounts alleged to be due pursuant to the Sub-Advisory Agreement and the Shared Services Agreement. As outlined in the Causes of Action above, there are significant amounts due to Acis LP by Highland Capital under or in connection with the Sub-Advisory Agreement and the

Shared Services Agreement, which constitute a right of recoupment and/or offset to the entirety of the Highland Capital Claims. Further, any portion of the Highland Capital Claims that are based on an *ultra vires* act of Acis LP, as alleged in Count 1 above, are void or voidable. Accordingly, the Highland Capital Claims are not enforceable under applicable law, and the Highland Capital Claims should therefore be disallowed.

**B.     The Highland Capital Claims Should be Disallowed under 11 U.S.C. § 502(b)(4).**

257.   The Highland Capital Claims are claims for services by an insider, Highland Capital, and the Highland Capital Claims exceed the reasonable value of the services provided by Highland Capital. Section 502(b)(4) of the Bankruptcy Code provides, in relevant part, that a claim for services of an insider or attorney of a debtor shall not be allowed to the extent that "such claim exceeds the reasonable value of such services."

258.   The purpose of section 502(b)(4) is: "(1) to prevent insiders of a debtor from extracting inflated compensation from the debtor at the expense of the debtor's creditors; and (2) to prevent over-generosity of a debtor prior to a bankruptcy filing." *Faulkner v. Canada (In re Heritage Org., L.L.C.)*, Case No. 04-35574-BJH-11, Adv. No. 04-3338, 2006 Bankr. LEXIS 4662, at *22-23 (Bankr. N.D. Tex. Jan. 5, 2006); *see also In re Allegheny Int'l*, 158 B.R. 332, 339 (Bankr. W.D. Pa. 1992) ("The purpose underlying 11 U.S.C. § 502(b)(4) is to prevent officers and directors (insiders) of a debtor from extracting inflated amounts for their services at the expense of the creditors").

**1.     Highland Capital is an Insider of the Debtors.**

259.   Under section 101(31) of the Bankruptcy Code, an insider includes certain enumerated parties, such as an officer of the debtor, affiliate, etc. Further, the list of enumerated "insiders" is not exclusive or exhaustive. *See In re Missionary Baptist Foundation of Am., Inc.*, 712 F.2d 206, 210 (5th Cir. 1983). Recently, the United States Supreme Court stated: "Courts

have additionally recognized as insiders some persons not on that [101(31)] list—commonly known as 'nonstatutory insiders.' The conferral of that status often turns on whether the person's transactions with the debtor (or another of its insiders) were at arm's length." *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018).

260. The Fifth Circuit has noted that "cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the parties and (2) whether the transaction . . . [was] conducted at arm's length." *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992).

261. Highland Capital is a statutory insider, a non-statutory insider, an admitted insider, and an adjudicated insider. The statutory definition of "insider" includes an "affiliate" of the debtor. 11 U.S.C § 101(31)(E). Prior to the entry of the Order for Relief, Highland Capital met the statutory definition of "affiliate" because Highland Capital "operate[d] the business or substantially all of the property of the [D]ebtor under a[n] . . . operating agreement." *See* 11 U.S.C § 101(2)(D). Under the Sub-Advisory Agreement and the Shared Services Agreement, Acis LP effectively ceded control over its operations to Highland Capital.[30]

262. Highland Capital is a non-statutory insider because Dondero controlled both Acis and Highland Capital prior to the date the Court entered the Order for Relief. The closeness of the Highland Capital-Acis relationship is demonstrated by the fact that both companies are under Dondero's common control, Acis had no employees and Acis was operated exclusively by Highland Capital employees. Transactions were not conducted at arm's length. Indeed,

---

[30] For purposes of section 502(b)(4), courts examine whether a party is an "insider" on the date the operative document was executed. Here, it is indisputable that Highland Capital was an insider when the Sub-Advisory Agreement and the Shared Services Agreement were executed, and Highland Capital was an insider on the Petition Date. *See Faulkner*, 2006 Bankr. LEXIS 4662, at *17 ("The determination of insider status is made as of the time the claimant provided services to the debtor."); *In re Allegheny Int'l*, 158 B.R. 332, 339 (Bankr. W.D. Pa. 1992) ("[T]he relevant time for determining one's status as an insider, under 11 U.S.C. § 502(b)(4), is the time services were rendered and when the compensation contracts for such services were formed[.]").

Dondero signed both the Sub-Advisory Agreement and the Shared Services Agreement for Highland Capital and Acis.

