

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 16, 2019**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, GP, | § | CASE NO. 18-30265-SGJ-11 |
| LLC, | § | (Jointly Administered Under |
|     Debtors. | § | Case No. 18-30264-SGJ-11) |
| _____ | § | (Chapter 11) |
| | § | |
| ROBIN PHELAN, CHAPTER 11 | § | |
| TRUSTEE, | § | |
|     Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 18-03078-SGJ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., HIGHLAND CLO FUNDING | § | |
| LTD, HIGHLAND HCF ADVISOR, LTD., | § | |
| HIGHLAND CLO MANAGEMENT, LTD., | § | |
| and HIGHLAND CLO HOLDINGS, LTD., | § | |
|     Defendants. | § | |

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO COMPEL ARBITRATION [DE # 102]

**I.**    **Introduction.**

Before this court is a Motion to Compel Arbitration (the "Arbitration Motion"),[1] requesting that the bankruptcy court send to arbitration only a ***sub-set*** of claims asserted in the above-referenced adversary proceeding (the "Adversary Proceeding").  Some procedural context is crucial in analyzing the merits of the Arbitration Motion and, thus, is set forth immediately below.

This Adversary Proceeding has morphed into a large, complex lawsuit—at this stage primarily involving 35 claims, 20 of which are grounded in fraudulent transfer theories.[2]  The Arbitration Motion, as explained below, seeks arbitration of ***eight*** of the 35 claims (*i.e.,* Counts 1-8).

The Arbitration Motion was filed by party Highland Capital Management, L.P. ("Highland").  Highland and a related company, Highland CLO Funding Ltd. ("HCLOF"), were originally the plaintiffs in this Adversary Proceeding, suing the Chapter 11 Trustee for injunctive relief (arguing early during the above-referenced Chapter 11 bankruptcy cases that the Chapter 11 Trustee was interfering with their business rights and decisions, essentially).  The Chapter 11 Trustee fired back with 35 counterclaims against Highland and HCLOF (adding three parties related to Highland as third-party defendants with regard to some of those 35 counterclaims).  Notably, these 35 counterclaims—***as directed toward Highland***—were also alleged to be objections to Highland's two $4,672,140.38 proofs of claim filed in the underlying bankruptcy cases.[3]  In that regard, the Chapter 11 Trustee stated that his Answer and Counterclaims included

---

[1] DE # 102.

[2] There is also a preference count and a section 550 recovery count—thus, 22 out of the 35 claims are chapter 5 avoidance actions and recovery.  11 U.S.C. §§ 544, 547, 548 & 550.

[3] *See Defendant's Amended Answer, Counterclaims (Including Claim Objections) and Third-Party Claims* (DE # 84), filed November 13, 2018, in response to the *Original Complaint and Request for Preliminary Injunction of*

"an objection to Highland Capital's proofs of claim pursuant to Federal Rule of Bankruptcy Procedure 3007(b), and the counterclaims asserted herein shall constitute recoupment and/or offset to such proofs of claim, to the extent such claims are otherwise allowed."[4]  In fact, after the 35 counts were articulated in the Chapter 11 Trustee's Answer and Counterclaims, there were 20 paragraphs (¶¶ 252-271, pp. 70-77) solely articulating the Chapter 11 Trustee's objections to Highland's proofs of claim.[5]  The Chapter 11 Trustee also filed yet a separate adversary proceeding, Adv. Proc. No. 18-03212, seeking his own injunctive relief, which has recently been consolidated with this Adversary Proceeding.[6]

The Chapter 11 Trustee ultimately proposed and obtained confirmation of a Chapter 11 plan in the underlying bankruptcy cases, and the Reorganized Debtors, now under new ownership and management, were vested in that plan with the counterclaims in this Adversary Proceeding (among other rights and claims).  The injunctive relief initially sought by Highland and HCLOF, as plaintiffs in the Adversary Proceeding, later became mooted by various orders in

---

*Highland CLO Funding, Ltd and Highland Capital Management Against Chapter 11 Trustee of Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (DE # 1), filed May 30, 2018, and also in response to the proofs of claims filed by Highland Capital Management, L.P. (*see Proof of Claim No. 27*, filed in Case No. 18-30264, and *Proof of Claim No. 13* filed in Case No. 18-30265, each in the amount of $4,672,140.38, with the basis of each of the proofs of claim listed as "Sub-Advisory Services and Shared Services"; these proofs of claim are virtually identical).

[4] DE # 84, ¶ 6.  The Chapter 11 Trustee has argued that the Highland proofs of claim should be disallowed under (i) section 502(b)(1) of the Bankruptcy Code (in that the Highland proofs of claim are allegedly unenforceable against the Debtors under the limited partnership agreement of Acis Capital Management, L.P. and applicable law); (ii) section 502(b)(4) of the Bankruptcy Code (in that the proofs of claim are for services of an insider of the Debtors and allegedly exceed the reasonable value of the services); and (iii) under section 502(d) of the Bankruptcy Code (in that the Trustee has asserted avoidance actions against Highland).  Finally, to the extent allowed at all, the Trustee has argued that the Highland proofs of claim should be equitably subordinated under section 510(c) of the Bankruptcy Code.  In summary, pursuant to section 502(b) and (d) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3007, the Trustee has sought entry of an order disallowing and expunging the Highland proofs of claim from the Debtors' claims registers.  *See id.* at ¶¶ 251-272.

[5] *Id.*

[6] DE # 124.

the bankruptcy cases and such claims were voluntarily dismissed without prejudice.[7]  Thus, Highland, which is pursuing the Arbitration Motion, now wears the hat of only a defendant (and proof of claimant), and the Reorganized Debtors are the plaintiffs asserting the 35 original "counterclaims" asserted by the Chapter 11 Trustee against Highland (which 35 claims are also objections to Highland's proof of claim).  The separate adversary proceeding that was filed by the Chapter 11 Trustee seeking injunctive relief  (Adv. Proc. No 18-03212) was consolidated into this Adversary Proceeding, and the style of this Adversary Proceeding was adjusted to reflect that the Chapter 11 Trustee had become situated as plaintiff.[8]  But, to be clear, the Reorganized Debtors are actually now plaintiffs in place of the Chapter 11 Trustee.  The Reorganized Debtors are Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP"), and they oppose the Arbitration Motion.[9]

Citing to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq.*, Highland argues that the bankruptcy court must enter an order compelling arbitration as to counts 1-8 because: (a) these eight counts revolve around the interpretation of certain prior versions of a Sub-Advisory Agreement and Shared Services Agreement (later defined); and (b) the aforementioned agreements contained binding arbitration clauses.  Highland also requests that the Adversary Proceeding be stayed regarding counts 1-8, pending binding arbitration.  The Reorganized Debtors dispute that there are binding arbitration clauses applicable to counts 1-8.  As explained further below, the aforementioned agreements were amended many times and the arbitration clauses were eventually eliminated in the last versions of the agreements.  The Reorganized

---

[7] DE # 79.