263.   Highland Capital is an admitted insider and an adjudicated insider.  During the trial on the involuntary petitions, the Debtors, controlled by Highland Capital, admitted that Highland Capital is an insider of the Debtors.[31]   Acis LP's Statement of Financial Affairs [Docket No. 165] (the "SOFA") lists payments to Highland Capital in the section titled "Payments or transfers of property made within 1 year before the filing of this case that benefited any insider."   The SOFA is signed by Isaac Leventon, an employee of Highland Capital (who has no official title or position with the Debtors).   Additionally, this Court has found that Highland Capital is an insider of the Debtors, stating: "the court believes it necessary to remove certain *insider* creditor claims, which are required not to be counted pursuant to section 303(b)(2) of the Bankruptcy Code.  *This would clearly include Highland Capital* (the Alleged Debtors do not dispute this)."  Opinion ¶ 38 (footnotes omitted) (emphasis added).

### 2.   The Highland Capital Claims Exceed the Reasonable Value of the Services Provided.

264.   "In analyzing the reasonableness of a claim for services under § 502(b)(4), a court should consider the totality of the circumstances involved at the time that the services were rendered."  *Faulkner*, 2006 Bankr. LEXIS 4662, at *23 (citing *In re Gutierrez*, 309 B.R. 488, 493 (Bankr. W.D. Tex. 2004)).   "Reasonable value" under Section 502(b)(4) is "synonymous with 'market value.'"  *In re Delta Air Lines, Inc.*, No. 05-17923 (cgm), 2010 Bankr. LEXIS 233, at *22 (Bankr. S.D.N.Y. Feb. 3, 2010).   "The burden of proof on reasonableness under § 502(b)(4) ultimately lies with the insider."  *Id*. at 24.  Thus, Highland Capital has the burden

---

[31] Transcript of Hearing on Emergency Motion to Abrogate or Modify 11 U.S.C Section 303(f), Prohibit Transfer of Assets, and Impose, Inter Alia, 11 U.S.C Section 363 Filed by Petitioning Creditor Joshua Terry (3); Emergency Motion to Set Hearing (related to Document (8) Motion to Dismiss Case Filed by Alleged Debtor Acis Capital Management, LP (9) (Case Nos. 18-30264-SGJ7 &18-30264-SGJ7) (the "2-7-18 Transcript"), Tr. 246: 8-9 ("[T]here are no insiders other than Highland on the list of eighteen[.]").

to establish the reasonableness of its claims. Further, when the validity of an insider's contract with a corporation is at issue, the burden is on the insider "'not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.'" *In re Marquam Inv. Corp.*, 942 F.2d 1462, 1465 (9th Cir. 1991) (quoting *Pepper v. Litton*, 308 U.S. 295, 306 (1939)).

265. Together, the Sub-Advisory Agreement and the Shared Services Agreement (as amended) charge Acis LP fees far exceeding the market value of the services provided under such agreements. First, the Trustee's professionals engaged in a marketing process in connection with the Brigade Motion. After conducting a diligent search of the market, the Trustee located a replacement for Highland Capital that provided the services Highland Capital previously provided the Debtor for roughly half the cost Highland Capital charged Acis LP. The Sub-Advisory Agreement and the Shared Services Agreement also significantly contributed to rendering Acis insolvent. In fact, the General Counsel of Highland Capital, Scott Ellington, admitted that as of February 7, 2018—one week after the Petition Date—Acis was insolvent or close to insolvent.[32]

266. Highland Capital cannot show that the exorbitant fees charged under the Sub-Advisory Agreement and the Shared Services Agreement are reasonable or that entry into such agreements was in good faith and demonstrates inherent fairness. Therefore, pursuant to section 502(b)(4), the Highland Capital Claims should be disallowed in their entirety.

## C. Highland Capital Received Voidable Transfers and Holds Property of the Estate, and the Trustee is Entitled to Setoff under Section 502(d) of the Bankruptcy Code.

267. As set out more fully above, the Trustee seeks, (i) avoidance of actual and constructively fraudulent transfers and obligations pursuant to sections 544 and 548 of the

---

[32] 2-7-18 Transcript, Tr. 219: 22-25 (THE COURT: Do you think Acis is in the zone of insolvency? THE WITNESS: I don't know the answer to that, but I would -- I would assume that it was -- that it's close.")

Bankruptcy Code, (ii) avoidance of preferential transfers pursuant to section 547 of the Bankruptcy Code; (iii) turnover of property the estate pursuant to section 542 of the Bankruptcy Code; and (iv) liability for the foregoing under section 550 of the Bankruptcy Code. Pursuant to section 502(d) of the Bankruptcy Code, the Court should therefore disallow the Highland Capital Claims.[33] The Court may do so even before adjudicating the causes of action set forth herein. *See In re Heritage Org., L.L.*C., 375 B.R. 230, 288-289 (Bankr. N.D. Tex. 2007) (finding a court order avoiding a transfer is not a prerequisite to disallowance of a claim).

**D.    The Highland Capital Claims Should be Equitably Subordinated.**

268.    Section 510(c) of the Bankruptcy Code expressly authorizes subordination of the allowed claim of one creditor to the allowed claims of other creditors "under principles of equitable subordination."