[8] DE # 124.

[9] DE # 123.

Debtors also urge that, even if there are applicable arbitration clauses, the court may and should exercise discretion and decline to order arbitration, since core bankruptcy matters are involved and arbitration would conflict with the purposes of the Bankruptcy Code. For the reasons set forth below, the Arbitration Motion is denied. This means that Counts 1-26 & 33-35 will go forward and be adjudicated in this Adversary Proceeding.[10] But as will be explained in a separate order that is being issued shortly following this order, there are certain counts complaining of *postpetition* state law torts and breaches of contract in this Adversary Proceeding (Counts 27-32) that this court believes should be separated out into a different adversary proceeding and consolidated with a contested matter involving a Highland request for allowance of a postpetition administrative expense claim [DE # 772].

## II.     Background Facts.

### A.     First, the Agreements Between the Parties.

As this court has noted on various occasions, Acis LP was formed in the year 2011, and is primarily a CLO portfolio manager.[11] Specifically, Acis LP provides fund management services to various special purpose entities that hold CLOs (which is an acronym for "collateralized loan obligations"). Acis LP was providing management services for five such special purpose entities (the "Acis CLOs") as of the time that it and its general partner were put into the above-referenced involuntary bankruptcy cases (the "Bankruptcy Cases"). The parties have informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs")

---

[10] The court notes that a Supplemental Motion to Withdraw the Reference in this Adversary Proceeding has recently been filed by Highland and HCLOF [DE # 134] and that motion will be addressed in due course hereafter. The ruling herein with regard to the Arbitration Motion does not affect such motion and such motion will be separately addressed, after a status conference, and through a report and recommendation to the District Court.

[11] Acis LP has managed other funds, from time to time, besides CLOs.

are structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of senior debt owed by large corporations and, therefore, earn revenue from the variable interest payments made by those corporations on such senior debt; and (b) on the liability side of their balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are mostly institutions and pension funds.  The CLO SPEs make a profit, based on the spread or "delta" between:  (a) the variable rates of interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the fixed rates of interest that the CLO SPEs must pay on their own tranches of debt.  At the bottom of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes," but these "notes" are genuinely equity).  As portfolio manager, Acis LP manages the CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs' portfolios) and communicates with investors in the CLO SPEs.  The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves have been in bankruptcy.  Only Acis LP which ***manages*** the CLO business and its general partner, Acis GP, were put into bankruptcy.

Historically, Acis LP has had four main sets of contracts that were at the heart of its business and allowed it to function.  They are described below.  The second and third agreements set forth below are highly relevant to the Arbitration Motion before the court.  The Chapter 11 Trustee, from time-to-time, credibly testified that these agreements collectively created an "eco-system" that allowed the Acis CLOs to be effectively and efficiently managed by Acis LP.

1.     The PMAs with the CLO SPEs.

First, Acis LP has various portfolio management agreements ("PMAs") **with the CLO SPEs**, pursuant to which Acis LP earns management fees. The PMAs have been the primary "assets" (loosely speaking) of Acis LP. They are what generate revenue for Acis LP.

2.     The Sub-Advisory Agreement with Highland.

Second, Acis LP had a Sub-Advisory Agreement (herein so called) with **Highland**. Pursuant to this agreement, Acis LP essentially sub-contracted for the use of Highland front-office personnel/advisors to perform management services for Acis LP (*i.e.,* so that Acis LP could fulfill its obligations to the CLO SPEs under the PMAs). Acis LP paid handsome fees to Highland pursuant to this agreement. This agreement was rejected (with bankruptcy court approval) by the Chapter 11 Trustee during the Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found resources to provide these services at a much lower cost to the estate, but he also had begun to believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment of Acis LP's creditors.

*There were five iterations of the Sub-Advisory Agreement between the parties over time*: (a) the initial Sub-Advisory Agreement, "made effective January 1, 2011" (which had an arbitration clause at section 16(f));[12] (b) an Amended and Restated Sub-Advisory Agreement, "made" May 5, 2011, "to be effective January 1, 2011" (which also had an arbitration clause at section 16(f))[13]; (c) an Amendment to Amended and Restated Sub-Advisory Agreement "entered into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

---

[12] Exh. 1 to Arbitration Motion.

[13] Exh. 2 to Arbitration Motion.

clause);[14] (d) Second Amended and Restated Sub-Advisory Agreement "made" on July 29, 2016, "to be effective January 1, 2016" (which had an arbitration clause at section 16(f));[15] and (e) the Third Amended and Restated Sub-Advisory Agreement "dated as of March 17, 2017" (***which suddenly contained no arbitration clause, with no explanation***).[16]

        3.     The Shared Services Agreement with Highland.

Third, Acis LP also had a Shared Services Agreement (herein so called) with Highland, pursuant to which Acis LP essentially sub-contracted for the use of Highland's back-office services (again, so that Acis LP could fulfill its obligations to the CLO SPEs under the PMAs). To be clear, Acis LP had no employees of its own—only a couple of officers and members. Acis LP paid handsome fees to Highland for the personnel and back-office services that Highland provided to Acis LP. This agreement was also rejected by the Chapter 11 Trustee during the Bankruptcy Cases (with Bankruptcy Court approval) for the same reasons that the Sub-Advisory Agreement with Highland was rejected.

***There were five iterations of the Shared Services Agreement between the parties over time***: (a) the initial Shared Services Agreement "effective as of January 1, 2011" (which had an arbitration clause at section 9.14);[17] (b) an Amendment to Shared Services Agreement, "entered into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration clause);[18] (c) a Second Amended and Restated Shared Services Agreement "dated effective

---

[14] Exh. 3 to Arbitration Motion.

[15] Exh. 4 to Arbitration Motion.

[16] Exh. 5 to Arbitration Motion.

[17] Exh. 6 to Arbitration Motion.

[18] Exh. 7 to Arbitration Motion.