269.    In *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977), the Fifth Circuit articulated what has become the most commonly accepted standard for equitable subordination of a claim. Under the *Mobile Steel* standard, a claim can be subordinated if the claimant engaged in some type of inequitable conduct that resulted in injury to creditors (or conferred an unfair advantage on the claimant) and if equitable subordination of the claim is consistent with the provisions of the Bankruptcy Code.

270.    During the time it completely dominated control of Acis, Highland Capital clearly engaged in abundant inequitable conduct related to Acis, as well as conferring numerous unfair advantages to itself, that resulted in injury to Acis's creditors. As outlined in detail above, Highland Capital increased the amount due to Highland Capital under the Sub-Advisory

---

[33] "Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title [11 USCS § 542, 543, 550, or 553] or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title." 11 U.S.C.§ 502(d)

Agreement, including charging amounts far in excess of appropriate market rates. This has resulted in a grossly inflated claim for Highland Capital as well as significant overpayments to Highland Capital for whatever services and value it did provide to Acis under these agreements.

271. Highland Capital was also the ringleader, and ultimate beneficiary, for the series of fraudulent schemes executed in the fall of 2017 that terminated or transferred away Acis LP's valuable rights in the ALF PMA, the ALF Shares, the Note, the 2017-7 Equity and the 2017-7 Agreements. This was done with the very specific intent to make Acis "judgment proof," as Acis's own counsel later boasted, and in order to ensure that Terry would never receive payment on his judgment, as Dondero has threatened. These transfers, while very damaging to Acis LP and its creditors, also furthered Highland Capital's plan to take over Acis LP's very lucrative portfolio management business and keep it under the control of Highland Capital and Dondero. Finally, even during the Bankruptcy Cases, Highland Capital has attempted to transfer and take over Acis LP's very lucrative Universal/BVK Agreement.

272. To the extent the Highland Capital Claims are allowed in any amount, they are clearly subject to equitable subordination and should be subordinated below all other allowed unsecured claims in the bankruptcy case.

## VI. <u>PRAYER</u>

The Trustee respectfully requests that the Court: (i) enter judgment declaring that Expense Overpayments made to Highland Capital in excess of 20% of Revenue and any agreements supporting such overpayments were *ultra vires* and, thus, void or voidable; (ii) enter judgment against Highland Capital for the recovery of any *ultra vires* payments made to Highland Capital; (iii) enter judgment against Highland Capital, Highland Funding, Highland Advisor, Highland Holdings and Highland Management for the avoidance and recovery of transfers fraudulently made and obligations fraudulently incurred and for civil conspiracy in

connection with such fraudulent transfers and schemes; (iv) enter judgment against Highland Capital, Highland Holdings and Highland Management for avoidance and recovery of preferential transfers received; (v) enter judgment against Highland Capital for tortious interference with contract; (vi) enter judgment against Highland Capital for breach of contract; (vii) enter judgment against Highland Capital and Highland Funding for civil conspiracy to breach fiduciary duties and for aiding and abetting breach of fiduciary duties; (viii) enter judgment against Highland Capital for breach of its fiduciary duties; (ix) enter judgment against Highland Capital, Highland Funding, Highland Advisor, Highland Management and Highland Holdings for punitive damages; (x) enter judgment against Highland Capital, Highland Funding, Highland Advisor, Highland Management and Highland Holdings for pre- and post-judgment interest at the greatest amount permitted by law; (xi) enter judgment against Highland Capital, Highland Funding, Highland Advisor, Highland Management and Highland Holdings for attorneys' fees and costs incurred in connection with the prosecution of this Adversary Proceeding; (xii) declare that Highland Capital, Highland Funding, Highland Advisor, Highland Management and Highland Holdings are each fully liable for any judgment entered for the Trustee in this Adversary Proceeding; (xiii) disallow, expunge and/or subordinate the Highland Capital Claims, pursuant sections 502(b)(1), (b)(4), and (d) and 510(c) of the Bankruptcy Code; and (xiv) grant any other such relief that the Trustee may show himself to be justly entitled in law or in equity.

**DATED: November 13, 2018.**

Respectfully submitted,

By:*/s/ Phillip Lamberson*

Phillip Lamberson
State Bar No. 00794134
Joe Wielebinski
State Bar No. 21432400
Rakhee V. Patel
State Bar No. 00797213
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com

**SPECIAL COUNSEL FOR THE
CHAPTER 11 TRUSTEE**

**-and-**

Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthias Kleinsasser
State Bar No. 24071357
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com

**COUNSEL FOR THE CHAPTER 11
TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2018, notice of this document will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this adversary proceeding pursuant to the Electronic Filing Procedures in this District. Service will also be made as required and allowed by Federal Rule of Bankruptcy Procedure 7004.

*/s/ Phillip Lamberson*
One of Counsel