January 1, 2015" (which had an arbitration clause at section 9.14);[19] (d) a Third Amended and Restated Shared Services Agreement "dated effective as of January 1, 2016 (which had an arbitration clause at section 9.14);[20] and (e) a Fourth Amended and Restated Shared Services Agreement "dated as of March 17, 2017" (**which suddenly contained no arbitration clause, with no explanation**).[21]

    4.    <u>The Equity/ALF-PMA.</u>

Fourth, until a few weeks before the Bankruptcy Cases were filed, Acis LP also had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs) whereby Acis LP provided services not just to the CLO SPEs themselves, but separately to the equity holder in the CLO SPEs. This portfolio management agreement with the equity holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would probably be easier to refer to it as the "Equity PMA"[22] (for ease of reference, the court will refer to it as the "Equity/ALF PMA"). Acis LP did not earn a specific fee pursuant to the Equity/ALF PMA, but the Chapter 11 Trustee and others credibly testified during the Bankruptcy Cases that Acis LP considered the agreement valuable and very important, because it essentially gave Acis LP the ability to control the whole Acis CLO eco-system—in other words, it gave Acis LP the ability to make substantial decisions on behalf of the CLO SPEs' *equity*—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs. In any event, shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling Acis LP:  (a) caused

---

[19] Exh. 8 to Arbitration Motion.

[20] Exh. 9 to Arbitration Motion.

[21] Exh. 10 to Arbitration Motion.

[22] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

Acis LP to terminate this Equity/ALF PMA; and (b) then caused the equity owner to enter into a new Equity PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. (one of the Defendants in this Adversary Proceeding).

     5.     <u>Limited Partnership Agreement of Acis LP.</u>

There is actually a fifth agreement that should be mentioned. Although not as integral as the previous four agreements, there was a certain Amended and Restated Agreement of Limited Partnership of Acis Capital Management, L.P., dated to be effective as of January 1, 2011 (the "LPA"), entered into among the general partner and limited partners of Acis LP. Reorganized Acis has argued in the Adversary Proceeding that this LPA limited in some respects the compensation that could be paid to Highland under the Sub-Advisory Agreement and the Shared Services Agreement.

**B.**     **Next, the 35 Counts Asserted Against Highland in this Adversary Proceeding.**

The Adversary Proceeding, distilled to its essence—and as currently framed—is all about certain activities of Highland and some of its affiliates and actors who controlled it, which activities were allegedly aimed at ***denuding Acis LP of all of its value,*** at a time when the former portfolio manager for Acis LP was on the verge of obtaining a very large judgment claim against Acis LP. Specifically, these activities of Highland began soon after: (a) it terminated former Acis CLO manager Joshua Terry ("Terry") in June 2016; (b) it began litigating with him (which litigation was sent to arbitration) in September 2016; and (c) Terry obtained an approximately $8 million arbitration award against Acis LP in October 2017, which was confirmed by a judgment in December 2017. The activities and counts revolve around: (a) Highland's alleged overcharging of Acis LP by more than $7 million for fees/expenses under the Sub-Advisory and Shared Services Agreement, as limited by the LPA (Counts 1-4); (b) alleged fraudulent transfers

of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory and Shared Services Agreements (Counts 5-8); (c) an alleged fraudulent transfer as to the Equity/ALF PMA (Counts 9-12); (d) an alleged fraudulent transfer pertaining to Acis LP's conveyance away of its so-called ALF Equity (Counts 13-16); (e) an alleged fraudulent transfer of a $9.5 million note receivable Acis LP held (Counts 17-20); (f) various other fraudulent transfers (Counts 21-24); (g) preferences (Count 25); (h) assertion of a section 550 recovery remedy for the aforementioned avoidance actions (Count 26); and (i) requests for punitive damages, an alter ego/veil piercing remedy, and attorneys' fees (Counts 33-35). There are also some counts complaining of postpetition state law torts and breaches of contract (Counts 27-32).

As mentioned earlier, Highland's Arbitration Motion only requests the court defer to arbitration Counts 1-8—that is the counts relating to: (a) Highland's alleged overcharging of Acis LP by more than $7 million for fees/expenses under the Sub-Advisory and Shared Services Agreement, as perhaps limited by the LPA (Counts 1-4); and (b) the alleged fraudulent transfers of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory and Shared Services Agreements (Counts 5-8). Highland argues that, *since all of these counts pertain to the Sub-Advisory Agreement and Shared Services Agreement* between Acis LP and Highland, the arbitration clauses in those agreements dictate that the counts be carved out from this Adversary Proceeding and sent to binding arbitration. Highland acknowledges that these two agreements were amended and restated numerous times, and that the last time they were amended (March 17, 2017) the arbitration clauses were eliminated, but Highland argues that, since all of the activity complained of in Counts 1-8 occurred *prior* to March 17, 2017, *the older iterations of the Sub-Advisory and Shared Services Agreements, with arbitration clauses, govern*. Highland zeroes in on the fact that Counts 1-4, at their essence, are assertions that the

fees for services charged by Highland in the Sub-Advisory and Shared Services Agreements were excessive for the years 2013, 2014, 2015, and through May 2016 (all before the March 17, 2017 iteration of the agreements). And Counts 5-8, while articulated as fraudulent transfer claims, pertain to the modifications made to the Sub-Advisory and Shared Services Agreements at various stages up to the March 17, 2017 versions.

The Reorganized Debtors have argued that it is quite clear that the last iterations of the Sub-Advisory and Shared Services Agreements intended to supersede in every way the prior versions. That includes the provisions directing arbitration. And, they argue, it does not matter **when** the causes of action occurred/accrued or not. What matters is that the parties agreed at some point that their disputes would not be sent to arbitration and this was the last governing document.

**C.      The Relevant Language in the Sub-Advisory and Shared Services Agreements Pertaining to (i) Arbitration and (ii) Superseding of Prior Agreements.**

As mentioned earlier, there was an arbitration clause at Section 16(f) of the Sub-Advisory Agreement until the last March 17, 2017 version. The clause read as follows:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[23]

In the Shared Services Agreement, an arbitration clause appeared at Section 9.14, as follows:

> Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[24]

---

[23] Exh. 1 of Arbitration Motion, at 7-8.

[24] Exh. 6 of Arbitration Motion, at 9-10.

As earlier mentioned, these two agreements were later amended and restated several times. The arbitration provisions remained identical until they were completely eliminated in March 2017. The Reorganized Debtor argues that this is a short analysis: there was no longer an operative arbitration provision as of March 17, 2017.

In the March 17, 2017 version of the Shared Services Agreement, the parties agreed "that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or noncontractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as 'Proceedings') may be brought in such courts."[25]

The same type language appeared in the March 17, 2017 version of the Sub-Advisory Agreement: "The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby."[26]

More generally, the March 17, 2017 versions of the agreements each provided that they "amended, restated and replaced the existing agreements *in [their] entirety*."[27] The March 17, 2017 agreements also each provided that they "supersede[d] all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter."[28]

---

[25] Exh. 10 of Arbitration Motion, § 8.04(b).

[26] Exh. 5 of Arbitration Motion, § 13.

[27] Exhs. 5 and 10 of Arbitration Motion, each at p. 1 (emphasis added).

[28] Exh. 5 of Arbitration Motion, ¶ 20; Exh.10 of Arbitration Motion, ¶ 8.14.

In summary, the Reorganized Debtors argue that, under Texas common law, basic principles of contract interpretation, and the plain language of the March 17, 2017 version of the agreements, there is no agreement to arbitrate. "A contract's plain language controls."[29] Because the prior versions of the agreements were "amended, restated and replaced in [their] entirety" with the March 17, 2017 agreements—which not only omit an arbitration provision, but also expressly provide for jurisdiction and venue in Texas state or federal courts—the Reorganized Debtors argue that there exists no valid agreement to arbitrate between Highland and Acis LP. The court's inquiry can and should end there. But, if the court concludes the arbitration clauses are still applicable, the Reorganized Debtors argue that the bankruptcy court has discretion ***not*** to compel arbitration when (a) bankruptcy core matters are involved, and (b) arbitration would conflict with the purposes of the Bankruptcy Code. Therefore, this is further reason why the Arbitration Motion should be denied.

## III.    Legal Analysis.

### A.    The Federal Arbitration Act and Arbitration Clauses Generally.

The FAA provides that arbitration agreements are always "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[30] Thus, the FAA reflects a liberal federal policy favoring arbitration, and requires arbitration agreements to be rigorously enforced according to their terms.[31] The FAA "expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the

---

[29] *Great Am. Ins. Co. v. Primo,* 512 S.W.3d 890, 893 (Tex. 2017).

[30] 9 U.S.C. § 2.

[31] *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (citations omitted).

arbitrability of claims should be resolved in favor of arbitration."[32] "There is a strong presumption in favor of arbitration and the party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity."[33]

When considering a motion to compel arbitration, the Fifth Circuit has held there are two threshold questions: (1) whether an arbitration agreement is valid; and (2) whether the dispute falls within the scope of the agreement.[34] To evaluate the enforceability of an arbitration agreement, courts apply the contract law of the state that governs the agreement,[35] whereas the scope of the agreement is a matter of federal substantive law.[36]

## B. Is There a Valid Agreement to Arbitrate that Applies Here and is Still Enforceable?[37]

With respect to the first element—whether a valid agreement to arbitrate exists—federal courts "apply ordinary state-law principles that govern the formation of contracts."[38] Here, the choice of law provisions of the Highland-Acis Agreements state: "This Agreement shall be

---

[32] *Primerica Life Ins. Co. v. Brown,* 304 F.3d 469, 471 (5th Cir. 2002) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)).

[33] *Carter v. Countrywide Credit Indus., Inc.,* 362 F.3d 294, 297 (5th Cir. 2004).

[34] *See Agere Sys. Inc. v. Samsung Elecs. Co. Ltd.*, 560 F.3d 337, 339 (5th Cir. 2009).

[35] *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) (citation omitted).

[36] *Graves v. BP Am., Inc.,* 568 F.3d 221, 222-23 (5th Cir. 2009); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 37 (5th Cir. 1990) (under federal law, courts "resolve doubts concerning the scope of coverage of an arbitration clause in a contract in favor of arbitration," and arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue").

[37] The court is assuming, without analysis, that the Chapter 11 Trustee (and the Reorganized Debtors) are bound by the arbitration clauses, if Acis LP affirmatively agreed to be bound by them and would still be bound by them outside of bankruptcy. Case law has stated that a bankruptcy trustee "stands in the shoes of the debtor for the purposes of [an] arbitration clause" and "the trustee-plaintiff is bound by the clause to the same extent as would the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989); *see also Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910 at *6 (N.D. Tex. July 30, 2014) (quoting *Hays*).

[38] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004).

governed by the laws of Texas. . . ."[39] "Under the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the law of the chosen state must be applied."[40] Accordingly, Texas law governs whether the parties are subject to an enforceable agreement to arbitrate.

Here, obviously the parties entered into an agreement to arbitrate in both the Sub-Advisory Agreement (Section 16(f))[41] and the Shared Services Agreement Section 9.14.[42] And, it would seem to be beyond peradventure that this was, at one time, enforceable between the parties, with regard to any disputes that arose regarding the agreements. The tricky conundrum here is that those arbitration provisions were deleted in the most recent iterations of the agreements—that is, the March 17, 2017 versions of the agreements. Highland argues that, since Counts 1-8 involve alleged overcharges under the agreements in years 2013-2016, and alleged fraudulent transfers up to March 17, 2017 (such fraudulent transfers allegedly occurring by virtue of modifications to the agreements that were made up to March 17, 2017), the pre-March 17, 2017 version of the agreements must be applied with respect to these Counts 1-8 and, thus, the arbitration provisions apply. In other words, what matters is when causes of action *accrue* not when they are ultimately asserted.

The parties have cited a handful of cases to the court, but the one that the court believes is most analogous is the *Coffman v. Provost * Umphrey Law Firm, L.L.P.* case.[43] In the *Coffman* case,

---

[39] *See, e.g.,* Exh. 1 to Arbitration Motion, § 16(a); Exh. 5 to Arbitration Motion, § 13; Exh. 6 to Arbitration Motion, § 9.05; Exh. 10 to Arbitration Motion, § 8.04(a).

[40] *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)).

[41] Exhs. 1-4 of the Arbitration Motion.

[42] Exhs. 6-9 of the Arbitration Motion.

[43] *Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720 (E.D. Tex. 2001).

the plaintiff was a former non-equity partner of a law firm and brought a lawsuit against the firm and its equity partners, alleging *inter alia*, breach of contract, breach of fiduciary duty, violations of Title VII and/or the Texas Commission on Human Rights Act ("TCHRA"), and violations of the Equal Pay Act. The law firm filed a motion to compel arbitration with regard to all of these claims. The law firm's motion to compel was based upon various partnership agreements which governed the law firm. The original partnership agreement was first effective on August 26, 1986, and the plaintiff did not sign that agreement. Subsequent to that time, however, the original partnership agreement was amended and restated on several occasions. The plaintiff admitted that she signed four partnership agreement documents: (1) a Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P.—Effective January 1, 1994 ("1994 Partnership Agreement"); (2) a Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P.—Effective January 1, 1996 ("1996 Partnership Agreement"); (3) an Amendment No. 1 to the Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P., Dated January 1, 1996—Effective January 1, 1997 ("1996 Amendment No. 1"); and (4) a Partnership Agreement of Provost * Umphrey Law Firm, L.L.P., As Restated —Effective January 1, 1998 ("1998 Partnership Agreement"). The earlier two agreements—*i.e.,* the 1994 and 1996 Partnership Agreements—did ***not*** contain an arbitration clause. The 1996 Amendment No. 1 and the 1998 Partnership Agreement, on the other hand, both contained an identical arbitration clause as follows:

> Binding Arbitration. The equity partners and non-equity partners shall make a good faith effort to settle any dispute or claim arising under this partnership agreement. If the equity or non-equity partners fail to resolve a dispute or claim, such equity or non-equity partner shall submit the dispute or claim to binding arbitration under the rules of the American Arbitration Association then in effect. Judgment on arbitration awards may be entered by any court of competent jurisdiction.[44]

---

[44] *Id.* at 723.

Additionally, all four of the above-referenced partnership agreements contained an integration clause stating that "[t]his agreement contains the entire agreement . . . and all prior agreements . . . are terminated."[45]

Interestingly, the plaintiff ***conceded*** that claims she asserted involving the 1996 Amendment No. 1 and the 1998 Partnership Agreement were required to go to arbitration (such claims requested determinations regarding: (1) the enforceability of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (2) breach of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (3) repudiation; and (4) breach of the duty of good faith and fair dealing). However, the plaintiff disagreed that her remaining claims were also required to go to arbitration and those were: (a) breach of the 1994 and 1996 Partnership Agreements; (b) breach of fiduciary duty; (c) violations of Title VII and/or TCHRA; and (d) violations of the Equal Pay Act. The district court granted in part and denied in part the motion to compel arbitration, holding that: (1) the plaintiff's contract claims arising under ***earlier*** partnership agreements, which ***did not*** contain arbitration clauses, were ***not arbitrable***; (2) a common law breach of fiduciary duty claim was arbitrable under the agreements (it appears that these claims arose after the 1996 Amendment No. 1 and 1998 Partnership Agreement); and (3) statutory sex-based discrimination claims were not arbitrable under the agreements.[46]

Relevant to the case at bar, the *Coffman* court noted, first, that the conduct underlying the alleged breaches of the 1994 and 1996 contracts occurred at a time when no arbitration clause was in effect. The plaintiff's complaint specifically alleged that, during the time the four

---

[45] *Id.*

[46] *Id.* at 733.

agreements were in effect, the law firm failed to properly calculate Plaintiff's compensation, failed to promote her, and deprived her of benefits from a tobacco case. The court noted that, if the law firm did participate in such conduct during the time that the 1994 and 1996 Partnership Agreements were in effect, such conduct could not have "arisen under" the 1996 Amendment No. 1 or the 1998 Partnership Agreement *because those agreements did not even exist at that time*. But, to the extent that the conduct Plaintiff complained of occurred when the 1996 Amendment No. 1 and the 1998 Partnership Agreement were in effect, her claims would be subject to arbitration.[47]

The court further noted that the arbitration clause should not be interpreted as covering the plaintiff's claims for breach of the 1994 and 1996 Partnership Agreements because the plain grammatical language of the arbitration clause gave no indication that it would apply retroactively. "To interpret the arbitration clause to apply retroactively would cause Plaintiff to forego her vested right to litigate an accrued claim."[48]

---

[47] *Id.* at 726 (citing *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (arbitration provision in 1994 shipping agreement did not cover conduct that occurred under prior shipping agreements); *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965) (claim based on conduct which had arisen "prior to" effective date of arbitration clause was not within scope of arbitration agreement); *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527, 533-34 (E.D.Va. 1999) (arbitration clause in fourth contract did not cover conduct that occurred when third contract was in effect); *Connett v. Justus Enters. of Kansas, Inc.*, Civ. A. No. 87–1739–T, 1989 WL 47071, at *2 (D. Kan. March 21, 1989) (arbitration clause did not apply when alleged fraudulent conduct occurred before plaintiff executed contract with arbitration clause); *George Wash. Univ. v. Scott*, 711 A.2d 1257, 1260-61 (D.C. Ct. App. 1998) (conduct that occurred before arbitration clause took effect was not arbitrable).

[48] *Coffman*, 161 F. Supp. 2d at 726-27 (citing *Sec. Watch*, 176 F.3d at 372–73 (arbitration clause did not reach disputes arising under earlier agreements because it is "nonsensical to suggest that [the plaintiff] would abandon its established right to litigate disputes arising under the [prior] contracts"); *Choice Sec. Sys. v. AT&T Corp*, No. 97-1774, 1998 WL 153254, at *1 (1st Cir. Feb.25, 1998) (arbitration clause in 1994 contracts did not apply to pre–1994 contracts when the language of the arbitration clause did not indicate "that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements"); *Hendrick*, 50 F. Supp. 2d at 535 (arbitration clause was not retroactive when the text of the clause expressed no language providing that it "reache[d] back in time to require an employee to arbitrate a claim which had accrued before the contract was signed or the [arbitration clause] took effect"); *Connett*, 1989 WL 47071, at *2 (arbitration clause did not apply retroactively when it did not specify that it applied to past conduct); *Kenworth of Dothan, Inc. v. Bruner–Wells Trucking, Inc.*, 745 So.2d 271, 275-76 (Ala. 1999) (arbitration clause was not retroactive when language of the clause did not so state); *George Wash. Univ.*, 711 A.2d at 1261 (arbitration clause was not retroactive when "the arbitration clause itself contained no indication whatsoever that its terms would apply . . . before [its effective date]").

Bottom line, the court in *Coffman* seemed to focus on ***when each cause of action accrued*** and looked to the ***agreement that governed at such time***. This court agrees with that reasoning and sees no reason why the result should be different in the case at bar, simply because the arbitration clauses in the case at bar were in ***earlier*** versions of the Sub-Advisory and Shared Services Agreements as opposed to being in the ***later*** versions of those agreements (in other words, the opposite sequence as in the *Coffman* case).

The Reorganized Debtors have cited a couple of cases that they believe justify a determination that there is no binding arbitration clause in the case at bar. One is the case of *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*[49] This case involved a motion to compel arbitration that was denied (which denial was affirmed by the Fifth Circuit). Like the case at bar, it involved a situation where there had been a succession of agreements, with earlier agreements containing arbitration provisions and the last agreement containing no arbitration clause. Specifically, in the *Goss-Reid* case, there were three agreements that were relevant. First, a **Franchise Agreement** between a franchisor named Transformational Technologies, Inc. ("TTI") and a party named Rittenhaus-Tate Organization ("RTO"). RTO was a business owned by Tracy Goss and Sheila Reid. The Franchise Agreement, among other things, provided that RTO's owners Tracy Goss and Sheila Reid would be "licensed franchisees of TTI" and would have use of certain of TTI's intellectual property. During the term of the Franchise Agreement, Tracy Goss and Sheila Reid developed certain consulting services technology they called "The Winning Strategy" and it apparently was built off of TTI's intellectual property. This first agreement contained a mandatory arbitration provision. Second, there was a **License**

---

[49] *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*, 54 Fed. Appx. 405 (5th Cir. 2002) (per curium opinion which is designated as having no precedential effect).

**Agreement** between the apparent successor-in-interest of TTI called Tekniko, Inc., on the one hand, and Tracy Goss, Sheila Reid and Goss-Reid & Associates, Inc. (collectively, "Goss/Reid"), on the other, pursuant to which Goss/Reid obtained a "a non-exclusive license to use the same intellectual property covered by the Franchise Agreement." This second agreement also contained a mandatory arbitration agreement. Third, there was a **Transfer Agreement** that appears to have been entered into by the same parties as the second agreement (Tekniko, Inc. and Goss/Reid). The Transfer Agreement "permanently transferred [to Goss/Reid] the non-exclusive right to use the intellectual property that was the subject of the prior agreements in exchange for a percentage of [Goss & Reid's] adjusted gross profits for that year." There was no arbitration provision in this third agreement and the agreement did not adopt or refer to the arbitration provisions contained in the earlier agreements. The third agreement stated that it constituted "an amendment to the License Agreement . . . between you and this company ('TEKNIKO'), supersedes all prior agreements between you and TEKNIKO and, except as provided below, will terminate your rights and those of TEKNIKO under the License Agreement."

At some subsequent time, Goss/Reid filed a lawsuit alleging improper use of "The Winning Strategy" by the entities Tekniko Licensing Corporation and Landmark Education Company. These Defendants (hereafter so called) asserted ownership themselves of "The Winning Strategy" based on the Franchise Agreement. The Defendants—citing to the arbitration clauses in both the Franchise Agreement and the License Agreement—filed a motion to compel arbitration, which was denied at the district court level and also at the Fifth Circuit. The district court determined that New York law applied (*i.e.,* the Transfer Agreement was governed by New York law and apparently the parties agreed that New York law applied), and that the Transfer Agreement constituted a novation and extinguished the arbitration provisions of the previous

agreements. On appeal, the Fifth Circuit stated that the issue before it was "whether the arbitration provisions of the Franchise and License Agreements were superseded by the Transfer Agreement. Thus, the question before us is one of contractual interpretation."[50]

The Fifth Circuit stated certain principles that apply under both New York and Texas law. Among other principles, the Fifth Circuit noted that courts construing contracts "should strive to give effect to the intentions of the parties, as expressed in the terms of the contract."[51] The Transfer Agreement stated that "it supersedes all prior agreements" between Goss/Reid and the predecessor-in-interest of one of the Defendants, Tekniko Licensing Corporation.[52] "This type of agreement clearly constitutes a novation under New York law."[53] The court also noted that it was not appropriate to consider any extrinsic or parol evidence, since there was no ambiguity in the Transfer Agreement. The court further stated that "[t]he only potential ambiguity raised by the Defendants is that the Transfer Agreement refers to itself as an 'amendment to the License Agreement.' Read as a whole, however, the Transfer Agreement plainly manifests an intention to supersede all prior agreements between the parties and, except as specifically provided, to terminate all rights and obligations under the License Agreement."[54]

The other case that the Reorganized Debtors have significantly relied upon to justify a determination that there is no binding arbitration clause in the case at bar is *Valero Energy Corp. v. Teco Pipeline Co.*[55] In *Valero*, there had been numerous agreements entered into over time

---

[50] *Id.* at *1.

[51] *Id.*

[52] *Id.*

[53] *Id.* (citing various New York state court cases).

[54] *Id.* at *2.

[55] *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

amongst the litigating parties, all of which involved gas pipelines and transportation rights, and those various agreements were not amendments or restatements of one initial agreement. Rather, there was an Operating Agreement, there were documents that were alleged to create a joint venture or partnership, a Purchase Agreement, an Ownership Agreement, a Transportation Agreement, and a couple of Settlement Agreements entered into later when various disputes arose. One of the key agreements, the so-called Operating Agreement, contained an arbitration clause. When party Teco Pipeline sued party Valero and other related parties, Valero moved to compel arbitration, arguing that the litigation was subject to the arbitration clause in the Operating Agreement. The trial court denied Valero's motion, but the court of appeals reversed.

Teco had argued that the claims it was asserting were not based on the Operating Agreement that contained the arbitration clause but, even if they were, a later Settlement Agreement essentially redefined the parties' relationship—essentially superseding the parties' relationship that had been set forth in the numerous prior agreements—and it did not have an arbitration clause. Rather the Settlement Agreement stated that:

> Each party irrevocably consents and agrees that any legal action, suit or proceeding against any of them with respect to their obligations, liabilities, or any other matter under or arising out of or in connection with this Agreement may be brought in the United States District Court for the Western District of Texas, San Antonio Division, or in the courts of the State of Texas, and hereby irrevocably accepts and submits to the jurisdiction of each of the aforesaid court in personam, generally and unconditionally with respect to any such action, suit or proceeding for itself and in respect of its properties, assets and revenues.[56]

Teco asserted that the quoted clause provided for the procedure to be used in future disputes, *i.e.,* that the parties would go through judicial channels, not arbitration. Teco also asserted that the intent to revoke the arbitration clause was signified by a typical merger clause contained in the

---

[56] *Id.* at 587.

Settlement Agreement. The appeals court disagreed with Teco's argument and determined arbitration was required. First, the court determined that the provision regarding litigation applied only to disputes arising under the Settlement Agreement not the previously executed Operating Agreement, Purchase Agreement, Ownership Agreement, or Transportation Agreements. There was nothing to indicate that all the terms of those previous agreements had been superseded by the Settlement Agreement. In fact, it appeared that only select terms of the earlier agreements were being modified. Significantly, the Settlement Agreement referred to an "Amendment No. 1" to the Operating Agreement being attached as an Exhibit D to the Settlement Agreement—suggesting that it remained in intact (except for the amendment attached). Moreover, there was a post-Settlement Agreement letter submitted into evidence stating that the prior Operating Agreement and arbitration provision were still in effect. The court addressed many other arguments made by Teco and, in the end, found nothing had superseded or otherwise revoked the prior arbitration clause.

This bankruptcy court does not consider the *Valero* or *Goss-Reid* cases to be dispositive of the situation in the case at bar. Those cases clearly dealt with a myriad of agreements—for example, in *Valero*, one key agreement had an arbitration clause, and an allegedly superseding Settlement Agreement (with no arbitration clause) was determined not to have been intended to supersede or replace the agreement with the arbitration clause. In *Goss-Reid*, there were also a myriad of agreements (*i.e.,* a franchise agreement, a license agreement and then a transfer agreement), and the last one containing no arbitration clause was held to have been a novation of the prior agreements. In *Valero* and *Goss-Reid*, the various agreements were not amendments or restatements of one initial agreement. The case at bar is more analogous to the *Coffman* case (involving amendments and restatements of an initial agreement) and the logic of that holding

seems sound to apply here—especially given the fact that there is nothing in the March 17, 2017 version of the agreements that suggests that the agreement to submit disputes to litigation in Texas and the deletion of the arbitration clauses should be applied retroactively. The court believes it should look at when a cause of action accrued and determine if there was a binding arbitration clause between the parties at that time in the governing version of the agreement. Thus, the court determines that there were valid arbitration agreements that applied to all disputes arising out of the Sub-Advisory Agreement and Shared Services Agreement—to the extent that those disputes involved conduct prior to March 17, 2017. Since Counts 1-8 involve conduct prior to March 17, 2017, Counts 1-8 fall within the scope of the arbitration agreements in the Sub-Advisory Agreement and Shared Series Agreement.

## C.     But Wait, this is Bankruptcy and Core Matters and a Proof of Claim Objection are Involved.

The analysis does not end here. Yes, there is an otherwise valid, binding arbitration clause that was contained in each of the Sub-Advisory and Shared Services Agreements (prior to March 17, 2017). And, yes, Counts 1-8 involve conduct and disputes arising under these pre-March 17, 2017 agreements. But what about the fact that these disputes arise in an adversary proceeding that involves mostly, if not entirely, "core" matters (*e.g.,* Counts 5-25 are all fraudulent transfers or preference claims under Section 544,[57] 547,[58] or 548;[59] Count 2 is a Section 542 turnover request;[60] Count 26 is a request for Section 550 recovery[61])? And what

---

[57] *See* 28 U.S.C. § 157(b)(2)(H).

[58] *See* 28 U.S.C. § 157(b)(2)(F).

[59] *See* 28 U.S.C. § 157(b)(2)(H).

[60] *See* 28 U.S.C. § 157(b)(2)(E).

[61] *See* 28 U.S.C. § 157(b)(2)(F) & (H).

about the fact that Highland (the counter-party to the Sub-Advisory and Shared Services Agreement who has asked for enforcement of the arbitration clauses in those agreements) has filed proofs of claim?[62] And what about the fact that Counts 1-8 (as with every count in the Adversary Proceeding) are all urged to be *offsets* to Highland's proofs of claim?[63] Highland's proofs of claim are based on the post-March 17, 2017 versions of the Sub-Advisory and Shared Services Agreements (*i.e.,* the versions that have no arbitration clauses). Highland has not argued that its proofs of claim are subject to arbitration (likely because they are governed by the post-March 17, 2017 versions of the Sub-Advisory and Shared Services Agreements). But, again, Highland argues that Counts 1-8 must be sent to arbitration, and the Reorganized Debtors argue that each of these counts present potential offsets to Highlands' proofs of claim. As a reminder, these counts are:

**COUNT 1**: Declaratory Judgment of Ultra Vires Acts by Acis LP in Violation of the LPA (Highland allegedly overcharged expenses by $7M+ (*i.e.*, excessive fees) under the Sub-Advisory and Shared Services Agreements).

**COUNT 2**: Turnover of Property of the Estate Under § 542 for Unauthorized Overpayments (turnover the $7M+ overcharged).

**COUNT 3**: Money Had and Received for Overcharges and Unauthorized Overpayments (again, seeking redress for the $7M+ overcharged—implicating the Sub-Advisory Agreement and Shared Services Agreement).

**COUNT 4**: Conversion for Unauthorized Overpayments (again, seeking redress for the $7M+ overcharged implicating the Sub-Advisory Agreement and Shared Services Agreement).

**COUNT 5**: Actual Fraudulent Transfer under § 548 related to the Sub-Advisory Agreement (modifications to the Sub-Advisory Agreement in subsequent iterations were allegedly fraudulent transfer, as were payments thereunder).

---

[62] *See* 28 U.S.C. § 157(b)(2)(B).

[63] *See* 28 U.S.C. § 157(b)(2)(C).

**COUNT 6**:     Actual Fraudulent Transfer Under TUFTA, § 24.005(a)(1) related to the Sub-Advisory Agreement (same theory as Count 5, asserted through section 544 of the Bankruptcy Code).

**COUNT 7**:     Constructive Fraudulent Transfer Under § 548(a)(1)(B) related to the Sub-Advisory Agreement (same facts as Count 5 only constructive not actual fraud).

**COUNT 8**:     Constructive Fraudulent Transfer Under TUFTA §§ 24.005(a)(2) and 24.006(a) related to the Sub-Advisory Agreement (same facts as Count 5, only constructive fraud under TUFTA, and asserted through section 544 of the Bankruptcy Code).

Thus, to recap, *five of the eight counts that Highland wants arbitrated* (Counts 2, and 5-8) clearly involve statutory core matters.[64]   Moreover, *all* of the counts in the Adversary Proceeding are asserted *defensively* to two proofs of claim—meaning *all eight counts that Highland wants arbitrated* (even Counts 1, 3, and 4) have transformed into statutory core matters.[65]   Does this matter?  This court believes yes.

The Fifth Circuit has shed some light on this topic in the cases of *In re Gandy* and *In re National Gypsum*.[66]   In those cases, the Fifth Circuit instructed that a bankruptcy court may decline to enforce arbitration clauses when it finds:  (a) the underlying nature of the proceeding

---

[64] *See* 28 U.S.C. § 157(b)(2)(E), (F), and (H).

[65] *See* 28 U.S.C. § 157(b)(2)(C).  This court realizes that, from a *Stern v. Marshall* perspective, 131 S. Ct. 2594 (2011), being a *statutory* "core" matter does not necessarily mean a bankruptcy court has Constitutional authority to issue final orders or judgments in the matter.  However, even if this *Stern* pronouncement has any relevance, when evaluating an arbitration clause/right, the court perceives that the various counterclaims here (*i.e.,* all 35 counts) are likely *inexplicably intertwined* with the Highland proofs of claim, such that the bankruptcy court would likely have Constitutional authority to adjudicate them.  While Highland's proofs of claim merely seek payment for services under the post-March 17, 2017 versions of the agreements—which is *after* the time frame that Counts 1-8 implicate—it is not so simple as dividing claims and counterclaims into discreet time periods.  For one thing, the Reorganized Debtors argue that modifications to the Sub-Advisory and Shared Services Agreements that increased fees that Highland could charge (and that Highland is now seeking in its proofs of claim) were tantamount to fraudulent transfers.  Thus, how does one evaluate the proofs of claim separately from this argument?  Additionally, Highland *has asserted unliquidated indemnification claims* in its proofs of claim that presumably reach back to earlier iterations of the Sub-Advisory and Shared Services Agreement (meaning that claims ultimately awarded to the Reorganized Debtors under earlier versions of the agreements might result in indemnification claims being asserted back against them by Highland relating to those very claims).  The point being that all of Highland's assertions in its proofs of claim seem inextricably intertwined with all the Counts in the Adversary Proceeding.

[66] *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489 (5th Cir. 2002); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.),* 118 F.3d 1056 (5th Cir. 1997).

derives from the provisions of the Bankruptcy Code; and (b) that enforcement of the arbitration provision would conflict with the purposes/goals of the Bankruptcy Code.[67] Some purposes/goals of the Code that might support a denial of arbitration, include: (1) the equitable and expeditious distribution of assets of the Debtor's estate; (2) centralized resolution of pure bankruptcy issues; (3) protection of creditors and reorganizing debtors from piecemeal litigation, and (4) the undisputed power of a bankruptcy court to enforce its orders.[68]

The *In re Gandy* opinion from the Fifth Circuit is worthy of discussion here. In *Gandy*, an individual Chapter 11 debtor had first, prepetition, filed a state court lawsuit against various business partners, asserting causes of action against them for making transfers out of a partnership affecting her ownership interests, and the causes of action included breach of contract, negligence, breach of fiduciary duty, fraud and constructive trust. There was an arbitration clause in the applicable partnership agreement and the state court granted a motion to compel arbitration. Then, the debtor filed a Chapter 11 case and removed the state court lawsuit to the bankruptcy court and filed new claims under sections 544, 548, 550, civil "RICO," and alter ego in a separate adversary proceeding, and requested substantive consolidation. The bankruptcy court granted consolidation of the two actions and then the defendants filed a motion to compel arbitration. The bankruptcy court denied the motion, after finding that the debtor was essentially seeking avoidance of fraudulent transfers. The Fifth Circuit affirmed the bankruptcy court's refusal to enforce an arbitration clause contained in the underlying partnership agreement. The court agreed with the bankruptcy court that the complaint essentially—more than anything else—sought avoidance of fraudulent transfers, and the court not only determined

---

[67] *Id.* at 1069.

[68] *Id.*

that such rights derived from the Bankruptcy Code (fully acknowledging the fact that there were state law tort claims and breach of contract also asserted) but also—in looking at whether enforcing the arbitration clause would conflict with the purposes of the Bankruptcy Code—noted that one central purpose of the Bankruptcy Code is the expeditious and equitable distribution of the assets of a debtor's estate. The court thought the avoidance actions predominated over the "peripheral" contract and tort claims and, in such a circumstance, "the importance of the federal bankruptcy forum provided by the Code is at its zenith."[69] The court stated that "[s]ome of the purposes of the Code we mentioned in *National Gypsum*[70] as potentially conflicting with the Arbitration Act include the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of the bankruptcy court to enforce its own orders."[71]

This court believes, like the court in *Gandy*, that this Adversary Proceeding—more than anything else—seeks avoidance of fraudulent transfers. Such avoidance theories derive from the Bankruptcy Code. Sections 542, 547, 548 and 550 of the Bankruptcy Code are front and center, as are the "strong arm" powers of section 544(a). Enforcing the arbitration clause here would conflict with the purposes of the Bankruptcy Code—one of the central purposes of which is the

---

[69] *Gandy,* 299 F.3d at 497.

[70] In the *National Gypsum* case, an asbestos litigation trust created under a confirmed plan filed a post-confirmation adversary proceeding against debtor's liability insurer, seeking a declaratory judgment that the plan had discharged its obligations to the insurance company. The insurance company, in response to the litigation, sought to exercise its rights to seek arbitration under a certain agreement. The Fifth Circuit, in affirming the lower courts' refusal to compel arbitration, stated that, "We believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, *i.e.*, whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code." *Nat'l Gypsum Co.*, 118 F.3d at 1067. Because the debtor sought to bar the insurance company's actions either by invoking section 524(a)'s discharge injunction or by invoking the terms of a confirmed plan, the proceeding derived entirely from the provisions of the Bankruptcy Code, and, hence, the *National Gypsum* court would not send the dispute to arbitration.

[71] *Gandy*, 299 F.3d at 500.

expeditious and equitable distribution of the assets of a debtor's estate. The avoidance actions in this Adversary Proceeding predominate over all other counts and, in such a circumstance, "the importance of the federal bankruptcy forum provided by the Code is at its zenith." Arbitrating Counts 1-8 would seriously jeopardize the Adversary Proceeding because they are an integral part of determining Highland's proofs of claim and the other core counts in the Adversary Proceeding. The bankruptcy court's quintessential duties are to adjudicate proofs of claim and to provide a central forum for litigation, whenever feasible and jurisdictionally sound. Indeed, in *Gandy*, the Fifth Circuit noted that when a proof of claim is filed, one of the "peculiar powers" of the bankruptcy court has been invoked and the nature of estate claims becomes "different from [their] nature . . . following the filing of a proof of claim."[72]

In summary, this court believes it has discretion under established Fifth Circuit authority to decline to order arbitration here.[73] It is, therefore,

**ORDERED** that the Arbitration Motion is **DENIED**.

**#### END OF MEMORANDUM OPINION AND ORDER####**

---

[72] *Id.* at 499 (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987)).

[73] *See also Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 389-90 (2d Cir. 2018) (in proceeding involving whether section 524 discharge was violated by credit card company whose agreement with debtor contained arbitration clause, Second Circuit held that bankruptcy court had discretion to decline to enforce the arbitration agreement; Second Circuit engaged in a particularized inquiry into the nature of the claim and the facts of the specific bankruptcy and determined that arbitrating claims for violations of the 524 injunction would "seriously jeopardize a particular core bankruptcy proceeding" because: "(1) the discharge injunction is integral to the bankruptcy court's ability to provide debtors with a fresh start, (2) the claim relates to an ongoing matter with continuing court supervision, and (3) the equitable powers of the court to enforce its own injunctions are central to the structure of the Code.").